**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

*Counsel for Plaintiffs City of Grand Rapids*
*General Retirement System and City of Grand*
*Rapids Police & Fire Retirement System*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF GRAND RAPIDS GENERAL RETIREMENT SYSTEM AND CITY OF GRAND RAPIDS POLICE & FIRE RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>               Defendants. | Case No. 3:20-cv-04737<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

Plaintiffs City of Grand Rapids General Retirement System and City of Grand Rapids Police & Fire Retirement System ("Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) documents filed publicly by Bayer Aktiengesellschaft ("Bayer" or the "Company") with the United States Securities and Exchange Commission ("SEC") and other regulators; (ii) press releases, presentations, and media reports issued and disseminated by the Company; (iii) analyst and media reports concerning Bayer; (iv) transcripts of Bayer's investor conference calls; and (v) other public information regarding the Company.

## I.   **INTRODUCTION**

1.     This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired Bayer American Depositary Receipts ("ADRs") between May 23, 2016 and March 19, 2019, inclusive (the "Class Period"). The claims asserted herein are alleged against Bayer and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.     Headquartered in Leverkusen, Germany, Bayer is a multinational pharmaceutical and life science company. On May 23, 2016, Bayer announced that it had made an unsolicited all-cash offer to acquire Monsanto Company ("Monsanto"), a provider of agricultural chemicals and other products based in St. Louis, Missouri. After a protracted regulatory approval process, on June 7, 2018, Bayer completed its all-cash acquisition of Monsanto for $128 per share, or $63 billion including debt (the "Acquisition"), representing a 44% premium to Monsanto's share price on May 9, 2016—the day prior to Bayer's first written proposal to acquire Monsanto.

3.     Before the Acquisition, Monsanto aggressively marketed and sold its flagship weed killer product, Roundup. Roundup is the most widely used weed killer around the world, which generated nearly $5 billion in annual revenue for Monsanto. The active ingredient in Roundup is glyphosate, a toxic chemical long suspected of causing cancer, including non-Hodgkin's

lymphoma—a lethal blood cancer.

4.      In March 2015, more than one year prior to Bayer's initial May 2016 offer to acquire Monsanto, the International Agency for Research on Cancer ("IARC"), an arm of the World Health Organization ("WHO"), found that there was strong evidence of an association between exposure to glyphosate and non-Hodgkin's lymphoma and concluded that glyphosate was "probably carcinogenic to humans."

5.      In early 2016, after the IARC classified glyphosate as "probably carcinogenic to humans," numerous lawsuits were filed against Monsanto by cancer-stricken plaintiffs, alleging that exposure to Monsanto's glyphosate-based weed killer, Roundup, had caused their cancer and that Monsanto failed to warn the public about the chemical's toxic effects.   One of the first Roundup cancer lawsuits brought against Monsanto was filed on January 26, 2016, in the Superior Court of the State of California for the County of San Francisco.  *See Johnson v. Monsanto Co.*, No. CGC-16-550128 (Cal. Super. Ct., Cnty. of S.F.) (the "*Johnson* Case").  Days later, on February 1, 2016, the first federal Roundup lawsuit was filed against Monsanto in the U.S. District Court for the Northern District of California.  *See Hardeman v. Monsanto Co.*, No. 3:16-cv-525 (N.D. Cal.) (the "*Hardeman* Case").  Many more lawsuits followed.

6.      On April 8, 2016, the Judge in the *Hardeman* Case refused to dismiss the lawsuit, giving rise to a wave of new lawsuits that flooded courts across the country.  In October 2016, after dozens more lawsuits were filed in federal courts, the Judicial Panel on Multidistrict Litigation consolidated these cases in the MDL No. 2741.  These cases have been centralized in the Northern District of California, overseen by the Honorable Judge Vince Chhabria.  *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-2741-VC (N.D. Cal.).

7.      In March 2017, the Environmental Protection Agency ("EPA") of California—a large agricultural state and vast market for Monsanto's Roundup product—adopted the IARC's classification of glyphosate as a probable carcinogen.  In July 2017, the State of California added glyphosate to its list of chemicals known to cause cancer.

8.      As a result of the March 2015 WHO study classifying glyphosate as "probably carcinogenic to humans" and the California EPA's classification of glyphosate as "a known

carcinogen," individuals alleging that Roundup caused personal injury, including cancer, had a greatly enhanced ability to sue Monsanto. These findings provided support for the causation element necessary for the Roundup cancer suits to succeed at trial and the number of Roundup lawsuits filed against Monsanto continued to surge.

9.     On September 14, 2016, Bayer entered into an agreement to purchase all of Monsanto's shares for $128 per share, representing a 44% premium over Monsanto's closing share price on May 9, 2016.  Due to a lengthy regulatory approval process, the Acquisition was not completed until nearly two years later.

10.    By June 2018, when Bayer finally consummated the Acquisition, not only had thousands of personal injury lawsuits related to Roundup exposure been filed against Monsanto, but plaintiffs in several of the first Roundup cancer cases had survived motions to dismiss, obtained damaging discovery, and fended off challenges to expert testimony and pretrial motions.  Indeed, around the same time, the *Johnson* Case was the first of the Roundup cancer cases set to go to trial. Despite the significant liability risks related to Monsanto's Roundup product, Bayer forged ahead and acquired Monsanto for $63 billion in cash—the largest acquisition in German corporate history—which the Company financed, in large part, with newly assumed debt.

