*Translation from German into English*

# STATEMENT

on the question of whether the members of the Board of Management of Bayer AG were acting in line with their duties under German stock corporation law when taking the decision to enter into, and to close, the "Agreement and Plan of Merger" with Monsanto Company, in particular concerning the liability risks arising from the glyphosate business

dated 7 February 2020

Linklaters

Linklaters LLP
Königsallee 49-51
40212 Düsseldorf
Postfach 10 35 41
40026 Düsseldorf

Telefon (+49) 211 22977-0
Telefax (+49) 211 22977-435

Linklaters LLP ist eine in England und Wales unter OC326345 registrierte Limited Liability Partnership, die als Anwaltskanzlei durch die Solicitors Regulation Authority zugelassen ist und deren Bestimmungen unterliegt. Der Begriff "Partner" bezeichnet in Bezug auf die Linklaters LLP Gesellschafter sowie Mitarbeiter der LLP oder der mit ihr verbundenen Kanzleien oder sonstigen Gesellschaften mit entsprechender Position und Qualifikation. Eine Liste der Namen der Gesellschafter der Linklaters LLP und der Personen, die zwar nicht Gesellschafter sind, aber als Partner bezeichnet werden, sowie ihrer jeweiligen fachlichen Qualifikation steht am eingetragenen Sitz der Firma in One Silk Street, London EC2Y 8HQ, England, oder unter www.linklaters.com zur Verfügung. Bei diesen Personen handelt es sich um deutsche oder ausländische Rechtsanwälte, die an ihrem jeweiligen Standort als nationale, europäische oder ausländische Anwälte registriert sind.

Wichtige Informationen bezüglich unserer aufsichtsrechtlichen Stellung finden Sie unter www.linklaters.com/regulation.
A41117012/19 Feb 2020

*Translation from German into English*

Linklaters

## 1    Preliminary remarks

### 1.1    Background

As a consequence of an agreement with a shareholder, Bayer Aktiengesellschaft, having its registered seat in Leverkusen, ("**Bayer AG**" or "**Bayer**") instructed us to prepare a statement regarding our expert legal opinion prepared for Bayer's Supervisory Board and dated 22 November 2018 on the question of whether the members of the Board of Management of Bayer AG were acting in line with their duties under German stock corporation law when taking the decision to enter into, and to close, the "Agreement and Plan of Merger" with Monsanto Company, in particular concerning the liability risks arising from the glyphosate business (the "**Legal Opinion**"). In addition, Bayer requested that we confirm that

– all memoranda were available to us which were prepared by the U.S. law firm that was instructed by Bayer AG in connection with acquiring Monsanto and closing the Monsanto transaction and dealt with the glyphosate-related legal complex and which contain an analysis of the legal framework and potential legal liability risks that could arise from the widespread use of glyphosate (the "**Memoranda**"),

– the Memoranda were a suitable decision-making basis for Bayer AG's Board of Management with respect to assessing the Roundup/glyphosate-related risks at the time of entering into the Monsanto transaction and at the last possible time of rescinding the merger agreement,

– Bayer AG's Board of Management acted in line with any recommendations included in the Memoranda and that

– Bayer AG's Board of Management acted in line with its duties in taking the decisions to enter into and close the merger agreement.

### 1.2    Preserving Bayer's legal position in the glyphosate-related legal disputes in the U.S.

Under applicable U.S. procedural law, claimants in U.S. civil proceedings are generally entitled to request that the defendant disclose documents that are relevant to the claimants' motions (which is referred to as "discovery"). Certain documents prepared by the defendant's lawyers or containing confidential correspondence between the defendant and its lawyers are excepted (which is referred to as the "legal privilege"). However, the legal privilege of these documents and other privileged documents may cease to apply if information from the relevant documents is also made available by the defendant to third parties – such as shareholders.

Hence, Bayer AG and the shareholder agreed in the agreement made between them that this statement may not contain any statements which could trigger a risk of legal privileges ceasing to apply.

Against this backdrop, in the interests of Bayer and its shareholders, this statement does not include any information and assessments which could limit or jeopardise the legal privilege of Bayer AG.

