Carol V. Gilden (*admitted pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
Email: cgilden@cohenmilstein.com

Nicole Lavallee (SBN 165755)
Jeffrey Miles (SBN 293869)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
  jmiles@bermantabacco.com

*Attorneys for Lead Plaintiffs and Additional Named Plaintiff*
[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br>　　　　　　　Plaintiffs,<br>　　vs.<br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br>　　　　　　　Defendants. | Case No: 3:20-cv-04737-RS<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>Date:　　　July 15, 2021<br>Time:　　　1:30 p.m.<br>Judge:　　　Richard Seeborg<br>Courtroom:　3 — 17th Floor |

[No.: 3:20-CV-04737-RS] PLS.' P&A IN OPPOSITION TO MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

ARGUMENT ......................................................................................................................... 9

I.      PLAINTIFFS STATE A § 10(B) CLAIM. ................................................................... 9
        A.      Plaintiffs Plead Numerous Material Misstatements and Omissions. ..................... 9
                (1)     The Complaint Clearly Alleges That Bayer's Due Diligence
                        Entirely Ignored the Review of Any Monsanto Roundup
                        Documents ................................................................................................. 10
                (2)     Defendants' Argument That the Complaint Alleges No False
                        Statements Regarding Bayer's Due Diligence Is Without Merit. ............. 11
                (3)     Defendants' Argument That the Complaint Merely Alleges
                        Inactionable Mismanagement Fails. ......................................................... 14
                (4)     The Complaint Alleges with Particularity That Defendants Falsely
                        Claimed That There Was Unequivocal Scientific Evidence That
                        Glyphosate Is Safe and Non-Carcinogenic. ............................................. 15
                (5)     Defendants Falsely Certified Bayer's Financial Statements. ................... 15
                (6)     The Alleged False Statements and Omissions Are Not Inactionable
                        Opinions or Mere Puffery. ....................................................................... 18
        B.      The Complaint Raises a Strong Inference of Scienter. ........................................ 19
                (1)     Defendants' Conduct Was a Reckless Departure from the Standard
                        Expected of Corporate Officers. .............................................................. 19
                (2)     Defendants' Violations of Accounting Standards Including IAS 37
                        Raise a Strong Inference of Scienter. ....................................................... 23
        C.      Plaintiffs Adequately Allege Loss Causation. .................................................... 25

II.     PLAINTIFFS STATE A § 20(A) CLAIM. .................................................................. 28

CONCLUSION .................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................9

*In re Bank of America Corp.*,
2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012)..........................................................18

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ..............................................................................26, 27

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ...........................................................9

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..................................................................................9

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
2020 WL 6270482 (E.D. Va. Oct. 26, 2020)...........................................................28

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D.N.J. 1999)......................................................................11, 21

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013).......................................................................22

*In re Corning, Inc. Sec. Litig.*,
1997 WL 235122 (S.D.N.Y. May 7, 1997) ........................................................17, 18

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ................................................................................23

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................................25

*Feola v. Cameron*,
2015 WL 12644566 (C.D. Cal. Nov. 24, 2015)........................................................24

*Freedman v. Value Health, Inc.*,
958 F. Supp. 745 (D. Conn. 1997).................................................................12, 21, 22

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)..........................................................14, 21

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ..............................................................................23

*Glazer Cap. Mgmt., LP v. Magistri,*
    549 F.3d 736 (9th Cir. 2008) ...................................................................................23

*Hall v. Johnson & Johnson,*
    2019 WL 7207491 (D.N.J. Dec. 27, 2019) ...............................................................27

*In re Hansen Nat. Corp. Sec. Litig.,*
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ....................................................................24

*Hardeman v. Monsanto Co.,*
    2021 WL 1940550 (9th Cir. May 14, 2021) ...................................................... *passim*

*Hessefort v. Super Micro Comput., Inc.,*
    2020 WL 1551140 (N.D. Cal. Mar. 23, 2020)......................................................23, 24

*Hildes v. Andersen,*
    2010 WL 4811975 (S.D. Cal. Nov. 8, 2010) .............................................................23

*Kaplan v. Rose,*
    49 F.3d 1363 (9th Cir. 1994) ....................................................................................11

*Lake v. Zogenix, Inc.,*
    2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) ...........................................................20

*Lloyd v. CVB Fin. Corp.,*
    811 F.3d 1200 (9th Cir. 2016) ..................................................................................23

*Lopez v. Smith,*
    203 F.3d 1122 (9th Cir. 2000) ..................................................................................29

*Luna* v. *Marvell Tech. Grp. Ltd.,*
    2016 WL 5930655 (N.D. Cal. Oct. 12, 2016).....................................................16, 17, 24, 25

*Malone v. Microdyne Corp.,*
    26 F.3d 471 (4th Cir. 1994) ......................................................................................16

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
    540 F.3d 1049 (9th Cir. 2008) ..................................................................................25

*Mulderrig v. Amyris, Inc.,*
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ......................................................................15

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda,*
    730 F.3d 1111 (9th Cir. 2013) ..................................................................................25

*In re Nvidia Corp. Sec. Litig.,*
    2010 WL 4117561 (N.D. Cal. Oct. 19, 2010)...........................................................17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
   575 U.S. 175 (2015)................................................................................................13, 18

*Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,*
   774 F.3d 598 (9th Cir. 2014) ...............................................................................19

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.,*
   96 F.3d 1151 (9th Cir. 1996) ................................................................................29

*Pirani v. Slack Techs., Inc.,*
   445 F. Supp. 3d 367 (N.D. Cal. 2020) ................................................................29

*Ponce v. SEC,*
   345 F.3d 722 (9th Cir. 2003) ................................................................................16

*In re RAIT Fin. Tr. Sec. Litig.,*
   2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)........................................11, 19, 21, 22

*Rieckborn v. Jefferies LLC,*
   81 F. Supp. 3d 902 (N.D. Cal. 2015) ..................................................................19

*Ronconi v. Larkin,*
   253 F.3d 423 (9th Cir. 2001) ................................................................................20

*Santa Fe Industries, Inc. v. Green,*
   430 U.S. 462 (1977)..............................................................................................14

*Schueneman v. Arena Pharm., Inc.,*
   840 F.3d 698 (9th Cir. 2016) ................................................................................9

*In re Silver Wheaton Corp. Sec. Litig.,*
   2019 WL 1512269 (C.D. Cal. Mar. 25, 2019).....................................................19

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.,*
   775 F. Supp. 2d 227 (D. Mass. 2011) ..................................................................27

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007)......................................................................................9, 20, 23

*Thomas v. Magnachip Semiconductor Corp.,*
   167 F. Supp. 3d 1029 (N.D. Cal. 2016)...............................................................24

*Twombly v. Bell Atl. Corp.,*
   550 U.S. 544 (2007)..............................................................................................9

*United States v. Rigas,*
   490 F.3d 208 (2d Cir. 2007).................................................................................19

*In re Walls Fargo Sec. Litig.*,
    12 F.3d 922 (9th Cir. 1993) ................................................................................14

*In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*,
    694 F. Supp. 2d 1192 (W.D. Wash. 2009)............................................................19

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .............................................................................18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a)(2)................................................................................................9

# PRELIMINARY STATEMENT

This case is about how desperation breeds recklessness and, ultimately, securities fraud.[1] In 2016, Bayer was in dire straits. Saddled with a failed over-the-counter drug business and facing a wave of consolidation among its competitors, Bayer was vulnerable to a hostile takeover, threatening the positions of its senior executives. So Bayer's CEO Werner Baumann hatched a plan to keep Bayer competitive while also making it unacquirable: Bayer would buy American agricultural behemoth Monsanto. But the plan was beset by numerous troubling red flags. Monsanto had infamously become known as "the most hated company in the world" after it was repeatedly caught concealing the health risks of its major products—forcing it to pay hundreds of millions of dollars in toxic tort settlements after internal documents revealed its misconduct. By 2016, Monsanto had also been accused in over a hundred lawsuits of concealing the cancer risks associated with yet another major product: its herbicide Roundup. Before the merger closed, the Roundup lawsuits increased exponentially—from 120 to over 5000—spurred on by the public release of just a fraction of Monsanto's internal documents. It was obvious to Defendants how explosive Monsanto's internal documents, to which they had access, could be at the upcoming Roundup trials.

