Jordan Eth (CA SBN 121617)
JEth@mofo.com
Mark R.S. Foster (CA SBN 223682)
MFoster@mofo.com
**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, CA  94105
Telephone:  (415) 268-7126
Facsimile:  (415) 268-7522

William Savitt (*pro hac vice*)
John F. Lynch (*pro hac vice*)
Noah B. Yavitz (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for defendants Bayer*
*Aktiengesellschaft, Werner Baumann,*
*Werner Wenning, Liam Condon,*
*Johannes Dietsch, and Wolfgang Nickl*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and <br><br> INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL, <br><br> Defendants. | Case No.:  3:20-cv-04737-RS <br><br> **DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** <br><br> CLASS ACTION <br><br> Date:  August 5, 2021 <br> Time:  1:30 p.m. <br> Judge:  Richard Seeborg <br> Courtroom:  3 — 17th Floor |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.    THE COMPLAINT FAILS TO PLEAD FALSITY WITH PARTICULARITY ..................... 2

    A.  The Complaint Does Not Plead False Statements About Due Diligence. .......................... 2

    B.  The Complaint Does Not Plead False Statements About the Evidence on
        Glyphosate Safety. .......................................................................................................... 7

    C.  The Complaint Does Not Plead False Statements About Bayer's Accounting
        for Glyphosate Legal Risks. ............................................................................................ 9

II.   THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER. ......... 12

III.  THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION. ........................................... 17

IV.  THE COMPLAINT DOES NOT PLEAD A VIOLATION OF SECTION 20(A) ................ 20

CONCLUSION ............................................................................................................................. 20

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                 **<u>Page(s)</u>**

*Cambridge Ret. Sys.* v. *Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020)...................................................................... 18

*City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................................. 6, 15

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017).......................................................................... 2, 6, 17

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005) ............................................................................................... 1

*Feola* v. *Cameron*,
2015 WL 12644566 (C.D. Cal. Nov. 24, 2015)..................................................... 16

*Freedman* v. *Value Health, Inc.*,
958 F. Supp. 745 (D. Conn. 1997) ................................................................... 5, 13

*Freudenberg* v. *E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................... 14-15

*Gavaldon* v. *Standard Chartered Bank Int'l (Am.) Ltd.*,
2020 WL 835311 (S.D. Cal. Feb. 20, 2020) ........................................................... 6

*GSC Partners CDO Fund* v. *Washington*,
368 F.3d 228 (3d Cir. 2004)................................................................................... 13

*Hall* v. *Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019) ..................................................... 19 n.17

*Hardeman* v. *Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021).......................................................................... 8 n.6

*Ikeda* v. *Baidu, Inc.*,
2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ................................................. 3, 8, 16

*In re Alphabet, Inc. Sec. Litig.*,
2021 WL 2448223 (9th Cir. June 16, 2021) ........................................................... 6

*In re Bank of Am. Corp.*,
2012 WL 135252 (S.D.N.Y. 2012) ......................................................................... 6

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D.N.J. 1999) ..................................................................... 5, 13

*In re Corning Inc. Sec. Litig.*,
1997 WL 235122 (S.D.N.Y. May 7, 1997).............................................................. 11

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007)...................................................................... 16

*In re HP Sec. Litig.*,
    2013 WL 6185529 (N.D. Cal. Nov. 26, 2013)......................................................... 13, 15 n.14

*In re Huffy Corp. Sec. Litig.*,
    577 F. Supp. 2d 968 (S.D. Ohio 2008)........................................................................ 15

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ..................................................................... 9 n.8

*In re NVIDIA Corp. Sec. Litig.*,
    2010 WL 4117561 (N.D. Cal. Oct. 19, 2010)..........................................10-11 & n.10

*In re RAIT Fin. Tr. Sec. Litig.*,
    2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) .....................................4-5, 13, 15 n.13

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)......................................................................... 8 n.7

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)..................................................................................... 12

*In re Silver Wheaton Corp. Sec. Litig.*,
    2019 WL 1512269 (C.D. Cal. Mar. 25, 2019) ...................................................... 11 n.11

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
    694 F. Supp. 2d 1192 (W.D. Wash. 2009)............................................................ 12 n.11

*Irving Firemen's Relief & Ret. Fund* v. *Uber Techs., Inc.*,
    998 F.3d 397 (9th Cir. 2021)..................................................................................... 17

*Knox* v. *Yingli Green Energy Holding Co. Ltd.*,
    2016 WL 6609210 (C.D. Cal. May 10, 2016) ....................................................... 18 n.16

*Lipton* v. *Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002)................................................................................ 12-13

*Lloyd* v. *CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016).................................................................................15-16

*Luna* v. *Marvell Technology Group Ltd.*,
    2016 WL 5930655 (N.D. Cal. Oct. 12, 2016)....................................................... 10 & n.9

*May* v. *KushCo Holdings, Inc.*,
    2020 WL 6587533 (C.D. Cal. Sept. 25, 2020)......................................................... 16

*Nathanson* v. *Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ....................................................................... 4

*NECA-IBEW Pension Trust Fund* v. *Bank of America Corp.*,
   2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) .............................................................................. 5

*Prodanova* v. *H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) ............................................................................................... 12

*S. Ferry LP, No. 2* v. *Killinger*,
   542 F.3d 776 (9th Cir. 2008) ................................................................................................. 14

*Salim* v. *Mobile Telesystems PJSC*,
   2021 WL 796088 (E.D.N.Y. Mar. 1, 2021) ........................................................................... 11

*Santa Fe Industries* v. *Green*,
   430 U.S. 462 (1977) ................................................................................................................. 3

*Special Situations Fund III, L.P.* v. *Am. Dental Partners, Inc.*,
   775 F. Supp. 2d 227 (D. Mass. 2011) ............................................................................. 19 n.17

*Thomas* v. *Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................................................. 17

*Wochos* v. *Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ..................................................................................... 2, 4, 17

*Zucco Partners, LLC* v. *Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ............................................................................................. 14-15

**Statutes & Rules**

28 U.S.C. § 1658(b)(1) ............................................................................................................ 18 n.16

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 11

# INTRODUCTION

Plaintiffs' opposition confirms the inadequacy of their pleading. It accuses defendants of committing securities fraud through statements on three subjects: (1) Bayer's merger diligence on Monsanto; (2) evidence concerning the safety of glyphosate; and (3) Bayer's accounting for glyphosate litigation risk. As defendants showed in their opening brief, however, the Complaint does not plead facts showing that any of defendants' statements were false when made, does not satisfy the heightened standard for pleading scienter, and does not allege with particularity that the stock drops for which plaintiffs seek recovery were caused by anything defendants said.

