Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, CHIEF JUDGE

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually And as Lead Plaintiffs on behalf Of all others similarly situated, And INTERNATONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all Others similarly situated,<br><br>          Plaintiffs,<br>   VS.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>          Defendants.<br>_____ | NO. 20-cv-04737-RS<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>San Francisco, California<br>Friday, October 15, 2021 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:  (By Zoom Webinar)

For Plaintiffs:

          COHEN MILSTEIN SELLERS & TOLL PLLC
          88 Pine Street
          14th Floor
          New York, New York  10005
      **BY:  JOEL P. LAITMAN, ESQ.**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

    (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Plaintiffs:

    COHEN MILSTEIN SELLERS & TOLL PLLC
    190 South LaSalle Street
    Suite 1705
    Chicago, Illinois  60603
  **BY:  CAROL V. GILDEN, ESQ.**

For Defendants:

    WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
    New York, New York 10019
  **BY:  JOHN F. LYNCH, ESQ.**
    **WILLIAM SAVITT, ESQ.**
    **NOAH B. YAVITZ, ESQ.**


    MORRISON & FOERSTER LLP
    425 Market Street
    San Francisco, California  94105
  **BY:  JORDAN ETH, ESQ.**

Also Present:

    **MARK WALTERS, ESQ.**

**Friday - October 15, 2021**                                **11:05 a.m.**

                    **P R O C E E D I N G S**

          **THE COURTROOM DEPUTY:**  Calling Case 20-cv-4737, City of Grand Rapids General Retirement System versus Bayer.

     Counsel, please state your appearances.

          **THE COURTROOM DEPUTY:**

          **MS. GILDEN:**  Yes.  Good morning, Your Honor.  Carol Gilden of Cohen Milstein Sellers and Toll, on behalf of the lead plaintiffs, Sheet Metal Workers National Pension Fund and the Teamsters Local 710 Pension Fund.

          **THE COURT:**  Good morning.

          **MR. LYNCH:**  Good morning, Your Honor.  John Lynch from Wachtel, Lipton, Rosen & Katz, along with my colleagues Bill Savitt and Noah Yavitz, and Jordan Eth of Morrison and Forester, here on behalf of defendants Bayer AG and the individual defendants.

     We also have, Your Honor, Mark Walters of the Bayer in-house legal department joining us in the virtual gallery.

          **THE COURT:**  Good morning.

          **MR. LAITMAN:**  Your Honor, excuse me.

          **THE COURT:**  Go ahead.

          **MR. LAITMAN:**  My name is Joel Laitman, also with the Cohen Milstein firm, representing the plaintiffs.  And I will be arguing.

          **THE COURT:**  Good morning.

**MR. LAITMAN:**  Good morning.

**THE COURT:**  All right, so another PSLRA case.  And we're discussing the motion to dismiss.

I have read through the papers and I think have a handle on what you are arguing, but why don't we go ahead and start with the moving party.  And that's -- Mr. Lynch, are you going to be speaking?

Go ahead.

**MR. LYNCH:**  I will, Your Honor.  Thank you very much.

Your Honor, the complaint in this case, as we have argued in our papers, fails to plead a claim of securities fraud for three independent reasons.  That's the failure to plead with particularity either the elements of falsity, scienter, or loss causation.  Each of these failures requires dismissal of the complaint.

The case involves three categories of statements that plaintiffs challenge as false in the wake of adverse results that Monsanto suffered in litigation.  Litigation concerning Monsanto's Roundup product.

The three categories are statements relating to the due diligence that Bayer conducted on the Monsanto acquisition, statements about the evidence or lack thereof connecting Roundup or glyphosate to cancer, and statements about Bayer's accounting for Roundup litigation risks.

I propose to discuss those in turn, and discuss the

failure --

**THE COURT:**  You know, not to short-circuit you, but as I said, I have read through your papers.  So what I'm sort of looking for is if you want to highlight some things.  You don't have to go through -- I understand that it's due diligence, glyphosate safety, accounting for risk of litigation loss.  So, I know those are your arguments.

So if you want to just tell me, you know:  Really, this is the -- you know, the flagship of the fleet here kind of thing, rather than giving me everything you gave me in the briefs.

**MR. LYNCH:**  Sure, Your Honor.

The -- the plaintiffs' principal claim relates to due diligence that Bayer conducted in the lead-up to the Monsanto acquisition.  They cite in their complaint dozens of statements issued both before and after the Monsanto merger closed, and before and after the first jury trial -- jury verdict was handed down in the *Johnson* case before Judge Chhabria.

**THE COURT:**  Right.

**MR. LYNCH:**  The claims before the closing and before the *Johnson* verdict came down don't say anything at all about glyphosate -- diligence on glyphosate litigation risks.  There's one statement they point to and sort of quote selectively to suggest it has to do with litigation risk.  Instead, it relates to political and regulatory risks involving renewal of the glyphosate license in Europe.  Can't

be the basis of a false statement.

After the *Johnson* verdict comes down, there's a handful of statements describing Bayer's diligence before the closing as adequate, extensive, diligent.  And Bayer -- I'm sorry, the plaintiffs --

**THE COURT:**  These are all primarily Mr. Baumann's statements?

**MR. LYNCH:**  They are primarily Mr. Baumann's statements, that's correct, the CEO.  Those statements are opinion statements.  Those statements are inactionable puffery, as the cases hold.

The plaintiffs read them all as --

**THE COURT:**  Isn't there a fundamental difference, though, between -- I mean, classic puffery statements are "We've got the best product in the world, it's fantastic, and it's going to light up the marketplace."  As opposed to "We did our" -- "Our due diligence was rigorous and thorough."

I mean, that's not a kind of -- that's not puffery.  Is it?

**MR. LYNCH:**  Your Honor, the -- it's -- not in this circuit.  Judge Engelmayer in New York, in the *Kinross* case, described it as puffery.

Cases are fairly consistent that those kinds of qualitative statements are protected opinion statements.  There are no well-pleaded allegations to suggest that any --

**THE COURT:** So would it be almost -- is it your position you would have to have -- if you're arguing about due diligence and the inadequacy or the misrepresentations about due diligence, you'd need something like: "Well, we looked at -- on such and such a date we looked at these documents," and in fact, they didn't?

Is that the -- does it have to reach that level? Or anything below that is that puffery?

**MR. LYNCH:** Um, the --

**THE COURT:** I guess what I'm trying to get at is it seems to me that there's a bit of a difference, and I don't -- Judge Engelmayer in -- is that the Southern District of New York?

**MR. LYNCH:** Correct.

**THE COURT:** I'm sure, you know, as he would be the first -- or she -- would be the first to acknowledge, that's only as good as its persuasive value. It's another district court, even out of circuit, saying things. And I'm sure it's a fine decision.

But, you know, in my mind, due diligence is making any representations about the degree of your diligence is, is just different than, as my question sort of indicated, statements about, you know, general activities and how things are going to go, and qualitative statements about your products. I mean, don't you think there's a difference?

Due diligence is a quite specific thing.  You know:  Did you do a robust due diligence or not?  And it isn't -- if you represent that you did, and the argument is you didn't, saying that's puffery is really kind of tough, I think.

MR. LYNCH:  Your Honor, I'm happy to move beyond puffery.

THE COURT:  All right.  Go ahead.

MR. LYNCH:  I would cite to Your Honor Chief Judge Burns's decision in the *Gavaldon* case against Standard Charter Bank, citing the *Kinross* decision from New York, and treating statements about a bank's robust due diligence as puffery because it implied an opinion or value judgment, and not a verifiable factual assertion.

But on opinion, which I think I'll agree is a stronger point, there are cases describing statements on due diligence as protected opinion statements.  And to cut to the chase, there are no well-pleaded allegations that anyone disbelieved Bayer's statements about either the appropriate or -- or extensive due diligence that was conducted on Monsanto before the deal closed.

Skipping to the highlights, Your Honor, the -- I think the -- the claim about due diligence highlights the pure hindsight nature of the plaintiffs' case here.  And it proceeds from adverse jury verdicts which cause -- which led to losses on Bayer ADR stock price.

It was reported that juries reacted unfavorably to internal documents that were produced at trial.  And so in the wake of that, plaintiffs go back and say that -- and try to interpret defendants' statements as communicating to the market that no stone was left unturned, which defendants didn't say. That the -- that Bayer folks had followed best practices and due diligence, which the Bayer folks didn't say.  And indeed, that Bayer -- that those best practices would be understood by the market to -- to include a review of Monsanto's internal correspondence on glyphosate.  Defendants did not say that, either.

**THE COURT:**  On this hindsight notion, though, you are sort of suggesting that:  Well, nobody knew that a jury was going to conclude in favor of the plaintiff and against Monsanto, and so therefore, it's hindsight to now be looking at what we now know is the conclusion of the jury.

But, but the plaintiffs are saying, um, you could almost take the jury out of it, and say: We think these materials -- which apparently also -- documents and the like, which also may have affected and influenced the jury, it may have, but they -- even if the jury never had been impaneled, we think those materials are -- those documents are defective in the sense that they constitute misrepresentations.

I mean, it's not -- in other words, why is -- I don't think the fact that we have the jury determination makes it a

hindsight case, because the jury decided -- the plaintiffs are going to rise or fall on whether or not the representations they have identified at the time they were made are misrepresentations.

So, why does it become a hindsight case because the jury was persuaded that these -- inferentially, that these were misrepresentations?

**MR. LYNCH:** The --

**THE COURT:** It may not have been a fair question. I don't know if you followed my question. But I -- if -- let me rephrase it.

**MR. LYNCH:** Sure.

**THE COURT:** If I'm understanding you correctly, you're saying that the reason we should view this as an improper hindsight case is because we're only -- the plaintiffs are only in a position to bring this because a jury verdict ended up concluding contrary to Monsanto. And we didn't know that, at the time all of these statements were made.

Is that fair? Is that what you're saying is why this is a hindsight case?

**MR. LYNCH:** That's fair, Your Honor.

**THE COURT:** Okay. So if the plaintiffs come back and they say: Well, let's just forget the jury was ever there, we are identifying documents and statements that we say are

misrepresentations, and they're either right or they're wrong. But why is it a hindsight case?

**MR. LYNCH:**  Um, Your Honor, the -- I think, Your Honor, it's fairly comparable to your decision in the *Bruce* case against -- rather, in the *Lake against Zogenix* case, where there was the -- if you remember, there was a claim about FDA submissions, and the -- it was a 505(b) submission.

**THE COURT:**  Uh-huh.

**MR. LYNCH:**  And the FDA rejected it initially.  And the plaintiffs claimed:  Oh, well, when you told us it was a 505(b) submission, you should have told us that, that you -- that you didn't submit this previous literature that the market would have thought was included in the submission.  And Your Honor rejected that claim as an impermissible pleading of fraud by hindsight.  I think this is a very comparable situation to that.

But, happy to move on from that point, Your Honor, and just reiterate there's been no particularized pleading of any -- anyone at Bayer who subjectively disbelieved the statements about adequate due diligence or extensive due diligence.  We have cited, going back to the Southern District of New York, the *Bank of America* situation, where -- where those -- the same kind of claims about -- or claims that there were false statements about -- about extensive due diligence were -- were

-- were attacked as fraudulent in the wake of adverse litigation, regulatory events that occurred with respect to Countrywide.  And those claims, likewise, were rejected as impermissible fraud by hindsight.

**THE COURT:**  I know you've got a scienter argument, you've got a loss-causation argument.

**MR. LYNCH:**  We do, Your Honor, and --

**THE COURT:**  Go ahead.

**MR. LYNCH:**  -- obviously, both elements require a pleading of particularity.  We submit, Your Honor, that the plaintiffs have not pleaded either scienter or loss causation with particularity with respect to either the statements about due diligence, the statements about glyphosate safety, or the statements about accounting for litigation risk.

**THE COURT:**  Let me ask you a procedure question. Despite the fact that I have been doing this for a long time, now, I really don't have a good handle on it to be candid with you.

Let's assume for a moment that I determine, let's say, on the falsity question, that there is -- and this is only for purposes of discussion, so don't assume this is what I've decided.  But, that there are averments that support the adequacy of the due diligence argument.  But there's not sufficient -- the pleadings don't support the idea that there -- that there was sufficient pleading with respect to the

falsity on the glyphosate safety.

If the Court makes that determination, is the answer that the motion to dismiss is granted with leave to amend?  Or is it that it is denied, but the claim will not include the -- or there's an opportunity -- I guess it's granted in part and denied in part, because the plaintiffs then could come back and try to fix the inadequate claims on the aspect of the claim which I've found deficient.

You understand -- let's say you're claiming false statements, as you've got three categories.  If I think some of the categories are satisfied, but not, is that just procedurally a grant the motion as to the inadequacy with respect to those claims, and then if they think those claims should still go forward, they have to amend?

How, procedurally, would you suggest the Court should operate?

**MR. LYNCH:**  Your Honor, I have to start by saying we don't believe the complaint --

**THE COURT:**  No, no, and I -- you know, I guessed you would say that.

**MR. LYNCH:**  Yes.

**THE COURT:**  And that's fine.  You have a right, you reserve that.  That's good.  But then, go to my question.

**MR. LYNCH:**  Your Honor, I believe the result there would be a -- a grant in part, and a denial in part.  The

claim to which the motion was denied would be permitted to go forward.

I presume the plaintiffs --

**THE COURT:**  Because, you know, the reason I wrestle with this is, in a sense, if you read the rule, if there is any part of the claim -- this is a 10(b) claim.  If there's any part of the 10(b) claim that is adequate, in a sense the motion is -- you just deny the motion.  It may not be that they could prevail on certain aspects of the claim, going forward, but they have a viable claim.  At the same time, if the determination is that there are -- that certain aspects of the claim are inadequate, that should be -- you know, should be ventilated early in the case.

And I'm just -- it's not -- this isn't the only case I've wondered, just procedurally, how you slice and dice it at a motion to dismiss.

But, that's fine.  I understand you may not -- it's -- it's not the major part of this motion.  It's just something I was wondering if you had a view on, procedurally, how to go about it.  But -- and you've answered it for me.  So --

**MR. LYNCH:**  I didn't catch the very last part, Your Honor.

**THE COURT:**  No, I said I think you've said what you think --

**MR. LYNCH:**  I think it's consistent with the practice

and decisions on motions to dismiss where the courts find aspects of the complaint sufficiently pleaded, that those are -- that that's the way it rolls.

THE COURT:  Okay.  All right.  Let me -- I'll come back to you, Mr. Lynch.

But let's start with you, Mr. Laitman.

MR. LAITMAN:  Yeah.  Your, Honor let me first deal with the due diligence.  In this particular complaint and the actual statements, what distinguishes this complaint is that as *Omnicare*, the Supreme Court has held, is what's important before you even get to the misrepresentations is what is the well-pled factual context?

And the context of the due diligence statements in this case is that you have Monsanto.  Its principal -- the argument of defendants is essentially:  How would any investor ever assume that the due diligence statements would have included actually looking at the Monsanto documents?

In this case, the well-pled context is, of course, every investor would have assumed that, because the main distinguishing characteristics of Monsanto over the prior 90 years was massive toxic tort liability, in terms of PCBs, DDT, dioxin, Agent Orange.

And as we pled in Paragraph 76, it is the revelation in the files of Monsanto about PCBs in 76 -- but it happened in all of these cases -- that triggered these massive,

100 million-dollar toxic tort settlement liabilities.  So --

THE COURT:  But isn't -- in terms of the actual representations being made, due diligence isn't somehow the exception to the rule.  If you're saying that there were misrepresentations with respect to the degree of due diligence that was -- that have been applied here, you have to identify the statements.

Just the fact -- the simple fact that the context in which this arises is, as you say, history of huge exposure because of the nature of some of what's going on here, you still need to identify, you know:  We did our due diligence, and we did it robustly.

MR. LAITMAN:  Yeah.

THE COURT:  Or whatever.

MR. LAITMAN:  So it's worth actually looking at the specific.

In the first period, from May, 2016, to September, 2016, when they were actually doing the due diligence, what they said is:  We confirmed -- confirmed -- 1.5 billion in cost savings and revenue benefits.

No reasonable investor, given the history of Monsanto -- and by the way, Roundup and glyphosate were the core driver of Monsanto revenue and profitability.  So no investor would have thought:  Oh, they're confirming and actually quantifying 1.5 billion in synergies and revenue benefits over the short

term, but they're not looking at the -- they're only looking on public documents with respect to Roundup.

And by the way, as Your Honor well knows from your own decisions, the opinion argument falls completely because *Omnicare*, the Supreme Court created an omission exception to showing subjective knowledge of falsity.  And that is, if there is an embedded fact in the due diligence statements that is not disclosed, that is material -- and in this case it's the non-examination of the key documents that would have exposed the risk from these cases -- that embedded fact satisfies *Omnicare* and satisfies the -- the argument, dispels the argument that this is a non-actionable opinion.

But it's --

**THE COURT:**  What do you -- what's your response to the Southern District of New York case that Mr. Lynch is presenting?

**MR. LAITMAN:**  Well, the case that I know that he's referring to primarily in the briefing, and he mentioned the *Bank of America* case in terms of --

**THE COURT:**  I'm thinking of the other one, Judge Engelmayer's case, that he says says that the due diligence representations are really puffery.

**MR. LAITMAN:**  Okay.  Because as Your Honor said, the Ninth Circuit in *Alphabet* said puffery are good -- good moniker statements.  "We're a well-regarded company.  We take

this seriously."

Here, and it's worth actually going beyond -- they quantify 1.5 million -- a due diligence that confirmed 1.5 million.  But more than that, actually, more than that, what they do after the Monsanto papers come out -- and by the way, this is a critical context point of view.  The due diligence statements happened over time.

So they -- there were the initial statements which were very specific --

(Phone rings)

**MR. LAITMAN:**  I apologize, Your Honor.  Let me...

There were the initial statements, and then the Monsanto papers came out in March of 2017.  And defendants began to be asked at their annual meetings and in their conference calls: Have you done due diligence?

What is their response?  They said:  Yes.  And there's -- the specificity is that:  Remember Merck?  We did a much better job in due diligence than we did in Merck.  That's not a puffery statement.  They're going into the qualitative nature of the due diligence in a way that isn't a good, a good -- a feel-good moniker of performance.

And, the same with respect to defendant Wennings (sic). At each of the annual meetings, following the release of the Monsanto papers, they say: We have done this exhaustive due diligence.  So the context is critically important for the due

diligence.

A, on their face, quantification of dollars and cents that you have done in due diligence, and then the qualitative nature of the due diligence compared to other due diligence you did with respect to other are not, on their face, puffery.

However, particularly in the context of post-*Monsanto*, they're making affirmative statements to assure the market that:  We have done everything.  And we know there's an embedded fact, an embedded fact which is not disclosed to investors.  Which is:  They never looked at the internal documents that the -- that all the juries ultimately saw that disclosed -- that disclosed the high-risk nature of the Roundup litigation.

Because it showed, just like in *PCBs*, that there were all these internal reports of scientists, their own scientists, who said: You know what?  The Roundup, the formulated version of Roundup is highly toxic.  When they got that back from that -- Dr. Parry, they fired him.  No investor knew anything about that.

In terms of the safety, and I know Your Honor --

**THE COURT:**  The glyphosate safety, go ahead.

**MR. LAITMAN:**  Safety.  As Your Honor is aware, in the Ninth Circuit in *Schueneman*, there -- the misrepresentations and omissions in this case that -- we allege both.

The omissions is once you start -- under *Schueneman*, the

Ninth Circuit decision in *Schueneman*, once you start to speak on a subject, then you have to be fully truthful.  And every single public filing, beginning in August, 2018, after the verdict, they are giving these unequivocal statements about the 800 studies.

Now, Your Honor, materiality is a fact-intensive issue that is never generally resolved on a motion to dismiss, anyway.  But this complaint is unusual, because you don't have to rely on plaintiffs as to the materiality.

When the -- when it comes out that they never -- when you get to 2019 and 2020 annual meetings, investors at those meetings are raising their hand and saying: What is it?  Are there 800 studies that demonstrate there's no carcinogeniety?

And it's only at that point, the very end of the class period, that we learn for the first time that they're gobbing in the 629 Monsanto-paid-for studies.  They're globbing in all of the safety assessments, the impact of glyphosate on skin, and so forth.

So on a motion to dismiss -- and by the way, this 800 -- the reference to the 800 studies and the reference to there's no difference between the formulated version and the Roundup version, which -- defendants annexed this email which, if you read it carefully, confirms, back in 2002, the head of product safety, William Heydens, is saying: We have a problem with surfactant.  Which is the formulated version, which is Roundup.

And so in terms of materiality of the safety and the 800 studies, it's highly material because they bothered -- under *Schueneman*, they bothered to affirmatively tout those purported positive facts, and they omitted very specific --

THE COURT:  Okay.

MR. LAITMAN:  And there's one other thing, Your Honor, if you would allow me.  I'll stop if you would prefer --

THE COURT:  Well, what I would like you to do now is the third prong, as I understand it, of the falsity presentation is the accounting for risk of litigation loss.

MR. LAITMAN:  Okay.

THE COURT:  But --

MR. LAITMAN:  There are three specific requirements under the international accounting principles that Bayer was bound to apply.  And we allege them specifically in the complaint.

The first is taking a provision for a contingent liability.  The provision is it's got to be more than 50 percent, it's got to be probable that there will be an outflow of money from that contingent liability.  That's the first prong.

In this case, their position is even in May of 2013, after they lost three jury trials, bellwether trials that are representative of thousands of others, even after they've lost

motions to overturn, JNOV motions to overturn the trial verdicts, even after all of those losses -- and we delineate each legal loss.  So 100 percent losses, their position on the accounting is it's less than 50 percent probable that there'll be an outflow.

What makes that position of 100 percent legal losses versus less than 50 percent probability of economic outflow even more outrageous is that in between the time that they signed the merger agreement, not the final -- in 2016, not the final merger which was in June of 2018, but from the -- when they signed the initial merger, there were 120 cases.  By the time they take over the financial statements and start reporting, they have 13,000 cases.

So you have two --

**THE COURT:**  But isn't it -- I mean, you're saying they're making material misrepresentations with respect to accounting risk.  Isn't it just as likely that they just are wrong?

They -- they -- you know, I know that -- one of these trials went on down the hall from me.  You know, they vigorously opposed -- "they" being Monsanto -- vigorously defended those cases.  Now, they didn't turn out as they wanted them to turn out.

But why, at the time they made their statements with respect to accounting for litigation loss, isn't it just as

possible they were profoundly wrong, rather than knowingly false?

**MR. LAITMAN:**  Um, the reason -- and this is also detailed in the pleading -- why the scienter is established is because --

**THE COURT:**  Yes.

**MR. LAITMAN:**  -- in their own annual reports, they have a paragraph that says when, as a matter of policy, we take a provision for litigation.  And the answer is we take it when there's a judgment.

There were three judgments in this case.  There were three judg- -- so they're going against their own policy to not disclose the -- to not take the provision that they were obligated under their own policy to take.

But even more -- but actually, even more compelling is that instead of doing the right thing, what the standards require, of actually doing what their policy said, they filled the financial statements with these misleading statements about the 800 studies of safety and so forth.

So -- and this is an instance not where you just have a mistake, a massive mistake, you have a 100 percent versus the 50, but in addition, you have the very unusual situation, go against your own policy, and you fill the financial statements with your misleading safety, unequivocal regulatory successes. So there's affirmative actions in addition to just the

accounting error.

And, I think that's what makes this a very, very unusual, --

**THE COURT:**  Okay.

**MR. LAITMAN:**  -- unusual case.

**THE COURT:**  My own little sort of esoteric point, if you could comment on it, that I asked Mr. Lynch, if I conclude in your umbrella a 10(b) claim, that there -- that, you know, you've satisfied -- well, any of these elements, falsity, scienter, loss causation.  If I find some of them you have and some of them you have not, what does that order look like?

Is it a:  Grant the motion to dismiss as to those aspects of the 10(b), with leave to amend?  Or is it:  Deny, because one of the three, or two of the three, I think you haven't had an adequate pleading?

**MR. LAITMAN:**  I think courts handle it differently.  But I think you -- the most common, in my experience, is the denial with the leave to replead.  This is the first pleading.  And --

**THE COURT:**  So it's actually a grant, in part, because --

**MR. LAITMAN:**  I mean you -- you -- well, however -- however you frame it.  But typically, under the first pleading, we'd be given an opportunity to replead those elements.

**THE COURT:**  I understand.  But you also, then -- what I hear you saying, is that you're -- you're not disagreeing that I need to -- if -- if there is a deficiency in one of the three bases for your falsity claims under 10(b), it should be fleshed out at the pleading stage.

It shouldn't just be:  Oh, I don't think you've done it, but you've done enough on one of these other theories, so you have a 10(b) claim, so motion denied.

**MR. LAITMAN:**  I think courts have done that, so I have seen that.

**THE COURT:**  I think they have, too.

**MR. LAITMAN:**  Yeah.

**THE COURT:**  I've seen that.

**MR. LAITMAN:**  So I don't -- I don't have a definitive answer, either way.

**THE COURT:**  Okay.

**MR. LAITMAN:**  But I would say that this is --

**THE COURT:**  Fair enough.  Fair enough.

**MR. LAITMAN:**  Yeah.

**THE COURT:**  All right.  Mr. Lynch?

**MR. LYNCH:**  Thank you, Your Honor.

I believe I heard Mr. Laitman say -- characterize again the Bayer statements to the effect of:  We have done everything.

The statements don't say that.  The statements before the

merger talk about merger control proceedings.  They talk about integration.  They talk about synergies.  Nothing about glyphosate litigation risk.  Nothing that plaintiffs have pleaded with particularity would give investors a reason to believe that internal documents had been reviewed.

There's a theory of corporate governance there that perhaps Bayer should have reviewed internal -- Monsanto's internal documents.  The documents that they point to, of course, are the ones that were reportedly instrumental during the jury trial, which goes back to your question of the hindsight nature of the pleading.

The -- we've cited the *Wochos v. Tesla* case, which says you need particularized allegations to support a claim that investors would read a statement in the specified way or the -- or the -- the kind of unexpressed way that you allege.  They haven't done that, other than to come up with theories of corporate mismanagement, which are barred by *Santa Fe Industries* doctrine, and by, frankly, the Ninth Circuit's decision in *Nathanson against Polycom*.

On the theory of -- and by the way, with respect to scienter on the claims about -- about due diligence, there's -- there's really no particularized pleading.  They rely on the core operations doctrine, which in this circuit would require particularized facts to suggest that the defendants had access to the disputed issue, meaning the -- the -- the purported

obligation to review internal documents, and the failure to do that.  Or, an allegation that the fact is so prominent that it would be absurd to suggest that the defendants hadn't noticed it or weren't aware of it.  There's no particularized pleading to support that standard of scienter on the due diligence claim.

On the 800 studies, Your Honor, the -- the -- plaintiffs claim those are false, and Mister -- as Mr. Laitman described it, based on answers to investor questions at a 2019 annual meeting.  The contradiction that they purport -- that they allege arises from that, those answers, is not -- is not -- is not well-pleaded.

The fact that Bayer was not able to determine a definitive number of studies is not an admission that there were less than 800.  There's a table in their complaint that adds up to more than 800.

The fact that the statements are not limited to carcinogenicity in 2019 but include additional data such as toxicity or neurotoxicity is not an admission, as they allege, that the vast majority of the more than 800 studies were not related to carcinogenicity, as the complaint alleges.

If there were some studies, as they allege, that were not directly addressed to carcinogenicity, the complaint -- in the end, the complaint refers to an EPA evaluation of carcinogenicity that considered a hundred -- that identified

121 studies as relevant to its analysis.  That does not contradict references to 800 studies.

But even if it did, Your Honor, we're in the triple digits of studies and government conclusions that glyphosate is not a carcinogen.  All of which makes it far-fetched, Your Honor, to claim that a discrepancy in the study count would be material to investors, or, for that matter, that stock drops that followed adverse litigation results corrected for any of those -- any such supposed miscount.

Mr. Laitman described the Bayer statements as communicating that the science was unequivocal.  The statements don't say that.  They pivot to that allegation in their brief.  The statements do not say that.

To the contrary, Bayer's own statements, as quoted in the complaint, referred to the IARC monograph that classified glyphosate as causing a risk of cancer.  The report that they allege ultimately gave rise to Roundup personal-injury claims against Monsanto in the first place.  That's at Paragraph 254 and Paragraph 5 of their complaint.

Bayer expressed views on the significance of that study.  But the fact that it was a topic of discussion at all in the market negates their suggestion that Bayer assured investors that the evidence -- the scientific record was unequivocal.  Not to mention the public record that glyphosate personal injury cases were going to trial, and would involve battles of

experts on opinions.

The -- the -- Mr. Laitman said that nobody in the market knew about this document, the document he refers to as suggesting some difference in the science between glyphosate and Roundup.  That's not correct.  They've alleged in their complaint the disclosure of the Monsanto papers.  As early as March of 2017, those papers were the subject of motion practice before Judge Chhabria.  So, those documents were in the market at the time that Bayer is alleged to have made false statements about -- about its diligence, and which plaintiffs characterize as -- as false.  And is suggesting that an internal -- a review of internal documents was performed.

With respect to scienter, if we're going to go claim by claim, the -- the -- the -- it's pleaded in a purely conclusory way with respect to these 800 studies.  It says that defendants knew or recklessly disregarded that there was considerable scientific evidence concluding that glyphosate could cause cancer.  That's at Paragraph 331.  It cites back to Paragraphs 80, 136, and 216.

The only contrary scientific evidence that's cited in the complaint, in those paragraphs, is that same IARC monograph.  Which, again, Mr. Baumann discusses in a number of statements that plaintiffs have challenged.

As for the accounting statements, again, pleaded in hindsight, there was ultimately a recording of a large loss on

the announcement of the glyphosate settlement.  Plaintiffs say that means they should have booked a provision in advance.  That claim runs -- it cannot support a pleading of falsity under the PSLRA.  It does not violate -- not sufficiently allege any violation of the applicable accounting standards.

They cite IAS 37 which, like FAS 5 or ASC 450, requires a recording of provisions only when losses are both probable and reasonably estimable.

As we've argued in our brief, Your Honor, plaintiffs have not pleaded with particularity either the probability prong, probability of loss, or the estimability prong for accounting periods before the settlement was announced in June of 2020.

Under, under the Ninth Circuit's decision -- sorry, the Northern District's decision in *Luna against Marvell Technologies Group*, an occurrence of an adverse judgment does not make losses probable.  There is an appeal pending there.  Just as there is an appeal in the early stages, post-trial motions pending in the glyphosate litigation.  And under *Luna*, it -- there's -- there's no sufficient allegation of falsity with respect to the -- to the probability of loss.

And as in *NVIDIA*, plaintiffs have not pleaded how a reliable estimate of any such losses might have been prepared.  In *NVIDIA*, there were no allegations to show -- if you recall, Your Honor, the chip defect?

**THE COURT:**  I do.

**MR. LYNCH:**  There was no allegations to support that there was any falsity in a failure to estimate losses on the chip defect.  Plaintiffs said: Oh, you can just look at the defect rate.  And Your Honor held you can't do that, if the plaintiffs haven't alleged a defect rate.  The same reasoning applies with respect to the accounting for litigation losses.

Mr. Laitman referred to a policy that was supposedly violated.  The policy refers to final judgments.  At the time of the alleged disclosures, there were not final judgments.  And, the -- again, these ASC 450 or IAS 37, the judgments about -- about probability, estimability of losses are recognized as opinion statements.  Judge Gilliam just held as much in the *Bloom Energy* decision a couple weeks ago.  The same holding is issued in the *Alliant Technology* decision out of the Ninth Circuit.

So the claim on the accounting should fail, for the additional reason that the complaint alleges nothing to indicate, you know, under *Omnicare*, the defendant subjectively disagreed with the opinions on the accounting treatment.

The standard for pleading scienter on these accounting cases -- on these accounting claims is that if -- particularized pleadings that the individual defendants were aware of the relevant accounting principle and also that the company's application of it was so obviously wrong that it creates a strong inference of deliberate misconduct.

The -- they haven't alleged any facts to support that standard. All they allege with respect to the defendants in this case is that they signed certifications that the financial statements complied with accounting standards. That does not suffice, on its own, to create an inference of scienter under the PSLRA, as held in *Zucco Partners*. Especially not on these facts, Your Honor.

Mr. Laitman referred to Bayer's financial reports. Bayer expressly disclosed in those financial reports the Roundup cases as a material legal risk. That's Exhibit No. 4 and Exhibit 6. Bayer was transparent about the judgments that it made on the question of establishing reserves, not to reserve for potential damage verdicts, until -- this was in the initial statement that plaintiffs point to, where the -- the initial response to the post -- to the *Johnson* verdict in August of 2018.

There was a question about the accounting for it. Mr. Nickl, I believe, said: We're not going to book a provision for damages; we will book provisions for legal expenses. And, and that's what they did.

And Bayer's accountants, meanwhile, as the financial statements state, had expressly signed off on Bayer's particular accounting judgments after conferring with in-house and outside counsel.

And unless Your Honor has -- we can talk about loss

causation, if you would like.

**THE COURT:**  I think I -- I -- you have covered that in the briefing.

Okay.  I'm sure Mr. Laitman wants to get -- everybody wants the last word.  I'll give you two minutes.

**MR. LAITMAN:**  Okay.  First of all, there's nothing about final judgments in this statement, in either the 2018 or '19 annual report, which describes when they take a provision.

Second of all, there were two -- there are two other prongs to the accounting, which are blatant as well.  It's 37.86 and 37.91.  And 37.86 says: You have to disclose four specific items.  Financial -- the financial effect, timing, and circumstances.  And there's nothing in any of the disclosures that satisfy 37.86.  And again, as I said, it's filled in with misrepresentations, as opposed to what is required under the rules.

The statement about the 800 -- the 800 studies, all I would do is refer Your Honor to Paragraphs 251 and -- I'm sorry, Paragraph 256 and 261.  Those paragraphs say the 800 studies confirm that this does not -- that glyphosate does not cause cancer.  That is an interpretation they don't want to focus on.  They want to focus on other statements.

But this is a motion to dismiss, and materiality is a fact-intensive issue.  And so all ambiguity goes -- goes in our favor.  And not the selective reading of -- that they would

prefer that the Court engage in.

And, um, the last issue that I would just say in terms of scienter is that this is a very, very unusual case, because you see culpable conduct by the defendants, themselves.  After they get the verdict, they hire lawyers, they hire experts to try to justify their own due diligence, and they offer a phony reason for why they didn't look at the documents.  They said:  The Justice Department order precluded us for from doing it.

We plead specifically, the merger agreement had a very specific mechanism where at any point up until June, 2018, Bayer could go in and look -- and ask to look at any documents they wanted, and it would preserve any antitrust concerns.

You don't offer a phony reason for not looking at the documents, if you've done everything right.  They're -- they understand, they understand that action and those statements are, themselves, misleading, and we allege them to be so, and are further indicative of scienter.

**THE COURT:**  Okay.  Thank you very much.  I will take the matter under submission, and get you an order.

**MR. LAITMAN:**  Okay, thank you.

**MR. LYNCH:**  Thank Your Honor.

**MR. LAITMAN:**  Thank Your Honor.

**THE COURT:**  Thank you.

(Proceedings concluded)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Tuesday, October 19, 2021