# Exhibit 1

Carol V. Gilden (*admitted pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile:  (312) 357-0369
Email: cgilden@cohenmilstein.com

Nicole Lavallee (SBN 165755)
Jeffrey Miles (SBN 293869)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
Email: nlavallee@bermantabacco.com
          jmiles@bermantabacco.com

*Attorneys for Lead Plaintiffs and Additional Named Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and | Case No: 3:20-cv-04737-RS **[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT** <u>CLASS ACTION</u> |
| INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated, | Courtroom:    3 – 17th Floor Judge:    Richard Seeborg **<u>JURY TRIAL DEMANDED</u>** |
| Plaintiffs, vs. | |
| BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL, | |
| Defendants. | |

No: 3:20-cv-04737 (RS) – [PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................... 2

II.     JURISDICTION AND VENUE AND INTRADISTRICT ASSIGNMENT.................... 12

III.    PARTIES ................................................................................................ 16

    A.      Plaintiffs.................................................................................... 16

    B.      Defendants ................................................................................ 17

    C.      Relevant Non-Parties ............................................................... 19

IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ....................... 20

    A.      Bayer and its Business ............................................................. 20

    B.      Bayer Hastily Seizes the Opportunity to Acquire Monsanto in Largest Foreign Acquisition in German History ................................................. 21

    C.      Defendants Recognized that Monsanto's Major Red Flags Required an Extensive Due Diligence Investigation.................................................. 24

        1.      The Dramatic Due Diligence Red Flag -- Monsanto's History of Product Liability Litigation.......................................................... 25

        2.      Monsanto's Growing Legal Exposure to Roundup Litigation................. 27

    D.      Defendants Present the Merger to Investors as an Unparalleled Opportunity for Shareholder Value and Promise an Extensive Due Diligence Investigation ................................................................... 29

    E.      After Signing the Merger Agreement in September 2016, Defendants Reassured Investors that the Due Diligence Investigation Would Continue Through the Lengthy Pre-Closing Period ............................................. 34

    F.      In the Pre-Closing Period Prior to June 2018, Damaging Internal Monsanto Documents Began to Emerge............................................... 35

        1.      March 2017 Damaging Monsanto Papers Emerge ................................. 35

        2.      After the Release of the Monsanto Papers, Defendants Falsely Reaffirm the Strength of Their Due Diligence and Tout the Benefits of the Merger ................................................................. 37

    G.      Almost Immediately After Closing the Merger, Jury Verdicts Begin to Reveal Bayer's Massive Exposure to Roundup Liability ..................................... 39

        1.      The *Daubert* Hearing and Order in the Roundup MDL Signal That the Roundup Litigation Will Involve a Battle-of-the-Experts on Whether Roundup Can Cause Cancer.......................................................... 39

        2.      During the *Johnson* Trial, Monsanto's Internal Documents Emerge as Central to Plaintiff's Case........................................................ 41

        3.      *Johnson* Verdict Awards Plaintiff $289 Million After Finding Monsanto Ignored Health Risks of Roundup.......................................... 44

        4.      Defendants Admit They Never Looked at Monsanto's Internal Documents, but Reassure Investors that Reevaluation of Roundup Litigation Risk is Unnecessary ................................................. 46

5.    *Johnson* Court Rejects Monsanto's Request to Overturn Verdict, Finding "No Legal Basis to Dispute" Jury's Conclusions.......................50

6.    In the *Hardeman* Trial, Plaintiff's Case Turns on Monsanto's Internal Documents Showing Roundup is More Toxic than Glyphosate Alone.................................................................................51

7.    The *Hardeman* Jury Awards $80 Million to Plaintiff, Finding Monsanto Consciously Disregarded Public Safety by Concealing Roundup's Health Risks ..........................................................54

H.    Unbeknownst to the Market, Defendants Internally Acknowledged that the Monsanto Due Diligence Investigation Was Potentially Inadequate ..................54

I.    In Bid to Prevent Shareholder Revolt, Defendants Present Expert Reports to Shareholders as Validating the Failed Due Diligence Investigation ................56

J.    The *Pilliod* Jury Renders Massive $2 Billion Verdict After Plaintiffs Present Dozens of Additional Internal Documents Showing Monsanto's Misconduct........................................................................................................59

K.    In An Effort to Regain Shareholder Support, Defendants Agree to An Audit of Bayer's Due Diligence Practices and to Release Linklaters and Habersack Reports as Confirmation of the Adequacy of its Due Diligence.........62

L.    Defendants Admit They Misled Investors About the Scientific Evidence on Roundup's Cancer Risks.............................................................................64

M.    The Linklaters and Habersack Reports Establish that Prior to Signing the Merger Agreement, Defendants Failed to Examine Any Internal Documents Related to Roundup Liability Risks....................................................65

N.    Bayer Announces $10.9 Billion Settlement of Roundup Litigation.....................69

O.    Bayer's Proposed Settlement Quickly Falls Apart ..............................................70

P.    Post-Class Period Events .......................................................................................71

1.    California Appeals Court Confirms that Defendants Misled Investors About the Roundup Liability Risks...........................................71

2.    Bayer Announces an $11.7 Billion Write-Down of Its Agricultural Assets .......................................................................................72

V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS...............................74

A.    Defendants' False and Misleading Statements About the Due Diligence Investigation of Monsanto .....................................................................................74

1.    Defendants' False and Misleading Statements and Omissions Before the Signing of the Merger Agreement.........................................74

2.    Defendants' False and Misleading Statements About the Results of the Pre-Signing Due Diligence Investigation ........................................75

3.    Defendants' False and Misleading Statements About the Due Diligence Investigation Prior to the Closing the Merger .........................78

4.    Defendants' False and Misleading Statements After the Closing of the Merger About the Adequacy of the Due Diligence Investigation....................................................................................82

B.    Defendants' False and Misleading Statements After Closing the Merger

About Bayer's Access to Monsanto's Internal Documents ................................. 88

    1.    Defendants' False and Misleading Statements About Bayer's Access to Monsanto's Internal Documents Under the Hold Separate Order ........................................................................ 88

C.    Defendants' False and Misleading Statements About the Evidentiary Basis for Monsanto's Science-Based Trial Defenses ....................................... 90

    1.    August 16, 2018 – Press Release ........................................... 90

    2.    August 23, 2018 – Conference Call ......................................... 91

    3.    August 30, 2018 – Quarterly Report for Q2 2018 ................................... 93

    4.    September 5, 2018 – Conference Call ....................................... 94

    5.    November 8, 2018 – Quarterly Report for Q3 2018 .............................. 94

    6.    November 13, 2018 – Press Conferences to Discuss Q3 2018 Earnings ........................................................................ 94

    7.    December 5, 2018 – Remarks at Bayer AG Capital Markets Day ........... 95

    8.    January 21, 2019 – Remarks in Exclusive Interview with *The Australian Financial Review* .................................................. 95

    9.    February 27, 2019 – Bayer's 2018 Annual Report and Press Release ........................................................................ 96

    10.    April 25, 2019 – Conference Call to Discuss Q1 2019 Earnings ............. 96

    11.    April 26, 2019 – Letter to Shareholders on Shareholder Votes ............... 97

    12.    April 26, 2019 – Statement of Management Board and Supervisory Board on Countermotions .................................................. 98

    13.    March 19, 2019 – Press Release from Bayer on Hardeman Verdict ........ 98

    14.    April 28, 2020 – Bayer Annual Shareholders Meeting ........................... 99

VI.    ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER ................................... 100

A.    Defendants' Knowledge or Reckless Disregard of Legal and Reputational Risks Prior to September 14, 2016 Support a Strong Inference of Scienter ....... 100

B.    Defendants' Knowledge or Reckless Disregard of Roundup Liability Risks from September 14, 2016 through June 7, 2018 ................................... 101

C.    Defendants' Knowledge or Reckless Disregard of Roundup Liability Risks from June 8, 2018 to June 24, 2020 .......................................... 102

D.    Defendants' Public Statements Regarding the Evidentiary Basis for Monsanto's Science-Based Trial Defenses Support a Strong Inference of Scienter ......................................................................... 102

E.    Defendants' Admission that They Never Reviewed Monsanto's Internal Documents Supports a Strong Inference of Scienter ......................... 104

F.    The Magnitude of the Glyphosate-Related Costs Supports a Strong Inference of Scienter ......................................................... 104

G.    Defendant Baumann Acted with Scienter ........................................ 104

H.    Defendant Wenning Acted with Scienter ........................................ 106

I.    Defendant Condon Acted with Scienter ............................................................. 108
J.    Defendant Dietsch Acted with Scienter ............................................................. 109
K.    Defendant Nickl Acted with Scienter ............................................................... 109

VII.    LOSS CAUSATION AND ECONOMIC LOSS .......................................................... 110

VIII.    THE PRESUMPTION OF RELIANCE .................................................................... 114

IX.    THE INAPPLICABILITY OF STATUTORY SAFE HARBOR ................................. 115

X.    CLASS ACTION ALLEGATIONS ......................................................................... 116

XI.    CLAIMS FOR RELIEF ......................................................................................... 118

COUNT I ......................................................................................................................... 118

COUNT II ........................................................................................................................ 120

XII.    PRAYER FOR RELIEF ......................................................................................... 121

XIII.    JURY TRIAL DEMAND ....................................................................................... 122

Court-Appointed Lead Plaintiffs Sheet Metal Workers' National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund ("Lead Plaintiffs"), along with additional named plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint individually, and on behalf of a class of similarly situated persons and entities, against Defendant Bayer Aktiengesellschaft ("Bayer" or the "Company") and Defendants Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl (together, the "Individual Defendants," and collectively with Bayer, the "Defendants").

Plaintiffs allege the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, based upon the investigation of Lead Counsel, which included, without limitation: (i) review and analysis of public filings made by Bayer and The Monsanto Company ("Monsanto") with government regulators; (ii) review and analysis of press releases and other publications, including those disseminated by certain of the Defendants and other related non-parties; (iii) review of news articles; (iv) review of materials and evidence produced by Bayer and Monsanto in other state and federal litigation; (v) interviews with former employees of Bayer and Monsanto, its affiliates and predecessors, and other third parties; (vi) consultation with individuals with expertise in due diligence, accounting and audit procedures, and damages; and (vii) complaints filed against Bayer and Monsanto. While multiple sources of evidence are already pleaded in this Complaint that adequately support the claims alleged herein, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein that will be revealed after Plaintiffs have a reasonable opportunity to conduct discovery.

## I.    INTRODUCTION

1.    This is a federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 brought on behalf of all persons or entities that purchased or otherwise acquired Bayer's publicly traded American Depositary Receipts ("ADRs") (Ticker: BAYRY; CUSIP: 506921907) from May 23, 2016 and July 6, 2020, inclusive (the "Class Period"), and were damaged as a result.

2.    In the spring of 2016, Bayer was gripped by fear of missing out during a frenzy of consolidation by its agrochemical competitors, with few acquisition options of its own still available. As the Company would later acknowledge, the only remaining option was Monsanto, the American agrochemical giant widely described as "the most hated company in the world." *See* Alex Planes, *Why Is Monsanto the Most Hated Company in the World?*, The Motley Fool (June 8, 2013; updated Oct. 11, 2018), https://www.fool.com/investing/general/2013/06/08/why-is-monsanto-the-most-hated-company-in-the-worl.aspx. The news that Bayer had made a $62 billion all-cash offer to Monsanto came as "a huge shock to investors," and sent the price of Bayer ADRs plunging by more than 7%, from a close of $27.03 per share on May 18, 2016 to $24.94 per share on May 19, 2016. [1] Investors worried about the massive price tag of the deal, which was larger than any acquisition in German history and would require Bayer to take on tens of billions of dollars of additional debt. There was, however, an additional concern: Bayer would also be assuming the considerable risks of acquiring a company with an infamous reputation.

3.    Monsanto's reputation grew out of a long history of concealing the health risks of its chemical products—such as polychlorinated biphenyls ("PCBs"), dichlorodiphenyltrichloroethane ("DDT"), and Agent Orange—which led to Monsanto paying hundreds of millions of dollars in toxic tort settlements. These settlements occurred after internal Monsanto documents emerged, revealing that Monsanto knew of and actively concealed or misrepresented specific health risks associated with these products, making Monsanto "one of the

---

[1] For the purposes of this Class Action Complaint, all references to prices of Bayer ADRs are split adjusted unless otherwise noted.

most derided names in corporate history." Phil Serafino and Aaron Kirchfield, *Monsanto Name Hated by Anti-GMO Forces May Vanish in Bayer Deal*, Bloomberg (May 23, 2016), https://www.bloomberg.com/news/articles/2016-05-23/monsanto-name-hated-by-anti-gmo-forces-may-vanish-in-bayer-deal.

4.      Monsanto's history of concealing the adverse health risks of its major products was a particularly significant "red flag"[2] to defendant Bayer. While Bayer was allegedly conducting its due diligence in 2016, Monsanto was embroiled in over 120 toxic tort cases, in which the plaintiffs alleged that exposure to Roundup—Monsanto's flagship and best-selling herbicide—caused non-Hodgkin's lymphoma ("NHL"), and that Monsanto had knowingly concealed Roundup's toxicity (the "Roundup Litigation"). The allegations in these cases closely mirrored the misconduct that had been alleged in the PCB and dioxin toxic tort cases Monsanto had faced for years.

5.      The Roundup cases had been filed after March 2015, when the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO") composed of independent research scientists, released a 92-page monograph (the "IARC Monograph") that concluded that glyphosate—the primary active ingredient in Roundup—is "probably carcinogenic to humans."

6.      These Roundup cases struck at the core of Monsanto's value because Monsanto's sales and profits were derived not just from its sales of the Roundup herbicide, but also from the substantial sales of seeds that would tolerate Roundup and other glyphosate herbicides.

7.      Each of these Roundup cases also posed a potential financial risk to Bayer because the plaintiffs in those cases sought to recover both compensatory damages, based on the economic harm from their cancer, and punitive damages, on the theory that Monsanto consciously disregarded evidence of Roundup's cancer risks going back decades. This latter element of potential punitive damages thus turned very specifically on the information in Monsanto's files

---

[2] FINRA defines "red flags" as "any information that it encounters that . . . would alert a prudent person to conduct further inquiry." FINRA Notice 10-22. https://www.finra.org/rules-guidance/notices/10-22.

that might show its knowledge and concealment of cancer risks associated with glyphosate and Roundup.

8. Given these facts and Monsanto's past corporate misconduct, it was essential that Bayer conduct meaningful due diligence as to the reputational and financial risk of the Roundup Litigation by examining Monsanto's files to determine if Monsanto had—as it had with its other products—known of and concealed Roundup's health and cancer risks.

9. ***However, as investors learned only years later, this essential due diligence was never performed.*** Indeed, the internal Monsanto documents that became the centerpiece of the Roundup trials were never reviewed or even requested by Defendants as part of their due diligence. As Defendants later admitted, Bayer's due diligence investigation of the Roundup liability risks was limited exclusively to memoranda by a U.S. law firm based on publicly-available documents and statements from Monsanto's representatives that they "expected to prevail" in the lawsuits.

10. The enormity of this due diligence failure was compounded by the fact that at the very same time Bayer was purportedly conducting its due diligence in the summer and fall of 2016, Monsanto was already segregating and producing relevant documents in a multidistrict litigation ("MDL") overseen by U.S. District Judge Vince Chhabria of the Northern District of California, which was comprised of all the federal Roundup cases (the "Roundup MDL"). In fact, Monsanto had produced at least 3.5 million pages of documents by October 31, 2016—yet none of these documents were ever examined by Bayer.

11. Rather than admit the absence of any meaningful due diligence of the risks attendant with the Roundup Litigation, Defendants did the opposite. Defendants told investors they would conduct "extensive due diligence" and that they fully understood the risks and potential legal exposure of the Bayer-Monsanto merger (the "Merger"), including any risks related to Monsanto's Roundup business. When Bayer announced in September 2016 that it purportedly completed its due diligence and signed a merger agreement with Monsanto, Defendants told investors that their due diligence investigation had "confirmed" and "verified" the substantial

benefits and low risks of the Merger with no mention at all of any risks attendant with the Roundup Litigation.

12.    Such assurances mattered to Bayer's shareholders because they had already witnessed the consequences of Bayer's prior ineffective due diligence. In 2014, Bayer had completed its disastrous acquisition of Merck & Co.'s over-the-counter ("Merck OTC") drug business, which Defendants admitted in September 2016 had been unsuccessful because of Bayer's failure to detect that the Merck OTC business was worth hundreds of millions of dollars less than presented. In short, Defendants assured investors that, unlike its due diligence investigation of Merck OTC, Bayer's due diligence investigation of Monsanto fully and thoroughly assessed the risk of acquiring Monsanto. Unfortunately, all of these assurances were blatantly false.

13.    But Defendants had plenty of time to conduct due diligence, even after they signed the Merger agreement on September 14, 2016. Because the Merger was a massive and complicated cross-border acquisition that required antitrust approval from more than 30 jurisdictions, Bayer did not anticipate closing the deal until the end of 2017, with an agreed upon outside date in June 2018. Defendants told investors that Bayer would have more than a year (if not longer) before closing the deal to compare their expectations with Monsanto's continued stand-alone performance and assess the risks and benefits of the Merger. In short, Defendants repeatedly led investors to believe that Bayer had thoroughly and extensively investigated Monsanto's legal and reputational exposure and would continue to do so through the closing of the merger in June 2018.

14.    However, once again, Defendants' assurances were blatantly false. In fact, even as damaging internal Monsanto documents from the Roundup cases were leaked to the public, Defendants did not seek to examine Monsanto's documents or disclose their prior due diligence failures. In March 2017, internal documents produced through the Roundup trials (which would later become known as the "Monsanto Papers") revealed that Monsanto had known about glyphosate's potential toxicity for years and had aggressively fought to conceal the risks from regulators and the public.

15. Although Defendants acknowledged Monsanto's unfavorable reputation and history of misconduct, Defendants continually insisted that Bayer's due diligence investigations had "scrutinized and reviewed" all the aspects of the Merger and uncovered "no evidence whatsoever" that would cause any concerns, even after the Monsanto Papers were released. Defendants emphasized that unlike the Merck OTC acquisition, Monsanto had gone "out of [its] way to provide us with transparency, data and visibility to the most critical questions we had." Analysts were largely convinced, with most voicing little concern about the ongoing Roundup Litigation.

16. On May 29, 2018, federal antitrust regulators approved the Merger. One week later, on June 7, 2018, Bayer closed the Merger, with the two companies set to begin integration following Bayer's completion of its divestitures. At that time, Defendants assured the market that nothing had changed since Bayer had announced plans to purchase Monsanto in May 2016, and Defendant Baumann told investors that the Merger was "just as attractive today as we assessed it be two years ago."

17. On June 19, 2018, CBS reported the commencement of the *Johnson v. Monsanto Company* trial (the "Johnson Case"), describing it as a bellwether case that could lead to the filing of "thousands" of additional Roundup cases. CBS also reported that the plaintiff, Johnson, had stated he could show scientific evidence that his exposure to Roundup caused his cancer and that Monsanto allegedly knew about the link, failed to warn people, and buried evidence from the public.

18. Two months later, on August 10, 2018, the California jury in *Johnson* concluded that the Plaintiff's exposure to Roundup was a "substantial factor" in causing his NHL and that Monsanto acted with "a conscious disregard for public safety," and awarded him $39 million in compensatory damages and $250 million in punitive damages.

19. The jurors later explained that they were persuaded in his favor after reviewing evidence from Monsanto's own files that it had known and concealed adverse studies of glyphosate and potentially manipulated academic research and regulators. The jury's verdict in *Johnson*

shocked the investment community who, buoyed by Defendants' confidence that there was no evidence of Monsanto's misconduct, had expected the jury to rule in Monsanto's favor. On the next trading day, the price of Bayer ADRs plunged to a seven-year low, falling by $2.92 from a close of $26.59 per share on August 10, 2018, to open at $23.67 per share on August 13, 2018, representing a decline of 11.0%.

20.    Following the verdict, Defendants remained defiant and insisted that the ruling would be overturned on appeal or in post-trial proceedings. They announced to investors that the jury's verdict was contrary to "the weight of the scientific evidence" and the "conclusions of regulators around the world" that glyphosate is safe. When analysts asked whether Defendants had examined Monsanto's internal documents prior to the Merger's closing, Defendants admitted for the first time that they had not done so, claiming that a "hold separate" order set in place by the Department of Justice in May 2018 ("the Hold Separate Order") prevented them from doing so.

21.    Defendants then reassured investors that, since they had access to Monsanto's internal documents after the Hold Separate Order was lifted, they were assured that there were no documents that would "qualify as a smoking gun" and that the documents admitted at trial were "taken out of context." In short, Defendants led investors to believe that Monsanto's liability turned almost exclusively on determinations by regulators, and that there were no additional internal documents that would be revealed that would increase Monsanto's risk of liability. But these assurances too were soon revealed to be false.

22.    In an attempt to further assuage investor concerns, beginning in August 2018, Defendants began making a series of new false and misleading statements about their purportedly rock-solid science-based trial defenses, which would purportedly enable them to ultimately prevail in the Roundup Litigation. Defendants claimed that there was certain unequivocal scientific evidence that they would present in future trials to demonstrate that Monsanto faced no liability, much less punitive damages. Defendants claimed, for example, that "800 studies" purportedly demonstrated that Roundup did not cause cancer, and that the EPA's regulatory approval of glyphosate in 2016 and 2017 exculpated Monsanto from liability. Defendants reassured investors

that the verdict was "inconsistent with the robust science-based conclusions of regulators and health authorities worldwide," and that the purported "800 scientific studies" were "a reflection of the longevity, the popularity and the reach" of Roundup. Defendants reiterated these claims about the purported evidentiary basis for their science-based trial defenses over the next twenty months to securities analysts and in Bayer's quarterly financial reports.

23.    However, Defendants either knew or recklessly disregarded the possibility that the scientific evidence did not unambiguously support their purportedly strong trial defenses, as Monsanto's own internal documents demonstrated. For example, in reality, Monsanto would be unable to present evidence at trial of 800 or more scientific studies showing glyphosate does not cause cancer, because as Defendants later admitted, the vast majority of these studies *did not in fact assess the carcinogenicity of either glyphosate (the chemical itself) or Roundup (the formulated product)*, but rather were safety studies on unrelated topics. Further, there was in fact considerable scientific evidence that glyphosate was more likely to be carcinogenic and more likely to cause NHL when combined with a surfactant in a formulated product such as Roundup, and this evidence would be a key focus of the Roundup trials. Further, there was in fact evidence that Monsanto had procured the regulatory approvals for glyphosate in part by withholding adverse scientific evidence from regulators and by ghostwriting research, and in any event the regulatory approvals were of glyphosate (the chemical itself) and not Roundup (the formulated product, which also contained a surfactant).

24.    On October 22, 2018, the trial court in the Johnson Case reduced the punitive damage award to $39.25 million, following Supreme Court precedent requiring a 1:1 punitive-to-compensatory damages ratio cap, but rejected Monsanto's request for a new trial and for judgment notwithstanding the verdict. The court ruled that "there is no legal basis to dispute the jury's determination that plaintiff's exposure to [glyphosate-based herbicides] GBHs was a substantial factor in causing his NHL." Investors, who had expected the verdict to be overturned given Bayer's reassurances, were again shocked, and by the time the market opened on October 23, 2018, the price of Bayer ADRs dropped from $22.00 at closing the prior trading day to $19.39, or 11.9%.

25.    Nevertheless, Defendants' emphatic statements that in the later trials Bayer would be able to present overwhelming and unequivocal scientific evidence that Roundup does not cause NHL gave investors false hope that there might well be different outcomes in the next trials. On March 19, 2019, those hopes were dampened. The jury in *Hardeman v. Monsanto Company* ("the Hardeman Case), the first of three planned "bellwether" federal Roundup lawsuits and the second Roundup lawsuit to go to trial, issued its verdict and awarded the plaintiff $80 million. The *Hardeman* jury concluded, like the jury in the Johnson Case, that the plaintiff's exposure to Roundup was a "substantial factor" in causing his NHL. The stock price reaction was immediate. By the opening of the market on March 20, 2019, the day after the *Hardeman* verdict, the price of Bayer ADRs had fallen from $19.67 to $17.52, or 11.0%.

26.    Two months later, the jury issued its verdict in the *Pilliod v. Monsanto Company* (the "Pilliod Case"), the third Roundup case to go to trial. In May 2019, the jury awarded the plaintiffs $2 billion in punitive damages, after plaintiffs presented dozens of additional internal Monsanto documents—which again Bayer had ignored during two years of alleged due diligence—showing Monsanto's manipulation of scientific studies and regulators. The documents demonstrated that EPA officials had agreed in private emails with Monsanto to oppose the IARC finding prior to IARC's publication of its final report. The EPA also appeared in other emails to have been acting in tandem with Monsanto to defer the detailed toxicological review of glyphosate scheduled by the Agency for Toxic Substances and Disease Registry ("ATSDR") by the Department of Health and Human Services ("HHS") scheduled for 2015.

27.    In the wake of the *Hardeman* and *Pilliod* decisions, shareholders were outraged and demanded to know how Bayer's due diligence, once again, had missed such an obvious vulnerability in the business it had acquired. News outlets like the *Financial Times* began to call the Monsanto acquisition "among the worst in corporate history." At the annual general stockholders' meeting ("AGM") in 2019, the Individual Defendants lost an unprecedented vote of no confidence by Bayer's shareholders, the first time a majority of shareholders had ever voted against the board of a German blue-chip company. One shareholder demanded an audit of Bayer's

due diligence practices, garnering the support of more than one-fourth of all shareholders. In an effort to win back shareholder support, Defendants announced an effort to "regain public trust" by "elevating our efforts in transparency"—which would include a new committee to monitor the Roundup Litigation by working with senior management (the Glyphosate Litigation Committee, chaired by Defendant Wenning)—and agreed to a "voluntary special audit" of the Company's due diligence practices.

28.    In early 2020, the results of the voluntary special audit confirmed the complete inadequacy of the due diligence investigation. Though the auditors purported to find that the due diligence investigation of Monsanto was sufficient under German law, the auditors revealed that Bayer never reviewed *any* internal Monsanto documents as part of its risk assessment of the legacy Roundup business, and had instead relied exclusively on legal memoranda assessing the regulatory review of glyphosate. By failing to review any internal Monsanto documents, Defendants repeated the very same mistakes that Bayer made during the Merck OTC acquisition—mistakes that Defendants repeatedly assured investors they were not making. Indeed, one of the auditors, Professor Hans-Joachim Böcking, wrote in his audit report that the purpose of due diligence is to look at "information not publicly available" in order to check assumptions already made based on publicly available information.

29.    In June and July of 2020, the materialization of the risks attendant with Bayer's massive due diligence failures and false and misleading statements finally began to take shape. On June 24, 2020, Defendants announced they had reached agreements with Plaintiff's counsel to settle the existing and future cases for approximately $10.9 billion, which Defendants estimated would resolve up to 75% of pending and unfiled claims. With that announcement came immediate questions about whether that amount would be sufficient to settle future cases. The ADR price collapsed to an opening price of $18.94 on June 25, 2020 from $20.54 at the close of the market the previous day, or 7.8%.

30.    On July 6, 2020 Judge Chhabria indicated he would likely reject the portion of the settlement relating to the resolution of future cases resulting in the anticipation that Bayer would

be required to pay additional funds beyond the $10.9 billion to resolve the future cases. With this announcement, Bayer's ADR price declined even further to an opening price of $17.77 on July 7, 2020 from $18.91 at the close of the market the previous day, or 6.1%.

31.    By misleading investors about the effectiveness of Bayer's due diligence of the Merger's legal and reputational risks, and the evidentiary basis for Monsanto's "science-based" trial defenses in the Roundup litigation and thereby the potential size and scope of Bayer's glyphosate-related legal exposure, Bayer avoided ADR share price declines that would have accompanied revelation of the actual legal and reputational risks associated with acquiring Monsanto.

32.    As reflected in the chart below, the adverse impact on Bayer investors was enormous by any measure. From May 23, 2016, when the proposal for the Merger was first announced with no disclosure of any risk from the Roundup Litigation, through the opening of the trading day on July 7, 2020, following Bayer's finalized announcement of its approximately $10.9 billion settlement of the Roundup Litigation, the price of Bayer ADR shares collapsed by 26.1%— from $24.06 to $17.77— resulting in a market capitalization loss of $12.87 billion or 20% of the purchase price of Monsanto.



## II.    JURISDICTION AND VENUE AND INTRADISTRICT ASSIGNMENT

33.    This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated under the Exchange Act, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

34.    This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

35.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute the alleged violations of law occurred in or affected persons in this District. Pursuant to the Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the San Francisco Division of this district is proper for the reasons in the following paragraph.

36. Related actions filed against Monsanto in connection with its glyphosate-based herbicide Roundup have been consolidated and are currently pending in this District. The Judicial Panel on Multidistrict Litigation selected the Northern District of California as the appropriate transferee district for these cases because "[t]wo of the earliest-filed and most procedurally advanced actions are pending in this district" and the Northern District of California "is both convenient and easily accessible for all parties . . . and has the necessary judicial resources and expertise to efficiently manage this litigation." See Transfer Order at 2, *In re Roundup Prods. Liab. Litig.,* No. 16-md 2741 (N.D. Cal.), ECF No. 1; *see also Hardeman*, No. 3:16-cv-525 (N.D. Cal.). In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. All of the transactions in the securities that are at issue in this action took place entirely within the United States.

37. As explained on Bayer's website, an ADR is "an instrument used widely by non-U.S. companies to offer and trade their shares conveniently and efficiently in the U.S. equity markets":

> [ADRs] are a U.S. dollar-denominated form of equity ownership in a non-U.S. company. They represent that company's shares and carry the rights attaching to them. An ADR is the physical certificate evidencing ownership of one or more ADSs. The terms ADR and ADS are often used interchangeably. The relation between the number of ADRs and the number of shares is typically referred to as the ADR ratio.

| | |
|---|---|
| **Ticker Symbol** | BAYRY |
| **CUSIP No.** | 072730302 |
| **Depositary Bank** | The Bank of New York Mellon |
| **ADR ratio** | 4:1 |

38. Since September 27, 2007, Bayer ADRs are traded in the U.S. over-the-counter market, under an OTC Level l ADR Program. At all times during the Class Period, all Bayer ADRs

represented ownership interests in ordinary shares of Bayer that were held on deposit by The Bank of New York Mellon.

39.    The Bayer ADRs purchases of Lead Plaintiff Sheet Metal Workers' National Pension Fund ("SMW Pension Fund") were made through its outside investment manager, Harding Loevner Funds, Inc. ("Harding Loevner"), which is incorporated in Delaware and maintains a business address in Bridgewater, New Jersey, using Morgan Stanley DW Inc. ("Morgan Stanley DW"), a U.S.-incorporated and U.S.-domiciled broker-dealer, which is incorporated in Delaware and maintains a business address in Purchase, New York. Thus, the securities at issue were present at all relevant times in the United States; all parties to the transactions in the securities were United States persons; and SMW Pension Fund incurred irrevocable liability within the United States to take and pay for the securities; Morgan Stanley DW incurred irrevocable liability within the United States to deliver the securities.

40.    The Bayer ADRs purchases of Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund ("Teamsters 710 Pension Fund") were made through its outside investment manager, Harding Loevner, which is incorporated in Delaware and maintains a business address in Bridgewater, New Jersey, using either Macquarie Securities Inc. ("Macquarie"), a U.S.-incorporated and U.S.-domiciled broker-dealer, which is incorporated in Delaware and maintains a business address in New York, New York, or Instinet Clearing Services, Inc. ("Instinet"), a U.S.-incorporated and U.S.-domiciled broker-dealer, which is incorporated in Delaware, and maintains a business address in New York, New York. Thus, the securities at issue were present at all relevant times in the United States; all parties to the transactions in the securities were United States persons; Teamsters 710 Pension Fund incurred irrevocable liability within the United States to take and pay for the securities; and either Instinet or Macquarie incurred irrevocable liability within the United States to deliver the securities.

41.    The Bayer ADR purchases of Plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("Local 542 Pension Fund") were made through its outside investment manager, Hardman Johnston Global Advisors LLC,

which is headquartered in Stamford, Connecticut, and incorporated in the state of Connecticut, using Merrill Lynch Pierce Fenner & Smith ("Merrill Lynch"), a U.S.-incorporated and U.S.-domiciled broker-dealer, which is incorporated in the state of Delaware and maintains a business address in New York, New York; or JP Morgan Securities, Inc., ("JP Morgan") a U.S.-incorporated and U.S.-domiciled broker-dealer, which is incorporated in the state of Delaware and maintains a business address in New York, New York; or UBS Securities LLC ("UBS"), a U.S.-incorporated and U.S.-domiciled broker-dealer, which is incorporated in the state of Delaware and maintains a business address in New York, New York; or Cowen & Co. LLC ("Cowen"), a U.S.-incorporated and U.S.-domiciled broker-dealer, which is incorporated in Delaware and maintains a business address in New York, New York. Thus, the securities at issue were present at all relevant times in the United States; all parties to the transactions in the securities were United States persons; Local 542 Pension Fund incurred irrevocable liability within the United States to take and pay for the securities; and Merrill Lynch, JP Morgan, UBS, or Cowen incurred irrevocable liability within the United States to deliver the securities.

42.    Lead Plaintiffs' purchases of BAYRY were conducted on each of the dates listed in the certifications attached hereto as Exhibits A and B, through the payment of $14,034,627 total in U.S. dollars disbursed from Lead Plaintiffs' custodial accounts maintained by The Bank of New York Mellon, which is incorporated in Delaware, and headquartered in New York, NY. Contemporaneous with Lead Plaintiffs' purchase and issuance of the ADRs, the 132,569 shares of Bayer ordinary shares in which they acquired an ownership interest were deposited with The Bank of New York Mellon, which held the shares for the benefit of Lead Plaintiffs.

43.    Local 542 Pension Fund's purchases of BAYRY were conducted on each of the dates listed in the certification attached hereto as Exhibit C, through the payment of $1,331,623.21 total in U.S. dollars distributed from Local 542 Pension Fund's custodial account maintained by Wells Fargo, which is incorporated in Delaware, and headquartered in San Francisco, CA. Contemporaneous with Local 542 Pension Fund's purchase and issuance of the ADRs, the 15,260

shares of Bayer ordinary shares in which they acquired an ownership interest were deposited with The Bank of New York Mellon, which held the shares for the benefit of the Pension Fund.

44.    On information and belief, (a) all Bayer ADRs were present at all relevant times in the United States; (b) all purchases or other acquisitions of Bayer ADRs during the Class Period were made in accounts at U.S. financial institutions; (c) in all purchases or other acquisitions of Bayer ADRs during the Class Period, either (i) the purchaser incurred irrevocable liability within the United States to take and pay for the securities, or (ii) the seller incurred irrevocable liability within the United States to deliver the securities, or (iii) title to the securities was transferred in the United States; and (d) all transactions in the Bayer ADRs during the Class Period occurred in the United States and cleared and settled in the United States.

45.    Defendant Bayer is subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below: (i) it engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States and this District; (ii) in committing the fraudulent acts complained of herein, Bayer operated as a unitary business and an integrated enterprise with its wholly-owned subsidiaries, including those based in this District and elsewhere in the United States, and controlled the internal affairs and operations of the subsidiaries to the extent that they became mere instrumentalities of their parent; and (iii) Bayer has had and continues to have continuous and systematic contacts with this forum that render it at home in the United States and in this District.

## III.    PARTIES

### A.    Plaintiffs

46.    Lead Plaintiffs SMW Pension Fund and Teamsters 710 Pension Fund are headquartered in Falls Church, Virginia, and Mokena, Illinois, respectively. As set forth in the certifications attached hereto as Exhibits A and B, Lead Plaintiffs purchased 530,276 shares of Bayer ADRs through transactions on the OTC Market.

47.     Named Plaintiff Local 542 Pension Fund is headquartered in Fort Washington, Pennsylvania. As set forth in the certification attached hereto as Exhibit C, Local 542 Pension Fund purchased 61,040 shares of Bayer ADRs through transactions on the OTC Market.

**B.     Defendants**

48.     Defendant Bayer, through itself and its divisions, is a German multinational pharmaceutical and life science company, based in Leverkusen, Germany. Over its 150-year history, Bayer had grown from its roots as a German synthetic dye manufacturer and member of the infamous I.G. Farben chemicals cartel—a supplier of Zyklon B and other deadly chemicals used by the Nazis in the Holocaust—to a global conglomerate with as many as 30 separate businesses, including pharmaceuticals, plastics, rubber, and chemicals. Bayer is one of the largest pharmaceutical companies in the world and employs nearly 100,000 people worldwide, with operations in almost 80 countries. Bayer has three main business lines: pharmaceuticals, which focuses on prescription medicines; consumer health, which focuses on over-the-counter products; and its agricultural business, Bayer Crop Science. Over the past decade, Bayer Crop Science has become one of the world's largest global agricultural companies and its crop protection business is the second largest in the world.

49.     Defendant Werner Baumann has served as Bayer's Chairman of the Company's Board of Management (CEO) since May 1, 2016, and since January 1, 2020, as Labor Director and Chief Sustainability Officer. Baumann joined Bayer in 1988 and held many roles over his more than 30-year tenure with the Company, including Chief Financial Officer, and Chairman of the Management Board (the "Management Board"), and Chief Strategy and Portfolio Officer. Baumann signed the Merger Agreement, dated September 14, 2016, was involved in the day-to-day operations of, and exercised power and control over Bayer, including by, among other things, directing its public statements and regulatory actions. Because of his senior position with the Company, Baumann possessed the power and authority to control the contents of the Merger Agreement, Bayer's reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

50.    Defendant Werner Wenning served as the Chairman of Bayer's Supervisory Board from October 1, 2012 until April 28, 2020. Wenning joined Bayer in 1966 and held many roles over more than a fifty-year tenure, including head of Corporate Planning and Controlling and Chairman of the Glyphosate Litigation Committee. Wenning signed the Merger Agreement, and was involved in the day-to-day operations of, and exercised power and control over Bayer, including by, among other things, directing its public statements and regulatory actions. Because of his senior position with the Company, Wenning possessed the power and authority to control the contents of the Merger Agreement, Bayer's reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

51.    Defendant Liam Condon has served as President of Bayer's Crop Science Division since December 2012, and, since January 1, 2016, as a member of the Company's Management Board. Condon was previously Managing Director of Schering AG ("Schering") and joined Bayer following the Company's acquisition of Schering in 2006. Condon also serves as Chairman of the Board of Directors of CropLife International, an agricultural industry association. Condon signed the Merger Agreement, and was involved in the day-to-day operations of, and exercised power and control over Bayer, including by, among other things, directing its public statements and regulatory actions. Because of his senior position with the Company, Condon possessed the power and authority to control the contents of the Merger Agreement, Bayer's reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

52.    Defendant Johannes Dietsch served as Bayer's Chief Financial Officer ("CFO") from October 1, 2014 until May 31, 2018, and as a member of the Company's Management Board from September 1, 2014 until May 31, 2018. Because of his senior position with the Company, Dietsch possessed the power and authority to control the contents of the Merger Agreement, Bayer's reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

53.    Defendant Wolfgang Nickl has served as Bayer's CFO since June 1, 2018, and as a member of the Company's Management Board since April 26, 2018. Nickl was involved in the

day-to-day operations of, and exercised power and control over Bayer, including by, among other things, directing its public statements and regulatory actions.

54.    Defendants Baumann, Wenning, Condon, Dietsch, and Nickl are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Bayer, possessed the power and authority to control the contents of the Merger Agreement, the Company's reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## C.    Relevant Non-Parties

55.    Monsanto is an indirect, wholly-owned subsidiary of Bayer and a leading producer of agricultural products, based in St. Louis, Missouri. Before its acquisition by Bayer in 2018, Monsanto was a public company that employed more than 20,000 people in almost 70 countries. In the 1990s, Monsanto pioneered a technology that enables certain crops to resist exposure to glyphosate, the active ingredient in Monsanto's Roundup herbicide. This technological advance propelled the success of both of Monsanto's divisions and reporting segments: (1) the Seeds and Genomics segment that led as a global producer of seeds and traits, such as glyphosate-tolerant seeds, and (2) the Agricultural Productivity segment that was one of the world's largest producers of crop protection products, such as herbicides like Roundup. Monsanto's total net sales across both segments in FY 2016 amounted to just over $13.5 billion. The Seeds division sold largely glyphosate tolerant seeds while the Agricultural Productivity segment sold the original flagship herbicide product Roundup. Nearly 75% of Monsanto's revenue came from its Seeds and

Genomics segment, providing $6 billion of profit for Monsanto in 2016, which constituted almost 87% of its profit for that year.

## IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    Bayer and its Business

56.    Over its more than 150-year history, Bayer had grown from its roots as a German synthetic dye manufacturer and member of the infamous I.G. Farben chemicals cartel—a supplier of Zyklon B and other deadly chemicals used by the Nazis in the Holocaust—to a global conglomerate with as many as 30 separate businesses, including pharmaceuticals, plastics, rubber, and chemicals. Beginning in 2010, as *Bloomberg* has reported, then-CEO Marijn Dekkers had led an aggressive effort to transform Bayer from "a stodgy chemicals conglomerate" best known as the maker of Aspirin into a respected and "more focused life sciences group," dedicated to a business model focused on "caring for plants, animals, and people," culminating in the Company's decision to spin off its $10 billion specialty-plastics division. By 2015, after a series of carefully planned acquisitions and divestitures, Bayer had grown to be the largest company in Germany's DAX-30 blue chip index, retaining that title even after its massive plastics divestment, and had the highest valuation on the Frankfurt Stock Exchange.

57.    By 2015, however, Bayer faced looming threats in both of its most profitable segments: pharmaceuticals and crop science. That year, as crop prices fell worldwide, the *Wall Street Journal* reported that Bayer's rivals were engaged in "a frenzy of agrochemicals transactions" that "threaten[ed] to leave Bayer marginalized." By the end of the year, Dow Chemical and DuPont had announced a $130 billion merger to combine seed and crop protection businesses. Just months later, in February 2016, Syngenta announced its acquisition by ChemChina, after rejecting an offer from Monsanto. At the same time, Bayer's blockbuster cardiovascular and eye-car drugs, Xarelto and Eylea, which together generated 35% of Bayer's pharmaceutical sales in 2018, had less than a decade left of patent protection, and analysts worried that the pipeline for new medicines was drying up.

58.    By 2016, Bayer's weakening positions in both segments left it vulnerable as a potential takeover target, with Monsanto considering an acquisition of Bayer's smaller agrochemical business, and Pfizer looking into acquiring Bayer's entire business. To shore up the company's portfolio, Defendant Wenning told the Management Board to examine all options for possible acquisitions, and Defendant Baumann, then a senior executive in charge of strategy, advocated for a controversial plan to acquire Monsanto, an agrochemical behemoth and pioneer of so-called "Frankenstein foods," or genetically-modified crops, a plan Baumann "had long set his eyes on," since at least 2011. The *Financial Times* reported that Baumann believed acquiring Monsanto would "make Bayer unacquirable," and would transform Bayer's smaller agrochemicals business into a market leader by achieving synergies between Bayer's pesticides and Monsanto's seeds and high-tech crops.

59.    In February 2016, Bayer suddenly announced that Dekkers, whose contract was originally set to run until the end of the year, would step down months earlier. The company named Baumann as his successor. Baumann continued his push for the Monsanto acquisition and had the support of Wenning, the Chairman of Bayer's board. The two men, known by colleagues as "big and small Werner," believed a major acquisition would provide "the extra heft" to generate the revenues necessary to "shield Bayer from unwanted suitors."

### B.    Bayer Hastily Seizes the Opportunity to Acquire Monsanto in Largest Foreign Acquisition in German History

60.    According to the *Wall Street Journal*, Defendant Baumann had been working on a potential acquisition of Monsanto "well before becoming CEO in 2016." But his predecessor, Dekkers, opposed the idea as "*as fraught with risks*," and "*reputational challenges springing from Monsanto's controversial image*." "[T]he idea so troubled Bayer's chief executive at the time that he didn't want to be associated with it."

61.    But when Dekkers suddenly stepped down, Baumann got the chance he needed to execute his plan. As *Bloomberg* later reported, in May 2016, just days into his tenure as CEO, Defendant Baumann secretly flew to St. Louis, "carrying a portable printer," to meet with

Monsanto's CEO, Hugh Grant, and make a "unsolicited, non-binding proposal" for a $62 billion all-cash acquisition of the agrochemical company. The size of the offer was staggering, nearly one-and-a-half times the size of Monsanto's market value at the time, representing a 44% premium, and dwarfing not only any prior Bayer acquisition but also any foreign acquisition by a German company in history.

62.    When the news of Bayer's $62 billion, $122-per-share all-cash offer leaked on May 18, 2016, the secret proposal came as "*a huge shock to investors*"—who Defendant Baumann had assured just weeks earlier that he saw "no need for a fundamental change in strategy"—and Bayer's ADR price dropped by $2.09, from a close of $27.03 per share on May 18, 2016 to $24.94 per share on May 19, 2016, a decline of 7.73%.

63.    Analysts raised concerns over the scale of the acquisition—not since Daimler's disastrous $38.6 billion acquisition of Chrysler in 1998 had a German company spent so much on a foreign acquisition—which would require taking on significant debt to finance. For example, analysts at Deutsche Bank, in a May 23, 2016 report, wrote that Bayer's "offer for Monsanto has not been taken well by investors," noting that "size, opportunity cost, financing structure as well as differences in opinion between management and investors on the strategic direction of Bayer" have all contributed to the drop in Bayer's share price.

64.    Other analysts echoed the sentiment. For example, analysts at Berenberg, in a May 20, 2016 report, wrote that they "struggled to find investors who favour this transaction," with many investors seeing the deal as "as a dramatic reversal of strategy" and "a value destructive process." Likewise, analysts at Natixis explained that they found the deal "unconvincing from a strategic angle," and stated that it would be "difficult to finance" and "would 'dilute' Bayer's image as a healthcare company." Jeremy Redenius, a senior at Bernstein, told the *Financial Times* that the "Bayer investors we have spoken with are not happy about this," explaining that investors had invested in Bayer "for its healthcare franchise not for its agri-chemicals business[,] [s]o buying Monsanto is not what they want."

65.    Analysts were not alone. Some of Bayer's largest shareholders called on the Supervisory Board to hold an extraordinary meeting of shareholders to vote on the proposed Merger. According to *Reuters,* in a June 7, 2016 letter to Defendant Wenning, Asif Rahman, a fund manager at Henderson Global Investors, Bayer's sixteenth largest shareholder, wrote that the proposed Merger represented "a major departure from a strategy of focus and integration of existing acquisitions," arguing that a shareholder vote was necessary "to repair market trust in the investment case." Similarly, Professor Christian Strenger, a Bayer shareholder and German corporate governance expert, called for a shareholder vote, telling *Handelsblatt* that "management and supervisory boards must develop a comprehensive picture of the potential effects and risks of an acquisition" and counseled, "in view of the massive criticism from investors, Bayer's supervisory board should initiate a renewed, intensive examination of its decision."

66.    Credit agencies echoed these sentiments. On May 24, 2016, the day after the Merger proposal was announced, Moody's placed Bayer's bond credit rating on review for a possible downgrade, noting that while the acquisition could provide material synergies, "the transaction will give rise to ***significant execution, reputational, and integration risks*** given its size both in terms of its monetary value and the scale of the operations acquired by Bayer."

67.    News outlets commented on the significant risks of acquiring Monsanto without adequate due diligence. Noting that Monsanto ranked as the fifth "***most hated***" company in the United States, *see* Melia Robinson, *Inside the Little-Known Monsanto Campus Where Scientists are Changing the Way You Eat*, Business Insider (Apr. 9, 2017), https://www.businessinsider.com/monsanto-photos-woodland-vegetable-business-2017-3, a reputation expert told *CNBC* that Bayer was "spending a lot to inherit a bad reputation" that would have "a knock-on effect of potential damage to sales and employee concerns." Likewise, *Bloomberg* noted that Monsanto was "widely detested" in Germany and viewed as "the main example of American corporate evil," with widespread opposition in the country to the use of glyphosate due to concerns that the chemical could cause cancer. These concerns raised the prospect that acquiring Monsanto meant "incorporating its bad reputation, which would also make

Bayer more vulnerable." Later that month, The Telegraph christened the deal "*the Frankenstein merger"* that "*could create a monster*."

### C.    Defendants Recognized that Monsanto's Major Red Flags Required an Extensive Due Diligence Investigation

68.    Due diligence for mergers and acquisitions ("M&A") is a critical part of the acquisition process. According to the Harvard Business Review, 70 to 90% of M&A transactions fail, but those that undergo a due diligence process are more likely to be successful than those that do not. Even when due diligence does not uncover concerns or problems that are fatal to a transaction, it can nonetheless impact the basics of the deal's valuation and price. For example, due diligence may yield information about reserve releases, tax exposures, or other financial obligations, that can provide the acquiror with better information to decide whether to proceed with the transaction at the original price. Thus, due diligence is essential to expose and mitigate a number of the potential threats and risks to a successful transaction and lead to better informed pricing, valuation or necessary adjustments. As a leading treatise on Due Diligence states:

> In the wake of a number of high-profile scandals, investor confidence in publicly available corporate and financial information has fallen dramatically. Material that was previously considered reliable, such as audited financial statements and other data certified by third parties, may now require *independent verification* by investors and their transaction professionals. Thus, as companies consider potential investments, make offerings of securities, and engage in investment advisor or investment steward transactions, the due diligence investigation has increasingly become more important. *The ultimate economic and strategic success of any transaction (and the liability of the professionals involved for their mistakes and oversights) depends significantly on the quality and detail of the due diligence investigation itself.*

69.    According to Plaintiffs' due diligence expert, it is widely recognized that any M&A due diligence should include reviews of any legal and reputational risks, which might be unrecorded liabilities. Further, in any merger, the acquiring company is expected to focus on the aspects of the deal that are most critical to the transaction or any red flags that pose the most significant risks. In this case, Monsanto's legal and reputational exposure were understood as among the most significant risks of the Merger and were of critical importance to Bayer and the market.

70.     Monsanto's legal and reputational exposure posed the most significant risk because Monsanto was known to have a long history of reputational harm due to product liability vulnerabilities—as discussed at length above—and therefore should have been a subject of primary focus.

71.     As part of the Merger, Bayer was expected to conduct due diligence into Monsanto to determine if Monsanto was an appropriate acquisition. In its 2016 Annual Report, Bayer explained that such due diligence is imperative, and the "failure to successfully integrate a newly acquired business or unexpectedly high integration costs, for example, could jeopardize the achievement of qualitative or quantitative targets and adversely impact earnings." In its 2016 Annual Report, Bayer explained its due diligence process for acquisitions in connection with the Merger as follows:

> In the course of due diligence and throughout the subsequent integration process, we seek to identify and classify the potential risks of an acquisition target such as compliance with applicable environmental regulations and occupational health and safety standards at production sites.

72.     In 2016, Bayer's experience with prior mergers and acquisitions underscored the importance of effective due diligence. In September 2016, Bayer admitted that the Company's failure to identify weaknesses in Merck & Co's OTC drug business prior to its $14.2 billion acquisition of Merck in 2014 was the primary reason the acquisition did not produce $200 million in annual savings that Bayer anticipated. Specifically, Defendant Baumann—who was the "driving force" behind the Merck acquisition—blamed a "limited ability to do due diligence in a highly competitive process" for the acquisition's failure. According to the *Wall Street Journal*, Bayer's due diligence failures with the Merck OTC acquisition "haunt[ed]" the Merger and "raise[d] questions about the vetting that Bayer has done on Monsanto deal."

### 1.     The Dramatic Due Diligence Red Flag -- Monsanto's History of Product Liability Litigation

73.     Indeed, due diligence was even more imperative for the Monsanto acquisition, given the massive size of the Monsanto acquisition, which dwarfed any of Bayer's prior

acquisitions and would require Bayer to take on considerable debt. Additionally, Monsanto's well-known reputation as "*the most hated company in the world*" and "*one of the most derided names in corporate history*"—which was tied to Monsanto's history as a manufacturer behind some of the most infamous chemical products, including DDTs, PCBs, and Agent Orange—necessarily obligated extensive due diligence of the reputational and legal risks of acquiring Monsanto. *See supra* § I. Indeed, after the Merger proposal was announced, news outlets commented that Bayer's absorption of Monsanto's damaged brand would potentially drag down Bayer's own widely-respected reputation, stating: "*Monsanto's bad reputation raises question over Bayer bid*.*" See* David Reid, *Monsanto's Bad Reputation Raises Questions over Bayer Bid*, CNBC (May 24, 2016), https://www.cnbc.com/2016/05/24/monsantos-bad-reputation-raises-questions-over-bayer-bid.html.

74.    On May 28, 2016, in an interview that was also reported by the *Wall Street Journal*, Defendant Baumann told the German Sunday newspaper *Frankfurter Allgemeine Sonntagszeitung* that Defendants were "*aware of Monsanto's reputation*," acknowledging investor concerns over the "reputational risks" of the Merger. Defendant Baumann assured the market, however, that Bayer knew "how [to] deal with it," explaining that "reputation is extremely important to us, precisely because we as a Bavarian have such an excellent reputation." For example, Defendant Baumann claimed that Bayer "would change the manners at Monsanto after a takeover" and called for a dialogue with environmental groups and nongovernment organizations about Monsanto's controversial business practices, including its glyphosate business. Additionally, Defendant Baumann claimed reputational problems with Monsanto's brand could be diminished by ending use of the Monsanto brand name, and relying on the "excellent reputation" of the "Bayer brand."

75.    Monsanto's troubled legal exposure was well known. By September 2016, at the time Bayer and Monsanto signed the Merger Agreement, Monsanto had agreed to pay nearly a billion dollars in settlements due to personal injury lawsuits that alleged injuries due to exposure to PCBs. The lawsuits alleged that Monsanto had known about the dangerous effects of PCB exposure for decades, and produced internal Monsanto memoranda dated as early as 1938 that

warned that PCBs were "so definitely toxic" at "low concentrations" that "[n]o liberties can be taken with it." Despite the mounting evidence—and Monsanto beginning to lose business as a result of the public understanding the dangers of PCBs—Monsanto publicly reassured its customers that the materials were safe, and actively tried to conceal evidence of the damage caused by PCBs. By the time of the September 2016 agreement, Monsanto told investors in its 2016 Form 10-K that it was still embroiled in lawsuits brought by municipalities claiming that Monsanto was responsible for PCB contamination. The month after Monsanto signed the Merger Agreement, it agreed to set aside $289 million to settle ongoing PCB litigation.

76.    The same concerns plagued dioxin, a chemical compound manufactured by Monsanto and used as the principal ingredient in Agent Orange. Just three years before the Merger, in 2013, Monsanto had agreed to pay $93 million to settle claims brought by a municipality due to a dioxin leak at a Monsanto manufacturing plant, which had resulted in two dozen workers suffering persistent dermatitis, and others reporting severe health effects ranging from severe pains to shortness of breath to loss of sensation in their limbs. Later studies concluded that exposed workers suffered from greater occurrences of cancer. The adverse health effects were known internally to be pervasive, with Monsanto's medical director in 1968 questioning internally whether there were "any employees" not suffering from dioxin exposure. Despite Monsanto's intimate knowledge of the dioxin's toxicity, the company continued to manufacture the chemical and worked with the United States government to develop Agent Orange, the disabling chemical cocktail used during the Vietnam War. Only decades later did the public learn that the chemical caused severe reproduction and developmental problems, including fetal malformations and stillbirths.

### 2.    Monsanto's Growing Legal Exposure to Roundup Litigation

77.    At the time the Merger proposal was announced in May 2016, Monsanto was beset by new lawsuits related to the potential toxicity of glyphosate, the active ingredient in Roundup. In addition to glyphosate, Roundup also contains surfactants, which are "wetting agents" or "surface-acting molecule[s]" that help the herbicide spread out and stay on leaf surfaces longer so

that the glyphosate can penetrate more easily. One such surfactant used in Roundup sold in the United States is polyethoxylated tallow amine ("POEA"). POEA has been banned for safety reasons in most of Europe.

78.    For more than three decades, glyphosate's potential genotoxicity—*i.e.*, the possibility of a chemical agent to cause cell damage, which in turn causes mutations that can lead to cancer—had been a topic of scientific debate. As early as 1981, scientists reported that rats exposed to glyphosate were associated with higher incidences of tumors.

79.    Although regulators in the United States and Europe had approved glyphosate, the IARC, an agency of the WHO, published a 92-page monograph on glyphosate concluding that glyphosate is "probably carcinogenic to humans." IARC is composed of independent scientists who are not paid for their work. The IARC report on glyphosate followed a year of research by seventeen scientists from eleven different countries, and the report cited 269 studies. In the wake of the IARC Report, dozens of plaintiffs filed lawsuits alleging that Roundup caused NHL. Monsanto faced as many as 120 cases by September 2016.

80.    News outlets later reported that, prior to the announcement of the proposed Merger, Defendants had analyzed the significant risks of the Merger internally. According to *the Wall Street Journal*, this review considered the "***legal and reputational dangers***" of the Merger, with the review specifically focused on the glyphosate litigation. The *Wall Street Journal* later reported that Baumann calculated that litigation and reputational risks "were limited and manageable" and that Bayer was "well-equipped to take on lawsuits against Roundup." At the same time, Dekkers continued to oppose the Monsanto acquisition, asking "that the Monsanto plan be kept under wraps until his departure."

81.    It is well recognized that any M&A due diligence should include extensive reviews of the legal and reputational risk of the acquisition. It was therefore critical that Bayer perform due diligence by investigating and examining Monsanto's internal documents and correspondence, including records concerning the safety and legal risks of the legacy Roundup and GBH-related business. This due diligence responsibility was particularly important, given the numerous red

flags present before the acquisition, including Monsanto's history of improper conduct and the pending legal actions.

82.     Defendants repeatedly characterized the Merger as friendly and stated that Bayer should not have been restricted in terms of its testing for legal and reputational vulnerabilities at Monsanto during its due diligence review. Although Defendants later indicated that antitrust regulators prevented full examination of Monsanto's internal documents, Bayer had ample opportunity to consult outside counsel in review of any competitively sensitive material, as the Merger Agreement expressly permitted. Further, Bayer would have been able to repeat the review in the form of a professionally conducted audit of the legacy Roundup business after the closing.

**D.      Defendants Present the Merger to Investors as an Unparalleled Opportunity for Shareholder Value and Promise an Extensive Due Diligence Investigation**

83.     In an effort to reassure nervous investors, Bayer decided to make the private proposal public on the next trading day, on May 23, 2016, confirming that Bayer had made a $62 billion offer, or $122 per share—37% over Monsanto's closing share price on May 9, 2016. Between the time the Merger was announced, and the signing of the Merger Agreement on September 14, 2016, Defendants repeatedly touted the benefits and minimized the risks of the Merger, which Defendants pledged would be "*confirmed through due diligence*." Additionally, Defendants repeatedly assured investors that Bayer's prior merger and integration experience prepared them to execute the Merger successfully.

84.     For example, on May 23, 2016, Defendant Baumann told investors that the Merger would result "in lower business risk while supporting further growth potential," and that Bayer was "*prepared to proceed immediately with due diligence*." Likewise, Defendant Dietsch told investors that Bayer anticipated the Merger would result in "financial benefits for Bayer and its shareholders," which Bayer "*expect[ed] to verify through the due diligence*." Additionally, Defendant Dietsch informed investors that Defendants "were very confident *we will maintain the strong integration track record*" and that they "assume[d] that integrating Monsanto from a business perspective will be no more complex than some of our previous acquisitions." And

Defendant Condon told investors that Bayer would be "*going through a diligent process* and I think we have a *very good track record of dealing with regulatory authorities* and ensuring any and all of their concerns are taken into account."

85.    During the same conference call, Defendant Baumann specifically acknowledged the reputational risks of acquiring Monsanto—including the political, regulatory, and reputational risks associated with glyphosate—but assured investors that those risks were not of concern. For example, Defendant Baumann acknowledged "*a political aspect to Monsanto*" and challenges in the "*political and regulatory environment*"—particularly those concerning "the topic of glyphosate and the pending renewal of the glyphosate authorization in Europe." But Defendant Bauman assured investors that Defendants "*underst[ood] the risk and the exposure that does exist*," and that even if regulators chose not to renew authorizations for glyphosate, "*[i]t would not affect the overall offer and proposal to acquire Monsanto*."

86.    On May 24, 2016, Monsanto announced that its board of directors had unanimously rejected Bayer's initial $122-per-share offer, determining that the proposal was "financially inadequate and the proposal failed to provide sufficient transaction certainty regarding regulatory and financing risks." Over the next few months, as Monsanto and Bayer continued to negotiate an acquisition, news outlets and analysts widely reported on Bayer's requests for access to Monsanto's internal information in order to conduct due diligence, which Monsanto repeatedly rebuffed until Bayer raised its offer.

87.    On May 28, 2016, after Monsanto rejected Bayer's initial $122-per-share offer, Bayer sent Monsanto a letter reiterating its $122-per-share proposal and informing Monsanto that Bayer had fully negotiated agreements with banks to provide the entire transaction financing and underwriting. Over the course of the next few weeks, Monsanto internally evaluated the offer and considered proposals from at least two other companies for alternative strategic transactions.

88.    On June 21, 2016, Defendant Baumann met with Monsanto's CEO, Hugh Grant, to discuss Bayer's proposal. Defendant Baumann told Grant that Bayer would not consider increasing its offer unless it first had access to perform due diligence to support a higher value. But Grant

responded that Monsanto's board of directors had already rejected the $122-per-share as inadequate, and that in order for Bayer to move to due diligence, Monsanto would need to have a higher price and a reverse break-up fee. Defendant Baumann and Grant agreed to have their respective financial advisors engage in discussions to focus on the particular due diligence areas that would assist Bayer in increasing its offer, with Defendant Baumann agreeing to consider Monsanto's requests for an increased reverse break-up fee. Four days later, according on June 25, 2016, financial advisors for Bayer and Monsanto discussed the value, break-up fee, and transaction process, including Bayer's primary areas of focus for due diligence that could affect the offer price.

89. News outlets and analysts followed the negotiations closely, emphasizing Bayer's efforts to conduct due diligence, expecting that Bayer wouldn't raise its offer without examining "confidential company data." For example, on June 13, 2016, Bloomberg reported that "due diligence looms as [the] next step" in Bayer's efforts to finalize the Merger, noting that Bayer's second $122-per-share offer included a request "seeking due diligence," but that Monsanto was "refusing to grant such access" until Bayer raised its offer. Specifically, an analyst at Piper Jaffray told Bloomberg that "Bayer is unlikely to budge on its offer without a look at confidential company data." Other analysts echoed that sentiment. For example, Bernhard Weininger, a Frankfurt-based analyst at Independent Research, told the German newspaper *Handelsblatt*: "Bayer would like to perform due diligence -- looking at Monsanto's internal business records -- before deciding whether to raise its bid."

90. But on July 14, 2016, Bayer announced in a press release that after it had received "***additional information***" in "***private discussions***," Bayer had increased its offer to $125-per-share, adding that it would agree to a $1.5 billion reverse break-up fee and stating that it had begun negotiations with Monsanto over the terms of a confidentiality agreement to allow for "extensive due diligence." In a report that day, analysts at JPMorgan downplayed the significance of the internal information that had been provided, explaining "[w]hile Bayer has received additional information during private discussions, we do not believe this represents full due diligence."

According to the analysts, Bayer's increased offer and break-up fee was likely "a gesture of goodwill potentially aimed to gain access to Monsanto books."

91.    The next day, Monsanto's board of directors unanimously rejected the revised Bayer proposal, but authorized management to provide limited due diligence to Bayer, including a management presentation. During the following days, Monsanto and Bayer and their financial advisors negotiated the terms of a confidentiality agreement (the "Confidentiality Agreement"), which included Monsanto's proposal for a three-month standstill provision. News outlets viewed Monsanto's latest rejection as "widely expected," but specifically commented on Bayer's efforts to get access to Monsanto's internal documents. According to *Reuters*: "Bayer said it was disappointed with Monsanto's decision to reject its latest offer, but was looking forward to continued dialogue with Monsanto under an appropriate confidentiality agreement that would allow access to additional information."

92.    On July 19, 2016, Monsanto and Bayer entered into a confidentiality agreement to permit access to additional information. Three days later, on July 22, 2016, Monsanto provided a management presentation to Bayer and their legal and financial advisors. Following the management presentation, Defendant Baumann told Grant that Bayer did not intend to increase its offer and Grant suggested it might be productive if he and Robert Stevens, one of Monsanto's independent directors, were to meet in person with Defendants Baumann and Wenning. *Bloomberg* reported on August 4, 2016 that Bayer had signed "confidentiality agreements to conduct due diligence on Monsanto, a process that is expected to last a few more weeks," and was "examining Monsanto's financial accounts."

93.    On August 5, 2016, Defendants Baumann and Wenning met with Grant and Stevens to discuss certain key terms in a potential negotiated transaction. During the meeting, Defendants Baumann and Wenning indicated that Bayer would be willing to increase its offer to $126.50. Later, in the same meeting, Defendants Baumann and Wenning told Monsanto that they were willing to increase the offer to $127.50 and that Bayer was prepared to commit to divest assets worth as much of 12% of Monsanto's net sales in order to obtain antitrust approvals.

94.    Five days later, on August 10, 2016, Defendant Baumann sent a letter to Grant confirming in writing the $127.50-per-share offer, subject to completion of confirmatory due diligence, and reiterating Bayer's commitment to divest assets representing up to 12% of Monsanto's net sales to obtain antitrust approvals and a $1.5 billion reverse break-up fee. At its regular meeting on August 11 and 12, 2016, Monsanto's board of directors reviewed Bayer's latest $127.50-per-share offer, along with the status of Monsanto's discussions with two other companies, and authorized Monsanto's management to provide due diligence information to Bayer.

95.    On August 14, 2016, according to the Background of the Merger later provided in Monsanto's Schedule 14A Proxy Statement filed with the SEC on November 10, 2016 (the "Proxy Statement"), Defendant Baumann and Grant agreed to a process for Bayer to proceed with its due diligence investigation of Monsanto. Five days later, on August 19, 2016, according to the Proxy Statement, Monsanto made available to Bayer and its legal and financial advisors' due diligence information regarding Monsanto. Up until that point, Reuters reported, Monsanto had given Bayer only "limited access to its books" and "a limited drip of information." During the next three weeks, from August 19 to September 12, 2016, Bayer and its advisors continued their due diligence investigations of Monsanto and its business.

96.    On September 14, 2016, Defendants announced that Bayer and Monsanto had executed the Merger Agreement, with Bayer agreeing to an all-cash $128-per-share acquisition of Monsanto, representing a premium of 44% on Monsanto's market value at the time, with a commitment to a $2 billion reverse break-up fee. Defendant Baumann told investors Bayer agreed to the higher offer "[f]ollowing additional information and thorough analysis conducted during [the] due diligence process," and that the "significant potential for sales and cost synergies" had been "***confirmed in due diligence.***"

97.    In sum, during this period, Defendants conveyed to investors at least three important facts: (1) they understood the significance of the legal and reputational risks of acquiring Monsanto; (2) they comprehensively evaluated (and would continue to evaluate) the benefits and

risks of Monsanto's business, including by reviewing Monsanto's internal documents; and (3) that they continued to confirm there were no issues that would impede the successful and financially beneficial integration of the two companies. But this could not have been further from the truth.

**E.      After Signing the Merger Agreement in September 2016, Defendants Reassured Investors that the Due Diligence Investigation Would Continue Through the Lengthy Pre-Closing Period**

98.      The Merger was supposed to take a year to complete (closing in September 2017) but was also subject to various regulatory approvals before the deal could be completed.

99.      After the Merger Agreement was signed, Defendants told investors that the Merger would continue to be evaluated until closing, by comparing Monsanto's "strand-alone performance" with Bayer's expectations. Indeed, Defendant Baumann later told investors, in a conference call on July 27, 2017, that the lengthy pre-closing period for the Merger with Monsanto (1-2 years) meant that Defendants would have plenty of time to catch any problems with the deal, explaining that the shorter pre-closing period for the Merck OTC acquisition, which lasted five months, was a "contributing factor" for the due diligence shortcomings:

> With Merck . . .when we took over the business, so we signed in May and we actually closed quarter 4, it was already eroding compared to our assumption [and] . . . I think in some areas, we could have seen a little bit more and should not have had the same level of surprise we are talking about right now, particularly with Dr. Scholl's and Coppertone. Some of it could have potentially been seen. We did not see it, but that was only one contributing factor.
>
> So now let's switch to the situation with Monsanto. While all of us are anxious to close the transaction as soon as possible, *the good thing of having to wait more than a year is that we see stand-alone performance of the company we are interested in.*

100.      Similarly, the Merger Agreement, which Monsanto filed as part of its Proxy Statement, informed investors that Bayer would be entitled to review Monsanto's internal documents prior to closing. Section 6.6 of the Merger Agreement required Monsanto to provide, upon Bayer's request, any "reasonable information in its possession" concerning (i) Monsanto, its subsidiaries, and its officers and directors; and (ii) Monsanto's "business, properties and personnel." If Bayer requested information that was particularly sensitive, Monsanto was required

to provide Bayer with access to an "electronic data room" for review by Bayer's "Clean Team" of any documents marked "Clean Team Only Information," as defined in the Confidentiality Agreement. And if Monsanto objected to any request or otherwise withheld information, Monsanto had to inform Bayer of the "general nature" of the withheld information and take measures to allow "reasonable disclosure," such as by providing (i) "clean room procedures," (ii) "redaction of text from documents," or (iii) "entry into a customary joint defense agreement with respect to any information to be so provided. Further, Monsanto was permitted to designate "competitively sensitive material" as "Outside Counsel Only Material" or with similar restrictions, which would only be provided to Bayer's outside counsel, subject to any additional confidentiality or joint defense agreements.

**F.      In the Pre-Closing Period Prior to June 2018, Damaging Internal Monsanto Documents Began to Emerge**

**1.      March 2017 Damaging Monsanto Papers Emerge**

101.    During the Pre-Closing Period, evidence of Monsanto's massive exposure in the Roundup Litigation was slowly revealed publicly for the first time, as the first Roundup lawsuits progressed through discovery and then trial. At the same time, more and more Roundup-related lawsuits were filed, growing from 120 in September 2016, when the Merger Agreement was signed, to more than 5,000 by June 2018, when the Merger closed.

102.    On October 3, 2016, the Judicial Panel on Multidistrict Litigation ("JPML") issued an order consolidating all the federal cases against Monsanto involving Roundup-related tort claims in the U.S. District Court for the Northern District of California, overseen by U.S. District Judge Vince Chhabria. By October 30, 2016, Monsanto told Judge Chhabria in a court filing that "substantial progress" had been made on general causation discovery and Monsanto had produced 3.5 million pages of documents, including Monsanto's EPA registration and correspondence files related to GBHs, Monsanto's files of scientific studies and literature related to the safety of GBH to people and other mammals, material safety data sheets regarding Monsanto GBH, labels for Monsanto GBH, and public communications by Monsanto regarding the safety of GBH. At the

time, Monsanto's document productions were subject to protective and confidentiality orders and other discovery-related protocols.

103.    On March 13, 2017, Judge Chhabria denied Monsanto's request to seal certain internal Monsanto documents relating to EPA reports on glyphosate, finding that there was "no credible argument" that the documents revealed any "trade secrets" that would justify sealing. In the same order, Judge Chhabria explained that while reports from the EPA and IARC are relevant, they were not "central to the general causation question":

> *Although Monsanto has taken inconsistent positions on this issue, at the most recent hearing it conceded that the IARC and EPA reports are relevant. . . . This does not mean, however, that the IARC and EPA reports are central to the general causation question; it means only that they are relevant.* The IARC and EPA reports analyze studies that were previously conducted on the carcinogenicity of glyphosate. The experts in this case will need to do the same thing – that is, they will need to analyze the studies themselves and offer opinions about what they show. *The opinions of the IARC and EPA about what the studies show, while important, are secondary*.

104.    Following the order, Judge Chhabria published the internal Monsanto documents on the district court's website on March 14 and 15, 2016. Release of the documents, which revealed Monsanto's efforts to manipulate academic research on the health risks of glyphosate, sparked a new wave of alarm over glyphosate's safety and scrutiny of Monsanto's research practices. These documents are widely referred to as the "Monsanto Papers."

105.    For example, the *New York Times* reported that the Monsanto Papers "raised questions" about the safety of glyphosate and the research practices of Monsanto, noting that the documents "included Monsanto's internal emails and email traffic between the company and federal regulators" that suggested that "Monsanto had ghostwritten research that was later attributed to academics" and "indicated that a senior official" at the EPA "had worked to quash a review" of glyphosate that was to have been conducted by the United States Department of Health and Human Services. According to *Reuters*, emails from a Monsanto executive proposed to ghostwrite parts of a 2013 report that was published under the names of several academic scientists, writing, "we would be keeping the cost down by us doing the writing" while researchers "would just edit & sign their names so to speak." In other documents, according to *Bloomberg*, Jess

Rowland, the EPA official in charge of evaluating the cancer risk of glyphosate, boasted to a Monsanto regulatory affairs manager about his efforts to block a review of glyphosate by the U.S. Department of Health and Human Services, saying "If I can kill this I should get a medal."

### 2. After the Release of the Monsanto Papers, Defendants Falsely Reaffirm the Strength of Their Due Diligence and Tout the Benefits of the Merger

106. Over the next few months, in the wake of the release of the Monsanto Papers, Defendants dismissed concerns over Monsanto's reputation and reassured investors that Bayer had conducted adequate due diligence. For example, at Bayer's annual shareholder meeting on April 28, 2017, Defendant Baumann acknowledged that Monsanto's reputation was "a major challenge," but assured investors that Bayer was addressing that challenge with "openness, expertise, and responsibility." At the same shareholder meeting, Defendant Wenning defended the Supervisory Board's oversight of the Merger, noting that the Supervisory Board reviewed "extensive information" and "all of the most important aspects" of the Merger, including "possible risks to Bayer's reputation," and that "[a]ll of the essential aspects [of the Merger] was scrutinized and reviewed by us in detail and are supported by us unreservedly."

107. On July 27, 2017, in a Q2 2017 earnings call, Defendant Baumann dismissed an analyst's question raising concerns about the adequacy of the due diligence of Monsanto, rejecting the analyst's comparison with the Merck OTC acquisition and stating that "*the due diligence process was quite different with [Merck OTC] compared to what we experienced with Monsanto*":

> [I]f we go back to the acquisition of [Merck OTC], the due diligence process was quite different with [Merck OTC] compared to what we experienced with Monsanto. *So the management presentation and the confirmatory due diligence with Monsanto, the Monsanto people went out of their way to provide us with transparency, data and visibility to the most critical questions we had that also related to value* and the composition of our business case because they wanted to convince us to pay a higher price compared to what was on the table and the process was different in terms of competitive pressure compared to what we saw with Merck.
>
> With Merck, . . . the issue was that we did not get a full transparency on the new product development pipeline and some of the newly launched products in the U.S. already. . . . I think in some areas, we could have seen a little bit more and should

not have had the same level of surprise we are talking about right now, . . . . Some of it could have potentially been seen. We did not see it, but that was only one contributing factor.

So now let's switch to the situation with Monsanto . . . And of course, as always in life, we don't know what we don't know. But given the perspective we have today with what I've just shared with you in terms of existing evidence, we have a very high level of comfort.

108.    On August 1, 2017, another round of Monsanto's internal documents were released by attorneys for Roundup MDL plaintiffs who obtained the documents from Monsanto during discovery. Like the first batch of "Monsanto Papers" released earlier that year, the latest documents "raised new questions" about Monsanto's "efforts to influence the news media and scientific research and revealed internal debate over the safety of [glyphosate]," such as by ghostwriting articles for academic researchers in an effort to discredit the IARC report. One former Monsanto employee, according to the *New York Times,* wrote in a 2015 email to a Monsanto executive: "I can't be part of deceptive authorship on a presentation or publication." In addition, the documents indicated that there were internal divisions at Monsanto, with one Monsanto scientist writing in an internal email: "If somebody came to me and said they wanted to test Roundup I know how I would react — with serious concern." Other documents suggested Monsanto was aware that Roundup was potentially more toxic than glyphosate alone, with one Monsanto executive writing in a 2002 email, "What I've been hearing from you is that this continues to be the case with these studies — Glyphosate is O.K. but the formulated product (and thus the surfactant) does the damage."

109.    As the Closing Date approached, hundreds of additional glyphosate-related lawsuits were filed against Monsanto, with 1,400 plaintiffs filing claims by May 2017. By the following year, that number would increase by nearly fivefold to 5,200 claims. But Defendants continued to reassure investors of the substantial benefits and low risks of the Merger. For example, at Bayer's annual shareholder meeting, on May 25, 2018, Defendant Baumann told investors that the Merger was "***just as attractive today as we assessed it to be two years ago.***" Similarly, in a press release the following week, Defendant Baumann stated that they had

"diligently prepared for the upcoming integration over the past two years," emphasizing that "[o]ur extensive experience in integrating other large companies has proven that we can and will be successful."

### G. Almost Immediately After Closing the Merger, Jury Verdicts Begin to Reveal Bayer's Massive Exposure to Roundup Liability

#### 1. The *Daubert* Hearing and Order in the Roundup MDL Signal That the Roundup Litigation Will Involve a Battle-of-the-Experts on Whether Roundup Can Cause Cancer

110. Starting on March 5, 2018, Judge Chhabria held "science week," seven days of hearings in the Roundup MDL to address *Daubert* challenges to the expert witnesses on which the plaintiffs and Monsanto intended to rely in the Roundup Litigation. These experts' opinions addressed the question of general causation—specifically, as Judge Chhabria put it, "whether glyphosate is capable of causing NHL at exposure levels humans might have experienced." The hearings were video-recorded and made publicly available on the U.S. Courts website.

111. On July 10, 2018, Judge Chhabria issued an order (the "*Daubert* Order") denying Monsanto's *Daubert* challenges to the plaintiffs' experts. *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102 (N.D. Cal. 2018). Although there were some potential problems with the plaintiffs' experts' testimony, Judge Chhabria wrote,

> [a]pplying the standard set forth in the case law for admission of expert testimony, the Court cannot go so far as to say these experts have served up the kind of junk science that requires exclusion from trial. And the testimony of [plaintiffs' three principal] experts is directly on topic, because they (in contrast to some other experts) went beyond the inquiry conducted by IARC, offering independent and relatively comprehensive opinions that the epidemiological and other evidence demonstrates glyphosate causes NHL in some people who are exposed to it. Accordingly, their opinions are admissible . . . .

*Id.* at 1109.

112. Specifically, Judge Chhabria noted, the plaintiffs' experts have:

> surveyed the significant body of epidemiological literature relevant to this question; identified at least a few statistically significant elevated odds ratios from case-control studies and meta-analyses; identified what they deem to be a pattern of odds ratios above 1.0 from the case-control studies, even if not all are statistically significant; emphasized that studies of glyphosate have focused on many different types of cancer but found a link only between glyphosate and NHL; given legitimate reasons to question the results of the primary study on which Monsanto relies [(*i.e.*, the Agricultural Health Study)]; and concluded, in light of all the

available evidence, that a causal interpretation is appropriate. . . . Therefore, the plaintiffs have presented evidence from which a reasonable jury could conclude that glyphosate can cause NHL at human-relevant doses.

*Id.* at 1151-52.

113.    Judge Chhabria further wrote that the scientific evidence regarding whether glyphosate is capable of causing NHL is "open to different interpretations" and "does not point unequivocally toward a particular conclusion." *Id.* at 1126, 1130.

114.    The *Daubert* Order also specifically detailed how the plaintiffs planned to attack the primary study on which Monsanto relied, the Agricultural Health Study ("AHS"). First, the plaintiffs' experts highlighted potential problems with the way glyphosate exposure was assessed during the AHS's initial and follow-up surveys (*i.e.*, exposure misclassification). Second, the plaintiffs' experts identified problems with how the AHS questionnaire asked about how respondent used personal protective equipment, noting that the survey did not ask how such equipment was used when applying glyphosate, and also that study participants may have felt an incentive to portray themselves as using protective gear properly even if they did not actually do so. Third, the plaintiffs' experts also contended there was a particular risk of misclassification where glyphosate is concerned (compared to other pesticides studied in the AHS) because use patterns changed dramatically in the mid-1990s with the introduction of glyphosate-resistant genetically engineered crops. The AHS's follow-up survey asked only about pesticide use during the last year of farming prior to the interview, rather than asking about all the intervening years. Further, the authors imputed the exposures of the approximately thirty-seven percent of participants who did not respond to the follow-up survey using a mathematical model, using a method that was susceptible to error. *Id.* at 1124-26.

115.    The *Daubert* Order thus made clear that there would be a battle-of-the-experts at each trial in the Roundup Litigation on the issue of general causation, which Judge Chhabria described as a "very close" question. *Id.* at 1108-09.

### 2. During the *Johnson* Trial, Monsanto's Internal Documents Emerge as Central to Plaintiff's Case

116. On June 7, 2018, Bayer announced it had completed the Merger for $128 per share, or $63 billion including debt, representing a 44% premium to Monsanto's share price on May 9, 2016. Defendant Baumann told investors: "Today is a great day . . . for our shareholders, because this transaction has the potential to create significant value." By that time, Defendants assurances to shareholders that the Merger was going smoothly had worked, with the price of Bayer ADRs rising by $6.23 from a close of $23.87 on May 24, 2016 to $30.10 on June 8, 2018, an increase of 26%.

117. Less than two weeks after the Merger's closing, pre-trial proceedings began in California state court in *Johnson v. Monsanto* (the "Johnson Case"), the first Roundup lawsuit to go to trial. News outlets and analysts widely covered the *Johnson* trial, but noted little concern by analysts, who had been buoyed by the consistent statements by Defendants expressing confidence that the prevailing scientific evidence unambiguously showed that Roundup was safe and non-carcinogenic, and that therefore they would prevail at trial by presenting science-based defenses that took into account the available scientific research as well as regulatory decisions based on that research.

118. However, as a result of the *Johnson* trial, the falsity of Defendants' unequivocal statements discounting any exposure from the Roundup Litigation began to emerge. The plaintiff in the Johnson Case, Dewayne Johnson, sought recovery based on theories that Roundup had a design defect and that Monsanto failed to warn him about its health risks, alleging that his exposure to glyphosate and GBHs developed by Monsanto caused him to develop NHL.

119. Whether glyphosate becomes more carcinogenic to humans when combined with a surfactant, as in Roundup, was a key issue at trial, and was covered in both the plaintiff's and Monsanto's opening statements. For instance, during his opening statement, Johnson's attorney stated:

> And so when we talk about Roundup, we're not talking about glyphosate. It is very, very important to understand the distinction. Glyphosate is a piece of Roundup, but

Roundup is both glyphosate and surfactant. And this is important because it's studied differently. It's studied completely differently. And this is something that's going to come out a lot throughout the trial, particularly when it comes to regulatory agencies because they look at glyphosate. They don't look at Roundup.

120. Further, during his opening statement, Johnson's attorney argued that Roundup's surfactant "basically latches onto the skin and therefore allows greater penetration into the human cell." And during the trial, Johnson put before the jury an internal email from Monsanto dated August 6, 2015, in which Monsanto's Dr. William Heydens acknowledged that Roundup's surfactant may play a role in causing cancer, stating, "the surfactant in the formulation will come up in the tumor promotion skin study because we think it played a role there."

121. The trial involved considerable expert testimony on both sides—a classic battle-of-the-experts—on the safety of glyphosate and the safety of GBHs including Roundup, and whether there was a material difference in safety between the two. Johnson's experts testified that to a reasonable degree of medical certainty, exposure to Roundup causes non-Hodgkin's lymphoma.

122. Johnson's case was supported by testimony from two expert witnesses on the issue of general causation. Johnson's first expert witness was Dr. Christopher Portier, PhD, whose qualifications included having led a U.S. governmental environmental health and toxic substances research department at the Centers for Disease Control and Prevention. Dr. Portier testified about his decades of experience with cancer risk assessments, and he testified that glyphosate caused cancer, based on his review of multiple relevant scientific studies. Dr. Portier testified that in assessing glyphosate as safe, U.S. and European regulators had violated their own standards, improperly credited self-serving chemical industry–backed research, and failed to properly analyze the data. Dr. Portier also testified about studies that found DNA damage in individuals who lived and worked in areas where glyphosate was sprayed from the air.

123. Johnson's second expert witness on the issue of general causation was Dr. Alfred Neugut, MD, PhD, an epidemiology expert and practicing oncologist who served as a professor of cancer research at Columbia University. Dr. Neugut testified that there was extensive scientific

research supporting the conclusion that GBHs cause NHL, and that while there were "multiple studies of glyphosate and every other cancer on earth," the only form of cancer that consistently showed a specific causal association with glyphosate was NHL.

124. Dr. Portier and Dr. Neugut also testified as to the flaws with the Agricultural Health Study, consistent with the testimony in the *Daubert* hearings in the Roundup MDL.

125. Johnson presented evidence at trial that Monsanto had acted with malice or indifference with respect to the health risks presented by Roundup. The evidence included documents showing Monsanto discounted legitimate questions surrounding glyphosate's safety and genotoxic effect, particularly when included in a formulated product containing a surfactant like Roundup, and failed to conduct adequate studies on its own. For example, Johnson presented evidence that the EPA was prepared to classify glyphosate as a possible carcinogen as early as 1983, when a study was published showing a causal association between glyphosate and kidney tumors in male mice. After Monsanto questioned the validity of the study, the EPA designed a new mouse study in consultation with Monsanto. Additionally, Johnson presented evidence that after peer-reviewed studies showing glyphosate's potential genotoxicity, Monsanto responded by trying to discredit or suppress the evidence. For example, Johnson presented a 2008 internal email from a high-level Monsanto scientist sent in response to a press release about a scientific paper concluding glyphosate increased cancer risks, which stated: "We have been aware of this paper for a[]while . . . how do we combat this?" Finally, other internal Monsanto emails, dated 2008 and 2009, showed that Monsanto was aware that the particular formulation of Roundup and POEA could be potentially more carcinogenic than glyphosate alone.

126. Johnson also introduced evidence that the regulatory approvals of glyphosate were deeply flawed because Monsanto had withheld adverse scientific evidence from regulators, including the U.S. Environmental Protection Agency ("EPA"). Johnson introduced evidence that Monsanto had withheld reports by Dr. James Parry of Swansea University in Wales, who served as a consultant to Monsanto, which concluded that both glyphosate and a GBH were potentially genotoxic and clastogenic. Johnson also introduced evidence Dr. Parry recommended further

studies of the Roundup formulation, but Monsanto refused to conduct them. And Johnson introduced evidence that Monsanto ghostwrote a key scientific research paper on glyphosate safety that Monsanto then used to respond to agency inquiries and to support regulatory reviews.

127.    Further, despite Defendants' later statements that Monsanto's science-based trial defenses were supported by over 800 scientific studies, no evidence to support those claims was introduced at the *Johnson* trial. Monsanto's opening statement in fact only cited 63 human epidemiology studies, 14 animal testing studies, and 140+ cell testing studies as relevant to the question of general causation. And Monsanto's defense focused on the epidemiology studies which, as Monsanto's lawyer admitted, only at most ten of which concerned NHL.

### 3.      *Johnson* **Verdict Awards Plaintiff $289 Million After Finding Monsanto Ignored Health Risks of Roundup**

128.    On August 10, 2018, after a three-week trial involving multiple expert witnesses on both sides, the *Johnson* jury reached a verdict, concluding that Roundup was a "***substantial factor***" in causing Johnson's NHL. Additionally, the jury concluded that Monsanto knew or should have known of the risks associated with exposure to Roundup[3] and that Monsanto "acted with malice or oppression" by failing to warn Johnson of the potential hazards and awarded Johnson $39 million in compensatory damages and $250 million in punitive damages.

129.    The market was shocked by the *Johnson* verdict and Bayer's share price plummeted on the news. By the time the market opened on the next trading day, Bayer's ADR price had fallen to $23.67 from the prior closing price of $26.59, or 11.0%, and it traded at a volume of 2,421,820 shares throughout the day on August 13, 2018, or over four times the average daily trading volume. Defendants were defiant, assuring investors that the jury's verdict was "at odds with the weight of scientific evidence" and "the conclusions of regulators around the world."

130.    Analyst reaction was mixed. For example, Mainfirst commented that while the loss was "surprising," the verdict "creates a material and likely long-running overhang for Bayer,"

---

[3] The term "glyphosate" does not appear on the *Johnson* verdict form, which specifically asked the jury to make findings as to Monsanto's Roundup products Roundup Pro® and Ranger Pro®.

noting that "the burden of proof in civil trials is low." Similarly, HSBC commented that the considerable scientific debate, with large numbers of studies on both sides of the carcinogenicity question, created considerable uncertainty and that "Bayer will have to justify what due diligence it has conducted on Roundup and any potential financial liability." And analysts at Berenberg noted that "Management also tells us that this issue was part of the due diligence when Bayer was reviewing its acquisition of Monsanto, and it was not seen as a major risk to the transaction."

131.    Other analysts expressed more alarm. For example, analysts at Citi Research reduced its price target by nearly 30%, writing, "The news over the weekend makes it virtually impossible to remain a buyer of Bayer shares." Analysts at Redburn reported that investors were voicing "reputational concerns" and raised questions about Bayer's "approach to transaction due diligence," noting that the due diligence failures with the Merck OTC acquisition "worried" investors "that the Monsanto deal will not end well."

132.    Other analysts, however, were buoyed by Defendant's assurances regarding the science supporting Roundup's non-carcinogenicity and the purported evidentiary support for Monsanto's science-based defenses, stating that the verdict in the Johnson Case was likely to be overturned, or at least reduced, by the trial court or on appeal. For example, on August 16, 2018, Redburn issued a report stating that based on having "spoken directly with Monsanto," it appeared "there is a very low likelihood that the company will settle with plaintiffs," especially considering that on appeal, "the trial outcome is set to be reviewed by a panel of technical experts instead of a regular state jury," and a "renewed emphasis upon scientifically linking Roundup to causing lymphoma could play to Monsanto and help overturn the initial verdict." Tony Jones, an analyst for Redburn, stated it was "reasonable" for the company's risk assessment to be founded upon "that regulatory status of glyphosate across all major geographies and that there is no credible, major study which demonstrates causality between reasonable exposure and primary cause of cancer." Similarly, on August 23, 2018, Berenberg issued a report noting that following the verdict, Bayer held a call for analysts and investors during which it "reiterated its complete confidence in the safety of glyphosate, noting that more than 800 studies support the product, and that it has

received strong regulatory endorsement around the world." Berenberg concluded: "we agree with Bayer that the weight of evidence supports the safety of glyphosate."

133.    News outlets specifically commented on investor concerns over the effectiveness of Bayer's due diligence and the emerging reputational challenges. The *Washington Post* quoted an expert in corporate reputation, who stated: "when evaluating its merger with Monsanto, Bayer probably factored in the costs of future litigation over thousands of Roundup lawsuits," but that "it remains to be seen" whether "Bayer also calculated the cost of reputational risks, including from whopping jury verdicts." In the same story, the *Washington Post* noted that another corporate adviser had asked, "Any stakeholder is going to be asking right now why they would buy Monsanto with this stuff hanging over its head?"

134.    Defendant Baumann, for his part, was deeply troubled by the drop in Bayer's ADR price following the *Johnson* verdict. In an exclusive January 21, 2019 interview with *The Australian Financial Review*, Baumann stated he was "concerned about the big drop in Bayer's share price since [the *Johnson* verdict]," and stated, "[w]e are concerned about the valuation of the company and share price." Nevertheless, Baumann said, "There is nothing wrong with the underlying strength and prospects of the company." Baumann also stated that "Bayer had adjusted the preparation for the next round of court battles," and that he was "hopeful" Bayer's "new approach" would see the "question of causation analysed and assessed in a substantially more objective manner than was the case in the Johnson trial."

4.    **Defendants Admit They Never Looked at Monsanto's Internal Documents, but Reassure Investors that Reevaluation of Roundup Litigation Risk is Unnecessary**

135.    Following the jury's verdict in the Johnson Case, Defendants repeatedly downplayed the verdict and continued to reassure investors that Bayer's legal exposure to the Roundup Litigation continued to be low because the scientific evidence unambiguously supported their trial defenses and regulators continued to conclude that glyphosate can be used safely. But the investment community wanted to know how Bayer's due diligence investigation failed to detect Monsanto's significant exposure to the Roundup Litigation.

136. On August 16, 2018, Defendants admitted for the first time that they never looked at Monsanto's internal documents before the closing of the Merger and told investors that due to the Hold Separate Order they "did not have access to detailed internal information at Monsanto."

137. That same day, the Hold Separate Order was lifted, and Defendants told investors that they "gain[ed] the ability to become actively involved in defense efforts in the glyphosate trials." In press releases and conference calls, Defendants led investors to believe that **this time** they had actually reviewed Monsanto's internal documents and found nothing to cause concern.

138. On August 23, 2018, Bayer held a conference call to discuss the Roundup Litigation. Defendant Baumann began his opening remarks by reiterating that they purportedly had only "limited access to Monsanto information" prior to closing:

> [T]he hold separate order imposed by the US Department of Justice ended last week, and this hold separate meant that we had to keep Monsanto Company separate from Bayer and had only limited access to Monsanto information. Also, our ability to publicly comment was limited but, as the hold separate has ended, we are now in a position to freely address all topics related to Bayer and Monsanto.

139. During that same call, Defendant Baumann later told investors that even though their "access to information was limited," Bayer's due diligence investigation was "appropriate":

> There have also been questions on the assessment of the litigation risk prior to Bayer and Monsanto signing the merger agreement. As the acquisition structure was a takeover of a publicly listed company, access to information was limited, as is usual in such scenarios. Bayer, through counsel, undertook appropriate due diligence of litigation and regulatory issues throughout the process leading to the finalisation of the merger.

140. Defendant Baumann admitted, however, that their due diligence investigation of the Roundup litigation risk was limited exclusively to "information that is out there in the public domain," but reassured investors that since having access to Monsanto's internal documents, they had found nothing that would raise any concerns:

> [A]s far as our access to Monsanto internal documentation is related – and also communication, you suggested, might have been a problem in the *Johnson* case – we have been under a complete hold separate, other than being allowed to put together our quarter two financials during the last two/two and a half months since the closing of the transaction*, so we have not had any access that goes beyond the information that is out there in the public domain. Since we have had access, we could reassure ourselves that there is no communication out there that would,*

*quote-unquote, qualify as 'smoking gun'*. Things have been used, as usual, by plaintiff lawyers, taken out of context.

141.    When an analyst from Barclays asked for confirmation that Bayer had since reviewed Monsanto's internal documents, Defendant Baumann reiterated that Defendants had done so:

> Question:    You said initially you didn't have sufficient access to [the internal communications], but you do now. Did I correctly understand you say you've now reviewed those and you're sufficiently satisfied that there is no meaningful adverse piece of information that will emerge from the internal communications at Monsanto?

> Baumann:    The internal communication that has been quoted in the *Johnson* case has been used out of context on purpose. There is nothing that we see related to that communication that would lead to us talking about the combined company now having misrepresented or withheld relevant data or actually said that glyphosate could probably cause cancer. None of that is actually the case, so we can solidly, with everything we know, stand behind our communication.
> . . . I think you also related it back to the due diligence at the time when we decided to acquire Monsanto. To put things into perspective, very few cases had been filed at the time in 2016 and the situation was quite different in terms of where this entire complex stood, at a very early stage in 2016, and where we are now, still at a very early stage but with the first case tried.

142.    Defendant Baumann later added that they also had not found any scientific evidence that would show "any relation" between GBHs and the occurrence of cancer:

> [T]here is no scientific evidence here that would lead to, let's say, a percentage-wise estimate of what that probability might look like. There is nothing that is in our hands or that is actually the result of the studies that are out there that suggests any relation between the application of glyphosate-based herbicides on one side and the occurrence of cancer of people who have been using that.

143.    During the same call, Defendant Baumann told investors that the jury's verdict was at odds with the scientific evidence, telling investors that there were "more than 800 scientific studies and reviews" and "conclusions of regulators and health authorities around the globe" about "glyphosate" (*i.e.*, the chemical glyphosate on its own, and not necessarily GBHs like Roundup) that "conclude that it can be used safely and does not cause cancer":

---

No: 3:20-cv-04737 (RS)  - [PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT                - 48

> The safety of glyphosate is substantiated by more than 800 scientific studies and reviews conducted over the course of many decades, which conclude that it can be used safely and does not cause cancer. This includes, notably, the US Agricultural Health Study. These findings are supported by the conclusions of regulators and health authorities around the globe, including the US Environmental Protection Agency, the National Institute of Health, European Chemicals Agency and the European Food Safety Authority, which have all concluded that glyphosate does not cause cancer.

144. Dismissing questions about the low "substantial evidence" standard for civil trials in California, Defendant Baumann told investors that the "verdict is inconsistent with the robust science-based conclusions of regulators and health authorities worldwide," and "completely inconsistent with all available facts," because Roundup was in "very good regulatory standing" and there was "strong science supporting" glyphosate's safety.

> This verdict is inconsistent with the robust science-based conclusions of regulators and health authorities worldwide, and we believe it is wrong. . . . .
>
> The more than 800 scientific studies are a reflection of the longevity, the popularity and the reach of our product. Countless researchers have studied glyphosate for regulatory submission and approval, and much of the scientific data on glyphosate comes from independent researchers with no connection to Monsanto. In particular, I point out the federally funded 2017 US Ag Health Study publication, which followed more than 50,000 farm workers and their spouses for more than 20 years and found no association between glyphosate-based herbicides and cancer.
>
> . . . [E]verything we know, not only by the studies that were undertaken by Monsanto but everybody else who has studied the product, also for regulatory and other purposes, suggests that this is a very, very robust assessment.

145. In an interview with the German newspaper *Handelsblatt*, Defendant Baumann echoed his statements during the August 23 conference call, stating that over the course of the merger process, Defendants "considered the legal risks" and "carried out due diligence to the extent that it is customary for the takeover of a listed company." He added that "the scope of the lawsuits that we are now dealing with could not be foreseen."

146. Analysts were largely persuaded by Defendants' statements about their trial defenses and the science purportedly supporting glyphosate's and Roundup's safety. For example, analysts at Berenberg, in a report on August 23, 2018, wrote: "we agree with Bayer that the weight of evidence supports the safety of glyphosate and we also agree that there should be no reason to

anticipate any slowdown in the day-to-day business." Similarly, analysts at Morningstar, in a report issued the same day, reported that "we believe the market has overreacted to the initial Aug. 10 verdict," writing:

> We expect Bayer's defense strategy will follow the typical pattern seen in major drug litigation, where cases are litigated one by one over a long period of time, wearing down the defense with heavy scientific support showing that glyphosate-related products were not responsible for causing cancer. Further, we believe the Aug. 10 ruling that awarded $289 million to a former groundskeeper with cancer will be appealed and that the final amount will be much lower. While nearly 8,000 cases remain, we believe most of them have low validity and are likely looking for any minor payment that might come with a potential class action settlement.

147. One month later, on September 5, 2018, Defendant Nickl downplayed the risk of potential damages awarded in those cases, telling investors that Bayer had made provisions for the costs of defending glyphosate cases for three years, but not for potential damages because Bayer was "more likely than not" to prevail in the lawsuits.

### 5. *Johnson* Court Rejects Monsanto's Request to Overturn Verdict, Finding "No Legal Basis to Dispute" Jury's Conclusions

148. On October 22, 2018, the court in *Johnson* ruled on post-trial motions, reducing the award of punitive damages from $250 million to $39 million, but denying Monsanto's motions for a new trial and for judgment notwithstanding the verdict. The court ruled that "***there is no legal basis to dispute the jury's determination that plaintiff's exposure to GBHs [glyphosate-based herbicides] was a substantial factor in causing his NHL***." By the time the market opened on October 23, 2018, the price of Bayer ADRs had already dropped from $22.00 at the prior market close to $19.39, or 11.9%, and throughout the day they traded at a volume of 1,993,429 shares, or over three times the average daily trading volume.

149. Defendants immediately announced that Bayer would appeal the verdict and assured investors that they expected to prevail. For example, Defendant Baumann assured investors that "[w]e are now joining forces between our litigation group and . . . the vast expertise we have, in particular, in product litigation cases . . . [a]nd we are also preparing the next cases with joint forces and our external legal support so that we believe that our chances to prevail

beyond the science and the fact[s] are very, very good" and "we are quite optimistic going into 2019 as the next cases are going to be litigated." And Defendant Condon continued to tout the expected benefits of the Acquisition, stating that "the combination of Bayer Crop Science and legacy Monsanto is a phenomenal combination" and "[t]his is really a special company that we have now put together."

150. Analysts at Mainfirst and Kepler Cheuvreaux, who had been listening to Bayer's reassurances about the evidence supporting Monsanto's defenses and likelihood of prevailing after trial acknowledged that the decision was "disappointing" and "worse than expected," respectively. But given that Defendants had flooded the market with false bravado and deceptive comments about Monsanto internal documents, the extent of their due diligence, and the state of science on Roundup, investors remained divided on how much worse things would get for Bayer. Some maintained a level of confidence that would have seemed deluded in the absence of Bayer's false reassurances, such as the analyst who reported that Bayer was "highly likely to win [the Johnson Case] on appeal." By contrast, a more skeptical analyst at TrueValue Labs wrote that "[a]s far as future trials, the well-known Monsanto Papers [the internal documents unsealed during litigation] underscore a potential for credibility issues with regards to prior scientific studies that distance glyphosate from cancer risk." But even this analyst did not conceive of how bad things would get, because Defendant Baumann had lied about the existence of the yet-to-be-released internal Monsanto documents that would be used against Monsanto at future trials.

**6.    In the *Hardeman* Trial, Plaintiff's Case Turns on Monsanto's Internal Documents Showing Roundup is More Toxic than Glyphosate Alone**

151. On January 28, 2019, Judge Chhabria held an evidentiary hearing in *Hardeman,* the first of three planned "bellwether" federal Roundup lawsuits and the second Roundup lawsuit to go to trial. Judge Chhabria ruled that he would allow evidence of Monsanto's corrupt influence over regulators and scientific research and evidence of Monsanto's ghostwriting. This evidence, he explained, was "super relevant."

152.    Nonetheless, many investors continued to trust Bayer's reassurances that the risks posed by the Roundup Litigation were minimal. One analyst at Credit Suisse, for example, cited the AHS scientific research touted by Bayer as a reason to expect that the impact of the litigation on Bayer would be only about $6 billion dollars.

153.    The *Hardeman* trial began on February 25, 2019. As in the *Johnson* trial, a key focus of the *Hardeman* trial was the difference in carcinogenicity between glyphosate and the formulated product Roundup, particularly during the liability and damages phase of the trial.

154.    At trial, evidence that Roundup (the formulated product) is more toxic than glyphosate alone—and that Monsanto *knew* it was potentially more toxic—proved to be central to Hardeman's case. One of Hardeman's experts, Dr. Dennis Weisenburger, testified about multiple studies showing that Roundup is up to ten times more genotoxic than glyphosate. Hardeman presented an internal email from Dr. Donna Farmer, a Monsanto toxicologist, which stated: "the terms glyphosate and Roundup cannot be used interchangeably." Hardeman also presented a 2002 email from Dr. William Heydens, Monsanto's head of Product Safety Strategy to Dr. Farmer, stating that "we are in pretty good shape with glyphosate but vulnerable with surfactants" and "this continues to be the case with these studies— Glyphosate is OK but the formulated product (and thus the surfactant) does the damage." In the email, Heydens writes: "Let's you and I sit down with all the new 'free studies' tomorrow. I want to see what they all say, and see if there's anything more we can do besides the usual 'pay no attention to the man behind the curtain.'"

155.    Hardeman also presented evidence of internal documents showing Monsanto manipulated scientific research and buried adverse findings, withholding them from regulators like EPA. The documents demonstrated that Monsanto had hired Dr. James Parry, a recognized expert in genotoxicology, in an effort to rebut an increasing number of studies showing that Roundup is genotoxic, but that this plan backfired when Dr. Parry found the studies showed an association between Roundup and cancer that merited greater study. One Monsanto employee reacted to Dr. Parry's findings by questioning whether Dr. Parry had "ever worked with industry before" and stated: "We may have to help him write all this." In another email exchange, Dr. Heydens wrote

that "[e]ven if we think we can eventually bring Parry around closer to where we need him," that they would still need a "back-up genotox supporter," adding that "[w]e have not made much progress and are currently very vulnerable in this area." And in another internal email presented by Hardeman, Monsanto's Director of Toxicology wrote:

> We want to find/develop someone who is comfortable with the genotox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genotox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. ***We simply aren't going to do the studies Parry suggest.***

156.    Other documents demonstrated that Monsanto ghostwrote scientific articles to misrepresent the safety of Roundup. Emails demonstrated that Monsanto had ghostwritten an article that had been published under the name of Dr. Gary Williams, which purported to conclude that, "under present and expected conditions of use, Roundup herbicide does not pose a health risk to humans." The Williams article was described as an "invaluable asset" for "responses to agencies" and "regulator[y] reviews" and stated that the article had "served us well in toxicology over the last decade."

157.    Further, at trial, Hardeman read into the record admissions by Monsanto that (a) it never conducted an epidemiological study to study the association between GBHs such as Roundup and NHL; (b) it had not conducted any long-term animal chronic toxicity studies on glyphosate since 1991; (c) it never conducted a long-term animal carcinogenicity study on any formulated pesticide product, including Roundup; and (d) it never conducted a long-term animal carcinogenicity study on any surfactant used in a glyphosate-based product.

158.    Finally, as in the *Johnson* trial, at the *Hardeman* trial, Monsanto did not present evidence of 800 scientific studies relevant to the question of whether Roundup causes NHL. Although Monsanto's attorney argued in their opening statement that "[t]here have been 800 scientific studies about Roundup," they immediately qualified that statement, conceding that "not all of those studies are dealing with cancer." The purported "800 scientific studies" were never mentioned again during the rest of the trial.

**7.    The *Hardeman* Jury Awards $80 Million to Plaintiff, Finding Monsanto Consciously Disregarded Public Safety by Concealing Roundup's Health Risks**

159.    On March 19, 2019, the jury in *Hardeman* reached a verdict, finding that the plaintiff's "exposure to Roundup was a substantial factor in causing his non-Hodgkin's lymphoma." Bayer responded by stating that the company was "confident the evidence in phase two will show that Monsanto's conduct has been appropriate and that the company should not be liable for Mr. Hardeman's cancer," again repeating that "more than 800 rigorous studies submitted to EPA, European and other regulators . . . confirms that these products are safe when used as directed."

160.    But those assertions were no more truthful than they had been before. By this point, though, investors believed them less. By the opening of the market on March 20, 2019, the day after the *Hardeman* verdict, the price of Bayer ADRs had fallen from $19.67 to $17.52, or 11.0%, and throughout the day it traded at a volume of 3,191,709 shares, or over five times the average daily volume. Following this news, numerous analysts downgraded Bayer stock.

161.    The harm that these verdicts caused to Bayer's reputation and bottom line went beyond the litigation risks. Not only had regulatory agencies begun to scrutinize past approvals of glyphosate, as discussed above, but consumers and retailers were also taking a new look at glyphosate-based products.

**H.    Unbeknownst to the Market, Defendants Internally Acknowledged that the Monsanto Due Diligence Investigation Was Potentially Inadequate**

162.    As early as September 2018, just weeks after the *Johnson* verdict, Defendants were already internally acknowledging that the due diligence investigation of Monsanto—specifically, its review of the Roundup Litigation risks—was potentially inadequate.

163.    As discussed in further detail below in Section IV.M, unbeknownst to the market, at the beginning of September 2018, the Supervisory Board commissioned the multinational law firm Linklaters LLP ("Linklaters") to prepare an expert legal opinion (the "Linklaters Report") on the question of whether the Management Board complied with their duties under German Stock

Corporation Law when deciding to enter into the Merger Agreement in September 2016 and to close the Merger in June 2018. The Linklaters Report was prepared by Dr. Ralph Wollburg, Co-Head of the Global M&A practice at Linklaters, despite the fact that Dr. Wollburg had, in 2016, publicly opposed demands (by Prof. Strenger and other Bayer shareholders) that Bayer hold a shareholder vote on the proposed Merger. According to *Handelsblatt,* in an article published on July 26, 2016, Dr. Wollburg "told *Handelsblatt* it was totally unnecessary for Bayer to hold an extraordinary meeting to consult its shareholders."

164.    The Linklaters Report was prepared only months before the annual general meeting ("AGM") in April 2019, where shareholders would vote on a resolution to discharge and approve the actions taken by the Management Board and the Supervisory Board for their acts over the prior year, as required by the German Stock Corporations Act ("AktG").[4]

165.    Although the Linklaters Report was completed by November 22, 2018 and was considered by the Supervisory Board at its December 2018 meeting, Bayer provided investors with only an abbreviated 3-page summary of the report at the 2019 annual shareholder meeting, and the market would not learn of the Linklater Report's most significant findings for more than a year. Defendant Wenning first disclosed the existence of the Linklater Report on February 27, 2019, in the Report of the Supervisory Board published in the 2018 Annual Report, explaining:

> At its meeting in December 2018, the Supervisory Board . . . also dealt once again with the risks arising from Monsanto's glyphosate business. This discussion also focused on a comprehensive expert report by a prominent law firm that examined compliance with audit obligations and duty of care responsibilities in this regard when the Monsanto transaction was prepared and implemented. The report came to the conclusion that the members of the Management Board had fulfilled their statutory duties in connection with the Monsanto transaction, particularly with regard to the examination and assessment of the liability risks related to the glyphosate business. The Supervisory Board concurred with the report's findings.

[4] Section 116 of the German Stock Corporations Act provides that every fiscal year, the AGM shall vote on a resolution "regarding the approval of the actions taken by the members of the management board and the approval of the actions taken by the members of the supervisory board, and the discharge to be granted to them." AktG, § 116(1). By approving the actions taken and granting discharge, the AGM "endorses the management of the company by the members of the management board and of the supervisory board." *Id.* § 116(2).

166. But Defendant Wenning's statement that a "prominent law firm" concluded that the Management Board "fulfilled their statutory duties" in connection with assessing the Roundup Liability risks of the Merger did little to mollify the growing frustration among shareholders.

167. On March 12, 2019, Professor Strenger, who had called on the Supervisory Board to hold a shareholder vote on the Merger in July 2016, ¶ 65, filed a countermotion ahead of the 2019 AGM opposing discharge of the Management Board and the Supervisory Board. The countermotion stated there had been an "incorrect assessment of the now dramatically increased legal risks of glyphosate related lawsuits." Prof. Strenger labeled the Linklaters Report "an understandably unqualified expert opinion" and noted Defendants' "impossibility of the ability to form the clearly necessary picture of the serious legal risks, only admitted in August 2018."

I. **In Bid to Prevent Shareholder Revolt, Defendants Present Expert Reports to Shareholders as Validating the Failed Due Diligence Investigation**

168. In March 2019, one month before the 2019 AGM, the Supervisory Board sought another legal opinion from Professor Mathias Habersack (the "Habersack Report"), a professor of private and business law at Ludwig-Maximilian University of Munich. According to *Manager Magazin,* the two legal opinions were commissioned because Defendant Wenning "want[ed] to avert a crushing defeat at the upcoming shareholders' meeting on April 26 with the help of legal opinions." He and Defendant Baumann were both reportedly "expecting sharp attacks there, claiming that they have not carefully examined the risks involved in buying" Monsanto.

169. Defendants Wenning and Baumann had reason to be concerned. On March 22 and April 3, 2019, the two leading proxy advisory firms Institutional Shareholder Services ("ISS") and Glass Lewis & Co. ("Glass Lewis") published recommendations against the discharge of the Management Board due to Defendants' failed due diligence investigation of the Roundup liability risks.

170. In a letter to shareholders distributed in the materials for the 2019 AGM, Defendants Baumann and Wenning responded to the ISS and Glass Lewis recommendations, relying on the Linklaters Report as support:

Based on the views held by regulatory authorities worldwide and scientists, the Management Board assessed the legal risks in connection with the use of glyphosate as low. When doing so, it also based its assessment on a detailed expert opinion prepared and updated regularly by a renowned U.S. law firm before the merger agreement was entered into. Compliance of the Board of Management with its legal duties has been confirmed by an external expert opinion prepared by the renowned international law firm Linklaters which – after an extensive review – came to the firm conclusion that the members of the Board of Management had complied with their legal duties in every respect with regard to the acquisition of Monsanto, and in particular with regard to the Board of Management's risk assessment of Monsanto's glyphosate-related businesses.

171.    That same day, Bayer released two near-identical 3-page abbreviated "summaries" of the purportedly independent Linklaters and Habersack reports and posted them on its website. In near identical language, the two summaries both found that the Management Board "could reasonably assume" they were making the decision, "including the liability risks arising from the glyphosate business of Monsanto, on the basis of adequate information." Both summaries based this conclusion on (i) "information on the scientific findings and risks associated with glyphosate," and (ii) "assessments of . . . the liability risks arising from the glyphosate business of Monsanto [that] were confirmed by Monsanto in the course of a due diligence process."

172.    At the 2019 AGM, Bayer shareholders expressed outrage over Defendants' due diligence failures. As *Bloomberg* reported: "At the heart of the debate was whether Baumann, Wenning and other leaders properly assessed the legal risks of Roundup, the controversial weedkiller it acquired together with Monsanto." According to *Handelsblatt,* in remarks at the 2019 AGM, Janne Werning, an analyst at Union Investment, a major Bayer shareholder, announced that they will vote against the discharge, stating: "***The management of Bayer has to face the accusation that it has neither recognized nor adequately taken into account the enormous legal risks of the Monsanto takeover***."

173.    According to *Fortune,* Professor Christian Strenger rejected Defendants' reliance on scientific evidence to defend their due diligence: "Mr. Baumann from Bayer always refers to 800 opinions that glyphosate is a safe product. But the big issue is how was it applied, and was it sold properly with sufficient warning signs." Prof. Strenger likewise argued Defendants were too "lenient with a proper analysis of the legal situation," rejecting Defendants' claim that Monsanto

was prohibited by the U.S. Department of Justice from giving Bayer full details of the Roundup Litigation: *"[Bayer] should have insisted. . . . These were not military secrets. Bayer should have told Monsanto, 'Either you get the DOJ to permit disclosure, or we're not going to proceed with the transaction.'"*

174. In their remarks at the 2019 AGM, Defendants Baumann and Wenning defended Bayer's due diligence, armed with the still-undisclosed Linklaters and Habersack reports, arguing that the Management Board "carefully weighed the opportunities and risks involved," which included "an assessment of the risks associated with the glyphosate business" based on three sources of information: (i) "publicly available documents from the regulatory authorities, which Bayer analyzed internally"; (ii) "statements and documents that Monsanto provided during due diligence"; and (iii) "on a detailed and regularly updated external expert opinion on the legal risks relating to glyphosate" by "a leading law firm and which was compiled before the acquisition agreement was signed." Defendant Wenning told shareholders that the Linklaters and Habersack reports found "that the Management Board had concerned itself in great depth with the opportunities of risks and risks of this transaction before the decision it took and continued to do this until the deal was executed."

175. Shareholders were unpersuaded. In an unprecedented vote, Defendants Baumann, Nickl, and Condon, and the other members of the Management Board lost the no-confidence vote, with 55% of shareholders voting in favor of the decision. According to the *Financial Times*, "It was a stinging rebuke: the first time a majority of shareholders had ever voted against the board of a German blue-chip company." In a separate vote, Prof. Strenger's motion for an audit of Bayer's M&A due diligence practices failed to pass, but garnered a support of 25.7% of shareholders, prompting Bayer to agree to take some of the recommendations under consideration in an attempt to assuage investors.

176. Following the stunning loss of the no-confidence vote, the Supervisory Board held an emergency meeting. According to *Bloomberg*, "[t]hough the result isn't legally binding, it

throws his [(*i.e.*, Baumann's)] future into question and prompted an immediate supervisory board session," noting that "[s]imilar rejections have cost German CEOs their jobs."

177. Analysts echoed these concerns. One analyst said afterwards that "[o]ne has to ask critically if the due diligence was faulty." Another investor remarked to the *Wall Street Journal,* "Management infected a healthy Bayer with the Monsanto virus, is now playing doctor but has no healing drug on hand." The article further noted that the acquisition was "unpopular with investors from the start," and *Bloomberg* reported that even if the weight of scientific evidence did show that glyphosate was as safe as Bayer leadership claimed, "[w]eighing scientific risk and legal risk are not the same thing, especially in a highly litigious environment like the U.S."

**J.      The *Pilliod* Jury Renders Massive $2 Billion Verdict After Plaintiffs Present Dozens of Additional Internal Documents Showing Monsanto's Misconduct**

178. On March 28, 2019, one day after the Hardeman Case concluded, the Pilliod Case became the third Roundup lawsuit to go to trial. As the last of the first three Roundup trials, the *Pilliod* plaintiffs had the benefit of even greater discovery into Monsanto's conduct.

179. Over the five-week trial, the plaintiffs presented never-before seen documents showing that Monsanto discounted legitimate questions surrounding Roundup's toxicity, failed to conduct adequate studies, surreptitiously contributed to and promoted articles reporting on glyphosate's safety, and lobbied regulators to conclude that glyphosate was safe. For example, the plaintiffs in *Pilliod* presented an internal memorandum instructing Monsanto employees to be "all about winning the argument," to "let nothing go," and to "discomfort our opposition," in order to prevent Roundup "being linked with. . . . safety concerns." In another internal memorandum, Monsanto emphasized the need to prevent restrictions on sales of Roundup by defending "glyphosate and Roundup against all toxicological allegations."

180. The *Pilliod* plaintiffs also presented dozens of additional internal Monsanto documents showing Monsanto's manipulation of scientific studies and regulators. The documents demonstrated that EPA officials had agreed in private emails with Monsanto to oppose the IARC finding prior to IARC's publication of its final report. And the EPA also appeared in other emails

Case 3:20-cv-04737-RS    Document 102-3    Filed 12/17/21    Page 66 of 129

to be acting in tandem with Monsanto to defer the detailed toxicological review of glyphosate scheduled by the ATSDR for 2015.

181.    As in the *Johnson* and *Hardeman* trials, whether Roundup was more carcinogenic than glyphosate alone because of the role of its surfactant was also a key issue at the *Pilliod* trial. The plaintiffs in *Pilliod* presented evidence that Monsanto scientists determined that POEA, the surfactant used in the version of Roundup sold in the United States (and that has been banned in some parts of Europe for safety reasons), had a synergistic effect with glyphosate that made it more genotoxic, and therefore more likely to cause cancer. The plaintiffs presented evidence that Monsanto knowingly chose to continue selling the POEA-based version of Roundup in the United States, even though less-toxic versions of Roundup that do not contain POEA are available and sold outside the United States. Further, the plaintiffs presented evidence of an internal Monsanto study that revealed that Roundup had a statistically and significantly higher rate of dermal absorption than pure glyphosate—at a rate 3.3 times the governmental limit. After receiving these results, Monsanto terminated the study and never published it.

182.    The plaintiffs in *Pilliod*, like the plaintiffs in *Johnson* and *Hardeman*, also presented evidence on the flaws of the AHS, including an internal Monsanto memorandum criticizing the AHS as inaccurate and unreliable. The memorandum, which was prepared by Monsanto's Dr. John Acquavella, states "[t]he exposure assessment in the AHS will be inaccurate" and "can produce spurious results."

183.    Additionally, as in the *Johnson* and *Hardeman* trials, at the *Pilliod* trial, Monsanto did not present evidence of more than 800 scientific studies supporting its defenses. In fact, the *Pilliod* plaintiffs' attorney explicitly argued in their opening statement that "there are not 800 studies on Roundup," and that "if that comes out of anyone's mouth, that's very misleading. There are 800 studies looking at eye irritation and skin irritation. There's about 25 studies on cancer, and . . . they don't look at Roundup, they look at glyphosate." Defendants did not refute this point and did not specifically cite a distinct number of studies on which their defenses relied.

No: 3:20-cv-04737 (RS)  - [PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT         - 60

184.    On May 13, 2019, the jury in the Pilliod Case reached a verdict, awarding the plaintiff more than $55 million in compensatory damages and $2 billion in punitive damages to a couple suffering from NHL. News outlets responded. One columnist at *Bloomberg* ripped "Bayer's consistent message . . . that science is on its side in the weedkiller cases," explaining that "weighing scientific risk and legal risk are not the same thing, especially in a highly litigious environment like the U.S":

> Bayer's supervisory board needs to take a serious look at how the company sets strategy and makes decisions because something has gone badly wrong. It must address whether its due diligence process for M&A is adequate. Some of the lawsuits afflicting Monsanto were happening in the background before the takeover completed. The German giant has commissioned work that says the board fulfilled its duties in assessing the risks. It's wrong if it thinks that gets the company off the hook.

> Consider the circumstances of how this deal happened. Buying Monsanto is not a transaction that was supported widely and then went suddenly awry. It was unpopular with investors from the start, marking a radical shift in strategy toward agriculture and constraining Bayer's ability to develop the pharma business through other deals. Shareholders protested but didn't get a vote on a takeover that emerged very much from Baumann's grand vision for the company. Hubris has followed.

185.    Similarly, the *Financial Times* commented that Bayer's apparent failure to predict the liability was a "blunder" caused by Bayer's "fear of missing out." *and "reflects badly on its due diligence."* News outlets ripped the deal as "***one of the worst in corporate history***" (*Financial Times*) "***one of the worst corporate deals***" (*The Wall Street Journal*), and one of the "***all-time worst deals***" (*The Globe and Mail*). Similarly, *Yahoo! Finance* wrote that Bayer's due diligence failures showed "staggering management incompetence sheltered by insularity and a lack of accountability," writing: "What's so astonishing is that Roundup's problems were hardly a secret. Some 11,000 cases were pending against Monsanto when Bayer bought the company, which was called by some "the most hated company in the world." And *The Globe and Mail* reported that the litigation risks of Roundup were obvious at the time of the Merger Agreement, stating: "***You can only wonder whether Bayer's advisers underplayed, or simply didn't understand, the severity of the litigation risks when they went to Germany to promote the Monsanto deal***."

186.    On June 13, 2019, Defendant Baumann sent an email to colleagues with the subject line "Letter from the Board of Management," admitting that the Monsanto acquisition had led to "questions of public trust" and the need to "elevate our efforts in transparency" and examine "how we engage with our stakeholders." Defendant Baumann announced that Bayer was preparing to launch an initiative to "regain public trust" with a commitment to developing a new alternative for glyphosate. The following day, Bayer announced a $5.6 billion commitment to sustainability and the development of a glyphosate alternative, taking out full-page advertisements in the *Washington Post* and *The New York Times* stating: "We listened. We learned."

**K.    In An Effort to Regain Shareholder Support, Defendants Agree to An Audit of Bayer's Due Diligence Practices and to Release Linklaters and Habersack Reports as Confirmation of the Adequacy of its Due Diligence**

187.    One month before the 2020 AGM, on February 27, 2020, Bayer announced that it had "reached an agreement" with Professor Strenger on a number of concessions, including a "voluntary special audit" of the Company's M&A due diligence practices, which Prof. Strenger had first called for the previous year, ¶ 65. The voluntary special audit would be performed by Professor Hans-Joachim Böcking of the University of Frankfurt and would be summarized in a report published by the end of March, ahead of the 2020 AGM. Additionally, as part of the agreement, Bayer said that Linklaters and Dr. Habersack would issue "more detailed statements" about the legal opinions they prepared ahead of the 2019 AGM, and that these statements would be published on the Bayer website. Finally, Bayer told investors that it had hired another independent lawyer, James B. Irwin, a retired mass-tort attorney, to prepare a report on the legal advice it commissioned before the Merger Agreement (the "Irwin Report"), which would likewise be published on the Company's website. According to the *Wall Street Journal,* noting the no-confidence vote the prior year, "[s]ome analysts expect the meeting to deliver another rebuke for Mr. Baumann if Bayer can't show it is making progress on settling the lawsuits."

188.    But the announced "audit" was in fact a public-relations ploy designed to give false reassurance to investors. Each of the four sources of supposed scrutiny to which Bayer said it would publicly submit—the "special audit" by Professor Bocking, the reports from Linklaters and

Professor Habersack, and the review by James B. Irwin—avoided answering whether Bayer's due diligence investigation had included a review of any internal Monsanto documents of the sort used in the Roundup litigation.

189.    On March 24, 2020, Bayer issued a press release announcing that the four reports were available on the Company's website. The press release said that Linklaters and Professor Habersack had "concluded that Bayer's Management Board had acted in due care in every respect and in compliance with its obligations under stock corporation law when making its decisions regarding the Monsanto acquisition" and wrote that James B. Irwin "comes to the conclusion that [the memorandum drafts by the U.S. law firm about glyphosate litigation] thoroughly address and appropriately assess potential risks in accordance with professional standards." The press release, by relying on those misleading reports, misled investors into believing that Bayer's due diligence had been far more thorough than it actually was.

190.    It apparently worked. Perhaps duped by Bayer's misleading "voluntary special audit," the shareholder advisory firm ISS—which had recommended voting against management the previous year—recommended a vote in favor of management at the Bayer's annual stockholders' meeting the following month.

191.    On April 28, 2020, at Bayer's annual stockholders' meeting, Defendant Wenning boasted, "We see the outcome of this audit as a confirmation that in our company, we are working with great professionalism and due diligence." He said that the Habersack report found that "the opinions [the memorandum drafts on glyphosate by the U.S. law firm] thoroughly address and appropriately assess potential risks in accordance with professional standards." And he said that James B. Irwin had concluded that "these statements [the memorandum drafts] looked intensely at the risks and evaluated these appropriately and in accordance with professional standards." He concluded, "All audits, therefore, have been successfully concluded and conclude and confirm the opinions of the Board and Supervisory Board." As with the press release issued ahead of the stockholders' meeting, these statements used misleading reports to mislead investors into believing that Bayer's due diligence had been far more thorough than it actually was. Defendant Baumann

argued that "no legal risks were hidden by Monsanto or its earlier shareholders," and that "it was assumed that we would be able to win all of the glyphosate-related cases."

192.    Defendants' misleading "voluntary special audit" and its false reassurances during the stockholders' meeting worked: 92.6% of shareholders voted this time in favor of the Bayer leadership's 2019 performance. An article by *Reuters* summarized the meeting in this headline: "Bayer board wins back shareholder support as weedkiller talks continue."

**L.    Defendants Admit They Misled Investors About the Scientific Evidence on Roundup's Cancer Risks**

193.    On April 28, 2020, in connection with the 2020 Annual General Meeting, Bayer released "detailed and supplemented answers" ("2020 AGM Answers") to certain shareholder questions asked at the 2019 and 2020 Annual General Meetings. Two of these questions concerned whether Defendants' repeated claims that "800 scientific studies"—which Defendants had long relied on to support its assertions that the jury verdicts were "at odds with the weight of scientific evidence"—confirmed that Roundup and GBHs do not cause cancer and are safe to use:

> Annual General Meeting (AGM) 2019: "In your 2018 interim report, you literally state that more than 800 scientific studies and supervisory authorities worldwide confirm that glyphosate and glyphosate-based herbicides are not carcinogenic and that they are safe to use. [...] 1) Does this statement in the interim report correspond to the truth, in particular with regard to the more than 800 studies which I consider unusually high?"

> AGM 2020: "How many scientific studies and confirmations by supervisory authorities worldwide confirm to date (alternatively until December 31, 2019), 'that glyphosate or glyphosate-based herbicides are not carcinogenic and safe, if used as intended' (information at the time of the 2018 interim report: 'more than 800')? How many scientific studies and confirmations by supervisory authorities with this content were added in the fiscal year 2019?"

194.    In its answer to these questions, Bayer admitted for the first time that *the vast majority of the "more than 800 scientific studies" it had claimed supported its defenses in the Roundup Litigation were not actually studies of glyphosate's or Roundups' carcinogenicity, but rather safety studies on unrelated topics*. Bayer explained that "[a]lthough examination of whether something is safe includes an assessment of whether it is carcinogenic, safety assessments

are not limited to carcinogenicity," and "the approach that we have taken . . . is to derive the relevant number of studies that the U.S. EPA has considered relevant for their safety and carcinogenicity assessment, respectively." The "more than 800 scientific studies" figure Bayer had repeatedly cited was based on the number of studies in a database maintained by EPA that "specifically examine the active ingredient glyphosate or Bayer's glyphosate-based formulations," with respect to "45 categories . . . that relate to human or mammalian health." Carcinogenicity was just 1 of the 45 categories listed, and many of the other categories had nothing at all to do with carcinogenicity, dealing instead with issues like "eye irritation," "dermal irritation," "dermal sensitization," "general metabolism," and "reproduction and fertility effects." Bayer then admitted that in 2017, EPA had conducted an evaluation of glyphosate's carcinogenic potential, and determined that *only 121 of the studies were relevant to the question of whether glyphosate causes cancer*.

195.    Bayer further admitted that "it is not possible to determine a definitive number of studies that confirm the non-carcinogenicity of glyphosate and glyphosate-based formulations." And despite Defendants' prior claims that regulatory authorities and other scientific institutions have confirmed that glyphosate does not cause cancer, Bayer admitted it was "not possible to . . . determine the number of 'scientifically sound' evaluations of glyphosate" by regulatory authorities. Bayer also admitted that many of the "more than 800 scientific studies" were potentially unreliable for other reasons, including their age (561 of the studies were conducted before 2010, and Monsanto noted a significant number were "done long ago") and Monsanto-friendly bias (629 of the studies were carried out by Monsanto itself).

**M.**    **The Linklaters and Habersack Reports Establish that Prior to Signing the Merger Agreement, Defendants Failed to Examine Any Internal Documents Related to Roundup Liability Risks**

196.    The Linklaters and Habersack Reports both make clear that the Management Board's decision to sign the Merger Agreement and to close the Merger were both made while recognizing the "known risks – in particular risks arising from [Monsanto's] glyphosate business." According to the Habersack Report, "the political and regulatory risks," "reputational risks," and

"the liability risks arising from the glyphosate business" were "equally perceived" and "taken into account" by the Management Board. But the Management Board, the Habersack Report explains, "considered the risks associated with the acquisition to be manageable," based on the purported "global consensus among all national scientific assessment agencies that glyphosate-based herbicides are not carcinogenic when used appropriately." According to the Habersack Report, the Management Board "did not have to make a different assessment of the risk situation on the basis of the IARC study cited in the lawsuits," concluding that "this study is only suitable to a very limited extent to provide proof that glyphosate is carcinogenic," because the IARC Report classified glyphosate "into category '2A' – *i.e.*, into the category which also includes substances such as hot beverages above 65° Celsius and working as a hairdresser as potentially carcinogenic."

197.    According to the Linklaters Report, the Management Board nonetheless "carried out an extremely in-depth analysis of the information and aspects relevant to the transaction," based on the following sources of information: (i) detailed reports to the Board of Management; (ii) presentations and explanations obtained from Bayer's competent departments;[5] and (iii) five memoranda (the "Merger Memoranda") dated April 6, July 22, August 30, and October 5, 2016, and November 8, 2018, which "covered, comprehensively and in much detail, all considerations relevant to the takeover of Monsanto."

198.    The Merger Memoranda included (i) "information regarding future growth opportunities for the agricultural industry and the current competitive situation of Bayer in the agricultural industry market in the light of the ongoing consolidation round"; (ii) "comprehensive business valuations of Monsanto and an analysis of whether Monsanto's business activities were compatible with those of Bayer"; and (iii) "information on how the purchase price had been determined." Notably, the "risks arising from [Monsanto's] glyphosate business" are not identified

[5] The Linklaters Report explains that "members of the second management level" were also present at Management Board meetings and available for "questions and discussions," regarding "[c]onsolidation in the agricultural industry market, the valuation of Monsanto, expected synergies, the takeover's impact on Bayer's financial leverage and credit rating, as well as regulatory issues and liability risks in connection with glyphosate."

in the Linklaters Report as a topic covered by the Merger Memoranda. On that topic, the Linklaters Report explains that the Management Board "gathered . . . detailed information on the liability risks arising from Monsanto's glyphosate business," while noting that "there was only a small number of pending lawsuits in connection with glyphosate at that time."

199.    Until the signing of the Merger Agreement, the Linklaters Report explains that of the eight meetings that the Management Board held from May to September 2016, only *one* of these meetings involved "the findings of the confirmatory due diligence," which involved Monsanto providing access to "Q&A and expert calls in all areas requested by Bayer in which potential risks and opportunities for the business case were identified." But the Linklaters Report makes clear that the only information provided at this meeting regarding the Roundup Liability risks were statements by "Monsanto representatives . . . that Monsanto had not established any provisions for glyphosate-related lawsuits and that, based on the scientific assessments, it expected to prevail in the lawsuits."[6] Indeed, the Linklaters Report explains that, based solely on "existing scientific findings and the analysis of the prospects of success of the pending or possible glyphosate-related lawsuits," the Management Board "made the assumption . . . that the liability risks were low." As for the non-litigation risks associated with Roundup and GBHs, the Linklaters Report explains that the Management Board "assume[d] that any political or reputational risks could be reduced by means of specific information and public-relations activities."

200.    Following the signing of the Merger Agreement, the Linklaters Report explains that the Management Board held four meetings between September 2017 and April 2018, and that the Management Board reported to the Supervisory Board in "four letters and two meetings." But the Linklaters Report states only that the Management Board "analysed and discussed the development of the risks of glyphosate-related lawsuits," and does not identify that the Management Board sought or examined any additional information, including internal Monsanto

[6] Similarly, the Habersack Report explains that the Management Board "ensured" that its assessments of the Roundup liability risks were confirmed by Monsanto in the course of a due diligence process prior to the conclusion of the merger agreement, and acted in line with these assessments.

documents.[7] The Habersack Report states that when considering whether to close the Merger, the Management Board "was able to rely on updated information on pending or possible lawsuits, including in particular the updated Memorandum," but the most recently updated memorandum at that time according to the Linklaters and Habersack Reports was from October 5, 2016. The only other memorandum discussed is dated November 8, 2018, five months *after* Bayer had closed the Merger.

201.  Instead, the Linklaters and Habersack Reports explain that the Management Board "assumed" that "the (significant) rise in the number of lawsuits in the meantime alone could not decisively influence the risk assessment," because of "the substantive assessment of the legal situation" and "the risk of actually being obliged to pay damages had not changed to the detriment of Monsanto and Bayer." The Board reached this conclusion because, "[w]ith the exception of the IARC assessment, all available studies still came to the conclusion that, according to current scientific knowledge, glyphosate is not carcinogenic if used under the conditions and for the purposes intended."[8] Likewise, according to the Habersack Report, the Management Board "did not have to assume on the basis of the considerably greater number of lawsuits that the liability risk had also increased in substantive terms."

202.  In connection with the Linklaters and Habersack Reports, Bayer also released the Irwin Report. He explained that he was asked to "assess and confirm in writing, whether the Memoranda deal with the Roundup/Glyphosate-Risks thoroughly and consistent with professional

---

[7] Similarly, the Habersack Report explains that "with regard to possible liability risks in connection with Monsanto's glyphosate business," the Management Board "was able to rely on updated information on pending or possible lawsuits, including in particular the updated Memorandum, when making its decision to close the merger agreement." Habersack Report at 12-13.

[8] Similarly, the Habersack Report stated that the Management Board "was entitled to assume that these risks had not significantly changed after the conclusion of the merger agreement," despite the fact "that the number of lawsuits pending against Monsanto had increased considerably," because "according to current scientific knowledge, still no risk of a carcinogenic effect on humans had to be expected if glyphosate was used appropriately and for the purposes intended, and the U.S. EPA had also announced that it continued to assume that glyphosate was not likely to be carcinogenic at relevant dose levels."

expectations and include a fair assessment of the litigation risks associated with the Glyphosate-Litigation." Notably, Irwin's letter does not mention Monsanto. Further, Irwin's letter states that he reviewed three drafts and one final memoranda, dated April 6, July 22, August 30, and October 5, 2016, but he does not mention the November 8, 2018 memoranda that, according to the Linklaters and Habersack Reports, was also provided to the Management Board.

**N.    Bayer Announces $10.9 Billion Settlement of Roundup Litigation**

203.    During the afternoon of June 24, 2020, on a conference call with investors, Bayer announced that it had reached a settlement with the Roundup plaintiffs (as well as settlements with plaintiffs suing over PCBs and the herbicide dicamba). Defendant Baumann explained that "[t]he resolution we have reached in the U.S. Roundup litigation is a multistep program that will bring closure to approximately 75% of the current Roundup product liability claims and puts in place a mechanism to resolve potential future claims efficiently."

204.    He explained the breakdown of the funds, and stated that he expected "between $8.8 billion and $9.6 billion" would go to "current filed and unfiled claims, which total approximately 125,000." He also said that "Bayer will pay $1.25 billion for a separate agreement that puts in place a mechanism to manage and resolve potential future litigation."

205.    Bayer VP and Assistant General Counsel Bill Dodero described the mechanism for resolving future claims as "an independent class science panel" that will "determine for purposes of the class whether Roundup can cause non-Hodgkin's lymphoma." He explained, "If the science panel determines that Roundup does not cause non-Hodgkin's lymphoma, class members will be barred from claiming otherwise, and this would effectively end this litigation for class members."

206.    Defendant Baumann explained that, between the existing and future claims, Bayer was committing to pay "between $10.1 billion and $10.9 billion." (Another $1.2 billion to settle other toxic tort litigation brought the high end of the announced total to about $12.1 billion.) Defendant Nickl said, "We currently expect cash outflows will not exceed USD 5 billion in 2020 and another USD 5 billion in 2021."

207.    Defendant Baumann explained that there were three reasons for settling: (i) "given future risk and uncertainty, this settlement is the most efficient and financially reasonable outcome for the company"; (ii) "to end the significant uncertainties and confusion caused by the 3 Roundup verdicts and the volume of pending litigation"; and (iii) "to return the conversation about the safety and utility of glyphosate-based herbicides to the scientific and regulatory arena and move it away from the jury trial setting, where decisions were made based on a very small number of unreliable studies and dubious methodologies."

## O.    Bayer's Proposed Settlement Quickly Falls Apart

208.    Immediately upon announcing the $10.9 billion settlement fund it became apparent that even this massive amount would not bring closure to all the glyphosate litigation. A *Bloomberg* article published early the morning of June 25, 2020, described all the uncertainties around the deal, explaining that "Bayer AG's $12.1 billion settlement to resolve U.S. lawsuits over its flagship weedkiller Roundup and other products offered only fleeting relief to investors looking to move on from the legal woes that have hobbled the stock for almost two years." In an article published in *The New York Times*, one lawyer for 5,000 plaintiffs was quoted as saying that the settlement "is nothing like the closure they're trying to imply." Putting it even more vividly, one of several plaintiffs lawyers quoted in an article in *Insurance Journal* described Bayer as "trying to stop a gigantic problem by putting its finger in the proverbial damn." By the time the market opened on June 25, 2020, the price of Bayer ADRs had fallen to $18.94 from $20.54 at the close of the market the previous day, or 7.8%, and it traded at a volume of 1,016,943 shares throughout the day on June 25, or almost twice the average daily trading volume. The more investors examined the deal, the more they realized that Bayer simply had not achieved the closure it said would come with a settlement.

209.    In a filing on July 6, 2020, Judge Chhabria warned that he was "skeptical of the propriety and fairness of the proposed settlement, and [was] tentatively inclined to deny" approval. Concerned about the creation of a panel of scientists to handle future claims, he remarked, "Why would a potential class member want to replace a jury trial and the right to seek punitive damages

with the process contemplated by the settlement agreement?" By the time the market opened on July 7, 2020, the price of Bayer ADRs had fallen from $18.91 at the close of the market the previous day to $17.77, or 6.1%, and traded at a volume of 895,830 throughout the day on July 7, or 1.5 times the average daily trading volume.

210. Then, according to one report by Law360, the court learned that Bayer had terminated its term sheets or refused to sign an agreement finalizing the settlement *after it had announced the settlement in June.* On August 27, 2020, Judge Chhabria chastised Bayer, saying he was disinclined to keep a stay in place while the settlement was pending, because doing so would make him "complicit in whatever shenanigans are taking place on the Bayer side." And he warned Bayer he might unseal letters from lawyers on the plaintiffs' side complaining that Bayer appeared to be reneging on its deal. By the following day, the price of Bayer ADRs had fallen $15.28 from a high of $31.67 in the days following the closing of the Merger to $16.40, a 48% decline.

## P.    Post-Class Period Events

### 1.    California Appeals Court Confirms that Defendants Misled Investors About the Roundup Liability Risks

211. On July 20, 2020, the California Court of Appeals ruled on Monsanto's appeal of the *Johnson* verdict, rejecting nearly every one of Monsanto's arguments. First, the Court of Appeals held that Johnson "presented abundant—and certainly substantial—evidence that glyphosate, together with the other ingredients in Roundup products, caused his cancer, explaining:

> Expert after expert provided evidence both that Roundup products are capable of causing non-Hodgkin's lymphoma (general causation) and caused Johnson's cancer in particular (specific causation). As we have mentioned, they testified that the IARC, a highly respected agency of the World Health Organization, had classified glyphosate as a probable human carcinogen. They further testified that to a reasonable degree of medical certainty, exposure to glyphosate causes non-Hodgkin's lymphoma. And two experts opined that Roundup products were a substantial contributing factor in the development of Johnson's non-Hodgkin's lymphoma given his heavy use of the product.

212. In contrast, the Court of Appeals noted that Monsanto's sole reasons to oppose this evidence were based "mischaracteriz[ations]" of Johnson's expert testimony and the standards for expert evidence.

213. Second, the Court of Appeals flatly rejected Monsanto's argument that even if some studies linked glyphosate and non-Hodgkin's lymphoma, those studies did not trigger a duty to warn because they only expressed a "minority view," explaining that Monsanto had a duty to warn of potential risks and "it was the jury's decision how much weight to give this evidence." In any event, the Court of Appeals explained that Monsanto presented no evidence that "establishes that the findings about glyphosate's potential link to cancer necessarily reflected a minority view," noting that Monsanto's reliance on documents from the EPA and European Chemicals Agency "do not undermine the strength of the [IARC] Monograph or render it a 'minority' position." The Court of Appeals explained that testimony at trial showed:

> IARC's work is "very transparent," and "many independent folks can come and review the process of what [it] actually do[es]." The IARC is recognized in the "scientific and academic cancer community" as "usually the main arbiter of what a cancer-causing agent is." One witness testified that to him it was "the number one arbiter in the world of whether something is actually carcinogenic and what the level of probability is that it is a carcinogen or not," and another testified he could not "think of any more reputable source that is impartial, non-biased, and unpaid."

214. Finally, the Court of Appeals also rejected Bayer's "silver bullet" argument that all the Roundup lawsuits were preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), concluding that Monsanto's argument was "foreclosed" by governing Supreme Court Precedent.

215. Three months later, the California Supreme Court denied Monsanto's request for review of the Court of Appeals' decision.

### 2. Bayer Announces an $11.7 Billion Write-Down of Its Agricultural Assets

216. On September 30, 2020, Bayer announced that it would write down the value of its agricultural assets by $11.7 billion and said that its dividend would be lower than usual in coming years. It blamed this primarily on the coronavirus pandemic, which it said had reduced biofuel

demand and caused negative currency effects. Not all investors trusted this explanation, perhaps due to Bayer's loss of credibility over the past years. A Credit Suisse analyst said during the company's conference call that "of course, cynically, one could say that you are concerned that it's going to cost you a lot more than you had originally anticipated to close out Roundup. And therefore, that is one of the other reasons that you are looking to sort of hold cash." Defendant Baumann said that this was not true: "you mentioned that we might be kind of hoarding money for a bigger than guided for our Roundup settlement. On that one, there is no news, yes, and that is certainly not the subject of discussion with the communication that we are sharing with you as we speak." That day, September 30, 2020, the price of Bayer ADRs dropped from $15.78 at opening to $14.95 at closing, or 5.3%, trading at a volume of 1,657,433 shares, or almost three times the daily average.

217.    The following day, on October 1, 2020, Citi analysts reduced their rating for Bayer from buy to hold, explaining that the "long suffering" buy recommendation had been based on the mistaken idea that the Roundup litigation was near resolution. Another analyst explained, "It was already quite clear that Monsanto's growth prospects had deteriorated over the last two and a half years, although the extent of that decline is greater than expected." An HSBC analyst speculated that the low dividends suggested that Bayer would end up paying significantly more than $17 billion to settle the Roundup cases. Another said, "Since Monsanto was acquired, Bayer has delivered its basket of bad news every year and it is clear now that the group will not deliver the revenue growth expected at the time of this acquisition." One thing was clear: the Monsanto acquisition would not be producing the originally promised payoff for Bayer.

218.    From the close of the market on September 30, 2020, to the close of the market on October 1, 2020, the price of ADRs fell from $14.95 to $13.77, or 7.9%, trading at a volume of 1,772,049 shares, or over three times the daily average. By the close on October 2, 2020, they had fallen further from $13.77 to $13.21, or 4.1%, trading at a volume of 1,405,787 shares, or over twice the daily average.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Defendants' False and Misleading Statements About the Due Diligence Investigation of Monsanto

#### 1.    Defendants' False and Misleading Statements and Omissions Before the Signing of the Merger Agreement

219.    The Class Period began on May 23, 2016, the day the Merger proposal was announced. On May 23, 2016, at around 7:00am GMT, Bayer held a conference call with investors to discuss the Merger and what Bayer's investors should expect. During that conference call, Defendant Baumann stated:

> *[L]ooking at political and regulatory environment, and with that also coming the topic of glyphosate and the pending renewal of the glyphosate in Europe*, yes, as you would expect us to do, *we have looked at it. We do understand the risk and the exposure that does exist. . . . It would not affect the overall offer and proposal to acquire Monsanto.*

220.    During the same conference call, on May 23, 2016, Defendant Dietrich stated:

> The preliminary analysis, *which we expect to verify through the due diligence,* shows that the combination will generate potential sales and cost
>
> ****
>
> We are very confident we *will maintain the strong integration track record, which we have built in the past.* We assume that *integrating Monsanto from a business perspective will be no more complex than some of our previous acquisitions, such as the Schering acquisition in 2006.*

221.    Further, also during that same conference call, on May 23, 2016, Defendant Condon stated:

> *[W]e will be going through a diligent process and I think we have a very good track record of dealing* with regulatory authorities and ensuring any and all of their concerns are taken into account, so that we consummate this deal.
>
> *I think we're a very trusted company in the US, but also here we'll go through a diligent process* and ensure that any and all concerns of regulatory authorities are taken fully into account and that we can consummate this deal.

222.    The statements quoted in ¶¶ 219-220 concerning the Bayer's assessment and understanding of the "*risk and the exposure*" of the Roundup and glyphosate-related business, and that such risk and exposure "*would not affect the overall offer and proposal to acquire*

*Monsanto*," were materially false and misleading when made because, at that time, the only information available to Defendants was one draft memorandum from a U.S. law firm, dated April 6, 2016, which did not include: (i) any evaluation or review of Monsanto's litigation history; (ii) the number and quality of pending and future Roundup lawsuits; (iii) the strength of the liability case against Monsanto and the strength of any available defenses; (iv) the number and average value of settlements and verdicts against Monsanto; or (v) a detailed understanding of how Monsanto had managed the litigation at the time of the actual or threatened litigation. Bayer and Defendant Baumann knew or recklessly disregarded that, at the time Defendant Baumann made these statements.

223.    The statements quoted in ¶¶ 219-220 relating to Bayer's "***strong integration track record***" and "***integrating Monsanto from a business perspective will be no more complex than some of our previous acquisitions"*** were materially false and misleading when made because they gave investors a false impression that Bayer's prior acquisitions were relevant to the due diligence investigation and integration process when, in fact, the Merger was its largest acquisition by nearly fourfold, was significantly more complicated than any prior acquisition, and involved far greater legal and reputational risks than any prior acquisition.

#### 2.    Defendants' False and Misleading Statements About the Results of the Pre-Signing Due Diligence Investigation

##### a.    September 14, 2016 – Press Release & Conference Call

224.    On September 14, 2016, Bayer issued a press release to announce the Merger Agreement, which stated: "***Bayer has confirmed sales and cost synergies assumptions in due diligence***" and "***Bayer has extensive experience in successfully integrating acquisitions from a business, geographic and cultural perspective.".***

225.    On September 14, 2016, at noon GMT, in an investor conference call held by Bayer to discuss the Merger Agreement, Defendant Baumann stated:

> This transaction is a compelling opportunity for the shareholders of both companies. ***Following receipt of additional information and thorough analysis conducted during the due diligence process***, we have raised our initial offer and

have agreed on an all cash consideration of $128.00 per Monsanto share, representing a premium of 44% to the Monsanto share price of $89.03 on May 9th, 2016, the day prior to our first proposal.

****

In combining our two companies, . . . *We have identified significant potential for sales and cost synergies, which was confirmed during due diligence.*

226.    During the same September 14, 2016 conference call, Defendant Condon stated: "*[W]e've gotten extensive, of course, advice from antitrust experts and law firm . . . And because of the high complementarity, again from a portfolio and a geographic point of view, we see very minor issues, which we think can be taken care of relatively speedily.*"

**b.        April 28, 2017 – Remarks at 2017 Annual General Meeting**

227.    On April 28, 2017, at around 8:00am GMT, in remarks at Bayer's 2017 Annual General Meeting, Defendant Wenning stated:

At the extraordinary Supervisory Board meeting in May*, all of the most important aspects of a possible acquisition were discussed at length*. These included, for example, issues relating to financing, such as a venture, potential synergies, the situation under antitrust law *and possible risks to Bayer's reputation.* . .

****

Mr. Baumann kept me constantly up-to-date on the progress of these negotiations. All of the other members of the Supervisory Board were also *informed several times in writing as to the progress of the negotiations*. At its meeting in September 2016, the Supervisory Board once again had *a detailed discussion on the acquisition and the conditions,* which by then have been agreed for the merger agreement. With -- *extensive information was also provided in writing in advance to this meeting,* too, including an analysis of antitrust considerations. . . . All in all, *the Supervisory Board fulfilled its supervisory and consultative duties in relation to this transaction in a very thorough and exhaustive manner.*

*All of the essential aspects,* which Mr. Baumann also referred to in his speech, *was scrutinized and reviewed by us in detail* and are supported by us unreservedly.

**c.        July 27, 2017 – Conference Call**

228.    On July 27, 2017, at noon GMT, in a conference call held to discuss the Bayer's Q2 2017 Earnings, Defendant Baumann stated

Let me maybe elaborate a little bit more on that. First of all, if we go back to the acquisition of the [Merck OTC] business, *the due diligence process was quite different with Consumer compared to what we experienced with Monsanto*. So the management presentation and the confirmatory due diligence with Monsanto,

*the Monsanto people went out of their way to provide us with transparency, data and visibility to the most critical questions we had* that also related to value and the composition of our business case because they wanted to convince us to pay a higher price compared to what was on the table and the process *was different in terms of competitive pressure compared to what we saw with Merck.*

With Merck, we were one of the bidding parties. . . . *So having said that, the issue was that we did not get a full transparency on the new product development pipeline and some of the newly launched products in the U.S. already,*

. . . . *[W]hen we took over the business, so we signed in May and we actually closed quarter 4*, it was already eroding compared to our assumption, which was already substantially discounted to the case that was presented by Merck and that has continued.

Last and I will also say this, I think in some areas, we could have seen a little bit more and should not have had the same level of surprise we are talking about right now, . . . . Some of it could have potentially been seen. We did not see it, but that was only one contributing factor.

229.    On May 25, 2018, in remarks during that 2018 Annual General Meeting, Defendant Wenning stated:

*In 2017, the Supervisory Board convened 9 times. Center stage of the Supervisory Board's work was taken, as last year, by the planned acquisition of Monsanto, which the Supervisory Board discussed in ordinary and extraordinary meetings in depth once again. In-between the meetings of the Supervisory Board, I met regularly and conducted in-depth exchanges with Mr. Baumann. In treating the Monsanto transaction, the Supervisory Board also concerned itself with the merger control proceedings in detail, as it did with the sales of business activities in order to comply with the requirements of the antitrust authorities.*

Further topics in this connection on which the Supervisory Board debated intensively on the basis of *detailed reports submitted by the Management Board were the financing concept for the Monsanto transaction, the valuation of Monsanto and the effects of the transaction on the rating of Bayer, as well as the question as to whether and the extent to which the assessment of the profitability of the transaction may differ compared to the original assessment once the authorization has been granted by the Supervisory Board*.

They also concerned themselves in detail with the planning for the period after the implementation of the transaction, most recently in its extraordinary meeting at the end of April 2018.

230.    The statements quoted in ¶¶ 224-229 concerning the extensiveness and detail of information reviewed during the due diligence investigation were materially false and misleading when made because, as Defendants have admitted, their "*access to information was limited.*" Specifically, prior to signing the Merger Agreement, (i) Defendants had not reviewed any internal

Monsanto documents related to the Roundup liability risks; (ii) Defendants' only information received from Monsanto were statements by Monsanto's representations that Monsanto "had not established provisions for Roundup litigation" and that "based on the scientific assessments, it expected to prevail in the lawsuits," and (iii) Defendants' remaining available information was limited to four memoranda by its legal adviser regarding the considerations relevant to the Merger, which did not evaluate or assess Monsanto's litigation history, the number and quality of pending and future Roundup-related cases, the strength of the liability case against Monsanto and the strength of any available defenses, the number and average value of settlements and verdicts against Monsanto, or a detailed understanding of how Monsanto had managed the litigation at the time of the actual or threatened litigation. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Bayer knowingly or recklessly disregarded to disclose this important information with the market.

231.    Further, these statements and omissions: (i) gave investors a false impression that Bayer had undertaken sufficient due diligence of the Roundup liability risks in accordance with relevant requirements, standards, and best practices detailed above, ¶¶ 68-69, 81; and (ii) gave investors a false impression that Bayer had made adequate preparations and dedicated adequate resources to due diligence investigation of Roundup liability risks when, in fact, Bayer had not prepared to review any internal Monsanto documents, despite knowing or recklessly disregarding the significant red flags, including (a) Monsanto's known product liability history, ¶¶ 73-79; (b) Monsanto's known reputation for concealing the health risks of its products, ¶¶ 73-76; (c) the massive size and scope of the Merger, ¶¶ 61; (d) analyst, shareholder, and credit agency reaction to the Merger proposal, ¶¶ 62-67.

**3.      Defendants' False and Misleading Statements About the Due Diligence Investigation Prior to the Closing the Merger**

**a.      April 28, 2017 – Remarks at 2017 Annual General Meeting**

232.    On April 28, 2017, at around 8:00am GMT, in remarks at Bayer's 2017 Annual General Meeting, Defendant Baumann stated:

We are, of course, aware that ***Monsanto does not have a good reputation*** in some countries, especially in Europe. And you can argue about whether the company has always acted wisely in its dealings with the public. ***However, that's not the Monsanto we know at all. Monsanto is a modern, highly innovative and extremely well-managed biotech company***.

*. . . **Monsanto's image is also the result of massive campaigns, whose organizers have managed to make the company a symbol of what many see as epitomizing a form of farming they oppose. The main focus of this criticism is green genetic engineering. However, let me stress once again at this point that there is no evidence whatsoever to support the fears that are being stoked by opponents of this technology.***

****

***Monsanto's image does, of course, represent a major challenge for us, and it's not an aspect that I wish to play down, yet we are facing this challenge with all those qualities that have made us what we are today: openness, expertise and responsibility.*** This means . . . after closing, we will manage the combined business in line with our standards as we do with all our other businesses. No ifs or butts about it.

### b.    July 27, 2017 – Conference Call

233.    On July 27, 2017, at noon GMT, in a conference call held by Bayer to discuss the Bayer's Q2 2017 Earnings. During that conference call, Defendant Baumann stated:

So now let's switch to the situation with Monsanto. ***While all of us are anxious to close the transaction as soon as possible, the good thing of having to wait more than a year is that we see stand-alone performance of the company we are interested in.*** And I can only say with a lot of respect that Hugh and his entire team and the entire organization at Monsanto do a fabulous job. . . . Things are going well at their end, they have solid growth, very, very strong also improvement in their profitability. ***So you can see on a stand-alone basis that the value we saw when we inked the deal obviously in the early, let's say, early days, which is always very important going forward, kind of is represented in the numbers that they report.***

Secondly, it is all about people who have to make it happen afterwards and also alignment. I've been through a number of those situations as some of my colleagues, also Liam has, in the past. And what we see here is somewhat unusual, but very pleasing. . . . . ***What it also turns into is we also see a very, very good level of cooperation and collaboration***. We see people that actually share the same values, also the same perspective on the market and then, of course, drives also execution going forward. So we are very confident that what is going to come together here is a business that will run and operate very well both in terms of the value creation we see going forward. So it is somewhat different. Although the question, of course, is I think very appropriate. And of course, as always in life, we don't know what we don't know. ***But given the perspective we have today with what I've just shared with you in terms of existing evidence, we have a very high level of comfort.***

### c.    May 25, 2018 – Annual Shareholders Meeting

234.    On May 25, 2018, at around 8:00am GMT, in remarks at Bayer's 2018 Annual General Meeting, Defendant Baumann stated:

> Since May 2016, exactly 2 years ago in fact, when we made our first offer to acquire Monsanto, many of our efforts have been focused on concluding this acquisition*. . . . We've been diligently preparing for the integration that lies ahead and look forward to putting our plans into action.*
>
> So what will Bayer look like following the acquisition of Monsanto? . . . [W]e *are acquiring new and very attractive businesses* that will take us forward to become a leading agriculture company. *The acquisition is as just attractive today as we assessed it to be 2 years ago.* And ladies and gentlemen, *I have been involved in a lot of acquisitions during my career. Due to various aspects and overall, I'm convinced that this acquisition has very great potential for creating value for our company, our shareholders and our customers.*

235.    On August 23, 2018, the German publication *Handelsblatt* published an interview, quoting Defendant Baumann stating:

> Question:    Investors and the general public are asking themselves the important question of whether Bayer misjudged the additional legal risks resulting from the takeover.
>
> Baumann:    In the course of the acquisition, we carried out due diligence within the framework that is customary for the takeover of a listed company. Of course, we also considered the legal risks. But you also have to see that at the time, the scope of the lawsuits that we are now dealing with could not be foreseen.
>
> Question:    Do you need to reassess the legal risks posed by glyphosate now?
>
> Baumann:    Nothing has changed at all in the compelling logic behind the takeover of Monsanto, in the value creation potential for our shareholders, in the attractiveness of the agricultural market and in our communicated goals.
>
> ****
>
> Question:    The plaintiffs' attorneys work with Monsanto's internal documents. They are supposed to prove that the group allegedly sees glyphosate itself as a cancer risk, but has not warned about it on the products.
>
> Baumann:    All I can say about this is that internal documents are sometimes cited out of context on the plaintiff's side. We stick to the fact that there is no causal connection between cancer and glyphosate and that it is a safe product to use from the perspective of regulators.

---

236.    The statements quoted in ¶¶ 232-235 concerning Defendants' ongoing assessment of the Merger's value since the signing of the Merger Agreement were materially false and misleading when made because they (i) gave investors a false impression that Defendants had undertaken an ongoing due diligence investigation of Monsanto since the signing of the Merger Agreement when, in fact, Defendants have admitted their "*access to information was limited*" and purportedly "*have not had any access that goes beyond the information that is out there in the public domain*" ¶ 140; (ii) gave investors a false impression that Defendants had undertaken an ongoing due diligence investigation of the Roundup liability risks based on new and publicly-available information and red flags, including the growing number of Roundup lawsuits when, in fact, Defendants have admitted that the most recent assessment of the Roundup liability risks available to and considered by Defendants was dated October 5, 2016. Specifically, prior to the closing of the Merger, (i) Defendants had not reviewed any internal Monsanto documents related to the Roundup liability risks, ¶¶ 136-141, 196-202; (ii) Defendants' only information received from Monsanto were statements by Monsanto's representations that Monsanto "had not established provisions for Roundup litigation" and that "based on the scientific assessments, it expected to prevail in the lawsuits," ¶¶ 196-202; and (iii) Defendants' remaining available information was limited to four memoranda from 2016 by its U.S. legal adviser regarding the considerations relevant to the Merger, which did not evaluate or assess Monsanto's litigation history, the number and quality of pending and future Roundup-related cases, the strength of the liability case against Monsanto and the strength of any available defenses, the number and average value of settlements and verdicts against Monsanto, or a detailed understanding of how Monsanto had managed the litigation at the time of the actual or threatened litigation, ¶ 198. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Bayer knowingly or recklessly disregarded to disclose this important information with the market.

237.    Further, these statements and omissions: (i) gave investors a false impression that Bayer had undertaken sufficient due diligence of the Roundup liability risks in accordance with relevant requirements, standards, and best practices detailed above, ¶¶ 68-69, 81; (ii) gave

investors a false impression that Bayer had made adequate preparations and dedicated adequate resources to due diligence investigation of Roundup liability risks when, in fact, Bayer had not prepared to review any internal Monsanto documents, despite knowing or recklessly disregarding the significant red flags, including (i) Monsanto's known product liability history, ¶¶ 73-79; (ii) Monsanto's known reputation for concealing the health risks of its products, ¶¶ 73-76; (iii) the massive size and scope of the Merger, ¶¶ 61; and (iv) analyst, shareholder, and credit agency reaction to the Merger proposal, ¶¶ 62-67.

### 4. Defendants' False and Misleading Statements After the Closing of the Merger About the Adequacy of the Due Diligence Investigation

238. On February 19, 2019, as part of the 2018 Annual Report, Defendant Wenning stated in a Report of the Supervisory Board, which stated:

> The deliberations of the Supervisory Board focused on questions relating to Bayer's strategy, portfolio, business activities and personnel matters. The work of the Supervisory Board focused particularly on two main areas that were each addressed at several meetings: First, the Monsanto transaction, including the progress of the merger control proceedings, the performance of the Monsanto business, the related risks and the integration of the business. And second, the further development of Bayer's strategy and the portfolio, efficiency and structural measures required to implement it. Between the meetings of the Supervisory Board, these issues were also the subject of an extensive dialogue between the Chairman of the Supervisory Board and the Chairman of the Management Board.

> The discussions at the meetings held in 2018 centered on the following topics. At its February meeting, the Supervisory Board dealt with the Annual Report 2017, the agenda for the Annual Stockholders' Meeting 2018, the status of the merger control proceedings relating to the Monsanto acquisition and the Group's risk management system, and adopted resolutions on the compensation of the Management Board. At an extraordinary meeting convened in April, the Supervisory Board looked in detail at the required divestment of parts of the Crop Science business in connection with the merger control proceedings for the Monsanto transaction. The Supervisory Board also approved a further reduction of Bayer's interest in Covestro.

> . . . At its September meeting, the Supervisory Board extended the service contract of Liam Condon by five years and that of Hartmut Klusik by one year, and appointed Stefan Oelrich to the company's Management Board for a three-year term commencing November 1, 2018. The Supervisory Board also approved Dieter Weinand's departure from the company by mutual agreement with effect as of October31, 2018. In addition, the Supervisory Board adjusted the performance targets for the Management Board for 2018 in view of the closing of the Monsanto acquisition. The Supervisory Board discussed the status of the glyphosate-related litigations in detail. The Supervisory Board then examined in great detail the further development of the strategy of the Bayer Group and its individual divisions. It was

established that the Supervisory Board explicitly supports the strategy of the Management Board.

At an extraordinary meeting in November, the Supervisory Board dealt in detail with the status of the Monsanto integration and the integrated financial planning. The Supervisory Board also once again looked closely at the status of the litigations in connection with glyphosate. The discussion also addressed the extent to which these risks had been analyzed and assessed prior to the Monsanto acquisition. Following the related discussion at the previous meeting, the Supervisory Board once again conferred about the further development of the strategy and adopted resolutions on a series of portfolio, efficiency and structural measures. Specifically, it discussed the planned divestment of the Animal Health business, the sunscreen and foot care businesses of the Consumer Health Division and the 60 percent interest in the German site services provider Currenta. In connection with the planned efficiency and structural measures, the Supervisory Board examined the increased alignment of the pharmaceutical research activities toward external innovation and the reduction of inhouse capacities in this area, the concentration of production for all recombinant Factor VIII products at the Berkeley, California, site, the decision not to utilize the Factor VIII facility built in Wuppertal, and adjustments to the corporate and central functions, service functions and country platforms. The Supervisory Board also discussed the updated financial planning of the Bayer Group and was briefed on the planned Capital Markets Day.

At its meeting in December 2018, the Supervisory Board undertook the routine review of the fixed compensation of the members of the Management Board and the pension amounts of the former members of the Management Board. Also at this meeting, the Management Board presented its planning for the business operations in the years 2019 through 2022 and its expectations for the company's future rating. The Supervisory Board approved the proposed financing framework for 2019 and the securing of a new credit facility. At this meeting, the Supervisory Board took a detailed look at the efficiency audit, which had been conducted with external support. Building on the discussions at previous meetings and a detailed examination of the relevant documents undertaken in the meantime, the Supervisory Board also dealt once again with the risks arising from Monsanto's glyphosate business. This discussion also focused on a comprehensive expert report by a prominent law firm that examined compliance with audit obligations and duty of care responsibilities in this regard when the Monsanto transaction was prepared and implemented. The report came to the conclusion that the members of the Management Board had fulfilled their statutory duties in connection with the Monsanto transaction, particularly with regard to the examination and assessment of the liability risks related to the glyphosate business. The Supervisory Board concurred with the report's findings. Finally, the Supervisory Board resolved to issue an unqualified declaration of future compliance with the German Corporate Governance Code. Following the December meeting, an information and discussion forum was held for the members of the Supervisory Board on the topic of innovation at Crop Science.

### a. April 26, 2019 – Letter to Shareholders on Shareholder Votes

239. On April 26, 2019, in a letter addressed to shareholders and distributed among the materials for the 2019 Annual General Meeting, Defendants Baumann and Wenning stated:

Bayer's Supervisory Board as well as the Board of Management recommend that shareholders grant the Board of Management a discharge for 2018. ***This reflects that both Boards are convinced that the members of the Board of Management have acted in full accordance with their obligations and duties.*** Before Bayer entered into the merger agreement with Monsanto, the Board of Management ***diligently and extensively reviewed the risks connected with Monsanto's glyphosate business.***

\*\*\*\*

***Based on the views held by regulatory authorities worldwide and scientists, the Management Board assessed the legal risks in connection with the use of glyphosate as low.*** When doing so, it also based its ***assessment on a detailed expert opinion prepared and updated regularly by a renowned U.S. law firm before the merger agreement was entered into***. Compliance of the Board of Management with its legal duties has been confirmed by an external expert opinion prepared by the renowned international law firm ***Linklaters which – after an extensive review – came to the firm conclusion that the members of the Board of Management had complied with their legal duties in every respect with regard to the acquisition of Monsanto, and in particular with regard to the Board of Management's risk assessment of Monsanto's glyphosate-related businesses***.

This risk assessment was also confirmed by the fact that when the merger agreement was entered into in September 2016, glyphosate-related lawsuits from only approximately 120 plaintiffs were pending and in none of them the courts had decided on the merits of the case. While the jury verdicts in the courts of first instance in the U.S. in August 2018 and March 2019 with respect to Glyphosate are disappointing, they are not final decisions but subject to appeal. ***Regardless of the outcome, the jury verdicts have no impact on future cases and trials because each one has its own factual and legal circumstances***. We continue to believe firmly in the scientific assessments that glyphosate-based herbicides do not cause cancer. Bayer will continue to defend its glyphosate-based herbicides vigorously.

###### b.    April 26, 2019 – Statement of Management Board and Supervisory Board on Countermotions

240.    On April 26, 2019, in a Statement of the Management Board and Supervisory Board distributed among the materials for the 2019 Annual General Meeting, Defendants stated:

***In the context of the acquisition of Monsanto, the Board of Management discussed the opportunities and risks of the acquisition very extensively and in numerous meetings and carefully weighed them against each other before making its decision to enter into the merger agreement in September 2016***. The Board of Management performed this risk assessment based on an information and update process which was in all respects adequate for an acquisition of such a scale and highly professional and verified this risk assessment with Monsanto in a confirmatory due diligence before entering into the merger agreement.

Of course, in the context of the acquisition, the Board of Management also reviewed ***the risks connected with Monsanto's glyphosate business***. This risk assessment clearly showed that, when used as directed, the products of Monsanto containing glyphosate are safe. There are more than 800 studies available which come to this conclusion, which has, to this day, also been continuously confirmed by the

competent regulatory authorities worldwide. Another assessment of the risk of cancer performed in 2017 by the U.S. environmental agency EPA, for example, took into account more than 100 studies considered relevant and came to the conclusion that a carcinogenic effect of glyphosate was "not likely", which is the most harmless assessment according to the EPA nomenclature. Particularly relevant is a large state-funded U.S. observational study which was conducted in the agricultural sector over a period of twenty years and which comes to the conclusion that glyphosate is not carcinogenic.

Following an intensive review, the Canadian ministry of health as recently as January 2019 clearly confirmed again that glyphosate was safe and emphasised that – based on the amount of glyphosate people come into contact with – there was currently no regulatory authority in the world that sees a risk of cancer. Only an assessment by a sub-organisation of the World Health Organization classifies glyphosate as "probably carcinogenic". However, in this assessment only the general hazard of glyphosate was assessed but not the risk of actual occurrence. Therefore, glyphosate was assessed to be as carcinogenic as the consumption of red meat and hot beverages.

Based on the views held by regulatory authorities worldwide and scientists, the Board of Management assessed the legal risks in connection with the use of glyphosate as low. When doing so, it also based its assessment on a detailed expert opinion prepared and updated regularly by a renowned U.S. law firm before the merger agreement was entered into. This risk assessment was also confirmed by the fact that when the merger agreement was entered into in September 2016, only approximately 120 glyphosate-related lawsuits were pending and in none of them the courts of the first instance had decided on the merits of the case. Accordingly, the allegation made in one of the countermotions that the Board of Management informed itself about the risks in connection with Monsanto's glyphosate business only in August 2018 is inaccurate.

Compliance of the Board of Management with its duties is confirmed by an external expert opinion

From the very beginning, the Supervisory Board was highly involved in the acquisition of Monsanto and in this context also intensively discussed the risks connected therewith – including the risks arising from Monsanto's glyphosate business. In contrast to what is alleged in one of the countermotions, immediately after the first jury decision became known in August 2018 and after the resulting share price losses, the Supervisory Board decided to review whether the members of the Board of Management had complied with their legal duties in the context of the acquisition of Monsanto. In early September 2018, the Supervisory Board instructed the renowned law firm Linklaters to prepare an expert opinion on this. After an extensive review, Linklaters came to the clear conclusion that the members of the Board of Management had complied with their legal duties in every respect with regard to both the conclusion of the merger agreement with Monsanto in September 2016 and the closing of the acquisition of Monsanto in August 2018. The Supervisory Board extensively discussed this expert opinion and based on this also comes to the conclusion that the Board of Management acted in compliance with its duties. Against this backdrop, the Board of Management and the Supervisory Board are firmly convinced that, in the context of the acquisition of Monsanto, they acted in compliance with their duties in every respect and at any time.

Convincing strategy of the Board of Management / Ratification of the actions for the fiscal year 2018 Irrespective of the above, the Board of Management and the Supervisory Board are disappointed at the current evaluation of Bayer by the capital market since such evaluation does not reflect the actual value of the company and the impact of the effects of the non-binding U.S. court decisions made so far on the pricing is too high.

At the same time, the Board of Management and the Supervisory Board are firmly convinced that the acquisition of Monsanto was the right decision. By acquiring Monsanto, Bayer became by far the leading company in the area of agriculture. Against this backdrop and with the objective of being able to acquire Monsanto, the Board of Management also agreed to the disposals required by the competition authorities, which were more extensive than originally intended. The disposed businesses generated attractive disposal proceeds of around € 7.4 B and significant disposal gains in the amount of € 4.1 B before taxes. The reduced volume of synergies that was a result of these disposals was offset by other, positive effects, such as the reduction of U.S. tax rates and the operational debt reduction of Monsanto during the long period of the review of the competition authorities; hence, on balance, a significant potential for value creation with respect to the overall acquisition existed.

Bayer is a perfectly healthy company with excellent growth opportunities, high profitability, a strong portfolio and a clear strategy. Also, the announced portfolio, efficiency and structural measures at the divisional and group level, which were decided by the Board of Management in November 2018 and agreed to unanimously by the Supervisory Board, are in line with this strategy. As leading innovator in the area of life sciences, Bayer is currently in an optimal position to profit from global megatrends in the areas of diet and health.

In its latest meeting, the Supervisory Board expressly confirmed again that it unanimously supports the Board of Management and its strategy, including the acquisition of Monsanto. This strategy is the right way for Bayer and Bayer will be very successful with it.

Against this backdrop, the Board of Management and the Supervisory Board unanimously uphold their resolution proposal to ratify the actions of the members of the Board of Management who held office in the fiscal year 2018 under agenda item number 2 of this year's Annual Stockholders' Meeting.

Prior to the signing of the acquisition agreement with Monsanto in September 2016, the Management Board discussed the transaction in great detail at numerous meetings and carefully weighed the opportunities and risks involved. Of course, this also *includes an assessment of the risks associated with the glyphosate business*. *This assessment was based firstly on publicly available documents from the regulatory authorities, which Bayer analyzed internally; secondly, on statements and documents that Monsanto provided during due diligence; and thirdly, on a detailed and regularly updated external expert opinion on the legal risks relating to glyphosate, which Bayer had commissioned from a leading law firm and which was compiled before the acquisition agreement was signed.* Based on all this information, the Management Board considered the liability risk in connection with glyphosate to be low.

### c.     April 26, 2019 – Remarks at Annual General Meeting

241.     On April 26, 2019, at around 8:00am GMT, in remarks at the 2019 Annual General Meeting, Defendant Baumann stated:

> ***The Management Board acted conscientiously in every respect.*** That is the conclusion reached in an expert opinion from the leading law firm, Linklaters, which the Supervisory Board commissioned in September 2018 immediately after the first verdict in the Johnson case. A second independent opinion given by Professor Habersack from the University of Munich in the spring of 2019 comes to the same conclusion.

242.     The statements quoted in ¶¶ 238-241 concerning the extensiveness and detail of information reviewed during the due diligence investigation were materially false and misleading when made because, as Defendants have admitted, their "***access to information was limited.***" Specifically, prior to signing the Merger Agreement, (i) Defendants had not reviewed any internal Monsanto documents related to the Roundup liability risks, ¶¶ 196-202; (ii) Defendants' only information received from Monsanto were statements by Monsanto's representations that Monsanto "had not established any provisions for Roundup litigation" and that "based on the scientific assessments, it expected to prevail in the lawsuits," ¶ 199 and (iii) Defendants' remaining available information was limited to four memoranda by its legal adviser regarding the considerations relevant to the Merger, which did not evaluate or assess Monsanto's litigation history, the number and quality of pending and future Roundup-related cases, the strength of the liability case against Monsanto and the strength of any available defenses, the number and average value of settlements and verdicts against Monsanto, or a detailed understanding of how Monsanto had managed the litigation at the time of the actual or threatened litigation, ¶ 198. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Bayer knowingly or recklessly disregarded to disclose this important information with the market.

243.     Further, these statements and omissions: (i) gave investors a false impression that Bayer had undertaken sufficient due diligence of the Roundup liability risks in accordance with relevant requirements, standards, and best practices detailed above, ¶¶ 68-69, 81; (ii) gave investors a false impression that Bayer had made adequate preparations and dedicated adequate

resources to due diligence investigation of Roundup liability risks when, in fact, Bayer had not prepared to reviewed any internal Monsanto documents, despite knowing or recklessly disregarding the significant red flags, including (a) Monsanto's known product liability history, ¶¶ 73-79; (b) Monsanto's known reputation for concealing the health risks of its products, ¶¶ 73-76; (c) the massive size and scope of the Merger, ¶¶ 61; and (d) analyst, shareholder, and credit agency reaction to the Merger proposal, ¶¶ 62-67.

**B.   Defendants' False and Misleading Statements After Closing the Merger About Bayer's Access to Monsanto's Internal Documents**

**1.   Defendants' False and Misleading Statements About Bayer's Access to Monsanto's Internal Documents Under the Hold Separate Order**

**a.   August 16, 2018 – Press Releases**

244.   On August 16, 2018, Bayer issued a press release, which stated:

> ***One of the requirements of the U.S. Department of Justice was that Bayer and Monsanto remain separate companies and continue to operate separately until completion of these divestments to BASF . . . Due to the aforementioned requirements imposed by the U.S. Department of Justice, Bayer did not have access to detailed internal information at Monsanto. Under these conditions, Bayer was not permitted to influence matters relating to Monsanto's business, and its ability to actively comment on them in detail was extremely limited***. Today, however, Bayer also gains the ability to become actively involved in defense efforts in the glyphosate trials and any other legal disputes.

**b.   August 23, 2018 – Conference Call to Discuss Glyphosate Litigation**

245.   On August 23, 2018, Bayer held a conference call to discuss the Roundup Litigation. Defendant Baumann began his opening remarks by reiterating that they had only "limited access to Monsanto information" prior to closing:

> [T]he hold separate order imposed by the US Department of Justice ended last week, ***and this hold separate meant that we had to keep Monsanto Company separate from Bayer and had only limited access to Monsanto information***. Also, our ability to publicly comment was limited but, as the hold separate has ended, we are now in a position to freely address all topics related to Bayer and Monsanto.
>
> ****
>
> There have also been questions on the ***assessment of the litigation risk*** prior to Bayer and Monsanto signing the merger agreement. ***As the acquisition structure was a takeover of a publicly listed company, access to information was limited,***

*as is usual in such scenarios*. Bayer, through counsel, ***undertook appropriate due diligence of litigation and regulatory issues throughout the process leading to the finalisation of the merger.***

246.    On August 23, 2018, Bayer held a conference call to discuss the Roundup litigation. During the call, Defendant Baumann stated:

As the acquisition structure was a takeover of a publicly listed company, **access to information was limited**, as is usual in such scenarios. Bayer, through counsel, ***undertook appropriate due diligence of litigation and regulatory issues throughout the process***, leading to the finalization of the merger.

**\*\*\*\***

[A]s far as our access to Monsanto internal documentation is related, also communication you suggested that might have been a problem in the Johnson case, ***we have been under a complete hold separate other than your being allowed to put together our quarter 2 financials during the last 2, 2.5 months the closing of the transaction. So we have not had any access that goes beyond the information that is out there in the public domain***.

### c.    August 23, 2018 – Conference Call to Discuss Glyphosate Litigation

247.    On August 23, 2018, Bayer held a conference call to discuss the Roundup litigation. During the call, Defendant Baumann stated:

Baumann:    Since we have had access, we could reassure ourselves that there is no communication out there that would "qualify as smoking gun." Things have been used as usual by plaintiff lawyers taken out of context. And as it has been the case for Monsanto before, that we, as a company, a joint company, stand firmly behind the science and the conduct related to, a, glyphosate and what we are doing as a company.

**\*\*\*\***

Question:    It's just a couple of quick follow-ups now actually. And the first one is on the internal communications question. You said, initially, you didn't have sufficient access to those, but you do now. Did I correctly understand you say you've now reviewed those and you're sufficiently satisfied that there is no meaningful adversities and information that will emerge from the internal communications at Monsanto?

Baumann:    I think there's not a lot I can add to my prior answer. The internal communication that has been quoted in the Johnson case is -- actually has been used out of context on purpose. ***There's nothing that we see related to that communication that would lead to us talking about the combined company now. Having misrepresented***

*or withheld relevant data, or actually, has said that glyphosate could probably cause cancer, none of that is actually the case. So we can, solidly with everything we know, stand behind our communication.*

\*\*\*\*

Baumann: I think you also related it back to the due diligence or the time when we decided to acquire Monsanto. Yet, to put things into perspective, very few cases had been filed at the time in 2016, and the situation was quite different in terms of where this entire complex stood in the very early stage in 2016 and where we are now, still at a very early stage, but with the first case tried.

248. The statements quoted in ¶¶ 244-247 concerning Bayer's ability to access Monsanto's internal documents under the Hold Separate Order were materially false and misleading when made because nothing in the Hold Separate Order prohibits reasonable merger due diligence, particularly where the Merger Agreement specifically obligates Monsanto to provide reasonable information, even if competitively sensitive. ¶ 100.

249. Further, these statements and omissions gave investors a false impression that notwithstanding Bayer's purported inability to review Monsanto's internal documents, that Defendants nonetheless could undertake appropriate due diligence of the Roundup liability risks when, in fact, such due diligence could not be adequate without evaluating Monsanto's litigation history, the number and quality of pending and future Roundup-related cases, the strength of the liability case against Monsanto and the strength of any available defenses, the number and average value of settlements and verdicts against Monsanto, or a detailed understanding of how Monsanto had managed the litigation at the time of the actual or threatened litigation. ¶¶ 68-69, 81. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Bayer knowingly or recklessly disregarded to disclose this important information with the market.

**C.** **Defendants' False and Misleading Statements About the Evidentiary Basis for Monsanto's Science-Based Trial Defenses**

**1.** **August 16, 2018 – Press Release**

250. On August 16, 2018, Bayer issued a press release, which stated:

As regards the glyphosate verdict in California on August 10, 2018, Bayer believes that *the jury's decision is at odds with the weight of scientific evidence*, decades of real world experience *and the conclusions of regulators around the world that*

*all confirm glyphosate is safe and does not cause non-Hodgkin's lymphoma*. The National Institutes of Health (NIH) recently reaffirmed glyphosate does not cause cancer. The U.S. Environmental Protection Agency (EPA), the European Food Safety Authority (EFSA), the European Chemicals Agency (ECHA) and other regulators around the world have also concluded that glyphosate can be used safely. The jury's verdict is just the first step in this case, and it remains subject to posttrial motions in the trial court and to an appeal, as announced by Monsanto. As this case proceeds, Bayer believes *courts ultimately will find that Monsanto and glyphosate were not responsible for Mr. Johnson's illness.*

### 2.    August 23, 2018 – Conference Call

251.    On August 23, 2018, Bayer held a conference call to discuss the Roundup litigation that was attended by Defendants Baumann, Nickl, and Condon. During his introductory remarks on the call, Defendant Baumann claimed that "*[t]he safety of glyphosate is substantiated by more than 800 scientific studies and reviews* conducted over the course of many decades, *which conclude that it can be used safely and does not cause cancer*. *This includes, notably, the U.S. Agricultural Health Study*." Baumann then said that "Bayer and the joint litigation team are working to ensure that, going forward, this *overwhelming science* will get the full consideration it deserves."

252.    During the August 23, 2018 call, in response to a question from Vincent Andrews of Morgan Stanley regarding Bayer's litigation strategy, Baumann said, "We will rigorously defend this case and also the cases that are up and coming because, quite frankly, we have a product that is in very good regulatory standing. *We have strong science supporting, across the board, the fact that there is no relation between the application of the product or products or herbicide-based formulations of glyphosate and cancer causes*."

253.    During the August 23, 2018 call, Defendant Baumann further stated:

> *There is nothing that is in our hands or that is actually the result of the studies that are out there that suggest any relation between the application of a glyphosate-based herbicide on one side and the occurrence of cancer of people who have been using it.* And as I mentioned earlier in my speech, *I think the best study to look at is the federal U.S. ag health study* that has been covering more than 50,000 people and their spouses over more than 20 years, which cannot stipulate any relation between the people that are applicating and using glyphosate on one side and then the occurrence of cancer. So I think that helps you put that -- your "probability question" into perspective.
>
> *Secondly . . . everything we know, not only by the studies that were undertaken by Monsanto, but everybody else who has studied the product also for regulatory*

No: 3:20-cv-04737 (RS)  - [PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT            - 91

*and other purposes, suggest that this is a very, very robust assessment. I've quoted* quite -- well *several times now more than 800 studies.* The product has been used, I think, in a very safe manner for more than 4 decades.

254.    During the August 23, 2018 call, Defendant Baumann further stated, in response to a question from Richard Vosser at JP Morgan about "the different formulations of Roundup relative to glyphosate" and "the role surfactants would play":

Okay. Richard, so first, *on the first question on the formulations, in general, there is no difference between your -- based on the studies that are out there, between the assessment of glyphosate as an active and then glyphosate-based formulations that are being used. Yes, so there is no difference*. And just coming back to the 2017 U.S. ag study, that study was actually done on the application of glyphosate-based formulations here. *I know that there's a lot of talk out there that what the EPA has said in terms of carcinogenicity of glyphosate as an active does not necessarily relate to the formulations out there but I think, if you have such strong, robust evidence, the data that is out there appears to be very, very consistent*.

Secondly on NHL, NHL is actually a cancer type that can have many, many causes. As far as the connection between non-Hodgkin lymphoma or other cancer types to glyphosate is related, I have to come back to what I said earlier: *there is no relation between the application of glyphosate and, let's say, the risk of developing cancer regardless of which form, in general, based on the studies that we know about*.

255.    Later, during the same conference call on August 23, 2018, Defendant Baumann responded to a question about the basis for his criticism of the IARC report:

Question:       This is Stuart Hosansky of Vanguard. My question is the IARC study that you have mentioned several times and indicated that you disagree with it. Can you provide us clarity as to where you believe that study was weak and why it should not be relied upon?

Baumann:       Yes. That's a good question. The IARC is a subdivision of the World Health Organization, so it's a reputable organization. And IARC stands for the International Agency of Cancer Research. What they do is they assess your different compounds for potential cancer risks, and then they classify your different classes. *They have not performed to, the best of my knowledge, separate individual and own studies,* but they classify, and the classification that glyphosate falls into is potentially carcinogenic. It's the same as it's actually labeled as a *2A classification, and it has the same classification as the regular consumption of very hard beverages or the regular consumption of red meat, yes, that should give you a perspective on what that IARC classification is all about, but no own studies.*

256.    During the same conference call on August 23, 2018, Defendant Baumann stated:

Okay. Thanks, Jo. First, on the ag health study, we don't know what the reasoning of the jury was behind the verdict they ended up with, but based -- and we don't have any insight because none of the details have been revealed other than the voting. But to the extent that we have been commenting on it, I want to make sure that one thing is crystal clear. ***The signs, the data, the facts and the regulatory standing clearly stand in favor of glyphosate, and that's why we've been very outspoken on, a, the verdict being inconsistent with facts, data, science and regulatory standing of the product***; and, b, our opinion that this is a wrong verdict. And I think there's not much more to it than we can -- than I've said so far.

### 3.    August 30, 2018 – Quarterly Report for Q2 2018

257.    On August 30, 2018, Bayer released its quarterly report for the second quarter of 2018 (the "Q2 2018 Interim Report"). The report was signed by Defendants Baumann, Condon, and Nickl, who certified that "[t]o the best of our knowledge," the report "includes a fair review of the development and performance of the business and the position of the Bayer Group, together with a description of the principal opportunities and risks associated with the expected development of the Bayer Group for the remaining months of the financial year."

258.    In a section addressing key recent events affecting the Company, the Q2 2018 Interim Report stated:

On August 10, 2018, a state court jury in San Francisco, United States, awarded US$39 million in compensatory and US$250 million in punitive damages to a plaintiff who claimed that a Monsanto product caused his non-Hodgkin lymphoma (NHL). The news impacted Bayer's share price, which declined quite considerably at times. We disagree with the verdict and intend to seek trial court review and appeal, if necessary. ***More than 800 scientific studies – including an independent study which followed more than 50,000 licensed pesticide applicators and farm workers and their spouses for more than 20 years – and regulatory authorities all over the world confirm that glyphosate and glyphosate-based herbicides do not cause cancer and are safe for use when used according to label instructions.*** Please see the "Legal Risks" section for further details.

259.    The Q2 2018 Interim Report's note on Legal Risks further stated:

***In view of more than 800 scientific studies – including an independent study which followed more than 50,000 licensed pesticide applicators and farm workers and their spouses for more than 20 years – and regulatory authorities all over the world confirming that glyphosate does not cause cancer and is safe for use when used according to label instructions, we continue to believe that we have meritorious defenses*** and intend to defend ourselves vigorously in all of these lawsuits.

### 4.    September 5, 2018 – Conference Call

260.    On a September 5, 2018 conference call with investors about Bayer's second quarter performance, Defendant Baumann stated:

> To the best of my knowledge, ***the US ag health study data has been published***, but let me elaborate a little bit more. Let me elaborate a little bit more on where the confusion might come from. ***The IARC assessment did not include the findings of that large, real-life evidence study because it was at the time of the assessment still preliminary and not, let's say, a finished document***. And that is why it did not find its way into the IARC assessment. From a scientific perspective, ***it actually backs up all the other 800 studies now with a real-life evidence study. With 50,000 farmers and then significant others, there is absolutely nothing that has been seen in terms of a statistical signal that there is a cause and effect relationship between the application of glyphosate as a formulated product*** – so ***not only the active, but as a formulated product*** – and the onset of cancer in some individuals, ***nothing whatsoever***.

### 5.    November 8, 2018 – Quarterly Report for Q3 2018

261.    On November 8, 2018, Bayer released its quarterly report for the third quarter of 2018, which was signed by Defendants Baumann, Condon, and Nickl. The report included a note on Legal Risks, which stated:

> ***In view of more than 800 scientific studies and regulatory authorities all over the world confirming that glyphosate is safe for use when used according to label instructions, including an independent study which followed more than 50,000 licensed pesticide applicators and farm workers and their spouses for more than 20 years which found no association between glyphosate-based herbicides and cancer, and the U.S. Environmental Protection Agency's 2018 risk assessment which examined more than 100 studies and concluded that glyphosate is "not likely to be carcinogenic to humans," we continue to believe that we have meritorious defenses and intend to defend ourselves vigorously in all of these lawsuits.***

### 6.    November 13, 2018 – Press Conferences to Discuss Q3 2018 Earnings

262.    Defendant Baumann repeated some of his false and misleading talking points about how all the evidence showed "glyphosate" (*i.e.*, the chemical glyphosate on its own) was safe:

> As I mentioned earlier, we are and remain convinced that glyphosate when used as directed is extremely safe and effective. . . . ***And against the backdrop of the overwhelming scientific and regulatory evidence and our own analysis that was conducted in-house both in our predecessor company and in the current company, we are fully behind these statements. We maintain them wholeheartedly.***

263.    At a second November 13, 2018 press conference, Defendant Baumann again misled investors about the the scientific evidence purportedly supporting glyphosate's and Roundup's carcinogenicity, and therefore Monsanto's trial defenses:

> I believe we have all been very surprised by the final ruling on the Johnson post-trial motions in October. We believe that this verdict is dead wrong, and we are therefore preparing an appeal with the California Courts of Appeal *in view of the more than 800 scientific studies and regulatory authorities all over the world confirming that glyphosate is safe for use when used according to label instruction, including an independent federally funded study which followed more than 50,000 licensed pesticide applicators and farmworkers and their spouses for more than 20 years, which found no association between glyphosate-based herbicides and cancer. . . . We continue to strongly believe that we have meritorious defenses and intend to defend ourselves vigorously in all of these lawsuits.*

### 7.    December 5, 2018 – Remarks at Bayer AG Capital Markets Day

264.    Defendant Baumann repeated similar talking points about Roundup during his remarks at Bayer's Capital Markets Day on December 5, 2018:

> It is very efficacious. It is a critical agent for actually herbicide control for farmers around the world that is vital for them to have access to. And we can only reiterate that it is safe. *And more than 800 studies have confirmed that also the most recent reanalysis that was done by all major regulatory bodies around the world, ranging from Australia, New Zealand, Japan to the U.S. EPA and the European agencies that have reconfirmed the safety of the product and, at the same time, that it is not carcinogenic.*

### 8.    January 21, 2019 – Remarks in Exclusive Interview with *The Australian Financial Review*

265.    During an exclusive interview published by *The Australian Financial Review* on January 21, 2019, Defendant Baumann stated that he was confident the *Johnson* verdict would be overturned on appeal and that Bayer would prevail in the Roundup Litigation because "[a]ll major registration agencies" and "regulatory agencies around the world" had "*re-confirmed the safety status of glyphosate*," and "based on more than 40 years of glyphosate use around the world and numerous comprehensive and credible scientific studies which have found *no link between use of the chemical and cancer*." Baumann also stated that "Bayer had adjusted the preparation for the next round of court battles after completing the Monsanto acquisition" and Bayer's new approach would see the "question of causation analysed and assessed in a substantially more objective

manner than was the case in the Johnson trial," and Bayer was therefore "optimistic that will reflect the safety profile of glyphosate."

### 9.    February 27, 2019 – Bayer's 2018 Annual Report and Press Release

266.    On February 27, 2019, Bayer released its 2018 Annual Report, which included a Chairman's Letter signed by Defendant Baumann, which stated:

> As I already mentioned, there was a great deal of discussion last year about the safety of glyphosate. The ruling by a court of first instance in the Johnson case led to negative reactions in the media and the capital markets. This played into the hands of the activists and professional critics of agriculture. Among consumers and stockholders, it mainly caused uncertainty.

> Yet the facts have not changed: *glyphosate is a safe product*. *That has been proven by numerous scientific studies and the independent assessments of regulatory authorities throughout the world over a period of more than 40 years.*

267.    In its interim financial statements for the third quarter of 2018, Bayer reported its Legal Risks, and stated:

> *In view of more than 800 scientific studies and regulatory authorities all over the world confirming that glyphosate is safe for use when used according to label instructions, including an independent study which followed more than 50,000 licensed pesticide applicators and farm workers and their spouses for more than 20 years which found no association between glyphosate-based herbicides and cancer,* and the U.S. Environmental Protection Agency's 2018 risk assessment which examined more than 100 studies and concluded that glyphosate is "not likely to be carcinogenic to humans," *we continue to believe that we have meritorious defenses and intend to defend ourselves vigorously in all of these lawsuits.*

### 10.    April 25, 2019 – Conference Call to Discuss Q1 2019 Earnings

268.    Defendant Baumann reaffirmed that "we are and continue to be convinced of the safety profile of glyphosate. . . . We believe that we will ultimately prevail in this litigation *on the strength of sound science*." He also informed investors that the judge had asked for a start to settlement discussions but said that "w[e] are rigorously defending ourselves against those with the appeal process that is ongoing. And with that, there's actually not much more color I can give to it at this point in time." He continued:

> Lastly, let me briefly update you on the glyphosate litigation, a topic that, of course, continues to be top of our minds and probably also for many of you. First of all, *we are and continue to be convinced of the safety profile of glyphosate*. Overall, there are now served lawsuits from 13,400 plaintiffs as of April 11. While this is an increase since our last reporting, it is by no means a

reflection of the merits of the litigation.

****

So what is ahead? The Pilliod case is ongoing in Alameda County and should conclude in early May.

****

*We believe that we will ultimately prevail in this litigation on the strength of sound science and remain committed to vigorously defending ourselves the benefit of our customers, employees and of course, our shareholders.* For more details, don't hesitate to access our website that we continue to update with all relevant information.

### 11.    April 26, 2019 – Letter to Shareholders on Shareholder Votes

269.    On April 26, 2019, in a letter addressed to shareholders and distributed among the materials for the 2019 Annual General Meeting, Defendants Baumann and Wenning stated:

Bayer's Supervisory Board as well as the Board of Management recommend that shareholders grant the Board of Management a discharge for 2018. This reflects that both Boards are convinced that the members of the Board of Management have acted in full accordance with their obligations and duties. Before Bayer entered into the merger agreement with Monsanto, the Board of Management diligently and extensively reviewed the risks connected with Monsanto's glyphosate business. *It was clearly concluded that, if used as directed, the products of Monsanto containing glyphosate are safe. There are more than 800 studies available which come to this conclusion*, which has, to this date, also been continuously confirmed by competent regulatory authorities worldwide. For example, the assessment by the U.S. Environmental Protection Agency *EPA examined more than 100 studies the agency considered relevant and concluded that glyphosate is 'not likely to be carcinogenic to humans,'* its most favorable rating. *Also particularly relevant is the independent 2018 National Cancer Institute supported Agricultural Health Study* which followed over 50,000 licensed pesticide applicators for more than twenty years and *which found no association between glyphosate-based products (such as Roundup) and cancer. Only one assessment by an agency of the World Health Organization ("IARC") classifies glyphosate as "probably carcinogenic".* As such, glyphosate was placed in the same category as the consumption of red meat and hot beverages. Since IARC's assessment in 2015, regulators worldwide continue to find that glyphosate -based products are safe when used as directed. For example, following an intensive review, Health Canada as recently as January 2019 clearly confirmed its previous safety assessment on glyphosate and emphasized that "no pesticide regulatory authority in the world currently considers glyphosate to be a cancer risk to humans at which humans are currently exposed.

Based on the views held by regulatory authorities worldwide and scientists, the Management Board assessed the legal risks in connection with the use of glyphosate as low.

****

*We continue to believe firmly in the scientific assessments that glyphosate-based*

*herbicides do not cause cancer*. Bayer will continue to defend its glyphosate-based herbicides vigorously.

### 12.    April 26, 2019 – Statement of Management Board and Supervisory Board on Countermotions

270.    On April 26, 2019, in a Statement of the Management Board and Supervisory Board distributed among the materials for the 2019 Annual General Meeting, Defendants stated:

Of course, in the context of the acquisition, the Board of Management also reviewed the risks connected with Monsanto's glyphosate business. This risk assessment clearly showed that, *when used as directed, the products of Monsanto containing glyphosate are safe. There are more than 800 studies available which come to this conclusion, which has, to this day, also been continuously confirmed by the competent regulatory authorities worldwide*. Another assessment of the risk of cancer performed in 2017 by the U.S. environmental agency EPA, for example, took into account more than 100 studies considered relevant and came to the conclusion that a carcinogenic effect of glyphosate was "not likely", which is the most harmless assessment according to the EPA nomenclature. *Particularly relevant is a large state-funded U.S. observational study which was conducted in the agricultural sector over a period of twenty years and which comes to the conclusion that glyphosate is not carcinogenic*.

Following an intensive review, the Canadian ministry of health as recently as January 2019 clearly confirmed again that glyphosate was safe and emphasised that – based on the amount of glyphosate people come into contact with – there was currently no regulatory authority in the world that sees a risk of cancer. Only an assessment by a sub-organisation of the World Health Organization classifies glyphosate as "probably carcinogenic". However, in this assessment only the general hazard of glyphosate was assessed but not the risk of actual occurrence. Therefore, glyphosate was assessed to be as carcinogenic as the consumption of red meat and hot beverages.

*Based on the views held by regulatory authorities worldwide and scientists, the Board of Management assessed the legal risks in connection with the use of glyphosate as low*.

### 13.    March 19, 2019 – Press Release from Bayer on Hardeman Verdict

271.    On March 19, 2019, following the jury's verdict in *Hardeman*, Bayer issued a press release, stating:

Regulatory authorities around the world consider glyphosate-based herbicides as safe when used as directed. *There is an extensive body of research on glyphosate and glyphosate-based herbicides, including more than 800 rigorous studies submitted to EPA, European and other regulators in connection with the registration process, that confirms that these products are safe when used as directed*. Notably, the largest and most recent epidemiologic study - the 2018 independent National Cancer Institute-supported long-term study that followed over 50,000 pesticide applicators for more than 20 years and was published after the IARC monograph - found no association between glyphosate-based herbicides and cancer. Additionally, EPA's 2017 post-IARC cancer risk assessment examined

more than 100 studies the agency considered relevant and concluded that glyphosate is "not likely to be carcinogenic to humans," its most favorable rating.

### 14.    April 28, 2020 – Bayer Annual Shareholders Meeting

272.    On April 28, 2020, Bayer held its Annual Shareholders Meeting, which was attended by Defendants Baumann, Wenning, and Nickl. At the meeting, Defendant Nickl stated:

> *Some plaintiffs say that the interplay between glyphosate and the surfactant represent a danger for the user of the product. Regulatory authorities, however, have assessed the safety of the surfactant category*, which are used in glyphosate-based herbicides. The U.S. Environmental Protection Agency concluded in 2009 that these *surfactants are not carcinogenic*.

> Glyphosate-based products, including Roundup, are the herbicides that have been studied more than any others worldwide. *Leading regulatory authorities came to the conclusion, again and again, that glyphosate-based herbicides from Bayer, when used appropriately, are safe and that glyphosate is not carcinogenic*. These conclusions are based on *comprehensive scientific findings* from over 40 years. In addition, there have been more than 100 studies that were carried out by the EPA when it comes to their cancer risk analysis and *a total of more than 800 safety studies*, which have been submitted to the regulatory authorities.

273.    The statements quoted in ¶¶ 250-272 concerning the evidentiary basis for Monsanto's science-based trial defenses were materially false and misleading when made because (1) Monsanto was unable to and never would present evidence at trial of 800 or more scientific studies showing glyphosate does not cause cancer, in part because as Defendants admitted on April 28, 2020, the vast majority of these studies did not assess either glyphosate's carcinogenicity or Roundup's carcinogenicity ¶¶ 127, 158, 183, 193-194; (2) Monsanto's science-based trial defenses were based primarily on approximately 63 epidemiological studies, of which at most ten actually concerned NHL, ¶ 127; (3) the AHS was deeply flawed due to issues with multiple pesticides being studied, exposure classification issues, imputation defects, and failure to detect known carcinogens, and the plaintiffs in the Roundup Litigation would be able to present evidence and argument concerning these flaws at trial, ¶¶ 114, 124; (4) there was in fact considerable scientific evidence concluding that glyphosate could cause cancer, and this evidence would be presented by the plaintiffs' experts in the Roundup Litigation trials, ¶¶ 110-115, 122-123; (5) there was in fact considerable scientific evidence that glyphosate was more likely to be carcinogenic and more likely to cause NHL when contained in a formulation with a surfactant such as Roundup,

and this evidence would be a key focus of the Roundup Litigation trials, ¶¶ 119, 123, 154, 181; and (6) Monsanto procured regulatory approvals for glyphosate in part by withholding adverse scientific evidence from regulators and ghostwriting research, and in any event regulators had approved glyphosate (the chemical itself) and not Roundup (the formulated GBH), and this evidence would be presented at the Roundup Litigation trials. ¶¶ 23, 125-126; 155-157.

## VI.    ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

274.    Numerous independent pieces of evidence support the inference that Defendants either knew they were making false statements and omissions to the market throughout the Class Period, or else recklessly disregarded the risk that they were misrepresenting the litigation and reputational risks of the Merger, the evidentiary basis for Monsanto's science-based trial defenses, and the size and scope of Bayer's potential liability in the Roundup litigation. These facts each support a strong inference of scienter, both independently and holistically.

### A.    Defendants' Knowledge or Reckless Disregard of Legal and Reputational Risks Prior to September 14, 2016 Support a Strong Inference of Scienter

275.    Prior to September 14, 2016, Defendants knew or recklessly disregarded that they had not examined any of Monsanto's internal documents relating to the Roundup litigation. The failure to examine these documents and meaningfully assess the financial and reputational risks arising from the Roundup litigation rendered its statements fraudulent because:

(a)    Defendants knew or recklessly disregarded that following the IARC report in March 2015 finding that glyphosate (the principal ingredient in Monsanto's flagship herbicide Roundup) was a probable human carcinogen cause of cancer, Monsanto was besieged with over 120 toxic tort cases alleging that Monsanto had known for decades (extending back to approximately 2000 if not earlier) that exposure to Roundup contributed to the cancer of the plaintiffs (the "Roundup Cases");

(b)    Defendants knew or recklessly disregarded that the Roundup Cases sought both compensatory damages (based the economic harm to the individual plaintiffs) as

well as punitive damages and that punitive damage award would be based on providing evidence that Monsanto's alleged warn consumers of the cancer risk attendant with Roundup was intentional and malicious and the punitive damage awards would be limited only by, *inter alia*, the amount sufficient to deter Monsanto from future alleged misconduct;

(c)    Defendants knew or recklessly disregarded (i) Monsanto's known product liability history, ¶¶ 73-79; (ii) Monsanto's known reputation for concealing the health risks of its products, ¶¶ 73-76; (iii) the massive size and scope of the Merger, ¶¶ 61; (iv) analyst, shareholder, and credit agency reaction to the Merger proposal, ¶¶ 62-67.

(d)    As a result, Defendants knew or recklessly disregarded that the only meaningful way to assess Monsanto's exposure to compensatory and punitive damage verdicts in the Roundup cases and thus the financial and reputational risks of the Monsanto acquisition would be to examine Monsanto internal documents related to Roundup and glyphosate;

(e)    Defendants knew or recklessly disregarded that they lacked sufficient basis to tout the benefits of the merger and the strength of its due diligence in 2016 given their failure to review or request any internal Monsanto documents related to Roundup.

(f)    Defendants knew or recklessly disregarded that Defendants failed to request or examine Monsanto's internal documents even though those at least 3.5 million pages of documents had been and were actual being collected and segregated by Monsanto for production in the consolidated Roundup cases pending in federal court in October 2016—just weeks after Bayer had agreed to the merger. ¶ 102.

**B.    Defendants' Knowledge or Reckless Disregard of Roundup Liability Risks from September 14, 2016 through June 7, 2018**

276.    From September 14, 2016 to June 7, 2018, Defendants knew or recklessly disregarded the risk that the due diligence investigation had not reviewed any internal Monsanto

documents related to Roundup or glyphosate, despite Monsanto's obligations and Bayer's rights under the Merger Agreement that would have provided them such access, ¶¶ 136-141, 196-202, despite numerous red flags occurring during this time period, including (i) Monsanto's known product liability history, ¶¶ 73-79; (ii) Monsanto's known reputation for concealing the health risks of its products, ¶¶ 73-76; (iii) the massive size and scope of the Merger, ¶ 61; (iv) analyst, shareholder, and credit agency reaction to the Merger proposal, ¶¶ 62-67.

### C. Defendants' Knowledge or Reckless Disregard of Roundup Liability Risks from June 8, 2018 to June 24, 2020

277. Following the closing of the Merger, and the verdict in the Johnson Case, Defendants knew or recklessly disregarded the risk that the due diligence investigation had not reviewed any internal Monsanto documents related to Roundup or glyphosate, despite gaining unfettered access to Monsanto's internal documents, and despite numerous red flags occurring during this time period, including: (i) the jury's verdict in the Johnson Case finding Monsanto liable for $289 million, which rested in large part on internal Monsanto documents that Defendants had not reviewed, ¶¶ 128-134; (ii) the trial court's rejection of Monsanto's motion for a new trial in the Johnson Case, indicating that Monsanto's legal defenses were weaker than presented, ¶ 148; (iii) the court rulings and jury verdict in the Hardeman Case finding Monsanto liable for $80 million, which rested in large part on internal Monsanto documents related to the increased toxicity of Roundup compared to the toxicity of glyphosate alone, ¶¶ 103, 151-161; and (iv) the jury verdict in the Pilliod Case finding Monsanto liable for $2 billion, which rested in part on newly disclosed documents showing Monsanto's misconduct that had not been reviewed by the due diligence investigation, ¶¶ 178-186.

### D. Defendants' Public Statements Regarding the Evidentiary Basis for Monsanto's Science-Based Trial Defenses Support a Strong Inference of Scienter

278. Between August 16, 2018 and April 28, 2020, Defendants knew or recklessly disregarded that their statements regarding the evidentiary basis for Monsanto's science-based trial defenses were false and misleading. During this period, Defendants repeatedly made false and

misleading statements about the evidentiary basis for Monsanto's science-based trial defenses in the Roundup Litigation and represented that Monsanto would not incur significant liability in the Roundup Litigation because (1) its science-based trial defenses were supported by "overwhelming" scientific evidence demonstrating the "fact" that glyphosate does not cause cancer, including "more than 800 scientific studies and reviews" such as the AHS, ¶¶ 251, 262; (2) the scientific evidence showed there was no difference in carcinogenicity between glyphosate and glyphosate-based formulations such as Roundup, ¶ 254, 260; and (3) regulatory authorities all over the world had confirmed glyphosate does not cause cancer, ¶¶ 250, 253, 256, 258, 259, 261-267, 269-272. Defendants knew or recklessly disregarded that (1) Monsanto was unable to and never would present evidence at trial of 800 or more scientific studies showing glyphosate does not cause cancer, in part because as Defendants admitted on April 28, 2020, the vast majority of these studies did not assess either glyphosate's carcinogenicity or Roundup's carcinogenicity. ¶¶ 127, 158, 183, 193-194; (2) Monsanto's science-based trial defenses were based primarily on approximately 63 epidemiological studies, of which at most ten actually concerned NHL, ¶ 127; (3) the AHS was deeply flawed due to issues with multiple pesticides being studied, exposure classification issues, imputation defects, and failure to detect known carcinogens, and the plaintiffs in the Roundup Litigation would be able to present evidence and argument concerning these flaws at trial, ¶¶ 114, 124; (4) there was in fact considerable scientific evidence concluding that glyphosate could cause cancer, and this evidence would be presented by the plaintiffs' experts in the Roundup Litigation trials, ¶¶ 110-115, 122-123; (5) there was in fact considerable scientific evidence that glyphosate was more likely to be carcinogenic and more likely to cause NHL when contained in a formulation with a surfactant such as Roundup, and this evidence would be a key focus of the Roundup Litigation trials, ¶¶ 119, 123, 154, 181; and (6) Monsanto procured regulatory approvals for glyphosate in part by withholding adverse scientific evidence from regulators and ghostwriting research, and in any event regulators had approved glyphosate the chemical (the chemical itself) and not Roundup (the formulated GBH), and this evidence would be presented at the Roundup Litigation trials, ¶¶ 23, 125-126; 155-157.

**E.    Defendants' Admission that They Never Reviewed Monsanto's Internal Documents Supports a Strong Inference of Scienter**

279.    In August 2018, following the *Johnson* verdict, Defendants admitted for the first time that they had not reviewed a single internal Monsanto document, despite telling investors that they had conducted a complete due diligence investigation of Monsanto, including a risk assessment of the Roundup litigation. ¶¶ 196-201. In addition, Defendants admitted that their sole basis for assessing the Roundup liability risk was four memoranda from 2016 by its U.S. legal adviser regarding the considerations relevant to the Merger, which did not evaluate or assess Monsanto's litigation history, the number and quality of pending and future Roundup-related cases, the strength of the liability case against Monsanto and the strength of any available defenses, the number and average value of settlements and verdicts against Monsanto, or a detailed understanding of how Monsanto had managed the litigation at the time of the actual or threatened litigation. ¶ 198.

**F.    The Magnitude of the Glyphosate-Related Costs Supports a Strong Inference of Scienter**

280.    The size and scope of the Merger, as the largest foreign acquisition in German corporate history, ¶ 63, as well as the Glyphosate-related litigation support a strong inference of scienter. By the end of the Class Period, Bayer publicly acknowledged that it expected at least 125,000 pending or unfiled glyphosate-related claims, with its $10.9 billion settlement resolving only 15,000 of them.

**G.    Defendant Baumann Acted with Scienter**

281.    In addition to the allegations detailed above in this section, Defendant Baumann was also personally involved with Bayer's acquisition of Monsanto. He was Bayer's point person during Bayer's initial interest in Monsanto, Bayer's decision to engage with the acquisition process, and Bayer's ultimate decision to acquire Monsanto. ¶ 49.

282.    Further, Defendant Baumann knew, or at least recklessly disregarded the litigation and reputational risks, and red flags detailed above. *See* § IV.C. Despite knowledge of these risks

and red flags, throughout the Class Period, Defendant Baumann repeatedly asserted that Bayer's due diligence adequately evaluated Monsanto's litigation and reputational risks. Thus, Defendant Baumann knowingly, or in reckless disregard, failed to disclose material information that made Defendants' statements to the market regarding Bayer's due diligence, and Bayer's legal exposure detailed above, false and misleading when made.

283.    It cannot be disputed that Defendant Baumann had actual knowledge that Bayer's due diligence had not adequately evaluated Monsanto's litigation and reputational risks. Prior to his tenure as CEO, Baumann had served as a senior manager overseeing Bayer's acquisition strategy, serving as the "driving force" behind Bayer's disappointing acquisition of Merck. In September 2016, Baumann admitted that Bayer's failure to anticipate Merck's weaknesses were due to Bayer's "limited ability to do due diligence." Thus, Defendant Baumann, more than anyone, should have known of the basic steps that would have been necessary to ensure that Bayer had sufficient information to evaluate Monsanto's litigation and reputational risks.

284.    Defendant Baumann was also personally involved in dealing with the Roundup Litigation once the Merger closed and in repeatedly making statements to investors about the scientific evidence supporting Monsanto's trial defenses, which Baumann stated included "more than 800 scientific studies and reviews" that supposedly confirmed glyphosate does not cancer, including the AHS, as well as evidence that there was "no difference" in the carcinogenicity of glyphosate versus glyphosate-based formulations such as Roundup. *See* § V.C. Baumann stated that he was working with "the joint litigation team" to "ensure that, going forward, this overwhelming science will get the full consideration it deserves," ¶ 251. Further, Baumann's remarks to *The Australian Financial Review* that were published on January 21, 2019 show that Baumann was informed about Monsanto's trial strategy, and specifically its "approach" and "preparation" relating to the "question of causation." *See* ¶¶ 134, 265. Given his involvementin the Roundup Litigation and in communicating about it to investors, Defendant Baumann knew, or recklessly disregarded, that Monsanto's trial defenses were not in fact backed by the scientific

evidence he touted and also that there was evidence that would be presented at trial that Roundup was more carcinogenic than glyphosate alone.

285.    Defendant Baumann personally signed Bayer's Q2 2018 Interim Report and certified that it fairly described the principal risks facing Bayer, including the risk posed by the Roundup Litigation. ¶ 257. Given his role in ensuring and certifying the accuracy of Bayer's Q2 2018 Interim Report, Baumann knew or recklessly disregarded that Monsanto's science-based trial defenses were not as strong as they were portrayed to be in the Q2 2018 Interim Report, as Monsanto was unable to present evidence at trial of 800 or more scientific studies showing glyphosate does not cause cancer, ¶¶ 127, 158, 183, 193-194; the AHS was deeply flawed due to issues with multiple pesticides being studied, exposure classification issues, imputation defects, and failure to detect known carcinogens, ¶¶ 114, 124; and Monsanto procured regulatory approvals for glyphosate in part by withholding adverse scientific evidence from regulators and ghostwriting research, and in any event regulators had approved glyphosate (the chemical itself) and not Roundup (the formulated GBH), ¶¶ 23, 125-126; 155-157.

286.    Further, Defendant Baumann signed and sent a letter to shareholders on April 26, 2019, which stated that Bayer had "assessed the legal risks in connection with the use of glyphosate as low" based on a review of the scientific evidence as to glyphosate's safety and potential carcinogenicity, including "more than 800 studies" demonstrating glyphosate's safety and the AHS. ¶ 239. Given his signing and sending of this letter, Defendant Baumann knew, or recklessly disregarded, that most of the scientific evidence cited in this letter did not support Monsanto's trial defenses and therefore did not support an assessment that the legal risks in connection with the Roundup litigation were low.

### H.    Defendant Wenning Acted with Scienter

287.    In addition to the allegations detailed above in this section, Defendant Wenning was also personally involved in Bayer's acquisition of Monsanto. As detailed in the Proxy Statement, Defendant Wenning met with Monsanto executives during the acquisition process. Additionally, Defendant Wenning was Chairman of the Supervisory Board during the entire

pendency of the acquisition through closing. Given his involvement in the Merger, Defendant Wenning knew, or recklessly disregarded, that Bayer had not performed adequate diligence, nor performed adequate management of Bayer's legal exposure, and made false and misleading statements to the contrary.

288.    Defendant Wenning signed and sent a letter to shareholders on April 26, 2019, which stated that Bayer had "assessed the legal risks in connection with the use of glyphosate as low" based on a review of the scientific evidence as to glyphosate's safety and potential carcinogenicity, including "more than 800 studies" demonstrating glyphosate's safety and the AHS. ¶ 239. Given his signing and sending of this letter, Defendant Wenning knew, or recklessly disregarded, that most of the scientific evidence cited in this letter did not support Monsanto's trial defenses and therefore did not support an assessment that the legal risks in connection with the Roundup litigation were low.

289.    Further, Defendant Wenning served Chairman of Bayer's Supervisory Board from October 1, 2012 until April 28, 2020, and as Chairman of Bayer's Glyphosate Litigation Committee from June 2019 through at least the end of that year.

290.    Bayer's Supervisory Board oversees and advises Bayer's Board of Management, which consists of Bayer's senior management team. According to Bayer's website,

> The role of the Supervisory Board is to oversee and advise the Board of Management. The Supervisory Board is directly involved in decisions on matters of fundamental importance to the company, regularly conferring with the Board of Management on the company's strategic alignment and the implementation status of the business strategy.

> The Chairman of the Supervisory Board coordinates its work and presides over the meetings. Through regular discussions with the Board of Management, the Supervisory Board is kept constantly informed of business policy, corporate planning and strategy.

291.    According to Bayer's 2019 Annual Report, Bayer's Glyphosate Litigation Committee "intensively deals with the glyphosate litigations, and oversees and advises the Board of Management in matters related to this topic." According to Bayer's website, the Glyphosate Litigation Committee is tasked with "intensively monitoring" the Roundup Litigation and "making

recommendations on the litigation strategy." Similarly, a Bayer presentation on corporate governance from March 2020 states that the Glyphosate Litigation Committee "makes recommendations on the litigation strategy."

292.    In his roles as Chairman of the Supervisory Board and Chairman of the Glyphosate Litigation Committee, Defendant Wenning discussed the Roundup Litigation in detail during at least six meetings between September 2018 and December 2019,[9] and engaged in intensive monitoring of the Roundup Litigation. Several of these meetings were attended by John H. Beisner, who Bayer called a "recognized expert in product liability litigation." Beisner was retained by Bayer to advise the Supervisory Board on trial tactics and mediation issues, and he was given comprehensive access to all relevant information and documents relating to the Roundup Litigation. Given Defendant Wenning's involvement in the Supervisory Board's and the Glyphosate Litigation Committee's oversight of the Roundup Litigation, he knew, or recklessly disregarded, that Monsanto's science-based trial defenses were not supported by overwhelming scientific evidence and that the plaintiffs in the Roundup Litigation would be able to present substantial evidence that glyphosate caused cancer and that glyphosate-based formulations such as Roundup can be more carcinogenic than glyphosate alone.

## I.    Defendant Condon Acted with Scienter

293.    In addition to the allegations detailed above in this section, Defendant Condon was also personally involved in Bayer's acquisition of Monsanto. Defendant Condon signed the Merger Agreement. Additionally, Defendant Condon was President of Bayer Crop Science during the entire pendency of the acquisition through closing. Given his involvement in the Merger, Defendant Condon knew, or at least recklessly disregarded, that Bayer had not performed adequate diligence, nor performed adequate management of Bayer's legal exposure, and made false and misleading statements to the contrary.

---

[9] These meetings include three meetings of the Supervisory Board in September 2018, November 2018, and December 2018, and three meetings of the Glyphosate Litigation Committee in 2019.

294.    Further, Defendant Condon personally signed Bayer's Q2 2018 Interim Report and certified that it fairly described the principal risks facing Bayer, including the risk posed by the Roundup Litigation, ¶ 257. Given his role in ensuring and certifying the accuracy of Bayer's Q2 2018 Interim Report, Condon knew or recklessly disregarded that Monsanto's science-based trial defenses were not as strong as they were portrayed to be in the Q2 2018 Interim Report, as Monsanto was unable to present evidence at trial of 800 or more scientific studies showing glyphosate does not cause cancer, ¶¶ 127, 158, 183, 193-194; the AHS was deeply flawed due to issues with multiple pesticides being studied, exposure classification issues, imputation defects, and failure to detect known carcinogens, ¶¶ 114, 124; and Monsanto procured regulatory approvals for glyphosate in part by withholding adverse scientific evidence from regulators and ghostwriting research, and in any event regulators had approved glyphosate (the chemical itself) and not Roundup (the formulated GBH), ¶¶ 23, 125-126; 155-157.

**J.    Defendant Dietsch Acted with Scienter**

295.    In addition to the allegations detailed above in this section, Defendant Dietsch was also personally involved in Bayer's acquisition of Monsanto. Given his involvement in the Merger, Defendant Dietsch knew, or at least recklessly disregarded, that Bayer had not performed adequate diligence, nor performed adequate management of Bayer's legal exposure, and made false and misleading statements to the contrary.

**K.    Defendant Nickl Acted with Scienter**

296.    In addition to the allegations detailed above in this section, Defendant Nickl was also personally involved in Bayer's acquisition of Monsanto. Given his involvement in the Merger, Defendant Nickl knew, or at least recklessly disregarded, that Bayer had not performed adequate diligence, nor performed adequate management of Bayer's legal exposure, and made false and misleading statements to the contrary.

297.    Further, Defendant Nickl personally signed Bayer's Q2 2018 Interim Report and certified that it fairly described the principal risks facing Bayer, including the risk posed by the Roundup Litigation, ¶ 257. Given his role in ensuring and certifying the accuracy of Bayer's Q2

2018 Interim Report, Nickl knew or recklessly disregarded that Monsanto's science-based trial defenses were not as strong as they were portrayed to be in the Q2 2018 Interim Report, as Monsanto was unable to present evidence at trial of 800 or more scientific studies showing glyphosate does not cause cancer, ¶¶ 127, 158, 183, 193-194; the AHS was deeply flawed due to issues with multiple pesticides being studied, exposure classification issues, imputation defects, and failure to detect known carcinogens, ¶¶ 114, 124; and Monsanto procured regulatory approvals for glyphosate in part by withholding adverse scientific evidence from regulators and ghostwriting research, and in any event regulators had approved glyphosate (the chemical itself) and not Roundup (the formulated GBH), ¶¶ 23, 125-126; 155-157.

## VII.    LOSS CAUSATION AND ECONOMIC LOSS

298.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Bayer ADRs, and operated as a fraud or deceit on Class Period purchasers of Bayer ADRs by failing to disclose and misrepresenting the adverse facts and risks detailed herein. Later, when Defendants' prior misrepresentations and fraudulent course of conduct, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to the market, the price of Bayer's ADRs declined significantly as the prior artificial inflation was released from the Company's share price. Specifically, Defendants' materially false and misleading statements, half-truths, and omissions misrepresented, *inter alia*, the extent of Bayer's due diligence when it acquired Monsanto, the extreme legal and reputational vulnerabilities of Monsanto's business, the evidentiary basis for Monsanto's science-based trial defenses in the Roundup Litiation and the corresponding extent of Monsanto's legal exposure to Roundup-related liability, and Bayer's due diligence practices.

299.    As a result of their purchases of Bayer's ADRs during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements, half-truths, and omissions had the intended

effect and caused Bayer's ADRs to trade at artificially inflated and/or maintained levels throughout the Class Period, closing as high as $35.29 on October 16, 2017.

300.    By concealing from investors the adverse facts and risks related to the Merger and Integration detailed herein, Defendants presented a misleading picture of Bayer's business and prospects. When the information and/or underlying conditions, and/or effects thereof, were revealed to the market through Defendants' corrective disclosures and/or materializations of the concealed risk, the price of Bayer's ADRs fell dramatically. These declines removed the artificial inflation from the price of Bayer's ADRs, causing economic loss to investors who had purchased Bayer ADRs during the Class Period.

301.    The declines in the price of Bayer's ADRs following the corrective disclosures and/or materializations of the concealed risk were a direct result of the nature and extent of Defendants' fraudulent misrepresentations, half-truths, and omissions being revealed to investors and the market. The timing and magnitude of the price declines in Bayer's ADRs, Defendants' post-Class Period revelations, and analyst reactions to the news, individually and collectively, negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

302.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate and maintain the price of Bayer's ADRs and the subsequent material decline in the value of Bayer's ADRs when Defendants' prior misrepresentations, misleading omissions and half-truths, and other fraudulent conduct were revealed.

303.    There were a number of material ADR price declines that clearly resulted from the corrective events. From May 23, 2016, the date Defendants announced their offer to acquire Bayer and conduct adequate due diligence, through July 6, 2020, Defendants falsely led investors to believe that Bayer's extensive due diligence confirmed that there was no material risk from the Roundup Litigation.

304. The falsity of these assurances began to emerge when the adverse jury verdict in *Johnson* was announced on August 10, 2018. The next trading day after the verdict, the price of Bayer ADRs plunged to a seven-year low, falling by $2.92 from a close of $26.59 per share on August 10, 2018, to open at $23.67 per share on August 13, 2018, representing a decline of 11.0%. This raised concerns that the Defendants' due diligence may have been inadequate, that the due diligence did not encompass Monsanto's emails heavily relied upon by the plaintiff in the Johnson Case, that Monsanto's science-based trial defenses did not rest on the strong evidentiary basis that Defendants led the market to believe, and that the financial exposure and risks from the Roundup Litigation were substantial. These concerns were articulated in the investor conference call on August 23, 2018 set forth above ¶¶ 138-146.

305. From August 16, 2018 through April 28, 2020, Defendants falsely led investors to believe that there was science-based evidence that unambiguously supported Monsanto's trial defenses and that would result in the trial court potentially overturning the verdict in *Johnson* and would lead to favorable results in future trials now that Bayer was assuming control of the litigation.

306. The expectation of a reversal of the *Johnson* verdict was shot down on October 22, 2018. The trial court, while reducing the punitive damages award to $39.25 million, rejected Monsanto's request for a new trial and for judgment notwithstanding the verdict. The court ruled that "there is no legal basis to dispute the jury's determination that plaintiff's exposure to [glyphosate-based herbicides] GBHs was a substantial factor in causing his NHL." Investors, who had been led to expect a reversal were shocked so that by the time the market opened on October 23, 2018, the price of Bayer ADRs dropped from $22.00 at closing the prior trading day to $19.39, or 11.9%.

307. The misleading nature of Defendants' claims was further revealed on March 19, 2019, when the adverse verdict was returned in the Hardeman Case against Bayer, after the plaintiffs had used Monsanto's own internal documents to demonstrate that even Monsanto itself internally had concerns about numerous adverse studies, had concealed adverse internal studies

from the public and regulators, and had systematically sought to tilt the science by ghostwriting academic paper and other articles supporting the safety of glyphosate. By the opening of the market on March 20, 2019, the day after the *Hardeman* verdict, the price of Bayer ADRs had fallen from $19.67 to $17.52, or 11.0%, and throughout the day it traded at a volume of 3,191,709 shares, or over five times the average daily volume.

308.    Through the disclosure on June 24, 2020, with Bayer's announcement that it had agreed to pay $10.9 billion to settle all current and future Roundup cases and the subsequent disclosure on July 6, 2020 that Judge Chhabria would not approve the mechanism for settling future claims for $1.25 billion—meaning that the settlement might well be higher than $10.9 billion—the market price of the ADRs reflected the materialization of the risk attendant with Bayer's failed due diligence and false statements.

309.    Bayer's ADR price collapsed to an opening price of $18.94 on June 25, 2020 from $20.54 at the close of the market the previous day, or 7.8%, and it traded at a volume of 1,016,943 shares throughout the day on June 25, or almost twice the average daily trading volume. By the time the market opened on July 7, 2020, the price of Bayer ADRs had fallen from $18.91 at the close of the market the previous day to $17.77, or 6.1%, and traded at a volume of 895,830 throughout the day on July 7, or 1.5 times the average daily trading volume.

310.    These ADR price reactions were the direct result of the market learning facts that Defendants had concealed throughout the Class Period, including that throughout the Merger and Integration, Monsanto's legal and reputational exposure to Roundup litigation was far greater than was known to the market—facts that an adequate due diligence process would have easily revealed. Indeed, these corrective disclosures and/or materializations of a concealed risk revealed to the market that the Company had made false and misleading statements, half-truths, and omissions throughout the Class Period, as detailed in Section V. The timing and magnitude of the drop in ADR's prices negate any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Bayer specific facts unrelated to Defendants' fraudulent conduct.

## VIII.    THE PRESUMPTION OF RELIANCE

311.    Plaintiffs and Class members are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, at all relevant times, the market for Bayer ADR shares was open, efficient, and well-developed for the following reasons, among others:

(a)    Bayer ADRs met the requirements for listing, and were listed and actively traded on the over-the-counter market, a highly liquid and efficient market;

(b)    The prices of Bayer ADRs reacted promptly to the dissemination of new information regarding the Company. Bayer ADRs were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional-investor participation;

(c)    At all relevant times during the Class Period, the price of Bayer ADRs traded in strict correlation with the price of Bayer capital stock;

(d)    Bayer capital stock met the requirements for listing, and were listed and actively traded on the Frankfurt Stock Exchange, a highly liquid and efficient market;

(e)    The prices of Bayer capital stock reacted promptly to the dissemination of new information regarding the Company. Bayer capital stock were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional-investor participation;

(f)    As a regulated issuer, Bayer filed periodic and annual reports with the company register in Germany (Unternehmensregister) and the over-the-counter market, and published its quarterly and annual reports, press releases, presentations and other material information of significance to investors on its website, including contemporaneous English-language versions of materials;

(g)    Bayer regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, publications on its

website and other Internet sites and through other wide-ranging public disclosures, such as conference calls, communications with the financial press and other similar reporting services; and

(h) Bayer was followed extensively by the media and by at least 25 securities analysts employed by major brokerage firms who wrote well in excess of 400 analyst reports about Bayer during the Class Period, which were distributed to those brokerage firms' sales forces and certain customers. Each of these reports was publicly available and entered the public marketplace.

312. As a result of the foregoing, the market for Bayer ADRs promptly digested current information regarding Bayer from all publicly available sources and reflected that information in the prices of Bayer ADRs. Under these circumstances, all purchasers of Bayer ADRs during the Class Period suffered similar injury through their purchase of Bayer ADRs at artificially inflated prices, and a presumption of reliance applies. Plaintiffs and Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this Complaint against Defendants are predicated in part upon material omissions of facts that Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose material adverse information regarding Bayer's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the merger as set forth above, that requirement is satisfied here.

## IX. THE INAPPLICABILITY OF STATUTORY SAFE HARBOR

313. The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. Nor can Defendants' omissions of material fact be subject to the safe harbor or bespeaks caution doctrine.

314.    First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor. Defendants' false and misleading statements and omissions alleged herein are not forward-looking because such statements: (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objective. To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

315.    Second, any purported forward-looking statements were not accompanied by meaningful cautionary language because any risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. Additionally, to the extent Defendants included any cautionary language, such language was not meaningful because any potential risks identified by Defendants had already manifested. To the extent Defendants included any cautionary language, it was not precise, not meaningful, and did not relate directly to any forward-looking statements at issue. Defendants' cautionary language was boilerplate and did not meaningfully change during the Class Period, despite the fact that conditions had materially changed.

316.    Third, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements were made, the speaker knew the statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

317.    Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that, during the proposed Class Period of May 23, 2016 through July 6, 2020, inclusive, purchased or otherwise acquired Bayer ADRs and were damaged thereby, except as excluded by definition. Excluded from the Class are: (1) Defendants; (2) members of the immediate family of each of the Individual

Defendants; (3) any subsidiary or affiliate of Bayer, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); (4) the directors and officers of Bayer during the Class Period, as well as the members of their immediate families; and (5) the legal representatives, heirs, successors, and assigns of any such excluded party.

318.    The members of the Class are so numerous that joinder of all members is impracticable. There are 3.93 billion outstanding shares of Bayer ADRs, with a significant number of shares held by banks, brokers and/or nominees for the accounts of their customers. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery. Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Bayer or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

319.    Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

320.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

321.    There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)      whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)      whether and to what extent the market price of Bayer's securities was artificially inflated during the Class Period because of the material misstatements alleged herein;

(f)      whether the Individual Defendants were controlling persons of Bayer;

(g)      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); and

(h)      whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

322.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.      CLAIMS FOR RELIEF

**COUNT I**
**For Violations of §10(b) of the Exchange Act**
**and Rule 10b-5 Against All Defendants**

323.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

324.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

325.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Bayer's ADR's; and (iii) cause Plaintiffs and members of the Class to purchase Bayer's ADR's at artificially inflated prices.

326.    The Individual Defendants (and Bayer, through their actions) were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

327.    As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly or in reckless disregard as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Bayer ADR's during the Class Period.

328.    In ignorance of the false and misleading nature of Defendants' statements and omissions and relying on the integrity of the market price for Bayer ADRs, Plaintiffs and other members of the Class purchased Bayer ARRs at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Bayer ADRs at the prices they paid, or at all, had they been aware that the market prices for Bayer ADRs had been artificially inflated and/or maintained. As set forth herein, when Defendants began to reveal adverse, previously undisclosed facts concerning the Company, the price of Bayer's securities declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a

direct and proximate result of their purchases of shares of Bayer's securities at artificially inflated prices and the subsequent decline in the price of shares of those securities when Defendants began to reveal such facts.

329.    By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

330.    Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein.

331.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

332.    As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Bayer's ADRs and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard for the falsity and misleading nature of their statements and omissions during the Class Period. Thus, Bayer is primarily liable under Section 10(b) of the Exchange Act.

333.    As set forth above, the Individual Defendants were controlling persons of Bayer during the Class Period, due to their senior executive and director positions with the Company and their direct involvement in the Company's day-to-day operations, as well as their ability to exercise and/or actual exercise of influence and control over the Company's dissemination of information.

334.    By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Bayer, including the content of its public statements with respect to the success of the due diligence

and Integration process of Monsanto, and the legal exposure flowing therefrom as well as the content of the statements the Company made to the market on those topics.

335. The Individual Defendants acted knowingly or in reckless disregard so as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased Bayer ADRs during the Class Period.

336. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Bayer ADRs, Plaintiffs and other members of the Class purchased Bayer ADRs securities at an artificially inflated price during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Bayer ADRs at the prices they paid, or at all, had they been aware that the market prices for Bayer ADRs had been artificially inflated and/or maintained.

337. As set forth herein, when Defendants subsequently revealed adverse, previously undisclosed facts concerning the Company, the price of shares of Bayer's securities declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Bayer ADRs at artificially inflated prices and the subsequent decline in the price of shares of those securities when such facts were revealed.

338. By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of Bayer in violation of Section 20(a) of the Exchange Act.

**XII.    PRAYER FOR RELIEF**

339. WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully pray for judgment against Defendants as follows:

    (a)    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as the Class Representatives, and appointing Cohen, Milstein, Sellers & Toll PLLC as Class Counsel pursuant to Rule 23(g);

(b)    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial together with prejudgment interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(d)    Granting such other and further relief as the Court deems just and proper.

## XIII.    JURY TRIAL DEMAND

340.    Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: December 17, 2021

Respectfully submitted,

*/s/ Carol V. Gilden*
    Carol V. Gilden (admitted *pro hac vice*)

**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile:  (312) 357-0369
Email: cgilden@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice*)
Susan G. Taylor (SBN 190753)
1100 New York Ave NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: stoll@cohenmilstein.com
        sgtaylor@cohenmilstein.com

Chris Lometti (*pro hac vice* forthcoming)
Benjamin F. Jackson (admitted *pro hac vice*)
Norhan Bassiouny (admitted *pro hac vice*)
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
Email: clometti@cohenmilstein.com
        bjackson@cohenmilstein.com
        nbassiouny@cohenmilstein.com

*Lead Counsel for Plaintiffs and the Class*


Nicole Lavallee (SBN 165755)
Jeffrey Miles (SBN 293869)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        jmiles@bermantabacco.com

*Liaison Counsel for Plaintiffs and the Class*