

# Bayer Aktiengesellschaft DB:BAYN

# Special Call

## Thursday, August 23, 2018 1:00 PM GMT

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

spglobal.com/marketintelligence

# Table of Contents

Call Participants ....................................................................... 3

Presentation ............................................................................ 4

Question and Answer ............................................................... 8

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Liam Condon**
*President of Bayer Crop Science Division & Member of Management Board*

**O. Maier**
*Head of Investor Relations*

**Werner Baumann**
*Chairman of the Board of Management & CEO*

**Wolfgang U. Nickl**
*CFO & Member of Management Board*

**ANALYSTS**

**Emmanuel Douglas Papadakis**
*Barclays Bank PLC, Research Division*

**Jo Walton**
*Crédit Suisse AG, Research Division*

**Kerry Ann Holford**
*Exane BNP Paribas, Research Division*

**Mark William Connelly**
*Stephens Inc., Research Division*

**Michael Leuchten**
*UBS Investment Bank, Research Division*

**Peter Verdult**
*Citigroup Inc, Research Division*

**Richard Vosser**
*JP Morgan Chase & Co, Research Division*

**Sachin Jain**
*BofA Merrill Lynch, Research Division*

**Sid Bhartiya**

**Simon P. Baker**
*Exane BNP Paribas, Research Division*

**Stuart Hosansky**

**Vincent Stephen Andrews**
*Morgan Stanley, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Ladies and gentlemen, thank you for standing by. Welcome to Bayer's Investor and Analyst Conference Call on Glyphosate Litigation. [Operator Instructions] I would now like to turn the conference over to Mr. Oliver Maier, Head of Investor Relations of Bayer AG. Please go ahead, sir.

**O. Maier**
*Head of Investor Relations*

Thank you, Haley, much appreciated, and good morning and afternoon to everyone joining us on the line today. We've invited you to join us today, obviously, to share our high-level perspective on the integration of Monsanto, which we officially kicked off last Tuesday, and then, obviously, we will take a closer look at the litigation and the recently acquired Monsanto Company, with an emphasis on the August 10th verdict in the Johnson versus Monsanto trial.

I am joined on the call today by Werner Baumann, our CEO; Wolfgang Nickl, our CFO; and by Liam Condon, member of our Board of Management, who leads our Crop Science division.

We will begin the call with some prepared comments and then proceed to Q&A. For the Q&A session, a housekeeping item, I would like to ask you to really please limit your questions to 1 to 2 per person to allow us to take questions from as many participants as possible in the time allotted. As always, before we begin, I would remind you of the cautionary language which we have shown at the beginning of the webcast and will be included in the transcript provided afterwards, just as we do in our quarterly disclosure.

With that and not much further ado, I will pass the call to Werner. The floor is yours, Werner.

**Werner Baumann**
*Chairman of the Board of Management & CEO*

All right. So thanks, Oliver. And ladies and gentlemen, welcome to our call today, and also, from my side, thanks for joining. As you know, the hold separate order imposed by the U.S. Department of Justice ended last week. And this hold separate meant that we had to keep Monsanto Company separate from Bayer and had only limited access to Monsanto information. Also, our ability to publicly comment was limited, but as the hold separate has ended, we are now in a position to freely address all topics related to Bayer and Monsanto. That said, we want to reach out to you as soon as possible and provide you with our view on the recent news and legal cases related to glyphosate and Dicamba.

But before we do this, allow me some remarks to frame the discussion. As Oliver already mentioned on Tuesday, we officially kicked off our joint organization and integration efforts. And I can tell you there's an awful lot of enthusiasm and excitement in the organization to go -- get going, finally get going now. Actually, as a matter of fact, we are now the leading ag company in the world, with the strongest innovation capabilities, the best product portfolio, most advanced digital platform and a very strong and also experienced ag management team in place. Together, we are fully committed to shape agriculture to benefit farmers, consumers and our planet. We are, as we speak, implementing our integration plans and look forward to sharing with you the details on our strategy, combined financials and meaningful pro forma information in our upcoming quarterly earnings call on September 5 and of course, during our Capital Markets Day on December 5. And let me also clearly state that despite the August 10th Johnson trial verdict and the following capital market reaction, nothing has changed concerning our strategy, attractive synergy potential and longer-term growth and margin expectations for our combined Crop Science business. We expect strong value creation through the Monsanto acquisition, including $1.2 billion in annual synergies targeted as of 2022 and accretion to our core EPS already in 2019. We are very optimistic for the future of the business.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Looking at the verdict in the Johnson trial, we think it is inconsistent with the robust science-based conclusions of regulators and health authorities worldwide, and we believe it is wrong. We are confident that our legal resources, now combined after the hold separate has ended, will have strengthened the company's ability to defend glyphosate in this litigation. We want to make sure that glyphosate will continue to be available to our key stakeholders as an excellent, safe and very important tool for modern agriculture.

So with that, let's move into the discussion on the safety profile of glyphosate and also the recent activity in the litigation. Farmers and growers have been using glyphosate safely and effectively for more than 40 years. The safety of glyphosate is substantiated by more than 800 scientific studies and reviews conducted over the course of many decades, which concludes that it can be used safely and does not cause cancer. This includes, notably, the U.S. agricultural health study.

These findings are supported by the conclusions of regulators and health authorities around the globe, including the U.S. Environmental Protection Agency, the National Institutes of Health, European Chemicals Agency and the European Food Safety Authority, which have all concluded that glyphosate does not cause cancer. Today, glyphosate continues to play a critical role in helping to manage weeds and deliver crops to markets around the world.

On Friday, August 10, 2018, the jury in the Superior Court of San Francisco found Monsanto liable in a lawsuit filed by Dewayne Johnson, who alleged the company's glyphosate-based herbicides, including Roundup and Ranger Pro, caused him to develop non-Hodgkin's lymphoma. And the jury awarded $39 million in compensatory and $250 million in punitive damages. Cancer is a personal tragedy and a terrible disease, and of course, we are very sympathetic to Mr. Johnson and his family. But glyphosate was not the cause. A verdict by one jury in one case does not change the scientific facts and the conclusions of regulators that glyphosate does not cause cancer. We will seek reversal of this jury verdict by the judge who tried the case and if necessary, from the judges of California appellate courts. We recognize that there will be challenges in this effort, but we are committed to vigorously defending these lawsuits and the products. Glyphosate is a valuable tool for growers around the world who count on us to continue to protect these tools for them and future generations. We are confident that our combined legal resources will help strengthen the company's ability to defend glyphosate in this litigation.

Of course, because the Johnson case is still pending, there are legal and also strategic boundaries as to how much we are able to say. However, I would like to share our views on the recent verdict, and let me cut right to the chase here. This verdict is inconsistent with the robust science-based conclusions of regulators and health authorities worldwide, and we believe it is wrong. We stand behind the product and the science backing it up. Customers and growers continue to tell us that glyphosate is an invaluable tool, and they remain confident that it can be used safely.

Recent statements from grower groups following the verdict say its ongoing indications of this support. Glyphosate has been on the market for over 40 years, and it is the most widely used herbicide in the world. The more than 800 scientific studies are a reflection of the longevity, the popularity and the reach of our product. Countless researchers have studied glyphosate for regulatory submission and approval, and much of the scientific data on glyphosate comes from independent researchers with no connection to Monsanto. In particular, I found out the federally funded 2017 U.S. ag health study publication which followed more than 50,000 farmworkers and their spouses for more than 20 years and found no association between glyphosate-based herbicides and cancer. The benefits of this well-established product for farmers and consumers around the world are widely recognized and has been for many decades.

This litigation only started when trial attorneys in the U.S. began running advertisements to recruit plaintiffs for lawsuits after the IARC incorrectly classified glyphosate in 2015 as a, I quote, "probable carcinogen," based on the very limited review of incomplete data. In fact, the review omitted the U.S. ag health study. In the Johnson case, unfortunately, the jury's verdict is in conflict with the weight of the scientific research that supports glyphosate.

We are looking at the trial proceedings very closely, and Bayer and the joint litigation team are working to ensure that, going forward, this overwhelming science will get the full consideration it deserves. As a

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

science and innovation company, we are committed to defending glyphosate and the benefits it brings to farming and to protecting the health and safety of the people using our products.

Let me now come to the obvious question, what is next. First of all, it's important to reiterate that, at the outset, that the jury's verdict is not a final decision in the Johnson case, nor does it have any direct impact on other glyphosate cases. Those in the audience who have dealt with U.S. litigation know that while far from certainty, liability decisions and high jury awards have been reversed or reduced by trial judges or on appeal. Our next steps will be to file post-trial motions with the trial court, and in some, we will be arguing to this court that the evidence and the law do not support the liability finding nor the damage awards. We will await a ruling on this motion before filing the appeal with the California Court of Appeal, if needed.

The litigation team has started to work on the respective documents, and for obvious reasons, we are not able to discuss this strategy or details related to that strategy at this time. Our expectation is that the motions will take months to be completed. An appeal would likely take a year or longer. It is also important to point out that Johnson was an expedited case in state court in California, which is separate from the federal cases that the judicial panel on -- the district litigation transferred to the Northern District of California.

The next trial is currently scheduled for late October in St. Louis in Missouri state court. The joint litigation team is fully engaged and expects to be well prepared for this next trial. In total, the number of plaintiffs across both state and federal litigation is approximately 8,000 as of the end of July. These numbers may rise or fall over time, but our view is that the number is not indicative of the merits of the plaintiffs' cases.

There were big questions on the assessment of the litigation risk prior to Bayer and Monsanto signing the merger agreement. As the acquisition structure was a takeover of a publicly listed company, access to information was limited as is usual in such scenarios. Bayer, through counsel, undertook appropriate due diligence of litigation and regulatory issues throughout the process, leading to the finalization of the merger.

To conclude my initial statements on glyphosate, I would like to also quickly put into perspective the separate matter of the glyphosate lawsuit in Brazil. This suit in Brazil is completely unrelated to the glyphosate litigation in the U.S. First, the company is not a party to this suit. There's not been a final ruling nor is it a ruling on glyphosate's safety. To be clear, no ban is currently in place. Customers and growers continue to sell and use glyphosate-based herbicides in Brazil.

So what happened? A federal judge in Brazil granted an injunction against Brazil's health agency, ANVISA, to suspend the use of 3 pesticides, including glyphosate, within 30 days of the court's August 3 order. This was mainly based on the allegation that the agency had not reviewed the registration of these products in a timely manner. Subsequent to the order, several key stakeholders in Brazil have expressed their intent to appeal the decision, including the Agriculture Minister, the Attorney General, ANVISA, the leading ag industry association and Aprosoja, the leading soybean growers association. The Brazilian Agriculture Minister, Blairo Maggi, continues to publicly support the importance of glyphosate to Brazilian farmers as well as its safety, and he has voiced confidence in the press that the ruling will be overturned.

We understand that, actually late yesterday, the Attorney General took the step of filing a remedy with the President of the Court, seeking to overturn the injunction. We'll get back to you as soon as we have any further updates.

Now let me switch gears and turn to another topic, the 2018 season and the Roundup Ready Xtend Crop System, our next-generation weed control system that includes Dicamba-tolerant sweets and low-volatility Dicamba products, including XtendiMax and VaporGrip technology. There was recently an article published by a German newsmagazine which inaccurately reported that Monsanto was a party to the new class-action litigation related to Dicamba. This unnecessarily pressured our share price. The fact is that there was no new class-action litigation filed against Monsanto last week. The proceedings mentioned in the German article have been pending for weeks or even months. We therefore contested the statements in court, and in the meantime, the German newsmagazine corrected their statement. That litigation alleges crop damage through off-target movement of Dicamba and/or antitrust monopolization claims. There are no personal injury claims.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Now let's talk about what really happens in the fields. USDA reports indicated record soybean yields in 2017 and soybean crops are reported to be in very good condition this year. Last year, growers reported 97% satisfaction with their weed control when using XtendiMax with VaporGrip technology with their Roundup Ready 2 Xtend soybeans.

In the current season to date, Monsanto has received 73% fewer inquiries about potential off-target movement than in 2017, while Dicamba-tolerant Roundup Ready 2 Xtend soybeans and Bollgard II XtendFlex cotton are nearly double the acres. We, of course, are taking these inquiries seriously, and a careful evaluation on a case-by-case basis is necessary. However, the company believes that it has meritorious defenses against all these allegations and will ultimately prevail in litigation.

On the regulatory front, the company is working cooperatively with the EPA and expect a renewal of XtendiMax and VaporGrip technology to be granted.

The EPA has publicly shared that it is aware of grower need for this new low-volatility Dicamba technology and expects to make a regulatory decision in time for growers to make their purchasing decisions for the 2019 growing season. We are confident that in working closely with EPA, the satisfactory solution for the farmers will be achieved.

I would like to conclude now by summarizing our key messages. We are, of course, very sympathetic to Mr. Johnson and his family, but we disagree with the verdict in the Johnson trial. The decision by one jury in one case does not change the fact that more than 800 scientific studies and reviews and other sources support the conclusion that glyphosate does not cause cancer. We will seek reversal of this jury verdict through the various litigation options available to us. This first verdict, which is not final, has no direct impact on the outcome of other glyphosate litigation matters. Demand for our glyphosate-based herbicides remains strong, and the regulatory status remains intact and unchanged.

Finally, there is no new Dicamba class action, and we have received 73% fewer off-target inquiries in the current year versus last year while the acres using the Dicamba-tolerant technology have nearly doubled.

We remain committed to vigorously defending both glyphosate and our XtendiMax with VaporGrip technology, along with the benefits they bring to farming and to protecting the health and safety of the people using our products. And we are confident that science will ultimately prevail in these cases. And of course, as I mentioned at the beginning of my talk, we are totally excited to now finally start running the leading ag business in the world.
With that, let me now open this call for your questions.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] The first question comes from the line of Mr. Vincent Andrews of Morgan Stanley.

**Vincent Stephen Andrews**
*Morgan Stanley, Research Division*

Vincent Andrews from Morgan Stanley. I guess just thinking about the U.S. Roundup litigation, as is typical, the plaintiffs are putting forth their, what they probably perceive to be, their best cases and they're trying in what is most likely the worst jurisdictions for you. And I guess if we sort of take the pessimistic view of this and hypothetically, you wind up losing another 3 or 4 of these cases and their large-scale verdicts, does that at all change the way you want to pursue the litigation? Are you adamant about vigorously fighting this litigation all the way through the appellate process? Or is there any sort of thought in your mind that it might make sense just to settle?

**Werner Baumann**
*Chairman of the Board of Management & CEO*

So Vincent, this is Werner speaking. Thanks for the question. As I mentioned before, we have a first instance, first case, that has been tried in a California state court, and we see this verdict, in the first instance, to be completely inconsistent with all available facts. And we will rigorously defend this case and also the cases that are up-and-coming because, quite frankly, we have a product that is in very good regulatory standing, we have strong science supporting across-the-board the fact that there is no relation between the application of the product or product -- or herbicide-based formulations of glyphosate and cancer causes, so Vincent, I hope I've been sufficiently clear that we will rigorously defend our position going forward.

**Operator**

The next question comes from the line of Mr. Sachin Jain of Bank of America.

**Sachin Jain**
*BofA Merrill Lynch, Research Division*

Questions, please. Firstly, the legal standard line I found in this jury district verdict was one of probable cause. There needs to be 51% certain for a potential link. Could you comment how that evidence standard may change as the legal process progresses and how you perceive that standard difference from a scientific conclusion, where, I guess, the evidence standard requirements are much higher, and how that is therefore important as we think about the future jury decisions? Secondly, Werner, you've commented extensively on your confidence in the robust science basis. Could you just provide your comments on the degree of comfort with Monsanto internal communication, which has been a real focus in the Johnson case plaintiff counsel, who have clearly used that to potentially muddy the waters? How much of that information did you have access to as part of your due diligence?

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Yes. Hi, Sachin. Thanks for the questions. First of all, the term "probable cause" is one that, to us, doesn't mean a lot because there is no scientific evidence here that would lead to, let's say, a percentage-wise estimate of what that probability might look like. There is nothing that is in our hands or that is actually the result of the studies that are out there that suggest any relation between the application of a glyphosate-based herbicide on one side and the occurrence of cancer of people who have been using it. And as I mentioned earlier in my speech, I think the best study to look at is the federal U.S. ag health study that has been covering more than 50,000 people and their spouses over more than 20 years, which cannot stipulate any relation between the people that are applicating and using glyphosate on one side and then the occurrence of cancer. So I think that helps you put that -- your "probability question" into

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

perspective. Secondly, kind of easing into the second part of your question, everything we know, not only by the studies that were undertaken by Monsanto, but everybody else who has studied the product also for regulatory and other purposes, suggest that this is a very, very robust assessment. I've quoted quite -- well several times now more than 800 studies. The product has been used, I think, in a very safe manner for more than 4 decades. And last, but not least, as far as our access to Monsanto internal documentation is related, also communication you suggested that might have been a problem in the Johnson case, we have been under a complete hold separate other than your being allowed to put together our quarter 2 financials during the last 2, 2.5 months since the closing of the transaction. So we have not had any access that goes beyond the information that is out there in the public domain. Since we have had access, we could reassure ourselves that there is no communication out there that would "qualify as smoking gun." Things have been used as usual by plaintiff lawyers taken out of context. And as it has been the case for Monsanto before, that we, as a company, a joint company, stand firmly behind the science and the conduct related to, a, glyphosate and what we are doing as a company.

**Operator**

The next question comes from the line of Mr. Simon Baker of Exane.

**Simon P. Baker**
*Exane BNP Paribas, Research Division*

2 for me, please. Just in terms of the composition of the existing plaintiffs, I wonder if you could give us a little bit more of a breakdown of the numbers by suggested or alleged cancer type? And also, the split of out-of-district, out-of-state plaintiffs within the overall action, there seems to have been quite a lot of forum shopping going on in this case. I wonder if you could give us some clarity on that. And then secondly, I know you don't want to talk about the post-trial motions, but can we perhaps talk about the motion from this trial that you filed on the 8th of August before the verdict was delivered? Could you give us an idea of when we'll get a decision on that, the grant wait for motions from this trial in that district? And any other areas that, I think in general terms, that we should be thinking of in terms of areas where you think there could be potential for declaring a mistrial?

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Yes. Thanks, Simon. As usual, coming to your first question, as usual, what -- as far as it relates to the composition of the trials, there are some claims that have been made with the trials that have been filed. We have no visibility to the composition of the trials. We know that the next trial that is scheduled for late October in St. Louis is another non-Hodgkin's lymphoma or type of non-Hodgkin's lymphoma trial. But our knowledge, let's say, across the number of the claims that have been made is limited at best at this point in time, and that also holds true for what is going on with, let's say, the individual and then the out-of-district litigation activities. As far as the post-August 8th motion is concerned, we would have to get back to you. I cannot answer that question on the spot.

**Operator**

The next question comes from the line of Mr. Richard Vosser of JPMorgan.

**Richard Vosser**
*JP Morgan Chase & Co, Research Division*

It's Richard Vosser from JPMorgan. 2 questions, please. The first one is on the different formulations of Roundup relative to glyphosate. Perhaps you could comment on the role a surface can -- or surfactants would play potentially in terms of the science that you detailed, whether different formulations might have different properties in terms of glyphosate. And then the second question, just adding on to the comments you just made, the second case being non-Hodgkin's lymphoma, I think the last EPA review suggested there was more limited information with respect to non-Hodgkin's lymphoma compared to other cancers, where they said there was no cause or link to glyphosate. Perhaps you could detail your thoughts and the science related to non-Hodgkin's lymphoma and potentially give us a breakdown of which, as to Simon's question, which -- how many cases are directly linked to non-Hodgkin's lymphoma.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Okay. Richard, so first, on the first question on the formulations, in general, there is no difference between your -- based on the studies that are out there, between the assessment of glyphosate as an active and then glyphosate-based formulations that are being used. Yes, so there is no difference. And just coming back to the 2017 U.S. ag study, that study was actually done on the application of glyphosate-based formulations here. I know that there's a lot of talk out there that what the EPA has said in terms of carcinogenicity of glyphosate as an active does not necessarily relate to the formulations out there. I think if you have such a strong [ revert ] evidence, the data that is out there appears to be very, very consistent. Secondly, on NHL, NHL is actually a cancer type that can have many, many causes. And as far as the connection between non-Hodgkin's lymphoma or other cancer types to glyphosate is related, I have to come back to what I said earlier that there is no relation between the application of glyphosate and the, let's say, the risk of developing cancer regardless of which form, in general, based on the studies that we know about.

**Operator**

The next question comes from the line of Jo Walton of Crédit Suisse.

**Jo Walton**
*Crédit Suisse AG, Research Division*

Jo Walton from Crédit Suisse. You've talked a lot about the agricultural health survey. Do you believe that, that was not sufficiently emphasized to the jury in this study and therefore a wider understanding of this would be helpful? Or do you think that they already knew this but decided another decision? I wonder if you could also just help us on the timing that you think that the multidistrict litigation studies -- cases may come to court. As I understand it, the current cases are the state cases, both in California and Missouri, and the so-called bellwether cases, where we should be able to get the best case on both sides. Presumably, they're still, is it 1 year, 2 years away from finality? And if I could just push my luck here, you have stated that you think you can bring more to the defense of this case. I wonder what it is in practice that you can bring. I'm sure that Monsanto weren't short of money for lawyers. What is it in practice you can do that Monsanto couldn't do?

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Okay. Thanks, Jo. First, on the ag health study, we don't know what the reasoning of the jury was behind the verdict they ended up with, but based -- and we don't have any insight because none of the details have been revealed other than the voting. But to the extent that we have been commenting on it, I want to make sure that one thing is crystal clear. The signs, the data, the facts and the regulatory standing clearly stand in favor of glyphosate, and that's why we've been very outspoken on, a, the verdict being inconsistent with facts, data, science and regulatory standing of the product; and, b, our opinion that this is a wrong verdict. And I think there's not much more to it than we can -- than I've said so far. On the MDL cases, those will not be tried before 2019. You mentioned the bellwether cases, it's also very important that -- maybe comment on it in a different context, and that is that the Johnson trial was not a bellwether case. Yes, so it was an individual accelerated case, which doesn't have any bearing and any meaning and a direct relation to all other cases that will be tried going forward. And then to your last question, Jo, the context of my comment on joint forces being more than each of the companies could have done individually simply relates to the fact that we have quite a bit, I would say, of experience in U.S. product litigation. And if, Jo, if you have the teams under one roof, you can strategize and discuss differently than you can at arms length. So it will always be better, yes, that we come together as one organization and then look at what we may be able to contribute, and that's what I meant with that statement. It actually relates to the significant experience Bayer has had in the past in U.S. product litigation.

**Operator**

The next question is from the line of Mr. Michael Leuchten of UBS.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Michael Leuchten**
*UBS Investment Bank, Research Division*

It's Michael from UBS. 2 questions, please. One, you mentioned how the Johnson case was expedited in California. And I was wondering if you could talk to the technical differences between the states, and I'm thinking about Proposition 65 relevant in California versus other states, including Missouri. So are there any differences that you would point towards that make a ruling in California not representative for what may or may not happen elsewhere? And then from a financial perspective, if I could ask you about provisioning. I know under U.S. GAAP, you tend not to take provisions for cases for a number of reasons, both for glyphosate, but maybe more importantly, for Dicamba. How do you think you can treat this from a balance sheet perspective?

**Wolfgang U. Nickl**
*CFO & Member of Management Board*

Yes, Michael. This is Wolfgang Nickl. I'll tackle your second question, and then I'll give it back to Werner for your first question. We will, of course, file our financial report on September 5 that we can now do for the combined company, and we will, of course, cover our legal risks for the combined company. We are reviewing the facts, and we will take appropriate accounting measures for anticipated defense costs associated with this litigation and defense costs only at this point, also based on IFRS regulations.

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Yes, Michael, just let me go to your first question on -- so on the technical implication, Proposition 65 in California doesn't have anything to do with, of course, with the glyphosate-related cancer trials. Proposition 65 stipulates, I think, there also is probable cancer risk. I think the same logic and factual base or let's say, the science and the regulatory standing that has been used in that context stands against that proposition, and that's all I can say relative to that question.

**Operator**

The next question comes from the line of Sid Bhartiya of DWS Investments.

**Sid Bhartiya**

So just a question actually. Regarding the high number of pending cases that are out there right now, do you guys have to record any sort of reserve charges or anything on the balance sheet to sort of like -- for the provisions that are out there?

**Wolfgang U. Nickl**
*CFO & Member of Management Board*

Yes, it's actually a similar question than what we just gave to Michael of UBS. We are likely -- we're still in the process of finalizing the financials that we'll file on September 5, but we currently assume that we just provide for the anticipated defense costs, and that is based on IAS, the IFRS rule 37. So no provision for damages at this point, independent of the number of cases.

**Operator**

The next question comes from the line of Mr. Emmanuel Papadakis of Barclays.

**Emmanuel Douglas Papadakis**
*Barclays Bank PLC, Research Division*

It's just a couple of quick follow-ups now actually. And the first one is on the internal communications question. You said, initially, you didn't have sufficient access to those, but you do now. Did I correctly understand you say you've now reviewed those and you're sufficiently satisfied that there is no meaningful adversities and information that will emerge from the internal communications at Monsanto? That's question number one. Question number two is just around, I know you can only take provisions for

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the defense costs, but in the context, your due diligence question was how has that changed since you originally did your due diligence, such that there was?

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Okay. So relative to your first question, I think there's not a lot I can add to my prior answer. The internal communication that has been quoted in the Johnson case is -- actually has been used out of context on purpose. There's nothing that we see related to that communication that would lead to us talking about the combined company now. Having misrepresented or withheld relevant data, or actually, has said that glyphosate could probably cause cancer, none of that is actually the case. So we can, solidly with everything we know, stand behind our communication. On the second question relative to the -- was it litigation?

**O. Maier**
*Head of Investor Relations*

The litigation, yes.

**Wolfgang U. Nickl**
*CFO & Member of Management Board*

Yes, again, we are still evaluating this. We, of course, know what we had in our assumption in terms of litigation costs. We are now reviewing what the colleagues at Monsanto currently anticipate, and we're considering that when we file our financials, and we'll be making that transparent to you as we go through the year.

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Yes, I think you also related it back to the due diligence or the time when we decided to acquire Monsanto. Yet, to put things into perspective, very few cases had been filed at the time in 2016, and the situation was quite different in terms of where this entire complex stood in the very early stage in 2016 and where we are now, still at a very early stage, but with the first case tried.

**Operator**

The next question comes from the line of Ms. Kerry Holford of Exane.

**Kerry Ann Holford**
*Exane BNP Paribas, Research Division*

It's Kerry Holford of Exane BNP Paribas. 2 questions, please. Firstly, the Monsanto 10-Q that is published back in April stated there were around 5,200 glyphosate cases filed. I think you mentioned something close to 8,000 today. So I just want to check, can we assume that an incremental 3,000 cases or so have been filed just in the past 4 to 5 months? And then secondly, I wanted to ask about your visibility on glyphosate and Roundup Ready seed sale. So if there is ultimately a negative impact on the sales of these products, how soon would you expect to see it perhaps? So essentially, how much inventory do you have in the system? When would audience come in to the next season? I think, if I'm correct, it's normally towards the end of the year. So if there were a slowdown in demand, would you expect to know about that this year? Or would it really be early next year?

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Okay, Kerry. Thanks for your 2 questions. Your understanding is correct that the 10-K filed by Monsanto for Q2, stipulated on Monsanto's Q2, stipulated the number of 50 to 100 cases. I mentioned that, at the end of July, that we have about 8,000 cases that have been filed so that you have full transparency and an update -- up-to-date number as we talk today. And with that, let me hand it over to Liam, who is going to answer your second question.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Liam Condon**
*President of Bayer Crop Science Division & Member of Management Board*

Yes, Thanks, Kerry, for the question. So in short, we do not anticipate any negative impact on sales. I think it's really important to just remind ourselves that nothing whatsoever has changed in the regulatory status of the products, and there is simply a very high demand and has been for many, many decades now for glyphosate. It's an invaluable tool for growers. And you've seen recently that multiple growers' associations have come out on behalf of their members, the growers, the farmers, telling us how important it is to have glyphosate as a tool to manage weed. And weed is the single-biggest challenge that farmers face, so they're going to continue using glyphosate.

**O. Maier**
*Head of Investor Relations*

So I think we have time for 2 or 3 more.

**Operator**

The next question comes from the line of Mark Connelly of Stephens.

**Mark William Connelly**
*Stephens Inc., Research Division*

Mark Connelly, Stephens in New York. A question for Liam. State regulators appear to be considering a much more aggressive stance than the EPA in regulating Dicamba. I can't think of a time in the last 15 years when state regulators have been so vocal and critical of the way that was introduced by the EPA, not by Monsanto. Do you think we may end up with application rules that are different state-by-state as a result of this off-target problem?

**Liam Condon**
*President of Bayer Crop Science Division & Member of Management Board*

Yes. Thanks a lot for the question. Maybe just let me state a little bit generally what's going on, the feedback that we've been receiving. So -- and Werner alluded to it earlier to a degree, Roundup Ready 2 Xtend soybean and XtendFlex cotton. Customers are telling us that they've actually got the cleanest fields that they've had in years. Individual growers, retailers, custom applicators are telling us they've had very successful on-target applications of XtendiMax and VaporGrip technology and that over a very, very broad acreage. So at least from the feedback that we're getting, there appears to be very -- really, really outstanding weed control. We are in discussion with the EPA about the overall situation, and we expect that the EPA will make a very timely decision on the renewal of XtendiMax and VaporGrip technology. You've probably -- I'm assuming you've seen that the EPA has publicly shared that they are aware of grower need for new low-volatility Dicamba technology, and that they expect to make a regulatory decision in time to inform seed and weed management purchasing decisions for the 2019 growing season, which is, basically, this is now the coming months. So end of the third quarter, the fourth quarter, this is when decisions are made. And we expect the EPA to take a decision then, and we think that will inform them what will happen at the state level. So I wouldn't speculate now on what will happen at the state level, but I think the states will take their guidance from the EPA, and that's why we're very much looking forward to the outcome and the final decision of the EPA in the near future.

**Operator**

The next question comes from the line of Peter Verdult of Citi.

**Peter Verdult**
*Citigroup Inc, Research Division*

Pete Verdult of Citi. Just 2 questions. Just over and above your October trial in Missouri, are there any other cases that you're aware of that are coming to trial in the coming months, and if so, which jurisdictions? Just following up, rather than being forward-looking, in terms of the rights issue document that you published, or the document in conjunction with the rights issue, I think there's about EUR 1.8

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

billion of noncurrent provisions on the balance sheet. I just wanted to get a sense if you could ballpark-quantify the current level of legal provisioning in that -- within that EUR 1.8 billion as it relates to glypho, Xarelto and Essure. And then secondly, for Liam, just thinking about glyphosate revenues, is 3 billion -- I think 3.7 billion was ag productivity sales last year. When we think about glypho, is over 75% of ag productivity sales, and is it right to think Brazil is probably ballpark 300 million to 400 million of revenues? Any help you can give into framing glyphosate commercially would be helpful.

**Werner Baumann**
*Chairman of the Board of Management & CEO*

All right, Peter. Thanks for the questions. So let me get at questions 1 and 2 before I hand it then over to Liam for the first question. So on the next trial, I mentioned the next trial is the one that is scheduled in Missouri. There is no other trial to my mind that has already been scheduled. Secondly, the EUR 1.8 billion that you mentioned in our books has a number of provisions in there. The provisions that we have made, both for Essure and also for the defense of Xarelto relates exclusively to the provisioning of defense costs, and your, let's say, order of magnitude, I would say, some in the area of maybe a couple of hundred million, yes, out of that EUR 1.8 billion. We'll come back to you and confirm that number, but that's, order of magnitude, what it's going to be.

**Operator**

In the interest of time, the last question comes from the line of Mr. Stuart Hosansky of Vanguard.

**Stuart Hosansky**

This is Stuart Hosansky of Vanguard. My question is the IARC study that you have mentioned several times and indicated that you disagree with it. Can you provide us clarity as to where you believe that study was weak and why it should not be relied upon?

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Yes. That's a good question. The IARC is a subdivision of the World Health Organization, so it's a reputable organization. And IARC stands for the International Agency of Cancer Research. What they do is they assess your different compounds for potential cancer risks, and then they classify your different classes. They have not performed to, the best of my knowledge, separate individual and own studies, but they classify, and the classification that glyphosate falls into is potentially carcinogenic. It's the same as it's actually labeled as a 2A classification, and it has the same classification as the regular consumption of very hard beverages or the regular consumption of red meat, yes, that should give you a perspective on what that IARC classification is all about, but no own studies. And maybe we can now come back to the third question that Peter asked, that Liam is going to get to.

**Liam Condon**
*President of Bayer Crop Science Division & Member of Management Board*

Yes. So thanks, Peter, for the question. And again, I'd just like to reemphasize because I think you're asking what's the potential risk of glyphosate sales, where to go. The verdict hasn't changed anything whatsoever from a regulatory point of view. And customers continue to demand the product. There is absolutely no change whatsoever in the pattern of demand for the product. Demand for glyphosate depends on the growing conditions and not on the jury decision in California. To your question, specifically, a significant portion of the ag productivity sales and gross profit that Monsanto has historically reported was from glyphosate-based herbicides. And basically, as you rightly said, this was last year, it was -- 3.7 billion was the total, and a significant portion of that, we don't break out the glyphosate part, but a significant portion is indeed glyphosate. And we don't break out the country-specific sales, so we don't give a specific number for Brazil, for example.

**O. Maier**
*Head of Investor Relations*

So I think we are running out of time. Haley, are there any more questions, or if that's not the case...

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**Operator**

We have no further questions. Please continue at any point.

**O. Maier**
*Head of Investor Relations*

Great. Thanks very much, everybody, for joining the call today. I'm looking forward to talking to you soon, especially since we have our Q2 release in 2 weeks. Thank you. Take care. Bye-bye.

**Werner Baumann**
*Chairman of the Board of Management & CEO*

Thank you. Thank you all.

**Liam Condon**
*President of Bayer Crop Science Division & Member of Management Board*

Thank you.

**Wolfgang U. Nickl**
*CFO & Member of Management Board*

Thank you.

**Operator**
Ladies and gentlemen, this concludes the investor and analyst conference call of Bayer AG. Thank you for participating. You may now disconnect.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.