Carol V. Gilden (*admitted pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
Email: cgilden@cohenmilstein.com

Nicole Lavallee (SBN 165755)
Jeffrey Miles (SBN 293869)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
           jmiles@bermantabacco.com

*Attorneys for Lead Plaintiffs and Additional Named Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br>                    Plaintiffs,<br>         vs.<br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br>                    Defendants. | Case No: 3:20-cv-04737-RS<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>Date:         April 14, 2022<br>Time:         1:30 p.m.<br>Judge:        Richard Seeborg<br>Courtroom:    3 — 17th Floor |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

ARGUMENT .......................................................................................................................... 8

I.    PLAINTIFFS PLEAD NUMEROUS MATERIAL MISREPRESENTATIONS
      REGARDING THE EVIDENTIARY BASIS FOR MONSANTO'S
      SCIENCE-BASED TRIAL DEFENSES IN THE ROUNDUP LITIGATION.................. 8

      A.    On Eleven Separate Occasions, Defendants Falsely Told Investors
            Monsanto's Trial Defenses Were Supported by Over 800 Scientific
            Studies.......................................................................................................... 10

      B.    Defendants Falsely Claimed the Agricultural Health Study Confirms That
            Roundup Does Not Cause Cancer and Failed to Inform Investors It Was
            Vulnerable to Strong Attacks at Trial in the Roundup Litigation........................ 12

      C.    Defendants Made False and Misleading Claims That the Scientific
            Evidence Clearly and Unambiguously Shows Roundup Does Not Cause
            Cancer. ........................................................................................................ 13

      D.    Defendants Falsely Claimed There Was No Evidence that
            Glyphosate-Based Herbicides Like Roundup Were More Likely to Cause
            Cancer Than the Chemical Glyphosate Alone.......................................................... 14

      E.    Defendants Misled Investors About Regulators' Views on Glyphosate
            Safety. .......................................................................................................... 17

II.   THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER. .................... 18

      A.    Defendants' Motive Support an Inference of Scienter. ......................................... 19

      B.    Defendants Had Knowledge of or Access to Information Revealing The
            Falsity of Their Statements About the Basis for Monsanto's
            Science-Based Trial Defenses and the Risk to Bayer Posed by the
            Roundup Litigation. .......................................................................................... 20

      C.    Defendants Personally Signed and Certified False or Misleading Investor
            Communications. .............................................................................................. 24

III.  THE COMPLAINT ADEQUATELY PLEADS CONTROL-PERSON
      LIABILITY.......................................................................................................................... 25

CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008).......................................................................................... 19

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ........................................................................................ 9

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ............................................................... 8

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ........................................................................................ 9

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
    496 F. Supp. 3d 952 (E.D. Va. 2020) ...................................................................... 9, 10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ................................................................................. 14, 19

*Coble v. Broadvision*,
    2002 WL 31093589 (N.D. Cal. Sept. 11, 2002) ......................................................... 16

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
    22 F.4th 1 (1st Cir. 2021)............................................................................................ 21

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...................................................................................................... 3

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)..................................................................................................... 19

*FindWhat Inv. Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ................................................................................... 16

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ........................................................................................ 8

*Hayden v. Portola Pharms., Inc.*,
    2021 WL 3506614 (N.D. Cal. Aug. 10, 2021) ................................................. 14, 17, 18

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ............................................................................... 9, 18, 20

*In re AnaptysBio, Inc. Sec. Litig.*,
    2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)............................................................. 22

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ....................................................................................... 17

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ........................................................................................ 25

*In re Daou Systems, Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) ..................................................................................... 8, 18

*In re Genworth Fin. Inc. Sec. Litig.*,
    103 F. Supp. 3d 759 (E.D. Va. 2015) .......................................................................... 22, 25

*In re K-tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ........................................................................................ 16

*In re LDK Solar Sec. Litig.*,
    2008 WL 4369987 (N.D. Cal. Sept. 24, 2008) ............................................................. 22

*In re Miva, Inc., Sec. Litig.*,
    544 F. Supp. 2d 1310 (M.D. Fla. 2008) ....................................................................... 24

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ...................................................................................... 22

*In re RAIT Fin. Tr. Sec. Litig.*,
    2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ................................................................ 22

*In re Roundup Prods. Liab. Litig.*,
    390 F. Supp. 3d 1102 (N.D. Cal. 2018) ....................................................................... 3

*In re Silicon Storage Tech, Inc. S'holder Deriv. Litig.*,
    2009 WL 1974535 (N.D. Cal. 2009) ............................................................................ 22

*In re Silver Wheaton Corp. Sec. Litig.*,
    2016 WL 3226004 (C.D. Cal. June 6, 2016) ................................................................ 25

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .............................................................................. 19, 23, 24

*In re Verity, Inc. Sec. Litig.*,
    2000 WL 1175580 (N.D. Cal. Aug. 11, 2000) .............................................................. 22

*In re Yahoo! Inc. Sec. Litig.*,
    2012 WL 3282819 (N.D. Cal. Aug. 10, 2012) .............................................................. 22

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ........................................................................................ 7

*Klein v. Altria Grp., Inc.*,
    525 F. Supp. 3d 638 (E.D. Va. 2021) ........................................................................... 9, 20

*Lewis v. Straka*,
    535 F. Supp. 2d 926 (E.D. Wis. 2008).......................................................................... 22

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ........................................................................................ 19

*Macovski v. Groupon, Inc.*,
  2021 WL 3550287 (N.D. Ill. Aug. 11, 2021) ........................................................................ 24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)................................................................................................... 19, 23

*Musacchio v. United States*,
  577 U.S. 237 (2016)......................................................................................................... 8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)....................................................................................................... 17

*Overton v. Todman & Co., CPAs, P.C.*,
  478 F.3d 479 (2d Cir. 2007)........................................................................................... 16

*Richard v. Nw. Pipe Co.*,
  2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) .............................................................. 24

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .......................................................................................... 23

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ...................................................................................... 9, 23

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft* (*Bayer*),
  2021 WL 4864421 (N.D. Cal. Oct. 19, 2021)......................................................... 7, 15, 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)......................................................................................... 8, 18, 19

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .......................................................................................... 23

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ..................................................................................................... 8

Exchange Act § 10(b) ............................................................................................... passim

Exchange Act § 20(a)............................................................................................... passim

**DOCKETED**

*Clark v. Monsanto Co.*,
  No. 20STCV46616 (Cal. Super. Ct., Los Angeles Cnty. Oct. 5, 2021) ................................... 7

*Stephens v. Monsanto Co.*,
  No. CIVSB2014801 (Cal. Super. Ct., San Bernardino Cnty. Dec. 9, 2021) ........................... 7

# GLOSSARY

| Term | Description |
|------|-------------|
| Amended Complaint | Amended Class Action Complaint (ECF No. 47). |
| DB __ | Defendants' Notice of Motion and Motion to Dismiss the Second Amended Class Action Complaint; Memorandum of Points and Authorities in Support Thereof (ECF No. 110). |
| Defendants | Bayer Aktiengesellschaft ("Bayer"), Werner Baumann ("Baumann") (Bayer's Chief Executive Officer ("CEO")), Werner Wenning ("Wenning") (former Chairman of Bayer's Supervisory Board), Liam Condon ("Condon") (President of Bayer's Crop Science Division and a member of the Management Board), Johannes Dietsch ("Dietsch") (Bayer's former Chief Financial Officer), and Wolfgang Nickl ("Nickl") (Bayer's current Chief Financial Officer). |
| EPA | U.S. Environmental Protection Agency. |
| GBHs | Glyphosate-based herbicides. |
| Individual Defendants | Defendants Baumann, Wenning, Condon, Dietsch, and Nickl. |
| NHL | Non-Hodgkin's lymphoma. |
| POEA | Polyethoxylated tallow amine. |
| SAC | Second Amended Class Action Complaint (ECF No. 107). |
| ¶ __ | References to paragraphs in the SAC. |

## PRELIMINARY STATEMENT

Saddled with a failed over-the-counter drug business and facing a wave of consolidation among its competitors, Bayer's move to acquire Monsanto in 2016 was fraught with risk. Monsanto had infamously become known as "the most hated company in the world" after it was repeatedly caught concealing the health risks of its major products.  And at the time the merger was announced, Monsanto was beset by over a hundred new toxic tort lawsuits accusing it of concealing the cancer risks associated with its flagship product, the herbicide Roundup ("Roundup litigation"). However, acquiring Monsanto served the personal goals of Bayer's top executives, particularly CEO Werner Baumann, because it effectively made Bayer unacquirable, ensuring their continued reign atop the corporate ladder of one of the largest companies in the world. So Bayer and its top executives pressed on.

As the rising tide of Roundup lawsuits loomed, Defendants sought to allay investors' concerns by repeatedly portraying Bayer's due diligence for the Monsanto acquisition as exhaustive—even though during two years of due diligence, from May 2016 to June 2018, Bayer chose not to examine even a single internal Monsanto document related to Roundup. The Court has already held these misrepresentations about Bayer's due diligence on Monsanto to be actionable under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

The house of cards built upon these false statements began to fall when the jury in the first bellwether trial in the Roundup litigation, *Johnson v. Monsanto*, awarded the plaintiff $289 million in damages after bombshell internal Monsanto emails were introduced into evidence at trial. Bayer's share price plummeted on the news.

Defendants were undeterred. However, because it was now clear that their purportedly exhaustive due diligence had missed the crucial internal Monsanto documents introduced as evidence in the *Johnson* trial, they were forced to pivot and refocus their disinformation campaign on a new topic: the evidentiary basis for Monsanto's science-based trial defenses. As alleged in new detail in Plaintiffs' SAC, Defendants attempted to rebuild their house of cards, assuage investors' fears about the Roundup litigation, and prop up Bayer's share price by launching a relentless barrage of false and misleading statements claiming that Monsanto's trial

defenses were supported by such overwhelming, unequivocal scientific evidence that Monsanto faced little risk of ultimate liability. It was a new twist, but essentially the same story, and Defendants' statements about the evidentiary basis for Monsanto's science-based trial defenses are actionable for the very same reasons the Court has already held Defendants' due diligence statements to be actionable.

The SAC alleges that as part of a conscious investor relations strategy, Defendants told investors that Monsanto's defenses were supported by far more scientific evidence than was truly the case. For example, Defendants repeatedly told investors Monsanto's defenses were supported by "more than 800 scientific studies" showing glyphosate does not cause cancer. However, Monsanto was unable to and never did present evidence of 800 or more such studies at trial, because as Defendants later admitted, *the vast majority of these studies had nothing to do with cancer.* Defendants also repeatedly stated there was *no* evidence that Roundup was more dangerous than glyphosate alone, even though there was in fact *extensive* scientific research supporting this conclusion and there were *numerous internal Monsanto emails and an unpublished internal Monsanto study* to this effect.

The SAC pleads that Defendants knew they were misleading investors about this subject matter or were at least deliberately reckless as to the possibility they were doing so because they had a clear motive to mislead investors, had extensive access to and/or knowledge of information showing their statements were false and misleading, and they personally signed communications to shareholders containing false and misleading statements. In response, Defendants meekly claim scienter was not established because they purportedly believed they were just following the science. But even if Defendants are to be believed, the SAC's allegations nevertheless support an inference of scienter that is at least as compelling as Defendants' feeble excuses for why their statements about Monsanto's trial defenses were so out of touch with reality.

Thus, the SAC adequately pleads claims under §§ 10(b) and 20(a) of the Exchange Act based on Defendants' false and misleading statements concerning the evidentiary basis for Monsanto's science-based trial defenses in the Roundup litigation. For these and the following reasons, Defendants' motion to dismiss should accordingly be denied.

**STATEMENT OF FACTS**

Bayer is a German chemicals conglomerate that merged with Monsanto in a process spanning from May 2016 through June 2018.[1] ¶¶ 16, 48, 61, 116. During this time, Monsanto faced an increasing number of toxic tort cases alleging it concealed the cancer risks associated with Roundup, its best-selling herbicide and flagship product. ¶¶ 4, 77, 79, 185. The Roundup litigation eventually encompassed thousands of lawsuits in both state and federal court, including many cases consolidated into a federal multi-district litigation in this District (the "Roundup MDL"), which was overseen by Judge Chhabria. ¶ 10.

Starting in March 2018, Judge Chhabria held seven days of hearings in the Roundup MDL to address the parties' *Daubert* challenges.[2] ¶ 110. Following extensive testimony, Judge Chhabria denied Monsanto's *Daubert* challenges, finding that the plaintiffs' experts could offer "independent and relatively comprehensive opinions that the epidemiological and other evidence demonstrates glyphosate causes NHL [(non-Hodgkin's lymphoma)] in some people who are exposed to it." ¶ 111 (quoting *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1109 (N.D. Cal. 2018)). Judge Chhabria reasoned that the scientific evidence regarding whether glyphosate causes cancer was "open to different interpretations" and "does not point unequivocally toward a particular conclusion," and that the issue of general causation in the Roundup litigation was "very close." ¶¶ 113, 115 (quoting *Roundup*, 390 F. Supp. 3d at 1108-09, 1126, 1130).

Shortly after the Bayer-Monsanto merger closed on June 7, 2018, pre-trial proceedings began in *Johnson v. Monsanto*, the first in a series of three "bellwether" trials in the Roundup litigation. ¶ 117. A key issue at trial was whether glyphosate is more likely to cause cancer when combined with a surfactant (a substance that helps a liquid spread over and wet a surface), as in Roundup, which combines glyphosate with the surfactant POEA. ¶¶ 119-20. Johnson introduced

---

[1] Further factual context for the false and misleading statements at issue on this motion is set forth in Plaintiffs' memorandum of points and authorities in opposition to Defendants' motion to dismiss the prior complaint. *See* Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss the Am. Class Action Compl. (May 21, 2021), ECF No. 73, at 3-9.

[2] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

a 2015 Monsanto internal email in which Monsanto's head of Product Safety Strategy acknowledged that Roundup's surfactant may play a role in causing cancer, as well as other internal Monsanto emails from 2008-2009 showing Monsanto was aware that the particular formulation of Roundup with POEA could be potentially more carcinogenic than glyphosate alone. ¶¶ 120, 154. Johnson also presented internal Monsanto documents showing that Monsanto had discounted legitimate questions regarding glyphosate's safety, failed to conduct adequate safety studies, attempted to discredit or suppress evidence suggesting glyphosate caused cancer, and procured glyphosate's regulatory approval by withholding scientific evidence from key regulators, including the EPA. ¶¶ 125-26.

Johnson's case was also supported by extensive expert testimony. ¶¶ 122-23. Johnson's first expert, a former research department head at the Centers for Disease Control with decades of experience conducting cancer risk assessments, testified that based on his review of numerous relevant scientific studies—including studies that found DNA damage in individuals who lived and worked in areas where glyphosate was sprayed from the air—he could conclude that glyphosate causes cancer. ¶ 122. The expert also testified that in approving glyphosate, U.S. and European regulators had violated their own standards and improperly credited self-serving chemical industry–backed research. ¶ 122. Johnson's second expert, a professor of cancer research at Columbia University and epidemiology expert, testified there was extensive scientific research supporting the conclusion that formulated products like Roundup cause cancer. ¶ 123.

On August 10, 2018, a jury found for Johnson and awarded him $289 million. ¶ 128. The result shocked investors, who had previously been led to believe the Roundup litigation posed no meaningful risk. Bayer's publicly traded American Depositary Receipts ("ADR") price plummeted 11% after trading over four times the average daily volume. ¶ 129.

Quickly pivoting to damage control, Defendants attempted to allay investors' fears about the Roundup litigation by launching a relentless barrage of false and misleading statements about the evidentiary basis for Monsanto's science-based trial defenses and misleading investors to believe Monsanto possessed such overwhelming, unequivocal evidence that there was little risk of ultimately being found liable in the Roundup litigation. ¶¶ 250-73. Relying on and repeating

these misrepresentations, securities analysis firm Redburn issued a report on August 16, 2018 stating that on appeal, "the trial outcome is set to be reviewed by a panel of technical experts instead of a regular state jury," and a "renewed emphasis upon scientifically linking Roundup to causing lymphoma could play to Monsanto and help overturn the initial verdict." ¶ 132. On August 23, 2018, another analyst firm, Berenberg, noted Bayer held a post-verdict call during which it "reiterated its complete confidence in the safety of glyphosate, noting that more than 800 studies support the product, and that it has received strong regulatory endorsement around the world." Berenberg concluded: "we agree with Bayer that the weight of evidence supports the safety of glyphosate." ¶ 132. (Such statements go far beyond passing references to a "consensus" scientific or regulatory view on "glyphosate's safety," as Defendants suggest. *See* DB 7, 17.)

But an unending series of legal defeats progressively revealed the falsity and misleading nature of Bayer's claims. On October 22, 2018, the *Johnson* court denied Monsanto's motions for a new trial and for judgment notwithstanding the verdict, stating "there is no legal basis to dispute the jury's determination that plaintiff's exposure to GBHs [glyphosate-based herbicides] was a substantial factor in causing his NHL [(non-Hodgkin's lymphoma)]." ¶ 148. These disclosures caused Bayer's ADR price to fall 11.9% the following day. *Id*. The *Johnson* verdict was later upheld in its entirety on appeal. ¶¶ 211-15.

*Hardeman*, the second bellwether trial, began on February 25, 2019. As in *Johnson*, evidence that Roundup (the GBH) is more toxic than glyphosate (the chemical) alone—and that Monsanto *knew* this was possible—proved central to the plaintiff's case. ¶¶ 153-54. One of the plaintiff's experts, Dr. Dennis Weisenburger, testified about multiple studies showing Roundup is up to ten times more genotoxic than glyphosate (and thus more likely to cause cancer). The plaintiff also presented internal Monsanto emails acknowledging glyphosate and Roundup were different and that, in the words of one email, "Glyphosate is OK but the formulated product (and thus the surfactant) does the damage." ¶ 154. The plaintiff also presented evidence that in obtaining approval for glyphosate, Monsanto manipulated scientific research, buried adverse findings, and withheld them from regulators like EPA. ¶¶ 154-56. On March 19, 2019, the jury rendered an $80 million verdict. The next day, Bayer's ADR price fell 11%. ¶ 160.

*Pilliod*, the third bellwether case, went to trial on March 28, 2019, presenting the same key issues regarding whether Roundup is more carcinogenic than glyphosate alone because of its surfactant. ¶¶ 178, 181. The plaintiffs presented documentary evidence that Monsanto knew Roundup was potentially more carcinogenic than glyphosate alone, and also that Monsanto knowingly chose to continue selling the POEA-based version of Roundup in the United States, even though Monsanto sells less-toxic non-POEA versions of Roundup outside the United States. ¶ 181. The plaintiffs also introduced dozens of internal Monsanto documents showing that Monsanto surreptitiously contributed to and promoted articles on glyphosate's safety; lobbied regulators to conclude glyphosate was safe; and worked in secret with EPA behind-the-scenes to promote the continuing approval of glyphosate. ¶¶ 178-80. The jury awarded the plaintiffs over $2 billion in damages. ¶ 184. Afterward, *Bloomberg* ripped "Bayer's consistent message . . . that science is on its side," explaining that "weighing scientific risk and legal risk are not the same thing, especially in a highly litigious environment like the U.S." ¶ 184. The volume of Roundup litigation cases subsequently soared to roughly 125,000— subjecting Bayer to billions of dollars' worth of additional potential liability. ¶¶ 204, 280.

The following year, ahead of Bayer's 2020 Annual General Meeting, Bayer released detailed answers to certain shareholder questions that had been asked at previous years' meetings. Two of these questions concerned whether Defendants' repeated claims that "800 scientific studies" confirmed that Roundup and GBHs do not cause cancer and are safe to use. Defendants had long relied on these purported "800 studies" to support their assertions that the jury verdicts in the Roundup litigation were at odds with the weight of scientific and regulatory evidence. ¶ 193; *see infra* pt. I (pp. 8-18). In its answer to these questions, Bayer admitted for the first time that the vast majority of the "more than 800 scientific studies" that it had claimed supported its defenses in the Roundup litigation were not actually studies of glyphosate's or Roundup's carcinogenicity, but rather safety studies on unrelated topics. ¶ 194; *see infra* pt. I.A (pp. 10-12).

On June 24, 2020, Bayer announced a commitment to pay "between $10.1 billion and $10.9 billion" to settle the entire Roundup litigation, triggering a 7.8% ADR price decline the

next day. ¶ 206. Then, on July 6, 2020, when Judge Chhabria indicated he was tentatively inclined to deny approval because of the proposed mechanism for resolving future claims, Bayer's ADR price plummeted further, dropping an additional 6.1%.[3] ¶¶ 209, 308.

Plaintiffs filed this action on July 15, 2020, alleging violations of § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants and violations of § 20(a) of the Exchange Act against the Individual Defendants. After Defendants moved to dismiss Plaintiffs' Amended Complaint, this Court denied Bayer's motion to dismiss as to Defendants' allegedly false and misleading statements concerning Bayer's due diligence efforts in connection with the Monsanto merger. *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft* (*Bayer*), 2021 WL 4864421, at *3-7 (N.D. Cal. Oct. 19, 2021). The Court further ruled that the Amended Complaint adequately pled a material misstatement concerning Roundup's safety risks compared to glyphosate, but held it did not state with particularity facts supporting a strong inference that Defendants acted with scienter when making statements about "glyphosate safety." *Id.* at *5.[4] Plaintiffs filed the SAC, clarifying that the alleged misrepresentations went beyond general statements concerning "glyphosate safety" and concerned the evidentiary basis for Monsanto's science-based trial defenses and augmenting the factual detail supporting the claims based on these misrepresentations. Defendants have moved to dismiss the SAC.[5] ECF No. 110.

---

[3] Defendants cite the recent verdicts in two state cases, *Clark v. Monsanto Co.*, No. 20STCV46616 (Cal. Super. Ct., Los Angeles Cnty. Oct. 5, 2021) and *Stephens v. Monsanto Co.*, No. CIVSB2014801 (Cal. Super. Ct., San Bernardino Cnty. Dec. 9, 2021). DB 5-6. However, the fact that Monsanto has won two trials out of approximately 125,000 Roundup cases is irrelevant to whether Defendants misled investors about the risks posed by the Roundup litigation as a whole.

[4] The Court also held that Plaintiffs failed to plead falsity as to Defendants' alleged misrepresentations relating to accounting for the risk of losses in the Roundup litigation. *Id.* at *4, *6. Plaintiffs did not include these misrepresentations in the SAC.

[5] Plaintiffs do not oppose the Court's taking judicial notice of Exhibits 1 through 11 to the Declaration of Noah B. Yavitz. ECF Nos. 111-12. However, as the Ninth Circuit made clear in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1003 (9th Cir. 2018), the Court may not assume as true or construe any statements in those exhibits in such a manner as to conflict with or undermine Plaintiffs' allegations or claims.

**ARGUMENT**

When evaluating a motion to dismiss, "the court must accept all material allegations in the complaint as true, *even if doubtful*, and construe them in the light most favorable to the non-movant." *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at \*3 (N.D. Cal. Aug. 7, 2020) (emphasis added)*.* Further, under the PSLRA, the Court must assess the complaint "*in its entirety*" and analyze the allegations "*holistically*." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007) (emphasis added). Here, the SAC, construed in Plaintiffs' favor and analyzed holistically, more than adequately pleads claims under §§ 10(b)[6] and 20(a) based on Defendants' false and misleading statements about the evidentiary basis for Monsanto's science-based trial defenses in the Roundup litigation.[7]

**I.    PLAINTIFFS PLEAD NUMEROUS MATERIAL MISREPRESENTATIONS REGARDING THE EVIDENTIARY BASIS FOR MONSANTO'S SCIENCE-BASED TRIAL DEFENSES IN THE ROUNDUP LITIGATION.**

To allege falsity under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-4(b)(1)). "[A] statement that is literally true can be misleading and thus actionable under

---

[6] To establish a violation of § 10(b) and Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Defendants do not dispute that the SAC adequately pleads elements (3), (4), or (5) with respect to Plaintiffs' claims based on the evidentiary basis for Monsanto's science-based trial defenses. *See* DB 7-17.

[7] In footnote 4 of Defendants' opening brief, Defendants attempt to incorporate into their brief the arguments they advanced in their initial motion to dismiss with respect to the alleged misrepresentations concerning Bayer's due diligence on Monsanto. *See* DB 7 n.4. These arguments are barred under the law of the case doctrine because the Court has already ruled on and rejected them in their entirety. *See Musacchio v. United States*, 577 U.S. 237, 245 (2016). Moreover, the Court denied Defendants' motion for leave to file a motion for reconsideration of their initial motion to dismiss. ECF No. 97. Defendants should not be permitted a third bite at the apple and to yet again relitigate their initial motion to dismiss. Nevertheless, should the Court permit Defendants to incorporate these arguments, the Court should also permit Plaintiffs to incorporate into this brief all the pertinent arguments in their opposition to Defendants' motion to dismiss the Amended Complaint. ECF No. 73.

---

the securities laws." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody*, 280 F.3d at 1006). Once securities issuers "tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (internal quotation marks omitted). "A misleading omission is material if there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699-700 (9th Cir. 2021) (alteration and internal quotation marks omitted).

"Although [a] defendant [may] 'repeatedly disclose[] the existence and relevant details of [ongoing] litigation,' . . . . 'disclosing a lawsuit's existence and allegations while also vigorously denying their validity does not satisfy a company's duty to make full, honest disclosures.'" *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 663 (E.D. Va. 2021) (quoting *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 963 (E.D. Va. 2020)). Yet that is exactly what Defendants did here. As part of a conscious investor relations strategy, Defendants repeatedly made demonstrably false and misleading statements about the evidentiary basis for Monsanto's science-based trial defenses in the Roundup litigation.[8]

Courts have repeatedly found such allegations sufficient to support § 10(b) claims. In *Klein v. Altria Group, Inc.*, investors sued tobacco companies Altria and JUUL, alleging that Altria defrauded investors by failing to disclose the litigation risks associated with JUUL's marketing practices when Altria acquired JUUL, 525 F. Supp. 3d at 659-61. The court upheld

---

[8] In an attempt at misdirection, Defendants seek to recast the alleged misrepresentations as concerning "the scientific and regulatory support for glyphosate's safety," DB 17, despite what the SAC actually and explicitly pleads, *see* ¶¶ 250-73. Defendants also regroup the alleged misrepresentations into four categories bearing little relation to why the misrepresentations are alleged to be misleading. *Compare* DB 8 *with* ¶ 273.

§ 10(b) claims based on these failures to disclose, ruling that "[b]ecause Defendants chose to speak about their marketing practices," they "had a duty to tell the entire truth" about their "exposure to litigation and regulatory risks to which those practices exposed them." *Id.* at 663.

Similarly, in *Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, after a federal jury returned a $176 million antitrust verdict against defendant company Jeld-Wen, the company publicly stated the suit was meritless—as it had before the verdict—and would not "material[ly] impact" the company. *Id.* at *1-2. The court then issued an opinion making detailed factual findings refuting Jeld-Wen's positions, but Jeld-Wen was defiant, publicly maintaining the ruling was incorrect. *Id.* The court found the defendants' statements characterizing the antitrust litigation as meritless to be actionably false, because the defendants knew the company was engaged in conduct that could be found illegal under U.S. antitrust laws. *See id.* at 963-65 & n.11.

As explained below, this case accords with *Klein* and *Jeld-Wen*. Here, the SAC more than adequately pleads that following the *Johnson* verdict, Defendants repeatedly made false and misleading statements regarding the evidentiary basis for Monsanto's science-based trial defenses in the Roundup litigation—and, by implication, the merits of the plaintiffs' claims and the risks posed by that litigation. These statements are thus clearly actionable under § 10(b) .

### A. On Eleven Separate Occasions, Defendants Falsely Told Investors Monsanto's Trial Defenses Were Supported by Over 800 Scientific Studies.

On eleven separate occasions between August 23, 2018, and April 28, 2020, Defendants told investors that Monsanto's trial defenses were supported by "more than 800 scientific studies." ¶¶ 251, 253, 258-61, 263-64, 267, 269-72. These were not stray remarks—they were talking points reiterated over and over in numerous conference calls with investors and the press (¶¶ 251, 253, 260, 263), in quarterly and annual reports (¶¶ 258-59, 261, 267), in letters, written statements, and presentations to shareholders (¶¶ 267, 269, 270, 272), and in a press release on the *Hardeman* verdict (¶ 271). Defendants described the studies as "rigorous" (¶ 271) and "overwhelming science" (¶ 251) "conducted over the course of many decades" (¶ 251), that supported Monsanto's "meritorious defenses" and would enable Monsanto to "defend [itself] vigorously in all of these lawsuits" (¶¶ 261, 263, 267). But they also took it a step further,

repeatedly and explicitly claiming the 800 studies demonstrated glyphosate and glyphosate-based formulations such as Roundup do not cause cancer. ¶¶ 251, 253, 258-60, 264, 269.

These statements were false and misleading because Monsanto was unable to and never would present evidence at trial of 800 or more scientific studies showing glyphosate does not cause cancer.[9] ¶¶ 127, 158, 183, 193-195, 273(1). Indeed, during the *Hardeman* trial, Monsanto's lawyer admitted in their opening statement that "not all" of the 800 studies "deal[] with cancer," ¶ 158, and during the *Pilliod* trial, Defendants did not even bother to rebut the plaintiff's attorney's statement in their opening argument that "there are not 800 studies on Roundup," ¶ 183. Defendants were unable to present such evidence because, as they finally admitted in a written statement released on April 28, 2020 in connection with Bayer's 2020 shareholder meeting, the vast majority of the "more than 800 scientific studies" Defendants had claimed supported Monsanto's defenses in the Roundup litigation were not actually studies of glyphosate's or Roundups' carcinogenicity, but rather safety studies on unrelated topics that had nothing at all to do with carcinogenicity—such as "eye irritation," "dermal irritation," "dermal sensitization," "general metabolism" and "reproduction and fertility effects."[10] ¶ 194. Bayer's "800 studies" figure was in fact based on the total number of studies in an EPA database that addressed glyphosate's impact on human or mammalian health—and most of these studies had nothing to do with cancer and could not support Monsanto's trial defenses. ¶ 194. Further, Bayer admitted it was not possible to determine a definitive number of studies or regulatory assessments concerning Roundup's carcinogenicity, and that many of the "more than 800 scientific studies" were unreliable for other reasons, including their age (561 were conducted

---

[9] Defendants contend that the Court has rejected the inference that Bayer admitted its statements about the purported 800 studies were false. DB 12 n.10. Not so. Rather, the Court only said that when Bayer stated the studies were "not limited to carcinogenicity," this was not "tantamount to an admission that the studies were unrelated to carcinogenicity." *Bayer*, 2021 WL 4864421, at *4. In any event, the SAC provides additional factual detail to explain why the vast majority of these studies were, in fact, unrelated to carcinogenicity, and that Defendants knew this yet continued to misrepresent the nature of the studies.

[10] Rather than address the SAC's allegations regarding the pre-shareholder meeting written statement, *see* ¶¶ 193-95, 273, Defendants instead misleadingly point to Nickl's speech at the 2020 meeting itself to mistakenly argue Bayer did not make this admission.

---

before 2010, and Monsanto noted a significant number were "done long ago") and Monsanto-friendly bias (629 of the studies were carried out by Monsanto itself). ¶ 195. Defendants thereby blatantly misled investors about Monsanto's odds of success at trial, causing the inflation and maintenance of Bayer's share price. Whether Monsanto's trial strategy was to "focus[] the jury's attention on certain evidence," DB 12, is irrelevant as investors reasonably expected that the supposedly overwhelming evidence which Bayer continually touted actually existed and would at least be summarized by Monsanto at trial, even if every last study were not put before the jury. These statements are accordingly actionable under § 10(b) .

**B.    Defendants Falsely Claimed the Agricultural Health Study Confirms That Roundup Does Not Cause Cancer and Failed to Inform Investors It Was Vulnerable to Strong Attacks at Trial in the Roundup Litigation.**

Defendants also repeatedly cited the Agricultural Health Study ("AHS"), a long-term epidemiological study of more than 50,000 licensed pesticide applicators, farmworkers, and their spouses, as strong support for Monsanto's litigation defenses. ¶¶ 251, 253, 254, 256, 258-61, 263, 267, 269-71. Defendants explicitly touted the AHS as the "best study to look at," ¶¶ 253, 269-07, and stated it "actually backs up all the other 800 studies now with a real-life evidence study," ¶ 260. Defendants repeatedly and explicitly claimed the AHS *confirmed* that glyphosate, glyphosate-based herbicides, and Roundup do not cause cancer. ¶¶ 253, 258-61, 263, 267, 269-71. As one example, Bayer's Q2 2018 quarterly report states that the AHS "*confirm[s]* that glyphosate and glyphosate-based herbicides *do not cause cancer*." ¶ 258 (emphasis added). During a September 5, 2018 investor conference call, Baumann stated the AHS demonstrated "there is *absolutely nothing* that has been seen in terms of a statistical signal that there is a cause and effect relationship between the application of glyphosate as a formulated product . . . and the onset of cancer in some individuals, *nothing whatsoever*." ¶ 260 (emphasis added).

These statements were misleading because Defendants omitted to disclose to investors that the AHS was vulnerable to strong attacks by the plaintiffs in the Roundup litigation. Plaintiffs continually presented evidence that the AHS was in fact deeply flawed due to issues with multiple pesticides being studied, exposure classification issues, imputation defects, and failure to detect known carcinogens. ¶¶ 114, 124, 273(3). As perhaps its greatest flaw,

approximately 37% of the AHS's participants did not respond to the key follow-up survey, so the authors simply assumed their level of glyphosate exposure using a flawed mathematical model. ¶ 114. Moreover, even if the AHS supported Monsanto's defenses, Defendants misleadingly presented it as unassailable evidence, without disclosing its questionable validity to investors.

### C. Defendants Made False and Misleading Claims That the Scientific Evidence Clearly and Unambiguously Shows Roundup Does Not Cause Cancer.

Defendants also repeatedly stated that the scientific evidence clearly and unambiguously showed that glyphosate and glyphosate-based herbicides such as Roundup are safe and do not cause cancer. ¶¶ 250-72. Defendants claimed their trial defenses were supported by "strong science . . . across the board," ¶ 252; "strong, robust evidence" based on "data" that is "very, very consistent," ¶ 254; "overwhelming scientific and regulatory evidence," ¶ 262; and "comprehensive scientific findings from over 40 years," ¶ 272. Baumann even claimed that both "Monsanto" and "*everybody else* who has studied the product . . . suggest that this is a very, very robust assessment." ¶ 253 (emphasis added). Defendants also repeatedly suggested that the *only* evidence that Roundup causes cancer was a March 2015 report by the International Agency for Research on Cancer ("IARC"). *See* ¶¶ 269 ("Only one assessment by an agency of the World Health Organization ('IARC') classifies glyphosate as 'probably carcinogenic'."); 270 ("Only an assessment by a sub-organization of the World Health Organization classifies glyphosate as 'probably carcinogenic'."); *see also* DB 3, 9.

These statements were false and misleading because they omitted to disclose that there was considerable scientific evidence that could potentially be presented by the plaintiffs in the Roundup litigation trials through expert testimony that glyphosate and Roundup can cause cancer, as discussed above. In short, Defendants' statements amounted to: "the Roundup plaintiffs have virtually no evidence supporting their case." But this was far from true.

Defendants argue these statements were opinions regarding the "the potential outcome of the glyphosate litigation" or "the overall state of the science." DB 10. Even assuming, *arguendo*, these statements were opinions—and they are not—they are still actionable. "If [the] plaintiff claims that an opinion is an affirmative misrepresentation, the complaint must allege either that

(i) the belief is both objectively untrue and was not subjectively held by the speaker; or (ii) the opinion statement included within it a false statement of a material fact." *Hayden v. Portola Pharms., Inc.*, 2021 WL 3506614, at *1 (N.D. Cal. Aug. 10, 2021) (citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017)). "If the plaintiff claims that an opinion was misleading because of an omission, the complaint must allege that the defendants omitted facts that are significant enough to make the opinion statement misleading to a reasonable person reading the statement." *Id.* Here, Defendants affirmatively misrepresented that the plaintiffs in the Roundup litigation would be unable to present evidence to support their claims beyond the IARC study, which was not true, and which Defendants subjectively understood to be untrue given that they were informed about the key evidence by Monsanto's lawyers. *See infra* pt. II (pp. 18-25). Defendants' purported opinions omitted to disclose numerous studies and other evidence supporting that Roundup ***does*** cause cancer, and these omissions made Defendants' statements significantly misleading to reasonable investors, and thus actionable. *See Hayden*, 2021 WL 3506614, at *1.

Defendants also argue that it would have been "false and misleading" for defendants "to suggest that glyphosate *is* a carcinogen" in light of California state court decisions holding Monsanto did not have to put a warning label on Roundup. DB 11. This ignores what Defendants' duty to investors actually was. Defendants were not obligated to tell investors that glyphosate might cause cancer. Rather, they were obligated to tell investors that the evidence was not unequivocal and that significant evidence existed from which juries in the Roundup litigation might conclude glyphosate causes cancer. The distinction is subtle—but crucial—and is reflected in the stock price declines following the trial losses. In sum, Defendants' statements suggesting that the scientific evidence clearly and unambiguously showed that Roundup does not cause cancer were false and misleading, and therefore actionable under § 10(b) .

**D.    Defendants Falsely Claimed There Was No Evidence that Glyphosate-Based Herbicides Like Roundup Were More Likely to Cause Cancer Than the Chemical Glyphosate Alone.**

Defendants stated on several occasions that there was ***no*** evidence that GBHs were more dangerous than glyphosate alone. For example, in a presentation at Bayer's annual shareholders

meeting on April 28, 2020, Nickl stated that while the Roundup litigation plaintiffs "say that the interplay between glyphosate and the surfactant represent a danger for the user of the product," regulators had "assessed the safety of the surfactant category" and concluded "that these surfactants are not carcinogenic," and that "glyphosate-based herbicides from Bayer . . . are safe and that glyphosate is not carcinogenic." ¶ 272. Similarly, during an August 23, 2018 conference call following the *Johnson* verdict, Baumann said, in response to a question about the role played by surfactants: "There is ***nothing*** that is in our hands or that is actually the result of the studies that are out there that suggest ***any relation*** between the application of a glyphosate-based herbicide on one side and the occurrence of cancer of people who have been using it." ¶ 253. He then went further and unequivocally stated there was "***no difference . . . between the assessment of glyphosate as an active [ingredient] and then glyphosate-based formulations***." ¶ 254.

These statements were false and misleading—as the Court has already held in part, *see Bayer*, 2021 WL 4864421, at *4 (addressing statements in ¶¶ 253-54)—because Defendants misleadingly failed to disclose to investors that there was considerable scientific evidence that glyphosate was more likely to be carcinogenic and more likely to cause cancer when contained in a formulation with a surfactant such as Roundup, and that the plaintiffs in the Roundup litigation would have this evidence available to put before juries. *See* ¶¶ 119, 123, 154, 181, 250-72, 273(5). For instance, during the *Johnson* trial, the plaintiff introduced expert testimony from an epidemiology expert and practicing oncologist who served as a professor of cancer research at Columbia University that there was, in fact, extensive scientific research supporting the conclusion that GBHs cause NHL. ¶ 123. Similarly, at the *Hardeman* trial, the plaintiff presented expert testimony about multiple studies showing that Roundup is up to ten times more genotoxic than glyphosate (and therefore more likely to cause cancer). ¶ 154. Further, Hardeman presented an internal email from Dr. Donna Farmer, one of Monsanto's very own toxicologists, which stated: "the terms glyphosate and Roundup cannot be used interchangeably." ¶ 154. And Hardeman presented a 2002 email from Dr. William Heydens, Monsanto's head of Product Safety Strategy to Dr. Farmer, stating that "we are in pretty good shape with glyphosate but vulnerable with surfactants" and "this continues to be the case with these studies—Glyphosate is

OK but the formulated product (and thus the surfactant) does the damage." ¶ 154. And in the *Pilliod* trial, the plaintiff presented evidence that Monsanto scientists determined that POEA, the surfactant used in the version of Roundup sold in the United States, has a synergistic effect with glyphosate that makes it more genotoxic and therefore more likely to cause cancer. ¶ 181. Further, the plaintiff presented evidence of an internal Monsanto study—which Monsanto never published—revealing Roundup had a significantly higher rate of dermal absorption than pure glyphosate, at a rate 3.3 times the governmental limit. ¶ 181.

Yet Defendants suggest that their statements about "***glyphosate***" did not mislead investors as to the risks associated with ***Roundup***. *See* DB 10. This is nonsense. In context, Defendants' statements about glyphosate's safety were clearly meant to imply that Roundup does not cause cancer and thereby falsely reassure investors about the risks Monsanto faced at trial. The conflating of glyphosate (the chemical alone) and Roundup (the GBH) is precisely what made these statements misleading.

Defendants next argue that Baumann's statements cannot have been false and misleading unless he was "contemporaneously aware" of the internal Monsanto emails demonstrating their falsity. DB 13. But as set forth above, the falsity of these statements is supported by more than those emails alone.  Further, "a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002)). This is a continuing duty—if a defendant subsequently learns of information revealing their statement was untrue or misleading when made, they have a duty to correct the misstatement. *See Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 486-87 (2d Cir. 2007); *Coble v. Broadvision*, 2002 WL 31093589, at *7 (N.D. Cal. Sept. 11, 2002) (collecting cases).

Defendants also attempt to characterize Baumann's statements as concerning his "opinion on" or "interpretation of" the "available research." DB 13-14. Even if these statements were opinions—and they are not—they are actionable under § 10(b)  because they incorporated false statements of material fact (that there were no Bayer or Monsanto internal documents or external

studies suggesting Roundup or other GBHs are more likely to be carcinogenic than glyphosate alone) and omitted facts that rendered them misleading (the existence of such evidence, about which reasonable investors expected Defendants to be informed). *See Hayden*, 2021 WL 3506614, at *1. Further, Baumann suggested to investors that he had conducted a meaningful inquiry on this issue—for example, reviewing the internal Bayer and Monsanto documents and the relevant scientific research—when in fact he had not, which makes his purported opinions actionable. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) (opinion statement that suggests to a reasonable investor that it is based on a meaningful inquiry is misleading if an inadequate inquiry has occurred); *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802-03 (9th Cir. 2017) (CEO's opinion materially false because it did not align with information in his possession at the time).

**E.      Defendants Misled Investors About Regulators' Views on Glyphosate Safety.**

Defendants repeatedly claimed that Monsanto's trial defenses were supported by regulatory assessments of glyphosate's safety and touted various regulators' surveys of the scientific research on glyphosate safety, which supposedly demonstrated that there was little to no evidence that Roundup could cause cancer. ¶¶ 250, 253-54, 256, 258-59, 261-67, 269-72. For instance, in three separate statements to investors on April 26, 2019, Defendants stated that the purported "800 studies" were "continuously confirmed by competent regulatory authorities worldwide," including the EPA. ¶¶ 269-70. Baumann went so far as to claim that "everybody" who "has studied the product . . . for regulatory and other purposes" had concluded that there is no relation between the application of glyphosate-based herbicides and cancer. ¶ 253. And in a January 21, 2019 interview with the *Australian Financial Review*, Baumann stated he was confident the *Johnson* verdict would be overturned on appeal and Bayer would prevail in the Roundup litigation because, *inter alia*, "[a]ll major registration agencies" and "regulatory agencies around the world" had "re-confirmed the safety status of glyphosate." ¶ 265. Nickl, for his part, assured investors during Bayer's 2020 Annual Shareholders Meeting that EPA "concluded in 2009 that . . . surfactants are not carcinogenic," and that "[l]eading authorities

came to the conclusion, again and again, that glyphosate-based herbicides from Bayer, when used appropriately, are safe and that glyphosate is not carcinogenic." ¶ 272.

These statements were misleading because Defendants failed to disclose to investors that Monsanto had procured regulatory approvals for glyphosate in part by withholding adverse scientific evidence from regulators and ghostwriting research. ¶¶ 104-05, 126, 151, 155-56. Moreover, regulators had approved glyphosate (the chemical itself) and not Roundup (the GBH), and this evidence would be presented at the Roundup litigation trials. ¶¶ 23, 125-26, 155-57, 273(6). For instance, during the *Johnson* and *Hardeman* trials, the plaintiffs presented evidence that in obtaining approval of glyphosate from EPA, Monsanto withheld reports by Dr. James Parry of Swansea University in Wales, a genotoxicology expert who served as a consultant to Monsanto, which concluded that both glyphosate and Roundup were potentially genotoxic and clastogenic—suggesting they caused cancer. ¶¶ 126, 155. The plaintiffs in these trials also introduced evidence that Monsanto ghostwrote a key glyphosate safety research paper used to support regulatory reviews. ¶¶ 126, 156.

Defendants' argument that the SAC "does not seriously attack the regulatory findings or the science behind them," DB 1, and does not "refute" the "regulatory record," DB 9, is a red herring. Defendants' statements omitted the existence of key internal documents undermining Monsanto's trial defenses, and their statements were misleading as to what, exactly, regulators had approved as safe—they had approved glyphosate or surfactants standing on their own, ***not*** Roundup. Thus, these statements are actionable under § 10(b) and Rule 10b-5, even if they were "statements of opinion," as Defendants claim. *See Hayden*, 2021 WL 3506614, at *1.

## II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER.

The SAC raises a strong inference of scienter because it pleads Defendants knew they were misleading investors about the evidentiary basis for Monsanto's science-based trial defenses or were at least deliberately reckless as to the possibility they were doing so. *See Alphabet*, 1 F.4th at 700-01; *In re Daou Sys.*, 411 F.3d at 1015. An inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 314, 324. An inference is "strong" when it is "more than

merely plausible or reasonable" and "***at least as likely***" as any other inference. *Id.* In assessing whether a complaint adequately pleads scienter, the Court "must consider the complaint in its entirety" and inquire "whether ***all*** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis added).[11]

Here, the SAC contains numerous factual allegations detailing Defendants' intent to "deceive, manipulate, or defraud" investors about the evidentiary basis for Monsanto's science-based trial defenses in the Roundup litigation. *Id.* at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & n.12 (1976)). Specifically, the SAC pleads scienter because it alleges (1) Defendants had a clear motive for misleading investors, (2) Defendants had knowledge of or access to information showing that their statements about the basis for Monsanto's trial defenses were false and misleading, and (3) Defendants Baumann, Condon, and Nickl personally signed communications to shareholders containing false and misleading statements. Taken together, these allegations show that Defendants either knew or were deliberately reckless as to the possibility that they had falsely or misleadingly portrayed the evidentiary basis for Monsanto's science-based trial defenses to Bayer's investors. Indeed, Defendants' alleged misrepresentations all occurred ***after*** the *Johnson* trial, where Monsanto had argued and presented its defenses in open court. Defendants' decision to continue to misrepresent Monsanto's trial defenses was an "extreme departure from the standards of ordinary care." *Align Tech., Inc.*, 856 F.3d at 619.

## A.      Defendants' Motive Support an Inference of Scienter.

Motive is relevant to establishing scienter. *See Matrixx Initiatives*, *Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). The SAC alleges Defendants had staked Bayer's future success and the

---

[11] Weighing the inferences, Plaintiffs' allegations are more compelling than Defendants'. *Tellabs*, 551 U.S. at 322-23.  But even if Defendants could offer a plausible alternative explanation of their state of mind, a "tie" in inferences goes to the Plaintiffs.  *See re In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (a claim will survive "if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged" (citation and internal quotation marks omitted)); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) (if "there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (a "tie favors the plaintiff").

value of the company on the risky Monsanto acquisition, and the key threat to the success of that acquisition was the risk posed by the Roundup litigation. *See* ¶¶ 6, 60, 67, 73, 80, 185. Just as Defendants' misrepresentations about Bayer's due diligence were meant to secure investor support for the Monsanto merger before it closed, Defendants' misrepresentations about the evidentiary basis for Monsanto's trial defenses were designed to ensure investor confidence following the Monsanto merger and inflated and maintained Bayer's share price. Hiding the true extent of the risks from the Roundup litigation served Defendants by enabling them to continue with their controversial plan to keep Bayer competitive in a consolidating market through the Monsanto acquisition, and enabled Defendants to maintain their high-profile jobs and reputations despite the massive and undisclosed risks to which they had exposed Bayer's shareholders. The SAC also alleges Defendants were motivated to prop up Bayer's share price. Baumann made this explicit in a January 21, 2019 interview with the *Australian Financial Review*, when he stated he was "concerned about the big drop in Bayer's share price since [the *Johnson* verdict]" and about "the valuation of the company and share price," at the very same time that he was making misleading statements about the evidence supporting Monsanto's trial defenses. ¶¶ 134, 265.

Taken together, the allegations in the SAC show Defendants had ample motive to mislead investors which is probative of scienter. *Cf. Klein*, 525 F. Supp. 3d at 666 (scienter pled with respect to claims Altria misrepresented litigation risks associated with acquiring JUUL because defendants "desperately wanted to acquire JUUL, regardless of the risks, and wanted investors to react favorably to the news of the investment," and "staked [Altria's] future on JUUL").

As this Court has already recognized, these allegations of motive are sufficient to plead scienter when considered alongside the associated well-pled false and misleading statements. *See Bayer*, 2021 WL 4864421, at *5.

**B.**     **Defendants Had Knowledge of or Access to Information Revealing The Falsity of Their Statements About the Basis for Monsanto's Science-Based Trial Defenses and the Risk to Bayer Posed by the Roundup Litigation.**

Defendants had knowledge of or access to information showing their statements were false and misleading, which is also probative of scienter. *Alphabet, Inc.*, 1 F.4th at 706 (courts consider "the executive's access to the information" demonstrating the statement was false and

misleading, and "whether, given the importance of the information, 'it would be absurd to suggest that management was without knowledge of the matter'" (citation omitted)). The SAC contains numerous detailed allegations about the "what," "when," "where," and "how" of Defendants' knowledge of or access to information demonstrating their statements were false and misleading.

First, the SAC alleges that Defendant Baumann, as Bayer's CEO, had the unquestioned ability to access all of Bayer's and Monsanto's internal documents and regulatory filings following the merger. *See* ¶¶ 21, 49, 54, 140-41. Indeed, Baumann admitted this and stated that he had reassured himself that there was no "smoking gun" evidence contained therein. ¶¶ 140, 247. Further, as part of his concerted efforts to reassure the market about the risks of the Roundup litigation, Baumann told investors and news outlets that he was working with "the joint litigation team" to "ensure that, going forward, this overwhelming science will get the full consideration it deserves," and that he was informed about Monsanto's trial strategy, including "the preparation for the next round of court battles" and Bayer's "new approach" following the *Johnson* verdict, as well as how the "question of causation" would be "analysed and assessed" on appeal. ¶¶ 134, 251, 265, 284. All of this reflects his direct access to pertinent information about Bayer's legal strategy from Bayer's legal counsel in the Roundup litigation. The receipt of such internal reports on a crucial matter indicates Baumann was "paying close attention" and was exposed to information rendering his public statements false, supporting an inference of scienter. *See Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9-10 (1st Cir. 2021) (the failed product was "important" enough that executives "would have paid at least some attention" and Defendants inquired about the product which raised a strong inference that they knew it did not work).

Second, Defendant Wenning participated in Bayer's Supervisory Board and Bayer's Glyphosate Litigation Committee. ¶¶ 289-91. As chairman of each of these committees, he discussed the Roundup litigation in detail during at least six meetings between September 2018

and December 2019.[12] ¶ 292. Some of these meetings were attended by John H. Beisner, a supposed "recognized expert in product liability litigation" who was specifically retained to advise on trial tactics for the Roundup litigation and to whom Bayer gave comprehensive access to all relevant information and documents relating to the litigation. ¶ 292. Participation in this committee tasked with discussing the key subject matter at issue is also probative of scienter. *See, e.g.*, *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015); *Lewis v. Straka*, 535 F. Supp. 2d 926, 930 (E.D. Wis. 2008).

Third, Defendants here not only had access to the information showing their statements were false and misleading—they actually took the extra step of ***informing the market*** of this access, which is further probative of scienter. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (defendants' informing market that they had real-time access to data was probative of scienter); *In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *13 (E.D. Pa. Dec. 22, 2008) (scienter pled because Defendants' service on management committee gave them access to "both inside and public information," in turn giving them "ample reason to know of the falsity of their statements").[13] Indeed, Defendants told the market, before making the alleged misrepresentations about Monsanto's trial defenses, that they had access to and had reviewed Monsanto's relevant internal documents, making this case different from *In re AnaptysBio, Inc. Sec. Litig.*, 2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) (cited on DB 16), where a confidential witness[14] alleged the defendant CEO was "heavily involved" in clinical trials, but where it was

[12] Defendants' claim that the April 26, 2019 statements attributed to Defendant Wenning, ¶¶ 269-70, pre-dated him joining the Glyphosate Litigation Committee in June 2019 and thus his membership is irrelevant, DB 16. First, Wenning participated in at least three meetings about the Roundup litigation before the alleged misrepresentations. ¶ 292 & n.9. Second, Wenning had a duty to correct or update his statements once he learned information demonstrating they were false and misleading. *See, e.g.*, *In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *13, *20 (N.D. Cal. Aug. 10, 2012); *In re LDK Solar Sec. Litig.*, 2008 WL 4369987, at *10-11 (N.D. Cal. Sept. 24, 2008); *In re Verity, Inc. Sec. Litig.*, 2000 WL 1175580, at *5 (N.D. Cal. Aug. 11, 2000).

[13] Defendants cite *In re Silicon Storage Tech, Inc. S'holder Deriv. Litig.*, 2009 WL 1974535, at *11 (N.D. Cal. 2009) for the proposition that board and committee membership without more, are insufficient to plead scienter. DB 16. *Silicon Storage* is inapposite here, where the SAC alleges more than board or committee membership alone.

[14] Further, unlike in *AnaptysBio*, the SAC's allegations in this regard are not based on confidential witness statements, which are subject to a heightened pleading standard requiring

unclear whether he knew of or had access to the *specific* information that was inconsistent with his statements about the results of those trials, *see id.* at *11.[15]

Further, courts interpret allegations analogous to those here as probative of deliberate recklessness and thus scienter. For example, in *In re VeriFone Holdings*, 704 F.3d at 710, the defendants had touted that their merger with another company would lead to financial benefits; however, when the benefits did not materialize, the company misreported its earnings for three quarters. *Id.* at 704. The Ninth Circuit found scienter adequately pled because, *inter alia*, the complaint alleged in detail the defendants were "hands-on" managers who would have been "aware of the complications associated with the . . . merger." *Id.* at 710.  Here, it is undeniable that Bayer's acquisition of Monsanto and assumption of the risk posed by the Roundup litigation were crucially important to Bayer. ¶ 50, 61. Thus, the most logical inference is that Defendants were aware of or at least reckless as to the evidentiary basis for Monsanto's trial defenses in the Roundup litigation.[16]

As another example, in *Schueneman*, 840 F.3d 698, Defendants told investors that animal testing supported FDA approval for their product, when in fact an important animal study suggested the product caused cancer, *id.* at 707-08. The Court found scienter adequately pled because the defendants knew about the adverse animal study and that it was "*the* sticking point

---

"sufficient particularity to establish their reliability and personal knowledge." 2021 WL 4267413, at *11 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)).

[15] Even if one accepts, *arguendo*, Defendants' argument that the SAC fails to plead that they were informed of specific information showing their statements to be false, the SAC ***still*** pleads scienter. In *Matrixx*, 563 U.S. 27, the defendants issued a press release stating that Zicam does not cause anosmia (loss of the sense of smell) when, in fact, the scientific evidence was insufficient to make such a determination and they had not conducted studies on the topic. The court found these allegations supported a strong inference of recklessness and therefore scienter. *Id.* at 49. Similarly, here, the SAC pleads at a minimum that the Individual Defendants stated that the scientific evidence clearly and unambiguously showed that Roundup did not cause cancer when it was insufficient to make such a determination and Monsanto's own research partially undermined their claims.

[16] Defendants cite *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008), DB 16, but *Killinger* concerned absolute reliance on a core-operations theory without any details that defendants were exposed to the information at issue. The SAC adequately pleads Defendants knew or had access to the information, including through participating in litigation oversight.

---

with the FDA," yet they told investors that "all the animal studies that [had] been completed" supported FDA approval, evidencing deliberate recklessness. *Id.* at 707-09. Similarly, here, Defendants repeatedly told investors that the scientific and regulatory evidence unequivocally supported Monsanto's trial defenses, when there was in fact there was considerable scientific evidence concluding that glyphosate and Roundup can cause cancer, including an internal Monsanto study and numerous internal Monsanto emails acknowledging the existence of such scientific evidence, which Baumann publicly claimed Defendants had reviewed. ¶¶ 140, 247.

The SAC thus alleges Defendants had knowledge of or access to information showing their statements were false and misleading, which supports a strong inference of scienter.[17]

### C. Defendants Personally Signed and Certified False or Misleading Investor Communications.

In addition, a defendant's personal signing or certification of financial reports, regulatory filings, or other investor communications that contain false or misleading information is probative of scienter. *See Richard v. Nw. Pipe Co.*, 2011 WL 3813073, at *5 (W.D. Wash. Aug. 26, 2011) (false certification of financial results supported finding of scienter in combination with allegations regarding motive and suspiciously timed departures from company); *In re Miva, Inc., Sec. Litig.*, 544 F. Supp. 2d 1310, 1318 (M.D. Fla. 2008) (scienter pled because defendant knowingly certified false statement in Form 10-K); *Macovski v. Groupon, Inc.*, 2021 WL 3550287 (N.D. Ill. Aug. 11, 2021) (scienter pled where defendants knowingly or recklessly made false statements in letters to shareholders).

The SAC alleges Defendants Baumann, Condon, and Nickl personally signed Bayer's Q2 2018 Interim Report and certified that the filing fairly described the risks facing Bayer, including the risks by the Roundup litigation, even though it contained multiple misrepresentations about

[17] Moreover, Defendants' contention that the far more "cogent" inference from their actions was that they were just following the science (DB 15) falls flat. Ensuring that the Roundup litigation did not derail the acquisition or investor confidence in the company is the more compelling reason behind Defendant's insistence in telling the public that Roundup does not cause cancer even in the face of considerable evidence that this was not close to the truth. Moreover, even if the Court found Defendants' explanation to be reasonable, the "tie" goes to the plaintiff for the purposes of weighing scienter inferences. *In re VeriFone*, 704 F.3d at 701.

the evidentiary basis for Monsanto's trial defenses. ¶¶ 257, 285, 294, 297. These certifications—although potentially insufficient to raise a strong inference of scienter standing purely on their own—are probative of scienter "when viewed holistically with the other allegations in the [complaint]" because "before certifying these documents, the Individual Defendants should have assured themselves that such documents were, in fact, accurate and not misleading." *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *12 & n.9 (C.D. Cal. June 6, 2016).

Similarly, the fact that Defendants Baumann and Wenning both signed the letter to shareholders on April 26, 2019, stating that Bayer had "assessed the legal risks in connection with the use of glyphosate as low" based on a purported review of the scientific evidence, ¶¶ 170, 239, 240, 269, 270, 286, 288, should be considered in the Court's scienter analysis, *see Genworth*, 103 F. Supp. 3d at 785 (repeated misrepresentations, including in a signed letter sent to shareholders, supported strong inference of scienter).

## III.     THE COMPLAINT ADEQUATELY PLEADS CONTROL-PERSON LIABILITY.

Because the Complaint pleads underlying violations of the Exchange Act, *see supra* pts. I-II (pp. 8-25), and because the Individual Defendants have never disputed they are controlling persons, Defendants' motion to dismiss Plaintiffs' § 20(a) claims should also be denied, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1113 n.6 (9th Cir. 2010).

### CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: March 2, 2022                           Respectfully submitted,

                                              **COHEN MILSTEIN SELLERS &
                                                TOLL PLLC**


                                              */s/ Carol V. Gilden*
                                              Carol V. Gilden (admitted *pro hac vice*)

                                              190 South LaSalle Street
                                              Suite 1705
                                              Chicago, IL 60603
                                              Telephone: (312) 357-0370
                                              Email:  cgilden@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice*)
Susan G. Taylor (SBN 190753)
1100 New York Ave NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: stoll@cohenmilstein.com
          sgtaylor@cohenmilstein.com

Chris Lometti (*pro hac vice* forthcoming)
Benjamin F. Jackson (admitted *pro hac vice*)
Norhan Bassiouny (admitted *pro hac vice*)
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
Email: clometti@cohenmilstein.com
          bjackson@cohenmilstein.com
          nbassiouny@cohenmilstein.com

*Lead Counsel*

Nicole Lavallee (SBN 165755)
Jeffrey Miles (SBN 293869)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
          jmiles@bermantabacco.com

*Liaison Counsel*

*Attorneys for Lead Plaintiffs Sheet Metal
Workers' National Pension Fund and
International Brotherhood of Teamsters Local
No. 710 Pension Fund, and Named Plaintiff
International Union of Operating Engineers
Pension Fund of Eastern Pennsylvania And
Delaware Local No. 542*