Carol V. Gilden (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Email: cgilden@cohenmilstein.com

Nicole Lavallee (SBN 165755)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
         avahdat@bermantabacco.com

*Attorneys for Lead Plaintiffs and Additional Named Plaintiff*
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>            vs.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>                    Defendants. | Case No: 3:20-cv-04737-RS<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:    March 23, 2023<br>Time:   1:30 p.m.<br>Ctrm:   3 – 17th Floor<br>Judge:  Richard Seeborg |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................................ 1

STATEMENT OF THE ISSUES TO BE DECIDED.................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

PRELIMINARY STATEMENT ............................................................................................... 1

RELEVANT BACKGROUND ................................................................................................. 2

    I.      FACTUAL AND PROCEDURAL BACKGROUND............................................... 2

    II.     THE PROPOSED CLASS REPRESENTATIVES AND CLASS COUNSEL........... 6

ARGUMENT ............................................................................................................................ 7

    I.      THIS ACTION SATISFIES ALL REQUIREMENTS OF RULE 23(A). .................. 8

        A.     The Proposed Class Is Numerous. ................................................... 8

        B.     The Proposed Class Shares Common Questions of Law and Fact. ................. 8

        C.     Plaintiffs' Claims Are Typical of the Class. ...................................... 9

        D.     The Proposed Class Representatives and Class Counsel Are Adequate......... 10

    II.     THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS OF
         RULE 23(B)(3) ARE SATISFIED. ........................................................... 11

        A.     Predominance: Common Factual and Legal Questions Predominate............. 11

             1.     Plaintiffs' Section 10(b) Claims Are Entitled to a Presumption
                 of Reliance Under *Basic v. Levinson*. ........................................... 12

                    a.     First *Cammer* Factor: High Average Trading Volume. .......... 13

                    b.     Second *Cammer* Factor: Securities Analyst Coverage. .......... 13

                    c.     Third *Cammer* Factor: Listing and Market Makers................. 13

                    d.     Fourth *Cammer* Factor: Eligibility to File Form S-3. ............. 14

                    e.     Fifth *Cammer* Factor: Reaction of Security to New
                        Company-Specific Information. ....................................... 14

                    f.     First *Krogman* Factor: Large Market Capitalization. ............. 14

                    g.     Second *Krogman* Factor: Narrow-Bid Ask Spread. ............... 15

                    h.     Third *Krogman* Factor: Large Public Float. ......................... 15

              2.     Plaintiffs' Section 10(b) Claims Are Entitled to a Presumption
                 of Reliance under *Affiliated Ute*. .................................................. 16

        B.     Superiority: A Class Action Is Superior to Other Available Methods
          for the Fair and Efficient Adjudication of This Action................................. 16

III.    PROPOSED CLASS COUNSEL SATISFY RULE 23(G). ....................................... 17

CONCLUSION.................................................................................................................... 17

1

2

# TABLE OF AUTHORITIES

**CASES**

*A.B. v. Haw. State Dep't of Educ.*,
  30 F.4th 828 (9th Cir. 2022) ........................................................... 9

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ............................................................... 12, 16

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................. 11

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ............................................................... 7, 12

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................. 12

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2022 WL 2954937 (N.D. Cal. July 26, 2022) ............................................ 10

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ............................................... 12, 13, 14

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
  2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) ............................................. 7

*Civil Rights Educ. & Enf't Center v. Hosp. Props. Tr.*,
  867 F.3d 1093 (9th Cir. 2017) ......................................................... 8

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................... 15

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ......................................................... 10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) .................................................................. 12

*Gold v. Lumber Liquidators, Inc.*,
  323 F.R.D. 280 (N.D. Cal. 2017) ....................................................... 8

*Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"),
  573 U.S. 258 (2014) .................................................................. 12

*Hayes v. MagnaChip Semiconductor Corp.*,
  2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ............................................ 13

*In re BofI Holding, Inc. Sec. Litig.*,
  2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) ............................................ 15

*In re Datatec Sys., Inc. Sec. Litig.*,
  2007 WL 4225828 (D.N.J. Nov. 28, 2007) ............................................... 11

*In re Dynex Cap., Inc. Sec. Litig.*,
   2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ............................................................................ 11

*In re EQT Corp. Sec. Litig.*,
   2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) ......................................................................... 9

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ........................................................................ 9

*In re Patriot Am. Hospitality Inc. Sec. Litig.*,
   2005 WL 3801595 (N.D. Cal. Nov. 30, 2005) ....................................................................... 7

*In re UTStarcom, Inc. Sec. Litig.*,
   2010 WL 1945737 (N.D. Cal. May 12, 2010) ........................................................................ 7

*In re VeriSign, Inc. Sec. Litig.*,
   2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) ......................................................................... 1

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ............................................................................. 11

*Johnson v. City of Grants Pass*,
   2022 WL 4492090 (9th Cir. 2022) ......................................................................................... 8

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................... 12, 13, 14, 15

*Luna v. Marvell Tech. Grp., Ltd.*,
   2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ...................................................................... 14

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) .................................................................................................. 8

*Nguyen v. Radient Pharms. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ................................................................................... 12, 13

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .................................................................................................. 7

*Owino v. CoreCivic, Inc.*,
   36 F.4th 839 (9th Cir. 2022) .................................................................................................. 8

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) .................................................................................................. 9

*Pelletier v. Endo Int'l PLC*,
   338 F.R.D. 446 (E.D. Pa. 2021) ........................................................................................... 15

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ..................................................................... 12

*Ruiz Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ................................................................................................ 9

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft,*
   2021 WL 4864421 (N.D. Cal. Oct. 19, 2021) .................................................... 6, 16

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft,*
   2022 WL 1570002 (N.D. Cal. May 18, 2022) ........................................................ 6

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007) .......................................................................................... 7

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG,*
   2017 WL 2378369 (C.D. Cal. May 31, 2017) .......................................................... 11

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ..................................................................................... 7, 8

*Zinser v. Accufix Research Inst., Inc.,*
   253 F.3d 1180 (9th Cir. 2001) ............................................................................ 7

**STATUTES**

Exchange Act § 10(b) .......................................................................................... 2, 6

Exchange Act § 20(a) .......................................................................................... 2, 6

**RULES**

Fed. R. Civ. P. 23 ......................................................................................... 1, 7, 8

Fed. R. Civ. P. 23(a) ......................................................................................... 2, 8

Fed. R. Civ. P. 23(a)(3) ...................................................................................... 9, 10

Fed. R. Civ. P. 23(a)(4) ......................................................................................... 10

Fed. R. Civ. P. 23(b)(3) ..................................................................................... 11, 16

Fed. R. Civ. P. 23(g)(1) .......................................................................................... 17

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on March 23, 2023, at 1:30 p.m., or as soon thereafter as this matter may be heard, before The Honorable Richard Seeborg, United States District Court for the Northern District of California, Courtroom 3, 17th Floor, 450 Golden Gate Avenue, San Francisco, Court-appointed Lead Plaintiffs Sheet Metal Workers' National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund ("Lead Plaintiffs") and additional plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware (collectively "Plaintiffs") will, and hereby do, respectfully move this Court for an entry of an Order, pursuant to Federal Rule of Civil Procedure 23, in the above-captioned action (the "Action"): (1) certifying the Class (defined below); (2) appointing Plaintiffs as Class Representatives; and (3) appointing Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Class Counsel.

This Motion is based upon this Notice of Motion and Memorandum of Points and Authorities, the Declaration of Carol V. Gilden in support thereof (the "Gilden Declaration" or "Gilden Decl.") and exhibits attached therefore, the pleadings and records on file in this action, and such further arguments and matters as the Court may consider.

## STATEMENT OF THE ISSUES TO BE DECIDED

The issues to be decided on this Motion are:

1.     whether the proposed Class should be certified;

2.     whether Plaintiffs should be appointed as Class Representatives; and

3.     whether Cohen Milstein should be appointed as Class Counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

"Class actions are particularly well-suited to federal securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty challenging wealthy corporate defendants." *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13, 2005).[1] This case is no exception, as Defendants' federal securities laws violations

---

[1] In this brief, emphasis in quotations is added and internal citations and quotation marks are omitted, except as otherwise noted. References to "Ex. __" are to exhibits to the accompanying Gilden

injured Plaintiffs and many thousands of proposed Class members[2] in the same manner. Thus, Rule 23(a)'s requirements are easily satisfied here:

1. **Numerosity**: Many thousands of investors, including 178 institutional investors, acquired many millions of nationally traded Bayer American Depositary Receipts ("ADRs") during the Class Period.

2. **Commonality and Typicality**: Defendants made the same false and misleading statements and omitted the same material facts when speaking to all of Bayer's investors.

3. **Adequacy**: Plaintiffs are substantial institutional investors that have demonstrated their commitment to zealous advocacy on behalf of the Class in this action and will continue to do so.

In addition, Rule 23(b)(3)'s requirements are likewise satisfied:

4. **Predominance**: The core elements of the claims here, including falsity and materiality, are susceptible to common proof. Further, reliance will be presumed for Plaintiffs' Section 10(b) claims and the related Section 20(a) claims.

5. **Superiority**: Defendants' conduct damaged thousands of geographically dispersed investors, making a class action the clearly superior method for adjudicating the claims and defenses here in a judicially efficient manner.

Accordingly, the Court should grant Plaintiffs' motion to (1) certify the Class; (2) appoint Plaintiffs as Class Representatives; and (3) appoint Cohen Milstein as Class Counsel.

## **RELEVANT BACKGROUND**

## **I.     FACTUAL AND PROCEDURAL BACKGROUND**

Bayer is a German chemicals conglomerate and one of the largest companies in the world. In 2015, Bayer was saddled with a failed over-the-counter drug business and was facing a wave of consolidation among its competitors that left it vulnerable to a takeover and threatened the positions

---

Declaration. References to "¶ __" are to the Second Amended Class Action Complaint (the "Complaint"), ECF No. 107. References to "Coffman Rpt." are to the accompanying Expert Report of Chad Coffman, CFA, which is attached as Exhibit A to the Gilden Declaration. References to "Mitts Rpt." are to the accompanying Expert Report of Professor Joshua R. Mitts, Ph.D., which is attached as Exhibit B to the Gilden Declaration.

[2] The proposed Class consists of all persons or entities that purchased or otherwise acquired Bayer's publicly traded American Depository Receipts ("ADRs") from May 23, 2016 to July 6, 2020, inclusive (the "Class Period"). Excluded from the Class are (1) Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) any subsidiary or affiliate of Bayer, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); (4) the directors and officers of Bayer during the Class Period, as well as the members of their immediate families; and (5) the legal representatives, heirs, successors, and assigns of any such excluded party. ¶ 317.

of its senior executives. By 2016, the situation was dire, as there were few major agrochemical firms left for Bayer to acquire or merge with. ¶¶ 12, 57–58. Defendant Baumann, who was then a senior strategy executive, hatched a plan for Bayer to acquire agrochemical behemoth Monsanto, believing this would "make Bayer unacquirable." ¶ 58. And in May 2016, just days after he became Bayer's new CEO, Baumann took immediate steps to acquire Monsanto, secretly flying to St. Louis to meet with Monsanto's CEO and make an unsolicited proposal for an acquisition. ¶ 61. On May 19, 2016, to the shock of investors around the world, Bayer announced that it had made a $62 billion all-cash offer to Monsanto—representing a **_44% premium_** on Monsanto's market value. ¶¶ 2, 61–62, 96.

Bayer's move to acquire Monsanto was, in the words of Bayer's former CEO Marijn Dekkers, "fraught with risks." ¶ 60. Monsanto had infamously become known as "the most hated company in the world" after it was repeatedly caught concealing the health risks of its major products. And at the time the merger was announced, Monsanto was beset by over a hundred new toxic tort lawsuits accusing it of concealing the cancer risks associated with its flagship product, the herbicide Roundup ("Roundup litigation"). These cases threatened Monsanto's core financials, as both Roundup and Roundup-tolerant seeds were major sources of revenues and profits. ¶¶ 4–6, 55. At the time of the acquisition, analysts saw the deal as a "value destructive process" and "unconvincing from a strategic angle," ¶ 64, and shareholders doubted the merger so much that they called for a shareholder vote, ¶ 65. However, acquiring Monsanto served the personal goals of Bayer's top executives, particularly CEO Werner Baumann, because it effectively made Bayer unacquirable, ensuring their continued reign atop the corporate ladder of one of the largest companies in the world. So Bayer and its top executives pressed on.

In the following months, Bayer, Baumann, and Defendants Wenning and Condon **_repeatedly_** and **_explicitly_** assured investors that Bayer was performing exhaustive due diligence on the merger's risks. ¶¶ 106–07, 219–37. In May 2016, when Bayer made its initial offer, Bauman expressly stated that Bayer looked at the "topic of glyphosate," that it "underst[ood] the risk and the exposure that does exist," and that this "would not affect the overall offer and proposal to acquire Monsanto." ¶ 219. In September 2016, Bayer and Baumann assured investors that initial due diligence had "confirmed" significant "sales and cost synergies." ¶¶ 96, 224–25. But Bayer had not reviewed or even requested

*any* internal Monsanto documents relating to Roundup's legal risks as part of the due diligence process—even though millions of pages had been collected and produced in the Roundup litigation and were essential to determining Monsanto's exposure. ¶¶ 9–10, 28, 102, 275(f), 279.

Bayer and Monsanto officially executed a merger agreement in September 2016, but the due diligence process was to continue until the transaction closed 21 months later in June 2018—ample time for additional diligence. ¶¶ 3, 16, 72, 96, 116. However, mirroring Bayer's and Baumann's failed due diligence for the prior acquisition of Merck's over-the-counter ("OTC") drug business, over the following two years, Bayer ***never*** availed itself of the agreed-upon disclosure procedures set forth in the merger agreement, ¶¶ 9, 28, 136—even when a major development in the Roundup litigation made doing so critical.

Specifically, in March 2017, the judge presiding over the Roundup litigation published a number of internal Monsanto documents that revealed Monsanto's efforts to manipulate academic research on glyphosate's health risks, sparking a wave of alarm over glyphosate's safety and Monsanto's questionable research and lobbying practices. ¶¶ 103–05. The documents became known as the "Monsanto Papers," and triggered hundreds of additional Roundup suits, to a total of 1400 by May 2017. ¶ 104–09.

Defendants immediately went to work falsely allaying investor concern. For example, between April 2017 and July 2017, Wenning falsely assured investors that Bayer had analyzed Monsanto's "possible risks to Bayer's reputation," ¶ 227, and Baumann falsely assured investors the diligence process had been far more extensive than the failed Merck OTC drug business due diligence, stating during an earnings call that "the Monsanto people went out of their way to provide us with transparency, data and visibility to the most critical questions we had," ¶¶ 107, 228. And in May 2018, Baumann told investors the merger was "just as attractive today as we assessed it to be two years ago." ¶ 109. The merger closed on June 7, 2018, after two years of due diligence (starting in May 2016) during which Bayer did not examine even a single internal Monsanto document related to Roundup.

The house of cards built upon Defendants' false statements began to fall when the jury in the first bellwether trial in the Roundup litigation, *Johnson v. Monsanto*, awarded the plaintiff $289 million in damages after bombshell internal Monsanto emails were introduced into evidence at trial.

Bayer's ADR price plummeted on the news. ¶¶ 120, 125–26, 128–29. On August 23, 2018, in response to the verdict, Defendants launched an entirely new barrage of false statements. For example, Baumann, who had been touting Bayer's purportedly extensive due diligence, suddenly changed course, falsely claiming that a "hold separate order" issued by the U.S. Department of Justice ("DOJ") prevented Bayer from being able to review Monsanto's internal Roundup documents—and admitting that previously, Bayer had only reviewed publicly available documents relating to Roundup in the due diligence process. ¶¶ 245–46. Baumann also misled investors to believe Bayer had now reviewed the internal Monsanto documents and confirmed there was no evidence to support the Roundup plaintiffs' claims, and that at trial Monsanto's internal documents had simply been "taken out of context." ¶¶ 137–45, 235, 247.

However, an unending series of legal defeats progressively revealed the falsity of these claims. In *Hardeman*, the second Roundup bellwether trial, plaintiff Hardeman introduced more internal Monsanto emails—which Bayer never sought to examine throughout its two-year due diligence process, ¶¶ 9, 28—evidencing that Monsanto knew Roundup was more toxic than glyphosate alone, and that Monsanto manipulated scientific research and buried adverse findings, ¶¶ 154–56. On March 19, 2019, the jury rendered an $80 million verdict for Hardeman. ¶¶ 25, 307. The day after the verdict, Bayer's ADR price plummeted further, and numerous analysts downgraded Bayer's securities. ¶ 160.

On March 22 and April 3, 2019, two leading proxy advisory firms published statements recommending that Bayer's senior management be fired for failing to perform adequate due diligence on the Roundup litigation. ¶ 169. At the annual shareholders meeting on April 26, 2019, Bayer's shareholders expressed outrage over Defendants' due diligence failures. ¶ 172. Defendants Baumann, Nickl, and Condon, and other members of Bayer's Management Board lost a no-confidence vote by a wide margin. ¶ 175. Despite this, they kept their jobs.

On March 28, 2019, the third bellwether case, *Pilliod*, went to trial. The plaintiffs again introduced numerous internal documents showing that Monsanto was aware of and attempted to conceal evidence that Roundup was potentially carcinogenic. The jury awarded the plaintiffs over $2 billion in damages. ¶ 184.

On June 24, 2020, Bayer announced a commitment to pay "between $10.1 billion and $10.9 billion" to settle the entire Roundup litigation. ¶ 206. Unsurprisingly, this disclosure triggered an immediate 7.8% ADR price decline on June 25, 2020. *Id.* Then, on July 6, 2020, the last day of the Class Period, the specter of Bayer needing to pay even more money to resolve future claims was raised by the presiding judge, who indicated he was tentatively inclined to deny approval because of the proposed mechanism for resolving claims. ¶¶ 209, 308. On this news, Bayer's ADR price immediately declined by an additional 6.1%. *Id.*

Plaintiffs filed this action on July 15, 2020, alleging violations of § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants and violations of § 20(a) of the Exchange Act against the Individual Defendants. After Defendants moved to dismiss Plaintiffs' Amended Complaint, this Court denied Defendants' motion to dismiss as to Defendants' allegedly false and misleading statements concerning Bayer's due diligence efforts in connection with the Monsanto merger. *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *3–7 (N.D. Cal. Oct. 19, 2021). Plaintiffs then filed the Second Amended Complaint to augment and bolster certain other claims that were dismissed without prejudice by the Court in that decision. ECF No. 107. Defendants again moved to dismiss, and the Court again denied the motion as to the claims based on Defendants' allegedly false and misleading statements concerning Bayer's due diligence on the Monsanto merger, while granting the motion as to the remaining claims. *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2022 WL 1570002, at *1–4 (N.D. Cal. May 18, 2022). The case then proceeded to discovery, and this motion followed.

## II.    THE PROPOSED CLASS REPRESENTATIVES AND CLASS COUNSEL

On October 21, 2020, the Court appointed Sheet Metal Workers' National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund as Lead Plaintiffs. ECF No. 44. Both now seek appointment as Class Representatives, along with Plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware. The proposed Class Representatives are all defined benefit pension plans that provide retirement income benefits to their participants. Collectively, they purchased or otherwise acquired more than approximately 591,316 Bayer ADRs during the Class Period and suffered substantial losses as a result of the securities law

1  violations alleged in this action. *See* Ex. C ¶ 2. The Court also previously appointed Cohen Milstein

2  as Lead Counsel. ECF No. 44. Cohen Milstein now seeks appointment as Class Counsel.

3  <u>**ARGUMENT**</u>

4         The Supreme Court has repeatedly emphasized the importance of class actions in redressing

5  violations of the federal securities laws, and courts in this Circuit overwhelmingly find securities fraud

6  actions appropriate for class treatment. *See*, *e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S.

7  308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal

8  antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement

9  actions[.]"); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543,

10  at *3 (N.D. Cal. Oct. 11, 2018) ("securities fraud cases fit Rule 23 like a glove"); *In re UTStarcom,*

11  *Inc. Sec. Litig.*, 2010 WL 1945737, at *10 (N.D. Cal. May 12, 2010) ("class treatment" is "superior to

12  individual actions in the context of securities litigation"); *In re Patriot Am. Hospitality Inc. Sec. Litig.*,

13  2005 WL 3801595, at *2 (N.D. Cal. Nov. 30, 2005) ("class treatment" is "generally appropriate" in

14  "securities fraud class actions").

15         Rule 23 promotes the effective enforcement of the securities laws for large numbers of injured

16  investors, and a class action conserves judicial resources by providing a single forum to litigate

17  investors' claims. Here, Plaintiffs have "affirmatively demonstrate[d]" that Rule 23's requirements are

18  satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), by a preponderance of the

19  evidence, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th

20  Cir. 2022) (en banc), and the Class should be certified.

21         Finally, while the Court's analysis in deciding whether to grant a class certification motion

22  frequently overlaps with "the merits of the plaintiff's underlying claim," *Dukes*, 564 U.S. at 351, "Rule

23  23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," *Amgen*

24  *Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered

25  to the extent—but only to the extent—that they are relevant to determining whether the Rule 23

26  prerequisites for class certification are satisfied." *Id.* If a court concludes that the moving party has

27  met its burden of proof, then the court has broad discretion to certify the class. *Zinser v. Accufix*

28  *Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

## I.     THIS ACTION SATISFIES ALL REQUIREMENTS OF RULE 23(A).

Under Rule 23(a), plaintiffs must show that (1) the class is so numerous that joinder of all the members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) plaintiffs' claims are typical of the class ("typicality"); and (4) the representative parties fairly and adequately protect the class's interests ("adequacy"). *See, e.g.*, *Owino v. CoreCivic, Inc.*, 36 F.4th 839, 844 (9th Cir. 2022); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). The proposed Class satisfies all four requirements.

### A.     The Proposed Class Is Numerous.

"While there is no fixed number that satisfies the numerosity requirement, generally, a class greater than forty is sufficient while one less than twenty-one is not." *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 287 (N.D. Cal. 2017) (Seeborg, J.). Here, an average of 2.91 million Bayer ADRs changed hands every week of the approximately four-year Class Period. Coffman Rpt. ¶ 30. Based on this volume, and Bayer ADRs' high annualized turnover velocity, it can be inferred that many thousands of investors owned and traded Bayer ADRs during the Class Period. *See id.* ¶¶ 28–33. Additionally, at least 178 institutional investors owned Bayer ADRs during the Class Period. *See id.* ¶ 74. Accordingly, the Class is so numerous that joinder of all members would be impracticable, and it satisfies the numerosity requirement.

### B.     The Proposed Class Shares Common Questions of Law and Fact.

"A class satisfies Rule 23's commonality requirement if there is at least one question of fact or law common to the class." *Johnson v. City of Grants Pass*, 2022 WL 4492090, at *14 (9th Cir. 2022). "The Ninth Circuit has acknowledged that the existence of shared legal issues with divergent factual predicates proves sufficient to satisfy Rule 23's commonality requirement." *Civil Rights Educ. & Enf't Center v. Hosp. Props. Tr.*, 867 F.3d 1093, 1107 (9th Cir. 2017). Demonstrating commonality requires a common contention that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Securities fraud cases "often present a paradigmatic common question of law or fact of whether a company omitted material information or made

1    misrepresentations that inflated the price of its [securities]." *In re EQT Corp. Sec. Litig.*, 2022 WL

2    3293518, at *20 (W.D. Pa. Aug. 11, 2022).

3            Here, the common questions include: (a) whether Defendants violated the Exchange Act;

4    (b) whether Defendants' statements omitted material facts necessary to make the statements made, in

5    light of the circumstances under which they were made, not misleading; (c) whether Defendants knew

6    or recklessly disregarded that their statements and omissions were false and misleading; (d) whether

7    the price of Bayer ADRs was artificially inflated; and (e) whether Defendants' conduct caused the

8    members of the Class to sustain damages and the extent of damages.

9            The resolution of these common questions will drive the outcome of this litigation, and class

10   members would have to address the same issues if the claims were pursued individually.

11           **C.      Plaintiffs' Claims Are Typical of the Class.**

12           Rule 23(a)(3), the typicality requirement, permits certification when "the claims or defenses of

13   the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

14   "The test of typicality is whether other members have the same or similar injury, whether the action

15   is based on conduct which is not unique to the named plaintiffs, and whether other class members have

16   been injured by the same course of conduct." *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 839

17   (9th Cir. 2022).

18           "Under the rule's permissive standards, representative claims are 'typical' if they are

19   reasonably co-extensive with those of absent class members; they need not be substantially identical."

20   *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (quoting *Parsons v. Ryan*,

21   754 F.3d 657, 685 (9th Cir. 2014)). "Factual differences involving the date of acquisition, type of

22   securities purchased and manner by which the investor acquired the securities will not destroy

23   typicality if each class member was the victim of the same material misstatements and the same

24   fraudulent course of conduct." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at

25   *10 (S.D.N.Y. Dec. 23, 2009).

26           Here, Plaintiffs' claims are typical of, if not virtually identical to, the claims of other members

27   of the Class; arise from the same events; invoke the same legal theories; are subject to the same

28   defenses; and will be proven with the same evidence. Like other members of the Class, Plaintiffs

1  purchased Bayer ADRs at artificially inflated prices and suffered losses as a result of Defendants'

2  misconduct. Accordingly, Plaintiffs and the Class members share identical interests in holding

3  Defendants accountable and maximizing investors' recovery, satisfying Rule 23(a)(3).

4  **D.    The Proposed Class Representatives and Class Counsel Are Adequate.**

5  To meet the requirement under Rule 23(a)(4) that the class representatives "fairly and

6  adequately protect the interests of the class," the district court must resolve two questions: "(1) do the

7  named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will

8  the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v.*

9  *Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). "[T]he evidentiary burden upon plaintiffs

10  is low; a class representative will be deemed inadequate only if startlingly unfamiliar with the case."

11  *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2022 WL 2954937, at *4 (N.D. Cal. July 26, 2022) (Seeborg, J.).

12  A proposed class representative must merely "present some affirmative evidence that they are familiar

13  with this case, the claims within it, and the role of a class representative." *Id.*

14  Here, Plaintiffs' interests are entirely aligned with those of the other Class members.

15  ***First***, both Plaintiffs and the other Class members acquired and held Bayer ADRs during the

16  Class Period and were damaged as a result of the same allegedly false and misleading statements and

17  omissions by Defendants. *See* Ex. C ¶ 2.

18  ***Second***, Plaintiffs have a meaningful financial stake in this litigation and have demonstrated

19  their ability to vigorously litigate this matter to protect the Class. As stated in their joint declaration,

20  each Plaintiff (a) understands the requirements and responsibilities of serving as a Class

21  Representative; (b) has reviewed the key pleadings to date; (c) will continue to monitor and assess the

22  progress of this litigation; and (d) will work with counsel to maximize the Class's recovery. *See* Ex. C

23  ¶¶ 3–5. Plaintiffs also filed amended complaints with comprehensive sets of claims, successfully

24  defended them against motions to dismiss, and have pursued discovery from Defendants and relevant

25  third parties and complied with their own discovery obligations. *See id.* ¶ 3.

26  ***Third***, Plaintiffs have demonstrated their adequacy by retaining counsel with the qualifications,

27  experience, and demonstrated ability to successfully litigate this action on behalf of the Class. *See*

28  Gilden Decl. ¶¶ 7–8 & Ex. D. Cohen Milstein is one of the preeminent securities class action law firms

in the country, having recovered billions of dollars in some of the largest and most complex securities class actions. *See* Ex. D. For these reasons, Cohen Milstein has previously been recognized as adequate by courts in this Circuit and throughout the country on numerous occasions. *See, e.g.*, *In re Dynex Cap., Inc. Sec. Litig.*, 2011 WL 781215, at *9 (S.D.N.Y. Mar. 7, 2011) ("Cohen, Milstein, Sellers & Toll, PLLC has the experience, knowledge, commitment and record of work on this case to merit appointment as Class Counsel."); *In re Datatec Sys., Inc. Sec. Litig.*, 2007 WL 4225828, at *7 (D.N.J. Nov. 28, 2007) (recognizing Cohen Milstein as "highly skilled attorneys with experience in securities class action litigation").

## II.   THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS OF RULE 23(B)(3) ARE SATISFIED.

This case also satisfies Rule 23(b)(3)'s requirements that (1) common questions of law or fact predominate over individual questions, and (2) a class action is superior to alternative methods of resolving the dispute. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

### A.   Predominance: Common Factual and Legal Questions Predominate.

Predominance under Rule 23(b)(3) "is a test readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625. The Class's claims all arise from the same course of conduct and will be proven through common evidence, and the Class's injuries are all predicated on the same artificial inflation and subsequent decline in Bayer's share price after the truth was exposed.[3] *See supra* § I.B. Common questions further predominate in this action because the Class is entitled to

---

[3] Defendants' Answer to the Second Amended Class Action Complaint asserts as an affirmative defense that Plaintiffs' claims are barred to the extent they require an extraterritorial application of federal securities laws. *See* ECF No. 127 at 151. However, Bayer's ADR program is sponsored by Bayer pursuant to an agreement between Bayer and the Bank of New York Mellon, *see* Mitts Rpt. ¶ 27, and courts have uniformly held that purchases of sponsored ADRs on U.S. OTC markets are domestic transactions that do not raise extraterritoriality concerns, *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at *4–7 (N.D. Cal. Jan. 4, 2017); *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *11–12 (C.D. Cal. May 31, 2017). In any event, even assuming, *arguendo*, that certain Class members' purchases of Bayer's sponsored ADRs could be found to be non-domestic, the evidence shows that (1) virtually all of the Class's purchases of Bayer ADRs during the Class Period were domestic transactions, (2) Plaintiffs' purchases of Bayer ADRs were typical domestic transactions, and (3) it is possible to determine on a Class-wide basis whether the Class's transactions in Bayer ADRs were domestic transactions. *See* Mitts Rpt. ¶¶ 8–10, 18–54. Accordingly, extraterritoriality issues pose no obstacle to class certification here.

a presumption of reliance for Plaintiffs' Section 10(b) claims. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (in federal securities fraud actions, "[w]hether common questions of law or fact predominate . . . often turns on the element of reliance"). The Supreme Court has identified two circumstances in which courts may employ a rebuttable presumption of reliance for securities class actions: (1) where there has been "fraud on the market," *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988); and (2) where the defendant failed to disclose facts it was under a duty to disclose, *see Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Both circumstances are present here.

### 1.    Plaintiffs' Section 10(b) Claims Are Entitled to a Presumption of Reliance Under *Basic v. Levinson*.

The predominance requirement is satisfied here because Plaintiffs can rely on the fraud-on-the-market presumption of reliance for their Section 10(b) claims. *See Basic*, 485 U.S. at 241; *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 263–64, 268–69 (2014); *Amgen*, 568 U.S. at 460–62. Under the fraud-on-the-market presumption, reliance on material public misrepresentations is presumed for Section 10(b) claims whenever an "investor buys or sells [securities] at the market price" because "the market price of shares traded on well-developed markets reflects all publicly available information, and hence any material misrepresentations." *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246–47).

In determining whether a market for a security is well developed—that it demonstrates "market efficiency"—courts rely principally on the five factors enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989): (1) the security's average weekly trading volume; (2) coverage of the security in securities analyst reports; (3) the number of market makers; (4) the company's eligibility to file a registration statement on Form S-3; and (5) security price reaction to unexpected corporate events or financial releases. *See Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *3 (N.D. Cal. Aug. 15, 2022). These factors are an "analytical tool" and not a "checklist." *E.g.*, *Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012). Courts also consider the factors in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001): (1) the company's market capitalization;

(2) the security's bid-ask spread; and (3) the size of the public float. *See id.* Here, both the *Cammer* factors and the *Krogman* factors demonstrate efficiency.

### a.    First *Cammer* Factor: High Average Trading Volume.

Throughout the Class Period, Bayer ADRs traded actively, with an average weekly trading volume of approximately 2.91 million shares, or 3.68% of ADRs outstanding, higher than the average security traded on the NYSE or NASDAQ. Coffman Rpt. ¶¶ 27, 30; *see Nguyen*, 287 F.R.D. at 571 ("[A]verage weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." (quoting *Cammer*, 711 F. Supp. at 1286)). Consistent with *Cammer*, economic theory, and empirical research, this high, active trading volume is strong evidence of the efficiency of the market for Bayer ADRs over the course of the Class Period. *See* Coffman Rpt. ¶¶ 28–33.

### b.    Second *Cammer* Factor: Securities Analyst Coverage.

During the Class Period, analysts from at least 24 separate firms followed Bayer and issued at least 1,229 reports. *See id.* ¶ 36. Bayer was also the subject of at least 21,482 unique articles. *See id.* ¶ 38. This extensive coverage also compellingly shows market efficiency.

### c.    Third *Cammer* Factor: Listing and Market Makers.

Market makers are financial intermediaries who trade in a particular security, standing ready to buy from and sell to individual investors, institutions, and other market makers. *See Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016) (the third factor is the presence of "market makers" or "'individuals [who] would react swiftly to company news and reported financial results by buying or selling [the security] and driving it to a changed price level.'"). A large number of market makers indicates market efficiency because it implies that many market participants are trading that particular security and generally provides a high degree of liquidity and lower transaction costs. Here, during the Class Period, there were at least 98 market makers for Bayer ADRs, Coffman Rpt. ¶¶ 40–42, which is strong evidence of market efficiency, *see Cammer*, 711 F. Supp. at 1293 ("For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one . . . .").

1

                **d.**        **Fourth *Cammer* Factor: Eligibility to File Form S-3.**

2

       Because throughout the Class Period there is no evidence that Bayer failed to file relevant

3 documents in a timely manner, pay dividends, or defaulted on its debts, Bayer effectively satisfied the

4 criteria for Form F-3 eligibility, which is further confirmatory evidence of market efficiency during

5 the Class Period. *See* Coffman Rpt. ¶¶ 43–45; *Cammer*, 771 F. Supp. at 1284.

6

7

                **e.**        **Fifth *Cammer* Factor: Reaction of Security to New Company-Specific Information.**

8

       "[O]ne of the most convincing ways to demonstrate [market] efficiency [is] to illustrate, over

9 time, a cause and effect relationship between company disclosures and resulting movements in

10 [security] price." *Cammer*, 711 F. Supp. at 1291. Courts have held that where the results of an event

11 study show price changes that are statistically significant, a cause-and-effect relationship exists

12 between the release of information pertaining to the company and the price of the company's

13 securities. *See, e.g., Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at *6 (N.D. Cal. Oct. 27,

14 2017) (an event case study "is a feature of virtually every securities action."). Here, an event study by

15 Plaintiffs' expert provides compelling evidence of Bayer ADR price reactions to Company

16 announcements, *see* Coffman Rpt. ¶¶ 46–67, which strongly indicates that Bayer ADRs traded in an

17 efficient market.

18

                **f.**        **First *Krogman* Factor: Large Market Capitalization.**

19

       "Market capitalization, calculated as the number of shares multiplied by the prevailing share

20 price, may be an indicator of market efficiency because there is a greater incentive for [securities]

21 purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Here,

22 Bayer's market capitalization averaged $2.02 billion throughout the Class Period, making it one of the

23 largest companies in the United States and the world. *See* Coffman Rpt. ¶ 69. In fact, Bayer was larger

24 than 57% of all publicly traded companies listed on the combined NYSE and NASDAQ exchanges,

25 as measured by market capitalization. *Id.* This is further evidence of market efficiency. *See id.* ¶¶ 68–

26 70.

27

28

1

### g.     Second *Krogman* Factor: Narrow-Bid Ask Spread.

"The bid-ask spread is the difference between the price at which investors are willing to buy the [security] and the price at which current [securities holders] are willing to sell their shares," with narrower bid-ask spreads associated with more efficient markets. *Krogman*, 202 F.R.D. at 478. The average percentage bid-ask spread for Bayer ADRs in each month throughout the Class Period was between 0.08% and 0.29%. Coffman Rpt. ¶ 72. This is well below the average and median bid-ask spread of a random sample of 100 common stocks trading on the NYSE and NASDAQ in March 2020 (the full month of the Class Period during which Bayer had the largest percentage bid-ask spread). *Id.* This narrow bid-ask spread further indicates market efficiency. *See id.* ¶¶ 71–72.

### h.     Third *Krogman* Factor: Large Public Float.

In determining efficiency, courts also consider public float, *i.e.*, "the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478. "Because insiders may have private information that is not yet reflected in [security] prices, the prices of [securities] that have greater holdings by insiders are less likely to accurately reflect all available information about the security." *Id.* During the Class Period, insiders held no outstanding shares of Bayer ADRs, meaning that 100% of Bayer's ADRs were held by non-insiders. This large percentage of shares held by non-insiders supports market efficiency.[4] Coffman Rpt. ¶ 73.

---

[4] Evidence concerning the lack of autocorrelation, considerable option trading in Bayer ordinary shares, and lack of any persistent divergence between the prices of Bayer ADRs and Bayer ordinary shares during the Class Period further supports market efficiency here. *See* Coffman Rpt. ¶¶ 75–80.

Plaintiffs also note that *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) does not "pose a significant obstacle to class certification in securities litigation." *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *7 (S.D. Cal. Aug. 24, 2021). Here, Plaintiffs propose an out-of-pocket damages methodology that is clearly capable of calculating damages Class-wide (*see* Coffman Rpt. ¶¶ 81–86) and thus satisfies whatever minimal burden might be posed by *Comcast* in a securities class action. *See, e.g.*, *id.* at *7 ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action."); *see also Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 487 (E.D. Pa. 2021) ( "*Comcast* applies only to antitrust cases . . . .").

2.     **Plaintiffs' Section 10(b) Claims Are Entitled to a Presumption of Reliance under *Affiliated Ute*.**

Plaintiffs are also entitled to a presumption of reliance for their Section 10(b) claims under *Affiliated Ute*, which provides that for claims involving a failure to disclose, "positive proof of reliance is not a prerequisite to recovery." 406 U.S. at 153. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id*. at 153–54. Plaintiffs' Section 10(b) claims allege that throughout the Class Period, Defendants' public statements omitted numerous material facts regarding Bayer's due diligence efforts in relation to the Monsanto acquisition. The Court upheld these allegations following extensive briefing. *Bayer*, 2021 WL 4864421, at *3. Because the Complaint alleges numerous actionable omissions, the Class is also entitled to rely on the *Affiliated Ute* presumption to establish reliance.

B.     **Superiority: A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action.**

Rule 23(b)(3) directs courts to consider four factors in evaluating whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy":

> the class members' interests in individually controlling the prosecution . . . of separate actions; the extent and nature of any litigation concerning the controversy already begun by . . . class members; the desirability . . . of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Each of these factors is satisfied here. First, Plaintiffs are unaware of any Class member who would prefer to prosecute her claims individually. Second, Plaintiffs are aware of no individual litigation seeking the same redress as the Complaint. Third, the geographical dispersion of Class members means that it is desirable for their claims to be litigated in a single forum to avoid inconsistent adjudications and promote fairness and efficiency. Finally, this case presents no unusual management difficulties. Judicial economy and the best interests of the Class thus favor class certification, and the alternative would deprive the Class of any practical recourse.

### III.     PROPOSED CLASS COUNSEL SATISFY RULE 23(G).

In appointing class counsel, courts consider counsel's work "in identifying or investigating potential claims," "experience in handling class actions," and "knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1). These factors favor appointing Cohen Milstein as Class Counsel. *See supra* § I.D.

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion should be granted.

Dated:  October 28, 2022

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By:      */s/ Carol V. Gilden*
    Carol V. Gilden (admitted *pro hac vice*)

190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
Email: cgilden@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: stoll@cohenmilstein.com

Chris Lometti (admitted *pro hac vice*)
Benjamin F. Jackson (admitted *pro hac vice*)
Norhan Bassiouny (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
Email: clometti@cohenmilstein.com
        bjackson@cohenmilstein.com
        nbassiouny@cohenmilstein.com

*Lead Counsel*

Nicole Lavallee (SBN 165755)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
         avahdat@bermantabacco.com

*Liaison Counsel*

*Attorneys for Lead Plaintiffs Sheet Metal Workers'
National Pension Fund and International Brotherhood
of Teamsters Local No. 710 Pension Fund, and Named
Plaintiff International Union of Operating Engineers
Pension Fund of Eastern Pennsylvania and Delaware*