Jordan Eth (CA SBN 121617)
JEth@mofo.com
**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, CA  94105
Telephone:  (415) 268-7126
Facsimile:  (415) 268-7522

William Savitt (*pro hac vice*)
Noah B. Yavitz (*pro hac vice*)
Emily R. Barreca (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for defendants Bayer*
*Aktiengesellschaft, Werner Baumann,*
*Werner Wenning, Liam Condon,*
*Johannes Dietsch, and Wolfgang Nickl*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>Defendants. | Case No.:  3:20-cv-04737-RS<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**<br><br><u>CLASS ACTION</u><br><br>Date:  April 13, 2023<br>Time:  1:30 p.m.<br>Judge:  Richard Seeborg<br>Courtroom:  3 — 17th Floor |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................ 6

I.   CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS
     HAVE NOT PROVEN THAT THEIR CLAIMS ARE TYPICAL OF THE
     PROPOSED CLASS. ............................................................................................. 8

II.  CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS
     HAVE NOT PROVEN THAT COMMON ISSUES PREDOMINATE. ............................ 14

     A.  Plaintiffs have not presented a common methodology for proving that
         putative class members traded Bayer ADRs domestically. ............................... 15

     B.  Plaintiffs have not proven that damages are capable of measurement on a
         class-wide basis consistent with their theory of liability. ................................. 18

     C.  Plaintiffs fail to establish their entitlement to the *Basic* presumption
         throughout the proposed class period. ............................................................... 21

CONCLUSION ............................................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Amchem Prods.* v. *Windsor*,
521 U.S. 591 (1997) .......................................................................................................... 7

*Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ..................................................................................................... 16, 22

*Affiliated Ute Citizens of Utah* v. *United States*,
406 U.S. 128 (1972) .................................................................................................... 22 n.4

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988) ..................................................................................................... 21, 22

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014) ............................................................................................ 9

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013) ................................................................................................... *passim*

*Crago* v. *Charles Schwab*,
2021 WL 4990234 (N.D. Cal. Oct. 27, 2021) ............................................................ 22 n.4

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ......................................................................................................... 6

*Hanon* v. *Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ................................................................................... 8, 13, 14

*In re Apple Inc. Sec. Litig.*,
2022 WL 354785 (N.D. Cal. Feb. 4, 2022) .................................................................. 18 n.2

*In re BofI Holding, Inc. Sec. Litig.*,
2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) .................................................................. 18

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017) ......................................................................................... 9, 16

*In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ........................................................................................ 22 n.4

*J.H. Cohn & Co.* v. *Am. Appraisal Ass'n*,
628 F.2d 994 (7th Cir. 1980) ......................................................................................... 14

*Lierboe* v. *State Farm Mut. Auto. Ins. Co.*,
350 F.3d 1018 (9th Cir. 2003) ......................................................................................... 8

*Loritz* v. *Exide Techs.*,
2015 WL 6790247 (C.D. Cal. July 21, 2015) ........................................................ 18, 19, 21

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) ................................................................................................ *passim*

*Mulderrig* v. *Amyris*,
340 F.R.D. 575 (N.D. Cal. 2021) .......................................................................... 18 n.2

*Nguyen* v. *Nissan N. Am., Inc.*,
487 F. Supp. 3d 845 (N.D. Cal. 2020) ........................................................................ 8

*Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ......................................................................... 6, 14,16

*Patel* v. *Facebook, Inc.*,
932 F.3d 1264 (9th Cir. 2019) ................................................................................. 16

*Pelletier* v. *Endo Int'l PLC*,
338 F.R.D. 446 (E.D. Pa. 2021) .......................................................................... 18 n.2

*Scor Holding (Switz.) AG Litig.*,
537 F. Supp. 2d 556 (S.D.N.Y. 2008) ...................................................................... 23

*Smyth* v. *China Agritech, Inc.*,
2013 WL 12136605 (C.D. Cal. Sept. 26, 2013) ......................................................... 8

*Stoyas* v. *Toshiba Corp.*,
896 F.3d 933 (9th Cir. 2018) ................................................................................. *passim*

*Stoyas* v. *Toshiba Corp.*,
2022 WL 220920 (C.D. Cal. Jan. 25, 2022) ................................................... 10, 11, 18

*Wang* v. *Chinese Daily News, Inc.*,
737 F.3d 538 (9th Cir. 2013) ..................................................................................... 6

*Werdebaugh* v. *Blue Diamond Growers*,
2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ......................................................... 18

**<u>Rules</u>**

Fed. R. Civ. P. 23 ................................................................................................ *passim*

**INTRODUCTION**

Plaintiffs seek class certification on the premise that this is a run-of-the-mill securities fraud action. According to plaintiffs, they purchased Bayer American depositary receipts (ADRs) domestically in over-the-counter trades, then sustained readily calculable damages when defendants' alleged misrepresentations were revealed as false. On those facts, plaintiffs contend that they have established each condition set out in Rule 23 of the Federal Rules of Civil Procedure.

Reality is far different. In fact, there is insufficient evidence to establish that the named plaintiffs purchased *any* Bayer ADRs in this country. To the contrary, brokerage records and contemporaneous trade communications show that plaintiffs acquired ADRs by instructing their brokers to purchase Bayer ordinary shares *in Europe* for immediate conversion into newly issued ADRs. And plaintiffs were not the only putative class members to undertake such trades; market evidence indicates that tens of millions of Bayer ADRs were created in similar globe-hopping transactions during the proposed class period. Expert analysis and precedent within this Circuit establish that plaintiffs' ADR purchases were extraterritorial, and as such are inactionable under *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010)*,* which limited Section 10(b) to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id*. at 267. Plaintiffs have thus failed to satisfy Rule 23(a)(3)'s typicality requirement, because their claims are subject to unique defenses. And even if plaintiffs could show that their own trades are actionable, certification would still be inappropriate under Rule 23(b)(3), because plaintiffs have offered no coherent account for how domesticity can be established on a class-wide basis for every *other* purchaser of Bayer ADRs during the proposed class period.

Nor have plaintiffs carried their burden of proving that damages are capable of measurement on a class-wide basis consistent with their theory of liability, as required under *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-34 (2013). On that point, plaintiffs rely upon the presentation of a professional expert witness who copy-and-pasted his standard methodology without any effort to tailor it to the unusual facts of this case. While that off-the-rack approach might work in the typical Section 10(b) action, it does not fit plaintiffs' theory of liability here.

Finally, plaintiffs have not shown that reliance can be proven on a common, class-wide basis throughout the proposed class period. Plaintiffs fail to establish that Bayer ADRs traded efficiently during a multi-week stretch in the middle of that period, when the average ADR price differed from that of Bayer's ordinary shares by as much as $16 per share. Without a showing of market efficiency, plaintiffs cannot establish that all prospective class members who bought Bayer ADRs during this disruption did so in reliance on the market price.

Under Rule 23, Plaintiffs had the burden to prove that this proceeding deserves class treatment. Their boilerplate motion does not carry that burden. Certification should be denied.

**BACKGROUND**

In May 2016, defendant Bayer made a $62 billion all-cash offer to acquire the agrochemical company Monsanto. ¶¶ 56, 62.[1] At the time, Monsanto was a defendant in litigation brought by customers who alleged that they developed cancer from exposure to glyphosate — the active ingredient in Monsanto's herbicide Roundup. ¶¶ 80-81. After the Monsanto merger closed in June 2018, Monsanto suffered several defeats in the pending glyphosate litigation, leading to a boom in copycat lawsuits. Although Bayer has always maintained that glyphosate is safe and non-carcinogenic, in June 2020 the company announced that to manage litigation risk it had agreed to pay up to $10.9 billion to settle current Roundup cases and establish a mechanism to resolve future claims. ¶ 190. The following month, the court overseeing that proposed settlement indicated it was unlikely to approve the resolution of future Roundup claims.

During the post-merger period, Bayer's equity valuation dropped. This decline affected Bayer ordinary shares, which are listed on the Frankfurt Stock Exchange in Germany. It also affected Bayer ADRs — negotiable instruments representing an interest in corresponding Bayer ordinary shares held on deposit by the Bank of New York Mellon ("BONY"). In BONY's capacity as the designated depositary bank for Bayer ADRs, and under an agreement entered into between BONY and Bayer, the bank accepts deposits of Bayer ordinary shares, issues corresponding ADRs, and redeems previously deposited Bayer ordinary shares upon the request of ADR holders. BONY

---

[1] All references to "¶ __" are to paragraphs in the Second Amended Complaint. Dkt. No. 107. All references to "Ex. __" are to exhibits attached to the Sealing Declaration of Emily R. Barreca.

charges a per-share fee for these services. *See* Amended and Restated Deposit Agreement at § 5.9, https://www.sec.gov/Archives/edgar/data/790075/000101915518000093/bayerdepnrec.htm.

On July 15, 2020, shortly after the proposed settlement went awry, two holders of Bayer ADRs filed a complaint claiming securities fraud by Bayer and certain of its officers and directors. Dkt. No. 1. Sheet Metal Workers' National Pension Fund (the "Sheet Metal Workers Fund") and International Brotherhood of Teamsters Local No. 710 Pension Fund (the "Teamsters Fund") were subsequently appointed as lead plaintiffs, and the International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware (the "Engineers Fund") was named as an additional plaintiff. Dkt. No. 44. Each is a large union pension fund. *Id.* at 2. As amended and narrowed following two motions to dismiss, the operative complaint alleges that over a proposed class period running from May 2016 to July 2020, defendants violated Section 10(b) and Section 20(a) of the Exchange Act by making misleading statements concerning the extent and effectiveness of Bayer's due diligence on Monsanto's glyphosate litigation.

Plaintiffs allege that they have claims under the Exchange Act because they purchased Bayer ADRs in the United States during the proposed class period. ¶ 36. Plaintiffs do not claim that they purchased Bayer ADRs on a domestic stock exchange, because Bayer ADRs do not trade on any such exchange. Instead, plaintiffs allege that they purchased Bayer ADRs "OTC" (over the counter), where ADRs transact through "inter-dealer quotation" systems. ¶¶ 46, 47. Using these trading networks, brokers seeking to purchase or sell Bayer ADRs can discover one another by posting "bid" and "ask" quotations. In aggregate, plaintiffs allege that they purchased 591,316 Bayer ADRs in 21 transactions between June 7, 2016 and June 23, 2020, all "on the OTC Market." ¶¶ 46, 47. As is typical for large pension funds, these transactions were undertaken on plaintiffs' behalf by outside investment managers, to which plaintiffs delegated full discretion to purchase and sell securities within defined policy parameters. The Sheet Metal Workers Fund and the Teamsters Fund shared an investment manager, Harding Loevner Funds, Inc. ("Harding Loevner"), ¶ 40; the Engineers Fund delegated its trading decisions to another investment manager, Hardman Johnston Global Advisors LLC ("Hardman Johnston"), ¶ 42.

Although plaintiffs have alleged that they purchased their ADRs "on the OTC Market," documents produced by their investment managers reveal otherwise. In each transaction for which sufficient evidence exists, contemporaneous communications and brokerage records show that plaintiffs' investment managers instructed their brokers to acquire ADRs by purchasing Bayer ordinary shares on the European market and converting those shares to ADRs with BONY.

For example, plaintiffs allege that on August 2, 2016, the Sheet Metal Workers Fund and the Teamsters Fund purchased 16,315 and 13,110 Bayer ADRs, respectively, for $106.6131 per ADR "on the OTC Market." ¶ 48; Dkt. No. 47 at 161, 165. Harding Loevner's records show that

Ex. S-12 (HL-002742) at '2745.

Documents produced by Instinet and BONY confirm that Harding Loevner's ADR order was faithfully executed through overseas purchase and conversion. Instinet's brokerage records show that at 8:44pm ET on August 1, Harding Loevner transmitted an order for 367,447 Bayer ADRs, to be implemented via the purchase of 367,447 Bayer ordinary shares "        ." Ex. S-13 (INSTINET000007) at rows 2-3; Ex. S-14 (INSTINET000001) at 12-13. Instinet's records show that Harding Loevner's order was then executed overseas on several European exchanges, resulting in an aggregate purchase of 367,323 ordinary shares at an average price of €94.9983 per share. Ex. S-13 (INSTINET000007). Following this acquisition, BONY reported an issuance of 367,323 new ADRs to Instinet on August 5, which were delivered to Harding Loevner for settlement. Zarcu Report ¶ 45 (citing BNYM000001).

When Instinet subsequently

Ex. S-15 (HL-002711) at 1; Zarcu Report ¶ 45. The price

paid by plaintiffs was thus determined by the market for Bayer ordinary shares, not the market for Bayer ADRs.

The available documentation indicates that this pattern of overseas purchase and ADR creation was repeated for all of the Bayer ADR purchases alleged by the Engineers Fund and the Teamsters Fund.  The same transaction structure is also present in each Bayer ADR purchase alleged by the Sheet Metal Workers Fund, save for three trades as to which virtually no evidence exists.  A detailed discussion of each transaction can be found in an expert report submitted by Cristian Zarcu, a securities professional with decades of experience executing ADR orders at major U.S. financial institutions, who has undertaken a comprehensive study of the alleged transactions at the request of defendants' counsel.  *See generally* Ex. S-3 ("Zarcu Report").

On October 28, 2022, plaintiffs moved to certify a class consisting of "all persons or entities that purchased or otherwise acquired Bayer's publicly traded [ADRs] from May 23, 2016 and to July 6, 2020," except for defendants and certain of their affiliates.  Dkt. No. 90 ("Mot.").  In that same motion, plaintiffs sought appointment as class representatives and asked the Court to designate their counsel as counsel to the proposed class.  *Id.*  Defendants now oppose class certification and plaintiffs' appointment as class representatives.

## ARGUMENT

Plaintiffs seeking class certification bear the burden of "actually prov[ing]—not simply plead[ing]—that their proposed class satisfies each requirement of" Rule 23, all by a preponderance of the evidence.  *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *see Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022).  The Court must conduct a "rigorous analysis" to determine if plaintiffs have satisfied the four requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy — as well as the requirements of at least one provision of Rule 23(b).  *Wang* v. *Chinese Daily News, Inc.*, 737 F.3d 538, 542-43 (9th Cir. 2013).

Plaintiffs' motion follows a path well-worn by investors alleging securities fraud.  Following a rote presentation on Rule 23(a), plaintiffs argue that they have also satisfied Rule 23(b)(3) — which requires the movant to establish that common issues of law or fact predominate

over individual questions and that a class action is superior to alternative methods of resolving the parties' dispute. *Amchem Prods.* v. *Windsor*, 521 U.S. 591, 615 (1997). Plaintiffs' summary approach might justify certification in the typical Section 10(b) action, but not here, where several unusual features place this litigation beyond Rule 23:

*First*, plaintiffs cannot prove typicality, because they acquired ADRs through overseas transactions that expose their claims to unique and potent defenses. Following the Supreme Court's decision in *Morrison*, Section 10(b) applies "only [to] transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 561 U.S. at 267. Plaintiffs concede that Bayer ADRs are not listed on any domestic exchange, and so they must establish that their alleged purchases were "domestic." But they cannot do so, because expert evidence and the documentary record demonstrate that plaintiffs' ADR purchases were extraterritorial. Moreover, even if the Court concludes that the question of extraterritoriality cannot or should not be resolved at this stage of the litigation, the very existence of this core dispute provides a sufficient ground to deny certification, because under governing Circuit precedent the presence of this unique and potentially dispositive defense renders plaintiffs atypical.

*Second*, plaintiffs have not identified any class-wide methodology for determining whether the putative class members traded their ADRs in the United States. Under Circuit law, and as confirmed by the record on this motion, the extraterritoriality of off-exchange ADR transactions presents an intensely transaction-specific issue, turning on expert analysis of trade communications, confirmation slips, and brokerage records. This dispositive, individualized question predominates over the common issues of law and fact identified by plaintiffs, rendering the class unsuitable for certification under Rule 23(b)(3).

*Third*, plaintiffs have also failed to articulate a class-wide methodology for calculating damages. The cut-and-paste methodology presented by their expert fails to reflect the theory of liability presented in the operative complaint and does not account for significant market factors that would have influenced any price impact from defendants' alleged misrepresentations. Plaintiffs thus fall far short of the standard for proving predominance with respect to damages.

*Finally*, plaintiffs have not shown that Bayer ADRs traded efficiently during a several-week interval in the middle of their proposed class period. Without this showing, plaintiffs cannot establish that the element of reliance is capable of class-wide resolution for the full proposed class period.

Because plaintiffs have failed to carry their burden as to typicality and predominance, they have not established their entitlement to class treatment under Rule 23. The motion for class certification should be denied.

## I. CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE NOT PROVEN THAT THEIR CLAIMS ARE TYPICAL OF THE PROPOSED CLASS.

To satisfy Rule 23(a)(3), a movant must prove by a preponderance of the evidence that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under this standard, a finding of typicality is "inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon* v. *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation omitted). The typicality inquiry thus "does not demand proof that a unique defense will ultimately defeat the class representative's claims." *Smyth* v. *China Agritech, Inc.*, 2013 WL 12136605, at *3 (C.D. Cal. Sept. 26, 2013) (internal quotation omitted). Instead, the relevant question is "only whether plaintiff is likely to be preoccupied with litigating the defense to the detriment of the class as a whole." *Id.* As such, while typicality necessarily fails where (as here) the proposed representatives lack viable claims, *see Lierboe* v. *State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003), it is also defeated where a unique defense is only "potentially dispositive" as to the claims of proposed class representatives. *Nguyen* v. *Nissan N. Am., Inc.*, 487 F. Supp. 3d 845, 860 (N.D. Cal. 2020).

Here, plaintiffs are atypical because they are vulnerable to a unique and dispositive defense: They cannot prove that any of their ADR purchases are actionable under Section 10(b) as domestic transactions. As the Ninth Circuit recently explained in *Stoyas* v. *Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018), the extraterritoriality of a trade in this context turns on where the investor incurred "irrevocable liability" for the transaction, which is determined by "where purchasers incurred the

liability to take and pay for securities and where sellers incurred the liability to deliver securities." *Id.* at 949. Under that standard, "[t]he fact that a U.S. entity places a buy order in the United States for the purchase of foreign securities on a foreign exchange is insufficient to incur irrevocable liability . . . in the United States." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 188-89 (2d Cir. 2014). Instead, the locus of irrevocable liability is determined through careful assessment of the record underlying "the formation of the [trade] contracts" and "the placement of purchase orders." *Toshiba*, 896 F.3d at 948-49. The relevant facts in this analysis "includ[e] who sold the relevant securities and how those transactions were effectuated, as evidenced by documentation such as confirmation slips." *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017) (quoted in *Toshiba*, 896 F.3d at 949). And the burden is on the plaintiff to establish domesticity. *See Morrison*, 561 U.S. at 254.

As exhaustively diagrammed in the expert report of Cristian Zarcu — a securities trader with decades of experience executing ADR orders for customers — there is insufficient evidence to conclude that plaintiffs purchased *any* ADRs on the secondary market in the United States. To the contrary, the contemporaneous record underlying the placement of purchase orders shows that plaintiffs irrevocably committed to purchase their ADRs at the moment their brokers executed the purchase of Bayer ordinary shares in Europe. Up until those foreign purchases, plaintiffs could have abandoned their ADR orders without liability. But once plaintiffs' brokers executed purchases for Bayer ordinary shares overseas, and thus committed capital to complete plaintiffs' ADR orders, plaintiffs were obligated to pay for the ADRs that they had ordered. *See* Zarcu Report ¶ 24. As Mr. Zarcu explains, drawing upon his deep experience in such transactions, this industry standard is well established — and for good reason, because if customers could simply renege upon their securities orders mid-execution, the market would cease to function. *Id.* Plaintiffs thus incurred irrevocable liability to take and pay for their ADRs outside the United States and beyond the reach of Section 10(b).

Indeed, as discussed in Mr. Zarcu's report, the facts of this case are virtually identical to those of *Toshiba*, where upon remand Judge Dean Pregerson denied class treatment of a Section 10(b) claim based on a finding that the alleged ADR purchase was extraterritorial. *See Stoyas* v.

*Toshiba Corp.*, 2022 WL 220920, at *5 (C.D. Cal. Jan. 25, 2022) (finding plaintiff atypical). In *Toshiba*, as here, the plaintiff's investment manager placed an order for ADRs to be fulfilled through the overseas purchase and conversion of foreign shares. *Id.* at *4. In *Toshiba*, as here, the investment manager's broker executed the order by purchasing foreign shares overseas for the purpose of conversion into ADRs. *Id.* In *Toshiba*, as here, the foreign shares were then converted at a depositary bank in the United States and delivered to the plaintiff as ADRs. *Id.* The *Toshiba* transaction is economically and thus legally indistinguishable from those alleged by plaintiffs here — as confirmed by Mr. Zarcu, who also served as an expert witness in that litigation. Zarcu Report ¶ 35. Weighing these facts, Judge Pregerson denied class treatment because "[o]nce [the broker] fully executed the purchase of common stock on the Tokyo Stock Exchange, [the plaintiff] was bound to take and pay for the ADRs, once converted." *Id.* at *4. The same market realities govern here, presenting a dispositive defense to plaintiffs' claims.

Anticipating that extraterritoriality would present an obstacle to certification, plaintiffs' motion responds (in a footnote) that "courts have uniformly held that purchases of sponsored ADRs on U.S. OTC markets are domestic transactions that do not raise extraterritoriality concerns." Mot. 11 n.3. But plaintiffs cannot establish that they purchased any of their ADRs on "U.S. OTC markets." Nor does it matter that Bayer "sponsored" its ADR program by entering into an exclusive depositary agreement with BONY. Sponsorship serves to facilitate stockholder communications, dividend payments, and other services related to stockownership. It does not dictate whether any given ADR transaction is domestic or extraterritorial. Zarcu Report ¶ 22. Indeed, as plaintiffs' own expert has admitted, ███████████████████ ████████████████████████████████ Ex. S-6 (Transcript of Deposition of Joshua Mitts ("Mitts Dep.")) at 60:24-61:4.

Although plaintiffs declined to brief the issue of extraterritoriality in any detail, they have offered an expert report on the topic from Professor Joshua Mitts, a law professor at Columbia Law School. *See* Dkt. No. 141-2 ("Mitts Report"). In that report, which discusses just seven trades, Prof. Mitts purports to have reviewed the transactional record for all of plaintiffs' ADR purchases. Based on this review, Prof. Mitts opines that plaintiffs incurred "irrevocable liability" for each of

their purchases in the United States. Mitts Report ¶ 41. Prof. Mitts' cursory and partial analysis in insufficient to prove typicality, for many reasons:

*First*, Prof. Mitts is a legal academic with no relevant experience in the securities industry. As he admitted at deposition, ███████████████████████████████████████ ████████████. Mitts Dep. at 17:10-14. Accordingly, unlike Mr. Zarcu, Prof. Mitts has no insight into the norms and practices of the securities industry that govern contract formation in connection with the ADR orders at issue here. Instead, Prof. Mitts' opinion is based on his experience ████████████████████████████████████████████████. *Id*. at 19-20. This lack of relevant experience renders his testimony wholly unpersuasive, because Prof. Mitts has not opined and cannot opine on the key issue: Whether plaintiffs incurred irrevocable liability to take and pay for ADRs when their brokers purchased Bayer ordinary shares overseas at plaintiffs' direction for immediate ADR conversion.

*Second*, Prof. Mitts' analysis is further hobbled by plaintiffs' strategic decision not to develop the factual record. Under *Toshiba*, the extraterritoriality inquiry turns on the nitty-gritty of purchase orders, trader communications, and contract formation. 896 F.3d at 949. On remand in that case, Judge Pregerson's analysis focused on the communications of the plaintiff's investment managers and brokers — because those were the individuals who actually conducted the alleged trade. *See Toshiba*, 2022 WL 220920, at *4. Here, plaintiffs made no effort to obtain equivalent communications from Harding Loevner, Hardman Johnston, or the brokers who executed the transactions. Indeed, plaintiffs requested no documents whatsoever from their own investment managers. Prof. Mitts's analysis of plaintiffs' transactions thus relied solely on brokerage and trade clearing records. The combination of this partial record and Prof. Mitts's inexperience led to a radical misinterpretation of plaintiffs' transactions.

For example, Prof. Mitts has offered the following analysis of the August 2, 2016 ADR purchase discussed above:

> [O]n August 2, 2016, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 13,110 sponsored Bayer ADRs from Instinet Corp. ("Instinet"). Clearing records indicate that Instinet fulfilled that order by transferring to the custody of that Plaintiff 13,110 of the 367,323 ADRs it had purchased from the Bank of New York Mellon that day. Trading records provided

by Instinet indicate that the order to purchase the foreign shares underlying this transaction was submitted at 20:44:48.560 the previous evening, August 1, 2016. Liability for Instinet's August 2 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable before the ADR order was even placed, i.e., at the time of the August 1 purchase of the foreign shares.

Mitts Report ¶ 46.  Under this telling, Instinet fulfilled plaintiffs' order by transferring newly issued ADRs that it had independently created earlier that day.  This blinks reality, ignoring ██████ ████████████ Instinet's corresponding purchase, and ██████████████████ —none of which plaintiffs obtained for Prof. Mitts.  Because Prof. Mitts lacked the communications underlying the trade, his analysis does not even attempt to address the core fact that Harding Loevner prompted Instinet's purchase of foreign shares for ADR conversion.

Third, because plaintiffs failed to supply Prof. Mitts with the key evidence, he was forced to rely on trade clearing records produced by the Depository Trust & Clearing Corporation. ██████ ██████████  But clearing records are of secondary relevance under *Toshiba*, because they demonstrate only how plaintiffs' trades ultimately settled — not how the orders were placed or how liability to purchase shares was incurred.  Clearing records thus provide at best indirect evidence of when and where an investor assumed its irrevocable obligation to "take and pay" for securities.

The danger of reliance on clearing records is well illustrated by the Mitts Report itself.  For example, Prof. Mitts presents the following analysis of the Teamsters Fund's December 9, 2016 purchase of 12,400 Bayer ADRs through Instinet:

> Clearing records indicate that Instinet acquired these ADRs by borrowing 10,000 and 40,000 ADRs from Industrial and Commercial Bank of China Financial Services in New York City, New York and Wedbush Securities / P3 Stock Loan in Los Angeles, California.  That is, the clearing records show that Instinet sold the Lead Plaintiff existing ADRs it had borrowed from other broker-dealers in the United States. For this reason, irrevocable liability for this purchase was incurred in the United States.

Mitts Report ¶ 42.  The facts are otherwise.

As detailed in the Zarcu Report, *id.* ¶¶ 60-63, plaintiffs' investment manager Harding Loevner submitted an order to its broker Instinet on the evening of December 8, 2016 for 243,245 ADRs.  Ex. S-20 (INSTINET000002) at row 2.  This order was fulfilled through a corresponding purchase order for 243,245 Bayer ordinary shares, executed overseas, which Instinet's records

confirm was "for ADRs." Ex. S-21 (INSTINET000009) at rows 2-3. Tracking the pattern observed across plaintiffs' transactions, Instinet provided Harding Loevner ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ . ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Ex. S-22 (HL-002737) at '2738. In reviewing this evidence, Mr. Zarcu has determined that the Teamsters Fund was obligated to take and pay for their ADRs as of the moment when Instinet committed capital to complete the ADR order by purchasing Bayer ordinary shares overseas. Zarcu Report ¶ 64. Thus, irrevocable liability was incurred outside the United States under *Toshiba*.

Prof. Mitts's contrary analysis of this transaction is based on the happenstance of its settlement. Records produced by BONY indicate that it issued 243,245 new ADRs to Instinet on December 16, 2016 — two days after the December 14 settlement date for Harding Loevner's ADR order. *See* Zarcu Report ¶ 66. Because of this delay in ADR issuance, Instinet was forced to fulfill plaintiffs' order by temporarily borrowing existing ADRs, as reflected in the clearing records relied upon by Prof. Mitts. *Id.* But this had no impact on plaintiffs' previously accrued "liability to take and pay for securities" or Instinet's "liability to deliver securities." *Toshiba*, 896 F.3d at 949. Indeed, plaintiffs ultimately paid the $99.2994 per share price that was set at the moment Instinet executed the purchase of ordinary shares in Europe, a price that reflected the overseas execution price plus foreign exchange and ADR issuance fees — notwithstanding the fact that Instinet was forced to settle the order through a stopgap loan of existing ADRs. This provides further confirmation that plaintiffs' commitment to "take and pay" for the ADRs accrued in Europe, where the economics of the trade were fixed.

*Finally*, even if Prof. Mitts analysis were grounded in experience and fact, it would still be insufficient to prove plaintiffs typical. As the Ninth Circuit cautioned in *Hanon*, class certification "should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." 976 F.2d at 508 (internal quotation

omitted) (citing *J.H. Cohn & Co.* v. *Am. Appraisal Assocs.*, 628 F.2d 994, 999 (7th Cir. 1980) ("[T]his court has indicated that the presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class . . . .")). Defendants have presented reliable, well-grounded opinion from an experienced industry expert showing that plaintiffs' ADR purchases were not domestic. If this case proceeds under plaintiffs' leadership, the extraterritoriality of their trades will remain a focus of their litigating efforts, since it will determine whether plaintiffs have any individual claims under the Exchange Act. Thus, even if the Court cannot resolve the extraterritoriality dispute on the present record, the case will still be disrupted by plaintiffs' efforts to overcome a unique defense.

The typicality requirement was crafted to avoid precisely the circumstance presented by plaintiffs' motion, in which facts and conduct "unique to the named plaintiffs" will derail class treatment. *Hanon*, 976 F.2d at 508. Plaintiffs have not carried their burden of proving that they are typical of the class.

## II.   CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE NOT PROVEN THAT COMMON ISSUES PREDOMINATE.

Rule 23(b)(3) requires that "the questions of law or fact common to the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). As the Ninth Circuit recently concluded in a thorough, *en banc* re-examination of this requirement, plaintiffs seeking to show predominance must prove by a preponderance of the evidence that the "essential elements of the cause of action . . . are capable of being established through a common body of evidence, applicable to the whole class." *Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022) (affirming class certification of antitrust claims). This analysis demands a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the class-wide evidence to prove the common question in one stroke." *Id.* (internal quotation and alteration omitted).

Plaintiffs have failed to prove predominance as to multiple elements of their claims, each of which provides a separate ground for denial of class certification:

*First*, independent of whether plaintiffs themselves purchased their Bayer ADRs domestically, they have not presented a common, class-wide methodology for establishing that *other* class members purchased their Bayer ADRs domestically. Extraterritoriality presents a central issue in this litigation, dictating whether each putative class member has any claim at all. However, as *Toshiba* instructs and the record on this motion confirms, the question of domesticity for off-exchange trades cannot be answered with documents typically accessible to investors, such as monthly account statements. Resolution instead turns upon an expert review of transaction-specific trading and brokerage records, often available only through subpoena. That analysis cannot be conducted on a class-wide basis, precluding a finding of predominance.

*Second*, plaintiffs have not carried their burden of showing that damages are capable of measurement on a class-wide basis consistent with their theory of liability. *See Comcast*, 569 U.S. at 33-34. Plaintiffs' expert contends that damages can be measured through a generic "out of pocket" model, in which price inflation will be measured day-to-day throughout the proposed class period. While courts within this Circuit have approved of that approach in prior Section 10(b) litigation, it does not suffice to capture the unusual features of this case, including plaintiffs' "materialization of the risk" theory of liability. Plaintiffs have thus failed to comply with the Supreme Court's directive in *Comcast*.

*Third*, plaintiffs have not shown that reliance can be established on a class-wide basis throughout the proposed class period. In particular, plaintiffs fail to establish that Bayer ADRs traded in an efficient market for a several-week period in June 2018. Without a showing of market efficiency, each class member who purchased Bayer ADRs during this period would need to prove reliance individually, precluding a finding of predominance.

### A. Plaintiffs have not presented a common methodology for proving that putative class members traded Bayer ADRs domestically.

As discussed above, a plaintiff asserting a violation of Section 10(b) bears the burden to plead and prove that they transacted domestically. *See supra* p. 9. This showing goes to a basic element of the Section 10(b) claim — whether fraud was committed "in connection with" a securities transaction governed by the antifraud statute. *Morrison*, 561 U.S. at 272. For that

reason, extraterritoriality presents an "essential element[] of the cause of action," which plaintiffs must show by a preponderance of the evidence is "capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666; *see also Patel* v. *Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019) (affirming grant of class certification as to claims under Illinois state law, but cautioning that "if future decisions or circumstances lead to the conclusion that extraterritoriality must be evaluated on an individual basis, the district court can decertify the class").

The Second Circuit's decision in *In re Petrobras Securities Litigation* is instructive on this point. 862 F.3d 250 (2d Cir. 2017). There, the Second Circuit considered a proposed class that included investors in a Brazilian company's debt securities that traded over-the-counter in the United States. *Id.* at 256-57. Applying the extraterritoriality standard subsequently adopted by this Circuit in *Toshiba*, the Second Circuit vacated class certification for lack of predominance, concluding that "the investigation of domesticity appears to be an 'individual question' requiring putative class members to 'present evidence that varies from member to member,'" including "transaction-specific facts" that "are not obviously 'susceptible to class-wide proof.'" *Id.* at 272 (internal quotation omitted). Because resolving the issue of extraterritoriality would require individualized evidence, the Second Circuit concluded that "it cannot be said that the class members' *Morrison* inquiries will 'prevail or fail in unison.'" *Id.* at 273-74 (quoting *Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013)).

The same reasoning applies here. As the Ninth Circuit made clear in *Toshiba*, proof of domesticity requires a careful review of facts "concerning contract formation, placement of purchase orders, passing of title, and the exchange of money." 896 F.3d at 949. If plaintiffs' proposed class were certified, transaction-specific evidence would need to be collected and reviewed for every single class member.

The record of this proceeding shows why class treatment will not work. In preparing their complaint, plaintiffs were advised by able counsel who had an ethical responsibility to assure themselves of the accuracy of plaintiffs' allegations. Yet, even after that inquiry, plaintiffs incorrectly alleged that they had purchased all of their Bayer ADRs domestically "on the OTC

Market." ¶¶ 48, 49. Plaintiffs did not realize their error until years later, after issuing subpoenas for trading records and retaining a law professor to spend ███████ hours poring through those files. Mitts Dep. at 48:7-14. And even then, plaintiffs got it wrong. As the Zarcu Report makes clear, yet more fact development was necessary, because the rule in *Toshiba* requires an examination of the communications through which trade contracts were formed. This resource-intensive process cannot conceivably be repeated for the entire class — and certainly does not present a "common body of evidence" for class-wide resolution.

In an attempt to paper over this obvious defect, plaintiffs point to contrary opinion from their law professor, Prof. Mitts. Mitts Report ¶ 51. Prof. Mitts advances two arguments for why extraterritoriality can be determined on a class-wide basis. Neither has any merit.

*First*, Prof. Mitts asserts that "the overwhelming majority of purchases in Bayer sponsored ADRs consisted of domestic purchases of *existing* ADRs on the secondary market." Mitts Report ¶ 52. To begin, this is irrelevant. Even if most Bayer ADR purchases during the proposed class period were demonstrably domestic, that would not absolve plaintiffs of their obligation to prove that extraterritoriality is capable of resolution on a class-wide basis by common evidence. Absent this proof, every class member would be required to present extensive, individualized evidence to prove that they transacted domestically. Moreover, as detailed in the Zarcu Report, Prof. Mitts's assessment of the prevalence of ADR issuances is incorrect. In reality, more than <u>17%</u> of ADR purchases during the proposed class period were fulfilled through the issuance of new ADRs. Zarcu Report ¶ 125. This is not a problem that can be swept under the rug, as Prof. Mitts suggests.

*Second*, Prof. Mitts argues that BONY's "ordinary practice" as the depositary bank for Bayer ADRs was to "require[e] foreign shares to be in the custody of the purchaser prior to issuing ADRs, such that the purchaser's irrevocable liability to purchase ADRs arises only after the purchase of foreign shares had already occurred." Mitts Report ¶ 53. But this simply presumes the conclusion that an investor cannot irrevocably commit to an ADR issuance prior to that issuance. Once again, Prof. Mitts ignores the market reality described by Mr. Zarcu and recognized by Judge Pregerson in *Toshiba* — when an investor places an ADR order to be fulfilled through the purchase of foreign shares, that investor is "bound to take and pay" for the ADRs as soon as its broker has

committed capital by executing the requested purchase. Zarcu Report ¶ 24; *Toshiba*, 2022 WL 220920, at *5. BONY's policies are beside the point.

> **B.      Plaintiffs have not proven that damages are capable of measurement on a class-wide basis consistent with their theory of liability.**

Certification of the proposed class should also be denied because plaintiffs have not proven that damages can be calculated on a class-wide basis consistent with their theory of liability. Under the Supreme Court's decision in *Comcast*, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." 569 U.S. at 35.[2] Consistent with that direction, courts in this Circuit have rejected certification where plaintiffs "failed to set forth a viable damages theory tied to [their] theory of liability." *Loritz* v. *Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015); *see also, e.g.*, *Werdebaugh* v. *Blue Diamond Growers*, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014).

To carry their burden under *Comcast*, plaintiffs solicited the services of Chad Coffman, a serial expert who has opined that because the economic issues in this matter are "▮▮▮▮▮▮" to other securities fraud cases, a generic "out-of-pocket" model is appropriate. Ex. S-30 (Deposition of Chad Coffman ("Coffman Dep.")) at 233:18-234:5. Mr. Coffman thus concludes that class damages can be determined by calculating "artificial inflation in the share price at the time of [ADR] purchase minus the artificial inflation per share at the time of [ADR] sale." Coffman Report ¶ 81.

While courts within this Circuit have found "out-of-pocket" models to be sufficient for purposes of certifying Section 10(b) classes, *see, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *7 (S.D. Cal. Aug. 24, 2021), Mr. Coffman does not even try to explain how he would adapt this approach to the unique complexities of this case. Indeed, at deposition, Mr. Coffman conceded that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] Plaintiffs suggest that the requirements of *Comcast* may not apply to securities class actions. *See* Mot. at 15 n.4 (citing *Pelletier* v. *Endo Int'l PLC*, 338 F.R.D. 446, 487 (E.D. Pa. 2021)). Plaintiffs are wrong. *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *10-12 (N.D. Cal. Feb. 4, 2022) (applying *Comcast* to Section 10(b) claim); *Mulderrig* v. *Amyris*, 340 F.R.D. 575, 587 (N.D. Cal. 2021) (same).

███████████████. Coffman Dep. at 211:7-9. This one-size-fits-all methodology falls "far short" of carrying plaintiffs' *Comcast* burden. *Comcast*, 569 U.S. at 34; *see also Exide Techs.*, 2015 WL 6790247, at *22 (plaintiffs' "general techniques for computing damages in securities fraud cases" insufficient under *Comcast*).[3]

As discussed below, and further detailed in an opinion submitted by Mark Garmaise, Professor of Finance at the University of California, Los Angeles, these gaps in Mr. Coffman's methodology render it unsuitable for the class-wide assessment of damages. Ex. S-2 ("Garmaise Report"). This provides yet another independent ground for the rejection of plaintiffs' proposed class.

### 1. Plaintiffs have not presented a damages methodology consistent with their "risk materialization" theory of liability.

Under plaintiffs' theory of liability, Bayer's alleged misrepresentations led the market to underestimate the litigation risk posed by the pending glyphosate litigation, causing loss when that risk later materialized through adverse developments in the litigation. ¶ 310. However, even where a company has accurately described a litigation risk, its stock price is still expected to decline when that risk actually materializes. A class-wide damages methodology under plaintiffs' risk-materialization theory would thus need to assess the degree to which the risk was understated, not simply the market reaction to negative developments in the glyphosate litigation.

This principle can be illustrated through a simple example: Suppose that a pending trial will result either in a verdict for Company A or a verdict for $100 million in damages against Company A. Suppose further that the probability of Company A losing is 15%, but that it has deceived the market into believing the probability of loss is only 5%. In the event of an adverse verdict, the probability of loss will increase to 100%, and the market value of Company A will decline by $95 million (95% x $100 million). Even if the market had not been deceived, however, the value of Company A would still have declined by $85 million (85% x $100 million). Under this stylized example, investors suffered a $10 million loss from Company A's deception—but this loss is

---

[3] As Mr. Coffman admitted at deposition, ████████████████████████████
████████████████████████ Coffman Dep. at 232:14-17.

untethered to the drop in market value. As Prof. Garmaise sets out in his report, this dynamic means that "the full price decline resulting from the *realization* of a risk is not a reliable measure of inflation resulting from an alleged misrepresentation about the *degree* of risk," leading to an overstatement of inflation. Garmaise Report ¶ 40.

As plaintiffs recognize, investors were aware that the glyphosate litigation presented a non-trivial liability risk. *See* Garmaise Report ¶¶ 34 & n.46. Mr. Coffman has acknowledged the resulting complexity presented by plaintiffs' "risk materialization theory of liability," Dkt. No. 141-1 ("Coffman Report") ¶ 15 & n.22, but has undertaken no effort to present a damages methodology that could address it on a class-wide basis. This failure is fatal to class certification under *Comcast*.

### 2. Plaintiffs fail to present a class-wide method to account for investors' evolving expectations as to whether Bayer would acquire Monsanto.

For the first two years of the proposed class period, Monsanto was a separate company from Bayer, and it remained uncertain whether Bayer would ultimately acquire Monsanto. *See* Garmaise Report ¶ 48 & n.62. This presents a significant hurdle to the class-wide measurement of damages, because it will require plaintiffs to model market expectations concerning the merger. Again, a stylized example is illustrative: Suppose that Monsanto's true exposure in the glyphosate litigation was $100 million, but that defendants' alleged misrepresentations led the market to believe that the exposure was only $20 million. If the market believed that Bayer was certain to acquire Monsanto, then these assumptions would imply inflation of $80 million in Bayer's market value. But if the market believed that the likelihood of merger was only 50%, then the same assumptions would imply inflation of $40 million (50% x $80 million) in Bayer's market value.

Absent a reliable methodology to control for this factor, it is not possible to determine damages on a class-wide basis — because any damages model that ignores its influence would necessarily overcompensate investors who purchased their Bayer ADRs before the merger closed in June 2018. Garmaise Report ¶ 50. As Prof. Garmaise observes, this problem is not easily solved. Analyst reports indicate that investor assessments of the probability that Bayer would acquire Monsanto varied widely from one another and over time. *See* Garmaise Report ¶¶ 52-56 (noting widely variable estimates, ranging from 30% to 90%).

Once again, Mr. Coffman has ███████████████████████████████████ ███████████████████████ Coffman Dep. at 224:16-225:5.  Plaintiffs' proposed methodology thus "fails to tie" its proposed calculation techniques "to the facts of [the] case," as required under *Comcast*.  *Exide Techs.*, 2015 WL 6790247, at *22.

> **3.    Plaintiffs offer no class-wide method to isolate damages resulting from the alleged corrective disclosures or account for variation in inflation.**

The lack of a damages model tied to plaintiffs' theory of liability is "particularly problematic" in cases such as this one, where plaintiffs allege nearly twenty misrepresentations and five separate corrective disclosure events over a four-year class period.  *Id.*  Perplexingly, plaintiffs allege that Bayer's statements were corrected by certain events in the Roundup litigation but not other, equivalent developments, such as the public release of internal Monsanto documents in March 2017 and public trial proceedings in July 2018.  Mr. Coffman does not offer any method for identifying which glyphosate litigation developments would be relevant for measuring damages and which would not be, in light of these numerous information releases.  *See* Garmaise Report ¶¶ 57-66.

Nor does Mr. Coffman explain how his proposed model would account for the continuous release of new information on Monsanto's potential litigation liability and ongoing changes to Bayer's business over the proposed four-year class period present additional challenges for calculating damages class-wide.  *See* Garmaise Report ¶¶ 67-76.  Rather than addressing these issues, Mr. Coffman simply offers a broad assurance that damages could be calculated using a laundry list of common valuation techniques.  *See* Coffman Report ¶ 85.  Supreme Court precedent makes clear that this is insufficient.  *Comcast*, 569 U.S. at 35.  Because plaintiffs thus offer no method to calculate damages under their own theory of the case accounting for investor-specific expectations, they "cannot possibly" establish that damages are susceptible to class-wide measurement.  *Id.*

> **C.    Plaintiffs fail to establish their entitlement to the *Basic* presumption throughout the proposed class period.**

Finally, plaintiffs have not shown that the element of reliance is capable of resolution on a common, class-wide basis throughout the proposed class period.  To carry this burden, plaintiffs

invoke *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), where the Supreme Court recognized a rebuttable presumption that investors who traded securities in an efficient market relied on public, material misrepresentations regarding those securities.[4] *Id*. at 245-48.  The existence of an efficient market is vital to plaintiffs' motion because without the *Basic* presumption, "individual reliance issues would overwhelm questions common to the class," defeating predominance.  *Amgen*, 568 U.S. at 462-63.

Plaintiffs fail to show that the market for Bayer ADRs was efficient during a several-week period in June 2018.  As plaintiffs' own expert acknowledges, there was a large, sustained divergence between the trading prices of Bayer ADRs on the U.S. over-the-counter market and Bayer ordinary shares on the German market during this period.  *See* Coffman Report n. 91.  In his report, Prof. Garmaise explains that this price divergence, which persisted from June 6 through June 25, 2018 and peaked at nearly $16 per ordinary share, is inconsistent with an efficient market. Garmaise Report ¶¶ 77-99.  In particular, the divergence violates the "law of one price" — the economic observation that in efficient markets, equivalent securities should trade at the same price. *Id.* ¶¶ 77, 81.  It further suggests that the price of Bayer ADRs failed to rapidly incorporate new information, undermining *Basic*'s core premise that in an efficient market, trading prices reflect publicly available material information.  *See* Garmaise Report ¶ 88; *Basic*, 485 U.S. at 247.  As Prof. Garmaise explains, while Mr. Coffman posits that a "combination" of several different factors could explain the price divergence in June 2018, none of those factors can account for the wide gap in trading prices and several are inconsistent with an efficient market for Bayer ADRs.  *See* Garmaise Report ¶ 83-97 (discussing Coffman Report n.91).

Accordingly, because plaintiffs have not established that Bayer's ADRs traded in an efficient market from June 6, 2018 through June 25, 2018, they cannot invoke the *Basic* presumption to satisfy predominance for this period.  *Amgen*, 568 U.S. at 462-63; *see also In re*

---

[4] Despite plaintiffs' assertion otherwise, they cannot establish a presumption of reliance using the criteria set forth in *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), as they do not base their claims primarily on omissions.  *See* Mot. at 16; *Crago* v. *Charles Schwab*, 2021 WL 4990234 (N.D. Cal. Oct. 27, 2021) (citing and discussing *In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2 F.4th 1199 (9th Cir. 2021)).

*Scor Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008) (declining to certify a class covering a time period for which plaintiffs failed to establish market efficiency).  Given the lack of evidence that Bayer ADRs traded efficiently for several weeks in June 2018, the Court should not approve any class that includes this period.

## CONCLUSION

As set forth above, plaintiffs have failed to carry their burden of proving by the preponderance of the evidence that they have satisfied the conditions of Rule 23.  Class certification should be denied.

Dated: February 3, 2023

By: */s/Jordan Eth*
Jordan Eth (CA SBN 121617)
JEth@mofo.com
**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, CA  94105
Telephone:  (415) 268-7126
Facsimile:  (415) 268-7522

William Savitt (*pro hac vice*)
Noah B. Yavitz (*pro hac vice*)
Emily R. Barreca (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for defendants Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl*