# EXHIBIT O-2
# (REDACTED)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and

INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,

Plaintiffs,

v.

BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,

Defendants.

Case No.: 3:20-cv-04737-RS

**Rebuttal Report of Cristian Zarcu**
February 3, 2023

HIGHLY CONFIDENTIAL

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   ASSIGNMENT AND COMPENSATION ......................................................... 2

III.  SUMMARY OF OPINIONS ............................................................................. 3

IV.   BACKGROUND ................................................................................................ 4

      A.    ADRs ........................................................................................................ 4

      B.    The Lifecycle of an ADR Purchase ......................................................... 5

V.    PLAINTIFFS INCURRED IRREVOCABLE LIABILITY TO TAKE
      AND PAY FOR BAYER ADRS OUTSIDE THE UNITED STATES ............................. 6

      A.    June 6, 2016 Purchases by SMW and Local 710 .................................... 7

      B.    August 2, 2016 Purchases by SMW and Local 710 .............................. 14

      C.    December 8, 2016 Purchases by SMW and Local 710 .......................... 23

      D.    December 18, 2017 Purchases by SMW and Local 710 ........................ 27

      E.    November 17, 2016 Purchase by IUOE .................................................. 31

      F.    February 22 and 23, 2017 Purchases by IUOE ...................................... 34

      G.    May 26 and May 27, 2020 Purchases by IUOE ..................................... 37

      H.    June 3, 2020 and June 4, 2020 Purchases by IUOE .............................. 43

      I.    June 23, 2020 Purchase by IUOE .......................................................... 48

      J.    February 14, March 27 and October 18, 2018 Purchases by SMW ..................... 51

VI.   IT IS NOT POSSIBLE TO DETERMINE ON A CLASS-WIDE
      BASIS THAT THE PROPOSED CLASS MEMBERS INCURRED
      IRREVOCABLE LIABILITY IN THE UNITED STATES FOR
      THEIR PURCHASES OF BAYER ADRS .................................................................... 52

VII.  CONCLUSION ................................................................................................. 54

HIGHLY CONFIDENTIAL

## I.  INTRODUCTION

1.  I am the founder, President, and Chief Operating Officer of TradeDynamiX, a financial services firm that offers a proprietary trade analytics suite, TDX, for securities brokers, dealers, regulators, and exchanges.  I hold Bachelor of Science degrees in finance and economics from the University of Idaho, and have been a member of the advisory board of the College of Business and Economics at the University of Idaho since 2015.  I passed the General Securities Principal Qualification Examination administered by the Financial Industry Regulatory Authority, Inc. ("FINRA"), and previously maintained Series 7, 24, 63, 55, and 3 licenses.

2.  I designed and developed TDX, including its surveillance algorithms and data visualization tools.  I also designed and currently operate a systematic trading operation, which includes fully automated portfolio analysis and modeling, rebalancing and trading on a daily basis in various asset classes, including stocks, options, American Depositary Receipts (ADRs), exchange-traded funds (ETFs), exchange-traded notes, and cryptocurrencies.

3.  Prior to founding TradeDynamiX in 2013, I was a managing director and head of the Analytic Trading Solutions group at Lazard Capital Markets from 2009 to 2012.  At Lazard, I was charged with modernizing the company's trading systems and technology infrastructure.

4.  From 2004 to 2009, I was a managing director and head of the Automated Trading Solutions group at Wachovia (now Wells Fargo). During that time, I designed Wachovia's suite of Automated Trading Solutions offerings, which provided trading analytics data and algorithmic trading, program trading, and direct market access trading facilities.

5.  From 2001 to 2004, I was a managing director and Head of Program Trading at Bank of America; from 2000 to 2001, I was the Head of the Agency Portfolio trading desk at Commerzbank Securities; and from 1995 to 2000, I was a trader at Salomon Brothers.

6.  Throughout my trading career, I have been involved in trading various asset classes, including ADRs, stocks, ETFs, bonds, and foreign exchange. In my capacity as a trader, I have advised clients on how to design and implement the most appropriate trading strategies for

the asset classes they were trading, in order to help them achieve their investment goals.  In connection with this work, I have executed countless ADR transactions on behalf of clients.

7.      During my time at Lazard, Wachovia, and Bank of America, I managed all regulatory, risk, and compliance aspects of the respective trading groups that I oversaw. In those roles, I was required to be readily familiar with the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and FINRA, federal securities laws, and internal compliance guidelines.  The compliance and regulatory aspects of these roles also involved, among other things, close interaction with the SEC and FINRA during periodic compliance examinations that I oversaw.

8.      A copy of my *curriculum vitae* is attached hereto as Appendix A.

## II.   ASSIGNMENT AND COMPENSATION

9.      I have been engaged by Defendants' counsel to respond to the opinions expressed in the expert report of Professor Joshua R. Mitts (the "Mitts Report") and to analyze the purchases of Bayer AG ADRs alleged in this action by plaintiffs Sheet Metal Workers' National Pension Fund ("SMW"), International Brotherhood of Teamsters Local No. 710 Pension Fund ("Local 710"), and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("IUOE," and together with SMW and Local 710, "Plaintiffs").

10.     I have been asked to consider two issues:

a.      *first*, whether Plaintiffs incurred irrevocable liability to take and pay for their purchases of Bayer ADRs in the United States; and

b.      *second*, whether it is possible to determine on a class-wide basis that members of the class proposed by Plaintiffs incurred irrevocable liability to take and pay for their purchases of Bayer ADRs in the United States.

11.     The analysis and opinions offered in this report are based upon my decades of experience as a securities trader and head of multiple trading desks, including my experience trading and executing orders to trade ADRs and foreign shares, my experience designing,

implementing, and operating trading systems, my education, my experience in performing similar analyses, the information, documentation, facts, and data as set out in Appendix B, and accepted and reliable methodologies, principles, and approaches.

12.     I am being compensated at an hourly rate of $1,050 for this report and for any testimony offered in this matter.  My compensation is not contingent on the outcome of this litigation.

13.     I have performed the analysis contained in this report with the information presently available to me.  I reserve the right to amend and/or supplement this analysis and report should additional or updated information become available.  If I am requested to testify, I may illustrate my testimony with demonstrative aids such as graphs, charts and/or slides.

## III.     SUMMARY OF OPINIONS

14.     For the reasons discussed in this report, I disagree with the conclusions offered in the Mitts Report.

15.     *First*, I have concluded that there is insufficient evidence to conclude that Plaintiffs incurred irrevocable liability to take and pay for any of their Bayer ADR purchases in the United States.  Moreover, as to all but three ADR purchases alleged by Plaintiffs—for which the evidence is insufficient to reach any well-supported conclusion—trading records show that Plaintiffs purchased Bayer ordinary shares (ticker symbol BAYN) outside the United States for immediate conversion to Bayer ADRs (ticker symbol BAYRY), thus incurring irrevocable liability to take and pay for each ADR order outside the United States.

16.     *Second*, I have concluded that it is not possible to determine on a class-wide basis whether members of the proposed class incurred irrevocable liability to take and pay for their individual ADR purchases in the United States, because the analysis turns upon an individualized inspection of trading communications and records.

## IV.    BACKGROUND

### A.    ADRs

17.    ADRs are negotiable financial instruments denominated in U.S. dollars, which represent an interest in the equity of a foreign company.[1]  ADRs are issued by depositary banks, which hold the underlying foreign shares on deposit.  The depositary bank provides a variety of services, from handling the operational complexity of creating and redeeming ADRs to distributing dividends to the ADR holders.  In return, the ADR holder pays a depositary fee, which is usually between 0 and 5 cents per share per year.  ADRs thus offer U.S. investors a mechanism to purchase equity in international companies without having to transact in foreign currencies.  If an investor chooses to redeem ADRs, it may deposit those ADRs with the depositary bank, which will then cancel the ADRs and at the same time deliver to the investor the redeemed foreign shares that were being held on deposit.[2]

18.    ADR programs can be structured as "sponsored" or "unsponsored."  A sponsored ADR is issued by the depositary bank in collaboration with the foreign company, while an unsponsored ADR is established without the foreign company's involvement.[3]  Sponsorship streamlines communications between issuers and stockholders, dividend payments, and other services related to stockownership.  Sponsored ADRs may trade on either a U.S. stock exchange or "over-the-counter" through inter-broker transactions[4]

---

[1] As a definitional matter, an ADR is a physical certificate that evidences ownership of an American Depositary Share (ADS), which is the actual security that investors trade.  *See* Am. Depositary Receipts, Release No. 274, 1991 WL 294145, at *2 n.5 (May 23, 1991). To avoid confusion, given the broader use of the term "ADR" by Prof. Mitts and Plaintiffs, I use "ADR" throughout my report to refer to the underlying ADS.

[2] *See* SEC Office of Investor Education and Advocacy, *Investor Bulletin: American Depositary Receipts*, available at https://www.sec.gov/investor/alerts/adr-bulletin.pdf.

[3] *Id.*

[4] For example, sponsored ADRs of the Chinese company Alibaba trade on the New York Stock Exchange under the ticker symbol BABA, while Bayer's sponsored ADRs trade over-the-counter.

### B.     The Lifecycle of an ADR Purchase

19.     An ADR purchase order begins with an investor who has determined to take an equity position in a foreign company.  An investor seeking to acquire foreign equity typically must choose between purchasing ADRs or purchasing shares on a foreign exchange where the ordinary shares of the foreign company are listed.[5]  If the investor chooses to acquire ADRs, they are faced with a second decision: whether to (a) acquire existing ADRs or (b) purchase shares on the foreign exchange and arrange for the issuance of new ADRs by depositing the foreign-bought shares with a depositary bank.

20.     While the decision whether to purchase existing ADRs or purchase foreign shares for the creation of new ADRs turns on a range of factors, in my experience the relative cost of trade execution is the predominant consideration.  When an investor seeks to purchase a large block of ADRs, the execution cost is heavily influenced by the liquidity of the market for existing ADRs, because the number of ADRs available and offered for trade may not be sufficient to accommodate the trade in a cost-efficient manner.  Indeed, in circumstances where an investor seeks to acquire a large block of ADRs, the available liquidity of existing ADRs may be insufficient to accommodate the trade at all.  In that circumstance, the investor's only option is to acquire the issuer's shares overseas, deposit them with a depositary bank, and receive newly issued ADRs.

21.     Unless directed otherwise by an investor, a securities professional executing an ADR purchase on an investor's behalf will typically review the volume of ADRs traded in the United States, the bid-ask spread, and market volatility to forecast the potential cost of that execution in the U.S. markets, then compare that predicted cost to the cost associated with

---

[5] Not all investors have both options, however.  In particular, some U.S. pension funds have internal policies that prohibit them from investing directly in the ordinary shares of foreign companies, while allowing investment in ADRs. ███████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████ *See* Ex. Z-1 (PLTFS-IUOE-000001) at 15, 16, 24.

creating new ADRs. Those latter costs include the price to be paid for the foreign shares and the cost of exchanging U.S. dollars into the local currency, along with any custodial or settlement fees associated with the transaction.

22.     The status of an ADR as "sponsored" or "unsponsored" does not impact the decision whether to acquire existing ADRs or create new ADRs through overseas purchases. Instead, that decision is made on a trade-by-trade basis based on the factors described in the preceding paragraphs, requiring a comparison of liquidity, bid-ask spread, and market volatility in the U.S. market for previously issued ADRs and the overseas market.

## V.     PLAINTIFFS INCURRED IRREVOCABLE LIABILITY TO TAKE AND PAY FOR BAYER ADRS OUTSIDE THE UNITED STATES

23.     Based on my review of the Mitts Report, I understand that Prof. Mitts has concluded that Plaintiffs incurred irrevocable liability in the United States for each of their alleged purchases of Bayer ADRs.[6] Prof. Mitts's conclusion is clearly refuted by the available evidence, key portions of which I understand were not available to him when he offered his opinion. Based on my review of the record, and drawing on my extensive experience executing similar transactions, I have concluded that at least 18 of Plaintiffs' 21 alleged purchases of Bayer ADRs all followed the same pattern: Plaintiffs' investment managers directed their brokers to acquire ADRs by purchasing Bayer ordinary shares outside the United States and converting those shares to newly issued ADRs via Bank of New York Mellon ("BNY Mellon"), the depositary bank for Bayer ADRs.[7]

---

[6] Expert Report of Professor Joshua R. Mitts, Ph.D., Dkt. No. 141, Ex. B ("Mitts Report") ¶ 41. While Plaintiffs have alleged 21 purchases of Bayer ADRs in this action, Prof. Mitts opines that he "reviewed all twenty (20) purchases of Bayer sponsored ADRs" by Plaintiffs. *Id.* Based on my review of Prof. Mitts's subsequent deposition testimony, I understand that ███████████ ████████████████████████████████████████████████████████████████ ████████████. *See* Ex. Z-3 (Transcript of Deposition of Prof. Joshua Mitts) at 121-23.

[7] As I explain further below, I have concluded that, with respect to three of the purchases alleged by SMW, the evidence is altogether insufficient to identify where SMW incurred liability to take and pay. Thus, I disagree with Prof. Mitts's conclusion that SMW incurred irrevocable liability in the United States for those trades, but cannot identify where irrevocable liability was incurred.

24.     Under well-established industry practice, because Plaintiffs had placed orders for ADRs as summarized above, they were irrevocably obligated to take and pay for those ADRs when their brokers had committed funds to acquire the underlying Bayer ordinary shares overseas.  As such, Plaintiffs incurred irrevocable liability to take and pay for these alleged purchases of Bayer ADRs outside the United States.  I analyze each of Plaintiffs' purchases below, using brokerage records, confirmation slips, communications produced by Plaintiffs' investment managers, and other relevant documents to document how each transaction was ordered and executed.[8]

### A.    June 6, 2016 Purchases by SMW and Local 710

25.     Plaintiffs have alleged that on June 7, 2016, SMW and Local 710 respectively purchased 25,100 and 20,100 Bayer ADRs.[9]  The Mitts Report concludes that irrevocable liability for both of these transactions was incurred in the United States.  While Prof. Mitts does not discuss SMW's purchase, he describes Local 710's acquisition as follows:

> [O]n June 6, 2016 at 21:47:37, Macquarie Securities ("Macquarie") placed an order to purchase 577,403 foreign shares of Bayer on the Frankfurt Stock Exchange (Xetra). The records indicate that irrevocable liability for the purchase of those foreign shares was incurred at that time. The next day, June 7, at 13:28:27, Macquarie placed an order to purchase 577,403 Bayer sponsored ADRs. Clearing records show that Macquarie transferred ownership of the foreign shares it had already purchased to Citibank, in New York, who subsequently transferred them to Bank of New York Mellon.  The Bank of New York Mellon then

---

See *infra* ¶ 124 (discussing ADR purchases alleged to have taken place on February 14, March 27, and October 18, 2018).

[8] The analysis below is limited to Plaintiffs' alleged purchases.  Notably, however, my review of brokerage and trading records indicates that when SMW and Local 710 liquidated their Bayer ADR position on April 12, 2019, they likewise transacted in the overseas market.  ██████████ ████████████████████████████████████████████████████████████████  Thus, many of SMW and Local 710's ADRs *never once* transacted on the domestic market—they were created through ADR conversion and later cancelled through ADR redemption.

[9] Dkt. No. 47 at 161, 165.

HIGHLY CONFIDENTIAL

issued Bayer sponsored ADRs to Citibank, who transferred ownership of those sponsored ADRs to Macquarie. Liability for Macquarie's June 7 purchase order for Bayer sponsored ADRs could not have become irrevocable fifteen hours before the order was even placed, i.e., at the time of the June 6 purchase of the foreign shares.[10]

Prof. Mitts thus reasons that "the order to purchase [Bayer ADRs] was not placed until the day after the foreign shares were purchased."[11] Based on this documentary record, Prof. Mitts concludes that irrevocable liability for the transaction "was incurred on June 7, at the time Bank of New York Mellon issued Bayer sponsored ADRs."[12]

26.    Prof. Mitts's analysis misinterprets brokerage records and omits critical documents that have subsequently been produced by Harding Loevner, the investment manager that conducted the trades on behalf of both SMW and Local 710.[13] Those records establish that,



. Based on my review of the record, this trade exhibited a pattern seen

---

[10] Mitts Report ¶ 39.

[11] Mitts Report ¶ 39 n. 47.

[12] *Id.*

[13] In my experience, investment managers routinely consolidate trades from many clients into large block trades, in order to achieve economies of scale, and also to maintain a consistent acquisition price for all underlying clients in the portfolio. This practice is evident in all of Plaintiffs' ADR purchases for which contemporaneous documentation exists. Indeed, each of Local 710's alleged trades were consolidated with simultaneous trades by SMW. While Plaintiffs have thus alleged 21 ADR purchases, those transactions were executed by Plaintiffs' investment managers in 16 block trades.

Prof. Mitts does not mention the participation of Harding Loevner at any point in his report, despite the fact that Harding Loevner was the entity that decided to invest in Bayer equity on behalf of SMW and Local 710, and that initiated and executed each of the trades alleged by those funds. As Plaintiffs' investment manager,

across nearly all of the transactions alleged by Plaintiffs. As such, while the available documentation differs from trade to trade, the description and conclusions offered below are generally applicable to Plaintiffs' alleged transactions in Bayer ADRs.

27.

28.    Based on my experience as a securities professional transmitting, receiving, and executing ADR transactions, Mr. Gowda's email was plainly a purchase order for Bayer ADRs, to be executed through the overseas acquisition of Bayer ordinary shares for the express purpose of conversion to ADRs. This conclusion is driven by several features of the communication.

---

[14] Ex. Z-5 (HL-002732).

[15] *Id.*

[16] 

[17] *Id.*

[18] *Id.*

[REDACTED]

29.     The table included in the body of Mr. Gowda's email confirms my understanding of the communication: [REDACTED] An experienced trader would recognize these instructions to constitute a "buy" order to purchase ADRs by acquiring Bayer ordinary shares on the local German market and then converting the ordinary shares to ADRs.

30.     Documents produced by Macquarie and BNY Mellon further confirm this conclusion, reflecting that Macquarie received a confirmatory order for 577,403[20] Bayer ordinary shares at 21:47:37 ET on June 6, 2016, after U.S. market hours and after Mr. Gowda submitted the purchase order referenced above.[21]  The same Macquarie record reflects an acquisition of

---

[19] In this context, OTD means "over the day," instructing the broker to spread the purchase throughout the trading day, while aiming to keep the number of shares traded to no more than 20% of the volume traded that day.

[20] In my experience, where a customer has ordered the purchase of a large block of shares, it is routine to see minor differences in the number of shares specified in a trade order and the number of shares ultimately purchased by the broker, as the broker is often afforded some discretion in execution.  The difference in the number of Bayer ADRs ordered by Harding Loevner and the number of ADRs ultimately purchased by Instinet is likely a result of adaptations made by Instinet to maintain best execution.

[21] MACQ_000001.

577,403 Bayer ADRs on June 7, 2016 by Macquarie.  As confirmed by Macquarie's internal records, these transactions were undertaken by Macquarie on behalf of the same client. Following this acquisition, BNY Mellon reported an issuance of 577,403 new ADRs to Macquarie on June 10, 2016, which were delivered to Harding Loevner for settlement.[22]

31.     The documents described above are typical of a transaction in which a client instructs a broker to acquire ADRs through the purchase and conversion of foreign shares.  In particular, the series of entries recorded in Macquarie's records are an example of what the industry refers to as a "cross" transaction, where newly issued ADRs received from a depositary bank are booked to a client.  Based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has instructed its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares.

32.     This consistent market practice reflects the basic principle that a client is obligated to take delivery of securities once its broker has committed capital to execute the order for those securities.  In my 28 years of experience as a securities professional, during which I have executed countless client orders for the acquisition of ADRs through the purchase of foreign shares, I have never once encountered a circumstance where a client was permitted to revoke an order after the initial overseas purchase.  Consistent with that experience and the animating principles of brokerage execution, it is my opinion that Plaintiffs were irrevocably obligated to take and pay for the ADR order described above as of the moment when Macquarie purchased Bayer ordinary shares outside the United States.

---

[22] BNYM000001.  Trade confirmation slip further confirms that the transaction described above is the same transaction alleged by Plaintiffs.  Plaintiffs' declarations represent that each acquired ADRs on June 7, 2016 at a price of $ 103.9916, exactly matching the price reflected on ▮▮▮▮. *See* Dkt. 47 at 161, 165; ▮▮▮

33.    My conclusion concerning Harding Loevner's purchase of Bayer ADRs is also consistent with the available market evidence, which indicates that it would have been economically irrational for Harding Loevner to purchase its desired quantity of Bayer ADRs on the domestic market. A volume analysis shows that 3,579,150 Bayer ordinary shares traded in Germany on June 7, 2016, while only 1,004,849 Bayer ADRs traded in the United States that day, a number that includes the 577,403 ADRs created by Macquarie.[23] A 20-day volume analysis shows that 5,469,326 Bayer ordinary shares traded in Germany on average in the 20 days prior to June 6th, 2016, while the average number of Bayer ADRs traded daily in the United States over the same period was only 308,840.[24] In my experience, no rational trader would have made the decision to acquire 577,403 existing Bayer ADRs on the secondary market on June 7, 2016, because that volume would have represented almost double the daily trading average, greatly increasing execution cost. The average volume in Bayer ordinary shares was an order of magnitude higher, and would have accommodated such a trade without any significant impact on the execution cost.

34.    I understand from reviewing the transcript of Prof. Mitts's deposition that he has suggested that Harding Loevner's June 6, 2016 email to Macquarie was ████████ ███████████████████████████████████████████"[25] Prof. Mitts is mistaken. Based on my extensive experience as a securities trader, Harding Loevner trader Vikram Gowda's email clearly represents an ADR purchase order, for the reasons set out above. As detailed above, the email provides actionable and detailed instructions to execute an order to acquire Bayer ADRs through the purchase of Bayer ordinary shares overseas. An experienced trader would understand the communication as such.

---

[23] Volume statistics in this report concerning Bayer ordinary shares are drawn from the data provided by Tick Data.

[24] Volume statistics in this report concerning Bayer ADRs are drawn from data published through Yahoo Finance.

[25] Ex. Z-3 (Transcript of Mitts Dep.) at 160:19-161:3.

HIGHLY CONFIDENTIAL

35.    Prof. Mitts separately opines that the transaction described above and those described below are distinguishable from that at issue in *Stoyas* v. *Toshiba Corp.*, No. 2:15-cv-04194 DDP-JC (C.D. Cal.).[26]  I authored the report on this subject that was credited by the Court in that proceeding.[27]  Based on my review of the records described above and my experience in the *Toshiba* litigation, I have concluded that the transactions at issue are economically indistinguishable.  Just as in the *Toshiba* litigation, irrevocable liability to take and pay for the Bayer ADRs was incurred the moment Macquarie acquired Bayer ordinary shares overseas on behalf of Plaintiffs.

36.    The similarities between the transactions and trade communications in the *Toshiba* case and this case are striking.  In *Toshiba*, the court focused on an email sent by a trader in the New York office of the plaintiff's broker, Barclays, to her counterparts in Barclays's Tokyo office.  The email had the subject line, "Japan ADR conversion trade for [the plaintiff's investment manager] Clearbridge – March 23," and stated:

> 2 portions to the TOSHIBA trade:
> Buy 70100 TOSYY [ADRs] →1 to 6 ratio = 420600 ORDS
> Buy 246200 6502 JT [Toshiba local shares in Japan]
> Both work over the 1st half of day[.]
> As for the ADR conversion piece, we will have a 4c commission
> rate apart from px.[28]

After receiving this email, the Barclays traders in Tokyo purchased local Toshiba ordinary shares in Japan, some of which were subsequently converted to ADRs through a depositary bank in the United States.

---

[26] *See* Mitts Report ¶ 39 & n.47.

[27] *See* Declaration of Cristian Zarcu, Exhibit B to Declaration of Eric Grannon in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, *Stoyas* v. *Toshiba Corp.*, No. 2:15-cv-04194 DDP-JC (C.D. Cal. May 20, 2021).

[28] Exhibit G to Declaration of Eric Grannon in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, *Stoyas* v. *Toshiba Corp.*, No. 2:15-cv-04194 DDP-JC (C.D. Cal. May 20, 2021).

37.     Similarly, in this case, Plaintiffs' instructed their brokers to buy foreign shares and create ADRs.  And just like in *Toshiba*, upon receiving these instructions, the broker proceeded as instructed to execute this order by buying foreign shares on the overseas market and then converting those shares to ADRs.  In my opinion as a trader with extensive experience in similar ADR purchases, these transactions are indistinguishable as a matter of trading practice.

**B.     August 2, 2016 Purchases by SMW and Local 710**

38.     Plaintiffs have alleged that on August 2, 2016, SMW and Local 710 respectively purchased 16,315 and 13,110 Bayer ADRs.[29]  The Mitts Report concludes that irrevocable liability for both of these transactions was incurred in the United States.  While Prof. Mitts does not discuss SMW's purchase, he describes Local 710's transaction as follows:

> On August 2, 2016, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 13,110 sponsored Bayer ADRs from Instinet Corp. ("Instinet"). Clearing records indicate that Instinet fulfilled that order by transferring to the custody of that Plaintiff 13,110 of the 367,323 ADRs it had purchased from the Bank of New York Mellon that day. Trading records provided by Instinet indicate that the order to purchase the foreign shares underlying this transaction was submitted at 20:44:48.560 the previous evening, August 1, 2016. Liability for Instinet's August 2 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable before the ADR order was even placed, i.e., at the time of the August 1 purchase of the foreign shares.[30]

39.     Again, the Mitts Report misinterprets brokerage records and omits critical documents that have subsequently been produced by Harding Loevner, the investment manager that conducted the subject trades on behalf of Plaintiffs.  As detailed below, ██████████

████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

---

[29] Dkt. No. 47 at 161, 165.

[30] Mitts Report ¶ 46.

40.    ████████████████████████████

████████████████████████████████

████████████████████████  ███████



42.    Based on my experience as a securities professional transmitting and executing ADR transactions, Mr. O'Connell's email was clearly an order by Harding Loevner on behalf of SMW and Local 710 for Bayer ADRs, to be executed through the purchase of Bayer ordinary

---

[31] Ex. Z-7 (HL-002729).

[32] *Id.*

[33] *Id.*

[34] *Id.*

shares in Germany for the express purpose of conversion to ADRs. This conclusion is driven by the same features discussed above in connection with Plaintiffs' June 6, 2016 purchases.

43.    ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ ██ ████████████████

██████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

██████ .[37]

44.    Documents produced by Instinet further confirm this conclusion, reflecting that Instinet received a purchase order for 367,447 Bayer ordinary shares at 20:44:48.560 ET on August 1, 2016, after U.S. market hours and after Mr. O'Connell submitted the purchase order referenced above.[38] As reflected in the same record, Instinet acquired these shares not in the U.S. markets, but rather in overseas markets—including the German Xetra exchange and various

---

[35] Ex. Z-8 (HL-002746).

[36] Ex. Z-9 (HL-002742).

[37] *Id.*

[38] Ex. Z-10 (INSTINET000007) at rows 2-3. The documents produced by Instinet contain electronic trading records conforming to the Financial Information eXchange Protocol (FIX). The FIX Protocol is a non-proprietary, free and open standard used by securities firms to facilitate the maintenance of electronic trading records. I have extensive experience interpreting and maintaining trading records under the FIX Protocol. The column headings and format of Instinet's records correspond to tagging used in the latest FIX protocol, and confirm that that the Instinet records reflect that Harding Loevner submitted an order for Bayer ADRs, to be fulfilled through the acquisition and conversion of Bayer ordinary shares. For example, ██████████ ███████████████████████████████████████████████████████████████████ . These tags are all part of a typical FIX message a broker would receive from a client in connection with a securities order.

European dark pools. The record further shows that Instinet employed a volume weighted average price ("VWAP") trading strategy, with a maximum participation of 20% of the daily volume in Bayer ordinary shares, as instructed by Harding Loevner: ██████████████

███████████[39] The instructions also clearly specify the foreign exchange transactions to be effected for the conversion of the local shares into ADRs. Another Instinet document reports that the broker recorded an entry for 367,447 Bayer ADR shares on August 1, 2016 at 20:44:49.323 ET, moments after receiving the purchase order for the same number of Bayer ordinary shares.[40]

45.    Following this acquisition, BNY Mellon recorded an issuance of 367,323 new ADRs to Instinet on August 5, 2016, which were delivered to Harding Loevner for settlement.[41] When Instinet subsequently supplied a confirmation slip to Harding Loevner for the ADR purchase, it recorded ████████████████████████

████████████████████████████████

████████████████████.[42] The price paid by Plaintiffs was thus determined by the market for Bayer ordinary shares, not the market for Bayer ADRs.[43]

---

[39] *Id.* VWAP is a very popular benchmark used in the industry. It is a "profile trading" strategy which leverages historical volumes traded as well as quantitative techniques to forecast volume and price in order to track the benchmark, without impacting it. The VWAP algorithm will attempt to distribute an order over its time horizon in an effort to closely match the historical volume distribution, known in the industry as the "volume curve" or "volume smile." The "max 20%" instruction simply tells the trader at Instinet not to exceed 20% of the total traded volume at any point during the day. Traders carefully consider their volume participation rates in order to avoid having unnecessary impact on the price of the stocks they are trading, and not exceeding 20% is quite typical for a VWAP trade.

[40] Ex. Z-11 (INSTINET000001) at rows 12-13.

[41] BNYM000001.

[42] Ex. Z-12 (HL-002711).

[43] The trade confirmation slips further confirm that the transaction described above is the same transaction alleged by Plaintiffs. Plaintiffs' declarations represent that each acquired ADRs on August 2, 2016 at a price of $106.6131, exactly matching ████████████████████
████████████████████

46. Contrary to Prof. Mitts's assertion "that liability for Instinet's August 2 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable before the ADR order was even placed, i.e., at the time of the August 1 purchase of the foreign shares," the record thus shows that Instinet recorded Harding Loevner's order for Bayer ADRs on August 1, 2016, simultaneously with the subsidiary order for Bayer ordinary shares. The documentation further establishes that Harding Loevner ██████████████ ████████████████████████████████████████████████ .

47. The documents described above are typical of a transaction in which a client instructs a broker to acquire ADRs through the purchase and conversion of overseas shares. In particular, the series of entries recorded in Instinet's records provide another example of a cross transaction, where newly issued ADRs received from the depositary are booked to a client. As discussed above, based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares. Plaintiffs were thus irrevocably obligated to take and pay for their ADRs as of the moment when Instinet purchased Bayer ordinary shares on the overseas market.

48. My conclusion concerning Harding Loevner's purchase of Bayer ADRs is also consistent with the available market evidence, which indicates that it would have been economically irrational for Harding Loevner to purchase its desired quantity of Bayer ADRs on the domestic market for existing Bayer ADRs. A 20-day volume analysis shows that 1,936,796 Bayer ordinary shares traded in Germany on average in the 20 days prior to August 2, 2016, while the average number of Bayer ADRs traded daily in the United States over the same period was only 84,805. In my experience, no rational trader would have made the decision to acquire 367,447 existing Bayer ADRs on the secondary market on August 2, 2016, because that volume represented more than four times the daily trading average, greatly increasing execution cost.

The average volume in Bayer ordinary shares was an order of magnitude higher, and would have accommodated such a trade without any significant impact on the execution cost.

### A. September 6, 2016 Purchases by SMW and Local 710

49.    Plaintiffs have alleged that on September 6, 2016, SMW and Local 710 respectively purchased 10,020 and 8,020 Bayer ADRs.[44]  The Mitts Report concludes that irrevocable liability for both of these transactions was incurred in the United States.  While Prof. Mitts does not discuss SMW's purchase, he describes Local 710's acquisition as follows:

> On September 6, 2016, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 8,020 sponsored Bayer ADRs from Instinet Corp. ("Instinet"). Clearing records indicate that Instinet fulfilled that order by transferring to the custody of that Plaintiff 8,020 of the 226,074 ADRs it had purchased from the Bank of New York Mellon that day. Trading records provided by Instinet indicate that the order to purchase the foreign shares underlying this transaction was submitted at 20:45:06.953 the previous evening, September 5, 2016. Liability for Instinet's September 6 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable before the ADR order was even placed, i.e., at the time of the September 5 purchase of the foreign shares.[45]

50.    Again, the analysis of the Mitts Report misinterprets brokerage records and omits critical documents that have subsequently been produced by Harding Loevner, the investment manager that conducted the subject trades on behalf of Lead Plaintiffs.  As detailed below, on

51.    

---

[44] Dkt. No. 47 at 161, 165.

[45] Mitts Report ¶ 47.

HIGHLY CONFIDENTIAL



52.    Based on my experience as securities professional transmitting and executing ADR transactions, Mr. Gowda's email was clearly an order by Harding Loevner on behalf of SMW and Local 710 for Bayer ADRs, to be executed through the purchase of Bayer ordinary shares in Germany for the express purpose of conversion to ADRs. This conclusion is driven by the same features discussed above in connection with Plaintiffs' June 6, 2016 purchases.

53.

[46] Ex. Z-13 (HL-002731).

[47] Id.

[48] Id.

[49] Ex. Z-14 (HL-002750).

[50] Id.

HIGHLY CONFIDENTIAL

54.     Documents produced by Instinet further confirm this conclusion, reflecting that Instinet received a confirmatory order for 217,071 Bayer ordinary shares initially recorded at 16:08:29.195 ET on September 2, 2016, a few minutes after Mr. Gowda's email to Instinet trader Jeffrey Crane.[51]  This order was reaffirmed 20:45:06.953 ET on September 5, 2016.[52]  As confirmed by the same record, Instinet acquired these shares not in the U.S. markets, but rather in overseas markets. The record shows that Instinet again employed a VWAP trading strategy with a maximum participation of 20% of the volume traded, as instructed by Harding Loevner: "███████████████." The same document reports that Instinet recorded an entry for 217,071 Bayer ADRs on September 5, 2016 at 20:45:07.531, less than a second after receiving the purchase order for the same number of shares of Bayer ordinary shares.[53]

55.     Following this acquisition, BNY Mellon reported an issuance of 226,074 new ADRs to Instinet on September 9, 2016, which were delivered to Harding Loevner for settlement.[54]  When Instinet subsequently supplied a confirmation slip to Harding Loevner for the ADR purchase, it recorded a trading price equal to the average price per Bayer ordinary share paid by Instinet overseas, plus foreign exchange fees and the transactional costs charged by BNY

---

[51] Ex. Z-11 (INSTINET000001) at row 21.

[52] Ex. Z-15 (INSTINET000008) at rows 2-3.

[53] Ex. Z-11 (INSTINET000001) at row 26.  Other Instinet records reflect an acquisition of 226,074 Bayer ordinary shares on September 6, 2016 by Instinet on behalf of Harding Loevner, as indicated by ████████████████████████████████████████ ██████████████████████████████████████  *See* Ex. Z-15 (INSTINET000008) at row 1164.  Instinet ultimately purchased a total of 226,074 local shares in accordance to new instructions received, which is confirmed by a trade ticket modification transmitted by Harding Loevner at 10:27:34.762 AM ET.  *See* Ex. Z-11 (INSTINET000001) at row 30. The FIX tag for ██████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████

[54] BNYM000001.

Mellon in connection with the ADR conversion.[55] The price paid by Plaintiffs was thus determined by the market for Bayer ordinary shares, not the market for Bayer ADRs.[56]

56. Contrary to Prof. Mitts's assertion that "Instinet fulfilled that order by transferring to the custody of that Plaintiff 8,020 of the 226,074 ADRs it had purchased from the Bank of New York Mellon that day,"[57] Instinet recorded Harding Loevner's order for Bayer ADRs on September 5, 2016, simultaneous with the subsidiary order for Bayer ordinary shares. Moreover, contrary to Prof. Mitts's second assertion that "[l]iability for Instinet's September 6 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable before the ADR order was even placed, i.e., at the time of the September 5 purchase of the foreign shares,"[58] the documentation establishes that Harding placed the order with Instinet to purchase Bayer ADRs, not on September 6, but rather at the same time that it placed the order to purchase the Bayer ordinary shares, on September 5.

57. The documents described above are typical of a transaction in which a client instructs a broker to acquire ADRs through the purchase and conversion of overseas shares. In particular, the series of entries recorded in Instinet's records provide yet another example of a cross transaction, where newly issued ADRs received from the depositary are booked to a client. As discussed above, based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the

---

[55] Ex. Z-16 (HL-002713).

[56] The trade confirmation slip further confirms that the transaction described above is the same transaction alleged by Plaintiffs. Plaintiffs' declarations represent that each acquired ADRs on September 6, 2016 at a price of $107.2068, exactly matching ███████████████████ ███████████████████████████████████████████

[57] Mitts Report ¶ 47.

[58] Id.

underlying purchase of foreign shares.  Plaintiffs were thus irrevocably obligated to take and pay for their ADRs as of the moment when Instinet purchased Bayer ordinary shares on the overseas market.

58.    My conclusion concerning Harding Loevner's purchase of Bayer ADRs is again consistent with the available market evidence, which indicates that it would have been economically irrational for Harding Loevner to purchase its desired quantity of Bayer ADRs on the domestic market for existing Bayer ADRs.  A 20-day volume analysis shows that 1,784,116 Bayer ordinary shares traded in Germany on average in the 20 days prior to September 6, 2016, while the average number of Bayer ADRs traded daily in the United States over the same period was only 52,460.  In my experience, no rational trader would have made the decision to acquire 217,071 existing Bayer ADRs on the secondary market on August 2, 2016, because that volume represented more than four times of the daily trading average, greatly increasing execution cost. The average volume in Bayer ordinary shares was an order of magnitude higher, and would have accommodated such a trade without any significant impact on the execution cost.

C.    **December 8, 2016 Purchases by SMW and Local 710**

59.    Plaintiffs have alleged that on December 8, 2016, SMW and Local 710 purchased 12,400 shares and 11,000 Bayer ADRs.[59]  The Mitts Report concludes that irrevocable liability for both of these transactions was incurred in the United States. While Prof. Mitts does not discuss SMW's purchase, he describes Local 710's transaction as follows:

> On December 9, 2016, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 12,400 Bayer sponsored ADRs through Instinet Corp. in New York. Clearing records indicate that Instinet acquired these ADRs by borrowing 10,000 and 40,000 ADRs from Industrial and Commercial Bank of China Financial Services in New York City, New York and Wedbush Securities / P3 Stock Loan in Los Angeles, California.[60]

---

[59] Dkt. No. 47 at 161, 165.

[60] Mitts Report ¶ 42.

Prof. Mitts thus reasons that "Instinet sold the Lead Plaintiff existing ADRs it had borrowed from other broker-dealers in the United States."[61]  Based on this account, Prof. Mitts concludes that "irrevocable liability for this purchase was incurred in the United States."[62]

60.    Again, the analysis of the Mitts Report both misinterprets brokerage records and omits critical documents that have subsequently been produced by Harding Loevner, the investment manager that conducted the relevant trades on behalf of SMW and Local 710.  As detailed below, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

61.    On December 8, 2016 at 4:30:31.674 PM ET, after trading hours in the United States, Instinet's records report that it received a buy order for 243,245 Bayer ADRs.[63]  Four hours later that same day, at 20:47:19.898 ET, Instinet's records reflect a corresponding purchase order for 243,245 Bayer ordinary shares.[64]  As confirmed by the same record, Instinet acquired these shares not in the U.S. markets, but rather overseas.  The record further reflects that Instinet employed a VWAP trading strategy, with a maximum participation of 20% of the volume traded, as instructed by Harding Loevner: "████████████████████████████████████████████[65] Moments later, at 20:47:20.769 on December 8, 2016, Instinet's records repeat and reconfirm the purchase order for Bayer ADRs.[66]

62.    ████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[61] *Id.*

[62] *Id.*

[63] Ex. Z-17 (INSTINET000002) at row 2.

[64] Ex. Z-18 (INSTINET000009) at rows 2-3.

[65] *Id.*

[66] Ex. Z-17 (INSTINET000002) at rows 4-5.

HIGHLY CONFIDENTIAL                                                        Page 24

████████████████  ████████████████████████████████

████████████████████████████████████████████████

██████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ This

trading record makes clear that Harding Loevner submitted an order to Instinet for Bayer ADRs, to be fulfilled through the purchase of Bayer ordinary shares.

63.    Notably, ███████████████████████████████████████

█████████████████████████████████████████████████████ .[69]

This detail further confirms that Harding implemented these purchases for SMW and Local 710 by acquiring Bayer ordinary shares overseas for conversion to ADRs.  Following this acquisition, BNY Mellon reported an issuance of 243,245 new ADRs to Instinet on December 16, 2016, which were delivered to Harding Loevner.[70]  When Instinet ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ .[71]  The price

paid by Plaintiffs was thus determined by the market for Bayer ordinary shares, not the market for Bayer ADRs.[72]

---

[67] Ex. Z-19 (HL-002737).

[68] *Id.*

[69] *See* Dkt. No. 47 at 161, 165.

[70] BNYM000001.

[71] Ex. Z-20 (HL-002714).

[72] The trade confirmation slip further confirms that the transaction described above is the same transaction alleged by Plaintiffs.  Plaintiffs' declarations represent that each acquired ADRs on December 9, 2016 at a price of $ 99.2994, ███████████████████████████████████

64.     The documents described above are typical of a transaction in which a client instructs a broker to acquire ADRs through the purchase and conversion of overseas shares. In particular, the series of entries recorded in Instinet's records provide yet another example of a cross transaction, where newly issued ADRs received from the depositary are booked to a client. As discussed above, based on my experience as a securities trader, Plaintiffs were irrevocably obligated to take and pay for their ADRs as of the moment when Instinet purchased Bayer ordinary shares outside the United States.

65.     This conclusion is again reinforced by economic data on the trading volume of Bayer ordinary shares and Bayer ADRs. A volume analysis shows that an average of 2,942,863 Bayer ordinary shares traded daily in Germany in the 20 days prior to December 9, 2016, while only 160,635 Bayer ADRs traded daily in the United States over the same period. In my experience, no rational trader would have made the decision to acquire a block of 243,245 Bayer ADRs domestically given these reported volumes, as the impact of such a purchase would have increased the execution cost. They would have instead chosen to trade local ordinary shares in Germany, where the average daily volume was an order of magnitude higher, which would have accommodated such a trade without any significant impact to execution cost.

66.     Prof. Mitts's contrary analysis of this transaction appears to be based on the circumstances under which the ADR purchase settled on December 14, rather than the manner in which Plaintiffs incurred an obligation to take and pay for those ADRs on December 8. As discussed above, records produced by BNY Mellon indicate that it issued 243,245 new ADRs to Instinet on December 16, 2016 — two days after the December 14 settlement date for Harding Loevner's ADR order.[73] Due to this apparent delay in ADR issuance, Instinet temporarily borrowed existing ADRs to deliver ADRs to Harding Loevner, as reflected in the clearing records relied upon by Prof. Mitts. It is not uncommon for brokers to borrow shares for delivery

[73] BNYM000001.

when settlement with a counterpart is delayed; this is one of the reasons stock loan desks exist on Wall Street. However, the fact that a broker borrowed securities to fulfill the broker's obligation to deliver the securities to its client has no bearing on *the client's* previously accrued obligation to take and pay for those securities. The loan serves to facilitate the timely delivery of shares to the client and nothing more.

67.    Notably, despite Instinet's alternative settlement arrangement, plaintiffs paid the $99.2994 per share price that ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████.[74]  This provides further confirmation that plaintiffs' commitment to take and pay for the ADRs accrued overseas.

### D.    December 18, 2017 Purchases by SMW and Local 710

68.    Plaintiffs have alleged that on December 18, 2017, SMW and Local 710 respectively purchased 20,200 and 19,900 Bayer ADRs.[75]  The Mitts Report concludes that irrevocable liability for both of these transactions was incurred in the United States. While Prof. Mitts does not discuss SMW's purchase, he describes Local 710's acquisition as follows:

> On September 18, 2017,[76] Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 19,900 sponsored Bayer ADRs from Instinet Corp. ("Instinet"). Clearing records indicate that Instinet fulfilled that order by transferring to the custody of that Plaintiff 19,900 of the 313,544 ADRs it had purchased from the Bank of New York Mellon that day. Trading records provided by Instinet indicate that it had placed an order to purchase a portion of the foreign shares underlying this transaction at 20:51:02.762 the evening of the preceding trading day, December 15, 2017. Specifically, Instinet obtained 78,525 of the 313,544 foreign shares in that order, which concluded executing on the foreign markets at 11:36:34.841 Eastern Time. By implication, the remaining 235,019 foreign shares had already been purchased. According to Instinet records, the purchase of 313,544 ADRs from the Bank of New York Mellon did not occur

---

[74] *See* Ex. Z-20 (HL-002714); Ex. Z-19 (HL-002737).

[75] Dkt. No. 47 at 161, 165.

[76] Although Prof. Mitts's report refers to "September 18, 2017" several times in discussing this transaction, Prof. Mitts appears to be referencing the December 18, 2017 transaction alleged by Plaintiffs.

until 11:56:29.281.  Liability for Instinet's September 6 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable ***before the ADR order was even placed***, i.e., at the time of the purchase of the foreign shares that morning for the partial amount (and even before that for the remaining foreign shares).[77]

69.     Again, the analysis of the Mitts Report misinterprets brokerage records and omits critical documents that have subsequently been produced by Harding Loevner, the investment manager that conducted the subject trades on behalf of Lead Plaintiffs.  As detailed below, ██ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████

70.     On December 15, 2017 at 16:52:04.309 ET, after trading hours in the United States, Instinet's records report that it received a purchase order for 314,103 Bayer ADRs.[78] Four hours later that same day, at 20:51:02.762 ET, Instinet's records reflect a corresponding purchase order for 78,525 Bayer ordinary shares.[79]  As confirmed by the same record, Instinet acquired these shares not in the U.S. markets, but instead overseas.  The record further reflects that Instinet employed a VWAP trading strategy, as instructed by Harding Loevner: "████████ ██████████████████████."[80]  Moments later, at 20:51:03.225 on December 15, 2017, Instinet's records repeat and reconfirm the purchase order for Bayer ADRs.[81]

71.     █████████████████████████████████████████████ ████████████████████████████████████████████ █ █████████ █████████████████████████████████████████████████████

---

[77] Mitts Report ¶ 48.

[78] Ex. Z-21 (INSTINET000003) at row 2.

[79] Ex. Z-22 (INSTINET000010) at rows 2-3.

[80] *Id.*

[81] Ex. Z-21 (INSTINET000003) at rows 5-6.

[82] Ex. Z-23 (HL-002739).

████████████████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

72.    ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████[84] This trading record makes clear that Harding Loevner submitted an order to Instinet for Bayer ADRs, to be fulfilled through the purchase of Bayer ordinary shares.

73.    Following Instinet's purchase of foreign shares, BNY Mellon reported an issuance of 313,544 new ADRs to Instinet on December 20, 2017, which were delivered to Harding Loevner for settlement.[85] When Instinet ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████.[86] The price paid by Plaintiffs was thus determined by the market for Bayer ordinary shares, not the market for Bayer ADRs.

74.    ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[83] *Id.*

[84] *Id.*

[85] BNYM000001.

[86] Ex. Z-24 (HL-002715).



.[89]

75.    Accordingly, contrary to Mitt's assertion that Instinet "fulfilled that order by transferring to the custody of that Plaintiff 19,900 of the 313,544 ADRs it had purchased from the Bank of New York Mellon that day," the documentation thus establishes that Instinet recorded Harding Loevner's order for Bayer ADRs on December 15, 2017, simultaneously with the subsidiary order for Bayer ordinary shares. The documentation further establishes that Harding Loevner instructed Instinet to purchase Bayer ADRs by acquiring and converting Bayer ordinary shares.[90]

76.    The documents described above are typical of a transaction in which a client instructs a broker to acquire ADRs through the purchase and conversion of overseas shares.  In particular, the series of entries recorded in Instinet's records provide yet another example of a cross transaction, where newly issued ADRs received from the depositary are booked to a client. Based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has ordered its broker to conduct a cross transaction is obligated to

---

[87] Ex. Z-23 (HL-002739).

[88] *Id.*

[89] Ex. 21 (INSTINET000003) at row 16.

[90] Prof. Mitts also asserts that "Instinet obtained 78,525 of the 313,544 foreign shares in that order, which concluded executing on the foreign markets at 11:36:34.841 Eastern Time. By implication, the remaining 235,019 foreign shares had already been purchased." Mitts Report ¶ 48.  This overlooks the four-to-one ratio between Bayer ADRs and Bayer ordinary shares then in effect.

HIGHLY CONFIDENTIAL                    Page 30

accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares. Thus, Plaintiffs were irrevocably obligated to take and pay for ADRs as of the moment when Instinet purchased Bayer ordinary shares outside the United States.

77.    As with the previous transactions discussed above, this conclusion is reinforced by economic data on the trading volume of Bayer ordinary shares and Bayer ADRs. A volume analysis shows that an average of 1,802,966 Bayer ordinary shares traded daily in Germany in the 20 days prior to December 18, 2017, while only 308,180 Bayer ADRs traded daily in the United States over the same period. In my experience, no rational trader would have made the decision to acquire a block of 313,544 Bayer ADRs domestically given these reported volumes, as the impact of such a purchase would have increased the execution cost. They would have instead chosen to trade local German shares in Germany, where the average daily volume was an order of magnitude higher, which would have accommodated such a trade without any significant impact to execution cost.

### E.    November 17, 2016 Purchase by IUOE

78.    Plaintiffs have alleged that on November 17, 2016, IUOE purchased 1,040 Bayer ADRs.[91] The Mitts Report does not discuss this trade, save for offering a blanket conclusion that liability for the transaction was irrevocably incurred in the United States.

79.    The analysis of the Mitts Report omits critical documents that have subsequently been produced by Hardman Johnston, the investment manager that conducted the subject trades on behalf of IUOE.[92] █████████████████████████████████████████

---

[91] Dkt. No. 47 at 169.

[92] As with Harding Loevner, Prof. Mitts does not once mention the participation of Hardman Johnston in his report, despite the fact that Hardman Johnston was the entity that decided to invest in Bayer equity on behalf of IUOE, and that initiated and executed each of the trades alleged by IUOE. ██████████████████████████████████



| Time | Sender | Message |
|------|--------|---------|
| ████ | ████ | ████████████████ |
| ████ | ████ | ███ |
| ████ | ████ | ████████████████ |
| ████ | ████ | █ |
| ████ | ████ | ████████████ |
| ████ | ████ | █ |
| ████ | ████ | ███ |
| ████ | ████ | ███████████████ |
| ████ | ████ | ████████████████ |
| ████ | ████ | █ |
| ████ | ████ | ██████████ |
| ████ | ████ | █████████████ |
| ████ | ████ | █ |
| ████ | ████ | ███████████████ |
| ████ | ████ | ████ |
| ████ | ████ | ████████████ |
| ████ | ████ | ███████ |
| ████ | ████ | █████ |

80.     While there appear to be gaps in the record — perhaps reflecting that Mr. Hufcut and Mr. Wakeman also communicated by phone or other means — the chat transcript indicates that Hardman Johnston ███████████████████████████████

<hr>

[93] Ex. Z-26 (HJ-002400) at 1-5.

HIGHLY CONFIDENTIAL



An experienced trader would understand Mr. Hufcut's instructions to be an order to purchase Bayer ADRs by acquiring Bayer ordinary shares on the local German market and converting those ordinary shares to ADRs.

81.    Notably, IUOE's investment policy provided that ███████████████████████████████████████████████████.[94]  This further reinforces the conclusion that Mr. Hufcut instructed Mr. Wakeman to purchase foreign shares for the sole purpose of subsequent conversion.

82.    Activity reported on the FINRA Trade Reporting Facility (TRF)[95] confirms that BAML created 24,730 Bayer ADRs as instructed, █████████████████████ ████████.[96]  This is also the price reflected in the certification that IUOE submitted to the Court.[97]  As noted above, this price reflected the cost of purchasing and converting Bayer ordinary shares.  The price paid by IUOE was thus determined by the market for Bayer ordinary shares, not the market for Bayer ADRs.

---

[94] Ex. Z-1 (PLTFS-IUOE-000001) at 15, 16, 24.

[95] The FINRA TRF provides FINRA members with a mechanism for reporting transactions that were not effected on an exchange.  *See* FINRA, *Trade Reporting Facility (TRF)*, available at https://www.finra.org/filing-reporting/trade-reporting-facility-trf.

[96] FINRA000005.

[97] Dkt. No. 47 at 169.

83.    Again, the documents described above are typical of a transaction in which a client instructs a broker to acquire ADRs through the purchase and conversion of overseas shares.  In particular, the Hardman Johnston and FINRA records provide yet another example of a cross transaction, where newly issued ADRs received from the depositary are booked through a firm account to facilitate the client ADR acquisition.  Based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares.  IUOE was thus irrevocably obligated to take and pay for its ADRs as of the moment when BAML purchased Bayer ordinary shares on the overseas market.

84.    My conclusion concerning Hardman Johnston's purchase of Bayer ADRs is also consistent with the available market evidence, which indicates that it would have been economically irrational for Hardman Johnston to purchase its desired quantity of Bayer ADRs on the domestic market for existing Bayer ADRs.  A 20-day volume analysis shows that 2,561,458 Bayer ordinary shares traded in Germany on average in the 20 days prior to November 17, 2016, while the average number of Bayer ADRs traded daily in the United States over the same period was only 108,385.  In my experience, no rational trader would have made the decision to acquire 24,730 existing Bayer ADRs on the liquidity-challenged secondary market on November 17, 2016.  The average volume in Bayer ordinary shares was an order of magnitude higher, and would have accommodated such a trade without any significant impact on the execution cost.

**F.    February 22 and 23, 2017 Purchases by IUOE**

85.    Plaintiffs have alleged that IUOE purchased 2,770 Bayer ADRs on February 22, 2017 and 1,620 Bayer ADRs on February 23, 2020.[98]   The Mitts Report does not discuss these

---

[98] Dkt. No. 47 at 169.

trades, save for offering a blanket conclusion that liability for these transactions was irrevocably incurred in the United States.

86.    Documents produced by Hardman Johnson directly contradict Prof. Mitts's conclusion. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

| Time | Sender | Message |
| --- | --- | --- |
| ██████████ | █████████ | █████████████████ |
| ██████████ | █████████ | ██ |
| ██████████ | █████████ | ███████████████ |
| ██████████ | █████████ | ██ |
| ██████████ | █████████ | ██████████████████████████ |
| ██████████ | █████████ | █████████ |
| ██████████ | █████████ | ████████ |
| ██████████ | █████████ | ███ |
| ██████████ | █████████ | ██████████████ |
| ██████████ | █████████ | ██████████ |
| ██████████ | █████████ | ████ |
| ████████ | ████████ | ████████████████████████ |
| ████████ | █████████ | █████████ |
| ████████ | █████████ | ███████ |
| ████████ | █████████ | █ |
| ████████ | ███████ | ███████████████████████████ |
| █████████ | ████████ | ████████ |
| █████████ | ████████ | █████████████ |
| █████████ | ████████ | █████████ |
| ████████ | ███████ | ████████████████████ |
| █████████ | ████████ | █████████ |
| █████████ | ████████ | ██████████ |
| █████████ | ████████ | ███ |

---

[99] Ex. Z-26 (HJ-0002400) at 7-9.



87.     In this series of communications, Mr. Hufcut initially ███████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████  On February

22, 2017, only 344,500 Bayer ADRs traded, while the volume in Bayer ordinary shares exceeded

3.4 million shares.  Both of these facts point to Hardman Johnston instructing JP Morgan to buy

Bayer ordinary shares.

88.     Again, because Hardman Johnston was ███████████████████████

████████, I conclude that this purchase of Bayer ordinary shares was for the purpose of

subsequent conversion to ADR.  Consistent with that interpretation, JP Morgan Securities

acquired Bayer ordinary shares for the equivalent of 67,225 Bayer ADRs on February 22, 2017

followed by another acquisition on February 23, 2017 for the equivalent of 39,475 Bayer ADRs.

JP Morgan Securities then reported a cross transaction for 67,225 Bayer ADRs on February 22,

2017 and a subsequent cross transaction for 39,475 Bayer ADRs on February 23, 2017.[100]  And

BNY Mellon records reflect the issuance of two blocks of Bayer ADRs on March 2, 2017—a

---

[100] FINRA000001.

plausible settlement date for the trades at issue—one for 67,225 Bayer ADRs and another for 39,475 Bayer ADRs.[101]

89.    Further confirmation of the overseas origin of IUOE's shares comes from its certification to the Court, which discloses that its purchase of Bayer ADRs on February 22, 2017 was booked at a price of $113.7895.[102]  This corresponds to a purchase of local shares at €108 per share with a foreign-exchange rate of 1.0536.  Market data from that day confirms that the foreign-exchange rate that day ranged from 1.0497 to 1.0556.[103]  Again, this indicates that the price paid by IUOE was determined by the market for Bayer ordinary shares, not the market for Bayer ADRs

90.    The documents described above are typical of a cross transaction in which a client instructs a broker to acquire ADRs through the purchase and conversion of overseas shares. Based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares.  IUOE was thus irrevocably obligated to take and pay for its ADRs as of the moment when JP Morgan Securities purchased Bayer ordinary shares outside the United States.

### G.    May 26 and May 27, 2020 Purchases by IUOE

91.    Plaintiffs have alleged that IUOE purchased 7,890 Bayer ADRs on May 26, 2020, and 8,160 Bayer ADRs on May 27, 2020.[104]  The Mitts Report concludes that irrevocable liability for these transactions was incurred in the United States.  While Prof. Mitts does not discuss the May 27, 2020 purchase, he describes IUOE's May 26, 2020 acquisition as follows:

---

[101] BNYM000001.

[102] *See* Dkt. No. 47 at 169.

[103] Foreign exchange data in this report was acquired from Yahoo Finance.

[104] Dkt. No. 47 at 169.

> On May 26, 2020, additional plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware purchased 7,980 Bayer sponsored ADRs through the IUOE Johnston account held at UBS Securities. According to clearing records, UBS Securities acquired these ADRs on the secondary market from Bank of America, N.A. and its own securities lending desk, which had borrowed Bayer sponsored ADRs from Credit Suisse.[105]

Prof. Mitts thus reasons that "the clearing records show that UBS Securities acquired existing ADRs from other broker-dealers in the United States," and concludes that "irrevocable liability for this purchase was incurred in the United States."[106]

92.   Documents produced by Hardman Johnston directly contradict Prof. Mitts's conclusion. As detailed below, ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

93.   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ :



| Time | Sender | Message |
|---|---|---|
| ████ | ████ | ███████████████████████ |
| ████ | ████ | ███████████████████████ |
| ████ | ████ | █████████████████████ |
| ████ | ████ | ███████████████████████ |
| ████ | ████ | ██████████████████ |
| ████ | ████ | ███ |
| ████ | ████ | ████████████ |
| ████ | ████ | ████████ |
| ████ | ████ | ███ |

---

[105] Mitts Report ¶ 43.

[106] *Id.*

[107] Ex. Z-26 (HJ-0002400) at 18-25.

| | | |
|---|---|---|
| ███████████ | █████ | ████████████████████████████████ |
| ███████████ | ████████ | ██████████████████████████████ |
| ███████████ | ████████ | ██████ |
| ███████████ | ████████ | █████████████████████ |
| ███████████ | ████████ | ██ |
| ███████████ | ████████ | █████████████████████ |
| ███████████ | ████████ | ████████████████████████ |
| ███████████ | ████████ | ██ |
| ███████████ | ████████ | ███████████████ |
| ███████████ | ████████ | ████████████████ |
| ███████████ | ██████ | ████████████ |
| ███████████ | ██████ | ████████████ |
| ███████████ | ██████ | ████████████████ |
| ███████████ | ██████ | ███████████████ |
| ███████████ | ████████ | ████████████ |
| ███████████ | █████ | █████████ |
| ███████████ | ████████ | ██████████████ |

94.    Contrary to Prof. Mitts's assertion that UBS acquired "these ADRs on the secondary market from Bank of America, N.A. and its own securities lending desk, which had borrowed Bayer sponsored ADRs from Credit Suisse Securities (USA)," the documentation establishes that Hardman Johnston instructed UBS to purchase Bayer ordinary shares in Germany for the purpose of converting them to ADRs.  Specifically, █████████████



HIGHLY CONFIDENTIAL                                                    Page 39

95.    Documents produced by UBS further confirm this analysis, showing that a block of 212,400 Bayer ADRs was transacted following the acquisition of the 450,000 shares of Bayer ordinary shares.[108]

96.    The series of entries reported in Hardman Johnston and UBS's records provide yet another example of a cross transaction, where newly issued ADRs received from the depositary are booked to a client.  Based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares.  IUOE was thus irrevocably obligated to take and pay for its ADRs as of the moment when UBS purchased Bayer ordinary shares on the overseas market.

97.    Again, Prof. Mitts's contrary analysis of this transaction appears to be based on the circumstances under which the ADR purchase settled, rather than the manner in which Plaintiffs incurred an obligation to take and pay for those ADRs.  Specifically, BNY Mellon records show that the depositary bank issued large blocks of Bayer ADRs on June 2, 2020 — several days after the May 28 settlement date for IUOE's purchase.[109]  Again, the delay in ADR issuance resulted in the broker settling the previously executed trade through a temporary stock loan.  Again, however, this alternate settlement arrangement does not impact the obligation to take and pay for Bayer ADRs, which accrued days earlier when the underlying Bayer ordinary shares were purchased.

98.    The record indicates that IUOE's May 27, 2020 ADR purchase followed the same execution pattern as the prior day's trade.  Specifically, on the morning of May 27, 2020, before

---

[108] UBS000001.

[109] BNYM000001.

trading hours in the United States, ███████████████████████████████████

███████████████████████████████████████

| Time | Sender | Message |
|------|--------|---------|
| ████████ | ██████ | █████ |
| ████████ | ██████ | ████████ |
| ████████ | ██████ | ████ |
| ████████ | ███████ | ████████████████████████████████████ |
| ████████ | ██████ | ████ |
| ████████ | ██████ | ████████████████████████████████████ |
| ████████ | ██████ | ████ |
| ████████ | ██████ | ███████████████████████ |
| ████████ | ██████ | █████████████████ |
| ████████ | ██████ | ██████████ |
| ████████ | ██████ | ██ |
| ████████ | ██████ | ███████████████████████ |
| ████████ | ██████ | ██ |
| ████████ | ██████ | ██ |
| ████████ | ██████ | ██████████████████████ |
| ████████ | ██████ | ██ |
| ████████ | ██████ | ████████████ |
| ████████ | ██████ | ██ |
| ████████ | ██████ | ███████████████ |

99.    The documentation establishes that Hardman Johnston ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████     This interpretation is

---

[110] Ex. Z-26 (HJ-0002400) at 27-32.

reinforced by the fact that Hardman Johnston conducted an equivalent trade the day before, and by the fact that ███████████████████████████████████████████████████████████████ ██████. Documents produced by UBS confirm that the broker complied with these instructions, showing that a block of 217,200 Bayer ADRs was reported following the acquisition of the 460,000 Bayer ordinary shares.[111]

100.    As with the prior day's trade, these records reflect an order for a cross transaction, where newly issued ADRs received from the depositary are booked to a client. Based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares. IUOE was thus irrevocably obligated to take and pay for its ADRs as of the moment when UBS purchased Bayer ordinary shares on the overseas market.

101.    My conclusion concerning IUOE's purchase of Bayer ADRs is again consistent with the available market evidence, which indicates that it would have been economically irrational for Hardman Johnston to purchase its desired quantity of Bayer ADRs on the domestic market for existing Bayer ADRs. A 20-day volume analysis shows that 3,536,517 Bayer ordinary shares traded in Germany on average in the 20 days prior to May 26, 2020, while the average number of Bayer ADRs traded daily in the United States over the same period was only 483,945, and 3,273,023 Bayer ordinary shares traded in Germany on average in the 20 days prior to May 27, 2020, while the average number of Bayer ADRs traded daily in the United States over the same period was only 494,650. In my experience, no rational trader would have made the decision to acquire hundreds of thousands of existing Bayer ADRs on the secondary market on May 26 or 27, 2020, because that volume would have represented close to half of the daily trading average, greatly increasing execution cost. The average volume in Bayer ordinary shares

---

[111] UBS000001.

was an order of magnitude higher, and would have accommodated such a trade without any significant impact on the execution cost.

**H.    June 3, 2020 and June 4, 2020 Purchases by IUOE**

102.    Plaintiffs have alleged that IUOE purchase 4,530 Bayer ADRs on June 3, 2020 and 3,620 Bayer ADRs on June 4, 2020.[112]  The Mitts Report concludes that irrevocable liability for these transactions was incurred in the United States.  While Prof. Mitts does not discuss the June 4, 2020 transaction, the Mitts Report describes IUOE's June 3, 2020 transaction as follows:

> [O]n June 3, 2020, additional plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware purchased 4,530 Bayer sponsored ADRs through the IUOE Johnston account held at Cowen & Co. According to clearing records, Cowen & Co. acquired these ADRs on the secondary market from other market participants in the United States including Bank of America, TD Ameritrade, SG America, E*Trade and others.[113]

Prof. Mitts thus reasons that "the clearing records show that Cowen acquired existing ADRs from other broker-dealers in the United States."[114]  Based on this account, Prof. Mitts concludes that "irrevocable liability for this purchase was incurred in the United States."[115]

103.    Again, the analysis of the Mitts Report omits critical documents that have subsequently been produced by Hardman Johnston.  As detailed below, on June 4, 2020, Hardman Johnston ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████

---

[112] Dkt. No. 47 at 169.

[113] Mitts Report ¶ 44.

[114] *Id.*

[115] *Id.*

104. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

| Time | Sender | Message |
|---|---|---|
| ████ | ████ | ████ |
| ████ | ████ | ████████████████ |
| ████ | ████ | ██████████████ |
| ████ | ████ | ████████████████ |
| ████ | ████ | ██████████████ |
| ████ | ████ | █ |
| ████ | ████ | ████████ |
| ████ | ████ | █ |
| ████ | ████ | ████████████████ |
| ████ | ████ | ████████ |
| ████ | ████ | ████████████████ |
| ████ | ████ | ██ |
| ████ | ████ | ████████████████ |
| ████ | ████ | ██ |
| ████ | ████ | ████████████████ |
| ████ | ████ | ██████ |
| ████ | ████ | ██████████ |
| ████ | ████ | ████ |

105. While the record again appears to be incomplete, this transcript establishes that Hardman Johnston instructed Cowen to purchase Bayer ordinary shares overseas for the express purpose of converting them to ADRs. This conclusion is based on several features of the

---

[116] Ex. Z-26 (HJ-0002400) at 38-45.

communicates described above.

106.    Documents provided by Cowen further confirm this analysis, showing

Notably, this matches exactly the transaction disclosed by IUOE in its certification: a purchase of 3,620 Bayer ADRs on June 4, 2020 for $17.8819.

107.    Furthermore, records provided by BNY Mellon documenting Bayer ADR issuances and cancellations show that a total of 94,980 Bayer ADRs were created on June 8, 2020, the settlement date for trades executed on June 4, 2020.[119] In addition, FINRA records

---

[117] COWEN_BAYER000001.

[118] *Id.*

[119] BNYM000001.

show a Bayer ADR report to the FINRA TRF for Cowen that day, for a total of 94,978 ADRs, matching the total number of shares Cowen booked to Hardman Johnston's 153 client accounts that day.[120]

108.    Cowen's records indicate that ████████████████████████████████



109.    The similarities in the implementation strategies for the two days indicate that the acquisitions of Bayer ADRs on June 3 and June 4 were part of a larger order that Hardman Johnston implemented over two days.   On both June 3 and June 4, 2020, Cowen reported ███

███████████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████   Again, this mirrors the transaction alleged by IUOE, which involved an acquisition of 4,530 shares on the same date at the same price of $18.3931 per share.  Documents produced by BNY Mellon further confirm this conclusion, showing the creation of exactly 119,992 Bayer ADRs on June 5, 2020, the same date as the settlement date for the trade effected by Cowen on June 3, 2020.[122]

---

[120]

[121] COWEN_BAYER000001.

[122] BNYM000001.

110.    Contrary to Prof. Mitts's assertion that Cowen acquired "these ADRs on the secondary market from other market participants in the United States including Bank of America, TD Ameritrade, SG America, E*Trade and others," these documents establish that Hardman Johnston instructed Cowen to purchase Bayer ordinary shares in Germany for the express purpose of converting them to ADRs.

111.    In my experience, the documents described above are again typical of those seen in a cross transaction, where newly issued ADRs received from the depositary are booked to a client.  As discussed above, based on my experience as a securities trader, Plaintiffs were irrevocably obligated to take and pay for their ADRs as of the moment when Cowen purchased Bayer ordinary shares outside the United States.

112.    Once again, this conclusion is reinforced by economic data on the trading volume of Bayer common shares and Bayer ADRs.  A volume analysis shows that an average of 3,354,874 Bayer common shares traded daily in Germany in the 20 days prior to June 3, 2020, while only 551,720 Bayer ADRs traded daily in the United States over the same period.  In my experience, no rational trader would have made the decision to acquire blocks consisting of hundreds of thousands of ADRs domestically given these reported volumes, as the impact of such a purchase would have increased the execution cost.  They would have instead chosen to trade local German shares in Germany, where the average daily volume was an order of magnitude higher, which would have accommodated such a trade without any significant impact to execution cost.

113.    Prof. Mitts's analysis of the June 3, 2020 transaction again appears to be based on the circumstances under which the ADR purchase settled, rather than the manner in which IUOE incurred an obligation to take and pay for those ADRs.  Specifically, BNY Mellon records show that the depositary bank issued blocks of Bayer ADRs on June 5 and June 8, 2020 that correspond to orders that Cowen fielded for Hardman Johnston.  Those ADRs were then transmitted to Hardman Johnston's clients via their respective custodians, including Wells Fargo,

HIGHLY CONFIDENTIAL                                        Page 47

PNC Bank, and others.[123] While I have reviewed the DTC records pertinent to these transactions, I have not identified any support for Prof. Mitts's claim that Cowen acquired the underlying ADRs on the secondary market from the entities that he lists in his report.

### I.    June 23, 2020 Purchase by IUOE

114.    Plaintiffs have alleged that on June 23, 2020, IUOE purchased 15,030 Bayer ADRs.[124] The Mitts Report does not discuss this trade, save for offering a blanket conclusion that liability for the transaction was irrevocably incurred in the United States.

115.    Documents I have reviewed directly contradict Prof. Mitts's conclusion. On the morning of June 23, 2020, ██████████████████████████████████████ ██████████████████████████████████████████ :

| Time | Sender | Message |
|---|---|---|
| ████████ | ██████ | ████████████████████ |
| ████████ | █████ | █████████████ |
| ████████ | ██████ | ██████████████ |
| ████████ | ██████ | ██████████████ |
| ████████ | █████ | ████████████████ |
| ████████ | █████ | ███████████████████████ ██ |
| ██████ | █████ | █ ███████████████ |
| █████ | ████ | █ |
| ████████ | ██████ | █████████ |
| ████████ | ██████ | ███████████████ |
| ████████ | ██████ | █████████ |
| ████████ | ██████ | █████████████ |

---

[123] DTC001195.

[124] Dkt. No. 47 at 169.

[125] Ex. Z-26 (HJ-0002400) at 47-56.



HIGHLY CONFIDENTIAL

116.    The above exchange makes clear that Hardman Johnston submitted an order for Bayer ADRs, to be fulfilled through the purchase of Bayer ordinary shares in Germany. Several features of the communication support this conclusion. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

117.    These messages also confirm that the price paid by the IUOE was determined by the market for Bayer ordinary shares, not the market for Bayer ADRs.[126] According to the communications from UBS, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ —the same price reported by IUOE in its certification to the Court.[128]

118.    My interpretation of the chat transcript copied above is confirmed by brokerage records. Specifically, a spreadsheet produced by UBS shows two entries for this transaction: (1) the "Agency Buy" order from Hardman Johnston, which was reported to the FINRA TRF at 11:59:17.719 AM ET; and (2) a "Riskless Principal" transaction, which reflected the acquisition of Bayer ADRs issued by BNY Mellon on behalf of Hardman Johnston.[129]

---

[126] *See id.*

[127] This is calculated by multiplying the €72.8661 price for ordinary shares by the 1.13252 exchange rate (72.8661 x 1.13252 = 82.5223), then dividing by four to account for the ADR ratio (82.5223 / 4 = 20.63058). Adding the 3.86 cents per share conversion fee for 91,202 ADRs yields $20.66918 (20.63058 + 0.0386*91,202 = 29.66918).

[128] *See* Dkt. No. 47 at 169.

[129] UBS000001.

HIGHLY CONFIDENTIAL

119.    The documents described above are once again typical of a cross transaction in which a client instructs a broker to acquire ADRs through the purchase and conversion of overseas shares.  Based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares.  IUOE was thus irrevocably obligated to take and pay for its ADRs as of the moment when UBS purchased Bayer ordinary shares outside the United States.

120.    My conclusion concerning Hardman Johnston's purchase of Bayer ADRs is also consistent with the available market evidence, which indicates that it would have been economically irrational for Hardman Johnston to purchase its desired quantity of Bayer ADRs on the domestic market for existing Bayer ADRs.  A 20-day volume analysis shows that 4,279,203 Bayer ordinary shares traded in Germany on average in the 20 days prior to June 23, 2020, while the average number of Bayer ADRs traded daily in the United States over the same period was only 801,295.  In my experience, no rational trader would have made the decision to acquire 364,810 existing Bayer ADRs on the liquidity-challenged secondary market on June 23, 2020. The average volume in Bayer ordinary shares was an order of magnitude higher, and would have accommodated such a trade without any significant impact on the execution cost.

**J.    February 14, March 27 and October 18, 2018 Purchases by SMW**

121.    Plaintiffs have alleged that SMW purchased 5,700 Bayer ADRs on February 14, 2018, 5,306 Bayer ADRs on March 27, 2018, and 14,910 Bayer ADRs on October 18, 2018.[130] The Mitts Report does not discuss these transactions, save for offering a blanket conclusion that liability for each was irrevocably incurred in the United States.

---

[130] Dkt. No. 47 at 161.

122.    The record does not contain communications between Harding Loevner and its brokers concerning the execution of these trades, or any other information that would indicate what instructions were given to the brokers, such as trade confirmation slips or FIX messages. Due to this lack of documentation, there is insufficient evidence to form an opinion on where and how SMW's February 14, March 27, and October 18, 2018 purchases of Bayer ADRs were executed. Accordingly, I disagree with Prof. Mitts's conclusion that the record shows irrevocable liability for these trades to have been incurred in the United States.

## VI.    IT IS NOT POSSIBLE TO DETERMINE ON A CLASS-WIDE BASIS THAT THE PROPOSED CLASS MEMBERS INCURRED IRREVOCABLE LIABILITY IN THE UNITED STATES FOR THEIR PURCHASES OF BAYER ADRS

123.    The Mitts Report concludes that the question of where irrevocable liability was incurred is capable of being determined on a class-wide basis for two reasons. Neither is sound.

124.    *First*, Prof. Mitts opines that "the overwhelming majority of purchases in Bayer sponsored ADRs consisted of domestic purchases of *existing* ADRs on the secondary market."[131] This is irrelevant. Even if Prof. Mitts were correct that most Bayer ADR purchases were conducted in the United States on the secondary market during the Class period, the discussion above highlights that an unknown number of large transactions were conducted through the purchase and conversion of Bayer ordinary shares overseas. Prof. Mitts has not identified any class-wide methodology for identifying these overseas trades, because there is no such methodology — as demonstrated by the discussion above, such trades can only be identified through an expert review of trade orders, brokerage records, and confirmation slips. None of that analysis is generalizable to a class of all purchasers of Bayer ADRs.

125.    Further, Prof. Mitts is simply wrong on this point. As support for his assertion that the "overwhelming majority" of Bayer ADR purchases during the proposed class period were for existing ADRs, Prof. Mitts cites the median daily volume of Bayer ADR issuances.[132]

---

[131] Mitts Report ¶ 52.

[132] Mitts Report ¶ 32.

But focusing on *daily* trading volume obscures reality.  As Plaintiffs' ADR purchase transactions demonstrate, new ADR issuances are typically concentrated in large blocks and executed on a single trade date, rather than spread out evenly over time.  Unsurprisingly, data reflecting *aggregate* trading volume in Bayer ADRs tells a different story.  During the proposed class period, BNY Mellon issued 72,615,161 new Bayer ADRs,[133] and 416,892,221 Bayer ADRs were purchased in total,[134] accounting for both new ADR issuances and transactions in existing ADRs.  New ADR issuances thus accounted for approximately 17.4% of all Bayer ADRs traded during the proposed class period.

126.    *Second*, Prof. Mitts opines that "the available evidence provides no basis to infer that the Bank of New York Mellon deviated from its ordinary practice of requiring foreign shares to be in the custody of the purchaser prior to issuing ADRs, such that the purchaser's irrevocable liability to purchase ADRs arises only after the purchase of foreign shares had already occurred."[135]  But the policies of a depositary bank have no bearing on the analysis of where investors incurred their liability to take and pay for ADRs.  That liability runs to the securities professional that is executing orders on the investor's behalf, not to the depositary bank through which the securities professional is processing an ADR conversion.

127.    The error in Prof. Mitts's emphasis of BNY Mellon policies is illustrated by the trade analysis presented above, none of which turns on BNY Mellon policies regarding pre-release of ADRs.  In each instance, Plaintiffs incurred irrevocable liability to take and pay for their Bayer ADRs when their brokers committed capital to purchase ordinary shares overseas.  This obligation arose not because of a conditional pre-release of ADRs by BNY Mellon, but instead because of Plaintiffs' commitment to follow through on the orders they had placed.

---

[133] BNYM000001.

[134] This figure is calculated by compiling the aggregate volume of trades (491,504,300), then subtracting the number of ADR cancellations (74,612,079), which is included in the underlying data but which does not reflect ADR purchases.

[135] Mitts Report ¶ 53.

128.    Moreover, were Prof. Mitts's reliance on depositary records correct, it would directly contradict the analysis adopted by the Court in *Toshiba*. In that case, the dispositive factor was likewise the plaintiff's contractual obligation to its broker — not any liability to the depositary bank. Accordingly, in *Toshiba*, as here, the analysis focused on an individualized review of trade communications and records.

## VII.    CONCLUSION

129.    For the reasons stated above, I have concluded that Plaintiffs' incurred irrevocable liability to take and pay for all but three of the alleged Bayer ADR purchases overseas. There exists insufficient evidence to reach any conclusion as to the remaining three transactions.

130.    In addition, for the reasons stated above, I have concluded that it is not possible to determine on a class-wide basis that proposed class members incurred irrevocable liability to take and pay for their Bayer ADR purchases in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd of February, 2023

Cristian Zarcu

HIGHLY CONFIDENTIAL

# Appendix A

| CRISTIAN ZARCU |
| --- |

**917-664-7645**
**czarcu@yahoo.com**
**https://www.linkedin.com/in/cristian-zarcu-928ba41b/**

Recognized Financial Services leader with extensive expertise in building and managing sales and trading businesses, with a focus on leveraging data/analytics and advanced technology to gain edge and manage risk. Expert witness and subject matter expert, inventor and pioneer of next generation Analytics, Trading Algorithms and Surveillance Technologies. Head Trader, Founder of several successful Quantitative Trading businesses, on an underpinning of Integrated Real-Time Analytics and Adaptive Algorithms. Contributor in Financial Media, print and broadcast.

**President/COO, TradeDynamiX LLC (2013 – Present):**

- Founded company to help regulators and financial market participants achieve a consistent and transparent approach to trading risks, via cutting-edge technology.
- Developed and deployed comprehensive Multi-Asset Trade Analytics, Risk Assessment and Surveillance platform (RedHat Linux, C++, Python, HTML5, EmWeb).
- Designed all trading and surveillance algorithms, as well as data visualization tools offered by TradeDynamiX.
- Provide trading algorithm design/development and implementation/support services for all asset classes.
- Designed multi-asset automated proprietary trading/risk system, currently running multiple systematic trading strategies (Stocks, Options, Commodities, FI, FX, Crypto), leveraging sophisticated portfolio modeling techniques, statistical models and forecasting methods.
- Deliver technological, regulatory expertise and advice to clients, and devise compliance and trade surveillance policies.
- Provide Expert Witness and Subject Matter Expert services to clients and regulators.
- Contributed as a regulatory and trading expert on Fox Business News, and published numerous articles on market structure.
- Held meetings with the SEC, FINRA, and SROs to discuss current compliance/regulatory reforms and challenges.

**Member of the Advisory Board, College of Business and Economics, University of Idaho (2015 – Present):**

- Assisted in the selection and recruitment of new College Dean.
- Provide support and advice to programs, assist in the development of new programs, and identify best practice standards.
- Serve as an ambassador and advocate to the programs providing a connection to and ongoing exchange of information and ideas with practitioners in the field and other external contacts.
- Assist in the identification and selection of new board members.

**MD, Head of Analytic Trading Solutions (ATS), Lazard Capital Markets (2009 -2012):**

- Recruited by CEO and charged with modernizing LCM's trading systems and technology infrastructure, to help achieve ambitious growth targets for LCM.
- Led and directed all new product strategies, product positioning and messaging, driving the commercial success of the franchise.
- Delivered operating standards, regulatory compliance and total quality management for multiple new lines of business.
- Founded the ATS group and coordinated with Finance, Compliance, Operations and Technology to upgrade all trading and regulatory/compliance systems within Lazard's existing infrastructure.
- Designed and deployed an Integrated Real-Time Analytics/Adaptive-Algo platform to gain edge in trading (UNIX, C++, C, Python, Pearl).
- Delivered revenue increases by more than 100% YOY every single year through target marketing to strategic clients throughout the US and Europe.
- Developed new Cost Analysis/Tracking System, which reduced operating costs by millions of dollars per year.
- Managed all regulatory, risk and compliance aspects of the business, from daily supervision and reporting, to close interaction with SEC and FINRA regulators during periodic examinations.
- Served on the Capital Markets Management team.

**MD, Head of Wells Fargo/Wachovia Automated Trading Solutions group (2004-2009):**

- Designed Wachovia's Automated Trading Solutions (WATS) offering and built it into a full-fledged suite of electronic trading businesses, including Algorithmic, Program Trading, DMA and Trade Analytics (UNIX, C++, C, Python, Pearl).
- Delivered the leadership and vision necessary to ensure that the group had the proper operational controls, administrative and reporting procedures, and people systems in place to effectively grow the business and to ensure financial strength and operating efficiency.

- Partnered with Operations, Compliance and Technology groups to achieve a consistent and transparent approach to risks, processes, information and reporting.
- Developed and led a multi-national team of sales/traders and technologists to create a powerful trading platform, which generated more than $100 million in revenues during my tenure, and became the primary execution engine for Wachovia's Equities division.
- Deployed the WATS trading suite as the main execution engine for the entire Equities Platform, resulting in millions of dollars in yearly cost savings.
- Managed all capital commitments for the group – from regulatory capital to the Risk Book for Index-related trading strategies, which involved quantitative portfolio creation and management.
- Responsible for all regulatory, risk and compliance aspects of the business, from daily supervision and reporting, to management of the periodic SEC and FINRA examinations.
- Served on the Equities Division Management team.

**MD, Head of Program Trading, Bank of America Securities (2001-2004):**

- Delivered leadership, management and strategic vision for the firm's electronic and program trading businesses.
- Successfully integrated Program Trading with the other product offerings of BAS, and raised visibility of the product internally and externally through education of senior management and existing sales force while increasing communications across the firm.
- Coordinated with counterparts in Cash, Derivatives, Converts, Prime Brokerage and Structured Products to lend credibility to PT product and leverage existing client relationships.
- Collaborated with COO's office to solve sales-credit issue between departments - motivated people by allowing their work to show on their P&L run: Prime Brokerage, Sales Research and Derivatives.
- Doubled revenues and more than tripled account base YOY by aggressively marketing to US and European accounts.
- Managed capital commitments for proprietary and client-related Index trading strategies.
- Responsible for all regulatory, risk and compliance aspects of the business, from daily supervision and reporting, to management of the periodic SEC and FINRA examinations.
- Served on the Equities Division Management team.

**Earlier Career Highlights:**

**Head of Agency Portfolio Trading Desk, Commerzbank Securities (2000-2001):**

- Created company's first program trading offering, and integrated it within existing trading and compliance/reporting infrastructure.

**Portfolio Sales/Trader, Salomon Brothers (1995-2000):**

- Employed quantitative portfolio creation and management tools to construct client baskets, and execute trades for Salomon Smith Barney, ranked as one of the top Portfolio Trading Desks in the world. Trades exceeded the billion-dollar mark having the potential to create significant market movement.
- Published research related to S&P, Russell and MSCI Index changes and rebalances, and managed proprietary trading risk book to facilitate liquidity for clients during such events.

**Education:**

- Elements of Artificial Intelligence, University of Helsinki (2019-2020)
- Blockchain Technologies, Business Innovation and Application, MIT Sloan School of Management (2019)
- B.S. in Finance, B.S. in Economics, Minor in International Business from the University of Idaho (Jan. 1992-May 1995).
- Studied Engineering at the University of Bucharest, Romania (Sept. 1989 – Dec. 1991).

**Other:**

- Lent regulatory and trading expertise to "The Willis Report" and "Varney & Co" on the Fox Business News network
- Published numerous articles on the complicated nature of the current market structure, emphasizing the challenges faced by traders and regulators alike in the era of high-frequency trading (WSJ, Barron's, Wall Street Daily, Markets Media etc.) .
- Invented and Patented Cross Trading Securities Methodology  (Patent # 8583537)
- Series 7, Series 63, Series 24, Series 3, Series 55 – lapsed at this time.
- Arrived in the US in 1992, after obtaining a full Track&Field scholarship at the University of Idaho.
- Big Sky Champion 110 Meter Hurdles, Romanian National Champion 50, 60 and 110 Meter Hurdles.
- Fluent in English and Romanian.

# Appendix B

## Documents Considered

**Discovery Materials**

1.  ABN000001
2.  BARC_000001-43
3.  BNYM000001
4.  BOFAS001-6
5.  Cowen_Bayer000001
6.  CS_SheetMetal-0000001-3
7.  DTCC001–DTCC034
8.  FINRA000001-15
9.  HJ-0000448-2400
10. HL-0001345-1403; HL-0002707-2753
11. HTS000001
12. INSTINET000001-11
13. Interactive000001
14. JEFF00000001-2
15. LS000001
16. FINRA000001-15
17. FIS000001
18. MACQ_000001-2
19. Maxim000001-2
20. MS_SheetMetal_000001-3
21. NYSE000001
22. OTC000001-13319
23. PLTFS-SMW-000906
24. PLTFS-IUOE-000001
25. SBern000001
26. SGAS000001-8
27. UBS000001-2
28. VIRTU000001-16
29. VTG000001
30. WFS000001-3

31.   WSANYC000001-6

## Deposition Transcripts

1.   Transcript of Deposition of Professor Joshua R. Mitts, Ph.D.

2.   Transcript of Deposition of International Brotherhood of Teamsters Local No. 710 Pension Fund Pursuant to Fed. R. Civ. P. 30(b)(6)

3.   Transcript of Deposition of Sheet Metal Workers' National Pension Fund Pursuant to Fed. R. Civ. P. 30(b)(6)

4.   Transcript of Deposition of International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware Pursuant to Fed. R. Civ. P. 30(b)(6)

## Materials Previously Filed with the Court

1.   Dkt. No. 141, Ex. A – Expert Report of Chad Coffman, CFA

2.   Dkt. No. 141, Ex. B – Expert Report of Professor Joshua R. Mitts, Ph.D.

3.   Dkt. No. 47 & Exs. A-C – Certifications Pursuant to the Federal Securities Laws of Sheet Metal Workers' National Pension Fund, International Brotherhood of Teamsters Local No. 710 Pension Fund, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware Pursuant to Fed. R. Civ. P. 30(b)(6)

## Other Publicly Available Documents

1.   Am. Depositary Receipts, Release No. 274, 1991 WL 294145, at *2 n.5 (May 23, 1991)

2.   SEC Office of Investor Education and Advocacy, *Investor Bulletin: American Depositary Receipts*, available at https://www.sec.gov/investor/alerts/adr-bulletin.pdf

3.   Declaration of Cristian Zarcu, Exhibit B to Declaration of Eric Grannon in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, *Stoyas* v. *Toshiba Corp.*, No. 2:15-cv-04194 DDP-JC (C.D. Cal. May 20, 2021)

4.   Exhibit G to Declaration of Eric Grannon in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, *Stoyas* v. *Toshiba Corp.*, No. 2:15-cv-04194 DDP-JC (C.D. Cal. May 20, 2021)