Carol V. Gilden (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Email: cgilden@cohenmilstein.com

Nicole Lavallee (SBN 165755)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        avahdat@bermantabacco.com

*Attorneys for Lead Plaintiffs and Additional Named Plaintiff*
[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>        Defendants. | Case No: 3:20-cv-04737-RS<br><br>**<u>CLASS ACTION</u>**<br><br>**PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**<br><br>Date:    April 13, 2023<br>Time:    1:30 p.m.<br>Ctrm:    3 – 17th Floor<br>Judge:   Richard Seeborg |

[No: 3:20-cv-04737-RS] PLAINTIFFS' REPLY ISO MOT. FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................................... 1

ARGUMENT ...................................................................................................................................... 3

I.  PLAINTIFFS' CLAIMS ARE TYPICAL OF THE PROPOSED CLASS. ............................ 3

A.  Courts have uniformly held that purchases of sponsored ADRs are domestic transactions that do not raise extraterritoriality concerns. ........................................... 3

B.  The *Toshiba II* decision on which Defendants rely applies only to a narrow category of unsponsored ADR transactions, does not address the passing of title, and is otherwise entitled to no weight here. ......................................................... 5

C.  Plaintiffs purchased Bayer ADRs in domestic transactions. ....................................... 6

1.  Title passed in the U.S.—game over. ............................................................. 7

2.  Irrevocable liability was also incurred in the U.S. .......................................... 7

D.  Extraterritoriality is neither dispositive nor will it be the focus of the litigation. .......... 8

E.  Mr. Zarcu's experience trading ADRs does not make him an expert on where liability attaches to financial transactions and his opinion is wholly unreliable. .......... 8

II.  PLAINTIFFS HAVE PROVEN THAT COMMON ISSUES PREDOMINATE. .................. 11

A.  Individualized inquiries do not predominate because domesticity can be presumed for the overwhelming majority of the Class's transactions. ........................ 11

B.  Plaintiffs have proven that damages are capable of measurement on a class wide basis consistent with their theory of liability. ...................................................... 12

1.  The out-of-pocket model can be used to calculate damages from materialization of the risk on a class-wide basis. ............................................ 13

2.  The likelihood of Bayer acquiring Monsanto and the standalone value of Monsanto can be quantified and used to determine artificial inflation. ............................................................................................................ 14

3.  The out-of-pocket damages model can accommodate the inclusion or exclusion of dates for corrective disclosures and price declines. ................... 14

C.  The minor divergence between the prices of Bayer ADRs and Bayer ordinary shares on 14 of the 1,037 trading days in the Class Period does not suggest the market was inefficient such that Plaintiffs cannot invoke the *Basic* presumption .......................................................................................................................... 15

CONCLUSION ................................................................................................................................ 15

**TABLE OF AUTHORITIES**

**CASES**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)............................................................................................... 7

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)......................................................................................................... 15

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..................................................................................................... 2, 15

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ........................................................................................ 12

*City of Miami Gen. Emps. Ret. Tr. v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)................................................................. 12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................... 2, 12, 13

*Cosby v. KPMG, LLP*,
2020 WL 3548379 (E.D. Tenn. June 29, 2020)............................................................... 13

*Eric P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 803 (2011)......................................................................................................... 13

*Gen. Elec. v. Joiner*,
522 U.S. 136 (1997)........................................................................................................... 9

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
141 S. Ct. 1951 (2021)..................................................................................................... 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)......................................................................................................... 15

*Hatamian v. Advanced Micro Devices, Inc.*,
2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)................................................................. 13

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ....................................................................................... 13

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ..................................................................................... 12

*In re Myford Touch Consumer Litig.*,
2018 WL 3646895 (N.D. Cal. Aug. 1, 2018) .................................................................. 11

*In re Oracle Corp. Sec. Litig.*,
2009 WL 1709050 (N.D. Cal. June 19, 2009) ................................................................. 10

*In re Petrobras Securities*,
862 F.3d 250 (2d Cir. 2017)............................................................................................. 11

*In re Scor Holding (Switz.) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008)......................................................................................... 15

*In re Silver Wheaton Corp. Sec. Litig.*,
    2017 WL 2039171 (C.D. Cal. May 11, 2017) ........................................................................... 14

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ................................................................................ 3, 4

*Junge v. Geron Corp.*,
    2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) ............................................................................. 13

*Loritz v. Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015) ........................................................................... 12

*Lyon v. ICE*,
    308 F.R.D. 203 (N.D. Cal. 2015)................................................................................................ 8

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010)......................................................................................................... 4, 5, 6

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016)............................................................................................. 12

*Pinker v. Roche Holdings Ltd.*,
    292 F.3d 361 (3d Cir. 2002)............................................................................................. 3, 4, 7

*Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*,
    645 F.3d 1307 (11th Cir. 2011) ................................................................................................. 7

*Rooney v. EZCORP, Inc.*,
    330 F.R.D. 439 (W.D. Tex. 2019) ........................................................................................... 13

*SEB Inv. Mgmt. v. Symantec Corp.*,
    335 F.R.D. 276 (N.D. Cal. 2020)............................................................................................. 13

*SEC v. Glob. Inv. Strategy UK Ltd.*,
    2021 WL 4896127 (S.D.N.Y. Oct. 19, 2021) ............................................................................ 6

*SEC v. World Capital Mkt., Inc.*,
    864 F.3d 996 (9th Cir. 2017) ..................................................................................................... 7

*Stoyas v. Toshiba Corp.* (*Toshiba I*),
    896 F.3d 933 (9th Cir. 2018) ............................................................................................ passim

*Stoyas v. Toshiba Corp.* (*Toshiba II*),
    2022 WL 220920 (C.D. Cal. Jan. 25, 2022) ...................................................................... 3, 5, 6

*Tyson Foods, Inc. v. Bouaphaeko*,
    577 U.S. 442 (2016)................................................................................................................. 11

*United States v. Martoma*,
    2013 WL 6632676 (S.D.N.Y. Dec. 17, 2013) ....................................................................... 7, 8

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
    2017 WL 2378369 (C.D. Cal. May 31, 2017) ............................................................................ 4

*Werdebaugh v. Blue Diamond Growers*,
    2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ........................................................................ 12

**STATUTES**

Exchange Act of 1934 § 10(b) ................................................................................................ passim

**RULES**

Fed. R. Civ. P. 23(b)(3) ................................................................................................................ 11

**OTHER AUTHORITIES**

SEC, *Investor Bulletin: Understanding Order Types* (July 12, 2017) ..................................................... 5

Securities Act Release No. 8287, Exchange Act Release No. 48482,
    68 Fed. Reg. 54,644 (Sept. 17, 2003) ........................................................................................ 1

# GLOSSARY

| Term | Description |
|------|-------------|
| COR | Expert Report of Chad Coffman, CFA (ECF No. 141-1) |
| CRR | Expert Rebuttal Report of Chad Coffman, CFA, attached as Exhibit B to the Gilden Declaration (defined below) |
| DB__ | Defendants' Memorandum of Points and Authorities in Opposition to Paintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 150) |
| Ex. __ | Exhibits to the Gilden Declaration (defined below) |
| Gilden Decl. | Declaration of Carol V. Gilden in Further Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Gilden Declaration"), filed concurrently herewith |
| MOR | Expert Report of Professor Joshua R. Mitts, Ph.D. (ECF No. 141-2) |
| MRR | Rebuttal Expert Report of Professor Joshua R. Mitts, Ph.D., attached as Exhibit A to the Gilden Declaration (defined above) |
| PB__ | Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel and Memorandum of Points and Authorities in Support Thereof (ECF No. 140) |
| ZRR | Rebuttal Report of Cristian Zarcu (ECF No. 151 Ex. O-2; ECF No. 152 Ex. S-3) |

**PRELIMINARY STATEMENT**

Defendants concede that nearly all the requirements for class certification—including numerosity, commonality, adequacy, and superiority—are met here. Their opposition raises only a few narrow challenges to typicality and predominance, all of which are meritless.

On typicality, Defendants argue that Plaintiffs cannot prove they acquired Bayer American Depositary Receipts (or "ADRs") in domestic transactions. This is nonsense. Plaintiffs are American pension funds whose American investment managers placed orders with American brokers to acquire Bayer's officially sponsored American Depositary Receipts (ADRs) in America from the America-based Bank of New York Mellon and other American sellers. They were able to do so because Bayer contracts with Bank of New York Mellon to establish a market in America for Bayer securities denominated in American currency. Courts have uniformly held that purchases of *sponsored* ADRs like Bayer's are domestic transactions that do not raise extraterritoriality concerns. And the mere fact that brokers working for Plaintiffs' investment managers bought Bayer ordinary shares, which are *different securities*,[1] in *legally separate transactions for which Plaintiffs have not brought § 10(b) claims* does nothing to change that and is ultimately an irrelevant sideshow.

On predominance, Defendants advance three arguments, all of which fail. First, Defendants argue that individualized inquiries will predominate due to the need to determine whether the Class members' Bayer ADR transactions were domestic or extraterritorial. But there is no evidence here of *any* extraterritorial Bayer ADR purchases. Moreover, Defendants concede that the overwhelming majority were purchases of existing ADRs, which *even under Defendants' theory* were unquestionably domestic because there were no related foreign share transactions. Common issues thus still predominate, as the only individualized determinations potentially required involve a single affirmative defense (extraterritoriality) applicable only to a small fraction of the Class.

---

[1] "ADRs are negotiable certificates issued by a United States depositary institution, typically banks, and they represent a beneficial interest in, but not legal title of, a specified number of shares of a non-United States company." *Stoyas v. Toshiba Corp.* (*Toshiba I*), 896 F.3d 933, 940 (9th Cir. 2018). Thus, "ADRs and the deposited securities are separate securities." *Id.* at 942 (quoting Securities Act Release No. 8287, Exchange Act Release No. 48482, 68 Fed. Reg. 54,644, at 54,644 n.4 & 54,646 (Sept. 17, 2003)).

Second, Defendants argue the out-of-pocket ("OOP") model proposed by Plaintiffs cannot measure damages on a class-wide basis consistent with Plaintiffs' theory of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013). This exact argument has been unanimously rejected in scores of class certification decisions. The OOP model is the gold standard for measuring securities-fraud damages and it is used in virtually all cases, like this one, where Plaintiffs bring claims under § 10(b) of the Exchange Act of 1934. In reality, Defendants fault Plaintiffs for not having done a detailed loss-causation analysis, which the Supreme Court has held is not required for class certification. Defendants' supposed concerns about the OOP model's ability to (1) address changes in artificial inflation over time considering the facts here, and (2) isolate corrective from confounding information, if any, on the corrective disclosure dates, are appropriately dealt with at the merits stage by using well-established techniques and proof common to all Class members.

Third, Defendants argue Plaintiffs cannot invoke the fraud-on-the-market presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (the "*Basic* presumption"), because Plaintiffs have purportedly failed to show the market for Bayer ADRs was efficient during 14 of the 1,037 trading days in the Class Period (*i.e.*, 1.4% of the Class Period), during which there was a minor divergence between the prices of Bayer ADRs and Bayer ordinary shares explained by several temporary supply-and-demand dynamics. To begin with, Defendants do not contend the market for Bayer ADRs was *inefficient* at *any* point during the Class Period; nor do they dispute that Plaintiffs are entitled to the *Basic* presumption *at least* during the other *98.6%* of the Class Period. Nor is there any evidence that during this 14-trading-day window the price of Bayer ADRs was not responding to public, material information, which is the relevant question for determining whether the market was efficient. Indeed, Defendants do not dispute that *at least* 10 of the 12 market efficiency factors, including four *Cammer* factors and all *Krogman* factors, support a finding of market efficiency during that window. Plaintiffs have thus shown they are entitled to the *Basic* presumption for the entire Class Period.

Plaintiffs' Motion should accordingly be granted in its entirety.

---

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE TYPICAL OF THE PROPOSED CLASS.

#### A.    Courts have uniformly held that purchases of sponsored ADRs are domestic transactions that do not raise extraterritoriality concerns.

Defendants' typicality argument ignores the crucial legal distinction between *sponsored* ADRs (like Bayer's) and *unsponsored* ADRs (like those at issue in *Stoyas v. Toshiba Corp.* (*Toshiba II*), 2022 WL 220920 (C.D. Cal. Jan. 25, 2022), the one non-binding case on which Defendants' entire typicality argument relies). Whereas an unsponsored ADR "is established with little or no involvement of the issuer of the underlying security," a sponsored ADR "is established with the active participation of the issuer," which "enters into an agreement with the depositary bank and the ADR owners" in the United States. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002) (citations omitted). Because by setting up a sponsored ADR program, a company voluntarily avails itself of U.S. securities markets and enters into agreements with U.S. counterparties, courts have uniformly held that over-the-counter ("OTC") purchases pursuant to that program are domestic transactions subject to U.S. federal securities laws.

For example, in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017), the court concluded that applying § 10(b) to the plaintiffs' ADR purchases was not an impermissibly extraterritorial application of U.S. law "[b]ecause Volkswagen sponsored the ADRs in the United States and Plaintiffs purchased the ADRs here, and because the United States has an interest in protecting domestic investors against securities fraud," *id.* at *1–2, *6–7. Notably, *Volkswagen* concerned OTC Level I ADRs sponsored by a German corporation, *see id.* at *4—the exact same type as Bayer's, Ex. C. The court explained that by sponsoring the ADRs, Volkswagen was "directly involved in the *domestic* offering of the ADRs," and "took affirmative steps to make its securities available to investors here in the United States." 2017 WL 66281 at *5–6 (emphasis added). Further, Volkswagen's ADRs "were sold to US investment advisers for the benefit of the US-resident Plaintiffs and were delivered through DTC, the principal US securities clearing and settlement system, to accounts at US financial institutions, and title transferred in the United States," *id.* at *4—facts identical to those here.

Similarly, in *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369 (C.D. Cal. May 31, 2017), the court held that the plaintiffs' purchases of German corporation Daimler's sponsored ADRs were domestic transactions because "Daimler AG sponsored the ADRs and was directly involved in the domestic offering of the ADRs," and because there, as here, "all broker-dealers, settling agents, and clearing houses associated with the [ADR] transactions were U.S. institutions," *id.* at *11–12. Crucially, as in *Volkswagen*, the ADRs in *Daimler* were OTC Level I ADRs sponsored by a German corporation, *id.* at *1 n.1—the exact same type as Bayer's.

The Ninth Circuit's decision in *Toshiba I*, 896 F.3d 933, is consistent with these cases. There, the Ninth Circuit recognized that a foreign corporation's involvement in facilitating the creation of ***unsponsored*** ADRs suggests purchases of those ADRs are domestic. *See id.* at 951–52.

The principle underpinning these decisions is that when a foreign corporation avails itself of U.S. capital markets, it must adhere to U.S. federal securities laws, including § 10(b) and Rule 10b-5. This is what makes these cases so different from *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), where the Supreme Court held it would be impermissibly extraterritorial to apply § 10(b) to ***foreign*** plaintiffs suing ***foreign*** (and American) defendants for misconduct relating to ***foreign*** shares traded on ***foreign*** exchanges, *id.* at 250, 273. The Supreme Court "rejecte[ed] the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad," citing potential conflicts with other countries' laws and securities fraud regulations. *Id.* at 267–70. These concerns have no application to ***American*** Depositary Receipts, the whole purpose of which is to "allow ***American*** investors to trade equities of a foreign corporation ***domestically***." *Pinker*, 292 F.3d at 371 (emphasis added).[2] For all these reasons, applying § 10(b) to Plaintiffs' and other Class members' purchases of Bayer's sponsored ADRs would not be an impermissibly extraterritorial application of federal law in violation of *Morrison*. Defendants thus have no viable extraterritoriality defense to Plaintiffs' claims and their typicality challenge fails.[3]

---

[2] Likewise, Defendants' purported trading expert, Cristian Zarcu, has opined that the purpose of ADRs is to offer investors "a hassle-free way to purchase shares of international companies ***without having to deal with foreign markets***." Ex. D at 52:25–53:21 (emphasis added). Mr. Zarcu is also not aware of a single ADR that trades outside the United States. *Id.* at 52:12–16.

[3] Defendants incorrectly suggest that Prof. Mitts has admitted that ADR sponsorship is insufficient to determine domesticity for individual trades. *See* DB10. Not so. Prof. Mitts testified

**B.    The *Toshiba II* decision on which Defendants rely applies only to a narrow category of unsponsored ADR transactions, does not address the passing of title, and is otherwise entitled to no weight here.**

Defendants' typicality argument hinges entirely on the Central District of California's non-binding decision in *Toshiba II*—a factually inapposite and legally questionable outlier.

Previously, in *Toshiba I*, the Ninth Circuit had held a court may determine the location of a securities transaction by applying the "irrevocable liability" test, which looks to "where purchasers incurred the liability to take and pay for securities, and where sellers incurred the liability to deliver securities," among other factors. *See* 896 F.3d at 949–51. Following remand, in *Toshiba II*, the district court denied the plaintiff's motion for class certification, ruling they could not show they incurred irrevocable liability to purchase ADRs in the United States, rendering them atypical of the proposed class. *See* 2022 WL 220920 at \*1–5 & n.5. The court reasoned that based on the terms of the plaintiff's ***market order*** to buy ***unsponsored*** Toshiba ADRs, they became "logically and legally bound" to buy the ADRs the moment their broker purchased Toshiba ordinary shares in Japan. *Id.* at \*3–4 & n.5. Because "the triggering event" for "incur[ring] irrevocable liability occurred in Japan," the plaintiff could not establish they purchased ADRs in a domestic transaction. *Id.* at \*5.

Defendants' superficial treatment of *Toshiba II* ignores the two things that made that case very different from, and ultimately inapplicable to, this case. First, *Toshiba II* concerned ***unsponsored ADRs*** issued by unaffiliated banks acting without Toshiba's approval or involvement. Unlike sponsored ADRs like Bayer's, unsponsored ADRs implicate *Morrison*'s animating comity concerns because the defendant may have done little to nothing to subject themselves to U.S. laws.

Second, *Toshiba II* concerned a ***market order***, which is "an order to buy or sell a stock at the best available price," that "[g]enerally . . . will be executed immediately." *Id.* at \*3 n.5 (quoting SEC, *Investor Bulletin: Understanding Order Types* (July 12, 2017)). As Prof. Mitts has explained, a market order reflects a binding commitment to transact in a triggering fashion—meaning that as soon as it is possible to transact, the purchaser becomes immediately bound to purchase the ordered

---

only that in his view the question of sponsorship does not conclusively resolve the ***factual question*** of ***where irrevocable liability*** was incurred. *See* Ex. E. at 58:19–61:4. Moreover, Plaintiffs have consistently argued that purchases of sponsored ADRs on U.S. OTC markets are domestic transactions that do not raise extraterritoriality concerns, such that it is unnecessary to examine where irrevocable liability was incurred for such transactions. *See supra*; PB11 n.3.

securities at the lowest price available. Ex. E at 140:18–141:2, 141:22–142:8, 213:18–24, 216:5-16. In *Toshiba II*, the plaintiff's market order for ADRs made it such that the ADR transaction was triggered and became binding when the foreign shares were purchased in Japan, because at that moment the order for ADRs had to be filled immediately by using the foreign shares to buy ADRs at the lowest available price. That is a very different situation from here, where the Plaintiffs' orders for ADRs were not market orders, but other types of orders that were legally cancellable until the ADRs were issued by Bank of New York Mellon in New York or acquired in existing form on the U.S. OTC market, *see* MOR ¶ 39 n.47; MRR ¶¶ 66–69, 72, 102, 108–09, which means the Plaintiffs incurred irrevocable liability in the United States.

Additionally, in *Toshiba II*, the parties did not raise, and the Court did not address, the potentially dispositive question of whether the passing of title to the ADRs within the United States was sufficient to establish domesticity, as other courts have held. *See infra* § I.C.1.

Finally, the legal analysis in *Toshiba II*—the only ADRs securities fraud case ***ever*** to deny class certification on extraterritoriality grounds—is questionable. It ignored the Ninth Circuit's guidance in *Toshiba I* on what factors to consider when analyzing where irrevocable liability was incurred, *see* 896 F.3d at 949–52 (listing factors), instead creating and then narrowly focusing on a new requirement that there be no foreign "triggering event" for the ADR transaction. This heightened requirement finds no basis in *Morrison*, *Toshiba I*, or any other case. *See, e.g.*, *SEC v. Glob. Inv. Strategy UK Ltd.*, 2021 WL 4896127, at \*6 (S.D.N.Y. Oct. 19, 2021) (the *Morrison* inquiry is not focused on "actions needed to carry out the transactions"). And it suggests that U.S. investors can bring § 10(b) claims for purchases of existing ADRs (because purchasers do not need to first acquire ordinary shares abroad), but not for purchases of newly issued ADRs (because they do)—even though both types of ADRs trade in the ***same U.S. OTC market***. S*ee* Ex. D at 303:23–304:3 (no arbitrage opportunities between newly issued ADRs and existing ADRs).

In sum, *Toshiba II* is neither binding nor dispositive here.

**C.      Plaintiffs purchased Bayer ADRs in domestic transactions.**

A plaintiff may establish an OTC securities transaction is domestic ***either*** by showing (1) title to that security passed in the United States, ***or*** (2) irrevocable liability was incurred in the

United States. *See, e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012). Plaintiffs can show both conditions are satisfied here.

### 1.    Title passed in the U.S.—game over.

The passing of title to a security in the United States is sufficient to show it was acquired domestically. *See, e.g.*, *Absolute Activist*, 677 F.3d at 62; *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307 (11th Cir. 2011) (§ 10(b) applied because title passed in U.S.).[4] Title to an ADR is distinct from the title to the shares underlying that ADR. *See, e.g.*, *Pinker*, 292 F.3d at 367 ("The holder of an ADR is not the title owner of the underlying shares; the title owner of the underlying shares is either the depositary, the custodian, or their agent."); *United States v. Martoma*, 2013 WL 6632676, at *5 (S.D.N.Y. Dec. 17, 2013) (ADRs are distinct securities "issued in the United States," "despite the fact that—by definition—they represent shares of stock in a foreign corporation."). Here, Plaintiffs have presented undisputed evidence that title to the ***ADRs*** they purchased passed to them in the United States. MRR ¶ 15. Plaintiffs will thus be able to show they purchased their Bayer ADRs in domestic transactions—full stop, game over.

### 2.    Irrevocable liability was also incurred in the U.S.

The irrevocable liability test—which looks to "where purchasers incurred the liability to take and pay for" the securities at issue, and "where sellers incurred the liability to deliver" those securities—can also be used to determine whether a transaction was domestic. *Toshiba I*, 846 F.3d at 949; *see also Absolute Activist*, 677 F.3d at 62. Here, the U.S.-based Plaintiffs' purchases of newly issued Bayer ADRs were made in New York from Bank of New York Mellon in exchange for previously purchased ordinary shares. *See* MOR ¶¶ 36–38, 45–50. Further, each of the Plaintiffs purchased existing Bayer sponsored ADRs on the domestic market. MOR ¶¶ 42–44; MRR ¶ 8. There is no evidence whatsoever that Plaintiffs irrevocably committed to purchase Bayer ***ADRs*** (not ordinary shares—***ADRs***) outside the United States. "While defendant[s'] contention that an investor could not purchase an [ADR] in the United States without a corresponding overseas transaction may

---

[4] The Ninth Circuit has yet to rule on whether the passing of title to an ADR is sufficient to establish domesticity, as this argument was not raised in *Toshiba I*. However, the Ninth Circuit has on several occasions approvingly endorsed *Absolute Activist*'s approach to determining domesticity. *See Toshiba I*, 896 F.3d at 948; *SEC v. World Capital Mkt., Inc.*, 864 F.3d 996, 1008 (9th Cir. 2017).

be true, it does not change the fact that a purchase in the United States still took place." *Martoma*, 2013 WL 6632676, at \*5 n.4 (citation omitted).

### D.    Extraterritoriality is neither dispositive nor will it be the focus of the litigation.

Defendants' extraterritoriality defense is not potentially dispositive of Plaintiffs' claims because it is generally meritless. Further, considering the minimal discovery Defendants have sought on this issue to date, there is no reason to believe extraterritoriality will "threaten to become a central focus of the litigation to the extent that it would interfere with [Plaintiffs'] representation of the class."[5] *Lyon v. ICE*, 308 F.R.D. 203, 213 (N.D. Cal. 2015). Moreover, the defense cannot possibly apply to each of the named Plaintiffs' purchases of *existing* Bayer ADRs, *see* MRR ¶ 8, which means ***Plaintiffs' (and the Class's) § 10(b) claims will survive even if the defense is successful***.

### E.    Mr. Zarcu's experience trading ADRs does not make him an expert on where liability attaches to financial transactions and his opinion is wholly unreliable.

The Court should give no weight to the unqualified and fundamentally unreliable opinion of Defendants' purported trading expert, Cristian Zarcu. First, Mr. Zarcu's lack of qualifications show his opinion is not credible—especially when compared with that of Plaintiffs' expert, Columbia Law School professor and financial economist Prof. Mitts, who is one of the U.S. Department of Justice's go-to experts for determining where financial transactions take place and how they are executed. *See* Ex. E at 17:20–18:12, 22:12–23:13. To begin with, Mr. Zarcu's experience as an ADRs *trader* gives him no special expertise in determining when and where *liability* to a financial transaction becomes irrevocable. Mr. Zarcu admitted as such at his deposition, disclaiming any expertise in determining where liability attaches to financial transactions. Ex. D at 12:9–13, 67:4–9. Which makes sense, because over the course of his entire career, Mr. Zarcu has *never* had *any* professional responsibility for determining where liability attaches to financial transactions. *See id.* at 79:17–24, 85:21–25,

---

[5] Defendants' argument that Plaintiffs made a "strategic decision not to develop the factual record," DB11, is false and hypocritical. Plaintiffs have subpoenaed 37 non-parties—including broker-dealers, trading platforms, FINRA, and DTCC—to obtain discovery relevant to Defendants' extraterritoriality defense. Gilden Decl. ¶ 10. Contrary to Defendants' assertions, Plaintiffs' subpoenas to their brokers requested communications with Plaintiffs' investment managers, *see id.* ¶ 12, so that it was not necessary to subpoena Plaintiffs' investment managers for those same communications as it would have been duplicative. Meanwhile, Defendants waited over four months after the Initial Case Management Conference to seek any discovery on extraterritoriality at all, and then they only sought documents from Plaintiffs' investment managers. *See id.* ¶ 11.

87:4–9, 88:9–21, 281:19–24, 282:21–283:2. He has no background in the legal or compliance aspects of securities transactions beyond that gained from working on trading desks. *See id.* at 68:22–72:17, 78:16–19, 88:22–89:7. Nor has Mr. Zarcu *ever* previously been asked by *anyone* to analyze where irrevocable liability attached to a financial transaction. *Id.* at 68:5–11. Although Mr. Zarcu submitted an expert report in the *Toshiba* litigation, his opinion there was limited to the "process, documents, and terminology" for the transactions at issue—he did not actually opine on where irrevocable liability was incurred, as he admitted under oath at his depositions in both *Toshiba* and this case. *Id.* at 36:6–37:25, 40:15–43:20. This lack of experience matters because how things appear to a trader may mask a more complicated reality behind the scenes in terms of the legal structures and obligations at play. *See* MRR ¶¶ 59–62. In other words, a trader is simply the wrong person to ask where a purchaser of securities incurred liability—that is not their expertise.

Mr. Zarcu's opinion should also be disregarded because his purported "methodology" is wholly unreliable. To begin with, Mr. Zarcu *does not have a real methodology*. MRR ¶¶ 18–22. He claims to have conducted a "holistic review of all of the evidence based on [his] experience as a trader," but he cannot describe what process he followed or what objective criteria he employed to reach his opinions. *See* Ex. D at 108:19–109:15, 110:14–112:9, 113:18–114:22, 115:25–116:8. There is no way to test or replicate his analysis. Indeed, Mr. Zarcu testified that the only way to do so would be to hire a trader with a comparable level of experience, and then "you wouldn't need to tell them what steps to take," they would simply "know, just like I know." *Id.* at 115:12–24, 311:15–25, 317:25–318:15. And despite claiming to use "accepted and reliable" methods, ZRR ¶ 11, Mr. Zarcu is unable to name a single other person who has ever used his supposed "methodology," *id.* at 109:16–24. Mr. Zarcu's opinion should thus be disregarded because it is "connected to existing data only by [his] *ipse dixit*." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). Prof. Mitts' methodology, by contrast, is reliable, replicable, and testable. *See* MOR ¶¶ 31–35; MRR ¶ 30.

Mr. Zarcu's "methodology" is also riddled with errors. Despite recognizing that ADRs and ordinary shares are different securities, Ex. D at 50:12–21, 57:16–18, Mr. Zarcu failed to consider where the transfer of title to the ADRs occurred (the United States), *id.* at 60:13–61:2, 162:19–25, MRR ¶¶ 14–16—even though the Ninth Circuit has explicitly stated this is relevant in determining

where irrevocable liability was incurred, *see Toshiba I*, 896 F.3d at 949. Likewise, despite agreeing that an order for ADRs is cancellable (*i.e.*, irrevocable liability has not been incurred) until it is fully executed, *see id.* at 16:19–17:3, 44:25–45:11, 271:23–272:9, Mr. Zarcu did not consider the locations of the final two steps in the execution process for a purchase of newly issued ADRs: the deposit of ordinary shares (New York) and the issuance of ADRs (also New York), MRR ¶¶ 17, 29.[6]

Mr. Zarcu also entirely failed to consider Plaintiffs' broker-dealers' customer agreements, which are the legal documents that ***actually determined*** Plaintiffs' obligations with respect to their Bayer ADR purchases. Ex. D at 80:4–81:9, 152:19–155:2; MRR ¶¶ 53, 61–62. As Prof. Mitts explains, every single one of these agreements effectively states that ADR orders are cancellable until fully executed, which means Plaintiffs did not incur irrevocable liability to purchase newly issued ADRs until those ADRs were issued by Bank of New York Mellon. MRR § IV.C.

These missteps are just the tip of the iceberg—Mr. Zarcu's report is also replete with mischaracterizations of the evidentiary record. As Prof. Mitts explains at length in his rebuttal report, Mr. Zarcu repeatedly (1) failed to consider or mistakenly interpreted clearing records, FINRA records, and internal broker-dealer documents; (2) failed to keep track of or clearly distinguish which of Plaintiffs' orders were carried out by which broker-dealers; and (3) misinterpreted trader communications, and in several cases ignored clear evidence that the question of whether and how many ADRs would be purchased had not even been considered at the time Bayer ordinary shares were purchased. MRR §§ III.D, IV.C. Ultimately, Mr. Zarcu's "methodology" boils down to a baseless assumption that irrevocable liability is incurred outside the United States for ***every*** new ADR issuance. *See* MRR ¶¶ 23–29; Ex. D at 124:14–125:11. But a methodology that ignores key evidence and instead simply "assumes what [it] sets out to prove" is "not based on discernible methods and methodology and therefore is not reliable." *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *28 (N.D. Cal. June 19, 2009) (citation and internal quotation marks omitted).

In sum, this Court should give no weight to Mr. Zarcu's opinions. Prof. Mitts' analysis

---

[6] At his deposition, Mr. Zarcu incorrectly claimed the deposit of ordinary shares either occurs in Germany or the location cannot be known, and he did not know with what institution the shares were deposited. Ex. D at 59:18–60:2, 242:16–22. He also incredibly claimed not to know Bank of New York Mellon is based in New York or that Bayer ADRs are issued there. *Id.* at 58:6–59:5.

conclusively shows Plaintiffs incurred irrevocable liability in the United States for their purchases of existing *and* newly issued Bayer ADRs. As such, Plaintiffs are typical of the Class.

## II.    PLAINTIFFS HAVE PROVEN THAT COMMON ISSUES PREDOMINATE.

### A.    Individualized inquiries do not predominate because domesticity can be presumed for the overwhelming majority of the Class's transactions.

A "common methodology for proving that putative class members traded Bayer ADRs domestically," DB15, is unnecessary because there is no evidence of any extraterritorial Bayer ADR purchases, *see supra* § I. In any event, Defendants concede the overwhelming majority (83% per Mr. Zarcu, and 87% per Prof. Mitts) of the Class's transactions were purchases of existing Bayer ADRs for which irrevocable liability was unquestionably incurred in the United States because there were no related foreign ordinary share transactions. *See* DB17; Ex. D at 65:9–66:20, 269:19–270:6, 270:15–271:9; MOR ¶¶ 32, 52; MRR ¶ 9–11. Common issues thus still predominate, as the only individualized determinations potentially required concern a single affirmative defense applicable only to the small minority of the Class that purchased newly issued ADRs. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphaeko*, 577 U.S. 442, 453 (2016) (so long as "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately," including "affirmative defenses peculiar to some individual class members."); *In re Myford Touch Consumer Litig.*, 2018 WL 3646895, at *2 (N.D. Cal. Aug. 1, 2018) ("[T]he adjudication of individualized affirmative defenses . . . typically does not defeat predominance.").

This is why Defendants' reliance on *In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017), is misplaced. There, *every single member* of the proposed class had to *individually* provide evidence that their transactions in the Brazilian debt securities at issue occurred in the United States. *See id.* at 256–57, 272–73. Here, the fact-finder or claims administrator would at most need to examine only a small fraction of the Class members' transactional documents, and any "issues unique to particular class members may be handled in a manner similar to that used when individualized damages inquiries arise in class action proceedings."[7] *Nitsch v. Dreamworks Animation SKG Inc.*,

---

[7] Claims administrators frequently address individualized questions by requiring class members

315 F.R.D. 270, 313 (N.D. Cal. 2016). Because the Class's Bayer ADR transactions "display certain common indicia of domesticity," "any variation across plaintiffs is, on balance, insufficient to defeat predominance." *Id.* at 274 n.27; *see also In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 312 F.R.D. 332, 351 (S.D.N.Y. 2015) (common issues predominated despite need to assess domesticity for hundreds out of thousands of class members).

### B. Plaintiffs have proven that damages are capable of measurement on a class wide basis consistent with their theory of liability.

The OOP damages model proposed by Plaintiffs is the gold standard for securities litigation, and it is virtually always used in § 10(b) cases like this one. *E.g.*, *City of Miami Gen. Emps. Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018). Indeed, it fits precisely with Plaintiffs' theory here. CRR ¶ 16. Despite this, Defendants argue the OOP model is incapable of measuring damages on a class-wide basis consistent with Plaintiffs' theory of liability, as required by *Comcast*, 569 U.S. 27. This exact argument has been rejected in scores of securities class certification decisions around the country—86 times and counting. Ex. F. Indeed, Defendants do not cite even a *single* § 10(b) case where a court has rejected an OOP model due to *Comcast* concerns.[8]

As to *Comcast*, Defendants offer the report of Prof. Mark Garmaise. Unlike Plaintiffs' expert Mr. Coffman, who has broad experience calculating damages in securities class actions and whose methodologies have been consistently credited by courts, *see* CRR ¶ 16 n.16 & App'x C, Prof. Garmaise has little experience addressing damages issues in securities fraud class actions, Ex. G at 12:21–14:2—and it shows. All his observations concerning the proposed OOP model are unrelated to whether it can be used class-wide to measure damages. Instead, they concern whether certain case-specific adjustments may ultimately prove necessary to (1) assess how artificial inflation may have evolved over time, and (2) isolate corrective from confounding information, if any, on the alleged corrective disclosure dates. CRR ¶ 30. These are loss-causation questions that will be

---

to submit affidavits or transaction records, and by using "other techniques tailored by the parties and the court to validate claims." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131–32 (9th Cir. 2017) (citation and internal quotation marks omitted).

[8] Defendants' citations are inapposite. *See Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (plaintiffs did not specify a damages model at all); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) (not a securities class action).

addressed at the merits stage and need not be addressed at the class certification stage. *See, e.g.*, *Eric P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 803, 809 (2011). Further, these concerns are present in virtually every securities class action and can easily be addressed by the OOP model based upon proof common to all Class members. Defendants' *Comcast* challenges thus fail.

### 1. The out-of-pocket model can be used to calculate damages from materialization of the risk on a class-wide basis.

Contrary to Defendants, materialization of the risk is a "loss-causation theory" to be "prove[n] at the merits stage" and it "does not contravene *Comcast* or defeat predominance." *Junge v. Geron Corp.*, 2022 WL 1002446, at *8 (N.D. Cal. Apr. 2, 2022). Courts have also repeatedly held the OOP model can calculate damages from materialization of the risk on a class-wide basis. *See, e.g.*, *Cosby v. KPMG, LLP*, 2020 WL 3548379, at *28 (E.D. Tenn. June 29, 2020) (certifying class in materialization-of-the-risk case where Mr. Coffman proposed OOP damages model); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450–51 (W.D. Tex. 2019) (same); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105–06 (S.D.N.Y. 2016) (same). Despite this, Defendants and Prof. Garmaise argue the OOP model cannot be used to calculate materialization-of-the-risk damages here because it supposedly cannot: (1) account for the impact of information unrelated to the fraud ("confounding information") and (2) account for changes during the Class Period of what Bayer could and should have disclosed, *i.e.*, time-varying artificial inflation. Both of these purported concerns are baseless.

Concern (1) can readily be addressed through basic disaggregation techniques: an event study or another valuation method can be used to calculate the artificial inflation of the share price, and then, once the finder of fact has determined the degree of risk that was fraudulently concealed, the portion of the inflation not attributable to that degree of risk can be isolated and removed. CRR ¶¶ 31–36. Prof. Garmaise's supposition that the *full* price decline cannot be attributed to Defendants' misrepresentations about risk is a premature assumption at this stage of the case. In any event, whether a "plaintiff will be unable to disaggregate the artificial inflation from confounding events" is "an inquiry into loss causation" that "need not be analyzed at the class certification stage." *SEB Inv. Mgmt. v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020); *accord Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016).

As to concern (2), if merits discovery shows that artificial inflation was not constant over the Class Period, the OOP model can be adjusted to account for this. As Mr. Coffman explains, no matter what the finder of fact determines, the results can easily be applied to a daily artificial inflation table that will accompany a loss causation report at the merits stage. CRR ¶¶ 37–42. Damages will still be calculated the same way for each Class member. *See In re Silver Wheaton Corp. Sec. Litig.*, 2017 WL 2039171, at *15 n.11 (C.D. Cal. May 11, 2017) ("Even if . . . the inflation ribbon changed over time, damages would still be subject to class-wide proof.").

### 2. The likelihood of Bayer acquiring Monsanto and the standalone value of Monsanto can be quantified and used to determine artificial inflation.

The OOP model can also account for investors' purportedly "evolving expectations as to whether Bayer would acquire Monsanto," DB20, on a class-wide basis at the merits stage. Prof. Garmaise does not dispute that the likelihood of the Monsanto merger and Monsanto's standalone value can be quantified and used to determine artificial inflation at a given point in time. CRR ¶¶ 44, 49–53. To the extent investors' expectations changed over the Class Period, that can be dealt with in the same manner as time-varying inflation. *See* CRR ¶¶ 45–48; *supra* § II.B.1. There is no predominance issue here because the formula for calculating damages will be the same for every Class member—no individualized inquiries are required. CRR ¶ 53.

### 3. The out-of-pocket damages model can accommodate the inclusion or exclusion of dates for corrective disclosures and price declines.

Prof. Garmaise faults Mr. Coffman for not having specified which days constitute corrective disclosures and which price declines should be used to measure artificial inflation. But this purported concern does not call into question the OOP model, which applies class-wide and is flexible enough to accommodate the inclusion or exclusion of different corrective disclosures and price declines. CRR ¶¶ 57–58. Even if, as Prof. Garmaise contends, Plaintiffs will have to address supposed changes in publicly available information about the Roundup Litigation and Bayer's corporate structure during the Class Period, the OOP model can account for any resulting time-varying inflation following a detailed loss causation analysis during the merits phase.[9] *See* CRR ¶¶ 54–64.

---

[9] Contrary to Defendants, "investor-specific expectations," DB21, are irrelevant to calculating

**C.  The minor divergence between the prices of Bayer ADRs and Bayer ordinary shares on 14 of the 1,037 trading days in the Class Period does not suggest the market was inefficient such that Plaintiffs cannot invoke the *Basic* presumption.**

Defendants argue Plaintiffs cannot invoke the *Basic* presumption because Plaintiffs have purportedly failed to show the market for Bayer ADRs was efficient during 14 of the 1,037 days in the Class Period (*i.e.*, 1.4% of the Class Period), during which there was a minor divergence between the trading prices of Bayer ADRs and Bayer ordinary shares. *See* DB22–23. To begin with, neither Defendants nor Prof. Garmaise contend the market for Bayer ADRs was *inefficient* at *any* point during the Class Period; nor do they dispute that Plaintiffs are entitled to the *Basic* presumption *at least* during the other *98.6%* of the days in the Class Period. *See* DB21–23; CRR ¶¶ 76–77. Nor, for the 14 trading days at issue, do Defendants dispute that at least *10 of the 12* market efficiency factors, including four *Cammer* and all *Krogman* factors, point toward market efficiency—their argument relates only to one additional factor, a lack of arbitrage opportunity. CRR ¶¶ 72–74. Here, the relevant question is whether the price of Bayer ADRs "reflect[ed] all public, material information," *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263 (2014), and Defendants present no evidence that, during this 14-trading-day window, the price of Bayer ADRs did not reflect all such information, [10] including the price of Bayer's ordinary shares.[11] CRR ¶¶ 77–78. Plaintiffs have shown they are entitled to the *Basic* presumption for the entire Class Period.[12]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be granted.

---

damages. The price of Bayer ADRs does not vary from investor to investor based on their individualized expectations, nor does the amount of inflation from Defendants' misrepresentations.

[10] Defendants' reliance on *In re Scor Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008) is misplaced. There, the plaintiffs could not show the market was efficient during a post-IPO SEC-mandated "quiet period," because at that time securities analysts were not reporting on the stock, and the market thus did not yet reflect all public material information. *Id.* at 572–79.

[11] The temporary divergence is explained by differences in the supply and demand dynamics for Bayer ADRs and ordinary shares that are unique to that 14-trading-day window. For instance, during that window, a cash distribution was to be paid to Bayer ADR holders but not ordinary shareholders, and there was a temporary restriction in the supply of new ADRs. *See* COR ¶ 80 n.91.

[12] To rebut the *Basic* presumption, Defendants "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021). Prof. Garmaise does not offer an opinion on lack of price impact, nor do Defendants offer any evidence of lack of price impact. Finally, to the extent the Court determines this case primarily concerns omissions, Plaintiffs are also entitled to the presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). PB16.

Dated:  March 21, 2023

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By:    */s/ Carol V. Gilden*
       Carol V. Gilden (admitted *pro hac vice*)

190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
Email: cgilden@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: stoll@cohenmilstein.com

Chris Lometti (admitted *pro hac vice*)
Benjamin F. Jackson (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
Email: clometti@cohenmilstein.com
          bjackson@cohenmilstein.com

*Lead Counsel*

Nicole Lavallee (SBN 165755)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
          avahdat@bermantabacco.com

*Liaison Counsel*

*Attorneys for Lead Plaintiffs Sheet Metal Workers'
National Pension Fund and International Brotherhood
of Teamsters Local No. 710 Pension Fund, and Named
Plaintiff International Union of Operating Engineers
Pension Fund of Eastern Pennsylvania and Delaware*