# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>     vs.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>        Defendants. | Case No: 3:20-cv-04737-RS<br><br><u>CLASS ACTION</u><br><br><br>Ctrm:  3 – 17th Floor<br>Judge:  Richard Seeborg |

**REBUTTAL EXPERT REPORT OF PROFESSOR JOSHUA MITTS, PH.D. ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**MARCH 21, 2023**

---

[No: 3:20-cv-04737-RS] REBUTTAL EXPERT REPORT OF PROFESSOR JOSHUA MITTS, PH.D. ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   THE ZARCU REPORT DOES NOT CONTEST MANY OF THE FINDINGS IN THE MITTS REPORT, INCLUDING THAT THE OVERWHELMING MAJORITY OF PURCHASES OF BAYER ADRS CONSISTED OF EXISTING ADRS, NOR DOES MR. ZARCU DISPUTE THAT TITLE TO NEWLY ISSUED ADRS WAS TRANSFERRED IN THE UNITED STATES. ......................................................................2

III.  THE ZARCU REPORT PROVIDES NO REPLICABLE METHODOLOGY TO DETERMINE WHEN THE PURCHASE OF FOREIGN SHARES YIELDS IRREVOCABLE LIABILITY TO PURCHASE ADRS. ...........................................7

   A.  The Zarcu Report Is Devoid of Any Replicable Methodology to Justify Its Conclusions. ...........................................................................................7

   B.  In Reality, the "Methodology" Underlying the Zarcu Report Is a Baseless Assumption That Irrevocable Liability Is Incurred Outside the United States for *Every* New ADR Issuance. ...................................................................8

   C.  The Zarcu Report Conjures Up Novel "Principles" Underlying "Cross Transactions" Which are Economically Nonsensical and Inconsistent with SEC and FINRA Rules. .......................................................................11

      1.  The Novel "Principles" Identified In The Zarcu Report Are Economically Nonsensical. ..........................................................11

      2.  Mr. Zarcu Misuses the Term "Cross Transaction" Contrary to SEC and FINRA Rules Setting Out the Obligations of Market Participants in Connection with "Cross Transactions." .............................14

   D.  The Zarcu Report Ignores Evidence That the Purchase of Bayer ADRs Often Had Not Yet Been Determined at the Time That Foreign Shares Were Purchased. ...........................................................................................18

IV.   MR. ZARCU'S OPINIONS ON THE CONTRACTUAL OBLIGATIONS OF BROKER-DEALER CUSTOMERS ARE UNRELIABLE, UNFOUNDED AND INCORRECT. ......................................................................................................20

   A.  Mr. Zarcu Does Not Purport To Have Expertise In The Contractual Obligations Of Broker-Dealer Customers. .......................................20

   B.  Mr. Zarcu Confuses Informal Practices Among Securities Traders with the Contractual Obligations of Broker-Dealer Customers. .......................23

   C.  Customers of the Broker-Dealers Considered in the Zarcu Report Are Not Obligated to Purchase Bayer Sponsored ADRs upon Acquiring Bayer Foreign Shares. ...........................................................................................25

      1.  Local 710 (June 7, 2016) via Macquarie Securities ......................25

      2.  Local 710 (August 2, 2016, December 9, 2016 and December 18, 2017) via Instinet ........................................................................28

      3.  SMW and Local 710 (December 9, 2016) via Morgan Stanley and Instinet ...............................................................................29

      4.  IUOE (November 17, 2016) via Bank of America Merrill Lynch .................33

      5.  IUOE (February 22 and 23, 2017) via JPMorgan Securities ...........................35

6.   IUOE (May 26-27, 2020) via UBS Securities ................................................37

7.   IUOE (June 3 and June 4, 2020) via Cowen & Co. ......................................40

8.   IUOE (June 23, 2020) via UBS Securities .......................................................43

9.   SMW (February 14, 2018; March 27, 2018; and October 18 2018) via Morgan Stanley ....................................................................................................44

V.   CONCLUSION ........................................................................................................47

[No: 3:20-cv-04737-RS] REBUTTAL EXPERT REPORT OF PROFESSOR JOSHUA MITTS, PH.D. ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

ii

# I.    **INTRODUCTION**

1.    Previously in this matter, I submitted the Expert Report of Professor Joshua Mitts, Ph.D., dated October 28, 2022 (the "Mitts Report"). In the Mitts Report, I opined that i) irrevocable liability for virtually all purchases of Bayer sponsored ADRs during the Class Period was incurred in the United States, ii) Plaintiffs' purchases of Bayer sponsored ADRs were typical of Class Members because irrevocable liability was incurred for those purchases within the United States, and iii) it is possible to determine on a Class-wide basis whether irrevocable liability was incurred in the United States by members of the Class. I provided expert testimony in this matter on January 6, 2023 (the "Mitts Deposition").

2.    My qualifications, publications, and expert witness testimony over the past five years are summarized in detail in my *curriculum vitae*, attached to the Mitts Report as Appendix A.

3.    I have been asked by Lead Plaintiffs Sheet Metal Workers' National Pension Fund ("SMW") and International Brotherhood of Teamsters Local No. 710 Pension Fund ("Local 710"), and additional plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("IUOE," and together with SMW and Local 710, "Plaintiffs") to provide opinions in response to the Rebuttal Report of Cristian Zarcu, dated February 3, 2023 (the "Zarcu Report") and the deposition of Mr. Zarcu, which occurred on March 8, 2023 (the "Zarcu Deposition").

4.    In this rebuttal report, I offer the following opinions:

    i.    The Zarcu Report does not contest many of the findings in the Mitts Report, including that the overwhelming majority of purchases of Bayer ADRs by members of the proposed Class during the proposed Class Period consisted of existing ADRs, nor does Mr. Zarcu dispute that title to newly issued ADRs was transferred in the United States.

    ii.    The Zarcu Report provides no replicable methodology to determine whether the purchase of foreign shares causes irrevocable liability to purchase ADRs to be incurred.

iii. Mr. Zarcu's opinions on the contractual obligations of broker-dealer customers are unreliable, unfounded and incorrect.

5. In reaching these opinions, I have relied upon various publicly available materials and other materials, which are listed in Appendix A and/or otherwise cited in this report.

## II. THE ZARCU REPORT DOES NOT CONTEST MANY OF THE FINDINGS IN THE MITTS REPORT, INCLUDING THAT THE OVERWHELMING MAJORITY OF PURCHASES OF BAYER ADRS CONSISTED OF EXISTING ADRS, NOR DOES MR. ZARCU DISPUTE THAT TITLE TO NEWLY ISSUED ADRS WAS TRANSFERRED IN THE UNITED STATES.

6. The Mitts Report explains why the involvement of the issuer and the presence of a single, established sponsor are likely to make the trading market for a sponsored ADR far more liquid and efficient than an unsponsored program.[1] The Zircon Report does not contest this point and agrees that Bayer sponsored ADRs differ from unsponsored ADRs, like those at issue in the *Toshiba* litigation, in important ways which are likely to lead to far more domestic trading in Bayer sponsored ADRs.[2] Nor does the Zarcu Report dispute the fact that the "dollar volume of trading in the market for over-the-counter sponsored ADRs was over twice as much as in the market for unsponsored ADRs, *i.e.*, $98 billion compared to $44 billion."[3]

7. The Zarcu Report also does not contest that the Bayer ADR program was sponsored. Nor does the Zarcu Report question the finding in the Mitts Report that "purchases and sales" of Bayer sponsored ADRs "would ordinarily take the form of ordinary domestic transactions where irrevocable liability to purchase existing sponsored ADRs was incurred at the time of trade confirmation. Like transactions in any other domestic security, the purchase or sale of existing Bayer sponsored ADRs would not involve the purchase or sale of foreign shares by any party to the transaction."[4]

8. Importantly, the Zarcu Report does not contest that ***every named Plaintiff purchased existing Bayer sponsored ADRs*** on the domestic market, as I explained in the Mitts Report and discuss

---

[1] Mitts Report ¶¶ 23-26.

[2] Zarcu Report ¶ 18 ("Sponsorship streamlines communications between issuers and stockholders, dividend payments, and other services related to stockownership.").

[3] Mitts Report ¶ 26.

[4] Mitts Report ¶ 28.

in detail below.  ***First***, several purchases by SMW consisted of existing Bayer sponsored ADRs: the purchase of 11,000 ADRs on December 9, 2016,[5] the purchase of 5,700 ADRs on February 14, 2018;[6] the purchase of 5,306 ADRs on March 27, 2018;[7] and the purchase of 14,910 ADRs on October 18, 2018.[8] ***Second***, Local 710 purchased 12,400 existing Bayer sponsored ADRs on December 9, 2016.[9] ***Finally***, several purchases by IUOE consisted of existing Bayer sponsored ADRs: the purchase of 7,980 ADRs on May 26, 2020;[10] the purchase of 8,160 ADRs on May 27, 2020;[11] and the purchase of 4,530 ADRs on June 3, 2020.[12]

9. The Zarcu Report also does not contest a central finding in the Mitts Report that "the overwhelming majority of purchases of Bayer sponsored ADRs during the Class Period consisted of existing ADRs."[13] Mr. Zarcu claims that "[n]ew ADR issuances thus accounted for approximately 17.4% of all Bayer ADRs traded during the proposed class period," which implies that 82.6% of trading volume consisted of existing Bayer ADRs.

10. For one, Mr. Zarcu's calculation is flawed. He calculates 17.4% by dividing 72,615,161 new Bayer ADRs by 416,892,221, which he claims is the difference between the "aggregate volume of trades," 491,504,300 and the number of ADRs cancelled, 74,612,079. But as I explained in the Mitts Report, "ADR issuances are not subject to trade reporting requirements and thus are not included in daily trading volume."[14] The same holds for ADR cancellations. Mr. Zarcu should have divided 72,615,161 by 564,119,461, the sum of the "aggregate volume of trades" (491,504,300) and the number of ADRs issuances (72,615,161). That yields a ratio of 12.87%. That is, a correct

---

[5] *See* discussion *infra* ¶¶ 74-77.

[6] *See* discussion *infra* ¶¶ 116-117.

[7] *See* discussion *infra* ¶¶ 118-119.

[8] *See* discussion *infra* ¶ 120.

[9] *See* discussion *infra* ¶¶ 78-83.

[10] Mitts Report ¶ 43.

[11] *See* discussion *infra* ¶¶ 102-103.

[12] Mitts Report ¶ 44; *see also* discussion *infra* ¶ 110.

[13] Mitts Report ¶ 32.

[14] Mitts Report ¶ 31 n.38 (citing FINRA trade reporting rules).

calculation with Mr. Zarcu's figures indicates that ***over 87% of trading volume consisted of existing ADRs***.

11.    Regardless of whether the daily trading volume of existing ADRs is 82.6% as Mr. Zarcu incorrectly estimates, or over 87% as I correctly calculate, it is clear that an "overwhelming majority" of purchases of Bayer sponsored ADRs during the Class Period consisted of existing ADRs. Mr. Zarcu did not contest this conclusion in the Zarcu Deposition.[15]

12.    Finally, paragraph 45 of the Mitts Report "examined records of trade executions during the Class Period provided by FINRA" to examine whether domestic purchasers of Bayer sponsored ADRs were located in the United States. Exhibit 1 to the Mitts Report found that, among the "forty (40) FINRA members whose purchases account for 99% of total purchases during the Class Period . . . every one of these purchasers of existing Bayer sponsored ADRs is located in the United States."[16] The Zarcu Report is completely silent on this point. The Zarcu Report does not even mention Exhibit 1 to the Mitts Report. One can only conclude that Mr. Zarcu agrees.

13.    In the Zarcu Report, Mr. Zarcu states that he is "readily familiar" with "federal securities laws"[17] and repeatedly cites to materials relevant to the district court's class certification opinion in *Stoyas v. Toshiba Corp.* (*Toshiba II*), 2022 WL 220920 (C.D. Cal. Jan. 25, 2022), to conclude that irrevocable liability to purchase Bayer ADRs was incurred when Bayer ordinary shares were acquired overseas on behalf of Plaintiffs.[18] Mr. Zarcu asserts that irrevocable liability can be determined by examining "brokerage records, confirmation slips, communications produced by

---

[15] Zarcu Dep. Tr. 271:4-9.

[16] Mitts Report ¶ 34.

[17] Zarcu Report ¶ 7.

[18] *See, e.g.*, Zarcu Report ¶ 35 ("Just as in the *Toshiba* litigation, irrevocable liability to take and pay for the Bayer ADRs was incurred the moment Macquarie acquired Bayer ordinary shares overseas on behalf of Plaintiffs."). Noting that he "authored the report on this subject that was credited by the Court in that proceeding," Mr. Zarcu apparently draws on nonpublic evidence to which he was privy in the *Toshiba* litigation to conclude that "the transactions at issue are economically indistinguishable." *Id.* Of course, I cannot evaluate Mr. Zarcu's conclusion without reviewing the nonpublic evidence to which he was privy, a point I made in the Mitts Deposition as well. *See* Mitts Dep. Tr. 282:7-11 ("I have not reviewed the totality of the evidentiary record in *Toshiba*. I'm not sure I could even if I wanted to because, in litigation in general, many documents are nonpublic.").

Plaintiffs' investment managers, and other relevant documents to document how each transaction was ordered and executed."[19]

14.    Despite professing to be "readily familiar" with federal securities law and the intricacies of *Stoyas v. Toshiba*,[20] Mr. Zarcu fails to acknowledge that the Ninth Circuit Court of Appeals listed "whether title to the shares was transferred within the U.S." as a factor for determining whether irrevocable liability was incurred in the United States.[21]   By contrast, the Mitts Report specifically noted that "the Ninth Circuit identified relevant factors to making this determination as the location(s) where . . . ***passing of title***" occur."[22]

15.    The lack of any reference to the passing of title in the United States is a curious omission in the Zarcu Report.  After all, there is no question that in every instance where newly issued Bayer sponsored ADRs were purchased by the Plaintiffs in this matter, title to those ADRs was transferred within the United States, between the Bank of New York Mellon (located in the United States) and the broker-dealers operating on behalf of the Plaintiffs (also located in the United States). Nowhere does the Zarcu Report suggest otherwise.[23]

---

[19] Zarcu Report ¶ 24.

[20] Zarcu Report ¶ 35 ("Based on my review of the records described above and my experience in the *Toshiba* litigation, I have concluded that the transactions at issue are economically indistinguishable.").

[21] *Stoyas v. Toshiba Corp.* (*Toshiba I*), 896 F.3d 933, 948 (9th Cir. 2018) ("[In *Absolute Activist*]*,* the Second Circuit also found an alternative means of alleging a domestic transaction: alleging that title to the shares was transferred within the U.S. . . . We recently indicated approval of the irrevocable liability test in *Securities and Exchange Commission v. World Capital Market, Inc.*, 864 F.3d 996 (9th Cir. 2017). There, we cited *Absolute Activist* and the irrevocable liability rule as support for holding that, where 'the undisputed evidence . . . shows that far more than $5 million in investor transactions took place in the Uanited States,' the district court properly rejected the argument that application of the Exchange Act was impermissibly extraterritorial. . . . Consistent with *World Capital Market* and the irrevocable liability test, in *Securities and Exchange Commission v. Levine*, 462 F. App'x 717 (9th Cir. 2011), we held that the Securities Act governed particular transactions 'because the actual sales closed in Nevada when [the individual] received complete stock purchase agreements and payments.'").

[22] Mitts Report ¶ 20 (emphasis added).

[23] The Zarcu Report claims that "the policies of a depositary bank have ***no bearing*** on the analysis of where investors incurred their liability to take and pay for ADRs." Zarcu Report ¶ 126.  But if those policies determine where title is transferred, they are highly relevant to determining where irrevocable liability was incurred.  As the Mitts Report explains, "the Bank of New York Mellon issues sponsored Bayer ADRs only after already-purchased foreign shares have been deposited in its custody."  Mitts Report ¶ 38.  The Mitts Report further discusses the relevant provisions of the Deposit Agreement

16.    When asked about this point in the Zarcu Deposition, Mr. Zarcu asserted, contrary to the opinion of the U.S. Court of Appeals for the Ninth Circuit in *Toshiba*, that it is irrelevant where title was transferred:

> Q. In forming your opinions, did you consider where a title to the Bayer ADRs is transferred?
> A. That was not relevant to my opinion.
> Q. . . . Why is the transfer of title in your view not relevant to where irrevocable liability is incurred?
> A. The decision as to where irrevocable liability took place and when is based on the information provided by in the case, and it's based on **where the local shares are acquired**.[24]

Mr. Zarcu's disregard for the location where title to the ADRs was transferred, which was identified by the Ninth Circuit Court of Appeals as a relevant factor in determining where irrevocable liability was incurred, undermines the reliability of his opinion.

17.    In fact, it appears that Mr. Zarcu was unaware of the locations of the final two steps in the execution process for a purchase of newly issued ADRs: the deposit of ordinary shares and the issuance of ADRs.  Mr. Zarcu incorrectly claimed that the deposit of ordinary shares with Bank of New York Mellon either occurs in Germany or the location cannot be known, and he claimed he did not know with what institution the shares were deposited.[25]  Mr. Zarcu also admitted that he did not consider where Bank of New York Mellon issues ADRs, and he claimed not to know Bank of New York Mellon is based in New York.[26]

---

which provide that ADRs are issued only **after** the Custodian has received the deposit of foreign shares. *Id.* ¶ 38 n.44.  Title to Bayer sponsored ADRs plainly was transferred within the United States, after the purchaser acquired the foreign shares.

[24] Zarcu Dep. Tr. 60:22-61:14.

[25] Zarcu Dep. Tr. 59:18-60:2; 242:16-22.

[26] *See* Zarcu Dep. Tr. 58:6-59:5.

**III.    THE ZARCU REPORT PROVIDES NO REPLICABLE METHODOLOGY TO DETERMINE WHEN THE PURCHASE OF FOREIGN SHARES YIELDS IRREVOCABLE LIABILITY TO PURCHASE ADRS.**

**A.    The Zarcu Report Is Devoid of Any Replicable Methodology to Justify Its Conclusions.**

18.    While Mr. Zarcu claims that his conclusions are based on "accepted and reliable methodologies, principles, and approaches," the Zarcu Report has no methodology to speak of. Rather, the Zarcu Report simply points to Mr. Zarcu's "experience as a securities trader" as a basis for concluding where irrevocable liability to purchase ADRs arose.[27]

19.    There is no question that Mr. Zarcu has experience as a securities trader.  But when asked specifically and repeatedly to explain what methodology he employed to determine where irrevocable liability was incurred, Mr. Zarcu could not answer the question:

> Q. Okay. And what methodology do you use to determine where liability attaches to a financial transaction?
> A. Just reviewing the information relating to the trading, the instructions given, confirmations—there's a variety of information that goes into that decision.
> Q. And once you have that information, what do you do with it to determine where the transaction takes place?
> A. Once I get sufficient information, that gives me the ability to determine where the trade took place.
> Q. Okay. And then I understand that you have the ability to determine where the trade takes place. But how specifically, mechanically, do you determine where the trade took place?
> A. As I mentioned earlier, analyzing the information related to the trade from communications to orders being transmitted electronically which contain a variety of information related to that trade to possibly confirmations received from—from the broker by the clients. There's a variety of information. So based on all that, I determine where the trade took place.[28]

20.    The conclusory assertion that he has "the ability to determine where the trade took place" is not a methodology.  Mr. Zarcu provides no criteria that would determine whether irrevocable liability attached to a transaction within the United States nor does he consider whether the available evidence is consistent with such criteria.  In fact, despite claiming in the Zarcu Report that his analysis

---

[27] Zarcu Report ¶ 64.

[28] Zarcu Dep. Tr. 13:19-14:24.

was based on "accepted and reliable methodologies, principles, and approaches," Mr. Zarcu could not identify a single person who used the "accepted methodologies" he supposedly employed:

> Q. Who else uses the methodology that you've described to me just now?
> A. I don't know.
> Q. You can't name a single other person who has used what you call this accepted methodology? . . .
> A. No.[29]

21.     When asked **how** to replicate his analysis—*i.e.*, how someone might analyze trading records, confirmation slips and communications to reach similar conclusions—Mr. Zarcu answered: "You would process it internally and [conclude]."[30]  "Processing" information and "concluding" is not a methodology.  When pressed to explain what he meant by "process," Mr. Zarcu replied: "Think."[31]  Just "thinking" is not a methodology either.

22.     Mr. Zarcu ultimately conceded that the only way to replicate his methodology is to find "somebody with my experience," that is, "somebody who has traded for a long time."[32]  But apparently even that would not be enough.  When asked "supposing I hired another experienced industry trader with similar experience to yours, what steps in particular would I have them take to recreate the analysis that you conducted for reaching your expert opinions in this case?"  Mr. Zarcu replied: "If you would hire an experienced trader like myself, you wouldn't need to tell them what steps to take . . . they would know, just like I know."[33]  Mr. Zarcu's methodology is not replicable by others because it does not exist.

**B.      In Reality, the "Methodology" Underlying the Zarcu Report Is a Baseless Assumption That Irrevocable Liability Is Incurred Outside the United States for *Every* New ADR Issuance.**

23.     In the Zarcu Report, Mr. Zarcu reaches the same conclusion over and over concerning each purchase by each of the named Plaintiffs in this action: based on his experience as a securities trader, irrevocable liability for the purchase of newly issued Bayer ADRs arose outside the United

---

[29] Zarcu Dep. Tr. 109:16-24.

[30] Zarcu Dep. Tr. 111:14-15 (modification is from errata sheet).

[31] Zarcu Dep. Tr. 111:16-18.

[32] Zarcu Dep. Tr. 115:19-24.

[33] Zarcu Dep. Tr. 317:25-318:15.

States. He reiterates this conclusion for every single purchase,[34] even when the communications with the Plaintiffs' investment managers differ.[35]

24.　　During the Zarcu Deposition, when questioned on this point, Mr. Zarcu admitted *twice* that he simply examines whether an investor purchased newly sponsored ADRs or not:

> Q. Can an investor purchase a newly issued Bayer ADR without incurring irrevocable liability abroad?
> A. The only way a newly created ADR happens if someone purchases the local shares first. So the answer to that is no. . . .
> Q. Can an investor purchase a newly issued Bayer ADR without incurring irrevocable liability in Germany, in your opinion?
> A. No.[36]

25.　　Mr. Zarcu then directly acknowledged that the *only* relevant question in his view is whether the ADR was newly issued or not:

> Q. . . . What then is the point of your methodology? Couldn't you just look to see if the transaction involved a newly issued ADR and call it a day?
> A. No.
> Q. Why not?
> A. Because I would have no way of knowing if it's a newly issued ADR, Counsel.[37]

26.　　This exchange shows that the lengthy discussions in the Zarcu Report of individual Plaintiffs' purchases are largely superfluous. At its core, Mr. Zarcu's approach is simple: if the purchase of ADRs involved the issuance of newly sponsored ADRs, irrevocable liability arose outside the United States. For this reason, it is ultimately unnecessary, in his view, to examine "contract formation, placement of purchase orders, passing of title, and the exchange of money," as the Ninth Circuit held in *Toshiba*.[38] Rather, according to Mr. Zarcu, the *only* relevant question is whether the security is a newly issued ADR.

---

[34] That is, except for three purchases by SMW about which he has "insufficient information" to reach a conclusion concerning irrevocable liability. *See* Zarcu Report ¶ 122 ("Due to [a] lack of documentation, there is insufficient evidence to form an opinion on where and how SMW's February 14, March 27, and October 18, 2018 purchases of Bayer ADRs were executed. Accordingly, I disagree with Prof. Mitts's conclusion that the record shows irrevocable liability for these trades to have been incurred in the United States.").

[35] Zarcu Report ¶¶ 32, 47, 57, 64, 76, 83, 90, 96, 100, 111, 119.

[36] Zarcu Dep. Tr. 124:14-125:11.

[37] Zarcu Dep. Tr. 125:12-20.

[38] *Toshiba I*, 896 F.3d at 949.

27. When asked specifically whether an instruction to a broker to acquire ordinary shares and convert to ADRs necessarily leads to incurring irrevocable liability abroad, Mr. Zarcu stated confusingly, "They will incur irrevocable liability abroad when the order is *started or completed*."[39] When asked to clarify, he explained: "*It can be either/or*."[40] Mr. Zarcu appears to believe that irrevocable liability is a kind of Schrödinger's cat: there are multiple points in the course of a transaction at which irrevocable liability could be simultaneously incurred and not incurred.[41] Ultimately it seems this does not trouble Mr. Zarcu because what really matters, in his view, is whether the ADR is newly issued or not.

28. Mr. Zarcu's flawed approach leads to absurd conclusions. Suppose foreign shares were acquired by a U.S. broker-dealer and one month (or year) later converted to ADRs in New York. By Mr. Zarcu's reasoning, that purchase of ADRs occurred outside the United States—even if a month (or year) had passed since there was any interaction with a foreign market. The nonsensical implication of this flawed approach is that *every* new issuance of Bayer ADRs *necessarily* occurred outside the United States, regardless of whether there was *any* connection between the foreign share purchase and ADR conversion.

29. Moreover, because Mr. Zarcu evaluated the evidence solely to determine *whether* ADRs were newly issued, it is understandable why he did not develop familiarity with basic facts like *where* Bayer ordinary shares are deposited (New York) and Bayer sponsored ADRs are issued (New York).[42] Those errors undermine the reliability of his opinions concerning where irrevocable liability was incurred for the purchase of Bayer sponsored ADRs.

---

[39] Zarcu Dep. Tr. 122:21-23.

[40] Zarcu Dep. Tr. 123:3.

[41] Schrödinger's cat is a thought experiment in quantum mechanics in which "a hypothetical cat may be considered simultaneously both alive and dead." *Schrödinger's Cat*, Wikipedia, https://en.wikipedia.org/wiki/Schr%C3%B6dinger%27s_cat (last visited March 16, 2023).

[42] Zarcu Dep. Tr. 58:6-59:5; 59:18-60:2; 242:16-22.

30.    By contrast, the Mitts Report employs a simple and replicable methodology to evaluate whether irrevocable liability for the purchase of newly issued Bayer sponsored ADRs occurred within the United States:

i.    *Step 1:* Did the Bank of New York Mellon's ADR custodial account supply the ADRs which were transferred to the purchaser's custodial account? If so, the purchaser bought newly issued ADRs (proceed to step 2).[43] If not, irrevocable liability was incurred in the United States because the purchase consisted of an existing ADR on the domestic market.[44] FINRA trading records also show if the transaction was an ordinary sale between broker-dealers rather than a custodial transfer of newly issued ADRs from the Bank of New York Mellon (which are not reported on FINRA trading records).[45]

ii.    *Step 2:* If the purchaser bought newly issued ADRs, did the purchase of foreign shares automatically trigger the purchase of ADRs, such that the purchaser was "logically and legally bound" to take ADRs upon buying foreign shares?[46] This condition could be satisfied by an ADR execution occurring simultaneously with the purchase of foreign shares or other records indicating that the ADR conversion was automatically triggered by the purchase of the foreign shares rather than subject to additional approval.

C.    **The Zarcu Report Conjures Up Novel "Principles" Underlying "Cross Transactions" Which are Economically Nonsensical and Inconsistent with SEC and FINRA Rules.**

1.    **The Novel "Principles" Identified In The Zarcu Report Are Economically Nonsensical.**

---

[43] This is DTCC account number 2504, which is described as "BNY MELLON/DEPOSITAR." *See* DTCC001167; DTCC001165; DTCC001166; DTCC001169; DTCC001168; DTCC001171.

[44] Mitts Report ¶¶ 32-35.

[45] Mitts Report ¶ 31 n.38.

[46] *Toshiba II*, 2022 WL 220920, at *4.

31.    As Mr. Zarcu acknowledged in the Zarcu Deposition, any portion of an order—including the ADR purchases—is cancellable until executed by the broker-dealer.[47] This obvious fact (which Mr. Zarcu himself reiterated in his *Toshiba* deposition[48]) notwithstanding, the Zarcu Report argues that, instead, irrevocable liability to take delivery for ADRs arises at the moment the foreign shares are purchased because of a "basic principle" underlying "cross transactions" that "a client is obligated to take delivery of securities once its broker has committed capital to execute the order for those securities."[49]

32.    It is not clear what Mr. Zarcu means by "commit[ing] capital." Of course, once a broker has committed cash to purchase foreign shares, *that purchase of foreign shares* is irrevocable. But the subsequent purchase of ADRs does not involve the commitment of any additional capital.[50] Rather, the broker is exchanging already purchased foreign shares for ADRs.[51] The Zarcu Report conflates committing cash to purchase *foreign shares* with committing foreign shares to purchase ADRs. The former occurs when orders to purchase foreign shares are executed (paying with cash), and the latter occurs when orders to purchase ADRs are executed (paying with foreign shares). In the Zarcu Deposition, Mr. Zarcu appeared to engage in a kind of evasive filibuster when asked to clarify this point:

> Q. . . . The capital a broker commits to purchasing foreign shares is cash; correct?
> A. Yeah, likely.
> Q. . . . That capital is committed when the order to purchase the foreign shares is executed; correct?
> A. As a general matter, yes.
> Q. And the capital that a broker commits to purchase ADRs is the underlying foreign shares; correct?
> A. Counsel, as we discussed earlier, that is a one—that's one single

---

[47] Zarcu Dep. Tr. 272:5-9 ("[T]he moment when somebody is obligated to take shares regardless of location … is when those shares are executed, not when they're confirmed.").

[48] Zarcu Toshiba Dep. Tr. 169:25-170:2 ("A: A client can cancel an order before it's been executed. Not once it becomes executed.").

[49] Zarcu Report ¶ 32.

[50] The exception is foreign exchange fees, for which capital is not committed until the ADR purchase is executed.

[51] Mitts Dep. Tr. 135:15-17 ("[T]he payment, the consideration for those American Depository Receipts is the foreign shares . . . .").

> transaction. When the broker commits to executing the underlying ordinary shares, that is with a specific purpose to be converted to ADRs.
> Q. So what capital is committed to the counterparty for the ADR issuance?
> A. What capital is committed to what counterparty, Counsel?
> Q. What capital is provided to the counterparty for the ADR issuance?
> A. I really don't understand your question, Counsel.[52]

33.    Moreover, cancelling an order to purchase ADRs with foreign shares would not have inflicted any harm on Plaintiffs' broker-dealers. The Zarcu Report repeatedly states that "Hardman Johnston was not permitted to hold foreign shares on behalf of IUOE."[53] But that is irrelevant. The asset managers allocated ADRs to client accounts only after they purchased the ADRs themselves. There is no question that those asset managers were permitted to hold Bayer foreign shares, and in many cases, the asset managers purchased far more foreign shares than ADRs, as Mr. Zarcu conceded in the Zarcu Deposition:

> Q. Isn't it the case that Hardman Johnston and Harding Loevner often purchased far more Bayer ordinary shares than were subsequently converted into Bayer ADRs?
> A. They did purchase, yes, both local and shares for the purpose of converting, yes.
> Q. But my—that wasn't my question. My question was isn't it the case that Hardman Johnston and Harding Loevner often purchased more Bayer ordinary shares than were subsequently converted into Bayer ADRs?
> A. In some of the transactions, yes.[54]

34.    For one example, consider IUOE's November 17, 2016 purchase via Bank of America Merrill Lynch. The broker purchased 174,730 foreign shares but only converted 24,730 to ADRs. The broker received payment from Hardman Johnston for the purchase of those foreign shares and was indifferent to whether a block was converted to ADRs or not. I understand that it has already been established that the market price of the ADRs closely tracks the market price of the foreign

---

[52] Zarcu Dep. Tr. 134:9-135:14.

[53] Zarcu Report ¶¶ 81, 88, 94, 99.

[54] Zarcu Dep. Tr. 135:17-23.

shares,[55] so neither the broker nor the broker's client suffer any change in their economic position following ADR conversion.[56]

35.    This indifference to ADR conversion is consistent with the chat transcript between Mr. Hufcut at Hardman Johnston and Mr. Gula at UBS Securities on February 22 and 23, 2017, where Mr. Gula wrote "*ok we can speak about ADR later [i.e., after acquisition of the foreign shares], no problem.*"[57]  There is simply no indication that the client or broker were particularly concerned with the ADR conversion, which was clearly a separate transaction, the volume and terms of which had yet to be determined.

> **2.    Mr. Zarcu Misuses the Term "Cross Transaction" Contrary to SEC and FINRA Rules Setting Out the Obligations of Market Participants in Connection with "Cross Transactions."**

36.    Mr. Zarcu repeatedly emphasizes that his opinion is premised on his unique understanding of ***cross transactions,*** which he defines as "where newly issued ADRs received from a depositary bank are booked to a client."[58]  For example, he writes that "a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares."[59]

37.    Notwithstanding his purported familiarity with SEC rules and regulatory obligations, Mr. Zarcu appears to be unaware that there are specific rules defining "cross transactions" and setting out the obligations of market participants with respect to "cross transactions."  Mr. Zarcu's personal beliefs are unanchored from and inconsistent with these rules governing cross transactions.  During the Zarcu Deposition, Mr. Zarcu was asked if he could recall reviewing any SEC or FINRA rules or

---

[55] *See, e.g.*, Coffman Report ¶ 27 ("[T]here was no persistent divergence between the price of Bayer ADRs and its underlying ordinary shares during the class period").

[56] The one exception is the very small foreign exchange conversion fee, which is only incurred for the ADR portion, but this is a *de minimis* amount relative to the size of the overall transaction (e.g., $0.02 per share).

[57] Zarcu Report ¶ 93 (quoting Zarcu Report Ex. Z-26 (HJ-0002400) at 18-25).

[58] Zarcu Report ¶¶ 31, 47, 57, 64, 76, 83, 96, 100, 111.

[59] Zarcu Report ¶¶ 47, 57, 76, 83 90, 96, 100, 119.

[No: 3:20-cv-04737-RS] REBUTTAL EXPERT REPORT OF PROFESSOR JOSHUA MITTS, PH.D. ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                                                14

regulations to help form his conclusions. Mr. Zarcu answered, "I don't remember, no."[60] Similarly, Mr. Zarcu was asked if he had reckoned with the fact that his personal definition of a "cross transaction" was inconsistent with how the SEC defines the term. "No," Mr. Zarcu answered, he had not.[61]

38. Under SEC and FINRA rules, there are two primary types of "cross transactions," which are closely related to each other. The first, and most common, type of "cross transaction" is governed by the Investment Advisers Act of 1940 and Investment Company Act of 1940, which prohibit investment advisers and funds from transacting with their clients.[62] These general prohibitions are subject to specific exceptions for permissible cross transactions such as disclosure obligations and that the transaction is effectuated at the market price.[63]

39. The second type is "[w]here a trade is internalized or crossed between a FINRA member[']s two customers."[64] While Hardman Johnston and Harding Loevner are investment advisers, the brokers analyzed in the Zarcu Report (who Mr. Zarcu claims engaged in "cross transactions") do not appear to be acting in an advisory capacity, so I infer that Mr. Zarcu is referring to this type of cross transaction. But here Mr. Zarcu is mistaken. As the FINRA definition indicates,

---

[60] Zarcu Dep. Tr. 94:22-23.

[61] Zarcu Dep. Tr. 141:12.

[62] *See* Investment Advisers Act of 1940, Section 206(3), 15 U.S.C.A. § 80b-6 ("[U]nlawful for any investment adviser . . . acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client . . . ."); *see also* Investment Company Act of 1940, Section 17a, 15 U.S.C.A. § 80a-17 ("[U]nlawful for any affiliated person [or any affiliated person of such a person] . . . knowingly to sell [or purchase] any security or other property" to or from the fund.).

[63] *See* Investment Advisers Act of 1940, Section 206(3), 15 U.S.C.A. § 80b-6 ("[D]isclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction" creates a permissible exception for cross transactions); *see also* Investment Company Act of 1940, Rule 17a-7, 17 CFR § 270.17a-7 ("The transaction [being] a purchase or sale, for no consideration other than cash payment against prompt delivery of a security for which market quotations are readily available; [and being] effected at the independent current market price of the security" creates a permissible exception for cross transactions).

[64] FINRA, *ORF Fix Specification* (2022), *available at* https://www.finra.org/sites/default/files/2022-06/FIX-Specs-ORF-Trade-Rptg-Nanos.pdf.

a cross transaction involves a transaction between a broker-dealer's ***two customers***.[65]  As the guide to the FINRA Over-the-Counter Reporting Facility (ORF) explains, a cross transaction occurs when the following conditions are present: (1) "Firm ABCD is submitting the trade"; (2) "ABCD is acting in an Agent capacity on both sides of the cross"; (3) "The trade is tape reportable but is not sent to clearing."[66]

40.    According to FINRA records, these conditions are not present in many of the transactions that Mr. Zarcu refers to as "cross transactions."  For example, when Instinet purchased Bayer sponsored ADRs on August 2, 2016 on behalf of Harding Loevner, these transactions were recorded as "sales" (reporting side code "S"), not "cross" (reporting side code "X"); the counterparty was a different broker-dealer (e.g., Goldman Sachs); and the trade was ***not*** tape-reportable (Media Rpt Fl is "N") but ***was*** sent to clearing (Clrng Fl is "Y").[67]  Virtually every characteristic of this alleged "cross transaction" according to Mr. Zarcu is contrary to FINRA's reporting rules for cross transactions.

41.    In fact, Mr. Zarcu admitted in the Zarcu Deposition that he did not assess whether any of the transactions he characterized as "cross transactions" satisfied the FINRA definition.[68]  For one, he acknowledged that he did not examine the reporting side code at all.[69]  When pressed, Mr. Zarcu claimed that he "assessed if the trade was reported to the tape, and I assessed they were sent to clearing because it was."[70]  But this explanation is nonsensical in light of the FINRA criteria for a cross

---

[65]  *See id.*; *see also Dep't of Enf't v. Mantei*, FINRA (Feb. 18, 2021), https://www.finra.org/sites/default/files/2021-03/OHO_Mantei_2015045257501_021721.pdf ("According to the Complaint, each set of transactions was, in substance, ***a cross trade between Firm customers.***"); *Dep't of Enf't v. Norton*, FINRA (Jan. 31, 2022), https://www.finra.org/sites/default/files/2022-03/OHO_Norton_2016048837401_090721.pdf ("On March 12, 2015, Norton facilitated a cross trade ***between two of his customers, AA and JM***. AA sold 7,900 shares of NUGN at $1.64 per share and Norton bought the same amount at the same price for JM.").

[66]  FINRA, *ORF Fix Specification*, *supra* note 64.

[67]  FINRA000005.

[68]  Zarcu Dep. Tr. 148:11-13.

[69]  Zarcu Dep. Tr. 150:3 ("I didn't consider Code S, no.").

[70]  Zarcu Dep. Tr. 150:15-17.

transaction, which provide that a cross transaction "*is* tape reportable but is *not* sent to clearing" (because the shares remain in custody of the broker-dealer despite the sale from one customer to another). By suggesting that cross trades *were* sent to clearing *because* they were tape-reportable, Mr. Zarcu not only contradicts the FINRA definition, which states just the opposite, but appears to be completely confused as to what a cross transaction actually is.

42.    Moreover, Mr. Zarcu's claim that "cross transactions" are inherently not cancellable is refuted by the FINRA data. Because FINRA has only produced executed trades, one would expect to find no cancellations in these data, but the FINRA records show several episodes of cancellations of cross transactions (even after execution).[71] For example, on January 29, 2018, a cross transaction for 12,000 Bayer ADRs at 3:29:52.548pm was cancelled at 3:30:23.552pm.[72] On September 13, 2018, a cross transaction for 150,000 Bayer ADRs at 12:43:10.954pm was cancelled at 2:59:51.168pm.[73] And on June 20, 2020, a cross transaction for 100,000 Bayer ADRs at 4:02:21.371pm was cancelled at 4:03:25.072pm.

43.    It appears that Mr. Zarcu conjured up a definition of "cross transaction" which is contrary to the SEC and FINRA rules with which he is purportedly familiar.[74] Mr. Zarcu does not dispute this. Rather, he flatly dismisses the relevance of SEC and FINRA definitions: "My definition of a cross doesn't match [the FINRA definition]," Mr. Zarcu states in the Zarcu Deposition, only to then conclude, "But that doesn't mean anything."[75] At the very least, ignoring the rules and regulations with which Mr. Zarcu is purportedly familiar casts doubt on the reliability of his opinion and the accuracy of his conclusions.

---

[71] The OATS data, which were not produced, include *orders* whether executed or not, and thus would likely show far more cancelled orders for cross trades. *See* FINRA, *OATS Definition FAQ, Cancel Report,* https://www.finra.org/filing-reporting/market-transparency-reporting/oats/faq/definitions (last updated Mar. 30, 2009) ("Cancel Report [is] submitted when an order is fully or partially cancelled. It may also be used to report a reduction in share quantity or the cancellation of all remaining shares of an order.").

[72] FINRA000002.

[73] FINRA000004.

[74] Zarcu Dep. Tr. 140:15.

[75] Zarcu Dep. Tr. 148:11-13.

**D.    The Zarcu Report Ignores Evidence That the Purchase of Bayer ADRs Often Had Not Yet Been Determined at the Time That Foreign Shares Were Purchased.**

44.    The central thesis of the Zarcu Report is that every purchase of newly issued ADRs is a single "cross transaction" where the purchase of foreign shares was but a mere step in consummating the purchase of a given quantity of newly issued ADRs.  The basic flaw with his theory is that for many of the ADR purchases examined by Mr. Zarcu, ***the question of whether and in what quantity ADRs would be purchased had not even been considered, much less determined, at the time the foreign shares were purchased***.

45.    For example, consider the purchase of 15,030 Bayer sponsored ADRs for IUOE via UBS on June 20, 2020.  Mr. Hufcut, in messages with Mr. Gula at UBS, ***did not even mention ADRs prior to completing the purchase of 500,000 Bayer foreign shares*** for Hardman Johnston.  Further, when ADRs were mentioned, the quantity of the order was often omitted. After a large block of foreign shares had already been purchased, Mr. Hufcut writes, "I am going to have some ADR splits for colleen when we are done today."[76]  A vague reference to a future conversation regarding converting shares to an unspecified quantity of ADRs is completely at odds with Mr. Zarcu's basic thesis.

46.    Similarly, messages on November 17, 2016 between Mr. Hufcut and a Mr. Wakeman from Bank of America Merrill Lynch illustrate another instance of a large block of Bayer foreign stock being purchased prior to the parties even mentioning ADRs.  Only after Mr. Wakeman writes at 7:33 am, "** complete bought 100k BAYN GY @91.1595 thanks" and then at 9:57 am, "** COMPLETE BOUGHT BAYN GY 125K@ gross 91.3042 thanks" does Mr. Hufcut mention ADRs.  At 10:49 am, after the two large foreign purchases had already been made, Mr. Hufcut writes, "I am going to send over my Bayer balances, .. have a little more on the Ord side and some ADR's as well … I would like this to be all done in the locals at 1 avg and converted back pls."[77]  The exchange of messages once again makes clear: the foreign purchases were made before any mention of ADRs, let alone a specification or agreement on the ultimate quantity of ADRs.

---

[76] Zarcu Report Ex. Z-26 (HJ-0002400) at 52.

[77] Zarcu Report Ex. Z-26 (HJ-0002400) at 1-4.

47.    A set of messages from a May 27, 2020 conversation between Mr. Hufcut and Mr. Gula provides another example of foreign share purchases being executed without the volume of ADRs being determined.  Mr. Gula wrote at 6:13 am, "BAYN GY," to which Mr. Hufcut replied at 6:14 am, "Morning, thanks … will be back shortly on it. I am checking to see if we are going to be back today or not" and then, at 7:00 am, adding, "I am sending over some more Bayer to buy … lets start with a 61.60 top to work pls. u can try darks more aggressively under 61.50." At 8:05 am, Mr. Gula wrote, "update: BOUGHT 106,653 BAYN GR @ 61.4840." It was not until 9:52 am that ADRs were mentioned, when Mr. Gula asked, "we will be booking some on ADRs today?" and Mr. Hufcut replies, "yes."[78]

48.    In all of these examples, ADRs only came up *after* a large purchase of foreign shares had been executed.  And in one case, even once ADRs were mentioned, the quantity of those purchases was given as "some."   There is simply no indication that any of the parties involved in these transactions were particularly concerned with whether the foreign shares would be converted to ADRs, as Mr. Zarcu conceded In the Zarcu Deposition:

> Q. Is there any indication here that the client or the broker were particularly concerned with holding foreign shares?
> A. I—*there's no discussion of that here*.[79]

49.    Even where a desired quantity of ADRs was specified in advance, the Zarcu Report does not provide any evidence indicating that these customers were legally bound to take and pay for the ADRs upon consummation of the purchase of foreign shares.  Mr. Zarcu's industry experience might suggest that it is *common* to do so, but it does not follow that those customers are irrevocably liable to purchase ADRs upon acquiring foreign shares.  As the following Section explains, Mr. Zarcu does not even purport to have expertise in the contractual obligations of broker-dealer customers.

[78] Zarcu Report Ex. Z-26 (HJ-0002400) at 27-30.

[79] Zarcu Dep. 137:21-24-138:2-3.

## IV. MR. ZARCU'S OPINIONS ON THE CONTRACTUAL OBLIGATIONS OF BROKER-DEALER CUSTOMERS ARE UNRELIABLE, UNFOUNDED AND INCORRECT.

### A. Mr. Zarcu Does Not Purport To Have Expertise In The Contractual Obligations Of Broker-Dealer Customers.

50.    The Zarcu Report repeatedly makes assertions regarding the obligations of broker-dealer customers.  For example, Mr. Zarcu states that "a client that has instructed its broker to conduct a cross transaction is *obligated* to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares."[80]  Elsewhere, Mr. Zarcu states that "Plaintiffs were thus *irrevocably obligated* to take and pay for their ADRs as of the moment when Instinet purchased Bayer ordinary shares on the overseas market."[81]  The term "obligated" or variants thereof appear over two dozen times in the Zarcu Report.

51.    But Mr. Zarcu does not purport to have any formal training or actual expertise in the obligations of broker-dealer customers.  He admitted as such in the Zarcu Deposition, conceding that he was not an expert on determining "where legal liability attaches to financial transactions."[82]  In the Zarcu Report, Mr. Zarcu claimed to be "readily familiar with the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and FINRA, federal securities laws, and internal compliance guidelines."[83]  But Mr. Zarcu does not explain how these rules and regulations govern the scope and timing of the obligations of customers to broker-dealers, much less how his experience with these rules and regulations supports his opinion that customers incurred irrevocable liability to purchase Bayer sponsored ADRs outside the United States.

52.    Moreover, it is my understanding that the SEC and FINRA rules with which Mr. Zarcu is purportedly familiar govern *broker-dealers' regulatory obligations*, but these rules are only tangentially relevant (if at all) to *customer obligations to broker-dealers*.   Rather, customer

---

[80] Zarcu Report ¶ 31 (emphasis added).

[81] Zarcu Report ¶ 47 (emphasis added).

[82] Zarcu Dep. Tr. 12:9-13.

[83] Zarcu Report ¶ 7.

obligations are generally governed by their agreements with broker-dealers. For example, I understand that this Court recently denied a motion to dismiss a claim by a customer alleging that their broker-dealer's online trading platform failed to close a short position at the customer's direction.[84] This Court found that the customer "plausibly states a claim for **breach of contract**" against the broker-dealer and found that a FINRA rule defining a broker's "best execution" duties was irrelevant to the customer's obligations.[85]

53.    Mr. Zarcu does not purport to have expertise on customers' obligations to broker-dealers in general, much less the broker-dealers whose trading communications he analyzes in the Zarcu Report. Mr. Zarcu does not even mention the terms and conditions of these broker-dealers, even though they exist and define the obligations that apply to those customers.[86] Nor does Mr. Zarcu draw on any general prior experience concerning customer obligations to broker-dealers. It does not appear that he has any.[87] By contrast, I have published peer-reviewed literature on the obligations of customers in the financial services industry.[88]

54.    Mr. Zarcu's lack of expertise on the contractual obligations of broker-dealer customers is striking because of his repeated comparisons to *Stoyas v. Toshiba*. Mr. Zarcu expressly bases his opinion in this matter on the similarity of the facts in this matter to the facts in Toshiba.[89] But in *Toshiba*, Mr. Zarcu stated specifically that he was not offering an opinion on where the purchaser's broker became irrevocably liable to purchase the ADRs.[90] In fact, Mr. Zarcu claimed not to even know the meaning of the term "irrevocable liability."[91]

---

[84] *Wright v. Charles Schwab & Co., Inc.*, 2021 WL 1056838 (N.D. Cal, Mar. 18, 2021).

[85] *Id.* at *6-7 (emphasis added).

[86] *See, e.g.*, *Terms and Conditions of Investment Business*, Macquarie (May 2022), https://www.macquarie.com/assets/macq/about/disclosures/macquarie-bank-limited-terms-of-business.pdf.

[87] Mr. Zarcu lacks any familiarity with basic terms like "consideration." Zarcu Dep. Tr. 15:18-20.

[88] *See, e.g.*, Joshua Mitts, *I Promise to Pay*, 62 J. L. Econ. 117 (2019).

[89] Zarcu Report ¶ 35.

[90] Zarcu Toshiba Dep. Tr. 94:7-12 ("Q: Are you offering an opinion in this report about where ClearBridge became liable to effectuate the transaction for the ADRs? A: No.").

[91] Zarcu Toshiba Dep. Tr. 258:20-259:13 ("Q: Is it your opinions that ClearBridge became

55.     It is unclear how Mr. Zarcu acquired expertise on the meaning of this term in the short time between his testimony in the *Toshiba* matter and this matter, and particularly puzzling because Mr. Zarcu refers to his experience prior to *Toshiba* when concluding in the Zarcu Report that irrevocable liability arose in Germany for the purchase of Bayer sponsored ADRs.[92]  If the basis for his conclusions in **this** matter was his industry experience prior to *Toshiba*, it is unclear why Mr. Zarcu did not rely on that expertise in the *Toshiba* matter.  In his *Toshiba* deposition, Mr, Zarcu concluded that "a client can cancel an order before it's been executed,"[93] consistent with the Mitts Report.

56.     Oddly, in the Zarcu Deposition, when presented with the discrepancy between his testimony in *Toshiba* and this case, Mr. Zarcu insisted that he was not offering an opinion on irrevocable liability at all:

> Q.  So as recently as one year, seven and a half months ago, you didn't even know the meaning of the term "irrevocable liability"; correct?
> A. Again, it appears that way.
> Q. And sitting here today, less than two years later, you claim to be an expert in determining where irrevocable liability attaches to an ADR purchase; is that correct?
> A. ***No. That's not what I claim***. What I claim is that I can tell where a transaction occurred based on the information provided to me.[94]

57.     But the Zarcu Report states just the opposite.  A principal opinion in the Zarcu Report is that "Plaintiffs incurred irrevocable liability to take and pay for Bayer ADRs."[95]  The term "irrevocable liability" appears thirty-two times throughout the Zarcu Report.  Mr. Zarcu simply cannot explain how he developed expertise on irrevocable liability in the year and a half since testifying that he lacks such expertise in *Toshiba*.

58.     Moreover, as I explained in the Mitts Report and the Mitts Deposition, it is my understanding that the district court in the *Toshiba* matter made a factual finding that the purchaser

---

irrevocably liable to purchase the 36,000 ADRs in Japan and not the United States? A: I don't know the meaning of that term.").

[92] Zarcu Report ¶ 35.

[93] Zarcu Toshiba Dep. Tr. 169:25-170:2 ("A: A client can cancel an order before it's been executed. Not once it becomes executed.").

[94] Zarcu Dep. Tr. 44:3-18.

[95] Zarcu Report ¶ 24.

was "legally bound to perform its contractual obligations" upon purchase of the foreign shares.[96] As I explain below, Mr. Zarcu's personal beliefs arising out of his experience as a practicing securities trader do not determine whether customers are "legally bound to perform [their] contractual obligations."

### B. Mr. Zarcu Confuses Informal Practices Among Securities Traders with the Contractual Obligations of Broker-Dealer Customers.

59.     While Mr. Zarcu does not identify actual customer obligations to broker-dealers, he does make a series of assertions concerning these obligations based on informal practices among securities traders. He writes that "*[u]nder well-established industry practice*, because Plaintiffs had placed orders for ADRs as summarized above, they were irrevocably obligated to take and pay for those ADRs when their brokers had committed funds to acquire the underlying Bayer ordinary shares overseas."[97]  Elsewhere he opines, "*Based on my experience as a securities trader*, which includes extensive experience concerning the *norms, practices, conventions*, *and expectations of market participants* conducting such cross transactions, a client that has instructed its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares."[98]  Throughout the Zarcu Report, Mr. Zarcu states repeatedly that his opinions regarding Plaintiffs' obligations and the location where irrevocable liability arose are based on his experience as a securities trader.[99]

60.     At best, Mr. Zarcu is confused.  Informal practices do not determine the obligations of market participants.  Rather, those obligations are what they are, and some practices are consistent with them while others are inconsistent with them.  For decades, securities professionals like Mr. Zarcu have engaged in practices which are inconsistent with their obligations.  For example, in the 2000s it emerged that over 100 publicly traded companies had improperly backdated extensive stock options

---

[96] Mitts Report ¶ 38 n.45 (quoting *Toshiba II*, 2022 WL 220920, at *4 (emphasis added)).

[97] Zarcu Report ¶ 24 (emphasis added).

[98] Zarcu Report ¶ 31 (emphasis added).

[99] Zarcu Report ¶¶ 31, 32, 47, 57, 64, 76, 83, 90, 96, 100, 111, 119.

awards, leading to extensive civil and criminal fines and penalties.[100]  In one criminal prosecution, the defendant asserted, much like Mr. Zarcu does here, that the practice of backdating options was widespread throughout the industry.  The defendant was convicted by a jury despite the jury having been informed that "a number of companies backdated their options."  In denying the defendant's motion for judgment of acquittal, the court concluded that industry practice "is simply not probative of [the defendant's] guilt or innocence."[101]  It is my understanding that courts have reached similar conclusions in other settings as well.[102]

61.    Moreover, even if the personal experience of a broker-dealer's employee could be theoretically relevant in determining the obligations of that broker-dealer's customers, Mr. Zarcu's experience is not.  He has **never** worked at **any** of the broker-dealers whose customer obligations he opines on in the Zarcu Report.  Nor does Mr. Zarcu give any reason to believe that his experience working at Lazard, Wachovia, Bank of America (prior to merging with Merrill Lynch), and Salomon Brothers, mostly during the 2000s, is informative concerning the obligations of customers of Macquarie, Instinet, Bank of America Merrill Lynch, UBS, or Cowen & Company in 2016.[103]  For the same reason, Mr. Zarcu's repeated comparisons to *Toshiba* are misguided because that matter also involved different broker-dealers than those in this matter, and Mr. Zarcu gives no reason to believe their policies concerning customer obligations were similar to the policies applicable here.

---

[100] *See, e.g.*, *Perfect Payday: Options Scorecard*, Wall St. J., https://www.wsj.com/public/resources/documents/info-optionsscore06-full.html (last updated Sep. 2007); David I. Walker, *Unpacking Backdating: Economic Analysis and Observations on the Stock Option Scandal*, 87 B.U. L. Rev. 561, 574 (2007); Charles Forelle *et al.*, *Brocade Ex-CEO, 2 Others Charged in Options Probe*, Wall St. J., July 21, 2006, at A1.

[101] *United States v. Reyes*, 2010 WL 2573497, at *6 (N.D. Cal. June 24, 2010).

[102] *See, e.g.*, *United States v. Mahaffy*, 2007 WL 1213738, at *3 n.5 (E.D.N.Y. Apr. 24, 2007) ("Industry practice is not a permissible defense to fraud."); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *15 (S.D.N.Y. Feb. 14, 2012) ("industry practice is irrelevant" to claim of breach of contract and breach of warranty).

[103] Mr. Zarcu does not suggest—as it would plainly be implausible—that his experience working from 2001 to 2004 as a junior managing director on a trading desk at Bank of America, prior to its merger with Merrill Lynch in 2008, is relevant to determining the obligations of Bank of America Merrill Lynch customers fifteen years later.

[No: 3:20-cv-04737-RS] REBUTTAL EXPERT REPORT OF PROFESSOR JOSHUA MITTS, PH.D. ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                24

**C.**    **Customers of the Broker-Dealers Considered in the Zarcu Report Are Not Obligated to Purchase Bayer Sponsored ADRs upon Acquiring Bayer Foreign Shares.**

62.    The obligations of the purchasers of Bayer sponsored ADRs are determined by the actual customer agreements with the broker-dealers executing Plaintiffs' orders.  Mr. Zarcu does not even acknowledge that these agreements exist, notwithstanding that they define customer obligations and yield conclusions which directly contradict Mr. Zarcu's opinions.  I now discuss each of the broker-dealers considered in the Zarcu Report and show how their specific customer obligations are inconsistent with Mr. Zarcu's personal beliefs.

**1.    Local 710 (June 7, 2016) via Macquarie Securities**

63.    Mr. Zarcu begins by discussing the purchase of Bayer sponsored ADRs on June 7, 2016 by Local 710 through Macquarie Securities.[104]  Mr. Zarcu agrees that Bayer sponsored ADRs were acquired by Macquarie in a separate transaction on June 7, after the foreign shares were purchased pursuant to an order submitted to Frankfurt on June 6.[105]  However, he concludes that based on his experience as a securities trader, "a client that has instructed its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares."[106]

64.    Mr. Zarcu's opinion is baseless.  Macquarie's published terms and conditions state, "Transmission of an order by you shall not give rise to a binding contract between us and you." [107] The terms and conditions do not provide an exception for "cross transactions" or ADRs nor do they mention an obligation to accept ADRs after the broker acquired foreign shares.  Rather, the terms and

---

[104] Zarcu Report ¶ 25.

[105] Zarcu Report ¶ 30 ("Documents produced by Macquarie and BNY Mellon further confirm this conclusion, reflecting that Macquarie received a confirmatory order for 577,403 Bayer ordinary shares at 21:47:37 ET on June 6, 2016, . . . . The same Macquarie record reflects an acquisition of 577,403 Bayer ADRs on June 7, 2016 by Macquarie. . . . Following this acquisition, BNY Mellon reported an issuance of 577,403 new ADRs to Macquarie on June 10, 2016, which were delivered to Harding Loevner for settlement.").

[106] Zarcu Report ¶ 31.

[107] *See, e.g.*, Macquarie, Terms and Conditions of Investment Business (May 2022), https://www.macquarie.com/assets/macq/about/disclosures/macquarie-bank-limited-terms-of-business.pdf.

[No: 3:20-cv-04737-RS] REBUTTAL EXPERT REPORT OF PROFESSOR JOSHUA MITTS, PH.D. ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                                          25

conditions state that order instructions may be cancelled "if we have not acted upon them."[108]  By Mr. Zarcu's own account, Macquarie had not yet "acted upon" the instruction to purchase Bayer sponsored ADRs until June 7, making those instructions cancellable.  Thus, even if Mr. Zarcu is correct that customers *typically* accept ADRs following the purchase of underlying foreign shares, his opinion that they are *obligated* to do so is inconsistent with the agreement which defines those obligations.

65.    In several paragraphs, Mr. Zarcu describes communications between Harding Loevner and Macquarie, which lead him to conclude that "[a]n experienced trader would recognize these *instructions* to constitute a "buy" order to purchase ADRs by acquiring Bayer ordinary shares on the local German market *and then* converting the ordinary shares to ADRs."[109]  Because the Macquarie customer agreement shows that customers were entitled to cancel the latter of these two "instructions"—*i.e.*, the conversion of ordinary shares to ADRs—so long as Macquarie had not yet "acted upon" that instruction, it is irrelevant whether or not Mr. Gowda's email on June 6, 2016 at 5:18pm ET was a "buy" order.

66.    Moreover, as I explained in the Mitts Report and Mitts Deposition, the *Toshiba* court characterized the order to purchase ADRs in that matter as a "market order," which the court defined as "an order to buy or sell a stock at the best available price.  Generally, this type of order will be executed immediately."[110]  And while Mr. Zarcu claims that these communications were similar in certain ways to those at issue in *Toshiba*,[111] he does not contest my conclusion that these communications fell short of a "market order."[112]

67.    The Zarcu Report is silent on this point here, and for good reason: little about the communication between Harding Loevner and Macquarie on June 6 at 5:18pm meets the definition of a "market order" as given by the court in *Toshiba*.  For one, the local German market was not open at

[108] *Id.* at § 6.3.

[109] Zarcu Report ¶ 29 (emphasis added).

[110] *Toshiba II*, 2022 WL 220920, at *3 n.5.

[111] Zarcu Report ¶ 36.

[112] Mitts Dep. Tr. 162:13-14 ("[I]t's fairly clear that this is not a market order as was the case in *Toshiba*.").

that time.  5:18pm in New York is 11:18pm in Germany, and the local market would not open for several more hours.  It was impossible for any order to have been "executed immediately."  Unlike a typical market order, which executes immediately, the entire order was cancellable at the very least until the German market opened, and Mr. Zarcu does not suggest otherwise.

68.     But there is an even more obvious reason why the communication between Harding Loevner and Macquarie on June 6 at 5:18pm falls short of a "market order."  The order could not have been "*executed immediately*" because it was specifically described as "OTD Max 20%," which Mr. Zarcu himself defines as "instructing the broker to spread the purchase throughout the trading day, while aiming to keep the number of shares traded to no more than 20% of the volume traded that day."[113]   By Mr. Zarcu's own definition, these instructions could not have been executed immediately—because the broker was instructed to spread the purchase throughout the trading day—and thus was not a "market order."[114]

69.     There are more reasons to conclude that the communication between Harding Loevner and Macquarie on June 6 at 5:18pm falls short of a "market order" as in *Toshiba*.  As I explained in the Mitts Deposition, because a market order is typically executed immediately, it is unusual for the number of shares in the order to differ from the number of shares which were ultimately executed.  Here, 577,938 shares were requested but only 577,403 shares were ultimately purchased.  Mr. Zarcu notes in a footnote that "[t]he difference in the number of Bayer ADRs ordered by Harding Loevner and the number of ADRs ultimately purchased by Instinet is likely a result of adaptations made by Instinet to maintain best execution."[115]  There appears to be an error in Mr. Zarcu's description because these instructions were executed by Macquarie, not Instinet.  In any event, Mr. Zarcu does not contest my conclusion in the Mitts Deposition, namely, that there was no "market order" for 577,938 Bayer sponsored ADRs—if there were, then 577,938 ADRs would have been purchased immediately.  Rather, Macquarie was instructed to place a series of small orders throughout the day in Germany and

---

[113] Zarcu Report ¶ 29 n.19.

[114] The instructions appear to have been implemented through a series of smaller market orders throughout the trading day, each of which would have become irrevocable upon execution.

[115] Zarcu Report ¶ 30 n.20.

subsequently convert those shares to ADRs. Each of those instructions, including the latter, was cancellable until executed by Macquarie. Harding Loevner was not obligated to purchase all the 577,938 Bayer foreign shares until they were acquired by Macquarie, nor was Harding Loevner obligated to exchange Bayer foreign shares for Bayer sponsored ADRs until that transaction was executed.

### 2. Local 710 (August 2, 2016, December 9, 2016 and December 18, 2017) via Instinet

70. When discussing purchases of Bayer sponsored ADRs by Instinet on August 2, 2016, Mr. Zarcu concedes that there were two distinct orders, noting that "Instinet executed Harding Loevner's ADR order" on August 2 after "acquiring 367,323 Bayer ordinary shares for conversion to a corresponding number of Bayer ADRs."[116] Mr. Zarcu then concludes that "the series of entries recorded in Instinet's records provide another example of a cross transaction, where newly issued ADRs received from the depositary are booked to a client" and concludes that "based on [his] experience as a securities trader . . . a client that has ordered its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares."[117] Mr. Zarcu repeats the same text (almost verbatim) for purchases of Bayer sponsored ADRs on December 9, 2016 and December 18, 2017.[118]

71. Again, Mr. Zarcu's opinion is baseless. Instinet's published terms and conditions provide that an order is cancellable so long as it has not been fully executed "on the Execution Venue to which it was routed."[119] The terms and conditions do not provide an exception for "cross transactions" or ADRs nor do they mention an obligation to accept ADRs after the broker acquired foreign shares. Rather, the terms and conditions make clear that even if an order has partially executed, a customer is liable only "for the portion of the order so executed."[120] Even if the ADR conversion

---

[116] Zarcu Report ¶ 43.

[117] Zarcu Report ¶ 47.

[118] I address unique facts in connection with the purchase of ADRs on December 9, 2016 *infra*.

[119] *Terms of Business*, Instinet (Sept. 2018), https://www.instinet.com/sites/default/files/public/documents/IEL_Terms_of_Business.pdf.

[120] *Id.*

was a "portion of the order," by Instinet's terms and conditions that portion was cancellable because it had not yet been executed.

72.    Moreover, as before, little about these communications with Instinet meet the definition of a "market order" as given by the court in *Toshiba*. Each time, the instructions were given at a time when the German markets were closed, so the order could not execute immediately.[121] Each time, the orders were subject to the same "OTD Max 20%" limitation, meaning that Instinet was instructed to place a series of small orders throughout the day in Germany, subject to a 20% contemporaneous volume limitation, and subsequently convert those shares to ADRs.[122] And unsurprisingly, in contrast to a market order which executes immediately for the indicated quantity, each time Instinet ultimately purchased fewer foreign shares than the original instructions.[123]

73.    Under Instinet's terms and conditions, each "portion" of these instructions was cancellable until executed, including the final portion, *i.e.*, the conversion of the Bayer foreign shares into Bayer sponsored ADRs. There is no basis for Mr. Zarcu's opinion that "Plaintiffs were thus irrevocably obligated to take and pay for their ADRs as of the moment when Instinet purchased Bayer ordinary shares on the overseas market."[124]

**3.    SMW and Local 710 (December 9, 2016) via Morgan Stanley and Instinet**

74.    Mr. Zarcu's discussion of the purchases of 11,000 and 12,400 Bayer sponsored ADRs by SMW and Local 710, respectively, on December 9, 2016, deserves particular attention. The Mitts Report explained that these purchases consisted of existing Bayer sponsored ADRs. Mr. Zarcu does not contest that SMW and Local 710 received title to and custody of existing Bayer sponsored ADRs rather than newly issued ADRs by the Bank of New York Melon. But Mr. Zarcu claims that this is irrelevant because, in his view, these were part of a larger purchase of newly issued Bayer sponsored

---

[121] Zarcu Report ¶¶ 40, 44, 61, 70.

[122] Zarcu Report ¶¶ 44, 61, 70 (Instructions for the transactions at ¶ 44 and ¶ 61 explicitly say VWAP / otd max 20%, but for the transaction at ¶ 70, the limitation-instruction was "vwap otd w discretion if improving avg," which is equivalent in effect without a specific 20% limit).

[123] Zarcu Report ¶¶ 41, 43, 61, 70, 71.

[124] Zarcu Report ¶ 47.

ADRs by Harding Loevner. He justifies the transfer of custody of existing domestic ADRs as driven solely by an (unexplained) delay in ADR settlement, concluding that "the loan serves to facilitate the timely delivery of shares to the client and nothing more."[125]

75. Even on its own terms, Mr. Zarcu's explanation is implausible: why would only 23,400 of the 243,245 ADRs—9.6%—settle on time, while the other 90+% were subject to a "delay in ADR issuance?"[126] The issuance of ADRs is straightforward, as evidenced by the fact the process can be coordinated with three short Bloomberg messages spanning just a single minute.[127] The notion that only 9.6% of a purchase would settle on time is as fanciful as it sounds—especially because ADRs can be issued instantly once the foreign shares have been acquired. Mr. Zarcu does not even attempt to give an explanation as to why such a delay concerning a partial quantity might have occurred.

76. His conclusions are not only unfounded—they are incorrect. Like all SMW purchases, the purchase of 11,000 ADRs on December 9 was executed by Morgan Stanley, not Instinet. Mr. Zarcu does not even mention Morgan Stanley in his report, much less examine the twelve (12) purchases by SMW executed by Morgan Stanley. There is no indication that this purchase of 11,000 ADRs on December 9 was anything other than an ordinary, domestic secondary market purchase of existing Bayer sponsored ADRs. Clearing records show that Morgan Stanley fulfilled that order of 11,000 ADRs *from its existing inventory of Bayer sponsored ADRs*. On December 14, the clearing date of the purchase, Morgan Stanley had 2,111,828 Bayer sponsored ADRs in its general free account with the DTCC. That day, Morgan Stanley received 52 ADRs and transferred 19,020 ADRs to purchasers, including the 11,000 ADRs to SMW, leaving 2,092,860 ADRs in its existing inventory. There was no loan "to facilitate the timely delivery of shares to the client,"[128] as Mr. Zarcu suggests.

---

[125] Zarcu Report ¶ 66.

[126] Zarcu Report ¶ 66.

[127] *See e.g.*, Zarcu Report Ex. Z-26 (HJ-002400) at '2404 ("11:29 AM ET, M. Lawn: John, you bought 24,730 BAYRY @ $97.605 / Local Price €91.47795 / FX = 1.06665 / Conversion Cost = $.03/share / I will put the ADR fill in once you agree; 11: 30 AM ET, J. Hufcut: Looks good to me; 11: 30 AM ET, M Lawn: Thx john, going in now on ADR").

[128] Zarcu Report ¶ 66.

Only 52 shares were transferred into Morgan Stanley's account that day, so there is no question that the purchase was fulfilled from existing inventory.

77.    The Zarcu Report discusses both purchases of 11,000 and 12,400 Bayer sponsored ADRs under the same heading: "December 8, 2016 Purchases by SMW and Local 710." If Mr. Zarcu is suggesting that the purchase of 11,000 existing Bayer sponsored ADRs by *Morgan Stanley* was somehow part of a purchase of newly issued 243,245 ADRs by *Instinet*, he is clearly confused. Those are two different broker-dealers. Mr. Zarcu repeatedly fails to keep track of or clearly distinguish which orders were carried out by which broker-dealers. On several occasions throughout his report, Mr. Zarcu fails to distinguish between purchases made by SMW and Local 710, even where they are discrete purchases made via different broker-dealers.[129]

78.    As for the purchase of 12,400 Bayer sponsored ADRs by Local 710, Mr. Zarcu does not identify any direct evidence indicating that these ADRs were part of the larger purchase of 243,245 ADRs. Unlike with other purchases, the 12,400 ADRs were not transferred to the custodial account of Local 710 out of the block of 243,245 ADRs—rather, the custodial transfer of 12,400 ADRs occurred two days before. Nor does Mr. Zarcu explain why this very small block of 5% of the order volume was settled on the ordinary timeframe of T+3 settlement while the remaining 95% of order volume took five days to settle.

79.    Trading records provided by FINRA explain why the 12,400 existing Bayer sponsored ADRs were purchased on the secondary market. According to these records, on December 9 at 9:10am—while Instinet was still accumulating foreign shares for Harding Loevner—a large sale of 238,753 Bayer sponsored ADRs was executed by Berenberg Capital Markets LLC and was immediately printed to the live transaction tape.

80.    Mr. Zarcu fails to mention this very large sale by Berenberg Capital Markets LLC on the morning of December 9 when concluding, incorrectly, that "no rational trader would have made the decision to acquire a block of 243,245 Bayer sponsored ADRs domestically given these reported

---

[129] Zarcu Report § V.A, at 7 ("June 6, 2016 Purchases by SMW and Local 710"), § V.B. at 14 ("August 2, 2016 Purchases by SMW and Local 710"), § V.C. at 23 ("December 8, 2016 Purchases by SMW and Local 710"), § V.D. at 27 ("December 18, 2017 Purchases by SMW and Local 710").

volumes, as the impact of such a purchase would have increased the execution cost."[130]  It would be rational for a trader to purchase a block of that size on the domestic market *when a similarly sized block was just sold on that same market*.

81.    In fact, there is ample evidence that Instinet attempted to do just that.  FINRA trading records indicate a series of "step out" transactions by Instinet on the morning of December 9, whereby Instinet allocated the execution of the purchase of 191,253 existing Bayer sponsored ADRs to a variety of U.S. broker-dealers, including Goldman Sachs, Convergex Solutions, Pershing LLC, and others.[131] These records indicate that Instinet sought to purchase existing Bayer sponsored ADRs on the domestic market to match against the large sale of 243,245 existing Bayer sponsored ADRs by Berenberg Capital Markets LLC.

82.    For one example, FINRA records indicate that Convergex Solutions purchased 28,002 Bayer sponsored ADRs on the domestic market in a step out transaction with Instinet on the morning of December 9.[132]  Clearing records indicate that Convergex received these ADRs through settlement from the National Securities Clearing Corporation and subsequently sold those ADRs to Wells Fargo Bank, N.A.  This custodial transfer occurred *before* the issuance of the 243,245 ADRs by the Bank of New York Mellon on December 16, indicating that these 28,002 ADRs were also acquired on the domestic market.

83.    Mr. Zarcu's attempt to characterize the purchase of 12,400 ADRs by Local 710 as merely a part of the block of 243,245 ADRs (the rest of which settled two days later) is unfounded. Like the purchase of 28,002 ADRs by Convergex, the purchase of 12,400 ADRs (which Instinet fulfilled by taking a short position, *i.e.*, *borrowing the shares on the domestic market*), was simply one of several attempts to acquire these ADRs on the domestic market in light of the substantial block of shares put up for sale by Berenberg Capital Markets.  By failing to consider these transactions,

---

[130] Zarcu Report ¶ 65.

[131] FINRA000005.

[132]  FINRA000005.

Mr. Zarcu reaches an erroneous conclusion regarding where irrevocable liability for the purchase of these 12,400 ADRs was incurred.

### 4.  IUOE (November 17, 2016) via Bank of America Merrill Lynch

84.    When discussing the purchase of 1,040 Bayer sponsored ADRs on November 17, 2016, Mr. Zarcu again acknowledges that the exchange of Bayer foreign shares for Bayer sponsored ADRs occurred in a separate transaction but insists that irrevocable liability for the purchase of Bayer sponsored ADRs arose when the Bayer foreign shares were purchased.[133]   In this case, the correspondence between John Hufcut of Hardman Johnston and Matthew Wakeman at Bank of America Merrill Lynch ("BAML"), reproduced in paragraph 79 of the Zarcu Report, directly undermines Mr. Zarcu's conclusion.

85.    For ease of exposition, I restate the critical elements of this correspondence.[134]  From 6:54am ET through 9:57am ET, Mr. Wakeman is purchasing 125,000 Bayer foreign shares at Mr. Hufcut's request.  At 9:57am, Mr. Wakeman writes that he completed the purchase of 125,000 Bayer foreign shares.  At 10:49am—nearly one hour later—Mr. Hufcut requests "a little more on the Ord side and some ADR's as well… I would like this to be all done in the locals at 1 avg and converted back pls."  Mr. Wakeman explains that he "will finish the 150k then do the manual locals for the ADR amount and average together."  At 11:21am, Mr. Wakeman states: "**TOTAL BAYN GY BOUGHT 174,730 ® GROSS 91.4779," to which Mr. Hufcut replies, "Great, thanks."   From 11:29am to 11:30am, three messages are exchanged, which completely undercut Mr. Zarcu's conclusion that irrevocable liability to acquire Bayer sponsored ADRs arose upon purchase of the foreign shares:[135]

| Time | Sender | Message |
|---|---|---|
| 11:29AM ET | M. Lawn | John, You Bought 24,730 BAYRY@ $97.605 Local Price=€91.47795<br>FX=1.06665<br>Conversion Cost=$.03/share<br>***I will put the ADR fill in once you agree*** |
| 11:30AM ET | J. Hufcut | Looks good to me |

[133] Zarcu Report ¶ 79.

[134] This correspondence is found in Bates number HJ-0002400 (*i.e.*, Zarcu Report Ex. Z-26), not HJ-002400 as in footnote 93 to the Zarcu Report.

[135] I have reproduced the relevant portion of the table in the Zarcu Report and added emphasis to the relevant text.

| 11:30AM ET | M. Lawn | Thx John, going in now on ADR |

86.    As this excerpt demonstrates, even after BAML had already purchased Bayer foreign shares, ***the purchase of Bayer sponsored ADRs using those foreign shares was expressly conditioned on Mr. Hufcut's further agreement***.  As a matter of simple logic, the sentence "I will put the ADR fill in ***once you agree***" implies that Mr. Hufcut was not obligated to agree at that moment.  Rather, the purchase of Bayer sponsored ADRs was a separate transaction, with its own terms (given in Mr. Lawn's 11:29am ET message), to which Mr. Hufcut's ***subsequent agreement*** was required before that transaction could execute.

87.    The Zarcu Report is completely silent on this point, stating only that "[f]ollowing Mr. Hufcut's confirmation of the proposed execution, Mr. Lawn responded that he was finalizing the ADR issuance ("going in now on ADR")."  Mr. Zarcu fails to discuss the ***express conditioning*** of the purchase of Bayer sponsored ADRs on Mr. Hufcut's subsequent approval.  Mr. Lawn's request for Mr. Hufcut's approval of the transaction terms underlying the ADR purchase—***after the Bayer foreign shares had already been purchased***—is logically inconsistent with Mr. Zarcu's conclusion that "IUOE was thus irrevocably obligated to take and pay for its ADRs as of the moment when BAML purchased Bayer ordinary shares on the overseas market."[136]  It is clear that Mr. Hufcut's approval was required to purchase the Bayer sponsored ADRs after the foreign shares had already been purchased.  Because Mr. Hufcut was entitled to reject that request, Hardman Johnston was not obligated to take and pay for Bayer sponsored ADRs at the moment when BAML purchased Bayer foreign shares.

88.    The fact that Mr. Hufcut's approval was required before Hardman Johnston was obligated to purchase the ADRs is consistent with BAML's own terms and conditions, which like those of Macquarie, provide that instructions may be cancelled so long as BAML has not yet "acted upon them."[137]  Contrary to Mr. Zarcu's beliefs, the terms and conditions do not provide an exception

---

[136] Zarcu Report ¶ 83.

[137] *General Terms & Conditions of Business for Professional Clients and Eligible Counterparties*, Bank of America Securities (Mar. 2022),

for "cross transactions" or ADRs nor do they mention an obligation to accept ADRs after the broker acquired foreign shares. For all these reasons, irrevocable liability to purchase these Bayer sponsored ADRs arose when Mr. Hufcut gave his approval, in the United States, to purchase 24,730 Bayer sponsored ADRs, after the foreign purchase had already been completed.

## 5.    IUOE (February 22 and 23, 2017) via JPMorgan Securities

89.    When Mr. Zarcu discusses the purchase of Bayer sponsored ADRs by IUOE on February 22 and 23, 2017,[138] he does not claim, as in prior episodes, that there was *any* instruction to purchase Bayer sponsored ADRs prior to purchase of the Bayer foreign shares. Rather, Mr. Zarcu identifies a series of instructions by Mr. Hufcut at Hardman Johnston to purchase Bayer foreign shares—not ADRs. Mr. Zarcu then states that "this purchase of Bayer ordinary shares was for the purpose of subsequent conversion to ADR [sic]"[139] and concludes that, based on his experience as a securities trader, "IUOE was thus irrevocably obligated to take and pay for its ADRs as of the moment when JP Morgan Securities purchased Bayer ordinary shares outside the United States."[140]

90.    As I explained in the Mitts Deposition, there is no question that the *purpose* of purchasing Bayer foreign shares was, at times, to acquire newly issued Bayer sponsored ADRs.[141] But it does not follow that Hardman Johnston or IUOE was *obligated* to purchase Bayer ADRs as soon as Bayer foreign shares were purchased, and Mr. Zarcu's assertion of such an obligation is baseless. There is simply no instruction to purchase Bayer sponsored ADRs in the chat transcript that Mr. Zarcu presents, either before or after the ADR purchase. And even if there had been, like other broker-

---

https://business.bofa.com/content/dam/boamlimages/documents/articles/ID17_1174/bofaml_general_terms_and_conditions_for_business.pdf ("You may only cancel or revise instructions with our consent if we have not acted upon them.").

[138] There appear to be multiple errors in Mr. Zarcu's report, which states "February 23, 2020," but the purchase occurred on February 23, 2017. Moreover, Mr. Zarcu misstates the volume of ADRs purchased by IUOE on February 22, 2017: it was 11,080, not 2,770, as stated in the Zarcu Report. The origin of the figure 2,770 is unclear.

[139] Zarcu Report ¶ 88.

[140] Zarcu Report ¶ 90.

[141] Mitts Dep. Tr. 171:3-8 ("the mere fact that two transactions are part of a client's strategy . . . [provides] no reason to think that one becomes noncancelable when the other executes.").

dealers, the terms of business of JPMorgan Securities provides that open orders are cancellable until executed.[142]

91.    Moreover, Mr. Zarcu's analysis is internally inconsistent.  The chat transcript in paragraph 86 of the Zarcu Report describes an order to purchase more than 200,000 Bayer foreign shares, but Mr. Zarcu can only identify the purchase of 67,225 and 39,475 newly issued Bayer sponsored ADRs, respectively—far less than 200,000.  And when Mr. Zarcu does identify purchases of newly issued ADRs, he points to a settlement date of March 2, 2017—*six trading days later*.  That is hardly a "plausible settlement date for the trades at issue,"[143] which occurred on February 22 and 23, 2017, when the settlement timeline was T+3 at the time, *i.e.*, three trading days after a given transaction.

92.    A careful examination of FINRA trading records shows that Mr. Zarcu misunderstood what happened on February 22 and 23, 2017.  These records indicate that JPMorgan Securities obtained the 67,225 Bayer sponsored ADRs which it sold to Hardman Johnston (of which 11,080 ADRs were allocated to IUOE) at a price of $113.7895 by purchasing *existing* Bayer sponsored ADRs from Citigroup Global Markets at a price of $113.70 per ADR.[144]  This evidence is completely inconsistent with Mr. Zarcu's thesis because it shows that JPMorgan Securities purchased existing ADRs from a domestic seller, Citigroup Global Markets, at a different price from the price at which it sold those ADRs to Hardman Johnston.  There is no indication that the purchase of over 200,000 Bayer foreign shares described in the chat log has any connection to the purchase of 67,225 ADRs by JPMorgan Securities from Citigroup on the domestic market.

93.    In fact, unlike with prior purchases, Mr. Zarcu is unable to match the purchase price of the ADRs by IUOE—$113.7895—to the purchase price of Bayer foreign shares.  He instead calculates the local price in Euros using a *range* of dollar-euro foreign exchange conversion rates and concludes

[142] *Terms of Business for Professional Clients*, J.P. Morgan, https://www.jpmorgan.com/content/dam/jpm/global/disclosures/by-region/terms-of-business-professional-clients.pdf (last visited March 17, 2023) ("Unless otherwise agreed, open orders are specific and will remain in effect until executed or cancelled").

[143] Zarcu Report ¶ 88.

[144] FINRA000001.

that the purchase price of $113.7895 is within this range.[145]  But so are many other purchase prices. The price of $113.7895 is well within the range of purchase prices of Bayer sponsored ADRs on the domestic market that day.  Over 88,000 existing ADRs were purchased on February 22, 2017 within the range of purchase prices implied by the chat transcript and foreign exchange rates given in the Zarcu Report.[146]  For this reason, Mr. Zarcu's theory based on the purchase price of these ADRs is unfounded.

94.    To summarize, FINRA trading records indicate that JPMorgan Securities purchased existing Bayer sponsored ADRs on February 22, 2017 from Citigroup Global Markets on the domestic market.  Irrevocable liability for those transactions arose in the United States.

95.    Similarly, on February 23, 2017, FINRA trading records indicate that JPMorgan Securities obtained 39,475 Bayer sponsored ADRs which it sold to Hardman Johnston (of which 6,480 ADRs were allocated to IUOE) at a price of $113.1612 by purchasing *existing* Bayer sponsored ADRs from Citigroup Global Markets at a price of $111.35 per ADR.[147]  This evidence is completely inconsistent with Mr. Zarcu's thesis because it shows that JPMorgan Securities purchased existing ADRs from a domestic seller, Citigroup Global Markets, at a different price from the price at which it sold those ADRs to Hardman Johnston.  There is no indication that the purchase of over 200,000 Bayer foreign shares described in the chat log has any connection to the purchase of 39,475 ADRs by JPMorgan Securities from Citigroup on the domestic market.

96.    That is, FINRA trading records indicate that JPMorgan Securities purchased existing Bayer sponsored ADRs on February 23, 2017 from Citigroup Global Markets on the domestic market. Irrevocable liability for those transactions arose in the United States.

### 6.    IUOE (May 26-27, 2020) via UBS Securities

---

[145] Zarcu Report ¶ 89.

[146] The chat transcript identified purchases of Bayer foreign shares at prices ranging from 107.50 to 108 EUR and the Zarcu Report identified a range of foreign exchange conversion rates from 1.0497 to 1.0556, which implies U.S. dollar purchase prices of $112.84 to $114.00.

[147] FINRA000001.

97.     When considering the purchase of 7,980 Bayer sponsored ADRs for IUOE via UBS Securities on May 26, 2020, Mr. Zarcu does not contest the Mitts Report's conclusion that these were existing Bayer sponsored ADRs but claims that, like the purchase through Local 710 on December 9, 2016, this was merely an "alternative settlement arrangement" due to an (unexplained) "delay in ADR issuance."[148]   Based on his experience as a securities trader, Mr. Zarcu concludes that IUOE was obligated to purchase the ADRs as soon as 450,000 Bayer foreign shares were purchased in Germany.[149]

98.     Mr. Zarcu's assertion is baseless.  As with the IUOE purchases on February 22 and 23, 2017, Mr. Zarcu cannot identify a single instruction to convert *any* part of these 450,000 Bayer foreign shares to ADRs—either before or after the foreign shares are purchased.  At most there is a vague reference in a chat message by Mr. Hufcut at Hardman Johnston that "*I am going to have a portion, -15% ,that upon completion I will be converting to ADRs*."[150]   But the response by Mr. Gula at UBS Securities undercuts Mr. Zarcu's thesis that irrevocable liability attached the moment the foreign shares were purchased: "*ok we can speak about ADR later, no problem*" to which Mr. Hufcut replies "*thx*."[151]   This exchange shows that Mr. Gula and Mr. Hufcut ***postponed any discussion concerning the purchase of ADRs until after the foreign shares were acquired.***  Plainly, if the ADR instruction arrived *after* the foreign shares were purchased, as it did here, there is no question that irrevocable liability to purchase Bayer sponsored ADRs arose in the United States.

99.     Moreover, there is no correspondence between Mr. Hufcut's vague reference on May 26 to converting ***15%*** of the foreign shares, and the amount which was ultimately converted to ADRs according to Mr. Zarcu: 212,400, or ***47.2%*** of the 450,000 foreign shares purchased on May 26.  This is further evidence that Hardman Johnston had not incurred any liability to purchase ADRs at the time of purchasing Bayer foreign shares in Germany.

---

[148] Zarcu Report ¶ 97.

[149] Zarcu Report ¶ 96.

[150] Zarcu Report ¶ 93 (quoting Zarcu Report Ex. Z-26 (HJ-0002400) at 18-25).

[151] Zarcu Report ¶ 93.

100.    As for the supposed settlement delay, again Mr. Zarcu's explanation is implausible even on its own terms: why would only 7,580 of the 212,400 ADRs—3.5%—settle on time, while the other 97.5% were subject to a delay?[152]  Issuance of ADRs is straightforward.[153]  The notion that only part of a purchase would settle on time is not credible, especially because, as prior chats have shown, ADRs can be issued quickly once the foreign shares have been acquired, as they were here.  Mr. Zarcu does not even attempt to give an explanation as to why that "delay" might have occurred.  As before, his theory is an unfounded guess, and an incorrect one at that.

101.    Clearing and trading records show that UBS Securities filled orders to purchase 71,190 Bayer sponsored ADRs on May 26 through transfers to custodial accounts for Hardman Johnston clients at PNC Bank and Wells Fargo Bank.  This amounted to 15.82% of the 450,000 Bayer foreign shares, *i.e.*, approximately equal to the 15% figure referenced by Mr. Hufcut in the chat excerpt.  However, UBS Securities filled these orders **not by converting Bayer foreign shares to ADRs**, as Mr. Zarcu suggests, but rather by **purchasing 80,000 existing Bayer sponsored ADRs** from ICAP Corporates LLC, based in New York.[154]  The Zarcu Report thus errs twice: not only did Mr. Hufcut and Mr. Gula **agree to postpone discussions of the ADR transaction until after the foreign shares were acquired**—thus, irrevocable liability could not have been incurred in Germany—but in the end, Hardman Johnston simply purchased existing ADRs on the secondary market from a domestic seller.

102.    Similar conclusions follow from the conversation on May 27, 2020 between Mr. Hufcut and Mr. Gula.  Mr. Hufcut does not reach any sort of agreement with Mr. Gula on the ADRs during that conversation, much less place anything approaching an order to purchase ADRs.  Rather, Mr. Gula simply asks vaguely if ADRs will be booked, to which Mr. Hufcut replies in the affirmative.  That is

[152] Zarcu Report ¶ 97.

[153] *See e.g.*, Zarcu Report Ex. Z-26 (HJ-002400) at *5 ("11:29 AM ET, M. Lawn: John, you bought 24,730 BAYRY @ $97.605 / Local Price €91.47795 / FX = 1.06665 / Conversion Cost = $.03/share / I will put the ADR fill in once you agree; 11: 30 AM ET, J. Hufcut: Looks good to me; 11: 30 AM ET, M Lawn: Thx john, going in now on ADR").

[154] FINRA000011; DTCC00119. It is most likely the 80,000 Bayer ADRs were purchased from ICAP Corporates LLC, but it is also possible they were acquired on the share lending market.  Either way, UBS transferred 7,980 **existing ADRs** to IUOE's custodial account at Wells Fargo Bank on May 28, 2020, the settlement day corresponding to the purchase by IUOE on May 26, 2020.

not even an order, much less a "market order" which would imply that Hardman Johnston would be logically and legally bound to acquire ADRs as soon as the foreign shares were purchased. When the foreign shares were acquired, Mr. Hufcut had not even specified how many ADRs he was even interested in purchasing.

103.    As with May 26, clearing records indicate that approximately 77,740 existing Bayer sponsored ADRs were purchased by UBS Securities on May 27 on behalf of Hardman Johnston clients.[155]  UBS fulfilled that order by opening a short position in Bayer sponsored ADRs, *i.e.*, by borrowing a total of 87,300 ADRs from UBS' securities lending unit. There is simply no evidence whatsoever to suggest that there was a settlement delay. Rather, Hardman Johnston and UBS Securities decided on May 27 to purchase ADRs on the domestic secondary market rather than converting Bayer foreign shares to ADRs.

### 7.    IUOE (June 3 and June 4, 2020) via Cowen & Co.

104.    As before, when considering the purchase of 4,530 and 3,620 Bayer sponsored ADRs for IUOE via Cowen & Co. on June 3 and 4, 2020, Mr. Zarcu does not contest the Mitts Report's conclusion that these were existing Bayer sponsored ADRs. Rather, Mr. Zarcu presents a chat transcript between Mr. Hufcut at Hardman Johnston and two traders at Cowen. He again argues that because Mr. Hufcut was purchasing Bayer foreign shares with the purpose of subsequently converting some portion of those shares to ADRs, irrevocable liability to purchase the ADRs attached when the foreign shares were acquired.

105.    Again, as before, Mr. Zarcu's conclusions are baseless and incorrect. First, the terms and conditions applicable to Cowen & Co. clients provide that open orders are cancellable until executed or expired.[156]  Thus, even if there was an order to purchase ADRs at the time the foreign shares were purchased (which seems highly unlikely, as I explain shortly), that order was cancellable until it was executed.

---

[155] DTCC001195.

[156] *Client Brokerage Terms and Conditions*, Cowen and Company (Aug. 2021), https://s33007.pcdn.co/wp-content/uploads/2021/09/Cowen-and-Co-Global-Terms-and-Conditions-8.26.2021.pdf.

106.    Second, in this case, there is no evidence that Mr. Hufcut had placed **any** order to buy ADRs when the foreign shares were purchased on June 3 and June 4.  Mr. Zarcu does not present any communications in connection with the purchase on June 3, which I take as a concession on his part that there are no such communications to support his thesis on that day.  As for the chat transcript on June 4, Mr. Hufcut does not even mention buying ADRs until 6:53am—over an hour after being told that he had already purchased 72,000 Bayer foreign shares.  When Mr. Hufcut mentions buying ADRs at 6:53am, he gives a vague estimate of "23k left in total" for the volume of ADRs that he will "send over once KJ is in."  This communication is too indefinite and tentative to be an order to purchase ADRs.

107.    At 7:08am, Mr. Joyce at Cowen & Co. indicates that he is planning to purchase an additional 23,745 "ords" (*i.e.*, ordinary shares) for the purpose of a future conversion to ADRs. However it is simply incorrect, on this record, to conclude that liability to purchase those ADRs arose at 7:08am.  Rather, it is only at 7:53am, after those additional 23,745 ordinary shares have been purchased, that Mr. Hufcut is asked to confirm the conversion of 23,745 foreign shares to 94,978 ADRs.  At 8:01am, Mr. Hufcut agrees to the transaction by writing "Thank u sir," and Mr. Joyce confirms execution of the transaction at 8:34am.  Liability to purchase those 94,978 ADRs did not become irrevocable until after Mr. Hufcut agreed to the second transaction at 8:01am.  By that point, the foreign shares had *already* been acquired.  There is thus no evidence whatsoever that Mr. Hufcut placed an order to purchase Bayer sponsored ADRs prior to or even during the purchase of the foreign shares.

108.    The Zarcu Report also discusses internal Cowen records which allocated the purchase of those 94,978 ADRs on June 4 to client accounts.[157]  That does not establish that irrevocable liability was incurred outside the United States.  The Zarcu Report also claims that "The same document states that the "Order Type" was a "Market Order."  But Mr. Zarcu is mistaken.  The purchases for Hardman Johnston—119,992 ADRs on June 3 and 94,978 ADRs on June 4—are *never* designated as market orders.  Rather, every row reflecting these purchases (there are multiple internal orders reflecting

---

[157] Zarcu Report ¶ 106.

transfers between Cowen & Co. average price and "flip" accounts) has either a blank order type or "Limit Order" designation, as the following screenshot shows:[158]

| Trade Date | CID Relationship | Short Name | Buy/Sell | Symbol | Quantity | Price | Order Type |
|---|---|---|---|---|---|---|---|
| 6/3/20 | Cowen and Company, LLC | ADRFA | SELL | BAYRY | 119992 | 18.3881 | |
| 6/3/20 | Cowen and Company, LLC | ADRAV | BUY | BAYRY | 119992 | 18.3931 | |
| 6/3/20 | Cowen and Company, LLC | COWPFLIP | BUY | BAYRY | 119992 | 18.3881 | |
| 6/3/20 | Cowen and Company, LLC | COWPFLIP | SELL | BAYRY | 119992 | 18.3931 | |
| 6/3/20 | Cowen and Company, LLC | ADRAV | SELL | BAYRY | 119992 | 18.3931 | |
| 6/3/20 | Cowen and Company, LLC | ADRFA | BUY | BAYRY | 119992 | 18.3881 | Limit Order |
| 6/3/20 | Cowen and Company, LLC | 0100ECUT | BUY | BAYRY | 119992 | 18.3931 | |
| 6/4/20 | Cowen and Company, LLC | ADRFA | SELL | BAYRY | 94980 | 17.876899 | |
| 6/4/20 | Cowen and Company, LLC | ADRAV | BUY | BAYRY | 94978 | 17.8819 | |
| 6/4/20 | Cowen and Company, LLC | ADRFA | SELL | BAYRY | 2 | 17.84 | Limit Order |
| 6/4/20 | Cowen and Company, LLC | COWPFLIP | SELL | BAYRY | 2 | 17.84 | |
| 6/4/20 | Cowen and Company, LLC | ADRFA | BUY | BAYRY | 2 | 17.84 | |
| 6/4/20 | Cowen and Company, LLC | COWPFLIP | BUY | BAYRY | 94980 | 17.876899 | |
| 6/4/20 | Cowen and Company, LLC | COWPFLIP | SELL | BAYRY | 94978 | 17.8819 | |
| 6/4/20 | Cowen and Company, LLC | ADRFA | BUY | BAYRY | 94980 | 17.8769 | Limit Order |
| 6/4/20 | Cowen and Company, LLC | ADRAV | SELL | BAYRY | 94978 | 17.8819 | |
| 6/4/20 | Cowen and Company, LLC | 0100ECUT | BUY | BAYRY | 94978 | 17.8819 | |

109.    Mr. Zarcu appears to confuse the purchase of those ADRs, which is listed in the above table and never involved a "market order," with the *allocation* of previously purchased ADRs to client accounts.  While Cowen & Co. included a "market order" designator on those *allocations* (perhaps for internal reasons), those allocations do not involve orders at all—market orders, limit orders or any other type of order.  Mr. Zarcu thus appears to have misunderstood the Cowen records, and admitted as much in the Zarcu Deposition:

> Q. Allocations are not orders, correct?
> A. No.
> Q. Are you aware that the market [order] designations that you cite in paragraph 106 of your report are for allocations?
> A. It's possible.[159]

110.    Finally, as for the purchases on June 3, 2020, Mr. Zarcu claims that he has not "identified any support for Prof. Mitts's claim that Cowen acquired the underlying ADRs on the secondary market from the entities that he lists in his report."[160]  DTCC records show that Mr. Zarcu

---

[158] I have hidden unnecessary columns to fit the screenshot on a single page.

[159] Zarcu Dep. Tr. 239:8-15.

[160] Zarcu Report ¶ 113.

is mistaken. Specifically, on the settlement day of June 5, 2020, corresponding to the transaction date of June 3, 2020, DTCC records show that 126,800 Bayer sponsored ADRs were transferred into the custodial account of Cowen & Co. and 123,690 ADRs were transferred out (including IUOE's allocation of 4,530 ADRs). Of those 126,800 ADRs transferred into Cowen's custodial account, 126,053 ADRs, or 99.4%, arrived from the National Securities Clearing Corporation (NSCC), account identifier "NSCC/0888." DTCC records show that of the 240,687 ADRs received and transferred through the NSCC, 148,039 ADRs were transferred from parties other than the Bank of New York Mellon.[161] It is thus reasonable to infer that the 126,053 ADRs transferred to Cowen & Co. consisted of existing Bayer sponsored ADRs arriving from other market participants.

### 8.   IUOE (June 23, 2020) via UBS Securities

111.   Finally, the Zarcu Report examines the purchase of 15,030 Bayer sponsored ADRs for IUOE via UBS on June 23, 2020. As before, Mr. Zarcu fails to mention that Mr. Hufcut *did not even mention ADRs prior to completing the purchase of 500,000 Bayer foreign shares* for Hardman Johnston. Even then, when mentioning ADRs for the first time after 500,000 foreign shares were acquired, Mr. Hufcut only states "I am going to have some ADR splits for colleen when we are done today."[162] The parties do not discuss price and quantity terms for the ADR conversion until after the entire 791,792 foreign shares are purchased at 11:37am. It is only *after* those shares are purchased that Mr. Hufcut is asked *three times* to approve the price and quantity for the ADR conversion: *first*, by Mr. Gula, who asks "shall I use this avg price for both EU and ADR booking?"; *second*, by Ms. Murphy, who asks Mr. Hufcut for his approval to "remove fills and then put fills back onto your local ticket"; and *finally*, by Mr. Gula who asks Mr. Hufcut to confirm at 11:47am, "And Colleen will be moving the below to ADRs: BOUGHT 91,202 BAYN GR@ 72,8661", to which Mr. Hufcut replies "Great, have a nice afternoon."[163]

---

[161] DTCC records show that the Bank of New York Mellon's ADRs were transferred to Bank of America, who transferred them to Cowen & Co.

[162] Zarcu Report Ex. Z-26 (HJ-0002400) at 52.

[163] Zarcu Report Ex. Z-26 (HJ-0002400) at 54-56.

112.    Because Mr. Zarcu's permission was required, and in fact could have been withheld on three separate occasions, after the foreign shares were acquired, it is nonsensical to conclude that Mr. Hufcut was obligated to purchase ADRs at the time the foreign shares were acquired.  Mr. Zarcu cannot answer the obvious question: if Mr. Hufcut was obligated to convert foreign shares to ADRs, how many was he obligated to convert?  Because Mr. Gula and Ms. Murphy are waiting for Mr. Hufcut to confirm how many ADRs to convert, Mr. Hufcut could have given *any number* as the answer.  The notion that Mr. Hufcut incurred irrevocable liability to purchase an unknown quantity of ADRs at the time the foreign shares were purchased is vacuous.

113.    When asked at his deposition, Mr. Zarcu stated, "as [the conversation] progresses, it talks about them being trade[d] under one ticket, so it's not a separate transaction."[164]  For one, the conversation reveals four distinct confirmations: *first*, at 11:37am, "Bought 791,792 BAYN GY@ 72.8661 in total today ( part FIX, part manual)"; *second*, at 11:47am, an amended confirmation reflecting the foreign shares which were not going to be converted to ADRs: "EU FIX amended: BOUGHT 700,590 BAYN GR@ 72.8661"; *third*, at 11:47am, the confirmation that "Colleen will be moving the below to ADRs: BOUGHT 91,202 BAYN GR@ 72,8661"; and *finally*, at 11:59am, the confirmation that the ADRs were issued: "Hey John, just printed you on the ADR, details below: FX: 1.13252 Conv Fee: 3.86c (50K@ 3c and Balance @ 4c)."[165]

114.    Nonetheless, even if these transactions were recorded on one internal "ticket" in a brokerage system, that record would reflect the *subsequent* decision by Mr. Hufcut, which arose *after* the foreign shares were purchased, to convert a smaller quantity of foreign shares to ADRs.  The memorialization of the transaction in a single internal ticket has little to do with whether Mr. Hufcut was obligated to purchase an undetermined quantity of ADRs at the time the foreign shares were purchased.  Plainly he was not—otherwise they would not have asked his permission on four separate occasions.

9.    **SMW (February 14, 2018; March 27, 2018; and October 18 2018) via**

[164] Zarcu Dep. Tr. 138:13-16 (second modification is from errata sheet).
[165] Zarcu Report Ex. Z-26 (HJ-0002400) at 54-56.

**Morgan Stanley**

115.    On February 14, 2018, March 27, 2018 and October 18, 2018, SMW purchased 5,700, 5,306 and 14,910 Bayer sponsored ADRs, respectively.  The Zarcu Report claims that "there is insufficient evidence to form an opinion on where and how SMW's February 14, March 27, and October 18, 2018 purchases of Bayer ADRs were executed."[166]

116.    Mr. Zarcu is completely mistaken.  FINRA and DTCC records show unequivocally that these purchases consisted of existing Bayer sponsored ADRs from U.S. broker-dealers on the domestic market.  As for the first purchase of 5,700 ADRs at a price of $30.71 by Morgan Stanley for SMW on February 14, 2018, FINRA records show that at 14:42:58 that day, INTL FCStone Financial Inc. (now known as StoneX Group) sold short Morgan Stanley 5,700 existing ADRs at a price of $30.71 per ADR.[167]  This transaction was classified as a short sale, not a cross transaction.  Based on FINRA records alone, it is clear that Morgan Stanley acquired existing Bayer ADRs from a U.S. counterparty and thus this purchase occurred in the United States.

117.    Moreover, DTCC records show a transfer of 5,700 ADRs from Morgan Stanley's custodial account to SMW's custodial account held at the Bank of New York Mellon on February 16, 2018 (*i.e.*, the T+2 settlement date corresponding to the purchase date of February 14, 2018).[168]  These 5,700 ADRs were transferred to Morgan Stanley from the NSCC custodial account, which is often employed for domestic transactions between broker-dealers.[169]

---

[166] Zarcu Report ¶ 122.

[167] FINRA000002.

[168] DTCC001178.

[169] *CNS*, DTCC, https://www.dtcc.com/clearing-services/equities-clearing-services/cns (last visited March 18, 2023) ("Within CNS, NSCC acts as the central counterparty for clearance and settlement for virtually all broker-to-broker equity, corporate and municipal bond and unit investment trust trading in the United States. CNS settles trades from the nation's major exchanges, markets and other sources and nets these transactions to one security position per Member per day.").  The NSCC custodial account received a deposit of ADRs from Merrill Lynch securities lending, reflecting the custodial transfer underlying the short sale of 5,700 existing ADRs. (The custodial transfer was in the amount of 7,000 ADRs, reflecting additional short sales beyond SMW's purchase of 5,700 ADRs.) This indicates that StoneX likely borrowed the 5,700 ADRs from Merrill Lynch to effectuate the short sale of 5,700 ADRs.

[No: 3:20-cv-04737-RS] REBUTTAL EXPERT REPORT OF PROFESSOR JOSHUA MITTS, PH.D. ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

118.    As for the second purchase of 5,306 ADRs at a price of $28.22 by Morgan Stanley for SMW on March 27, 2018, FINRA records show that at 12:39:59 that day, INTL FCStone Financial Inc. sold short Morgan Stanley 5,306 existing ADRs at a price of $28.22 per ADR.[170]  This transaction was classified as a short sale, not a cross transaction.  Based on the FINRA records alone, it is clear that Morgan Stanley acquired existing Bayer ADRs from a U.S. counterparty and thus this purchase occurred in the United States.

119.    Moreover, DTCC records show a transfer of 5,306 ADRs from Morgan Stanley's custodial account to SMW's custodial account held at the Bank of New York Mellon on March 29, 2018 (*i.e.*, the T+2 settlement date corresponding to the purchase date of March 27, 2018).[171]  These 5,306 ADRs were transferred to Morgan Stanley from the NSCC custodial account, which is often employed for domestic transactions between broker-dealers.[172]

120.    Finally, as for the third purchase of 14,910 ADRs at a price of $22.4282 by Morgan Stanley for SMW on October 18, 2018, FINRA records do not report an executed trade.  An examination of DTCC records shows that Morgan Stanley simply fulfilled that order from its existing inventory of 10,316,020 Bayer ADRs, *i.e.*, by transferring custody of existing ADRs held in its inventory on the settlement date of October 20, 2018.[173]  This purchase clearly occurred in the United States.

121.    These episodes powerfully illustrate the unreliability of the Zarcu Report for two reasons.  ***First***, even if Mr. Zarcu believes, incorrectly, that ***clearing*** records are irrelevant to determining whether irrevocable liability was incurred in the United States, his failure to even consider whether there might be FINRA ***trading*** records underlying these transactions—which he repeatedly

[170] FINRA000002.

[171] DTCC001178.

[172] The NSCC custodial account received ADRs from other U.S. based market participants in the netting process, including Goldman Sachs (5,638 ADRs), Morgan LLC (2,526 ADRs), Cowen (1,880 ADRs), Merrill (2,304 ADRs), NFS LLC (9,835 ADRs), Pershing (11,000) ADRs, and others. Critically, *none* of the deposits into the NSCC custodial account that day originated from the ADR issuance account at the Bank of New York Mellon.

[173] DTCC001185.

examined elsewhere in the Zarcu Report[174]—shows the lack of a consistent, replicable methodology underlying his analysis.

122.    **Second**, Mr. Zarcu's justification for concluding that there is "insufficient evidence to form an opinion" on this purchase was based solely on the lack of "communications between Harding Loevner and its brokers concerning the execution of these trades, or any other information that would indicate what instructions were given to the brokers."[175]  But that illustrates precisely what is wrong with Mr. Zarcu's approach: in the ordinary course of trading where existing ADRs are purchased on the domestic market, where irrevocable liability unquestionably arose in the United States, there may very well be no extraordinary communications of that kind.  Mr. Zarcu's myopic focus on broker communications causes him to miss the most basic evidence in FINRA and DTCC records showing the purchase of existing Bayer ADRs on the domestic market.

## V.    CONCLUSION

123.    In this report, I offer three opinions.  First, the Zarcu Report does not contest many of the findings in the Mitts Report, including that the overwhelming majority of purchases of Bayer ADRs by members of the proposed Class during the proposed Class Period consisted of existing ADRs, nor does Mr. Zarcu dispute that title to newly issued ADRs was transferred in the United States. Second, the Zarcu Report provides no replicable methodology to determine whether the purchase of foreign shares causes irrevocable liability to purchase ADRs to be incurred.  Finally, Mr. Zarcu's opinions on the contractual obligations of broker-dealer customers are unreliable, unfounded and incorrect.

124.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

JOSHUA R. MITTS, PH.D.

---

[174] Zarcu Report ¶¶ 82, 83, 88, 107, 118.
[175] Zarcu Report ¶ 122.

# Appendix A

# Materials Considered

1.    Expert Report of Professor Joshua R. Mitts, Ph.D (Oct. 28, 2022) and all materials cited therein.

2.    Expert Report of Chad Coffman, CFA (Oct. 28, 2022).

3.    Rebuttal Report of Cristian Zarcu (Feb. 3, 2023) and all exhibits thereto.

4.    Transcript of Deposition of Cristian Zarcu (Mar. 8, 2023) (cited as "Zarcu Dep. Tr.") and all exhibits thereto, including the Transcript of Deposition of Cristian Zarcu (July 23, 2021) in *Stoyas v. Toshiba Corp.*, No. 2:15-cv-04194-DDP (JCx) (C.D. Cal.) (cited as "Zarcu Toshiba Dep. Tr.").

5.    *Schrodinger's Cat*, https://en.wikipedia.org/wiki/Schr%C3%B6dinger%27s_cat (last visited March 16, 2023).

6.    FINRA, *ORF Fix Specification* (2022), *available at* https://www.finra.org/sites/default/files/2022-06/FIX-Specs-ORF-Trade-Rptg-Nanos.pdf.

7.    *Dep't of Enf't v. Mantei*, FINRA (Feb. 18, 2021), https://www.finra.org/sites/default/files/2021-03/OHO_Mantei_2015045257501_021721.pdf.

8.    *Dep't of Enf't v. Norton*, FINRA (Jan. 31, 2022), https://www.finra.org/sites/default/files/2022-03/OHO_Norton_2016048837401_090721.pdf.

9.    FINRA, *OATS Definition FAQ, Cancel Report*, https://www.finra.org/filing-reporting/market-transparency-reporting/oats/faq/definitions (last updated Mar. 30, 2009).

10.   Joshua Mitts, *I Promise to Pay*, 62 J. L. Econ. 117 (2019).

11.   *Perfect Payday: Options Scorecard*, Wall St. J., https://www.wsj.com/public/resources/documents/info-optionsscore06-full.html (last updated Sep. 2007).

12.   David I. Walker, *Unpacking Backdating: Economic Analysis and Observations on the Stock Option Scandal*, 87 B.U. L. Rev. 561, 574 (2007).

13.   Charles Forelle *et al.*, *Brocade Ex-CEO, 2 Others Charged in Options Probe*, Wall St. J., July 21, 2006, at A1.

14.   *CNS*, DTCC, https://www.dtcc.com/clearing-services/equities-clearing-services/cns (last visited March 18, 2023).

15.   *Terms and Conditions of Investment Business*, Macquarie (May 2022), https://www.macquarie.com/assets/macq/about/disclosures/macquarie-bank-limited-terms-of-business.pdf.

16.   *Terms of Business*, Instinet (Sept. 2018), https://www.instinet.com/sites/default/files/public/documents/IEL_Terms_of_Business.pdf.

17.    *General Terms & Conditions of Business for Professional Clients and Eligible Counterparties*, Bank of America Securities (Mar. 2022), https://business.bofa.com/content/dam/boamlimages/documents/articles/ID17_1174/bofaml_general_terms_and_conditions_for_business.pdf.

18.    *Terms of Business for Professional Clients*, J.P. Morgan, https://www.jpmorgan.com/content/dam/jpm/global/disclosures/by-region/terms-of-business-professional-clients.pdf (last visited March 17, 2023).

19.    *Client Brokerage Terms and Conditions*, Cowen and Company (Aug. 2021), https://s33007.pcdn.co/wp-content/uploads/2021/09/Cowen-and-Co-Global-Terms-and-Conditions-8.26.2021.pdf.