# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>        Defendants. | Case No: 3:20-cv-04737-RS<br><br>**CLASS ACTION**<br><br><br>Date:  April 13, 2023<br>Time:  1:30 p.m.<br>Ctrm:  3 – 17th Floor<br>Judge:  Richard Seeborg |

**EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................... 1

II. SUMMARY OF OPINIONS ................................................................................. 2

III. THE OUT-OF-POCKET METHOD IS WIDELY ACCEPTED BY COURTS AT THE CLASS CERTIFICATION STAGE AND DR. GARMAISE'S CONCERNS WILL BE ADDRESSED AT THE MERITS STAGE ................................ 5

IV. THE OUT-OF-POCKET METHOD IS FLEXIBLE ENOUGH TO ACCOMMODATE ALL OF DR. GARMAISE'S CONCERNS ................................... 12

    A. Materialization of Risk ....................................................................... 12

    B. Merger Completion Likelihood .......................................................... 19

    C. Identification of Relevant Dates ......................................................... 23

    D. Changes in Roundup Litigation and Bayer's Business ............................... 30

V. DR. GARMAISE PRESENTS NO EVIDENCE TO DISTURB MY CONCLUSION THAT BAYER ADRS TRADED IN AN EFFICIENT MARKET THROUGHOUT THE CLASS PERIOD .......................................................... 33

## I.    INTRODUCTION

1.    On October 28, 2022, I submitted an expert report (the "Coffman Report" or my "Report") in this matter, in which I opined on the efficiency of the market for Bayer Aktiengesellschaft ("Bayer" or the "Company") American Depositary Receipts ("Bayer ADRs" or the "ADRs").[1]  In my Report, I concluded that the market for Bayer ADRs was efficient during the Class Period and that damages in this action can be calculated on a class-wide basis using a common methodology.[2]

2.    Following the submission of my Report, counsel for Plaintiffs provided me with a copy of the February 3, 2023 Expert Rebuttal Report of Mark Garmaise, Ph.D. (the "Garmaise Report") submitted in support of Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel filed February 3, 2023.  I have been asked by counsel for Plaintiffs to review and respond to Dr. Garmaise's contentions that I have (1) supposedly failed to provide a methodology to reliably calculate damages for all class members consistent with Plaintiffs' theory of liability[3] and (2) purportedly failed to demonstrate that Bayer ADRs traded in an efficient market during the entire Class Period.[4]  My responses to the Garmaise Report are set forth in this document (my "Rebuttal Report").

3.    In formulating my opinions set forth in this Rebuttal Report, I have relied upon the

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings given to them in the Coffman Report.  Throughout this Rebuttal Report the term "efficiency" refers to "semi-strong market efficiency" as defined in my Report (see Coffman Report ¶¶ 19 – 20).

[2] Coffman Report ¶¶ 6 – 7.  The putative Class Period is from May 23, 2016 through July 6, 2020 (see Coffman Report ¶ 1).

[3] Garmaise Report Section V.

[4] Garmaise Report Section VI.

analysis already described in my prior Report; my knowledge, experience, and formal training in economics, finance, and statistics; and the allegations and facts presented in this lawsuit.  I also have considered: (1) the Garmaise Report; (2) the Garmaise Deposition;[5] (3) data, analyses, and back-up materials provided by Dr. Garmaise to counsel for Plaintiffs that Dr. Garmaise claims to have considered in connection with the Garmaise Report; and (4) other relevant materials and information.  The materials I have relied upon and considered in reaching my opinions in this Rebuttal Report are identified in the attached **Appendix A**, in addition to the materials I identified in Appendix A to my prior Report.

4.     My qualifications and rate of compensation for work in this matter were identified in my prior Report.  I have attached an updated version of my curriculum vitae as **Appendix B**.

5.     I reserve the right to amend this Rebuttal Report to reflect new information that becomes available to me, including from the discovery process and/or future rulings of the Court.

## II.     SUMMARY OF OPINIONS

6.     There are a number of important elements of my analysis and opinions that the Garmaise Report does not address or dispute.  First, my Report empirically analyzes twelve well-established factors to evaluate the market efficiency of Bayer ADRs, all of which support a finding of market efficiency.[6]  The Garmaise Report does not dispute the results of any of these twelve factors; indeed, it only addresses two out of the twelve factors I analyzed (i.e., *Cammer* Factor 5 and Additional Factor 4 relating to arbitrage opportunities).[7]

---

[5] Counsel provided me with a copy of the transcript from Dr. Garmaise's sworn testimony taken on March 9, 2023 (the "Garmaise Deposition").

[6] Coffman Report Section VII.

[7] Garmaise Report n.132 & Section VI.B.

[No: 3:20-cv-04737-RS] EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA                    2

7. Second, Dr. Garmaise offers no criticism of the event study I presented in my Report to evaluate market efficiency.[8] Dr. Garmaise does not perform his own event study[9] and he relies upon the results of my event study in the Garmaise Report.[10] Therefore, he does not dispute (1) that I performed a valid event study regression, (2) that I properly controlled for market effects, (3) that my event study model appropriately accounts for relevant changes in Bayer ADRs' volatility and its relationship to the market control, or (4) that my findings regarding days on which Bayer ADRs exhibited statistically significant returns during the Class Period are accurate.

8. Third, Dr. Garmaise does not offer an opinion related to price impact, and therefore does not establish a lack of price impact from the alleged misstatements and/or omissions.

9. Fourth and finally, Dr. Garmaise does not dispute that the out-of-pocket methodology is a well-accepted measure of damages in Section 10(b) securities cases and is measured as the artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale. Dr. Garmaise also does not dispute that computing damages and quantifying artificial inflation per share is unnecessary at the class certification stage of litigation.[11]

10. Dr. Garmaise offers two opinions: (1) that I have not provided a class-wide damages methodology that is consistent with Plaintiffs' theory of liability[12] and (2) that I have not demonstrated that Bayer ADRs traded in an efficient market throughout the entire Class Period.[13] Both of Dr. Garmaise's opinions are flawed and meritless.

[8] See for example, Garmaise Deposition 99:23 – 100:3: "Q. Do you agree that Mr. Coffman performed a valid event study regression?...A. I haven't considered that question."

[9] Garmaise Deposition 100:19 – 101:2.

[10] *See, e.g.*, Garmaise Report ¶¶ 15, 32, 65 & nn.76, 88 & 90; *see also* Garmaise Deposition 101:11 – 19.

[11] *See* Garmaise Report n.35 ("I am not suggesting that Mr. Coffman should have either performed a loss causation analysis or quantified inflation in his report.").

[12] Garmaise Report Section V.

[13] Garmaise Report Section VI.

11. Dr. Garmaise's first opinion, that I purportedly have not provided a class-wide damages methodology consistent with Plaintiffs' theory of liability, is incorrect. Importantly, he does not dispute that the general damages framework or methodology (i.e., the out-of-pocket method) that I detailed in my Report is standard and virtually always used in securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act to calculate damages on a class-wide basis, and does not suggest that a different approach would be more appropriate here.

12. Instead, Dr. Garmaise's observations concerning a damages methodology in this case relate to whether certain case-specific adjustments may ultimately be necessary at the merits stage to (1) assess how the artificial inflation may have evolved over time during the Class Period, and (2) isolate corrective from confounding information, if any, on the alleged corrective disclosure dates. Answering these questions requires a detailed loss causation analysis, which I understand is not required at the class certification stage of the litigation. Additionally, these more detailed issues regarding loss causation (i.e., disaggregating the effect of confounding information and whether constant dollar or some other alternative for back-casting inflation are appropriate) are present in virtually every certified securities class action matter, are regularly the subject of expert discovery during the merits phase of the litigation, and in any event, such analyses are determined based upon proof that is common to all class members.

13. Dr. Garmaise's second opinion is primarily based on criticisms of one of the twelve factors I analyzed related to market efficiency, a lack of arbitrage opportunity. His arguments are focused solely on a temporary price divergence between Bayer ADRs and Bayer ordinary shares, which I provided reasons for in my Report, during a period that is less than three weeks long during a more than four-year Class Period. Furthermore, the relevant question in this context is whether the market for Bayer ADRs was sufficiently efficient such that one can presume that the value of the alleged misstatements and omissions was impacting the price of Bayer ADRs during the Class

Period.  Despite the temporary price divergence that Dr. Garmaise takes issue with, I am not aware of any evidence, and Dr. Garmaise has not presented any, to suggest that the market for Bayer ADRs was not responding quickly to value-relevant information, including the price of Bayer ordinary shares.  Therefore, Dr. Garmaise does not provide evidence that Bayer ADRs traded in an inefficient market at any point during the Class Period.

14.    As a result of the forgoing, nothing in the Garmaise Report disturbs my opinions that the market for Bayer ADRs was efficient during the Class Period and that economic damages in this matter can be calculated on a class-wide basis based on a common approach and methodology consistent with Plaintiffs' theory.

## III. THE OUT-OF-POCKET METHOD IS WIDELY ACCEPTED BY COURTS AT THE CLASS CERTIFICATION STAGE AND DR. GARMAISE'S CONCERNS WILL BE ADDRESSED AT THE MERITS STAGE

15.    Dr. Garmaise argues the following:

> …rather than providing a damages methodology tailored to Plaintiffs' theory of liability, Mr. Coffman provides a generic description of how damages could be calculated for a securities fraud claim. That generalized description does not address several distinctive features of Plaintiffs' theory of liability in, or the economic realities of, this case. Mr. Coffman has therefore not provided a methodology that can be used to calculate damages on a class-wide basis consistent with Plaintiffs' allegations in this case.[14]

16.    Dr. Garmaise is incorrect.  The out-of-pocket methodology I described in my Report fits precisely with Plaintiffs' theory in this matter: that through a series of corrective disclosures and materialization of the risks attendant with Bayer's failed due diligence and misleading statements, the market finally learned the truth about the risks associated with the Roundup litigation and once revealed, the price of Bayer ADRs fell, harming investors who bought at inflated prices.[15]  Dr. Garmaise's contentions are misplaced for two additional reasons: (1) the out-of-pocket damages

---

[14] Garmaise Report ¶ 22.

[15] Coffman Report ¶ 15.

method that I described in my Report is widely accepted at the class certification stage without the specification of case-specific inputs (i.e., artificial inflation per share throughout the Class Period);[16] and (2) specifying an approach to determine artificial inflation per share throughout the Class Period is dependent on a detailed loss causation analysis, which I understand is not required at this stage of the litigation. As a result, Dr. Garmaise's claims are meritless, and I indeed provided a clear and well-accepted damages methodology in my Report, consistent with prior cases in which classes have been certified where I presented this same methodology. Even still, as described below in Section IV, the out-of-pocket method I presented in my Report is flexible enough to accommodate all of the supposed concerns raised by Dr. Garmaise in the Garmaise Report.

17.    I concluded in my Report that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.[17] Specifically, I described:

> There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act. This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide). The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

> Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.[18]

---

[16] Appendix C contains a list of numerous examples of securities litigation matters, including ones in this District, that have led to successful class certification within the last 10 years where I presented the standard out-of-pocket damages methodology without the specification of artificial inflation.

[17] Coffman Report ¶ 86.

[18] Coffman Report ¶¶ 81 – 82.

18.    Importantly, Dr. Garmaise does not dispute the validity of the out-of-pocket method in calculating damages in securities cases.  Dr. Garmaise also does not dispute that damages under the out-of-pocket method are measured as the artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale.  In fact, he does not even mention the "out-of-pocket" method in the Garmaise Report.  Further, Dr. Garmaise even concedes that the approach I outlined on my Report at least "*can*, at best, measure inflation at the time of the alleged corrective disclosures."[19]

19.    Rather, Dr. Garmaise's arguments are strictly limited to supposed "distinctive aspects of this case"[20] and his unsupported claim I have "not identified any methodology for the class-wide measurement of inflation consistent with Plaintiffs' theory of liability."[21]  In other words, while Dr. Garmaise does not dispute that I provided a well-accepted *formula* for calculating damages, he takes issue with my approach because I have not yet explained how I would calculate the *specific inputs* to that damages formula (i.e., artificial inflation per share).  Notably, in criticizing the damages methodology described in my Report, Dr. Garmaise does not offer any alternative approach.

20.    As an initial matter, it is important to draw a distinction between two concepts: the damages formula itself and the inputs to the damages formula.  I made clear in my Report that quantifying artificial inflation per share for each day in the Class Period, the inputs to the damage formula, is a question separate and apart from whether there is a common method for computing damages for the Class.[22]  In my Report, I described how the quantification of artificial inflation per share can rely on a variety of different valuation techniques including, but not limited to, event

[19] Garmaise Report ¶ 74.
[20] Garmaise Report ¶ 25.
[21] Garmaise Report ¶ 28.
[22] Coffman Report ¶ 83.

studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above.[23] Dr. Garmaise, without basis, is suggesting that I am required to provide a more detailed description of the specific approach I would take to calculate artificial inflation for each day in the Class Period in this matter.[24] However, I explained in my Report how the determination of artificial inflation per share for each day in the Class Period is a case-specific, fact-specific loss causation exercise.[25] Indeed, Dr. Garmaise explicitly acknowledges the following:

> I am not suggesting that Mr. Coffman should have either performed a loss causation analysis or quantified inflation in his report.[26]

> …a loss causation analysis may ultimately be necessary to calculate damages…[27]

21.    Yet, Dr. Garmaise still takes issue with the fact that I have not explicitly demonstrated "*how* inflation will ultimately be quantified."[28] Specifically, Dr. Garmaise criticizes the damages methodology described in my Report by claiming that I have not articulated how I would appropriately: (1) account for the extent to which investors may have been misled about the Roundup litigation risk;[29] (2) incorporate investor uncertainty about the likelihood that Bayer would acquire Monsanto;[30] (3) consider information regarding due diligence and other litigation

---

[23] Coffman Report ¶¶ 84 and 85.

[24] *See, e.g.*, Garmaise Report ¶ 25 ("Instead of providing a methodology for calculating damages that can address the distinctive aspects of this case, Mr. Coffman suggests the possibility of using 'an event study that measures price reactions' to alleged corrective disclosures, which he characterizes as a 'widely-used technique.' Mr. Coffman does not, however, set out any details of how the basic financial tool of an event study, or the other financial tools he references, might be applied to calculate damages in this matter in a manner consistent with Plaintiffs' theory of liability.").

[25] Coffman Report ¶ 85.

[26] Garmaise Report n.35.

[27] Garmaise Report ¶ 25.

[28] Garmaise Report ¶ 25 (emphasis in original).

[29] Garmaise Report Section V.A.

[30] Garmaise Report Section V.B.

developments;[31] (4) account for developments in the Roundup litigation and other changes in Bayer's business.[32]  I address each of these four flawed arguments in detail below in Section IV.  In summary, none of Dr. Garmaise's objections relate to whether the general out-of-pocket damages methodology can be applied uniformly and formulaically in this matter using common proof on a class-wide basis, which is the relevant question at this stage of the litigation.  Instead, all four of his primary arguments are premised on how artificial inflation would ultimately be quantified.  If necessary, accounting for any of these factors raised by Dr. Garmaise would require a detailed loss causation analysis, which I understand is not required at the class certification stage.[33]

22.    Regardless, as described in detail in Section IV, the out-of-pocket method can accommodate all of the loss-causation-related supposed concerns that Dr. Garmaise raises in his report.  I further understand that an actual class-wide damages calculation conducted during the merits phase of the litigation needs only to be economically reasonable as opposed to calculated with precision.  I am not aware of any securities class action case where out-of-pocket damages could not be reasonably calculated during the merits phase of the litigation due to any of the points raised by Dr. Garmaise (e.g., difficulty in determining the evolution of artificial inflation throughout the Class Period, or accounting for the impact of confounding information).

23.    Indeed, these questions of loss causation are present in virtually every securities class action matter, can substantially depend on information obtained during discovery,[34] and are

---

[31] Garmaise Report Section V.C.

[32] Garmaise Report Section V.D.

[33] Dr. Garmaise quotes from my deposition in this matter taken on December 21, 2022 ("Coffman Deposition") where I stated: "Exactly how one would quantify that inflation to address all the sorts of issues you're raising, I have no opinion on."  Garmaise Report n.33 & Coffman Deposition 211:7 – 9.  The reason I have no opinion related to exactly quantifying inflation at this time is because as described in this section, it is a premature loss causation question.

[34] For instance, internal emails obtained in discovery may indicate what information was known or available to defendants at the start of a class period, which provides useful information in determining whether it is reasonable to back-cast the full amount of artificial inflation dissipated on

determined based upon proof that is common to all class members. For example, in many cases there is a dispute about whether the newly released information that is alleged to be corrective is confounded by other information unrelated to the fraud, and if so, how to reasonably estimate the value of that potentially confounding information. In addition, in many cases there is typically a battle of the experts at the merits stage regarding whether a constant dollar methodology is appropriate and how artificial inflation per share evolved during the class period. Answering these questions, and the four raised by Dr. Garmaise, requires a detailed loss causation analysis, which I understand is not required at this stage of the litigation, and, as a result, I have not been asked to perform at this time.

24.    Nevertheless, as I described in my Report, whatever approach is ultimately used to determine the quantification and evolution of artificial inflation per share throughout the Class Period, it would be class-wide in nature and does not depend on the identity or circumstance of any specific investor.[35] In other words, Dr. Garmaise's concern that I have not outlined which specific method I would use, or that an event study may not be suitable, is irrelevant at the class certification stage. Furthermore, the subsequent artificial inflation per share for each day during the Class Period could easily be used as inputs in the out-of-pocket damages formula I described in my Report.[36] I

---

the alleged corrective disclosure dates to the start of the class period. As another example, internal financial estimates and projections may be useful in evaluating how much of the price reaction on an alleged corrective disclosure date was due to corrective versus confounding information.

[35] Coffman Report ¶¶ 84 – 85.

[36] To put this into perspective, suppose investor Z purchased a share of Bayer ADRs on June 1, 2018 and sold it on October 1, 2018 after a corrective disclosure. At the merits stage, assume an event study analysis determines that the most reasonable estimate of artificial inflation present in Bayer ADRs is $7.00 and $4.00 on June 1, 2018 and October 1, 2018, respectively. In this instance, damages for investor Z would be $3.00 ($7.00 artificial inflation at time of purchase less $4.00 at time of sale). Alternatively, suppose a different valuation technique at the merits stage indicates that the most reasonable estimate of artificial inflation present in Bayer ADRs is $6.00 and $5.00 on June 1, 2018 and October 1, 2018, respectively. In this hypothetical scenario, investor Z's share would be damaged by $1.00 ($6.00 artificial inflation at time of purchase less $5.00 at time of sale). In both instances, the out-of-pocket method can be applied to calculate damages for investor Z, and all Class members, regardless of the specific technique used to determine the inputs into the damages formula

am not aware of any evidence, and Dr. Garmaise has not presented any, to demonstrate that there are unique circumstances in this matter that would preclude the quantification of artificial inflation per share for each day during the Class Period (i.e., the inputs to the out-of-pocket damages formula) from being calculated for the Class as a whole.

25.    Dr. Garmaise further attempts to discredit the damages methodology described in my Report by describing my language as "generic"[37] and "generalized."[38]  He further states: "In short, Mr. Coffman has not provided any details about how one could adapt his 'widely-used' approach to reliably estimate inflation given the specific complexities of this case."[39]  This argument is meaningless and misses the very point I am making.  I use the same "generalized" language to describe the out-of-pocket damages methodology because the methodology is not in dispute.  The overall damages methodology described in my Report is articulated the same way across many reports because it is the standard and well-accepted approach to damages.  I, like numerous other experts, have used the same overall approach to evaluate damages in reports in cases in which the classes have been certified.  Furthermore, the out-of-pocket method I described in my Report, without the specification of how to determine artificial inflation per share, has been accepted as a "methodology" in numerous cases I have provided testimony for in which classes have been certified throughout the country and this District,[40] which Dr. Garmaise does not dispute.  Dr. Garmaise has not cited any prior cases in which a court ruled that the out-of-pocket method was not a sufficient "methodology" at the class certification stage.

---

(i.e., artificial inflation per share for each day during the Class Period).

[37] Garmaise Report ¶¶ 10 and 22.

[38] Garmaise Report ¶ 22.

[39] Garmaise Report ¶ 25.

[40] *See* Appendix C.

26.    At most, Dr. Garmaise is suggesting that in calculating the precise artificial inflation per share that would be the inputs to the out-of-pocket damages model, one would have to account for the value of certain information.  This is a premature question and in my experience, has never been an impediment to applying the well-accepted out-of-pocket methodology on a class-wide basis.  Dr. Garmaise is suggesting that unless I can articulate, prior to any merits discovery, exactly how one could precisely quantify artificial inflation and specify exactly how it evolved during the Class Period, then no such method for doing so can be presumed to exist.  My understanding is that this type of loss causation proof is not required at this stage of the proceedings.

## IV.    THE OUT-OF-POCKET METHOD IS FLEXIBLE ENOUGH TO ACCOMMODATE ALL OF DR. GARMAISE'S CONCERNS

27.    As I described above in Section III, none of Dr. Garmaise's criticisms relate to whether the general out-of-pocket damages methodology can be applied formulaically in this matter using common proof on a class-wide basis or whether the general out-of-pocket damages methodology is consistent with Plaintiffs' theory of liability.  Instead, all of his objections prematurely relate to whether certain adjustments would ultimately be necessary to the quantification of artificial inflation as a matter of loss causation at the merits stage and how Plaintiffs will ultimately analyze and prove loss causation.  Below I explain in turn how the out-of-pocket method I described in my Report is adaptable to accommodate all of Dr. Garmaise's criticisms.

### A.  Materialization of Risk

28.    Dr. Garmaise's first concern related to damages is how to account for the materialization of risk.  Specifically, he argues:

> …Plaintiffs and Mr. Coffman claim that the alleged misrepresentations understated the degree of Roundup litigation risk, which ultimately materialized through the alleged corrective disclosures. In a matter involving the materialization of known risk, inflation will be based upon the degree to which the alleged misrepresentations affected the market's assessments of both the probability and severity of that risk. In such a case, price declines occurring in response to the ex post realizations of the risk do

> not measure the impact of the alleged misrepresentations on ex ante expectations of the likelihood or the size of the losses.[41]

> Mr. Coffman's assertion that one could use price reactions to alleged corrective disclosures to measure inflation is further complicated by the disconnect between the subject matter of the alleged misrepresentations, which relate to Bayer's due diligence in connection with the Merger, and that of the alleged corrective disclosures, which do not discuss Bayer's due diligence but instead are outcomes of certain Roundup lawsuits.[42]

29. As an initial matter, Dr. Garmaise does not offer an opinion related to price impact, and therefore does not establish a lack of price impact from the alleged misstatements and/or omissions. As a result, Dr. Garmaise has not presented any evidence to support the supposed "disconnect" he raises. Therefore, I am not aware of any evidence demonstrating that it would be inappropriate to measure artificial inflation by at least starting with an event study that measures the price reactions to the alleged corrective disclosures.[43]

30. Second, Dr. Garmaise's arguments are unrelated to whether or not there is a class-wide methodology to measure damages. His discussion of the supposed issues I would encounter measuring artificial inflation because of Plaintiffs' materialization of risk theory boils down to two basic loss causation questions: (1) accounting for the impact of information unrelated to the fraud ("confounding information") and (2) accounting for time-varying artificial inflation over the Class Period. Again, he is prematurely raising concepts that are not relevant at this stage of the litigation and regardless, the standard out-of-pocket damages model described in my Report is flexible enough to easily incorporate the materialization of risk (and thus Dr. Garmaise's concern). Indeed, I have employed the standard out-of-pocket damages methodology in numerous other cases alleging

---

[41] Garmaise Report ¶ 30.

[42] Garmaise Report ¶ 45.

[43] Certainly, adjustments might be necessary to reflect that the entire abnormal return might not be reflective of dissipation of artificial inflation, but that would be evaluated as part of a detailed loss causation analysis.

materialization of risk theories in which the classes have been certified.[44]  Plaintiffs' materialization of risk theory does not preclude me from quantifying artificial inflation throughout the Class Period for Bayer ADRs and measuring damages on a class-wide basis at the merits stage.

31.    First, I will illustrate the concept of accounting for the impact of confounding information based on the hypothetical example of a materialization of risk that Dr. Garmaise provides in his report.  He describes a scenario where the market expects that Monsanto has a 5% chance of an adverse litigation outcome resulting in a damages award of $100 million, but Bayer concealed from the market that the true likelihood of an adverse outcome was really 15%.  Dr. Garmaise explains that on the day the adverse litigation outcome was announced, Bayer's market value would have decreased by $95 million when the risk materialized, but that full $95 million would not be entirely attributable to the alleged misstatements and omissions.[45]  Dr. Garmaise utilizes this illustration to conclude that "the full price decline resulting from the realization of a risk is not a reliable measure of inflation resulting from an alleged misrepresentation about the degree of risk and would overstate any inflation and damages."[46]

32.    Dr. Garmaise further argues that "Mr. Coffman would need to articulate a model that would assess the impact of a but-for disclosure regarding Bayer's due diligence on the market's expectations of litigation risk, prior to the alleged corrective disclosures."[47]  He also claims, without citing to any authority, that "an event study would not allow [Coffman] to calculate damages in this matter, as it would not provide an estimate of how the market's ex ante assessment of either (i) the

---

[44] See, for example, *In re Computer Sciences Corporation Securities Litigation,* No. 1:11-cv-610-TSE-IDD (E.D. Vir.), and *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

[45] Garmaise Report ¶¶ 39 – 40.

[46] Garmaise Report ¶ 40.

[47] Garmaise Report ¶ 43.

likelihood of an adverse outcome or (ii) the ultimate exposure resulting from such an outcome was affected by the alleged misrepresentations."[48] Dr. Garmaise is simply wrong.

33. In making these claims, Dr. Garmaise fails to acknowledge not only that the out-of-pocket method is easily adaptable to this scenario, but also that an event study could still be used to measure the full price decline on the corrective disclosure dates (e.g., the date that the company announced the adverse litigation outcome in his example).[49] Specifically, a portion of the decline could be disaggregated to account for the contemporaneous release of confounding information, if necessary. This analysis would directly address Dr. Garmaise's concern that damages would somehow be overstated because the analysis isolates the economic impact of only the fraud-related information.

34. Indeed, using Dr. Garmaise's hypothetical, suppose an event study analysis determines there was a $9.50 decline in the share price (after controlling for market factors) on the day on which the company announced the adverse litigation outcome. This would imply that an adverse litigation outcome is worth $10.00 per share. In this hypothetical, the stock price dropped by 95% of the $10.00 (i.e., $9.50) because 5% of the risk of the adverse litigation outcome had already been disclosed and was therefore already priced into the stock. In this specific instance, I agree with Dr. Garmaise that it would be improper to attribute the full $9.50 per share decline to the fraud (i.e., the company's failure to disclose the additional 10% risk of the negative litigation outcome) because the

---

[48] Garmaise Report ¶ 44.

[49] Even if Dr. Garmaise were correct and an event study is inappropriate to use in this matter (which he has not demonstrated), I explicitly described in my Report how the quantification of artificial inflation per share can rely on a variety of other different valuation techniques (see Coffman Report ¶¶ 84 and 85). Without knowledge of what information will be learned in discovery, it is impossible to determine whether some of the techniques listed in my Report will play any role in quantifying the value of artificial inflation in this matter.

vast majority of this price decline is due ultimately to bad luck that there was an adverse litigation outcome, which the company did not expect, and is thus confounding information.

36. Therefore, because the company concealed a 10% known risk, then a $1.00 price decline on the disclosure date (10% of the $10.00 implied value of the litigation outcome) would be due to the fraud, and the remaining $9.00 per share decline would be considered unrelated to the fraud (i.e., due to confounding information). Dr. Garmaise's only reason in stating that I cannot measure inflation using an event study is based on the notion that I cannot attribute the full $9.50 price decline, in this illustration, to the fraud. However, as I have demonstrated in this example, I can start from an event study and determine the portion of the decline attributable only to the concealed risk. Damages in this instance would not be overstated because the impact of any confounding information would be removed before using the artificial inflation per share estimate as an input in the out-of-pocket formula.

36. In any event, even if Dr. Garmaise were to determine that disaggregation is impossible in this case (an opinion that he does not express and which is not supported by the record existing to date), the out-of-pocket formula could easily handle that outcome on a class-wide basis by assigning 0% artificial inflation to the alleged newly disclosed corrective information.[50]

37. Second, the out-of-pocket method can be similarly adjusted to account for changes during the Class Period of what Bayer could and should have disclosed, or, in other words, time-varying artificial inflation. In determining the appropriate assumption for the quantification of artificial inflation, the relevant inputs depend on the facts and evidence that existed and were

[50] Dr. Garmaise argues that I have not proposed a methodology "for disaggregating the portion of any price decline stemming from those since-dismissed theories of liability." Garmaise Report ¶ 26. This is simply an alternative way of speculating that a portion of the information released on the alleged corrective disclosure dates may ultimately be confounding. Even if this proves to be true at the loss causation stage, I have demonstrated within this section how the out-of-pocket damages model is easily adaptable to account for confounding information.

[No: 3:20-cv-04737-RS] EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA                    16

concealed and what could and should have been disclosed at different points in time.  This is the essence of what the parties investigate during discovery and what the finder of fact is asked to ultimately determine.  The role of a damages expert is to assist the finder of fact in determining artificial inflation/damages based upon those findings.  It is premature to specify these details before conducting a loss causation analysis that considers information learned in merits discovery.  Who knew what, when they knew it, and what could and should have been disclosed are at the heart of what the finder of fact is asked to ultimately resolve based upon evidence presented by the parties after the completion of discovery.[51]  It is premature at the class certification stage to: (1) speculate that the evidence will show something different from what Plaintiffs allege, or (2) attempt to specify how these details would hypothetically impact Plaintiffs' quantification of artificial inflation without actually knowing what the evidence will show.

38.    In any event, even if it turns out through merits discovery that true economic artificial inflation was not constant over the Class Period, the out-of-pocket method outlined in my Report can account for such a circumstance and mechanically calculate damages on a class-wide basis.  Indeed,

---

[51] Dr. Garmaise claims that I have "provided no basis to assume that the market would have predicted the ultimate jury findings or the exposure with certainty" and that I acknowledged during my deposition that "Bayer could not have disclosed the outcome of the Johnson case before it occurred."  Garmaise Report ¶ 43.  At this time, I am not offering an opinion on what Bayer could have disclosed and when the Company could have disclosed it.

Dr. Garmaise also claims that I do "not address how one could measure inflation resulting from the alleged misrepresentations regarding the nature of the Company's pre-Merger due diligence on Monsanto's potential Roundup litigation liability, given that the actual extent of this potential liability was allegedly not known to Bayer."  Garmaise Report ¶ 46.  I understand that this reflects an inaccurate description of Plaintiffs' claims.  Namely, Plaintiffs allege that Bayer misrepresented the extent and thoroughness of its due diligence into the risks posed by the Roundup litigation against Monsanto.  Regardless, at this time, I am not offering an opinion on what Bayer could have disclosed and when the Company could have disclosed it.

These claims raise premature loss causation questions that will be dealt with at the merits stage and therefore do not disturb the opinions I presented in my Report.

the out-of-pocket damages methodology described in my Report has accounted for artificial inflation that develops throughout a class period in other matters.[52]

39.    For example, assume an event study analysis determines that there was a $10.00 decline in the share price attributable to the fraud on a day on which corrective information was released. Under a constant dollar back-casting methodology, such a finding would imply that $10.00 per share of artificial inflation existed on each day of the class period prior to this corrective disclosure.  Now assume that the evidence obtained in discovery suggests that only half of the corrective information, or $5.00 per share, could have been disclosed for the first month of the Class Period.  In that case, purchasers during the first month of the class period who held through the corrective disclosure would have purchased shares with $5.00 of artificial inflation (50% of $10.00) whereas shares purchased after the first month contained the full $10.00 of artificial inflation per share.

40.    The same out-of-pocket formula set out in my Report (artificial inflation at the time of purchase minus artificial inflation at the time of sale, which Dr. Garmaise does not dispute) still results in the appropriate assessment of damages.  This example shows that the artificial inflation need not be constant over time for the out-of-pocket damages methodology to be applied class-wide.

41.    Further, this example demonstrates that even under Plaintiffs' theory of a materialization of risk, the out-of-pocket damages model can incorporate the changing economic impact of information at different points during the Class Period.  No matter how the finder of fact weighs the evidence, whether it determines that artificial inflation was constant over the Class Period, or 90% or 50%, for instance, of the full amount of artificial inflation was present in Bayer ADRs at certain points in the Class Period, the result can easily be applied to any daily artificial

---

[52] See, for example, *Bank of America Corporation Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, No. 09 MDL 2058 (PKC) (S.D.N.Y.); *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 3:02-CV-1152-M (N.D. Tex.); and *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB (D. Or.).

inflation table that would accompany a loss causation report after merits discovery is complete.  In other words, regardless of what the fact-finder decides, the methodology for calculating damages will remain the same and apply equally to each Class member.

42.    Furthermore, if the finder of fact determines that the economic impact of a hypothetical disclosure was $0 as of a certain date, the out-of-pocket formula appropriately handles this outcome on a class-wide basis by assigning 0% artificial inflation to the relevant time period.

### B.  Merger Completion Likelihood

43.    Despite acknowledging that I did not need to quantify artificial inflation in my Report,[53]  Dr. Garmaise argues that "measuring damages" prior to the Monsanto merger must incorporate changes in the expectations that the merger would be completed.  Specifically, Dr. Garmaise claims:

> …there was uncertainty about whether the Merger would be completed during the two-year period prior to the actual close of the Merger on June 7, 2018, and analysts and investors disagreed about the likelihood of merger completion. Because the alleged corrective disclosures relate to Monsanto, their impact on Bayer's ADR price prior to the Merger close would depend on the probability of merger completion. As a result, estimating damages prior to the Merger close necessitates an alternative methodology, or at the very least an additional element of a methodology, for measuring inflation, taking into account the likelihood that the Merger would close. Mr. Coffman fails to provide any methodology for measuring this probability and calculating inflation during the period prior to June 7, 2018.[54]

44.    First and foremost, Dr. Garmaise does not dispute that measuring the likelihood of the Monsanto merger is possible,[55] he is only arguing that it should be considered at this time. Furthermore, contrary to his assertion, I did not "fail" to provide such a methodology.  Rather, I did not delve into the details of the Monsanto merger likelihood in my Report as this is another a

---

[53] Garmaise Report n.35.

[54] Garmaise Report ¶ 31.

[55] For example, Dr. Garmaise cites to academic literature that models merger completion rates (see Garmaise Report n.63).

premature loss causation question.  Indeed, I made clear during my deposition that the likelihood of the Monsanto merger completion is "something that I would want to evaluate carefully,"[56] meaning, at the loss causation stage when quantifying artificial inflation.  That being said, whether there is a need to incorporate the likelihood of the merger into a damages analysis is itself a loss causation determination.

45.    Second, Dr. Garmaise is incorrect that this notion "necessitates an alternative methodology."[57]  The out-of-pocket methodology can incorporate this factor on a class-wide basis, if even needed.  The essence of this premature loss causation argument is how to adjust for potential time-varying inflation during the Class Period, which I addressed at length above in Section IV.A.  As a result, I do not repeat my explanation for how the out-of-pocket methodology can incorporate time-varying inflation and be applied class-wide.

46.    However, it is worth highlighting that Dr. Garmaise himself provides an example that illustrates how the out-of-pocket formula I presented in my Report could formulaically accommodate his concern, if necessary.  Specifically, Dr. Garmaise states:

> As a simple example, consider a hypothetical situation in which Monsanto discloses that it has unexpectedly lost cash equivalent to $1 per Bayer ADR. If the disclosure occurred after the Merger was completed, then the price of a Bayer ADR would likely fall by $1, because Monsanto's loss would be the same as Bayer's loss and would directly affect Bayer's share price. But if the disclosure occurred prior to the Merger completion, when the Merger was still uncertain (e.g., while it was being reviewed by regulators), the effect on the Bayer ADR price would likely be less than $1, reflecting the fact that that the Merger might not be completed, in which case the loss would not affect the Bayer ADR price. For example, if the market believed there was only a 10% chance that the Merger would succeed, then, all else equal, the disclosure would only lead to a decline of $0.10 in the Bayer ADR price.[58]

---

[56] Coffman Deposition 224:23 – 24.

[57] Garmaise Report ¶ 31.

[58] Garmaise Report ¶ 49.

47. To take Dr. Garmaise's example slightly further, assume that the $1 decline in the price of Bayer ADRs is the artificial inflation that is assumed to have dissipated on an alleged corrective disclosure date due to the fraud, after an exhaustive loss causation analysis. Also assume that a loss causation analysis at the merits stage determines that during the first month of the Class Period, the market believed there was a 10% chance that the Monsanto merger would succeed. In such a circumstance, purchasers during the first month of the class period who held through the corrective disclosure would have purchased shares with $0.10 of artificial inflation (10% of $1.00). Artificial inflation could be similarly adjusted for shares purchased after the first month based on the estimated probability that the Monsanto merger would succeed.

48. The same out-of-pocket formula set out in my Report (artificial inflation at the time of purchase minus artificial inflation at the time of sale, which Dr. Garmaise does not dispute) still results in the appropriate assessment of damages. This example shows that the artificial inflation need not be constant over time for the out-of-pocket damages methodology to be applied class-wide.

49. While I understand that it is not necessary at the class certification stage to articulate if measuring the potentially changing likelihood of the Monsanto merger is even needed, or how I would do so, Dr. Garmaise himself provides examples of how it could be done. One could utilize analysts' estimates of the likelihood of the merger completion throughout the Class Period, which is precisely what Dr. Garmaise presents in his report.[59] For instance, Morningstar apparently estimated early in the Class Period (as of September 2016) that there was a 75% chance that the merger would be completed.[60] One could also utilize investor surveys, as cited by Dr. Garmaise, to measure the likelihood of merger completion throughout the Class Period. For example, Dr. Garmaise highlights a September 2016 investor survey that Bernstein conducted with 74 respondents "in an attempt to

---

[59] Garmaise Report Exhibit 2.

[60] Garmaise Report Exhibit 2.

[No: 3:20-cv-04737-RS] EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA          21

gauge the deal's [Monsanto merger's] success probability and any other investor sentiment."[61]  Dr. Garmaise notes that Bernstein's survey indicated at the time that investors anticipated a 53% chance of deal completion.[62]

50.    Obviously, these estimates around the same time of 53% and 75%, for example, are different.  Dr. Garmaise harps on this fact, stating: "not only did stated expectations [of the Monsanto merger completion] differ among analysts, they also differed between analysts and investors, and among investors."[63]  This claim is a red herring.  Dr. Garmaise's pointing out of numerous estimates of this factor does not prevent an economist from valuing it.  One would not expect every market participant to have an identical expectation about the likelihood of the merger completion (and Dr. Garmaise does not opine that they should).  I understand that an actual class-wide damages calculation conducted during the merits phase of the litigation needs only to be economically reasonable as opposed to calculated with precision.  Thus, as a purely hypothetical example, in lieu of data aggregating every investor's thoughts at all points in time during the Class Period, a potential approach at the loss causation stage could be to utilize the average of the different analyst estimates as a reasonably proxy to estimate the merger completion likelihood.[64]

---

[61] Garmaise Report ¶ 53 and "Bayer/Monsanto: From Anger to Acceptance? Results of Our Investor Survey – Deal Agreement Seen as 80% Likely, Consummation Only 53%, We See Lower Odds," *Bernstein,* September 13, 2016.

[62] Garmaise Report ¶ 53 and "Bayer/Monsanto: From Anger to Acceptance? Results of Our Investor Survey – Deal Agreement Seen as 80% Likely, Consummation Only 53%, We See Lower Odds," *Bernstein,* September 13, 2016.

[63] Garmaise Report ¶ 53.

[64] To be clear, I am not opining that this is the method that will ultimately be used at the loss causation stage.

51.    As another example, when asked during my deposition how I would "go about evaluating the market's assessment of the likelihood of Bayer's acquisition of Monsanto closing during the preclose period?"[65] I explained:

> Well, there are quantitative techniques of comparing the price of Monsanto with the price of Bayer and how those move over time to try to get an assessment of the probability that the deal would go through. So there are quantitative methods for doing that.[66]

52.    Dr. Garmaise takes issue with this, claiming that the value of Monsanto stock prior to the merger reflects both the likelihood of merger completion as well as the stand-alone value of Monsanto, so in order to use the quantitative method that I described during my deposition I would need to value Monsanto as a stand-alone company for every day prior to the merger.[67]  However, Dr. Garmaise never claims that such a valuation exercise is impossible.  It could be done at the merits stage if needed.  Again, by making this claim, Dr. Garmaise is prematurely focusing on the details of a loss causation analysis.

53.    In sum, Dr. Garmaise's arguments relating to the potentially changing likelihood of the Monsanto merger fail.  He never claims that the merger likelihood cannot be measured.  His claims simply boil down to how to implement time-varying inflation, which is adaptable into the standard out-of-pocket formula, can be applied on a class-wide basis, and regardless, is a concern that would be dealt with at the merits stage.

### C.  Identification of Relevant Dates

54.    Dr. Garmaise's third concern is related to which dates would ultimately be used to measure artificial inflation.  Specifically, he states:

> Mr. Coffman fails to provide a methodology capable of objectively and reliably identifying relevant disclosures and measuring their impact on

---

[65] Coffman Deposition 225:8 – 11.

[66] Coffman Deposition 225:12 – 17.

[67] Garmaise Report ¶ 55.

> inflation. Mr. Coffman's approach of measuring inflation using the price reaction of Bayer's ADRs following the alleged corrective disclosures fails to account for other releases of information during the course of the Roundup litigation.[68]

55.    First, Dr. Garmaise's argument on this point does not call into question the out-of-pocket damages methodology outlined in my Report.  Second, Dr. Garmaise does not offer an opinion related to price impact, and therefore does not establish a lack of price impact from the alleged misstatements and/or omissions.  Third, there is no dispute that the market price of Bayer ADRs declined in a statistically significant manner in the wake of all five alleged corrective disclosures.[69]  Specifically, my event study shows that the price declines in Bayer ADRs, after controlling for market effects, are statistically significant at the 95% confidence level or greater on August 13, 2018,[70] October 23, 2018,[71] March 20, 2019,[72] June 25, 2020,[73] and July 7, 2020.[74]

56.    Rather, Dr. Garmaise's concerns amount to yet another loss causation question, that is, which price declines should be used to measure artificial inflation as well as which days constitute corrective disclosures of the relevant truth.  The determination as to whether a certain alleged corrective disclosure should be included in or excluded from the damages analysis is a matter of loss causation that will be addressed at the merits stage.  It is not necessary to, and I do not, address here

---

[68] Garmaise Report ¶ 66.

[69] As noted previously, Dr. Garmaise offers no criticism of my event study, does not perform his own event study, and thus does not dispute the event study results on any dates during the Class Period, including the alleged corrective disclosure dates.

[70] Plaintiffs allege that corrective information was released on Friday, August 10, 2018 and impacted the price of Bayer ADRs on Monday, August 13, 2018 (see, Complaint ¶¶ 19, 129, and 304).

[71] Plaintiffs allege that corrective information was released on October 22, 2018 and impacted the price of Bayer ADRs on October 23, 2018 (see, Complaint ¶¶ 24, 148, and 306).

[72] Plaintiffs allege that corrective information was released on March 19, 2019 and impacted the price of Bayer ADRs on March 20, 2019 (see, Complaint ¶¶ 25, 160, and 307).

[73] Plaintiffs allege that corrective information impacted the price of Bayer ADRs on June 24, 2020 and June 25, 2020 (see, Complaint ¶¶ 29, 208, and 309).  I address Dr. Garmaise's concerns related to the price increase on June 24, 2020 within this section below.

[74] Plaintiffs allege that corrective information was released on July 6, 2020 and impacted the price of Bayer ADRs on July 7, 2020 (see, Complaint ¶¶ 30, 209, and 309).

whether there is economic evidence that the stock price movements in the wake of the five alleged corrective disclosures (or any other dates during the Class Period) reflect price impact that should be considered as part of a loss causation or damages analysis.  Indeed, during my deposition, I made it clear that at this time, I am not offering an opinion on which dates should be considered corrective disclosures.  For example:

> Just to be clear, that doesn't mean I analyzed loss causation and affirmatively said these events [corrective disclosures] did reveal some fraud. I'm just saying there is a logically, economically coherent story by which that could be the case.[75]

> I haven't done a loss causation analysis. So to what degree any decline at the end of the class period associated with a corrective disclosure, *I haven't even determined whether there are corrective disclosures*…[76]

57.    Even still, the out-of-pocket damages model I described in my Report is flexible enough to accommodate the inclusion or exclusion of different corrective disclosure dates.  Namely, if a loss causation analysis or the finder of fact determines that there was no inflation that dissipated on an alleged corrective disclosure, the out-of-pocket method still would apply class-wide, and it would be assumed that $0 of artificial inflation dissipated from the price of Bayer ADRs on such date.  Indeed, I described this concept during my deposition.[77]  Similarly, if a loss causation analysis

---

[75] Coffman Deposition 119:5 – 9.

[76] Coffman Deposition 210:17 – 22.

[77] Coffman Deposition 108:3 – 109:4:

> Q. If you can't causally tie a price decline to the revelation of relevant information, then the out-of-pocket damages methodology would be inapplicable, right?

> A. No, it would be completely applicable. The answer might just be zero. Right, I mean if the amount of inflation, let's say you have three correct disclosures, alleged corrective disclosures and, you know, each one of them there was a dollar abnormal stock price and so there were losses of $3 being alleged, if you can't tie -- causally tie those drops to the misrepresentations or omissions in a case for two of the three, then the damages at most would be related to one of those three drops. Or if the finder of fact determined all three, there is no causation, then the artificial inflation implied by that is zero and damages would be zero. So it's not an indictment of the out-of-pocket methodology or whether you can do it classwide that is just an indictment of plaintiffs' theory or the evidence they have, but it doesn't

or the finder of fact determines that there was inflation that dissipated (or was introduced) on a date not initially pled by Plaintiffs, the out-of-pocket method still would apply class-wide, and it would be assumed that artificial inflation dissipated from (or was introduced into) the price of Bayer ADRs on such date.

58.    Thus, Dr. Garmaise's criticism regarding which specific dates are applicable in measuring artificial inflation is misplaced and irrelevant at this stage of the litigation, and regardless, the out-of-pocket method is flexible enough to incorporate different alleged corrective disclosure dates or any additional dates that may be deemed relevant.  For completeness, however, I will address Dr. Garmaise's premature arguments related to specific dates below.

59.    First, Dr. Garmaise notes that my event study shows a statistically significant price increase on June 24, 2020 and states: "To the extent that Mr. Coffman suggests one should use this price reaction to measure inflation, he has not described how a price increase could be used in a manner consistent with Plaintiffs' theory of liability."[78]  In making this claim, Dr. Garmaise ignores Plaintiffs' allegations that news articles published on June 25, 2020 also contained corrective information.[79]  Further, as mentioned above, Dr. Garmaise does not dispute that there was a price

---

> change that the out-of-pocket methodology can be applied classwide. It still gives the right answer.

[78] Garmaise Report n.76.

[79] See Complaint ¶ 208:

> Immediately upon announcing the $10.9 billion settlement fund it became apparent that even this massive amount would not bring closure to all the glyphosate litigation.  A *Bloomberg* article published early the morning of June 25, 2020, described all the uncertainties around the deal, explaining that "Bayer AG's $12.1 billion settlement to resolve U.S. lawsuits over its flagship weedkiller Roundup and other products offered only fleeting relief to investors looking to move on from the legal woes that have hobbled the stock for almost two years."  In an article published in *The New York Times*, one lawyer for 5,000 plaintiffs was quoted as saying that the settlement "is nothing like the closure they're trying to imply."  Putting it even more vividly, one of several plaintiffs lawyers quoted in an article in *Insurance Journal* described Bayer as "trying to stop a gigantic problem by putting its finger in the proverbial damn."  By the time the market opened on June 25,

decline in Bayer ADRs on June 25, 2020 that was statistically significant at the 95% confidence level (and beyond the 99% confidence level).  Whether some, none, or all of the abnormal price movements following the allegedly corrective information released on June 24, 2020 and June 25, 2020 will be used to measure artificial inflation is a question that will be dealt with at the merits stage.[80]

60.    Second, Dr. Garmaise does not dispute that there was a statistically significant price decline on August 13, 2018 in the wake of the alleged corrective information that the jury found Monsanto liable for Roundup litigation.  For example, *Reuters* tied the price decline on August 13, 2018 to the alleged corrective information, stating: "Shares in Bayer plunged almost 10 percent to their lowest in almost two years after a California jury ordered the German company's subsidiary Monsanto to pay $289 million in damages…"[81]  Nevertheless, Dr. Garmaise makes arguments related to whether certain investors were aware of the alleged corrective information before the alleged corrective disclosure dates (i.e., "truth on the market").  Specifically, he cites to examples of information released before the first alleged corrective disclosure, such as:

> …internal Monsanto documents, including emails, relating to internal discussion of glyphosate's health risks were made publicly available on March 14, 2017, March 15, 2017, and August 1, 2017…[82]

> …the *New York Times* discussed the documents from the March 2017 release, including by summarizing and quoting from an email that reportedly suggested that 'company officials … could ghostwrite research

---

2020, the price of Bayer ADRs had fallen to $18.94 from $20.54 at the close of the market the previous day, or 7.8%, and it traded at a volume of 1,016,943 shares throughout the day on June 25, or almost twice the average daily trading volume. The more investors examined the deal, the more they realized that Bayer simply had not achieved the closure it said would come with a settlement.

[80] To be clear, I have not yet evaluated whether there is economic evidence that the stock price movements on June 24, 2020 and/or June 25, 2020 reflect price impact that should be considered as part of a loss causation or damages analysis.

[81] "Bayer shares down after Monsanto ordered to pay damages," *Reuters,* August 13, 2018.

[82] Garmaise Report ¶ 59.

on glyphosate by hiring academics to put their names on papers that were actually written by Monsanto.'[83]

Following the release of another batch of internal Monsanto documents in August 2017, the *New York Times* reported that '[d]ocuments released Tuesday in a lawsuit against Monsanto raised new questions about the company's efforts to influence the news media and scientific research and revealed internal debate over the safety of its highest-profile product, the weed killer Roundup.'[84]

The so-called 'Monsanto Papers' were also discussed during a hearing before the House of Representatives Committee on Science, Space, and Technology relating to glyphosate on February 6, 2018.[85]

During the *Johnson* trial, Monsanto's emails were introduced as evidence starting on July 9, 2018… Plaintiffs acknowledge that the Johnson trial was 'widely covered' by analysts and the press, suggesting that this evidence would have been widely available.[86]

61.    Whether investors were aware of certain details regarding Monsanto ahead of the alleged corrective disclosures, and how that might impact the quantum of artificial inflation, requires a detailed loss causation analysis, which I have repeatedly stated I understand is not required at the class certification stage.  Moreover, a loss causation analysis would need to evaluate whether the information cited by Dr. Garmaise originated from sources that investors would normally rely on in making investment decisions or whether the information was conveyed with sufficient force and/or credibility such that it partially revealed the relevant truth concealed by the alleged misstatements and omissions.  More importantly, none of the dates cited by Dr. Garmaise call into question the standard out-of-pocket damages methodology described in my Report; rather, they are relevant only to the ultimate quantum of artificial inflation.  The out-of-pocket methodology is flexible enough to incorporate some, none, or all of the abnormal price movements following the five alleged corrective disclosures (as well as any other dates).

---

[83] Garmaise Report ¶ 60.

[84] Garmaise Report ¶ 60.

[85] Garmaise Report ¶ 61.

[86] Garmaise Report ¶ 62.

62. Third, Dr. Garmaise suggests that there may be two additional dates that may need to be considered in measuring artificial inflation (i.e., August 16, 2018 and July 15, 2019). He states:

> In addition, Mr. Coffman fails to explain how his methodology would account for other statements Bayer made about its pre-merger due diligence. For example, Plaintiffs allege that in a press release on August 16, 2018, Bayer 'admitted for the first time that [it] never looked at Monsanto's internal documents before the closing of the Merger.' Given that Plaintiffs' allegations are that Bayer misled the market about the nature and extent of its due diligence leading to inflation in Bayer's ADR price, it seems logical that inflation would have differed before and after this press release (and, perhaps, that this press release could have helped to correct prior alleged misrepresentations).[87]

> Mr. Coffman fails to explain how he would account for other developments in the Roundup litigation that would presumably also be relevant to measuring inflation under Plaintiffs' theory of liability. For example, Plaintiffs allege that the Johnson court's reduction of the punitive damages award and denial of Bayer's post-trial motions [on October 22, 2018] is a corrective disclosure. However, they and Mr. Coffman do not discuss the effect of a similar post-trial ruling in the Hardeman case on July 15, 2019. Following that news, Bayer's ADRs experienced a statistically significant positive residual return according to Mr. Coffman's event study.[88]

63. It is misleading for Dr. Garmaise to suggest that I overlooked these dates. I already stated above how at this time, I am not offering an opinion on which dates should be considered corrective disclosures. As a result, I have not analyzed whether the price movements on August 16, 2018 or July 15, 2019 (or other dates) should be considered in the quantification of artificial inflation. A detailed loss causation analysis at the merits stage would evaluate whether August 16, 2018 or July 15, 2019 or any other dates represent the revelation of the relevant truth concealed by the alleged misstatements or omissions. In my experience, at the merits stage of this type of litigation, it is not uncommon for a loss causation analysis to identify additional corrective disclosures or eliminate previously pled alleged corrective disclosures. As stated above, if a loss causation analysis or the finder of fact determines that there was inflation that dissipated (or was

---

[87] Garmaise Report ¶ 64.

[88] Garmaise Report ¶ 65.

introduced) on a date not initially pled by Plaintiffs, the out-of-pocket method still would apply class-wide, and it would be assumed that artificial inflation dissipated from (or was introduced into) the price of Bayer ADRs on such date.

64.     In conclusion, Dr. Garmaise's concerns related to "salient developments in the lawsuits, including during the discovery process before the trials, during the trials but before the verdicts, or after the verdicts"[89] can be incorporated into the out-of-pocket methodology on a class-wide basis at the loss causation stage if needed.

### D.  Changes in Roundup Litigation and Bayer's Business

65.     Dr. Garmaise's final argument related to damages is that I have not established how I would account for the potential changing economic impact of information over time, such as supposed changes in public information available regarding Roundup liabilities and Bayer's corporate structure.[90]  Despite stating that I acknowledged in my Report that inflation can vary over time,[91] Dr. Garmaise argues:

> Specifically, as I discuss in Section V.D.1, Mr. Coffman has provided no information about how one could adjust inflation to account for changes over the four-year Proposed Class Period in the market's expectations regarding the risk of the Roundup litigation, given the evolution in publicly available information on this topic over time. Furthermore, as described in Section V.D.2, Mr. Coffman fails to explain how his approach could account for Bayer's changing business structure, including changes resulting from the Merger, despite acknowledging that the Merger 'altered the makeup of the [C]ompany, as well as what information would be considered relevant by market participants, and therefore also potentially impacted the return-generating process'.[92]

66.     Again, Dr. Garmaise's concern amounts to speculation about the evolution of artificial inflation throughout the Class Period.  He points to examples of potential changing conditions that I

---

[89] Garmaise Report ¶ 57.

[90] Garmaise Report ¶ 33.

[91] Garmaise Report ¶ 67.

[92] Garmaise Report ¶ 67.

supposedly have not accounted for, such as (1) changes in the nature of the Roundup litigation risk, including the number of lawsuits and Roundup plaintiffs and publicly available information regarding the Roundup litigation;[93] (2) changes in the market's expectations of the likelihood of an adverse ruling or the size of Monsanto's exposure;[94] (3) changes due to the merger with Monsanto;[95] (4) shifts in Bayer's reporting segments;[96] and (5) changes to Bayer's capital structure.[97]

67.    Dr. Garmaise also focuses on that fact that in my Report, I acknowledged that the "merger with Monsanto altered the makeup of the [C]ompany, as well as what information would be considered relevant by market participants, and therefore also potentially impacted the return-generating process."[98]  This is precisely why I constructed a regression model to specifically control for this, and importantly, Dr. Garmaise does not dispute my event study.

68.    Even if the nature of the alleged fraud was changing during the Class Period or Bayer was experiencing changes due to the merger with Monsanto, for example, the question of whether any of the factors raised by Dr. Garmaise would cause a hypothetical but-for disclosure of the relevant truth to have a different economic impact at different points in the Class Period requires a detailed loss causation analysis.  In Section IV.A above, I discussed time-varying inflation at length, and noted in particular that it is dealt with at the loss causation stage and that regardless, the out-of-pocket method is flexible enough to incorporate different findings related to the evolution of artificial inflation.  For the same reasons described above, this argument does not disturb my

---

[93] Garmaise Report ¶ 68.
[94] Garmaise Report ¶ 73.
[95] Garmaise Report ¶ 75.
[96] Garmaise Report ¶ 75.
[97] Garmaise Report ¶ 75.
[98] Coffman Report ¶ 51 and Garmaise Report ¶ 74.

opinions and Dr. Garmaise's claims related to the "changing economics"[99] are both premature and irrelevant.

69.     Dr. Garmaise concludes by arguing that constant dollar inflation or constant percentage inflation "are inappropriate in this case."[100]  To be clear I did not offer the opinion that constant dollar inflation or constant percentage inflation must be used in this matter.  I provided them as examples of common approaches that have been accepted by courts, and made clear that: "the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery."[101]  The ultimate approach used to quantify artificial inflation over the Class Period is subject to a loss causation analysis and will be determined at the merits stage.  It is premature for Dr. Garmaise to conclude that such approaches are "inappropriate."  Even still, the out-of-pocket method I described in my Report is flexible enough to incorporate time-varying inflation (as discussed at length in Section IV.A).

70.     In conclusion, I am not at this time offering an opinion on what the factual evidence will ultimately show or how alternative findings would be ultimately applied to determine the appropriate portion of the artificial inflation attributable to the alleged corrective disclosure events during the Class Period.  Instead, I am showing that the out-of-pocket model proposed in this case for calculating damages is flexible enough to incorporate any alternative finding raised by Dr. Garmaise and can be applied on a class-wide basis consistent with Plaintiffs' liability theory.

71.     Dr. Garmaise identifies no special circumstances in this case that make the traditional out-of-pocket damages framework inappropriate at class certification.  The critiques he offers simply concern potential circumstances, routine in cases like this one, that may later implicate the precise

---

[99] Garmaise Report ¶ 76.

[100] Garmaise Report ¶ 76.

[101] Coffman Report ¶ 85.

amount of damages caused by Defendants' misconduct and which, in any event, can be addressed using a class-wide approach. The out-of-pocket damages framework regularly and effectively addresses these types of loss causation questions at the merits stage. Regardless of which approach, or combination of approaches, is ultimately used as the loss causation input to the out-of-pocket damages model, the formula to calculate class-wide damages will be mechanical, the proof will be common to the Class, and the results will apply class-wide. As described above, the general out-of-pocket damages model advanced in my Report can handle a variety of loss causation input assumptions and the ultimate result can be applied on a class-wide basis.

## V.    DR. GARMAISE PRESENTS NO EVIDENCE TO DISTURB MY CONCLUSION THAT BAYER ADRS TRADED IN AN EFFICIENT MARKET THROUGHOUT THE CLASS PERIOD

72.    Dr. Garmaise does not offer the opinion that the market for Bayer ADRs was inefficient during the Class Period, and he does not dispute my empirical analysis of well-established factors that support a finding of market efficiency throughout the entire Class Period. In particular, my Report analyzed twelve factors, demonstrating that: (1) the average weekly trading volume of Bayer ADRs during the Class Period far exceeded benchmarks that courts have established (*Cammer* Factor 1);[102] (2) a large number of securities analysts followed Bayer during the Class Period, and there was also substantial press coverage among other sources of publicly available information regarding the Company (*Cammer* Factor 2);[103] (3) Bayer ADRs were actively traded by market makers during the Class Period (*Cammer* Factor 3);[104] (4) Bayer effectively satisfied the criteria for Form F-3 eligibility (*Cammer* Factor 4);[105] and (5) there was a strong cause-and-effect relationship

[102] Coffman Report ¶¶ 28 – 33.
[103] Coffman Report ¶¶ 34 – 39.
[104] Coffman Report ¶¶ 40 – 42.
[105] Coffman Report ¶¶ 42 – 45.

between new Company-specific information and the market price of Bayer ADRs during the Class Period (*Cammer* Factor 5).[106] The analyses in my Report also showed that (6) Bayer ADRs had a market capitalization that was higher than the majority of NYSE and NASDAQ stocks during the Class Period (*Krogman* Factor 1);[107] (7) Bayer ADRs had a bid-ask spread well below the average and median bid-ask spread of a random sample of 100 common stocks trading on the NYSE and NASDAQ (*Krogman* Factor 2);[108] and (8) insiders apparently did not hold any outstanding shares of Bayer ADRs, meaning that 100% of Bayer ADRs were held by non-insiders (*Krogman* Factor 3).[109] My Report further demonstrated that: (9) Bayer ADRs were traded by sophisticated traders, with over 21% of its public float held by institutions during the Class Period on average (Additional Factor 1);[110] (10) there was no evidence of persistent autocorrelation in Bayer ADRs during the Class Period (Additional Factor 2);[111] (11) there was active trading in Bayer options during the Class Period (Additional Factor 3)[112] and (12) there was no persistent divergence between the price of Bayer ADRs and its underlying ordinary shares during the Class Period, indicating little to no opportunities for arbitrage (Additional Factor 4).[113]

73. Taken together, these metrics provide strong economic evidence that support my opinion that Bayer ADRs traded in an efficient market throughout the entire Class Period.[114]

---

[106] Coffman Report ¶¶ 46 – 67.

[107] Coffman Report ¶¶ 68 – 70.

[108] Coffman Report ¶¶ 71 – 72.

[109] Coffman Report ¶ 73.

[110] Coffman Report ¶ 74.

[111] Coffman Report ¶¶ 75 – 78.

[112] Coffman Report ¶ 79.

[113] Coffman Report ¶ 80.

[114] Dr. Garmaise argues in a footnote that only *Cammer* Factor 5 can establish semi-strong form market efficiency while the other eleven factors I evaluate in my Report cannot. *See* Garmaise Report n.132 ("Mr. Coffman has no reliable basis to reach a conclusion of semi-strong-form market efficiency based on these factors alone, other than the fifth *Cammer* factor—price reaction to new information."). However, Dr. Garmaise does not provide any evidence disputing that the other

Importantly, Dr. Garmaise does not challenge the results I reported for any of these twelve factors. Furthermore, he does not address my analysis of ten out of the twelve factors.[115]

74.    Dr. Garmaise's primary criticism regarding my market efficiency opinion relates to Additional Factor 4, the analysis of a lack of arbitrage opportunity.[116,117]  In my Report, I explicitly acknowledged a temporary price divergence in Bayer ADRs and Bayer ordinary shares in June 2018, stating:

> I observe a relatively larger divergence between the prices on 12 trading days from June 6, 2018 through June 21, 2018.  This temporary divergence occurred during a time when 1) there was a cash distribution that would be

factors I analyzed *support* a finding of market efficiency throughout the entire Class Period (with the exception of the results of Additional Factor 4, which is discussed at length in this section below). Indeed, Dr. Garmaise explicitly acknowledges that he does "not take issue with the notion that these factors might be considered."  Dr. Garmaise's attempt to reject the relevance of eleven out of the twelve factors I analyzed is misleading.

[115] Specifically, *Cammer* Factors 1 – 4, *Krogman* Factors 1 – 3, and Additional Factors 1 – 3.

[116] Garmaise Report Section VI.

[117] Dr. Garmaise offers a brief criticism of my *Cammer* Factor 5 analysis in a footnote (see Garmaise Report footnote 132).  Dr. Garmaise claims that my analysis of *Cammer* Factor 5 "cannot provide reliable evidence of market efficiency from the perspective of financial economics" and takes issue with two components of my analysis: (1) the expected direction of the price movements on the sets of dates that I analyzed; and (2) my identification of Least News Dates.  Both of these points are flawed.

First, Dr. Garmaise's assertion that I needed to, *ex ante*, apply some subjective approach to predict which direction the stock price would move is a red herring.  I am not aware of any authority to suggest that is necessary in this context.  Moreover, Dr. Garmaise does not provide a single example of a date in my *Cammer* Factor 5 analysis that was associated with a directionally inconsistent price movement.

Second, Dr. Garmaise's claim that my use of Least News Dates is inconsistent with academic literature appears to be a suggestion that rather than comparing earnings announcements to the 25 Least News Dates, I apparently should have compared earnings announcements to the more than 1,000 other trading days in the Class Period.  This is misleading.  The purpose of the cause-and-effect analysis is to compare earnings announcements (dates with news) to a control group.  In my view, my selection of Least News Dates is a proper control group in this context.  The alternative suggested by Dr. Garmaise would inappropriately contaminate the Least News Dates with dates that that could potentially contain value-relevant information.  Dr. Garmaise's suggestion is simply ill-suited to evaluate cause and effect.

In my Report, I provided direct and unrefuted evidence that earnings announcements are associated with greater incidence of statistically significant abnormal stock price movements, larger magnitudes of price movements, and greater trading volume than days with no news.  This objective analysis provides strong evidence of a cause-and-effect relationship.  Neither of Dr. Garmaise's arguments offers a credible refutation of my conclusions and as a result of the foregoing, his claims do not disturb my opinions.

paid to Bayer ADR shareholders that was not being paid to Bayer ordinary shareholders; 2) BNY Mellon had temporarily suspended its issuances and cancellations of Bayer ADRs; 3) the merger with Monsanto was being completed; and 4) there was a spike in short interest in Bayer ADRs likely resulting from merger arbitrage activity…Therefore, this temporary divergence in prices is likely due to this combination of temporary unique supply and demand differences and is not suggestive of a divergence from market efficiency.[118,119]

75.    Dr. Garmaise agrees that at least a portion of the price divergence is explained by my first reason, the cash distribution.[120] He also acknowledges that my second reason, BNY's temporary suspension of issuances and cancellations, "may have contributed to the divergence in prices and its persistence."[121] However, Dr. Garmaise attempts to argue that "the market for Bayer ADRs did not incorporate all public information concerning Bayer's ordinary share price."[122] He further claims:

> Mr. Coffman fails to reliably establish market efficiency throughout the Proposed Class Period, particularly during the period from June 6, 2018 to June 25, 2018, when the Bayer ADR price deviated substantially from that of Bayer ordinary shares. As Mr. Coffman acknowledges, in efficient markets, equivalent assets should trade at the same price, but for much of June 2018, they diverged by a wide margin. Though Mr. Coffman offers four potential reasons for the divergence, his explanations either do not provide a rationale for the observed phenomenon, are insufficient to explain the magnitude of the deviation, or are consistent with the presence of limits to arbitrage that financial economists have recognized as impediments to market efficiency.[123]

---

[118] Coffman Report n.91.

[119] Dr. Garmaise analyzes 14 trading days instead of the 12 trading days that I pointed to in my Report. Specifically, he states: "Mr. Coffman acknowledges a deviation for the period from June 6, 2018 to June 21, 2018 (Coffman Report, fn. 91), but my analysis of intraday prices shows that the difference persists (though smaller in size) through June 25, 2018." Garmaise Report n.119. This is irrelevant. First, Dr. Garmaise acknowledges that the divergence on the two additional dates is smaller in size. Regardless, my opinions in my Report as well as this Rebuttal Report are the same whether I analyze the 12 trading days or the 14 trading days proposed by Dr. Garmaise.

[120] Garmaise Report ¶¶ 90 – 92 and Exhibit 7.

[121] Garmaise Report ¶ 94.

[122] Garmaise Report ¶ 97.

[123] Garmaise Report ¶ 17.

76.    As an initial matter, Dr. Garmaise is fixated on a short portion of the Class Period, namely, his argument is limited to 14 trading days out of 1,037 trading days, or 1.4% of the Class Period.  He has not provided any evidence or opinions to dispute the efficiency of the market for Bayer ADRs outside of this 14 trading day period.  Dr. Garmaise also does not claim that the temporary price divergence on these 14 trading days renders the market for the Bayer ADRs inefficient, he only goes as far as saying that "large differences are evidence that the prices of the Bayer ADRs did not react quickly to publicly available ordinary share prices, which is inconsistent with market efficiency."[124]

77.    I disagree.  While I understand that he has presented isolated examples of price discrepancies between Bayer ADRs and Bayer ordinary shares on an intraday basis,[125] and claims that I have not fully explained the divergence, Dr. Garmaise does not come close to proving that the price of Bayer ADRs was not reacting to the price of Bayer ordinary shares or other widely-available information, which is the relevant question.  During this temporary period in June 2018, the price of Bayer ADRs was clearly taking into account the price of Bayer ordinary shares, *in addition to* the short-term supply and demand characteristics I already described in my Report.  In other words, the presence of these temporary factors that may have impeded arbitrage for a short time period does not mean that the market for Bayer ADRs completely ignored the price of Bayer ordinary shares or other publicly available information, or that it rendered the market for Bayer ADRs inefficient.  Dr. Garmaise's suggestion otherwise is baseless.  The far more compelling evidence is the 98.6% of the Class Period where there was no consistent divergence in the market price of Bayer ADRs and Bayer ordinary shares.

[124] Garmaise Report ¶ 87.

[125] Garmaise Report ¶¶ 87 – 88.

78.    Furthermore, in focusing on the potential characteristics underlying the temporary price divergence between Bayer ADRs and Bayer ordinary shares, Dr. Garmaise is overlooking the context of analyzing the efficiency of the market for Bayer ADRs in the first place.  Indeed, the relevant question in this situation is whether the market for Bayer ADRs was sufficiently efficient such that one can presume that the value of the alleged misstatements and omissions was impacting the price of Bayer ADRs during the Class Period.  Despite the temporary price divergence and Dr. Garmaise's arguments, I am not aware of any evidence, and Dr. Garmaise has not presented any, to suggest that the market for Bayer ADRs was not responding quickly to value-relevant information, including the price of Bayer ordinary shares.  Indeed, I clearly made this point during my deposition, stating:

> …to put this whole discussion in context, you know, the question—the relevant question being asked here is, is the market for Bayer ADRs sufficiently efficient that if there were material misstatements, that the price of the ADRs would reflect it. And none of the issues we are talking about now, small divergences over a short period of time related to a combination of supply and demand issues and a clear explanation for a portion of that divergence as a result of this rights distribution and how it had to be performed in my view causes any question as to whether the market is sufficiently efficient that material misstatements would be impounded in the price.[126]

79.    Finally, Dr. Garmaise extends his argument related to the price divergence to claim that it causes a supposed issue in calculating damages.  Specifically, he asserts:

> In addition, these price deviations raise questions as to how damages could be reliably measured on a class-wide basis during the June 2018 period. Given the price deviations between the ADRs and ordinary shares, and the fact that that the ADR prices did not quickly incorporate value-relevant information from the ordinary share price in this period, Mr. Coffman fails to explain how to determine the impact of the alleged misrepresentations on the price of the Bayer ADRs during this period.[127]

---

[126] Coffman Deposition 98:3 – 18; *see also* Coffman Deposition 100:9 – 101:25.

[127] Garmaise Report ¶ 99.

80.    As discussed at length above in Section IV, determining precisely how to calculate damages is a premature loss causation question.  Regardless, the out-of-pocket damages methodology I described in my Report could handle Dr. Garmaise's concern related to the price divergence if necessary.  For example, Dr. Garmaise and I both present a calculation of the difference between the closing prices of Bayer ordinary shares and Bayer ADRs during the Class Period.[128]  A loss causation analysis at the merits stage could ensure that this price divergence in June 2018, which is easily calculated, is excluded from the quantification of artificial inflation.

81.    In sum, none of Dr. Garmaise's arguments related to the price divergence or market efficiency in general disturb my opinion that the market for Bayer ADRs was efficient throughout the Class Period.

82.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 21, 2023.

Chad Coffman

---

[128] Garmaise Report Exhibit 5 and Coffman Report Exhibit 14.

# Appendix A
# Documents Considered

**Prior Reports and Depositions in this Matter**

- Market Efficiency Report of Chad Coffman, CFA, dated October 28, 2022, including all data and all documents included in the Appendices of that report.
- Deposition of Chad Coffman, CFA, dated December 21, 2022.
- Rebuttal Report of Mark Garmaise, Ph.D., dated February 3, 2023, including data, analyses, and back-up materials provided by Dr. Garmaise to counsel for Plaintiffs that Dr. Garmaise claims to have considered in connection with the Garmaise Report.
- Deposition of Mark Garmaise, Ph.D., dated March 9, 2023.

**Court Documents**

- Amended Class Action Complaint filed January 19, 2021, in *Sheet Metal Workers' National Pension Fund v. Bayer Aktiengesellschaft,* No. 3:20-cv-04737-RS (N.D. Cal).
- Order Denying Defendants' Motion to Dismiss filed October 19, 2021, in *Sheet Metal Workers' National Pension Fund v. Bayer Aktiengesellschaft,* No. 3:20-cv-04737-RS (N.D. Cal).
- Second Amended Class Action Complaint filed December 30, 2021, in *Sheet Metal Workers' National Pension Fund v. Bayer Aktiengesellschaft,* No. 3:20-cv-04737-RS (N.D. Cal).
- Order Denying Motion to Dismiss filed May 18, 2022, in *Sheet Metal Workers' National Pension Fund v. Bayer Aktiengesellschaft,* No. 3:20-cv-04737-RS (N.D. Cal).

**Court Decisions and Securities Law**

- Class Certification Decisions listed in Appendix C.
- *In re Computer Sciences Corporation Securities Litigation*, No. 1:11-cv-610-TSE-IDD (E.D. Vir.).
- *Washtenaw County Employees' Retirement System v. Walgreen Co.,* No. 15-cv-3187 (N.D. Ill.).
- *Bank of America Corporation Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, No. 09 MDL 2058 (PKC) (S.D.N.Y.).
- *Erica P. John Fund, Incorporated v. Halliburton Company*, No. 3:02-CV-1152-M (N.D. Tex.).
- *Murphy v. Precision Castparts Corporation*, No. 3:16-cv-00521-SB (D. Or.).

**Bayer Aktiengesellschaft News**

- "Bayer shares down after Monsanto ordered to pay damages," *Reuters*, August 13, 2018.

**Bayer Aktiengesellschaft Analyst Reports**

- "Bayer/Monsanto: From Anger to Acceptance? Results of Our Investor Survey – Deal Agreement Seen as 80% Likely, Consummation Only 53%, We See Lower Odds," *Bernstein*, September 13, 2016.

# Appendix B

**CHAD W. COFFMAN, MPP, CFA**

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:         (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com


**EMPLOYMENT:**

**Global Economics Group, LLC**
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

**Market Platform Dynamics, LLC**
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


**EDUCATION:**

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
            Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  - In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  - Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court for the Western District of Washington at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed expert rebuttal report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2011**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court for the Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD, United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court for the Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc. and Apple Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018. Filed expert rebuttal report February 22, 2019. Filed expert report June 7, 2019. Deposition September 6, 2019.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>In Re Genworth Financial, Inc. Securities Litigation, Civ. A. No. 3:14-cv-00682-JAG, United States District Court for the Eastern District of Virginia, Richmond Division</u>. Filed declaration re: Plan of Allocation June 2, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts</u>. Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois</u>. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017. Filed expert report November 11, 2020. Filed expert rebuttal report December 14, 2020. Deposition January 29, 2021.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert report May 19, 2017. Deposition July 20, 2017. Filed expert rebuttal report September 14, 2017. Filed expert report January 22, 2019. Filed expert rebuttal report March 1, 2019. Deposition March 26, 2019.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018. Deposition January 31, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018. Filed declaration re: Plan of Allocation and calculation of aggregate damages May 6, 2019.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in <u>Kevin Murphy, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Precision Castparts Corp., Mark Donegan, and Shawn R. Hagel, Defendants, No. 3:16-cv-00521-SB, United States District Court for the District of Oregon, Portland Division</u>. Filed expert report March 2, 2018. Filed expert report March 22, 2019. Filed expert reply report June 19, 2019. Deposition July 19, 2019.

- Testifying expert in <u>In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division</u>. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in <u>Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois</u>. Filed expert report July 13, 2018. Deposition September 21, 2018. Filed rebuttal reply report May 17, 2019.

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018**.**

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018. Filed expert report December 14, 2018. Filed expert report March 8, 2019. Filed declaration re: Plan of Allocation July 19, 2019.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018. Filed expert report July 26, 2019. Filed expert report November 1, 2019.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division.</u> Filed expert report September 20, 2018.

- Testifying expert in <u>City of Sunrise General Employees' Retirement Plan, Plaintiff vs. FleetCor Technologies, Inc., et al., Defendants, No. 1:17-CV-02207-LMM, United States District Court for the Northern District of Georgia Atlanta Division</u>. Filed expert report January 4, 2019. Deposition March 20, 2019. Filed expert report May 6, 2019.

- Testifying expert in <u>Guevoura Fund LTD., On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., Defendants, Case No. 1:15-cv-07192-CM, Case No. 1:18-cv-09784-CM,</u>

United States District Court for the Southern District of New York. Filed expert report January 18, 2019.

- Testifying expert in <u>Leon D. Milbeck On Behalf of Himself and All Others Similarly Situated, v. TrueCar, Inc, et al., Defendants, No. 2:18-cv-02612-SVW, United States District Court for the Central District of California</u>. Filed expert report March 8, 2019. Deposition April 8, 2019.

- Testifying expert in <u>Lewis Cosby, Kenneth R. Martin, as Beneficiary of the Kenneth Ray Martin Roth IRA, and Martin Weakly On Behalf of Themselves and All Others Similarly Situated, vs. KPMG, LLP, Case No. 3:16-cv-00121, United States District Court for the Eastern District of Tennessee, Knoxville Division</u>. Filed expert report March 15, 2019. Deposition April 12, 2019. Filed supplemental expert report April 19, 2019. Deposition April 25, 2019. Filed rebuttal reply report June 14, 2019.

- Testifying expert in <u>Shawn Sanawaz, Individually and On Behalf of All Other Similarly Situated, v. Intellipharmaceutics International Inc., Isa Odidi, and Domenic Della Penna, Defendants, No. 1:17-cv-05761-JPO, United States District Court for the Southern District of New York.</u> Filed expert report May 06, 2019.

- Testifying expert in <u>Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan</u>. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying expert in <u>West Virginia Investment Management Board, Stichting Blue Sky Global Equity Active Low Volatility Fund, and Stitching Blue Sky Active Large Cap Equity USA Fund vs. SCANA Corporation., et al., Civ. A. No. 3:17-cv-2616-MBS, United States District Court for the District of South Carolina.</u> Filed expert report June 28, 2019. Deposition August 16, 2019.

- Testifying expert in <u>Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee.</u> Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying expert in <u>In Re Dr. Reddy's Laboratories Limited Securities Litigation, No. 3:17-cv-06436-PGS-DEA, United States District Court for the District of New Jersey.</u> Filed expert report July 19, 2019. Deposition September 10, 2019.

- Testifying expert in <u>Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado.</u> Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in <u>In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York.</u> Filed expert report February 13, 2020.

- Testifying Expert in <u>In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey.</u> Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert declaration in <u>Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York</u>. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert declaration in In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division. Filed declaration September 28, 2020.

- Testifying Expert in Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021.

- Testifying Expert in City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York. Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey. Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California. Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York. Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois. Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey.</u> Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in <u>In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York</u>. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in <u>Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022.

- Testifying Expert in <u>Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in <u>In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York</u>. Filed expert report on October 15, 2021.

- Testifying Expert in <u>Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division</u>. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in <u>In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division</u>. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in <u>David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey</u>. Filed expert report on November 1, 2021.

- Testifying expert in <u>In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York</u>. Filed expert report December 1, 2021.

- Expert declaration in <u>Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division</u>. Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in <u>Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut</u>. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert <u>In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York</u>. Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in <u>Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals</u>

International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey. Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York. Filed expert report July 15, 2022.

- Testifying Expert in BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.),  et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal. Filed expert report September 30, 2022.

- Testifying Expert in Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division. Filed expert report October 28, 2022. Deposition December 21, 2022.

- Testifying Expert in In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara. Filed expert report December 12, 2022.

- Testifying Expert in In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California. Filed expert report January 27, 2023.

- Testifying Expert in Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah. Filed expert report March 3, 2023.

- Testifying Expert in <u>Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland.</u> Filed expert report March 16, 2023.

- Testifying Expert in <u>Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee, and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division.</u> Filed expert report March 20, 2023.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division.</u> Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in <u>Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York</u>. Filed expert report May 29, 2018. Deposition July 24, 2018.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.


**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)


**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).


**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.


**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.

# Appendix C

| # | Case Name | Case Number | US District/Division | Date of Class Certification Decision |
|---|-----------|-------------|----------------------|--------------------------------------|
| 1 | Junge v. Geron Corp. | No. 3:20-cv-00547-WHA | Northern District of California, San Francisco Division | 04/02/22 |
| 2 | The Police Retirement System of St. Louis v. Granite Construction Incorporated | No. 3:19-cv-04744-WHA | Northern District of California | 01/21/21 |
| 3 | In re SanDisk LLC Securities Litigation | No. 3:15-cv-01455-VC | Northern District of California, San Francisco Division | 09/04/18 |
| 4 | In re Intuitive Surgical Securities Litigation | No. 5:13-cv-01920-EJD | Northern District of California | 12/22/16 |
| 5 | Hatamian v. Advanced Micro Devices, Inc. | No. 4:14-cv-00226-YGR | Northern District of California | 03/16/16 |
| 6 | In re Aphria, Inc. Securities Litigation | No. 1:18-cv-11376-GBD | Southern District of New York | 08/30/22 |
| 7 | In re Conduent Inc. Securities Litigation | No. 2:19-cv-08237-SDW | District of New Jersey | 02/28/22 |
| 8 | In re Pareteum Securities Litigation | No. 1:19-cv-09767-AKH-GWG | Southern District of New York | 01/21/22 |
| 9 | Holwill v. AbbVie Inc. | No. 1:18-cv-6790 | Northern District of Illinois | 09/23/21 |
| 10 | Utesch v. Lannett Company, Inc. | No 2:16-cv-05932-WB | Eastern District of Pennsylvania | 08/12/21 |
| 11 | In re Navient Corporation Securities Litigation | No. 1:17-cv-08373-RBK-AMD | District of New Jersey | 03/11/21 |
| 12 | Dougherty v. Esperion Therapeutics, Inc. | No. 2:16-cv-10089-AJT-RSW | Eastern District of Michigan | 11/19/20 |
| 13 | In re Perrigo Company PLC Securities Litigation | No. 1:19-cv-00070-DLC | Southern District of New York | 09/24/20 |
| 14 | Plymouth County Retirement System v. GTT Communications, Inc. | No. 1:19-cv-00982-CMH-MSN | Eastern District of Virginia, Alexandria Division | 09/10/20 |
| 15 | Keippel v. Health Insurance Innovations, Inc. | No. 8:19-CV-00421-WFJ-CPT | Middle District of Florida, Tampa Division | 08/28/20 |
| 16 | Cosby v. KPMG, LLP | No.: 3:16-CV-121-TAV-DCP | Eastern District of Tennessee, Knoxville Division | 06/29/20 |
| 17 | Public Employees' Retirement System of Mississippi v. Treehouse Foods, Inc. | No. 1:16-cv-10632 | Northern District of Illinois | 02/26/20 |
| 18 | Weiner v. Tivity Health, Inc. | No.: 3:17-cv-01469 | Middle District of Tennessee, Nashville Division | 01/29/20 |

# Appendix C

| # | Case Name | Case Number | US District/Division | Date of Class Certification Decision |
|---|-----------|-------------|----------------------|--------------------------------------|
| 19 | Levy v. Gutierrez | No. 1:14-cv-00443-JL | District of New Hampshire | 09/30/19 |
| 20 | Di Donato v. Insys Therapeutics | No. CV-16-00302-PHX-NVW | District of Arizona | 09/20/19 |
| 21 | Deora v. Nanthealth, Inc. | No. 2:17-CV-01825-BRO-MRW | Central District of California, Western Division | 07/30/19 |
| 22 | City of Sunrise General Employees' Retirement Plan v. FleetCor Technologies, Inc | No. 1:17-cv-02207-LMM | Northern District of Georgia, Atlanta Division | 07/17/19 |
| 23 | Milbeck v. TrueCar, Inc. | No. 2:18-cv-02612-SVW-AGR | Central District of California | 05/09/19 |
| 24 | In re EZCORP, Inc. Securities Litigation | No. 1:15-cv-00608-SS | Western District of Texas | 02/19/19 |
| 25 | Guevoura Fund Ltd. v. Sillerman | No. 1:15-cv-07192-CM No. 1:18-cv-09784-CM | Southern District of New York | 02/04/19 |
| 26 | Murphy v. Precision Castparts Corp. | No. 3:16-cv-00521 | District of Oregon, Portland Division | 06/27/18 |
| 27 | Washtenaw County Employees' Retirement System v. Walgreen Co. | No. 15-cv-3187 | Northern District of Illinois | 03/29/18 |
| 28 | Baker v. SeaWorld Entertainment, Inc. | No. 3:14-cv-02129-MMA-AGS | Southern District of California | 11/29/17 |
| 29 | KBC Asset Management NV v. 3D Systems Corporation | No. 0:15-cv-02393-MGL | District of South Carolina, Rock Hill Division | 09/28/17 |
| 30 | Howard v. Liquidity Services, Inc. | No. 1:14-cv-01183-BAH | District of Columbia | 09/06/17 |
| 31 | Gross v. GFI Group, Inc. | No. 1:14-cv-09438-WHP | Southern District of New York | 08/23/17 |
| 32 | Kasper v. AAC Holdings, Inc. | No. 3:15-cv-00923 | Middle District of Tennessee, Nashville Division | 07/14/17 |
| 33 | In re Virtus Investment Partners, Inc. Securites Litigation | No. 15-cv-1249-WHP | Southern District of New York | 05/15/17 |
| 34 | Beaver County Employees' Retirement Fund v. Tile Shop Holdings Inc. | No. 0:14-cv-00786-ADM-TNL | District of Minnesota | 07/28/16 |
| 35 | In re NII Holdings, Inc. Securities Litigation | No. 1:14-cv-00227-LMB-JFA | Eastern District of Virginia, Alexandria Division | 11/17/15 |