# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
Case No. 3:20-cv-04737-RS
- - - - - - - - - - - - - - - - - - - - - - - -x
SHEET METAL WORKERS' NATIONAL
PENSION FUND and INTERNATIONAL
BROTHERHOOD OF TEAMSTERS LOCAL
NO. 710 PENSION FUND, individually
and as Lead Plaintiffs on behalf of
all others similarly situated, and
INTERNATIONAL UNION OF OPERATING
ENGINEERS PENSION FUND OF EASTERN
PENNSYLVANIA AND DELAWARE, individually
and as Named Plaintiff, on behalf of
all others similarly situated,
                    Plaintiffs,
          -against-
BAYER AKTIENGESELLSCHAFT,
WERNER BAUMANN, WERNER WENNING,
LIAM CONDON, JOHANNES DIETSCH, and
WOLFGANG NICKL,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - -x
                         March 8, 2023
                         10:00 a.m.
     ***** HIGHLY CONFIDENTIAL *****
               Virtual Videotaped
Deposition of CRISTIAN ZARCU,
taken by Plaintiff, pursuant to Notice,
held remotely, before Sharon Pearce, RDR,
CRR, CRC, NYRCR, a Registered Diplomate
Reporter, Certified Realtime Reporter, and
Notary Public of the State of New York.

A P P E A R A N C E S:

     COHEN MILSTEIN SELLERS & TOLL PLLC
          Attorneys for Plaintiffs
          88 Pine Street
          14th Floor
          New York, New York 10005
     BY:  BENJAMIN JACKSON, ESQ.
          CAROL GILDEN, ESQ.


     WACHTELL LIPTON ROSEN & KATZ
          Attorneys for Defendants and
          The witness
          51 West 52nd Street
          New York, New York 10019
     BY:  NOAH B. YAVITZ, ESQ.
          EMILY BARRECA, ESQ.




 ALSO PRESENT:
     ADAM VENTURINI, Videographer
     CLINT THOMAS, Concierge
     JOSHUA MITTS

Page 3

ZARCU - HIGHLY CONFIDENTIAL

THE VIDEOGRAPHER: Okay. Good morning. We are going on the record at 10:00 a.m. Eastern Standard Time on March 8, 2023. Please note that this deposition is being conducted virtually.

This is Media Unit 1 of the video recorded deposition of Cristian Zarcu taken by counsel for plaintiff in the matter of Sheet Metal Workers National Pension Fund, et al., v. Bayer AG, et al., Case No. 3:20-cv-04737. This deposition is being conducted remotely using virtual technology.

My name is Adam Venturini representing Veritext New York, and I'm the videographer. The court reporter today is Sharon Pearce, also from Veritext.

I'm not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome.

Page 4

ZARCU - HIGHLY CONFIDENTIAL

If there are any objections to proceeding, please state them at the beginning.  Counsel and all present will be included on the stenographic record.

Will the court reporter please swear in the witness, and then counsel may proceed.

C R I S T I A N   Z A R C U,

having first been duly sworn by Sharon Pearce, the Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. JACKSON:

Q.    Good morning.  My name is Ben Jackson, and I represent the plaintiffs in this matter.

Could you please state your full name for the record.

A.    Good morning, Counsel.  My name is Cristian Zarcu.

Q.    And have you ever used a different name or an alias?

Page 5

ZARCU - HIGHLY CONFIDENTIAL

A.      I have not.

Q.      And you understand that you're providing testimony under oath today?

A.      I do.

Q.      And you understand that this means that you must give truthful testimony?

A.      Yes, I do.

Q.      And that means that you're giving testimony under penalty of perjury.

Do you understand that?

A.      I do.

Q.      And that also means that today you're giving your testimony just as if you were in court before a judge and a jury.

Do you understand that?

A.      Yes, I do.

Q.      Are there any medications or substances affecting your ability to understand and respond to questions truthfully today?

A.      No.

Q.      Is there any reason at all you

ZARCU - HIGHLY CONFIDENTIAL

can't testify truthfully and accurately today?

A.    No.

Q.    I'm just going to go over some ground rules.  Your counsel has probably gone over them with you before.  But I just want to make sure that this flows and works as efficiently as possible for everyone involved.

First, I will ask questions. You will provide responses.  And your counsel may provide objections.  And all of that will be recorded by the court reporter.

Do you understand?

A.    I do.

Q.    And you must give a verbal response to all of my questions rather than, say, a nod of the head or hand gestures.

Do you understand?

A.    Yes, I do.

Q.    I'd just ask that you wait until I finish my question, and then I will wait

ZARCU - HIGHLY CONFIDENTIAL

until you finish your answer before I move on to the next question.

Do you understand?

A.    I do.

Q.    Now, your counsel may object to my questions.  But unless you are instructed not to answer by your counsel, you still need to answer my questions.

Do you understand?

A.    I do.

Q.    We can take a break any time you want.  Just let me know.  My only request is that you answer whatever question is pending before we break.

Do you understand?

A.    I do.

Q.    And during the course of today's deposition, I'm going to use the term "ADRs" to refer to the American depositary shares underlying American Depositary Receipts.

Is that agreeable to you?

A.    Yes.

Q.    Okay.  Where are you physically

Page 8

ZARCU - HIGHLY CONFIDENTIAL
located today?

A.    I am in Rancho Santa Fe,
California.

Q.    Okay.  And is anyone in the room
with you?

A.    No.

Q.    If anyone joins you in the room
and they're not on camera, will you please
let us know?

A.    I will.

Q.    We're conducting today's
deposition via Zoom.  If you have any
technical difficulties, for example,
hearing or seeing others in the
deposition, will you tell us so that we
can address them?

A.    Certainly.

Q.    Okay.  I may show you some
documents on the screen.  If you have any
difficulty seeing or understanding those
documents, will you tell me so that we can
make things clearer for you?

A.    Yes, I will.

Q.    Do you have any papers or other

Page 9

ZARCU - HIGHLY CONFIDENTIAL
materials on your desk that we can't see on the screen?

A.    Just a box of tissues.

Q.    Okay.  That's fine.

Anything else besides that box of tissues?

A.    No.  I mean, my desk is very white, so there's a bunch of documents up stacked on the shelves to my left, but nothing in my immediate reach, if you will.

Q.    Okay.  Is it -- that's fine.

And you understand that during the deposition, while we're on the record, you are not to communicate with anyone -- well, actually -- strike that.

You understand that you are not to communicate with anyone during your deposition other than via this Zoom audio and video line, including via text message, email, or otherwise; correct?

A.    What about during breaks, if I go out and my wife is home?

Q.    Well, we would ask that you --

ZARCU - HIGHLY CONFIDENTIAL

if you speak to your wife, you not talk to her about the substance of your testimony, please.

A.    Yeah.  My wife has nothing to do with this.  Yes.  Absolutely.

Q.    Great.

And you understand that during this deposition, you're not to consult any sources of information, such as the internet or text messages or email unless I specifically direct you to do so; right?

A.    I do, yes.

Q.    Okay.  Is your phone currently turned off?

A.    It is on mute.  Should I turn it all the way off?

Q.    I think that would be good if you turned it off while we are on the record.

A.    Okay.

Q.    Please let me know when it's turned off.

A.    It is off now.

Q.    Great.

ZARCU - HIGHLY CONFIDENTIAL

A.    I will put it in my pocket, though.

Q.    That's fine.

And do you have any other communication devices in front of you and turned on other than the computer you're using to conduct the Zoom conference?

A.    I do not.

Q.    Okay.  And you understand that any communication devices aside from the computer I just referred to must be kept off while you're giving testimony; correct?

A.    Correct.

Q.    All right.  Great.

On what topics do you consider yourself to be an expert?

A.    I consider myself to be an expert on matters related to trading from the actual trading of securities of various kind, different asset classes and all the systems, regulations, and any processes or I guess regulations attached to those -- to that trading.

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.   Any other topics on which you consider yourself to be an expert?

A.    Again, anything related to trading.

Q.    Okay.

A.    That's a pretty broad definition there.

Q.    Do you consider yourself to be an expert on determining where legal liability attaches to financial transactions?

A.    I am not a legal expert, no.

Q.    Do you consider yourself to be an expert on determining where in the world a financial transaction takes place?

A.    As related to trading, yes.

Q.    Okay.   And what is the basis for that expertise?

A.    My experience of almost 30 years of trading.

Q.    Okay.   Are you familiar with the legal term "liability"?

A.    Generally, yes.

Q.    What does it mean?

ZARCU - HIGHLY CONFIDENTIAL

A.      Just --

MR. YAVITZ:  Object to the form of the question.  You can answer.

A.      When somebody becomes obligated to a specific action.

Q.      Okay.  Do you know how to determine where liability attaches to a financial transaction?

A.      Would you mind clarifying that question?  I'm not sure what you mean.

Q.      Sure.  How do you determine where liability attaches to a financial transaction?

A.      Where as in physical location?

Q.      Yes.

A.      Yes.  In accordance to my experience in trading, yes, I do.

Q.      Okay.  And what methodology do you use to determine where liability attaches to a financial transaction?

A.      Just reviewing the information relating to the trading, the instructions given, confirmations -- there's a variety of information that goes into that

ZARCU - HIGHLY CONFIDENTIAL
decision.

Q.    And once you have that information, what do you do with it to determine where the transaction takes place?

A.    Once I get sufficient information, that gives me the ability to determine where the trade took place.

Q.    Okay.  And then I understand that you have the ability to determine where the trade takes place.  But how specifically, mechanically, do you determine where the trade took place?

A.    As I mentioned earlier, analyzing the information related to the trade from communications to orders being transmitted electronically which contain a variety of information related to that trade to possibly confirmations received from -- from the broker by the clients. There's a variety of information.  So based on all that, I determine where the trade took place.

Q.    Okay.  Are you familiar with the

ZARCU - HIGHLY CONFIDENTIAL

legal term "irrevocable"?

A.    I am familiar with the term irrevocable, yes.

Q.    What do you understand it to mean?

MR. YAVITZ:  Objection.  Calls for a legal opinion.

A.    My understanding of "irrevocable" is that it can't be changed.

Q.    Okay.  Are you familiar with the legal term "consideration"?

A.    As a general matter, I guess, yes.

Q.    Okay.  What do you understand the legal term "consideration" to mean?

MR. YAVITZ:  Same objection.

A.    By itself, the word doesn't tell me much.  I mean, it depends what else is attached to it.

Q.    Okay.  Well, let me ask you a question using that phrase.

What consideration is provided when a purchaser acquires ADRs?

MR. YAVITZ:  Objection to the

Page 16

ZARCU - HIGHLY CONFIDENTIAL
form of the question.

A.    I would like clarification of what you mean there.  I'm not sure exactly what that means in the context of this testimony.

Q.    Okay.  We can cover that later today.

When do you consider an order to buy ADRs to be fully executed?

A.    To be fully executed?  When it's fully executed, if that's what you're asking?

Q.    Yes.  Yes.  What is your understanding of what fully executed means?

A.    Well, to me, the word "fully" kind of means fully, complete, so --

Q.    So what -- so what is the stage of an ADR transaction at which you would consider it to be fully executed?

MR. YAVITZ:  Objection. Incomplete hypothetical.

A.    Whenever the client completes it to be -- considers it to be complete

ZARCU - HIGHLY CONFIDENTIAL

when -- or when my full order has been executed.

Q.    Okay.  Moving on to a different topic.

You have been engaged by the defendants to serve as one of their expert witnesses in this case; correct?

A.    Yes.

Q.    When did the defendants engage you as one of their expert witnesses?

A.    I believe it was at the beginning of November or October.  I forget.  At the end of October.  One of the two.

Q.    And that was in 2022?

A.    Yes.  That's correct.

Q.    Okay.  Do you have a written engagement agreement with the defendants in this case?

A.    My engage -- my agreement is with a company called Eleven Canterbury. I'm not sure if there's a direct agreement with -- with Wachtell in this case.

Q.    Okay.  So you have a contract

ZARCU - HIGHLY CONFIDENTIAL

with Eleven Canterbury, and Eleven Canterbury may have a contract with Wachtell; is that correct?

A.    Yes.

Q.    Okay.

A.    Fair.

Q.    What is your hourly rate at which you're being compensated for your report and testimony in this matter?

A.    The hourly is 1,050, which is inclusive of Eleven Canterbury's fee.

Q.    Okay.  And what is Eleven Canterbury's fee?

A.    It's a percentage of the -- of the fee.

Q.    Do you know what percentage that is?

A.    Not off the top of my head right now.

Q.    Okay.  Is it correct that your compensation in this matter is not contingent on the outcome of the litigation?

A.    That is correct.

Page 19

ZARCU - HIGHLY CONFIDENTIAL

Q.      Are you receiving any compensation in connection with this case other than compensation you're receiving for your hourly rate for your report and testimony?

A.      No, I am not.

Q.      Okay.  Are you currently engaged as an expert witness in any other matters?

A.      I'm engaged in one more matter, yes.

Q.      And what matter is that?

A.      That is related to a regulation called Consolidated Audit Trail.

Q.      Okay.  So that's not a securities class action?

A.      No, it is not.

Q.      Okay.  And how many cases have you previously served as an expert witness?

A.      Probably about seven or eight or maybe nine at this point.

Q.      Were any of those cases federal securities class actions?

A.      I'm not sure if they were

ZARCU - HIGHLY CONFIDENTIAL

federal securities class actions.  I mean, I was engaged in the Toshiba securities case, but I don't know if it was federal or not.

Q.    Okay.  Other than the Toshiba case, have you ever served as an expert witness in a securities case?

A.    I have served in -- I mean, all the cases that I'm involved in involve some kind of a trading of securities.  But I'm not sure if you mean that in a legal way or --

Q.    Well, let me -- let me try to put a finer point on the question.

Have you ever served as an expert witness in a securities fraud class action other than the Toshiba case?

A.    I think, by that definition, no.

Q.    Okay.  Other than the -- did the Toshiba case concern ADRs?

A.    Yes, it did.

Q.    Okay.  Other than the Toshiba case, have you ever served as an expert witness in a case involving ADRs?

ZARCU - HIGHLY CONFIDENTIAL

A.    No.

Q.    Okay.  And have you ever served as an expert for a plaintiff in a securities fraud case?

A.    Yes, I have.

Q.    And what case was that?

A.    That's the other case that I just mentioned earlier, Consolidated Audit Trail.

Q.    I thought you said that that was not a securities fraud case.  Is that case a securities fraud case?

A.    Oh, I'm sorry.  I missed the securities fraud part.  I thought you were referring to generally.

Q.    Okay.  That's fine.

So just to clarify, you've only ever, when serving as an expert witness in securities fraud cases, testified on behalf of defendants; is that correct?

A.    Yes.

Q.    Okay.  And are there any court rulings that you're aware of that precluded or limited your expert

Page 22

ZARCU - HIGHLY CONFIDENTIAL

testimony?

A.    There are not.

Q.    Okay.  And -- okay.

Have you been deposed before?

A.    Yes, I have.

Q.    And were you deposed in the Toshiba litigation?

A.    Yes, I was.

Q.    Okay.  And because you've never served as an expert witness in a securities fraud case aside from Toshiba, you've never, aside from the Toshiba case, been deposed in a securities fraud case; is that correct?

A.    Not in a securities fraud case, no.

Q.    Okay.  Have you ever been convicted of a crime?

A.    No.

Q.    Have you ever been personally named as a party in a lawsuit?

A.    No.

Q.    Okay.  Did you meet with anyone to prepare for today's deposition?

Page 23

ZARCU - HIGHLY CONFIDENTIAL

A.    Did I meet with anyone?  I had a couple of Zoom calls with counsel.

Q.    And by counsel, are you referring to Mr. Yavitz and Ms. Barreca?

A.    Correct.

Q.    Did you meet with anybody else besides Mr. Yavitz and Ms. Barreca to prepare for today's deposition?

A.    No.

Q.    Okay.  When did you meet with Mr. Yavitz and Ms. Barreca to prepare for today's deposition?

A.    I met with them yesterday and Friday, I want to say.

Q.    Any other times?

A.    No, not to prepare for this, no.

Q.    About how long did you spend preparing for today's deposition?

A.    With counsel or in general?

Q.    Well, let's start with with counsel.

A.    Probably three, four hours on each occasion.

Q.    Okay.  And how long did you

Page 24

ZARCU - HIGHLY CONFIDENTIAL

spend preparing for today's deposition aside from your meetings with counsel?

A.    I spent a significant amount of time, probably 20, 30 hours, maybe more.

Q.    What exactly did you do to prepare for today's deposition besides meeting with counsel?

A.    Just review the general materials in the case, you know, self-preparation.

Q.    Did you review any documents in the course of preparing for today's deposition?

A.    Yes.  I did look at the documents, yes.

Q.    And you looked at the documents that are cited in your expert report?

A.    Yes.

Q.    Did you look at any other documents?

A.    I glanced at documents possibly, other documents in the case.

Q.    Okay.  Did you review the transcript of the deposition of any other

Page 25

ZARCU - HIGHLY CONFIDENTIAL

witness in this case?

A.    I did review Professor Mitts'
deposition.

Q.    Did you review any other
deposition transcript?

A.    I don't think so at this point.

Q.    Did you review the deposition
transcript from your deposition in the
Toshiba case when you were preparing for
today's deposition?

A.    I did not.

Q.    Okay.  Did you speak with anyone
besides Mr. Yavitz and Ms. Barreca about
the substance of the testimony you plan to
give today?

A.    No.

Q.    Okay.  Did you take any notes
when you were preparing for today's
deposition?

A.    Did I take any notes when I was
preparing for the deposition?

Q.    Yes.

A.    Possible.  I always jot things
down.

Page 26

ZARCU - HIGHLY CONFIDENTIAL

Q. Okay. But you don't -- you're not aware of any prepared notes that you took to help you prepare for today?

MR. YAVITZ: Object to the form of the question.

Q. Yeah. Let me withdraw that and ask again.

You don't have a document consisting of your notes to assist you with testifying today?

A. No, I don't.

Q. Okay. Do you personally invest in securities?

A. Yes, I do.

Q. Have you invested in Bayer?

A. Over my lifetime as an investor, it's possible. I don't remember.

Q. Okay. Are you currently invested in Bayer ADRs?

A. No.

Q. Are you currently invested in Bayer common stock?

A. No.

Q. Have you traded ADRs before?

Page 27

ZARCU - HIGHLY CONFIDENTIAL

A.    Yes, I have.

Q.    When was the last time you traded an ADR?

A.    Today.

Q.    Okay.  All right.  So I'm going to mark as our first exhibit -- and, of course, the main exhibit for today -- a copy of your expert report in this matter.

(Zarcu Exhibit 1, Rebuttal Report of Cristian Zarcu dated February 3, 2023, was hereby marked for identification, as of this date.)

Q.    So if you refresh your Exhibit Share, it should show up there momentarily.

A.    I have a question.  Is it okay if I have an open copy of my own report on my own desktop?

Q.    That's fine.

A.    Okay.  But just so you know, my folder is still empty.

Q.    It's taking a while to load.  It's a large --

A.    But I have it, again.  I just

ZARCU - HIGHLY CONFIDENTIAL

wanted to let you know that.

Q.   It's taking quite a while to load, so I'm just going to wait until it's formally introduced, and --

A.   Okay.

Q.   Well, let me try doing this again, and I'll see if this works.

A.   Sure.

Q.   All right.  Now it should be loaded.

A.   I see it now.  Yes.

Q.   Great.  Mr. Zarcu, is this report a complete statement of your opinions in this case?

A.   Yes, it is.

Q.   And does the report present all of the bases and reasons for the opinions presented in it?

A.   Yes, it does.

Q.   Does the report disclose all the facts and data you relied on in forming your opinions?

A.   Yes, it does.

Q.   And since you issued this

ZARCU - HIGHLY CONFIDENTIAL

report, have you identified any errors in it?

A.    I have not.

Q.    Is there anything in your report that requires correction or amendment or modification?

A.    I do not believe so.

Q.    Are there any statements in your report that you have otherwise concluded are not entirely accurate?

A.    No.

Q.    Have you done any additional work with respect to the opinions in your report since you issued it?

A.    I received a few -- I guess a couple of productions of documentation.

Q.    And you reviewed those.

Okay.  So you reviewed the -- a few productions that came in after you issued your report; correct?

A.    Correct.

Q.    And following your review of those productions, you determined that it was not necessary to change anything in

Page 30

ZARCU - HIGHLY CONFIDENTIAL

your report; is that correct?

A.    Correct.

Q.    Okay.  How much time did you spend preparing your report?

A.    Oh, I spent a lot of time. Hundreds of hours.

Q.    Hundreds of hours.  Okay.

And other than you, did anyone provide edits to your report in this matter?

A.    No.

Q.    Did anyone instruct you to make any changes to your report?

A.    No.

Q.    Is there anyone you communicated with other than counsel in preparing your report?

A.    No.

Q.    What materials did you review in preparing your report?

A.    I reviewed the materials presented in the case.  I reviewed Doctor -- or Professor Mitts' report, as I mentioned earlier, his deposition, and all

ZARCU - HIGHLY CONFIDENTIAL
the documentations that were provided to
me.

Q.    Did you prepare the list of
documents that are listed in Appendix B to
your report?

A.    I did.

Q.    And you reference discovery
materials in your report.

Did you request that defendants'
counsel provide you with those specific
discovery materials?

A.    Defendants' counsel provided me
with all the materials in the case is my
understanding, and I've requested others
as I conducted my analysis.

Q.    And what other materials beyond
those that were produced in this case did
you request from counsel?

A.    Well, I requested new
material -- more materials versus what I
originally received, and those are
specifically related to communications and
trading records from some of the parties
involved.

ZARCU - HIGHLY CONFIDENTIAL

Q.    And are there any materials that you requested that you were not provided with?

A.    Yes.  I would have liked to see communications on a complete -- on a complete basis for all of these transactions.  Some of them were not available is my understanding.

Q.    Are there any materials you reviewed when preparing your report that you chose not to rely on?

A.    There was a lot of information that was not necessarily relevant or -- in forming my opinions.

Q.    Okay.  Who selected the documents that you reviewed in the course of forming your opinions?

A.    I selected the documents.

Q.    And you reference some case law in your report; correct?

A.    I'm not sure what you're referring to.

Q.    Well, you referenced a judicial decision in your case report, in your

ZARCU - HIGHLY CONFIDENTIAL

expert report; is that correct?

A.    Yes.

Q.    Okay.  Did you participate in selecting which case law would be included in your expert report?

A.    That I participated, I selected it.

Q.    Okay.  So how did you become aware of the case law that was cited in your expert report?

A.    This was related to a case that I was involved in before, the Toshiba case.

Q.    Okay.  Are you offering any opinion as to the applicability of case law to the issues that are presented in this case?

A.    I am not aware, so I'm not offering any legal opinions, no.

Q.    Okay.  Let's go to paragraph 35 of your report.

Now, there, you write, "Professor Mitts separately opines that the transaction described above and those

Page 34

ZARCU - HIGHLY CONFIDENTIAL

described below are distinguishable from that at issue in Stoyas v. Toshiba Corp," and then there's a case cite.  And then the next sentence says, "I authored the report on this subject that was credited by the Court in that proceeding."

Do you see that?

A.    Yes, I do.

Q.    And you then continue, "Just as in the Toshiba litigation, irrevocable liability to take and pay for the Bayer ADRs was incurred the moment Macquarie acquired Bayer ordinary shares on behalf of plaintiffs."

Do you see that?

A.    Yes, I do.

Q.    Now, your report in the Toshiba case in fact did not address the issue of where irrevocable liability attaches to a financial transaction; correct?

A.    Again, I don't know what you mean by it attaches to a financial traction.

Q.    Well, your report in the Toshiba

Page 35

ZARCU - HIGHLY CONFIDENTIAL

case didn't address the issue of

irrevocable liability; correct?

MR. YAVITZ:  Objection to the
form of the question.

A.    I believe it did.

Q.    Oh, it did?  Well, let's take a
look at that report.

MR. JACKSON:  I'm going to
introduce as our Exhibit 2 Mr. Zarcu's
expert report from the Toshiba case.

(Zarcu Exhibit 2, Declaration of
Cristian Zarcu dated May 19, 2021, was
hereby marked for identification, as
of this date.)

Q.    And Mr. Zarcu, please let me
know when you have that loaded.

A.    I have it now.  I'm just going
to open it.

Q.    All right.  Mr. Zarcu, do you
recognize this document?

A.    It's not loaded yet.  I'm sorry.
It's just going to --

Q.    That's fine.

A.    -- the little circle going

ZARCU - HIGHLY CONFIDENTIAL around. It says file preview. It says it may take a while. So I'll let you know when it's up.

Okay. I have it now.

Q. Okay. Great. Do you recognize this document?

A. This says Zarcu Toshiba report. And if I can glance at it real quick, yes, it looks to be my report in the Toshiba case, yes.

Q. And this is a true and correct copy of that report?

A. I mean, I have no way of knowing that. I'm going to have to assume that it is.

Q. Okay. As best you can tell, this is a true and correct copy of your expert report from the Toshiba case; correct?

A. It appears that way.

Q. Okay. Let's go to page 2. And let's look at the introduction. There, you write, "I have been retained by Toshiba Corporation in connection with the

ZARCU - HIGHLY CONFIDENTIAL

above-captioned matter to provide testimony based on my experience as a securities trader that will assist the Court in understanding the process, documents, and terminology involved with the Toshiba order placed by ClearBridge on behalf of plaintiff AIPTF on March 20, 2015."

Do you see that?

A.    I do.

Q.    Okay.  Now let's go to page 4. And let's look at where it says "Assignment."  There, you wrote, "I have been asked to apply my years of experience managing trading desks for securities transactions, including trading of American Depositary Receipts ('ADRs'), to analyze the process, documents, and terminology involved with the order for Toshiba shares placed by ClearBridge on behalf of plaintiff AIPTF on March 20, 2105."

Do you see that?

A.    Yes, I do.

Page 38

ZARCU - HIGHLY CONFIDENTIAL

Q.    So in the Toshiba case, you were not asked to opine on where the plaintiff incurred irrevocable liability to purchase Toshiba ADRs; correct?

A.    I'm pretty sure I talked about irrevocable liability in that report.

Q.    Well, does the word "irrevocable" appear in this expert report?

A.    I believe it does.  I -- that's what I --

Q.    I'll represent to you that I have term searched this report, and the word "irrevocable" does not appear in it.

Is that surprising to you?

A.    Not necessarily.  To me, irrevocable liability just refers to when the client was committed and obligated to pay for this -- for the ADRs.

Q.    Okay.  Do you know that the word "irrevocable" doesn't appear in this expert report?

A.    I do not know that, no.

Q.    Did you know that the word

ZARCU - HIGHLY CONFIDENTIAL

"liability" doesn't appear in this expert report?

A.    I -- I don't remember.

Q.    Did you know that the word "liable" doesn't appear in this expert report?

A.    Again, I don't recall the words in the report.

Q.    Okay.  So you sat for a deposition in the Toshiba case; correct?

A.    I did.

Q.    And I'm going to introduce as our next exhibit the -- as Exhibit 3 the transcript of your deposition from the Toshiba case.  So give that a moment. This one might take a moment to load because it's a fairly lengthy exhibit. Please let me know when you have that loaded.

A.    Sure.

    (Zarcu Exhibit 3, Deposition transcript dated July 23, 2021, was hereby marked for identification, as of this date.)

Page 40

ZARCU - HIGHLY CONFIDENTIAL

A.     I have it, actually.

Q.     Okay.  Great.

A.     I'm just going to open it.
Let's see how long that takes.  So --

Q.     All right.  Please let me know
when you have it loaded up.

A.     Yes.  It's still generating the
file preview, but I will let you know.

Q.     Well, why don't I share my
screen to move things along.  And then
when you have the document loaded, you can
let me know.

A.     Sounds good.

Q.     Okay.  Now, you testified under
oath at your deposition in the Toshiba
case; correct?

A.     Yes, I did.

Q.     And you gave your testimony
under penalty of perjury; correct?

A.     That is correct.

Q.     And you provided truthful
testimony at that deposition; correct?

A.     Correct.

Q.     All right.  Let's go to page 94

ZARCU - HIGHLY CONFIDENTIAL

of the transcript in the Toshiba case. And specifically, I'm going to go to lines 7 through 12.

There, there is a question and an answer that read as follows:

"QUESTION:  Are you offering an opinion in this report about where ClearBridge became liable to effectuate the transaction for the ADRs?

"ANSWER:  No."

That was your testimony in the Toshiba case; correct?

A.    It appears to be that way, yes.

Q.    Okay.  Now let's go to page 258 of this transcript.  And we're going to go to lines 20 there through the following page, page 259, line 13.

A.    Would you mind -- can you zoom in?  It's very hard for me to read.

Q.    Sure.  I will try to zoom in. Let's see if this will make things easier.

A.    Thank you.

Q.    There we go.

Page 42

ZARCU - HIGHLY CONFIDENTIAL

"QUESTION:  Is it your opinion that ClearBridge became irrevocably liable to purchase the 36,000 ADRs in Japan and not the United States?

"ANSWER:  I don't know the meaning of that term.

"QUESTION:  That term, irrevocably liable, it doesn't appear anywhere in your report; correct?

"ANSWER:  I don't believe so.

"QUESTION:  That's not an opinion -- you're not giving an opinion today regarding the irrevocable liability, are you?

"ANSWER:  I am not.

"QUESTION:  There's no opinion regarding irrevocable liability being offered in your report; correct?

"ANSWER:  I don't believe so, no."

Q.    Do you see that, Mr. Zarcu?

A.    Yes, I do.

Q.    Okay.  So I'm going to stop the screen share now.

ZARCU - HIGHLY CONFIDENTIAL

A.    I finally have the deposition on my file here.

Q.    Great.  And as far as you can tell, is this a true and correct copy of the deposition transcript from your deposition in the Toshiba case?

A.    It appears to be that way, yes.

Q.    Okay.  Now, in the Toshiba case, you did not opine on where the plaintiff incurred irrevocable liability to purchase Toshiba ADRs; correct?

MR. YAVITZ:  Objection to the form of the question.

A.    It appears that way.

Q.    In fact, at the time of your deposition in the Toshiba case, you didn't even know the meaning of the term "irrevocably liable"; correct?

A.    It appears that way, yes.

Q.    Okay.  Now, you were deposed in Toshiba on Friday, July 23, 2021; correct?

A.    That sounds about right, yes.

Q.    And that was about one year, seven and a half months ago; correct?

Page 44

ZARCU - HIGHLY CONFIDENTIAL

A.    Yes.

Q.    So as recently as one year, seven and a half months ago, you didn't even know the meaning of the term "irrevocable liability"; correct?

A.    Again, it appears that way.

Q.    And sitting here today, less than two years later, you claim to be an expert in determining where irrevocable liability attaches to an ADR purchase; is that correct?

MR. YAVITZ:  I object to the form of that question.

A.    No.  That's not what I claim. What I claim is that I can tell where a transaction occurred based on the information provided to me.

Q.    Okay.  And I have one other question about your deposition transcript in the Toshiba case.  It relates to page 169.  I will, for the sake of time, just share my screen again.

A.    Okay.

Q.    Now, here, on page 169, line 25,

Page 45

ZARCU - HIGHLY CONFIDENTIAL

through page 170, line 2, you said, "A client can cancel an order before it's been executed.  Not once it becomes executed."

Do you see that?

A.    Yes.

Q.    Now, is there anything inaccurate about the testimony that you gave there?

A.    I don't believe so.

Q.    Okay.  Great.

All right.  Let's go back to your report in this case, which has been marked previously as Exhibit 1.  And let's go to page 5, the summary of your opinions.

A.    Page 5?

Q.    I'm sorry.  I'm sorry.  I meant the Toshiba -- your expert report in the Toshiba case, which is Exhibit 2, page 5.

So I just have a question about the first paragraph here under "Summary of Opinions," which says, "Based on my professional experience, my review of the

ZARCU - HIGHLY CONFIDENTIAL documents and data listed in Exhibit B, AIPTF acquired its ownership interest in Toshiba by purchasing 216,000 shares of 6502 common stock in Japan, when Barclays Japan acquired the Toshiba shares in Japan based on the order placed by ClearBridge on AIPTF's behalf.  No part of this purchase took place using the facilities of the OTC Market in the United States."

Do you see that?

A.    Yes.

Q.    Your opinion concerned how AIPTF, the plaintiff in that case, acquired its "ownership interest in Toshiba."

Why did you use the phrase "ownership interest in Toshiba"?

A.    I don't recall the exact reasoning behind it, but they -- it seems that that's what an AER certificate conversed them, an ownership interest in a foreign company.

Q.    Okay.  And here, you used the phrase "the OTC Market" with both "OTC"

ZARCU - HIGHLY CONFIDENTIAL

and "Market" capitalized.

Does that term refer to the company "OTC Market"?

A.    It is possible, yes.

Q.    Okay.  So your opinion was that no part of the plaintiff's purchase in the Toshiba case took place using the facilities of the company OTC Market; correct?

A.    Yeah.  It was part of one of the claims in the case.

Q.    Okay.  So you did not opine that no part of the plaintiff's purchase took place on a U.S. over-the-counter market; correct?

A.    Actually, I did.  None of it took place in the U.S.

Q.    Okay.  Interesting.

So let's go to page 26 of this report, the very end.  The very last line in your report is "I declare under the penalty of perjury that the foregoing is true and correct."

Do you see that?

ZARCU - HIGHLY CONFIDENTIAL

A.    Hang on.  I'm sorry.  I'm not there.  What page again?

Q.    26.

A.    Yes, I see that.

Q.    Okay.  And let's go now to page 5 of the report.

A.    We're still in the Toshiba report?

Q.    Still in the Toshiba report.

A.    Okay.

Q.    And let's look at Section I there and the second sentence.  You wrote, "When U.S. investors are looking to trade in the stock of foreign companies, they most typically have two options:  1) trade on foreign exchanges where the shares of foreign companies are listed or 2) trade in the U.S. markets via ADRs."

Do you see that?

A.    Yes.

Q.    So as you declared under penalty of perjury in the Toshiba case, ADRs trade in the U.S. markets; correct?

MR. YAVITZ:  I object to the

ZARCU - HIGHLY CONFIDENTIAL

form of the question.

Mischaracterizes the document.

Q.    Okay.  Well, let me -- let me quote from the document, because I don't think I'm mischaracterizing it.

Here, you wrote, "ADRs trade in the U.S. markets"; correct?

A.    Yes.

Q.    Okay.  Is anything about that statement that you made under penalty of perjury inaccurate?

A.    ADRs do trade in the U.S.

Q.    So ADR purchases are made in the U.S. market; correct?

MR. YAVITZ:  Object to the form of the question.

A.    They could be, yes.

Q.    Okay.  Now let's go to the bottom of page 5.  Here, you wrote, in the second-to-last sentence on the page, "ADRs are designed to provide investors with an alternative to direct ownership of a company's common stock through separate and distinct instruments that can be

ZARCU - HIGHLY CONFIDENTIAL

traded on U.S. markets."

Do you see that?

A.    Hold on a second.  I'm sorry.
Where are you?

Q.    The second-to-last sentence on
page 5 in the Toshiba report.

A.    Yes, I see it now.  So let me
just glance at it real quick.

Q.    Sure.

A.    I see it.

Q.    Okay.  So as you declared under
penalty of perjury in the Toshiba case,
ADRs are separate and distinct instruments
from a foreign company's common stock;
correct?

A.    That's what it says in there,
yes.

Q.    And is there anything about that
statement that's inaccurate?

A.    I don't think so.

Q.    And as you declared under
penalty of perjury in the Toshiba case,
the purpose of ADRs is to provide
investors with an alternative to a

ZARCU - HIGHLY CONFIDENTIAL

company's common stock through a separate and distinct security that trades in the United States; is that correct?

MR. YAVITZ:  Object to the form of the question.  Are you reading from the report?

MR. JACKSON:  No.  I'm asking him the question.

A.    It says it can be traded in the United States.

Q.    Okay.  So let me ask the question again.

The purpose of ADRs is to provide investors with an alternative to a company's common stock through a separate and distinct security that trades in the United States; correct?

MR. YAVITZ:  Objection to form.

A.    They can be traded in the United States, Counsel.

Q.    Are you aware of any ADRs that trade outside the United States?

A.    An ADR can be created and doesn't need to trade in the United States

ZARCU - HIGHLY CONFIDENTIAL

to actually be acquired.

Q.   Sitting here today, can you name a single company that has an ADR that trades outside the United States?

A.   As I mentioned, it doesn't have to be traded outside the United States. It doesn't have to be traded in the United States.  It can be acquired in the United States by the purchase of local shares, followed by the creation of ADRs.

Q.   Are you aware of a single company that has created an American Depositary Receipt that trades outside the United States?

A.   No.

Q.   Let's go to page 6 of this report.  It says here at the top of the page, "ADRs are designed to provide investors with an alternative to direct ownership of a company's common stock through separate and" -- oh, I'm sorry. Let me -- let me -- I'm reading the wrong sentence.  Let me strike that.

The top of page 6, it says,

Page 53

ZARCU - HIGHLY CONFIDENTIAL

"ADRs offer U.S. investors looking for a relatively easy way to diversify their portfolio with international investments a hassle-free way to purchase shares of international companies without having to deal with foreign markets."

Do you see that?

A.    Yes, I do.

Q.    So as you declared under penalty of perjury in the Toshiba case, ADRs are sold to, quote, U.S. investors, end quote; correct?

A.    I'm declaring that they can acquire -- they can diversify their portfolio by acquiring ADRs, yes.

Q.    Okay.  And the U.S. investors who buy ADRs do not have to, quote, deal with foreign markets; correct?

A.    That's what I'm stating there, yes.

Q.    All right.  Let's go to page 8 of your report here.  And let's look at the fifth line on the page towards the right.  You write, "A broker may check the

ZARCU - HIGHLY CONFIDENTIAL

volume of ADRs traded in the

United States."

Do you see that?

A.     I am not quite there yet.  But

let me see.   I see it, yes.

Q.     Okay.  And so as you state here,

ADRs trade in the United States; correct?

MR. YAVITZ:  Object to the form

of the question.  Are you asking all

ADRs?  Are you asking generically?

Are you asking for the basic

proposition of whether ADRs can trade

in the United States?  The question is

completely ambiguous.

MR. JACKSON:  Your objection is

noted.  I'm going to re-ask the

question.

Q.     As you state here, ADRs trade in

the United States; correct?

A.     They are -- ADRs trade in the

United States, yes, that is correct.

Q.     And that means that ADRs are, as

a general matter, bought and sold

domestically; correct?

Page 55

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Object to the form of the question.

A.    Not necessarily.  They can be created and cancelled, not traded.

Q.    Okay.  Well, we'll go on to talk about the creation process a little bit later.

Let's set aside your Toshiba report for now, and let's go back to the Bayer report, which has previously been marked as Exhibit 1.

A.    Okay.

Q.    Paragraphs 15 and 16 summarize your opinions in this case; is that correct?

A.    Yes, they do.

Q.    And are those all your opinions and conclusions -- well, strike that.

Is that a summary of all of your opinions and conclusions in this case?

A.    Yes, it is.

Q.    Are you opining on any other matters at this stage in the litigation?

A.    No.

Page 56

ZARCU - HIGHLY CONFIDENTIAL

Q.     Will you be expressing any other opinions at a class certification hearing if you are called to testify?

A.     These are my opinions for the case.

Q.     Okay.  Have you been asked to opine on any matters in this case other than these two matters?

A.     No.  These are the two matters that I've been asked to opine.

Q.     And did you undertake any analysis in this case beyond the tasks reflected in your expert report?

A.     I am not sure exactly what you mean by that.  I mean, I've performed analysis that seemed relevant to me regarding the transactions at hand.

Q.     Let me try it a different way.

Is -- does your report reference all of the analyses that you conducted in forming your opinions?

MR. YAVITZ:  Objection.  Form.

A.     I believe so.

Q.     Okay.  Let's look at

Page 57

ZARCU - HIGHLY CONFIDENTIAL

paragraph 15.

You have -- is it fair to say that you've reached the conclusion that there is insufficient evidence to conclude that the plaintiffs incurred irrevocable liability to take and pay for any of their Bayer ADR purchases in the United States?

A. That is what I'm saying, yes.

Q. Okay. Now, Bayer ADRs are securities; correct?

A. Yes.

Q. And Bayer ordinary shares are also securities; correct?

A. Correct.

Q. Bayer ADRs and ordinary shares are different securities; correct?

A. They are.

Q. Bayer ADRs are issued by the Bank of New York Mellon; correct?

A. Correct.

Q. And Bayer ordinary shares are issued by Bayer; correct?

A. Seems that way, yes.

Q. Bank of New York Mellon is based

ZARCU - HIGHLY CONFIDENTIAL

in New York; correct?

A.    Based -- I mean, they're -- they have offices in New York.  But they have offices in other locations as well.

Q.    Sure.  But I'm asking where they're based.  So Bank of New York Mellon is based in New York; correct?

A.    I am not sure if that's where their headquarters are.

Q.    Okay.  When Bank of New York Mellon issues ADRs, it does so in New York; correct?

A.    I am not aware of the physical location of where they issue the ADRs from.

Q.    You formed an opinion in this case about where the plaintiffs incurred irrevocable liability to acquire ADRs without considering where Bank of New York Mellon issues its Bayer ADRs?

A.    You're asking me to pinpoint the location to New York.  I had not done that.

Q.    No.  What I'm asking you is did

ZARCU - HIGHLY CONFIDENTIAL

you consider the location of where Bank of New York Mellon issues ADRs when you formed your opinions?

A.    No, I did not.

Q.    Okay.  Bayer is based in Germany; correct?

A.    Yes.

Q.    So when Bayer issues ordinary shares, it does so in Germany; correct?

A.    Likely.

Q.    Okay.  And investors seeking to acquire Bayer ADRs can obtain them by depositing Bayer ordinary shares with Bank of New York Mellon; correct?

A.    They could obtain the ADRs by depositing the ordinary shares, yes.

Q.    And that deposit of shares occurs in the United States; correct?

A.    No.  That deposit occurs in Germany initially.

Q.    And with what institution located in Germany are the shares deposited?

A.    We don't have information for

Page 60

ZARCU - HIGHLY CONFIDENTIAL

that in this case.

Q.    Did you review Bank of New York Mellon's deposit agreement with Bayer in forming your opinions in this case?

A.    I looked at it, yes.

Q.    Okay.  And are you aware that that agreement says that the deposit of the shares underlying Bayer American Depositary Receipts occurs with the Bank of New York Mellon in New York?

A.    I don't recall that.

Q.    Okay.  Now, when the ADRs are issued by Bank of New York Mellon, title to the ADRs transfers to the purchaser; correct?

A.    I am not sure at what point the title transfers from one to the other, no.

Q.    Do you know where in the world that transfer of title occurs?

A.    I don't know for a fact, no.

Q.    In forming your opinions, did you consider where a title to the Bayer ADRs is transferred?

A.    That was not relevant to my

ZARCU - HIGHLY CONFIDENTIAL

opinion.

Q.    Okay.  And why is the title of -- why is -- strike that.

Why is the transfer of title in your view not relevant to where irrevocable liability is incurred?

MR. YAVITZ:  Object to form.

You can answer.

A.    The decision as to where irrevocable liability took place and when is based on the information provided by in the case, and it's based on where the local shares are acquired.

Q.    Your summary of your first opinion in paragraph 15 here uses the term "ADR order."

What do you understand that term to mean?

A.    I think it's self-evident.  An order is an order to purchase something.

Q.    And what is an ADR order an order to purchase?

A.    It is an order to purchase ADRs, and it could contain information on how to

ZARCU - HIGHLY CONFIDENTIAL

achieve that, which we've seen in our case in a few of the transactions.

Q.    Let's go to paragraph 16.

Now, here, you conclude that it's not possible to determine on a class-wide basis whether members of the proposed class incurred irrevocable liability to take and pay for their individual ADR purchases in the United States, because the analysis turns upon an individualized inspection of trading communications and records.

Do you see that?

A.    Yes, I do.

Q.    Are you familiar with the term "secondary market"?

A.    Yes, I am.

Q.    What do you understand it to mean?

A.    Those are all the markets where registered securities trade, like the New York Stock Exchange, NASDAQ.

Q.    To purchase an ADR on a secondary market, an investor does not

Page 63

ZARCU - HIGHLY CONFIDENTIAL

need to first purchase ordinary shares; correct?

A.    As a general term, there's no requirement for such.  But it depends on each individual transaction.  That cannot be made as a general statement for all ADRs traded.

Q.    Under what circumstances would an investor who is purchasing an ADR in the secondary market need to first acquire foreign ordinary shares?

A.    Well, you're giving me a scenario where you're already including in your premise that they acquired on a secondary market in the U.S., so --

Q.    Right.

A.    -- you're excluding the possibility of them actually acquiring it overseas, which is not the case in what we're discussing.

Q.    Well, let's say an investor has decided that they do not want to engage in an overseas purchase of ordinary shares. Let's say they specifically want to

Page 64

ZARCU - HIGHLY CONFIDENTIAL purchase existing ADRs on the secondary market.

A.    Okay.

Q.    Does an ADR purchaser who is buying ADRs on the secondary market need to first acquire foreign ordinary shares?

A.    Well, Counsel, you're giving the premise that they don't want to do that. So how can they need to if they don't want to?

Q.    Let me try this a different way.

Have you seen any evidence that any members of the proposed class who purchased Bayer ADRs on the secondary market incurred irrevocable liability outside the United States?

MR. YAVITZ:  Object to the form of the question.

A.    I haven't seen any evidence that any of the members of the class acquired ADRs in the United States, period, Counsel.

Q.    Okay.  So why is it that a purchase of an existing ADR implicates a

Page 65

ZARCU - HIGHLY CONFIDENTIAL
foreign share transaction?

A.    You're again making a very
general statement with a premise that's
built in.  So if I am acquiring ADR in the
United States, I'm obviously not acquiring
it overseas.  So I'm not sure exactly what
you mean.

Q.    So existing ADRs do not require
the conversion of ordinary shares into
ADRs; correct?

A.    Well, that's self-evident that
if they already exist, then they don't
need to be created.

Q.    So does anyone who purchases an
existing ADR need to first purchase
ordinary shares?

A.    Somebody who purchases existing
ADRs, it doesn't appear like there's a
need to create them if they're already
existing.

Q.    Correct.
And so if I have purchased an
existing ADR, is there any reason to
believe that I have incurred irrevocable

ZARCU - HIGHLY CONFIDENTIAL

liability abroad, in your opinion?

A.    If you've purchased an existing ADR -- again, information specific to the transaction is quite relevant, but if you're telling me that you bought it in the United States, and it's already created, obviously you don't need to go create it again.

Q.    And that would mean that there is no corresponding foreign share purchase; correct?

A.    In the very narrow scenario that you're describing, it seems that way, yes.

Q.    And that would mean, in turn, that irrevocable liability was not incurred outside the United States; correct?

A.    It would appear so under your narrow scenario, yes.

Q.    Okay.  What are you claiming to be an expert on in connection with this report?

MR. YAVITZ:  Objection to the form of the question.

ZARCU - HIGHLY CONFIDENTIAL

A.    I am an expert in ADR trading specific to this report.

Q.    Okay.  Do you have any special expertise in determining when and where legal liability attaches to financial transactions?

A.    You asked that question earlier, and I am not a legal expert, no.

Q.    Okay.  Have you ever published anything on determining where liability attaches to a financial transaction?

A.    No.

Q.    Okay.  Have you ever taken a course that covered determining where liability attaches to a financial transaction?

A.    No.

Q.    Have you ever taught a course that covered determining where liability attaches to a financial transaction?

A.    No.

Q.    Have you ever participated in a workshop or a conference where there was discussion of how to determine where

ZARCU - HIGHLY CONFIDENTIAL

irrevocable liability to a financial transaction is incurred?

A.    No.

Q.    Have you ever before this case, when acting in a professional capacity, been asked by anyone to analyze where irrevocable liability attached to a financial transaction?

A.    Not in the terms as you described them, no.

Q.    Do you have any other prior experience outside of this case in determining where in the world irrevocable liability attaches to a financial transaction?

A.    Not as described by you.  But again, I've participated in the Toshiba case where I had to determine where the obligation to take and pay for the ADRs occurred.

Q.    Now, you don't have a law degree; correct?

A.    I do not.

Q.    You've never studied law; right?

Page 69

ZARCU - HIGHLY CONFIDENTIAL

A.    I have not.

Q.    You have no legal training; correct?

A.    I do not.

Q.    You have never held a position in a legal department; right?

A.    No.

Q.    And you've never been responsible for analyzing contracts with broker dealers; correct?

A.    I'm not sure what you mean by "analyzing."  I've signed many contracts with broker dealers and other vendors in all sorts of capacities.

Q.    Have you ever been professionally responsible for reviewing and analyzing the terms and conditions of contracts with broker dealers?

A.    So I've always reviewed the contracts that I've signed, but I didn't create the contracts.

Q.    Okay.  Do you purport to be an expert on compliance?

A.    I'm sorry.  Could you repeat

Page 70

ZARCU - HIGHLY CONFIDENTIAL
that question?

Q.    Do you purport to be an expert on compliance?

A.    I am expert in compliance related to trading, yes.

Q.    Okay.  But you've never held a position in a compliance department; right?

A.    I have not.

Q.    You started your career working on a trading desk; right?

A.    Correct.

Q.    And you have spent nearly your entire career working in electronic and program trading; right?

A.    Yes.  That's a fair statement as a general matter.

Q.    So what you did for a living was you ran trading desks; right?

A.    That is correct.

Q.    You were responsible for making decisions about how to allocate capital; right?

A.    Among other things, yes.

ZARCU - HIGHLY CONFIDENTIAL

Q.    But when it came to legal matters, you were never the ultimate decisionmaker; correct?

A.    Correct.

Q.    On legal matters, you took direction from the compliance and legal departments where you worked; right?

A.    I have consulted with them, yes, when I needed to.

Q.    Okay.  So you've never had, during your career as a trader, professional responsibility for determining where liability attaches to transactions that you or your trading desk are engaging in; right?

MR. YAVITZ:  Object to the form of the question.

A.    In the course of my career, I have traded ADRs thousands and thousands of times, and that has informed my opinion as to where those transactions occurred.

Q.    Right.  But that wasn't my question.

My question was whether you had

Page 72

ZARCU - HIGHLY CONFIDENTIAL
professional responsibility for
determining where liability attaches to a
financial transaction.

You've never had such
responsibility; correct?

A.     That is a very general question,
Counsel.  As a matter of fact, as, you
know, being the head of trading, clearly,
I know exactly where the transactions
occurred; right?

Q.     So when your legal and
compliance departments worked with you
when you were running trading desks, did
they defer to your opinion on legal
matters?

A.     No.

Q.     Now, let's look at our next
exhibit, which is a copy of your LinkedIn
profile.  This one will be Exhibit 4.

(Zarcu Exhibit 4, LinkedIn
profile of Cristian Zarcu, was hereby
marked for identification, as of this
date.)

A.     It's not there yet.

ZARCU - HIGHLY CONFIDENTIAL

Q.    I know.  I haven't -- I actually haven't even stamped it yet.

A.    Oh, I'm sorry.

Q.    So you have beaten me to the punch.

Okay.  It should be loaded now.

A.    I see it.

Q.    And Mr. Zarcu --

A.    I am trying to load it.  One second.  Sorry.

Q.    Sorry.

A.    I have it.

Q.    Okay.  To the best of your knowledge, is this a true and correct copy of the contents of your LinkedIn profile?

A.    I have no reason to believe otherwise.

Q.    Let's start with the column on the left, the column in blue, specifically the section that reads "Top Skills."

There, there's a reference to program trading.

Do you see that?

A.    Yes, I do.

ZARCU - HIGHLY CONFIDENTIAL

Q.   What is program trading?

A.   Program trading refers to the trading of entire lists as one -- under one strategy.

Q.   And your program trading skills don't encompass determining where liability attaches to financial transactions; correct?

A.   Not in a legal term, no.

Q.   Okay.  What is electronic trading?

A.   Well, electronic trading is really every -- everything related to trading these days.  It's all electronic transmitted in one way or another.  The term is used broadly to include trading that involves the use of computers in some fashion or another.  It's a very broad term.

Q.   Understood.

And your electronic trading skills that you reference here don't encompass determining where liability attaches to financial transactions;

Page 75

ZARCU - HIGHLY CONFIDENTIAL
correct?

A.    Again, not as a legal matter, no.

Q.    And the next skill that's listed here is "Equities."

Your skills relating to equities do not encompass determining where liability attaches to financial transactions; correct?

A.    Not in a legal sense, no.

Q.    Here, you list two certifications:  Uniform Securities Agent State Law and GSRE.

Do you see that?

A.    Yes.

Q.    Those certifications don't have anything to do with determining where liability attaches to financial transactions; correct?

A.    I don't believe so, no.

Q.    And here you list a few publications.

None of these publications address how to figure out where in the

Page 76

ZARCU - HIGHLY CONFIDENTIAL world liability attached to a financial transaction; correct?

A.    Probably, yeah.

Q.    And then there's a patent listed here for cross trading securities during time windows at the volume weighted average price.

Do you see that?

A.    I do.

Q.    And that's not a patent for a method or technology for figuring out where in the world liability attaches to a financial transaction; correct?

A.    That is correct.

Q.    All right.  Let's go back to your expert report, which has been marked as Exhibit 1.  And no surprises.  We are going to go to the CV, which has been attached as Appendix A.  So please let me know when you're there.

A.    I think the -- oh, I'm sorry.  You know what?  Let me go to the one that you have there, because mine doesn't have that.

Page 77

ZARCU - HIGHLY CONFIDENTIAL

Okay.  I have it.

Q.    Is this CV a current and accurate list of your credentials?

A.    Yes.  It should be.

Q.    In the introductory paragraph, you reference "extensive expertise in building and managing sales and trading businesses, with a focus on leveraging data/analytics and advanced technology to gain edge and manage risk."

Do you see that?

A.    Yes.

Q.    So none of those things have anything to do with determining where liability attaches to financial transactions; correct?

MR. YAVITZ:  Object -- I'm sorry.  Object to the form of the question.

A.    Not legally, no.

Q.    Okay.  And it says that you're an inventor and pioneer of next-generation analytics, trading algorithms, and surveillance technologies; right?

Page 78

ZARCU - HIGHLY CONFIDENTIAL

A.    Correct.

Q.    But you've never developed any technologies that are used to determine where in the world liability for a financial transaction is incurred; correct?

A.    Correct.

Q.    And then it says that you were a head trader, founder of several successful quantitative trading businesses, and you've done so on an underpinning of integrated real-time and adaptive algorithms; correct?

A.    Correct.

Q.    Fair to say you've spent your entire career in trading?

A.    In matters relating to trading, yes.

Q.    Okay.  Let's look at the first entry here where it says you were President/COO, TradeDynamiX LLC, from 2013 to the present.

How many employees does TradeDynamiX have?

ZARCU - HIGHLY CONFIDENTIAL

A.    We don't have employees.  Just two partners.

Q.    And then who is the other partner?

A.    His name is Arnold Meyer.

Q.    Okay.  And you're the second partner?

A.    I am the other partner, yes.

Q.    What services does TradeDynamiX offer?

A.    We offer a multi-asset system to -- it's an analytics system and surveillance system that allows folks to understand how the market trades and capture behavior that shouldn't exist.

Q.    Does TradeDynamiX offer advice to clients on where liability attaches to financial transactions?

A.    No.

Q.    And does TradeDynamiX offer advice to clients on when liability attaches to financial transactions?

A.    No.

Q.    Who are TradeDynamiX's clients,

ZARCU - HIGHLY CONFIDENTIAL

generally speaking?

A.    Broker dealers, generally.

Q.    Is Bank of America Merrill Lynch a client of TradeDynamiX?

A.    No.

Q.    Is Cowen a client of TradeDynamiX?

A.    No.

Q.    Is Instinet a client of TradeDynamiX?

A.    No.

Q.    Is J.P. Morgan Securities a client of TradeDynamiX?

A.    They are not.

Q.    Is Macquarie Securities a client of TradeDynamiX?

A.    No.

Q.    Is UBS a client of TradeDynamiX?

A.    They are not.

Q.    Is Bank of New York Mellon a client of TradeDynamiX?

A.    No.

Q.    Is Harding Loevner a client of TradeDynamiX?

Page 81

ZARCU - HIGHLY CONFIDENTIAL

A.    No.

Q.    Is Hardman Johnston a client of TradeDynamiX?

A.    No.

Q.    So fair to say that none of the plaintiffs' investment managers or broker dealers are clients of TradeDynamiX?

A.    They are not clients.  Correct.

Q.    Okay.  The third-to-last bullet here says "Provide expert witness and subject matter expert services to clients and regulators."

Do you see that?

A.    I do.

Q.    Just to make sure I understand, you are not providing your expert witness services in this case through TradeDynamiX; correct?

A.    That is correct.

Q.    Okay.  And the last bullet here is "Held meetings with SEC, FINRA, and SROs to discuss current compliance/regulatory reforms and challenges."

ZARCU - HIGHLY CONFIDENTIAL

Did any of those meetings concern issues relating to determining where irrevocable liability attaches to financial transactions?

A.    No.

Q.    Okay.  Now let's look at the entry for Lazard.

Do you know approximately how many employees Lazard Capital Markets had when you worked there?

A.    I don't know.  A few hundred. I'm not sure of the exact number.

Q.    Okay.  The first bullet here is "Recruited by CEO and charged with modernizing LCM's trading systems and technology infrastructure, to help achieve ambitious growth targets for LCM."

Do you see that?

A.    I do.

Q.    What was your bailiwick at Lazard, so to speak?

A.    I'm not sure.  What do you mean what was my bailiwick?

Q.    Did your responsibilities extend

Page 83

ZARCU - HIGHLY CONFIDENTIAL

beyond the analytic trading solutions group?

A.    In the process of building that, I started that business from scratch, so that involved a lot of changes on the -- I guess the infrastructure used by Lazard and the trading system, so it did initially, yes.

Q.    Okay.  Did you have any enterprise-level responsibilities when you worked at Lazard?

A.    I don't know what you mean by enterprise-level responsibilities.

Q.    Did you have any responsibilities for overseeing any aspects of Lazard's operations for Lazard Capital Markets as a whole?

A.    I was part of the executive committee making decisions on a variety of matters, but, as such, I guess we made decisions together for the firm, yes.

Q.    Okay.  And the fourth bullet here says that you coordinated with finance, compliance, operations, and

Page 84

ZARCU - HIGHLY CONFIDENTIAL
technology to upgrade all trading and regulatory/compliance systems within Lazard's existing infrastructure.

Did you have enterprise-wide responsibility for upgrading Lazard's regulatory/compliance systems?

A.    Again, I don't know what the definition of enterprise-wide means, quite honestly.  So in the process of building the business that I built, we made a lot of changes to their systems.

Q.    Okay.  But did you -- did you have responsibility for the regulatory and compliance systems at Lazard as a whole?

A.    Probably not as a whole, no.

Q.    Okay.  And then the second-to-last bullet here says, "Managed all regulatory, risk, and compliance aspects of the business, from daily supervision and reporting, to close interaction with SEC and FINRA regulators during periodic examinations."

Do you see that?

A.    Yes.

Page 85

ZARCU - HIGHLY CONFIDENTIAL

Q.    Those responsibilities that are described there, were they limited to the analytic trading solutions group, or did they extend beyond the group?

A.    They are specific to my group.

Q.    Okay.  And then the last bullet here says that you served on the Capital Markets Management team.

What was the Capital Markets Management team?

A.    It was comprised of all the heads of businesses.

Q.    And what were your responsibilities on the Capital Markets Management team?

A.    We made decisions on a variety of topics from capital employment to the firm level to direction and strategies, stuff like that.

Q.    Did you have any responsibilities at Lazard for determining where liability is incurred for a financial transaction?

A.    Not legally, no.

Page 86

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  Now let's look at the entry for Wells Fargo/Wachovia where you worked from 2004 to 2009; correct?

A.    Yes.

Q.    Okay.  The third bullet here says that you partnered with the compliance group to achieve a consistent and transparent approach to risks, processes, information, and reporting.

Do you see that?

A.    Yes.

Q.    And the second-to-last bullet here says, "Responsible for all regulatory, risk, and compliance aspects of the business, from daily supervision and reporting, to management of the periodic SEC and FINRA examinations."

Do you see that?

A.    I do.

Q.    Did those responsibilities that I just described extend beyond the automated trading solutions group?

A.    No.  They're directly related to my group.

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  Do you have any responsibilities -- strike that.

Did you have any responsibilities at Wells Fargo or Wachovia for determining where liability is incurred for a financial transaction?

A.    Not from a legal perspective, no.

Q.    Okay.  Now let's look at the entry for Bank of America Securities.  The second-to-last bullet here is "Responsible for all regulatory, risk, and compliance aspects of the business, from daily supervision and reporting, to management of the periodic SEC and FINRA examinations."

Did those responsibilities extend beyond the program trading group?

A.    No.

Q.    Okay.  And the last bullet here says, "Served on the Equities Division Management team."

Did you have -- strike that.

What was the Equities Division

Page 88

ZARCU - HIGHLY CONFIDENTIAL

Management team?

A.    It's similar to what we discussed at Lazard.  All the heads of businesses were part of that group, and we decided macro matters related to strategy for the firm, things like that.

Q.    Do you have any -- strike that.

Did you have any responsibilities at Bank of America Securities for determining where liability is incurred for a financial transaction?

A.    Not legally, no.

Q.    And same question for your time at Commerzbank Securities and Salomon Brothers.

Did you have any responsibilities at those two firms for determining where liability is incurred for a financial transaction?

A.    No.

Q.    Okay.  So you've only ever worked in front-end trading; correct?

A.    Well, my business currently does more than that, but from a trading

ZARCU - HIGHLY CONFIDENTIAL

perspective, yes.

Q.    Okay.  So your opinions in this case are based on your experience as a trader; correct?

A.    Yeah, and things related to trading.

Q.    During your financial career, have you ever had responsibility for managing the mechanics of settling financial transactions?

A.    Well, settlements were part of the responsibility and duty to the clients.  So I'm not sure what you mean by the mechanics.

Q.    Okay.  Well, let me try it a different way.

You don't purport to be an expert on trade settlement mechanics; correct?

A.    I am an expert in all things related to trading.  Settlement is part of what I have done my entire career.  Clients always raise issues with settlement.  There's obviously -- they're

Page 90

ZARCU - HIGHLY CONFIDENTIAL

part of what we do on a regular basis as traders.

Q.    Do you consider yourself to be an expert on trade clearance?

A.    Again, those are all parts of what -- what a trader does, what the, you know, head of trading does.  You have to be familiar and know everything related to trading.

Q.    I'm not really asking whether you have experience with these things.  I'm asking whether you consider yourself to be an expert on things.

For example, I have traded stocks.  I don't consider myself to be an expert on trading.  So I'll just ask the question again.

Do you consider yourself to be an expert on trade clearance?

A.    As relating to the products that I've traded, yes.

Q.    Okay.  And do you consider yourself to be an expert on trade reorganization?

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection to the form of the question.

A.    I don't know what you mean by that.

Q.    Okay.  In paragraph 1 of your report, you mention that you previously held Series 7, 24, 63, 55, and 3 licenses.

My question for you is when did those licenses lapse?

A.    So you can only hold these securities licenses if you are employed by a broker dealer.  Initially, they expired -- I don't know -- maybe a couple of years after I left Lazard.  They usually last a while after you leave a broker dealer.  I regained my 7 and 63 for a client engagement I had -- I don't know -- three, four years ago.  I forget. But they probably lapsed by now.  So --

Q.    And for what jobs did you need a Series 24 license?

A.    When you're a -- to run a business, that is a requirement.  So being the head of trading, I had to have the 24.

ZARCU - HIGHLY CONFIDENTIAL

Q.    Understood.

So for every job where you were the head of a trading desk, you had to maintain your Series 24; is that correct?

A.    That is correct.

Q.    Okay.

MR. YAVITZ:  And if we reach a natural breaking point, I think we've been going a little over an hour now.

MR. JACKSON:  Yeah.  I just have maybe, like, three-ish minutes of questions, and then we can take a break.

MR. YAVITZ:  Sounds good.

MR. JACKSON:  Okay.

BY MR. JACKSON:

Q.    So let's go to paragraph 31 of your report.

A.    31.

Q.    Please let me know when you're there.

A.    Almost there.  Okay.

Q.    So here, you state that a client that has instructed its broker to conduct

ZARCU - HIGHLY CONFIDENTIAL

a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares.

Do you see that?

A.    Yes, I do.

Q.    You have no formal legal training in interpreting the obligations of broker-dealer customers; correct?

A.    Not a legal -- from a legal perspective, no.

Q.    Okay.  Do you have any actual professional experience in determining the legal obligations of broker dealer customers?

A.    Not from a legal perspective, but as a practitioner of almost three decades, I do know when my clients become obligated to take and pay for the shares that I purchase for them.

Q.    Is it your understanding that SEC and FINRA rules govern customer obligations to broker dealers?

A.    Well, SEC and FINRA are

ZARCU - HIGHLY CONFIDENTIAL obviously the regulators overseeing the industry. So they are the regulators.

Q. So you don't cite any specific SEC or FINRA rules defining customer obligations to broker dealers in your report; correct?

A. I don't recall if I cite anything related to SEC or FINRA.

Q. Okay. You didn't consider any SEC or FINRA rules defining customer obligations to broker dealers in forming your opinions; correct?

A. I don't recall, but I consider my experience of almost 30 years trading these securities.

Q. But sitting here today, you can't recall considering any specific SEC or FINRA rules or regulations when you formed your opinions in this case; correct?

A. Yeah. Unless they're listed, I don't remember, no.

Q. Okay. And are you aware that courts have held that customer obligations

ZARCU - HIGHLY CONFIDENTIAL

to broker dealers are a question of contract law?

MR. YAVITZ:  Object to the form of the question.

A.    I am not aware of any.

Q.    Okay.  And in your report, you don't cite any legal authorities that address how to interpret contracts; correct?

A.    I do not believe so, no.

Q.    And that's because you didn't even consider any such authorities in forming your opinion; right?

A.    Yeah.  I didn't need to.

Q.    And you have no special expertise whatsoever in interpreting the contractual obligations of broker dealers; correct?

MR. YAVITZ:  Object to the form of the question.

A.    I don't know what you mean by interpreting the contractual obligations of broker dealers.  As a practitioner, as the head of trading for almost three

Page 96

ZARCU - HIGHLY CONFIDENTIAL

decades, I do know what my obligations were to my clients, yes.

Q.   All right.  I think now is a good time for a break.  Let's go off the record.

THE VIDEOGRAPHER:  Okay.  Off the record 11:17 a.m. Eastern Standard Time.

(Recess)

THE VIDEOGRAPHER:  Back on the record 11:30 a.m. Eastern Standard Time.

BY MR. JACKSON:

Q.   Welcome back, Mr. Zarcu.

A.   Thank you.

Q.   Did you have any discussions about the substance of your testimony with your counsel during the break just now?

A.   I did not.

Q.   What do you understand the term "irrevocable liability" to mean?

A.   To me, irrevocable liability refers to when a client becomes obligated to take and pay for the securities they

Page 97

ZARCU - HIGHLY CONFIDENTIAL

ordered.

Q.    And where did the plaintiffs take their ADRs after they purchased them?

A.    The -- and you're referring to our transactions, I'm assuming?

Q.    Yes.

A.    As established in my report, the client became obligated to take and pay their ADRs the moment they placed -- not the moment they placed, but rather the moment they started acquiring their shares overseas.

Q.    Okay.  If an investor makes a series of two related transactions, does liability for the later transaction necessarily attach when the earlier transaction is completed?

MR. YAVITZ:  Objection. Incomplete hypothetical.

A.    That's a very vague hypothetical, Counsel.  I can't answer that.

Q.    Okay.  Well, let me try to make it simpler for you, less vague.

ZARCU - HIGHLY CONFIDENTIAL

There's two transactions, Transaction A and Transaction B.  You can't do Transaction B until you do Transaction A.

Do you become liable for Transaction B the second Transaction A completes?

MR. YAVITZ:  Objection. Incomplete hypothetical.

A.    That is not sufficient information for me to answer.  Sorry.

Q.    Okay.  Is it your opinion that the purchase of Bayer ordinary shares on the local German market and the conversion of ordinary shares to ADRs are the same financial transaction?

A.    The orders to acquire ADRs via the acquisition of local shares and conversion, that is one transaction, yes.

Q.    Okay.  And so it's your understanding that a purchase of two distinct and separate securities, the ordinary shares and the ADRs, is in fact legally one transaction?  Do I have --

Page 99

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.

Objection.  Mischaracterizes testimony.

A.    So you just described it as a purchase of two different securities.  We are not discussing that in our case.  We had the purchase of one security via the acquisition of local shares, the purchases for the ADRs via the acquisition in Germany and conversion to dealers.

Q.    Well, you testified earlier today that ADRs and ordinary shares are separate and distinct securities; correct?

A.    That is correct.

Q.    So is a transaction to purchase ADRs following the acquisition of ordinary shares one financial transaction or two?

A.    It is one financial transaction.

Q.    Okay.  And -- well, we're going to explore that over the course of today.

Is it your -- let me strike that.

Let's go to paragraph 33 of your report.  There, you write, starting on

ZARCU - HIGHLY CONFIDENTIAL

second line, "It would have been economically irrational for Harding Loevner to purchase its desired quantity of Bayer ADRs on the domestic market." And then you note that the Bayer ADRs traded in the U.S., whereas Bayer ordinary shares trade in Germany.

Do you see that?

A.    I do.

Q.    Okay.  So Bayer's ADRs can be purchased in two ways:  On the secondary market in the United States and on the primary market; correct?

MR. YAVITZ:  Objection to form.

A.    What do you mean they can be purchased in the primary market?

Q.    Well, you can either purchase existing Bayer ADRs in the secondary market, or you can convert ordinary shares into ADRs; correct?

A.    Yes.

Q.    Okay.  Now, I have a question for you about the conversion.

Where does the conversion take

Page 101

ZARCU - HIGHLY CONFIDENTIAL
place?

A.    The conversion is affected by
the depositary bank, seemingly in the
United States.

Q.    Okay.  And let's go to
paragraph 126 of your report.

A.    I'm sorry.  126?

Q.    126.  That's right.  On page 53.
There, you write, "The policies of a
depositary bank have no bearing on the
analysis of where investors incurred their
liability to take and pay for ADRs.  That
liability runs to the securities
professional that is executing orders on
the investor's behalf, not to the
depositary bank through which the
securities professional is processing an
ADR conversion."

Do you see that?

A.    Let me see that exactly.
Which -- so it's in 126?

Q.    The second-to-last and then the
last sentence in paragraph 126.

A.    Yes, I see that.

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  Is it your opinion that when the plaintiffs purchased Bayer ADRs, they only incurred liability to the securities professional that executed the order on their behalf?

MR. YAVITZ:  Objection.  Form.

A.    The trade was placed with the -- with the broker dealer, not with the depositary bank.  The depositary bank is only a facilitator of the transaction.

Q.    Okay.  So here, you write the liability runs to the securities professional that is executing orders; correct?

A.    Yes, I do.

Q.    Okay.  So the plaintiffs in your view are liable to the broker dealer who executes their order; is that correct?

A.    Yes.  The transaction will have settled with the broker dealer.  Yes.

Q.    Okay.  The plaintiffs in this case are located in the United States; correct?

A.    I believe so, yes.

Page 103

ZARCU - HIGHLY CONFIDENTIAL

Q.    The plaintiffs' broker dealers in this case are also located in the United States; correct?

A.    They certainly have offices in the United States, but they also have offices overseas, it appears.

Q.    Okay.  So do you know -- strike that.

The agreement between the plaintiffs and the securities professionals that executed the plaintiffs' Bayer ADR orders was formed in the United States between the U.S.-based plaintiffs and their U.S. broker dealer; correct?

MR. YAVITZ:  Objection.  Form.

A.    I don't know what you mean by the agreement was formed in the United States.  The orders were very clearly instructing the broker dealers to acquire shares overseas for the purpose of creation of ADRs.

Q.    I'm not asking about where the transaction would take place.  You said

ZARCU - HIGHLY CONFIDENTIAL

here that the liability runs to the securities professional that is executing orders on the investor's behalf.

You then testified that the plaintiffs are based in the United States and also that the broker dealers are based in the United States.

Does it not then follow that the liability between the plaintiffs and the -- and their broker dealers was incurred in the United States?

MR. YAVITZ:  Objection.  Form.

A.    That's not what I testified to, Counsel.  I said the broker dealers have offices in the United States, but they also have offices overseas where the executions were actually implemented by representatives of broker dealers overseas.

Q.    Did the plaintiffs in this case place their orders with U.S. or foreign offices of the broker dealers you're referring to?

A.    We have communications between

ZARCU - HIGHLY CONFIDENTIAL

the investment representing the plaintiffs directly with broker dealers overseas.

Q.    Do you have any evidence that the plaintiffs incurred contractual liability to overseas broker dealers in connection with their Bayer ADR purchases?

MR. YAVITZ:  Objection.  Form.

A.    I don't know what you mean by contractual evidence.  The evidence I have is the communications, the FIX order transmitted to the brokers, the confirmations that very clearly show what the instructions were to acquire local shares overseas for the purpose of converting to ADRs, and there's agreement on both sides.

Q.    So is it your opinion that whenever a U.S. investor asks a broker dealer to execute a foreign transaction, that they have incurred liability abroad?

MR. YAVITZ:  Objection. Incomplete hypothetical.

A.    That's unrelated to what I'm opining on.  Sorry.

Page 106

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  When you use the phrase "liability runs to the securities professional," what does -- what do you understand that to mean?

A.    That the depositary institution has no bearing on when the obligation to take and pay for the securities or where occurs in this transaction.  It's all related to where the orders are directed and what the instructions were.  And that's through the investment professional that is involved in acquiring those shares.

Q.    All right.  Let's move on. Let's go to paragraph 18 of your report.

Now, here, you write that ADR programs can be sponsored or unsponsored.

Do you see that?

A.    Yes.

Q.    Now, earlier, we discussed the Toshiba case.

Do you remember that?

A.    I do.

Q.    That case concerned unsponsored

Page 107

ZARCU - HIGHLY CONFIDENTIAL

ADRs; correct?

A.    Yes.

Q.    Bayer's ADRs are sponsored; correct?

A.    That is correct.

Q.    Do you have an understanding of the differences between sponsored and unsponsored ADRs?

A.    I do.

Q.    Do you agree that there are significant differences between sponsored and unsponsored ADRs?

MR. YAVITZ:  Objection.  Form.

A.    I don't know what you mean by significant, but there are differences, yes.

Q.    What differences are there between sponsored and unsponsored ADRs?

MR. YAVITZ:  Objection. Incomplete hypothetical.

A.    In sponsored ADRs, the company is actually involved in it.  Unsponsored, the company is not.

Q.    In paragraph 11 of your report,

Page 108

ZARCU - HIGHLY CONFIDENTIAL

you say that your analysis and opinions in the report are based on, among other things, "accepted and reliable methodologies, principles, and approaches."

Do you see that?

A.    Yes.

Q.    What methodologies are you referring to here?

A.    Everything that I've come across in my trading career, agreements between -- tacit agreements seemingly between traders on both sides, the investment manager's side, the broker's side, when do we think, you know, an order is an order, what's an order, what's not an order.  So it's a variety of things.

Q.    If I wanted to recreate the methodology that you used in this case, what steps would I follow?

MR. YAVITZ:  Objection.  Form.

A.    You would go review the documentation in the case.  You would go review communications available in the

Page 109

ZARCU - HIGHLY CONFIDENTIAL

case.  You would go review FIX orders, order information, emails in forming of those orders, confirmations, email confirmations, possibly -- all sorts of different information available in the case really.

Q.    How then do you use that information to determine where irrevocable liability was incurred?

A.    I think it's self-evident that if you have information showing you direction of the investment manager to the broker to acquire something overseas, that is an overseas transaction.

Q.    Who else uses the methodology that you've described to me just now?

A.    I don't know.

Q.    You can't name a single other person who has used what you call this accepted methodology?

MR. YAVITZ:  Objection.  Asked and answered.

A.    No.

Q.    Okay.  Let's go to paragraph 24.

ZARCU - HIGHLY CONFIDENTIAL

The last sentence here is "I analyzed" -- I'm sorry.  Strike that.

Let's go to paragraph 24.  The last sentence here reads, "I analyzed each of plaintiffs' purchases below using brokerage records confirmation slips, communications produced by plaintiffs' investment managers, and other relevant documents to document how each transaction was ordered and executed."

Do you see that?

A.    I do.

Q.    What process did you use when reviewing this evidence for a given transaction?

A.    What do you mean by "process"?

Q.    What process did you use to review the evidence referred to in paragraph 24 when you were reviewing the evidence for a given transaction?

A.    I don't really understand your question.

Q.    How would I replicate the process that you used to review the

ZARCU - HIGHLY CONFIDENTIAL

brokerage records, confirmation slips, and communications and other relevant documents for each of the plaintiffs' transactions?

A.    As the sentence states, you would analyze the purchases, the records, the confirmation slips, the communications.  I think it's self-evident what I'm stating in there.

Q.    How would I analyze that information?  What would I do with it once I had it?

A.    You would process it internally and include it.

Q.    And when you say "process," what do you mean?

A.    Think.

Q.    So what information in these documents did you use to make a determination one way or the other about where irrevocable liability was determined, was incurred?

A.    As the sentence states, purchase records, brokerage records, confirmation

Page 112

ZARCU - HIGHLY CONFIDENTIAL
slips, communications, all the relevant documents involved.

Q.    So your methodology, as you just described it -- tell me if this is fair. Your methodology is a holistic review of all of the evidence based on your experience as a trader?

A.    Yes.

Q.    Why did you use that methodology?

MR. YAVITZ:  Objection.  Form.

A.    It is the only way to arrive at a conclusion.

Q.    Okay.  What assumptions did you make, if any, while you were conducting your analysis?

MR. YAVITZ:  Objection.  Form.

A.    What assumptions did I make? That will vary from case to case.

Q.    Can you think of any assumptions that you made while you were forming your opinions in this case?

MR. YAVITZ:  Objection.  Form.

A.    Each one of the transactions

ZARCU - HIGHLY CONFIDENTIAL
provides some information but not others.
There has been some inferences made based
on volumes traded in the United States
versus volumes traded overseas, some based
on previous communications that seemingly
continue the same trade.  So it'll vary.

Q.    After you determined how each
transaction was ordered and executed, how
did you then determine where irrevocable
liability was incurred?

A.    Again, based on all the
information offered by each one of the
transactions, that is all a comprehensive
review of all the information, and only
that way I can arrive at a real
conclusion.

Q.    Did you apply any rules or
principles to determine where irrevocable
liability was incurred?

MR. YAVITZ:  Objection.  Form.

A.    What do you mean by rules or
principles?

Q.    Was there an algorithm that
you -- well, let me try this -- let's

Page 114

ZARCU - HIGHLY CONFIDENTIAL
start this over.

You're an expert on algorithmic
trading; correct?

A.    That is correct.

Q.    Do you know what an algorithm
is?

A.    I do.

Q.    Did you develop an algorithm to
determine where irrevocable liability was
incurred for the plaintiffs' Bayer ADR
transactions?

A.    No.  I didn't need to.

Q.    Did you develop a set of
principles that you used to guide the
decision as to where irrevocable liability
was incurred for plaintiff Bayer --
plaintiffs' Bayer ADR purchases?

A.    The set of principles, I didn't
develop it overnight.  That's just
engrained in me through my trading period
over three decades.

Q.    So your methodology is you read
all of the evidence relating to a
transaction, and based on your experience

Page 115

ZARCU - HIGHLY CONFIDENTIAL

as a trader, you go with what your gut says about where liability was incurred?

MR. YAVITZ:  Objection to form.

A.    No.  I don't go with what my gut said, Counsel.  I go with my experience of running trading businesses for a very long time and with all the principles associated with running those businesses and the rules and regulations. That's what I go with.

Q.    Is the only way that I can replicate the methodology that you used to find someone with similar experience and just have them do a holistic review of the evidence relating to each specific transaction?

MR. YAVITZ:  Objection.  Form.

A.    Yeah.  I think you need somebody with my experience, somebody who has traded for a long time and fully understands how these transactions occur and a full review of all the documentation available to reach those conclusions, yes.

Q.    Okay.  And are there any -- did

**Page 116**

ZARCU - HIGHLY CONFIDENTIAL
you develop any criteria, written criteria
that you used to determine where
irrevocable liability was incurred?

MR. YAVITZ:  Objection.  Form.

A.    Did I develop written criteria?

Q.    Yes.

A.    I did not need to.

Q.    Did you apply any criteria to
determine where irrevocable liability was
incurred?

MR. YAVITZ:  Objection.  Form.

Are you asking other than as he
explained in his report?

Q.    No.  I'm just asking what
criteria did you use to determine where
irrevocable liability was incurred?

A.    The criteria as illustrated
throughout my report and we've been
discussing I'm pretty sure for the past
half an hour.

Q.    What -- can you list the
criteria for me?

A.    Well, let me just give you an
example.  If an order is placed to acquire

Page 117

ZARCU - HIGHLY CONFIDENTIAL
local securities overseas with a purpose
of creating ADRs from them, that is one
criteria that I used.

Q.    Okay.  Let's -- were there any
other criteria that you used besides
whether shares would have to be purchased
overseas?

A.    Yes, there were.

MR. YAVITZ:  Objection to form.

Q.    What other criteria were there?

A.    I looked at the FIX messages
transmitted.  I looked at the confirmation
emails sent by clients, so those were some
of the criteria that I considered as well.

Q.    Well, those are the documents
you looked at.  I'm asking what criteria
did you apply to those documents?

A.    Well, if those FIX messages
clearly informed me that there's a
security transaction to be acquired
overseas, that's a criteria.  If the
confirmation coming back from the broker
dealer states that we just acquired local
shares for overseas, and this is the FX

Page 118

ZARCU - HIGHLY CONFIDENTIAL
rate, and this is the ADR creation rate, and we did create those ADR streams, that's another criteria.

Q.   Okay.  We'll come back to that in just a minute.

For all of the transactions that you analyzed in parts Roman numeral V and then dot a through i of your report, you reached the conclusion that the plaintiffs' investment manager made an order for Bayer ADRs to be executed through the purchase of Bayer ordinary shares in Germany; correct?

A.   Where are we, Counsel?  I'm sorry.

Q.   Part Roman numeral V of your report.  So starting on paragraph 23.

A.   Okay.  Would you mind repeating the question?

Q.   Yes.  So for all of the transactions that you analyzed in parts Roman numeral V, a through i of your report, you reached the conclusion that plaintiffs' investment manager made an

ZARCU - HIGHLY CONFIDENTIAL

order for Bayer ADRs to be executed through the purchase of Bayer ordinary shares in Germany; correct?

A.    No.    That is misstating my opinion, Counsel.

Q.    Okay.    I don't think it is. This isn't a trick question.    I'm -- let me direct you to paragraph 28, just to make things easier here.

Okay.    In paragraph 28, you -- in referring to the June 6, 2016, purchases by SMW and Local 710, you write, "Based on my experience as a securities professional transmitting, receiving, and executing ADR transactions, Mr. Gowda's email was plainly a purchase order for Bayer ADRs, to be executed through the overseas acquisition of Bayer ordinary shares for the express purpose of conversion to ADRs."

Do you see that?

A.    I do.

Q.    Okay.    So for each of the purchases in parts Roman numeral V, a

ZARCU - HIGHLY CONFIDENTIAL

through i of your report, your overarching conclusion, based on your experience, was that the investment manager had made an order for Bayer ADRs to be executed through the purchase of Bayer ordinary shares in Germany; correct?

A.    Can you point me to where you're reading?  Because I don't see a through i. I don't understand what you're referring to here.  Sorry.

Q.    Paragraphs -- let's see if I can make this easier for you -- 23 --

A.    Yes.

Q.    -- through 120.  It's basically all of section Roman numeral V of your report except for subsection j.

A.    So I am specifying in that paragraph that I've concluded that at least 18 of the transactions occurred that way.

Q.    Right.  Okay.

A.    I've seen all of them.

Q.    For those 18 transactions, your conclusion was that the plaintiffs'

ZARCU - HIGHLY CONFIDENTIAL
investment manager made an order for Bayer
ADRs to be executed through the purchase
of Bayer ordinary shares in Germany;
correct?

A.    That is correct.

Q.    Okay.  Now, in order to purchase
a newly issued ADR, an investor has to
first acquire foreign ordinary shares;
correct?

A.    In order for the -- for an
investment manager to acquire newly
created ADRs, they would have to purchase
the shares -- the local shares first.

Q.    Okay.  So -- and you testified
earlier that it's your opinion that if an
investor instructs its broker -- well,
strike that.

Is it your opinion that if an
investor instructs its broker to acquire
ordinary shares abroad and then convert
the shares to ADRs, they have incurred
irrevocable liability abroad?

MR. YAVITZ:  Objection.  Form.

A.    What do you mean and then

Page 122

ZARCU - HIGHLY CONFIDENTIAL

instructed to convert?  I'm confused by

your question.

Q.    Is it your opinion that if an

investor instructs its broker to acquire

ordinary shares abroad and then convert

them to ADRs, they have incurred

irrevocable liability abroad?

MR. YAVITZ:  Objection.  Form.

Are you asking at the moment of

instruction or some other moment in

the transaction?

MR. JACKSON:  I'm asking -- I

don't understand why that matters.  So

your objection is noted.

Q.    But the question is if an

investor instructs its broker to acquire

ordinary shares and convert to ADRs, have

they necessarily incurred irrevocable

liability abroad?

A.    They will incur irrevocable

liability abroad when the order is started

or completed.

Q.    Okay.  Started or completed?

A.    Yes.

ZARCU - HIGHLY CONFIDENTIAL

Q.    Which is it?

A.    It can be either/or.

Q.    When is the order for the ADRs completed?

A.    When the client either -- when either the broker dealer completes the order or the client says, "I'm done with the order."

Q.    How do you know that an order for ADRs is complete?

A.    Counsel, I know it's complete when I finish the number of shares ordered by my client.

Q.    Okay.  So --

A.    When the client tells me to stop.

Q.    The number of shares of the ordinary shares or of the ADRs?

A.    So the order initially is to acquire the local shares for the purpose of converting them to ADRs; right? Throughout the communications that we've seen, the instructions are directly related to that position of the local

Page 124

ZARCU - HIGHLY CONFIDENTIAL

shares.  The creation of the ADRs is a result of the acquisitions of those local shares.  So as we've seen in our case, the instructions are directed to the acquisitions of the local shares.

Q.    Can an investor purchase a newly issued Bayer ADR without incurring irrevocable liability abroad?

MR. YAVITZ:  Objection.  Form. Incomplete hypothetical.

A.    Can they purchase -- I'm sorry -- a --

Q.    Can an investor purchase a newly issued Bayer ADR without incurring irrevocable liability abroad?

A.    The only way a newly created ADR happens if someone purchases the local shares first.  So the answer to that is no.

Q.    So you -- an investor cannot -- why would the answer to that be no?  If -- can -- the question is can an investor purchase a Bayer ADR without incurring irrevocable liability in Germany?

Page 125

ZARCU - HIGHLY CONFIDENTIAL

A.    Counsel, your question is -- was if an investor can purchase a newly created ADR, not an ADR.

Q.    Yeah.  You're right.  Let me start over.

Can an investor purchase a newly issued Bayer ADR without incurring irrevocable liability in Germany, in your opinion?

A.    No.

Q.    Okay.  What then is the point of your methodology?  Couldn't you just look to see if the transaction involved a newly issued ADR and call it a day?

A.    No.

Q.    Why not?

A.    Because I would have no way of knowing if it's a newly issued ADR, Counsel.

Q.    Okay.  Well, couldn't you just -- are you aware that Bank of New York Mellon -- hold on.  Let me back up here.

How do you determine whether a

ZARCU - HIGHLY CONFIDENTIAL

transaction is a newly issued ADR or an existing ADR?

A.    We've been discussing that.  You have to review the entire -- all the information associated with the transaction to determine that.

Q.    So do you ever need to buy ordinary shares to buy an existing ADR?

A.    Seemingly, no.  If you're just buying an existing ADR that's already out there, it doesn't need to be created; right?

Q.    Right.  So if you see that -- withdrawn.

Is it your opinion that an investor cannot incur irrevocable liability in the United States when purchasing an unsponsored ADR?

MR. YAVITZ:  Objection.  Form.

A.    I think I mentioned that in my report.  The sponsored or not sponsored has nothing to do with the obligation to take and pay for the ADRs.

Q.    In your opinion.  Okay.

ZARCU - HIGHLY CONFIDENTIAL

Is there any evidence that would suggest to you that an investor incurred irrevocable liability in the United States to purchase an American Depositary Receipt?

A.    The evidence --

MR. YAVITZ:  Objection.  Form.

Go ahead.

A.    The evidence would be the exact same.  They would allow me to inform my opinion if it was -- if it happened overseas.

Q.    And what evidence is that?

A.    All the communications involved in the transaction, the orders, the confirmations, as we've discussed before, the totality of the information associated with the transaction.

Q.    Now, you repeatedly emphasized that your opinion is premised on your understanding of what you call cross transactions; correct?

A.    I emphasized that my opinion is based on my experience of almost 30 years

Page 128

ZARCU - HIGHLY CONFIDENTIAL

in trading ADRs and running trading businesses.

Q.    The question was whether you -- do you use the term "cross transactions" in your report?

A.    I do.

Q.    Okay.  And your opinions are based in part of your understanding of what cross transactions are; correct?

MR. YAVITZ:  Objection to form.

A.    My opinions are based on my experience, Counsel.

Q.    Okay.  And do you understand what the term "cross transaction" means?

A.    Yes.

Q.    Okay.  Let's go to paragraph 31.

MR. YAVITZ:  Of his report?

Q.    Of your report.  Yes.

And here, you say that a cross transaction is where newly issued ADRs received from a depositary bank are booked to a client.

Do you see that?

A.    Yes.

ZARCU - HIGHLY CONFIDENTIAL

Q.    What is your understanding of what it means for a purchase to be booked to a client?

A.    That is when the -- well, there's an actual physical I guess process that somebody has to do in order to issue those -- to allocate those shares to the client.

Q.    Okay.  And what evidence can be used to prove that a purchase was booked to a client's account?

A.    That would be -- it could be communications.  It could be possibly DTC confirmations received by the client.  It could be records from the broker dealer of what they report to FINRA.  It could be possibly FINRA documents if the reporting is accurate and correct.  It's a variety of things.

Q.    Now, for 18 of the plaintiffs' transactions, the ones that are addressed in parts V dot a through i of your report, you reached the conclusion that they were cross transactions; correct?

Page 130

ZARCU - HIGHLY CONFIDENTIAL

A.    I believe so.  I don't remember if I specify each one of them.  But that sounds about right.

Q.    Okay.  And here, in paragraph 31, you write, "Based on my experience as a securities trader, which includes extensive experience concerning the norms, practices, conventions, and expectations of market participants conducting such cross transactions, a client that has instructed its broker to conduct a cross transaction is obligated to accept the ADRs it has ordered immediately upon the execution of the underlying purchase of foreign shares."

Do you see that?

A.    I do.

Q.    Okay.  Here, you're referring to what traders expect when they engage in what you call a cross transaction.

Is that fair to say?

MR. YAVITZ:  Objection.  Form.

A.    I am referring to what's been my experience and what the market

Page 131

ZARCU - HIGHLY CONFIDENTIAL

participants expect when such a

transaction occurs, yes.

Q.    So in the next paragraph,

paragraph 32, you claim the "basic

principle" underlying what you call cross

transactions is "that a client is

obligated to take delivery of securities

once its broker has committed capital to

execute the order for those securities."

Do you see that?

MR. YAVITZ:  Objection.  Form.

Objection.  Mischaracterizes the

document.

Q.    Well, let me -- let me rephrase

that.

In paragraph 32, you write,

"This consistent market practice reflects

the basic principle that a client is

obligated to take delivery of securities

once its broker has committed capital to

execute the order for those securities."

Do you see that?

A.    Yes.

Q.    Okay.  Do you agree that once a

ZARCU - HIGHLY CONFIDENTIAL

broker has committed its clients' capital

to purchase foreign shares, that purchase

of the foreign shares is irrevocable?

MR. YAVITZ:  Objection.  Form.

A.    It depends on what the order is,

Counsel.

Q.    So -- well, you state here that

a client is obligated to take delivery of

securities once its broker has committed

capital to execute the order; correct?

A.    I say that, yes.

Q.    So under ordinary circumstances,

when a broker commits capital to purchase

foreign shares, the client becomes

obligated to take delivery of the shares

at that time; correct?

MR. YAVITZ:  Objection.

Incomplete hypothetical.

A.    What do you mean by "ordinary

circumstances," Counsel?

Q.    Is it or is it not the case that

a client is obligated to take delivery of

foreign shares once its broker has

committed capital to execute the order for

ZARCU - HIGHLY CONFIDENTIAL
those foreign shares?

MR. YAVITZ:  Objection.  I'm sorry.  Go ahead.

A.    ADRs.

Q.    What's that?  I'm sorry?

A.    If the order is for ADRs, they're obligated to take the ADRs.

Q.    Okay.  Well, what is the -- let's put aside foreign exchange fees for a second, and let's just talk about the purchase of ordinary shares and the purchase of ADRs.

What is the capital that a broker commits to purchasing foreign shares?

MR. YAVITZ:  Objection.  Form.  Incomplete hypothetical.

A.    I'm not sure what you mean by what is the capital.

Q.    What capital does a broker commit to purchase foreign shares?

A.    Initially, it commits its own capital.  They are the counterparties in the transaction in the marketplace.

ZARCU - HIGHLY CONFIDENTIAL

Q. Okay. And what capital does a broker typically commit when it's purchasing foreign shares?

A. I just answered, Counsel. I'm not sure I understand what you mean.

Q. Okay. Well, let me try this a different way.

The capital a broker commits to purchasing foreign shares is cash; correct?

A. Yeah, likely.

Q. And the capital that's committed when the order to -- strike that.

That capital is committed when the order to purchase the foreign shares is executed; correct?

A. As a general matter, yes.

Q. And the capital that a broker commits to purchase ADRs is the underlying foreign shares; correct?

MR. YAVITZ: Objection. Form.

A. Counsel, as we discussed earlier, that is a one -- that's one single transaction. When the broker

ZARCU - HIGHLY CONFIDENTIAL

commits to executing the underlying ordinary shares, that is with a specific purpose to be converted to ADRs.

Q.    So what capital is committed to the counterparty for the ADR issuance?

MR. YAVITZ:  Objection.  Form.

A.    What capital is committed to what counterparty, Counsel?

Q.    What capital is provided to the counterparty for the ADR issuance?

MR. YAVITZ:  Same objection.

A.    I really don't understand your question, Counsel.

Q.    I think that's a good enough answer.

In forming your opinion, did you consider whether Hardman Johnston and Harding Loevner were permitted to purchase and hold foreign shares for the plaintiffs?

A.    It was part of my decisionmaking process.

Q.    Isn't it the case that Hardman Johnston and Harding Loevner often

Page 136

ZARCU - HIGHLY CONFIDENTIAL purchased far more Bayer ordinary shares than were subsequently converted into Bayer ADRs?

A.    They did purchase, yes, both local and shares for the purpose of converting, yes.

Q.    But my -- that wasn't my question.

My question was isn't it the case that Hardman Johnston and Harding Loevner often purchased more Bayer ordinary shares than were subsequently converted into Bayer ADRs?

A.    In some of the transactions, yes.

Q.    In paragraph 93 of your report, which I'll give you a second to go to, you quote a conversation between a Hardman Johnston trader and a UBS Securities on February 22nd to 23, 2017.

Do you see that?

A.    I'm sorry.

Q.    Paragraph 93.

A.    And what's the date again that

ZARCU - HIGHLY CONFIDENTIAL

you're quoting?

Q.    Oh, I'm sorry.  It's -- the date there was wrong.

So you quote a conversation here between a Hardman Johnston trader and a UBS trader on May 26, 2020.

Do you see that?

A.    Yes, I do.

Q.    Okay.  And if you look on page 39, in the fourth chat down, the trader there writes, "Okay.  We can speak about ADR later.  No problem."

Do you see that?

A.    I'm not sure I see it right now as we -- is it on -- is it on the next page possibly?

Q.    Page 39.  Yes.  Fourth chat down.

A.    Oh, I see.  Yes.  I see that.

Q.    Is there any indication here that the client or the broker were particularly concerned with holding foreign shares?

MR. YAVITZ:  Objection.  Form.

Page 138

ZARCU - HIGHLY CONFIDENTIAL

A.    I -- there's no discussion of that here.

Q.    Okay.  Do you agree that for the transaction that's being discussed here, the ADR conversion was a separate transaction for which the quantity and price had not yet been determined?

MR. YAVITZ:  Objection.  Form.

A.    I do not agree that there's a separate transaction, no.

Q.    Okay.  Why not?

A.    Because I'm pretty sure the conversation, as it progresses, it talks about them being trader under one ticket, so it's not a separate transaction.

Q.    So whether or not a transaction is on the same ticket is determinative of where irrevocable liability is incurred?

MR. YAVITZ:  Objection. Mischaracterizes testimony.

A.    In pretty much every case of that information, when the broker dealers acquire local shares for more than one -- the purpose of converting them to ADRs,

Page 139

ZARCU - HIGHLY CONFIDENTIAL

every single time they traded it as one, which is not surprising, as what we do as traders, clients expect an average price for all their -- the entire transaction. So this is nothing surprising here for me.

Q.    Have you examined whether the FINRA data that's been produced in this case reflects cancellations of cross transactions?

A.    Whether the FINRA data reflects cancellations?

Q.    Yes.

A.    Actually, yes, I have.

Q.    You examined whether the FINRA data reflects cancellations across transactions?

A.    Well, I remember analyzing one of the sales transactions when -- I forget which one of the plaintiffs liquidated their entire positions in Bayer ADRs.

Q.    Well, the question I had was did you specifically, in forming your opinions, consider whether cancellations of cross transactions were reflected in

ZARCU - HIGHLY CONFIDENTIAL

the FINRA data that's been produced in this case?

A.    Well, not to inform these opinions that I'm talking about, no.  The sales -- I do mention the sales transaction in the report, though.

Q.    Okay.  Did you claim to be familiar with the rules and regulations of U.S. Securities and Exchange Commission and FINRA?

MR. YAVITZ:  Objection.  Form. All of them?

Q.    Generally.

A.    Generally, yes.

Q.    Are you aware that there are specific regulations defining cross transactions?

A.    Certainly.

Q.    Are you aware that there are specific regulations setting out the obligations of market participants with respect to cross transactions?

A.    I'm sure there are.

Q.    Are you aware that the SEC has

ZARCU - HIGHLY CONFIDENTIAL

employed the term "cross transaction" repeatedly in connection with prohibitions in the Investment Advisors Act of 1940 and Investment Company Act of 1940?

MR. YAVITZ:  Objection.  Form.

A.     Likely.

Q.     In forming your opinions, did you consider whether your definition of cross transaction was inconsistent with how the SEC uses this term?

A.     No.

Q.     Is it your position that plaintiffs' broker dealers were investment advisors?

MR. YAVITZ:  Objection.  Form.

A.     I'm sorry.  Would you mind repeating that?

Q.     Yes.  Is it your position that the plaintiffs' broker dealers were investment advisors?

A.     No.

MR. YAVITZ:  Same objections.

A.     Sorry.  The plaintiffs' broker dealers were broker dealers.  The

Page 142

ZARCU - HIGHLY CONFIDENTIAL plaintiffs also had investment advisors separately.

Q. Did you evaluate whether an exemption to the cross transaction prohibitions under the statutes that I just mentioned apply to the plaintiffs' transactions?

A. No.

MR. YAVITZ: Objection. Form. Are you using "cross transactions" in some specialized legal sense, separate and apart from Mr. --

MR. JACKSON: As I just -- as I just mentioned, Counsel, I'm using it in the sense in which the SEC has defined that term in connection with the prohibitions in the Investment Advisors Act and the Investment Company Act.

Q. So -- and Mr. Zarcu, I believe your answer to that question was no?

A. Would you mind repeating the question? Because we got a little --

Q. Yeah. Did you evaluate whether

**Page 143**

ZARCU - HIGHLY CONFIDENTIAL

an exemption to the cross transaction prohibitions under the Investment Advisors Act of 1940 and Investment Company Act of 1940 apply to the plaintiffs' transactions and Bayer ADRs?

A.    No.

Q.    All right.  I'm going to mark as our next exhibit -- just give me one second -- a document -- this will be Exhibit 5.

(Zarcu Exhibit 5, FIX Specifications for the Over the Counter Trade Reporting Facility, was hereby marked for identification, as of this date.)

Q.    And this document is called FIX Specifications for the Over the Counter Trade Reporting Facility, and it's published by FINRA.

Mr. Zarcu, please let me know when you have this loaded.

A.    I have it.

Q.    Okay.  Have you seen this document before?

ZARCU - HIGHLY CONFIDENTIAL

A.    Let's wait until it loads, Counsel.  I'm sorry.  That takes a while.

Q.    That's okay.

A.    We're still waiting.  Is it a large document?

Q.    It is a large document.

A.    Yeah.  It's still -- it's still turning here.

Q.    All right.  Let's just give it a second to load up.

A.    Okay.  I have it.

Q.    Okay.  Once you have it loaded, please let me know if you've seen this document before.

A.    Not this specific document, no.

Q.    Okay.  I'm going to share my screen to bring you to page 67 of this document.

Mr. Zarcu, are you aware that FINRA defines a cross trade as "where a trade is internalized or crossed between a FINRA member's two customers"?

A.    That is one -- one notion of a cross.

ZARCU - HIGHLY CONFIDENTIAL

Q.    Well, your notion of what a cross transaction is is inconsistent with what FINRA's is; correct?

MR. YAVITZ:  Objection.  Form.

A.    Can you show me the page, Counsel?

Q.    It should be up on the screen.

A.    Oh, sorry.  I've got to move my -- under the -- the other exhibit that I have here.

Okay.  So would you mind repeating the question?

Q.    Yes.  Are you aware that FINRA defines a cross trade as where a trade is internalized or crossed between a FINRA member's two customers?

MR. YAVITZ:  Objection.  Form.

A.    So a cross transaction, as I'm pretty sure I described in my report, as I'm referring to is that is one of the ways described in the industry is basically when you're crossing internally, to be able to book a trade such as an ADR trade, how do -- your own internal books

**Page 146**

ZARCU - HIGHLY CONFIDENTIAL

your own general accounts to the client, and a transaction that doesn't take place on an exchange, right, because you just created it and received it from the depositary, and that's referred to as a cross. And as you're seeing in documents received from the broker dealers, that is actually described as such in their own internal documents.

Q. Are you aware that your definition of cross transaction as you just described it, as you used in your report, is inconsistent with FINRA's definition of a cross transaction?

MR. YAVITZ: Objection. Form.

A. I don't know that it's inconsistent. It's still a transaction -- transacting securities from one account to another. They specify what they're requiring to be reporting in this specific instance.

Q. Okay. Well, FINRA defines it as a trade that's crossed between two customers.

ZARCU - HIGHLY CONFIDENTIAL

Do you see that?

MR. YAVITZ:  Objection.  Are you referring to something that actually specifies it's a definition anywhere in this page?

Q.    Yes.  Underneath where it says "Cross Trade Report," it says, "Where a trade is internalized or crossed between a FINRA member's two customers."

MR. YAVITZ:  So it uses the term "cross" when defining cross trade.  Understood.

MR. JACKSON:  Yes.

Q.    Now, when FINRA defines it, a cross trade has to consider between two customers; correct?

A.    The document that you showed me clearly says that here.  That's not an exclusive definition of a cross, Counsel.

Q.    Well, which two customers were involved in the plaintiffs' Bayer ADR purchases?

MR. YAVITZ:  Objection.  Form.

A.    As I mentioned, that's not on

ZARCU - HIGHLY CONFIDENTIAL
defining cross, Counsel. It's pretty clear in my report what I'm referring to.

Q. Right. And my question to you, again, is your definition of cross transaction is inconsistent with FINRA's definition of cross trade; correct?

MR. YAVITZ: Objection. Form. You haven't established that this is FINRA's definition.

A. My definition of a cross doesn't match what's in that document. But that doesn't mean anything.

Q. Now, FINRA here specifically defines the conditions that need to be present for a cross transaction to be reported to the over-the-counter reporting facility as one, Firm ABCD is submitting the trade; two, ABCD is acting in an agent capacity on both sides of the cross; and three, the trade is tape reportable but is not sent to clearing."

Do you see that?

MR. YAVITZ: Objection. Form.

A. I see that.

Page 149

ZARCU - HIGHLY CONFIDENTIAL

Q.    In reaching the conclusion that some of plaintiffs' Bayer ADR transactions were cross transactions, you didn't assess whether the reporting side code for the transaction indicated it was a sale or a cross, did you?

A.    Counsel, the documents provided by the broker dealers indicated as such.

Q.    They indicated --

A.    Cross.

Q.    Well, that wasn't my question.

My question was did you assess whether the reporting side code for the transaction indicated it was a sale under Code S or a cross under Code X?

MR. YAVITZ:  Objection.  Form.

A.    And I answered, Counsel, that I assessed it based on what the broker reports in their own internal documents as --

Q.    Okay.  So the answer is no, you did not assess whether the reporting side code for the transaction communicated there was a sale under Code S or a cross

Page 150

ZARCU - HIGHLY CONFIDENTIAL under Code X.

A.    I didn't consider Code S, no.

Q.    Okay.  Did you assess whether the counterparty was a different broker dealer?

A.    Yes, I did.

Q.    Okay.  Did you assess whether the trade was tape reportable but not sent to clearing?

A.    I did assess whether the trade was tape reportable, yes.

Q.    Did you assess whether the trade was sent to clearing?

A.    I assessed if the trade was reported to the tape, and I assessed they were sent to clearing because it was.  We have documentation stating so, yes.

Q.    Okay.  But you didn't mention that in your expert report; correct?

A.    I'm pretty sure I talk about settlement and the entire process of trading throughout my report, Counsel.

Q.    All right.  Well, in forming your opinions, you did not consider

ZARCU - HIGHLY CONFIDENTIAL

Macquarie's terms and conditions for its broker dealer customers, did you?

A.    I'm sorry.  Can you repeat that?

Q.    Yes.  In forming your opinions, you did not consider Macquarie's terms and conditions for its broker dealer customers; correct?

A.    I did not need to.

Q.    And in forming your opinions, you didn't consider Instinet's terms and conditions for its broker dealer customers, did you?

A.    We didn't have any transactions involving a broker dealer customer of any of these brokers, Counsel.

Q.    It's your opinion that none of the plaintiffs' transactions involved a customer of a broker dealer?

A.    Counsel, you just mentioned that I didn't read the policies regarding Macquarie's broker dealer clients.

Q.    Correct.

A.    Out of the transactions that I've seen involved a broker dealer client

Page 152

ZARCU - HIGHLY CONFIDENTIAL

of another broker dealer, the transactions that we've seen are between the investment managers of the plaintiffs and the broker dealers executing their transaction.

Q.    Aren't the investment managers customers of the broker dealer?

A.    But they're not broker dealer, Counsel.

Q.    They're broker dealer customers, are they not?

A.    Counsel, the way you're describing -- you're saying something now that's not the same as what you said a moment ago, and you're asking the question.

Q.    Okay.  Let me try to make this clearer.

Plaintiffs' investment managers were customers of the broker dealers they used to effectuate the Bayer ordinary share and Bayer ADR transactions in this case; correct?

A.    Correct.

Q.    Okay.  In forming your opinions,

Page 153

ZARCU - HIGHLY CONFIDENTIAL
did you consider Macquarie's terms and conditions for the customers of its broker dealer business?

MR. YAVITZ:  Objection.  Form.

A.    That's a different question than you asked earlier.

Q.    Okay.  Well, what's the answer to the new question in your view?

A.    I didn't read their policies, no.

Q.    Okay.  Did you review Instinet's policies?

A.    No.

Q.    Did you review Bank of America Merrill Lynch's policies?

A.    I didn't need to, no.

Q.    Did you review UBS' policies?

A.    I didn't need to.

Q.    Did you review Cowen's policies?

A.    No.

Q.    Did you review J.P. Morgan Securities' policies?

A.    No.

Q.    Did you review, in forming your

Page 154

ZARCU - HIGHLY CONFIDENTIAL
opinions in this case, any of the terms
and conditions of any broker dealer?

A.    I did not review terms and
conditions, no.

Q.    And you've never worked at any
of the broker dealers whose customer
obligations you discuss in your report;
correct?

A.    I used to work for Bank of
America.

Q.    Okay.  Did you work in Bank of
America's broker dealer business?

A.    Certainly.

Q.    Okay.  And when was that?

A.    That's stated in my -- 2001 to
2004, I believe.

Q.    Okay.  So 19 years ago, you
worked for Bank of America's broker dealer
business; correct?

A.    I think the math is correct,
Counsel.

Q.    Have you since that time ever
reviewed Bank of America Merrill Lynch's
agreements with its customers?

Page 155

ZARCU - HIGHLY CONFIDENTIAL

A.    No.

Q.    Okay.  And you haven't worked on a trading desk for over a decade now; right?

A.    Actually, I run a trading business right now as we speak, Counsel.

Q.    Oh, TradeDynamiX.  Of course.

So TradeDynamiX trades for its own account.

A.    Correct.

Q.    Okay.  Now, let's look at paragraph 24 of your report, previously marked as Exhibit 1.

A.    24?

Q.    Yes.

A.    Okay.

Q.    And here, you say, "Under well-established industry practice, because plaintiffs had placed orders for ADRs as summarized above, they were irrevocably obligated to take and pay for those ADRs when their brokers had committed funds to acquire the underlying Bayer ordinary shares overseas."

ZARCU - HIGHLY CONFIDENTIAL

Do you see that?

A.    Yes.

Q.    Is it your opinion that industry practice determines where legal liability attaches?

MR. YAVITZ:   Objection.   Form.

A.    As I mentioned before, I'm not a lawyer.   I'm not here to offer a legal opinion.

Q.    Okay.   In paragraph 31, you refer to the norms, practices, conventions, and expectations of market participants.

Do you see that?

A.    If I can get there.   One second, please.   Where are we looking?

Q.    Paragraph 31.   And it's the last sentence there.   You say that you considered the norms, practices, conventions, and expectations of market participants.

Do you see that?

A.    I do.

Q.    Is it your opinion that norms,

ZARCU - HIGHLY CONFIDENTIAL
practices, conventions, and expectations determine the contractual obligations of market participants?

MR. YAVITZ:  Objection.  Form.

A.    If you're asking for a legal opinion, that's not what I'm offering.

Q.    Okay.  Now, the only judicial decision you mentioned in your expert opinion here is the Central District of California's decision in Toshiba; correct?

A.    That sounds right.

Q.    Are you aware of other case law addressing how to determine whether an ADR purchase is domestic or foreign?

MR. YAVITZ:  Objection.  Form.

A.    That wasn't part of my assignment.

Q.    Okay.  So you don't know how to -- you don't know how to determine what cases are or are not relevant to determining where liability attaches to a financial transaction; correct?

A.    Again, that wasn't part of my assignment.

Page 158

ZARCU - HIGHLY CONFIDENTIAL

Q. Okay. So I'm going to mark as our next exhibit -- and we'll just go over this, and then we can break for lunch -- the Ninth Circuit's decision in Toshiba.

(Zarcu Exhibit 6, Ninth Circuit's decision in Toshiba case, was hereby marked for identification, as of this date.)

Q. And this will be Exhibit 6.

Mr. Zarcu, please let me know when you have that loaded.

A. Yeah. I don't have it just yet. Let's see. I see now it's loading.

Q. Please let me know when it's loaded.

A. Yes. I have it now.

Q. Okay. Have you ever read the Ninth Circuit's decision in the Toshiba case?

A. I don't believe I did.

Q. Okay. Let's go to page 10 of the document. There's a heading there that says --

A. Page 10? Hold on. I'm sorry.

Page 159

ZARCU - HIGHLY CONFIDENTIAL

Q.    Yes.  Let me know when you're there.

A.    You mean the actual page that's stated in the middle or the PDF page?

Q.    The page number on the bottom right.

A.    I see.  Okay.

Q.    So on page 10, there is a paragraph that starts with the phrase "Cases since Morrison."

Do you see that?

A.    Yes.

Q.    And I'm just going to read to you a passage from that paragraph.  That paragraph reads, "Cases since Morrison have articulated an 'irrevocable liability' test to determine when a securities transaction is domestic... Because irrevocable liability determines the timing of a transaction, it also determines the location a plaintiff must plausibly allege 'that the purchaser incurred irrevocable liability within the United States to take and pay for a

Page 160

ZARCU - HIGHLY CONFIDENTIAL
security, or that the seller incurred
irrevocable liability within the
United States to deliver a security.'"

Do you see that?

A.    I do.

Q.    Okay.  Now let's go to page 11.

And towards the top left-hand
corner of that page, it says "factual
allegations concerning contract formation,
placement of purchase orders, passing of
title, and the exchange of money are
directly related to the consummation of a
securities transaction."

Do you see that?

A.    I actually don't.  I'm sorry.
Where are we?

Q.    It's the first full paragraph on
page 11.  It's about a third of the way
down on the left-hand -- well, actually,
not the first full paragraph.  It's the
paragraph at the top left, the last
sentence.

A.    Oh, after "Furthermore."  Okay.
You started.

Page 161

ZARCU - HIGHLY CONFIDENTIAL

Q.    Yes.    Yes.    "Factual allegations concerning contract formation, placement of purchase orders, passing of title, and exchange of money are directly related to the consummation of a securities transaction."

Do you see that?

A.    I do.

Q.    Okay.  In forming your opinions about plaintiffs' Bayer ADR purchases, what evidence, if any, did you consider relating to contract formation?

A.    I'm sorry.  What -- would you repeat that, please?

Q.    Sure.  In forming your opinions about the plaintiffs' Bayer ADR purchases, what evidence, if any, did you consider relating to contract formation?

A.    Counsel, I did not consider legal aspects of the opinion.  I'm offering you the opinion of just a market practitioner, not as a lawyer.

Q.    Well, I know.  But what I'm asking is, in forming your opinions about

Page 162

ZARCU - HIGHLY CONFIDENTIAL

plaintiffs' Bayer ADR purchases, what factual materials did you consider that relate to contract formation?

A.    I don't know what you mean by --

MR. YAVITZ:  Objection to form.

A.    I'm not sure what you mean by "contract formation."  I've considered all the documents that we've discussed, everything in the case from orders placed by the investment managers to FIX orders to the documentations received back by the investment managers confirming those trades.  We've discussed what I've reviewed.  So all those --

Q.    Now --

A.    -- point to me when that obligation occurred.

Q.    Now, earlier you testified that in forming your opinions in this case, you did not consider factual evidence relating to the passing of title; is that correct?

A.    I did not look at the actual title.  That seems like outside of my scope.

Page 163

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  And what evidence, if any, relating to the exchange of money did you consider in forming your opinions about plaintiffs' Bayer ADR purchases?

A.    The investment managers instructed their brokers to acquire the local share overseas, which obviously involved an exchange of money overseas in order to create ADRs.

Q.    Okay.  Well, I think now is a good time to break.  So why don't we go off the record.

A.    Okay.

THE VIDEOGRAPHER:  Okay.  Off the record 12:31 p.m. Eastern Standard Time.

(Luncheon recess:  12:31 p.m.)

**Page 164**

ZARCU - HIGHLY CONFIDENTIAL

A F T E R N O O N   S E S S I O N

1:07 p.m.

THE VIDEOGRAPHER:  We are back on record 1:07 p.m. Eastern Standard Time.

BY MR. JACKSON:

Q.    Welcome back, Mr. Zarcu.

A.    Thank you.  I don't think I see you on camera, though.

Q.    I can see myself on camera.  Why don't we go off the record and get this sorted.

A.    It's all good.  It gave me -- it just popped -- an arrow key popped up, and I just was able to --

Q.    Okay.  Okay, great.

Same question as for the last break.  Did you discuss the substance of your testimony with anyone during your break?

A.    I did not.

Q.    I'd like to ask you some questions about paragraphs 25 through 37 of your report.  These are the paragraphs

Page 165

ZARCU - HIGHLY CONFIDENTIAL concerning the June 6, 2016, purchases by SMW and Local 710.

Please let me know when you're there.

A.    I am there.

Q.    I'm going to use the term "market order" to refer to an order to buy or sell a security at the best available price.

Do you understand?

A.    I understand that it's not necessarily the definition of a market order, but fine.

Q.    That's the definition I'll use just for simplicity sake.

A.    That's fine.

Q.    Now, you don't contest in your report that this transaction or these transactions, the June 6, 2016, purchases by SMW and Local 710, did not involve a market order; correct?

MR. YAVITZ:   Objection.   Form.

A.    That's a double negative there. So --

Page 166

ZARCU - HIGHLY CONFIDENTIAL

Q.    Yeah.  Let me -- let me try to -- let me try to rephrase it.

The June 6, 2016, purchases by SMW and Local 710 did not involve a market order as I just defined it; correct?

MR. YAVITZ:  Objection.  Form.

A.    I think it did involve a market order as you described it, obtaining the best possible price available.

Q.    In order to buy or sell a security immediately at the best available price?

All right.  Well, let's look at paragraph 27 here.

A.    Okay.

Q.    Now -- let me -- let me rephrase that.

I'm going to use the term "market order" to refer to an order to buy or sell a security immediately at the best available price.

Is that agreeable to you?

A.    Yes.

Q.    Okay.  And do you contest that

ZARCU - HIGHLY CONFIDENTIAL

this transaction -- these transactions did not involve a market order?

MR. YAVITZ:  Objection.  Form.

A.    They were not an instruction to execute it i,mediately.  That's for sure.

Q.    Okay.  So let's look at paragraph 27.  The communication here is between Harding Loevner and Macquarie on June 6th at 5:18 p.m. Eastern Time.

Do you see that?

A.    Yes.

Q.    5:18 p.m. in New York is 11:18 p.m. in Germany; correct?

A.    Yeah, I think so.

Q.    So the local German market wasn't open at the time of this communication; correct?

A.    Yes.

Q.    So this order could not be executed immediately; correct?

A.    It couldn't.

Q.    And the entire order could be cancelled at least until the German market opened the following day; correct?

Page 168

ZARCU - HIGHLY CONFIDENTIAL

A.    Yes.

Q.    Paragraph 29, you mention that this order involved an instruction to purchase at OTD Max 20 percent.

Do you see that?

A.    Correct.

Q.    And in footnote 19, you define OTD Max 20 percent as instructing the broker to spread the purchase throughout the trading day while aiming to keep the number of shares traded to no more than 20 percent of the volume traded that day.

Do you see that?

A.    Yes.

Q.    So for this -- for these transactions, the broker was instructed to spread the purchase of the ordinary shares throughout the trading day; correct?

A.    Yeah.  It was an over-the-day instruction.  Yes.

Q.    And that means that because the order was OTD Max 20 percent, it could not be executed immediately; correct?

A.    It could not have been executed

ZARCU - HIGHLY CONFIDENTIAL

immediately.  Yes.  It was an over-the-day order.  Correct.

Q.    Now, in paragraph 26, going back up there, it says that Harding Loevner purchased 577,938 ADRs.

Do you see that?

A.    Yes.

Q.    Now, if this were a market order for ADRs, 577,938 ADRs would have been purchased; correct?

MR. YAVITZ:  Objection.  Form.

A.    If it would have been a market order, presumably, it would have been executed, acquired local shares, and converted to ADRs.  That's the scenario we're discussing?

Q.    Yes.

A.    Generally, I think yes.

Q.    Okay.  And then in paragraph 30, and also in paragraph 33, you mention that only 577,403 ADRs were purchased.

Do you see that?

A.    Yes, I do.

Q.    Okay.  Does that change your

Page 170

ZARCU - HIGHLY CONFIDENTIAL

opinion about -- well, you know what?

Strike that.

Let's now go to paragraph 40. This refers to the August 2, 2016, purchases by SMW and Local 710.

Here, it says that Harding Loevner sent the instructions for this order at 4:43 p.m. Eastern Time.

Do you see that?

A.    We're looking at August 2nd? I'm sorry?

Q.    Yes.  That's right.

A.    Where is the time?  I don't see the time immediately, as I'm staring at it, but --

Q.    Paragraph 40.

A.    Oh, I'm sorry.  Yes. Paragraph 40, 4:43.  Yes, I do see that.

Q.    So the instructions for that trade were sent when the German markets were closed; correct?

A.    As well as the United States markets, yes, correct.

Q.    Right.  And then let's look at

Page 171

ZARCU - HIGHLY CONFIDENTIAL

paragraph 44.  Paragraph 44 refers to an instruction that was sent at 8:44 p.m. Eastern Time.

Do you see that?

A.    Yes, I do.

Q.    And the German markets were closed when that instruction was sent; correct?

A.    Yes, I believe so.

Q.    All right.  Now let's look at paragraph 61, which relates to the December 8, 2016, purchases by SMW and Local 710.  In paragraph 61, there's a reference to instructions that were sent at 4:30 p.m. Eastern Time.

Do you see that?

A.    Yes.

Q.    Okay.  So the German markets were closed when that instruction was sent; correct?

A.    Correct.

Q.    Okay.  And now let's look at paragraph 70.  This one refers to the December 18, 2017, purchases by SMW and

Page 172

ZARCU - HIGHLY CONFIDENTIAL

Local 710.

In paragraph 70, it says that there are instructions that were sent at 4:52 p.m. Eastern Time.

Do you see that?

A.    Yes.

Q.    And the German markets were closed when those instructions were sent; correct?

A.    Yes.

Q.    Now, because the German markets were closed when Harding Loevner sent the instructions in paragraphs 40, 44, 61, and 70, which we just discussed, these orders could not execute immediately; correct?

A.    Correct.

Q.    And if these orders were subject to an OTD max 20 percent limitation, this means that a broker was instructed to place a series of orders for ordinary shares throughout the trading day in Germany; correct?

MR. YAVITZ:    Objection.    Form.

A.    Under that scenario, if

Page 173

ZARCU - HIGHLY CONFIDENTIAL

the broker was instructed -- I mean, if the broker is instructed to execute over the day, yes.

Q.   Okay.  Let's talk about the December 9, 2016, purchases by SMW and Local 710, paragraphs 59 through 67.

Now, let me know when you're there.

A.   I am there.

Q.   Okay.  You don't contest that SMW and Local 710 received title to and custody of existing Bayer-sponsored ADRs for these purchases; correct?

A.   I do not have any opinion in my report regarding the title transfer, no.

Q.   Okay.  So you contend that for these purchases, SMW and Local 710 only received existing ADRs because of a delay in ADR issuance.

That's the term you used in paragraph 66; correct?

A.   Let me glance at it to just verify, but likely.

(Witness perusing document.)

Page 174

ZARCU - HIGHLY CONFIDENTIAL

Yes.   Would you mind repeating? I'm sorry.

Q.   Yeah.   You contend that SMW and Local 710 only received existing ADRs from these purchases because of a delay in ADR issuance; correct?

MR. YAVITZ:   Objection. Mischaracterizes his report.

A.   What I'm saying is a broker dealer had to borrow the shares.

Q.   Okay.

A.   They hadn't received their ADRs from BNY Mellon.   The records show that they're issued two days late.

Q.   Okay.   So the shares that were received by SMW and Local 710 were existing ADRs; correct?

A.   I don't know what they were -- what SMW and 7 -- Local 710 received.   All we know is what the broker dealer received.

Q.   Okay.   So you see no evidence that the -- that SMW and Local 710 received newly issued ADRs in connection

ZARCU - HIGHLY CONFIDENTIAL

with the December 9, 2016, purchases; correct?

A.    What I've seen is that the BNY Mellon depositary was delayed in issuing the ADRs, and as a matter of operational process on Wall Street, when somebody fails to deliver on settlements, it is normal practice to go borrow those shares to make the delivery whole.  Those -- that process of settlement is unrelated to the process of the actual trading and the acquisition.

Q.    Okay.  Now, are you aware that SMW's purchase of 11,000 ADRs on December 9, 2016, was executed by Morgan Stanley?

A.    I'm sorry.  Which one?

Q.    Morgan Stanley.

A.    No, no.  I meant which transaction?  Can we --

Q.    Yes.  Are you aware that SMW's what you call their December 8, 2016, purchase was executed by Morgan Stanley?

MR. YAVITZ:  Objection.  Form.

ZARCU - HIGHLY CONFIDENTIAL

A.    Counsel, I'm aware that Morgan Stanley was involved at some point, but can you point me to my report so I can review what we're talking about?

Q.    Well, I'd like to, but are you aware that you don't even mention Morgan Stanley in your report?

A.    It is possible.

Q.    Do you have any idea why you don't mention Morgan Stanley in your report?

A.    So in the process of reviewing the documentation, there's repeated mention of step-out trades, which basically involved a payment of commissions to a broker that's not executing in the case.  So Morgan Stanley may have been one of them.  It's possible.

Q.    Did you examine -- well, strike that.

Are you aware, Mr. Zarcu, that SMW made 12 purchases of Bayer ADRs that were executed by Morgan Stanley?

MR. YAVITZ:  Objection.  Form.

ZARCU - HIGHLY CONFIDENTIAL

Foundation.

A.    Counsel, are we referring to the transactions at hand?

Q.    Yes.  I'm asking you if you're aware that 12 of SMW's purchases of Bayer ADRs during the class period were executed by Morgan Stanley.

MR. YAVITZ:  Objection.
Foundation.  I don't believe you have established that fact.

Q.    You may answer.

A.    Can you point me to where that is?  Because I'm not sure what you're referring to, Counsel.  I'm sorry.

Q.    Well, I'm just saying you didn't consider that in your report, did you?

MR. YAVITZ:  Objection.
Foundation.

A.    I considered all the documentation related to each of the transactions involved.

Q.    Did you consider whether Morgan Stanley fulfilled SMW's orders from its inventory of existing Bayer ADRs?

ZARCU - HIGHLY CONFIDENTIAL

A.    As mentioned in my report, I have considered where the acquisitions took place, and I'm pretty sure I'm stating that in my report throughout it.

Q.    Okay.  So you have no explanation for why your report doesn't mention Morgan Stanley.

MR. YAVITZ:  Objection. Argumentative.  Form.

A.    I gave you my explanation, Counsel.

Q.    What evidence do you have that Local 710's purchase of 12,400 Bayer ADRs on December -- what you say is December 8, 2016, was part of the larger purchase of 240,000 -- I'm sorry.  Let me strike that.  Let me start that one over.

What evidence do you have that Local 710's purchase of 12,400 Bayer ADRs was part of the larger purchase of 243,245 ADRs?

A.    The average price happens to be exactly the same, all the communications involved in the trade, so I'm listing all

ZARCU - HIGHLY CONFIDENTIAL

of that in my report.

Q.    Now, in forming your opinion here, you didn't consider when the custodial transfer of the block of 243,245 ADRs occurred, did you?

MR. YAVITZ:  Objection.  Form.

A.    As I mentioned prior and I mentioned in my report, the settlement issue is a separate -- separate issue altogether.  It's got nothing to do with when the client became obligated to take and pay for the ADRs.

Q.    So that's a no, you didn't consider when the custodial transfer of the large block of ADRs occurred.

MR. YAVITZ:  Objection.  Form.

A.    I think I'm stating in my report that I'm considering all of that.  I'm addressing it.  I'm addressing Professor Mitts' points, and I'm pointing out why he's wrong.  So yes, I am considering it.

Q.    Okay.  So where in your report does it say that you considered when the custodial transfer of the block of 243,245

Page 180

ZARCU - HIGHLY CONFIDENTIAL

ADRs occurred?

A.    Counsel, I'm not addressing that specific trade.  I'm making a general statement in my report that separates the two parts of the transaction, one being the acquisition, the actual trade, and the other one the settlement.

Q.    Okay.  So for the transactions that are addressed in paragraph 59 through 67 of your report, did you consider when the custodial transfer of the 12,400 ADRs to Local 710 occurred?

MR. YAVITZ:  Objection.  I think you directed the witness already to paragraph 66.

A.    I think I'm addressing that, right, in the fact that BNY Mellon was delayed in issuing the ADRs.

Q.    Yeah, but did you address when the custodial transfer of the 12,400 ADRs to Local 710 occurred?

MR. YAVITZ:  Objection.  Form. Asked and answered.

A.    I addressed the overall block.

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  And where does it -- here does it say that you considered evidence of when the custodial transfer of the overarching block of 243,245 ADRs occurred?

MR. YAVITZ:  Objection.  Form.  Asked and answered.  You can answer.

A.    Sorry.  Paragraph 66, as discussed above, the records produced by BNY Mellon indicate that it issued 243,245 ADRs on December 16th, two days after the December 14th settlement.

Q.    Is it your understanding that when ADRs are issued, that that occurs at the exact same time as the custodial transfer of ADRs?

MR. YAVITZ:  Objection.  Form.  Incomplete hypothetical.

A.    Not necessarily.

Q.    Okay.  So it is possible for ADRs to be issued on one day and then for the custodial transfer to occur on another day; correct?

A.    It is possible.

Page 182

ZARCU - HIGHLY CONFIDENTIAL

Q.    Now, paragraph 66 addresses the day on which the new ADRs were issued; correct?

MR. YAVITZ:  Objection. Mischaracterizes report.

A.    I am describing the delay in the creation of the ADRs.  Yes.

Q.    Okay.  And by the creation, you mean the issuance; correct?

A.    Correct.

Q.    Now, paragraph 66 does not address the custodial transfer of ADRs, does it?

MR. YAVITZ:  Objection. Mischaracterizes report.

A.    It doesn't need to address the custodial transfer, no.

Q.    Okay.  In forming your opinion about the December 8, 2016, purchases by SMW and Local 710, you did not examine FINRA trading records to determine whether the 12,400 existing Bayer ADRs were purchased on the secondary market, did you?

Page 183

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.

A.    I examined every FINRA record that I have, yes.

Q.    Okay.  And where here does it say that you examined FINRA records relating specifically to the purchase of 12,400 Bayer ADRs by the plaintiffs on December 8, 2016?

A.    I don't know if I'm referring specifically to this trade.

Q.    But you claim that you reviewed that evidence, but you didn't mention it in your report?

A.    I reviewed every single FINRA document, yes.

Q.    Now, in your opinion, would it be rational for a trader to purchase a large block of ADRs in the domestic market when a similarly sized block was just sold in that same market?

MR. YAVITZ:  Objection.  Form.

A.    Could you please re -- I guess, rephrase that or re-ask it?

Q.    Yeah.  In your opinion, would it

Page 184

ZARCU - HIGHLY CONFIDENTIAL

be rational for a trader to buy a large block of ADRs on the domestic market if a similarly sized block was just sold on the domestic market?

A.    That doesn't give me enough information at all.

Q.    Okay.  If -- if -- so why -- what information would you need to make an assessment as to whether it would be rational for a trader to buy on the domestic market in that circumstance?

A.    I'd need historical information. I'd need historical volumes, historical price movements, volatilities, bid-ask spreads, all sorts of different things.

Q.    Well, let's assume that the price of Bayer ADRs is the same if you buy new -- newly issued ADRs through conversion or if you acquire them on the secondary market.

Would it be rational for a trader to buy a large block of ADRs on the secondary market when a similarly sized block was just sold on that market?

Page 185

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.
Incomplete hypothetical.

A.    Not at all.

Q.    Why not?

A.    Because the trader doesn't have enough information to make that decision.

Q.    Okay.  So what information would the trader need?

A.    Everything that I listed earlier, Counsel.  If -- just because a block gets printed on the tape, that doesn't tell you anything about the liquidity available in the marketplace. Every single one of these transactions that we're discussing printed to the tape or reported to the tape as such.

So the 577,000 block trade that we discussed in Macquarie, that was reported, so was this block.  So if a trader attempted to place another order for 577,000, they would have destroyed the market in the shares, because only -- if I remember correctly, less than 300,000 shares traded that day in the local -- in

ZARCU - HIGHLY CONFIDENTIAL the U.S. market for the ADRs.  So --

Q.    Okay.

A.    -- that's why.

Q.    I see.  So let me try to rephrase this, then.

Let's assume that both -- just assume for the sake of argument that both the -- that Bank of New York Mellon can accommodate a request to purchase a certain quantity of ADRs and the secondary market is sufficiently liquid that it could also accommodate a purchase of that same quantity of ADRs.

Would it be rational for a trader to purchase a large quantity of ADRs on the secondary market if a similar block was just sold on the secondary market?

MR. YAVITZ:  Objection. Incomplete hypothetical.

A.    Counsel, there is so much more information that I need to tell you what decision I would make as a trader.

Q.    Okay.  Well, let's go to --

ZARCU - HIGHLY CONFIDENTIAL

let's move on to a different transaction.

Let's talk about the November 17, 2016, purchase by IUOE, which is on paragraph 78 through 84.

A.    Okay.

Q.    Now let's go to paragraph 79 and examine the correspondence that you have incorporated into your report.

A.    Okay.

Q.    From 6:54 a.m. Eastern Time through 9:57 a.m. Eastern Time, Mr. Wakeman is purchasing 125,000 Bayer foreign shares at Mr. Hufcut's request.

Do you see that?

A.    Yes.

Q.    And at 9:57 a.m. Eastern Time, Mr. Wakeman writes that he completed the purchase of 125,000 Bayer foreign shares.

Do you see that?

A.    Yes.

Q.    And then at 10:49 a.m.  Eastern Time, which is nearly an hour later, Mr. Hufcut requests "a little more on the ord side and some ADRs as well... I would

ZARCU - HIGHLY CONFIDENTIAL

like this to be all done in the locals at one average and converted back, please."

Do you see that?

A.    Yes.

Q.    And then Mr. Wakeman explains that he "will finish the 150K and then do the manual locals for the ADR amount and average together."

Do you see that?

A.    Yes.

Q.    And then at 11:21 a.m., Mr. Wakeman writes, "Total BAYN GY bought 174,730," and then it says "Gross 91.4779," to which Mr. Hufcut replies, "Great, thanks."

Do you see that?

A.    Yes.

Q.    Then at 11:29 a.m. Eastern Time, Mr. or Ms. Lawn writes, "John, you bought 24,730 BAYRY at $97.605.  Local price equals 91.47795 Euros.  FX equals 1.06665.  Conversion cost equals $0.03 a share."  And then he writes, "I will put the ADR fill in once you agree."

Page 189

ZARCU - HIGHLY CONFIDENTIAL

Do you see that?

A.    Yes.

Q.    And then Hufcut says, "Looks good to me," and then Lawn says, "Thanks, John.  Going in now on ADR."

Do you see that?

A.    Yes.

Q.    Now, the sentence "I will put the ADR fill in once you agree" shows that Mr. Hufcut was not obligated to accept the ADR fill at that moment; correct?

A.    No.

MR. YAVITZ:  Objection to form. Sorry.  You can answer.

A.    It does not.

Q.    Why is that?

A.    They are merely talking about the details on the FX just confirming. It's a confirmation.  It's not an order. The order was placed when he asked them to actually acquire the underlying shares for the ADRs.

Q.    So in your point of view, it's completely unnecessary, it's totally

Page 190

ZARCU - HIGHLY CONFIDENTIAL

superfluous for Mr. Lawn to ask if Mr. Hufcut agrees and for Mr. Hufcut to indicate his agreement.

MR. YAVITZ:  Objection. Argumentative.

A.    I didn't say that at all.

Q.    Okay.  So what is the purpose of Mr. Lawn or Ms. Lawn asking whether or not Mr. Hufcut agrees to the ADR fill?

MR. YAVITZ:  Objection.  Form. Mischaracterizes document.

A.    The question is if he's confirmed the details, meaning the FX rate, meaning the charge for the ADRs. That's what that's referring to.

Q.    So -- so it's referring to the price for the ADR fill?

MR. YAVITZ:  Objection.  Form.

A.    It's referring to the terms of the ADR conversion.

Q.    So your opinion is that -- your opinion is that IUOE here became liable to purchase ADRs even before the terms of that contract had been set and agreed to?

Page 191

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.
Argumentative.

A.    So they are liable to acquire and pay for those shares the moment they start acquiring them, yes.

Q.    In what quantity and at what price?

A.    Again, it depends.  It depends. If they stopped before they finished the order, they would have been liable to acquire the exact shares they completed. At the end, they were liable to acquire the entire 24,730.

Q.    So your opinion is that whenever someone says, "I would like to acquire ADRs by converting them -- by using foreign shares," that they become immediately liable for an unknown quantity and an unknown price the second the foreign shares are brought.

Is that your opinion?

MR. YAVITZ:  Objection. Argumentative.  Mischaracterizes testimony.  Let's tone it down a

Page 192

ZARCU - HIGHLY CONFIDENTIAL

little bit, please, Mr. Jackson.

A.      Counsel, there's nothing unknown about a transaction that just occurred; right?  If I have acquired the shares, I clearly know the price.  That means I've effected FX transactions during that time period, so I would know what that rate is. So what you're seeing is just a confirmation that here's the local price and here's the conversion after the FX rate was 1.0665, and the conversion cost is $0.03 a share.  That's all that is.

Q.      Okay.  So in your point of view, IUOE became liable to purchase the ADRs once they made the order to buy the foreign shares?

MR. YAVITZ:  Objection.  Form. Mischaracterizes testimony.

A.      No, Counsel.  What I stated is that they became liable the moment those shares were acquired.

Q.      And how -- and when you --

A.      To convert them into ADRs, not when the order is placed.

Page 193

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  So your opinion is that IUOE became liable to buy ADRs once the order to buy the ordinary shares was executed; correct?

MR. YAVITZ:  Objection.  Form. Mischaracterizes testimony.

A.    What I stated is that they became liable the moment the broker began executing those.  So at any point in time, even if they cancelled the order while it was executing, they would have been liable for the shares that had been acquired up to them.

Q.    Okay.  And at what price would they have been liable to purchase the ADRs at the moment the ordinary shares began executing?

A.    The average price of the locals were acquired, considering the FX rate during that time and including the conversion cost.

Q.    Okay.  Even though those hadn't been agreed upon until 11:29 a.m. Eastern Time.

ZARCU - HIGHLY CONFIDENTIAL

A.    Counsel, you can't agree on a local price until you actually execute it; right?  Until you actually know what that price is, you can't agree on an FX exchange rate until you know what that is. So yes.  They would have to wait until it's executed to know what they agreed to.

Q.    Your testimony is that IUOE became liable to buy ADRs, but they wouldn't know exactly what they became liable for until after the ordinary shares were purchased?

MR. YAVITZ:  Objection.  Form. Mischaracterizes testimony.

A.    Counsel, when an order is executed over a period of time, how could someone know in advance what that price is going to be unless there's some kind of guarantee involved?

Q.    Okay.  So let's suppose that Bank of America Merrill Lynch had reneged, had failed to execute the ADR fill if the transaction had stopped after the ordinary shares were purchased.

Page 195

ZARCU - HIGHLY CONFIDENTIAL

What would IUOE have been liable for to their trading counterparty?

MR. YAVITZ:  Objection.  Form. Incomplete hypothetical.

A.    What do you mean by they would have failed to execute?  I don't understand.

Q.    Well, let's -- let me try to put this a different way.

Let's say the ADR fill was never put in.  And let's say -- so what would IUOE have been liable for to their trading counterparty for the ADR trade?

MR. YAVITZ:  Objection.  Form. Which trading counterparty?

A.    Your hypothetical is highly -- it's incomplete, first of all.  Who is -- who is not putting the order in?

Q.    Well, let me ask you a question.

Was -- let me ask you a different question.

Was Mr. Hufcut entitled to reject Lawn's offer to put in the ADR fill?

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.

A.     No.

Q.     So why did Lawn in your view ask Hufcut for whether he agreed to the terms of this transaction?

MR. YAVITZ:  Objection.  Form.

A.     So whenever you complete an order, you give the client a confirmation that here's what I just executed, and there's a component in there, right, the conversion cost, and I'm just looking for final confirmation.  Look at all these terms.  Yes, go ahead.

Q.     Okay.  If Hufcut had said, "I don't want you to put the ADR fill in.  I would like to just keep the ordinary shares," would that have been acceptable?

MR. YAVITZ:  Objection.  Form.

A.     That's just not the way this -- the market works, Counsel.  There's a clear instruction to acquire shares with the purpose of converting them.  So that means that a portfolio manager had taken the time to research what instrument they

ZARCU - HIGHLY CONFIDENTIAL

want to be invested in, and once that order is placed, it is not something that a trader would decide, Oh, I'm going to just cancel because now I'm going to take the locals.  It just doesn't work that way.

Q.    Okay.  So in your telling, the phrase "I will put the ADR fill in once you agree" was just to provide confirmation to Mr. Hufcut.  It wasn't a request for permission.  Is that fair?

A.    Definitely --

MR. YAVITZ:  Objection.  Form.

A.    -- a request for permission.  "I will put the ADR in" simply means that I will probably send you the FIX confirmation for you to receive, nothing else.

Q.    Okay.  And then -- so you just referred to the "I will put the ADR fill in" portion of sentence.

What does the "once you agree" portion of that sentence refer to?

A.    As we discussed earlier, the

ZARCU - HIGHLY CONFIDENTIAL

trader -- and actually, Lawn may not have been a trader, but the point is the representative of the broker dealer is just simply confirming to the client these are the actual terms of the conversion confirmed, and I will send it.

Q.    So in your telling, the phrase "once you agree" means confirmed; Is that correct?

A.    It is industry practice that after executing an order of this nature, you will confirm with the clients before you send the orders back as a confirmation.  Yes.

Q.    What happens if the client rejects the confirmation?

A.    The client cannot reject the confirmation.  The client can't say, "Oh, I disagree with the $0.03 per share conversion cost."  I agree with BNY to be 2.5, but that's about it.

Q.    Okay.  And what happens in that circumstance?

A.    In that circumstance, the broker

ZARCU - HIGHLY CONFIDENTIAL

dealer may say, "Oh, sorry.  Apologies. That's going to be 2.5."  And they likely adjust.  If that cost of conversion is including in the final price reported in dollars, that gets amended, and then the confirmation gets sent by FX.

Q.    So is the purpose of this confirmation, as you call it, to finalize the terms of the transaction?

A.    No.

MR. YAVITZ:  Objection.  Form.

A.    It is not.  It's just to confirm the terms.

Q.    Okay.  So what agreement exactly in your point of view is Mr. or Ms. Lawn here asking about?

MR. YAVITZ:  Objection.  Form.

A.    I think I've answered that multiple times, Counsel.  They're just agreeing on the terms displayed.

Q.    All right.  Let's move on to paragraphs 85 through 90.  This concerns the February 22nd and 23, 2017, purchases by IUOE.

ZARCU - HIGHLY CONFIDENTIAL

Now, for this purchase, there was no instruction to buy Bayer ADRs before the purchase of the foreign shares; correct?

MR. YAVITZ:  Objection.  Form.

A.    I need to glance at this real quick, Counsel.

Q.    Sure.

A.    (Witness perusing document.)

Okay.  Would you mind repeating your question?  Sorry.

Q.    Yeah.  Actually, just before we do that, another quick question about the document we just discussed.

So what if -- what happens if the client --

A.    Sorry.  Which document we just discussed?

Q.    The Hufcut/Lawn conversation. But just a question about the confirmation process as you described it for ADR transactions.

What happens if the client rejects the conversion cost?

**Page 201**

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.

A.    Which conversion cost are we referring to?

Q.    Let's start with the FX conversion cost.

What happens if the client rejects the FX conversion cost?

MR. YAVITZ:  Objection.  Form. Incomplete hypothetical.

A.    You've got to give me some background here.  Why would the client reject the foreign exchange rate?

Q.    All right.  Let's go back to paragraph 79.  And let's look at the 11:29 a.m. Eastern Time chat from Mr. or Ms. Lawn.  You know, there, it says -- well, let's start with the conversion cost.

So right here, it says conversion cost equals $0.03 a share.

What happens if the client says, "I don't agree to that"?

MR. YAVITZ:  Objection.  Form. Incomplete hypothetical.

Page 202

ZARCU - HIGHLY CONFIDENTIAL

A.    I think I already answered that question.  I gave you the example if the client says 2.5 because that's what they agreed with by BNY, that just gets changed.

Q.    Okay.  All right.  Let's move back to paragraph 79.

Okay.  Now let's go to 86.  86. Paragraph 86.

So --

A.    86.  Okay.

Q.    So the chat transcript here describes an order to buy more than 200,000 Bayer foreign shares; correct?

A.    Well, that's not correct, actually.  There's no specification of what securities they're discussing. However, my research shows that that's what they're referring to.

Q.    Okay.  And now let's go to paragraph 88.  Here, there is a reference to the purchase of 67,225 and 39,475 newly issued Bayer ADRs.

Do you see that?

Page 203

ZARCU - HIGHLY CONFIDENTIAL

A.    Yes.

Q.    And in paragraph 88, you also mention that the settlement date for the newly issued ADRs was March 2, 2017.

Do you see that?

A.    Yes.

Q.    So that settlement date of March 2, 2017, is six trading days after the February 22, 2017, chat referred to in paragraph 86; correct?

A.    It appears that way.  I'm not looking at a calendar here.

Q.    Okay.  The settlement timeline at the time of these trades was T plus three; right?

A.    I believe so.

Q.    And that generally means three trading days after a given transaction; right?

A.    Correct.

Q.    So the ADRs settled six days after the date that you claim IUOE became irrevocably obligated to purchase them; correct?

ZARCU - HIGHLY CONFIDENTIAL

A.    It appears that way.

Q.    And that's even though the settlement timeline at that time was T plus three; right?

MR. YAVITZ:  Objection.  Form.

A.    Yeah.  We've seen plenty of instances in other transactions where the -- those were delayed.

Q.    Okay.  What is your explanation for why the ADRs for this transaction settled six days after the day you claim IUOE became irrevocably obligated to purchase them?

MR. YAVITZ:  Objection to form.

A.    Unfortunately, this transaction doesn't provide sufficient information to establish why that is.  We just obviously see that it is.

Q.    Okay.  Let's go to paragraph 89. Here, you say the purchase price of the ADRs was $113.7895, so 78 and change cents; is that right?

A.    113.7895.  Yes.

Q.    Yeah.  So you were unable to

Page 205

ZARCU - HIGHLY CONFIDENTIAL

match this price to the purchase price of
the Bayer foreign shares; correct?

MR. YAVITZ:  Objection.

A.    There was not enough information
for that.

Q.    So what you did was you
calculated the local price in Euros using
a range of Dollar-Euro foreign exchange
conversion rates, and then you concluded
that the purchase price of 113.7895 was
within the range; correct?

A.    Yes.

Q.    Did you consider -- well, strike
that.

You didn't consider whether
existing ADRs that were purchased on
February 22, 2017, also traded within that
range of prices, did you?

A.    I don't -- let me see.
Actually, I'm pretty sure I'm mentioning
the ranges where they traded in
paragraph 87.

Q.    Well, you're referring there to
the ranges on February 22, 2017; correct?

ZARCU - HIGHLY CONFIDENTIAL

A.    I am referring to the ranges when the acquisition took place, yes.

Q.    Okay.  And you're saying that there, Bayer ADR is traded between 112.84 and 114 that day; right?

A.    I think so.  Yes.

Q.    And the purchase price of the ADRs here, as mentioned in paragraph 89, was 113.7895; correct?

A.    That may be a different day.  I don't know.  Let me see.

(Witness perusing document.)

Q.    Well, let me make this a little easier.

In the first paragraph -- in the first sentence of paragraph 89, you write, "On February 22, 2017," and then you say that the Bayer ADRs were booked at a price of 113.7895.

Do you see that?

A.    I'm sorry.  Where are we?

Q.    Paragraph 89.

A.    Okay.

Q.    The first sentence says that

Page 207

ZARCU - HIGHLY CONFIDENTIAL

IUOE's purchase of Bayer ADRs on February 22, 2017, was booked at a price of 113.7895.

Do you see that?

A.    Yes.

Q.    Now let's look at paragraph 88. I'm sorry.  Paragraph 87.

There, you mention that the Bayer ordinary shares were trading at a range of 104.95 to 10 -- I'm sorry -- Bayer ADRs were trading between 112.84 and 114 that day?

Do you see that?

A.    Yes, I do.

Q.    So the purchase price of the ADRs that you refer to in paragraph 89 was actually within the range of the trading prices for existing ADRs on that same day; correct?

A.    Counsel, the discussion that the traders are having is around the price of 108.

Q.    That's not my question.

A.    Obviously -- it may not be your

ZARCU - HIGHLY CONFIDENTIAL

question, but the facts are that they were

talking about a price that took place in

Germany and not in the United States.

Q.    Well, let's try this again.

In paragraph 89, you said that

the purchase price for IUOE's shares was

113.7895; correct?

A.    That is correct.

Q.    And in paragraph 87, you said

that on the day that IUOE bought those

Bayer ADRs, existing Bayer ADRs were

trading at a range of 112.84 to 114;

correct?

A.    Correct.

Q.    That means that the 113.7895

price that IUOE paid for its ADRs was

within the range of prices at which

existing ADRs traded that same day;

correct?

A.    Which is highly speculative,

Counsel, because those -- the prices will

be related.  Otherwise, the possibility

for arbitrage comes in, which will correct

the price, and it will bring them right in

ZARCU - HIGHLY CONFIDENTIAL

line.  The point I'm making is, though, that the conversation between traders is unrelated to the trading reg in the United States that day.  And also I'm making the point that the volume in the United States that day does not support that purchase as a block.

Q.    Okay.  Well, that was a very long answer to a yes-or-no question.  So I'll try this a little more simply.

Is the number 113.7895 in between 112.84 and 114?

A.    Sure.

Q.    Great.  Now, you didn't examine any clearing records for this transaction, did you?

MR. YAVITZ:  Objection.  Form. Foundation.

A.    I examined all the clearing records that I -- that I have for the case.  Yes, I did.

Q.    Okay.  Did you examine clearing records for this specific transaction by IUOE between February 22nd and 23, 2017?

ZARCU - HIGHLY CONFIDENTIAL

A.    I don't recall if I had these specific documents that you're referring to.

Q.    Okay.  Now let's look at paragraph 88.

A.    Okay.

Q.    Here, it says that J.P. Morgan Securities acquired Bayer ordinary shares for the equivalent of 67,225 Bayer ADRs in February 22, 2017, followed by another acquisition on February 23, 2017, for the equivalent of 39,475 Bayer ADRs.

Do you see that?

A.    I do.

Q.    Do you know from whom J.P. Morgan acquired the 67,225 Bayer ADRs it sold to Hardman Johnston?

MR. YAVITZ:  Objection to form.

A.    It appears from the documentation we have they acquired overseas.

Q.    And on what basis are you making that conclusion?

A.    On the basis that the price

**Page 211**

ZARCU - HIGHLY CONFIDENTIAL

discussed by the traders does not match the United States price that day, and also on the basis that the United States volume in ADR -- in Bayer ADRs was not significant to accommodate that block of stock.

Q.    Okay.  So let me just unpack that.

So first you said the price discussed by the traders does not match the United States price that day.

You -- that's what you said; right?

A.    The execution price, it does not, yes.

Q.    Okay.  And we just established that the price that was paid, which was 113.7895, was within the price -- the trading price range of 112.84 to 114 for existing Bayer ADRs that day; correct?

A.    Counsel, that is the price after an FX conversion and an inclusion of a fee for the creation of the ADRs.  So you are misunderstanding the process of

Page 212

ZARCU - HIGHLY CONFIDENTIAL
acquisition and creation of the ADRs in
this case.

Q.    I'm asking you whether the price
that IUOE paid was within the range of
prices at which existing Bayer ADRs traded
on February 22, 2017.

MR. YAVITZ:  It's been answered.

A.    As I mentioned to you earlier,
the price for the Bayer ADRs in the
United States is based on the price for
the underlying securities in Germany.  So
obviously, they're going to be in the same
range.  But that is not what the traders
are discussing.

Q.    So -- okay.  Well, we'll take
that up another time.

Let's go to paragraphs 91
through 101.  These are about IUOE's
May 26th to 27, 2020, purchases.  Now,
let's go to paragraphs 95 through 96.

Now, here, you concluded that
IUOE was obligated to purchase the ADRs as
soon as 450,000 Bayer foreign shares were
purchased in Germany; right?

Page 213

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ: Objection. Form.

A.    Where am I concluding that? I'm sorry.

Q.    In -- all right. In paragraphs 95 through 96, you concluded that IUOE became obligated to buy ADRs as soon as 450,000 Bayer foreign shares were purchased in Germany; correct?

MR. YAVITZ: Objection. Mischaracterizes the report.

A.    If I may just review the paragraphs there.

Q.    Why don't I just read you the language from the report. Okay? Because I don't think I'm mischaracterizing it. This isn't a trick question.

Paragraph 95. "A block of 212,400 Bayer ADRs was transacted following the acquisition of the 450,000 shares of Bayer ordinary shares."

Do you see that?

A.    Yes.

Q.    And then at the end of paragraph 96, it says, "IUOE was thus

ZARCU - HIGHLY CONFIDENTIAL
irrevocably obligated to take and pay for
its ADRs as of the moment when UBS
purchased Bayer ordinary shares in the
overseas market."

Do you see that?

A.    I see that.

Q.    Okay.  So your conclusion was
that IUOE became obligated to buy Bayer
ADRs as soon as 450,000 shares of Bayer
ordinary stock were purchased in Germany;
right?

MR. YAVITZ:  Objection.
Mischaracterizes -- mischaracterizes
the report.  450,000 does not appear
in paragraph 96 I think is the source
of the accidental trick.

Q.    All right.  Well, let's see.
Your opinion was that IUOE
became irrevocably obligated to take and
pay for its ADRs as of the moment when UBS
purchased Bayer ordinary shares overseas;
correct?

A.    Correct.

Q.    Okay.  Now, in paragraph 97, you

Page 215

ZARCU - HIGHLY CONFIDENTIAL

don't contest that the actual ADRs that were acquired by IUOE were existing ADRs; correct?

MR. YAVITZ:  Objection.  Form.

A.    I need to read that paragraph, please.

(Witness perusing document.)

Okay.  Would you mind re-posing your question, Counsel?

Q.    Yeah.  You don't contest that the ADRs that were ultimately acquired by IUOE in this transaction were existing ADRs; correct?

MR. YAVITZ:  Objection.  Form.

A.    I am not talking about the specific ADRs in the report.  I'm talking about the delayed settlement in that paragraph.

Q.    Okay.  You can't identify a single instruction to convert any foreign shares to ADRs in connection with this transaction, can you?

A.    I have to read the communications, Counsel.

Page 216

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  Well, let me rephrase that, actually.

The block of 450,000 shares of Bayer that you refer to in paragraph 95, do you see that?

A.    Yes.

Q.    You don't have any evidence that Hardman Johnston requested that any part of that block of shares be converted to ADRs, do you?

MR. YAVITZ:  Objection.  Form. Mischaracterizes documents and report.

A.    I absolutely do, Counsel.  It is in my report.

Q.    Okay.  Well, let's look at paragraph 93.

A.    Okay.

Q.    Okay.  And there's a chat here between Hardman Johnston trader John Hufcut and UBS.

Do you see that?

A.    Yes.

Q.    So let's look at the second entry from the top.  Hufcut writes --

ZARCU - HIGHLY CONFIDENTIAL

actually, give me one second.  Oh, yeah.

Let's go to paragraph 93.  Hufcut writes

in the second entry from the top, "I am

going to have a portion, negative 15

percent, that upon completion I will be

converting to ADRs."

            Do you see that?

A.    Yes.

Q.    And then the UBS broker

responds, "Okay.  We can speak about ADR

later.  No problem."

            Do you see that?

A.    Yes.

Q.    And Hufcut replies, "Thanks."

            Do you see that?

A.    Yes.

Q.    So Mr. Gula of UBS and

Mr. Hufcut had postponed any discussion

concerning the purchase of ADRs until

after the foreign shares were acquired;

correct?

            MR. YAVITZ:  Objection.  Form.

    Mischaracterization of document.

A.    I don't know that they agreed to

Page 218

ZARCU - HIGHLY CONFIDENTIAL

speak after the acquisition.  They said we'll speak later.

Q.    Well, the ADR instruction arrived after the foreign shares had already been purchased; correct?

MR. YAVITZ:  Objection.  Form. And mischaracterizes the document.

A.    We don't know that.

Q.    Do you know if the ADR instruction arrived before the foreign shares were purchased?

A.    I just --

MR. YAVITZ:  Objection.

A.    -- don't know that.

Q.    Okay.  So when did the ADR instruction arrive in connection with this transaction?

A.    The traders discuss that at 6:02.

Q.    They discuss that at 6:02?

A.    Yes.  He's telling them we can speak about -- I will have a portion of it for ADRs.

Q.    Okay.  But do they agree on a

**Page 219**

ZARCU - HIGHLY CONFIDENTIAL

price in that communication?

A.    No.

Q.    Do they agree on a quantity in that communication?

A.    No, not specifically, no.

Q.    Okay.  So the chat that you're referring to there, that's not a market order; right?

MR. YAVITZ:  Objection.  Are you referring to your specialized definition of market order, Mr. Zarcu's definition of market order, or some other definition?

Q.    Well, let's probe that real quick.

Mr. Zarcu, what's your definition of a market order?

A.    A market order usually means an order without a limit.

Q.    An order without a limit.

A.    Yes.

Q.    That's it.  Okay.

And what exactly -- what do you understand that to mean?

Page 220

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ: Objection. Form.

A.    What do I understand what to mean?  Purchasing without a limit?

Q.    Yes.

A.    Again, it depends on what other instructions I'm given.  If it's an over-the-counter, over-the-trade, over-the-day order as a market, that means I'm trading over a period of time.  So it depends.  I'd need more information than that.

Q.    Okay.  So here's my question.

Was there a -- did the communications here reflect a market order to purchase ADRs?

A.    At times, they had specific limits on the order, yes.  They used that.

Q.    So they -- so you're saying that the communications here reflect a market order to purchase ADRs?

MR. YAVITZ: Objection. Form.

A.    No, Counsel.  What I'm saying is that at times, they actually used the limit to acquire the shares, and that

ZARCU - HIGHLY CONFIDENTIAL

limit changed over time, it appears.

Q.    Okay.  So in paragraph 93, is there any evidence that the transaction referred to in this paragraph relating to ADRs is a market order?

A.    So at 11:26 a.m., the UBS trader was asking what's the plan for the auction, and he's being told please complete today.  At that point, that's clearly a market order.

Q.    And what makes you say that?

A.    When somebody is instructing you to you complete today, that means they want to be done.  So the price consideration is no longer in place.

Q.    And how do you know that that instruction relates specifically to the purchase of Bayer ADRs?

A.    It relates to the purchase of the local shares, Counsel.

Q.    Okay.  So it doesn't relate to the purchase of the ADRs.

A.    It certainly does, as the ADRs were created on the basis of the

Page 222

ZARCU - HIGHLY CONFIDENTIAL

acquisition of the locals, yes.

Q.    Well, let's go back to the 6:02 a.m. chat, second one from the top. It says, "I am going to have a portion that I will be converting back to ADRs."

Do you see that?

A.    Yes.

Q.    And then Mr. Gula eventually responds, "Okay.  We can speak about that later.  No problem."

Do you see that?

A.    Yes.

Q.    And at no point in this chat do Mr. Gula or Mr. Hufcut agree on the quantity of Bayer ADRs that are to be purchased; correct?

MR. YAVITZ:  Objection.  Form.

A.    We don't have any evidence of that in this conversation.

Q.    Okay.  And at no point in this conversation that's referred to in paragraph 93 do Mr. Gula and Mr. Hufcut agree on the conversion rate for the FX portion of that transaction; correct?

Page 223

ZARCU - HIGHLY CONFIDENTIAL

A.    We do not have evidence of that information.

Q.    And at no point during the conversation referred to in paragraph 93 do Mr. Gula and Mr. Hufcut agree on the remainder of the pricing terms for the purchase of Bayer ADRs; correct?

MR. YAVITZ:  Objection.  Form.

A.    What are you referring to, Counsel?

Q.    Do Mr. Gula and Mr. Hufcut in this conversation agree on the conversion rate between the ordinary shares and the Bayer ADRs?

MR. YAVITZ:  Objection.  Asked and answered.

A.    I thought I answered that question.

Q.    Okay.  Great.

Now, you didn't examine FINRA records -- let me strike that.

Your report doesn't mention that you examined FINRA records concerning this May 26th to 27, 2020 transaction, does it?

**Page 224**

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Sorry.  Objection.  Mischaracterizes his report.

A.    I'm pretty sure I mentioned that those were reported in the tape, but I can't tell you off the top of my head right now.

Q.    And --

A.    In the FINRA records.

Q.    Okay.  Well, in paragraphs 91 through 101, nowhere do you mention your examination of FINRA records; correct?

A.    It's possible I'm not mentioning relating to this specific trade, but I'm mentioning it related to all the transactions.

Q.    And in paragraph 91 through 101, you don't mention having examined clearing records concerning this transaction; correct?

MR. YAVITZ:  Objection.  Form.  Mischaracterizes document.

A.    As I mentioned before, clearing records have been -- all the DTC --

ZARCU - HIGHLY CONFIDENTIAL

everything provided in these transactions I have reviewed.

Q.   If the clearing records and trading records for this transaction showed that UBS filled Hardman Johnston's order by buying existing ADRs from a counterparty in New York, would that change your conclusion that irrevocable liability for this transaction was incurred abroad?

MR. YAVITZ:   Objection. Incomplete hypothetical.

A.   You're changing the date given in the transaction, Counsel.  So, you know, you're going to have to give me a lot more information than that.

Q.   Well, let me represent to you that the clearing and trading records for this transaction show that UBS filled Hardman Johnston's order by buying existing ADRs from a counterparty in New York.

Does that change your conclusion that irrevocable liability for this

Page 226

ZARCU - HIGHLY CONFIDENTIAL

transaction was incurred abroad?

MR. YAVITZ:  Objection. Incomplete hypothetical.  Is this addressed in paragraph 97 of this report?

MR. JACKSON:  Counsel, I ask you to keep your -- hold on for one second, please.  I'd ask you to keep your speaking objections to a minimum and keep your objections in line with Rule 30.  Thank you.

Q.    Mr. Zarcu, you may answer the question.

A.    Could you repeat the question, please?

Q.    Yes.  I will represent to you that the clearing and trading records for this transaction show that UBS acquired existing Bayer ADRs from a counterparty in New York to fill Hardman Johnston's order.

Does that change your conclusion about whether irrevocable liability for this transaction was incurred outside the United States?

Page 227

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.

A.    Is this a hypothetical, Counsel?

Q.    Yes.

A.    So what you're saying to me is that if you're showing me proof that it took place in the U.S., will I change my opinion?

Q.    Yes.

A.    Well, I'm pretty sure I've told you all along, and it's in my report, that my opinion is drawn from all the information available in each one of the transactions.  So if a piece of evidence in the transaction showed me that it was purchased in the U.S., obviously, I would change my conclusion.  But that doesn't exist in our case.

Q.    Well, we'll see about that.

Let's go to paragraphs 102 through 13.  These ones refer to IUOE's June 3rd to 4, 2020, purchases.

Now, for these purchases, you don't contest that IUOE acquired existing Bayer ADRs; correct?

Page 228

ZARCU - HIGHLY CONFIDENTIAL

A.    That is incorrect, Counsel.

Q.    Okay.  Well, let's look at paragraph 104.

Now, here, it says that there is a chat between Hardman Johnston trader John Hufcut, who we all recognize by now, and Cowen traders.

And if you look at this chat, Mr. Hufcut doesn't even mention buying ADRs until 6:53 a.m. Eastern Time; is that correct?

A.    It appears that way, yes.

Q.    And that's actually over an hour after being told by Mr. Dooley at Cowen that he had already purchased 72,000 Bayer foreign shares in that 5:48 a.m. Eastern Time chat; correct?

A.    Correct.

Q.    And then at -- again at 6:53 a.m. Eastern Time, Mr. Hufcut says he'll send specifics for ADRs trade "once KJ is in."

Do you see that?

A.    Yes.

ZARCU - HIGHLY CONFIDENTIAL

Q.    And Mr. Hufcut does not specify the exact quantity for the ADRs purchased; right?

MR. YAVITZ:  Objection.  Form. Mischaracterizes document.

A.    I mean, he says about 23K left total.  So I don't know what that means necessarily.

Q.    But Mr. Hufcut doesn't specify an exact quantity for the number of Bayer ADRs to be purchased, does he?

A.    It doesn't seem to be specified exactly, no.

Q.    Now let's go to 7:08 a.m. Eastern Time.

A.    Yes.

Q.    Mr. Joyce at Cowen says he's planning to purchase 23,745 ords for conversion into ADRs.

        Do you see that?

A.    Yes.

Q.    And Mr. Hufcut is not asked until 7:53 a.m. to confirm the conversion of 23,745 foreign shares to 94,978 ADRs.

Page 230

ZARCU - HIGHLY CONFIDENTIAL

Do you see that?

MR. YAVITZ:  Objection.  Form.

A.    Are you referring to the 7:53 message there, "Will FX" --

Q.    Yes.

A.    -- "as per ticket" and all that?

Q.    Yes.

A.    I see that there.  Yes.

Q.    And that all occurred after the ordinary shares had already been purchased; correct?

MR. YAVITZ:  Objection.  Form.

What do you mean by the ordinary shares?

Q.    Well, let me try to specify it.

The 7:53 a.m. Eastern Time message to confirm the conversion of 23,745 foreign shares to 94,978 ADRs is made well after the earlier message about the purchase of the 72,000 Bayer foreign shares.  Fair?

A.    What's the question, Counsel?  I'm sorry.

Q.    Let me try this a different way.

Page 231

ZARCU - HIGHLY CONFIDENTIAL

So Mr. Hufcut at 7:53 a.m. Eastern Time confirms the conversion of 23,745 foreign shares to 94,978 ADRs; correct?

MR. YAVITZ:  Objection.  Form.  Mischaracterizes document.

A.    He presents the terms.  Yes.

Q.    Okay.  And the ordinary shares had been purchased before 5:48 a.m. Eastern Time, as we discussed before; correct?

MR. YAVITZ:  Objection.  Form.  What ordinary shares?

A.    The ordinary shares were not purchased before 5:48, Counsel.

Q.    What makes you think -- okay.

A.    There are 72,000 shares out of 201,000 shares.

Q.    Let me try this again.  I think I'm actually misreading the document.

So let's just try to take this in order.

7:08 a.m. Eastern Time, the Cowen broker says he's going to buy 23,745

Page 232

ZARCU - HIGHLY CONFIDENTIAL

shares; correct?

A.    Yes.

Q.    Okay.  7:53 a.m. Eastern Time, the Hardman Johnston trader confirms the conversion of the ordinary shares to ADRs; correct?

MR. YAVITZ:  Objection.  I think you might mean 8:01 a.m.

Q.    Oh, sure.  8:01 a.m.  Yes.

A.    Okay.

Q.    Is that fair?

Now, at 8:34 a.m. Eastern Time, the Cowen trader then confirms the execution of the ADR transaction.

Do you see that?

A.    He confirms the quantity and the price.

Q.    Okay.  Is there any evidence that Mr. Hufcut from Hardman Johnston placed any order to buy ADRs when the foreign shares were purchased?

MR. YAVITZ:  Objection.  Sorry. Objection to form.  You may answer.

A.    Clearly.  It's right there.

Page 233

ZARCU - HIGHLY CONFIDENTIAL

Q.    And what --

A.    Well, starting at 6:53, "I have some ADRs that I'll send over."  Then at 7:08, "Buying additional 23,745," the exact number of shares that will be converted to ADRs.

Q.    Okay.  But that -- those shares were purchased before a request to convert to a specific quantity of ADRs was made; correct?

MR. YAVITZ:  Objection.  Form. Mischaracterizes document.  Lack of foundation.

A.    Counsel, as we encountered this situation before, you are again referring to the terms, just a confirmation of the FX, the local acquisition price, and the target price for the Bayer ADRs.

Q.    Okay.  Well, let's look at paragraph 106.

Now, here, you claim that internal Cowen records show that the June 3rd to 4, 2020, order for Bayer ADRs was a market order; correct?

Page 234

ZARCU - HIGHLY CONFIDENTIAL

A.    Can I read that, please?

Q.    Sure.

A.    (Witness perusing document.)

Okay.

Q.    All right.  And you cite the document -- in footnotes 117 to 18, you cite the document Cowen_Bayer00001 as support for that claim; right?

A.    It appears so, yes.

Q.    Let's take a look at that document, which I have marked as Exhibit 7.  You should be able to download it in native form.

(Zarcu Exhibit 7, An Excel spreadsheet, Bates Cowen_Bayer0000001, was hereby marked for identification, as of this date.)

A.    It says "Unable to create preview for this slide."

Q.    Yeah.  You'll have to download it in native format to your computer.

A.    It's not quite giving me that choice though.

THE CONCIERGE:  Sir, sorry.

Page 235

ZARCU - HIGHLY CONFIDENTIAL

This is Clint, the tech.  If you right click on it, you will get the ability to select download.

THE WITNESS:  I get back, forward, reload, save as, print, translate in English, page source, and inspect.  That's all I got.

MR. YAVITZ:  Yeah.  I get the same.

THE CONCIERGE:  Counsel, would you like to go off the record and we can troubleshoot?

MR. YAVITZ:  No objection here. We've been at about an hour, anyways. Or maybe not.  I've lost track of time.

MR. JACKSON:  No objection.

THE VIDEOGRAPHER:  So are we going off the record?

MR. JACKSON:  Yeah.  Let's go off the record.

THE VIDEOGRAPHER:  All right. Off the record 2:13 Eastern Standard Time.

Page 236

ZARCU - HIGHLY CONFIDENTIAL

(Recess)

THE VIDEOGRAPHER:  We are back on the record 2:27 p.m. Eastern Standard Time.

BY MR. JACKSON:

Q.    Welcome back, Mr. Zarcu.

Same question as other breaks. Did you discuss the substance of your testimony with counsel during the break?

A.    I did not.

Q.    And I have marked as Exhibit 7. You now have that loaded onto your computer?

A.    I do, yes.

Q.    And I understand that your counsel sent that to you by email.  Your email and communication devices other than the Zoom that we're on now have now been turned off; correct?

A.    That is correct.

Q.    I'm going to share my screen just to make it easier for us to navigate this spreadsheet.

A.    Okay.

ZARCU - HIGHLY CONFIDENTIAL

Q.    So I'm going to filter this spreadsheet as follows so that we can further discuss the June 3rd and 4, 2020, purchases by IUOE.

So the first thing I'm going to do is filter Column A for trade date to the dates I just mentioned, June 3rd and 4, 2020.  And then next I'm going to filter Column M, which is the buy/sell column for buy, because IUOE made purchases of Bayer ADRs on that date.

Do you understand?

A.    I understand that.  But I'd rather you not put that by yourself.

Q.    Okay.  Well, we'll get to that in a minute.  I'm going to go down to Column Q for quantity.

A.    Yes.

Q.    And I'm going to filter it for 119992 and 94978.

A.    Okay.

Q.    Now, those are the amounts of Bayer ADRs that Hardman Johnston ordered as you mentioned in paragraphs 104 and 106

Page 238

ZARCU - HIGHLY CONFIDENTIAL

through 109; right?

A.    I believe so, yes.

Q.    Okay.  Now let's look at Column AA, which is labeled "Order Type."

And as you see here, all of these purchases are labeled either as a limit order or they have a blank order type; correct?

A.    I mean, what you're showing me on the screen appears to be that way, yes.

Q.    Okay.  And none of these transactions are labeled as market orders; correct?

A.    Counsel, the portion you're showing on the screen does not show that, no.

Q.    Okay.  Now -- I'm going to stop sharing my screen.

Now, do you understand the difference between a purchase of ADRs and an allocation of previously purchased ADRs to client accounts?

A.    Can you repeat that question, Counsel?

ZARCU - HIGHLY CONFIDENTIAL

Q.    Sure.  Do you understand the difference between a purchase of ADRs and an allocation of previously purchased ADRs to client accounts?

A.    I assume there is a difference between a purchase and allocation, yes.

Q.    Allocations are not orders; correct?

A.    No.

Q.    Are you aware that the market designations that you cite in paragraph 106 of your report are for allocations?

A.    It's possible.

Q.    And if the market order designations that you cite in paragraph 106 are for allocations and not purchases, would that change your opinion about whether IUOE's June 3rd to 4th ADR purchases were acquired through market orders?

A.    Not necessarily, no.  That's a reflection of how -- what kind of orders they were, unless I see a number

**Page 240**

ZARCU - HIGHLY CONFIDENTIAL
specifically showing me the limit price,
but it's not relevant either way anyway.
So okay.

Q.    Okay.  Let's go now to the ADR
sales.  These are discussed in
paragraph -- paragraphs 121 and 1 -- I'm
sorry.  Strike that.

The ADR sales.  These are
referred to in paragraph 24 of your
report, actually, at the very beginning.

Please let me know when you're
at paragraph 24.

A.    I'm there now.

Q.    Okay.  Now, footnote 8 here in
relevant part says that "The record
indicates that Harding Loevner redeemed
SMW and Local 710's remaining Bayer ADRs
into Bayer ordinary shares, then sold them
overseas."  And then you continue, "Thus,
many of SMW and Local 710's ADRs never
once transacted on the domestic market --
they were created through ADR conversion
and later cancelled through ADR
redemption."

Page 241

ZARCU - HIGHLY CONFIDENTIAL

Do you see that?

A.    Yes.

Q.    And then in paragraph 17, which is a little bit farther up in your report, you write, "If an investor chooses to redeem ADRs, it may deposit those ADRs with the depository bank, which will then cancel the ADRs and at the same time deliver to the investor the redeemed foreign shares that were being held on deposit."

Do you see that?

A.    Yes.

Q.    Now, Bank of New York Mellon, as we discussed earlier, is the depositary bank for Bayer ADRs; correct?

A.    Correct.

Q.    And Bank of New York Mellon is based in the United States; correct?

A.    We discussed that before.  They have offices in the United States and overseas likely, yes.

Q.    But the Bank of New York Mellon is based in the United States; correct?

Page 242

ZARCU - HIGHLY CONFIDENTIAL

A.    They have offices in the United States.  Yes.

Q.    Okay.  And Harding Loevner is also in the United States; correct?

A.    Yes.

Q.    When Harding Loevner redeemed SMW and Local 710's Bayer ADRs, it did so by depositing their Bayer ADRs with Bank of New York Mellon in the United States; correct?

A.    Well, no.  They went through the broker dealer, so it's the broker dealer who deposited it.  There's an extra step there.

Q.    Sure.  When Harding Loevner's broker dealer redeemed SMW and Local 710's Bayer ADRs, it did so by depositing the Bayer ADRs with Bank of New York Mellon in the United States; correct?

A.    We don't know the location where they deposited it.

Q.    Did you review the deposit agreement between Bayer -- you know what? Strike that.  I believe I asked you that

Page 243

ZARCU - HIGHLY CONFIDENTIAL

earlier.

Just again to ask, you did not review the deposit agreement between Bank of New York Mellon and Bayer for the Bayer ADR program, did you?

MR. YAVITZ:  Objection. Mischaracterizes testimony.

A.    I reviewed the documents presented to me regarding the agreement, yes.

Q.    Okay.  And even though you reviewed the deposit agreement between Bayer and Bank of New York Mellon for the Bayer ADR program, you don't know the location at which Bayer ADRs are redeemed.

A.    Again, I don't recall from the document.  I remember it was more than 100 pages long, and I reviewed plenty of documentations, so I don't recall exactly what the location was for that, no.

Q.    Are you familiar with the term "middle office"?

A.    Certainly.

Q.    What do you understand the term

**Page 244**

ZARCU - HIGHLY CONFIDENTIAL

"middle office" to mean?

A.    It refers to the group of people who takes care of the transaction downstream from trading.

Q.    Is the middle office the function that actually books trades into the firm's books and records?

A.    Well, that depends, because traders do a lot of the booking themselves.  So it kind of varies from firm to firm.

Q.    And when -- if the middle office -- strike that.

Is the middle office responsible for taking trades that have been executed for a client, averaging the price, if necessary, and sending a notice to the trade affirmation system?

MR. YAVITZ:  Objection.  Form.

A.    Not necessarily, no.  The traders do that quite a bit.

Q.    Okay.  So the trader sometimes sends a notice to the trade affirmation system to the client?

Page 245

ZARCU - HIGHLY CONFIDENTIAL

A.    I mean, you've got to tell me what you mean by the trader affirmation system.

Q.    Sure.  Are you familiar with the term "institutional delivery system"?

A.    Not as a specific term.

Q.    Well, what do you understand that term to mean?

A.    It sounds to me like it's related to the delivery of the shares somehow, to the institutions that are the client broker dealer possibly.

Q.    Do you know what it means to affirm a trade?

A.    I certainly do, yes.

Q.    Okay.  What do you understand that term to mean?

A.    Well, they just confirm the terms of the trades.

Q.    Okay.  And in your opinion, does a broker dealer client incur a legal obligation for a trade once it has been affirmed?

MR. YAVITZ:  Objection to form.

Page 246

ZARCU - HIGHLY CONFIDENTIAL

A.    As discussed earlier, Counsel, they're obligated to take and pay those shares when the orders are executed, not when they're affirmed.

Q.    Okay.  So you believe it's irrelevant whether or not a client has affirmed a trade as to -- strike that.

You believe it's irrelevant to determining where irrevocable liability has been incurred whether or not a client has affirmed a trade.

MR. YAVITZ:  Objection.  Form. Mischaracterizes testimony.  You may answer.

A.    It is definitely irrelevant. Those are two pieces of transaction.  The affirming side of the trade just simply means the two sides match everything submitted by each side.  And at that point, they can proceed with the settlement of the trade.  That's all that is.

Q.    During your trading career, did you ever supervise middle office staff?

Page 247

ZARCU - HIGHLY CONFIDENTIAL

A.    I certainly did.

Q.    Okay.  At what firms did you supervise middle office staff?

A.    All of them.

Q.    Okay.  In supervising middle office staff, did you personally interact with operations personnel to resolve settlement and clearance issues?

A.    I have.

Q.    And what was the nature of the issues that you worked on with the settlement and clearance folks?

A.    Various issues.  Trades unaffirmed, DK, which means don't know the trade.  There's a variety of stuff that has come up over the years -- mismatching prices, mismatching shares and allocations, all sorts of things.

Q.    And were you the decisionmaker at the firms you worked at concerning regulatory issues relating to settlement and clearance?

MR. YAVITZ:  Objection.  Form.

A.    You're going to have to give me

Page 248

ZARCU - HIGHLY CONFIDENTIAL

some specifics to that, Counsel.

Q.    Okay.  What responsibilities did you have during your trading career with respect to regulatory issues relating to settlement and clearance?

A.    So as we discussed earlier, I was a Series 24 registered representative. As a head of a trading business, all that falls under my responsibility.  Everything related to compliance, the regulatory obligations, it is first my responsibility and then the compliance office.  So as much as I am not a compliance officer or a lawyer, all that is my responsibility as a head of the business.  And anything that breaks breaks over my head.

Q.    Are you familiar with the term "back office"?

A.    The term backlogs?

Q.    Back office.

A.    Oh, I'm sorry.  Back office. Certainly, yes.

Q.    And what do you understand that term to mean?

ZARCU - HIGHLY CONFIDENTIAL

A.    Again, it's another piece in the machinery that handles the actual settlement and making sure the transactions match between clients and brokers.

Q.    And after a trade settles, the back office generates bookkeeping transactions that show the settlement of the securities and booking of monies; correct?

MR. YAVITZ:  Objection.  Form.

Q.    And during your trading career -- so let me back up.

The answer to that question was yes; right?

A.    Yes.

Q.    Okay.  During your trading career, did you ever supervise back office staff?

A.    So every operation relating to trading had maybe not a direct reporting line into me.  There was always a separate structure for back office and middle office, but they were always dotted line

ZARCU - HIGHLY CONFIDENTIAL

into the head of trading.

Q.    Okay.  You've never held a Series 27 license; correct?

A.    No.

Q.    And you've never served as a registered financial and operations principal, otherwise known as a FinOp?

A.    No, not -- as I said, I've served as a head of trading.

Q.    And if there was a problem that affected the settlement of transactions on your desk, did you have ultimate authority to decide how to clear the trade?

MR. YAVITZ:  Objection.  Form.

A.    Depending on the situation, yes.

Q.    Okay.  Was -- what was the FinOp's responsibility with respect to determining how to clear trades on the trading desk that you were in?

A.    Again, depends on the situation, Counsel.  It's impossible for me to give you a blanket response to that.

Q.    Okay.  Well, when you say that you had responsibility for determining how

Page 251

ZARCU - HIGHLY CONFIDENTIAL

to clear trades, did the FinOp have the -- on the trading desk that you worked on have the ability to override your decisions if they disagreed with you on how to clear a trade?

MR. YAVITZ:  Objection.  Form.

A.     They did not.

Q.     Did the legal or compliance departments at the firms that you worked at have authority to override your decisions on how to clear trades if they disagreed with you?

MR. YAVITZ:  Objection.  Form.

A.     They did.

Q.     Okay.  And if a new situation came up, such as a new trading vehicle or a change in clearance regulations, was it your responsibility to determine how the new instrument would be cleared?

A.     That's a very broad question, Counsel.  What do you mean exactly?

Q.     If a -- if your desk -- strike that.

If there was a new trading

Page 252

ZARCU - HIGHLY CONFIDENTIAL
vehicle or a change in clearance regulations, was it your responsibility to determine how to implement any needed changes to clearing processes to accommodate the new trading vehicle or regulations?

MR. YAVITZ:  Objection.  Form.

A.    Ultimately, it's always my responsibility.  I'll give you an example. Changes to settlement dates, T plus three, T plus two, if something breaks, it's my responsibility.  Yes.  I'm not the one implementing the change, but it is my responsibility to make sure it's done.

Q.    Okay.  Have you seen any evidence in this case that the DTCC transferred custody of Bayer ordinary shares to the plaintiffs?

A.    I have seen the DTC documents, yes.

Q.    And have you seen evidence in the DTCC documents that you reviewed that custody of Bayer ordinary shares were transferred to the plaintiffs?

Page 253

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.

A.    The DTC documents that I have reviewed, so there were settlement confirmations from DTC that actually showed allocations, but there were a separate set of documents from DTC that simply showed journal entries and transactions between broker dealers.

Q.    Great.  So did the DTCC documents that you reviewed evidence that custody of Bayer foreign common stock was transferred to the plaintiffs in this case?

MR. YAVITZ:  Objection.  Form.

A.    So as I mentioned before, right, there's a set of confirmations that the clients, the plaintiffs have received likely that show those shares booked.  And there's another set of documents that just simply show movement of shares, varied shares between broker dealers in various capacities and lending to each other unrelated to the actual acquisition of the shares.

Page 254

ZARCU - HIGHLY CONFIDENTIAL

Q.    And have you seen any evidence in this case, whether from the DTCC or another source, that any of the plaintiffs ever retained custody of Bayer foreign common stock?

MR. YAVITZ:  Objection.  Form. Retained custody?

A.    Have I seen any evidence that they retained custody of the Bayer foreign shares?

Q.    Yes.

A.    I believe the documents that were provided to me were only regarding Bayer ADRs.

Q.    Okay.  And the foreign ordinary shares of Bayer never ended up on the plaintiffs' books and records in this case, as far as you know; correct?

A.    Related to the conversion to ADRs.

Q.    Yes.

A.    I believe that's probably the case.

Q.    Okay.  Have you seen any

Page 255

ZARCU - HIGHLY CONFIDENTIAL

evidence in this case that the plaintiffs accepted any responsibility to settle trades in foreign securities?

MR. YAVITZ:  Objection.  Form.

A.    The orders were for Bayer ADRs by the acquisition of local shares, so the settlement would have been in Bayer ADRs, not the locals.

Q.    Okay.  Have you seen any evidence that the books and records for plaintiffs in this case ever indicated that the plaintiffs' books trades in Bayer ordinary shares?

A.    Not related to these transactions.

Q.    All right.  Let's go to section Roman numeral VI of your report on page 52.

A.    52.  Okay.

Q.    Okay.  Now, this section of your report addresses, as the title suggests, whether it is possible to determine on a class-wide basis that the proposed class members incurred irrevocable liability in

Page 256

ZARCU - HIGHLY CONFIDENTIAL

the United States for their purchases of Bayer ADRs; right?

A.    Yes.  It appears that way.

Q.    And in paragraph 124, you opine that it is irrelevant whether class members purchase existing ADRs on the secondary market; correct?

MR. YAVITZ:  Objection.  Form. Mischaracterizes the report.

A.    I am referring to Professor Mitts' opinion; right?

Q.    Yes.  So let me just read the opening of this paragraph, and then I'll ask the question again.

Paragraph 124 starts with "First, Professor Mitts opines that the overwhelming majority of purchases in Bayer sponsored ADRs consisted of domestic purchases of existing ADRs on the secondary market.  This is irrelevant."

Do you see that?

A.    Yes.

Q.    So it's your opinion that it is irrelevant whether the overwhelming

ZARCU - HIGHLY CONFIDENTIAL

majority of purchases in Bayer's sponsored ADRs consisted of domestic purchases of existing ADRs in the secondary market; correct?

A.    It is irrelevant to our transactions, which all appear to be conducted overseas, yes.

Q.    Now, existing ADRs have already been converted; correct?

A.    You mean already created; right?

Q.    Yes.

A.    Yes.  That is the definition of existence.  Yes.

Q.    Okay.  So purchases of existing Bayer ADRs do not need to involve the purchase of Bayer ordinary shares; correct?

A.    I think we've established that earlier.  If somebody buys something that's already existing, yes.

Q.    Okay.

A.    By definition, it doesn't need to be created again.

Q.    So for purchases of existing

Page 258

ZARCU - HIGHLY CONFIDENTIAL
ADRs, do you need to analyze the trade orders, brokerage records, and confirmation slips to determine whether irrevocable liability was incurred abroad?

MR. YAVITZ:  Objection.  Form. Incomplete hypothetical.  Sorry.  You can answer.

A.    As I mention throughout this conversation, each transaction needs to be analyzed by itself to be able to understand exactly what has happened.  So I can't make a blanket statement.

Q.    Okay.  Well, why is it necessary to apply the methodology, as you call it, that you lay out in your report to trades in existing Bayer ADRs to determine where irrevocable liability was incurred in connection with producing them?

MR. YAVITZ:  Objection.  Form.

A.    My decision has been informed by a full review of all the documents available within each transaction.  So before I can make that statement, I would like to see the transaction we're

Page 259

ZARCU - HIGHLY CONFIDENTIAL
discussing in detail.

Q.    Right.  But if the ADRs already exist, and if you don't need to buy foreign shares to acquire them, then why do you need to use your methodology at all?

A.    In order to draw a conclusion.

Q.    But why?

A.    As I mentioned before, each one of the transactions needs to be analyzed in its own right to fully understand what occurred.

Q.    But isn't the purpose of your analysis to determine whether or not the purchase of Bayer ADRs requires a foreign share purchase?

MR. YAVITZ:  Objection.  Form.

A.    The purpose of my analysis was to determine where and how the transactions occurred and when did the clients become obligated to take and pay for the shares.

Q.    Okay.  And why is it necessary to apply that methodology to existing

ZARCU - HIGHLY CONFIDENTIAL

Bayer ADRs, which, as we discussed earlier, trade on the U.S. market and do not require the conversion of ordinary shares into ADRs?

MR. YAVITZ:  Objection.  Form.

A.     Each acquisition is different. So I would have to see the details of it before I can opine on it.

Q.     All right.  Let's look at paragraph 124.

You opine that there needs to be a class-wide methodology for identifying these overseas trades?

Do you see that?

A.     Where am I looking?  I'm sorry? 124?

Q.     Paragraph 124.

A.     Where is that?  I'm sorry.  I don't see it.

MR. YAVITZ:  Maybe just read -- maybe just read the entirety of paragraph 124.

Q.     I'll read the -- it's the second-to-last sentence there.  You say,

**Page 261**

ZARCU - HIGHLY CONFIDENTIAL

"Professor Mitts has not identified any class-wide methodology for identifying these overseas trades, because there is no such methodology."

Do you see that?

A.     Yes.

Q.     And then you say that "As demonstrated by the discussion above, such trades can only be identified through an expert review of trade orders, brokerage records, and confirmation slips."

Do you see that?

A.     Yes.

Q.     Now, as we discussed earlier, in order to purchase a newly issued Bayer ADR, the purchaser must first acquire Bayer ordinary shares in an overseas trade; correct?

MR. YAVITZ:  Objection.  Form.

A.     In order to create new ADRs, you must acquire local shares to create ADRs. Correct.

Q.     Okay.  So to determine which Bayer ADR purchases require the purchaser

ZARCU - HIGHLY CONFIDENTIAL
to first buy Bayer ordinary shares overseas, all we need to do is determine whether the Bayer ADRs that were purchased were newly issued; correct?

A.    That is one of the pieces of information, yes.

Q.    Isn't that piece of information sufficient to know that the purchaser had first acquired Bayer ordinary shares overseas?

MR. YAVITZ:  Objection.  Form. Mischaracterizes the report.

A.    Well, Counsel, if that was sufficient by itself, we wouldn't have this conversation.  You would be agreeing with me; right?  So we'd have to have proof of every single one of the transactions we're discussing; yet you're arguing against it.

Q.    Well, I think that --

A.    No, it's not.

Q.    Let me ask the question again.
Can't we figure out whether or not a Bayer ADR purchase involved the

Page 263

ZARCU - HIGHLY CONFIDENTIAL
purchaser first buying Bayer ordinary shares overseas by simply determining whether the Bayer ADRs that were purchased were newly issued by Bank of New York Mellon?

MR. YAVITZ:  Objection to form.

A.    I'm sorry.  Can you please repeat that?

Q.    Why isn't it sufficient -- well, strike that.

In order to determine whether a Bayer ADR purchase first required the purchaser to buy Bayer ordinary shares overseas, isn't it sufficient to just figure out if the share -- if the Bayer ADRs that they purchased were issued by Bank of New York Mellon?

MR. YAVITZ:  Objection.  Form.

Q.    Strike that.  Let me try again.

To determine which Bayer ADR purchases required the purchaser to first buy Bayer ordinary shares overseas, all we need to do is determine whether the Bayer ADRs that were purchased were newly issued

Page 264

ZARCU - HIGHLY CONFIDENTIAL

by Bank of New York Mellon; correct?

MR. YAVITZ:  Objection.  Form.

A.    As I mentioned earlier, that is one piece of the puzzle.  As we've seen in the repeated cases here, that creation is sometimes late, sometimes delayed.  So we need to have a full picture to make those decisions, Counsel.

Q.    Well, would it be sufficient to simply determine whether or not -- strike that.  Let me try this again.

If we had determined that the ADRs that were acquired were newly issued by Bank of New York Mellon, why wouldn't that be sufficient to, in your view, conclude that irrevocable liability had been incurred abroad?

MR. YAVITZ:  Objection.  Asked and answered.

A.    Well, I could ask you the same question, Counsel, because we know they were newly issued ADRs; yet you're arguing that they weren't purchased overseas.  So --

Page 265

ZARCU - HIGHLY CONFIDENTIAL

Q.    Well, I'm asking what your opinion is.  If you knew that the ADRs were newly issued, was there any other analysis that you would have to do to determine whether or not irrevocable liability had been incurred abroad?

A.    I would do the exact same analysis that I've conducted in case here.

Q.    Do you understand what the word "sufficient" means?

MR. YAVITZ:  Objection.  Form. Argumentative.

A.    Yes, I do.

Q.    Okay.  And suppose that we have evidence of an ADR transaction.  The ADRs that were purchased were newly issued by Bank of New York Mellon.

Is that information sufficient for you to conclude that irrevocable liability was incurred abroad?

MR. YAVITZ:  Objection.  Form. Asked and answered.

A.    Relating to what transaction, Counsel?  You can't make that decision

Page 266

ZARCU - HIGHLY CONFIDENTIAL

blankly without seeing the supporting evidence, much like I've done in this analysis, and we keep discussing it.

Q.    Well, right.  But if -- let's try this again.

If every purchase of a newly issued ADR involves a foreign share purchase, then why do you need more information than whether or not an existing ADR was purchased to determine whether irrevocable liability was incurred abroad?

A.    For the same reason you did, Counsel.  You want to see a complete picture of the transaction in order to prove that it did occur there.  So we have sufficient information showing that these were newly issued ADRs being purchased. They are arguing that they were not.  So that is why.  I need the full picture to be able to show exactly what happened.

Q.    Well, let's try this as a matter of logic.  Let's suppose that all purchases of existing ADRs involve

**Page 267**

ZARCU - HIGHLY CONFIDENTIAL irrevocable liability being incurred abroad.

Why do we need any other information about the ADR purchase to determine -- other than whether or not the ADR was newly issued to determine where irrevocable liability was incurred?

MR. YAVITZ:  Objection to the form of the question.

A.    Just because we don't know the rest of the piece of the puzzle, Counsel.

Q.    Why is it necessary to review trade orders, brokerage records, and confirmation slips to determine whether a Bayer ADR purchase was preceded by a purchase of Bayer ordinary shares?

MR. YAVITZ:  Objection.  Form.

A.    I think my answer is going to be the same, Counsel.  You're questioning whether the obligation happened in this case when we have clear evidence of newly issued ADRs in this case.  So that is why.

Q.    Suppose that there is a document that shows conclusively that a Bayer ADR

Page 268

ZARCU - HIGHLY CONFIDENTIAL
was acquired through a new issuance by
Bank of New York Mellon.

What other information, if any,
would you need to conclude where
irrevocable liability for acquiring that
ADR was incurred?

MR. YAVITZ:  Objection.  Form.
Incomplete hypothetical.

A.    As we've discussed before, if
the scenario changes and there's
conclusive evidence one way or the other,
they could be agreed upon by two parties,
perhaps you can arrive at that conclusion.
But as we're seeing here, that's not
happening.  So a complete picture of the
transaction in my opinion is required to
arrive at that conclusion.

Q.    Can you conceive of any
circumstances where, in your opinion,
irrevocable liability for a newly issued
ADR was incurred within the United States?

MR. YAVITZ:  Objection.  Form.
Incomplete hypothetical.

A.    I'm sorry.  Can you repeat that?

Page 269

ZARCU - HIGHLY CONFIDENTIAL

Q.    Can you conceive of any circumstances where, in your opinion, irrevocable liability for a newly issued ADR was incurred within the United States?

A.    I'm describing those scenarios and I'm illustrating using our transactions, the type of scenarios where it's pretty clear to me, and these are pretty clear as well.

Q.    Well, what evidence would indicate to you that irrevocable liability for an ADR was incurred within the United States?

MR. YAVITZ:  Objection.  Form.

A.    I would again have to see the evidence of each transaction to make that decision, Counsel.

Q.    So sitting here today, you can't give even one example of a factual circumstance where, in your opinion, irrevocable liability for an ADR purchase would be incurred within the United States.

A.    If I had an order that states

Page 270

ZARCU - HIGHLY CONFIDENTIAL

clearly from the investment manager go acquire previously issued ADRs in the U.S. markets, and all the documents would support that, yes, that would be a pretty easy conclusion to support, yes.

Q.    So let's go to paragraph 125. The final sentence of that paragraph says that new ADR issuances thus accounted for approximately 17.4 percent of all Bayer ADRs traded during the proposed class period.

Do you see that?

A.    Yes.

Q.    So do you agree that by your own calculation, if 17.4 percent of the Bayer ADR trading volume consisted of new ADR issuances, then 82.6 percent of the Bayer ADR trading volume consisted of transactions and existing ADRs?

A.    That's correct.

Q.    Would you agree that 82.6 percent of the total trade volume is an overwhelming majority of that trade volume?

Page 271

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.

A.    It is a majority, yes.

Q.    Do you agree that 82.6 percent of a total is an overwhelming majority of that total?

MR. YAVITZ:  Objection.  Form.

A.    That probably qualifies as such, yes.

Q.    And purchases and sales of existing Bayer ADRs are ordinarily domestic transactions where irrevocable liability to purchase the ADRs is incurred at the time of the trade confirmation; correct?

MR. YAVITZ:  Objection.  Form.

A.    Just addressing again the time when somebody becomes obligated to take those shares.  You just said trade confirmation.  Which confirmation are you referring to?

Q.    Well, let me try that again.

Transactions in existing Bayer ADRs are ordinarily domestic transactions where irrevocable liability is incurred at

ZARCU - HIGHLY CONFIDENTIAL

the time the ADR transaction is confirmed by the client; correct?

MR. YAVITZ: Objection. Form.

A.    I think we've discussed the moment when somebody is obligated to take shares regardless of location. That is when those shares are executed, not when they're confirmed.

Q.    So your opinion is that irrevocable liability is not incurred at the time a trade is confirmed.

MR. YAVITZ: Objection. Form.

A.    Counsel, it depends on what your definition of confirmed is. A confirm is actually something that occurs post-trade in the industry. So that is already after the fact, after the acquisition of the shares. As I stated repeatedly, the client becomes obligated to take and pay for the shares regardless of where they trade the moment they are acquired, not when they're confirmed.

Q.    Okay. In Professor Mitts' report, he wrote that of the 40 FINRA

**Page 273**

ZARCU - HIGHLY CONFIDENTIAL members whose purchases account for 99 percent of total purchases during the class period, every one of those purchasers' existing Bayer's sponsored ADRs was located in the United States.

You don't contest that conclusion in your report, do you?

A.    That's not relevant to my opinions.

Q.    Now, in paragraph 128 of your report, you write that in the Central District of California's decision in Toshiba, "the dispositive factor was likewise the plaintiff's contractual obligation to its broker."

Do you see that?

A.    Yes.

Q.    When an investor buys ADRs, who is their contractual counterparty?

MR. YAVITZ:  Objection.  Form.

A.    Who was the investor in this case, Counsel?

Q.    The client of the broker dealer. When a broker dealer's client buys ADRs,

Page 274

ZARCU - HIGHLY CONFIDENTIAL

who is their contractual counterparty?

MR. YAVITZ:  Objection.  Form.

A.    The two counterparties are the investment manager and the broker involved in the transactions.

Q.    So it's your opinion that the counterparty for an ADR purchase by an investment manager is the broker dealer with whom they place their purchaser; is that right?

MR. YAVITZ:  Objection.  Form.  I don't think he testified there's only one counterparty.

A.    I believe that's pretty obvious.

Q.    Okay.  And, now, you don't plan to offer an opinion on how the Court should interpret the Central District of California's Toshiba decision, do you?

A.    I do not.

Q.    And -- so just to go back to the questions I asked about counterparties.

So in your view, the plaintiffs' counterparties for their ADR purchases were their broker dealers; is that

Page 275

ZARCU - HIGHLY CONFIDENTIAL

correct?

MR. YAVITZ: Objection. Form.

A. Well, the plaintiffs were not directly engaging with the broker dealers. They were engaging to the broker dealers -- I'm sorry -- with the broker dealers via their investment managers.

Q. So your opinion addresses where the plaintiffs incurred irrevocable liability to take and pay for their purchases of Bayer ADRs; correct?

A. Correct.

Q. To whom did the plaintiffs in this case incur irrevocable liability?

A. That liability was incurred to the brokers who executed the actual trades.

Q. Okay. I think now is a good time for a break for us. So why don't we go off the record.

MR. YAVITZ: Yes.

THE VIDEOGRAPHER: We are off the record 3:04 p.m. Eastern Standard Time.

Page 276

ZARCU - HIGHLY CONFIDENTIAL

(Recess)

THE VIDEOGRAPHER:  Back on the record 3:25 p.m. Eastern Standard Time.

BY MR. JACKSON:

Q.    Welcome back, Mr. Zarcu.

Same question as for the prior breaks.  Did you discuss the substance of your testimony with anyone during the break?

A.    I did not.

Q.    Okay.  So your claimed expertise is in how orders for securities transactions are entered and executed; correct?

MR. YAVITZ:  Objection.  Form.

A.    My claimed expertise in trading and anything related to trading, Counsel.

Q.    Okay.  And your expertise in trading encompasses how securities transactions are entered; right?

A.    As a general term, yes.

Q.    Okay.  And you, as an expert on trading, are also an expert, according to

Page 277

ZARCU - HIGHLY CONFIDENTIAL

you, on how trades are executed as well; right?

A.    I think according to my experience, not just according to me, but yes.

Q.    Sure.  And you have about three decades of experience largely in trading and running trading desks; correct?

A.    I do have three decades of -- almost three decades of experience in trading and running trading businesses, yes.

Q.    And why do you think your experience as a trader is important in determining where irrevocable liability attaches to a financial transaction?

A.    As a practitioner of almost three decades, I think being involved in those situations thousands of times, I believe I'm in a very good position to opine on those with authority.

Q.    And what exactly is it about being an experienced trader that you think is helpful in figuring out where liability

Page 278

ZARCU - HIGHLY CONFIDENTIAL

for a transaction was incurred?

A.    Everything about being a trader and running trading businesses and dealing with these types of transactions and handling client orders and interacting with clients, you know, obviously familiarizes me with all the expectations, the rules of the game, which, again, places me in a good position to opine on this matter.

Q.    Okay.  And you had gained the experience we were just talking about in trading positions and Lazard and Wells Fargo or Wachovia and Bank of America Securities, among some other places; right?

A.    Correct.

Q.    And when you worked at Lazard and Wells Fargo and Wachovia and Bank of America, you had significant responsibilities for regulatory risk and compliance matters; right?

A.    Correct.

Q.    Okay.  And your experiences

**Page 279**

ZARCU - HIGHLY CONFIDENTIAL

fulfilling those responsibilities are in part the source of your claimed expertise in analyzing the Bayer ADR transactions in this case; right?

A.    Well, that's the totality of my experience, not just those.

Q.    Okay.  Well, just a question for you.

In fact, when you worked at Lazard and Wells Fargo/Wachovia and Bank of America, they were repeatedly sanctioned by FINRA and the New York Stock Exchange for not properly entering, executing, and reporting securities transactions; correct?

MR. YAVITZ:  Objection.  Form.

A.    That's quite possible.  I don't know the details of what you're describing.  I know Wells Fargo has paid billions in fines.  Yes.

Q.    Yes.  Do you know what a BrokerCheck report is?

A.    I do.

Q.    What is a BrokerCheck report?

ZARCU - HIGHLY CONFIDENTIAL

A.    It shows the record of a registered representative over the years.

Q.    Okay.  I'm going mark as our next exhibit your BrokerCheck report. This will be Exhibit 8.

(Zarcu Exhibit 8, BrokerCheck Report of Cristian Zarcu, was hereby marked for identification, as of this date.)

A.    I don't have it yet.

Q.    It's taking a while to load.

MR. YAVITZ:  All that experience.

THE WITNESS:  Must be.  I see it now.  I'm trying to open it.  It's taking its time, unfortunately.

I have it now.

Q.    Okay.  Do you recognize this document?

A.    It appears to be a BrokerCheck report for me.

Q.    Okay.  And this is, as far as you know, a true and correct copy of your BrokerCheck report; correct?

ZARCU - HIGHLY CONFIDENTIAL

A.    I haven't looked at it, but I would imagine it would be.

Q.    Okay.  Let's just go to page 5. Now, there's a few firms here that didn't appear on your CV, so I just wanted to ask you some questions about them.

You were registered as a broker with IEX Services LLC from September 2018 to December 2018; correct?

A.    Yes.

Q.    What is IEX Services LLC?

A.    IEX is an exchange.

Q.    Okay.  And what were your responsibilities at IEX?

A.    I engaged in a temporary contract with them to advise them on their interaction with the broker dealers.

Q.    Okay.  And did you have any responsibilities for determining where liability is incurred for a financial transaction when you worked at IEX?

A.    No.  That had nothing to do with my engagement, no.

Q.    Okay.  And did you leave your

**Page 282**

ZARCU - HIGHLY CONFIDENTIAL
employment with IEX when that engagement ended?

A.    Yeah.  Again, it was a temporary contract.

Q.    Okay.  And you were also registered as a broker with Credit Lyonnais Securities (USA), Inc., from August 2000 to May 2001; is that right?

A.    Yes.

Q.    And what kind of firm is Credit Lyonnais Securities (USA)?

A.    Well, Credit Lyonnais Securities (USA) was the U.S. arm of Credit Lyonnais Bank of France, and they basically transact mostly in international securities, and I was acting as a liaison between U.S. business and the international businesses in various locations.

Q.    Did you have any responsibilities for determining where liability is incurred for a financial transaction when you worked at Credit Lyonnais?

ZARCU - HIGHLY CONFIDENTIAL

A.    Not specifically, no.

Q.    Okay.  And why did you not include Credit Lyonnais on the CV attached to your expert report?

A.    It was not significant enough. It's a small period of time.  I was on my way to a bigger opportunity to -- at Bank of America.  So it didn't seem important to be there.

Q.    Did you leave Credit Lyonnais voluntarily?

A.    Yes, I did.

Q.    Okay.  You were registered with a broker -- I'm sorry.  Strike that.

You were registered with FINRA as a broker with Lazard Capital Markets LLC from May 2009 to January 2013; correct?

A.    That sounds about right.

Q.    Okay.  And you were registered with FINRA as a broker with Wachovia Capital Markets LLC from April 2004 to February 2009; correct?

A.    Probably.

Page 284

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  And you were registered with FINRA as a broker with Banc of America Securities LLC from June 2001 to April 2004; correct?

A.    Again, it looks like it, yes.

Q.    And your responsibilities at those three firms included responsibility for ensuring compliance with FINRA obligations; correct?

A.    Yes.  FINRA is obviously one of the regulators.

Q.    Okay.  We're going to look through the BrokerCheck reports for Lazard and Wachovia and Banc of America.  So I'm going to mark as our next exhibit, which will be Exhibit 9, a broker -- a BrokerCheck report for Lazard.

(Zarcu Exhibit 9, BrokerCheck Report for Lazard, was hereby marked for identification, as of this date.)

A.    Okay.

Q.    This one is -- these next few reports may take a little while to load because they're longer documents.  So

Page 285

ZARCU - HIGHLY CONFIDENTIAL

please let me know when you have that one loaded up.

A.    Lazard is loaded up right now. I mean, loaded up as in I see it, but now it's loading.  I'm sorry.

Q.    That's okay.

A.    Yeah.  It's taking a while. Still loading up.  I'm sorry.

Q.    That's okay.

Well, you know, what I will do is I'll share my screen just to move things along, just because --

A.    It just popped up.

Q.    Oh, great.

I'm may share my screen shortly anyway just in the interest of expediting things.  So --

A.    Okay.

Q.    So this is the BrokerCheck report for Lazard Capital Markets.  I'll represent to you the title page says that this is the BrokerCheck report for FM Partners Holdings LLC, but this is actually the BrokerCheck report for Lazard

Page 286

ZARCU - HIGHLY CONFIDENTIAL

Capital Markets, as we'll see shortly.

So I'm just going to share my screen to make this go more quickly.

So first I'm going to direct us to pages 31 through 33 of the report.

MR. YAVITZ:  Cristian, if there's any other portion of the report that you need to read in order to provide context for the section that Mr. Jackson is directing you to, I'm sure he wouldn't mind you doing that.

MR. JACKSON:  Absolutely.

Q.    So looking at page 31.

A.    Would you mind -- can you make that bigger?

Q.    Yeah.  Let me see if I can.  Let me stop the screen share here and put this on a different screen.

A.    Okay.

Q.    Okay.  So we are now I think more zoomed in.

A.    Okay.

Q.    So let's look here at where it

ZARCU - HIGHLY CONFIDENTIAL

says "Disclosure 7 of 15."  It says here that in September of 2012, FINRA alleged that Lazard Capital Markets engaged in a pattern or practice of late reporting of transactions to FINRA and NASDAQ.

Do you see that?

A.    I am not sure where that is, honestly.

Q.    Okay.  Well, let me try reading -- let me try reading this.  It says here that in September 2012, FINRA alleged that Lazard Capital Markets was engaged in a "pattern or practice of late reporting without exceptional circumstances in violation of NASD Rule 2110."

Do you see that?

A.    Yes.

Q.    And it says that Lazard Capital Markets failed to correct execution time reported to FINRA and NASDAQ on some last sale reports.

Do you see that?

A.    I see that, yes.

Page 288

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  And it says that Lazard Capital Markets failed to notify customers that the transaction was executed at an average price.

Do you see that?

A.    I don't see specifically where it is, but I'm going to take your word for it.

Q.    Okay.  And it says here that on -- in September 2012, FINRA alleged that Lazard Capital Markets failed on some occasions to provide written notification disclosing to its customers the correct type of compensation the firm charged for the transaction.

Do you see that?

A.    Yeah.  I see it.  Yes.

Q.    Okay.  And it says here that in September 2012, FINRA alleged that Lazard Capital Markets failed to properly mark sell orders as short sales on its brokerage order memorandum.

Do you see that?

A.    Yes, I see it.

**Page 289**

ZARCU - HIGHLY CONFIDENTIAL

Q. Okay. And it also says here that the firm failed to submit new order information to the order audit trail system or OATS for reportable orders and that the firm submitted inaccurate routed market participant identifier information to OATS and that the firm's written procedures failed to provide for minimum requirements for adequate supervisory procedures in best execution, anti-intimidation/coordination, other trading rules, including rules to review clearly erroneous transactions, and SEC Rule 612 of Regulation NMS.

Do you see that?

A. I do.

Q. Okay. And for these violations, as you'll see on the next page, FINRA censured Lazard and fined it $40,000.

Do you see that?

A. I see the 40,000, yes.

Q. Okay. Now let's go to pages 34 through 35.

A. Okay.

Page 290

ZARCU - HIGHLY CONFIDENTIAL

Q.    This one is Disclosure 8 of 15. It says here that in August of 2012, FINRA sanctioned Lazard and fined it $15,000 because it entered orders into the NASDAQ market center that failed to correctly indicate whether the orders were a buy, short sale, or long sale.

Do you see that?

A.    Yes.

Q.    Okay.  And now let's look at pages 35 through 37, and specifically Disclosure 9 of 15.  It says here that in August 2012, FINRA sanctioned Lazard and fined it $15,000 because it entered orders into the NASDAQ market center that failed to correctly indicate whether the orders were a buy, short sale, or long sale.

Do you see that?

A.    Yeah.  I can't say that I see. Where does it say that?  But I'll take your word for it.  Again, I --

MR. YAVITZ:  Well, Cristian, you should make sure that you see the stuff he's referencing.  So just take

**Page 291**

ZARCU - HIGHLY CONFIDENTIAL

a second.

A.    Where does it say that Lazard didn't put the buy, sell, or -- where does it say in this specific paragraph here?

Q.    Let me try to --

A.    It talks about OATS in that same paragraph right there.  I did notice that reference to the not putting buy or sell or short sale previously, but I don't see it here.

Q.    Yeah.  You know, actually, I read it wrong for this -- for this disclosure.  This one says -- I was reading the previous one, to be clear, by accident.

A.    Okay.

Q.    So for this one, it says that in December of 2011, FINRA sanctioned Lazard and fined it because it transmitted numerous reportable order events or ROES to the order audit trail system or OATS that were rejected by OATS for context or syntax errors.

Do you see that?

Page 292

ZARCU - HIGHLY CONFIDENTIAL

A.    I do.

Q.    Okay.  And let's look at pages 37 through 39.  Disclosure 10 of 15.  It says here that in June 2010, FINRA sanctioned Lazard and fined it over half a million dollars because it improperly engaged in a course of practice of using the firm's error account to effect price adjustments for agency trades done primarily on the floor of the NYSE for its largest institutional client.

Do you see that?

A.    I see that, yes.

Q.    Do you know who that client was, by any chance?

A.    I have never seen these before.

Q.    Okay.  So during your time at Lazard where you had significant regulatory and compliance responsibilities, the company was repeatedly sanctioned by FINRA and fined over half a million dollars for regulatory and compliance violations relating to how orders were entered and executed; correct?

Page 293

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.
Use of the word "Lazard."

A.    So all these are absolutely news to me.  I personally have not been made aware of any fines.  And just for your knowledge, Lazard had more than one trading desk, not just my own.  So I personally don't understand why these are on my BrokerCheck and where does -- is this my BrokerCheck or is this Lazard?

Q.    No, no.  That was the Lazard BrokerCheck, Mr. Zarcu.

A.    I mean, I'm unfamiliar with any of these, and just so you understand how my systems operate, right, so everything is algorithmically designed and traded. Everything is automatically generated by the computer.  So there's no way that my orders ended up buy, sell, or sale short indicators.  My OATS reporting was automated.  And we didn't use the error account.  So it sounds to me like this is completely unrelated to my own activities. So I have no idea what this is.

**Page 294**

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  Let's take a look, then, at -- may be the same case for Wachovia, but we'll see.  Let's look at the BrokerCheck report for Wachovia.  I'm going to mark that as our next exhibit.

A.    Okay.

Q.    This one is -- as you might imagine, is quite a lengthy document, so it may take --

A.    I would imagine so.

Q.    -- might take a little bit to load.

        (Zarcu Exhibit 10, BrokerCheck Report for Wachovia, was hereby marked for identification, as of this date.)

Q.    This will be Exhibit 10.

A.    So I have the title.  Now I'm trying to load.

Q.    I'll share my screen to move it along.

A.    Okay.

Q.    This is a -- this is a 339-page document, so it will probably be easier if I navigate it for us.

Page 295

ZARCU - HIGHLY CONFIDENTIAL

Now, as we discussed earlier, you worked at Wachovia from April 2004 to February 2009; correct?

A.    Yeah.  That sounds right.

Q.    Okay.  So I'm going to represent to you that this is the BrokerCheck report for Wells Fargo Securities LLC and Wachovia Capital Markets LLC.  The title says that it's for Wells Fargo Securities LLC, but it covers both, as you'll see as we go through it.

Do you understand?

A.    I do.

Q.    Okay.  I am now going to bring us to page 136.

MR. YAVITZ:  It's very small.

MR. JACKSON:  I will -- I'll zoom in.

MR. YAVITZ:  Thank you.

Q.    So here it says "Disclosure 84 of 145."  It says here that in February 2009, FINRA alleged that Wachovia failed to transmit last sale reports to the NASDAQ trade reporting facility and

ZARCU - HIGHLY CONFIDENTIAL

failed to designate some of them as late, executed short sale transactions and failed to properly report them to the NASDAQ trade reporting facility and failed to submit certain reports to the NASDAQ trade reporting facility for the offsetting riskless portion of riskless principle transactions.

Do you see that?

A.    I do.

Q.    And on page 137, it says that FINRA also alleged that the firm's supervisory procedures failed to provide for one or more of the minimum requirements for adequate written supervisory procedures in best execution, sales indicator order marking and trade input, soft dollar agreements, and the order audit trail system or OATS.

Do you see that?

A.    I do.

Q.    And for these sanctions, FINRA sanctioned -- I'm sorry.  Strike that.

For these violations, FINRA

ZARCU - HIGHLY CONFIDENTIAL

sanctioned Wachovia and fined it.

Do you see that?

A.    I'm not seeing -- oh, I see the front.

Q.    Okay.

A.    Yes.

Q.    All right.  Now let's go to the next disclosure, 85 of 145.  It says here that in November of 2008, FINRA sanctioned Wachovia and fined it for failing to timely last sales reports to NASDAQ.

Do you see that?

A.    Yes.

Q.    Okay.  Now I'm going to bring us to page 226 of this document.

MR. YAVITZ:  Which, I'll just note for the record we still don't have a complete copy of it.

MR. JACKSON:  I can assure you that it is just hundreds of pages of similar content, most of which -- the vast majority of which is not relevant here.

Q.    So we'll go to Disclosure 144 of

ZARCU - HIGHLY CONFIDENTIAL

145.    It says here that in September of 2005, FINRA -- I'm sorry.  Strike that. It says here that in September of 2005, the New York Stock Exchange Division of Enforcement sanctioned Wachovia and fined it over half a million dollars for failing to submit accurate trading information on electronic blue sheets.

Do you see that?

A.    Yeah.

Q.    Do you know what an electronic blue sheet is?

A.    Well, it's a very specific -- a specific class of securities traded --

Q.    And --

A.    -- which I had never traded. That was never part of my responsibility at Wachovia.  No.

Q.    Okay.  And let's go to Disclosure 145 now.  It says here that in December of 2004, NASD alleged that in the fourth quarter of 2003 and the first quarter of 2001, Wachovia made available reports on its routing of non-directed

ZARCU - HIGHLY CONFIDENTIAL
orders that contained incorrect or
incomplete information on a variety of
topics.

Do you see that?

A.    My desk wasn't even live in
December of 2004.

Q.    Okay.  So we can just ignore
that one disclosure.

Now, I just want to ask you,
during your time at Wachovia, the
company -- not your trading desk, but the
company was repeatedly sanctioned by FINRA
and the New York Stock Exchange for
regulatory and compliance violations
relating to how orders were described and
reported to regulators; correct?

A.    It appears that way, yes.

Q.    Okay.  And let's set that
document aside.  And I'm going to mark as
our next exhibit the BrokerCheck report
for Bank of America.  And similarly, this
is a lengthy report, so it may take a
while to load.

MR. YAVITZ:  And Ben, I just

**Page 300**

ZARCU - HIGHLY CONFIDENTIAL

want to say you're still sharing your screen.  I just want to make sure we don't get your outline or something.

MR. JACKSON:  There you go.  I will stop sharing my screen.  Thank you.

(Zarcu Exhibit 11, BrokerCheck Report for Banc of America Securities LLC, was hereby marked for identification, as of this date.)

Q.    And I'm going to introduce this as Exhibit 11.

A.    Yeah.  My Wachovia one never loaded, by the way.

Q.    It's -- these two are quite lengthy, so --

A.    I don't doubt it.  They got fined billions and billions of dollars.  They keep getting fined.

Q.    The Banc of America one is also about 330 pages long.  So it could take a little while to load.  So to move things along, again, I will share my screen.

A.    Sure.

Page 301

ZARCU - HIGHLY CONFIDENTIAL

Q.    So as we discussed earlier, you worked at Bank of America from June 2001 to April of 2004; correct?

A.    I believe those dates are correct.  Yes.

Q.    Okay.  I'm going to take us to page 195 of this document.  And let's look at Disclosure 73 of 88.  It says here that in March 2003, NASD sanctioned Banc of America and fined it $5,000 for failing to timely report orders to OATS; correct?

A.    It says that, yes.

Q.    Okay.  And just so the record is clear, are you aware that NASD later changed its name to FINRA?

A.    I am aware of that, yes.

Q.    Okay.  And let's look at the following page for Disclosure 74 of 88.  It says here that in March 2003, the New York Stock Exchange Division of Enforcement sanctioned Banc of America and fined it $75,000 for violating the exchanges market on close and limit on close order entry and cancellation

Page 302

ZARCU - HIGHLY CONFIDENTIAL

procedures and policy.

A.    I see that.

Q.    Okay.  And let's look at the next disclosure, 75.  It says here that in December of 2003, NASD sanctioned Banc of America and fined it for violations relating to reporting securities transactions causing locked or crossed market conditions to occur and failing to accurately report short interest positions.

A.    I see it.

Q.    Okay.  And now let's go to Disclosure 78 on this BrokerCheck report. You see here that in June of 2001, NASD sanctioned Banc of America and fined it over $100,000 for regulatory violations relating to entering bid or ask quotations in NASDAQ that caused locked or crossed market conditions as well as issues relating to order execution.

A.    I see that.

Q.    Okay.  Now, during your time at Bank of America, the company was

ZARCU - HIGHLY CONFIDENTIAL

repeatedly sanctioned by NASD and the New York Stock Exchange and fined hundreds of thousands of dollars for regulatory and compliance violations relating to how orders were described and executed; correct?

MR. YAVITZ:  Objection.  Form.

A.    It appears that way.

Q.    Okay.  So just a few questions for you about -- you can set that document aside.  Just a few questions about some different topics.  And let me stop my screen share this time so I don't further embarrass myself.

So first question:  Is it fair to say that newly issued Bayer ADRs and existing ADRs trade in the same market?

MR. YAVITZ:  Objection.  Form.

A.    So newly issued ADRs, as we described earlier, they actually don't trade.  They just get created.

Q.    Okay.  Are there any arbitrage opportunities that you're aware of between newly issued ADRs and existing ADRs?

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.

A.    No, I don't believe so.

Q.    Okay.  And have you seen any indication in the evidence that you've reviewed that the price of an ADR transaction depends on whether you acquire newly issued ADRs or existing ADRs if there's sufficient liquidity in the market?

MR. YAVITZ:  Objection.  Form. Incomplete hypothetical.

A.    I don't think I understand your question, Counsel.  I'm sorry.

Q.    Yeah.  Have you seen any indication that if the price -- strike that.

Let's talk about things from the purchaser's perspective.

Does a purchaser of Bayer ADRs in your opinion care whether they acquire existing ADRs or new ADRs if the execution costs for both is the same?

MR. YAVITZ:  Objection.  Form. Incomplete hypothetical.

ZARCU - HIGHLY CONFIDENTIAL

A.    It's not -- you're not giving me sufficient information to have an informed opinion here, Counsel.  Sorry.

Q.    Okay.  Well, let's assume we're looking at two potential transactions, one in which you buy a certain quantity of new ADRs and another where you buy a certain -- the same quantity of existing ADRs.

If the execution price -- if the execution cost for those two transactions is the same, does the purchaser care or not whether they are buying newly issued or existing ADRs?

MR. YAVITZ:  Objection.  Form.

A.    It depends on everyone's situation, I guess.  Not -- it's hard to say without knowing their, you know, underlying motivation for the acquisition and all sorts of other things.

Q.    Aside from -- well, strike that.

What are the circumstances in which an investor would prefer to acquire newly issued ADRs versus existing ADRs?

Page 306

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.

A.    As we described -- as I described in my report and as we discussed, obviously liquidity becomes an important factor in that.  So that is definitely one of the considerations.  And all things being equal, if the liquidity is available, I guess one could decide that.  But again, we would need a lot more information to make that decision.

Q.    So let me just try this a different way.

Would a customer be indifferent between purchasing a newly issued ADR or an existing ADR if the price to them was the same?

MR. YAVITZ:  Objection.  Form. Incomplete hypothetical.

A.    I again don't have sufficient information to know what a customer would want to do.

Q.    Okay.  I just have one thing to cover, and then we can take a short break.

Have you saved any of the

Page 307

ZARCU - HIGHLY CONFIDENTIAL
documents that have been introduced as exhibits today to your personal computer?

MR. YAVITZ: Objection. Form. Are you asking, like, during the deposition?

Q. During the deposition. During the deposition.

A. So I had to download the Cowen document that the counsel forwarded to me.

Q. Yeah.

A. Other than that, I haven't touched any.

Q. Okay. Just to comply with the protective order in this case, I would ask that you delete that document and then confirm that you've done so.

A. Give me one second. I'll do it right now.

Q. Okay.

MR. YAVITZ: While he's doing that, I'll just note for the record that I don't think the Banc of America BrokerCheck exhibit ever loaded either. So we only had the snippets

ZARCU - HIGHLY CONFIDENTIAL

that we saw.

MR. JACKSON:  Okay.  It's -- I'm seeing it loaded in my Exhibit Share. So --

MR. YAVITZ:  Oh, I see that.  I got it now.  When I hit "reload," it eventually loaded.

MR. JACKSON:  Yeah.  Sometimes you have to hit "reload."

A.    Okay.  Oh, I'm sorry.  The file is open, so I can't delete it.  One second.  Let me just close it.  I wasn't sure if we were going to need it again or not.

Q.    Yeah.  Sorry.  We're just required to do this on the record by the order in the case.

A.    It's not a problem at all.  Yes. So that's gone.

Q.    Okay.  Great.

I think now we can go off the record for maybe five minutes.

THE VIDEOGRAPHER:  All right. Off the record 3:57 p.m. Eastern

ZARCU - HIGHLY CONFIDENTIAL

Standard Time.

(Recess)

THE VIDEOGRAPHER:  We are back on the record 4:12 p.m. Eastern Standard Time.

BY MR. JACKSON:

Q.    Welcome back, Mr. Zarcu.

Same question as with previous breaks.  Did you discuss the substance of your testimony with your counsel during the break?

A.    I did not.

Q.    Okay.  And did you discuss the substance of your testimony with anyone else during the break?

A.    I didn't discuss anything with anybody else, no.

Q.    All right.  Just a few more questions for now.

The -- if I wanted to do a step-wise re-creation of the methodology that you used to analyze the plaintiffs' ADR transactions, how would I do so?

MR. YAVITZ:  Objection.  Form.

Page 310

ZARCU - HIGHLY CONFIDENTIAL

A.    I'd start with the review of the materials generally in the case and then start to zoom into each of the transactions and uncover the available information regarding communications, trade transactions, FIX orders, confirmations, email confirmations, and then try to piece together the puzzle for each one of the transactions.

Q.    And if -- and when you reviewed that evidence, if you encountered any evidence that the transaction in Bayer ADRs was related to a purchase of Bayer ordinary shares abroad, did you then conclude, based on that, that irrevocable liability for the ADR purchase was incurred abroad?

MR. YAVITZ:  Objection.  Form.

A.    As I mentioned earlier, the -- my opinions are based on the totality of the information that I've been able to research and some that I've asked for from the counsel and they provided.  So it's not just one little piece that informed my

ZARCU - HIGHLY CONFIDENTIAL

opinion.  It's all of them together.

Q.    Okay.  So you looked at all of the evidence for indications that and overseas foreign share purchase was related to a Bayer ADR purchase.  Is that fair?

MR. YAVITZ:  Objection.  Form.  Mischaracterizes report and testimony.

A.    I mean, as I said before, I looked at all the information available to follow the steps in the transaction and be able to reconstitute what actually happened.

Q.    Okay.  And so if I wanted to replicate your methodology, could I simply look at all of the evidence in the case and all of the evidence relating to the transactions and then draw my own conclusion about where irrevocable liability was incurred?

MR. YAVITZ:  Objection.  Form.  You personally?

A.    Add to that my 30 years of trading experience, and you're there.

ZARCU - HIGHLY CONFIDENTIAL

Q.    Okay.  So in order to use the methodology that you've laid out, you would need a trader with sufficient experience to do a holistic review of the evidence?

MR. YAVITZ:  Objection.  Form.

A.    You would need someone with extensive experience like myself to conduct that analysis, yes.

Q.    Okay.  And when you were -- let me just -- let's go back to Exhibit 1, which was your report.

A.    Okay.

Q.    And let's look for -- just give me one second to find the relevant section of your report.

A.    Okay.

Q.    So let's go to paragraph 24.

A.    Okay.  24.

Q.    Yeah.  So here, you -- you -- strike that.

Here, in paragraph 24, you say that you analyzed the brokerage records for plaintiffs' purchases; right?

ZARCU - HIGHLY CONFIDENTIAL

A.    I'm saying I analyze each plaintiffs' purchases using brokerage records, confirmation slips, communications, and other relevant documents.

Q.    What steps did you undertake when you were analyzing the available brokerage records of plaintiffs' purchases of Bayer ADRs?

MR. YAVITZ:  Objection.  Form.

A.    It depends on the record.  I was provided with certain spreadsheets that I opened and analyzed and looked for the -- for information related to the transactions at hand.

Q.    What information were you looking for in the brokerage records that you analyzed?

A.    I was looking for any piece of information available that would help me form my decision.

Q.    And what pieces of information did you find in the brokerage records that you reviewed that were helpful to your

**Page 314**

ZARCU - HIGHLY CONFIDENTIAL
decisions?

MR. YAVITZ:  Objection.  Form.

A.     There's a multitude of them, but among them, number of shares, prices of execution, in certain instances, the cross transactions reported.  It depends. There's a variety of timestamps, security symbol.  So it depends.  They are not the same.  Each broker produces different types of records.

Q.     And what was the purpose of reviewing the brokerage records?

MR. YAVITZ:  Objection.  Form.

A.     Just the piece of the puzzle and understanding the order of events and what occurred in the transactions.

Q.     When you reviewed the confirmation slips for plaintiffs' purchases, what steps did you take?

MR. YAVITZ:  Objection.  Form. You mean, like, the order he read the document in?

Q.     Yes.  What steps did you undertake when you reviewed the

Page 315

ZARCU - HIGHLY CONFIDENTIAL

confirmation slips for plaintiffs' Bayer ADR purchases?

A.    Well, confirming the client's name, the security, looking at shares, looking at prices, things of that nature.

Q.    And what evidence in the confirmation slips would indicate that a -- strike that.

What information contained in confirmation slips is in your view relevant to determining where irrevocable liability was incurred?

MR. YAVITZ:  Objection.  Form.

A.    Well, the price paid for the acquisition of the ADRs would link it to the acquisition overseas and the price obtained for the ADR, which was based on the purchase of the German shares and not the U.S. market and ADRs.

Q.    Okay.  And so the methodology that you employed was designed to try to match up characteristics of a foreign Bayer share purchase with characteristics of a Bayer ADR purchase; correct?

**Page 316**

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form. Mischaracterizes testimony.

A.    I mean, I wasn't -- I didn't have a specific design in mind.  I was just looking for pieces of information that would inform me as to how a transaction may have occurred.

Q.    Is whether an overseas transaction in Bayer securities occurred the determinative factor for whether irrevocable liability was incurred abroad?

MR. YAVITZ:  Objection to form. Incomplete hypothetical.

A.    You are asking me if the prices of an overseas acquisition of the foreign shares is necessary for what again?  I'm sorry?

Q.    Let me try to rephrase the question.

Is the overseas acquisition of Bayer ordinary shares in connection with an ADR purchase sufficient to conclude that irrevocable liability for the Bayer ADR purchase was incurred abroad?

Page 317

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection.  Form.  Asked and answered.

A.    Yeah.  I don't have sufficient information for that, how are those orders connected to -- that is why it takes an analysis of all the information available per transaction.

Q.    So the purpose of your analysis is to try to link the foreign ordinary share purchase to the Bayer ADR purchase.

MR. YAVITZ:  Objection.  Form.

A.    No.  That wasn't my purpose.  My purpose was to understand how each one of the transactions occurred.

Q.    So are you offering an opinion on where irrevocable liability was incurred?

MR. YAVITZ:  Objection.  Form.  Mischaracterizes report.

A.    I am offering -- and it's in my report -- the opinion of where the clients were obligated to take and pay for the securities, yes.

Q.    Okay.  And supposing I hired

Page 318

ZARCU - HIGHLY CONFIDENTIAL

another experienced industry trader with similar experience to yours, what steps in particular would I have them take to recreate the analysis that you conducted for reaching your expert opinions in this case?

MR. YAVITZ:  Objection.  Form. Calls for speculation.

A.      If you would -- sorry.

MR. YAVITZ:  Go ahead.

A.      If you would hire an experienced trader like myself, you wouldn't need to tell them what steps to take so they would know, just like I know.

Q.      Okay.  I don't have any further questions at this time.  But I'll reserve the remainder of our time for recross, if necessary.

MR. YAVITZ:  Okay.  Do you mind if we take just five, and then I'll come back and I have a few questions?

MR. JACKSON:  Not at all.

MR. YAVITZ:  Okay.  Let's go off the record.  Thanks.

ZARCU - HIGHLY CONFIDENTIAL

THE VIDEOGRAPHER:  Off the record 4:22 p.m. Eastern Standard Time.

(Recess)

THE VIDEOGRAPHER:  Back on the record 4:31 p.m. Eastern Standard Time.

BY MR. YAVITZ:

Q.    Hi, Mr. Zarcu.

A.    Hello, Mr. Yavitz.

Q.    So since -- since I'm the one asking the questions, not Ben, I'll start with his question.

Did you discuss the substance of your testimony with me or anyone else during the break?

A.    I did not.

Q.    Okay.  Do you recall that you discussed with Mr. Jackson the use of the term "irrevocable liability to take and pay for shares" in your report?

A.    Yes.

Q.    Now, the phrase "irrevocable liability" was also used extensively in

ZARCU - HIGHLY CONFIDENTIAL

Professor Mitts' report; right?

A.    Yes, it was.

Q.    In fact, his entire opinion was framed around the question of irrevocable liability; right?

A.    I believe so.

Q.    So why did you use that phrase in your report?

A.    I guess because he used it, and it's sort of similar to what I understand the meaning when was the client committed to take and pay for the securities. That's kind of how he used it.

Q.    So your lay understanding of the phrase is the moment when the client was obligated to take and pay for the securities; is that right?

A.    That is correct.

MR. JACKSON:  Objection to form.

Q.    And that's the lay -- oh, I'm sorry.

MR. JACKSON:  Yeah.  I just wanted to object to the form.  Go ahead.

Page 321

ZARCU - HIGHLY CONFIDENTIAL

Q.    And that's the lay understanding that you applied throughout your report in discussing irrevocable liability; right?

MR. JACKSON:  Objection to form.

A.    That is correct.

Q.    So you were asked repeatedly by Mr. Jackson whether your prior experience included responsibility for determining where transactions occurred.

Do you recall that?

MR. JACKSON:  Objection to form.

A.    Yes, I do.

Q.    Did your prior experience -- strike that.

Did your prior professional experience require you to know when transactions occurred?

A.    Undoubtedly, yes.

Q.    Did your prior experience require you to become familiar with when a client incurred an obligation to take and pay for ADRs?

MR. JACKSON:  Objection to form.

A.    Absolutely.

Page 322

ZARCU - HIGHLY CONFIDENTIAL

Q.    So in your role as a trader issuing orders for ADRs, this morning, for example, did you need to know at what point you became obligated to take and pay for those ADRs?

MR. JACKSON:  Objection to form.

A.    No, because I already know.

Q.    Fair enough.

But was it important that you know the moment when you became obligated to take and pay for ADRs?

A.    Well, yes.  The moment I get executions.

Q.    Yeah.  In your role as a broker dealer trader, receiving and implementing orders for ADRs, was it important to your job to understand the point at which your client became obligated to take and pay for their ADRs?

MR. JACKSON:  Objection to form.

A.    Absolutely.

Q.    Now, Mr. Jackson asked you about some line items that didn't appear in your CV.

Page 323

ZARCU - HIGHLY CONFIDENTIAL

Do you recall that?

A.    Yes, I do.

Q.    One of those items that he didn't mention was a brief period of employment at the successor to Salomon Brothers.

Do you recall being employed briefly after a Salomon Brothers merger?

A.    Well, yes, I was.  I started my career at Salomon Brothers, which ultimately merged with Smith Barney.  The combination Salomon-Smith Barney was acquired by Travelers, and ultimately, that merged with Citi, and ended up being Citi.

Q.    Yeah.  And during the period where Salomon Brothers had been acquired by Citi, did you have any responsibility with respect to the issuance of ADRs?

MR. JACKSON:  Objection to form.

A.    Sorry.  In my early career, I acted as a liaison between the U.S. desk and -- for Salomon specifically and the international locations that we had, and

Page 324

ZARCU - HIGHLY CONFIDENTIAL

as such, I was involved in a lot of ADR acquisitions similar to what we're discussing here.

Q.    Okay.  And you're -- strike that.

And in your report, you're offering your expert opinions on the trades alleged by plaintiffs based on all of that experience and understanding; right?

MR. JACKSON:  Objection to form.

A.    I am basing my opinions on my -- the totality of my experience, yes.

Q.    Do you recall that Mr. Jackson at various points during his examination of you asked questions about the process you followed or the steps you applied in connection with your analysis?

A.    Yes, I do.

Q.    Is it right that your process was to apply your experience and professional judgment to a review of the documents underlying the trades alleged?

MR. JACKSON:  Objection to form.

ZARCU - HIGHLY CONFIDENTIAL

A.    Yes, it is.

Q.    And the goal of your process was to develop an understanding of how the trades were ordered and executed based on your experience with thousands of equivalent trades; right?

MR. JACKSON:  Objection to form.

A.    That is correct.

Q.    Why do you think that your opinion is useful to the Court in its independent resolution of where legal liability was incurred for these transactions?

Or strike that and state it differently.

Why do you think it would be useful for the Court to have your expert opinion and interpretation of the trader communications, brokerage records, and other documents that you describe, discuss, and analyze in your report?

MR. JACKSON:  Objection to form.

A.    Because the obligations to take and pay for the share revolves around the

ZARCU - HIGHLY CONFIDENTIAL
trading aspect of these transactions and
not the settlement as to the transactions.
Those are two completely separate aspects
of a trade that occurs.

Q. And would you agree that the trading aspect of these transactions relies heavily upon specialized language, norms, conventions that would only be familiar to someone who has operated extensively in that industry?

A. Undoubtedly.

MR. JACKSON: Objection to form.

A. Undoubtedly, there's trader lingo, trader relationships that lead to this kind of trust and understanding of what the process needs to be.

Q. Got it.

Now, you were asked some questions by Mr. Jackson about the definition of the term "cross trade."

Do you recall that?

A. I do.

Q. Do any of your opinions rely upon whether the transactions alleged by

**Page 327**

ZARCU - HIGHLY CONFIDENTIAL

plaintiffs fell within any regulatory definition of the term "cross trade"?

A.    Not at all.

Q.    Do any of your opinions rely upon whether the transactions at issue fell within any definition of "cross trade" that may have been adopted by FINRA?

A.    No, not at all.

Q.    So what was the function of your reference to cross trade in developing your opinions and issuing your report?

A.    As I mentioned earlier, when counsel asked me, whenever there's a transaction that involves multiple broker accounts, when something gets booked into the broker's house account, and then it gets flipped back to the client, that's referred to as a cross.

Q.    And in fact, a number of the -- strike that.

And in fact, did you see the traders who conducted these trades in this case referring to those transactions as

Page 328

ZARCU - HIGHLY CONFIDENTIAL

cross trades?

MR. JACKSON:  Objection to form.

A.    There were mentions of that, yes.

Q.    Okay.  I want to look at paragraph 79 of your report.  That was marked previously as Exhibit 1.  If you can just open it up and let me know when you're there.

A.    Okay.

Q.    Do you recall discussing this paragraph with Mr. Jackson?

A.    Yes.

Q.    So I want to focus on the 11:29 a.m. Eastern Time message sent by Ms. Lawn, which you discussed extensively with Mr. Jackson.

Can you let me know when you are at that portion of your report.

A.    I am there now.

Q.    So looking at the message sent by Ms. Lawn at 11:29 a.m., she provides a confirmation listing certain details of the ADR transaction, including local

**Page 329**

ZARCU - HIGHLY CONFIDENTIAL

price, FX conversion price, and ADR conversion cost; is that right?

MR. JACKSON:  Objection to form.

A.    That is correct.

Q.    Is it your understanding that all of those details would have been determined based on prevailing market rates?

MR. JACKSON:  Objection to form.

A.    So the acquisition of the local shares would have been based on the prevailing prices at the time of the acquisition.  Similarly, the foreign exchange rate would have been based on the activity in the market at the time of the prices in the marketplace.  And the conversion costs, as we've discussed earlier, that's a negotiated part with the depositary bank.

Q.    And that negotiation --

MR. JACKSON:  I'm sorry to interrupt.  Can we just go off the record for, like, one minute so I can close the blinds in my office?

Page 330

ZARCU - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Absolutely.  Let's go off the record.

MR. JACKSON:  Yeah.

THE VIDEOGRAPHER:  Off the record 4:40 p.m. Eastern Standard Time.

(Recess)

THE VIDEOGRAPHER:  Back on the record 4:41 p.m. Eastern Standard Time.

BY MR. YAVITZ:

Q.   So before our little break there, Mr. Zarcu, I think you were testifying that the details in the 11:29 a.m. Eastern Time message sent by Ms. Lawn reported in paragraph 79 of your report concerning the ADR conversion were all based on market conditions at the time; is that right?

A.   Yes.

Q.   Is it your understanding that when Mr. Hufcut submitted his orders, his order for ADRs at 10:49 a.m., he was committing to a transaction based on

Page 331

ZARCU - HIGHLY CONFIDENTIAL

prevailing market rates?

MR. JACKSON: Objection to form.

A. I believe he was aware of the fact that the price would be affected by the market rates and conditions, yes.

Q. So when Ms. Lawn sent that confirmation, is it your understanding that she was confirming that she had correctly calculated the previously agreed-upon market rates?

MR. JACKSON: Objection to form.

A. Well, I mean, all we have to do is just look at the line above when Mr. Wakeman confirms the number of shares and the price for the acquisition in the local marketplace. So she's referencing that price in her own message. So yes.

Q. So if, for example, Ms. Lawn had gotten the FX conversion wrong and said FX equals two, would that be a circumstance in which a trader would respond, "No, I can't confirm. You got it wrong"?

MR. JACKSON: Objection to form.

A. Yes.

Page 332

ZARCU - HIGHLY CONFIDENTIAL

Q.    So the purpose of this confirmation is to make sure that the mechanical process of papering the previously agreed transaction has been performed correctly; right?

MR. JACKSON:  Objection to form.

A.    Yes.  That is correct.

Q.    Okay.  Now, I want to go to paragraph 104 of your report.  And I'm going to have the same basic questions. Let me know when you're there.

A.    104?

Q.    Yeah.  104.

A.    I am there now.

Q.    Okay.  So I think you previously discussed this with Mr. Jackson too.  I want to direct you to the message sent at 7:53 a.m. Eastern Time by K. Joyce.

Do see that message?

A.    I do.

Q.    Is this similarly a confirmation of a previously agreed-upon market rate transaction?

MR. JACKSON:  Objection to form

Page 333

ZARCU - HIGHLY CONFIDENTIAL

and also calls for a legal conclusion.

A.    It contains information about the transactions, much like the previous one, not quite as detailed, but yes.

Q.    Okay.  You can set aside your report for a moment.

You testified that if existing shares are purchased through instruction to acquire existing shares, then that could constitute a domestic transaction; right?

MR. JACKSON:  Objection to form.

A.    I believe it's self-evident.  If somebody directs someone to specifically purchase local shares, that they would be local shares.

Q.    Right.  Your report also includes several examples where you concluded that a transaction was not domestic even though it involved a borrowing of existing shares; right?

MR. JACKSON:  Objection to form.

A.    That is correct.

Q.    Suppose the only fact you know

**Page 334**

ZARCU - HIGHLY CONFIDENTIAL

is that investor received existing ADRs.

Would that be enough to determine whether the investor acquired those ADRs in a domestic transaction?

MR. JACKSON:  Objection to form.

A.    No, not at all.

Q.    What additional information would be required?

A.    As discussed previously with Mr. Jackson, we would need information related to the communications between traders.  We would need information related to the orders placed, confirmations, emails sent back with confirmations, or communications much like the ones we have on our screen, where information related to that transaction gives me the ability to have a clear picture of how it actually occurred.

Q.    And that's because, as described in your report, in order to determine where the obligation to take and pay was incurred, you need to know how the order was submitted and executed; right?

ZARCU - HIGHLY CONFIDENTIAL

MR. JACKSON:  Objection to form.

A.    That is correct.  As I mentioned earlier, the obligation to take and pay for the shares revolves around where the actual trade occurred.

Q.    So in your opinion, Professor Mitts hasn't presented any methodology for determining on a class-wide basis which Bayer ADR trades during the class period were acquired in a domestic transaction; right?

MR. JACKSON:  Objection to form.

A.    He has not.

Q.    By the way, are you aware of any methodology for determining on a class-wide basis whether individual Bayer ADR transactions were conducted on the OTC market?

A.    As I mentioned before, each transaction needs to be analyzed thoroughly from every aspect in order to determine how it occurred and what the intentions of the traders were.

Q.    You had a colloquy with

Page 336

ZARCU - HIGHLY CONFIDENTIAL

Mr. Jackson about the counterparty to an ADR transaction.

Do you recall having a discussion with Mr. Jackson about that?

A.    I do.

Q.    So in this sequence of trades alleged by plaintiffs, is it your understanding that the broker dealers were acting as agents for plaintiffs' investment managers in connection with the transactions?

MR. JACKSON:  Objection to form and calls for a legal conclusion.

A.    Yes, it is, and evidence points to that, yes.

Q.    So when -- in your experience, when a broker dealer who was acting as an agent commits to purchase foreign shares from a foreign counterparty, they're also committing their client to that acquisition; right?

MR. JACKSON:  Objection to form.

A.    That is correct.

Q.    So the client's obligation to

ZARCU - HIGHLY CONFIDENTIAL

take and pay for those shares becomes
effective at the moment when that
commitment occurs overseas; right?

MR. JACKSON:  Objection to form.

A.    That is correct, as illustrated
throughout my report, yes.

Q.    Okay.  Just one last point I
want to discuss with you.  It has to do
with the BrokerCheck documents that
Mr. Jackson showed you.

Do you recall reviewing
several -- several documents pulled from
BrokerCheck?

A.    I do.

Q.    Did you see anything in those
documents to suggest that any of the
censures that you reviewed had anything to
do with your role at any of the companies
for which you reviewed BrokerCheck
records?

A.    No, not at all.  All those fines
appeared to be related to mostly mail
transactions.  My -- the groups that I was
responsible for everywhere were the

Page 338

ZARCU - HIGHLY CONFIDENTIAL
electronic trading businesses, algorithmic trading businesses, automated trading businesses, where everything is as it sounds pretty much automated from auto generation to cancel/replace logic.  So there would be no way for my group to have sent out an order without the designation of buy/sell or sell short.  So that would not apply to me.  That clearly comes from a different part of the business other than what I was involved in.

Q.    By the way, when you say that your -- strike that.

When you say that the groups you were responsible for were electronic trading businesses, algorithmic, and automated trading businesses, are you referring to trading desks in which the trades themselves were executed using automated, algorithmic, or electronic methods?

A.    Yes, and also the communications electronic, but yes.

Q.    But nevertheless, you did have

ZARCU - HIGHLY CONFIDENTIAL

direct communications with clients concerning orders and execution of orders and the like; right?

A. Absolutely. Much like we saw in our case, there is always a communication between traders and clients. And you also see the electronic communications. For example, we have seen plenty of examples where the clients wanted to institute -- implement the trades via algorithm. So those are separate components. The communication between a broker and the client never stops.

Q. Got it.

Returning for a moment to the BrokerCheck documents that we looked at.

In your experience, is it uncommon for major financial institutions to receive de minimis censures for minor reporting errors?

A. No. It occurs all the time, and banks receive significantly larger fines for many other penalties. They pay billions and billions of dollars in fines

Page 340

ZARCU - HIGHLY CONFIDENTIAL

a year.

Q.    To your understanding, were any of the fine amounts that Mr. Jackson presented to you -- would they have been material to the institutions that -- to which they were applied?

MR. JACKSON:  Objection to form and calls for a legal conclusion.

A.    Yeah.  I mean, I don't know what the bank would consider material.  When they paid billions of dollars, I'm not sure they'd consider half a million material, but it would be material to me for sure.

Q.    And I think a moment ago, you testified that it's not uncommon for major financial institutions to be censured for minor reporting errors.

Is it the case that broker dealers, financial institutions, and the like, in your experience, often submit information to FINRA that is somewhat inaccurate?

MR. JACKSON:  Objection to form

Page 341

ZARCU - HIGHLY CONFIDENTIAL

and mischaracterizes testimony.

A.    Yes.  One would have to follow the -- I guess the creation and institution of the consolidated audit of the new regulation replacing OATS to see the amount of issues that brokers actually have and complain about regarding to reporting.  So yes, it's common.

Q.    So in your opinion, is the -- are the records recorded by FINRA less than completely reliable as a re-creation of transactions that actually occurred?

MR. JACKSON:  Objection to form.

A.    We're moving away from the BrokerCheck, I'm assuming; right?

Q.    Yeah.  We're moving away from the BrokerCheck.  Yeah.

A.    Yes.  The documents that were provided by FINRA, which I reviewed for this -- for this case, provide information that's not reliable, and I can give you some examples.  The first three trades that we've discussed here, in 2016, the Macquarie trade, for example, shows

**Page 342**

ZARCU - HIGHLY CONFIDENTIAL

Macquarie reporting close to 1.3 million ADRs at the exact same price.  So there's always duplications.  There's the step-outs to other brokers can be reported the same time with the totality of the actual acquired ADRs.  So that is not a good source of reliable information to build a picture of what happened in the transaction.

Q.    So when you cited the FINRA records at various points in your report, were you taking that with a grain of salt?

A.    I always do, yes.

Q.    Okay.  I have no further questions.  So I'll turn it back over to Mr. Jackson, if he has any.

MR. JACKSON:  Yeah.  I think I'll have a few questions.  Why don't we take a break for, like, three minutes or something and then we'll come back.

MR. YAVITZ:  Sounds good.

THE VIDEOGRAPHER:  Okay.  Off the record 4:54 p.m. Eastern Standard

Page 343

ZARCU - HIGHLY CONFIDENTIAL

Time.

(Recess)

THE VIDEOGRAPHER:  Back on the record 5:05 p.m. Eastern Standard Time.

MR. JACKSON:  Mr. Zarcu, plaintiffs have no further questions. Thank you for your time today.

THE WITNESS:  Thank you, Counsel.

MR. YAVITZ:  And defendants will designate this -- the transcript of this deposition Highly Confidential. And I think we can go off now. Thanks.

THE VIDEOGRAPHER:  All right. We are off the record at 5:05 p.m., and this concludes today's testimony.

(TIME NOTED:  5:05 p.m.)

Page 344

SHEET METAL WORKERS' NATIONAL PENSION FUND, et al. vs. BAYER AKTIENGESELLSCHAFT, et al. 3/8/2023 - CRISTIAN ZARCU

ACKNOWLEDGEMENT OF DEPONENT

I, CRISTIAN ZARCU, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____     03/20/2023
CRISTIAN ZARCU                  Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____, 20___.


_____
NOTARY PUBLIC

**ERRATA SHEET**

**CASE:** *Sheet Metal Workers' Nat'l Pension Fund, et al.* v. *Bayer AG, et al.*, Case No. 3:20-cv-04737-RS (N.D. Cal.)

**DEPOSITION DATE:** March 8, 2023

**DEPONENT:** Cristian Zarcu

| PAGE:LINE | CHANGE | REASON |
|---|---|---|
| 33:19 | **Replace** aware **with** a lawyer | Transcription error |
| 34:24 | **Replace** traction **with** transaction | Transcription error |
| 99:11 | **Replace** dealers **with** ADRs | Transcription error |
| 111:15 | **Replace** include it **with** conclude | Transcription error |
| 117:25 | **Replace** for **with** from | Transcription error |
| 138:15 | **Replace** trader **with** traded | Transcription error |
| 147:25 | **Replace** on **with** only | Transcription error |
| 152:8 | **Replace** dealer **with** dealers | Transcription error |
| 167:6 | **Replace** i ,mediately **with** immediately | Transcription error |
| 193:14 | **Replace** them **with** then | Transcription error |
| 193:20 | **Insert** that **before** were | Transcription error |
| 197:15 | **Insert** not **before** a | Transcription error |
| 198:21 | **Replace** agree **with** agreed | Transcription error |
| 198:22 | **Replace** 2.5, **with** 2.5" -- | Transcription error |
| 199:5 | **Replace** including **with** included | Transcription error |
| 209:4 | **Replace** reg **with** range | Transcription error |
| 267:12 | **Replace** piece **with** pieces | Transcription error |
| 315:20 | **Replace** and **with** for | Transcription error |
| 320:12 | **Replace** the meaning **with** to mean | Transcription error |
| 337:23 | **Replace** mail **with** manual | Transcription error |
| 341:5 | **Replace** audit of **with** audit trail -- | Transcription error |
| 342:5 | **Insert** that **between** brokers **and** can | Transcription error |
| 342:6 | **Insert** at **before** the same | Transcription error |

CERTIFICATION

I, SHARON PEARCE, RDR, CRR, CRC, NYRCR, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of March, 2023.

_____

SHARON PEARCE

RDR, CRR, CRC, NYRCR

*       *       *

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.