# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
CASE No. 3:20-cv-04737-RS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SHEET METAL WORKERS' NATIONAL PENSION FUND and
INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO.
710 PENSION FUND, individually and as Lead
Plaintiffs on behalf of all others similarly
situated, and INTERNATIONAL UNION OF OPERATING
ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA
AND DELAWARE, individually and as
Named Plaintiff, on behalf of all others
similarly situated,
                              Plaintiffs,
              -against-
BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER
WENNING, LIAM CONDON, JOHANNES DIETSCH, and
WOLFGANG NICKL,
                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

              ** HIGHLY CONFIDENTIAL **
               VIDEOTAPED DEPOSITION OF
                JOSHUA R. MITTS, PH.D.
                 APPEARING REMOTELY
                FRIDAY, JANUARY 6, 2023
                     9:50 a.m.

REPORTED BY:
DANIELLE GRANT
APPEARING REMOTELY FROM RICHMOND COUNTY, NEW YORK

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A      Yes.

Q      So you were executing -- strike that.

You were transmitting that trade as a retail investor personally, correct?

A      Yes.

Q      So I'll revise my question slightly, then.

In a professional capacity, have you ever transmitted, executed, or documented any securities transaction?

MR. JACKSON:   Objection to form.

A      No.

Q      Is that fair to say that you have no professional experience in securities trading?

MR. JACKSON:   Objection to form.

A      No, it is not fair to say that.

Q      What is your professional experience in securities trading?

A      For several years, I have served as an advisor to the U.S. Department of Justice.  The nature of my work with the U.S. Department of Justice is in a

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL professional capacity.  It encompasses a number of activities in connection with securities trading.  One activity, for example, is the careful review of trading activity brokerage records, the mechanics of clearing and settlement.  I am regularly called upon to provide professional advice and analysis in connection with securities trading.  That analysis may extend to and, in fact, previously has encompassed trading in ADRs as well as other securities.

Q    Prior to this case, had you ever offered an expert opinion on whether a securities transaction took place in the United States?

MR. JACKSON:  Objection to form. Objection.  Mischaracterizes his report.

A    Could you clarify what do you mean by an expert opinion?

Q    I'll start by saying, when I say, "expert opinion" I mean an opinion as an expert in connection with litigation.  So with that understanding, I'll repeat the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

publish in peer-reviewed journals in finance, economics, and law.  My scholarship examines a number of topics in connection with trading in the financial markets.  That scholarship encompasses a wide range of substantive matters.

Q    In preparing your report, you relied upon your professional experience and professional judgment, right?

A    Yes.

Q    What experience and professional judgment did you rely upon in preparing your report?

MR. JACKSON:  Objection to form.

A    As I explain in my report, I have both reviewed the evidence which was available to me and considered that evidence in light of my experience examining data in connection with trading policies and procedures and the mechanics of clearing settlement and related activity by broker/dealers and other participants in the financial industry.  To take an example, in my work with the U.S. Department of Justice,

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

I am frequently asked to examine detailed trading and transactional records as well as communications, policies, procedures, sometimes compliance audits and other internal memoranda produced by participants in the financial industry.  By reviewing what now has been thousands and thousands of pages of documents, and often in the course of very detailed inquiries into the mechanics of trading and the broker/dealer industry, I have developed expertise on questions which I discuss in my report.

Q    Are you an expert in interpreting trade clearing records?

MR. JACKSON:  Objection to form and to the extent it calls for a legal conclusion.

A    I would characterize my expertise both as a scholar and as one who has examined clearing and settlement records in substantial detail for many years and conducted analysis which has been relied upon by law enforcement and other parties in connection with regulatory and criminal

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

in the United States as either an

extraterritorial trade or as a foreign

trade, okay?

A    I understand.

Q    So if I use that terminology,

you'll understand what I'm talking about?

A    Yes.

Q    Great.

Okay.   Let's go to Section 4A of

your report, which starts at Paragraph 23.

Let me know when you're there.

A    I'm there.

Q    Great.

So in this section, you contrast

sponsored and unsponsored ADR programs,

right?

A    Yes.

Q    So once you determine that an ADR

is sponsored, is that sufficient evidence to

conclude that a given transaction in that

ADR was domestic?

MR. JACKSON:   Objection.   Calls

for a legal conclusion.

A    I am going to construe your use of

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
sufficient evidence to conclude that a given transaction in that ADR was domestic?

A    That's correct.

MR. JACKSON:  Objection to form.

Q    What other information do you need to make a determination whether a sponsored ADR was domestic?

A    My report explains the methodology that I use, which I believe in my opinion is consistent with what the courts have set out to answer that question.

Q    And in your report, your methodology includes an examination of clearing and settlement records?

A    My report states in Paragraph 20, which is just on the prior page, that the relevant factors to making this determination include the location or locations where contract formation, placement of purchase orders, passing of title, and the exchange of money occur, as well as who sold the relevant securities and how those transactions were effectuated as evidence by documentation such as

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

consists of the foreign shares.

So it is actually a purchase of securities, and I -- I used that term knowing that we can use the term "conversion," as is often used in the foreign exchange market for example in converting one currency to another in situations where we -- what we really mean is purchasing -- like foreign exchange, we purchase one with the other.

But I just want to be clear that what is actually happening is that the Bank of New York Mellon is issuing new American depository receipts.  It is selling those American depository receipts.  And the payment, the consideration for those American depository receipts is the foreign shares, inevitably because the foreign shares are denominated in foreign currency and the ADRs in U.S. currency, the conversion process will entail, typically, the payment of some sort of foreign exchange fee which reflects the currency differential.  More of a technical point you could come back to.  But in essence, this is the purchase of new

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
and objection mischaracterizes report.

A    The report explains in Footnote 47 how the sequence here is opposite to that described in Toshiba where the market order to purchase Toshiba unsponsored ADRs was placed three days before the purchase of the foreign shares occurred.  In that case, the court concluded, as I understand it, the evidence was such that once Barclays fully executed the purchase of common stock on the Tokyo Stock Exchange, AIPTF was bound to take and pay for the ADRs.  But based on the Macquarie records which I reviewed, the order to purchase ADRs was not placed until the day after the foreign shares were purchased.

And I'll just say one more thing, which is in Footnote 47.  The court described the -- in Toshiba, the order as a market order.  And if I recall correctly, even defined market order as an order which is subject to an understanding of immediate execution, that upon placing a market order, there is an expectation that the order will

Page 141

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

immediately execute at the prevailing price.

Q    Um-hmm.

A    Simplify it.

I did not identify any evidence that a market order had been placed before the June 6 purchase of the foreign shares had commenced, nor did I identify any evidence indicating that a market order had been placed at all.

Q    How is a market order typically evidenced?

A    It will vary from broker to broker, but generally, a broker may record a market order with some designation, NKT for example.  It can vary from broker to broker. When that destination is present, that, of course, doesn't necessarily imply that the broker has, in fact, submitted what is typically thought of as a market order to an exchange.

It could be used, as was the case here, to -- it seems anyway -- that is what the court seems to be saying in Toshiba is that it was used to reflect a willingness to

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

transact immediately.

What I would be looking for in the records would be a similar willingness to transact in this sort of triggering fashion, meaning as soon as the foreign shares were purchased the ADR purchase was irrevocable. I would be looking for some evidence of that.

I didn't find any evidence of such an order, whether it was called market or whether it reflected in some other way that -- that commitment to transact immediately, I did not find that in the Macquarie records prior to June 6.

Q    Okay.  Thank you.  That's helpful.

Have you heard of an entity called Harding Loevner Funds?

A    I have heard of Harding Loevner in that it is my understanding from reviewing both the complaint, some of the productions, both at the time my report was written and subsequently, that Harding Loevner, at least one of their entities, served as a sort of asset manager for the plaintiffs, or at least one or more of the plaintiffs.

Page 162

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL yet occurred, and it -- more I guess to your question, it seems not actionable in its present form.

And in fact, as I explain in Paragraph 39, 577,938 ADRs were not purchased; 577,403 ADRs, it seems from the data were. I don't know if that is because perhaps there was a dollar value limitation which we're not seeing in this message. I don't know if that's because the market turned out to be less liquid than they had assumed the prior day. But I -- it's fairly clear that this is not a market order as was the case in Toshiba. It's not even clear to me that this is an order, because it reflects a number that doesn't have any context.

So typically, when one places an order, like a limit order, there's a price per share which reflects the buyer's willingness to buy and a maximum quantity and a minimum quantity. And here, it couldn't have been the 577,938 was the minimum quantity, because the data showed that 577,403 were purchased.

Page 171

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

irrevocable.

But the mere fact that two transactions are part of a client's strategy, it may be that the two transactions occur very close in time.  There's no reason to think that one becomes noncancelable when the other executes.  I've never heard of that, and it would be very strange, I think, if one were to take that view.

Q     So I want to make sure.  I'm not characterizing your testimony, but I'm trying to understand how you're characterizing it.  So is it your position that, upon the purchase of German shares in response to this email, the stockholder -- the investment manager rather, would have the choice between keeping those German shares, or that point, deciding to continue on with their plan and creating ADRs using those shares?

MR. JACKSON:  Objection to form.

A     It is my opinion that all of the evidence that is before me, including this email and the brokerage reports, indicate

Page 213

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Well, at that point, it might not seem so desirable to convert to ADRs if the exchange rate is going to make the transaction not desirable.  The point is the economic structure of this transaction makes some cancelability all the way until that final moment.  And there's certainly no evidence which would suggest the contrary here.

Q    Right.  So in your opinion, are market orders typically cancelable until executed?

MR. JACKSON:  Objection to the form and beyond the scope.

A    Well, in the ordinary course, that question isn't -- is somewhat nonsensical, meaning it has an internal contradiction.  A market order expresses a willingness, a binding willingness to transact at the current market price.  It is, in fact, often viewed as a particularly dangerous way to transact because one must take the price as it is.

So market orders execute

Page 216

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
certainty and -- and the broker knows that,
if the conditions for the order are met, the
transaction is irrevocable.

A market order basically has no
conditions other than quantity.  So the
market order is kind of like, well, I'm
willing to trade, basically, at any price.
And I think that's why it's so critical to
distinguish a market order from a limit order
where that willingness to trade is
conditional.  And it's that conditionality
which gives the broker certainty and makes
the broker able to cancel the order because
the broker knows under the conditions under
which it's going to become irrevocable.

Q    I fully acknowledge that in the
ordinary course, because market orders are
filled quickly due to the very limited
conditions on market orders, it would be
impractical to cancel it.  However, suppose
I place a market order after close of market
one evening.  Can I cancel it until the
market opens and the order is executed the
following day?

Page 282

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

plaintiff's investment manager in which communications were available in which the court could scrutinize the details of the transaction at issue, right?

MR. JACKSON:  Objection to form.

A    As I said, I -- I have not reviewed the totality of the evidentiary record in Toshiba.  I'm not sure I could even if I wanted to because, in litigation in general, many documents are nonpublic.

Q    But you spent hundreds of hours preparing this report, right?

MR. JACKSON:  Objection to the extent it mischaracterizes -- well, you know, actually, withdrawn.

You can answer.

A    As I said previously, I don't have the exact number of hours in front of me.

Q    But I think you testified that it was more than 200 in your rough recollection.

A    I don't believe that I gave a specific number.  I don't believe I said that it was precisely more than 200.  I

Page 297

CERTIFICATE

STATE OF NEW YORK )

)ss:

COUNTY OF RICHMOND)

I, DANIELLE GRANT, a Certified Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That JOSHUA R. MITTS, PH.D, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness remotely.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 10th day of January, 2023.

_____

DANIELLE GRANT