# EXHIBIT G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

SHEET METAL WORKERS'            )
NATIONAL PENSION FUND and       )
INTERNATIONAL BROTHERHOOD       )
OF TEAMSTERS LOCAL              )Case No.
NO. 710 PENSION FUND,           )3:20-cv-04737-RS
individually and as Lead        )
Plaintiffs on behalf of         )
all others similarly            )
situated, and,                  )
                                )
INTERNATIONAL UNION OF          )
OPERATING ENGINEERS             )
PENSION FUND OF EASTERN         )
PENNSYLVANIA AND                )
DELAWARE, individually          )
and as Named Plaintiff,         )
on behalf of all others         )
similarly situated,             )
            Plaintiffs,          )
                                )
            vs.                  )
                                )
BAYER AKTIENGESELLSCHAFT,       )
WERNER BAUMANN, WERNER          )
WENNING, LIAM CONDON,           )
JOHANNES DIETSCH and            )
WOLFGANG NICKI,                 )
            Defendants.          )
_____         )


REMOTE VIDEOTAPED DEPOSITION OF
MARK GARMAISE
Los Angeles, California
Thursday, March 9, 2023


Reported By:
CATHI IRISH, RPR, CRR, CLVS

Page 2

March 9, 2023

10:59 a.m.

Remote videotaped deposition of MARK GARMAISE, with all participants appearing via videoconference, before Cathi Irish, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York.

A P P E A R A N C E S:


        COHEN MILSTEIN SELLERS & TOLL, PLLC
        Attorneys for Plaintiffs
                190 South LaSalle Street
                Suite 1705
                Chicago, Illinois 60603
        BY:  CAROL GILDEN, ESQ.
                BENJAMIN F. JACKSON, ESQ.


        WACHTELL LIPTON ROSEN & KATZ
        Attorneys for Defendants
                51 West 52nd Street
                New York, New York 10019
        BY:  NOAH B. YAVITZ, ESQ.
                EMILY R. BARRECA, ESQ.


    ALSO PRESENT:
        JOE RAGUSO, videographer
        THOMAS MUNK, Veritext concierge
        CHAD COFFMAN

Page 4

THE VIDEOGRAPHER:  Good morning. We are going on the record at 10:59 a.m. EST on Thursday, March 9, 2023.

This deposition is being conducted virtually.  Quality of recording depends on quality of camera and Internet connection of participants.  What is seen from the witness and heard on screen is what will be record.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video recorded deposition of Mark Garmaise being taken by counsel here in the matter of Sheet Metal Workers' National Pension Fund, et al., versus Bayer AG, et al., filed in the United States District Court for the Northern District of California, case number 3:20-cv-04737-RS.

This deposition is being

Page 5

conducted remotely.  My name is Joe Raguso representing Veritext and I am the videographer.  The court reporter is Cathi Irish.

I am not authorized to administer an oath.  I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will state an appearance and affiliation for the record, followed by the court reporter swearing in the witness.

MS. GILDEN:  Carol Gilden on behalf of the lead plaintiffs.

MR. YAVITZ:  Noah Yavitz, Wachtell Lipton Rosen & Katz, on behalf of defendants, here with my colleague Emily Barreca.

MS. GILDEN:  And I should also add my colleague Ben Jackson is here as well.

///

M A R K   G A R M A I S E, called as a witness, having affirmed to tell the truth, was examined and testified as follows:

EXAMINATION

BY MS. GILDEN:

Q.    Good morning, Professor Garmaise. Did I pronounce your name correctly?

A.    Good morning, Counselor.  Thank you, yes, Garmaise.

Q.    Excellent.  Excellent.  My name is Carol Gilden and I represent the lead plaintiffs in this matter.  The Sheet Metal Workers' National Pension Fund, The International Brotherhood of Teamsters Local 710 Pension Fund as well as the additional named plaintiff, The International Union of Operating Engineers Pension Fund.

Would you please state your name for the record?

A.    My name is Mark Garmaise.

Q.    Have you ever used any aliases before?

GARMAISE - HIGHLY CONFIDENTIAL

A.    Sometimes I use my middle name, Mark Jeremy Garmaise.  No other aliases.

Q.    Now, Professor, you've been deposed before; correct?

A.    Yes, Counselor.

Q.    So you understand that you are providing testimony under oath today; correct?

A.    Yes, Counselor.

Q.    And you also understand that you have to answer all the questions truthfully under penalty of perjury; correct?

A.    Yes, Counselor.

Q.    Professor, where are you located right now?

A.    I am in my residence in Los Angeles.

Q.    Is anyone else in the room with you?

A.    No.

Q.    Is there any reason that you cannot provide full, complete and truthful testimony today?

GARMAISE - HIGHLY CONFIDENTIAL

A.   No, Counselor.

Q.   Are you currently taking any medications that would affect your ability to respond to questions fully and truthfully today?

A.   No, Counselor.

Q.   And do you have any medical conditions that would prevent you from testifying fully and truthfully today?

A.   No, Counselor.

Q.   How many times have you been deposed before?

A.   I have been deposed roughly 10 times before.

Q.   And of those depositions, were any of them virtual like today's proceeding?

A.   Yes.  Yes, at least two that I can think of were virtual.

Q.   So you're familiar with how virtual depositions work, in other words?

A.   Yes.

Q.   Very good.  I'm going to go over a few ground rules.  This will be pointers

Page 9

GARMAISE - HIGHLY CONFIDENTIAL

I'm sure that you have reviewed previously but I always think it's good to start out the deposition just reviewing them.

First, you must give a verbal response to my questions.  The court reporter, of course, can only take down one person speaking so please wait until I finish my question to answer, and in turn, I will similarly wait until you finish your answer before I move on to the next question.  Is that agreeable?

A.   Thank you, Counselor, understood.

Q.   Now, your counsel may object to questions but you will have to answer them unless you're instructed not to answer. Do you understand that?

A.   Yes, understood.

Q.   And if at any time you need a break, please let me know.  We can go off the record.  The only caveat, of course, would be that you cannot take a break while a question is pending.  Is that agreeable?

A.   Thank you, Counselor, understood.

GARMAISE - HIGHLY CONFIDENTIAL

Q.    Do you have a cell phone with you right now?

A.    I have a cell phone in this room with me.  I can put it outside the room, if you would prefer.

Q.    Well, it makes no difference as long as it is turned off so that there's no texting or anything like that going on during the deposition.

A.    Okay, I might ask for a moment to turn it off.  It's not right here next to me but may I just go turn it off?

Q.    Absolutely, absolutely, please do.

A.    Thank you, it is turned off.

Q.    Excellent.

Do you have any other electronic devices such as a Think Pad or an iPad in the room with you?

A.    I have a second computer, a backup computer.  I just wanted to be very organized but I can put that in another room if that would be preferable.  It's not on at the moment but I do have a

GARMAISE - HIGHLY CONFIDENTIAL

backup computer here next to me.

Q.   That's fine.  You don't need to remove it as long as it's not open with programs running or anything like that.

So can we agree that during today's deposition you won't have anything on your screen except for the deposition itself and any exhibits that we show you today?

A.   Yes, thank you, I'm just making sure.  Yes.  All I have up is Zoom for this deposition and Exhibit Share.

Q.   Thank you.  Thank you.

Do you have any notes or written materials in front of you?

A.   I'm glad you asked that, Counselor.  I was going to ask you.  I do have a clean copy of my report here.  I was just going to ask if that was permissible.  If not, I can put it outside the room.  I wanted to check with you.

Q.   That's fine if you have it with you.  And you have nothing else other than a clean copy of your report, correct, in

GARMAISE - HIGHLY CONFIDENTIAL

the room with you?

A.    Nothing relevant to this case. There's some books that, you know, English literature, et cetera.  Nothing relevant to this case other than the clean copy of the report.

Q.    Excellent, excellent.

Okay, today when I use the term Bayer, I'm going to be referring to Bayer AG, the defendant in this case.  Is that agreeable to you?

A.    Thank you, Counselor, understood.

Q.    And when I use the term ADR, I'll be referring to American depository receipts and in particular the ones at issue in this litigation.  Is that agreeable to you?

A.    Yes, Counselor, understood, thank you.

Q.    Now Professor, have you ever authored a report in a securities fraud class action before this matter?

A.    Yes, I've prepared reports in two -- yes, in one securities class action

GARMAISE - HIGHLY CONFIDENTIAL

case.

Q.    And what was the name of that case?

A.    I believe the caption was Hayden versus Portola.

Q.    And what did your report concern; in other words, what opinion did you render?

A.    I was asked questions about whether the plaintiffs' expert had presented a damages methodology and as I recall, there were also some questions about market efficiency.  I'm not recalling all the details but in broad outlines, those were the major questions.

Q.    So other than Portola, you have not rendered opinions in securities class actions before; is that correct?

A.    Portola is the other case in which I rendered an opinion in a securities class action matter.

Q.    So there are no other such cases other than, of course, today and Portola?

A.    No other securities class action

GARMAISE - HIGHLY CONFIDENTIAL

cases, yes, Counselor.

Q.   And in your work in that case, did you render an opinion for the defendant?

A.   Yes, I was retained by counsel for the defendants in that matter.

Q.   All right.  And we'll be coming back to that a little bit later.  Are you currently working on any other securities for class actions other than this case?

MR. YAVITZ:  Objection; form.

THE WITNESS:  No, Counselor.

BY MS. GILDEN:

Q.   In the Portola case, did the court certify a class?

A.   I'm not certain how that was resolved.  I have some recollection that the matter was settled.  I don't know if that was before or after the class was certified.

Q.   Thank you.

MS. GILDEN:  Ben, I'd like you to load Professor Garmaise's report.

(Exhibit 1, Rebuttal Report of

GARMAISE - HIGHLY CONFIDENTIAL

Mark Garmaise, Ph.D., marked for identification.)

BY MS. GILDEN:

Q.   And Professor, please take a few minutes to look through your report.  I'm going to be asking you some general questions about this.

A.   I see.  I'm just going to have a glance.

(Witness perusing document.)

Thank you, Counselor.  I have my report in hand.

Q.   Do you recognize the report that's contained in Exhibit Number 1?

A.   I'll just glance quickly through it.  There seem to be some highlights that I don't recall having made.  Perhaps you folks may have introduced those but leaving aside the highlights, this appears to be my report.  I'm not going to look through every page but this appears to be my page.  There are some additional highlights here.

Q.   Sure.  And I will represent to

Page 16

GARMAISE - HIGHLY CONFIDENTIAL

you that those highlights are highlights that were put on by your counsel as that part of the report has been put under -- requested to be put under seal so for that reason, certain confidential sections in the report were highlighted.

A.   Thank you, Counselor.

Q.   Did you sign the report on February 3, 2023?

A.   Well, I instructed that my -- let me make sure the date.

I instructed that my electronic signature be affixed to the report on February 3, 2023.

Q.   So the signature that appears on page 48, that is your electronic signature; correct?

A.   That is my electronic signature, yes.

Q.   Did you read through your report before signing it?

A.   Yes.

Q.   Did you read through the exhibits before signing the report?

GARMAISE - HIGHLY CONFIDENTIAL

A.    Yes.

Q.    Have you done any additional work since you signed the report on February 3, 2023 relating to the opinions that you gave in the report?

A.    No, Counselor, I have not.

Q.    And does Exhibit Number 1 contain a complete statement of your opinions in this case?

A.    Exhibit Number 1 contains a complete statement of my current opinions in this matter.  If I am asked by counsel, I may form new opinions but as of present, I have not been asked by counsel to do so and this contains the current state of my opinions in this matter.

Q.    Thank you.  Do you have any other opinions that are not listed just to confirm?

MR. YAVITZ:  Objection; form.

MS. GILDEN:  I'll rephrase it.

BY MS. GILDEN:

Q.    Do you have any other opinions that are not contained in the report

GARMAISE - HIGHLY CONFIDENTIAL

concerning this litigation?

A.    No, Counselor, I do not.

Q.    Professor, did you personally prepare the report?

A.    This report is my work.  I collaborated on some aspects of it with members of the Cornerstone staff but I reviewed every line of this report.  It contains my opinions.  This is my report.

Q.    And who at Cornerstone assisted you and collaborated with you?

A.    My primary points of contact were Brian Fryd, F-R-Y-D, and John Pokorny, P-O-K-O-R-N-Y.

Q.    And what specifically did Mr. Fryd do to collaborate with you on the report?

A.    Well, I don't think I can distinguish between the work done by those two gentlemen, and I believe that I don't know exactly.  I believe they had other staff in support of them.  So I can supply an answer describing the nature of my collaboration with Cornerstone as an

GARMAISE - HIGHLY CONFIDENTIAL

entity.  I can't distinguish the roles of the individuals whose names I gave you.

Q.   Okay, fair enough.  Can you then describe in general the nature of the collaboration that you did with Cornerstone, whether it was with these two individuals or others at Cornerstone?

A.   Yes, Counselor.  I wrote the first draft of this report.  I wrote the outline.  I instructed Cornerstone staff to undertake various statistical tests which they did at my direction.  They contributed to some of the text sections in the report, made edits, all of which I reviewed.  I discussed the matter with them.  I think that's a fairly complete summary of the nature of our collaboration.

Q.   And were you retained personally by counsel for Bayer in this matter or was the retention through Cornerstone?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I was retained personally, Counselor.

Page 20

GARMAISE - HIGHLY CONFIDENTIAL

BY MS. GILDEN:

Q.   And in turn, did you retain Cornerstone?

A.   No, I did not.

Q.   Did counsel for Bayer retain Cornerstone?

A.   I don't know.  I worked with Cornerstone on this matter.  I don't know what was the nature of their contractual engagement.

Q.   So tell me how billing has been handled with respect to Cornerstone's work in connection with your report.

A.   With respect to Cornerstone's work, I'm not sure how their billing has been handled.

Q.   Do you know who they send bills to in connection with the work that they performed, assisting you in preparing your report?

A.   No, I do not.

Q.   Do you know the rates that were charged?

A.   Just to clarify, Counselor, we're

GARMAISE - HIGHLY CONFIDENTIAL

report?

A.    Counselor, shall I include the time that I spent preparing for this deposition today or only the time spent up to the filing of the report?

Q.    Up to the filing of the report.

A.    I'm going to give a rough sense. That's my recollection.  As I sit here today, it was something on the order of 90 hours.

Q.    And in connection with your preparation for your testimony today, approximately how many hours did you prepare?

A.    It might have been on the order of another 25 to 30 hours roughly.

Q.    And what did you do to prepare for your testimony today?

A.    I reread my report carefully.  I thought about the various elements of it. I discussed the report with members of the Cornerstone staff, and I discussed the report with counsel.

Q.    And by counsel, you are referring

GARMAISE - HIGHLY CONFIDENTIAL

to whom?

A.    By counsel I'm referring to Mr. Noah Yavitz and Ms. Emily Barreca.

Q.    And your consultation with counsel, approximately how many hours did you spend consulting with counsel?

A.    I spent approximately two and a half hours consulting with counsel.

Q.    When did that take place?

A.    That meeting took place on Monday of this week.

Q.    Was it a virtual meeting?

A.    Yes, Counselor.

Q.    And just going back for a minute to your preparation for your testimony today, you also had discussions with staff from Cornerstone; correct?

A.    Yes, Counselor.

Q.    Who did you speak with at Cornerstone?

A.    Present in those meetings were Mr. Brian Fryd, Mr. John Pokorny, Mr. John Rozoff, R-O-Z-O-F-F, and Mr. Sasha Aganin, A-G-A-N-I-N.

Page 24

GARMAISE - HIGHLY CONFIDENTIAL

Q.    How many meetings did you have with those individuals?

A.    Are you asking, Counselor, how many meetings that I had after filing my report to prepare for this deposition with those individuals?

Q.    Yes.

A.    I would estimate on the order of roughly five meetings with those individuals.  Not all individuals were present for all meetings.

Q.    And in terms of the five meetings, about how many hours in total did you spend in meetings with the individuals from Cornerstone in preparation for your deposition today?

A.    I have not tallied that number but I will give a rough estimate.  I would estimate it to be roughly seven to eight hours but that is a rough estimate.

Q.    That's fine.  That's understood.

In terms of just going back to your work preparing your report, you estimated that you spent approximately 90

Page 25

GARMAISE - HIGHLY CONFIDENTIAL

hours; correct?

        A.    Yes, Counselor, that is my estimate.

        Q.    Over what period of time did you spend those hours preparing the report?

        A.    Over which months did I work on this report, is that your question, Counselor?

        Q.    Yes, that's fine.

        A.    I believe the work began in late November 2022 and extended through December 2022, January 2023 and perhaps just a little bit into the very beginning of February 2023.

        Q.    And I'd like you to turn for a moment to Appendix C in your report.

        A.    Thank you, Counselor, I am with you.

        Q.    And does this reflect -- let me get there myself -- does this reflect all the materials that you considered in connection with rendering your report?

        A.    Yes, Counselor.

        Q.    Did you personally review all

GARMAISE - HIGHLY CONFIDENTIAL

these materials?

A.   Well, for example, if we turn to the data section, this is page 8 of the appendix, I did not personally review every individual data point.  I saw summary statistics or results based on those data but I did not inspect every individual data point.

Q.   Anything else?

A.   Counselor, to be clear, are you asking did I review any component of these documents or entire documents?  May I ask for some clarification, please?

Q.   Sure.  So what I'm trying to understand, Professor, is in Exhibit C, there's a list of many materials and so what I am trying to find out is what materials you personally spent time with in preparing your report that's contained in Exhibit Number 1.

MR. YAVITZ:  Objection to form.

I think you mean Appendix C.

MS. GILDEN:  Yes, appendix.

///

GARMAISE - HIGHLY CONFIDENTIAL

BY MS. GILDEN:

Q.    With that clarification, that was my question.

A.    Thank you.  I reviewed -- for the documents listed here, certainly for the documents that are cited in my report, I reviewed the section cited in context so I reviewed the paragraph or two before and a paragraph or two after.  I personally reviewed hundreds of these documents. That's not to say every single word in them but components of them.  May I ask just for a moment, there's nothing that -- well, okay, for example, under Analyst Reports, this is on page 7, there's a section -- I'll give you a moment to catch up with me.  In addition to the analyst reports specified above and I list some additional reports there.

Sorry, Counselor, are you with me?

Q.    I am.

A.    So in that list I was given many reports by counsel, hundreds of which I

Page 28

GARMAISE - HIGHLY CONFIDENTIAL

reviewed.  Some of the reports concerned Bayer's competitors.  I did not review those reports in any detail so is that helpful?

Q.    Yes, yes, it is.

And so sitting here today, is there anything in your report or in the exhibits to the report that you would like to change or correct?

A.    I did notice a typo.  I'm not sure if you want to spend time on that but in terms of substance, no.  But yes, I did notice a typo.

Q.    And where is the typo?

A.    The typo is in Exhibit 4.  One of the analyst firms is listed here as Exane BNP Paribus.  I think Paribas should be B-A-S.  I just happened to notice that.

Q.    Thank you.  Anything else that you would like to change or correct?

A.    No, Counselor.

Q.    Professor, I'd like you to turn to Exhibit 6C to your report.  I'm going to have a series of questions about

GARMAISE - HIGHLY CONFIDENTIAL

Exhibit 6 and its subcomponents.

A.    Okay.

Q.    And my question for you is:  What date is being plotted on Exhibit 6C?

A.    6C stated depicts August 7, 2012 as stated here.  I'm just checking my -- well, Counselor, I'm not sure -- as I mentioned to you, I printed a clean copy of my report and I'm consulting that now and I see that there is a disconnect between what's given in the pdf that you've asked me to download and a clean copy of my report.  The clean copy of my report has for Exhibit 6C the date June 5, 2018.  I don't have an explanation for why the date appears to be different on the pdf that you have provided to me.

Q.    And so for the record, this pdf that is contained in Exhibit 1 is what your counsel filed in this matter and so it reflects the date of August 7, 2012. Do you have any explanation for that?

A.    I do not.  I will notice I see in this pdf version, I see another typo as I

Page 30

GARMAISE - HIGHLY CONFIDENTIAL

look at it.  At the bottom it says four 4 DRs.  As I look at my clean copy, it says four ADRs.  I know that you did ask me if this exhibit represented my report.  I did not review every page of it, Counselor.  I now do see a discrepancy in Exhibit 6C or at least two discrepancies.

Q.   All right.  I'd like to turn to Exhibit 6F.

A.   Yes, Counselor, I'm with you.

Q.   And again, this is for the record.  6F shows a date of August 2, 2012 and so my question is again, why does the date August 2, 2012 appear, which is more than three years before the start of the class period?

A.   Counselor, I don't know why that date appears in the pdf version.  I'm looking at my clean copy here and it gives the date of June 8, 2018.  I notice in this pdf version a number of typos in the time, the timestamp on the X axis.  I notice further divergences, 4 DRs in this version rather than four ADRs.  In my

GARMAISE - HIGHLY CONFIDENTIAL

clean copy of my report it says four ADRs minus 1.664.  Here I notice for the pink series here I notice a different number, 4 DRs minus 1.886.  I cannot explain those discrepancies.

Q.    If you would please scroll down to Exhibit 6G in the report contained in Exhibit 1, do you see any inaccuracies in this exhibit?

A.    Yes, Counselor.  So in my clean copy of my report, the date -- let me just make sure I've got the right, yes, 6G, the date reads June 11, 2018.  I see that there is a different date here on this pdf version.  I see that the timestamps appear to have some error in them.  I notice here it reads in the pdf 4 DRs.  In my clean copy it reads four ADRs.  In my clean copy it reads four ADRs minus 1.664.  In here there is a different number, 1.886.  I'm just going to take a moment to review the caption.

Again, references in this pdf to 4 DR rather than ADRs.  There's some typos

GARMAISE - HIGHLY CONFIDENTIAL
in the caption as well describing the
promised distribution for ADR.  The dates
on this pdf do not appear correct to me,
nor do they appear to match my clean copy
of this report.

Q.    Well, we will talk with your
counsel about what you're referring to.
Unfortunately, we do not have that in
front of us but nonetheless, we'll address
that a little more fully during a break,
but I want to finish going through the
exhibit so that we know exactly which
exhibits contained in Exhibit 6 are not
accurate.

MR. YAVITZ:  If I can just
interject momentarily, the version --
it does appear there are defects in
this version of the pdf that was
included as an exhibit.  The version
filed under seal has unredacted
correct versions of these exhibits and
we also produced to you our code that
produces correct versions of all these
exhibits.  So just I wanted to make

GARMAISE - HIGHLY CONFIDENTIAL

clear that you do have copies of the correct versions, recognizing that this one is in error and we can provide a corrected version of the unsealed version of the document.

MS. GILDEN:  Thank you, Noah.  We can address that a little more fully during a break.

MR. YAVITZ:  Understood, please continue.

MS. GILDEN:  I just want to go through and just make sure the record is clear about which of the subparts of Exhibit 6 are not accurate because this is the one that was filed under seal.

BY MS. GILDEN:

Q.    Okay.  So Professor, why don't you look through the rest of Exhibit 6 with the subparts and tell me which ones are not accurate.  We left off with exhibit -- I believe it would be Exhibit 6 -- I think we were at 6G.

A.    Thank you, Counselor.  I'm going

GARMAISE - HIGHLY CONFIDENTIAL

to begin my review with 6A to be comprehensive.

Q.   Sure, of course.

A.   And I'll beg your patience as I glance at this.

Q.   Please take your time.

A.   Thank you, Counselor.

(Witness perusing document.)

I don't see any discrepancies between my clean copy of 6A and the version in this pdf.

I'm now reviewing 6B.

(Witness perusing document.)

I do not see any discrepancies between 6B in this report and the version in my clean copy in my report.

We discussed 6C, is that correct, Counselor?

Q.   Yes.

A.   As I noted, there are a number of discrepancies there.

(Witness perusing document.)

I do not note any discrepancies between the pdf and my clean version of

GARMAISE - HIGHLY CONFIDENTIAL
6D.

(Witness perusing document.)

I do not note any discrepancies between the pdf and my version of 6E.

(Witness perusing document.)

Did we discuss 6F already?

Q.   Let's see.  I think we had.

A.   (Witness perusing document.)

Sorry, Counselor, are you checking or should I continue?

Q.   Please, please.  I was just checking because I thought we had covered 6G.

A.   6F, Counselor.  I do notice a number of discrepancies between the pdf version of Exhibit 6F and my clean copy. The date in this pdf version appears to be incorrect.  The timestamps have typos in them.  There are references to DRs rather than ADRs.  It should be four ADRs minus 1.664.  In this pdf it says 4 DRs minus 1.886.  There's a minor typo after the word note.  There should be a colon instead of the number 3.  Again, 4 DRs

GARMAISE - HIGHLY CONFIDENTIAL

should be ADRs.  In the caption it should read with the promised future distribution of .416 dollars per ADR, there's a typo here.  The date is incorrect.  The date for the market close should be June 21, 2018, not the incorrect number there.

I'm now proceeding to 6G.  There are errors in this or discrepancies that appear to me to be errors in this pdf version.  I think it may be the same set of errors.  Rather than repeating them let me just check.

Q.    Sure.

A.    I believe for 6G it's the same set of errors as for 6F.

I'm now proceeding to 6H.  6H has an incorrect date in the pdf version.  6H has incorrect timestamps.  The word ADRs is not written out correctly here in the pdf version of 6H.  It should be four ADRs minus 1.664 not what's described here for the pink series.  Minor typo, source should be colon, not source 2.  Note should be colon, not note 2.  The caption

GARMAISE - HIGHLY CONFIDENTIAL

also contains errors.  ADR is spelled incorrectly.  Future distribution should be .416 per ADR.  The dates given in the caption are incorrect.

I'm now proceeding to 6I.  6I has an incorrect date.  It should be June 13, 2018.  The pdf version has a discrepancy. The timestamps are incorrect.  DRs is written here instead of ADRs.  The amount should be four ADRs minus 1.664 for the pink series, not what's written here. There are various typos in the caption. The promised distribution should be .416 per ADR and the dates are incorrect as given in the caption.

I'm now proceeding to 6J.  These appear to be similar errors.  The dates, timestamps, ADRs.

Q.  And that's fine if you --

A.  Sorry.

Q.  Just generically for each exhibit, that's fine.

A.  Sorry.  I just wanted to be careful.  Absolutely.

GARMAISE - HIGHLY CONFIDENTIAL

Q.    It will be faster that way.

A.    Sure, sure.  Similar set of errors there as I've described for the previous slides.  6K, again similar set of errors.  6L, a similar set of errors.  6M, a similar set of errors.  6N, a similar set of errors.  6O, a similar set of errors.  6P, a similar set of errors.  6Q, similar set of errors.  6R, a similar set of errors.  6S, similar set of errors.  Sorry, let me be -- yes, there are errors in 6S as well.  6T, a similar set of errors, and 6U, yes, a similar set of errors.

Thank you for your patience, Counselor.

Q.    Thank you in turn for your patience in going through these and just identifying them for us.

Okay, so what I'd like to do is turn back to paragraph 1 of your report.

A.    Yes, Counselor, I'm with you.

Q.    And this reflects that you are a professor of finance; correct?

GARMAISE - HIGHLY CONFIDENTIAL

A.    Yes, Counselor.

Q.    What was your undergraduate degree in?

A.    Mathematics and philosophy.

Q.    You don't have an economics degree; correct?

A.    I have a Ph.D. in finance.  I consider finance to be a branch of economics, financial economics, so I would say my Ph.D. is in that branch of economics.

Q.    When you got your Ph.D., what was it officially described as a Ph.D. in, separate from what you may personally consider it to be?

A.    I think the formal designation was likely something like Ph.D. in business but the common practice is to refer to the Ph.D. as belonging to the field in which it is earned, marketing, finance, et cetera.  In my case it was in finance.

Q.    Did your course work for your undergraduate degree involve developing

GARMAISE - HIGHLY CONFIDENTIAL methodologies for measuring damages in securities fraud class actions?

A.    My course work for my undergraduate degree included classes in economics and corporate finance in which valuation was one of the themes considered and I consider -- it is my view that valuation is relevant to the consideration of damages.

Q.    Separate from your view that it's -- valuation may be relevant to damages, did your course work as an undergrad involve developing a methodology for measuring damages in a securities fraud class action?

A.    Well, I didn't take a course with the title that you've described but as I explained in my previous response, I do believe that valuation is very related to the question of damages calculations and that did come up as a theme in several of my courses in undergrad.

Q.    And did the course work for your Ph.D. involve developing methodologies for

GARMAISE - HIGHLY CONFIDENTIAL

measuring damages in securities fraud class actions?

A.   Similarly to my undergrad, in my graduate work I spent a fair amount of time thinking about valuation, valuation theory, and I regard that as highly relevant for damages calculations.

Q.   But did your work involve methodologies for measuring damages in a securities fraud class action specifically?

MR. YAVITZ:  Objection; form.

THE WITNESS:  My work involved developing methodologies for valuation.  I believe that that may be applied in a variety of settings, including to a damages methodology in a class action framework.

BY MS. GILDEN:

Q.   Now, in connection with paragraph 7, you state you have formal training in economics.  Where was that training?

A.   I took formal courses in economics as an undergraduate at Harvard

GARMAISE - HIGHLY CONFIDENTIAL

College.  I took formal courses in economics as a doctoral student at Stanford University.  Those are the places where I received formal training in economics.

Q.  How many courses in economics did you take as an undergrad?

A.  Wow, Counselor, you're asking me to go back a little further than I'm comfortable going back.  But I'll do my best.

Q.  Do your best, do your best.

A.  That was some time ago but I'll do my best.  I recall roughly three to four economics classes as an undergraduate.

Q.  And as -- let me rephrase it.

In connection with your Ph.D., how many classes in economics did you take?

A.  Probably somewhere on the order of six graduate level classes on economics.  That's economics specifically. Speaking of financial economics as a

GARMAISE - HIGHLY CONFIDENTIAL
branch of economics, another roughly six
or so speaking generally, classes on
financial economics in particular.

Q.   So are you saying you took a
total of 12 classes in economics?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I'm sorry, are we
speaking of across my graduate and
undergraduate educations?

BY MS. GILDEN:

Q.   We're talking about your graduate
education.

A.   It was probably a little bit
higher than that.  I gave you rough
ranges.  It was probably a little bit more
than that but let's say somewhere in the
range of 12 to 18 classes in economics,
including financial economics as a branch
of economics.

Q.   Okay.  Fair enough.

I would like you to turn to
paragraph 2 of your report.

A.   Thank you, Counselor, I'm with
you.

GARMAISE - HIGHLY CONFIDENTIAL

Q.    Paragraph 2 of your report lists the areas that you consider yourself to be an expert in and so my question is for you:  What is the basis for your expertise in corporate finance?

A.    Basis for my expertise in corporate finance is my Ph.D. in finance. It's my having taught classes in corporate finance for more than 20 years and it is my having published multiple papers in finance journals on the subject of corporate finance.

Q.    Similarly, what is your basis for saying you have expertise in valuation?

A.    The basis for my expertise in valuation is my Ph.D. in finance and my having spent 20-plus years having taught valuation classes or having taught valuation in courses in finance at the graduate level.

Q.    Same question with respect to entrepreneurship, what is your basis for stating that you have expertise in entrepreneurship?

GARMAISE - HIGHLY CONFIDENTIAL

A.    The basis is my Ph.D. in finance, my having taught courses related to entrepreneurship for roughly 20 years and my having published papers on financing of entrepreneurial businesses in finance journals.

Q.    Would your answer be any different with respect to what you just testified to if we asked about real estate?

A.    My answer for both real estate and banking would largely mirror my answer for entrepreneurship.  Perhaps I might add for banking I've also done some consulting work with the bank as an additional foundation for my expertise.

Q.    And without describing or revealing the identity of the bank since it was a consulting relationship, what specifically was the nature of the consulting work that you performed for that bank?

A.    I was asked to consult with the bank on their loan approval model and to

GARMAISE - HIGHLY CONFIDENTIAL

assess its performance and essentially avoiding defaults and minimizing risk, maximizing profit.

Q.    Approximately when did you perform this work?

A.    About 10 years ago.

Q.    And have you done any work since this time as a consultant for any other banks?

A.    Are we excluding in the context of litigation?

Q.    For now, yes, excluding litigation.

A.    Excluding the context of litigation, I have not done other consulting work for a bank since that time.

Q.    And in connection with litigation, have you performed consulting work for banks?

A.    Yes, here I'll refer to the appendices in my report.  Here I will refer to Appendix B of my report.

Q.    Appendix B?

GARMAISE - HIGHLY CONFIDENTIAL

A.    Appendix B of my report, yes.

Q.    Thank you.

A.    Are you with me, Counselor?

Q.    I am.

A.    So as described there, I have been retained by East West Bank.  I was retained by Bank of America.  And as I look here, those are the only banks I see listed here.

Q.    Okay.  And none of those cases were securities fraud class actions; correct?

A.    Those were not securities class actions but actually, Counselor, you're now refreshing my memory and I would like to update an answer that I gave at the beginning of this deposition.  I think you asked --

Q.    Thank you.

A.    Oh, well, I'll just add additional information.  I'm not sure I said something different but I'll just mention there was another securities case in which I was involved.  I don't recall

GARMAISE - HIGHLY CONFIDENTIAL

if it was class action but that was again roughly 10 plus -- I think roughly 10 years ago. That was a matter of Abu Dhabi versus some of the credit rating agencies and Morgan Stanley, as I recall, but I don't recall if that was a class action.

Q. Can you tell me generally what the nature of your work consisted of in that matter, the Abu Dhabi matter?

A. My report there was focused on the importance of empirical work in finance, just emphasizing that the basis for drawing conclusions in finance is usually some empirical arguments or some data, that was the thrust of that report.

Q. Since we are in the appendix, if you would turn for a moment to Appendix A of your report, and in particular I'm going to direct your attention to the section titled Peer Review Journal Article Published -- Articles Published.

A. Yes, Counselor, I'm with you.

Q. So this section of your appendix lists a variety of topics that you

Page 49

GARMAISE - HIGHLY CONFIDENTIAL

published research on; correct?

A.    Yes, Counselor.

Q.    In any of the research that you published that is listed under Peer Reviewed Journal Articles, did any of those research papers involve developing a methodology for measuring damages in a securities fraud class action?

A.    These papers involved developing methodologies, empirical methodologies, methodologies in finance.  Some of the papers involved developing valuation methodologies.  None of these papers considers a context of a securities litigation class action.

Q.    Turning back to your report and in particular I'd like to focus you on paragraph 4 of your report.

A.    Yes, Counselor.

Q.    So in the last three years, what classes have you taught as a professor at UCLA?

A.    I have taught venture capital and private equity.  And I taught a corporate

GARMAISE - HIGHLY CONFIDENTIAL

finance class and I don't recall right now if that was three or four years ago but something close to three years. I don't recall offhand.

Q. And in your classes involving venture capital, did those classes address in any way securities class actions?

MR. YAVITZ: Objection; form.

THE WITNESS: In those classes, one of the key themes is valuation and I believe that valuation is related to the calculation of damages. In my venture capital and private equity class, I don't recall discussing securities class actions in particular.

BY MS. GILDEN:

Q. And in your classes involving -- in your classes involving private equity, did you discuss securities fraud class actions?

A. Sorry, Counselor, I realize it's ambiguous from the description in that paragraph but that is actually one class.

GARMAISE - HIGHLY CONFIDENTIAL

The class is called venture capital and private equity and what I just gave you was for that class.

Q.    Okay.  And then with respect to your classes involving finance, and I may have asked this in part but I just want to make sure I have a clear answer, did you discuss securities fraud class actions in your finance classes?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I think the topic of fraud in the market as it related to market efficiency did come up in that corporate finance class that I taught.  I don't recall exactly how much time was spent on that but I think it was mentioned as a point that it related to this idea from the law.

BY MS. GILDEN:

Q.    Okay.  Turning to paragraph 6 of your report, are you there?

A.    Thank you, Counselor, I'm with you.

Q.    You say that you were engaged to

GARMAISE - HIGHLY CONFIDENTIAL

review and assess whether Mr. Coffman's methodology -- to review and assess whether Mr. Coffman has proposed a methodology capable of estimating damages on a class-wide basis consistent with plaintiffs' theory of liability.

Do you see that?

A.    Thank you, Counselor, I'm with you.

Q.    Who asked you to do that specifically?

A.    Mr. Noah Yavitz.

Q.    And was Mr. Yavitz the one who retained you for this matter?

MR. YAVITZ:  Objection; form.  Go ahead.

THE WITNESS:  Yes, he was.

BY MS. GILDEN:

Q.    You also say in paragraph 6 that you were asked to review and respond to Mr. Coffman's analyses regarding market efficiency.

My question again is:  Who asked you to perform that review and response?

GARMAISE - HIGHLY CONFIDENTIAL

A.    Mr. Noah Yavitz.

Q.    What is your understanding of why Mr. Yavitz asked you to review and assess whether Mr. Coffman proposed a methodology capable of estimating damages on a class-wide basis?

MR. YAVITZ:  Objection; form. And Mr. Garmaise, to the extent your response would require you to divulge privileged communications with me regarding strategy or otherwise, please limit that response to just high level.

BY MS. GILDEN:

Q.    Exactly.  I'm not interested in privileged communications.  I'm seeking your understanding of why you were asked to do this.

A.    I am not a legal expert so I don't have a deep understanding of why I was asked to do this.  My general understanding is it has some relevance to the current state of the legal proceedings in this matter.

GARMAISE - HIGHLY CONFIDENTIAL

Q.    And similarly, what is your understanding of why you were asked to review and respond to Mr. Coffman's analyses regarding market efficiency?

MR. YAVITZ:  Same objection and instruction.

THE WITNESS:  Similarly, I have some sense that it is relevant to the nature of the current legal proceedings in this matter.

BY MS. GILDEN:

Q.    And what did you rely on in forming your opinion with respect to the damages methodology?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I relied on the analysis presented in my report.  I relied on my expertise in finance and economics.  I relied on the materials that I reviewed as described in Appendix C of the report.

BY MS. GILDEN:

Q.    And in rendering an opinion on Mr. Coffman's analyses regarding market

GARMAISE - HIGHLY CONFIDENTIAL
efficiency, what did you rely on in
forming your opinion?

A.    Similarly, I relied on my
knowledge, my academic expertise, my
training in finance and economics.  I
relied on the materials described in
Appendix C to the report and I relied upon
my analysis of those materials.

Q.    Have you reviewed any securities
fraud cases from the Ninth Circuit Court
of Appeals?

MR. YAVITZ:  Objection; form.
Are you asking decisions issued by the
Ninth Circuit Court of Appeals itself?

MS. GILDEN:  That is the
question.

THE WITNESS:  I am not certain.
I think it is possible that the Hayden
versus Portola matter was in the Ninth
Circuit but I am not certain.

BY MS. GILDEN:

Q.    So my question is, and just to
clarify, have you reviewed any securities
fraud decisions from the Ninth Circuit

GARMAISE - HIGHLY CONFIDENTIAL

Court of Appeals?

A.    Would that include decisions in this matter?

Q.    No, it would not because there are no Ninth Circuit Court of Appeals decisions in this case.

A.    I see.  I think I may have failed to draw a distinction between the Ninth Circuit District versus that court of appeal.  Is that the distinction you're drawing, Counselor?

Q.    Right, so I'm asking about the appellate court and then I will turn to whether you have reviewed any decisions. Maybe this is a good spot.  Let's just start with a clean slate here.

Have you reviewed any decisions involving securities fraud cases for the Northern District of California?

A.    I don't recall with specificity. It is possible that I may have seen a decision or decisions of that kind but I don't recall offhand the names of those decisions.

Page 57

GARMAISE - HIGHLY CONFIDENTIAL

Q.    You reviewed decisions in this case; correct?

A.    So here I will turn to Appendix C.  I'll refer you, Counselor, to the Legal Documents section in Appendix C.  And as described there, I did review two orders.  I assume those are included in legal decisions.

Q.    Yes.  Outside of the orders in this case, did you review any decisions in a securities fraud class action by the Northern District of California federal court?

A.    I don't recall.  It's possible that I may have.  I have seen some decisions.  I don't recall.

Q.    Do you know what predominance means in the context of class certification?

MR. YAVITZ:  Objection; form.  Calls for legal opinion.

BY MS. GILDEN:

Q.    You may answer.

A.    Counselor, it sounds like you may

Page 58

GARMAISE - HIGHLY CONFIDENTIAL be using that in a legal context and I am not a legal expert. I don't have any specialized legal knowledge.

Q. Do you have an understanding of what predominance means in the context of class certification?

MR. YAVITZ: Same objection. Asked and answered.

BY MS. GILDEN:

Q. You may answer.

A. I don't have anything substantive to say about that.

Q. You reviewed the plaintiffs' class certification papers; correct?

A. Might I ask what you mean by papers? So I did review the legal documents described in Appendix C, including the complaint. There's a plaintiffs' notice of motion, motion for class certification. I reviewed Mr. Coffman's expert report. Is that what you had in mind as papers, Counselor?

Q. Yes, that's what I was referring to.

Page 59

GARMAISE - HIGHLY CONFIDENTIAL

A.    Yes, Counselor, I reviewed those materials.

Q.    And as you sit here today, you have no understanding of what predominance means in the context of class certification; correct?

MR. YAVITZ:  Objection; mischaracterizes testimony.

THE WITNESS:  Counselor, I have some recollection of having seen it mentioned in some of those documents. I don't have a legal expertise to really say much of substance.  If you'd like to review with me the mention of predominance in these papers, I'm happy to do so but as I sit here today, I don't have anything particular to say about it.

BY MS. GILDEN:

Q.    Well, I'm not asking you for your knowledge or opinion as a legal matter or legal expert.  I'm asking you whether you have an understanding of what predominance means in the context of class

Page 60

GARMAISE - HIGHLY CONFIDENTIAL

certification.

MR. YAVITZ:  Objection; form.

BY MS. GILDEN:

Q.    You may answer.

A.    I am not a legal expert.  I have seen the term predominance used.  I have only a very vague and general sense of what it means and it is not an expert opinion certainly.

Q.    And what is your general sense of what it means?

A.    As I vaguely recall, and this is outside my area of expertise, something that I read I think in one of the legal submissions in this case, it relates in some way to whether issues concerning the class are more important in some legal sense that I don't know and cannot define than issues that might affect an individual claimant.  That is my vague and general recollection.

I'm doing my best, Counselor, to answer your questions as I sit here.  I did not consider this question.  I don't

GARMAISE - HIGHLY CONFIDENTIAL

have any formal opinions on it.

Q.    And so with respect to individual claimant issues, can we agree in the securities fraud context that these would be issues that relate to the individual class members as opposed to the class as a whole?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I'm sorry, may I hear that question again, please?

BY MS. GILDEN:

Q.    Sure.

So with respect to individual issues, or that is issues that could affect an individual claimant, can we agree that those issues would just relate to an individual claimant as opposed to the class as a whole?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Counselor, I feel that you may be making a legal point here in which I don't really have the expertise to speak.  I'm not sure as a financial economist that it's within

Page 62

GARMAISE - HIGHLY CONFIDENTIAL
my expertise to answer what strikes me as quite possibly a legal question.

BY MS. GILDEN:

Q.    Let's sort of go at it this way. In your opinion, do individual issues of damages exist in this case?

A.    I'm not sure what an individual issue of damages is.  Can I ask you to define that for me, please?

Q.    So an individual issue of damage would be an issue that is unique to a particular class member in determining their damages that would not apply to other investors.

MR. YAVITZ:  Objection; form.

BY MS. GILDEN:

Q.    You may answer.

A.    Thank you, Counselor.  Thank you for that explanation.  I think that there may be issues in this matter in the calculation of damages that do differ amongst potential claimants.

Q.    And what are those issues?

A.    Here, for example, I'll refer you

GARMAISE - HIGHLY CONFIDENTIAL

to Section V.B of my report.  This is page 20.  May I proceed, Counselor?

MR. YAVITZ:  You can finish your answer.  Go ahead.

THE WITNESS:  Okay.  So, for example, in Section V.B of my report, I describe the fact that in calculating damages in this matter, it is important to take into account that the probability of merger completion between Bayer and Monsanto could very well have varied over time prior to the completion of the merger, and that is an issue as one example that might apply to certain members of the class and not to others.

BY MS. GILDEN:

Q.   And that is your determination of what or an example of what an individual issue is?

A.   Well, again, Counselor, I don't want to speak to any legal concepts and I'm not sure I actually understand from a legal perspective what an individual issue

GARMAISE - HIGHLY CONFIDENTIAL

is. I am raising the analysis in Section V.B of an example of why potentially a different damages methodology or at the very least an additional element to the damages methodology may be required for some members of the class as opposed to others.

MR. YAVITZ: I just want to say I think we've been going about an hour and a half. If there's a natural breaking point somewhere in here, I just want to put that on the radar.

MS. GILDEN: Yes. Thank you, Noah. I was about to say before I move on to other topics, this is I think a good time to take a break.

Professor, Noah, how much time would you like? 15 minutes, is that sufficient?

MR. YAVITZ: 15 is good for me but I defer entirely to Professor Garmaise.

THE WITNESS: 15 would be great. Thank you so much.

GARMAISE - HIGHLY CONFIDENTIAL

THE VIDEOGRAPHER:  We're off the record.  The time is 12:28 p.m.

(Recess taken from 12:28 p.m. to 12:50 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:50 p.m.

BY MS. GILDEN:

Q.   Professor Garmaise, I'm going to ask you this question after the break and I will ask you this question every time we do have a break.  Did you discuss anything of substance regarding your testimony today with anyone during the break?

A.   No, Counselor.

Q.   All right.  Professor, you raised several arguments relating to Mr. Coffman's analysis of Cammer factor five and the 12th factor that he analyzes relating to, if you will, lack of arbitrage opportunity.

My question to you is this:  Do you agree that all the other 10 factors that Mr. Coffman analyzed in his report support a finding that the market for

GARMAISE - HIGHLY CONFIDENTIAL

Bayer ADRs was efficient during the class period?

MR. YAVITZ:  Objection; form.

THE WITNESS:  So here, Counselor, I think it's probably best for me to refer to footnote 132 in my report. This is on page 39.  May I proceed?

BY MS. GILDEN:

Q.    Yes.

A.    So in that footnote I note that Mr. Coffman reaches his conclusion of efficiency based on a number of factors, some of which you just outlined.  I do not take issue with the notion that these factors might be considered but from the perspective of financial economics, Mr. Coffman has no basis to reach a conclusion of semi-strong market efficiency based on these factors alone, other than the fifth Cammer factor, price reaction to new information.  And as I further note in that footnote, Mr. Coffman offers a test that does not involve forming any ex ante hypotheses regarding

GARMAISE - HIGHLY CONFIDENTIAL

expected price reaction following such an event and from the perspective of financial economics, a test of that kind cannot offer reliable evidence of market efficiency.  And in addition, I make the point that Mr. Coffman's use of the least news dates is not consistent with the two studies that he cites in support of his approach.

Q.   So Professor, in your report you do not dispute that the average weekly trading volume of Bayer ADRs points to market efficiency, which is Cammer factor number 1; correct?

MR. YAVITZ:  Objection; form.

THE WITNESS:  As I describe in this footnote 132, I do not take issue with the notion that trading volume might be considered but from the perspective of financial economics, Mr. Coffman has no reliable basis to reach a conclusion of semi-strong market efficiency based on these factors alone, other than the fifth

GARMAISE - HIGHLY CONFIDENTIAL

Cammer factor price reaction to new information.

BY MS. GILDEN:

Q.  I realize that's what your report says, what you just read, but that was not my question.  So what I'm going to do is go through each factor of Cammer, 1 through 4, and I'd like to focus on them individually so let me rephrase this and start again.

In your report you do not dispute that the average weekly trading volume of Bayer ADRs points to market efficiency?

A.  In my report, I acknowledge that that factor might be considered, but I do not consider from the perspective of financial economics -- from the perspective of financial economics, I do not consider that one can draw a conclusion about market efficiency based on that factor alone.

Q.  Well, that wasn't my question, whether just that factor alone would be sufficient for market efficiency.  My

GARMAISE - HIGHLY CONFIDENTIAL
question focused just on that factor pointing to and supporting a potential finding of market efficiency.

MR. YAVITZ:  Objection.  Sorry.

BY MS. GILDEN:

Q.   So let me once again rephrase and re-ask my question.

In your report, you do not dispute that the average weekly trading volume of Bayer ADRs indicates potential market efficiency?

MR. YAVITZ:  Objection; form. Asked and answered.

BY MS. GILDEN:

Q.   You may answer.

A.   Counselor, it is my opinion that that factor, trading volume, may be considered in an analysis of market efficiency.  It is a factor that may be correlated with market efficiency, but that factor alone does not form a reliable basis from the perspective of financial economics for concluding that a market is efficient.

Page 70

GARMAISE - HIGHLY CONFIDENTIAL

Q.    And in your report, you do not dispute that there was significant analyst coverage of Bayer ADRs; correct?

MR. YAVITZ:  Objection; form.

THE WITNESS:  In my report, I do not take up that question.

BY MS. GILDEN:

Q.    So in other words, you don't dispute it?

MR. YAVITZ:  Same objection.

BY MS. GILDEN:

Q.    You may answer.

A.    I do not address that question in my report.

Q.    In your report, you do not dispute that there was a presence of market makers for Bayer ADRs; correct?

A.    I do not consider that question in my report.

Q.    In your report, do you not dispute that Bayer satisfied the criteria effectively for Form F-3 eligibility?

A.    So for this factor as well, which as I describe in my report might be

GARMAISE - HIGHLY CONFIDENTIAL

considered, but I do not consider from the perspective of financial economics to form a reliable basis alone to make -- to draw a conclusion of semi-strong market efficiency for this factor as well that you've just described.  I do not consider it in my report.

Q.    In your report, you do not dispute that the market capitalization of Bayer ADRs was large; correct?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I don't consider that question in my report.

BY MS. GILDEN:

Q.    In your report, you do not dispute that the bid/ask spread for Bayer ADRs was relatively low in the class period?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I do not consider that question in my report.

BY MS. GILDEN:

Q.    And in your report, you do not dispute that Bayer ADRs were held by

GARMAISE - HIGHLY CONFIDENTIAL

non-insiders?

MR. YAVITZ:  Objection; form.

THE WITNESS:  For this question as well, which I view as one that might be considered in analysis of market efficiency but cannot from the perspective of financial economics form the basis alone of the conclusion on market efficiency for that factor as well, I do not consider it in my report.

BY MS. GILDEN:

Q.    In your report, you do not dispute that the level of institutional ownership of Bayer ADRs supports or could be viewed as supporting market efficiency?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Well, I would say it's a factor that could be considered.  It's a factor that's correlated with market efficiency but I do not regard it from the perspective of financial economics as forming a reliable basis to draw

Page 73

GARMAISE - HIGHLY CONFIDENTIAL

conclusion about market efficiency.

BY MS. GILDEN:

Q.   And in your report, you do not dispute that there's no evidence of statistically significant correlation for Bayer ADRs?

A.   I do not.  I do not take up that issue in my report.

Q.   And then in your report, you also do not dispute that there was considerable option trading in Bayer ordinary shares during the class period?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I do not take up that question in my report.

BY MS. GILDEN:

Q.   Okay.  Would you turn to paragraph 12 of your report?

A.   Thank you, Counselor, I'm with you.

Q.   Your first opinion states that Mr. Coffman provides no meaningful guidance on how one might estimate the effect of the alleged misrepresentations

GARMAISE - HIGHLY CONFIDENTIAL

on the market's assessment of the likelihood or severity of Roundup losses.

Do you see that?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Yes.

BY MS. GILDEN:

Q.    In your report, you yourself don't provide meaningful guidance on how one might estimate the effect of the alleged misrepresentations on the market's assessment of the likelihood or severity of Roundup litigation losses; is that correct?

A.    Counselor, as described in paragraph 6 of my report, I was asked to review and assess Mr. Coffman's, whether or not Mr. Coffman has proposed a methodology to that end and I concluded that he has not provided a class-wide damages methodology consistent with plaintiffs' theory of liability.  To that end I describe various reasons for that opinion, including the one you just read. That was my task, to assess Mr. Coffman's

Page 75

GARMAISE - HIGHLY CONFIDENTIAL
report and that is what I'm providing
opinions on here.

Q.   But you don't provide guidance on
that issue yourself in your report;
correct?

MR. YAVITZ:  Objection; form.

THE WITNESS:  That was not part
of my assignment and it's not
something that I undertook.

BY MS. GILDEN:

Q.   Do you agree that an event study
is often used to determine the amount of
artificial inflation dissipated on a
corrective disclosure?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I don't have an
opinion on that matter.  I'm not a
legal expert and I don't have anything
to say about how often various
techniques have been used in different
litigation.

BY MS. GILDEN:

Q.   Would you agree that an event
study has been used in securities fraud

Page 76

GARMAISE - HIGHLY CONFIDENTIAL

cases to determine the amount of

artificial inflation dissipated on a

corrective disclosure?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I don't think --

well, perhaps we should define terms.

In my view, an events study can be

used to calculate the abnormal return

for a given stock on a given day, but

moving from that to calculating the

dissipation of inflation would require

additional work so I don't think an

event study can do it on its own.

BY MS. GILDEN:

Q.    And do you agree that an event

study can be used as a starting point to

estimate inflation dissipated on a certain

date and that further adjustments can be

made to account for the impact of

confounding information if necessary?

MR. YAVITZ:  Objection to form.

Compound.

THE WITNESS:  I agree that an

event study can be used to calculate

GARMAISE - HIGHLY CONFIDENTIAL

the abnormal return for a given stock on a given day and I think that more work is then required to calculate the dissipation of inflation.

BY MS. GILDEN:

Q.   So you would agree that further adjustments can be made --

MR. YAVITZ:  Objection; form.

Q.   -- in order to make that determination?

A.   In theory speaking very broadly and generally, might certain unspecified adjustments be made, yes, it's possible but I think that that requires some explanation.  That's a bit of a general comment.

Q.   I'm not sure what you mean by it requires some explanation, it's a general comment.  Can you please expand upon that, what you mean?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Well, as we've been discussing, an event study can be used to determine the stock specific

Page 78

GARMAISE - HIGHLY CONFIDENTIAL
abnormal return, but to then move from that to a calculation of inflation requires consideration of other issues, one of which you mentioned, confounding information.  There may be other issues, industry movements, other changes that would need to be accounted for.

BY MS. GILDEN:

Q.    Turning to your second opinion, you say that Mr. Coffman did not provide a method to determine a methodology that estimates the market's view of the likelihood the merger would close and that that would therefore be needed to calculate inflation during this period.

MR. YAVITZ:  Objection; form.  Is that a question?

BY MS. GILDEN:

Q.    That's your opinion, is it not?

A.    Sorry, Counselor, are you reading from my report or are you paraphrasing it? I just want to make sure I'm with you.

Q.    So I have read through -- read in

GARMAISE - HIGHLY CONFIDENTIAL

part of the report, I just summed it up in terms of your second opinion.

A.   I see.  Well, as described in paragraph 14, my second opinion is that Mr. Coffman suggests in his language that the most widely used technique for assessing damages would make use of Bayer's ADR price reaction to the alleged corrected disclosures.  If one were to make use of such a technique, it would -- one must make an adjustment for -- during the pre-merger closing period, one must make an adjustment to calculate inflation that would account for the assessed probability of merger completion.

Q.   And you were just reading from your report; correct?

A.   I read perhaps a sentence or two and then the rest was my own paraphrasing.

Q.   I see.  And so your third opinion is that "Mr. Coffman fails to provide a methodology to objectively and reliably identify relevant disclosures, or to measure how they affected inflation over

GARMAISE - HIGHLY CONFIDENTIAL

time."

And that appears in your paragraph 15; correct?

A.    I think I'll be a bit careful here.  So I say in paragraph 15 that Mr. Coffman describes potentially -- potentially using the price reaction of Bayer ADRs following alleged corrective disclosures as one method, and if one were to use such a method, I point out in this paragraph that one would have to account for other changes in the information mix over time in order to calculate the changing inflation.

Q.    And that would be necessary to do to come up with the exact formula; correct?

MR. YAVITZ:  Objection; form.

MS. GILDEN:  The exact dollar amount?

MR. YAVITZ:  Same objection.

THE WITNESS:  Well, the question I'm taking up in the report is had Mr. Coffman proposed a class-wide

GARMAISE - HIGHLY CONFIDENTIAL damages methodology consistent with plaintiffs' theory of liability, he has not.  He has provided very little detail, no meaningful detail on the question of how he would calculate inflation.  In this paragraph 15, I note that if one were to use what Mr. Coffman describes as the widely used approach of measuring post alleged corrective disclosure in price drops, if one were to use such an approach, which Mr. Coffman does not say he necessarily will, but he mentions that it's one, quote, unquote, widely used approach, in that case if one were to do so, it would be important to account for a changing information mix over time.

BY MS. GILDEN:

Q.   And in your report, you also assert that Mr. Coffman fails, this is in paragraph 17, "to reliably establish market efficiency throughout the proposed class period, particularly during the

Page 82

GARMAISE - HIGHLY CONFIDENTIAL period from June 6, 2018 to June 25, 2018."

What is the basis for your opinion?

A.   The basis for that opinion comes in two parts.  The first we discussed a little while ago, and it's described in footnote 132, in which I describe from the perspective of financial economics what is necessary to establish market efficiency. And as we've discussed, as I describe in that footnote, it is necessary from the perspective of financial economics to form ex ante hypotheses and to test them. Mr. Coffman does not do that and furthermore, the way that Mr. Coffman chooses his comparison, at least news dates, is not consistent with the literature that he cites.  Those are two of the bases.

The third basis for this statement focuses particularly on what happens from June 6th to June 25, 2018. Mr. Coffman in his report argues that one

GARMAISE - HIGHLY CONFIDENTIAL

piece of evidence in favor, arguing or supporting the argument that Bayer's ADRs trade in efficient market was that they moved in tandem with the ordinary shares, and I find during this period in mid June 2018, they did not and that that is inconsistent with market efficiency.

Q.    Professor, what is the class period alleged by plaintiffs in this action?

A.    I'll refer to paragraph 20 of my report in which I describe the proposed class period as lying between May 23, 2016 and July 6, 2020.

Q.    And that's approximately four years; correct?

A.    Yes, Counselor.

Q.    And turning back to paragraph 17, the number of trading days that paragraph 17 focuses on is, I believe, about 12; is that correct?

A.    Well, there are two statements in the first sentence of paragraph 17.  The first is Mr. Coffman fails to reliably

Veritext Legal Solutions
212-279-9424        www.veritext.com        212-490-3430

GARMAISE - HIGHLY CONFIDENTIAL
establish market efficiency throughout the class period, and then there is a second statement to which I believe you're alluding, which is particularly during the period from June 6th to June 25, 2018.  I believe that second period is a little bit more than 12 days but it's on the order, it's a little bit bigger.

Q.   Right.  And what my question went to were trading days.  So I think it's about 12 trading days.

A.   I think Mr. Coffman identifies in his report a shorter period of persistent divergence that I believe does line up with 12 trading days.  As I recall, the period I'm identifying here is somewhat extended from that identified by Mr. Coffman, so I think it is slightly more than 12 trading days but not by a large margin, Counselor, no substantive disagreement here.

Q.   Professor, what do plaintiffs allege as their theory of liability in this case?

GARMAISE - HIGHLY CONFIDENTIAL

MR. YAVITZ:  Objection; form.

THE WITNESS:  Counselor, my --

BY MS. GILDEN:

Q.    In your view.

A.    In my understanding of plaintiffs' theory of liability is supplied in paragraph 20 of my report in which I state I understand the alleged misrepresentations that remain actionable following the court's rulings relate to, number 1, statements made prior to the close of the merger about the nature and extent that bears due diligence and to Monsanto's potential Roundup litigation and to --

THE REPORTER:  A little slower, please.

A.    I apologize.  I apologize.  I'm going to repeat this for the record.

So my understanding of plaintiffs' theory of liability is given in paragraph 20 of my report in which I state I understand that the alleged misrepresentations that remain actionable

GARMAISE - HIGHLY CONFIDENTIAL

following the court's rulings relate to two items.  Number 1, statements made prior to the close of the merger about the nature and extent of Bayer's due diligence into Monsanto's potential Roundup litigation liability, and number 2, statements made after the merger closed about the adequacy of Bayer's due diligence of Monsanto's potential Roundup liability.

Q.   And how did you arrive at this understanding of the plaintiffs' allegations as reflected in paragraph 20 of your report?

A.   My understanding, as described in paragraph 20 of my report, has three bases.  The first is my reading of the plaintiffs' complaint.  The second is my review of Mr. Coffman's report.  My third is discussion with defense counsel.

Q.   What is your understanding of how a plaintiff can prove a misstatement or omission caused their economic loss?

MR. YAVITZ:  Objection; form.

Page 87

GARMAISE - HIGHLY CONFIDENTIAL

THE WITNESS:  I don't consider that -- that question here.  I am concerned, as I describe in paragraph 6 of my report, my assignment has two components, reviewing and assessing whether Mr. Coffman has proposed a class-wide damages methodology consistent with plaintiffs' theory of liability and Mr. Coffman's analysis regarding market efficiency, so I don't consider the question that you just asked in this report.

BY MS. GILDEN:

Q.   Are you familiar with the term "price impact"?

A.   Well, I'm familiar with it as a financial economist.  I'm wondering if perhaps you're using that in a specific legal sense, Counselor.

Q.   Well, I'm asking you what your understanding is of the term "price impact."

MR. YAVITZ:  Objection; form.

THE WITNESS:  From my perspective

Page 88

GARMAISE - HIGHLY CONFIDENTIAL

of a -- as a financial economist, I would view price impact as considering the question of whether or not a specific event changed the price of an asset.

BY MS. GILDEN:

Q.   Do you agree that nothing in your analysis contained in your report would allow you to opine as to a lack of price impact from the alleged misrepresentations?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I don't take up that question in this report.

BY MS. GILDEN:

Q.   Turning to the discussion in your report beginning on page 10 under heading V, and that reads, "Mr. Coffman fails to provide a methodology that would reliably calculate damages for all proposed class members consistent with plaintiffs' theory of liability," Mr. Coffman's report describes the out-of-pocket method.  Are you familiar with the term out-of-pocket

Page 89

GARMAISE - HIGHLY CONFIDENTIAL

method?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Yes, I saw that in Mr. Coffman's report.

BY MS. GILDEN:

Q.   What is your understanding of what that term means?

A.   Effectively, Mr. Coffman proposes, as described in paragraph 23 of my report, that one can calculate damages based on the amount of artificial inflation in the price of Bayer's ADRs, the out-of-pocket methodology considers effectively changes in artificial inflation experienced by securities holders.

Q.   And do you understand that out-of-pocket damages are the difference between inflation at the time of purchase and inflation at the time of sale?

A.   Yes, that is my understanding.

Q.   And the out-of-pocket method is a well accepted methodology to calculate damages on a class-wide basis in

GARMAISE - HIGHLY CONFIDENTIAL

securities fraud cases for claims brought under Section 10b of the Exchange Act; correct?

MR. YAVITZ:  Objection; form. Calls for a legal opinion.

THE WITNESS:  Counselor, I don't have a view on the legal question that you asked.  I was asked does Mr. Coffman propose a class-wide damages methodology consistent with plaintiffs' theory of liability. Mr. Coffman describes the out-of-pocket damages methodology as you described it, which depends on artificial inflation, but Mr. Coffman provides no guidance on how artificial inflation will be calculated or could be calculated, no meaningful guidance, and it is therefore my opinion that he has not proposed a damages methodology.

BY MS. GILDEN:

Q.    So you are not aware that the out-of-pocket damages methodology is a

GARMAISE - HIGHLY CONFIDENTIAL

well accepted methodology to calculate damages on a class-wide basis in securities fraud cases, is that what you're saying?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Counselor, are you asking about well accepted in a legal context?

BY MS. GILDEN:

Q.    Yes.

A.    I'm a financial economist.  I'm not a legal expert.  I was asked to provide my opinion as a financial economist and whether or not Mr. Coffman has proposed a class-wide damages methodology.  It's my opinion that he has not.  There's no meaningful detail here on how Mr. Coffman would propose to or propose to another expert to calculate inflation in the absence of some meaningful description of how inflation will be calculated.  I conclude that there is not a reliable damages methodology being proposed here by Mr. Coffman.

GARMAISE - HIGHLY CONFIDENTIAL

Q.   Are you aware of any Section 10b case where an out-of-pocket damages methodology was not accepted by the court?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Counselor, I'm not a legal expert and I cannot speak to legal questions.  I can only speak as a financial economist and from my perspective as a financial economist, if someone proposes, as Mr. Coffman did, to use the out-of-pocket methodology and then says nothing meaningful about how inflation will be calculated, it is my opinion as a financial economist that that person, Mr. Coffman in this case, has not proposed a damages methodology.

BY MS. GILDEN:

Q.   So your answer is no, you are not aware of any Section 10b case where an out-of-pocket damages methodology was not accepted by the court?

MR. YAVITZ:  Same objection.

THE WITNESS:  I don't have legal

Page 93

GARMAISE - HIGHLY CONFIDENTIAL

knowledge to speak to that question.

BY MS. GILDEN:

Q.   So the answer is you're not aware one way or another?

A.   I am not aware one way or another.

Q.   Do you agree that the out-of-pocket damages method is used oftentimes to calculate damages?

MR. YAVITZ:  Objection; form.

THE WITNESS:  In what context, Counselor, are we speaking?

BY MS. GILDEN:

Q.   In securities fraud class action asserting 10b claims.

MR. YAVITZ:  Same objection.

THE WITNESS:  Counselor, I really cannot speak to the legal context here.  All I can do is offer my opinion as a financial economist, which is that in the absence of some meaningful principle or guidance on calculating inflation, one cannot be said to have proposed damages

GARMAISE - HIGHLY CONFIDENTIAL

methodology and Mr. Coffman has not provided that guidance.

BY MS. GILDEN:

Q.    Are you aware of any reason that the out-of-pocket damages approach would not apply class-wide in this case?  And that's a yes or no answer.  And then we can sort of go from there.  So I'm going to ask it again.

A.    Thank you.

Q.    Are you aware of any reason that the out-of-pocket damages approach would not apply class-wide in this case?

MR. YAVITZ:  Professor, you can answer however you like.

THE WITNESS:  There may be reasons that the out-of-pocket damages methodology, which Mr. Coffman has not provided but for which there are some offhand comments that he has provided, there may be reasons that such an approach could not be applied uniformly to every member of the class in this matter.

GARMAISE - HIGHLY CONFIDENTIAL

BY MS. GILDEN:

Q.    And are you aware of any reason that any approach to calculating damages would not apply class-wide in this case?

MR. YAVITZ:  Objection; form.

THE WITNESS:  There may be conversations that differ for different members of the class in this case.

BY MS. GILDEN:

Q.    What are those considerations?

A.    Here I turn to Section V.B of my report, paragraph 47.  As I mentioned earlier, Mr. Coffman does not specify what methodology would appropriately measure inflation in this matter but he does mention one potential approach of which is to use an event study to analyze the stock price response to alleged corrective disclosures.  If one were to use such an approach, one would have to take into account the fact that the merger probability between Bayer and Monsanto was not necessarily one before the close of

GARMAISE - HIGHLY CONFIDENTIAL

the merger.  That is one example.  Second example comes from Section V.D in which I discuss changing information about the number of Roundup plaintiffs in the case. Another potential consideration is that the estimate, the damages methodology should take into account that during part of the class period there were disclosures by Monsanto and Bayer about the number of Roundup plaintiffs, perhaps in other parts of the class there were not.  So those would be different considerations for different class members potentially.

Q.   Do you agree that those questions would be common to the class?

A.    Well, I'm not sure if you're asking me a legal question but from my perspective as a financial economist, no. So, for example, if we look at the issue of merger probability, estimating the market's assessment of the merger probability, that would be a different methodology or at the very least a different element of the methodology that

**Page 97**

GARMAISE - HIGHLY CONFIDENTIAL
would be necessary only before the merger closed.  It would not be relevant or necessary after, concerning people, for example, who bought shares after the merger closed.

Q.    It is your affirmative opinion that the constant dollar back casting method cannot be applied in this matter?

MR. YAVITZ:  Objection; form.

THE WITNESS:  No, it is my opinion that there are various barriers and obstacles that would have to be applied, that would have to be surmounted in order to apply the constant dollar method, for example, this consideration of the merger probability in the earlier part of the class period.  Mr. Coffman does not provide a methodology to -- does not describe a methodology to handle that particular issue in this matter.

BY MS. GILDEN:

Q.    Do you dispute that the out-of-pocket damages methodology can

GARMAISE - HIGHLY CONFIDENTIAL

account for time varying inflation?

MR. YAVITZ:  Objection; form.

THE WITNESS:  The out-of-pocket damages methodology is a very general description of a damages methodology that depends on some measure of artificial inflation.  Mr. Coffman has not described how he would -- how he or another expert would calculate artificial inflation and therefore he does not provide a class-wide damages methodology.  I'm not opining that no such methodology potentially exists, simply that Mr. Coffman has not provided one.

BY MS. GILDEN:

Q.    And so my question is:  Can the out-of-pocket damages methodology account for time varying inflation?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Hypothetically there could be versions of the out-of-pocket damages methodology that make use of time varying inflation.

GARMAISE - HIGHLY CONFIDENTIAL

Mr. Coffman has not told us, has not provided any meaningful guidance in his report on how he would calculate inflation.

BY MS. GILDEN:

Q.    Is it your opinion that an alternative damages approach other than the out-of-pocket method should be used in this matter?

A.    No, Counselor.  It's my opinion that Mr. Coffman has not provided a class-wide damages methodology consistent with plaintiffs' theory of liability.

Q.    Have you ever utilized the out-of-pocket methodology in any of your prior engagements to calculate damages in a securities fraud matter?

A.    I have calculated damages in non-securities fraud matters.  I have not calculated damages in a securities fraud matter.

Q.    Do you agree that Mr. Coffman performed a valid event study regression?

MR. YAVITZ:  Objection; form.

GARMAISE - HIGHLY CONFIDENTIAL

THE WITNESS:  I haven't considered that question.

BY MS. GILDEN:

Q.   Just to follow up, did you find any statistical errors in Mr. Coffman's regression analysis?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I haven't considered that question.  It was not part of my assignment.  I did not consider it.

BY MS. GILDEN:

Q.   Did you attempt to replicate Mr. Coffman's event study?

A.   I don't believe that we did.  I did not personally.  I am not certain if my collaborators did.

Q.   Did you perform your own event studies in this matter?

A.   No, my assignment, as I described, was to review and assess whether Mr. Coffman's proposed methodology and to review and respond to his analyses regarding market efficiency and performing

GARMAISE - HIGHLY CONFIDENTIAL

an event study was not within that remit.

Q.    Would you agree that Mr. Coffman's event study is valid and accurate?

MR. YAVITZ:  Objection; form. Asked and answered.

THE WITNESS:  I haven't reviewed that question.

BY MS. GILDEN:

Q.    Did you rely in any way on Mr. Coffman's event study in reaching your opinions in your report?

A.    I make reference to some findings from Mr. Coffman's event study in my discussion in Section V.C, I believe.  One moment.

Yes, so in Section V.C I make note of some of Mr. Coffman's findings.

Q.    And you don't disagree with any of Mr. Coffman's event study findings; isn't that true?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I haven't formed an opinion on that matter.

GARMAISE - HIGHLY CONFIDENTIAL

BY MS. GILDEN:

Q.    Do you agree that there are statistically significant declines in the wake of each of the corrective disclosures?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I haven't considered that question.  Mr. Coffman provides some analysis but I did not evaluate it.

BY MS. GILDEN:

Q.    Do you agree that an event study is often used to determine the amount of artificial inflation dissipated on a corrective disclosure?

A.    Counselor, we discussed this question earlier.  In my view, an event study is a tool in finance and economics used to calculate firm specific abnormal returns in a given day.  That in and of itself is not sufficient to calculate dissipation of artificial inflation.

Q.    Do you agree that an out-of-pocket method can be used alongside

GARMAISE - HIGHLY CONFIDENTIAL
disaggregation methods to determine the
exact amount of inflation in Bayer ADRs?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I'm not sure I
follow that question.  You made
reference to strategies -- if I may
ask to have a clarification, please.

BY MS. GILDEN:

Q.    Sure.  So all that I'm asking is
whether you agree that the out-of-pocket
method can be used alongside
disaggregation methods to determine the
exact amount of inflation in an ADR in
which misrepresentations and omissions
were made.

MR. YAVITZ:  Same objection.

THE WITNESS:  Counselor, I have
not considered that question.  I have
considered whether or not Mr. Coffman
has proposed a damages methodology and
I find that he has not.

BY MS. GILDEN:

Q.    Do you agree that accurate
disaggregation must be performed after a

GARMAISE - HIGHLY CONFIDENTIAL

thorough loss causation analysis is complete?

MR. YAVITZ:  Same objection.

THE WITNESS:  May I ask you to define disaggregation, please?

BY MS. GILDEN:

Q.    Well, are you familiar with the term disaggregation as an economist, as a finance professor?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Yes.  I'm concerned you may be using it in a legal sense but yes, I have heard the term.

BY MS. GILDEN:

Q.    Please tell me what your understanding of disaggregation means.

A.    Broadly speaking, disaggregation means breaking a unit into several parts.

Q.    And in the context of a corrective disclosure that a company makes, is disaggregation necessary to determine the exact amount of inflation that is in a particular security?

MR. YAVITZ:  Objection; form.

GARMAISE - HIGHLY CONFIDENTIAL

THE WITNESS:  I don't follow that question.  I'm not sure -- I'm not sure how an event study could be used to determine the level of inflation.  Was that your question, Counselor?

BY MS. GILDEN:

Q.   That was not exactly my question.  So my question was the role of disaggregation in determining the amount of inflation that is in a particular security and whether disaggregation is -- strike that.  Let me ask it this way.

What is your understanding of loss causation?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I am not a legal expert.  I have a general non-expert understanding of loss causation.  Shall I supply that, Counselor?

BY MS. GILDEN:

Q.   Yes, please.

A.   I am not a legal expert.  This is not a formal opinion of mine.  My general understanding of loss causation is that it

GARMAISE - HIGHLY CONFIDENTIAL
is an analysis of the mechanisms leading
to a decline in economic value for certain
agents.  Again, not a formal legal view on
that question.

Q.   And if one is to perform an
analysis of loss causation, would you
agree that it is necessary to remove the
effect of confounding information?

MR. YAVITZ:  Objection; form.

THE WITNESS:  A loss causation
analysis, as I've described it in this
non-formal, non-legal expert way,
should provide guidance on the various
components leading to a loss,
including, as you described it, the
effects of confounding information.

BY MS. GILDEN:

Q.   And would you agree that fact
discovery is necessary before
disaggregation can be properly performed
to remove confounding information?

MR. YAVITZ:  Objection; form.

THE WITNESS:  So as I describe in
paragraph 25 of my report, well, a

Page 107

GARMAISE - HIGHLY CONFIDENTIAL

loss causation analysis may ultimately be necessary to calculate damages. Such an analysis is not necessary to determine how inflation will ultimately be quantified and to describe a methodology to calculate class-wide damages.

BY MS. GILDEN:

Q.    Let me ask you, in your report, you say that Mr. Coffman does not provide a methodology to measure inflation that would incorporate investor uncertainty about the likelihood that Bayer would acquire Monsanto.  My question to you is: Why can't the out-of-pocket method of damages be used with disaggregation methods to measure the uncertainty investors might have had on Bayer acquiring Monsanto?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Well, my opinion is that Mr. Coffman has not provided a damages methodology.  It's not my opinion that there is no such possible

GARMAISE - HIGHLY CONFIDENTIAL

damages methodology.

BY MS. GILDEN:

Q.    Do you believe it is impossible to measure the likelihood the merger would close at a given point in time?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I believe -- no, I do not believe it's impossible.  I believe it's challenging.  I believe Mr. Coffman has not provided a methodology to do so.

BY MS. GILDEN:

Q.    Well, if it can be measured, which you seem to agree it can be, how would you calculate measuring the merger likelihood?

A.    Counselor, I was not asked to consider that question.  My assignment was to evaluate -- in part was to evaluate whether Mr. Coffman has proposed a damages methodology, if one were to rely upon ex post price declines, as Mr. Coffman suggests might be possible here, though he does not commit to that, and in that

GARMAISE - HIGHLY CONFIDENTIAL
context it would be important to account for the probability of merger completion, Mr. Coffman has said nothing about how he might do that.

Q.   In your report, you state Mr. Coffman fails to explain how inflation could reliably and objectively be estimated using ADR price changes following alleged corrective disclosures and not other information regarding due diligence or other litigation developments.

My question to you is:  Do you dispute that the out-of-pocket damages methodology can account for the inclusion or exclusion of alleged corrective disclosures during the class period?

MR. YAVITZ:  I object to the form of that question.

THE WITNESS:  It's my opinion that Mr. Coffman has not explained how inflation could be reliably estimated following alleged corrective disclosures and not other information.

GARMAISE - HIGHLY CONFIDENTIAL

It is not my opinion that it's impossible to do so but it is my opinion that Mr. Coffman has not described the methodology for doing so.

BY MS. GILDEN:

Q.   Do you dispute that the out-of-pocket damages methodology can be used in cases alleging a materialization of the risk theory?

MR. YAVITZ:  Objection; form.

THE WITNESS:  It's my opinion, as described in Section V.A of my report, that Mr. Coffman has not provided a methodology that could account for this materialization of risk.  It's not my opinion that there is no such damages methodology that could, simply that Mr. Coffman has not provided one.

BY MS. GILDEN:

Q.   In your report, you state that Mr. Coffman fails to explain how inflation could reliably and objectively be estimated throughout the class period

GARMAISE - HIGHLY CONFIDENTIAL

accounting for developments in the Roundup litigation and other changes to Bayer's business.

My question to you is:  Why can't the out-of-pocket method be used with disaggregation methods to measure the changes in Bayer's business?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Counselor, it's my opinion that Mr. Coffman has not provided a damages methodology, that Mr. Coffman has failed to explain, to provide a methodology to account for potential changes in Bayer's business over time.  It's not my opinion that it's impossible to do so, it's simply that Mr. Coffman has not done so, not offered such a methodology.

BY MS. GILDEN:

Q.   My next question is:  Why can't the out-of-pocket method be used with disaggregation methods to account for developments in the Roundup litigation?

MR. YAVITZ:  Same objection.

Page 112

GARMAISE - HIGHLY CONFIDENTIAL

THE WITNESS:  Counselor, it's my opinion that Mr. Coffman has failed to explain how one could account for changing information regarding Monsanto's liability and that Mr. Coffman has not provided a damages methodology.  It is not my opinion that there is no potential damages methodology that could account for this issue, simply that Mr. Coffman has not provided such a methodology.

BY MS. GILDEN:

Q.    Would you take a moment to read paragraph 76 in your report?  And it begins at the bottom of page 35 and continues on to page 36.

A.    Certainly, Counselor.  Paragraph 76 --

Q.    Just read it to yourself.

A.    Sorry.  Okay.

Just one moment, please.

MR. YAVITZ:  And Professor, if you need to read anything around there for context, I'm sure Ms. Gilden won't

GARMAISE - HIGHLY CONFIDENTIAL

begrudge you that.

MS. GILDEN:  Absolutely, absolutely, feel free to do that.

THE WITNESS:  Thank you, Counselor, I've refreshed my memory of this paragraph.

BY MS. GILDEN:

Q.   You state in the paragraph that the possible methods to calculate inflation that Mr. Coffman offered are, quote, inappropriate in this case.

My question to you is:  In your opinion why are they inappropriate?

A.   Let me take these two in turn.

Q.   Certainly.

A.   Thank you.  With respect to the constant percentage inflation, as I describe in this section, to be specific, I guess it's V.D.2, I believe, there were changes in Bayer's business over time so a potential but for disclosure could have had a different impact proportionately as Bayer's divisions changed, as the types of divisions that it had that changed could

GARMAISE - HIGHLY CONFIDENTIAL

have an impact because Bayer's systematic risk, the coefficient measure and the co-movement between Bayer and market returns as calculated by Mr. Coffman because that was changing and because of the capital structure, so all of those would be challenges that a constant percentage and the inflation model would have to address, in addition to which you would also have to address the merger probability issue that we were discussing earlier.

For the constant dollar inflation method, I'll highlight here again that the merger probability assessment, as I describe in Section V.B of my report, that makes simply applying the constant dollar approach inappropriate in this matter.

Q.   Do you agree that choosing a methodology is inappropriate at this stage of the litigation?

MR. YAVITZ:  Objection; form.

THE WITNESS:  I'm not a legal expert and I cannot speak to what is

GARMAISE - HIGHLY CONFIDENTIAL

legally appropriate or not.  I was asked has Mr. Coffman provided a classified damages methodology and as I describe in my report, it is my opinion that he isn't.

MS. GILDEN:  We've been going about an hour.  Let's -- I know, Noah, you suggested at some point taking a break for lunch.  I think it's almost 2 o'clock East Coast time.  Perhaps for you it's coming up on the hour of lunch, Professor.  What would you like to take, a half hour?  20 minutes? What works for you?

MR. YAVITZ:  I think a half hour works for us.

MS. GILDEN:  Okay.

THE VIDEOGRAPHER:  If all parties agree to go off the record.

MR. YAVITZ:  Let's go off the record.

THE VIDEOGRAPHER:  We are off the record.  The time is 1:55 p.m.

(Lunch recess taken at 1:55 p.m.)

Page 116

GARMAISE - HIGHLY CONFIDENTIAL

A F T E R N O O N    S E S S I O N

(Time noted:  2:41 p.m.)

M A R K    G A R M A I S E,    resumed and testified as follows:

THE VIDEOGRAPHER:  We're back on the record.  The time is 2:41 p.m.

CONTINUED EXAMINATION

BY MS. GILDEN:

Q.   Hello, Professor.  So my question to you is going to be a question I asked earlier following a break, and that is during the break, did you discuss the substance of your testimony here today with anybody?

A.   No, Counselor.

Q.   Thank you.

So Professor Garmaise, in your report, you don't opine that the market for Bayer ADRs was inefficient at any point during the class period; isn't that true?

MR. YAVITZ:  Objection; form.

THE WITNESS:  Yes, Counselor, that is correct.  It's my opinion, as

GARMAISE - HIGHLY CONFIDENTIAL
described in section 6 of the report, that Mr. Coffman fails to reliably demonstrate that the Bayer ADRs traded in an efficient market during the entire proposed class period.

BY MS. GILDEN:

Q.    But you're not saying that the market for Bayer ADRs was inefficient at any point during the class period, are you?

MR. YAVITZ:  Same objection.

THE WITNESS:  Counselor, it's my opinion that Mr. Coffman has failed to reliably demonstrate that the Bayer ADRs traded in an efficient market during the entire proposed class period.

BY MS. GILDEN:

Q.    So do you have an opinion regarding market efficiency for Bayer ADRs during the class period?

A.    My only opinion is that Mr. Coffman has not established efficiency throughout the entire proposed class

Page 118

GARMAISE - HIGHLY CONFIDENTIAL

period on this matter of efficiency.

MS. GILDEN:  Noah, we're going to take a very short break.  I just want to review my notes and just see if there's anything else that we need to cover and then you may have questions of your own.  So we'll make this super short.  Let's just go off the record and we'll be back on momentarily.

THE VIDEOGRAPHER:  We are off the record.  The time is 2:43 p.m.

(Recess taken from 2:43 p.m. to 2:46 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:46 p.m.

BY MS. GILDEN:

Q.   Professor, once again, my question to you is whether you discussed anything of substance regarding your testimony here today with anyone during our short break a few moments ago.

A.   No, Counselor, I did not.

MS. GILDEN:  Thank you.  Well, I have no further questions at this time

GARMAISE - HIGHLY CONFIDENTIAL

subject to reserving the right to recross following anything your counsel may or may not want to ask you.

MR. YAVITZ:  Professor Garmaise, I just have one quick little thing.

EXAMINATION

BY MR. YAVITZ:

Q.    You said in response to some of your questions -- the questions that you received from Ms. Gilden -- strike that.

Do you recall testifying that you collaborated with Cornerstone staffers in connection with the preparation of your report?

A.    Yes, Counselor.

Q.    Could you explain what you meant by the term "collaborate"?

A.    I provided overall direction to the report so I wrote the first draft, I wrote the outline, I in some cases instructed them to run specific tests. They did so at my explicit direction. There were some components of the report

GARMAISE - HIGHLY CONFIDENTIAL

that to which they contributed writing or editing.  That is what I meant by collaborating.

Q.    And for those portions of the report whether Cornerstone staffers contributed writing, did you subsequently edit and otherwise assure yourself that those portions of the report respected your own opinions?

A.    Yes, I edited and reviewed every single line of this report.  This is my report in every respect.

MR. YAVITZ:  Thanks, I have no further questions.

MS. GILDEN:  I have no further questions either.  Professor, I want to thank you very much for your time and testimony today.

MR. YAVITZ:  I'll add my thanks. I just want to designate this testimony today highly confidential for the record.

THE WITNESS:  Thanks so much for your time.

                GARMAISE - HIGHLY CONFIDENTIAL

THE VIDEOGRAPHER:  If it's okay with counsel, I'll close out the video record.

We're off the record at 2:48 p.m. EST and this concludes today's testimony given by Mark Garmaise.  The total number of media units used was four and will be retained by Veritext.

(Time noted:  2:49 p.m.)

_____

MARK GARMAISE


Subscribed and sworn to before me this _____ day of _____, 2023.


_____
              Notary Public

# ERRATA SHEET

**CASE:**  *Sheet Metal Workers' Nat'l Pension Fund, et al.* v. *Bayer AG, et al.*, Case No. 3:20-cv-04737-RS (N.D. Cal.)

**DEPOSITION DATE:**  March 9, 2023

**DEPONENT:**  Mark Garmaise

| PAGE:LINE | ORIGINAL | CORRECTED | REASON |
|---|---|---|---|
| 15:23 | my page | my report | Transcription error |
| 29:24 | I will notice | I will note | Transcription error |
| 45:5 | on financing | on the financing | Transcription error |
| 45:16 | with the bank | with a bank | Transcription error |
| 51:13 | fraud in the market | fraud on the market | Transcription error |
| 59:13 | I don't have a legal expertise | I don't have the legal expertise | Transcription error |
| 72:9 | form the basis alone of the conclusion | form the basis alone for a conclusion | Transcription error |
| 76:8 | an events study | an event study | Transcription error |
| 80:23–25 | the question I'm taking up in the report is had Mr. Coffman proposed | the question I'm taking up in the report is has Mr. Coffman proposed | Transcription error |
| 81:3–4 | theory of liability, he has not. | theory of liability? He has not. | Transcription error |
| 81:10–12 | of measuring post alleged corrective disclosure in price drops, | of measuring post alleged corrective disclosure price drops, | Transcription error |
| 82:18–19 | chooses his comparison, at least news dates, is not consistent | chooses his comparison least news dates is not consistent | Transcription error |
| 85:13–14 | nature and extent that bears due diligence | nature and extent of Bayer's due diligence | Transcription error |
| 89:13–14 | Bayer's ADRs, the out-of-pocket methodology | Bayer's ADRs. The out-of-pocket methodology | Transcription error |
| 91:14–15 | my opinion as a financial economist and whether or not | my opinion as a financial economist on whether or not | Transcription error |
| 93:24–94:2 | one cannot be said to have proposed damages methodology | one cannot be said to have proposed a damages methodology | Transcription error |
| 95:7–8 | There may be conversations that differ | There may be considerations that differ | Transcription error |
| 95:18 | one potential approach of which | one potential approach, which | Transcription error |

| PAGE:LINE | ORIGINAL | CORRECTED | REASON |
|---|---|---|---|
| 100:22–23 | was to review and assess whether Mr. Coffman's proposed methodology | was to review and assess whether Mr. Coffman proposed a methodology | Transcription error |
| 108:22 | methodology, if one were to rely upon | methodology. If one were to rely upon | Transcription error |
| 113:22 | potential but for disclosure | potential but-for disclosure | Transcription error |
| 114:8–9 | that a constant percentage and the inflation model | that a constant percentage inflation model | Transcription error |
| 115:4 | classified damages methodology | class-wide damages methodology | Transcription error |
| 115:6 | that he isn't. | that he hasn't. | Transcription error |

Page 122

C E R T I F I C A T E

STATE OF NEW YORK        )

                         : ss.

COUNTY OF NASSAU         )


        I, CATHI IRISH, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

        That MARK GARMAISE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

        I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of March, 2023.

        _____
        CATHI IRISH, RPR, CRR, CLVS

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.