# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>          Defendants. | Case No.: 3:20-cv-04737-RS |

**Supplemental Report of Cristian Zarcu**
April 3, 2023

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................... 1

II.     PROF. MITTS'S NEW ANALYSES OF PLAINTIFFS' TRADES RELY ON A
        MISUNDERSTANDING OF THE RECORD AND ADR TRADING PRACTICES ...... 2

        A.      June 6, 2016 Purchases by SMW and Local 710..................................................... 3

        B.      August 2, 2016 Purchases by SMW and Local 710.................................................. 7

        C.      December 8, 2016 Purchases by SMW and Local 710............................................ 8

        D.      November 17, 2016 Purchase by IUOE.................................................................. 11

        E.      February 22 and 23, 2017 Purchases by IUOE..................................................... 13

        F.      May 26 and May 27, 2020 Purchases by IUOE..................................................... 14

        G.      June 3 and June 4, 2020 Purchases by IUOE........................................................ 17

        H.      June 23, 2020 Purchase by IUOE ......................................................................... 19

        I.      February 14, March 27 and October 18, 2018 Purchases by SMW ..................... 21

III.    PROF. MITTS'S PROPOSED METHODOLOGY CANNOT BE APPLIED ON A
        CLASS-WIDE BASIS............................................................................................ 22

IV.     CONCLUSION...................................................................................................... 23

## I.    INTRODUCTION

1.    I previously submitted the Rebuttal Report of Cristian Zarcu, dated February 3, 2023, Dkt. No. 151-29 (the "Zarcu Report"), and provided expert testimony in this matter on March 8, 2023, Dkt. No. 164-4.  In the Zarcu Report, I offered the following opinions:

a.    First, I concluded that there is insufficient evidence to conclude that plaintiffs Sheet Metal Workers' National Pension Fund ("SMW"), International Brotherhood of Teamsters Local No. 710 Pension Fund ("Local 710"), and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("IUOE," and together with SMW and Local 710, "Plaintiffs") incurred irrevocable liability to take and pay for any of their Bayer ADR purchases in the United States.  As to all but three ADR purchases alleged by Plaintiffs—for which the record is insufficient to reach any well-supported conclusion—trading records show that Plaintiffs purchased Bayer ordinary shares outside the United States for immediate conversion to Bayer ADRs, thus incurring liability to take and pay for each ADR order abroad.[1]

b.    Second, I concluded that it is not possible to determine on a class-wide basis whether members of the proposed class incurred irrevocable liability to take and pay for their individual ADR purchases in the United States, because the analysis turns upon an individualized inspection of trading communications and records.[2]

2.    Counsel to Defendants have asked me to respond to the new opinions offered and the new evidence discussed in the Rebuttal Expert Report of Professor Joshua Mitts, Ph.D. on Plaintiffs' Motion for Class Certification, Dkt. No. 164-1 (the "Mitts Reply").

3.    For the reasons discussed in this supplemental report, I disagree with the new opinions offered in the Mitts Reply, which are based on a flawed understanding of well-established trading practices and conventions, the record, and my prior report.  As such, I have concluded that the opinions offered in my prior report remain valid.  *See* Part II.

---

[1] Zarcu Report ¶ 15.

[2] Zarcu Report ¶ 16.

4.      In addition, following Prof. Mitts's formulation of a new methodology in the Mitts Reply, I have re-evaluated my opinion concerning the class-wide resolution of whether liability for ADR purchases was incurred domestically.  As discussed below, I have concluded that Prof. Mitts's proposed methodology cannot be applied on a class-wide basis, because it requires individualized review of trading records.  *See* Part III.

5.      The analysis and conclusions offered in this supplemental report are based upon my decades of experience as a securities trader and head of multiple trading desks, my education, my experience in performing similar analyses, the information, documentation, facts, and data as set out in Appendix B to the Zarcu Report and Appendix A to this report, and accepted and reliable methodologies, principles, and approaches.  This includes (a) my expertise in assessing the obligations of broker-dealer customers, developed over decades across many trading positions—including my current role—in which it was critical to understand when my counterparties and I were obligated to take and pay for securities;[3] and (b) my understanding of the specialized language, norms, and conventions of the ADR trading markets, developed through my professional experience in those markets.[4]

6.      I have performed the analysis contained in this supplemental report with the information presently available to me.  I reserve the right to amend and/or supplement this analysis and report should additional or updated information become available.

## II.    PROF. MITTS'S NEW ANALYSES OF PLAINTIFFS' TRADES RELY ON A MISUNDERSTANDING OF THE RECORD AND ADR TRADING PRACTICES

7.      Prof. Mitts's opening report discussed only 7 of Plaintiffs' 21 ADR purchases. My rebuttal report analyzed the relevant communications and records for each trade and explained the basis for my opinion that irrevocable liability to take and pay was incurred outside

---

[3] I previously discussed this experience at my deposition.  *See* Zarcu Dep. Tr., Dkt. No. 164-4, at 321-22.

[4] *See id.* at 326.

the United States for at least 18 of Plaintiffs' 21 purchases.[5]  The Mitts Reply analyzes 10 of the trades that Prof. Mitts did not previously address, concluding that irrevocable liability to take and pay for each was incurred in the United States.  Prof. Mitts's new opinions suffer from fundamental errors that undermine his analysis of each trade.

### A.    June 6, 2016 Purchases by SMW and Local 710

8.    In my prior report, I detailed the documentary record demonstrating that on June 6, 2016, SMW's and Local 710's investment manager Harding Loevner submitted an ADR purchase order to Macquarie, instructing the broker to execute the order by acquiring 577,938 Bayer ordinary shares overseas and converting those shares to ADRs through the depositary bank BNY Mellon.  Based on my experience as a securities professional transmitting, receiving, and executing ADR trades, I concluded that SMW and Local 710 were obligated to take and pay for their portion of this ADR order immediately upon Macquarie's execution of the underlying purchase of foreign shares overseas.[6]

9.    With respect to Local 710, the Mitts Reply does not appear to take issue with my description of the sequence of communications that resulted in the execution of the June 6, 2016 purchase.  Instead, Prof. Mitts (a) claims that my opinion is "baseless" because Macquarie's

---

[5] Prof. Mitts takes issue with my adoption of the term "irrevocable liability," which featured prominently in his opening report.  *See generally* Mitts Opening Report, Dkt. No. 141-2 (employing the term "irrevocably liability" 36 times and presenting three opinions with reference to it).  As I explained at deposition, I understand and use the term "irrevocable liability to take and pay" to refer to an investor's obligation to take and pay for securities without any right of cancellation.  *See* Zarcu Dep. Tr. at 320-21.  Understanding this point of obligation was an essential part of my job as a trader for many years—simply put, to operate as a trader, a securities professional needs to know when he and his counterparty have committed to a trade.

[6] Zarcu Report ¶¶ 26-37.  I previously noted that this type of cross-market trade is referred to in the industry as a "cross" transaction.  That nomenclature is confirmed by the record in this case, where the traders conducting the relevant transactions repeatedly referred to them as "cross" trades. *See, e.g.*, Ex. Z-26 to Zarcu Report (HJ-0002400), Dkt. No. 152-30, at 18, 42.  In his reply, Prof. Mitts observed that such transactions may not fall within various competing definitions of the term "cross transaction" adopted by regulators in other contexts.  Mitts Reply ¶¶ 37-43.  That is correct, but irrelevant to my opinion, which is based on market practices and norms concerning the specific type of cross-market trade at issue here, which I refer to as a "cross" transaction following industry convention.

"Terms and conditions of investment business" provide that "order instructions may be cancelled 'if we have not acted upon them'";[7] and (b) suggests that my opinion is incorrect because the transaction did not involve a "market order."[8]  Neither of these critiques is valid.

10.     *First*, Prof. Mitts has misunderstood the relevant portion of Macquarie's terms and conditions, which provides:

> If, after instructions are received, we believe it is not reasonably practicable to act upon such instructions within a reasonable time, we may (a) defer acting upon those instructions until it is, in our reasonable opinion, practicable to do so, or (b) notify you that we are refusing to act upon such instructions. We can only cancel instructions if we have not acted upon them. Instructions may only be withdrawn or amended by you with our consent. We shall not be liable for any losses resulting from such deferral, cancellation, amendment or refusal.[9]

Based on my experience as a securities professional who routinely reviewed such brokerage terms and conditions, Prof. Mitts has misread the document.  The guidance quoted above limits the right of Macquarie ("we") to cancel instructions under circumstances where *Macquarie* concludes that it is "not reasonably practicable to act upon" those instructions; it does not expand the circumstances in which a *client* can cancel a trade.

11.     In any event, even if Prof. Mitts's understanding of the quoted passage were correct, it would not impact my opinion, because Macquarie had clearly "acted upon" Local 710 and SMW's ADR order once it committed over $58 million to execute the order through the purchase of overseas shares.  Macquarie's posted terms and conditions thus do not purport to alter the trading conventions described in my prior report, under which Local 710 and SMW became obligated to take and pay for their ADRs upon the purchase of the underlying shares.

---

[7] Mitts Reply ¶ 64 (citing Macquarie, *Terms and conditions of investment business* (May 2022), https://www.macquarie.com/assets/macq/about/disclosures/macquarie-bank-limited-terms-of-business.pdf).

[8] *Id.* ¶¶ 64-69.

[9] Macquarie, *Terms and conditions of investment business*, https://www.macquarie.com/assets/macq/about/disclosures/macquarie-bank-limited-terms-of-business.pdf.

12.     *Second*, Prof. Mitts's discussion of whether the transaction involved a "market order" both misunderstands that term and misstates its relevance.  A market order is simply "an order to buy or sell a security at the prevailing market price," without any price limit.[10]  Prof. Mitts is correct that "[g]enerally, this type of order will be executed immediately"[11]—but that is only because market liquidity will "generally" permit rapid execution for small, retail orders.  For large orders, it is commonplace for traders to couple a market order with an instruction to distribute the transaction over the course of the day.  That is what happened in nearly all of the trades alleged by Plaintiffs.[12]  If, on the other hand, a trader requires a market order to be filled immediately, then he or she will typically include an "Immediate-or-Cancel" instruction.[13]

13.     Prof. Mitts is thus mistaken in asserting that immediate execution is the litmus test for whether a trade involves a "market order."  Contrary to his assertion, a "market order" can be placed before the market opens, and can be executed over the course of a trading day.  Indeed, that is exactly what happened in the *Stoyas* v. *Toshiba Corp.* case, where the order in question was submitted before the open of trading in Japan with an instruction to "work over the 1st half of day."[14]  But even if Plaintiffs had submitted limit orders, it would not make a difference— because once their brokers executed those orders by purchasing shares overseas, Plaintiffs were committed to take and pay for the ADRs they had ordered at the price that had been achieved

---

[10] SEC, *Special Study:  Report Concerning Display of Customer Limit Orders* (May 4, 2000), available at https://www.sec.gov/news/studies/limitorder.htm.

[11] Mitts Reply ¶ 66.

[12] *See, e.g.*, Ex. Z-5 to Zarcu Report (HL-002732), Dkt. No. 152-9 ("Please work OTD Max 20%"); Ex. Z-7 to Zarcu Report (HL-002729), Dkt. No. 152-11 ("Please work OTD Max 20%"); Ex. Z-13 to Zarcu Report (HL-002731), Dkt. No. 152-17 ("OTD 15-20% MAX").

[13] *See* SEC, *Investor Bulletin:  Understanding Order Types* (July 12, 2017), available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_ordertypes (discussing order types).

[14] Exhibit G to Declaration of Eric Grannon, *Stoyas* v. *Toshiba Corp.*, No. 2:15-cv-04194 (C.D. Cal.), ECF No. 114-8.  Prof. Mitts suggests that my discussion of *Toshiba* "draws on nonpublic evidence."  Mitts Reply ¶ 13 n.18.  The record is public, quoted in my prior report, and was presented to Prof. Mitts at deposition.  Mitts Dep. Tr. at 282.  He has decided not to address it.

(plus fees). Accordingly, as I concluded in my opening report, Plaintiffs' trades are economically indistinguishable from the trade at issue in *Toshiba*.

14. With respect to SMW's June 6, 2016 ADR purchase, Prof. Mitts does not offer any specific analysis beyond a broad assertion that all of SMW's transactions were "executed by Morgan Stanley," rather than the brokers indicated on Harding Loevner's internal communications.[15] While Prof. Mitts does not provide any support for this claim, it appears to be based on a mistaken understanding of Morgan Stanley's role in the trades alleged by SMW.

15. Contemporaneous trading records indicate that Morgan Stanley's involvement in the trade began *after* execution of the overseas purchase, when it was designated as a "step-out" beneficiary.[16] Contrary to Prof. Mitts's assumption, this step-out designation does not confer an operational role in trade execution. Instead, step-outs allow the executing broker to allocate credit for a trade *after* execution has taken place, often in recognition of prior research or analysis performed by the step-out beneficiary. As FINRA has explained:

> A step-out allows a member to allocate all or part of a client's position from a *previously executed* trade to the client's account at another broker-dealer. In other words, a step-out functions as a client's position transfer, rather than a trade; there is no exchange of shares and funds and no change in beneficial ownership.[17]

Though step-outs can be reported to FINRA, the designated brokers do not execute the order.[18]

16. Morgan Stanley's status as a step-out beneficiary is thus irrelevant to SMW's trade execution, and so is irrelevant to the question of when and where SMW became obligated to take and pay for its ADRs. Morgan Stanley's irrelevance is demonstrated not just by the total

---

[15] Mitts Reply ¶ 76.

[16] *See* MACQ_0000091.

[17] FINRA, *Trade Reporting Frequently Asked Questions – Section 301: Reporting Step-Outs*, available at https://www.finra.org/filing-reporting/market-transparency-reporting/trade-reporting-faq#301 (emphasis added).

[18] While step-outs thus shed no light on where and when the client becomes obligated to take and pay for its ADRs, they can impact settlement, in circumstances where the beneficiary broker undertakes an alternate settlement arrangement to deliver ADRs following execution.

absence of contemporaneous communication between Harding Loevner and Morgan Stanley, but also by the economics of the transactions.  Significantly, notwithstanding Prof. Mitts's contention that different brokers executed SMW's and Local 710's trades, both Plaintiffs paid the *same* price per ADR for their June 6, 2016 purchases—equal to Macquarie's average overseas acquisition price for ordinary shares, plus foreign exchange fees and transaction costs charged by BNY Mellon in connection with the ADR conversion.

17.    Accordingly, for the reasons stated in this section and in my prior report, my opinion remains that Local 710 and SMW incurred an irrevocable obligation to take and pay for their June 6, 2016 purchases outside the United States.

**B.    August 2, 2016 Purchases by SMW and Local 710**

18.    In my prior report, I detailed the documentary record demonstrating that on August 1, 2016, Harding Loevner submitted an ADR purchase order on behalf of SMW and Local 710 to Instinet, instructing the broker to execute the order by acquiring 367,447 Bayer ordinary shares overseas and converting those shares to ADRs through BNY Mellon.  Based on my experience as a securities professional transmitting, receiving, and executing ADR trades, I concluded that SMW and Local 710 were obligated to take and pay for their portion of this ADR order immediately upon the execution of the underlying purchase of foreign shares overseas.[19]

19.    With respect to Local 710's August 2, 2016 purchase, Prof. Mitts's analysis relies entirely on "terms of business" published by Instinet, which he describes as providing that "an order is cancellable so long as it has not been fully executed 'on the Execution Venue to which it was routed.'"[20]  The relevant portion of the terms and conditions reads as follows:

---

[19] Zarcu Report ¶¶ 39-48.

[20] Mitts Reply ¶ 71 (citing Instinet, *Terms of Business* (Sept. 2018), available at https://www.instinet.com/sites/default/files/public/documents/IEL_Terms_of_Business.pdf).

> In the event that the Client wishes to terminate the processing of unexecuted Orders, it can endeavour to do so by cancelling the Orders through the Electronic Service or by calling the relevant trading desk. For the avoidance of doubt, an Order (or part thereof) cannot be successfully cancelled on the Execution Venue to which it was routed if Instinet receives (partial or full) execution(s) of that Order and the Client shall be liable for the portion of the Order so executed.[21]

20.     Prof. Mitts again misunderstands the brokerage guidance.  This passage does not purport to expand a client's ability to cancel a transaction.  Instead, it sets out the procedure through which a client can "endeavour to" cancel an "unexecuted Order[]," while specifying "[f]or the avoidance of doubt" a non-exclusive circumstance in which orders *cannot* be cancelled.  Instinet's posted guidance thus does not alter the trading conventions described in my prior report, under which Local 710 and SMW became obligated to take and pay for their ADRs upon the purchase of the underlying Bayer ordinary shares overseas.

21.     Prof. Mitts is silent concerning SMW's August 2, 2016 purchase.  To the extent his blanket disagreement with my conclusions is premised on Morgan Stanley's status as a "step-out" beneficiary, he is mistaken.  Accordingly, for the reasons stated in this section and in my prior report, my opinion remains that Local 710 and SMW incurred an irrevocable obligation to take and pay for their August 2, 2016 purchases overseas.[22]

**C.     December 8, 2016 Purchases by SMW and Local 710**

22.     In my prior report, I detailed the documentary record demonstrating that on December 8, 2016, Harding Loevner submitted an ADR purchase order on behalf of SMW and Local 710 to Instinet, instructing the broker to execute the order by acquiring 243,245 Bayer ordinary shares overseas and converting those shares to ADRs through BNY Mellon.  Based on my experience as a securities professional transmitting, receiving, and executing ADR

---

[21] *See* Instinet, *Terms of Business* (Sept. 2018), available at https://www.instinet.com/sites/default/files/public/documents/IEL_Terms_of_Business.pdf.

[22] Prof. Mitts offers the same analysis for Local 710's December 18, 2017 ADR purchase and is likewise silent concerning SMW's purchase of that date.  Accordingly, the Mitts Reply does not disturb my opinion concerning those trades, for the reasons stated in this section and above.

transactions, I concluded that SMW and Local 710 were obligated to take and pay for their portion of this ADR order immediately upon the execution of the underlying purchase of foreign shares overseas.[23]

23.     As I explained in my prior report, due to a two-day delay in BNY Mellon's issuance of new ADRs to Instinet, the broker temporarily borrowed existing ADRs to deliver to Harding Loevner.[24]  The Mitts Reply argues that this commonplace settlement arrangement is "implausible," because (a) "[t]he issuance of ADRs is straightforward"; and (b) there is accordingly no reason why "only 23,400 of the 243,245 ADRs—9.6%—[would] settle on time, while the other 90+% were subject to a 'delay in ADR issuance.'"[25]  Prof. Mitts's critique reflects a misunderstanding of both my report and the basic mechanics of ADR issuance.  I have not opined that "only 23,400" of the ADRs in Harding Loevner's order issued by the settlement date.  BNY Mellon records indicate that no ADRs from the trade were issued to Instinet until December 16, 2016.[26]  In other words, 100% of the ADR issuance was delayed.  Nor is Prof. Mitts correct in his assertion that issuance of ADRs is "straightforward," a claim for which he cites no pertinent evidence and with respect to which he has no apparent experience.[27]  In my extensive experience arranging ADR issuances, the process cannot even begin until delivery of the underlying shares and can then be delayed by weeks due to a range of technical impediments.

---

[23] Zarcu Report ¶¶ 60-67.

[24] *See id.* ¶ 66.  The Mitts Reply mischaracterizes this as a concession that SMW and Local 710 "purchased existing Bayer sponsored ADRS on the domestic market."  Mitts Reply ¶ 8.  While it appears that SMW and Local 710 ultimately *received* existing ADRs upon settlement, they became obligated to take and pay for those ADRs overseas.

[25] Mitts Reply ¶ 75.

[26] BNYM000001.

[27] As support for his understanding of the ADR issuance process, Prof. Mitts cites a confirmatory exchange between Hardman Johnston and a broker concerning IUOE's November 17, 2016 ADR purchase, which he presents as evidence that "the process can be coordinated with three short Bloomberg messages spanning just a single minute."  Mitts Reply ¶ 75.  "Coordination" is not the same thing as issuance.  BNY Mellon records indicate that the ADR issuance for that trade took place on November 30, 2016.  *See* BNYM000001.

24.     The Mitts Reply separately argues that Harding Loevner's order for 243,245 ADRs was not issued on behalf of SMW or Local 710, but other unnamed clients. As to SMW, Prof. Mitts asserts that Morgan Stanley was the executing broker. As discussed above, Prof. Mitts has mistaken an allocation of "step-out" credit with trade execution, negating his analysis.

25.     With respect to Local 710's December 8, 2016 purchase, Prof. Mitts argues that I have "not identif[ied] any direct evidence indicating that [its] ADRs were part of the larger purchase of 243,245 ADRs."[28]  The record shows that Plaintiffs' investment manager Harding Loevner purchased a large block of ADRs on the alleged date at the alleged price, down to the fourth decimal point. Prof. Mitts's suggestion that Instinet simultaneously but separately executed a smaller trade at the exact same price is completely implausible—not only does it lack any support in the record, it would require Instinet to violate its duty of best execution.

26.     Resisting the obvious explanation—Local 710's purchase of ADRs for $99.2994 per unit was part of its investment manager's much larger purchase of ADRs for $99.2994 per unit at the same time—Prof. Mitts offers an elaborate story based on a misinterpretation of FINRA and DTCC records. According to Prof. Mitts, FINRA records show that before the open of U.S. markets on December 9, 2016, Berenberg Capital Markets LLC executed a "large sale of 238,753 Bayer sponsored ADRs."[29]  This purportedly prompted "a series of 'step out' transactions by Instinet on the morning of December 9, whereby Instinet allocated the execution of the purchase of 191,253 existing Bayer sponsored ADRs to a variety of U.S. broker dealers."[30]

27.     There are several problems with this analysis. First, the Berenberg transaction was not a sale, but instead a cross transaction, with Berenberg on both sides of an internal transaction reported to the tape as a bookkeeping matter.[31]  Second, the "step out" trades

---

[28] Mitts Reply ¶ 78.

[29] Mitts Reply ¶ 79.

[30] Mitts Reply ¶ 81.

[31] FINRA000005 at Line 116448 (the "Rptd Side Cd" is marked as "X," indicating a cross, rather than "S" for sale).

referenced by Prof. Mitts are linked not to Berenberg's internal trade, but instead to Instinet's underlying execution of Harding Loevner's order for 243,245 ADRs. For example, Prof. Mitts highlights FINRA data showing a 28,002 ADR step-out transaction reported by Convergex, which he says was linked to the Berenberg "sale." In fact, there is unassailable evidence that these 28,002 ADRs were part of the larger block of 243,245 ADRs executed by Instinet: Step-out instructions sent by Harding Loevner to Instinet after the execution directed the executing broker to allocate step-out credit for 28,002 of the newly issued ADRs to Convergex.[32]

28.    Accordingly, for the reasons stated in this section and in my prior report, my opinion remains that Local 710 and SMW incurred an irrevocable obligation to take and pay for their December 8, 2016 purchases outside the United States.

**D.    November 17, 2016 Purchase by IUOE**

29.    In my prior report, I reviewed contemporaneous communications between IUOE's investment manager Hardman Johnston and brokers at Bank of America Merrill Lynch ("BAML") concerning IUOE's November 17, 2016 purchase of Bayer ADRs. Based on my analysis of those communications and related records, I concluded that Hardman Johnston instructed BAML to acquire those ADRs through the purchase and conversion of overseas shares, and thus that IUOE was irrevocably obligated to take and pay for its ADRs as of the moment when BAML purchased Bayer ordinary shares in the overseas market.[33]

30.    While Prof. Mitts does not deny that IUOE acquired its ADRs through overseas purchase and conversion, he has adopted a different reading of the relevant communications. Under that interpretation, Prof. Mitts concludes that "even after BAML had already purchased Bayer foreign shares, the purchase of Bayer sponsored ADRs using those foreign shares was expressly conditioned on [Hardman Johnston's] further agreement."[34] Prof. Mitts derives this

---

[32] INSTINET000036.

[33] Zarcu Report ¶¶ 79-84.

[34] Mitts Reply ¶ 86 (emphasis omitted).

understanding from the following exchange:

| 11:29AM ET | BAML | John, You Bought 24,730 BAYRY@ $97.605 Local Price=€91.47795 FX=1.06665 Conversion Cost=$.03/share I will put the ADR fill in once you agree |
|---|---|---|
| 11:30AM ET | Hardman Johnston | Looks good to me |
| 11:30AM ET | BAML | Thx john, going in now on ADR |

31.    Prof. Mitts's reading of this passage ignores critical context and misunderstands the nature of BAML's inquiry.  The full record of the trade communication reflects that at 10:55AM ET, BAML acknowledged receipt of a purchase order for 24,730 Bayer ADRs.[35] BAML responded: "Will finish the 150k *then do the manual locals for the ADR amount* and average together."[36]  Thus, when BAML received Hardman Johnston's ADR order, it had yet to purchase the Bayer ordinary shares intended for conversion.  BAML then completed Hardman Johnston's supplemental purchase order over the next twenty-five minutes.  At this point, following the execution of the underlying Bayer ordinary share purchases, Hardman Johnston had committed to take and pay for its ADR order based on the prevailing market price for foreign-exchange and ADR conversion fees.

32.    After completing the overseas purchase of additional Bayer ordinary shares for conversion to ADRs, BAML then messaged to confirm the foreign exchange and conversion cost, in the messages highlighted above.  However, in my experience as a securities professional who has conducted thousands of equivalent transactions, BAML's inquiry was *not* an opportunity for Hardman Johnston to cancel the transaction altogether.  Rather, BAML was simply confirming that Hardman Johnston agreed with its assessment of the market rate for the associated fees.  This was not an opportunity to cancel the ADR conversion itself, but to correct any errors in the calculation of the foreign exchange and conversion costs.

[35] *See* Ex. Z-26 to Zarcu Report (HJ-0002400) at 4 ("thanks … see[ ]the 24730 ADR ticket").

[36] *Id.* (emphasis added).  Hardman Johnston did not produce the referenced ticket.

33.    Accordingly, for the reasons stated in this section and in my prior report, my opinion remains that IUOE incurred an irrevocable obligation to take and pay for its November 17, 2016 purchase outside the United States.

**E.    February 22 and 23, 2017 Purchases by IUOE**

34.    In my prior report, I examined contemporaneous communications between IUOE's investment manager Hardman Johnston and brokers at JP Morgan Securities (JPMS) concerning IUOE's February 22 and 23, 2017 purchases of Bayer ADRs.  Based on my analysis of those communications and related records, I concluded that Hardman Johnston instructed JPMS to acquire ADRs through the purchase and conversion of overseas shares, and thus that IUOE was irrevocably obligated to take and pay for its ADRs as of the moment when JPMS purchased Bayer ordinary shares in the overseas market.[37]

35.    Relying upon FINRA records, Prof. Mitts claims that Hardman Johnston's communications with JPMS are irrelevant, and that, instead, IUOE's February 2017 purchase orders were fulfilled by JPMS through the acquisition of existing ADRs from Citigroup Global Markets in two transactions:  (a) a purchase of 67,225 ADRs for $113.70 per unit on February 22; and (b) a purchase of 39,475 ADRs for $111.35 per unit on February 23.[38]

36.    Prof. Mitts has misinterpreted the FINRA records, which instead support my conclusion.  As Prof. Mitts concedes, IUOE has certified that it purchased Bayer ADRs at a unit price of $113.7895 on February 22 and $113.1612 on February 23.[39]  This precisely matches the cross transactions reported to FINRA by JPMS, which I relied upon in my report.[40]  JPMS also

---

[37] Zarcu Report ¶¶ 86-90.

[38] Prof. Mitts also takes issue with the fact that linked ADR issuances settled on March 2, 2017, which he says is inconsistent with the prevailing T+3 settlement timing.  Mitts Reply ¶ 91.  This overlooks the fact that ADR settlement could not begin until the purchase of Bayer ordinary shares settled.  As such, the settlement timeline for this cross transaction—and many others— was extended.  As discussed in my prior report and above, this is why Plaintiffs' brokers occasionally borrowed ADRs to accelerate delivery on previously executed orders.

[39] *See* Dkt. No. 47 at 169.

[40] Zarcu Report ¶ 89 (citing FINRA000001).

entered trades with Citigroup that day, but at different prices—indeed, the February 23 purchase cited by Prof. Mitts took place at a price nearly $2 per ADR lower than what IUOE has certified. Prof. Mitts offers no explanation for his belief that JPMS resold those shares to IUOE at a substantial markup.

37.     The account presented in my prior report is far more plausible.  As with all of IUOE's trades, Hardman Johnston made the rational decision to execute its ADR order through the overseas purchase and conversion of Bayer ordinary shares.  Contrary to Prof. Mitts's inference, Hardman Johnston's acquisition of hundreds of thousands of Bayer ordinary shares on February 22 and February 23 was not a coincidence, but yet another example of this same practice.[41]  Accordingly, for the reasons stated in this section and in my prior report, my opinion remains that IUOE incurred an irrevocable obligation to take and pay for its February 2017 purchases overseas.

**F.     May 26 and May 27, 2020 Purchases by IUOE**

38.     In my prior report, I reviewed contemporaneous communications between IUOE's investment manager Hardman Johnston and brokers at UBS London (UBS), UBS trading records, and BNY Mellon records concerning IUOE's May 26 and May 27, 2020 ADR purchases.  Based on my analysis of those documents, I concluded that Hardman Johnston instructed UBS to acquire ADRs through the purchase and conversion of overseas shares, and thus that IUOE was irrevocably obligated to take and pay for its ADRs as of the moment when UBS purchased Bayer ordinary shares in the overseas market.[42]

---

[41] Prof. Mitts also asserts that "the terms of business of JPMorgan Securities provides that open orders are cancellable until executed."  Mitts Reply ¶ 90.  In fact, the terms cited by Prof. Mitts provide only that "open orders . . . will remain in effect until executed or cancelled," without purporting to alter the market convention for order cancellation or define the circumstances under which an order is considered "open."  *See* J.P. Morgan, *Terms of Business for Professional Clients*, available at https://www.jpmorgan.com/content/dam/jpm/global/disclosures/by-region/terms-of-business-professional-clients.pdf.

[42] Zarcu Report ¶¶ 92-101.  As noted in my prior report, BNY Mellon records show that the issuance of ADRs to UBS was delayed until June 2, 2020—several days after the May 28 settlement date for IUOE's purchase—resulting in UBS borrowing ADRs to ensure timely

39.     The Mitts Reply again adopts a contrary interpretation of the trade communications, focusing on a key communication in which the Hardman Johnston trader instructed UBS that he was going to convert approximately 15% of a purchase of Bayer ordinary shares to ADRs.[43]  Prof. Mitts argues that because UBS and Hardman Johnston postponed further discussion on the details of this ADR order while UBS was executing the underlying purchase of ordinary shares overseas, Hardman Johnston had no obligation to follow through with the ADR conversion.  But such deferral is typical among traders—particularly traders who repeatedly conduct similar transactions.  While the record is less than complete, my opinion— based on long experience in equivalent trades—is that securities professionals in the position of the Hardman Johnston and UBS traders would have understood Hardman Johnston to have placed an order for ADRs prior to the overseas purchase of Bayer ordinary shares.

40.     Moreover, it is not necessary to rely solely on an analysis of trade communications.  As discussed in my prior report, further evidence of Hardman Johnston's ADR order is provided in the trade records produced by UBS, which show that Hardman Johnston executed an order for 212,400 ADRs on May 26 at the exact price alleged by IUOE ($16.8392 per ADR).[44]  In an attempt to discredit this evidence, Prof. Mitts argues that 212,400 ADRs represents the conversion of "*47.2%* of the 450,000 [Bayer ordinary] shares purchased on May 26."[45]  This criticism is based on an elementary error.  Bayer ADRs have traded at a four-to-one ratio to underlying shares since 2017.[46]  212,400 ADRs corresponds to 53,100 Bayer ordinary shares—a figure that matches the purchase instruction communicated by Hardman Johnston.

---

settlement.  *See* Zarcu Report ¶ 97.  Prof. Mitts argues that this account is implausible, again based on his misunderstanding of both my report and the complexities of ADR issuance.  *See* Mitts Reply ¶ 100.

[43] Ex. Z-26 to Zarcu Report (HJ-0002400) at 19 ("i am going to have a portion, ~15%, that upon completion I will be converting back to ADR's").

[44] Zarcu Report ¶ 95 (citing UBS000001).

[45] Mitts Reply ¶ 99 (emphasis in original).

[46] *See* Bayer AG, *ADR Program*, available at https://www.bayer.com/en/investors/adr-program.

41.     FINRA records also report a cross transaction by UBS for 212,400 ADRs on May 26, 2020 at the exact price alleged by IUOE.[47]  Prof. Mitts does not address this FINRA evidence.  Instead he argues that "[c]learing and trading records show that UBS Securities filled orders to purchase 71,190 Bayer sponsored ADRs on May 26" by purchasing "80,000 existing Bayer sponsored ADRs from ICAP Corporates LLC."[48]  But Prof. Mitts's only authority for his claim about ICAP Corporates is a FINRA record reporting a transaction at the wrong price ($16.91 vs. $16.8392) that nowhere mentions UBS as a counterparty.[49]  In fact, Prof. Mitts concedes in a footnote that he cannot actually link this record to IUOE's purchase, opining without support that it "is also possible [the ADRs] were acquired [from an unidentified seller] on the share lending market."[50]

42.     As for IUOE's follow-on May 27, 2020 transaction, Prof. Mitts points only to DTCC records indicating that UBS borrowed 87,300 ADRs from itself on May 29, 2020.[51]  Again, Prof. Mitts cannot explain UBS records reflecting an order from Hardman Johnston for 217,200 ADRs on May 27, 2020, as well as FINRA records in which UBS reported a cross transaction for the same amount on the same date at the exact price alleged by IUOE ($16.974 per unit).[52]  BNY Mellon records indicate that no corresponding ADRs were issued to UBS until June 2.  This delay in ADR issuance explains UBS's decision to settle through internal borrowing of existing ADRs.

43.     Accordingly, for the reasons stated in this section and in my prior report, my opinion remains that IUOE incurred an irrevocable obligation to take and pay for its May 26 and May 27, 2020 purchases outside the United States.

---

[47] FINRA000011.

[48] Mitts Reply ¶ 101.

[49] FINRA000011.

[50] Mitts Reply ¶ 101 n.154.

[51] Mitts Reply ¶ 103.

[52] UBS000001.

**G.      June 3 and June 4, 2020 Purchases by IUOE**

44.      In my prior report, I reviewed contemporaneous communications between IUOE's investment manager Hardman Johnston and brokers at Cowen, Cowen trading records, and BNY Mellon records concerning IUOE's June 3 and June 4, 2020 purchases of Bayer ADRs. Based on my analysis of those documents, I concluded that Hardman Johnston instructed Cowen to acquire ADRs through the purchase and conversion of overseas shares, and thus that IUOE was irrevocably obligated to take and pay for its ADRs as of the moment when Cowen purchased Bayer ordinary shares in the overseas market.[53]

45.      Once again, Prof. Mitts disputes this conclusion based on a misunderstanding of the underlying trade communications and brokerage records.  As for the June 4, 2020 transaction, Prof. Mitts argues that Hardman Johnston did not confirm its order for 94,978 Bayer ADRs until after the underlying foreign shares "had already been acquired."[54]  This is contradicted by the relevant portion of the chat transcript, reproduced below[55]:

| 7:06AM ET | J. Hufcut | can I send u some BAYRY to take overseas and combine with the local for an avg, then convert? |
|---|---|---|
| 7:06AM ET | K. Joyce | Yes sir |
| 7:08AM ET | K. Joyce | Buying additional 23745, makes 201,735 ords on day between both tix |
| 7:08AM ET | J. Hufcut | agreed |
| 7:53AM ET | K. Joyce | Will FX as per ticket splits .... Ord avg on total: +201,735 BAYN.GY for 63.3572 EUR. Will keep 177,990 for Ords, and FX 23745 for 94,978 BAYRY |
| 8:01AM ET | J. Hufcut | Thank u sir |
| 8:34AM ET | K. Joyce | Bot 94978 BAYRY for 17 .8819 |

46.      As reflected in this transcript, Mr. Hufcut of Hardman Johnston asked at 7:06AM if he could "send [Cowen] some BAYRY to take overseas and combine with the local for an avg,

[53] Zarcu Report ¶¶ 103-13.

[54] Mitts Reply ¶ 107.

[55] Ex. Z-26 to Zarcu Report (HJ-0002400) at 34-36.

then convert"—indicating his intention to transmit an ADR order ticket. While neither Cowen nor Hardman Johnston produced this order ticket, Mr. Joyce copied the quantity from that ticket into the chat minutes later, indicating that Cowen would be buying an "*additional* 23745." After Mr. Hufcut verified Mr. Joyce's calculation of the total purchase quantity ("agreed"), Mr. Joyce executed the "additional" purchase of Bayer ordinary shares, reported back the average price achieved that day ("Ord avg on total . . . 63.3572 EUR"), and advised Mr. Hufcut that Cowen would convert consistent with Hardman Johnston's order for 94,978 ADRs ("Will FX as per ticket splits . . . 23745 for 94,978 BAYRY").[56]

47.     As discussed in my prior report, these contemporaneous communications are confirmed by Cowen's internal records, which show a purchase order for 94,978 ADRs being allocated from a Cowen "flip" account to 153 Hardman Johnston client accounts, including IUOE, on June 4, 2020.[57] These records exactly match the date, price, and quantity of the trade alleged by IUOE. Prof. Mitts does not dispute any of this, save to quibble over whether the Cowen records indicate that the underlying purchase was a "Market" or "Limit" order.[58] I agree that the Cowen records are obscure on this point, with multiple conflicting entries. But that does not matter. The trade communications themselves make clear that Hardman Johnston submitted an order for ADRs to be executed at the market price through overseas purchase and conversion. And the Cowen records confirm that the order was executed consistent with this instruction. As I opined in my prior report, IUOE was committed to take and pay for its ADRs once the underlying ordinary shares were purchased in this cross transaction.[59]

---

[56] *Id.*

[57] *See* Zarcu Report ¶ 106.

[58] Mitts Reply ¶ 108.

[59] The Mitts Reply also asserts the "terms and conditions applicable to Cowen & Co. clients provide that open orders are cancellable until executed or expired." Mitts Reply ¶ 105. Prof. Mitts does not cite any language in Cowen's published terms to support this conclusion. My review of the document has identified none. *See* Cowen and Company, *Client Brokerage Terms and Conditions* (Aug. 2021), available at https://s33007.pcdn.co/wp-content/uploads/2021/09/Cowen-and-Co-Global-Terms-and-Conditions-8.26.2021.pdf.

48.    As for the June 3, 2020 transaction, Prof. Mitts relies solely on tenuous and unreliable tracing of clearing records.  Prof. Mitts notes that on June 5, 2020, Cowen received 126,053 ADRs from the National Securities Clearing Corporation (NSCC), and 148,039 ADRs of 240,687 ADRs transferred through the NSCC that day came from parties other than BNY Mellon.  Based on these facts alone, Prof. Mitts opines that it is "reasonable to infer that the 126,053 ADRs transferred to Cowen consisted of existing Bayer sponsored ADRs."[60]

49.    Prof. Mitts does not even cite the relevant clearing records, let alone explain the basis for his opinion that they shed light on when and where IUOE committed to purchase its ADRs.  Meanwhile, as discussed in my prior report:  (a) Cowen records show that it executed a purchase order from Hardman Johnston for 119,992 Bayer ADRs on June 3, 2020, with a price and allocation to IUOE exactly corresponding to IUOE's alleged trade; (b) FINRA records indicate that Cowen reported a cross trade for 119,992 Bayer ADRs at the same price on June 3, 2020; and (c) BNY Mellon records reflect that the depositary bank issued 119,992 ADRs on June 5, 2020, the trade settlement date.[61]  All of this points to Cowen executing an ADR order through the purchase and conversion of shares overseas.  Prof. Mitts offers no alternate explanation.

50.    Accordingly, for the reasons stated in this section and in my prior report, my opinion remains that IUOE incurred an irrevocable obligation to take and pay for its June 3 and June 4, 2020 purchases outside the United States.

### H.    June 23, 2020 Purchase by IUOE

51.    In my prior report, I reviewed contemporaneous communications between IUOE's investment manager Hardman Johnston and brokers at UBS, UBS trading records, and BNY Mellon records concerning IUOE's June 23, 2020 purchase of Bayer ADRs.  Based on that analysis, I concluded that Hardman Johnston instructed UBS to acquire ADRs through the purchase and conversion of overseas shares, and thus that IUOE was irrevocably obligated to

---

[60] Mitts Reply ¶ 110.

[61] Zarcu Report ¶ 108.

take and pay for its ADRs when UBS purchased ordinary shares abroad.[62]

52.    Prof. Mitts concedes that IUOE's June 23, 2020 purchase was filled through the delivery of newly issued ADRs, but provides an alternate interpretation of the trading communications between Hardman Johnston and UBS.  According to Prof. Mitts, Hardman Johnston "did not even mention ADRs prior to completing the purchase of 500,000 Bayer foreign shares" and then sought "confirmation" regarding the ADR order "three times."[63]

53.    Prof. Mitts's first observation is accurate but irrelevant.  As reflected in the trade communications, following the purchase of 536,289 Bayer ordinary shares, Mr. Hufcut of Hardman Johnston sent a series of messages at 11:23AM indicating that he had transmitted an ADR order ticket to Colleen Murphy of UBS.[64]  UBS's internal records confirm this, showing an order from Hardman Johnston for 364,810 ADRs (corresponding to 91,202 Bayer ordinary shares) at 11:22AM that day.[65]  After receiving this instruction, UBS executed purchases for an additional 255,503 Bayer ordinary shares for Hardman Johnston, of which 91,202 shares stemmed from the ADR order.[66]

54.    According to Prof. Mitts, this record does not supply sufficient information to answer "the obvious question:  If Mr. Hufcut was obligated to convert foreign shares to ADRs, how many was he obligated to convert."[67]  But the answer is straightforward—91,202 shares, the ADR order amount reflected in UBS's records.  And that is exactly the amount that UBS converted and delivered to Hardman Johnston to fulfill IUOE's order.

55.    Prof. Mitts's further analysis of the contemporaneous trade communications

---

[62] Zarcu Report ¶¶ 115-20.

[63] Mitts Reply ¶ 111.

[64] Ex. Z-26 to Zarcu Report (HJ-0002400) at 53 ("I just sent the ADR portion to Colleen [Murphy of UBS] / to work with u on creating a manual ticket for one avg before the conversion").

[65] UBS000001.

[66] Ex. Z-26 to Zarcu Report (HJ-0002400) at 53-56.

[67] Mitts Reply ¶ 112.

reflects his lack of relevant experience in the industry.  The Mitts Reply argues that UBS sought "four distinct confirmations" of Hardman Johnston's ADR order.[68]  None of these communications were confirmations.  They simply show UBS traders updating Hardman Johnston on the execution of its ADR order[69] and soliciting its preference on trade documentation.[70]  It is customary and expected for traders to update their clients continuously on the status of execution—as can be seen in many of the other trades analyzed in my prior report.  And while UBS sought guidance concerning how Hardman Johnston wanted the trade to be *documented*, none of that changes the fact that Hardman Johnston had submitted an order for 364,810 Bayer ADRs to be fulfilled through the purchase of 91,202 ordinary shares—and that this order become irrevocable when the underlying shares were then purchased.  Accordingly, for the reasons stated in this section and in my prior report, my opinion remains that IUOE incurred an irrevocable obligation to take and pay for its June 23, 2020 purchase overseas.

## I.  February 14, March 27 and October 18, 2018 Purchases by SMW

56.    In my prior report, I concluded that there was insufficient information to conclude whether SMW incurred irrevocable liability to take and pay for its February 14, March 27, and October 18, 2018 purchases in the United States.[71]  Prof. Mitts responds by citing FINRA and DTCC records pertaining to transactions between Morgan Stanley and several third parties.[72]

57.    As discussed above, there is no evidence to indicate that Morgan Stanley was the

---

[68] Mitts Reply ¶ 113.

[69] Mitts Reply ¶ 113 ("Bought 791,792 BAYN GY@ 72.8661 in total today ( part FIX, part manual)"); *id*. ("EU FIX amended:  BOUGHT 700,590 BAYN GR@ 72.8661"); *id*. ("Colleen will be moving the below to ADRs: BOUGHT 91,202 BAYN GR@ 72,8661"); *id.* ("Hey John, just printed you on the ADR, details below: FX: 1.13252 Conv Fee: 3.86c (50K@ 3c and Balance @ 4c)").

[70] Mitts Reply ¶ 111 (citing UBS's request for guidance concerning whether Hardman Johnston wanted its trading ticket to reflect the average price paid for all Bayer ordinary shares that day); *id.* (citing UBS explanation that multiple tickets may be required to document trade).

[71] Zarcu Report ¶ 122.

[72] Mitts Reply ¶¶ 115-20.

executing broker (as opposed to step-out beneficiary) for *any* of SMW's trades.  Indeed, Prof.

Mitts can (and does) point to equivalent FINRA and DTCC records in connection with ADR

purchases where brokerage records clearly establishes that Instinet, Macquarie, and other brokers

executed the transaction for SMW through overseas purchase and conversion.  Accordingly,

without any record of how SMW's trade orders in 2018 were transmitted and implemented, there

is insufficient evidence to determine whether the FINRA and DTCC records cited by Prof. Mitts

reflect "step-outs," alternate settlement arrangements, or actual domestic transactions.

### III.    PROF. MITTS'S PROPOSED METHODOLOGY CANNOT BE APPLIED ON A CLASS-WIDE BASIS

58.    In my prior report, I concluded that it was not possible to determine on a class-

wide basis whether individual investors incurred irrevocable liability to take and pay for their

Bayer ADRs in the United States, because the inquiry necessarily requires an individualized

review of trade communications.[73]  The Mitts Reply proposes a new methodology for analyzing

irrevocable liability, which I have analyzed to determine whether it can be applied on a class-

wide basis.[74]  I conclude that it cannot.

59.    Prof. Mitts's new methodology has two steps:

> Step 1: Did the Bank of New York Mellon's ADR custodial account supply the ADRs which were transferred to the purchaser's custodial account? If so, the purchaser bought newly issued ADRs (proceed to step 2). If not, irrevocable liability was incurred in the United States because the purchase consisted of an existing ADR on the domestic market. FINRA trading records also show if the transaction was an ordinary sale between broker-dealers rather than

---

[73] Zarcu Report ¶¶ 123-28.

[74] Mitts Reply ¶ 30.  Prof. Mitts contrasts this "methodology" with my purported lack of a methodology.  Mitts Reply ¶ 21.  While Prof. Mitts has now chosen to formulate his approach as a two-step analysis, our approach is the same:  Both Prof. Mitts and I simply reviewed available records to assess the point of obligation.  Nor is Prof. Mitts correct that, under my analysis, "the only relevant question is whether a security is a newly issued ADR."  Mitts Reply ¶ 26.  For example, I agree with Prof. Mitts that if a domestic broker executed an ADR order by converting a prior inventory of ordinary shares into new ADRs, then liability for the transaction would be incurred domestically.  Mitts Reply ¶ 28  That hypothetical was not presented in this case, so I had no occasion to address it.

a custodial transfer of newly issued ADRs from the Bank of New York Mellon (which are not reported on FINRA trading records).

Step 2: If the purchaser bought newly issued ADRs, did the purchase of foreign shares automatically trigger the purchase of ADRs, such that the purchaser was "logically and legally bound" to take ADRs upon buying foreign shares? This condition could be satisfied by an ADR execution occurring simultaneously with the purchase of foreign shares or other records indicating that the ADR conversion was automatically triggered by the purchase of the foreign shares rather than subject to additional approval.

60.    "Step 1" of this methodology does not supply a tool for class-wide resolution of irrevocable liability, because it incorrectly assumes that whenever clearing records suggest that an investor received an existing ADR, that investor necessarily traded in the United States.  As discussed above and in my prior report, however, the circumstances of settlement are often uninformative, because delays in ADR issuance may lead brokers to seek alternate settlement arrangements for ADR orders executed through overseas purchase and conversion.

61.    "Step 2" of this methodology is even more problematic.  In it, Prof. Mitts acknowledges that there are a range of circumstances in which purchasers of newly issued ADRs are "'logically and legally bound'" to take ADRs upon buying underlying foreign shares—a key concession to a central point of my analysis—but proposes that these circumstances can be identified through a review of unspecified "records."  As reflected by the extensive expert submissions compiled in this litigation, the analysis subsumed within Step 2 cannot be undertaken en masse—it requires detailed investigation of trading and brokerage records by an individual with suitable expertise in the shorthand, norms, and practices of ADR traders.

62.    Accordingly, I conclude that Prof. Mitts's proposed methodology cannot resolve on a class-wide basis whether the proposed class members incurred irrevocable liability to take and pay for their ADRs in the United States.

## IV.    CONCLUSION

63.    For the reasons stated above, my opinions and conclusions as stated in the Zarcu Report remain unchanged.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of April, 2023

Cristian Zarcu

# Appendix A

## **Documents Considered**

### **Discovery Materials**

1. INSTINET000013-000048

2. MACQ_0000003-0000129

### **Deposition Transcripts**

1. Transcript of Deposition of Cristian Zarcu, Dkt. No. 164-4

### **Materials Previously Filed with the Court**

1. Rebuttal Expert Report of Professor Joshua Mitts, Ph.D., Dkt. No. 164-1

### **Other Publicly Available Documents**

1. Bank of America Securities, *General Terms & Conditions of Business for Professional Clients and Eligible Counterparties* (Mar. 2023), available at https://business.bofa.com/content/dam/boamlimages/documents/articles/ID17_1174/bofaml_general_terms_and_conditions_for_business.pdf

2. Cowen and Company, *Client Brokerage Terms and Conditions* (Aug. 2021), available at https://s33007.pcdn.co/wp-content/uploads/2021/09/Cowen-and-Co-Global-Terms-and-Conditions-8.26.2021.pdf

3. FINRA, *Trade Reporting Frequently Asked Questions – Section 301: Reporting Step-Outs*, available at https://www.finra.org/filing-reporting/market-transparency-reporting/trade-reporting-faq#301

4. Instinet, *Terms of Business* (Sept. 2018), available at https://www.instinet.com/sites/default/files/public/documents/IEL_Terms_of_Business.pdf

5. J.P. Morgan, *Terms of Business for Professional Clients*, available at https://www.jpmorgan.com/content/dam/jpm/global/disclosures/by-region/terms-of-business-professional-clients.pdf

6. Macquarie, *Terms and conditions of investment business* (May 2022), https://www.macquarie.com/assets/macq/about/disclosures/macquarie-bank-limited-terms-of-business.pdf

7. SEC, *Special Study:  Report Concerning Display of Customer Limit Orders* (May 4, 2000), available at https://www.sec.gov/news/studies/limitorder.htm

8. SEC, *Investor Bulletin:  Understanding Order Types* (July 12, 2017), available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_ordertypes