Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, CHIEF JUDGE

| | | |
|---|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, And INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) | NO. 20-cv-04737-RS |
| Plaintiffs, VS. | ) ) ) | |
| BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL, Defendants. | ) ) ) ) ) ) ) | San Francisco, California Thursday, April 13, 2023 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street
14th Floor
New York, New York  10005
**BY:  BENJAMIN F. JACKSON, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Plaintiffs:

COHEN MILSTEIN SELLERS & TOLL PLLC
190 South LaSalle Street
Suite 1705
Chicago, Illinois  60603
BY:  **CAROL V. GILDEN, ESQ.**

BERMAN TABACCO
425 California Street
Suite 2300
San Francisco, California  94104
BY:  **ALEXANDER S. VAHDAT, ESQ.**

For Defendants:

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
BY:  **NOAH B. YAVITZ, ESQ.**
     **EMILY ROSE BARRECA, ESQ.**

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105
BY:  **JORDAN ETH, ESQ.**

**Thursday, April 13, 2023**                    **1:30 p.m.**

                **P R O C E E D I N G S**

        **THE COURTROOM DEPUTY:**  Calling Case 20-CV-4737, Sheet Metal Workers National Pension Fund versus Bayer.

    Counsel, please state your appearances.

        **MR. JACKSON:**  Good afternoon, Your Honor.  Ben Jackson from Cohen Milstein Sellers & Toll PLLC on behalf of the lead plaintiffs and additional named plaintiff, and then my colleagues, Carol Gilden also from Cohen Milstein, Alex Vahdat from Berman Tabacco.

        **THE COURT:**  Good afternoon.

        **MR. YAVITZ:**  Good afternoon, Your Honor.  Noah Yavitz from Wachtell, Lipton, Rosen & Katz for the defendants.  I'm here today with my colleague, Emily Barreca and --

        **MR. ETH:**  Good afternoon, Your Honor.  Jordan Eth for defendants.

        **THE COURT:**  Good afternoon.

    Well, we're here on the question of class certification.  I read through what you provided for me, but why don't I let the moving party, plaintiffs, in the discussion.

        **MR. JACKSON:**  Thank you, Your Honor.

    Class actions are virtually always the fairest and most efficient way to litigate federal securities fraud claims.  And this case is no exception.  It's actually a straightforward, run-of-the-mill, Section 10(b) case about domestic securities.

And defendants concede that nearly all of the requirements for class certification are met here.  They only raise a few narrow challenges to typicality and predominance, all of which fail.

So first, let's talk about typicality.  The plaintiffs' claims here are typical of the class.  They will be proven using the same evidence, they arise from the same facts, they invoke the same legal theories, they'll be subject to the same defenses.

**THE COURT:**  You seem to make much about this existing ADRs, and if there's a lack of supply then there are new ADRs, and that those who are acquiring these investment vehicles are going to be in a different -- different posture.

**MR. JACKSON:**  Yes.  So, let's unpack that, that is an excellent question, Your Honor.  So there is a distinction between existing ADRs and new ADRs.  Let's talk about what that is.

So the way that Bayer's ADR program works is that there are two ways you can acquire a Bayer ADR.  You can either in a preceding transaction acquire foreign shares, bring them to the Bank of New York Mellon in New York which then converts them into ADRs.  And that's a transaction that happens in the United States, the counterpart is the Bank of New York Mellon type transfers in the United States.

The other way is to --

THE COURT:  They say the transaction is really the acquisition of the shares in Germany.  Correct?

MR. JACKSON:  Well, it's important here to remember that ADRs and the foreign shares that underlie them are separate and distinct securities.  And this has been recognized in the case law.  For example, the Third Circuit's decision in *Pinker versus Roche*.  Title to those two securities is distinct; the transactions are distinct.

And so even though in order to obtain a new ADR you first have to go acquire foreign shares in Germany, that doesn't mean you bought ADRs in Germany.  It just means that it's a preceding transaction that you need to undertake before --

THE COURT:  I understand.  You're saying that, the third prong being title transfer, if we follow the Second Circuit then Ninth Circuit *Toshiba* decision, the transfer wouldn't be possible until the -- while the shares have been acquired; they have then, if you will, morphed into ADRs at the Bank of New York Mellon.

MR. JACKSON:  Correct.

THE COURT:  Yes.

MR. JACKSON:  Yes.  So you have two separate transactions.

So let's say I instruct my broker, I go to my broker and I say:  I want to acquire ADRs.  The broker can then fill that transaction one of four ways.

So one way is it goes to the U.S. over-the-counter market and it buys an existing ADR.  The second way is they can fill it from its inventory of existing ADRs.

The third way is it can do a step out to another broker where that broker gets to choose how to execute the transaction.  And then the fourth way is to go acquire foreign shares in Germany, and then bring them to the Bank of New York Mellon in New York, which then converts them to ADRs.

Now, as Mr. Zarcou, the defendant's expert, stated at his deposition, all these transactions are cancelable until they are fully executed.

And in the case of an ADR's purchase, that means that it is cancelable.  Irrevocable liability has not been incurred until the transaction is complete.  And the transaction for a newly-issued ADR is not complete until the Bank of New York Mellon does that conversion in the United States, in New York. In title transfers in New York.

As for existing ADRs, just to also take a step back here for one second, the existing ADRs constitute 83 to 87 percent of the class's transactions in this case.  It's 83 percent according to Mr. Zarcou, the defendant's expert; it's 87 percent according to our expert Professor Mitts.  Regardless of which expert you credit, it's an overwhelming majority of the class's transactions.

And even under the defendant's theory of this case, those

transactions don't raise any extra-territoriality concerns. There's no need to engage in any kind of class-member-by-class-member transaction-by-transaction analysis, because there's no preceding foreign share purchase for --

THE COURT:  Right.  So I take it it's your theory that, at worst, we would be excluding about 15 percent or so of your proposed class.  And that, in your mind, would be the worst scenario that would be the possible result here.  Even though I know you say that I shouldn't exclude the new -- the ADRs that are created in -- before transfer.

MR. JACKSON:  Exactly.  And just to bear in mind here, the plaintiffs in this case purchased both new and existing ADRs.  So even if the defendants are successful with their extra-territoriality defense, their claims will survive, in any event.

And then as to the issue of predominance, just to take a step back here, the only way that there would be a predominance issue here would be if it were impossible or if it would require class-member-by-class-member transaction-by-transaction analysis to identify which purchases were of new ADRs and which purchases were of existing ADRs.  And we have proposed a methodology that does just -- that does -- that is able to do that without engaging in class-member-by-class-member transactions.

So Professor Mitts' methodology is able to identify which transactions were new ADRs and which were existing, using data and documents that have been produced by the DTCC, which maintains clear records, and FINRA, which maintains trading records.  And those records have already been produced for the entire class period for the entire class's transactions.

And Professor Mitts' methodology can look at that data and determine which purchases were of new ADRs, which, according to defendant's theory, are the only ones that raise the extra territoriality concerns and which, according to defendant's theory -- which we do not agree with -- all of those transactions are extra-territorial because they are all preceded by foreign share purchases.

So there's no predominance issue here, because we can determine exactly which transactions fall under which category on a class-wide basis using what is essentially common proof.

And it's worth also keeping in mind here, the plaintiffs here are American investment funds.  And they invested with American investment managers who then, in turn, placed orders with American brokers, who then went out and bought Bayer American depositary receipts from either the Bank of New York Mellon or from other sellers on the U.S. over-the-counter market.

There's no reason why any of these transactions really occurred outside the United States.  There would be no reason

why the Court would have to apply Section 10(b) outside the United States in this case.

And the reason they were able to do that is because Bayer actually contracts with the Bank of New York Mellon to establish a market in the United States for Bayer securities, denominated in American currency.  The whole point of Bayer's sponsored ADR program is to entice U.S. investors to invest in Bayer by enabling them to do that without engaging in foreign transactions.

And through this program, Bayer gets to tap the U.S.'s deep capital markets.  And U.S. investors get to acquire ownership stakes in Bayer without having to engage in stock transactions in Germany, or without having to buy Euros, and plus they get the benefit of the U.S. federal securities laws and investor protections.  That's the whole point of this program.

And so, you know, that's precisely the reason why courts in cases like *Vancouver v. Daimler* or *In Re Volkswagen Clean Diesel* have held that sponsored ADRs don't raise extra-territoriality concerns.

And by the way, both of those cases are right on point here.  They both concern the Level 1 over-the-counter ADRs issued by a corporation based in Germany.  It's exactly the same as Bayer's situation.  There's just no reason why the plaintiff's transactions here are atypical because they're

extra-territorial.

And now, just, I wanted to address a few of the defendants's predominance arguments, because I think it's also important to keep those in mind.

Now, just as a reminder, predominance doesn't mean that there are no individualized inquiries that are required.  It doesn't mean that we will necessarily prevail on every issue at trial.  It just means that common issues predominate over individualized inquiries.  It means that the class-member-by-class-member inquiries, to the extent they are required at all, will not overwhelm the common issues and make this case unmanageable.

And the defendants -- we've shown that.  And the defendants's attacks on predominance all fail here.  They make three major attacks.  I would like to address them each in turn.

THE COURT:  Sure.

MR. JACKSON:  One, as we discussed earlier, there is no reason to believe that individualized inquiries concerning extra-territoriality will predominate over the common inquiries in this case.

Again, the overwhelming majority of the class's transactions, 83 to 87 percent, were of existing ADRs.  Which, under defendants's theory, don't raise any extra-territoriality concerns.  And as to the purchase of newly-issued ADRs,

defendants contend all of these purchases were extra-territorial.

So all we need to be able to do to avoid a predominance issue is to identify a methodology that distinguishes between new and existing. Professor Mitts' methodology does that.

Second, as to the defendants' attacks on the out-of-pocket damages model, it's worth keeping in mind the out-of-pocket model is the gold standard for securities fraud damages. It's virtually always used in virtually every Section 10(b) case.

The courts have rejected *Comcast* challenges to the out-of-pocket model that defendants -- like defendants challenge here, in 86 decisions around the country, and counting. And we have cited those in the Gilden reply declaration, Exhibit F.

Ultimately what the defendants' critique here boils down to also is that we haven't done a loss-causation analysis. We haven't specified exactly how we're going to calculate artificial inflation. But that's a merits question. It's not a question that we need to address in class certification, as the Supreme Court held in *Halliburton I*.

And also, as to the basic presumption, the defendants argue that we're not entitled to the basic presumption of reliance. Just to take a step back, the way that the basic presumption works is to show entitlement to the presumption, we just have to show the market for the securities at issue was

efficient during the class period.

And what that means is the stock, the ADR price, rapidly incorporated public material news and relevant information. And, we've done that. And to rebut that showing, the defendants must prove a lack of price impact. But they don't offer any evidence of lack of price impact.

Professor Garmaise said at his deposition that he wasn't offering an opinion on it in this case. It's not present in Professor Garmaise's report. Defendants don't argue there is a lack of price impact in the brief. They simply haven't done that.

So as long as we show that there is some evidence of market efficiency, we're entitled to the basic presumption. And we've done that. The defendants don't dispute that ten out of the 12 factors that courts have identified for market efficiency have been satisfied for the entire class period. They also don't contend that the market for Bayer ADRs was inefficient at any point during the class period. And that's all we need. That's why we win on that issue.

Now, the defendants do raise a challenge to a 14-trading-day period during the class period. That's 14 out of the 1,037 days in the class period. They say one of the factors out of the 12 cuts in their direction for that 14-trading-day period.

And the reason why is they say that during that period,

the evidence indicates that there was an arbitrage opportunity. You could have -- there was an arbitrage opportunity between the Bayer ADRs and Bayer ordinary shares.

And what the lack of arbitrage opportunity factor measures is -- the whole idea for that factor is that in an efficient market, if you have two securities that are equivalent to each other, their prices should track each other's.  And if one of the prices -- or both of the prices, for some reason -- they're not -- they're mispriced, that's evidence of inefficiency.

But the problem with this 14-trading-day period is that during that period there were various reasons why Bayer ADRs and ordinary shares weren't exactly equivalent to each other. During that period the ADR-holders were going to receive a cash distribution that would not be paid to ordinary shareholders. The ordinary shareholders had voting rights that the Bayer ADR-holders could not exercise.

There was a spike in short interest for one of the securities but seemingly not for the other.  I might be misstating that, but it's along those lines.

And there are various other temporary supply-and-demands dynamics that explain why those two securities weren't tracking each other during precisely that period.

And aside from the fact they weren't necessarily equivalent, what defendants would have to show for this factor is that one or both of the securities was mispriced.  That, for

some reason, it wasn't reacting to public news.  Usually you do that in securities cases by conducting what's called an "event study."  They haven't done that.

You would have to offer other evidence that one or both is mispriced, not just that the price is different.  They haven't done that.

And, in order to show that there was a lack of arbitrage, that there was -- I'm sorry -- an arbitrage opportunity, you'd have to show that for some reason traders weren't able to capitalize on this.  That there was some sort of restriction on trading.

THE COURT:  How does the burden function in this instance?  I mean, you're pointing towards the defendants, saying they haven't established this, that, and the other thing.

Is it their burden to do that at this stage?

MR. JACKSON:  Excellent question, Your Honor.  No, it's our burden.  It's a preponderance-of-the-evidence standard, of course, as the Ninth Circuit said in *Olean*.

But it's important to keep in mind that this is one of 12 factors.  So the other 11 factors cut in our favor for this 14-day period.  The defendants don't dispute ten of them.  They make an attack on our use of an event study which relates to *Cammer* Factor 5 but we can go into why that attack doesn't make much sense.

I just wanted to pause there to see if Your Honor has specific questions.

**THE COURT:**  No.

**MR. JACKSON:**  Okay.  So, as to that one other *Cammer* factor that the defendants have made an attack on, that's *Cammer* Factor 5, relates to event studies.  Studies that shows that the price of the security is reacting to news.

The defendants' expert, Professor Garmaise, makes two points.  His first point is that he believes that our expert selected the wrong control group of dates for his event study, and that that means that his event study isn't (Inaudible).

Now, the way that event studies work is you compare days where you know public material information is being released about the company.  Earnings announcements.  Things like that.  And you compare them to a control group where, ideally, no news is being released.  And then you use the differences between the two to see how the price is reacting to information.

The proper control group for an event study in the federal securities fraud context is a set of what's called "least used dates."  And the reason why you want to use those dates is they're dates where nothing relevant to the company or very little relevant to the company happens.

Professor Garmaise's preferred approach would be to use the entire rest of the class period.  Which makes no sense, because there are, of course, other days besides the earnings

announcement days or days where major things happen where other things that are relevant to the company have happened.  And it would contaminate the control group if you were to include them.

Professor Garmaise also critiques our event study for not predicting in which direction the price would move following the earning announcements.  But he -- what -- it's important to note what he doesn't say, which is that the price movement was inconsistent with what you would expect on any of the days.  And also, the literature that he cites does not say that you must specify a price direction for your event study.  So there's simply no reason why our event study is problematic, which shows that, in fact, 11 of the 12 factors are satisfied, even for that 14-trading-day period.

And I think another important thing to keep in mind here, again, just taking a step back, just going back to the top -- topic of new versus existing ADRs.  The way that a new ADR purchase really works is your broker goes to Germany, and buys foreign Bayer shares.  And it then brings them to Bank of New York Mellon.

Bank of New York Mellon, in a separate transaction, takes those foreign shares as consideration.  As the thing that you are buying the ADRs with.  And it then gives you newly-issued ADRs.

The title to those ADRs transfers in the United States.

The purchaser is located in the United States.  The seller is Bank of New York Mellon.  Everything about this transaction -- and also the broker terms and conditions in this case all specify that the transaction that you're engaged in is cancelable until it's fully executed.  And that's really what irrevocable liability means. it means you can't cancel it anymore.

So what really happened for those new ADR purchases is they were cancelable until they were fully executed, which happened in New York.  So there's simply no reason why there are actually any extra-territoriality issues here, at all.

**THE COURT:**  Okay.  Let me hear from the other side. And then you can come back if you need to.

**MR. JACKSON:**  Thank you, Your Honor.

**THE COURT:**  Mr. Yavitz.

**MR. YAVITZ:**  Thank you, Your Honor.

Your Honor, we recognize that federal courts generally, usually, certify classes for Section 10(b) claims.  But this is an unusual case.  And there's a really simple reason why.

Here, plaintiffs sent their brokers to Europe to buy Bayer ordinary shares for conversion into American depository receipts.  And it is those ADRs that they're now suing about.

And the only prior case to examine this kind of cross-border transaction found that it was extra-territorial, and thus, outside the scope of Section 10(b).  That's Judge

Pregerson's decision in *Toshiba*.

THE COURT:  Right.

MR. YAVITZ:  Where class certification was denied. And we think he got it right.

The reasoning of *Toshiba* and the record on this case --

THE COURT:  I don't get your argument to the extent -- Judge Pregerson, fine judge.  Another District Judge.  Okay. He was the first one to look at this, perhaps.

But the third prong, the title-transfer prong, I don't quite understand your argument that it's got extra-territorial problems.

MR. YAVITZ:  Understood.

THE COURT:  I just don't get it.

MR. YAVITZ:  Thank you.

THE COURT:  To be quite candid with you.

MR. YAVITZ:  Sure.  And, happy to address that.

So in our view that is the -- title transfer is the rule in the Second Circuit.  It is not the rule in the Ninth Circuit.

THE COURT:  Well, who says it shouldn't be the rule in the Ninth Circuit?

MR. YAVITZ:  The Ninth Circuit does.

THE COURT:  In what case?

MR. YAVITZ:  In *Toshiba*.  So --

THE COURT:  I don't think it says that in *Toshiba*.

**MR. YAVITZ:**  Well, when we look at *Toshiba*, what we see when we read the opinion is the Ninth Circuit was providing its definitive guidance on what the extra-territoriality -- how the standard should be in this circuit.

**THE COURT:**  Right.

**MR. YAVITZ:**  It canvassed the case law.  It looked at the Second Circuit rules.  It described the irrevocable liability test.

It then described -- and I'll -- I want to quote this because I think the language that it uses is very important. It noted the Second Circuit also found an alternative -- and I'll stress -- alternative means of alleging a domestic transfer, alleging that title to the shares was transferred in the United States.

But when it came time to announce the standard for the circuit, on the very next page of the opinion, the Court of Appeals did not adopt the alternative test.  It adopted the irrevocable liability test.  And if the court --

**THE COURT:**  They're not inconsistent.  Irrevocable liability, as your counterpart has just pointed out, is what we're looking to determine if it's there or not.  And one of the prongs in *Absolute Activist* is the title -- is title transferred within this country.  That's -- they're not -- by saying "irrevocable liability," they're not contradicting the three prongs in the Second Circuit opinion.

The Ninth Circuit does not say:  We reject the Second Circuit's formulation.

MR. YAVITZ:  That's correct.  The Ninth Circuit did not specifically reject passage of title.

THE COURT:  Right.

MR. YAVITZ:  It recognized there were three different ways to satisfy domesticity in the Second Circuit.

The first is the irrevocable liability test.  The second is the passage --

(Reporter clarification)

THE COURT:  Irrevocable liability you're using as a separate prong.  I don't think that's -- we're trying to determine when there's irrevocable liability.

MR. YAVITZ:  That's right.

THE COURT:  And you may do that with looking at various different ways in which that can occur.  It's not -- it's not transfer of title separate and apart from irrevocable liability, is it?

MR. YAVITZ:  Well, transfer of title is one of the factual circumstances that the Ninth Circuit looked at as one of the many factors for it.

THE COURT:  Right.

MR. YAVITZ:  But the irrevocable liability test, itself, it looks at when irrevocable liability to take and pay for the shares was incurred.  Which is different from when

title ultimately transferred.  It can be that -- it could be that passage of title ultimately sheds some light on when that irrevocable liability was incurred.

THE COURT:  Okay, fair enough.

MR. YAVITZ:  But, there are circumstances -- and this is what Judge Pregerson recognized -- in which one can take on an obligation, uncancellable obligation, put in an order with your broker that you cannot cancel, and that order can be executed, and thus consummated, overseas, with ultimate delivery and passage of title to happen in the United States.

THE COURT:  Do you agree we're talking now about the 15 percent of new ADRs?

MR. YAVITZ:  So --

THE COURT:  Or whatever the percentage is?

MR. YAVITZ:  We know -- we know that this impacts at least 13 percent of the class, which is some 90 million ADRs. The problem is identifying which portion of the class that --

THE COURT:  Well, they have a methodology to do that.

MR. YAVITZ:  Well, their methodology doesn't work, unfortunately.  That's what Mr. Zarcou considered in his report.

The issue with their methodology is it relies entirely on clearing.  It relies entirely on where the shares ultimately came from, at the end of the day.  Which -- where the ADRs came from, at the end of the day.

The problem with that analysis is, given the nature of these cross-border trades in which one tells one's broker "Go to Germany, buy the shares; I'll take the ADRs that come from them," there are circumstances -- and it seems to happen with some frequency, as we can see from the evidence here -- in which the ADR issuance process is delayed.  And so even though irrevocable liability was committed to overseas, through that "Go to Germany, buy it, and come back and I'll take it," even though that was overseas, ultimately the shares you get are existing ADRs.

And so even though it looks from clearing records as though you have received existing ADRs, in fact, your commitment happened overseas.

And so that's why the only way -- and you can see this in the granular analysis that both experts performed.  The only way to determine whether one is committed to an existing ADR or a new ADR is to actually look at the transactional records, and to actually look at the trade communications.

And there's many examples of this in plaintiff's charts. Examples where we have clear evidence that they went to their brokers and said "Create new ADRs for me.  Go to Germany.  Buy, buy Bayer shares for conversion."

But then ultimately, because the Bank of New York Mellon took too long to convert, you end up with borrowed shares, borrowed existing shares.  So that's why, in those

circumstances, you see Mr. Zarcou identifying errors in Professor Mitts' analysis where he has mistakenly believed that -- that what is -- what is a trade where irrevocable liability was incurred overseas is actually domestic.

So I want to touch briefly, though, on this, the three-prong point from *Toshiba*.  So -- to revisit it.

So the -- so *Toshiba* recognized that under *Absolute Activist* in the Second Circuit, there are three ways to establish that a trade is domestic.

The first is the irrevocable liability test which looks at where liability to take and pay for the shares was incurred.

The second, and separate -- and alternative as the Ninth Circuit described it -- test is a passage-of-title test, which looks solely at where title passed.  If title passed in the United States, that's sufficient under that test, which the Ninth Circuit did not adopt in *Toshiba*.

And the third, the third test is the predominantly foreign test.  This is actually a central focus and lead argument, it appears, in plaintiff's brief, is satisfaction of the predominantly foreign test.  Which the Ninth Circuit did specifically reject.  That was the test at issue in both the *Volkswagen* case and the *Vancouver* case that they cited.

And under the predominantly foreign test, it is a central question whether the comity considerations of *Morrison* and -- *Reyes* and *Morrison* have been satisfied.  In both of those

cases, those Volkswagen cases involving -- as Mr. Jackson described it, are exactly the same point.

The defendants conceded that they were domestic transactions.  They argued that because of the foreign flavor, essentially, of the trade, they should nevertheless be treated as extra-territorial.  And the courts in those cases, they rejected that argument.

We're not making that argument.  Because it's not the test in the Ninth Circuit.  The test is solely irrevocable liability.

So, I want to address one -- a couple other points.  One is this idea -- this idea that the true transaction at issue is the conversion of the foreign share into an ADR domestically that.  The actual trade involved here is dropping off a Bayer ordinary share at BNY Mellon's door, and then getting back an ADR.

I think that's -- it's not the theory that plaintiffs put in their complaint, certainly.  And I think it's a theory that is fundamentally incompatible with a Section 10(b) claim here, for a couple of reasons.  And I just wanted to unpack it, because we haven't had an opportunity to discuss this before.

So, first, it just should be noted that this is not something that has any basis in the actual expert testimony of their -- of Professor Mitts, of their expert.

He opined that irrevocable liability for a newly-issued

ADR is -- can be and may be -- may occur overseas in circumstances in which the overseas trade triggers a domestic trade.

So, but turning then -- turning to the Section 10(b) point. So, first, the fraud-on-the-market presumption doesn't really makes sense under this idea where the consideration for the trade is not the money that they alleged in their complaint, but actually a foreign share.

Under that framework, investors who receive ADRs, they weren't relying on the prevailing price of the ADR market. They were just exchanging one security, the Bayer ordinary share, for another security. The Bayer ADR. The underlying price of those securities was irrelevant to the transaction. It was just a one-for-one exchange at a fixed ratio.

Two, as the Ninth Circuit's observed, for fraud to be in connection with the purchase or sale of any security, it has to be done to induce the purchase at issue. If the purchase at issue is just this exchange, plaintiffs have no allegations, none, explaining how Bayer induced anyone to convert a Bayer ordinary share into an ADR.

And, and then you get to damages, where the wheels really fall off the bus. What loss did plaintiffs suffer from converting a Bayer ordinary share into an ADR? They allege nothing. Because they can't allege nothing. The transaction's completely reversible. ADR, you can always go back to BNY

Mellon and get your Bayer ordinary share back.

That's actually what happened to all of the ADRs at issue in this case for plaintiffs. They just converted them back to Bayer ordinary shares, and then sold them on the driven market.

**THE COURT:** So your argument that to get out from under the reaction you would expect, which is: We're not focused on proving item damages when we're at the class certification phase, your argument is, as I understand it, is you have to at least show some evidence of damage. And putting aside whether or not there may be difficulties in determining the precise damage amount, which would not defeat class cert, you're saying it's a more fundamental problem.

**MR. YAVITZ:** Absolutely. What I'm saying is if they had pleaded this in their complaint rather than pleading that these were over-the-counter transactions, we would have moved to dismiss as a matter of law on each of these bases. Because this -- this domestic exchange simply does not implicate Section 10(b) liability.

I want to turn just briefly to *Toshiba*, which is not a topic that I heard much in Mr. Jackson's presentation. And in particular, to Judge Pregerson's decision on remand.

So, I think it's important to note, first of all, that there's an argument that *Toshiba* is somehow distinguishable. That there's a difference because here there weren't market orders, and in *Toshiba* there were market orders.

The premise of that argument, as I understand it, which is mostly presented in Professor Mitts' reply report, the argument is that a market order has to be executed immediately, and therefore, that was the driving force behind the *Toshiba* decision.  This immediate execution.

But, in fact, the ADR order in *Toshiba* was submitted before the overseas market opened, with instructions to execute it over the course of the day, not immediately.  It was just like plaintiff's trades here.  And nothing in *Toshiba* suggests that it turned on the presence of a market order.

*Toshiba's* really on all fours here.  And unless Your Honor believes that *Toshiba*, on remand, did not fairly apply the Ninth Circuit standard for extra-territoriality, I think it, at least as a persuasive precedent, suggests a similar result.

**THE COURT:**  Again, that's all it is.  It's not more than that.

**MR. YAVITZ:**  Absolutely.

**THE COURT:**  So distinguishing it is -- is fine, and I understand that you -- you're saying that they failed in doing so.  But, it rises or falls on whether or not I agree with it.

**MR. YAVITZ:**  Absolutely.

**THE COURT:**  Yeah.

**MR. YAVITZ:**  I want to focus just for another -- because I think it seems like to be a central point, or at least it's evolved to be a central point in the presentation,

which was not necessarily evident from their reply.  Which is: How big of a problem is extra territoriality?

How big -- what portion of the class does it impact?  How does that interface with the predominance and typicality arguments?  And so, just to spend a moment on that.

I think it's fairly conceded, fairly well conceded that for the newly-issued ADRs, an individualized inquiry would be required.  For that 13 percent, those, you know, millions and millions of ADRs an individualized inquiry would be required.

The reason I say I think it's fairly well conceded is the methodology proposed by Professor Mitts requires an individualized inquiry for newly-issued ADRs.

And, I heard a characterization of the predominance standard, and how that fact will impact the economic standard. As I understand the evolution of Ninth Circuit law -- and it has been evolving on this point in the last two years -- there's been significant development in how the Ninth Circuit looks at predominance.

And I think -- we cited the *Olean* case which I think was an important development in that area, but we also just submitted a very recent decision from the Ninth Circuit.  This is the *Van v. LLR* case.  Or -- yeah, *LLR* case, which, I think is very instructive on how the Ninth Circuit is approaching this question.

So in *Van*, defendants have provided evidence undercutting

the claims of just a tiny, tiny portion of the class.  The District Court found that this was a *de minimus* problem.  And so it granted certification.  That grant was then vacated.

And the Ninth Circuit explained in *Van* that the *de minimus* standard rested on a misunderstanding of the Rule 23 inquiry.  Because the defendants in that case had invoked an individualized issue and (Inaudible) evidence that at least some class members lacked meritorious claims, they had shown that an inquiry into each class member might be necessary.  And that *de minimus* showing was enough.  In *Van*, it was just two out of 13,000.  That *de minimus* showing was enough to require plaintiffs to prove that, quote:

"Class-member-by-class-member assessment of the individualized issues will be unnecessary or workable."

In other words, if the Court finds any evidence at all that the class may include an extra-territorial trade, then the burden's on the plaintiffs to show that the inquiry will be workable.

Plaintiffs haven't come close to demonstrating that burden.

**THE COURT:**  With respect to the new.

**MR. YAVITZ:**  Well --

**THE COURT:**  Not with respect to the existing.  Right?

**MR. YAVITZ:**  Well, the problem is finding the needle

in the haystack.  The problem is distinguishing between the two.

THE COURT:  Well --

MR. YAVITZ:  If they had a methodology that could determine which is new and which is old, and if they were willing today to abandon that portion of the class, then it would follow that they've presented a class-wide resolution. But the issue is -- and we have had limited ability to test this because the methodology only really came up in reply.

The issue is that the methodology proposed, the clearing-record-focused -- the DTC-record-focused methodology that Professor Mitts has proposed cannot distinguish, cannot tell where plaintiffs -- where a plaintiff or investor undertook liability to take and pay for the share.

THE COURT:  Well, this is where the rubber meets the road in this case.  So let me just, on that point, hear back from the plaintiffs here.  And we'll go from there.

MR. JACKSON:  I'd first like to address --

THE COURT:  I want you to address that specific question.  Don't go back and tell me about other things. Address that question.

MR. JACKSON:  Sure, Your Honor.  I believe the question -- and Your Honor can explain if I've misunderstood it -- is:  Why does Professor Mitts' methodology work?

THE COURT:  Do you have a methodology --

**MR. JACKSON:**  Yeah.

**THE COURT:**  -- to make this a workable process of this determination?  That's the question.

**MR. JACKSON:**  Yeah.  Let me explain to you how Professor Mitts' methodology works, and then also why there are no issues with it, despite what Mr. Zarcou contends.

**THE COURT:**  Go ahead.

**MR. JACKSON:**  So the way that Professor Mitts' methodology works -- and this is laid out in Paragraph 30 in his rebuttal report, and also in his opening report in the paragraphs that are cited there -- is you look at the DTCC clearing records, and you see if the Bank of New York Mellon ADR custodial account supplied the ADRs to the purchaser's account.  That's how you tell if the purchase was of a newly-issued ADR.  Or if it's -- if it occurs that way, it's new.  If it did not, if the ADR was supplied by a different -- it was cleared from a different account, it's existing.

   Now, the reason that this approach works despite Mr. Zarcou's contentions is Mr. Zarcou's whole approach is what you would expect a trader to think.  That's what he is.  He looks at things that traders know how to look at.  He looks at Bloomberg charts.  He looks at emails.  He looks at the order confirmations.  But he never looked at the clearing records. And you might ask yourself:  Why is that?

   I think the answer is because he doesn't know how.  That's

the sort of thing a financial economist like Professor Mitts knows how to do.  It's not the sort of thing traders have experience with.

And the reason the clearing records are the most important thing to look at is because we've seen several examples of this in the case that Mr. Zarcou and Professor Mitts go back and forth on.

You may tell your broker:  You know, I'd like you to go buy Bayer foreign shares and then convert them to ADRs because I think that that's what's going to get me the best price.

But your broker doesn't actually have to do that.  The broker might instead, if it can get a better price by buying existing ADRs, do that.  I believe there's one example in this case, for example, where Mr. Zarcou says, well, they told their broker to go buy new ADRs.  And Professor Mitts says:  Well, yeah, but then a big block of existing ADRs came on the market, so the broker bought that instead.

The other way that the broker might fill the order is through a step out to another broker, for whatever reason. Another way they might do it is they might fill it from existing inventory.  The broker's job is to get the best price for its client.

So the way that you figure out what they ultimately did, which ADRs were ultimately acquired, is you look at the clearing records.  That's what tells you the answer.  You don't

-- their whole methodology is based on the beginning and the middle of the transaction.  It's based on what the broker was told to do, and it's based on whether they bought foreign shares.

Whether the purchaser actually wound up acquiring newly-issued ADRs, well, you figure that out from the DTCC records, and also from the FINRA records.

And I also just want to clarify one other point here.  The FINRA records serve as a check on the DTCC records.  So the -- if you have a newly issued ADR, those are not reported -- that doesn't show up in the FINRA data.  So you have a methodology to identify the new ADRs.  You have a check, that's how it works.

Now, Mr. Zarcou's methodology, if you want to talk about errors, okay, he didn't look at where title was transferred.  Even though the *Toshiba* decision from the Ninth Circuit identifies that as a relevant factor.

He didn't look at where the last two steps in executing an ADR purchase occurred, in New York.  Deposit of the shares and conversion.  At his deposition, he claimed that he didn't even know Bank of New York Mellon was based in New York.  He didn't consider that.

His methodology -- he didn't look at the broker terms and conditions that actually govern when the trade is cancelable.

His methodology fundamentally is:  I can't tell you how I

did it, but I know it when I see it.  That's not a methodology.
It is not something that is reliable.

And so those are the reasons why we have a model that can
actually do this in a reliable and testable and replicable way.

The other thing also to keep in mind about these DTCC and
FINRA records is that they have already been produced.  Like,
we have the records for the entire class's transactions for the
entire class period.

It is simply not the case that, going forward, this is
going to be the focus of the litigation, or that we're going to
have to do class-member-by-class-member discovery.

You know, it's a far cry from, for example, the *Van versus
LLR* case that the defendant submitted to Your Honor a few days
ago.  In that case what the Ninth Circuit said was:  Well, for
about 20 percent of the class, we're going to have to have --
we might have to have 13 or 14,000 depositions.  We might have
to spend months at trial on this.

This is going to be dealt with in, like, a couple days at
trial, at most.  So there's just simply no reason why it poses
an issue here.

**THE COURT:**  Your counterpart says if I simply reread
Judge Pregerson's decision in the Central District, I will be
swept away by its persuasive force.  Why is he wrong?

**MR. JACKSON:**  So there are several reasons why *Toshiba*
is problematic.  So the first --

**THE COURT:** *Toshiba II*.

**MR. JACKSON:** *Toshiba II*, I should say.  Or as it was referred to in a recent decision, *Toshiba III*.  It's very confusing.  But, *Toshiba II*.

So it's factually inapposite, and we have issues with the legal reasoning.  And I want to unpack both of those things.

So first, factually, it's about an unsponsored ADR. Unsponsored ADRs raise extra-territoriality concerns because the defendant company might have absolutely no involvement with the U.S. federal securities markets.

But the other crucial thing about *Toshiba II* is that it involved a market order for ADRs that couldn't even exist until you bought the foreign shares.  So let me explain that.

So a market order, in a nutshell, is I tell my borrower: I want to buy X number of ADRs at whatever the best price you can get me is.  So it's basically if there is liquidity in the market to meet, to match my order, it becomes binding essentially immediately.  The order executes immediately.

But what happened in the *Toshiba* case -- and you can see this in the Court's decision -- the Court called out that the plaintiff in that case could not have been liable to purchase non-existent ADRs.  It couldn't have been liable to buy ADRs that didn't exist.

In *Toshiba*, you had an unsponsored ADR.  And the -- the way that the transaction worked was there wasn't liquidity to

meet the market order.  So what had to happen was the broker had to go out and buy the foreign shares.  And then once it had acquired the foreign shares, the ADRs could be created.  So liability attached.  It's a very unique factual circumstance.

It's a far cry from this case, where --

**THE COURT:**  So you are effectively -- you're not questioning Judge Pregerson's analysis.  You're saying it's -- you're saying it's just a different factual situation.

Or, are you saying:  It's a different factual situation, and therefore distinguishable, but in addition, Judge Pregerson is wrong in his analysis?

What are you telling me on that?

**MR. JACKSON:**  It's the latter Your Honor.  It is both that it's factually inapposite, and that it is not well reasoned.  And I'm very hesitant to use the phrase "well reasoned" --

**THE COURT:**  Well, I know, he's a big boy.  He won't be offended.

(Laughter)

**THE COURT:**  I just want to know what -- if you're saying, you know:  He got it right but in a very different scenario, or it's a very different scenario and he also got it wrong.

I'm obviously going to go back and spend some time with it.

**MR. JACKSON:** I should also -- there's one other reason why it is factually inapposite, which is that there is no evidence in that case that the broker terms and conditions were such that the ADR order didn't become binding until it was fully executed by, you know, for example, conversion in the United States.

In our case, we have evidence about what the broker agreements actually say. And they say the order's cancelable until it's fully executed.

But legally, the real problem with *Toshiba II*, fundamentally, is if you take the Court's reasoning and you draw it out to its logical conclusion, Judge Pregerson has said if you bought a new ADR, if you acquired your ADR through conversion, you don't have a Section 10(b) claim. That requires the application of Section 10(b) out of the United States. But if you did have, if you bought an existing ADR in the over-the-counter market, you do have a Section 10(b) claim.

But as we were discussing earlier, whether you acquired a new or existing ADR is, to some degree, up to your broker. It's based on, in some cases, just happenstance.

And it's also a distinction that finds no basis in *Toshiba I*, or even the Supreme Court's decision in *Morrison*. There was actually a recent case in the Eastern District of Virginia that said just that, that criticized *Toshiba II* for drawing that distinction. That case is *In Re Volkswagen*

*Securities* litigation.

And the other problem with *Toshiba II* is that in *Toshiba I*, the Ninth Circuit said:  Okay, you've got to figure out where irrevocable liability's incurred.

So what do you do?  You look at where title transferred.  You look at the placement of the purchase orders.  You look at how the contracts were formed.  You look at how the money was exchanged, what type of money was exchanged.

And Judge Pregerson's analysis doesn't go through those factors.  He just zeroes in on whether there is a triggering event for the ADR purchase.  That doesn't find any basis in *Toshiba I*; it doesn't find any basis in *Morrison*.

And you wind up with this absurd rule where people who bought securities that were newly issued don't have a claim, but people who bought existing ones do, even though they may not have specified that they wanted one or the other.

And it actually brings up another point.

**THE COURT:**  Well, it's not an absurd result in the sense that if you looked -- if he's right that certain -- it may be that the investor doesn't care.  But, under his analysis, some of the transactions are extra-territorial, and therefore not violative of U.S. securities laws.

So it's not -- it's -- I understand your argument that it's -- it's absurd from the standpoint of an investor who couldn't care less whether or not it's existing or -- or new.

But the law is the law, and he has to make the determination on extra-territoriality.  So it's not an absurd result from that perspective.

MR. JACKSON:  Certainly.  And just to keep in mind, the standard here that he applied was irrevocable liability. In our case it's very different.  The purchases of the Bayer ADRs that the plaintiffs and other class members made were cancelable until they were actually completed.  And they were all completed in the United States, absent factual evidence to the contrary which doesn't exist here.

In *Toshiba*, you had this unique circumstance, unique factual circumstance that dictated a different result.

But one other point the defendants made that I would like to address is this idea of reference pricing creates issues. That because the price was set by reference to some foreign transaction, it really makes our transaction foreign.

Now, firstly, there are lots of securities in the U.S. federal securities markets that are priced by reference to things that happen outside the United States.  It's very common for options and derivatives.  So a ruling here that that would render transactions extra-territorial could actually wreak havoc on significant portions of the U.S. federal securities markets.

But, it's also worth keeping in mind that that is not one of the factors that the Ninth Circuit outlined in *Toshiba*.

It's not based on where pricing is set.  It is based on the four factors I just went through before.

And there's a good reason for that.  We can agree on a price, but we may not have agreed on a quantity yet.  We can agree on a price, but the terms of our agreement between each other can say that the transaction is actually cancelable until it's fully executed.  Until I signed on the dotted line.

And this whole idea that there are no damages here because of the conversion, the Bayer ADR's transaction is a transaction where you pay for it with Bayer foreign shares.  The -- what you -- your price that you are paying is the value of the consideration that you are supplying.  It's the value of the foreign share.  So this idea that there's no damages or no price that's really being paid is -- that is just not correct.

It's also important to keep in mind that for the irrevocable liability standard, irrevocable liability is based on either where the purchaser agrees to take and pay for the securities or where the seller delivers the securities.

**THE COURT:**  Right.

**MR. JACKSON:**  And here, the seller is always delivering the securities in the United States.  It's yet another reason why irrevocable liability has been established.

**THE COURT:**  I've got a 2:30 Zoom hearing.  So I'll give you five more minutes, and then we're calling it a day.

**MR. JACKSON:**  Thank you, Your Honor.

**THE COURT:** Thank you.

**MR. YAVITZ:** Thank you, Your Honor.

Just a few points.  I want to start with what analysis *Toshiba -- II*, I suppose, the Ninth Circuit's *Toshiba --* actually requires.  Because what I'm hearing from the other side of the V is that it is enough to focus solely on clearing records and where title passed.  And, and that is not the *Toshiba* standard.

*Toshiba* is about liability to take or pay.  And it instructs the District Courts, instructs the investors, to look to factual allegations concerning contract formation; concerning placement of purchase orders; concerning, yes, passing of title; and also concerning the exchange of where -- where money is exchanged.

The first two steps of that are completely ignored under Professor Mitts' and plaintiffs' methodology.  They do not examine or consider where the contract was formed.  They do not examine or consider where the contract was consummated.  They only look at where title passed.  They only look at clearing records.

And I've heard -- I heard a lot of descriptions of hypothetical situations in which an investor approaches a broker and says "Just get me some ADRs, I don't care where it comes from."  But -- that may happen, but that is not what happened here.  And there is certainly no guarantee that that

is what happened for every single class member.

We have here multiple examples of trades in which the -- in which the plaintiffs, plaintiffs' investment managers, approached the broker and said:  Access local liquidity and create ADRs.  Could not have been clearer.  Go to Germany, buy shares for conversion.

And what we have -- the reason that matters is we have testimony from only one expert here on the market dynamic at play, which is that for that type of transaction -- and this is what Judge Pregerson recognizes, this is the market dynamic he recognized, whatever persuasive value that has.

For that type of transaction, liability to take the ADRs -- to take and pay for the ultimate ADRs is triggered when the foreign share is purchased.  It's just how this ADR market operates.

And I heard some description of what the brokerage agreements mean in this context.  An actual examination of those brokerage agreements, that they mean nothing at all like what plaintiff is describing.

One of the agreements, Aquarian (Phonetic), is one of the clearest examples of trades.  Aquarian just says we can't cancel once we started to act upon this -- once we started to act upon a trade.  That says nothing at all.  It does not displace the market dynamic at issue.

I also heard some efforts to distinguish the facts in

*Toshiba* saying that that was a hyper-specialized circumstance in which it was absolutely necessary to get the ADRs -- none of that has any purchase in the actual opinion.

And if one reads the opinion that -- Judge Pregerson's careful opinion, you see that what he focused on was this exact market dynamic. Which is that for this type of trade, these cross trades, as Mr. Zarcou describes them, the overseas purchase triggers the domestic -- the liability, the ultimate liability.

There's a few other things, I'm sorry; there's a lot that came out during that last...

On the price point, the reference price point. This isn't a circumstance in which someone bought an ADR and said: I'll pay whatever the market rate is right now in Germany.

This is a circumstance in which plaintiffs instructed their brokers: Go overseas, buy German shares, and convert them. The brokers did that. They established a unique price for -- over the course of the day for how much, it costs to buy those (Inaudible) shares.

They then added exchange costs, they added conversion costs for the ADR, and that was the price that plaintiffs paid. That was the price the plaintiffs paid, even where, due to delays in ADR issuance, they ultimately got these preexisting shares borrowed as a stopgap measure.

I understand this is not one of the factors in *Toshiba*,

but this is just such clear proof that the trade, the consummation of the trade, happened overseas.  It happened when those foreign shares were purchased.  And that -- that is the key, key point here.

**THE COURT:**  Okay.

**MR. YAVITZ:**  And it's what distinguishes it, I believe, from the commonplace examples they were describing.

**THE COURT:**  Okay.  Thank you very much.  I'll take the matter under submission, and give you an order.

**MR. YAVITZ:**  Thank you, Your Honor.

(Proceedings concluded)

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

   /s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Sunday, May 7, 2023