UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEET METAL WORKERS NATIONAL PENSION FUND, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BAYER AKTIENGESELLSCHAFT, et al.,<br><br>Defendants. | Case No. 20-cv-04737-RS<br><br>**ORDER CERTIFYING CLASS** |

# I. INTRODUCTION

Plaintiffs in this securities action have moved for certification of a damages class under Federal Rule of Civil Procedure 23(b)(3). Defendants, in opposition, focus largely on the contention that Plaintiffs have not established typicality or predominance because their acquisitions of Bayer American Depositary Receipts do not qualify as domestic transactions under federal securities law. As discussed in greater detail below, this argument is not persuasive, and there are no significant extraterritoriality concerns on the record presented. Defendants' additional arguments against class certification are similarly unconvincing. Because Plaintiffs have made all the requisite showings under Rule 23, the proposed class will be certified.

# II. BACKGROUND

As discussed previously, *e.g.*, Dkt. 90, this case arises out of averred misrepresentations made by Bayer and its executives in connection with the company's acquisition of the agrochemical company Monsanto. In the Second Amended Class Action Complaint ("SAC"),

Plaintiffs bring claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. These claims are based on two categories of averred misrepresentations, only one of which (Defendants' alleged statements concerning Bayer's due diligence efforts surrounding the Monsanto acquisition) was pleaded adequately and remains a viable theory of liability. *See* Dkt. 122.

Plaintiffs are each pension funds that collectively purchased close to 600,000 Bayer American Depositary Receipts, or "ADRs." ADRs are "negotiable certificates issued by a United States depositary institution, typically banks, and they represent a beneficial interest in, but not legal title of, a specified number of shares of a non-United States company." *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 940 (9th Cir. 2018). Purchasing ADRs "allow[s] American investors to trade equities of a foreign corporation domestically." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 371 (3d Cir. 2002). Bayer ADRs are traded in the over-the-counter ("OTC") market,[1] and each ADR represents an ownership interest "in ordinary shares of Bayer that [have been] held on deposit by The Bank of New York Mellon." Dkt. 107 ("SAC") ¶ 38.

After two motions to dismiss were denied, Plaintiffs moved for certification of a damages class under Rule 23(b)(3). The proposed class is defined as follows:

> [A]ll persons or entities that purchased or otherwise acquired Bayer's publicly traded [ADRs] from May 23, 2016 to July 6, 2020, inclusive (the "Class Period"). Excluded from the Class are (1) Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) any subsidiary or affiliate of Bayer, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); (4) the directors and officers of Bayer during the Class Period, as well as the members of their immediate families; and (5) the legal representatives, heirs, successors, and assigns of any such excluded party.

Dkt. 140 ("Mot."), at 2 n.2. Plaintiffs additionally seek appointment as class representatives, and

---

[1] "Publicly held securities in the United States are traded both on formally centrally organized securities exchanges," such as the New York Stock Exchange, "which are operated as auction markets, and in the more loosely organized 'over-the-counter' markets which operate through a more fragmented 'market maker' system." 1 THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION § 1:10, Westlaw (database updated Dec. 2022) (footnote omitted).

1  for appointment of Cohen Milstein Sellers & Toll PLLC as Class Counsel.

2  In support of their motion, Plaintiffs rely on the expert report of Dr. Joshua Mitts, who looks to trading data to determine that irrevocable liability for purchasing Bayer ADRs occurred within the United States. They also refer to the expert report of Chad Coffman, a financial analyst who discusses the efficiency of the Bayer ADR market during the Class Period and describes an "out-of-pocket" model for measuring classwide damages. Defendants, for their part, rely on the expert testimony of Cristian Zarcu. Mr. Zarcu reaches the opposite conclusion as Dr. Mitts, arguing that, based on his examination of the trading data and his experience as a trader, such irrevocable liability occurred outside the United States for many of the ADRs purchased by the putative class members. Defendants also provide expert testimony from Dr. Mark Garmaise, whose report rebuts Mr. Coffman's findings on market efficiency and critiques his approach to calculating damages. Finally, Plaintiffs offer rebuttal reports from Dr. Mitts and Mr. Coffman.

### III. LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. To obtain class certification, plaintiffs bear the burden of showing they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir. 2001). Plaintiffs must establish these requirements by a preponderance of the evidence. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc).

Rule 23(a) provides that a court may certify a class only if the following four requirements are met: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy of representation, respectively. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If all four Rule 23(a) prerequisites are satisfied, plaintiffs must also "satisfy through

evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Such common questions need only be capable of classwide resolution; plaintiffs are not required to show that "the evidence in fact establishes [they] would win at trial." *Olean*, 31 F.4th at 667. If these showings have been made and the class is certified, the court must appoint class counsel. Fed. R. Civ. P. 23(g).

## IV. DISCUSSION

Defendants' main argument is that class certification is inappropriate because many of Plaintiffs' transactions occurred outside of the United States. On this basis, Defendants contest Plaintiffs' assertion that they have shown typicality and the predominance of common questions. As this constitutes the primary zone of disagreement between the parties, the first section below provides an overview of the relevant law in this area, followed by a discussion of how Plaintiffs acquired Bayer ADRs. For the reasons laid out at the end of that section, Plaintiffs' transactions do not raise extraterritoriality concerns. As the following two sections then discuss, Plaintiffs have established each requirement under Rule 23(a) and Rule 23(b)(3).

**A. The Proposed Class Does Not Present Extraterritoriality Concerns**

*1. "Domestic Transactions" of Securities:* Morrison *and* Toshiba

The Exchange Act and Rule 10b-5 both prohibit misleading statements made in connection with the sale of a security in a domestic market. In *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court specifically addressed the territorial scope of the Exchange Act, given significant disparities in how the Circuits had interpreted the Act to that point. Looking to the text, the Court clarified the Act applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 267. Whether a security falls into the latter category turns exclusively on "whether the purchase or sale is made in the United States," rather than whether the alleged misleading conduct occurred in the United States. *Id.* at

269–70. Thus, if the transactions occur outside the United States, the Act does not apply. This, the Court reasoned, was clear based on the jurisprudential presumption against extraterritorial application of American law; the problematic "interference with foreign securities regulation that application of § 10(b) abroad would produce"; and the fact that a contrary reading would "make nonsense" of the Act's text. *Id.* at 268–69 & n.10.

Although ADRs are not the same as regular shares of a foreign corporation and do not necessarily trade on national exchanges, they are nonetheless "securities" under the Exchange Act. *See Toshiba*, 896 F.3d at 939–42, 947. Given *Morrison*'s firm command that a security not listed on a national exchange must be purchased or sold in the United States, the Ninth Circuit in *Stoyas v. Toshiba Corp.* adopted the "irrevocable liability test" to determine where a transaction occurred for the purposes of the Exchange Act. This test, which comes from the Second Circuit's decision in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), holds that a plaintiff must make at least one of three showings to establish a transaction was domestic: (1) "the purchaser incurred irrevocable liability within the United States to take and pay for a security"; (2) "the seller incurred irrevocable liability within the United States to deliver a security"; or (3) title to the securities was transferred within the United States. *Toshiba*, 896 F.3d at 948 (quoting *Absolute Activist*, 677 F.3d at 67–68).

This formulation of the irrevocable liability test requires clarification, as the *Toshiba* Court did not clearly delineate these showings as three distinct prongs. In *Toshiba*, the Court stated that the test was intended to capture "where purchasers incurred the liability to take and pay for securities, and where sellers incurred the liability to deliver securities." *Toshiba*, 896 F.3d at 949. It went on to note that passing of title, among other factual allegations, could evidence a domestic transaction. *Id.* Yet, as Plaintiffs correctly observe, the Ninth Circuit "has yet to rule on whether the passing of title to an ADR is sufficient to establish domesticity, as this argument was not raised in [*Toshiba*]." Dkt. 163 ("Reply"), at 7 n.4.

Defendants understand *Toshiba* to include only the first two prongs listed above as part of the irrevocable liability test, and they argue transfer of title is a different test altogether. This

ORDER CERTIFYING CLASS
CASE NO. 20-cv-04737-RS
5

1    argument relies almost entirely on the fact that in *Toshiba*, when the Court discussed *Absolute*
2    *Activist*, it noted that "[t]he Second Circuit also found an *alternative means* of alleging a domestic
3    transaction: alleging that title to the shares was transferred in the U.S." 896 F.3d at 948 (emphasis
4    added). Based on this verbiage, Defendants argue the Ninth Circuit has not accepted transfer of
5    title as sufficient to show a domestic transaction.

6          This is a cramped reading of *Toshiba* and an incorrect view of the irrevocable liability test,
7    for several reasons. First, courts both before and after *Toshiba* have recognized that the transfer-
8    of-title prong is a part of the irrevocable liability test. *See Takiguchi v. MRI Int'l, Inc.*, 47 F. Supp.
9    3d 1100, 1109 (D. Nev. 2014); *In re Tezos Sec. Litig.*, No. 17-cv-06779-RS, 2018 WL 4293341, at
10   *8 (N.D. Cal. Aug. 7, 2018); *In re Volkswagen AG Sec. Litig.*, No. 122CV00045RDAWEF, 2023
11   WL 2505539, at *11 (E.D. Va. Mar. 14, 2023). This includes several of the Ninth Circuit district
12   court decisions *Toshiba* cited in support of adopting the *Absolute Activist* test. *See SEC v. Yin Nan*
13   *Michael Wang*, No. LA CV13-07553 JAK (SSx), 2015 WL 12656906, at *10 (C.D. Cal. Aug. 18,
14   2015) ("Thus, the issue presented is where irrevocable liability was incurred or where title to the
15   securities passed."); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
16   No. 2672 CRB (JSC), 2017 WL 66281, at *3 (N.D. Cal. Jan. 4, 2017). Commentators have
17   likewise read *Toshiba* to have adopted all three prongs. 17 J. WILLIAM HICKS, CIVIL LIABILITIES:
18   ENFORCEMENT & LITIGATION UNDER THE 1933 ACT § 4.4, Westlaw (database updated May 2023)
19   (describing *Toshiba* as having "adopted the 'irrevocable liability' test," which requires showing
20   either "(1) irrevocable liability is incurred in the United States or (2) title passes within the United
21   States"); 1 HAROLD S. BLOOMENTHAL & SAMUEL WOOLF, SECURITIES LAW HANDBOOK § 22:102,
22   Westlaw (database updated June 2022) (same).

23         By the same token, the *Toshiba* Court never disavowed the transfer-of-title prong. While it
24   is true the Court used the word "alternative" to describe the transfer-of-title prong, it did not
25   describe it as an alternative *test*. The better reading of this portion of the opinion is to see this as an
26   effort by the Court to differentiate the first two prongs, which both include the words "irrevocable
27   liability," from the transfer-of-title prong, which does not. The transfer-of-title prong is,

28

furthermore, fully consistent with the concept of irrevocable liability; it thus fits comfortably with the first two prongs under the overarching umbrella of "the irrevocable liability test." In addition, the Court expressly rejected the "predominantly foreign" test for domesticity, which it found unpersuasive. *See* 896 F.3d at 950 (distinguishing *Parkcentral Global Hub v. Porsche Automobile Holdings*, 763 F.3d 198 (2d Cir. 2014)). One would expect the Ninth Circuit to have offered similar reasoning (or any reasoning) if its intent was to reject transfer-of-title prong.

Thus, under *Toshiba*, a plaintiff can establish domesticity by showing that the buyer or seller incurred irrevocable liability within the United States, or by showing that title to a security passed within the United States. Only one of these prongs needs to be established to allay extraterritoriality concerns. This understanding is consistent with *Toshiba*, *Absolute Activist*, and *Morrison* and the reasoning underpinning these decisions, and it is in line with the numerous other district court decisions that have adopted this construction.

*2. How Bayer ADRs Were Acquired*

Buying securities is more complex than buying groceries. This is especially true where a security, like an ADR, itself relies on a foreign security. Both parties' experts generally agree as to the process for how Plaintiffs acquired Bayer ADRs (though they reach different conclusions about whether these transactions were domestic under *Morrison*). As the details of this process are relevant to the domesticity determination of the trades, it must be examined.

As noted above, Plaintiffs each worked with an outside investment manager at all relevant times.[2] The investment managers, in turn, worked with at least one broker-dealer to acquire Bayer ADRs.[3] When deciding to invest in ADRs, the investment managers could choose between (1) purchasing existing ADRs available on the OTC market, or (2) "purchas[ing] shares on the foreign

---

[2] SMW Pension Fund and Teamsters 710 Pension Fund both worked with Harding Loevner Funds, Inc., and Local 542 Pension Fund worked with Hardman Johnston Global Advisors LLC. SAC ¶¶ 39–41.

[3] The relevant broker-dealers include Morgan Stanley DW Inc., Macquarie Securities Inc., Instinet Clearing Services, Inc., Merrill Lynch, JP Morgan Securities, Inc., UBS Securities LLC, and Cowen & Co. LLC. SAC ¶¶ 39–41.

exchange and arrang[ing] for the issuance of new ADRs by depositing the foreign-bought shares with a depositary bank." Dkt. 151-29 ("Zarcu Rpt.") ¶ 20. As Mr. Zarcu explains, the cost of trade execution is the primary factor influencing this decision; sometimes, though, an investor may want to buy more ADRs than the market of existing ADRs has to offer, so the only option would be to seek issuance of new ADRs. *Id.*

Trades of existing ADRs made up over 80% of the ADR transactions involved in this case, and they were executed "[l]ike transactions in any other domestic security." Dkt. 141-2 ("Mitts Rpt.") ¶ 28; *see* Zarcu Rpt. ¶ 125. The remainder involved issuances of new ADRs, which included a few more steps. In these instances, a broker-dealer acquired Bayer shares from the Frankfurt Stock Exchange in Germany. The broker-dealer then placed ADR orders with Bank of New York Mellon ("BONY"), which is the exclusive depositary institution for Bayer shares.[4] Once the shares were deposited with BONY, the Bank then issued ADRs back to the broker-dealer (sometimes by way of another intermediary, like Citibank), who then transferred the ADRs into the Plaintiffs' custody. Mitts Rpt. ¶¶ 39, 45–49.

3. Analysis

Though the parties largely agree on how the trades were executed here, they disagree as to where in the transaction process irrevocable liability was incurred. Defendants do not challenge the transactions involving existing ADRs, but they argue that, for the roughly 20% of trades involving *new* ADRs, Plaintiffs incurred irrevocable liability for the purchases "at the moment

---

[4] Bayer ADRs are "sponsored" ADRs, as further evidenced by both Bayer's and BONY's public representations. Mitts Rpt. ¶ 27. This is in contrast to "unsponsored" ADRs. The Third Circuit has described the general differences between the two:

> An unsponsored ADR is established with little or no involvement of the issuer of the underlying security. A sponsored ADR, in contrast, is established with the active participation of the issuer of the underlying security. An issuer who sponsors an ADR enters into an agreement with the depositary bank and the ADR owners. The agreement establishes the terms of the ADRs and the rights and obligations of the parties, such as the ADR holders' voting rights.

*Pinker*, 292 F.3d at 367 (citations omitted).

1    their brokers executed the purchase of Bayer ordinary shares in Europe." Dkt. 150 ("Opp."), at 9;
2    *see* Zarcu Rpt. ¶ 32 (noting that securities clients are never "permitted to revoke an order after the
3    initial overseas purchase"). Irrevocable liability thus occurred outside the United States. Dr. Mitts,
4    on the other hand, suggests this view is misplaced: irrevocable liability was incurred when BONY
5    issued the ADRs to the broker-dealers, which occurred in the United States. *See* Mitts Rpt. ¶ 39. In
6    other words, for Defendants, the salient act is the purchase of Bayer shares in Germany that led to
7    the creation of the ADRs; for Plaintiffs, the salient act is the issuance of the ADRs themselves.

     Defendants rely heavily on *Stoyas v. Toshiba Corp.* ("*Toshiba II*"), No. 15-cv-04194 DDP-
JC, 2022 WL 220920 (C.D. Cal. Jan. 25, 2022), the district court order that followed the Ninth
Circuit's remand in *Toshiba*. There, reviewing a very similar set of facts, the court denied class
certification on extraterritoriality grounds.[5] It concluded the plaintiffs' acquisition of newly issued
ADRs began "with the trade of underlying Toshiba common stock." *Id.* at *5. Once this occurred,
the plaintiffs were "logically and legally bound to perform [their] contractual obligations." *Id.* at
*4. "Thus, the triggering event that caused ClearBridge [the investment manager] (and by
extension, [plaintiffs]) to incur irrevocable liability occurred in Japan when Barclays [the broker-
dealer] acquired the shares of Toshiba common stock on the Tokyo Stock Exchange." *Id.*

     While *Toshiba II*'s logic is initially appealing, especially considering the underlying
factual similarities with the present case, its analysis is incomplete. The court focused exclusively
on the first prong of the irrevocable liability test without analyzing the second or third: where the
seller incurred irrevocable liability, and where title to the ADRs was transferred. Here, neither
Defendants nor Mr. Zarcu meaningfully address these two prongs, yet either can serve as a basis
for concluding the transactions at issue do not raise extraterritoriality concerns. First, Plaintiffs
have shown that the seller of the ADRs (i.e., BONY) incurred irrevocable liability to deliver the
securities once the broker-dealers deposited the Bayer shares they had acquired in Germany. Mitts

---

[5] *Toshiba II* appears to be the only district court decision in the Ninth Circuit thus far that has applied *Toshiba*'s irrevocable liability test in the context of a motion for class certification.

1   Rpt. ¶ 38 & n.44. Relatedly, Plaintiffs have shown that title to the ADRs was transferred between

2   BONY and one of the relevant broker-dealers, and, subsequently, from the broker-dealers to

3   Plaintiffs (via the investment managers). Dkt. 164-1 ("Mitts Reply Rpt.") ¶¶ 14–17 & n.23.[6] All of

4   these acts occurred in the United States.

5         Defendants contend, in effect, that Plaintiffs cannot satisfy the test because they incurred

6   irrevocable liability when their brokers purchased Bayer shares in Frankfurt. Even accepting this

7   as true, it does not negate or somehow outweigh the fact that Plaintiffs have satisfied the other two

8   prongs of the irrevocable liability test. *Morrison*'s singular focus on domestic transactions

9   stemmed from an aversion to multifactor tests with "unpredictable and inconsistent

10  application[s]," 561 U.S. at 260, instead favoring a bright-line rule, *id.* at 285 (Stevens, J.,

11  concurring). *Morrison* thus supports the conclusion that all three *Toshiba* prongs are equally valid

12  in determining whether a transaction is domestic and need not (indeed, should not) be weighed

13  against each other. As long as one is shown, a domestic transaction has occurred. The test should

14  thus be understood as a rule of inclusion: together, all three prongs help actualize *Morrison*'s

15  intent to ensure Exchange Act and Rule 10b-5 claims can encompass "domestic transactions of

16  any kind." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 180 (2d

17  Cir. 2014). Thus, even if a "corresponding overseas transaction" was necessary here, "it does not

18  change the fact that a purchase in the United States still took place." *United States v. Martoma*,

19  No. 12 CR 973 PGG, 2013 WL 6632676, at *5 (S.D.N.Y. Dec. 17, 2013) (quoting *Phelps v.

20  Stomber*, 883 F. Supp. 2d 188, 209 (D.D.C. 2012)). Plaintiffs have therefore established the trades

21  are domestic within the meaning of *Toshiba* and *Morrison*.[7] Defendants' counterargument is

---

[6] Defendants seek leave to file a supplemental report from Mr. Zarcu to respond to "late-breaking evidence" contained in the Mitts Reply Report. *See* Dkt. 167. However, Defendants do not appear to object to the portions of the Mitts Reply Report that are relevant here to answering the extraterritoriality question (namely, those discussing transfer of title). The motion is thus denied.

[7] Plaintiffs, as well as Dr. Mitts, suggest the fact Bayer ADRs are sponsored should essentially be dispositive in resolving the domesticity question. They note, for instance, that "courts have uniformly held that purchases of sponsored ADRs on U.S. OTC markets are domestic transactions that do not raise extraterritoriality concerns." Mot., at 11 n.3. While this may be true with respect to motions to dismiss, this is inaccurate in the class certification context. Indeed, the two cases on

ORDER CERTIFYING CLASS
CASE NO. 20-cv-04737-RS

10

therefore rejected, and its impact (or, rather, lack thereof) on Plaintiffs' Rule 23 showings is discussed below.

**B. The Rule 23(a) Factors Are Met**

*1. Numerosity*

The parties do not dispute that the putative class members are sufficiently numerous to warrant certification. Indeed, as Plaintiffs note, the volume of Bayer ADR trades during the Class Period suggests that there are thousands of class members. There are also "at least 178 institutional investors" that owned Bayer ADRs during this time. Mot., at 8. The numerosity requirement is thus easily satisfied.

*2. Commonality*

The parties similarly do not dispute that there are questions common to the putative class. These include, among others: "(a) whether Defendants violated the Exchange Act; (b) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;" and "(c) whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading." *Id.* at 9. As in many securities actions, these questions appear capable of classwide resolution. *E.g.*, *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 646 (C.D. Cal. 2018). Plaintiffs have thus demonstrated that the commonality requirement is met here.

*3. Typicality*

Plaintiffs assert their claims are typical of, "if not virtually identical to," the claims of the absent class members, as they are all predicated on the same alleged misconduct and rely on the

---

which Plaintiffs primarily rely for this point — *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017), and *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. CV 16-02942 SJO (KSx), 2017 WL 2378369 (C.D. Cal. May 31, 2017) — were both decided on motions to dismiss, and both were decided before *Toshiba*. Given plaintiffs must clear a higher bar to obtain class certification than to survive a motion to dismiss, *Olean*, 31 F.4th at 665; and in light of *Morrison*'s emphasis on situs of the transaction versus situs of the misleading conduct, 561 U.S., at 268; the case law does not appear to imply that an ADR is necessarily traded domestically just because it was sponsored.

same legal theories. Mot., at 9. Defendants argue that Plaintiffs are atypical because they are vulnerable to the "unique and dispositive defense" of extraterritoriality. Opp., at 8. For the reasons discussed above, this argument is unpersuasive and there are no significant extraterritoriality concerns here. Like other securities class actions, Plaintiffs have shown the class members writ large have been "the victim[s] of the same material misstatements and the same fraudulent course of conduct," rendering Plaintiffs typical. *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009).

    *4. Adequacy*

Finally, Plaintiffs and proposed Class Counsel are adequate to represent the Class. Plaintiffs have all purchased Bayer ADRs and have an adequate stake in seeing this case to resolution, and the proposed Class Counsel has significant experience handling similar actions. Defendants do not dispute this. As such, the adequacy requirement is met here as well.

**C. The Rule 23(b)(3) Factors Are Met**

    *1. Predominance*

Defendants argue Plaintiffs have not established predominance for three reasons. First, independent of their own extraterritoriality concerns, Plaintiffs have failed to present "a common, class-wide methodology for establishing that *other* class members purchased their Bayer ADRs domestically." Opp., at 15. Second, Plaintiffs have failed to show that damages may be calculated on a classwide basis, and that their damages methodology contains several flaws. Third, Plaintiffs cannot invoke the *Basic* presumption of reliance for the entire Class Period because they have failed to show that "Bayer ADRs traded in an efficient market for a several-week period in June 2018." *Id.* None of these arguments are persuasive, and Plaintiffs have satisfied their burden to show that common questions predominate over individual ones.

    a. <u>Extraterritoriality</u>

First, as the discussion above illuminates, there is no extraterritoriality problem for Plaintiffs themselves. Defendants are correct to state that any class members who obtained their ADRs in a foreign transaction would not be entitled to recover. Yet, as Dr. Mitts's report suggests,

1  and as Defendants concede, the overwhelming majority of all Bayer ADR trades during the Class
2  Period involved existing ADRs. For the minority involving new ADRs, there is no evidence to
3  suggest the same analysis above could not be extended to most (if not all) of the absent class
4  members. As Plaintiffs suggest, if Defendant is able to mount an extraterritoriality defense to any
5  absent class members, this can be handled "in a manner similar to that used when individualized
6  damages inquiries arise in class action proceedings." *Nitsch v. Dreamworks Animation SKG Inc.*,
7  315 F.R.D. 270, 313 (N.D. Cal. 2016) (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168
8  (9th Cir. 2014)). Further, if at a later point in this case it becomes evident that such individualized
9  inquiries will be necessary, the class definition may be revised or the proceedings bifurcated
10 appropriately. *In re Petrobas Secs.*, 862 F.3d 250, 274 (2d Cir. 2017).

b. Damages

Second, Defendants maintain that Plaintiffs have not offered a reliable method to measure damages on a classwide basis. They claim Plaintiffs' approach is fatally flawed in at least three ways: (1) Plaintiffs have not offered a way to model the degree to which Defendants understated the risk stemming from the glyphosate ("Roundup") litigation; (2) they do not provide a way to control for investors' varied expectations concerning the Bayer-Monsanto merger; and (3) they have not presented a method to differentiate between the alleged corrective disclosures and other, equivalent releases of information (including those originating from the Roundup litigation).

As an initial matter, it is worth noting that the Ninth Circuit has expressly held district courts should not deny class certification where the putative class "will require determination of some individualized questions at trial" — including, for instance, damages. *Olean*, 31 F.4th at 668. Indeed, a class can be certified with respect to some issues but not others. *See id.* (citing *In re Urethane*, 768 F.3d 1245, 1255 (10th Cir. 2014)). Here, numerous common questions, including those surrounding Bayer's due diligence efforts, its external communications, and the effects of both on the market, clearly predominate.

Moreover, Defendants' attacks on Plaintiffs' damages methodology are premature, and none warrant denying class certification. Plaintiffs have shown that, contrary to Defendants'

1   assertion, investor uncertainty around the risk posed by the ongoing glyphosate litigation can be

2   factored into the out-of-pocket damages model.[8] The same is true regarding investors' beliefs

3   about the Bayer-Monsanto merger, as well as the impact of the alleged corrective disclosures on

4   the ADR price. In each case, the but-for ADR price (and class members' damages) would be

5   subject to classwide proof. Indeed, courts have routinely found the out-of-pocket model flexible

6   enough to accommodate such complicating factors. *See, e.g., Mulderrig v. Amyris, Inc.*, 340

7   F.R.D. 575, 589 (N.D. Cal. Dec. 8, 2021); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106

8   (S.D.N.Y. 2016). True, Plaintiffs "may face substantial hurdles in actually proving loss causation

9   and out-of-pocket damages." *Id.* (quoting *Barrick*, 314 F.R.D. at 106). Yet the fact that calculating

10  damages is a complex undertaking does not undermine the use of the out-of-pocket model, nor

11  does it militate against certifying the class. Defendants' arguments, valid though they may be, are

12  thus better left for a later stage of litigation. *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 335

13  F.R.D. 276, 288 (N.D. Cal. 2020).

    c. The *Basic* Presumption of Reliance

15  Finally, Defendants argue Plaintiffs have failed to show that the market for Bayer ADRs

16  was efficient for the entire Class Period. Under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), a

17  plaintiff seeking class certification may "invoke a rebuttable presumption of reliance based on the

18  fraud-on-the market theory." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 131 S. Ct. 1951,

19  1958 (2021). This involves proving "(1) that the alleged misrepresentation was publicly known;

20  (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff

21  traded the stock between the time the misrepresentation was made and when the truth was

22  revealed." *Id.* (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)).

23  Defendants here argue that Plaintiffs have failed to satisfy the third element, market efficiency, for

24  a twelve-day period in June 2018, because there was a "large, sustained divergence" between

---

[8] Separately, it's not entirely clear why this argument is relevant, since "Plaintiffs have removed allegations concerning misrepresentations about Bayer's accounting for legal risks related to Roundup and no longer seek to proceed on this theory of liability." Dkt. 122, at 2.

1    Bayer ADR prices and Bayer regular share prices during this time. Opp., at 22. Such a divergence

2    is also referred to as an "arbitrage opportunity." Dkt. 141-1 ("Coffman Rpt.") ¶ 80. This suggests

3    that "the price of Bayer ADRs failed to rapidly incorporate new information" during this period.

4    Opp., at 22.

5         Proving market efficiency in order to invoke the *Basic* presumption involves examining

6    multiple factors. Courts in the Ninth Circuit have commonly looked to those outlined in *Cammer*

7    *v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989): (1) "whether the stock trades at a high weekly

8    volume"; (2) "whether securities analysts follow and report on the stock"; (3) "whether the stock

9    has market makers and arbitrageurs"; (4) "whether the company is eligible to file [a short form

10   registration statement with the SEC]"; and (5) "whether there are empirical facts showing a cause

11   and effect relationship between unexpected corporate events or financial releases and an

12   immediate response in the stock price." *Purple Mtn. Tr. v. Wells Fargo & Co.*, No. 18-cv-03948-

13   JD, 2022 WL 3357835, at *3 (N.D. Cal. Aug. 15, 2022) (alteration in original) (internal quotation

14   marks omitted); *see Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999). Some courts also

15   examine the factors listed in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), which include

16   market capitalization, the bid-ask spread, and the size of the public float. *See Malriat v.*

17   *QuantumScape Corp.*, No. 21-cv-00058-WHO, 2022 WL 1794629, at *13 (N.D. Cal. Dec. 19,

18   2022). Plaintiffs here discuss all eight of these factors, as well as four additional factors:

19   ownership by institutional investors; autocorrelation (that is, whether "previous price movement

20   have the ability to predict future price movement"); the amount of options trading; and the lack of

21   arbitrage opportunities. Coffman Rpt. ¶¶ 74–80. In their view, the Bayer ADR market was

22   efficient for the entire Class Period according to at least ten of these factors.

23        Between June 6 and June 25, 2018, there does appear to have been a disparity between the

24   Bayer ADR price and the ordinary Bayer share price. As both Mr. Coffman and Dr. Garmaise

25   discuss, these discrepancies overlap with a period in which BONY announced "a cash distribution

26   for ADR holders that ordinary shareholders were not expecting to receive." Dkt. 151-1 ("Garmaise

27   Rpt.") ¶ 91. While the experts disagree about how much this decision would be expected to impact

28

United States District Court
Northern District of California

the Bayer ADR price, it is apparent that the price discrepancy was due to this external (and somewhat unusual) situation. It was not, in other words, because investors suddenly decided to stop paying attention to market information for two weeks. Even accepting the argument that one of the efficiency factors (lack of arbitrage opportunity) was not satisfied for this period, Defendants have not shown that any of the other factors weigh against overall market efficiency. As Plaintiffs observe, "the relevant question is whether the price of Bayer ADRs 'reflect[ed] all public, material information.'" Reply, at 15 (alteration in original) (quoting *Halliburton*, 573 U.S. at 263). Looking at the whole picture, Defendants' arguments simply do not outweigh the fact that Plaintiffs have convincingly shown market efficiency for the Class Period (including the two weeks in question) under nearly all the *Cammer*, *Krogman*, and additional factors. As such, Plaintiffs have established market efficiency such that they may invoke the *Basic* presumption for the entire Class Period.[9]

*2. Superiority*

In addition, Plaintiffs assert (and Defendants do not deny) that the class device is the superior vehicle for resolving the claims in this case. The volume and complexity of the claims make the case readily amenable to classwide resolution, and judicial economy would be enhanced through consolidated litigation. There is no indication that any class members would prefer individual litigation; indeed, the limited size of any potential recovery for individual class members suggests the class device is the only practical way to obtain relief. Thus, the superiority requirement is also met here.

### V. CONCLUSION

Plaintiffs have met all of the requirements of Rule 23(a) and Rule 23(b)(3). As such, the motion is granted, and the following class is certified:

---

[9] Plaintiffs point out that the time period Defendants flag represents less than 2% of the entire Class Period. Reply, at 15. Even so, if the market was inefficient for this time, the proper recourse would appear to be to excise that portion from the Class Period — but not, as Defendants suggest, to deny class certification. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009).

> All persons or entities that purchased or otherwise acquired Bayer's publicly traded American Depositary Receipts from May 23, 2016 to July 6, 2020, inclusive (the "Class Period").
>
> Excluded from the Class are (1) Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) any subsidiary or affiliate of Bayer, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); (4) the directors and officers of Bayer during the Class Period, as well as the members of their immediate families; and (5) the legal representatives, heirs, successors, and assigns of any such excluded party.

Plaintiffs are appointed as class representatives, and Cohen Milstein Sellers & Toll PLLC is appointed as Class Counsel. A separate order will enter regarding the associated administrative motions to file materials under seal. A further case management conference is scheduled for June 15, 2023.

**IT IS SO ORDERED**.

Dated: May 19, 2023

_____
RICHARD SEEBORG
Chief United States District Judge