11.    Throughout the Class Period, Defendants touted the Acquisition as "a compelling transaction for shareholders" that would create "significant value" by generating "stronger growth, better profitability, and a more resilient business profile."  Defendants also highlighted that the combined business has "the potential to command a premium valuation" and assured investors that the Acquisition "will translate into attractive financial benefits for Bayer and its shareholders." Defendants specifically downplayed the liability risks related to Monsanto's Roundup product, emphasizing that Bayer conducted a "thorough analysis" during the due diligence process and "undertook appropriate due diligence of litigation and regulatory issues throughout the process" which led Bayer to finalize the Acquisition.  These and similar statements made by Defendants during the Class Period were false and misleading.  In truth, Defendants knew or recklessly disregarded that the Acquisition would not result in the benefits for Bayer that Defendants had represented, due to Monsanto's significant exposure to liability risk related to Roundup.  As a

result of Defendants' misrepresentations, Bayer ADRs traded at artificially inflated prices during the Class Period.

12.     The truth began to emerge on August 10, 2018, when a jury in the *Johnson* Case found unanimously that Monsanto's glyphosate-based Roundup weed killer was a "substantial factor" in causing the plaintiff to develop non-Hodgkin's lymphoma and that Monsanto knew, or should have known, the risks associated with exposure to the chemical and failed to warn of this severe health hazard.  The jury also found that Monsanto acted with "malice or oppression" and should be punished for its conduct.  Accordingly, the jury ordered Monsanto to pay $39 million in compensatory damages and $250 million in punitive damages.  On this news, the price of Bayer ADRs declined over 11%, from $26.59 per ADR to $23.59 per ADR.

13.     On October 22, 2018, although the court in the *Johnson* Case reduced the award of punitive damages from $250 million to $39 million to match the compensatory damages awarded to the plaintiff, the court otherwise denied Monsanto's motion for judgment notwithstanding the verdict and Monsanto's motion for a new trial, and upheld the jury's verdict, ruling that "there is no legal basis to disturb the jury's determination that plaintiff's exposure to [glyphosate-based herbicides] was a substantial factor in causing his [non-Hodgkin's lymphoma]."  On this news, the price of Bayer ADRs declined nearly 9%, from $22.00 per ADR to $20.10 per ADR.

14.     Then, on March 19, 2019, a jury in the *Hardeman* Case—the first federal Roundup cancer lawsuit to proceed to trial—issued a verdict on causation in phase one of the bifurcated trial, finding that plaintiff's "exposure to Roundup was a substantial factor in causing his non-Hodgkin's lymphoma."  On this news, the price of Bayer ADRs declined over 9%, from $19.67 per ADR to $17.85 per ADR.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15

U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Bayer transacts business in California, including in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.  In addition, related actions filed against Monsanto in connection with its glyphosate-based herbicide Roundup have been consolidated and are currently pending in this District.  The Judicial Panel on Multidistrict Litigation selected the Northern District of California as the appropriate transferee district for these cases because "[t]wo of the earliest-filed and most procedurally advanced actions are pending in this district" and the Northern District of California "is both convenient and easily accessible for all parties . . . and has the necessary judicial resources and expertise to efficiently manage this litigation."  *See* Transfer Order at 2, *In re Roundup Prods. Liab. Litig.*, No. 16-md-2741-VC (N.D. Cal.), ECF No. 1; *see also Hardeman*, No. 3:16-cv-525.

### III.    PARTIES

17.    Plaintiffs are public pension funds that provide retirement and other benefits to active and retired public employees, police officers, and firefighters in the City of Grand Rapids, Michigan.  As indicated on the certifications submitted herewith, Plaintiffs purchased Bayer ADRs at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

18.    Defendant Bayer is a multinational pharmaceutical and life science company. Incorporated under the laws of Germany, the Company maintains its corporate headquarters in Leverkusen, Germany.  As explained on Bayer's website, ADRs "are a U.S. dollar-denominated form of equity ownership in a non-U.S. company" and "are an instrument used widely by non-U.S. companies to offer and trade their shares conveniently and efficiently in the U.S. equity markets."  Bayer ADRs represent Bayer ordinary shares and as of September 20, 2017, when Bayer performed an ADR ratio change, four Bayer ADRs correspond to one Bayer ordinary share.  Bayer ADRs are registered by Bayer with the SEC on Form F-6 and are issued by a U.S. bank, The Bank of New York Mellon, acting as depositary.  Since September 27, 2007, Bayer ADRs have traded in the U.S. over-the-counter market under ticker symbol "BAYRY."

19.     Defendant Werner Baumann ("Baumann") has served as Bayer's Chief Executive Officer and Chairman of the Company's Board of Management since May 1, 2016.

20.     Defendant Werner Wenning ("Wenning") served as the Chairman of Bayer's Supervisory Board from October 1, 2012 until April 28, 2020.

21.     Defendant Liam Condon ("Condon") has served as President of Bayer's Crop Science Division and a member of the Company's Board of Management since January 1, 2016.

22.     Defendant Johannes Dietsch ("Dietsch") served as Bayer's Chief Financial Officer ("CFO") from October 1, 2014 until May 31, 2018, and as a member of the Company's Board of Management from September 1, 2014 until May 31, 2018.

23.     Defendant Wolfgang Nickl ("Nickl") has served as Bayer's CFO since June 1, 2018, and as a member of the Company's Board of Management since April 26, 2018.

24.     Defendants Baumann, Wenning, Condon, Dietsch, and Nickl are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Bayer, possessed the power and authority to control the contents of the Company's reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

IV.     **BACKGROUND**

25.     In March 2015, more than one year prior to Bayer's May 2016 initial offer to acquire Monsanto, the WHO classified glyphosate, the active ingredient in Monsanto's flagship weed killer product, Roundup, as "probably carcinogenic to humans."

26.     In early 2016, there was a surge of personal injury lawsuits filed against Monsanto by individuals alleging that Roundup had caused their cancer.

27.     When Bayer completed its acquisition of Monsanto in June 2018, the Company faced thousands of personal injury lawsuits relating to Roundup exposure and plaintiffs in several of the first of these cases had already survived motions to dismiss, obtained damaging discovery, and fended off challenges to expert testimony and pretrial motions.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

28.     The Class Period begins on May 23, 2016, when the Company issued a press release announcing that Bayer had made an unsolicited all-cash offer to acquire Monsanto for $122 per share, representing a 37% premium over Monsanto's closing share price on May 9, 2016—the day before Bayer presented its first written offer to Monsanto.  The press release described the Acquisition as having "[c]ompelling value-creation potential" and touted it as a "compelling opportunity to create a global agriculture leader."  In the press release, Defendant Baumann is quoted as saying that the Acquisition would generate "substantial value" for Bayer's shareholders.

29.     That same day, the Company held two investor conference calls to discuss its offer to acquire Monsanto.  During the first conference call, Defendant Baumann stated that "we expect to create substantial value for our shareholders" and described Monsanto as "an extraordinary fit and a major advance for us."  Defendant Dietsch stated that the Acquisition "would have a positive impact on our earnings and margin development" and "we are convinced that the combined business should be able to claim a premium valuation."  In discussing the merits of the transaction, Defendant Baumann described the Acquisition as "a highly attractive value proposition" that would allow Bayer to "tap into opportunities to drive further growth and an even better financial profile."  Defendant Baumann described the Acquisition as having "superior value creation potential" and stated that "it's actually very difficult to see something that is similarly attractive, as we see here, with the proposed acquisition of Monsanto."  Defendant Condon stated that "there's a tremendous opportunity in here to create additional value, which is beyond what we can create purely by ourselves."  In response to an analyst's question regarding the potential non-renewal of glyphosate's license in Europe due to concerns over health risks associated with exposure to the chemical and whether that posed a material risk to the Acquisition, Defendant Baumann stated "as

1  you would expect us to do, we have looked at it.  We do understand the risk and the exposure that

2  does exist" and "[i]t would not affect the overall offer and proposal to acquire Monsanto."

3       30.     During the second conference call held later that day, Defendant Baumann stated

4  that "[f]ollowing thorough consideration and preparation, we strongly believe that it is actually the

5  combination of the two businesses that captures best the inherent value, and we are fully committed

6  to pursuing the transaction."  Defendant Dietsch stated that "this combination will bring significant

7  short and long-term benefits to farmers across the globe; and, they will translate into attractive

8  financial benefits for Bayer and its shareholders."

9       31.     On July 14, 2016, Bayer issued a press release announcing that the Company had

10 increased its all-cash offer to purchase Monsanto from $122 per share to $125 per share,

11 representing a 40% premium over Monsanto's closing share price on May 9, 2016.  The press

12 release stated that "[t]he revised offer retains compelling value creation potential for Bayer

13 shareholders" and "fully captures the intrinsic value of Monsanto, and shares the synergy benefits

14 that the combination would create."

15      32.     On July 27, 2016, Bayer held a conference call with analysts and investors to

16 discuss the Company's financial results for the second quarter of 2016.  During the call, Defendant

17 Baumann emphasized that "there is very, very sound logic and rationale for looking at a significant

18 capital deployment into the acquisition of Monsanto versus doing something different, either in

19 consumer or in pharma."

20      33.     On September 14, 2016, the Company issued a press release announcing that Bayer

21 and Monsanto had signed a definitive merger agreement under which Bayer would acquire

22 Monsanto for $128 per share in an all-cash transaction, representing a 44% premium to Monsanto's

23 closing share price on May 9, 2016.  The press release stated that Bayer's acquisition of Monsanto

24 "represents a major step forward for our Crop Science business and reinforces Bayer's leadership

25 position as a global innovation driven Life Science company with leadership positions in its core

26 segments, delivering substantial value to shareholders, our customers, employees and society at

27 large."  The press release also stated that "[b]eyond the attractive long term value creation potential

28 of the combination, Bayer expects the transaction to provide its shareholders with accretion to core

EPS (earnings per share) in the first full year after closing and a double-digit percentage accretion in the third full year."  In the press release, Defendant Baumann is quoted as saying "I am convinced that Monsanto will flourish as part of one of the most respected and trusted companies in the world."

34.    That same day, Bayer and Monsanto held a joint investor conference call to discuss the signing of the merger agreement.  During the call, Defendant Baumann stated "[t]his transaction is a compelling opportunity for the shareholders of both companies.  Following receipt of additional information and thorough analysis conducted during the due diligence process, we have raised our initial offer and have agreed on an all cash consideration of $128.00 per Monsanto share, representing a premium of 44% to the Monsanto share price of $89.03 on May 9, 2016, the day prior to our first proposal."

35.    Also during the call, Defendant Baumann emphasized that "[i]n combining Bayer and Monsanto, we will create a global leader in the agricultural industry" and "we expect to create significant value for our shareholders."  Defendant Baumann further touted the Acquisition as "an extraordinary fit and a major advance for us," emphasizing that "[b]oth Monsanto and we at Bayer are absolutely convinced that this combination of our two complementary businesses has a compelling logic and creates value in a major way for all constituencies."  Defendant Baumann described the Acquisition as "a synergistic case which has the potential to achieve a premium valuation based on our improved profitability, strong earnings accretion, and enhanced earnings growth" and "[o]verall, we believe that this is a highly value accretive transaction which benefits not only the shareholders but also our customers, employees, and all stakeholders involved."  During the call, Defendant Dietsch stated that "[t]he combination of Bayer and Monsanto represents an attractive value equation opportunity" and "[t]he combined [agriculture] business is a premium asset which has the potential to command a premium valuation."  Defendant Dietsch also stated that "[w]e expect significant near term synergy potential and, in addition, substantially longer term synergies from integrated solutions" and "[a]s a result, we expect stronger growth, better profitability, and a more resilient business profile."

36.    On October 26, 2016, Bayer issued a press release announcing its financial results

1  for the third quarter of 2016. In the press release, Defendant Baumann is quoted as saying that the

2  Acquisition is "a major strategic milestone for Bayer" and "[t]he two companies are a perfect fit

3  and complement each other ideally."

4       37.    On February 22, 2017, Bayer issued a press release announcing its financial results

5  for fiscal year 2016. In the press release, Defendant Baumann is quoted as saying "[t]his

6  transaction is the perfect fit for our strategy of seeking leadership positions with our Life Science

7  activities in attractive, innovation-driven markets" and "[o]nce the businesses have been

8  combined, Bayer would be able to create substantial additional value in the long term through

9  more innovation, stronger growth and greater efficiency."

10      38.    On April 28, 2017, Bayer held its annual shareholders' meeting. During the

11  meeting, Defendant Baumann stated that "through the transaction, we intend to create substantial

12  additional value in the long term for the company, for you, our shareholders, and the society as a

13  whole." Defendant Baumann also stated that "[t]he acquisition of Monsanto is the perfect fit for

14  our strategy of aspiring to occupy leadership positions with our Life Science businesses in

15  attractive, innovation-driven markets. And we are convinced that together with Monsanto, we will

16  be able to create substantial added value in the long term through more innovation, stronger growth

17  and greater efficiency." During the meeting, Defendant Baumann downplayed the negative

18  perception of Monsanto, stating that "[w]e are, of course, aware that Monsanto does not have a

19  good reputation in some countries, especially in Europe. And you can argue about whether the

20  company has always acted wisely in its dealings with the public. However, that's not the Monsanto

21  we know at all. Monsanto is a modern, highly innovative and extremely well-managed biotech

22  company." During the meeting, Defendant Wenning assured investors that Bayer's "Supervisory

23  Board fulfilled its supervisory and consultative duties in relation to this transaction in a very

24  thorough and exhaustive manner," emphasizing that "[a]ll of the essential aspects . . . [were]

25  scrutinized and reviewed by us in detail and are supported by us unreservedly."

26      39.    That same day, Bayer also issued a press release regarding its annual shareholders'

27  meeting. The press release stated that the Acquisition would "create substantial additional value"

28  for Bayer's shareholders. In the press release, Defendant Baumann is quoted as saying that "[t]he

acquisition of Monsanto is the perfect fit for our strategy" and "[t]ogether with Monsanto, we will be able to create substantial additional value in the long term through more innovation, stronger growth and greater efficiency."

40.     On July 27, 2017, Bayer held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2017.  During the call, in response to an analyst's question about the Company's level of comfort with the due diligence Bayer performed in connection with the Acquisition, Defendant Baumann assured investors that "the Monsanto people went out of their way to provide us with transparency, data and visibility to the most critical questions we had that also related to value and the composition of our business case because they wanted to convince us to pay a higher price compared to what was on the table" and emphasized that "we have a very high level of comfort" on Bayer's due diligence.

41.     On May 25, 2018, Bayer held its annual shareholders' meeting.  During the meeting, despite mounting Roundup cancer lawsuits against Monsanto, Defendant Baumann assured investors that "[t]he acquisition is just as attractive today as we assessed it to be 2 years ago" and "this acquisition has very great potential for creating value for our company, our shareholders and our customers."  Defendant Baumann also stated that "[w]ithout question, the acquisition of Monsanto has extended our position in the agricultural sector" and further emphasized the acquisition as "a very important and logical step in the evolution of Bayer."

42.     That same day, Bayer issued a press release regarding its annual shareholders' meeting.  In the press release, Defendant Baumann is quoted as saying that "[v]iewed from various aspects and overall, I'm convinced that this acquisition has very great potential for creating value for our company, our stockholders and our customers."

43.     On June 4, 2018, Bayer issued a press release announcing that the Company had received all the required regulatory approvals to move forward with the Acquisition and Bayer expected to complete its purchase of Monsanto on June 7, 2018.  In the press release, Defendant Baumann is quoted as saying that "[t]he acquisition of Monsanto is a strategic milestone in strengthening our portfolio of leading businesses in health and nutrition.  We will double the size of our agriculture business and create a leading innovation engine in agriculture, positioning us to

better serve our customers and unlock the long-term growth potential in the sector." The press release also quotes Defendant Baumann as saying "[t]he acquisition is anticipated to generate significant value" and "Bayer expects a positive contribution to core earnings per share starting in 2019" and "[f]rom 2021 onward, that contribution is expected to be double-digit percentage." In the press release, Defendant Baumann emphasized that "[w]e have diligently prepared for the upcoming integration over the past two years" and "[o]ur extensive experience in integrating other large companies has proven that we can and will be successful."

44.     On June 7, 2018, Bayer issued a press release announcing the completion of the Acquisition. In the press release, Defendant Baumann is quoted as saying "[t]oday is a great day . . . for our shareholders, because this transaction has the potential to create significant value."

45.     The statements set forth above in ¶¶28-44 were materially false and misleading and they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that the Acquisition would burden Bayer with significant exposure to the risk of suffering billions of dollars in judgments and reputational damage, among other things, if lawsuits brought against Monsanto alleging that exposure to its glyphosate-based Roundup product caused cancer, were successful. As a result, Defendants' positive statements about the prospects of the Acquisition and the benefits it would create for Bayer's business were materially false and/or misleading and/or lacked a reasonable basis.

## VI.    THE TRUTH EMERGES

46.     On August 10, 2018, a jury in the *Johnson* Case—the first Roundup cancer lawsuit to go to trial—found unanimously that Monsanto's glyphosate-based Roundup weed killer was a "substantial factor" in causing the plaintiff to develop non-Hodgkin's lymphoma and that Monsanto knew, or should have known, the risks associated with exposure to the chemical and failed to warn of this severe health hazard. The jury also found that Monsanto acted with "malice or oppression" and should be punished for its conduct. As a result, the jury ordered Monsanto to pay $39 million in compensatory damages and $250 million in punitive damages. On this news,

1    the price of Bayer ADRs declined over 11%, from $26.59 per share to $23.59 per share.

2        47.    However, despite these disclosures, Bayer downplayed the significance of the jury

3    verdict in the *Johnson* Case and continued to misrepresent the prospects of the Acquisition.  On

4    August 16, 2018, the Company issued a press release announcing that it would begin integrating

5    Monsanto into Bayer's business.  The press release stated that the Acquisition "gives rise to a

6    leading agriculture company with a high level of innovative strength, a strong product portfolio

7    and the highest ethical standards" and "Bayer expects that the acquisition will already make a

8    positive contribution to core earnings per share starting in 2019, with a double-digit percentage

9    from 2021 onward."

10       48.    On August 23, 2018, the Company held a conference call with analysts and

11   investors to discuss Bayer's integration of Monsanto, as well as the verdict in the *Johnson* Case.

12   During the call, Defendant Baumann assured investors that, despite the jury verdict in the *Johnson*

13   Case, "nothing has changed concerning our strategy, attractive synergy potential and longer-term

14   growth and margin expectations for our combined Crop Science business" and "[w]e expect strong

15   value creation through the Monsanto acquisition."  Defendant Baumann downplayed the

16   significance of the verdict in the *Johnson* Case and the risk of future liability from other Roundup

17   cases, emphasizing that "[a] verdict by one jury in one case does not change the scientific facts

18   and the conclusions of regulators that glyphosate does not cause cancer" and that the *Johnson* Case

19   "was an individual accelerated case, which doesn't have any bearing and any meaning and a direct

20   relation to all other cases that will be tried going forward."  Defendant Baumann also stressed that

21   Bayer would rigorously defend its position going forward in the glyphosate litigations,

22   highlighting "the significant experience Bayer has had in the past in U.S. product litigation."

23   Moreover, to quell investor concerns over "big questions on the assessment of the litigation risk

24   prior to Bayer and Monsanto signing the merger agreement," Defendant Baumann assured

25   investors that "Bayer, through counsel, undertook appropriate due diligence of litigation and

26   regulatory issues throughout the process, leading to the finalization of the merger."  Defendant

27   Baumann stated further that at "the time when we decided to acquire Monsanto . . . very few cases

28   had been filed at the time in 2016, and the situation was quite different in terms of where this entire

1    complex stood in the very early stage in 2016 and where we are now, still at a very early stage, but

2    with the first case tried."

3       49.    On September 5, 2018, the Company issued a press release announcing its financial

4    results for the second quarter of 2018.  In the press release, Defendant Baumann is quoted as saying

5    that "[t]he acquisition of Monsanto brings together two strong and highly complementary

6    businesses" and "[w]e are now a leader in the agricultural industry."  The press release also stated

7    that as a result of the Acquisition, "Bayer now also has the strongest portfolio of seed and crop

8    protection products for a wide range of crops and indications, the best research and development

9    platform and the leading digital farming business" and "its existing herbicides business was

10    significantly enlarged."

11       50.    That same day, the Company held a conference call with analysts and investors to

12    discuss Bayer's financial results for the second quarter of 2018.  During the call, Defendant

13    Baumann again downplayed the significance of the Roundup cancer lawsuits against Monsanto,

14    stating "[f]rom a scientific perspective . . . there's absolutely nothing that has been seen in terms

15    of a statistical signal that there is a cause-and-effect relationship between the application of

16    glyphosates as a formulated product, so not only the active, but also a formulated product, and the

17    onset of cancer on some individuals.  Nothing whatsoever."  In response to an analyst's question

18    regarding the level of the Company's provisioning of litigation reserves for the glyphosate lawsuits

19    against Monsanto, Defendant Nickl also downplayed the risk of potential damages awarded in

20    those cases, responding that Bayer only had reserved "for the legal cost for 3 years for the defense

21    in the glyphosate complex" and not for damages because "[it] is not our practice to accrue for

22    damages [a]nd that's also not possible if it's not estimable," and "if it is not more likely than not"

23    and "we therefore have not put any provision on the books for potential damages."

24       51.    The statements set forth above in ¶¶47-50 were materially false and misleading and

25    they failed to disclose material facts necessary to make the statements made, in light of the

26    circumstances under which they were made, not false and misleading.  Specifically, Defendants

27    willfully or recklessly made and/or caused the Company to make false and misleading statements

28    that failed to disclose that the Acquisition would burden Bayer with significant exposure to the

1  risk of suffering billions of dollars in judgments and reputational damage, among other things, if

2  lawsuits brought against Monsanto alleging that exposure to its glyphosate-based Roundup

3  product caused cancer, were successful.  As a result, Defendants' positive statements about the

4  prospects of the Acquisition and the benefits it would create for Bayer's business as well as

5  statements downplaying the risk of potential liability and damages in the Roundup cancer lawsuits

6  were materially false and/or misleading and/or lacked a reasonable basis.

7      52.    On October 22, 2018, despite reducing the award of punitive damages from $250

8  million to $39 million, the Judge overseeing the trial in the *Johnson* Case denied Monsanto's

9  motion for judgment notwithstanding the verdict and Monsanto's motion for a new trial and upheld

10  the jury's verdict, ruling that "there is no legal basis to disturb the jury's determination that

11  plaintiff's exposure to [glyphosate-based herbicides] was a substantial factor in causing his [non-

12  Hodgkin's lymphoma]."  On this news, the price of Bayer ADRs declined nearly 9%, from $22.00

13  per ADR to $20.10 per ADR.

14      53.    However, Bayer continued to downplay the significance of these disclosures and

15  misrepresent the prospects of the Acquisition.  On December 5, 2018, the Company held a

16  conference call with analysts and investors.  During the call, in describing Bayer's response to the

17  glyphosate lawsuits against Monsanto, including the Company's imminent appeal of the jury

18  verdict in the *Johnson* Case, Defendant Baumann emphasized that "[w]e are now joining forces

19  between our litigation group and . . . the vast expertise we have, in particular, in product litigation

20  cases . . . [a]nd we are also preparing the next cases with joint forces and our external legal support

21  so that we believe that our chances to prevail beyond the science and the fact[s] are very, very

22  good" and "we are quite optimistic going into 2019 as the next cases are going to be litigated."

23  Moreover, despite lawsuits filed by approximately 9,300 plaintiffs as of October 30 2018, all

24  alleging that exposure to Monsanto's glyphosate-based products caused cancer, with additional

25  lawsuits anticipated, and despite already losing one such case at trial, Defendant Condon continued

26  to tout the Acquisition, stating that "the combination of Bayer Crop Science and legacy Monsanto

27  is a phenomenal combination" and "[t]his is really a special company that we have now put

28  together."

54.     On February 27, 2019, the Company issued a press release announcing its financial results for the fiscal year 2018.  Despite reporting that, as of January 28, 2019, lawsuits from more than 11,000 plaintiffs had been served in the United States in connection with their exposure to Roundup, the press release quoted Defendant Baumann as saying that "[w]e have the science on our side and will continue to vigorously defend this important and safe herbicide for modern and sustainable farming."

55.     That same day, the Company held a conference call with analysts and investors to discuss Bayer's financial results for the fiscal year 2018.  During the call, Defendant Baumann downplayed the risks of the increasing number of Roundup cancer lawsuits filed, stating "[w]hile there's an increase [in lawsuits filed] since our last reporting, it is by no means a reflection of the merits of the litigation."

56.     The statements set forth above in ¶¶53-55 were materially false and misleading and they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that the Acquisition would burden Bayer with significant exposure to the risk of suffering billions of dollars in judgments and reputational damage, among other things, if lawsuits brought against Monsanto alleging that exposure to its glyphosate-based Roundup product caused cancer, were successful.  As a result, Defendants' positive statements about the prospects of the Acquisition and the benefits it would create for Bayer's business as well as statements downplaying the risk of potential liability and damages in the Roundup cancer lawsuits were materially false and/or misleading and/or lacked a reasonable basis.

57.     Then, on March 19, 2019, a jury in the bellwether *Hardeman* Case—the first federal Roundup cancer lawsuit against Monsanto to proceed to trial—issued a verdict on causation in phase one of the bifurcated trial, finding that plaintiff's "exposure to Roundup was a substantial factor in causing his non-Hodgkin's lymphoma."  On this news, the price of Bayer ADRs declined over 9%, from $19.67 per ADR to $17.85 per ADR.

58.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's ADRs, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.   LOSS CAUSATION

59.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Bayer ADRs and operated as a fraud or deceit on the Class (as defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Bayer ADRs fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their purchases of Bayer ADRs during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.   CLASS ACTION ALLEGATIONS

60.   Plaintiffs bring this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons who purchased or otherwise acquired Bayer ADRs during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Bayer and their families and affiliates.

61.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

62.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether Defendants violated the Exchange Act;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether the Individual Defendants are personally liable for the alleged

misrepresentations and omissions described herein;

          (e)      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

          (f)      Whether Defendants' conduct impacted the price of Bayer ADRs;

          (g)      Whether Defendants' conduct caused the members of the Class to sustain damages; and

          (h)      The extent of damage sustained by Class members and the appropriate measure of damages.

63.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

64.     Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

66.     Bayer's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

67.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Bayer who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

1   **X.     PRESUMPTION OF RELIANCE**

2          68.     At all relevant times, the market for Bayer ADRs was an efficient market for the

3   following reasons, among others:

4                  (a)     Bayer ADRs met the requirements for listing, and were listed and actively

5   traded on the U.S. over-the-counter market, a highly liquid and efficient market;

6                  (b)     Bayer filed periodic public reports;

7                  (c)     Bayer regularly and publicly communicated with investors via established

8   market communication mechanisms, including through regular disseminations of press releases

9   through major newswire services and through other wide-ranging public disclosures, such as

10  communications with the financial press and other similar reporting services; and

11                 (d)     Bayer was followed by several securities analysts employed by major

12  brokerage firm(s) who wrote reports which were distributed to the sales force and certain

13  customers of their respective brokerage firm(s).  Each of these reports was publicly available and

14  entered the public marketplace.

15         69.     As a result of the foregoing, the market for Bayer ADRs promptly digested current

16  information regarding Bayer from all publicly available sources and reflected such information in

17  the price of Bayer ADRs.  Under these circumstances, all purchasers of Bayer ADRs during the

18  Class Period suffered similar injury through their purchase of Bayer ADRs at artificially inflated

19  prices and the presumption of reliance applies.

20         70.     A Class-wide presumption of reliance is also appropriate in this action under the

21  Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

22  because the Class' claims are grounded on Defendants' material omissions.  Because this action

23  involves Defendants' failure to disclose material adverse information regarding Bayer's purchase

24  of Monsanto—information that Defendants were obligated to disclose—positive proof of reliance

25  is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the

26  sense that a reasonable investor might have considered them important in making investment

27  decisions.  Given the significance of the Acquisition to Bayer and the impact it could have on the

28  Company's business, including Monsanto's exposure to significant liability risk from the Roundup

1    lawsuits, which Bayer would assume as a result of the Acquisition, that requirement is satisfied

2    here.

3    **XI.**    **CAUSES OF ACTION**

4    **COUNT I**

5

6    **For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**<br>**Against All Defendants**

7    71.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above

8    as if fully set forth herein.

9    72.    During the Class Period, Defendants carried out a plan, scheme, and course of

10    conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

11    public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs

12    and other members of the Class to purchase Bayer ADRs at artificially inflated prices.

13    73.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made

14    untrue statements of material fact and/or omitted to state material facts necessary to make the

15    statements not misleading; and (iii) engaged in acts, practices, and a course of business which

16    operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain

17    artificially high market prices for Bayer ADRs in violation of Section 10(b) of the Exchange Act

18    and Rule 10b-5, promulgated thereunder.

19    74.    Defendants, individually and in concert, directly and indirectly, by the use, means

20    or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

21    continuous course of conduct to conceal adverse material information about the Company's

22    financial well-being, operations, and prospects.

23    75.    During the Class Period, Defendants made the false statements specified above,

24    which they knew or recklessly disregarded to be false and misleading in that they contained

25    misrepresentations and failed to disclose material facts necessary in order to make the statements

26    made, in light of the circumstances under which they were made, not misleading.

27    76.    Defendants had actual knowledge of the misrepresentations and omissions of

28    material fact set forth herein, or recklessly disregarded the true facts that were available to them.

1   Defendants engaged in this misconduct to conceal Bayer's true condition from the investing public

2   and to support the artificially inflated prices of the Company's ADRs.

3          77.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity

4   of the market, they paid artificially inflated prices for Bayer ADRs.  Plaintiffs and the Class would

5   not have purchased the Company's ADRs at the prices they paid, or at all, had they been aware

6   that the market prices for Bayer ADRs had been artificially inflated by Defendants' fraudulent

7   course of conduct.

8          78.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

9   the other members of the Class suffered damages in connection with their respective purchases of

10  the Company's ADRs during the Class Period.

11         79.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act

12  and Rule 10b-5, promulgated thereunder.

13                                         **COUNT II**

14                    **For Violations of Section 20(a) of the Exchange Act**
                          **Against the Individual Defendants**
15

16         80.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above

17  as if fully set forth herein.

18         81.     The Individual Defendants acted as controlling persons of Bayer within the

19  meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions,

20  participation in and/or awareness of the Company's operations, direct involvement in the day-to-

21  day operations of the Company, and/or intimate knowledge of the Company's actual performance,

22  and their power to control public statements about Bayer, the Individual Defendants had the power

23  and ability to control the actions of Bayer and its employees.  By reason of such conduct, the

24  Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

25  **XII.    PRAYER FOR RELIEF**

26         82.     WHEREFORE, Plaintiffs pray for judgment as follows:

27         (a)     Determining that this action is a proper class action under Rule 23 of the

28  Federal Rules of Civil Procedure;

---

1       (b)    Awarding compensatory damages in favor of Plaintiffs and other Class

2 members against all Defendants, jointly and severally, for all damages sustained as a result of

3 Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

4       (c)    Awarding Plaintiffs and the Class their reasonable costs and expenses

5 incurred in this action, including attorneys' fees and expert fees; and

6       (d)    Awarding such equitable/injunctive or other further relief as the Court may

7 deem just and proper.

## XIII.   JURY DEMAND

83.   Plaintiffs demand a trial by jury.

DATED: July 15, 2020          Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

-and-

HANNAH ROSS*
(hannah@blbglaw.com)
AVI JOSEFSON*
(avi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:   (212) 554-1400
Fax:   (212) 554-1444

*Counsel for Plaintiffs City of Grand Rapids*
*General Retirement System and City of Grand*
*Rapids Police & Fire Retirement System*

*Pro hac vice* forthcoming

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Peggy Korzen, on behalf of City of Grand Rapids General Retirement System ("Grand Rapids General"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Grand Rapids General. I have reviewed the complaint and authorize its filing.

2. Grand Rapids General did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Grand Rapids General is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Grand Rapids General's transactions in the Bayer Aktiengesellschaft securities that are the subject of this action are set forth in the chart attached hereto.

5. Grand Rapids General has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Grand Rapids General will not accept any payment for serving as a representative party on behalf of the Class beyond Grand Rapids General's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of July, 2020.


Peggy Korzen
Executive Director
*City of Grand Rapids General Retirement System*

**City of Grand Rapids General Retirement System**
**Transactions in Bayer Aktiengesellschaft**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchases | 6/7/2016 | 4,400 | 103.9916 |
| Purchases | 8/2/2016 | 2,925 | 106.6131 |
| Purchases | 9/6/2016 | 1,760 | 107.2068 |
| Purchases | 12/9/2016 | 2,600 | 99.2994 |
| Purchases | 12/18/2017 | 4,900 | 31.9280 |
| | | | |
| Sales | 10/27/2016 | (445) | 98.5000 |
| Sales | 6/28/2017 | (500) | 138.5100 |
| Sales | 11/29/2017 | (1,550) | 32.0500 |
| Sales | 1/25/2018 | (1,400) | 33.3400 |
| Sales | 1/30/2018 | (2,100) | 32.7100 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Peggy Korzen, on behalf of City of Grand Rapids Police & Fire Retirement System ("Grand Rapids P&F"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Grand Rapids P&F.  I have reviewed the complaint and authorize its filing.

2. Grand Rapids P&F did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Grand Rapids P&F is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Grand Rapids P&F's transactions in the Bayer Aktiengesellschaft securities that are the subject of this action are set forth in the chart attached hereto.

5. Grand Rapids P&F has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Grand Rapids P&F will not accept any payment for serving as a representative party on behalf of the Class beyond Grand Rapids P&F's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15th day of __July__, 2020.


_Peggy Korzen_
Peggy Korzen
Executive Director
*City of Grand Rapids Police & Fire Retirement System*

**City of Grand Rapids P&F Retirement System**
**Transactions in Bayer Aktiengesellschaft**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchases | 6/7/2016 | 4,200 | 103.9916 |
| Purchases | 8/2/2016 | 2,760 | 106.6131 |
| Purchases | 9/6/2016 | 1,675 | 107.2068 |
| Purchases | 12/9/2016 | 2,600 | 99.2994 |
| Purchases | 12/18/2017 | 5,000 | 31.9280 |
| | | | |
| Sales | 10/27/2016 | (175) | 98.5000 |
| Sales | 8/29/2017 | (335) | 128.8500 |
| Sales | 1/25/2018 | (1,100) | 33.3400 |
| Sales | 1/30/2018 | (1,175) | 32.7100 |