### 1.3    The scope of assessment of the Legal Opinion

The Legal Opinion was based on the following scope of assessment:

*Translation from German into English*

Linklaters

> "*We have been requested to assess on the basis of the facts described above whether the members of the Board of Management acted in line with their duties under German stock corporation law when they decided to enter into the merger agreement with Monsanto despite known risks – in particular in connection with Monsanto's glyphosate business – and to close the merger agreement – despite the changes that occurred after the merger agreement had been entered into, including the increased number of glyphosate-related lawsuits.*"

The scope of assessment of our expert Legal Opinion did not include any assessment as to whether the members of Bayer AG's Supervisory Board acted in line with their duties.

## 2       Confirmations

We hereby confirm that

–       all Memoranda were available to us;

–       we hold the view that the Memoranda were a suitable decision-making basis for Bayer AG's Board of Management with respect to assessing the Roundup/glyphosate-related risks at the time of entering into the Monsanto transaction and at the last possible time of rescinding the merger agreement and that

–       we hold the view that Bayer AG's Board of Management acted in line with its duties in taking the decisions to enter into and close the merger agreement.

The Memoranda do not contain any recommendations for action addressed to Bayer AG's Board of Management.

The above confirmations are provided on the basis of the comprehensive assessment we made for the purposes of preparing the Legal Opinion dated 22 November 2018.

## 3       Summary

The conclusion of our assessment – which is fully in line with the conclusion of the Legal Opinion – is that when making the decision to enter into the merger agreement with Monsanto despite there being known risks – in particular risks arising from its glyphosate business – the members of the Board of Management complied with their duties as members of a corporate body. This holds true for both the decision to enter into the merger agreement (the "**Takeover Decision**", see Section 3.1 below) and the decision to close the merger agreement (see Section 3.2 below).

For the purposes of this statement, we have largely refrained from including the detailed case law references and references to comments by legal scholars provided in the Legal Opinion.

### 3.1     When making the decision to enter into the merger agreement, the members of the Board of Management complied with the duties they owed as members of a corporate body

Pursuant to section 93 para. 1 sentence 1 of the German Stock Corporation Act (*Aktiengesetz – AktG*) members of the board of management of a stock corporation under German law (*Aktiengesellschaft – AG*) are obliged to apply the standard of care of a prudent and conscientious business manager (*ordentlicher und gewissenhaft handelnder Geschäftsleiter*) when performing their management activities. According to these provisions, the board of

# Linklaters

management must apply the standard of care objectively required for appropriate compliance with its duties, and the members of the board of management bear the burden of proof of having met this standard of care (section 93 para. 2 sentence 2 of the German Stock Corporation Act).

In performing its management function, the board of management will, inevitably, take business opportunities and risks on the company's behalf. This gives rise to a risk of errors of judgement and business failure. However, it is not intended for the board of management to be liable for any such business failure, provided that it appropriately prepared its decision. Instead, according to the case law of the Federal Court of Justice (*Bundesgerichtshof – BGH*), the company and the investors continue to bear the entrepreneurial risk (Federal Court of Justice, judgment of 21 April 1997, case no.: II ZR 175/95 = NJW 1997, 1926 (ARAG/Garmenbeck)). Therefore, if members of the board of management make entrepreneurial decisions, they will not be subject to liability without fault (*Erfolgshaftung*).

Therefore, members of the board of management are granted a wide margin of discretion for the purpose of making entrepreneurial decisions, which is subject to only limited review by the courts: Pursuant to section 93 para. 1 sentence 2 of the German Stock Corporation Act, members of the board of management who make a(n entrepreneurial) decision will not be liable, if when making entrepreneurial decisions, they were allowed to reasonably assume that they were acting on the basis of adequate information and in the company's best interest, and provided that they were not subject to inappropriate influence at the time of decision-making (which is referred to as the *Business Judgement Rule*).

The decision to enter into the merger agreement was an entrepreneurial decision taken by the Board of Management in compliance with the requirements of the Business Judgement Rule – which thus acted in all respects in line with its duties:

3.1.1    Existence of an entrepreneurial decision

The definition of an 'entrepreneurial decision' within the meaning of section 93 para. 1 sentence 2 of the German Stock Corporation Act will be met if the board of management may choose between several legally permissible alternatives of conduct. It must not be clear at the time when the decision is made which of these alternatives will turn out to be (more) advantageous for the company in hindsight.

By this standard, the Takeover Decision was an entrepreneurial decision within the meaning of section 93 para. 1 sentence 2 of the German Stock Corporation Act. This is because when making its decision the Board of Management was at least able to choose between two legally permissible alternatives of conduct, i.e. seeking to take over Monsanto under the negotiated merger agreement or ending the takeover attempt. From the relevant ex ante perspective both alternatives involved opportunities and risks for Bayer and neither of the possible decision alternatives violated any duties of the members of the Board of Management which were imposed by law, statutes or any service agreement.

3.1.2    Acting on the basis of adequate information

When taking the Takeover Decision, the Board of Management was also allowed to reasonably assume that it was acting on the basis of "*adequate information*". This is because the Board of Management – even considering that a strict standard of

*Translation from German into English*

**Linklaters**

assessment is applied as a result of the transaction's size and significance for Bayer – complied with its duty to create an adequate basis of information in all respects:

(i)    Adequacy of the basis of information

The Federal Court of Justice ruled that the board of management is not required to obtain every conceivable piece of information when it takes a decision in a specific situation. Instead, it is necessary and sufficient that the decision by the board of management as to which pieces of information it uses as a basis for making its entrepreneurial decision when choosing among the sources of information available, and the manner in which it weighs and assesses the information available, be reasonable and comprehensible. In this context, it is granted a wide margin of discretion.

It is the conclusion of our assessment that, considering the standards described above, the members of the Board of Management were allowed to reasonably assume that they were taking the Takeover Decision on the basis of adequate information:

<u>An extremely in-depth analysis of the transaction and of its opportunities and risks</u>

The Board of Management carried out an extremely in-depth analysis of the information and aspects relevant to the transaction.

- The Board of Management had been provided with extensive information – especially in the form of detailed reports to the Board of Management, presentations and explanations obtained from Bayer's competent departments as well as the Memoranda dated 6 April 2016, 22 July 2016, 30 August 2016, 5 October 2016 and 8 November 2018 – which covered, comprehensively and in much detail, all considerations relevant to the takeover of Monsanto. This includes, without limitation, information regarding future growth opportunities for the agricultural industry and the current competitive situation of Bayer in the agricultural industry market in the light of the ongoing consolidation round. Furthermore, comprehensive business valuations of Monsanto and an analysis of whether Monsanto's business activities were compatible with those of Bayer, as well as information on how the purchase price had been determined, were available to the Board of Management. In addition, the Board of Management assessed the synergy effects and transaction costs to be expected, the transaction's merger control implications, the regulatory and political risks, as well as the reputational risks, the possibilities of financing the purchase price and the impact of the financing structure on Bayer's credit rating and on Bayer's net financial liabilities.

- The Board of Management also gathered – although there was only a small number of pending lawsuits in connection with glyphosate at that time – detailed information on the liability risks arising from Monsanto's glyphosate business. In particular, analyses were available to the Board

*Translation from German into English*

## Linklaters

of Management according to which, as a result of the IARC assessment, an increasing number of lawsuits had been filed against Monsanto (after the merger agreement's conclusion, the number of pending lawsuits against Monsanto increased from 37 lawsuits to lawsuits with a total of approx. 1,400 claimants); however, from a scientific perspective and according to the assessments by regulatory authorities throughout the world, there was no evidence of a link between the claimants' cancers and their exposure to glyphosate.

- The Board of Management carried out an in-depth analysis of the information available and discussed it in its meetings. During these meetings, members of the second management level were also present and available to the Board of Management for questions and discussions. Consolidation in the agricultural industry market, the valuation of Monsanto, expected synergies, the takeover's impact on Bayer's financial leverage and credit rating, as well as regulatory issues and liability risks in connection with glyphosate, amongst other things, were the subject of these in-depth analyses and discussions.

Ensuring an ongoing information flow about the transaction

In our opinion, the Board of Management, in addition, undertook measures that were in all respects reasonable to ensure that not only at the start of the process of considering the takeover would the information on which the Takeover Decision was to be based be adequate, but instead, on the basis of a sufficient information and update process, it would remain up-to-date and adequate until the date of the Takeover Decision:

- Until the conclusion of the merger agreement, the Board of Management dealt – in some cases exclusively – with new information on the takeover of Monsanto in a large number of its meetings. For instance, the agenda items recorded in the minutes of eight meetings of the Board of Management held in the period between May and September 2016 include updates and statements relating to sets of issues concerning the envisaged transaction which were current at the relevant point in time.

- In one of these meetings of the Board of Management, the findings of the confirmatory due diligence, in the course of which Monsanto had granted Bayer access to Q&A- and expert calls in all areas requested by Bayer in which potential risks and opportunities for the business case were identified, were explained to the Board of Management. In the context of the confirmatory due diligence, Monsanto representatives stated, among other things, that Monsanto had not established any provisions for glyphosate-related lawsuits and that, based on the scientific assessments, it expected to prevail in the lawsuits.

Ensuring reliable documents and reliable reviews and analyses

The Board of Management also properly ensured the preparation of the documents for the meetings of the Board of Management. The documents are,

*Translation from German into English*

**Linklaters**

in particular, based on comprehensive reviews and analyses by the competent departments and their department heads as well as by renowned external advisers, especially law firms and investment banks. The reviews and analyses covered all topics which are relevant to an M&A transaction of such scope. In the present case, the Board of Management was entitled to rely on such preparatory work even in its decision-making as the presentation, the scope and the level of detail of the documents indicate a very thorough review and analysis and, accordingly, there are no indications that the tasks assigned were not carried out properly.

3.1.3   Acting free of special interests and inappropriate influence

There are no indications that the members of the Board of Management did not make their Takeover Decision in an objective and unbiased manner and free of conflicts of interest.

3.1.4   Acting in the company's best interest

When taking the Takeover Decision, the members of the Board of Management could reasonably assume that they were acting in the company's best interest:

When taking its decision, the board of management must be guided by the interests of the enterprise. In this context, the relevant perspective for members of the board of management is that at the time of their decision-making ("*ex ante perspective*"). The wide margin of discretion to which the board of management is entitled in this context will only be exceeded if the decision is obviously to the detriment of the company, if the decision is plainly unreasonable or if the decision gives rise to irresponsible risks. When assessing whether the risks taken are irresponsible, one also has, according to the correct view held by legal scholars, to take into account whether the risks were taken on the basis of a risk cover that was in line with the relevant standard of care and customary in the relevant industry and what was the probability of the risks materialising in the individual case.

In our opinion, the members of the Board of Management met these standards. According to the results of our review, the members of the Board of Management made their entrepreneurial decision, which is comprehensible in every respect, by making a comprehensive overall assessment of the material aspects of the takeover of Monsanto under consideration:

- In the opinion of the Board of Management, a final consolidation round in the agricultural industry market was taking place at the time of the Takeover Decision. The Board of Management made the assumption, which was comprehensible in every respect, that in the future only those businesses would remain competitive in the long term in the agricultural industry market that had a strongly integrated product portfolio in both business areas. Prior to the takeover of Monsanto, Bayer had a significant market position in the "*Crop Protection*" division, but only a minor position in the market for "*Seeds & Traits*". The situation of Monsanto was exactly the opposite. Against this backdrop, Monsanto's agricultural industry business was largely complementary to Bayer's agricultural industry business. After the acquisition of Monsanto, the

**Linklaters**

combined entity would generate revenues which would be allocable to the two business units "*Crop Protection*" and "*Seeds & Traits*" in roughly equal parts. This would result in the creation of a provider with a very strong competitive position in both areas.

- According to the assessment of the Board of Management, Monsanto was the only strategic takeover objective left in the ongoing consolidation round which would allow Bayer, by means of the combination of the portfolios of both Monsanto and Bayer, to achieve a leading market position in both business areas of the agricultural industry market. In this context, the Board of Management considered Monsanto to be the most innovative and profitable agricultural business in the world, which would, in the opinion of the Board of Management, be an ideal complement to Bayer. By means of the acquisition of Monsanto, Bayer CropScience would become the global number one in the agricultural sector and have globally leading technologies in the fields of seeds, chemical plant protection and biological plant protection. In addition, Bayer CropScience would become the leading innovator in the area of "*Digital Farming*", which would potentially revolutionise the agricultural industry.

- The Board of Management further assumed that the takeover of Monsanto would generate considerable sales synergies.

- In addition, the Board of Management assumed that the conditions of the takeover negotiated with Monsanto – particularly the purchase price per Monsanto share – were attractive. This is especially true as, despite the necessary premium on the exchange price of Monsanto – and taking into account the materialisation of perceived risks –, Bayer would be able to exploit a significant part of the synergies to be generated.

- The ability to pay the total purchase price of approx. €57 billion when due had been ensured by means of a financing structure which would maintain an investment grade rating for Bayer. Furthermore, the Board of Management assumed that Bayer would be able to bear the burden resulting from the increase in net financial liabilities associated with the purchase price.

- The Board of Management permissibly considered the risks associated with the acquisition to be manageable. In particular, the Board of Management was entitled to assume that any political or reputational risks could be reduced by means of specific information and public-relations activities. Regulatory risks related to the approval of glyphosate were analysed and taken into account for the U.S. and the EU.

- In addition, the Board of Management assumed that the economic risks associated with the transaction would remain within a manageable scope – even if all economic risks existing from a conservative perspective fully materialised, irrespective of the point in time, the probability or the exact extent of such materialisation.

  The Board of Management's assessment of the liability risks arising from Monsanto's glyphosate business was also comprehensible in every respect. On

Linklaters

the basis of existing scientific findings and the analysis of the prospects of success of the pending or possible glyphosate-related lawsuits, the Board of Management made the assumption, which was permissible in every respect, that the liability risks were low. In particular, the Board of Management took into account the fact that all national scientific assessment authorities worldwide came to the conclusion that herbicides containing the active substance glyphosate are not carcinogenic when used properly. The Board of Management could also take into account in its assessment that glyphosate was classified as category "2A" in the IARC study cited by the claimants in the United States. The IARC also classified substances such as hot beverages over 65° Celsius or the activity as a hairdresser into this category. In view of the low probability of occurrence, the Board of Management was allowed to accept the theoretically conceivable high maximum overall risk of glyphosate-related lawsuits.

Consequently, according to the assessment made by the Board of Management without any error of discretion, the considerable opportunities associated with the acquisition of Monsanto were greater than the risk of material liability arising from glyphosate-related lawsuits, which was very low from the ex ante perspective to be taken.

**3.2    In the period between the conclusion of the merger agreement and the closing of the takeover, the members of the Management Board complied with the duties they owed as members of a corporate body**

The members of the Board of Management also acted in line with their duties under German stock corporation law when they decided to close the merger agreement – despite the changes that had occurred after the conclusion of the merger agreement, including the increase in the number of glyphosate-related lawsuits. Bayer would, in principle, have been able to terminate the merger agreement prior to closing (see Section 3.2.1); however, even prior to the closing of the merger agreement, the Board of Management, on the basis of adequate information, permissibly came to the conclusion that the opportunities of the Monsanto takeover clearly outweigh its risks (see Section 3.2.2 below).

3.2.1    Existence of a termination option

After the conclusion of the legally binding merger agreement, Bayer was in principle obliged to close the takeover of Monsanto. However, Bayer was entitled to terminate the merger agreement if the takeover was not closed until 14 June 2018, in particular following a lack of antitrust approvals and clearances. Given the circumstance that the sale of business units of Bayer was necessary in order to obtain antitrust clearance of the takeover, Bayer was able to unilaterally prevent the antitrust authorities' approval of the closing in accordance with the provisions of the merger agreement and to terminate the merger agreement. In this case, however, Bayer would have had to pay a reverse break fee (i.e. a payment due to the non-completion of the transaction) in the amount of U.S.$2 billion to Monsanto.

# Linklaters

3.2.2    Closing the takeover was in line with the duties of the Board of Management

Despite the option to terminate the merger agreement, it was, in every respect, in line with the due exercise of the discretion of the Board of Management not to exercise the right of termination and to close the takeover of Monsanto:

The decision on whether to exercise the existing option to terminate the merger agreement is of a prognostic nature as, from an ex ante perspective, the consequences of the termination cannot be predicted with final certainty. Against this backdrop, this decision is – just like the decision on the conclusion of the merger agreement – an entrepreneurial decision of the Board of Management, which is subject to the rules of the business judgement rule. Therefore, liability pursuant to section 93 para. 1 sentence 2 of the German Stock Corporation Act is excluded if the Board of Management was entitled to assume that it was acting on the basis of adequate information and in the company's best interest also with regard to the decision to close the merger agreement despite the existing termination option.

These requirements are met in the present case:

In particular, the Board of Management comprehensively analysed and discussed the progress of the takeover process in a great number of meetings even after the conclusion of the merger agreement, *inter alia* in four meetings of the Board of Management held between September 2017 and April 2018. Moreover, the Board of Management reported to the Supervisory Board in detail, *inter alia* in four letters and two meetings of the Supervisory Board. In particular, the Board of Management also analysed and discussed the development of the risks of glyphosate-related lawsuits and the economic performance of Monsanto and Bayer (including the resulting adjustments to the forecasts on a stand-alone basis and on a synergy-case basis); thus, during the entire period between the conclusion of the merger agreement and the closing of the takeover, the Board of Management informed itself about all material circumstances, including the opportunities and risks resulting from the transaction. Consequently, it was entitled to assume at any time that it was acting on the basis of adequate information.

When making its decision not to terminate the merger agreement despite the existing termination option, the Board of Management was also entitled to assume that it was acting in the company's best interest. This is because the Board of Management carefully weighed the circumstances in favour of and against the closing of the takeover and – within the margin of its entrepreneurial discretion – came to the conclusion, which was comprehensible in every respect, that the closing of the takeover was in the interests of Bayer:

- On the basis of the information available to the Management Board, it took into account in detail that the value creation potential of the takeover of Monsanto was unchanged as compared to plans of 2016. The Board of Management assumed that, for this reason, the takeover of Monsanto was still very attractive and continued to meet the expectations initially associated with the transaction. In this context, the Board of Management was also entitled to take into account that the acquisition of Monsanto meant a considerable strengthening of the Crop Science business, both with regard to the expansion of promising

*Translation from German into English*

## Linklaters

technologies and with regard to the possible supply of holistic plant protection systems.

- By contrast, the Board of Management also was not required to terminate the merger agreement with regard to the risks of glyphosate-related lawsuits potentially arising from the takeover: With the exception of the IARC assessment, all available studies still came to the conclusion that, according to current scientific knowledge, glyphosate is not carcinogenic if used under the conditions and for the purposes intended. Correspondingly, the U.S. EPA also continued to assume that glyphosate is "*not likely to be carcinogenic to humans at relevant dose levels*". Against this backdrop and on the basis of the assessments available to it, the Board of Management was permitted to assume that the (significant) rise in the number of lawsuits in the meantime alone could not decisively influence the risk assessment. It is rather the case that the Board of Management could assume that the substantive assessment of the legal situation was unchanged and that, consequently, the risk of actually being obliged to pay damages had not changed to the detriment of Monsanto and Bayer. At the time when the Board of Management made its decision, an assessment of the U.S. law firm retained to assess the glyphosate-related risks in the U.S., which had been updated once more, was available to the Board of Management and the Board of Management took the results of such assessment into account.

- Finally, the Board of Management could also take the relevant aspect into account that in the event of the termination of the merger agreement, Bayer would have given up all opportunities resulting from the takeover while having to bear the transaction costs incurred until then as well as a reverse break fee in the amount of U.S.$2 billion.

All in all, we believe that, for this reason, the decision of the Board of Management to adhere to the merger agreement and to close the takeover was also in line with its duties in every respect.

[*signature*]

Dr Ralph Wollburg
*Rechtsanwalt* (German lawyer)