Bayer's response to these red flags was shockingly reckless. ***During two years of due diligence, from May 2016 to June 2018, Bayer chose not to examine even a single internal Monsanto document related to Roundup.*** At the same time, Defendants falsely assured investors that no stone was being left unturned in the due diligence process. But Defendants' duplicity did not stop there. After the merger closed, Bayer further misled investors by issuing a series of ***unequivocal*** statements claiming Monsanto's Roundup documents posed no significant

---

[1] References to "¶__" are to the Amended Class Action Complaint (the "Complaint"), ECF No. 47. Defendants include Bayer Aktiengesellschaft ("Bayer"), Werner Baumann (Bayer's Chief Executive Officer ("CEO")), Werner Wenning (former Chairman of Bayer's Supervisory Board), Liam Condon (President of Bayer's Crop Science Division and a member of the Management Board), Johannes Dietsch (Bayer's former Chief Financial Officer ("CFO")), and Wolfgang Nickl (Bayer's current CFO). ¶¶ 49-55. Defendants Baumann, Wenning, Condon, Dietsch, and Nickl are collectively referred to hereinafter as the "Individual Defendants." All references to "Ex. __" are to exhibits attached to the declaration of Carol V. Gilden.

legal risk; that 800 studies demonstrated that glyphosate, Roundup's main active ingredient, *"did not cause cancer"*; that there was *no evidence* that formulated glyphosate such as Roundup was more toxic than glyphosate alone; and that Bayer's financial statements properly disclosed the Roundup litigation. The falsity of these claims began to emerge as Monsanto lost every subsequent trial and appellate battle, causing Bayer's ADR price to plummet until the true dimension of the liability was finally disclosed in 2020, when Bayer revealed it would be forced to pay a staggering *$10.9 billion* or more to resolve the Roundup cases.

Defendants now seek to dismiss Plaintiffs' claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, § 78t(a), for the Class Period of May 23, 2016 to July 6, 2020. Defendants argue they made no false statements *at all*. They argue their statements about Bayer's due diligence were not misleading because no reasonable investor would have expected them to look beyond public documents in examining Roundup's legal risks. Further, they argue there was nothing misleading about claiming that scientific and regulatory evidence *unequivocally* supported Monsanto's defenses. And they argue that their financial reports properly accounted for the Roundup litigation—even though they didn't disclose any monetary exposure beyond litigation costs until the half-year report for 2020.

But each of these arguments is refuted by the Complaint's particularized allegations. First, the Complaint makes clear no reasonable investor would have imagined—much less accepted—that Bayer would rely solely on public documents in assessing the risk of the Roundup litigation, given how comprehensive Bayer claimed its due diligence was and the particularized red flags Defendants disregarded. Indeed, investors were outraged when, years later, they learned of Bayer's grossly inadequate due diligence. The Complaint also details that Defendants' claims about purportedly supportive evidence were *clearly false* because only a fraction of the 800 studies even related to cancer, they were not uniformly supportive of Monsanto's claims, and 629 of the studies were carried out by Monsanto and thus equivocal evidence at best. Further, the Complaint details that Baumann's statements about formulated glyphosate were *flatly contradicted* by internal Monsanto emails recognizing evidence that

formulated glyphosate posed a cancer risk—emails Baumann had assured investors that Bayer had reviewed, and which he claimed did not contain any "smoking gun." Finally, the Complaint alleges that Defendants' certifications of Bayer's financial results massively inflated Bayer's profits or at the very least failed to disclose the true dimensions of Bayer's full financial exposure in the Roundup cases, and rested on repeated findings that the likelihood of an economic outflow from the Roundup cases was "remote" or "improbable"—findings wholly inconsistent with the reality that Bayer lost every single Roundup trial and appeal.

Defendants also argue there are insufficient allegations of scienter because there is no evidence any of the Defendants were "diligence experts" or were guided by an ulterior motive. Once again, these arguments ignore the particularized allegations that Defendants repeatedly ignored serious red flags and rushed into the Monsanto acquisition to remain competitive in a consolidating market, to stave off being acquired, and to preserve their own high-profile jobs.

Finally, Defendants' loss causation arguments ignore the direct link between Defendants' misrepresentations regarding the due diligence, purportedly exculpatory evidence, and Monsanto's true financial exposure and the announcements that triggered the price declines.

For these and the following reasons, Defendants' motion should be denied in its entirety.

### STATEMENT OF FACTS

Bayer is a German chemicals conglomerate and one of the largest companies in the world. It has three main lines of business: prescription drugs; over-the-counter ("OTC") drugs and medical products; and crop science. ¶ 49. In 2014, as part of an effort to "transform" Bayer from a "stodgy chemicals conglomerate" to a "more focused life sciences" company, defendant Baumann, then a senior strategy executive, was tasked with spearheading Bayer's acquisition of pharmaceutical giant Merck's OTC drug business. ¶¶ 57, 73. The acquisition was a disaster. Bayer's due diligence failed to detect that Merck's OTC business was worth hundreds of millions of dollars less than presented. ¶¶ 12, 73. Baumann specifically blamed a "limited ability to do due diligence in a highly competitive process" for the acquisition's failure. ¶ 73.

By 2015, Bayer was not only saddled with the failed Merck OTC business and declining revenues in its prescription drugs and crop science businesses, but also was facing a wave of

consolidations among its competitors— including Dow Chemical, DuPont, Syngenta, and ChemChina—that vastly increased their size. ¶¶ 2, 58-59. This new reality left Bayer vulnerable to a takeover, threatening the positions of its senior executives, including Baumann. By 2016, the situation was dire. There were few major agrochemical firms left for Bayer to acquire or merge with. ¶¶ 58-60. Baumann, then a senior strategy executive, proposed that Bayer acquire agrochemical behemoth Monsanto, believing this would "make Bayer unacquirable." ¶ 59.

However, Bayer's then-CEO, Marijn Dekkers, quickly shot down Baumann's plan, calling it "fraught with risks." ¶ 61. His concerns were well founded. Monsanto has been widely described as "the most hated company in the world" because of its long history of concealing the health risks of its major chemical products—including PCBs, dioxin, DDT, and Agent Orange. ¶¶ 2-3. Further, after internal documents emerged evidencing Monsanto's knowledge and concealment of the health risks associated with PCBs and dioxins, Monsanto was forced to pay hundreds of millions of dollars in associated toxic tort settlements. ¶¶ 2-4, 59, 102.

By early 2016, Monsanto's toxic tort troubles were quickly deepening. Besides the PCB and dioxin cases, Monsanto was beset by over a hundred new toxic tort cases (the "Roundup litigation") alleging that it had once again concealed the adverse health effects of one of its flagship products: Roundup, its best-selling herbicide. ¶ 4. Harmed individuals began filing the Roundup lawsuits in 2015 after the International Agency on Cancer Research ("IARC") issued a 92-page study concluding that glyphosate, Roundup's primary active ingredient, was "probably carcinogenic to humans." ¶ 80. These cases threatened Monsanto's core financials as both Roundup and Roundup-tolerant seeds were major sources of revenues and profits. ¶¶ 4-6, 56.

Nevertheless, in May 2016, and just days into his tenure as Bayer's new CEO, Baumann took immediate steps to acquire Monsanto—the only major agrochemical firm left for Bayer to acquire. ¶ 2. Baumann secretly flew to St. Louis to meet with Monsanto's CEO and make an unsolicited proposal for an acquisition. ¶ 62. On May 19, 2016, to the shock of investors around the world, Bayer announced that it had made a $62 billion all-cash offer to Monsanto—representing a *44% premium* on Monsanto's market value. ¶¶ 2, 62-63, 97.

In the following months, Bayer, Baumann, and Defendant Condon *repeatedly* and

*explicitly* assured investors that Bayer was performing extensive due diligence on the merger's risks, and that the Roundup litigation would *surely* be resolved in Monsanto's favor. ¶¶ 107-08, 219-37. In May 2016, when Bayer made its initial offer, Bauman expressly stated that Bayer looked at the "topic of glyphosate," that it "underst[ood] the risk and the exposure that does exist," and that this "would not affect the overall offer and proposal to acquire Monsanto." ¶ 219. In September 2016, Bayer and Baumann assured investors that initial diligence had "confirmed" $1.5 billion in "sales and cost synergies." ¶¶ 97, 224-25; Ex. 1. But Bayer had not reviewed or even requested *any* internal Monsanto documents relating to Roundup's legal risks—even though millions of pages had been collected and produced in the Roundup litigation and were *essential* to determining Monsanto's exposure. ¶¶ 9-10, 28, 103, 328(f), 332.

Bayer and Monsanto officially executed a merger agreement in September 2016, but the due diligence process was to continue until the transaction closed 21 months later in June 2018—ample time for additional diligence. ¶¶ 13, 16, 84. However, mirroring Bayer's and Baumann's failed due diligence for the Merck OTC acquisition, over the following two years, Bayer *never* availed itself of the agreed-upon disclosure procedures set forth in the merger agreement, ¶¶ 9, 28, 124—even when a major development in the Roundup litigation made doing so critical.

Specifically, in March 2017, the judge presiding over the Roundup litigation published a number of internal Monsanto documents that revealed Monsanto's efforts to manipulate academic research on glyphosate's health risks, sparking a wave of alarm over glyphosate's safety and Monsanto's questionable research and lobbying practices. ¶¶ 104-06. The documents became known as the "Monsanto Papers," and triggered hundreds of additional Roundup suits, to a total of 1400 by May 2017. ¶ 110. Defendants immediately went to work falsely allaying investor concern. In April 2017, Defendant Wenning falsely assured investors that Bayer had analyzed Monsanto's "possible risks to Bayer's reputation." ¶ 227. Between April and July 2017, Baumann falsely assured investors the diligence process had been far more extensive than the failed Merck deal's due diligence, ¶ 228, and that Monsanto's poor reputation merely reflected opposition to "green genetic engineering," ¶ 232. And in May 2018, Baumann told investors the merger was "just as attractive today as we assessed it to be two years ago." ¶¶ 110, 234.

The merger closed on June 7, 2018. Shortly after, pre-trial proceedings began in *Johnson v. Monsanto*, the first Roundup lawsuit to go to trial. ¶¶ 111-12. On June 19, 2018, CBS News issued a report describing the trial as a bellwether that could lead to the filing of thousands of additional cases. ¶ 113. CBS reported that the court would permit Mr. Johnson to offer scientific evidence that Roundup caused his cancer and that Monsanto knowingly concealed the link. Exs. 2-3. In response, Bayer's ADR price fell 8.8% over three days. ¶ 113. At trial, Johnson presented ***internal documents produced by Monsanto*** proving that exposure to glyphosate causes cancer. ¶ 116. On August 10, 2018, a jury found for Johnson and awarded him $289 million. ¶¶ 117. The result shocked investors, who had been led to believe the Roundup cases posed no meaningful risk, and Bayer's ADR price plummeted 11% after trading over four times the average daily volume. ¶ 118. The verdict was later upheld in its entirety on appeal. ¶¶ 214-18.

On August 23, 2018, in response to the verdict, Defendants launched an entirely new barrage of false statements. First, Baumann, who had been touting Bayer's purportedly extensive due diligence, suddenly changed course, falsely claiming that a "hold separate order" issued by the U.S. Department of Justice ("DOJ") prevented Bayer from being able to review Monsanto's internal Roundup documents—and admitting that previously, Bayer had only reviewed publicly available documents relating to Roundup in the due diligence process. ¶¶ 245-46. Second, Baumann misled investors to believe Bayer had now reviewed the internal Monsanto documents and confirmed there was no evidence to support the Roundup plaintiffs' claims, and that at trial Monsanto's internal documents had simply been "taken out of context." ¶¶ 125-33, 235, 247. Third, Defendants Bayer, Baumann, and Wenning began claiming that 800 studies and various regulatory approvals unequivocally supported Monsanto's defenses. ¶¶ 20-23, 131-32, 144, 253, 257, 261, 265. But, as Defendants admitted years later in April 2020, only a fraction of these purported 800 studies concerned glyphosate's carcinogenicity. ¶¶ 174-76. Even more damning, 629 of the studies were in fact carried out by Monsanto, as Baumann admitted years later. ¶ 177.

These additional misrepresentations misled investors into believing there was unequivocal evidence that would overturn the *Johnson* verdict and produce a different outcome in future trials. But an unending series of legal defeats progressively revealed the falsity of these

claims. For example on October 22, 2018, the *Johnson* court denied Monsanto's motions for a new trial and for judgment notwithstanding the verdict, stating "there is no legal basis to dispute the jury's determination that plaintiff's exposure to [glyphosate-based herbicides] GBHs was a substantial factor in causing his NHL [(non-Hodgkin's lymphoma)]." ¶ 24. These disclosures caused Bayer's ADR price to fall 11.9% the following day. ¶ 136.

In *Hardeman*, the second Roundup bellwether trial, plaintiff Hardeman introduced more internal Monsanto emails—which Bayer never sought to examine throughout its two year due diligence process, ¶¶ 9, 28—evidencing that Monsanto knew Roundup was more toxic than glyphosate alone, and that Monsanto manipulated scientific research and buried adverse findings, ¶¶ 141-43. On March 19, 2019, the jury rendered an $80 million verdict for Hardeman. ¶¶ 25, 351. The day after the verdict, Bayer's ADR price fell 11%, and numerous analysts downgraded Bayer's stock. ¶ 145. Yet investors continued to be misled even after the *Johnson* and *Hardeman* verdicts, as shown by post-trial statements from securities analysts at such firms as JPMorgan, Redburn, Berenberg, and Morningstar expressing confidence that Monsanto would ultimately prevail based on the scientific and regulatory evidence. *See* ¶¶ 121, 134, 138, 140.

On March 22 and April 3, 2019, two leading proxy advisory firms published statements recommending that Bayer's senior management be fired for failing to perform adequate due diligence on the Roundup litigation. ¶ 154. At the annual shareholders meeting on April 26, 2019, Bayer's shareholders expressed outrage over Defendants' due diligence failures. ¶ 157. Defendants Baumann, Nickl, and Condon, and other members of Bayer's Management Board lost a no-confidence vote by a wide margin. ¶ 160. Despite this, they kept their jobs and continued making false statements, as described below. *See infra* pt. I.A.

On March 28, 2019, the third bellwether case, *Pilliod*, went to trial. Once again, the plaintiffs introduced internal documents showing that Monsanto discounted legitimate questions surrounding Roundup's toxicity, failed to conduct adequate studies, surreptitiously contributed to and promoted articles on glyphosate's safety, and lobbied regulators to conclude glyphosate was safe. ¶¶ 163-64. The jury awarded Pilliod over $2 billion in damages. ¶ 165. Afterward, *Bloomberg* ripped "Bayer's consistent message . . . that science is on its side," explaining that

"weighing scientific risk and legal risk are not the same thing, especially in a highly litigious environment like the U.S." ¶ 165. News outlets criticized Bayer's Monsanto acquisition as "one of the worst in corporate history" (*Financial Times*), "one of the worst corporate deals" (*The Wall Street Journal*), and one of the "all-time worst deals" (*The Globe and Mail*). ¶ 166.

On June 24, 2020, Bayer announced a commitment to pay "***between $10.1 billion and $10.9 billion***" to settle the entire Roundup litigation. ¶ 189. Unsurprisingly, this disclosure triggered an immediate 7.8% ADR price decline on June 25, 2020. *Id.* Then, on July 6, 2020, the last day of the Class Period, the specter of Bayer needing to pay ***even more*** money to resolve future claims was raised by the presiding judge*,* who indicated he was tentatively inclined to deny approval because of the proposed mechanism for resolving claims. ¶¶ 192, 353. On this news, Bayer's ADR price immediately declined by an additional 6.1%. *Id.*

Defendants' material misrepresentations infected Bayer's financial reporting as well. Incredibly, even though Bayer sustained an unending barrage of legal defeats in the Roundup litigation for nearly two straight years after Bayer assumed control of Monsanto ***in 2018***, Bayer never recorded ***any*** provisions or charges to income for the Roundup litigation or otherwise disclosed it as a contingent liability as required under International Financial Reporting Standards ("IFRS"), and particularly International Accounting Standard ("IAS") 37, until ***after*** the $10.9 billion Roundup settlement fund was announced ***in June 2020***. ¶¶ 194-213, 268-320. As a result, this massively inflated Bayer's profits during the Class Period (or at the very least failed to disclose the true dimensions of Bayer's financial exposure in the litigation). *See* ¶ 316.

Finally, just last week, on May 14, 2021, the Ninth Circuit affirmed the jury verdict in *Hardeman*, holding that "sufficient evidence was presented to the jury that the association between glyphosate and cancer was, at minimum, 'knowable' by 2012," and upholding the jury's award of punitive damages because "substantial evidence was presented that Monsanto acted with malice by, among other things, ignoring Roundup's carcinogenic risks." Ex. 4 (*Hardeman v. Monsanto Co.*, 2021 WL 1940550 (9th Cir. May 14, 2021)) at *19-20. The Ninth Circuit held that "internal emails were presented supporting that Monsanto was consciously aware of the potential health risks associated with Roundup," which evidenced "despicable conduct . . . with a

willful and conscious disregard of the rights or safety of others," and thereby "provide[d] the substantial evidence necessary to support punitive damages." *Id.*

## ARGUMENT

The Complaint, construed in Plaintiffs' favor and analyzed holistically, more than adequately pleads claims under Sections 10(b) and 20(a). A complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required; rather, a complaint must merely include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly v. Bell Atl. Corp.*, 550 U.S. 544, 555, 570 (2007)). When evaluating a motion to dismiss, "the court must accept all material allegations in the complaint as true, ***even if doubtful***, and construe them in the light most favorable to the non-movant." *Bos. Ret. Sys. v. Uber Techs., Inc.,* 2020 WL 4569846, at *3 (N.D. Cal. Aug. 7, 2020) (emphasis added). Further, under the PSLRA, the Court must assess the complaint "***in its entirety***" and analyze the allegations "***holistically***." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007) (emphasis added). Here, Plaintiffs have filed a meticulous, detailed, and organized Complaint that when construed in Plaintiffs' favor and analyzed holistically contains more than sufficient factual detail to state claims against Defendants under § 10(b) and § 20(a).

## I.    PLAINTIFFS STATE A § 10(B) CLAIM.

### A.    Plaintiffs Plead Numerous Material Misstatements and Omissions.

A statement is actionable under § 10(b) if it "create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Once securities issuers "tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (quotation marks omitted).

Here, the Complaint details the ***many*** false or misleading statements or omissions by Defendants concerning: (1) Bayer's purportedly exhaustive due diligence for the Monsanto acquisition; (2) whether there was unequivocal evidence that Roundup does not cause cancer;

and (3) Monsanto's liability exposure in the Roundup litigation. The Complaint also clearly explains *why* these statements were false or misleading. First, as part of the due diligence process, Defendants and those working at their direction did not request or review *any* internal Monsanto documents relating to Roundup's legal risks, despite their clear ability to do so. Second, *at the time of the alleged misstatements and omissions*, Monsanto possessed bombshell internal documents showing it intentionally concealed that glyphosate could cause cancer. These documents could have been requested by Bayer during the diligence process, were produced by Monsanto in the Roundup litigation (*see* ¶¶ 14, 103-06, 109), and were recently cited by the Ninth Circuit as evidence that Monsanto was "consciously aware of the potential health risks associated with Roundup," Ex. 4 at *20. Bayer's withholding of this crucial information about how limited its due diligence really was "altered the total mix of available information," and was therefore material to investors. *Kaplan v. Rose*, 49 F.3d 1363, 1381 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). The Complaint therefore states plausible claims under § 10(b).

### (1)    The Complaint Clearly Alleges That Bayer's Due Diligence Entirely Ignored the Review of Any Monsanto Roundup Documents

Defendants implausibly suggest that neither a reasonable investor nor any of Defendants would have expected Bayer to examine Monsanto's internal Roundup documents as part of its due diligence process. *See* Defs.' Br. 6-7. This argument defies the undisputed function of due diligence: to assess risk. ¶¶ 69-70. The Complaint alleges Defendants recklessly disregarded well-pled red flags that told them the risks posed by the Roundup litigation could not properly be assessed only by looking at public documents: (1) internal Monsanto documents had shown that Monsanto intentionally concealed the health risks attendant with its major PCB and dioxin products, ¶¶ 3, 76-77; (2) those documents caused Monsanto to pay hundreds of millions of dollars in toxic tort settlements, ¶¶ 76-77; (3) the plaintiffs in the Roundup litigation alleged Monsanto engaged in the very same pattern of misconduct during an overlapping time period and also with respect to a major product, ¶ 4; (4) the release of the Monsanto Papers revealed just how damaging Monsanto's Roundup documents might be in the impending trials, ¶¶ 14-15,

102-06; and (5) the number of Roundup cases had increased exponentially during Bayer's two years of purported due diligence: from 120 cases in 2016 to over 5000 in June 2018, ¶ 102. These red flags, coupled with Bayer's admittedly inadequate due diligence for the Merck OTC acquisition (¶¶ 12, 73), should have indicated to Defendants that they would have to review internal Monsanto documents relating to Roundup to properly evaluate Monsanto's associated legal risks. Further, throughout the process of acquiring Monsanto, securities analysts repeatedly expressed concern about Bayer's ability to access Monsanto's internal information to conduct due diligence. ¶¶ 87, 90, 129. And under the merger agreement, Defendants had the right to review these documents. ¶ 101. Yet Defendants recklessly proceeded without doing so.

### (2)    Defendants' Argument That the Complaint Alleges No False Statements Regarding Bayer's Due Diligence Is Without Merit.

Defendants argue the Complaint fails to allege Defendants gave investors a "false impression" about due diligence relating to glyphosate. Defs.' Br. 7-8. But the Complaint alleges with particularity that Defendants repeatedly and falsely conveyed three important facts to investors: (1) they had fully informed themselves as to the significant legal and reputational risks of acquiring Monsanto, ¶ 219-20, 227; (2) during the due diligence process, they thoroughly evaluated the benefits and risks of Monsanto's business, including by reviewing Monsanto's internal documents, ¶¶ 221, 224-29; and (3) they continued to confirm there were no issues that would impede the beneficial integration of the two companies, ¶ 232-35.

A statement meant to assure investors about the extent of due diligence is actionable under § 10(b) if the defendant knew or recklessly disregarded that the due diligence was less extensive or rigorous than conveyed by the statement. For instance, courts have found statements about due diligence to be materially false and misleading when: (1) the defendant stated the due diligence was "extensive" but there was in fact no meaningful due diligence, *In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *6 (E.D. Pa. Dec. 22, 2008); (2) the defendant stated the company had done "all the due diligence that one does when one buys a public company," when in fact the due diligence was "based almost entirely on public information," *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 371-72 (D.N.J. 1999); and (3) the defendant stated the company

conducted a "full review" of the acquisition target, but later admitted due diligence shortcomings and the company incurred enormous losses, *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 757 (D. Conn. 1997). Here, the picture of the due diligence painted by Defendants was completely out of step with reality—and Defendants knew or recklessly disregarded this at the time. Indeed, the Complaint's allegations in this regard are extensive.

***First***, before the merger agreement was signed, Baumann and Condon assured investors during a May 23, 2016 conference that they understood the risks of acquiring Monsanto, that Bayer would conduct a due diligence process, and that Bayer had a strong track record for mergers and that "integrating Monsanto from a business perspective will be no more complex than some of our previous acquisitions." ¶¶ 219-21. These statements were misleading because Defendants had not reviewed ***any*** analyses of Monsanto's exposure to or management of the ***then-pending*** Roundup litigation, and because the merger was Bayer's largest acquisition by nearly fourfold and involved far greater legal and reputational risks than any of its prior acquisitions, including the failed acquisition of Merck's OTC business. ¶¶ 222-23.

***Second***, in September 2016, Baumann stated Bayer had "confirmed in due diligence" the deal's "significant potential for sales and cost synergies" of $1.5 billion. ¶¶ 97, 224-25; Ex. 1. No reasonable investor would have believed this "confirmation" of the merger's ***profitability*** wholly excluded an assessment of the potential liabilities associated with the Roundup litigation.

***Third***, with respect to the due diligence that occurred before the merger agreement, Defendants Bayer, Baumann, and Wenning made numerous false or misleading statements between September 14, 2016 and July 27, 2017 suggesting that the diligence had been more extensive and detailed than was really the case. ¶¶ 219-29. For instance, in a May 23, 2016 investor call Baumann claimed that Bayer fully understood the "risk and the exposure" relating to glyphosate, and in a July 27, 2017 earnings call, Baumann stated that "the Monsanto people went out of their way to provide us with transparency, data and visibility to the most critical questions we had." ¶¶ 219, 228. These statements were misleading because in fact, Defendants merely accepted at face value Monsanto's claim that it would prevail in the Roundup litigation,

without reviewing any internal Monsanto documents or conducting any further analysis.[2] ¶ 230.

*Fourth*, with respect to the due diligence that occurred between signing and closing in June 2018, Baumann repeatedly suggested that Bayer's due diligence confirmed investors had little to fear from the Roundup litigation. ¶¶ 232-35. For instance, Baumann stated at Bayer's 2018 Annual General Meeting that "[t]he acquisition is just as attractive today as we assessed it to be 2 years ago." ¶ 234. And on August 23, 2018, when *explicitly* questioned about Monsanto's internal documents by a journalist, Baumann responded "All I can say about this is that internal documents are sometimes cited out of context on the plaintiff's side." ¶ 235. These statements misleadingly implied that Bayer had reviewed the Monsanto documents at issue in the Roundup litigation when the due diligence process *still* had not involved *any* such review. ¶ 236.

*Finally*, on several occasions, Defendants made false or misleading statements *about their access to Monsanto's internal documents*. For instance, in August 2018, Bayer and Baumann each claimed for the first time that Bayer could not access internal Monsanto documents on orders from DOJ. ¶¶ 244-47. But DOJ did not actually prohibit Bayer from reviewing Monsanto's internal documents as part of reasonable merger due diligence, ¶¶ 248-49, and the merger agreement provided for the review of sensitive Monsanto internal documents via several mechanisms, ¶ 101. These statements misled investors to believe they rested on "meaningful legal inquiry," which they did not. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Defendants do not now dispute that DOJ's order did not prohibit reasonable due diligence, or that the merger agreement required Monsanto to provide reasonable access to competitively sensitive information. ¶¶ 101, 248.

There is no question that merger due diligence should include extensive reviews of an acquisition's legal and reputational risks. ¶¶ 69-70, 82. Here, *anyone* would know that investors expected Defendants to review Monsanto's internal documents, given the merger's massive size and scope and Monsanto's notoriety as "the most hated company in the world" and reputation for

---

[2] The legal memoranda Defendants had actually reviewed at the time of these statements also relied only on public information. ¶ 230.

covering up the negative health effects of its products and its relatedly massive legal liabilities. ¶¶ 2-4, 59, 69-83, 102. Indeed, Monsanto previously agreed to pay hundreds of millions of dollars to settle the PCB and dioxin litigation in which the misconduct mirrored that at issue here. ¶¶ 4, 76-77. But time and again, Defendants suggested to investors that they had completed such a review, when none was done. These statements are therefore actionable under § 10(b).

Defendants' arguments to the contrary are unavailing. First, Defendants contend that they did not have access to the bombshell documents at issue here until they were revealed in the Roundup trials. Defs.' Br. 6-7. This is wrong—the documents had in fact been collected and produced by Monsanto at the same time as the due diligence process, and Defendants need only have requested them. *See* ¶¶ 10, 103. Second, Defendants argue Plaintiffs' allegations about the Board's failure to receive information regarding the Roundup litigation risks are insufficiently particularized. But Baumann admitted Defendants never looked at internal Roundup documents, ¶ 128, and Defendants concede the only information they received about the Roundup Litigation consisted of publicly available information summarized in legal memoranda, *see* Defs.' Br. 8-9.

### (3)    Defendants' Argument That the Complaint Merely Alleges Inactionable Mismanagement Fails.

Defendants argue Plaintiffs have only alleged a failure to report mere "corporate mismanagement." Defs.' Br. 7. Not so. Plaintiffs are not alleging mere mismanagement (*i.e.*, a poorly managed diligence process), but rather deception relating to the mismanagement (e.g., misrepresenting the thoroughness of the diligence process), which is actionable under § 10(b)*, see, e.g.*, *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993), *superseded by statute on other grounds*, 15 U.S.C. § 78u-4(b)(1). Defendants' citation to *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977), Defs.' Br. 7, is inapposite because even under *Santa Fe*, "where the conduct involves deception related to the mismanagement—and not mismanagement alone—the claims are actionable under the federal securities laws." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010).

**(4)    The Complaint Alleges with Particularity That Defendants Falsely Claimed That There Was Unequivocal Scientific Evidence That Glyphosate Is Safe and Non-Carcinogenic.**

Defendants contend that glyphosate's safety is a mere matter of opinion, and that the Complaint does not allege that this opinion was "subjectively or objectively false." Defs.' Br. 11. This is a red herring. Plaintiffs do not allege that glyphosate is unsafe (though it may be), or that Defendants falsely believed it was safe. Rather, Plaintiffs allege Defendants falsely represented to investors—***even after*** the *Johnson* verdict—that the scientific evidence ***unequivocally*** shows glyphosate is non-carcinogenic, when in fact there is considerable evidence going the other way. ¶¶ 22-25, 175-76, 250, 252-66, 331, 349. For instance, Defendants repeatedly claimed over 800 studies showed glyphosate "does not cause cancer." ¶¶ 131, 174, 256, 257, 270. But (a) these studies were predominantly "safety assessments" unrelated to carcinogenicity, ¶¶ 23, 175; (b) many in fact supported IARC's conclusion that glyphosate probably caused cancer in humans, ¶ 23; and (c) as Defendants well knew, 629 of the 800 studies were conducted by Monsanto itself, ¶ 177. As another example, Baumann told investors, without qualification, that "there is no difference" between "the assessment of glyphosate as an active [ingredient] and then [sic] glyphosate-based formulations that are being used," even as internal Monsanto emails recognized that the Roundup formulation was potentially more toxic than glyphosate alone. ¶¶ 5, 79-80, 141, 250-51. These statements are actionable under § 10(b) because Defendants suggested Monsanto would surely prevail when they knew the evidence was equivocal at best.[3] As both California appellate courts and the Ninth Circuit have now held, there was sufficient evidence to support compensatory and punitive damages in the Roundup litigation. ¶¶ 214-18; Ex. 4 at *20.

**(5)    Defendants Falsely Certified Bayer's Financial Statements.**

The complaint also states a § 10(b) claim based on Defendants' materially false certifications that Bayer's financial statements complied with IFRS. Financial accounting

---

[3] Defendants contend "[t]he fact that Monsanto internal documents would be admissible in trials against Monsanto did not make it misleading for defendants to state their opinions about the safety of glyphosate and Monsanto's 'meritorious defenses.'" Defs.' Br. 13-14. Not so. Defendants had "duty to include all facts necessary to render a statement accurate and not misleading." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1012 (N.D. Cal. 2020).

standards like IFRS and § 10(b) serve "similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated." *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994). False or misleading certifications that a company's financial statements complied with applicable accounting standards can establish liability under § 10(b). *See, e.g.*, *Ponce v. SEC*, 345 F.3d 722, 732-34 (9th Cir. 2003) (upholding § 10(b) claim against defendant for falsely certifying that the company complied with accounting standard FAS 2, and "paint[ing] a rosier financial picture of [the company] than actually existed").

Here, Defendants falsely certified that Bayer's financial statements complied with IFRS. IAS 37.10 required Bayer to record a provision for a liability of uncertain timing and a charge to income when there was a present obligation as a result of a past event, an "economic outflow" was "probable" (*i.e.*, likelihood greater than 50%), and a reliable estimate could be made. ¶ 202-04. Further, even where the outflow was less than 50% likely or inestimable, other disclosures were required. Under IAS 37.86, where an economic outflow from an uncertain liability was "not remote," Bayer was required to disclose the estimated financial effect, an indication of the uncertainties relating to the amount or timing of any outflow, and the possibility of reimbursement. ¶ 207. Finally, under IAS 37.91, Bayer was required to state if any of the information required under IAS 37.86 could not be practicably disclosed. ¶ 207. It is undisputed that Bayer complied with none of these IAS requirements and, in fact, did not record a provision or make any disclosures under IAS 37 until *after* settling the Roundup litigation in June 2020.

Defendants contend that even after losing three jury trials and as the number of Roundup cases exploded to over 55,000, the likelihood of any outflow from the Roundup litigation remained "remote" until the litigation settled in June 2020. This is absurd. After the *Johnson* verdict in August 2018, and considering they had access to Monsanto's internal documents and resources, it was undeniable to Defendants that the probability of an economic outflow for the Roundup litigation was "not remote." As Bayer sustained loss after loss in court, this probability only increased, becoming "probable" *at the latest* by the *Pilliod* verdict in May 2019.[4] Therefore,

---

[4] In arguing that the existence of an adverse judgment does not imply a litigation loss is probable, Defendants cite *Luna* v. *Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, at \*5 (N.D. Cal.

from the *Johnson* verdict onward, Bayer was required to disclose the Roundup litigation as a contingent liability, and to provide *some* estimate of the liability; and by May 2019 at the latest Bayer needed to record a provision of several billion dollars for the litigation. *See* ¶¶ 29, 210-13, 272, 279, 286, 292, 296, 302, 307, 312. Yet until Bayer announced the Roundup litigation settlement fund in June 2020—*for over $10 billion*—it had made no provision or disclosure under IAS 37 relating to the Roundup litigation *at all*,[5] which massively inflated Bayer's profits during the Class Period, or at the very least failed to otherwise disclose the true dimensions of its exposure, as was required. *See* ¶ 316. Defendants thus repeatedly falsely certified Bayer's financial statements, starting with Bayer's Q2 2018 earnings report, and ending, with Bayer's half-year financial report for 2020. ¶¶ 272, 279, 286, 292, 296, 302, 307, 312, 314-15, 326.

Accordingly, the complaint states a § 10(b) claim based on Defendants' materially false certifications of Bayer's financial statements.[6] *See In re Corning, Inc. Sec. Litig.*, 1997 WL 235122, at *5, *8 (S.D.N.Y. May 7, 1997) (denying motion to dismiss § 10(b) claims based on company's failure to disclose a potential $1 billion charge to income for litigation, because

---

Oct. 12, 2016), and *In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *5 (N.D. Cal. Oct. 19, 2010). Defs.' Br. 15. Neither case applies here. In *Luna*, the plaintiffs alleged the defendants violated GAAP by not accruing a loss contingency for an adverse judgment against company Marvell. 2016 WL 5930655 at *2-3. The court disagreed, explaining that the adverse judgment alone did not necessitate the accrual of a loss contingency because the likelihood of a loss depended on numerous factors, Marvell had strong arguments on appeal, and the plaintiff did not allege Marvell knew it would lose. Under those facts, the adverse judgment did not imply that "defendants' decision not to accrue a reserve was fraudulent, rather than a permissible judgment call." *Id.* at *5-6. *Luna* is therefore factually inapposite. It concerns a litigation whose outcome was uncertain but likely to be resolved in the company's favor, unlike here, where the Complaint clearly alleges an economic outflow was probable at the latest by the time of the *Pilliod* verdict.

*Nvidia* is also inapposite because it says nothing about the import of adverse judgments. The "probable loss[es]" referred to in that decision and cited by Defendants in their opening brief, *see* Defs.' Br. 15, are accounting charges relating to the costs associated with remedying product defects, not losses as a result of lawsuits, *see* 2010 WL 4117561, at *4-8.

[5] Bayer mentioned the Roundup litigation in "Legal Risks" notes in certain financial statements, but these notes merely mention the litigation's existence and summarize certain key developments. They are not disclosures of contingent liabilities under IAS 37.86 (¶¶ 270, 284, 305), as Defendants' opening brief effectively concedes. *See* Defs.' Br. 14-16. Bayer *never* specifically disclosed the Roundup litigation as a contingent liability under IAS 37. ¶¶ 212-13, 268, 272, 279, 286, 292, 296, 302, 307, 312.

[6] Defendants argue that accounting errors are implausible here because Bayer received unqualified audit opinions and never restated its books. Defs.' Br. 15 n.7. But auditors have no skill in evaluating legal risks, Bayer's auditors did not review the internal Roundup documents.

---

allegations of adverse verdict that spurred additional lawsuits "at an accelerated rate" and public outcry could "reasonably be interpreted as implying that the problem was serious *enough* that some responsible person at [the company] recognized the need to disclose this developing problem in financial statements and knowingly refrained from doing so.")

### (6)    The Alleged False Statements and Omissions Are Not Inactionable Opinions or Mere Puffery.

Defendants argue many of the alleged misstatements and omissions are opinions or inactionable puffery. These arguments fail. ***First***, Defendants argue many of the challenged statements concerning due diligence, glyphosate's safety, and accounting for litigation risks are mere "statements of opinion," and particularly those from Wenning and Baumann. Defs.' Br. 1, 10-11, 13. Even assuming, *arguendo*, that these statements were opinions, they are still actionable because they were "misleadingly incomplete." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188-89 (9th Cir. 2021) (quoting *Omnicare*, 575 U.S. at 185). "For example, if a company declares that 'We believe our conduct is lawful,' a reasonable investor likely expects such an assertion to rest on some meaningful legal inquiry." *Id.* (quoting *Omnicare*, 575 U.S. at 185). Investors expected Defendants' statements about Roundup's legal risks to rest on a meaningful inquiry, which had not in fact occurred, making Defendants' purported opinions "misleading to a reasonable person reading [them] fairly and in context." *Omnicare*, 575 U.S. at 194.

This is precisely why *In re Bank of America Corp.*, 2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012), cited by Defendants, Defs.' Br. 10-11, is inapposite. There, the plaintiffs provided no reason to infer that the defendant corporate officers disbelieved their claims that extensive merger due diligence had occurred. *See id.* at *5-6. Here, the opposite is true. Monsanto's history of concealing adverse health effects of major products leading to hundreds of millions of dollars in toxic tort settlements, the ongoing Roundup litigation, the release of the Monsanto Papers, and Defendants' failure to review even a single internal Roundup document provide more than a sufficient basis to infer Defendants could not have fully believed the statements they made.

***Second***, Defendants claim their representations about Bayer's due diligence were mere puffery. Defs.' Br. 10 n.4. But statements that diligence was "extensive" or "comprehensive" are

not mere puffery if no meaningful diligence was actually performed. *See RAIT*, 2008 WL 5378164, at *6. Further, "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). Here, the statements about the Monsanto litigation and Bayer's due diligence were not mere puffery as they were capable of verification.

*Third*, Defendants argue that because implementing accounting standards sometimes requires discretionary judgments, their statements about the Roundup litigation risk are therefore "statements of opinion that cannot support a claim." Defs.' Br. 14-15. As a preliminary matter, accounting principles "neither establish[] nor shield[] guilt in a securities fraud case," *United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007), and "[w]hether or not [the accountant] employed the [relevant accounting] standards is a verifiable factual statement that is material to those relying on its certification," *In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009). Regardless, even if a certification is a statement of opinion, it can nevertheless lead to § 10(b) liability if the plaintiffs establish subjective falsity, meaning that a defendant "believed it was false or misleading at the time it was given." *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 921 (N.D. Cal. 2015); *see In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *13 (C.D. Cal. Mar. 25, 2019) ("[T]he Court finds that plaintiffs adequately allege that Deloitte did not believe . . . that Silver Wheaton's financial statements complied with IFRS."). Plaintiffs' allegations support an inference of subjective falsity. Although accounting standards sometimes allow for a range of reasonable interpretations, that was not the case here with respect to IAS 37. There is no way Defendants could have reasonably believed that there was at most a remote chance Bayer would incur liability after the *Johnson* verdict and increasingly after that time as Bayer sustained loss after loss in court. ¶ 326.

**B.     The Complaint Raises a Strong Inference of Scienter.**

**(1)     Defendants' Conduct Was a Reckless Departure from the Standard Expected of Corporate Officers.**

In Defendants' telling, they cannot have defrauded Bayer's investors because they are not "experts" on due diligence, they delegated the due diligence review to their lawyers and other

professionals, and nobody ever gave them an explicit yet narrow warning about "deficiencies in the glyphosate diligence." Defs.' Br. 17-18. None of these things are required to plead scienter. All that is required are "allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (quotation marks omitted). Scienter is established when the plaintiff properly pleads "an obvious financial incentive" for the alleged misstatements or omissions as well as "specific allegations of behavior on the part of defendants which cut against the non-fraudulent inference." *Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *12 (N.D. Cal. Jan. 27, 2020) (Seeborg, J.). An inference of scienter is "strong" when it is *as likely or more likely* as any other inference. *See Tellabs*, 551 U.S. at 324.

The factual allegations here, viewed both individually and holistically, meet that standard. The Complaint alleges specific facts that explain *why* Defendants would ignore and then minimize the Roundup litigation's obvious risks. First, Baumann had a history of failed and reckless due diligence practices as evidenced by the failed Merck OTC acquisition. ¶¶ 12, 73. Second, Bayer was late to the table in the rapid consolidation in the agrochemical industry, such that Bayer could only have remained competitive by merging with Monsanto. ¶¶ 2, 58-59. Third, Baumann was focused on acquiring Monsanto even before he became CEO, and even though he was overruled by his then-superiors because of Monsanto's reputational risks. ¶¶ 59, 61.

The Complaint further alleges that Defendants recklessly proceeded with their purchase of Monsanto without conducting adequate due diligence, despite the *numerous red flags* associated with the merger, including its massive size and scope; Monsanto's reputation for concealing the health risks of its products and its history of toxic tort litigation resulting in massive payouts; IARC's March 2015 report on glyphosate's carcinogenicity; the widespread negative reaction to the merger by financial analysts, the media, Moody's, and a large percentage of Bayer's shareholders (¶¶ 63-68); and the outrage expressed by shareholders.

Beyond simply ignoring these red flags, Defendants then *repeatedly* assured investors they had conducted a thorough and complete review of the acquisition's risks, *even though* they had never reviewed *any* Monsanto internal documents; *even though* those documents had

already been collected and produced in the Roundup litigation; and *even though* Defendants clearly had the legal right and ability to request and review them. This egregious self-interested behavior is an extreme departure from the standard of conduct investors expect from corporate officers—as shown by investors' fury when Defendants' misconduct came to light. For instance, in April 2019, after two leading proxy advisory firms recommended that Bayer's senior management be fired for failing to perform adequate due diligence on the Roundup litigation, Defendants Baumann, Nickl, and Condon lost a no-confidence vote at Bayer's annual shareholder meeting by a wide margin after Bayer's shareholders expressed outrage over Defendants' failure to properly assess Roundup's legal risks. ¶¶ 154-60.

Further, nearly *all* of the factors identified by courts as supporting a strong inference of scienter in § 10(b) cases centering on merger due diligence exist here. *First*, Defendants had access to or knowledge of facts contradicting their public statements. *See, e.g.*, *Freudenberg*, 712 F. Supp. 2d at 198; *RAIT*, 2008 WL 5378164 at *12-13. The internal Monsanto documents introduced into evidence at trial in the Roundup litigation were collected and produced well before the merger closed, and Defendants had the right and plenty of time to review them.

*Second*, Defendants admitted serious shortcomings in Bayer's due diligence via their August 2018 concession that they never looked at Monsanto's internal documents before the closing, as confirmed by the conspicuous omission in the "special audit" and legal memoranda Bayer published in March 2020 of any mention of whether Bayer reviewed the internal Monsanto documents used at trial in the Roundup litigation. ¶¶ 168-70; *see Cendant*, 60 F. Supp. 2d at 371-72 (scienter adequately pleaded where company claimed it did "all the due diligence that one does when one buys a public company" but CEO later admitted the diligence was "based almost entirely on public information"); *Freedman*, 958 F. Supp. at 757 (scienter adequately pleaded where defendants claimed to have conducted "full review" of acquisition target's earnings potential but later admitted "shortcomings" in diligence).

*Third*, the Individual Defendants all held senior positions with a duty to monitor core business operations such as major acquisitions, and had the ability to direct the due diligence process. *See Freudenberg*, 712 F. Supp. 2d at 187, 192; *RAIT*, 2008 WL 5378164, at *12-13.

*Fourth*, there was a huge disparity between Defendants' claim that Bayer had no exposure in the Monsanto litigation and the actual $10.9 billion impairment, which represented a material portion of the entire $63 billion price Bayer paid to acquire Monsanto. *See RAIT*, 2008 WL 5378164 at *13 ("[T]he sheer size of the impairment eventually taken by [the company] adds to the inference that the Officer Defendants and [the company] by imputation must have had some awareness that the problem was brewing."); *Freedman*, 958 F. Supp. at 757 (the great "magnitude of the problems" with the merger supports a strong inference of scienter).

*Fifth*, the fraud became apparent soon after the merger's completion. *Freedman*, 958 F. Supp. at 757 (scienter established because of, *inter alia*, "the rapidity with which the problems became apparent after the merger"). In sum, the Complaint raises a strong inference of scienter by explaining *why* Defendants' conduct was reckless if not intentional.

Defendants' scienter arguments rely heavily on *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277 (S.D.N.Y. 2013), and in doing so miss the mark. In *City of Austin*, the Court held that the plaintiff failed to plead scienter because although several former employees allegedly believed that the due diligence was inadequate, the plaintiff did not allege those employees "communicated those concerns to [the defendants], let alone that they persuaded the defendants . . . that the diligence was inadequate." *Id.* at 299. Further, the plaintiff did not allege that the defendants "knew, or had reason to know, that [the company] had done materially less homework than was customary." *Id.* at 300. Here, the Complaint contains ample particularized facts showing that Defendants knew or had reason to know that Bayer's due diligence was insufficient, that glyphosate was potentially carcinogenic, and that Monsanto faced a reasonable probability of massive liability in the Roundup litigation. Further, as explained above, nearly all of the factors previously identified by courts as supporting a strong inference of scienter in § 10(b) cases centering on merger due diligence apply here.[7]

---

[7] Defendants incorrectly argue that Plaintiffs' scienter allegations are not particularized to the Individual Defendants. *See* Defs.' Br. 18-19. As to Baumann, the Complaint alleges he was the driving force behind the merger and highly motivated to see it through at all costs; that he had previously overseen the disastrous Merck OTC acquisition; and that he undisputedly knew the basic steps needed to ensure Bayer had sufficient information to evaluate Monsanto's legal risks given the many red flags. ¶¶ 334-36. Yet he did nothing to ensure that Monsanto's internal

**(2)    Defendants' Violations of Accounting Standards Including IAS 37 Raise a Strong Inference of Scienter.**

Significant violations of GAAP standards provide evidence of scienter. *E.g., In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005). A certification of a financial statement is probative of scienter "if the person signing the certification was severely reckless in certifying the [statement's] accuracy."[8] *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 7474 (9th Cir. 2008) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). Here, Defendants' certifications of Bayer's financial statements starting with Bayer's Q2 2018 earnings report and ending with Bayer's half-year financial report for 2020 were severely reckless and strongly probative of scienter.

First, "the length of time a defendant knows of potential issues" supports an inference of scienter. *Hildes v. Andersen*, 2010 WL 4811975, at *5 (S.D. Cal. Nov. 8, 2010). Defendants were or should have been aware of the risks posed by the Roundup litigation for **years** before they disclosed them under IAS 37, as evidenced by numerous public statements about the litigation during this timeframe, as well as extensive media coverage and questioning from analysts and investors. Yet Defendants did not make any of the required disclosures under IAS 37, because doing so would have contradicted their false statements, providing strong evidence of Defendants' "intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319.

Second, Bayer's failure to comply with IAS 37 once an economic outflow in the Roundup litigation became probable ultimately massively inflated its net income, and "substantial allegations" that inaccurate accounting figures significantly inflated a firm's net

---

documents were reviewed as part of the diligence process, and despite this, repeatedly and personally assured investors of the adequacy of Bayer's due diligence. As to the other individual defendants—Wenning, Condon, Dietsch, and Nickl—the Complaint alleges that they signed the merger agreement, were actively involved in the merger process, and made numerous specific false statements. *See* ¶¶ 51-54, 85, 221, 226-27, 229, 238-39, 265, 268-69, 321-24, 337-40.

[8] Contrary to Defendants, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016), states only that a failure to allege "the role of the individual defendants in preparing the company's accounting statements" factors into the scienter analysis in certain circumstances—not that it is a pleading requirement, *see id.* at 1207.

income raise "a strong inference . . . that senior management intentionally misstated earnings," and therefore of scienter. *Hessefort v. Super Micro Comput., Inc.*, 2020 WL 1551140, at *6 (N.D. Cal. Mar. 23, 2020). Such accounting errors that "dramatically affect[]" a company's financial results, "and in ways that strongly suggest a typical corporate executive should have noticed them," are strongly probative of scienter. [9] *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016). Here, because "the magnitude of the accounting error is great," the provisions that were violated "are relatively straightforward," and "the mistake [wa]s pervasive over a long period of time," *id.*, Defendants' certification of Bayer's financial results raises a strong inference of scienter.

That Defendants obtained "unqualified audit opinions," Defs.' Br. 20, does not show that they were not proceeding recklessly because auditors are not experts in the intricacies or significance of legal defeats and their opinions on such matters are entitled to little if any weight. Additionally, the cases Defendants cite on this point are inapposite as they do not concern litigation risk. *See* Defs.' Br. 20 (citing *Feola* v. *Cameron*, 2015 WL 12644566 (C.D. Cal. Nov. 24, 2015), and *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007)). Nor is there any reason to believe Bayer's auditors reviewed the internal Monsanto documents in question. Further, the fact that Bayer included boilerplate cautionary statements about litigation risk and that it disclosed it was reserving for defense costs, Defs.' Br. 20, does not aid Defendants. These statements effectively assured investors that in Bayer's view, although litigation was risky as a ***general*** matter, the Roundup litigation ***specifically*** would not result in adverse judgments or significant settlements. Bayer's statement that it planned to reserve for defense costs only served to amplify its publicly stated confidence in prevailing in the litigation, and was in this sense actually part and parcel of its pattern of false and misleading statements.[10]

_____

[9] Revenue or earnings inflation of as little as 25%-46% can provide powerful circumstantial evidence of scienter. *Hessefort*, 2020 WL 1551140, at *6 (collecting cases). The inflation here was much greater—in some periods, it would have erased Bayer's net income altogether. ¶ 316.

[10] *Luna*, 2016 WL 5930655, cited by Defendants, Defs,' Br. at 20, is different from the instant case. Unlike here, where Defendants did not disclose Monsanto's exposure beyond litigation costs, in *Luna*, the defendants disclosed the total amount of the potential loss ($1.54 billion) and explicitly stated the company could not "reasonably estimate the upper range of the

## C.    Plaintiffs Adequately Allege Loss Causation.

The Complaint adequately pleads loss causation, which is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 346 (2005). There are two ways to plead loss causation. First, the plaintiff may plead a "corrective disclosure," meaning the "practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). Second, the plaintiff may plead a "materialization of the risk," meaning the defendants' misrepresentations concealed a risk "that materialized and played some part in diminishing the market value of a security." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013).

Here, the Complaint pleads six loss causation events associated with significant declines in Bayer's ADR price: (1) the June 19, 2018 CBS news report; (2) the *Johnson* verdict; (3) the trial court's denial of Monsanto's request for new trial in *Johnson*; (4) the *Hardeman* verdict; (5) Bayer's announcement of the $10.9 billion settlement; and (6) the presiding judge's suggestion he would not approve the settlement.[11] ¶¶ 341-55. As explained above, *see supra* pt. I.A, the Complaint alleges Defendants made additional misstatements and omissions to reassure investors between each stock drop and each of the corrective disclosures. Each of these events was both a corrective disclosure and a materialization of the risk. Defendants' misleading statements took many forms, from false statements about the extent of Bayer's due diligence as to the merger's risks; to statements that there was unequivocal scientific and regulatory evidence backing Monsanto's defenses; to statements and financial reports suggesting there was not even a remote chance Monsanto would lose the Roundup cases. Each of the loss causation events alleged in the Complaint revealed Defendants' fraud by showing that Bayer's true exposure in

possible loss." *Id.* at *7; *Luna*, No. 15-cv-05447-RMW, Dkt. No. 73-9, RJN Ex. 9 at 20.

[11] Defendants contend events (5) and (6) were not corrective disclosures because they did not reveal inaccuracies in prior financial statements and because "Bayer had consistently disclosed glyphosate litigation as a contingent liability throughout the alleged class period, thus announcing to the market that it believed the possibility of damages to be more than remote." Defs.' Br. 23. But as explained above, this is ***completely false***. *See supra* note 5.

the litigation was significantly greater than portrayed—causing the inflation in Bayer's ADR price caused by Defendants' misrepresentations to dissipate, and in turn causing Plaintiffs' losses. The Complaint therefore clearly alleges these events were corrective disclosures and provides a direct causal link between each of Defendants' misrepresentations and the relevant declines in Bayer's ADR price. Further, each of these events materialized the risk to Bayer from the Roundup litigation that Defendants had concealed through their misstatements. Accordingly, Plaintiffs have properly pled loss causation. Defendants' arguments to the contrary fail.

*First*, Defendants argue that the CBS News report cannot serve as a corrective disclosure because the Monsanto Papers were publicly disclosed in March 2017. Defs.' Br. 21-22. But Plaintiffs allege that Defendants responded to the Monsanto Papers with further false statements affirming their due diligence and suggesting the Monsanto Papers had no effect on Monsanto's exposure in the Roundup Litigation. *See* ¶¶ 107-10. Additionally, the CBS report assembled for the first time several critical facts suggesting that Monsanto's exposure in the Roundup litigation was greater than Defendants had claimed, most importantly that the judge in *Johnson* had rejected Monsanto's argument that Plaintiffs' scientific evidence was junk, which meant (a) there would be a battle of the experts at trial; (b) Johnson was now more likely to win; and (c) a win for Johnson would serve as a bellwether and would likely trigger "thousands" more cases against Monsanto. ¶ 113; Exs. 2-3. It is not surprising this report would trigger an 8% decline in Bayer's ADR price because it corrected, *inter alia*, Baumann's assessment just a few weeks earlier that the merger was "just as attractive today as we assessed it to be two years ago."[12] ¶ 110.

*Second*, Defendants argue the *Johnson* and *Hardeman* verdicts do not relate back to Defendants' misrepresentations or reveal new information. Defs. Br. 22-23. But "a disclosure need not precisely mirror the earlier misrepresentation," and "if the market treats allegations in a

___

[12] Defendants also incorrectly argue that if the CBS report is a corrective disclosure, then some of Plaintiffs' claims are time-barred. Defs.' Br. n.10. But the Complaint alleges only that the truth "*began* to emerge" in the CBS Report, ¶ 347 (emphasis added), and a "corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures," *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).

lawsuit as sufficiently credible to be acted upon as truth, and the inflation in the stock price attributable to the defendant's misstatements is dissipated as a result, then the allegations can serve as a corrective disclosure." *BofI*, 977 F.3d at 790, 792. Price declines following jury verdicts are sufficient to plead loss causation because the verdict reveals new information to the market by confirming that the case is sufficiently credible for a jury to find liability. *See, e.g.*, *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *27 & n.8 (D.N.J. Dec. 27, 2019) (toxic tort verdict linking company's product and disease can serve as a corrective disclosure because it reveals falsity of defendants' prior assertions that there was no such link); *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 244-45 (D. Mass. 2011) (jury verdicts were loss causation events because "[d]efendants' misrepresentations materially misled investors and analysts in such a way as to impede assessments of the nature and gravity of the risk to [the company's] share price posed by the . . . lawsuit" and verdicts materialized the risk). Whether "evidence was presented in open court," Defs.' Br. 22, is a red herring—the question is whether there was ***evidence that was sufficiently credible to support a jury verdict***.

As to Defendants' argument that the jury verdicts cannot constitute a materialization of concealed risks because "Defendants did not and could not have 'concealed' the risk that they would suffer losses in public trials," Defs.' Br. 23, Defendants in fact on numerous occasions assured investors the cases were meritless and that they would prevail at trial. The *Hardeman* verdict—the first after Bayer assumed control of Monsanto and the Roundup litigation's defense—served as a corrective disclosure to Defendants' post-*Johnson* misstatements. For instance, between the *Johnson* and *Hardeman* verdicts, Baumann held a conference call with investors to discuss the Roundup litigation at which he was explicitly asked whether Bayer had now reviewed Monsanto's internal documents to confirm "there is no meaningful adverse piece of information that will emerge from the internal communications at Monsanto." ¶ 129. Baumann responded that there was "nothing that we see . . . that would lead to us talking about the combined company now having misrepresented or withheld relevant data or actually said that glyphosate could probably cause cancer," and that Bayer "solidly" stood behind its prior statements." ¶ 129. Baumann then stated that there was "no scientific evidence" to suggest "any

relation between the application of glyphosate-based herbicides . . . and the occurrence of cancer"; that "more than 800 scientific studies" supported Bayer's defenses; and that the verdict was "inconsistent with the robust science-based conclusions of regulators and health authorities worldwide" and "completely inconsistent with all available facts." ¶¶ 130-32. The *Hardeman* verdict revealed these statements were false, causing Bayer's ADR price to drop. ¶ 351.

The loss causation analysis in *Cambridge Retirement System v. Jeld-Wen Holding, Inc.*, 2020 WL 6270482 (E.D. Va. Oct. 26, 2020), is instructive here. After a federal jury returned a $176 million antitrust verdict against defendant company Jeld-Wen, the company publicly stated the suit was meritless—as it had before the verdict—and would not "material[ly] impact" the company. *Id.* at *1-2. The court then issued an opinion making detailed factual findings refuting Jeld-Wen's positions (the "Antitrust Decision"), and Jeld-Wen's stock price dropped 5%. *Id.* But Jeld-Wen remained defiant, publicly maintaining the ruling was incorrect. *Id.* Ultimately, though, Jeld-Wen backtracked, admitting it expected to incur $76.5 million in liability charges (the "Liability Announcement"), causing the company's stock to drop 19% the next day. *Id.*

In a subsequent federal securities class action, the court held these allegations were sufficient to plead loss causation because the Antitrust Decision's "detailed factual recitation" caused the market to "finally start to realize that Jeld-Wen's protestations of innocence would not shield them from liability," and the Liability Announcement "disclosed new facts to the market—namely, that Jeld-Wen expected to incur a $76.5 million loss from the [antitrust] litigation," which in turn "altered the risk calculus for investors." *Id.* at *10. Additionally, the confirmation of the antitrust allegations in court "constitute[d] a disclosure of new facts that an investor could reasonably rely on to make investment decisions." *Id.* Plaintiffs here have adequately pleaded loss causation for the same reasons: the CBS report, jury verdicts and litigation losses, and settlement developments revealed that the risks posed by the Roundup litigation were far greater than Defendants had previously portrayed them to be. In sum, construing all inferences for Plaintiffs, the Complaint adequately pleads loss causation.

II.    **PLAINTIFFS STATE A § 20(A) CLAIM.**

Because the Complaint pleads underlying violations of the Exchange Act, *see supra* pt. I,

and because the Individual Defendants do not dispute they are controlling persons, *see* Defs.' Br. 24, Plaintiffs have adequately pleaded claims under Section 20(a) of the Exchange Act, *see Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.,* 96 F.3d 1151, 1161 (9th Cir. 1996).

**CONCLUSION**

For the foregoing reasons, Defendants' motion should be denied.[13]

Dated: May 21, 2021                    Respectfully submitted,

                                       */s/ Carol V. Gilden*

                                       Carol V. Gilden (admitted *pro hac vice*)
                                       **Cohen Milstein Sellers & Toll PLLC**
                                       190 South LaSalle Street
                                       Suite 1705
                                       Chicago, IL 60603
                                       Telephone: (312) 357-0370
                                       Email: cgilden@cohenmilstein.com

                                       Steven J. Toll (admitted *pro hac vice*)
                                       Susan G. Taylor (SBN 190753)
                                       1100 New York Ave NW, Suite 500 East
                                       Washington, DC 20005
                                       Telephone: (202) 408-4600
                                       Facsimile: (202) 408-4699
                                       Email: stoll@cohenmilstein.com
                                               sgtaylor@cohenmilstein.com

                                       Joel P. Laitman (*pro hac vice* forthcoming)
                                       Chris Lometti (*pro hac vice* forthcoming)
                                       Benjamin F. Jackson (admitted *pro hac vice*)
                                       88 Pine Street, Fourteenth Floor
                                       New York, NY 10005
                                       Telephone: (212) 838-7797
                                       Facsimile: (212) 838-7745
                                       Email: jlaitman@cohenmilstein.com
                                               clometti@cohenmilstein.com
                                               bjackson@cohenmilstein.com

                                       *Lead Counsel*

[13] If the Court grants the motion as to any defendant, Plaintiffs respectfully request leave to amend. *See, e.g.*, *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 376 (N.D. Cal. 2020) ("The Ninth Circuit has 'repeatedly held that a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" (quoting *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000))).

Nicole Lavallee (SBN 165755)
Jeffrey Miles (SBN 293869)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email:  nlavallee@bermantabacco.com
           jmiles@bermantabacco.com

*Liaison Counsel*

*Attorneys for Lead Plaintiffs Sheet Metal Workers' National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, and Named Plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania And Delaware Local No. 542*