Because the Complaint does not plead falsity, plaintiffs resort in their opposition to rewriting defendants' statements into assurances that "no stone was being left unturned" in Bayer's diligence on Monsanto and that the science "unequivocally supported Monsanto's defenses" in the glyphosate litigation — blanket promises that were supposedly proven false when juries delivered verdicts against Monsanto. Pls.' P&A in Opp'n to Defs.' Motion to Dismiss ("PB") at 1-2. But defendants said nothing of the sort, and plaintiffs cannot allege securities fraud through made-up statements and hindsight pleading. *See* Point I, *infra*.

Plaintiffs fare no better on scienter. Even after supplementing their complaint with exhibits, plaintiffs *still* offer nothing that shows knowing or deliberately reckless misrepresentation — no detailed allegations of anything defendants knew that was different from what they said, no confidential witnesses, no admissions or stock sales, and not even a cogent reason *why* they would lie about expected liability that plaintiffs insist was imminent and inevitable. *See* Point II, *infra*.

Lastly, plaintiffs fail to answer for fatal gaps in their pleading of loss causation. The Complaint points to six stock drops, all purportedly caused by defendants' misrepresentations. But two of those — following a media report and an early jury verdict against Monsanto — happened before defendants had breathed a word about litigation diligence, glyphosate science, or accounting for liability. And the final four reflected investors' reaction to the unpredictable outcomes of well-publicized litigation. Because Section 10(b) does not "provide investors with broad insurance against market losses" like those, *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005), the Court should dismiss plaintiffs' claims with prejudice. *See* Point III, *infra*.

**ARGUMENT**

**I.    THE COMPLAINT FAILS TO PLEAD FALSITY WITH PARTICULARITY.**

To state a Section 10(b) claim, plaintiffs must identify false representations and set out with particularity the "reasons why [each] statement is misleading." *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (internal quotation omitted). Moreover, because nearly all of the statements challenged in the Complaint were concededly expressions of opinion, plaintiffs must present particularized allegations that either show defendants did not believe their own words or else misled the market about how they formed their beliefs. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017).

The Complaint fails on both fronts, and plaintiffs' opposition cannot rescue it. While plaintiffs accuse defendants of misrepresenting Bayer's diligence of Monsanto, the state of the science on glyphosate, and management's views on glyphosate litigation risk, plaintiffs do not point to any allegations that pass muster under the demanding standard set by the Private Securities Litigation Reform Act ("PSLRA").

**A.    The Complaint Does Not Plead False Statements About Due Diligence.**

Plaintiffs' marquee claim is unchanged: they accuse defendants of misleading investors into believing that Bayer reviewed millions of pages of internal Monsanto communications about glyphosate. *See* PB 13-14; ¶ 328(f). As set out in defendants' opening brief, however, plaintiffs allege no statement that created any such market perception — not with particularity, not at all. The Complaint instead leans heavily on defendants' generic, pre-merger statements about Bayer's acquisition process, none of which purported to address diligence about glyphosate liability. Indeed, the Complaint does not allege a *single* statement on litigation-related diligence that pre-dates August 2018, when Monsanto lost a jury verdict in the *Johnson* glyphosate lawsuit, after which defendants opined generically on the "appropriateness" of Bayer's diligence. *See, e.g.*, ¶ 245. These post-*Johnson* opinion statements are also inactionable, both because plaintiffs have not pleaded that defendants subjectively disbelieved them or lacked a basis to make them and because they are generic characterizations that no reasonable investor would view as material. *See* Defs.' P&A in Support of Motion to Dismiss ("OB") at 6-11.

Plaintiffs have no valid response. To the contrary, their briefing confirms that this litigation is nothing but an improper attempt to retool accusations of mismanagement into securities fraud. Tellingly, plaintiffs' *lead argument* on falsity is that supposed red flags "should have indicated to [d]efendants that they would have to review internal Monsanto documents relating to Roundup to properly evaluate Monsanto's associated legal risks." PB 11. That retrospective theory of managerial negligence runs smack into *Santa Fe Industries* v. *Green*, 430 U.S. 462 (1977), where the U.S. Supreme Court held that a Section 10(b) claim cannot be pleaded through allegations of "internal corporate mismanagement." *Id.* at 479-80.

In an effort to evade *Santa Fe*, plaintiffs have put forward what they apparently believe to be their strongest examples of false statements about glyphosate diligence. PB 11-14. Only two even mention glyphosate. *First*, plaintiffs insist that on a May 23, 2016 conference call, Mr. Baumann misrepresented Bayer's diligence on glyphosate litigation risk when he "claimed that Bayer fully understood the 'risk and exposure' relating to glyphosate." PB 12 (quoting ¶ 219). As defendants have previously pointed out, however, Mr. Baumann was discussing "risk and exposure" from the "pending renewal of the [regulatory] glyphosate authorization in Europe" — not litigation liability. OB 9 n.3.[1] Plaintiffs do not even attempt to square their allegations with that context. *See Ikeda* v. *Baidu, Inc.*, 2021 WL 1299046, at *8 (N.D. Cal. Apr. 7, 2021) (dismissing falsity pleading as "illogical" because it "selectively ignore[d] . . . surrounding context" (internal quotation omitted)).

*Second*, plaintiffs point to an August 23, 2018 conference call where Mr. Baumann said, in response to an analyst's question concerning documents cited in the *Johnson* trial, "[a]ll I can say about this is that internal documents are sometimes cited out of context on the plaintiff's side." PB 13 (quoting ¶ 235). That statement does not imply that Bayer had reviewed non-public Monsanto communications as part of its pre-merger diligence. Indeed, during the same conference

---

[1] *See* Ex. 2 (S&P Global transcript of May 23, 2016 Bayer AG "M&A Call") at 13-14 ("At the same time, looking at political and regulatory environment and with that also coming to the topic of glyphosate and the pending renewal of the glyphosate authorization in Europe, yes, as you would expect us to do, we have looked at it. We do understand the risk and the exposure that does exist, also in different grades of potential renewal or nonrenewal").

call, Mr. Baumann disclosed that Bayer's access to Monsanto documents had been limited by a "hold separate" order required by the Department of Justice. *See* ¶ 245.[2]  By plaintiffs' own account, this disclosure informed the market that "previously, Bayer had only reviewed publicly available documents relating to Roundup in the due diligence process."  PB 6.  Having been explicitly told, per plaintiffs, that Bayer's diligence process did *not* include the review of internal Monsanto communications about glyphosate, investors could not have been misled.[3]

The other diligence-related statements cited in plaintiffs' brief have nothing to do with glyphosate at all — they address broad business topics like the "integrat[ion of] Monsanto from a business perspective," "sales and cost synergies," and Bayer's questions to Monsanto concerning the "value and the composition of [its] business."  PB 12 (quoting ¶¶ 97, 220, 224, 228).  Plaintiffs suggest that when defendants mentioned general diligence on these other topics, investors would have understood that to include a detailed review of decades of emails on glyphosate. *Id*.  Plaintiffs are not entitled to that implausible inference, which reflects a roundabout attempt to "bootstrap a claim for internal corporate mismanagement . . . by alleging that the corporation or its directors failed to disclose that mismanagement or breach." *Nathanson* v. *Polycom, Inc.*, 87 F. Supp. 3d 966, 977 (N.D. Cal. 2015).  *See Wochos,* 985 F.3d at 1193 (plaintiff alleging a "special or nuanced meaning that differs from what the literal words suggest" must plead adequate supporting facts).

According to plaintiffs, the sufficiency of these allegations is supported by three precedents — none from this Circuit or this decade. *See* PB 11-12 (citing *In re RAIT Fin. Tr. Sec. Litig.*, 2008

---

[2] Plaintiffs claim that Mr. Baumann misinterpreted the "hold separate" order, which they say provided mechanisms under which Bayer could have reviewed non-public Monsanto communications. *See* PB 13; ¶ 248 (suggesting that the government order did not bind Bayer because of provisions in its separate merger agreement with Monsanto).  Even if that were a fair interpretation, it would not support a claim for securities fraud, because plaintiffs have not alleged that Mr. Baumann's description of the public order was materially misleading.  Defendants identified this lack of materiality in their moving brief, OB 11 n.5; plaintiffs make no response.

[3] Nor did Mr. Baumann's statements during the August 2018 conference call mislead the market on whether Bayer reviewed Monsanto emails after the merger closed. *See* PB 13.  Mr. Baumann's comments that day were directed to documents in the public trial record, which he opined had been "taken out of context," and to the lack of Monsanto documents that would "qualify as [a] smoking gun."  ¶ 247.  The Complaint takes no position on whether Bayer reviewed the trial record, and it does not allege how Mr. Baumann's "smoking gun" characterization was false. *See* OB 14 n.6.

WL 5378164 (E.D. Pa. Dec. 22, 2008); *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354 (D.N.J. 1999); *Freedman* v. *Value Health, Inc.*, 958 F. Supp. 745 (D. Conn. 1997)). Those decisions only highlight what is missing from plaintiffs' pleading — unlike the Complaint, each featured explicit, false statements about specific diligence undertaken by a defendant. *RAIT* involved a real-estate firm that claimed its loans were sound because of "credit underwriting [that] involve[d] an extensive due diligence process." 2008 WL 5378164, at *5 n.12. The court held that to be a misrepresentation of the company's diligence based on pleadings that established a "complete deficiency" in the defendant's underwriting process, which lacked "any meaningful ongoing credit analysis whatsoever." *Id*. at *6. In *Cendant*, the defendants said they had followed their usual practice of vetting a target company's non-public accounting records. 60 F. Supp. 2d at 371. This was false because they had not, in fact, undertaken the promised review. *Id*. And in *Freedman*, the defendant said it had conducted a "full review" of a merger target's earnings potential, then admitted that it "blew it" and confessed "shortcomings" in revenue diligence. 958 F. Supp. at 757.

This is not *RAIT*, or *Cendant*, or *Freedman* — rather, it is akin to *NECA-IBEW Pension Trust Fund* v. *Bank of America Corp.*, which dealt with the fallout from a takeover of Countrywide Financial, where avowedly "extensive" diligence did not detect widespread misconduct. 2012 WL 3191860, at *19 (S.D.N.Y. Feb. 9, 2012), *report & recommendation adopted by* No. 10-CV-440-LAK-HBP (S.D.N.Y. Mar. 6, 2012), ECF No. 65. That was not enough to plead falsity, because the plaintiffs did not "allege that [Bank of America] did not actually perform due diligence in any of the [areas it specified], or that some specific departure was made from its stated due diligence protocol." *Id*. at *19. Rejecting the plaintiffs' hindsight pleading, the opinion concluded that, as here, "the fact that a due diligence investigation turned out to reach results that ultimately proved to be incorrect does not mean that a statement by a company that it had performed extensive due diligence was false at the time it was made." *Id*.

Moreover, because many of the statements challenged in the Complaint were subjective characterizations of Bayer's diligence process, plaintiffs must also overcome the heightened pleading standard that applies to statements of opinion. *See* ¶¶ 127, 245 (diligence was "customary" and "appropriate"); ¶¶ 227, 239 (merger process was "extensive[]" and "very

thorough and exhaustive"). To plead that these statements were actionably false, the Complaint either needs specific facts that show defendants "d[id] not honestly hold [those] beliefs," or else must "identify[] particular (and material) facts going to the basis for [their] opinion . . . whose omission ma[de] the opinion statement[s] at issue misleading to a reasonable person reading the statement[s] fairly and in context." *City of Dearborn*, 856 F.3d at 616 (internal quotation omitted).

Plaintiffs have not met this heavy burden. *See* OB 10. In opposing dismissal, they insist that because defendants did not review internal Monsanto documents about glyphosate, they "could not have fully believed" their opinions on Bayer's pre-merger diligence. PB 18. This implausibly assumes that defendants knew that Bayer's diligence could not be "extensive," "customary," or "appropriate" unless it included such document review. *See In re Bank of Am. Corp.*, 2012 WL 1352523, *6 (S.D.N.Y. 2012) (dismissing complaint for failure to allege with particularity that defendants disbelieved their description of pre-merger diligence as "extensive").

Finally, defendants' characterizations of Bayer's diligence are inactionable because they are immaterial puffery — another independent basis for dismissal. *See* OB 10 n.4. Plaintiffs' only response is that defendants' subjective descriptions were "capable of objective verification" and thus material. PB 19. They offer no explanation, however, as to how a characterization of diligence as "appropriate" or "extensive" could be objectively confirmed. Courts have repeatedly held otherwise on equivalent facts. *See Gavaldon* v. *Standard Chartered Bank Int'l (Am.) Ltd.*, 2020 WL 835311, at *7 & n.3 (S.D. Cal. Feb. 20, 2020) (description of diligence as "robust" was puffery because it "impl[ied] opinions or value judgments, not verifiable factual assertions"); *City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013) (characterization of pre-merger diligence as "detailed," "in-depth," and "extensive" was puffery). *See also In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *14 (9th Cir. June 16, 2021) (immaterial puffery where defendant described employer as having "very robust and strong privacy program" despite knowing about highly significant defects in its privacy controls).[4]

---

[4] Plaintiffs also suggest that defendants' opinions about and subjective descriptions of Bayer's diligence are actionable because they did not "rest on a meaningful inquiry" and because Bayer supposedly performed "no meaningful diligence." PB 18-19. But the Complaint acknowledges that defendants' views on the sufficiency of Bayer's diligence were informed by expert legal

**B.     The Complaint Does Not Plead False Statements About the Evidence on Glyphosate Safety.**

Plaintiffs barely try to salvage their claim that defendants mischaracterized the publicly available research on glyphosate. ¶ 131. As set out in defendants' opening brief, defendants' comments on the state of the science were well-supported statements of opinion. OB 11-14. In a single, perfunctory paragraph, plaintiffs argue that this is all a "red herring," because their actual theory is that "[d]efendants falsely represented to investors . . . that the scientific evidence *unequivocally* shows glyphosate is non-carcinogenic, when in fact there is considerable evidence going the other way." PB 15. Plaintiffs say this repeatedly in their brief, *see id.* at 1, 2, 6, 9, 15, but the facts are just the opposite. As the Complaint itself recognizes, defendants consistently spoke about the "weight of the scientific evidence" and the "conclusions of regulators around the world" — statements that (accurately) implied broad agreement among scientists and regulators, but not unanimity. *See, e.g.*, ¶¶ 252, 267 (collectively characterizing plaintiffs' comments on glyphosate research as statements "concerning the weight of the scientific evidence").[5]

While defendants never suggested that the research on glyphosate was unequivocal, they did highlight 800 scientific studies confirming the safety of glyphosate. Plaintiffs say this citation of favorable research was misleading for three reasons, none well-founded. *First*, plaintiffs assert that the safety studies cited by defendants were "unrelated to carcinogenicity." PB 15. Their only support for that, however, is a misreading of a public statement by Bayer explaining that such safety assessments "are not *limited* to carcinogenicity" but include "additional data" such as

advice, including four legal memoranda prepared by Bayer's legal counsel over the course of their diligence. *See* ¶ 185 (quoting an independent lawyer with specialization in mass-tort claims as having found that the diligence memoranda "deal[t] with the Roundup/ Glyphosate-Risks thoroughly and consistent with professional expectations and include[d] a fair assessment of the litigation risks associated with the Glyphosate-Litigation").

[5] Elsewhere in their briefing, plaintiffs selectively quote Mr. Baumann as saying there is "'no scientific evidence' to suggest 'any relation between the application of glyphosate-based herbicides . . . and the occurrence of cancer.'" PB 27-28. Mr. Baumann actually opined that "[t]here is no scientific evidence here that would lead to, let's say, a percentage-wise estimate of what that probability might look like" and that there were no studies identifying "any relation between the application of glyphosate-based herbicides on one side and the occurrence of cancer of people who have been using that." ¶ 130. Plaintiffs have not pleaded how either of these comments was false, nor that Mr. Baumann subjectively disbelieved them — indeed, the Complaint does not even include either in its kitchen-sink list of allegedly misleading statements. *See* ¶¶ 219-326.

toxicity. ¶ 175 (emphasis added). *Second*, plaintiffs contend that "many" of the studies supported the International Agency for Research on Cancer's (IARC) conclusion that glyphosate could be carcinogenic. PB 15. While the Complaint alleges that certain of the studies were discussed in the IARC's report, ¶ 23, it provides no basis to infer that any found glyphosate to be unsafe or carcinogenic.[6] *Third*, plaintiffs note that "629 of the 800 studies were conducted by Monsanto itself." PB 15. This is beside the point — private funding does not render a study unscientific.

Plaintiffs also return to an August 23, 2018 conference call in which Mr. Baumann, responding to an analyst's question, opined that "based on the studies that are out there, between the assessment of glyphosate as an active and then glyphosate-based formulations," the "data that is out there appears to be very, very consistent" and "so there is no difference." ¶ 250. Plaintiffs have not alleged or argued that Mr. Baumann subjectively disbelieved that opinion.[7] Instead, they claim that Mr. Baumann's comments in 2018 were contradicted by an internal Monsanto email exchange from 2002, which plaintiffs characterize as a concession that Roundup is "potentially more toxic than glyphosate alone." ¶ 251. As defendants have already explained, however, those emails do not contradict Mr. Baumann's characterization of glyphosate science, because they described the research on glyphosate-based formulations as having "no currency with regulatory or serious scientists" due to its reliance on "ad hoc non-standard, unvalidated models using unrealistic dose levels." Ex. 1 (Apr. 25, 2002 email from Donna Farmer to William Heydens) at 2; *see* OB 12-13. Regardless, Mr. Baumann was under no obligation to recite that Monsanto employees had expressed opinions on the topic of glyphosate formulations sixteen years prior — particularly since the Monsanto emails had already been widely reported in the press. *See* ¶ 109; *Ikeda*, 2021 WL 1299046, at *10 ("[T]he securities laws do not require the disclosure of publicly available information.").

---

[6] Notably, the IARC did not even attempt to "gaug[e] the carcinogenic effects from real-world human exposure;" instead, it limited its inquiry to whether glyphosate "is capable of causing cancer under some circumstances." *Hardeman* v. *Monsanto Co.*, 997 F.3d 941, 951 (9th Cir. 2021).

[7] *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015) ("Courts have repeatedly held publicly stated interpretations of the results of various clinical studies to be 'opinions' . . . ." (internal quotation and alteration omitted)).

**C.    The Complaint Does Not Plead False Statements About Bayer's Accounting for Glyphosate Legal Risks.**

Plaintiffs' claims of wide-ranging accounting fraud likewise fall flat.  To state a claim on that theory, they must specifically allege why Bayer's accounting determinations were wrong.  In addition, because Bayer's accounting assessments were statements of opinion that reflected a subjective exercise of management judgment about litigation risk, plaintiffs must also allege facts demonstrating that defendants subjectively disbelieved Bayer's accounting or omitted key facts going to its basis.  The Complaint alleges nothing like that.  OB 14-16.

Plaintiffs again stretch the facts beyond the breaking point in an unsuccessful effort to meet their pleading burden.  According to plaintiffs, fraud is pleaded because Bayer "made no provision or disclosure under [the relevant accounting guidelines] relating to the Roundup litigation at all" until June 2020.  PB 17.  This purportedly violated accounting guidance requiring Bayer to reserve for litigation liability that is "probable" and "reliab[ly] estima[ble]" and to disclose liability that is more than "remote[ly]" likely.  ¶¶ 202, 207.

Plaintiffs misstate Bayer's disclosures.  In fact, Bayer consistently reserved for anticipated defense costs associated with glyphosate lawsuits, while explaining that it had not reserved for potential liability for such litigation due to its inability to estimate damages or evaluate the likelihood of any loss.  *See, e.g.*, Ex. 6 (Bayer 2019 Annual Report) at 152, 215-17.  And Bayer's accounting disclosures included detailed information on glyphosate litigation in their discussion of the company's "material legal risks," accompanied by a warning that it was "possible that judgments or future settlements for such risks . . . could significantly affect [Bayer's] revenues and earnings" and an explanation that "[p]rovisions for litigations are established under certain conditions in the case of legal risks."  *Id.* at 152.  While plaintiffs insist that this is "not a disclosure of contingent liabilities," they have not pleaded — as they must — *why* it does not satisfy the accounting guidelines, contrary to the unqualified opinions of Bayer's outside auditors.[8]  Notably, plaintiffs' briefing on this point goes beyond the Complaint, which confines itself to vague

---

[8] *See In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 985-86 (N.D. Cal. 2007) ("[I]n light of the unqualified opinions issued [by the outside auditor] . . . the complaint fails to raise a plausible inference that the financial statements were misstated . . . .").

allegations that Bayer recorded "little or no provision for probable amounts owed to" glyphosate plaintiffs. *See, e.g.*, ¶¶ 273, 280, 297, 313.

Plaintiffs also argue that Bayer should have extrapolated an accounting reserve of "several billion dollars" by "May 2019 at the latest" based on Monsanto's losses in a pair of early trials, PB 16-17, and that its failure to do so is "wholly inconsistent with the reality that Bayer lost every single Roundup trial and appeal," *id.* at 3. This hindsight pleading flies in the face of clear precedent. In *Luna* v. *Marvell Technology Group Ltd.*, 2016 WL 5930655 (N.D. Cal. Oct. 12, 2016), for example, Judge Whyte dismissed an equivalent accounting-fraud claim brought against defendants who recorded no reserve pending the appeal of a $1.5 billion verdict. Although the *Luna* complaint had alleged that at least some liability was probable because the defendant issuer made "no meaningful arguments" on appeal against a portion of the judgment, the plaintiff's fraud claim was rejected because the accounting guidelines mandate a subjective, multi-factor analysis under which "the existence of an adverse judgment alone does not imply that a litigation loss is 'probable.'" *Id.* at *4, *5. The same logic applies with even greater force here, where plaintiffs insist that two adverse verdicts compelled the conclusion that tens of thousands of *other* jurors in *other* lawsuits would likely reach the same conclusion.[9]

Similarly, in *In re NVIDIA Corp. Securities Litigation*, 2010 WL 4117561 (N.D. Cal. Oct. 19, 2010), this Court rejected securities fraud claims against an issuer that had delayed a $200 million reserve for contingent liability arising from its defective products. Despite extensive confidential witness testimony, the Court granted dismissal because the plaintiff had not pleaded with the "great detail" required by the PSLRA that the defendants "knew a 'probable loss' could result" from the defect. *Id.* at *5. The Court also held that an accounting charge could not be reasonably estimated by multiplying the product defect rate against the number of products sold,

---

[9] Plaintiffs attempt to distinguish *Luna* because the plaintiff there supposedly did not "allege[ that] an economic outflow was probable" and because the defendant "had strong arguments on appeal." PB 16-17 n.4. In fact, the plaintiff in *Luna* specifically alleged that the defendants "were aware . . . that an adverse outcome [on a portion of the appeal] was probable," *Luna*, 2016 WL 5930655, at *4 (internal quotation omitted). And the decision did not turn on the strength of the defendants' appellate arguments, but rather the fact that litigation outcomes are unpredictable. *See id.* at *6 ("[P]laintiff does not explain why or how defendants should have known in advance that [the defendant issuer] would lose on these issues at the Federal Circuit.").

because plaintiffs had not alleged "what the known rate of defect was." *Id.* at *8. The same principles apply here, where the Complaint does not allege with particularity that defendants knew future litigation losses were probable, yet plaintiffs imply that total liability should have been estimated by multiplying damages from the early trials against the total number of pending cases.[10]

Unable to distinguish any of that authority, plaintiffs reach for a single, decades-old, pre-PSLRA decision, *In re Corning Inc. Securities Litigation*, 1997 WL 235122 (S.D.N.Y. May 7, 1997). While *Corning* involved facially similar claims — an allegation that defendants committed fraud by failing to reserve for mass-tort liability — it applied an unrecognizable pleading standard. Not only did the decision allow non-particularized pleading, it also applied the now-obsolete construction of Rule 12(b)(6) under which a complaint "should not be dismissed unless it appears clear that the plaintiff cannot prove . . . any set of facts which would entitle him to relief." *Id*. at *5. No wonder, then, that the court denied dismissal of "entirely general" allegations, even though they did not "begin to 'add up' to" the accounting charge proposed by the plaintiffs, on the bare logic that the complaint nevertheless indicated that a "serious liability problem was developing." *Id.* at *2, *5. Notably, nowhere in *Corning*'s limited legal analysis did the court even attempt to reconcile the plaintiff's allegations with accounting guidelines. The case thus has zero bearing here — and plaintiffs' attempt to rely on it only underscores the weakness of their legal theory.

Moreover, *Corning* does not speak to a further ground for dismissal: As plaintiffs recognize, accruals and disclosures of contingent liabilities are routinely held to be statements of opinion, and thus can support liability under Section 10(b) only where a complaint pleads subjective falsity or the omission of material underlying facts. *See, e.g.*, *Salim* v. *Mobile Telesystems PJSC*, 2021 WL 796088, at *8 (E.D.N.Y. Mar. 1, 2021) (holding that litigation accounting disclosures are statements of opinion); OB 15-16.[11] Plaintiffs' claims thus fail because they cannot identify any such allegations in the Complaint. *See* Point II, *infra*.

[10] Plaintiffs maintain that *NVIDIA* is inapposite because it involved contingent liability arising from product defects, not litigation. PB 17 n. 4. This argument goes nowhere; the same accounting rule governs both, and requires the same accounting determinations as to likelihood and estimability.

[11] While plaintiffs cite authority holding that accounting determinations are matters of opinion, *see In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *12 (C.D. Cal. Mar. 25, 2019), they also note that "whether or not [an auditor] employed [accounting] standards" is not an opinion. PB

## II.    THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER.

Plaintiffs' claims should also be dismissed because they do not adequately allege scienter. As detailed in defendant's opening papers, the Complaint presents no details on defendants' state of mind — and certainly not enough to establish that defendants' statements marked "an *extreme* departure from the standards of ordinary care . . . which present[ed] a danger of misleading [investors] that [was] either known to the defendant or [was] so *obvious* that the actor must have been aware of it." *Prodanova* v. *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (internal quotation omitted). *See* OB 16-21.

In opposing dismissal, plaintiffs offer no response at all on defendants' state of mind concerning glyphosate science, effectively abandoning that point. As for the rest of the statements challenged in the Complaint, plaintiffs lean on the bare assertion that defendants *must* have known Bayer's diligence was insufficient and its accounting faulty, because they held top positions at the company, the Monsanto transaction was important, and the glyphosate litigation soured so soon after the merger closed. This conclusory pleading does not satisfy the PSLRA — rather, it presents the type of fraud by hindsight that the statute was designed to eradicate. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999).

**Due diligence.** Plaintiffs still have not identified any plausible reason why defendants would have misrepresented Bayer's diligence and steered the company into what the Complaint paints as a calamitous acquisition. All plaintiffs have to offer on this count is that Bayer allegedly botched its diligence in a prior acquisition, that it believed it needed to acquire Monsanto to "remain[] competitive," and that Mr. Baumann "was focused on acquiring Monsanto." PB 20.[12] Of course, "[i]f scienter could be pleaded merely by alleging that officers and directors possess

---

19 (citing *In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009)). Here, plaintiffs have challenged defendants' certifications that, "[t]o the best of [their] knowledge," Bayer followed accounting guidelines. Ex. 4 (Bayer 2018 Annual Report) at 226. That is not analogous to an auditor's certification that it actually employed such guidelines.

[12] Plaintiffs also suggest that defendants had a motive to cut corners on the Monsanto acquisition because the possibility of a hostile takeover "threaten[ed] the positions of its chief executives." PB 1. This entrenchment theory has no basis in the Complaint — and plaintiffs cannot explain why anyone would have thought that sabotaging Bayer's diligence would safeguard his or her job.

motive . . . to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Lipton* v. *Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (internal quotation omitted). In any event, plaintiffs' theory of motive cannot explain why defendants would try to dupe investors about supposedly "obvious" glyphosate risks that were sure to blow up in short order, rather than considering and making judgments about those risks. Courts have repeatedly rejected fraud claims predicated on the notion that companies would neglect diligence to engage in such "suicide mission" acquisitions. *GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 244 (3d Cir. 2004); *see In re HP Sec. Litig.*, 2013 WL 6185529, at *6 (N.D. Cal. Nov. 26, 2013) (dismissing for lack of scienter where complaint "fail[ed] to establish any coherent motive as to why Defendants would knowingly purchase a company for several times its actual value"). The same result should follow here.

Despite striking out on motive, plaintiffs contend that they have nevertheless pleaded fraudulent intent by satisfying "nearly all of the factors identified by courts as supporting a strong inference of scienter in § 10(b) cases centering on merger due diligence." PB 21. To concoct this multi-factor test, however, plaintiffs recycle the same irrelevant decisions that they cited on the falsity element. These include: *In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008), which did not even involve misstatements about merger due diligence, *id.* at *6; *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354 (D.N.J. 1999), in which the defendants knowingly lied about having undertaken specific steps in diligence, hid known accounting irregularities, and ignored an explicit warning from their outside accountant about the falsity of accounting disclosures, *id.* at 371-72; and *Freedman* v. *Value Health, Inc.*, 958 F. Supp. 745 (D. Conn. 1997), a pre-PSLRA decision holding that scienter was pleaded because of highly suspicious stock sales and because "admissions that [defendants] 'blew it' and performed inadequate due diligence" demonstrated the type of "mere" recklessness that has been rejected as insufficient by the Ninth Circuit, *id.* at 755, 758. *See also* PB 21 (citing *Freudenberg* v. *E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 196-97 (S.D.N.Y. 2010), where scienter was pleaded for misstatements about loan diligence through the testimony of confidential witnesses who had directly informed the defendants

that challenged statements were false and who had attended meetings at which the defendants admitted knowledge of that falsity).

Once again, plaintiffs' cases show just how widely the Complaint misses the mark. For example, plaintiffs try to check off one of their "factors" by claiming that Mr. Baumann "admitted serious shortcomings in Bayer's due diligence" when he cited government restrictions on information-sharing. PB 21. But unlike plaintiffs' "we blew it" precedents, this was not an admission of flawed diligence at all — and Bayer has never said that its review should have included the document dragnet that plaintiffs now contend was needed to avoid Section 10 liability.

Drawing upon the same inapposite authority, plaintiffs also maintain that scienter should be inferred from the "huge disparity between [d]efendants' claim that Bayer had no exposure in the Monsanto litigation" and the $10.9 billion settlement, as well as the fact that the "fraud became apparent soon after the merger's completion." PB 22. Yet defendants never claimed that Bayer had "no exposure" in the glyphosate litigation. Rather, certain defendants opined — months *after* the merger closed — that while it was not feasible to reliably quantify the material risk presented by the litigation, they believed Monsanto would prevail based on the available scientific evidence. Though that prediction did not bear out, there is no inference of scienter to be drawn from the fact that the first jury verdict against Monsanto happened to come right after closing.

Lastly, plaintiffs say they have pleaded scienter with respect to statements about due diligence because the individual defendants "all held senior positions with a duty to monitor core business operations such as major acquisitions, and had the ability to direct the due diligence process." PB 21, 22 n.7. But the Ninth Circuit requires that plaintiffs pursuing this theory "go beyond a mere inference of management knowledge of all 'core operations'" and specifically plead "details about the defendants' access to information within the company." *S. Ferry LP, No. 2* v. *Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). Plaintiffs can point to no such details, because the Complaint confines itself to vague descriptions of the individual defendants' general participation in the transaction. *See* ¶¶ 334-40 (alleging without particularity that each individual defendant was "personally involved" with the acquisition). *Compare, e.g.*, *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) (holding "allegations that senior management . . . closely

reviewed the accounting numbers generated . . . each quarter . . . and that top executives had several meetings in which they discussed quarterly inventory numbers" were insufficient to establish scienter for inaccurate accounting disclosures).[13]  Even if this were enough to establish that defendants were versed in the nitty-gritty of diligence performed by Bayer's advisors, it would not support any inference that defendants knew — or believe today — that such diligence required a deep dive into Monsanto's past communications on glyphosate.  *See In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 999 (S.D. Ohio 2008) (no scienter for statement that company had conducted "extensive due diligence" where company retained diligence specialists).[14]

Notwithstanding plaintiffs' protestations to the contrary, the decision in *City of Austin Police Retirement System* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277 (S.D.N.Y. 2013), is thus illustrative.  In that case, the defendant CEO had falsely told the market that his company did "far more homework than one would typically see in a significant acquisition," but the court nevertheless dismissed a securities fraud claim for failure to plead with particularity that he "knew, or had reason to know, that [the company] had done materially less homework than was customary." *Id.* at 299-300.  So too here.  Even if defendants' statements about due diligence were inaccurate — and they were not — the Complaint contains no particularized facts showing that any defendant knew, or had reason to know, that Bayer's diligence was insufficient.

**Accounting for glyphosate legal risks.**  Plaintiffs have also failed to plead scienter for the individual defendants' accounting certifications.  Under this Circuit's law, a complaint alleging accounting fraud must present particularized facts "demonstrating that defendants knowingly and recklessly engaged in an improper accounting practice, for example, that a company's external

---

[13] *See also RAIT*, 2008 WL 5378164, at *13 (cited at PB 21) (scienter pleaded with respect to misstatements on issuer's credit risk where defendants met twice weekly to monitor credit risks and high-level confidential witnesses confirmed that defendants were aware of undisclosed risk).

[14] Because their own diligence "expert" did not opine that Bayer's diligence fell short, *see* ¶ 70, plaintiffs resort to allegations of "red flags" that purportedly obligated Bayer to undertake a massive pre-merger review of Monsanto emails.  Far from the "[i]n your face facts that cry out, 'how could defendants not have known'" required to plead scienter in this Circuit, *In re HP*, 2013 WL 6185529, at *6 (internal quotation omitted), plaintiffs' "red flags" have little connection to their theory of fraud.  *See* PB 20 (noting the size of the Monsanto merger, Monsanto's poor reputation, the existence of the IARC report, and the market's negative reaction to the merger).

auditors counseled against a practice or that a company's CFO was aware that the practice was improper." *Lloyd* v. *CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016). This requires allegations showing that "[d]efendants w[ere] aware of the relevant [accounting] principle," "how [it] was being interpreted," and that their "incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing." *May* v. *KushCo Holdings, Inc.*, 2020 WL 6587533, at *5 (C.D. Cal. Sept. 25, 2020).

The Complaint supplies none of that. Nor can it explain why defendants should have doubted their auditor's explicit approval of Bayer's glyphosate accounting. Even generalized auditor approval is "highly probative of an absence of scienter" where accounting violations are alleged. *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007); *see also Feola* v. *Cameron*, 2015 WL 12644566, at *8 (C.D. Cal. Nov. 24, 2015). Here, Bayer's independent auditor disclosed that it had *specifically* reviewed the company's accounting for legal risks like the glyphosate litigation and found it to be appropriate.[15] Plaintiffs insist, without citation, that it was extremely reckless for defendants to trust that guidance because "auditors are not experts in the intricacies or significance of legal defeats," PB 24 — never mind that defendants are themselves not alleged to be experts in those "intricacies" and that Bayer's auditors represented that their review was based on "experience from similar proceedings in the past." Ex. 4 (Bayer 2018 Annual Report) at 267; *see also id.* (disclosing that Bayer's litigation reserves were developed through the evaluation of its "[i]nternal and external legal counsel"); *Ikeda* v. *Baidu, Inc.*, 2021 WL 1299046, at *9 (N.D. Cal. Apr. 7, 2021) (dismissing securities fraud claim absent a showing that defendant "did not believe its own counsel's legal opinion").

In a final effort to convince the Court that defendants' faith in Bayer's expert advisors marked an extreme departure from ordinary care, plaintiffs contend that the Complaint pleads

---

[15] *See, e.g.*, Ex. 4 (Bayer 2018 Annual Report) at 267 (disclosing that Bayer's independent auditor "held regular discussions . . . with the Company's internal legal department in order to be informed about current developments and the reasons that led to the corresponding estimates," "obtained external attorney's certificates, which [it] compared with the risk assessment made by Management" about the litigation, and then "critically assessed the assumptions underlying the provisions for expected defense costs and checked the amount of the provisions for plausibility on the basis of experience from similar proceedings in the past and on other evidence").

scienter because Monsanto's glyphosate liability proved to be large and the relevant accounting guidelines "are relatively straightforward." PB 23-24. This is pure hindsight pleading. In any event, as the Ninth Circuit has observed in the related context of goodwill accounting, the magnitude of an alleged accounting misstatement does not "alone establish[] a strong inference of scienter or contribute[] strongly to such an inference." *City of Dearborn*, 856 F.3d at 622; *see also Thomas* v. *Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016) (cited at PB 24) ("[A]llegations regarding the nature and magnitude of the alleged accounting violations will rarely be enough by themselves to show scienter."). And plaintiffs themselves claim that the accounting determination here was so "intrica[te]" that it eluded the grasp of expert accountants, let alone business executives like defendants. PB 24.

## III.    THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION.

Plaintiffs' claims should also be dismissed for failure to plead loss causation, which requires particularized allegations tying investor losses to "the very facts" about which defendants allegedly misled the public. *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021). As the Ninth Circuit recently reiterated, this standard cannot be met through "general allegations, which lump together the effects of various" purported misrepresentations. *Irving Firemen's Relief & Ret. Fund* v. *Uber Techs., Inc.*, 998 F.3d 397, 408 (9th Cir. 2021). Yet that is precisely how plaintiffs have pleaded and briefed the issue, claiming that a news report, three adverse trial outcomes, and two announcements about a proposed settlement each served as a corrective disclosure and a materialization of risk concerning "[d]efendants' fraud" generally. PB 25-26. Plaintiffs still have not linked any of those events to defendants' alleged misstatements about diligence, glyphosate science, and legal-risk accounting.

**CBS News report.** The June 2018 CBS News report was not a corrective disclosure, because the "new" information it purportedly revealed had become public knowledge more than a year earlier, through the public release of the "Monsanto Papers." *See* OB 21-22. According to plaintiffs, that prior revelation was mooted by defendants' "false statements affirming their due diligence and suggesting the Monsanto Papers had no effect" on Monsanto's litigation exposure. PB 26. But the Complaint does not allege any such false statements. Indeed, the Complaint does

not present *any* statement by *any* defendant addressing the Monsanto Papers before the CBS News report aired.  Plaintiffs alternately suggest that CBS News "assembled for the first time several critical facts" about Monsanto's litigation risk, "most importantly that the judge . . . had rejected Monsanto's argument that Plaintiffs' scientific evidence was junk."  PB 26.  The Complaint does not even mention this "most important[]" fact, let alone plead that it "first" became public via CBS News — nor could it so plead, since the pre-trial decisions in the litigation were public knowledge. *See* Pls.' Request for Consideration and Judicial Notice at 2 (seeking notice of the CBS News report because it "discusse[d] matters of public record").[16]

   **Adverse glyphosate decisions.**  Plaintiffs also fail to plead that adverse litigation outcomes in two early glyphosate trials were corrective disclosures, because none of them revealed anything about Bayer's pre-merger diligence, glyphosate science, or the appropriateness of Bayer's prior accounting determinations.  OB 22-23.  Both trials were public and both were intensely covered in the press.  *See* ¶ 112.  Accordingly, as plaintiffs acknowledge, the only new information revealed by each judgment was how the jury or the court had weighed "whether there was evidence that was sufficiently credible to support a jury verdict" against Monsanto.  PB 27.  That is not enough to plead a corrective disclosure, as plaintiffs' own lead authority on loss causation makes clear.  *See Cambridge Ret. Sys.* v. *Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 969-70 & n.18 (cited at PB 28)  (E.D. Va. 2020) (holding that an adverse jury verdict did *not* unmask fraud because it "contained minimal factual findings," and a subsequent court opinion was a corrective disclosure because it "revealed new, previously undisclosed facts" about the defendant's misconduct). Because the Complaint does not allege that defendants misled the public as to the mental processes

---

[16] If the Court concludes that the stock drop following the CBS News report is enough to plead loss causation, then it should dismiss plaintiffs' claims directed to pre-July 2018 statements as untimely under the Exchange Act's two-year statute of limitations.  *See* OB 22 n.10 (citing 28 U.S.C. § 1658(b)(1)).  Plaintiffs respond that the news report may not have "reveal[ed] the full scope of the defendants' [alleged] fraud in one fell swoop."  PB 26 n.12.  The question, however, is not whether defendants' supposed fraud was "full[y]" revealed, but whether after the news report "a plaintiff [could have] adequately plead[ed] his claim" based on the facts reasonably available to him.  *Knox* v. *Yingli Green Energy Holding Co. Ltd.*, 2016 WL 6609210, at *7 (C.D. Cal. May 10, 2016) (holding that "[i]f the market learned of the fraud . . . so too would a reasonably diligent investor").

of judges and jurors, it cannot plead loss causation based on how those individuals interpreted the public record.[17]

For the same reason, the Complaint does not plead that the glyphosate trial outcomes were the materialization of a risk that was concealed by defendants' alleged misstatements. Straining to explain how Bayer could have "concealed" the danger of losses in litigation that it publicly disclosed as a material legal risk, plaintiffs claim that defendants "on numerous occasions assured investors the cases were meritless and that they would prevail at trial." PB 27. This argument has no bearing on the August 10, 2018 verdict in *Johnson*, because the Complaint alleges no statement about the glyphosate litigation by any defendant prior to that date. And the supposed post-*Johnson* "assurances" cited by plaintiffs were accurate statements of defendants' opinions concerning the science on glyphosate. *See* Point I, *supra*. None of those statements concealed the obvious risk that the courts might interpret trial evidence differently.

**Glyphosate settlement.** As set out in defendants' moving papers, the June 2020 announcements concerning Bayer's potential $10.9 billion settlement of glyphosate claims were neither corrective disclosures (because they did not reveal the falsity of any prior statement) nor the materialization of undisclosed risk (because Bayer had consistently disclosed the material legal risk posed by glyphosate litigation). OB 23-24. Aside from vague generalities about the sufficiency of their pleading, plaintiffs address these settlement-related disclosures only once, in a footnote, where they reiterate their belief that Bayer did not disclose glyphosate litigation as a contingent liability. PB 25 n.11. That argument is premised on a misreading of Bayer's accounting disclosures, *see* Point I.C, *supra*, and thus cannot support loss causation.

---

[17] Plaintiffs suggest that post-verdict stock drops are nevertheless sufficient to plead loss causation based on two precedents, *Hall* v. *Johnson & Johnson*, 2019 WL 7207491 (D.N.J. Dec. 27, 2019), and *Special Situations Fund III, L.P.* v. *Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227 (D. Mass. 2011). Neither decision supports plaintiffs' position, and neither even applied the particularized pleading standard adopted in this Circuit. *See Hall*, 2019 WL 7207491, at *27 n.8 (holding that "[t]o the extent [a] jury verdict or documents publicly released during the lawsuit *contained new information* regarding the association between asbestos and ovarian cancer . . . — revealing the alleged falsity of Defendants' assertions to the contrary — the jury verdict *may* have been a corrective disclosure" (emphasis added)); *Special Situations*, 775 F. Supp. 2d at 245 (not addressing the question whether the market's knowledge of trial evidence undermined the plaintiffs' argument that a post-verdict market reaction established loss causation).

**IV.    THE COMPLAINT DOES NOT PLEAD A VIOLATION OF SECTION 20(A).**

Because plaintiffs have failed to state a claim under Section 10(b), their Section 20(a) claims must also be dismissed.  OB 24.

**CONCLUSION**

The Court should dismiss the Complaint with prejudice for the reasons stated above and in defendants' opening papers.

Dated:    June 21, 2021

By:    ___/s/ Jordan Eth_____
Jordan Eth (CA SBN 121617)
JEth@mofo.com
Mark R.S. Foster (CA SBN 223682)
MFoster@mofo.com
**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, CA  94105
Telephone:  (415) 268-7126
Facsimile:  (415) 268-7522

William Savitt (*pro hac vice*)
John F. Lynch (*pro hac vice*)
Noah B. Yavitz (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for defendants Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl*