# EXHIBIT S-2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>     v.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>            Defendants. | Case No.: 3:20-cv-04737-RS |

**Rebuttal Report of Mark Garmaise, Ph.D.**
February 3, 2023

HIGHLY CONFIDENTIAL

Table of Contents

I.   Qualifications .................................................................................................. 1

II.  Assignment and Compensation .................................................................. 2

III. Summary of Opinions ................................................................................ 2

IV.  Background and Summary of Allegations .............................................. 6

     A.   Overview of Bayer's Merger with Monsanto ................................. 6

     B.   Summary of Plaintiffs' Allegations ................................................. 8

V.   Mr. Coffman Fails to Provide a Methodology That Would Reliably Calculate Damages for All Proposed Class Members Consistent with Plaintiffs' Theory of Liability .................. 10

     A.   Mr. Coffman Fails to Provide a Methodology that Could Reliably Measure Damages Consistent with Plaintiffs' Theory of Liability in a Manner that Accounts for the Extent to which Investors May Have Been Misled About the Roundup Litigation Risk ...14

          1.   Inflation in a Case Involving the Materialization of Risk ............................. 15

          2.   Mr. Coffman Fails to Provide a Methodology to Assess the Extent to Which Investors Were Misled About the Roundup Litigation Risk, If at All ..................... 17

          3.   Mr. Coffman Fails to Explain How One Could Measure Inflation Accounting for Plaintiffs' Allegation that Bayer Did Not Know and Therefore Could Not Have Disclosed the True Extent of Monsanto's Roundup Litigation Risk Prior to August 2018 ............................................................................................19

     B.   Mr. Coffman Does Not Provide a Methodology to Measure Inflation that Would Incorporate Investor Uncertainty About the Likelihood that Bayer Would Acquire Monsanto .................................................................................................20

     C.   Mr. Coffman Fails to Explain How Inflation Could Reliably and Objectively Be Estimated Using ADR Price Changes Following Alleged Corrective Disclosures and Not Other Information Regarding Due Diligence or Other Litigation Developments...............25

     D.   Mr. Coffman Fails to Explain How Inflation Could Reliably and Objectively Be Estimated Throughout the Proposed Class Period Accounting for Developments in the Roundup Litigation and Other Changes to Bayer's Business ............................................29

          1.   Mr. Coffman Fails to Explain How One Could Account for Changing Information Regarding Monsanto's Roundup Liability ......................................... 30

          2.   Mr. Coffman Acknowledges that the Merger Changed Bayer's Business and "Return-Generating Process" But Provides No Methodology to Account for These Changes in Measuring Inflation.................................................................. 33

VI.  Mr. Coffman Fails to Reliably Demonstrate that the Bayer ADRs Traded in an Efficient Market During the Entire Proposed Class Period ............................................. 36

     A.   Market Efficiency in Financial Economics.........................................37

B.    The Price of Bayer ADRs Diverged from that of the Bayer Ordinary Shares in a Manner Inconsistent with Market Efficiency for an Extended Period in June 2018 ..........39

## I.      Qualifications

1.      I am a Professor of Finance at the Anderson School of Management at The University of California, Los Angeles ("UCLA Anderson").  I joined UCLA Anderson's faculty in 2001 and received tenure in 2008.  From 2016 to 2018 I served as area head of Finance for UCLA Anderson, and I was the Senior Associate Dean for the Full Time MBA Program during the 2014–2015 term.  I received my A.B. in Mathematics and Philosophy from Harvard College and my Ph.D. in Finance from Stanford University.  Prior to joining the faculty at UCLA Anderson, I was an Assistant Professor at the University of Chicago Graduate School of Business.

2.      I am an expert in the areas of corporate finance, valuation, entrepreneurship, real estate, and banking.  In my research, I have examined the role of information in financial markets and the financing of entrepreneurial firms.

3.      My research has been widely cited and published in several top-tier peer-reviewed academic journals, including *Review of Financial Studies*, *Journal of Finance*, and *Quarterly Journal of Economics*.  I have served as an Associate Editor of *Review of Financial Studies* and *Journal of Law, Finance, and Accounting.*  I act as a referee for several academic journals, including *The Journal of Finance*, *Review of Financial Studies*, *Journal of Financial Economics*, *Journal of Political Economy*, *Review of Economic Studies*, *Journal of Economic Behavior and Organization*, and *The Journal of Law, Economics and Organization*.  I served on the American Finance Association Nominating Committee in 2007.

4.      I have taught courses on Corporate Finance and Venture Capital and Private Equity at the UCLA Anderson School for twenty years.  I have received numerous awards for my research and teaching, including the 2004 BGI Brennan Award for the best paper published in the *Review of Financial Studies*, the 2005 BGI Brennan Runner-up Award for the best paper published in the *Review of Financial Studies*, the 2007 Citibank Teaching Award for most outstanding MBA teacher, and the Best Paper Award in 2017 for my paper published in the *Review of Corporate Finance Studies*.

5.      A copy of my curriculum vitae is included as **Appendix A**.  A list of my testimony over the last four years is attached as **Appendix B**.

## II.    Assignment and Compensation

6.    I have been engaged by counsel for Bayer Aktiengesellschaft ("Bayer" or "the Company") to review and respond to the opinions expressed in the Expert Report of Chad Coffman, CFA dated October 28, 2022 (the "Coffman Report").  Specifically, I have been asked to review and assess whether Mr. Coffman has proposed a methodology capable of estimating damages on a class-wide basis consistent with Plaintiffs' theory of liability.  I have also been asked to review and respond to Mr. Coffman's analyses regarding market efficiency.

7.    In formulating my opinions, I have relied on my knowledge, prior experience, academic research and teaching on relevant topics, and formal training in economics and finance. In performing my analyses, I have examined a variety of materials, including legal pleadings, deposition transcripts, academic literature, equity analyst and public press commentary, and other public data.  A complete list of the materials I considered in forming my opinions is contained in **Appendix C** to this report.

8.    I am being compensated at my standard billing rate of $975 per hour.  The staff of Cornerstone Research, who have worked at my direction, has assisted me in this matter.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

9.    My work on this matter is ongoing, and I reserve the right to modify or supplement my opinions in the event that I become aware of additional facts, information, or contentions of the parties or any witnesses.

## III.    Summary of Opinions

10.    The economic circumstances affecting Bayer and informing a reliable methodology for the calculation of potential damages in this case are distinctive and require a methodology specifically tailored to these particular issues.  The generic approach proposed by Mr. Coffman, which is based on his unfounded assumption that the economic issues in this matter are "identical or nearly identical" to other cases, does not explain how potential damages

could be reliably calculated in a manner consistent with Plaintiffs' theory of liability.[1]  Though Mr. Coffman opines that damages will need to be calculated based upon inflation in the price of Bayer ADRs,[2] he disavows any opinion on how an approach could account for the distinctive economic issues in this matter.  As I discuss below, there are at least four distinctive economic issues in this case that must be addressed in the class-wide calculation of inflation and damages over the more than four-year Proposed Class Period in a manner consistent with Plaintiffs' theory of liability.[3]

11.    Mr. Coffman does not even acknowledge, much less engage with, these challenges.  His generic references to an event study and other "techniques" are not an adequate description of a reliable methodology for measuring damages on a class-wide basis in a manner consistent with Plaintiffs' theory of liability, given the economic factors specific to this case:

12.    *First,* Mr. Coffman acknowledges this case to be one in which Plaintiffs allege that Defendants' misrepresentations caused the market to underestimate litigation risks that ultimately materialized through the alleged corrective disclosures.  Thus, it is critical that any methodology purporting to estimate damages be able to reliably measure the degree to which the alleged misrepresentations affected the market's assessments of both the probability and severity of those risks.  Mr. Coffman provides no meaningful guidance on how one might estimate the effect of the alleged misrepresentations on the market's assessment of the likelihood or severity of Roundup litigation losses.  The ADR price impact of *ex post* realizations of these losses measured using the "widely-used" approach Mr. Coffman describes cannot be employed without

---

[1] Deposition of Chad W. Coffman, CFA, and Exhibits, December 21, 2022 ("Coffman Deposition"), 232:14–234:5.

[2] An American Depositary Receipt ("ADR") "is a negotiable certificate that evidences an ownership interest in American Depositary Shares … which, in turn, represent an interest in the shares of a non-U.S. company that have been deposited with a U.S. bank."  *See* United States Securities and Exchange Commission Office of Investor Education and Advocacy, "Investor Bulletin: American Depositary Receipts," August 2012.  During the Proposed Class Period, Bayer ADRs traded on the OTC Markets Group Pink Open Market.  Prior to September 20, 2017, one ADR represented one ordinary share, while after that date, one ADR represented 0.25 ordinary shares.  *See* "BAYRY – Bayer A.G.," *OTC Markets*, https://www.otcmarkets.com/stock/BAYRY/overview; "ADR Program," *Bayer*, https://www.bayer.com/en/investors/adr-program.

[3] Capitalized terms not defined in this section are defined in Section IV.

adjustment to estimate the market's *ex ante* expectations of the magnitude of the losses in the absence of the alleged misrepresentations.  Mr. Coffman does not explain how a damages methodology consistent with Plaintiffs' theory of liability can meet this challenge.

13.    Further, Mr. Coffman fails to explain how he could measure, in a manner consistent with Plaintiffs' allegations, any price impact of Defendants having allegedly misled the market about Roundup-related litigation exposure.  In particular, Plaintiffs allege that Bayer's "failed due diligence" prevented the Company from reviewing documents that "were essential to determining Monsanto's exposure,"[4] raising the question—nowhere addressed by Mr. Coffman—how an alternative, allegedly truthful, disclosure, would have affected the ADR price.

14.    *Second,* Bayer's merger with Monsanto was completed approximately halfway through the Proposed Class Period.  Mr. Coffman suggests that the most "widely-used" technique for assessing damages would utilize Bayer's ADR price reaction to the alleged corrective disclosures—which took place after the Merger closed—to measure inflation prior to the completion of the Merger attributable to Defendants' alleged misrepresentations.  Because those disclosures relate to Monsanto, any effect on the price of Bayer's ADRs prior to the Merger's closing necessarily depends in part on the market's assessment of the likelihood that the Merger would be completed.  Prior to the Merger's closing on June 7, 2018—*i.e.,* for the first two years of the Proposed Class Period—a methodology that estimates the market's view of this likelihood will therefore be needed to calculate inflation during this period.  Mr. Coffman has provided no methodology to determine this likelihood.

15.    *Third*, the approach Mr. Coffman describes of measuring inflation using the price reaction of Bayer's ADRs following alleged corrective disclosures ignores other similar developments in the Roundup litigation.[5]  For example, Mr. Coffman fails to explain how he would assess any change in inflation based on Bayer's ADR price reaction following the *Johnson* court's October 22, 2018 reduction of punitive damages and denial of Bayer's post-trial

---

[4] Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel and Memorandum of Points and Authorities in Support Thereof, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.*, October 28, 2022 ("Memorandum of Law ISO Motion for Class Certification"), p. 4.

[5] I refer to the disclosures referenced in the "Loss Causation and Economic Loss" section of the Complaint as alleged corrective disclosures.

motions (one of the alleged corrective disclosures). Nor does he explain why Bayer's ADR price reaction following a similar post-trial decision in the *Hardeman* lawsuit on July 15, 2019 would not also be relevant. Notably, according to Mr. Coffman's event study, Bayer's ADR price increased in a statistically significant manner following the post-trial decision in *Hardeman*. Mr. Coffman fails to provide a methodology to objectively and reliably identify relevant disclosures, or to measure how they affected inflation over time.

16.     *Fourth,* there were dramatic changes over the course of the Proposed Class Period in the information available to the market regarding Monsanto's Roundup litigation liabilities and Bayer's corporate structure. For example, the number of plaintiffs bringing Roundup cases increased from 1,100 in February 2017 to more than 50,000 by the time of the last alleged corrective disclosures in June and July 2020, and analysts' estimates of Bayer's potential liabilities correspondingly shifted over time. Mr. Coffman fails to explain how one could measure the degree to which the alleged misrepresentations caused the market to misunderstand the litigation risks faced by Monsanto at different stages of the Proposed Class Period. Moreover, Bayer's corporate structure changed substantially over the course of the Proposed Class Period, suggesting that inflation may have evolved over time for this reason as well.

17.     *Finally*, Mr. Coffman fails to reliably establish market efficiency throughout the Proposed Class Period, particularly during the period from June 6, 2018 to June 25, 2018, when the Bayer ADR price deviated substantially from that of Bayer ordinary shares. As Mr. Coffman acknowledges, in efficient markets, equivalent assets should trade at the same price, but for much of June 2018, they diverged by a wide margin. Though Mr. Coffman offers four potential reasons for the divergence, his explanations either do not provide a rationale for the observed phenomenon, are insufficient to explain the magnitude of the deviation, or are consistent with the presence of limits to arbitrage that financial economists have recognized as impediments to market efficiency.

### IV.    Background and Summary of Allegations

### A.    Overview of Bayer's Merger with Monsanto

18.    On May 23, 2016, Bayer announced its offer to acquire Monsanto, a global producer of agricultural products for farmers, for $122 per share (the "Merger").[6]  Monsanto rejected this offer on May 24, 2016, and Bayer made three subsequent offers to acquire Monsanto in the following four months.[7]  On July 14, 2016, Bayer announced its second offer to acquire Monsanto for $125 per share, which Monsanto rejected on July 19, 2016.[8]  On September 5, 2016, Bayer announced its third offer to acquire Monsanto for $127.50 per share.[9]  After further negotiations, Bayer's fourth offer, of $128 per share, was formally accepted on September 14, 2016, with the signing of the corresponding Definitive Merger Agreement (the "Merger Agreement").[10]  Monsanto shareholders approved the Merger on December 13, 2016, but the deal still needed approval from a number of regulators, including the U.S. Department of Justice, the European Commission, Canada's Competition Bureau, Russia's Federal Anti-Monopoly Service, China's Commerce Ministry, Brazil's Administrative Council for Economic Defense, Mexico's Federal Economic Competition Commission, and Australia's Competition and Consumer Commission.[11]  Many of these approvals did not come until 2018, including

---

[6] Second Amended Class Action Complaint, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.,* December 30, 2021 ("Complaint"), ¶¶ 32, 86; "Monsanto has rejected a $62 billion takeover offer," *Business Insider,* May 24, 2016.

[7] Complaint, ¶¶ 86–96.

[8] "Bayer Raises Takeover Bid for Monsanto," *New York Times*, July 14, 2016; "Monsanto Rejects Bayer's Revised Takeover Bid of $125 a Share," *New York Times*, July 19, 2016.

[9] "Bayer Raises Monsanto Cash Takeover Offer to $65bn," *The Guardian*, September 6, 2016; "Bayer Sweetens Monsanto Bid To $65 Billion, $127.5 A Share," *Investor's Business Daily*, September 6, 2016.

[10] Complaint, ¶ 96; "Bayer-Monsanto Deal Would Forge New Agricultural Force," *Wall Street Journal*, September 14, 2016; Agreement and Plan of Merger by and among Bayer Aktiengesellschaft, KWA Investment Co., and Monsanto Company, September 14, 2016.

[11] "BRIEF-Monsanto shareowners approve Bayer deal," *Reuters News*, December 13, 2016; "Justice Department to Allow Bayer's Acquisition of Monsanto After Companies Make Concessions – Sources," *Dow Jones Institutional News*, April 9, 2018; "Bayer wins EU approval for $62.5 billion Monsanto buy," *Reuters News*, March 21, 2018; "Competition Bureau reaches consent agreement with Bayer in its proposed acquisition of Monsanto," *Competition Bureau*

important approvals from the European Commission and U.S. Department of Justice on March 21, 2018 and May 29, 2018, respectively.[12]  The Merger ultimately closed on June 7, 2018, over two years after the initial offer was made, at $128 per share.[13]

19.    Monsanto managed its business in two reportable segments: (i) Seeds and Genomics and (ii) Agricultural Productivity.[14]  Within its smaller Agricultural Productivity segment, Monsanto's flagship product was Roundup, a herbicide based on the chemical compound glyphosate, used to control weeds in both agricultural and non-agricultural settings and sold globally.[15]  As of August 31, 2016, Roundup was the largest crop protection brand in the world, and the Agricultural Productivity segment, which was dominated by Roundup, accounted for 26% of Monsanto's total net sales in 2016.[16]  In addition to Roundup, Monsanto

*Canada*, May 30, 2018, https://www.canada.ca/en/competition-bureau/news/2018/05/competition-and-innovation-safeguarded-in-the-canadian-agricultural-sector.html; "Bayer receives Russian approval for Monsanto acquisition," *St. Louis Business Journal*, April 20, 2018; "China conditionally approves Bayer's acquisition of Monsanto," *Reuters News*, March 13, 2018; "Bayer-Monsanto deal approved by Brazil's antitrust agency," *S&P Global Market Intelligence*, February 7, 2018, https://www.spglobal.com/marketintelligence/en/news-insights/trending/7zoplkbthuxsjawk-whyyq2; "Bayer/Monsanto given final greenlight," *Global Competition Review*, June 5, 2018, https://globalcompetitionreview.com/article/bayermonsanto-given-final-greenlight; "ACCC won't oppose Bayer's proposed acquisition of Monsanto," *M2 Presswire*, March 22, 2018.

[12] "Bayer wins EU approval for $62.5 billion Monsanto buy," *Reuters News*, March 21, 2018; "European Commission Conditionally Approves Bayer-Monsanto Transaction; Focus Moves to US DOJ's Decision," *Goldman Sachs*, March 21, 2018, p. 1 ("Bayer announced that the European Commission (EC) has conditionally approved the company's proposed acquisition of Monsanto. While we still await the US DOJ's decision on the transaction, we see today's conditional approval as a major milestone towards closing the transaction"); "Ploughing Ahead: DoJ Approves Merger," *Deutsche Bank*, May 29, 2018, p. 1 ("The US DoJ has granted approval of Bayer's merger with Monsanto. This was most the [*sic*] important approval and we expect the approvals in Canada and Mexico to follow very shortly, suggesting the deal can be officially closed in the coming days.").

[13] Bayer Press Release, "Bayer closes Monsanto acquisition," June 7, 2018.

[14] Monsanto Company, Form 10-K for Fiscal Year Ended August 31, 2016, Filed on October 19, 2016 ("Monsanto 2016 10-K"), p. 3.

[15] Monsanto 2016 10-K, pp. 20, 26; "Glyphosate," *United States Environmental Protection Agency*, https://www.epa.gov/ingredients-used-pesticide-products/glyphosate.

[16] Monsanto 2016 10-K, pp. 16, 20, 26 (Monsanto reported total net sales of $13,502 million for the fiscal year ended August 31, 2016 and $3,514 million in net sales for the Agricultural Productivity segment).

also manufactured several other herbicide products within its Agricultural Productivity segment, including Harness and Dicamba.[17]

**B.      Summary of Plaintiffs' Allegations**

20.      Plaintiffs allege that the price of Bayer ADRs was inflated due to certain alleged misstatements and omissions (collectively the alleged "misrepresentations") between May 23, 2016 and July 6, 2020, inclusive (the "Proposed Class Period").[18]  I understand that the alleged misrepresentations that remain actionable following the Court's rulings on two motions to dismiss relate to (i) statements made prior to the close of the Merger about the nature and extent of Bayer's due diligence investigation into Monsanto's potential glyphosate litigation ("Roundup litigation") liability; and (ii) statements made after the Merger closed about the adequacy of Bayer's due diligence on Monsanto's potential Roundup litigation liability.[19]

21.      Plaintiffs allege that information correcting the alleged misrepresentations was released through the following five events:

    a.      On **August 10, 2018**, the jury in the *Johnson v. Monsanto* trial found that Roundup was a "substantial factor" in causing the plaintiff's cancer and awarded $289 million in compensatory and punitive damages.[20]  Plaintiffs claim that the verdict "raised concerns that the Defendants' due diligence may have been inadequate, [and] that the due diligence did not encompass Monsanto's emails heavily relied upon by the plaintiff in the Johnson Case."[21]

---

[17] Monsanto 2016 10-K, p. 6.

[18] Complaint, ¶ 317.

[19] Order Denying Defendants' Motion to Dismiss, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.,* October 19, 2021, p. 1; Complaint, ¶¶ 219–249.  I further understand that according to the Order Denying Motion to Dismiss, "Plaintiffs have not pleaded with particularity misrepresentations concerning Monsanto's science-based trial defenses. Plaintiffs thus cannot proceed on this theory of liability."  *See* Order Denying Motion to Dismiss, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.,* May 18, 2022, p. 2.

[20] Complaint, ¶¶ 18, 304.

[21] Complaint, ¶ 304.

b.  On **October 22, 2018**, the court in the *Johnson* case "rejected Monsanto's request for a new trial and for judgment notwithstanding the verdict," while also reducing punitive damages to $39 million.[22]  Plaintiffs claim that this decision corrected investors' "expectation of a reversal of the *Johnson* verdict."[23]

c.  On **March 19, 2019**, the jury in the *Hardeman v. Monsanto* trial also found that Roundup was a "substantial factor" in causing the plaintiff's cancer and awarded damages of $80 million.[24]  Plaintiffs allege that the verdict further revealed the "misleading nature" of Bayer's claims, "after the plaintiffs had used Monsanto's own internal documents to demonstrate that even Monsanto itself internally had concerns about numerous adverse studies, had concealed adverse internal studies from the public and regulators, and had systematically sought to tilt the science by ghostwriting academic papers and other articles supporting the safety of glyphosate."[25]

d.  On **June 24, 2020**, Bayer announced an agreement "to settle the existing and future cases for approximately $10.9 billion," which would cover an estimated 75% of current and potential future cases.[26]

e.  On **July 6, 2020**, the judge overseeing the settlement "indicated he would likely reject the portion of the settlement relating to the resolution of future cases."[27]  Plaintiffs allege that this disclosure, along with the disclosure on June 24, 2020, "reflected the materialization of the risk attendant with Bayer's failed due diligence and false statements."[28]

---

[22] Complaint, ¶¶ 24, 306.

[23] Complaint, ¶ 306.

[24] Complaint, ¶¶ 25, 307.

[25] Complaint, ¶ 307.

[26] Complaint, ¶¶ 29, 308.

[27] Complaint, ¶¶ 30, 308.

[28] Complaint, ¶ 308.

**V.     Mr. Coffman Fails to Provide a Methodology That Would Reliably Calculate Damages for All Proposed Class Members Consistent with Plaintiffs' Theory of Liability**

22.     As requested by Defendants' counsel, I have evaluated whether Plaintiffs have provided a methodology for calculating class-wide damages that is consistent with their theory of liability.  As discussed below, rather than providing a damages methodology tailored to Plaintiffs' theory of liability, Mr. Coffman provides a generic description of how damages could be calculated for a securities fraud claim.  That generalized description does not address several distinctive features of Plaintiffs' theory of liability in, or the economic realities of, this case.  Mr. Coffman has therefore not provided a methodology that can be used to calculate damages on a class-wide basis consistent with Plaintiffs' allegations in this case.

23.     Mr. Coffman states that "damages in this action can be calculated on a class-wide basis using a common methodology," based upon the amount of "artificial inflation" in the price of Bayer's ADRs.[29]  Though Mr. Coffman does not define the term "inflation," I understand "inflation" on any given day during a class period to be equal to the difference between the security's actual trading price on that day and the price at which it would have traded if the alleged "truth" had been publicly disclosed—*i.e.*, the "but-for price."

24.     Mr. Coffman opines that damages can be estimated by calculating "artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale."[30]  As Mr. Coffman acknowledges, it will be necessary to measure "artificial inflation" at all times during the Proposed Class Period.[31]  Yet Mr. Coffman does not propose a methodology for estimating inflation at *any* time during the Proposed Class Period, let alone at all times.[32]  Indeed, at deposition, Mr. Coffman disavowed any opinion as to how to quantify price inflation, stating "exactly how one would quantify … inflation … I have no opinion on."[33]

---

[29] Coffman Report, ¶¶ 7, 81.

[30] Coffman Report, ¶ 81.

[31] Coffman Report, ¶¶ 81, 85.

[32] Coffman Report, ¶ 82.

[33] Coffman Deposition, 211:7–9 ("Exactly how one would quantify that inflation to address all the sorts of issues you're raising, I have no opinion on.").

Mr. Coffman has further claimed that the "quantification of the artificial inflation per share requires a detailed loss causation analysis," but that "whatever the method for determining the artificial inflation per share, it would be common to all class members."[34]

25.    While a loss causation analysis may ultimately be necessary to calculate damages, such an analysis is not necessary to determine *how* inflation will ultimately be quantified and to *describe a methodology* to calculate damages on a class-wide basis consistent with Plaintiffs' theory of liability.[35]  Instead of providing a methodology for calculating damages that can address the distinctive aspects of this case, Mr. Coffman suggests the possibility of using "an event study that measures price reactions" to alleged corrective disclosures, which he characterizes as a "widely-used technique."[36]  Mr. Coffman does not, however, set out any details of how the basic financial tool of an event study, or the other financial tools he references, might be applied to calculate damages in this matter in a manner consistent with Plaintiffs' theory of liability.[37]  In short, Mr. Coffman has not provided any details about how one could adapt his "widely-used" approach to reliably estimate inflation given the specific complexities of this case.

26.    For example, Mr. Coffman acknowledges that the Court has dismissed several categories of misrepresentations—each of which were alleged to have been revealed false by the same alleged corrective disclosures relied upon in the Complaint.  However, he has "not proposed a methodology" for disaggregating the portion of any price decline stemming from those since-dismissed theories of liability.[38]  Similarly, Mr. Coffman acknowledges that the "widely-used" approach would need to "consider whether and to what extent any non-fraud related information (*i.e.* 'confounding information') contributed to the observed price

---

[34] Coffman Report, ¶ 83.

[35] I am not suggesting that Mr. Coffman should have either performed a loss causation analysis or quantified inflation in his report.

[36] Coffman Report, ¶ 84.

[37] Coffman Report, ¶ 84.

[38] Coffman Deposition, 216:7–19.

movement,"[39] yet he testified that he is "not offering an opinion on what would be necessary" to do so.[40]

27.    Mr. Coffman also acknowledges that "inflation per share may have evolved over the class period" and discusses different assumptions that could ultimately be made about how inflation evolved over time, if at all.[41]  Though he lists different "valuation techniques" that he speculates could be used to determine how inflation evolved, he testified that he does not know which (if any) of the example techniques that he lists in his report would be relevant to measuring the evolution of inflation over time given the specific issues of this case.[42]  And while Mr. Coffman acknowledged in his deposition that "a reasonable analysis of the inflation per share … would have to take into account what information is already public and what information remains concealed under plaintiffs' theory of the case," he does not provide any methodology for doing so.[43]

28.    In essence, Mr. Coffman has stated that damages can be calculated based on estimated inflation but has not identified any methodology for the class-wide measurement of inflation consistent with Plaintiffs' theory of liability.  Mr. Coffman instead provides only general references to a "widely-used" approach and various other "valuation techniques" that could be used, and thus fails to provide a methodology that can reliably calculate damages consistent with Plaintiffs' theory of liability.[44]

---

[39] Coffman Report, ¶ 84.  If there is such confounding information, Mr. Coffman argues that some further valuation techniques may need to be used to disentangle the price impact of alleged corrective disclosures from the price impact of confounding information.

[40] Coffman Deposition, 213:8–21 ("Q. Is it fair to gather that since you regard it as part of the loss causation analysis you're not proposing a methodology for identifying the portion of the post corrective disclosure stock drops that stem from the revelation of the fraud?  A. That's correct […] I have not done that analysis and am not offering an opinion on what would be necessary to do that analysis.").

[41] Coffman Report, ¶ 85.

[42] Coffman Deposition, 218:9–16 ("Have you developed an opinion, sitting here today, on whether any reliable valuation technique exists for measuring the evolution of inflation in this case?  A. I have not done any specific work to evaluate which, if any, of these methodologies would be necessary or what methodology would be necessary.").

[43] Coffman Deposition, 194:2–7.

[44] Coffman Report, ¶¶ 84–85; Coffman Deposition, 232:11–17, 233:19–23.

29.    Mr. Coffman's failure to provide any meaningful detail of a possible damages methodology is particularly problematic in this litigation, where Plaintiffs' theory of liability, coupled with the economic realities of the case, presents a number of distinctive features that will complicate any effort to calculate damages on a class-wide basis in a manner consistent with the theory of liability. As detailed below, Mr. Coffman has acknowledged—but failed to make any effort to confront—several of these features:

30.    As discussed in Section V.A, Plaintiffs and Mr. Coffman claim that the alleged misrepresentations understated the degree of Roundup litigation risk, which ultimately materialized through the alleged corrective disclosures. In a matter involving the materialization of known risk, inflation will be based upon the degree to which the alleged misrepresentations affected the market's assessments of both the probability and severity of that risk. In such a case, price declines occurring in response to the *ex post* realizations of the risk do not measure the impact of the alleged misrepresentations on *ex ante* expectations of the likelihood or the size of the losses. Mr. Coffman provides no explanation of how he would address this issue.

31.    As discussed in Section V.B, there was uncertainty about whether the Merger would be completed during the two-year period prior to the actual close of the Merger on June 7, 2018, and analysts and investors disagreed about the likelihood of merger completion. Because the alleged corrective disclosures relate to Monsanto, their impact on Bayer's ADR price prior to the Merger close would depend on the probability of merger completion. As a result, estimating damages prior to the Merger close necessitates an alternative methodology, or at the very least an additional element of a methodology, for measuring inflation, taking into account the likelihood that the Merger would close. Mr. Coffman fails to provide any methodology for measuring this probability and calculating inflation during the period prior to June 7, 2018.

32.    As discussed in Section V.C, Mr. Coffman fails to explain how one could objectively and reliably identify relevant disclosures pertaining to the Roundup litigation and measure their impact on inflation. Mr. Coffman's approach of measuring inflation using the price reaction of Bayer's ADRs following the alleged corrective disclosures ignores other similar developments in the Roundup litigation, including releases of information following which the price of the Bayer ADRs did *not* decrease, according to Mr. Coffman's event study.

33.     As discussed in Section V.D, there were changes in the information available to the market regarding Monsanto's Roundup liabilities and Bayer's corporate structure over the course of the Proposed Class Period.  Mr. Coffman fails to explain how one could account for this changing information in measuring inflation over time consistent with Plaintiffs' theory of liability.

**A.     Mr. Coffman Fails to Provide a Methodology that Could Reliably Measure Damages Consistent with Plaintiffs' Theory of Liability in a Manner that Accounts for the Extent to which Investors May Have Been Misled About the Roundup Litigation Risk**

34.     Plaintiffs allege it "was essential that Bayer conduct meaningful due diligence as to the *reputational and financial risk* of the Roundup Litigation," and that these risks ultimately materialized through a series of alleged corrective disclosures relating to developments in the Roundup litigation, including jury verdicts finding Monsanto liable for plaintiffs' cancer.[45] Notably, Plaintiffs also acknowledge that investors knew of these risks to some degree, alleging that "Monsanto's legal and reputational exposure were understood as among the most significant risks of the Merger and were of critical importance to Bayer and the market."[46]

35.     In a case such as this one, in which plaintiffs allege that defendants misled the market about the degree of a particular risk, any price declines following alleged corrective disclosures do not represent inflation, because even had the true risk been known by the market, the price *still* would have declined by some amount when that risk ultimately materialized.

---

[45] Complaint, ¶¶ 8 (emphasis added), 29, 301, 304–310.

[46] Complaint, ¶ 69.  The Roundup litigation risk was also noted by commentators on investor forums even prior to the start of the Proposed Class Period.  For example, an article on October 15, 2015 noted that "U.S. personal injury law firms are gathering plaintiffs for what they say could be 'mass tort' actions against Monsanto (NYSE: MON) that claim the company's Roundup herbicide has caused cancer in farm workers and others exposed to the chemical, Reuters reports," while another article from July 10, 2017 stated that "More than 800 cancer patient are suing Monsanto because they used Roundup and later developed cancer. Investors should monitor the success or failure of these lawsuits."  *See* "Lawsuits mount against Monsanto over alleged Roundup cancer link," *Seeking Alpha*, October 15, 2015, https://seekingalpha.com/news/2833386-lawsuits-mount-against-monsanto-over-alleged-roundup-cancer-link; "The Impact Of Glysophate [*sic*] Regulation And Litigation On Monsanto," *Seeking Alpha*, July 10, 2017, https://seekingalpha.com/article/4086589-impact-of-glysophate-regulation-and-litigation-on-monsanto.

Therefore, as I explain in Section V.A.1, using the price declines following the alleged corrective disclosures to measure inflation would overstate inflation and thus overcompensate Plaintiffs.

36.    Instead, any calculation of inflation must be based on the extent to which the market was misled about the risk by the alleged misrepresentations before the risk materialized. As I explain in Section V.A.2, Mr. Coffman has identified no methodology that would allow one to measure inflation in this manner consistent with Plaintiffs' theory of liability.  Though Mr. Coffman suggests that this type of measurement is premature and requires a loss causation analysis aided by fact discovery,[47] such analysis is not required to explain *how* damages could be calculated.

37.    Moreover, Mr. Coffman does not explain what information he expects to gain from fact discovery and how that would inform his approach.  In particular, as I explain in Section V.A.3, Plaintiffs allege that Bayer did not review any of Monsanto's internal documents until after the Merger was completed.[48]  Even assuming those documents contain non-public information about the true risk of the Roundup litigation, Plaintiffs allege that Bayer did not have that information.[49]  It is therefore unclear how Mr. Coffman could expect to use that information (that was allegedly available to Monsanto but not Defendants) to determine how whatever allegedly truthful disclosure Defendants should have made would have affected investors' beliefs about the true risk to Bayer, or the effect of those beliefs on the price of Bayer's ADRs. Certainly, Mr. Coffman has provided no information about how one could make such a determination, as would be necessary to calculate damages.

### 1.    Inflation in a Case Involving the Materialization of Risk

38.    The Roundup litigation verdicts represent realizations of the risk of negative litigation outcomes and associated damages awards (as I explain in more detail in Section V.A.2 below).  Unless the actual damages awards were consistent with the market's prior expectation

---

[47] Coffman Report, ¶¶ 83–84.

[48] Complaint, ¶ 136.

[49] References to the "true risk" of the Roundup litigation should not be construed to indicate that this risk differed from what was known to investors.  I have not reached any opinion on that subject, and for purposes of this report assume Plaintiffs' allegations as pled.

(including both the certainty of a liability verdict against Monsanto and the size of the damages awarded), Bayer's ADR price would have changed as a result of the news, regardless of whether there were any misrepresentations.  Thus, the ADR price would have declined in response to the realization of an unexpectedly large damages award, even absent any alleged misrepresentations.

39.     As a hypothetical and stylized example, suppose there were only two possible outcomes to a Roundup lawsuit:  either a verdict in favor of Monsanto or a verdict against Monsanto resulting in a damages award of $100 million.  Suppose that the market, incorporating any alleged misrepresentations, believed that the probability of an adverse verdict resulting in Monsanto's paying $100 million was 5%.  In an efficient market, an expected loss of 5% x $100 million = $5 million would be incorporated into the market value of the company and its ADR price.  In the event of an adverse verdict, the probability of the loss would increase to 100%, and the market value of the company would decline by the additional $95 million to reflect the resulting certainty of the adverse verdict.

40.     Now suppose that absent the alleged misrepresentations, the market would have expected a 15% probability of an adverse verdict.  Had the true probability been disclosed before the verdict, an additional $10 million expected loss ($100 million x (15% – 5%)) would have been factored into the price of Bayer's ADRs.  However, the market price would *not* have reflected the full impact of the $100 million loss that was actually realized when the verdict was announced.  Even in this scenario, Bayer's market value would have decreased by $85 million when the risk materialized.  Thus, the full price decline resulting from the *realization* of a risk is not a reliable measure of inflation resulting from an alleged misrepresentation about the *degree* of risk and would overstate any inflation and damages.[50]

---

[50] This example further oversimplifies the situation by assuming that the size of the damages award in the event of an adverse verdict is known in advance.  If the size of the damages award were also uncertain, then the decline in market value of the company would depend on both the realization of the adverse verdict and the size of the award relative to market expectations.  Thus, if the damages award were different than expected, that would provide an additional dimension that would cause the reaction to a but-for disclosure to be different from the actual reaction.  In the hypothetical stylized example above, suppose the market thought in the event of an adverse verdict, Monsanto would be required to pay $100 million, but the actual verdict was instead $1 billion.  Then, upon announcement of the verdict, Monsanto's market value would decline by $995 million, reflecting the actual verdict of $1 billion less the expected loss of $5 million.  However, a disclosure of the true probability of 15% would, prior to the realization of the risk,

      **2.**      **Mr. Coffman Fails to Provide a Methodology to Assess the Extent to Which Investors Were Misled About the Roundup Litigation Risk, If at All**

41.      As described above, Plaintiffs allege that Defendants' statements about its due diligence misled the market regarding the "*reputational and financial risk* of the Roundup Litigation*,*" and that the alleged corrective disclosures represent materializations of those risks.[51] Mr. Coffman similarly states that "[t]he Complaint alleges that through a series of corrective disclosures and *materialization of the risks* attendant with Bayer's failed due diligence and misleading statements, the market finally learned the truth about the risks associated with the Roundup litigation."[52]  In deposition, he also reiterated that Plaintiffs allege that "[t]hey were lied to about the risks and then some of the risks ultimately came to pass."[53]  In discussing the initial *Johnson* trial verdict in August 2018, Mr. Coffman also stated that "I understand plaintiffs to be alleging that that event reflect[s] the materialization of a risk … and so my understanding is that … [the] Johnson verdict provided the market with new information about the risks that the company actually faced and the market, therefore, updated its expectations as to the financial impact of those risks."[54]  In other words, Plaintiffs appear to allege that the alleged corrective disclosures represent *realizations* of the risk that Monsanto (and consequently Bayer, once the Merger was completed) could be liable for damages in various litigations related to Roundup.

---

still have led to an additional expected loss of $10 million because the market would *not* have incorporated the $1 billion verdict into its estimate.

[51] Complaint, ¶ 8 (emphasis added); Complaint, ¶ 301 ("The declines in the price of Bayer's ADRs following the corrective disclosures and/or materializations of the concealed risk were a direct result of the nature and extent of Defendants' fraudulent misrepresentations … being revealed to investors and the market.").  *See also, e.g.*, Complaint, ¶ 29 ("In June and July of 2020, the materialization of the risks attendant with Bayer's massive due diligence failures and false and misleading statements finally began to take shape"); Complaint, ¶ 308 (following alleged corrective disclosures on June 24 and July 6, 2020, "the market price of the ADRs reflected the materialization of the risk attendant with Bayer's failed due diligence and false statements").

[52] Coffman Report, ¶ 15 (emphasis added).

[53] Coffman Deposition, 106:24–107:2.

[54] Coffman Deposition, 182:4–18.

42.     If the market for the Bayer ADRs were efficient, as Mr. Coffman claims, then the ADR price would have incorporated the market's expectation of the Roundup lawsuits' impact on Bayer's future cash flows.[55]  That expectation would have been based on (i) the likelihood of a negative litigation outcome being realized and (ii) the distribution of the size of damages awarded conditional on the realization of a negative litigation outcome, as in the simplified example discussed above.

43.     Consequently, had Bayer made a hypothetical statement earlier in the Class Period revealing the allegedly true nature and extent of its due diligence, the market would have updated its expectation, but Mr. Coffman has provided no basis to assume that the market would have predicted the ultimate jury findings or the exposure with certainty.  Indeed, he acknowledged at deposition that Bayer could not have disclosed the outcome of the *Johnson* case before it occurred.[56]  Thus, when the risks materialized through the alleged corrective disclosures, Bayer's ADR price could have still changed even absent any misrepresentations.  As a result, the price reactions to these alleged corrective disclosures cannot, on their own, be used to reliably measure inflation attributable to the alleged misrepresentations.  Instead, Mr. Coffman would need to articulate a model that would assess the impact of a but-for disclosure regarding Bayer's due diligence on the market's expectations of litigation risk, *prior* to the alleged corrective disclosures, which he fails to do.

44.     Mr. Coffman has failed to provide a methodology that could address even the oversimplified example provided above.  Mr. Coffman writes that "the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (i.e. a 'corrective disclosure')."[57]  Such an event study would not allow him to calculate damages in this matter, as it would not provide an estimate of how the market's *ex ante* assessment of *either* (i) the likelihood of an adverse outcome or (ii) the ultimate exposure resulting from such an outcome was affected by the alleged misrepresentations, yet both are

---

[55] Coffman Report, ¶ 6.

[56] Coffman Deposition, 202:12–16.

[57] Coffman Report, ¶ 84.

necessary to measuring inflation consistent with Plaintiffs' theory of liability.  There is nothing in Mr. Coffman's report that describes in any meaningful detail how one could meet these challenges to measuring inflation in a manner consistent with Plaintiffs' theory of liability.

> **3.    Mr. Coffman Fails to Explain How One Could Measure Inflation Accounting for Plaintiffs' Allegation that Bayer Did Not Know and Therefore Could Not Have Disclosed the True Extent of Monsanto's Roundup Litigation Risk Prior to August 2018**

45.    Mr. Coffman's assertion that one could use price reactions to alleged corrective disclosures to measure inflation is further complicated by the disconnect between the subject matter of the alleged misrepresentations, which relate to Bayer's due diligence in connection with the Merger, and that of the alleged corrective disclosures, which do not discuss Bayer's due diligence but instead are outcomes of certain Roundup lawsuits.  Even assuming these litigation developments do, as Plaintiffs allege, provide corrective information about the nature and extent of Bayer's due diligence on Monsanto's potential Roundup litigation liability, Mr. Coffman fails to provide any methodology for translating observed price reactions to information about the Roundup litigation into a measure of price inflation created by the alleged misrepresentations about Bayer's due diligence.

46.    This is particularly noteworthy because Mr. Coffman proposes using stock price reactions to alleged corrective disclosures, which provided the market with information about Monsanto's legal exposure, despite Plaintiffs' allegations that Bayer did not have documents "essential to determining" that exposure.  Specifically, according to Plaintiffs, "Bayer had not reviewed or even requested *any* internal Monsanto documents relating to Roundup's legal risks as part of the due diligence process," and did not obtain those documents until August 2018.[58] Plaintiffs claim that these documents "were essential to determining Monsanto's exposure," which implies that without these documents Bayer could not have known, and thus could not

---

[58] Memorandum of Law ISO Motion for Class Certification, pp. 3–4 (emphasis in original).  *See also* Memorandum of Law ISO Motion for Class Certification, p. 4 ("The merger closed … after two years of due diligence … during which Bayer did not examine even a single internal document related to Roundup"); Complaint, ¶¶ 136–137, 244.

have disclosed, the true Roundup litigation risk to the market.[59]  Mr. Coffman does not address how one could measure inflation resulting from the alleged misrepresentations regarding the nature of the Company's pre-Merger due diligence on Monsanto's potential Roundup litigation liability, given that the actual extent of this potential liability was allegedly not known to Bayer. Mr. Coffman thus fails to propose a methodology to measure price inflation consistent with this aspect of Plaintiffs' theory of liability.

> **B.**    **Mr. Coffman Does Not Provide a Methodology to Measure Inflation that Would Incorporate Investor Uncertainty About the Likelihood that Bayer Would Acquire Monsanto**

47.    As discussed above, while Mr. Coffman does not specify what methodology would appropriately measure inflation in this matter, he suggests that one potential approach would be to use an event study to examine the stock price reaction to the alleged corrective disclosures.[60]  Yet he fails to acknowledge that such an event study would measure the price decline in response to the alleged corrective disclosures on specific dates between August 2018 and July 2020, not the price decline that would have occurred if the alleged misrepresentations had been corrected before Bayer had completed the Merger with Monsanto.  This is despite that fact that Mr. Coffman acknowledged in deposition that the same information can have a different effect on a company's stock price at different points in time.[61]

48.    This issue is critical in this case because not only would any inflation be expected to change over time, the changing relationship between Bayer and Monsanto suggests that a separate methodology, or at the very least an additional element of a methodology, is necessary to measure inflation before the Merger was completed relative to after the Merger.  As discussed in more detail below, during the extended interval between Bayer's initial offer in May 2016 and the Merger's closing on June 7, 2018, there existed uncertainty and changing expectations

---

[59] Memorandum of Law ISO Motion for Class Certification, p. 4.

[60] Coffman Report, ¶ 84.

[61] Coffman Deposition, 26:25–27:6 ("Q: Got it, but if the context has changed where someone would interpret that information differently, than an identical disclosure can prompt a different market reaction; is that what you are saying? A: Possibly, yes.").

regarding whether the transaction would be consummated.[62]  Any calculation of inflation before the Merger was completed would need to account for the uncertainty and changing expectations.[63]

49.      As a simple example, consider a hypothetical situation in which Monsanto discloses that it has unexpectedly lost cash equivalent to $1 per Bayer ADR.  If the disclosure occurred after the Merger was completed, then the price of a Bayer ADR would likely fall by $1, because Monsanto's loss would be the same as Bayer's loss and would directly affect Bayer's share price.[64]  But if the disclosure occurred prior to the Merger completion, when the Merger was still uncertain (*e.g.*, while it was being reviewed by regulators), the effect on the Bayer ADR

---

[62] For example, analysts and public press commented on the possibility that the Merger would not be completed during this time.  *See, e.g.,* "Bayer/Monsanto: From Anger to Acceptance? Results of Our Investor Survey - Deal Agreement Seen as 80% Likely, Consummation Only 53%, We See Lower Odds," *Bernstein*, September 13, 2016; "Bayer Raises Takeover Bid for Monsanto," *New York Times*, July 14, 2016 ("Shares of Monsanto were up 2.3 percent in midday trading on Thursday, though at $103.55 they were still well below the offer, suggesting investor skepticism over the prospects of an agreement.").  Furthermore, as shown in Exhibit 1, Monsanto's stock traded at a price well below the offer price throughout much of the pre-Merger period, suggesting substantial uncertainty as to the merger completion.

[63] Indeed, the academic literature shows that not all announced mergers are completed and that there is substantial heterogeneity in the probability of completion across proposed deals.  Fich et al. (2015) and Dhaliwal et al. (2016) find a completion rate of approximately 83% in their respective samples, which cover similar periods (1984–2011 and 1985–2010, respectively). Bereskin et al. (2018), based on a more recent sample (1994–2014), estimates a merger completion rate of 78%.  Serdar and Erel (2013), with a sample of merger attempts in the European Union between 1997 and 2006, estimate a 62% probability of merger completion.  *See* Eliezer M. Fich et al., "Motivated Monitors: The Importance of Institutional Investors' Portfolio Weights," *Journal of Financial Economics* 118, no. 1, 2015, pp. 21–48 at pp. 23, 24, 29; Dan S. Dhaliwal et al., "Shared Auditors in Mergers and Acquisitions," *Journal of Accounting and Economics* 61, no. 1, 2016, pp. 49–76, at pp. 49–51, 54; Fred Bereskin et al., "The Effect of Cultural Similarity on Mergers and Acquisitions: Evidence from Corporate Social Responsibility," *Journal of Financial and Quantitative Analysis* 53, no. 5, 2018, pp. 1995–2039 at pp. 2004, 2006, 2013–2014; I. Serdar Dinc and Isil Erel, "Economic Nationalism in Mergers and Acquisitions," *The Journal of Finance* 68, no. 6, 2013, pp. 2471–2514 at p. 2494.  Bayer provided an example of the risks to merger completion when it decided not to pursue the acquisition of Schiff Nutrition International in 2012, after a competitor made a higher bid.  *See* "Bayer Drops Bid for Schiff Nutrition," *New York Times*, November 20, 2012.

[64] This simple example is meant to illustrate the effect of the merger probability on the impact to Bayer's ADR price and ignores potential complexities that could change the precise magnitude of the impact.

price would likely be less than $1, reflecting the fact that that the Merger might not be completed, in which case the loss would not affect the Bayer ADR price. For example, if the market believed there was only a 10% chance that the Merger would succeed, then, all else equal, the disclosure would only lead to a decline of $0.10 in the Bayer ADR price.

50. Therefore, to calculate damages, Mr. Coffman needs a methodology that can measure and account for investors' assessed probability of the Merger. An event study of price reactions at the end of the Proposed Class Period, after the Merger was completed, could not, on its own, provide an estimate of inflation *prior* to the Merger completion, when there was some chance that the Merger would not occur. Because any impact of a disclosure about Bayer's due diligence into Monsanto would be smaller when the Merger was uncertain to be approved than when the Merger had already been completed, using price reactions to the alleged corrective disclosures will overstate inflation earlier in the Proposed Class Period. Instead, inflation would depend on investors' assessment of the probability that the Merger would be completed and could have varied over time as the market's expectations of the Merger's success changed.[65]

51. Mr. Coffman does not explain how one could account for this critical issue, and thus has not provided any methodology that can measure inflation before the Merger was completed. Thus, Mr. Coffman has not established that "damages … are subject to a … common methodology that can be applied to the Class as a whole."[66]

52. Mr. Coffman's claim is further undermined by the complexities inherent in reliably estimating investors' assessment of the Merger probability in this case. As demonstrated in Exhibit 2, estimates of the merger completion probability varied widely among analysts even around the same point in time (when analysts would have had access to the same set of information to inform their estimates). For example, in September 2016, Bernstein estimated the

---

[65] Indeed, Mr. Coffman acknowledged that inflation could be affected by "the market's assessment of the likelihood of the [merger] closing." *See* Coffman Deposition, 224:16–225:5 ("Q: Would you expect that during the preclose period, inflation in the price of Bayer ADRs would be impacted by the market's assessment of the likelihood of the market closing? … A: Possibly. I mean that's something I would want to evaluate carefully. I don't know that I can give you an answer right now. I think it would be speculative to say whether it absolutely would or wouldn't, but it is something I certainly would want to think about and consider carefully.").

[66] Coffman Report, ¶ 86.

probability of merger completion at 30%, Morningstar provided an estimate of 75%, and Citi estimated a 60% chance that the Merger would go through at either the current offer price or a higher price.[67]  Similarly, in March and April 2017, reported estimates ranged from 75% (Bernstein) to 90% (Citi).[68]

53.    Moreover, not only did stated expectations differ among analysts, they also differed between analysts and investors, and among investors.  For example, Bernstein surveyed a set of investors in Bayer and Monsanto and found "deal agreement seen as 80% likely, consummation only 53%," but noted that Bernstein "see[s] lower odds."[69]  In fact, different investors provided estimates of merger completion in each five percentage point range between 5–10% and 90–95% in Bernstein's survey, highlighting the wide variation of views.[70]

54.    This investor and analyst disagreement presents a problem for estimating investors' assessments of the merger completion probability from analyst reports.  Mr. Coffman cannot simply use the analysts' reported estimates; he would need to determine how to aggregate the varied estimates across analysts and over time and explain why that aggregated estimate is a reliable measure of the market's probability assessment.  A similar problem would arise if Mr. Coffman claims that fact discovery can address this issue—even if information about the companies' or regulators' beliefs about the Merger's likelihood of success exists, Mr. Coffman

---

[67] "Bayer/Monsanto: From Anger to Acceptance? Results of Our Investor Survey - Deal Agreement Seen as 80% Likely, Consummation Only 53%, We See Lower Odds," *Bernstein*, September 13, 2016, p. 2; "We Expect the Bayer Acquisition of Monsanto is More Likely to Close than Not," *Morningstar*, September 23, 2016, p. 2; "Alert: Left with Little Choice but to Accept Bayer's Offer," *Citi*, September 16, 2016, p. 2.

[68] "We Expect the Bayer Acquisition of Monsanto is More Likely to Close than Not," *Morningstar*, March 17, 2017, p. 2; "Alert: Conditional EU Approval Positive for DOW and DD," *Citi*, March 27, 2017, p. 1; "Global Chemicals: State of Play in Chemicals M&A - Where We Stand in the Six (Potential) Deals," *Bernstein*, April 6, 2017, p. 1; "Grinding Higher Toward Bayer Deal," *Citi*, April 10, 2017, p. 1.

[69] "Bayer/Monsanto: From Anger to Acceptance? Results of Our Investor Survey - Deal Agreement Seen as 80% Likely, Consummation Only 53%, We See Lower Odds," *Bernstein*, September 13, 2016, p. 1 (capitalization omitted).

[70] "Bayer/Monsanto: From Anger to Acceptance? Results of Our Investor Survey - Deal Agreement Seen as 80% Likely, Consummation Only 53%, We See Lower Odds," *Bernstein*, September 13, 2016, p. 3.

would need a methodology to determine how those assessments related to investors' assessments.

55.    Furthermore, while Mr. Coffman testified in deposition that "there are quantitative techniques of comparing the price of Monsanto with the price of Bayer and how those move over time to try to get an assessment of the probability that the deal would go through," this cursory description does not constitute a reliable methodology for measuring that probability throughout the Proposed Class Period.[71]  In an efficient market, Monsanto's stock price prior to the closing of the Merger would reflect the likelihood that the Merger would be completed at the offer price (as well as the possibility that the terms of the Merger agreement might change), and the stand-alone value of Monsanto in the event that the Merger would *not* be completed.[72]  To the extent that Mr. Coffman proposes some analysis of the Monsanto stock price to estimate the merger completion probability, he would need to be able to reliably value Monsanto as a stand-alone company throughout the more than two year pre-Merger period accounting for the release of all new, value-relevant information about the company.

56.    Thus, although the merger completion probability likely evolved over the Proposed Class Period,[73] Mr. Coffman has provided no methodology to account for the impact of

---

[71] Coffman Deposition, 225:12–16.

[72] Robert W. Holthausen and Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice*, First Edition (Westmont, IL:  Cambridge Business Publishers, 2017), p. 188.  To be more precise, Monsanto's share price would reflect the likelihood, and the value per share, of each of the following scenarios (which may not be an exhaustive list):  that the Merger would be completed at the offer price; that a merger would be completed under other terms (and potentially with another company); that regulators would not approve the Merger, leading to Bayer paying Monsanto a $2 billion "break-up fee;" and that Monsanto would terminate the Merger.  To calculate the merger completion probability, Mr. Coffman would have to account for all of these possibilities.

[73] There were numerous developments during the Proposed Class Period that likely impacted the market's assessment of the merger completion probability, including the approval of the Merger by Monsanto's board of directors on September 14, 2016; the vote by Monsanto shareholders approving the Merger on December 13, 2016; divestitures undertaken by Bayer to receive regulatory approval for the Merger, including Bayer's agreement to divest parts of its Crop Science business in October 2017; regulatory developments including conditional approval for the Merger granted by the European commission on March 21, 2018 and DOJ approval granted on May 29, 2018.  Beyond events specific to Monsanto and Bayer, other news could also have affected the merger completion probability.  For example, following the election of President Trump in November 2016, Bayer's CEO stated that there was "widespread concern about

these changes on the calculation of damages, as underscored by his focus on price reactions to the alleged corrective disclosures, and references to "constant dollar inflation" or "constant percentage inflation," or to "information contained in internal documents obtained in discovery."[74]  Mr. Coffman states that "the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (i.e. a 'corrective disclosure')."[75]  An event study of this kind, however, cannot estimate the merger completion probability that is needed for calculating damages in this matter.  Mr. Coffman provides no meaningful guidance in his report for how such a probability could be calculated.

### C.   Mr. Coffman Fails to Explain How Inflation Could Reliably and Objectively Be Estimated Using ADR Price Changes Following Alleged Corrective Disclosures and Not Other Information Regarding Due Diligence or Other Litigation Developments

57.    Moreover, Mr. Coffman fails to explain why it would be appropriate to distinguish between price declines following certain developments related to the Roundup litigation (*i.e.*, the alleged corrective disclosures), on the one hand, and the price reactions to *other* salient developments in the lawsuits, including during the discovery process before the trials, during the trials but before the verdicts, or after the verdicts, on the other.

---

increasing protectionism," which was also discussed by analysts.  Subsequently, analysts at Kepler Cheuvreux mentioned the possibility that "a protectionist Trump administration raises the risks" that the Merger would not be completed.  *See* Bayer Press Release, "Bayer and Monsanto to Create a Global Leader in Agriculture," September 14, 2016, p. 1; "Monsanto shareholders back Bayer deal, CEO hopeful of U.S. approval – Reuters News," *Reuters News*, December 13, 2016; "Bayer, Monsanto start $2.5 billion asset sale to get merger clearance: sources," *Reuters News*, March 9, 2017; Bayer Press Release, "Bayer signs agreement to sell selected Crop Science businesses to BASF for EUR 5.9 billion," October 17, 2017; Bayer Press Release, "European Commission conditionally approves Bayer's proposed acquisition of Monsanto," March 21, 2018; Bayer Press Release, "U. S. Department of Justice conditionally approves Bayer's proposed acquisition of Monsanto," May 29, 2018; "Why Trump's win worried Bayer's CEO," *St. Louis Business Journal,* November 28, 2016; "Far more farmer than Pharma?" *Kepler Cheuvreux*, November 21, 2016, p. 8.  Exhibit 2 shows how analysts updated their views on the likelihood the Merger would be completed over time.

[74] Coffman Report, ¶ 85.

[75] Coffman Report, ¶ 84.

58.     To the extent that the price reaction of Bayer ADRs to the alleged corrective disclosures are relevant to measuring inflation as Plaintiffs allege, that suggests that the price reaction to similar litigation developments would also be relevant.[76]  Mr. Coffman fails to provide any methodology for reliably identifying which information releases on which dates would be relevant for measuring inflation, and which would not be, in light of the numerous public developments in the Roundup litigation that occurred before and after the alleged corrective disclosures.

59.     For example, Plaintiffs allege that the *Johnson* verdict "raised concerns that the Defendants' due diligence may have been inadequate, [and] that the due diligence did not encompass Monsanto's emails heavily relied upon by the plaintiff in the Johnson Case."[77] However, as part of the discovery process in the Roundup multidistrict litigation in California, internal Monsanto documents, including emails, relating to internal discussion of glyphosate's health risks were made publicly available on March 14, 2017, March 15, 2017, and August 1, 2017—over a year before the *Johnson* verdict.[78]

60.     These documents were widely covered by public press sources.  For example, the *New York Times* discussed the documents from the March 2017 release, including by summarizing and quoting from an email that reportedly suggested that "company officials … could ghostwrite research on glyphosate by hiring academics to put their names on papers that were actually written by Monsanto."[79]  *Reuters* reported that "[e]mployees of Monsanto Co

---

[76] Mr. Coffman has also failed to explain how he would account for other issues with analyzing the alleged corrective disclosures.  For example, Plaintiffs allege that Bayer's announcement of an agreement "to settle the existing and future cases for approximately $10.9 billion" around 12:45 PM ET on June 24, 2020 was a corrective disclosure.  *See* Complaint, ¶¶ 29, 308. However, Mr. Coffman's event study shows that the price of Bayer's ADRs *increased* in a statistically significant manner on that day.  *See* Coffman Report backup materials, "Bayer Exhibits.xlsx".  To the extent that Mr. Coffman suggests one should use this price reaction to measure inflation, he has not described how a price increase could be used in a manner consistent with Plaintiffs' theory of liability.

[77] Complaint, ¶ 304.

[78] "The Monsanto Papers – Master Chart," *Wisner Baum*, https://www.wisnerbaum.com/assets/Monsanto%20Roundup%20pages/Secret%20Documents/monsanto-documents-chart-101217.pdf.

[79] "Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed Documents," *New York Times*, March 14, 2017, 8:48 PM ET.

ghostwrote scientific reports that U.S. regulators relied on to determine that a chemical in its Roundup weed killer does not cause cancer, farmers and others suing the company claimed in court filings."[80]  Following the release of another batch of internal Monsanto documents in August 2017, the *New York Times* reported that "[d]ocuments released Tuesday in a lawsuit against Monsanto raised new questions about the company's efforts to influence the news media and scientific research and revealed internal debate over the safety of its highest-profile product, the weed killer Roundup."[81]  The *Wall Street Journal* also wrote that "[t]he emails show Monsanto's efforts to marshal scientists in defense of its product and combat research at odds with its own."[82]

61.     The so-called "Monsanto Papers" were also discussed during a hearing before the House of Representatives Committee on Science, Space, and Technology relating to glyphosate on February 6, 2018.[83]  The committee hearing was covered by public press, including an article by the Associated Press that discussed scientific studies about glyphosate's potential health risks and noted that the "finding that glyphosate is likely carcinogenic triggered a wave of lawsuits over its continued use."[84]

62.     During the *Johnson* trial, Monsanto's emails were introduced as evidence starting on July 9, 2018.[85]  The *Guardian*, for example, reported on July 9, 2018 that Johnson's counsel "presented internal Monsanto emails that he said showed how the agrochemical company

---

[80] "Plaintiffs in U.S. lawsuit say Monsanto ghostwrote Roundup studies," *Reuters News*, March 14, 2017, 8:17 PM ET.

[81] "Monsanto's Sway Over Research Is Seen in Disclosed Emails," *New York Times*, August 1, 2017, 8:36 PM ET.

[82] "Monsanto Employee Emails Show Efforts to Marshal Scientists," *Wall Street Journal*, August 3, 2017, 7:15 PM ET.

[83] Hearing on "In Defense of Scientific Integrity: Examining the IARC Monograph Programme and Glyphosate Review" before the Committee on Science, Space, and Technology of the United States House of Representatives, February 6, 2018, https://www.govinfo.gov/content/pkg/CHRG-115hhrg28933/pdf/CHRG-115hhrg28933.pdf, pp. 39, 113–114.

[84] "GOP lawmakers take aim at WHO agency over Roundup ingredient," *Associated Press*, February 6, 2018, 5:20 PM ET.

[85] "Johnson Trial (2018)," *Wisner Baum*, https://www.wisnerbaum.com/toxic-tort-law/monsanto-roundup-lawsuit/johnson-trial-2018-/.

rejected critical research and expert warnings over the years while pursing and helping to write favorable analyses of their products."[86]  Plaintiffs acknowledge that the *Johnson* trial was "widely covered" by analysts and the press, suggesting that this evidence would have been widely available and incorporated in the price of Bayer ADRs if the market were efficient, as Mr. Coffman claims.[87]

63.    Mr. Coffman does not acknowledge any of the above statements, let alone address how one could account for the public release of Monsanto's documents or other developments in the Roundup litigation in measuring inflation.[88]

64.    In addition, Mr. Coffman fails to explain how his methodology would account for other statements Bayer made about its pre-merger due diligence.  For example, Plaintiffs allege that in a press release on August 16, 2018, Bayer "admitted for the first time that [it] never looked at Monsanto's internal documents before the closing of the Merger."[89]  Given that Plaintiffs' allegations are that Bayer misled the market about the nature and extent of its due diligence leading to inflation in Bayer's ADR price, it seems logical that inflation would have differed before and after this press release (and, perhaps, that this press release could have helped to correct prior alleged misrepresentations).[90]  However, Mr. Coffman provides no methodology that could account for any change in inflation due to this disclosure.[91]

---

[86] "Monsanto 'bullied scientists' and hid weedkiller cancer risk, lawyer tells court," *The Guardian*, July 9, 2018, 11:17 PM ET.

[87] Complaint, ¶ 117.

[88] I note that Mr. Coffman's event study finds no statistically significant price movement in Bayer ADRs on any of the dates of these developments (*i.e.,* on March 14, 2017, March 15, 2017, March 16, 2017, August 1, 2017, August 2, 2017, February 6, 2018, July 9, 2018, or any subsequent date in the *Johnson* trial before the verdict).  *See* Coffman Report backup materials, "Bayer Exhibits.xlsx".

[89] Complaint, ¶ 136.

[90] Though Mr. Coffman's model shows that the price change in Bayer ADRs was statistically significant and negative on this date, an analysis of intraday data shows that the price of Bayer's ordinary shares decreased prior to the issuance of the press release, and then *increased* after the issuance of the press release at 8:16 AM ET (during German market hours) and closed higher at 11:30 AM ET.  Bayer's ordinary share return from the time of the press release until German market close was 0.7%, and an ETF tracking the EURO STOXX 50 (the market index used by Mr. Coffman in his event study analysis) increased 0.3% during the same period (converted to dollars, these returns were 0.9% and 0.5%, respectively).  When the U.S. market opened, the ADR traded at a price consistent with the contemporaneous ordinary share price (*i.e.,* a price that

65.     Finally, Mr. Coffman fails to explain how he would account for other developments in the Roundup litigation that would presumably also be relevant to measuring inflation under Plaintiffs' theory of liability.  For example, Plaintiffs allege that the *Johnson* court's reduction of the punitive damages award and denial of Bayer's post-trial motions is a corrective disclosure.[92]  However, they and Mr. Coffman do not discuss the effect of a similar post-trial ruling in the *Hardeman* case on July 15, 2019.[93]  Following that news, Bayer's ADRs experienced a statistically significant *positive* residual return according to Mr. Coffman's event study.  Mr. Coffman provides no methodology to account for this development in his calculation of inflation.

66.     In sum, Mr. Coffman fails to provide a methodology capable of objectively and reliably identifying relevant disclosures and measuring their impact on inflation.  Mr. Coffman's approach of measuring inflation using the price reaction of Bayer's ADRs following the alleged corrective disclosures fails to account for other releases of information during the course of the Roundup litigation.

**D.     Mr. Coffman Fails to Explain How Inflation Could Reliably and Objectively Be Estimated Throughout the Proposed Class Period Accounting for Developments in the Roundup Litigation and Other Changes to Bayer's Business**

67.     Mr. Coffman acknowledges that inflation can vary over time but fails to propose a methodology for reliably measuring inflation throughout the Proposed Class Period accounting for the distinctive economic circumstances of this case.[94]  Specifically, as I discuss in Section V.D.1, Mr. Coffman has provided no information about how one could adjust inflation to account for changes over the four-year Proposed Class Period in the market's expectations

reflected the decline in the ordinary share price prior to the press release) and increased from open to close.  *See* Coffman Report backup materials, "Bayer Exhibits.xlsx"; *Refinitiv; Tick Data*.

[91] Coffman Report, ¶ 85.

[92] Complaint, ¶ 306.

[93] "U.S. judge slashes Roundup jury award to $25.3 million; Bayer still plans to appeal," *Reuters News*, July 15, 2019.

[94] Coffman Report, ¶ 85.

regarding the risk of the Roundup litigation, given the evolution in publicly available information on this topic over time.  Furthermore, as described in Section V.D.2, Mr. Coffman fails to explain how his approach could account for Bayer's changing business structure, including changes resulting from the Merger, despite acknowledging that the Merger "altered the makeup of the [C]ompany, as well as what information would be considered relevant by market participants, and therefore also potentially impacted the return-generating process."[95]

### 1.    Mr. Coffman Fails to Explain How One Could Account for Changing Information Regarding Monsanto's Roundup Liability

68.    Even if the true risk posed by the Roundup litigation was concealed from investors as Plaintiffs allege, and even if Mr. Coffman could somehow assess what the market's but-for expectation of the true risk would have been absent the alleged misrepresentations, his approach is *still* inadequate to measure inflation on a class-wide basis throughout the entire Proposed Class Period, because he has not provided a methodology to account for changes in information regarding Monsanto's potential Roundup liability throughout the Proposed Class Period.  The nature of the Roundup litigation risk changed throughout the Proposed Class Period, including in terms of the number of lawsuits and Roundup plaintiffs,[96] and the nature of the publicly available information about the litigation also evolved throughout the Proposed Class Period.[97]  Logically, the market's reaction to a hypothetical disclosure of alleged deficiencies in Bayer's due diligence may have been different when there were 1,100 Roundup plaintiffs than when there were 5,200 or 50,000 such plaintiffs—and indeed, analysts appear to have estimated

---

[95] Coffman Report, ¶ 51.

[96] As I discuss in this section, the number of Roundup litigation plaintiffs reported in Monsanto and Bayer financial statements increased from 1,100 in early 2017 to over 50,000 in 2020. Plaintiffs also note that prior to the merger close, "more and more Roundup-related lawsuits were filed, growing from 120 in September 2016, when the Merger Agreement was signed, to more than 5,000 by June 2018."  *See* Complaint, ¶ 101.

[97] For example, internal Monsanto documents were made public in March 2017 and August 2017 and were widely covered by the media, and additional information relevant to the Roundup litigation risk came out over the course of the various Roundup lawsuits, including the multidistrict litigation in California and the *Johnson* trial.  *See* Section V.C.

potential total exposure based in part on the number of plaintiffs.[98]  Yet Mr. Coffman provides no way to account for this in his damages approach.

69.    In an efficient market, this information would be incorporated into the price of Bayer ADRs.  To reliably measure only the effect of the alleged misrepresentations on the price of the Bayer ADRs, Mr. Coffman's approach would need to be able to isolate the incremental impact of the alleged misrepresentations on the market's expectations of the Roundup litigation risk at each point in time.  Though Mr. Coffman acknowledges that "inflation per share may have evolved over the class period," he does not identify a method for measuring the impact on inflation of these ongoing changes in public information.[99]

70.    To overcome this obstacle, Mr. Coffman would need to develop a methodology capable of modeling the market's evolving expectations of Monsanto's Roundup litigation risk over time relative to what would have been expected absent the alleged misrepresentations. While Mr. Coffman alludes to "valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above" as potential tools to use in evaluating how "inflation evolved over the class period," he fails to explain how any of these techniques could be used to measure the incremental effect of the alleged misrepresentations given the evolution in the information available to the market.[100]

71.    For example, Monsanto disclosed information about the Roundup litigation beginning in its fiscal Q2 2017 Form 10-Q, which reported that the company was "defending lawsuits in various state and federal courts, in which approximately 1,100 plaintiffs claim to have

---

[98] *See, e.g.*, "Those Chains Prove a Little Tough to Unshackle…" *Barclays*, August 13, 2018, p. 1 ("4500 cases resulting in $298m awarded each" as a "worst case scenario"); "Bernstein Chemicals: Roundup Not Ready… A Summary of Herbicide Related Issues for Bayer and DowDupont," *Bernstein*, August 20, 2018, p. 3 ("if we assign even a relatively high expectation value of $5mln per case, we could see Bayer settling the case for $4bn"); "European Industrial Chemicals: Value Chain Extension – Initiating Coverage at the Cusp of a Slowdown," *Bernstein*, September 24, 2018, p. 80 ("We assume a worst case of $5bn (based on Dupont's C-8 case at $1.25mm average for the first 4,000 plaintiffs and the second 4,000 considered spurious"); "It Never Rains in California but Girl Don't They Warn Ya, It Pours," *Mainfirst*, March 19, 2019, p. 3 ("We now model EUR 11bn of nominal settlement … based on a broad USD 1m per lawsuit assumption").

[99] Coffman Report, ¶ 85.

[100] Coffman Report, ¶ 85.

been injured by exposure to glyphosate-based products manufactured by the company."[101] Monsanto continued to provide information about the scope of the Roundup litigation in subsequent SEC filings.[102]  Following the Merger, Bayer also provided information about the number of plaintiffs in the Roundup litigation.[103]  These estimates are reported in Exhibit 3.  As shown in the exhibit, as of February 28, 2017, there were approximately 1,100 Roundup plaintiffs; one year later, there were 5,200.  By the time of the final alleged corrective disclosures in June and July of 2020, there were more than 50,000.[104]

72.    Similarly, after the *Johnson* verdict, analysts began discussing the size of Bayer's liability, whether through settlement or adverse judgments.  These expectations, too, changed substantially over time.  Specifically, initial predictions (in August through October of 2018)

---

[101] Monsanto Company, Form 10-Q for the Quarterly Period Ended February 28, 2017, Filed on April 6, 2017, p. 33.

[102] Monsanto Company, Form 10-Q for the Quarterly Period Ended May 31, 2017, Filed on June 29, 2017, p. 34; Monsanto Company, Form 10-K for Fiscal Year Ended August 31, 2017, Filed on October 27, 2017, p. 102; Monsanto Company, Form 10-Q for the Quarterly Period Ended November 30, 2017, Filed on January 5, 2018, p. 30; Monsanto Company, Form 10-Q for the Quarterly Period Ended February 28, 2018, Filed on April 5, 2018, p. 36.

[103] Bayer AG, "Bayer Interim Report as of June 30, 2018," September 5, 2018, p. 67; Bayer AG, "Bayer Interim Report as of September 30, 2018," November 13, 2018, p. 57; Bayer AG, "Bayer Annual Report 2018," February 27, 2019, B Consolidated Financial Statements Section 29; Bayer AG, "Bayer Quarterly Statement as of March 31, 2019," April 25, 2019, p. 20; Bayer AG, "Bayer Half-Year Financial Report as of June 30, 2019," July 30, 2019, p. 45; Bayer AG, "Bayer Quarterly Statement as of September 30, 2019," October 30, 2019, p. 25; Bayer AG, "Bayer Annual Report 2019," February 27, 2020, p. 98; Bayer AG, "Bayer Quarterly Statement as of March 31, 2020," April 27, 2020, p. 17; Bayer AG, "Bayer Half-Year Financial Report as of June 30, 2020," August 4, 2020, p. 49.

[104] At deposition, Mr. Coffman acknowledged that the number of plaintiffs could be relevant to assessing inflation but also suggested that investors may have already expected increases in the number of plaintiffs.  *See* Coffman Deposition, 229:22–230:24.  However, analyst commentary indicates that while some degree of increase had been expected, the contemporaneous increases were substantial and changed expectations.  For example, on July 30, 2019, Berenberg noted that "[o]wing to the increase in the number of outstanding US glyphosate cases from 13,400 in April to 18,400 currently, we raise our estimate of total net glyphosate costs from EUR10bn to EUR13bn," and on October 30, 2019, Susquehanna noted that the "sharp increase in numbers [of plaintiffs] factors into our revised settlement estimate."  *See* "Flooded by legal cases," *Berenberg*, July 30, 2019, p. 1; "Bayer/Roundup Litigation: Updated Settlement Thoughts and Estimates," *Susquehanna*, October 30, 2019, p. 3.

tended to be lower than the settlement proposed in June 2020 and clustered around $4–6 billion, while later predictions reached $8–14 billion by mid-2020, as shown in Exhibit 4.

73. Moreover, as I discussed in Section V.C above, there were also numerous releases of Monsanto internal documents, and other developments in the Roundup litigation, over the course of the Proposed Class Period. These developments, too, could have caused the market to update its expectations regarding the likelihood of an adverse ruling or the size of Monsanto's potential exposure.

### 2. Mr. Coffman Acknowledges that the Merger Changed Bayer's Business and "Return-Generating Process" But Provides No Methodology to Account for These Changes in Measuring Inflation

74. Though Mr. Coffman notes that Bayer's "merger with Monsanto altered the makeup of the [C]ompany, as well as what information would be considered relevant by market participants, and therefore also potentially impacted the return-generating process,"[105] he fails to provide any methodology that can account for such changes in Bayer's business when measuring inflation. Instead, as noted above, he suggests using an approach that can, at best, measure inflation at the time of the alleged corrective disclosures (which themselves occurred over a two-year period, between August 2018 and July 2020).

75. In part as a result of the Merger, Bayer's business changed dramatically over the course of the Proposed Class Period. For example:

a. At the start of the Proposed Class Period, Bayer reported five operating segments—Pharmaceuticals, Consumer Health, Crop Science, Animal Health, and Covestro—but divested two of those segments (Animal Health and Covestro[106]) during the Proposed Class Period, such that by the time

---

[105] Coffman Report, ¶ 51.

[106] Bayer spun off its MaterialScience segment as a separate entity, Covestro, on September 1, 2015, but retained some ownership. Covestro began trading on October 6, 2015. Bayer reported Covestro as part of its consolidated financials until Q3 2017, when it sold part of its remaining stake in Covestro. Bayer exited its position in Covestro by Q2 2018. *See* Bayer AG, "Interim Group Management Report as of September 30, 2015," October 29, 2015, p. 4; Bayer AG, "Bayer Interim Report as of September 30, 2017," October 26, 2017, p. 5; Bayer AG, "Bayer Interim Report as of June 30, 2018," September 5, 2018, p. 58.

of the last alleged corrective disclosure, the Company had only three operating segments.[107]  Sales in the two divested segments represented 28–32% of Bayer's total sales from Q2 2016 through Q2 2017.[108]  Additionally, the remaining segments changed in importance over the Proposed Class Period.  For the quarter ended June 30, 2016, for example, Crop Science was Monsanto's second largest business segment, recording €2.5 billion of revenue, 21% of Bayer's total.[109]  Four years later—after the Merger was completed and other divestitures completed—that same segment was Bayer's largest by revenue, recording €4.8 billion of revenue, 48% of Bayer's total.[110]  Similarly, Crop Science's average quarterly EBITDA was €470 million between Q2 2016 and Q2 2018, and increased to €1.3 billion between Q3 2018 and Q1 2020.[111]

---

[107] Bayer AG, "Interim Group Management Report as of June 30, 2016," July 27, 2016, p. 36; Bayer AG, "Bayer Half-Year Financial Report as of June 30, 2020," August 4, 2020, p. 6.

[108] Bayer AG, "Interim Group Management Report as of March 31, 2016," April 26, 2016, p. 31; Bayer AG, "Interim Group Management Report as of June 30, 2016," July 27, 2016, pp. 31, 36; Bayer AG, "Interim Group Management Report as of September 30, 2016," October 26, 2016, pp. 31, 36; Bayer AG, "Bayer Annual Report 2016," February 22, 2017, pp. 131, 208–209; Bayer AG, "Bayer Interim Report as of March 31, 2017," April 27, 2017, pp. 26, 31; Bayer AG, "Bayer Interim Report as of June 30, 2017," July 27, 2017, pp. 30, 35.

[109] Bayer AG, "Interim Group Management Report as of June 30, 2016," July 27, 2016, pp. 31, 36.

[110] Bayer AG, "Bayer Half-Year Financial Report as of June 30, 2020," August 4, 2020, pp. 29, 38–39.

[111] EBITDA is a measure of company earnings before interest payments, taxes, depreciation, and amortization.  *See* Robert W. Holthausen and Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice*, First Edition (Westmont, IL:  Cambridge Business Publishers, 2017), p. 782.  I excluded Q2 2020 from the calculation of average EBITDA due to the Roundup settlement, which led to an EBITDA of negative €8.8 billion for Crop Science in Q2 2020.  *See* Bayer AG, "Interim Group Management Report as of June 30, 2016," July 27, 2016, p. 36; Bayer AG, "Interim Group Management Report as of September 30, 2016," October 26, 2016, p. 36; Bayer AG, "Bayer Annual Report 2016," February 22, 2017, pp. 208–209; Bayer AG, "Bayer Interim Report as of March 31, 2017," April 27, 2017, p. 31; Bayer AG, "Bayer Interim Report as of June 30, 2017," July 27, 2017, p. 35; Bayer AG, "Bayer Interim Report as of September 30, 2017," October 26, 2017, p. 36; Bayer AG, "Bayer Annual Report 2017," February 28, 2018, pp. 213–214; Bayer AG, "Bayer Interim Report as of March 31, 2018," May 3, 2018, p. 28; Bayer AG, "Bayer Interim Report as of June 30, 2018," September 5, 2018, p. 41; Bayer AG, "Bayer Interim Report as of September 30, 2018," November 13, 2018, p. 34; Bayer AG, "Bayer Annual

b.    Mr. Coffman noted that "the relationship between Bayer ADRs [and] market factors" may have changed "over time," and uses a "rolling model to account for [these] evolving relationships."[112]  Indeed, the coefficient measuring the co-movement between Bayer and market returns in Mr. Coffman's model varied dramatically over the Proposed Class Period, from a low of 0.71 on December 1, 2016, to a high of 1.40 on April 29, 2019—a 97% increase.[113]

c.    Bayer's capital structure changed as a result of the Merger with Monsanto. Specifically, it financed more than $43 billion of the $63 billion acquisition price with debt.[114]  Not surprisingly, therefore, Bayer's debt-to-equity ratio increased substantially over the Proposed Class Period, from 0.26 on June 30, 2016 to 0.64 on June 30, 2020—an increase of 146%.[115]

76.    Mr. Coffman makes no attempt to provide a methodology that can grapple with these changing economics.  The "often-used" assumptions he offers—"'constant dollar inflation,' which implies that the artificial inflation was the same dollar amount during the Class Period," and "'constant percentage inflation,' which implies the price was inflated by a

---

Report 2018," February 27, 2019, B Consolidated Financial Statements Section 4; Bayer AG, "Bayer Quarterly Statement as of March 31, 2019," April 25, 2019, p. 6; Bayer AG, "Bayer Half-Year Financial Report as of June 30, 2019," July 30, 2019, p. 34; Bayer AG, "Bayer Quarterly Statement as of September 30, 2019," October 30, 2019, p. 10; Bayer AG, "Bayer Annual Report 2019," February 27, 2020, p. 70; Bayer AG, "Bayer Quarterly Statement as of March 31, 2020," April 27, 2020, p. 6.

[112] Coffman Report, ¶ 52.

[113] Coffman Report, Exhibit 5 and backup materials, "Bayer Exhibits.xlsx".

[114] Bayer AG, "Bayer Interim Report as of June 30, 2018," September 5, 2018, p. 6.

[115] Bayer reported financial liabilities of €19,390 million as of June 30, 2016, and its market capitalization was €74,425 million on June 30, 2016, representing a debt-to-equity ratio of 0.26. Bayer reported financial liabilities of €41,076 million as of June 30, 2020, and its market capitalization was €64,634 million on June 30, 2020, representing a debt-to-equity ratio of 0.64. *See* Bayer AG, "Interim Group Management Report as of June 30, 2016," July 27, 2016, p. 28; Bayer AG, "Bayer Half-Year Financial Report as of June 30, 2020," August 4, 2020, p. 19; *Refinitiv*.

consistent percentage"[116]—are inappropriate in this case, given the fundamental changes in Bayer's business and the fact that, at the start of the Proposed Class Period, Monsanto was a separate company from Bayer.

## VI. Mr. Coffman Fails to Reliably Demonstrate that the Bayer ADRs Traded in an Efficient Market During the Entire Proposed Class Period

77.    Mr. Coffman concludes that Bayer ADRs "traded in an open, developed, and efficient market at *all relevant times* during the Class Period."[117]  However, he does not reliably demonstrate that this conclusion does in fact hold throughout the four-year Proposed Class Period.[118]  In fact, as Mr. Coffman notes in his report, the price of the Bayer ADRs deviated substantially from that of Bayer ordinary shares for a period in June 2018.[119]  As I discuss in this section, this apparent violation of the "law of one price," which states that equivalent securities should have the same price, is inconsistent with market efficiency, and Mr. Coffman's proffered explanations do not explain how this gap in prices could be consistent with market efficiency. Thus, Mr. Coffman fails to reliably demonstrate that the Bayer ADRs traded in an efficient market throughout the Proposed Class Period.

78.    Moreover, this finding poses questions for how damages would be measured reliably on a class-wide basis during this period in June 2018.  Given the price differences between the ADRs and the ordinary shares, and the fact that the ADR prices did not quickly incorporate value-relevant information from the ordinary share price in this period, Mr. Coffman fails to explain how to determine how the alleged misrepresentations affected the price of Bayer ADRs during this period.

---

[116] Coffman Report, ¶ 85.

[117] Coffman Report, ¶ 27 (emphasis added).

[118] For example, Mr. Coffman's analysis of the fifth *Cammer* does not include any date from June 2018 as either an earnings or guidance date or a "least news" date.  *See* Coffman backup materials.

[119] Mr. Coffman acknowledges a deviation for the period from June 6, 2018 to June 21, 2018 (Coffman Report, fn. 91), but my analysis of intraday prices shows that the difference persists (though smaller in size) through June 25, 2018.

### A.    Market Efficiency in Financial Economics

79.    Financial economists generally describe three different degrees of market efficiency—weak-form, semi-strong-form, and strong-form efficiency—categorized based on the type of information disseminated to market participants and the speed with which this information is incorporated into security prices.[120]  Mr. Coffman appears to opine on the semi-strong form of efficiency, noting that "[t]he market efficiency standard … necessary for the presumption of reliance conforms most closely with … 'semi-strong form' efficiency."[121]  In a market that is semi-strong form efficient, Mr. Coffman notes, "all publicly available information is reflected in a security's current market price," and "security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information."[122]  Importantly for this case, publicly available information includes information about the company (*e.g.*, press reports, company releases, etc.), historical prices, and prices of other securities (such as Bayer ordinary shares).[123]

80.    The financial economics literature has analyzed the question of market efficiency for over 50 years, and has shown that even securities that *generally* trade efficiently may trade inefficiently at certain times.  This literature identifies "anomalies" with respect to market efficiency, such as markets reacting to stale information, which should not occur because efficient markets would incorporate that information the first time it became available.[124]  The

---

[120] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, 1970, pp. 383–417 at p. 383; Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617 at pp. 1576–1577.  Under the weak-form market efficiency, prices reflect all information contained in market data and hence investors cannot predict future returns based on historical data.  Under the semi-strong-form market efficiency, prices reflect all publicly available information and adjust completely and rapidly to the announcement of publicly available information.  Under the strong-form market efficiency, prices reflect all available information, both public and private.

[121] Coffman Report, ¶ 20.

[122] Coffman Report, ¶ 20.

[123] At deposition, Mr. Coffman agreed that the price of Bayer ordinary shares is information that should be reflected in the price of Bayer ADRs in an efficient market.  *See* Coffman Deposition, 92:12–93:8.

[124] *See, e.g.,* Gur Huberman and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance* 56, no. 1, 2001, pp. 387–396.

expectation is that when new information is released in efficient markets, arbitrageurs will identify that information and trade on it such that the market price rapidly reflects this new information.  The literature, however, has shown that limits to arbitrage may impede market efficiency.[125]  One such limit to arbitrage is constraints on short-selling, which can lead to delays in new information being reflected in security prices, resulting in less efficient (or inefficient) markets.[126]

81.    A key characteristic of efficient markets is that two assets, or two bundles of assets, that represent identical claims on the same future cash flows, trade at the same price.[127] In this case, that implies that one Bayer ordinary share should have the same price as four Bayer ADRs when expressed in a common currency.  If this is not the case, arbitrage theory suggests that a trader would observe the price difference and simply trade the securities simultaneously in a way that guarantees a profit.  For example, if four ADRs are more expensive than one ordinary share, a trader will sell short ADRs and use the proceeds to purchase ordinary shares at a lower price, making riskless profits from the price difference.[128]  Indeed, Mr. Coffman notes that if the

---

[125] *See, e.g.,* Andrei Shleifer and Robert W. Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52, no. 1, 1997, pp. 35–55 ("Shleifer and Vishny (1997)"); Kent Daniel et al., "Investor Psychology in Capital Markets: Evidence and Policy Implications," *Journal of Monetary Economics* 49, no. 1, 2002, pp. 139–209; Gene D'Avolio, "The Market for Borrowing Stock," *Journal of Financial Economics* 66, no. 2–3, 2002, pp. 271–306 ("D'Avolio (2002)").

[126] Douglas W. Diamond and Robert E. Verrecchia, "Constraints on Short-Selling and Asset Price Adjustment to Private Information," *Journal of Financial Economics* 18, no. 2, 1987, pp. 277–311; Charles M. Jones and Owen A. Lamont, "Short-Sale Constraints and Stock Returns," *Journal of Financial Economics* 66, no. 2–3, 2002, pp. 207–239; Pedro A. C. Saffi and Kari Sigurdsson, "Price Efficiency and Short Selling," *The Review of Financial Studies* 24, no. 3, 2011, pp. 821–852; Arturo Bris et al., "Efficiency and the Bear: Short Sales and Markets Around the World," *The Journal of Finance* 62, no. 3, 2007, pp. 1029–1079; Ekkehart Boehmer and Juan (Julie) Wu, "Short Selling and the Price Discovery Process," *The Review of Financial Studies* 26, no. 2, 2013, pp. 287–322; Alessandro Beber and Marco Pagano, "Short-Selling Bans Around the World: Evidence from the 2007–09 Crisis," *The Journal of Finance* 68, no. 1, 2013, pp. 343–381 at pp. 344–345.

[127] Owen A. Lamont and Richard H. Thaler, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," *Journal of Political Economy* 111, no. 2, 2003, pp. 227–268; Shleifer and Vishny (1997).

[128] Short selling is a way for investors to profit from declines in the price of a security.  To sell a stock short, an investor who does not own the stock sells shares it borrowed from another market

two "securities did not trade in tandem, then there would be opportunities for arbitrage," which he defines as "the 'exploitation of security mispricing in such a way that risk-free economic profits may be earned.'"[129]

82.    In an efficient market, any such divergence would be short-lived; as investors exploited the price differences, the prices would converge until no more excess profits could be earned.  If, however, limits to arbitrage—such as constraints on shorting the ADRs—impeded efficiency, then the price differences could persist for an extended period.  Such price differences, under Mr. Coffman's own theory, would demonstrate a lack of efficiency because publicly available information (*i.e.*, Bayer's ordinary share price) was not "reflected in [the Bayer ADRs'] current market price."[130]

### B.    The Price of Bayer ADRs Diverged from that of the Bayer Ordinary Shares in a Manner Inconsistent with Market Efficiency for an Extended Period in June 2018

83.    As noted above, Mr. Coffman concludes that Bayer ADRs "traded in an … efficient market at *all relevant times* during the Class Period."[131, 132]  However, he does not

---

participant, in the hopes of later buying back the shares at a lower price and then returning them. The short seller typically pays a small percentage fee to the lender, which reflects the cost of borrowing the stock.  *See* D'Avolio (2002), pp. 271–272.

[129] Coffman Report, ¶ 80.

[130] Coffman Report, ¶ 20.

[131] Coffman Report, ¶ 27 (emphasis added).

[132] Mr. Coffman reaches his conclusion of efficiency based upon his analysis of a number of factors that "financial economists and courts apply when evaluating market efficiency under the 'fraud on the market' theory"—trading volume, analyst coverage, market makers, SEC form S-3 eligibility, price reaction to new information, market capitalization, the bid-ask spread, public float, institutional ownership, autocorrelation, options, and "lack of arbitrage opportunity." (Coffman Report ¶¶ 8, 25, 28–46).  I do not take issue with the notion that these factors might be considered.  However, from the perspective of financial economics, Mr. Coffman has no reliable basis to reach a conclusion of semi-strong-form market efficiency based on these factors alone, other than the fifth *Cammer* factor—price reaction to new information.  To analyze that factor, Mr. Coffman compares (a) the frequency of statistically significant residual returns and (b) the average magnitude of residual returns between days with earnings and guidance announcements and "25 days with the least news" about Bayer (Coffman Report, ¶¶ 62–63).  From the perspective of financial economics, this type of analysis is insufficient to establish market efficiency, as it does not test whether "prices adjust to new publicly available information rapidly

reliably demonstrate that this conclusion does in fact hold throughout the over four-year Proposed Class Period.[133]  In particular, one factor that he analyzed in support of his claim is what he describes as a "lack of arbitrage opportunity," because "there was no persistent divergence between the prices of Bayer ADRs and Bayer ordinary shares throughout the Class Period."[134]  He appears to have reached this conclusion by simply plotting the prices of Bayer ADRs and ordinary shares (in his Exhibit 14).  Though he acknowledges a "relatively large[] divergence between the prices" in June 2018, he dismisses it as "likely due to [a] combination of temporary unique supply and demand differences and is not suggestive of a divergence from market efficiency."[135]

84.     To the contrary, the large divergence in prices in this period—the average difference during the overlapping period of trading on each date reaches nearly $16 per ordinary

---

and in an unbiased fashion."  In fact, the test would show the same result if, on each day, the ADR price reacted in the "wrong" direction—meaning it declined following good news or increased following bad news.  An analysis that does not form an *ex ante* hypothesis regarding the expected price reaction following an event, such as the one Mr. Coffman proffers in his report, cannot test whether the stock price reacted to news in the expected direction and thus cannot provide reliable evidence of market efficiency from the perspective of financial economics.  *See*, *e.g.*, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1, 1997, pp. 13–39 at p. 16.

In addition, Mr. Coffman's use of "least news dates" is not consistent with the academic studies that Mr. Coffman cites in support of the approach.  Beaver (1968) segments his sample into report and non-report periods based on earnings announcement dates, defining his non-report periods as all of the "weeks not included in the 17 week report periods" surrounding earnings announcement dates.  May (1971) chooses "all weeks of the year, excluding weeks of earnings announcements" as the "standard of comparison."  *See* William H. Beaver, "The Information Content of Annual Earnings Announcements," *Journal of Accounting Research* 6, 1968, pp. 67–92 at p. 74; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research* 9, 1971, pp. 119–163 at p. 135.  In contrast, Mr. Coffman's test only analyzed 45 days (20 earnings and guidance announcements and 25 "least news dates") out of a class period of nearly 1,000 trading dates.  Moreover, Mr. Coffman excluded three days from his set of "least news dates" that met the same criteria as the other 25 but for which he subjectively determined there were "news articles that [he] could not dismiss as immaterial" (Coffman Report, ¶¶ 59, 62, fn. 69).

[133] For example, Mr. Coffman's analysis of *Cammer* 5 does not include any date from June 2018 as either an earnings or guidance date or as a "least news" date.  *See* Coffman backup materials.

[134] Coffman Report, ¶ 80.

[135] Coffman Report, fn. 91.

share—appears to be a violation of the "law of one price," which holds that in efficient markets securities (or sets of securities) which have the same claims to future cash flows must trade at the same price.[136]  Mr. Coffman testified that "economically these assets are essentially an equivalent claim on future cash flows of a firm. So … there is a clear relationship between prices of the Bayer common shares and the Bayer ADRs."[137]  He continued:

> [I]f you have another market out there that has a -- that is a security that is effectively equivalent in the respects that I described before in terms of what the ultimate claim of that asset is and there is an active trading market for that security as well, then economic theory would tell you that there should be one price for those two things.[138]

85.    Exhibit 5 shows the historical differences in closing prices of Bayer's ordinary shares and ADRs during the Proposed Class Period.[139]  As Mr. Coffman acknowledges, there are substantial differences between the prices of the two securities in June 2018.[140]

86.    Importantly, because the markets for the ADRs and the ordinary shares do not close at the same time, it is possible to observe pricing differences, particularly if they are not directionally consistent, which would not be inconsistent with market efficiency.  If, for example, news were released after the German market closed but while Bayer ADRs were still trading, one would expect that information, in an efficient market, to be incorporated into the

---

[136] *See* Exhibit 7.  As I explain in this section, for a brief period in June 2018 the two securities did not represent claims on exactly the same future cash flows, due to timing differences in a special rights offering for ordinary shareholders and a special dividend for ADR holders, but the difference is too small to justify the observed price divergence.

[137] Coffman Deposition, 81:5–9.  Mr. Coffman also explained that "Bayer common and Bayer ADRs are effectively the same asset."  *See* Coffman Deposition, 81:13–14.

[138] Coffman Deposition, 91:19–92:2.

[139] Specifically, Mr. Coffman plots the two price series, whereas Exhibit 5 shows a single line representing the difference in those two series.  This does not appear to be due to illiquidity in the ADR, as Mr. Coffman finds weekly trading volume in the Bayer ADR above 1% of ADRs outstanding during June 2018.  The average daily trading volume for the ADRs in June 2018 was approximately 779,000 shares, versus 411,000 for the period from May 23, 2016 through May 31, 2018.  *See* Coffman Report, Ex. 3, backup materials, "Bayer Exhibits.xlsx".

[140] Coffman Report, fn. 91 ("I observe a relatively larger divergence between the prices on 12 trading days from June 6, 2018 through June 21, 2018.").

price of the ADRs faster than in the price of ordinary shares (because the ADRs were actively trading while the Xetra market was closed) and potentially lead to a difference between the closing prices.

87.    To examine this price divergence in more detail, Exhibit 6 shows intraday prices of Bayer's ordinary share and ADR for each trading day in June 2018, including the periods of time where both markets were open.  Consistent with the price gap observed from closing prices, the intraday price charts show that, between June 6, 2018 and June 25, 2018, the prices of the two securities diverged substantially during the period of time when both markets were open (9:30 to 11:30 AM ET).[141]  For example, on June 19, 2018, the average difference between the ADR and the ordinary share price during the period of overlapping trading hours for the two securities was approximately $16, or approximately 14% of the closing price of the ordinary shares.[142]  The large differences are evidence that the prices of the Bayer ADRs did not react quickly to publicly available ordinary share prices, which is inconsistent with market efficiency.[143]

88.    Moreover, in addition to differences in the level of prices, the ADR and ordinary share prices changed by different amounts during the periods of overlapping trading during this time period, raising questions as to whether new information was incorporated into the price of each security.  The average difference between the ADR and ordinary share returns was 0.69 percentage points, and these differences were more substantial on certain days.  For example, on June 18, 2018, between 9:30 and 11:30 AM ET, the ADR price increased by 4.59%, while the ordinary share price decreased slightly by 0.02%, and on June 19, 2018, the ADR price increased

---

[141] Mr. Coffman acknowledges a deviation for the period from June 6, 2018 to June 21, 2018 (Coffman Report, fn. 91), but my analysis of intraday prices shows that the difference persists (though smaller in size) through June 25, 2018.

[142] *See* Exhibit 7.  The average difference in price between the ordinary share and four ADRs during the period of overlapping trading was $15.69.  The Bayer ordinary shares closed at €96.63 on June 19, 2018, or $111.86 at the contemporaneous exchange rate of 1.15756 dollars per euro.

[143] The average daily price difference between the ordinary share and four ADRs for the period June 6, 2018 and June 25, 2018 is greater than $1.99 (the highest closing price of the rights). This difference is statistically significant at the 95% confidence level.

by 2.29%, while the ordinary share price only increased by 0.33%.[144]  The difference in returns exceeded 1% on 7 out of the 14 trading days in the June 6, 2018 to June 25, 2018 period.

89.     While Mr. Coffman acknowledges the price divergence in June 2018, he does not provide any analysis that attempts to explain in detail how such a gap in prices is consistent with market efficiency.  Instead, Mr. Coffman only mentions in a footnote four different explanations for the price difference, none of which justifies his conclusion that the "temporary divergence in prices … is not suggestive of a divergence from market efficiency."[145]

90.     In attempting to explain this apparent violation of the law of one price, Mr. Coffman first notes that "[t]here was a cash distribution that would be paid to Bayer ADR shareholders" but not to holders of the ordinary shares.[146]  This cannot explain a price difference of the observed magnitude, because the cash distribution was far smaller than the observed price difference.

91.     On June 3, 2018, in connection with the financing of the Monsanto acquisition, Bayer announced a capital increase via subscription rights for existing holders of Bayer ordinary shares.[147]  Shareholders were able to acquire two new shares at 81 euros per share for every 23 shares they held at the time, an approximately 20% discount to the contemporaneous price.[148] The period for holders of the ordinary shares to exercise their corresponding subscription rights was scheduled to last from June 6, 2018 to June 19, 2018.[149]  However, since the Bayer rights

---

[144] On June 18, 2018, the ADR price increased from $119.94 to $125.44, while the ordinary share price (converted to dollars at the contemporaneous exchange rate) decreased from $114.41 to $114.39.  On June 19, 2018, the ADR price increased from $124.00 to $126.84, while the ordinary share price (converted to dollars at the contemporaneous exchange rate) increased from $111.87 to $112.23.  These examples highlight both the difference in price levels and the difference in returns.

[145] Coffman Report, fn. 91.

[146] Coffman Report, fn. 91.

[147] "Bayer resolves capital increase with subscription rights against cash contributions in the amount of 6.0 billion euros to finance the acquisition of Monsanto," *Dow Jones Institutional News*, June 3, 2018, p. 1.

[148] "Bayer Rights Issue Confirms Monsanto Close Is Near," Jefferies, June 4, 2018, p. 1.

[149] "Bayer resolves capital increase with subscription rights against cash contributions in the amount of 6.0 billion euros to finance the acquisition of Monsanto," *Dow Jones Institutional News*, June 3, 2018, p. 1.

were not registered under the United States Securities Act of 1933, BNY Mellon (as the depositary institution for Bayer's ADRs) was not permitted to pass the rights on to ADR holders.[150]  BNY Mellon instead sold the rights in the German market and distributed the proceeds received from the sale to ADR holders.[151]  This created a cash distribution for ADR holders that ordinary shareholders were not expecting to receive, thus becoming a plausible source of price difference between the two securities.[152]

92.     From the information about the cash distribution to ADR holders, one can infer the size of the price divergence that was justified by this event, and over what time period.  The subscription rights traded on the Xetra exchange in Frankfurt between June 6, 2018 to June 15, 2018.[153]  The closing price for the rights during that window of time ranged between $1.57 and $1.99 per ordinary share.[154]  Consistent with that range, BNY Mellon announced on June 15, 2018 that it would be distributing a gross amount equal to $1.66 per ordinary share, or $0.416 per ADR.[155]  Therefore, the expected cash distribution for ADR holders could have explained a difference between ADR and ordinary share prices of, at most, $1.99 per ordinary share (based on the highest closing price of the rights) from June 6, 2018 through June 15, 2018.  Since the

---

[150] BNY Mellon Corporate Action Notice, "Cash Distribution Resulting from the Sale of Rights," June 15, 2018, p. 1.

[151] BNY Mellon Corporate Action Notice, "Cash Distribution Resulting from the Sale of Rights," June 15, 2018, p. 1.

[152] As discussed, the rights were issued to holders of the ordinary shares and started trading in the German market on June 6, 2018.  Consistently, Bayer's ordinary shares started trading ex-rights (*i.e.*, without including the value of the rights offered in the stock price) on June 6, 2018.  *See* "Bayer resolves capital increase with subscription rights against cash contributions in the amount of 6.0 billion euros to finance the acquisition of Monsanto," *Dow Jones Institutional News*, June 3, 2018, pp. 1–2.

[153] "Bayer resolves capital increase with subscription rights against cash contributions in the amount of 6.0 billion euros to finance the acquisition of Monsanto," *Dow Jones Institutional News*, June 3, 2018, p. 2.

[154] The closing prices for the rights were originally recorded in euros.  The lowest and highest closing prices during this window of time were €1.33 (on June 12, 2018) and €1.71 (on June 14, 2018), respectively.  The corresponding closing prices in dollars are calculated using the contemporaneous exchange rates of 1.17887 and 1.16473 dollars per euro on June 12, 2018 and June 14, 2018, respectively.

[155] BNY Mellon Corporate Action Notice, "Cash Distribution Resulting from the Sale of Rights," June 15, 2018, p. 1.

distribution was issued to those who owned ADRs when the market closed on June 21, 2018, the cash distribution could have explained a price divergence of $1.66 per ordinary share only from June 15, 2018 (when the distribution was announced) through June 21, 2018; thereafter, there was no difference in claims between one ordinary share and four ADRs. As shown in Exhibit 7, the observed divergence between the ADRs and the ordinary shares was often far greater than $1.99 in the period from June 6, 2018 to June 21, 2018.

93.     Mr. Coffman's three other explanations for the price divergence also fail to reconcile the observed price differences with market efficiency, and instead highlight the limits to arbitrage that could have impeded efficiency during June 2018.

94.     *First*, Mr. Coffman notes that "BNY Mellon had temporarily suspended its issuances and cancellations of Bayer ADRs."[156] Though this limitation may have contributed to the divergence in prices and its persistence, it cannot explain the difference in a manner consistent with market efficiency. To the contrary, it represents a limit to arbitrage of the type that has been recognized as impeding efficiency, as discussed above.

95.     *Second*, Mr. Coffman cites the fact that "[t]he merger with Monsanto was being completed" in June 2018.[157] This explanation does not provide a rationale for the observed phenomenon. The Merger closed on June 7, 2018, yet the price divergence persisted through June 19, 2018, when the average divergence during overlapping hours was $15.69, and remained above $0.76 through June 22, 2018. Moreover, even putting the persistence of the divergence aside, the fact that the "merger with Monsanto was being completed" does not explain how or why the ordinary shares and ADRs could trade at different prices, let alone in a manner consistent with market efficiency.

96.     *Finally*, Mr. Coffman attempts to explain the divergent prices by citing "a spike in short interest in Bayer ADRs."[158] Mr. Coffman ignores the fact that there was a contemporaneous spike in the cost of borrowing Bayer ADRs. Exhibit 8 shows that short interest in the Bayer ADRs across the Proposed Class Period peaked in June 2018, and Exhibit 9

---

[156] Coffman Report, fn. 91.

[157] Coffman Report, fn. 91.

[158] Coffman Report, fn. 91.

further shows that within June 2018, short interest moved generally in tandem with the observed divergence in average intraday prices between the ADR and ordinary share.  More importantly, Exhibit 10 shows that the period of price divergence in June 2018 coincides with a period of extremely high cost for borrowing ADRs, with a peak rate of almost 180% to borrow an ADR for a year.[159]  To put this figure in context, academic research has found that stock loan fees are typically far lower, rarely exceeding 15%.[160]  These high costs could have prevented traders who believed that the Bayer ADRs did not reflect information contained in the prices of ordinary shares from trading on their beliefs.  Moreover, as Mr. Coffman notes, BNY Mellon had temporarily suspended issuances and cancellations of Bayer ADRs, potentially further restricting the ability of investors to trade on their assessments of information.[161]  Thus, although this limitation may have contributed to the divergence in prices and its persistence, it cannot explain the difference in a manner consistent with market efficiency.  To the contrary, it represents a limit to arbitrage which has been recognized in peer-reviewed literature as impeding efficiency.[162]

---

[159] This rate is based on the "Last Rate" reported by S3 Partners, which measures the fee for shares sold short on a given date.  S3 Partners also provides an "Offer Rate," which represents an average fee across all existing short positions.  The offer rate for Bayer ADRs also increased in June 2018, reaching a high of 119% on June 27, 2018.  S3 Partners data is recorded as of the settlement date.  Following academic literature analyzing short selling, I adjust the data in order for it to correspond to the relevant trade date.  *See, e.g.,* Dmitriy Muravyev et al., "Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options," *The Journal of Finance* 77, no. 3, 2022, pp. 1787–1828 ("Muravyev et al. (2022)") at p. 1800.

[160] Engelberg et al. (2018) report a median borrowing rate of 0.1% and a rate of 14.8% at the 99th percentile based on a sample of U.S. stocks covering the period from July 1, 2006 to December 31, 2011.  Muravyev et al. (2022) similarly find a 99th percentile borrowing rate of 15.0%, using a sample of U.S. stocks with exchange-traded options covering the period from July 2006 to August 2015.  *See* Joseph E. Engelberg et al., "Short-Selling Risk," *The Journal of Finance* 73, no. 2, 2018, pp. 755–786 ("Engelberg et al. (2018)") at pp. 761–762; Muravyev et al. (2022) at pp. 1798, 1801–1803.

[161] Coffman Report, fn. 91.

[162] *See, e.g.,* Engelberg et al. (2018) at pp. 755–756 ("[E]mpirical papers have shown that static impediments to short selling significantly affect asset prices and efficiency. The idea in the literature is simple: if short selling is costly, short sellers may be less likely to trade, and as a result prices may be biased or less efficient (e.g., Miller (1977), Diamond and Verrecchia (1987), Lamont and Thaler (2003)).").

97.     Such limits to arbitrage could have prevented Bayer ADRs from incorporating all public information.  Indeed, as explained above, the market for Bayer ADRs did not incorporate all public information concerning Bayer's ordinary share price, which Mr. Coffman acknowledges as "a piece of information that investors in the ADR[s] consider" and should be reflected in the ADR price in an efficient market.[163]

98.     In sum, the price of the Bayer ADRs deviated substantially from the price of the ordinary shares between June 6, 2018 and June 25, 2018.  Mr. Coffman's proposed explanations fail to account for the magnitude of the price deviation and are instead consistent with limits to arbitrage that could have impeded efficiency.  Thus, Mr. Coffman fails to reliably demonstrate that the Bayer ADRs traded in an efficient market throughout the entire Proposed Class Period as he claims.

99.     In addition, these price deviations raise questions as to how damages could be reliably measured on a class-wide basis during the June 2018 period.  Given the price deviations between the ADRs and ordinary shares, and the fact that that the ADR prices did not quickly incorporate value-relevant information from the ordinary share price in this period, Mr. Coffman fails to explain how to determine the impact of the alleged misrepresentations on the price of the Bayer ADRs during this period.

---

[163] At deposition, Mr. Coffman agreed that the price of Bayer ordinary shares is information that should be reflected in the price of Bayer ADRs in an efficient market.  *See* Coffman Deposition, 92:12–93:8.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd of February, 2023

_____

Mark Garmaise, Ph.D.

**Appendix A**

## MARK J. GARMAISE

**Office Address**
Finance Dept.- Room C416
UCLA Anderson
110 Westwood Plaza
Los Angeles, CA 90095-1481
Tel.: (310) 794 - 4118
E-mail: mark.garmaise@anderson.ucla.edu

## ACADEMIC EMPLOYMENT

| | |
|---|---|
| *Professor of Finance* | UCLA Anderson,  2014-present. |
| *Robert D. Beyer '83 Term Chair in Management* | UCLA Anderson, 2015-2018. |
| *Area Head, Finance* | UCLA Anderson, 2016-2018. |
| *Senior Associate Dean, Full Time MBA Program* | UCLA Anderson,  2014-2015. |
| *Associate Professor of Finance (with tenure)* | UCLA Anderson,  2008-2014. |
| *Assistant Professor of Finance* | UCLA Anderson,  2002-2008. |
| *Visiting Assistant Professor of Finance* | UCLA Anderson,  2001- 2002. |
| *Assistant Professor of Financ*e | University of Chicago, 1998- 2002. |

## EDUCATION

*Stanford University, Graduate School of Business*
Ph.D. degree in Finance, June 1998.

*Harvard College*
Bachelor of Arts degree, Magna Cum Laude, in Mathematics and Philosophy, 1994.

## RESEARCH INTERESTS

Corporate Finance
Real Estate
Entrepreneurship
Banking

## PEER REVIEWED JOURNAL ARTICLES PUBLISHED

Garmaise, Mark J., "Rational Beliefs and Security Design," *Review of Financial Studies,* Winter 2001, 14.4, pp. 1183-1213.

Garmaise, Mark J., and Tobias Moskowitz, "Informal Financial Networks: Theory and Evidence," *Review of Financial Studies,* Winter 2003, 16.4, pp. 1007-1040. Granted the *Barclays Global Investor/ Michael Brennan Award* for the best paper published in Vol. 16 of the *Review of Financial Studies.*

**Appendix A**

Garmaise, Mark J., and Tobias Moskowitz, "Confronting Information Asymmetries: Evidence from Real Estate Markets," *Review of Financial Studies,* Summer 2004, 17.2, pp. 405-437. Granted the *Barclays Global Investor/ Michael Brennan Runner-Up Award* for the best paper published in Vol. 17 of the *Review of Financial Studies.*

Benmelech, Efraim, Mark J. Garmaise and Tobias Moskowitz, "Do Liquidation Values Affect Financial Contracts? Evidence from Commercial Zoning Laws," *Quarterly Journal of Economics*, August 2005, 120.3, pp. 1121-1154.

Garmaise, Mark J., and Tobias Moskowitz, "Bank Mergers and Crime: The Real and Social Effects of Credit Market Competition," *Journal of Finance*, April 2006, 61.2, pp. 495-538.

Garmaise, Mark J., "Production in Entrepreneurial Firms: The Effects of Financial Constraints on Labor and Capital," *Review of Financial Studies*, March 2008, 21.2, pp. 543-577.

Garmaise, Mark J., and Tobias Moskowitz, "Catastrophic Risk and Credit Markets," *Journal of Finance*, April 2009, 64.2, pp.657-707.

Garmaise, Mark J., and Gabriel Natividad, "Information, the Cost of Credit and Operational Efficiency: An Empirical Study of Microfinance," *Review of Financial Studies*, June 2010, 23.6, pp. 2560-2590.

Garmaise, Mark J., "Ties that Truly Bind: Noncompetition Agreements, Executive Compensation and Firm Investment," *Journal of Law, Economics, and Organization*, Volume 27, Number 2, August 2011, pp. 376-425.

Carlin, Bruce, Bhagwan Chowdhry and Mark J. Garmaise, "Investment in Organization Capital," *Journal of Financial Intermediation*, Volume 21, Issue 2, April 2012, pp. 268-286.

Garmaise, Mark J., and Gabriel Natividad, "Cheap Credit, Lending Operations and International Politics: The Case of Global Microfinance," *Journal of Finance*, Volume 68, Number 4, August 2013, pp. 1551-1576.

Garmaise, Mark J., "The Attractions and Perils of Flexible Mortgage Lending," *Review of Financial Studies*, Volume 26, Number 10, October 2013, pp. 2548-2582.

Garmaise, Mark J. "Borrower Misreporting and Loan Performance." *Journal of Finance*, Volume 70, Number 1, February 2015, pp. 449-484.

Fracassi, Cesare, Mark J. Garmaise, Gabriel Natividad and Shimon Kogan, "Business Microloans for U.S. Subprime Borrowers," *Journal of Financial and Quantitative Analysis*, Volume 51, Issue 1, February 2016, pp. 55-83.

Garmaise, Mark J., and Gabriel Natividad, "Spillovers in Local Banking Markets," *Review of Corporate Finance Studies*, Volume 5, Issue 2, September 2016, pp. 139-165. Editor's Choice article. Granted the Best Paper Award in 2017 for the *Review of Corporate Finance Studies*.

Garmaise, Mark J., and Gabriel Natividad, "Consumer Default, Credit Reporting and Borrowing Constraints," *Journal of Finance*, Volume 72, Number 5, October 2017, pp. 2331–2368.

Garmaise, Mark J., and Gabriel Natividad, "Financial Flexibility: At What Cost?," *Journal of Financial and Quantitative Analysis*, Volume 56 , Issue 1, February 2021 , pp. 249 – 282

Aiello, Darren, Mark J. Garmaise and Gabriel Natividad, "Competing for Deal Flow in Local Mortgage Markets," *Review of Corporate Finance Studies*, forthcoming.

Garmaise, Mark J., Yaron Levi and Hanno Lustig, "Spending Less After (Seemingly) Bad News," conditionally accepted at the *Journal of Finance*, forthcoming.

**Appendix A**

**OTHER- PUBLISHED COMMENT AND OVERVIEW ARTICLE**

Garmaise, Mark J., "Marketing Issues in Corporate Finance." *Journal of Marketing Research* Volume 46, 2009, pp. 324-26.

Garmaise, Mark J., "Alternative mortgage contracts and affordability- overview." *Regional Science and Urban Economics*, January 2020, 103386.

**WORKING PAPERS**

"What Problem Do Intermediaries Solve? Evidence From Real Estate Markets," (with Darren Aiello and Taylor Nadauld), working paper, UCLA Anderson.

"Intermediary Profits in a Time of Scarcity," (with Mark Jansen and Jason Snyder), working paper, UCLA Anderson.

"Collateral Damage: Low-Income Borrowers Depend on Cash Flow-Based Lending," (with Mark Jansen and Adam Winegar), working paper, UCLA Anderson.

"Fiscal Windfalls and Entrepreneurship: Fostering Entry or Promoting Incumbents?," (with Gabriel Natividad), working paper, UCLA Anderson.

"Reducing Leverage While Increasing Delinquency Risk," (with Erik Berwart, Mauricio Larrain, Gabriel Natividad and Patricio Valenzuela), working paper, UCLA Anderson.

"Corruption, Firm Governance and the Cost of Capital," (with Jun Liu), working paper, UCLA Anderson.

"Informed Investors and the Financing of Entrepreneurial Projects," working paper, UCLA Anderson.

**SYNERGISTIC ACTIVITIES**

Associate Editor, *Journal of Law, Finance and Accounting*, 2015-present.

Associate Editor, *Review of Financial Studies*, 2002-2005.

American Finance Association Nominating Committee, 2007.

Referee for the *Journal of Finance, Review of Financial Studies, Journal of Financial Economics, Journal of Political Economy, Review of Economic Studies, Journal of Economic Behavior and Organization, Journal of Law, Economics and Organization*, 1998-present.

**AWARDS**

Executive MBA Teaching Excellence Award, 2018.

Neidorf Decade Teaching Award, 2012.

Full-time MBA Teaching Excellence Award, 2011.

Fully Employed MBA Teaching Excellence Award, 2009.

Citibank Teaching Award for Most Outstanding MBA teacher, 2007.

Eric and "E" Juline Faculty Excellence in Research Award, 2006.

Dean George W. Robbins Assistant Professor Teaching Award, 2005.

TEACHING EXPERIENCE

*Assistant, Associate and Full Professor.*                    UCLA Anderson, Autumn 2001-present.
Venture Capital, Corporate Finance: campus and evening MBA programs, MFE program.

*Assistant Professor.*                    University of Chicago, Autumn 1998-2001.
Corporation Finance: campus, evening and executive programs.

**Appendix B**

**Testimony Experience of Mark J. Garmaise, Ph.D.**

1.      **United States Bankruptcy Court In re: Altadena Lincoln Crossing LLC, Case: 2:17-BK-14276-BB**

I was retained by East West Bank.  I filed an expert report, and I was deposed in April 2018.

2.      **Roger Hogan, an individual, Hogan SRK, Inc., (d/b/a Capistrano Toyota/Scion), a California corporation, and R&C Motor Corporation (d/b/a Claremont Toyota), a California corporation v. Toyota Motor Sales, U.S.A., Inc., a California corporation, Case: 30-2017-00933647-CU-FR-CJC**

I was retained by Roger Hogan.  I was deposed in March and May 2019.  I testified at trial in June 2019.

3.      **John Barker, individually and on behalf of all other persons similarly situated v. Insight Global, LLC a Delaware limited liability company; and second amended and restated Insight Global, LLC 2013 Incentive Unit Plan, Case: 16-cv-07186 BLF.**

I was retained by the plaintiffs.  I filed an expert report, and I was deposed in May 2019.

4.      **Waldrup v. Countrywide Fin. Corp., et al., Case No. CV 13-08833 and Williams v. Countrywide Fin. Corp., et al., Case No. CV 16-04166**

I was retained by Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, N.A., Bank of America Corporation, LandSafe, Inc., and LandSafe Appraisal Services, Inc.  I filed an expert report, and I was deposed in August 2019.

5.      **Twentieth Century Fox Film Corporation and Fox 21 v. Netflix, Superior Court of California, County of Los Angeles, West District, Case No. SC126423.**

I was retained by Netflix, Inc.  I filed an expert report, and I was deposed in November 2019.

6.      **Perella Weinberg Partners LLC, et al. v. Michael A. Kramer, et al., Index No. 653488/2015 (N.Y. Sup. Ct.)**

I was retained by PWP.  I filed an expert report, and I was deposed in November 2019.

**Appendix B**

7.      **Alameda County Employees' Retirement Association, et. al. v. Portola Pharmaceuticals, Inc., et al., No. 3:20-cv-00367-VC (N.D. Cal.)**

I was retained by Portola Pharmaceuticals, Inc. and individual employee defendants.  I filed an expert report, and I was deposed in May 2022.

8.      **Valeant Pharmaceuticals International, Inc. Securities Litigation, No. 3:18-cv-00343 (D.N.J)**

I was retained by Valeant Pharmaceuticals International, Inc.  I filed an expert report, and I was deposed in June 2022.

**Appendix C**

# Documents Considered

**Academic Articles**

- A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1, 1997, pp. 13–39

- Alessandro Beber and Marco Pagano, "Short-Selling Bans Around the World: Evidence from the 2007–09 Crisis," *The Journal of Finance* 68, no. 1, 2013, pp. 343–381

- Andrei Shleifer and Robert W. Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52, no. 1, 1997, pp. 35–55

- Arturo Bris et al., "Efficiency and the Bear: Short Sales and Markets Around the World," *The Journal of Finance* 62, no. 3, 2007, pp. 1029–1079

- Charles M. Jones and Owen A. Lamont, "Short-Sale Constraints and Stock Returns," *Journal of Financial Economics* 66, no. 2–3, 2002, pp. 207–239

- Dan S. Dhaliwal et al., "Shared Auditors in Mergers and Acquisitions," *Journal of Accounting and Economics* 61, no. 1, 2016, pp. 49–76

- Dmitriy Muravyev et al., "Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options," *The Journal of Finance* 77, no. 3, 2022, pp. 1787–1828

- Douglas W. Diamond and Robert E. Verrecchia, "Constraints on Short-Selling and Asset Price Adjustment to Private Information," *Journal of Financial Economics* 18, no. 2, 1987, pp. 277–311

- Ekkehart Boehmer and Juan (Julie) Wu, "Short Selling and the Price Discovery Process," *The Review of Financial Studies* 26, no. 2, 2013, pp. 287–322

- Eliezer M. Fich et al., "Motivated Monitors: The Importance of Institutional Investors' Portfolio Weights," *Journal of Financial Economics* 118, no. 1, 2015, pp. 21–48

- Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, 1970, pp. 383–417

- Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617

- Fred Bereskin et al., "The Effect of Cultural Similarity on Mergers and Acquisitions: Evidence from Corporate Social Responsibility," *Journal of Financial and Quantitative Analysis* 53, no. 5, 2018, pp. 1995–2039

**Appendix C**

- Gene D'Avolio, "The Market for Borrowing Stock," *Journal of Financial Economics* 66, no. 2–3, 2002, pp. 271–306

- Gur Huberman and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance* 56, no. 1, 2001, pp. 387–396

- I. Serdar Dinc and Isil Erel, "Economic Nationalism in Mergers and Acquisitions," *The Journal of Finance* 68, no. 6, 2013, pp. 2471–2514

- Joseph E. Engelberg et al., "Short-Selling Risk," *The Journal of Finance* 73, no. 2, 2018, pp. 755–786

- Kent Daniel et al., "Investor Psychology in Capital Markets: Evidence and Policy Implications," *Journal of Monetary Economics* 49, no. 1, 2002, pp. 139–209

- Matteo P. Arena, "Corporate Litigation and Debt," *Journal of Banking and Finance 87*, 2018, pp. 202–215

- Matteo P. Arena and Brandon Julio, "Litigation Risk Management Through Corporate Payout Policy," *Journal of Financial and Quantitative Analysis*, 2022, pp. 1–27

- Matteo P. Arena and Stephen P. Ferris, "A Global Analysis of Corporate Litigation Risk and Costs," *International Review of Law and Economics 56*, 2018, pp. 28–41

- Owen A. Lamont and Richard H. Thaler, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," *Journal of Political Economy* 111, no. 2, 2003, pp. 227–268

- Pedro A. C. Saffi and Kari Sigurdsson, "Price Efficiency and Short Selling," *The Review of Financial Studies 24*, no. 3, 2011, pp. 821–852

- Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research* 9, 1971, pp. 119–163

- William H. Beaver, "The Information Content of Annual Earnings Announcements," *Journal of Accounting Research* 6, 1968, pp. 67–92

## Agreements

- Agreement and Plan of Merger by and among Bayer Aktiengesellschaft, KWA Investment Co. and Monsanto Company, September 14, 2016

## Analyst Reports

- "Monsanto Expected to Earn Less Than $5 EPS Through 2018," *Bernstein*, July 13, 2016.

**Appendix C**

- "Reassessing the Risk-Reward – Upgrade to Buy," *Citi*, August 25, 2016

- "Quick Take: Bayer Willing to Raise Monsanto Bid to $127.50/Share, Still Hard To See a Closing of This Deal," *Bernstein*, September 6, 2016

- "Bayer/Monsanto: From Anger to Acceptance? Results of Our Investor Survey - Deal Agreement Seen as 80% Likely, Consummation Only 53%, We See Lower Odds," *Bernstein*, September 13, 2016

- "Alert: Left with Little Choice but to Accept Bayer's Offer," *Citi*, September 16, 2016

- "We Expect the Bayer Acquisition of Monsanto is More Likely to Close Than Not," *Morningstar*, September 23, 2016

- "Far More Farmer than Pharma?," *Kepler Cheuvreux*, November 21, 2016

- "1FQ17 – Just the Outlook," *CLSA*, January 5, 2017

- "Global Chemicals: State of Play in Chemicals M&A - Where We Stand in the Big Five Deals," *Bernstein*, February 2, 2017

- "We Expect the Bayer Acquisition of Monsanto is More Likely to Close Than Not," *Morningstar*, March 17, 2017

- "Alert: Conditional EU Approval Positive for DOW and DD," *Citi*, March 27, 2017

- "Global Chemicals: State of Play in Chemicals M&A - Where We Stand in the Six (Potential) Deals," *Bernstein*, April 6, 2017

- "Grinding Higher Toward Bayer Deal," *Citi*, April 10, 2017

- "Monsanto Fears are Receding," *Kepler Cheuvreux*, May 9, 2017

- "MON 3017 Preview: Can Soybeans Rescue a Weak Quarter? Will Monsanto Even Tell Us What Xtend Premiums are?," *Bernstein*, June 23, 2017

- "Bayer: Post Q2:17 Results – Model Update," *Bernstein*, July 31, 2017

- "Global Chemicals: State of Play in Chemicals M&A - Where We Stand in the Six Deals," *Bernstein*, August 14, 2017

- "Bayer/Monsanto: What the EC Anti-Trust Regulators are Worried About (and How That Compares to Dow/DuPont)," *Bernstein*, September 5, 2017

- "Brazilian Intacta RR2 Issue Potentially A Big Deal," *Barclays*, January 24, 2018

- "Quick Take: Bayer/Monsanto – More Thoughts on what the DOJ Could be Targeting," *Bernstein*, March 19, 2018

- "European Commission Conditionally Approves Bayer-Monsanto Transaction; Focus Moves to US DOJ's Decision," *Goldman Sachs*, March 21, 2018

- "Ploughing Ahead: DOJ Approves Merger," *Deutsche Bank*, May 29, 2018

**Appendix C**

- "Bayer Rights Issue Confirms Monsanto Close Is Near," *Jefferies*, June 4, 2018

- "Bayer's Remorse?," *Mainfirst*, August 12, 2018

- "Bayer Announces June 7 Closing Date for Monsanto Acquisition," *Morningstar*, August 13, 2018

- "Glyphosate Litigation: Quantifying the Overhang," *Berenberg*, August 13, 2018

- "Those Chains Prove a Little Tough to Unshackle…," *Barclays*, August 13, 2018

- "Bernstein Chemicals: Roundup Not Ready… a Summary of Herbicide Related Issues for Bayer and DowDupont," *Bernstein*, August 20, 2018

- "2Q18 Second Opinion," *Credit Suisse*, September 6, 2018

- "Valuation Discount Too Great to Ignore, Though Execution in 2019 is Key to Closing the Gap," *JP Morgan*, September 18, 2018

- "European Industrial Chemicals: Value Chain Extension – Initiating Coverage at The Cusp of a Slowdown," *Bernstein*, September 24, 2018

- "Jump in the Fire," *Redburn*, September 24, 2018

- "Reassessing Crop Forecasts," *Berenberg*, October 3, 2018

- "Bayer: When Should You Settle for Less? Expert Call Highlights," *Bernstein*, October 8, 2018

- "Litigation Concerns Surrounding Glyphosate Lead to Increase in Bayer's Uncertainty Rating to High," *Morningstar*, October 23, 2018

- "Judge Lowers Penalty Against Bayer in Glyphosate Case, but Reduction is Less than Initially Signaled," *Morningstar*, October 23, 2018

- "Valuation vs Negative EPS Momentum," *Credit Suisse*, November 14, 2018

- "The Song Does Not Remain the Same," *Redburn*, December 17, 2018

- "Glyphosate Update and Litigation Timeline," *Credit Suisse*, January 31, 2019

- "Bayer: Lessons from the Large Cap Patent Cliffs. What is a Fair Multiple for Pharma Today and Tomorrow?," *Bernstein*, February 8, 2019

- "Q4 18 Preview – Overshadowed by Lawsuits," *Mainfirst*, February 12, 2019

- "Newly Published Study Linking Glyphosate to NHL Ahead of the Hardeman Trial," *Credit Suisse*, February 15, 2019

- "4Q18 Second Opinion," *Credit Suisse*, February 28, 2019

- "Remain on the Sidelines, with Glyphosate Trial 2 & 3 the Next Events," *JP Morgan*, March 1, 2019

**Appendix C**

- "State of the Ag," *Redburn*, March 4, 2019

- "It Never Rains in California but Girl Don't They Warn Ya, It Pours," *Mainfirst*, March 19, 2019

- "Bayer: Initial Thoughts as They Lose the First Roundup Bellwether," *Bernstein*, March 20, 2019

- "At Court and on the High Seas," *Commerzbank*, March 20, 2019

- "Hardeman Trial Moves to Phase 2 After Unanimous Jury Ruling in Phase 1," *Credit Suisse*, March 20, 2019

- "Roundup Trial Setback Presents Buying Opportunity," *Pareto*, March 20, 2019

- "Bayer Loses Another Glyphosate Case, but Scientific Studies Still Support its Product," *Morningstar*, March 21, 2019

- "Risk/Reward Increasingly Asymmetric," *Bankhaus Lampe*, March 22, 2019

- "Seeing the Wood for the Trees," *Liberum*, March 28, 2019

- "Phase 2 of Hardmen Trial Goes Against Bayer, As Expected," *Pareto*, March 28, 2019

- "The Risk is Too Meaty; Down to Hold," *Berenberg*, March 29, 2019

- "Cautious for Q1, In-Line With Consensus," *Pareto*, April 18, 2019

- "1Q19 Second Opinion," *Credit Suisse*, April 26, 2019

- "Remain on Sidelines Ahead of Pilliod Glyphosate Trial Outcome," *JP Morgan*, April 26, 2019

- "Judge Awards Over $2B in Damages Against Bayer in Glyphosate Case, but Lower Costs Likely on Appeal," *Morningstar*, May 14, 2019

- "Bayer in 2025: Crop Primer. Back to Fundamentals.," *Bernstein*, May 20, 2019

- "Glyphosate Litigation, a Round-Up," *Berenberg*, June 10, 2019

- "Focus on Ag Ahead of Challenging 2Q," *Credit Suisse*, July 4, 2019

- "FLASH: Damages Cut but Re-Trial Denied," *Mainfirst*, July 16, 2019

- "Weather to Trim 2019 Crop Performance," *Liberum*, July 17, 2019

- "Flooded by Legal Cases," *Berenberg*, July 30, 2019

- "Weak Q2 Due to Crop, Guidance Ambitious," *Liberum*, July 30, 2019

- "Preparing the Ground," *Mainfirst*, July 30, 2019

HIGHLY CONFIDENTIAL

- "Remain on the Sidelines Ahead of the Upcoming Gordon Trial in Missouri," *JP Morgan*, July 31, 2019

- "A Good Garden May Have Some Weeds," *Exane BNP Paribas*, September 16, 2019

- "3Q'19 Results Likely to See Substantial Increase in the Number of Glyphosate Plaintiffs," *JP Morgan*, October 9, 2019

- "Still in the Bagain Basement," *Barclays*, October 24, 2019

- "Bayer/Roundup Litigation: Updated Settlement Thoughts and Estimates," *Susquehanna*, October 30, 2019

- "One Fateful January," *Berenberg*, October 31, 2019

- "Forecasts Rebased for the Sale Animal health and Current; SOTP Suggests Limited Upside," *JP Morgan*, October 31, 2019

- "Glyphosate news Remains Most Important," *Bank of America Merrill Lynch*, December 4, 2019

- "One New Year, Two Big Deals: Up to Buy," *Berenberg*, December 16, 2019

- "Bayer: What is the Evidence that Glyphosate Causes Cancer?," *Bernstein*, January 15, 2020

- "Tip of the Feinberg? - Upgrade to Buy," *Mainfirst*, January 27, 2020

- "Thoughts Into Q4, Revisited," *Barclays*, February 18, 2020

- "Digging Into the Ag Pipeline," *Redburn*, February 21, 2020

- "Earnings Growth is Rarely so Cheap," *Berenberg*, February 28, 2020

- "FY19 Results Second Opinion," *Credit Suisse*, February 28, 2020

- "Fundamentals Suggest Limited Upside from Here," *JP Morgan*, March 2, 2020

- "Simply Undervalued – Upgrading to Buy," *Deutsche Bank*, March 4, 2020

- "Catalyst Call: Buy Idea," *Deutsche Bank*, March 10, 2020

- "Incorporating COVID into our Model," *Mainfirst*, March 25, 2020

- "Attractive Valuation and GLP +VE Risk-Reward," *Bank of America Merrill Lynch*, April 27, 2020

- "Climbing Back into the Good Books," *Berenberg*, April 27, 2020

- "Solid Start to 2020 in all Units," *Liberum*, April 27, 2020

- "Settling Down but not Settled," *Mainfirst*, April 27, 2020

- "1Q20 Results Second Opinion," *Credit Suisse*, April 28, 2020

**Appendix C**

- "The Benefits of Not Having a Chemicals Business Anymore," *Exane BNP Paribas*, April 28, 2020

- "Addressing Three Big Investor Concerns," *Redburn*, May 19, 2020

- "Investment Thesis," *Deutsche Bank*, May 27, 2020

- "Feedback from External Legal Expert Call," *Bank of America Merrill Lynch*, June 3, 2020

- "A Growth/Valuation Mismatch," *Commerzbank*, June 16, 2020

- "GLP Settlement Appears Imminent," *Bank of America Merrill Lynch*, June 23, 2020

- "Quick Hepatic Inspection: Takes on Litigation Newsflow," *Barclays*, June 23, 2020

- "Transfer of Coverage," *Mainfirst*, June 23, 2020

- "Despite High Legal Costs Related to Glyphosate, Bayer Still Looks Well-Positioned for Growth," *Morningstar*, June 24, 2020

In addition to the analyst reports specified above:

- All analyst reports covering Bayer and Monsanto provided to me by Counsel over the date range 11/6/15–7/29/20

- All analyst reports covering Bayer available for purchase from CapIQ and Refinitiv from one trading day before through three trading days after each alleged corrective disclosure date in this action[1]

- All analyst reports covering Bayer and Monsanto available for purchase from CapIQ and Refinitiv from one trading day before through three trading days after the "Monsanto Papers" release dates referenced in the "Wisner Baum Monsanto Papers Master Chart" before the first alleged corrective disclosure date in this action[2]

**Books and Book Chapters**

- Robert W. Holthausen and Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice*, First Edition (Westmont, IL:  Cambridge Business Publishers, 2017)

---

[1] The alleged corrective disclosure dates in this action are 8/10/18, 10/22/18, 3/19/19, 6/24/20, and 7/6/20.  The following date ranges were searched in CapIQ and Refinitiv for analyst reports covering Bayer:  8/9/18–8/15/18, 10/19/18–10/25/18, 3/18/19–3/22/19, 6/23/20–6/29/20, 7/2/20–7/9/20.

[2] The "Monsanto Papers" release dates referenced in the "Wisner Baum Monsanto Papers Master Chart" before any alleged corrective disclosure date in this action are 3/14/17, 3/15/17, and 8/1/17.  The following date ranges were searched in CapIQ and Refinitiv for analyst reports covering Bayer and Monsanto:  3/13/17–3/20/17 and 7/31/17–8/4/17.

**Appendix C**

**Data**

- OTC Markets Data:  Intraday trading data for Bayer ADRs (including trade timestamp, size, price, and type)

- Refinitiv:  Bayer ADR dividends; Bayer market capitalization; Bayer ordinary share daily closing price; Bayer subscription rights price; Monsanto daily closing price; Monsanto dividends; USD/EUR daily exchange rate

- S3 Data:  Short interest and cost of borrowing

- Tick Data:  Intraday price and trading data for Bayer ordinary shares, iShares Core EURO STOXX 50 UCITS ETF (DE), and EUR/USD exchange rate

**Depositions**

- Deposition of Chad W. Coffman, CFA, and Exhibits, December 21, 2022

**Expert Reports**

- Expert Report of Chad W. Coffman, CFA, and Backup Materials, October 28, 2022

**Government Reports**

- United States Securities and Exchange Commission Office of Investor Education and Advocacy, "Investor Bulletin: American Depositary Receipts," August 2012

**Hearings**

- Hearing on "In Defense of Scientific Integrity: Examining the IARC Monograph Programme and Glyphosate Review" before the Committee on Science, Space, and Technology of the United States House of Representatives, February 6, 2018, available at https://www.govinfo.gov/content/pkg/CHRG-115hhrg28933/pdf/CHRG-115hhrg28933.pdf

**Legal Documents**

- Order Denying Defendants' Motion to Dismiss, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.*, October 19, 2021

- Second Amended Class Action Complaint, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.*, December 30, 2021

- Order Denying Motion to Dismiss, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.*, May 18, 2022

**Appendix C**

- Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel and Memorandum of Points and Authorities in Support Thereof, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.*, October 28, 2022

## Press Releases

- Bayer Press Release, "Bayer and Monsanto to Create a Global Leader in Agriculture," September 14, 2016

- Bayer Press Release, "Bayer closes Monsanto acquisition," June 7, 2018

- Bayer Press Release, "Bayer signs agreement to sell selected Crop Science businesses to BASF for EUR 5.9 billion," October 17, 2017

- Bayer Press Release, "European Commission conditionally approves Bayer's proposed acquisition of Monsanto," March 21, 2018

- Bayer Press Release, "U.S. Department of Justice conditionally approves Bayer's proposed acquisition of Monsanto," May 29, 2018

- BNY Mellon Corporate Action Notice, "Cash Distribution Resulting from the Sale of Rights," June 15, 2018

- BNY Mellon Depositary Receipts Announcement, "Books Closed / Open Announcement," June 5, 2018

- BNY Mellon Depositary Receipts Announcement, "Books Closed / Open Announcement," June 19, 2018

## Public Press

- "ACCC won't oppose Bayer's proposed acquisition of Monsanto," *M2 Presswire*, March 22, 2018

- "Bayer Drops Bid for Schiff Nutrition," *New York Times*, November 20, 2012

- "Bayer Raises Takeover Bid for Monsanto," *New York Times*, July 14, 2016

- "Bayer receives Russian approval for Monsanto acquisition," *St. Louis Business Journal*, April 20, 2018

- "Bayer Sweetens Monsanto Bid to $65 Billion, $127.5 a Share," *Investor's Business Daily*, September 6, 2016

- "Bayer wins EU approval for $62.5 billion Monsanto buy," *Reuters News*, March 21, 2018

- "Bayer, BASF win new trial on $60 mln damage award in weedkiller lawsuit," *Reuters News*, July 7, 2022

**Appendix C**

- "Bayer, Monsanto start $2.5 billion asset sale to get merger clearance: sources," *Reuters News*, March 9, 2017

- "Bayer-Monsanto Deal Would Forge New Agricultural Force," *Wall Street Journal*, September 14, 2016

- "Bayer resolves capital increase with subscription rights against cash contributions in the amount of 6.0 billion euros to finance the acquisition of Monsanto," *Dow Jones Institutional News,* June 3, 2018

- "BRIEF-Monsanto shareowners approve Bayer deal," *Reuters News*, December 13, 2016

- "China conditionally approves Bayer's acquisition of Monsanto," *Reuters News*, March 13, 2018

- "GOP lawmakers take aim at WHO agency over Roundup ingredient," *Associated Press*, February 6, 2018

- "Justice Department to Allow Bayer's Acquisition of Monsanto After Companies Make Concessions -- Sources," *Dow Jones Institutional News*, April 9, 2018

- "Monsanto 'bullied scientists' and hid weedkiller cancer risk, lawyer tells court," *The Guardian*, July 9, 2018

- "Monsanto's Sway Over Research Is Seen in Disclosed Emails," *New York Times*, August 2, 2017

- "Monsanto Employee Emails Show Efforts to Marshal Scientists," *Wall Street Journal*, August 3, 2017

- "Monsanto has rejected a $62 billion takeover offer," *Business Insider*, May 24, 2016

- "Monsanto Rejects Bayer's Revised Takeover Bid of $125 a Share," *New York Times*, July 19, 2016

- "Monsanto shareholders back Bayer deal, CEO hopeful of U.S. approval – Reuters News," *Reuters News*, December 13, 2016

- "Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed Documents," *New York Times*, March 14, 2017

- "Monsanto's Weed Killer, Dicamba, Divides Farmers," *New York Times*, September 21, 2017

- "Plaintiffs in U.S. lawsuit say Monsanto ghostwrote Roundup studies," *Reuters News*, March 15, 2017

- "U.S. judge slashes Roundup jury award to $25.3 Million; Bayer still plans to appeal," *Reuters News*, July 15, 2019

- "Why Trump's win worried Bayer's CEO," *St. Louis Business Journal*, November 28, 2016

**SEC Filings and Annual Reports**

- Bayer AG, "Interim Group Management Report as of September 30, 2015," October 29, 2015

- Bayer AG, "Interim Group Management Report as of March 31, 2016," April 26, 2016

- Bayer AG, "Interim Group Management Report as of June 30, 2016," July 27, 2016

- Monsanto Company, Form 10-K for Fiscal Year Ended August 31, 2016, Filed on October 19, 2016

- Bayer AG, "Interim Group Management Report as of September 30, 2016," October 26, 2016

- Bayer AG, "Bayer Annual Report 2016," February 22, 2017

- Monsanto Company, Form 10-Q for Quarterly Period Ended February 28, 2017, Filed on April 6, 2017

- Bayer AG, "Bayer Interim Report as of March 31, 2017," April 27, 2017

- Monsanto Company, Form 10-Q for Quarterly Period Ended May 31, 2017, Filed on June 29, 2017

- Bayer AG, "Bayer Interim Report as of June 30, 2017," July 27, 2017

- Bayer AG, "Bayer Interim Report as of September 30, 2017," October 26, 2017

- Monsanto Company, Form 10-K for Fiscal Year Ended August 31, 2017, Filed on October 27, 2017

- Monsanto Company, Form 10-Q for Quarterly Period Ended November 30, 2017, Filed on January 5, 2018

- Bayer AG, "Bayer Annual Report 2017," February 28, 2018

- Monsanto Company, Form 10-Q for Quarterly Period Ended February 28, 2018, Filed on April 5, 2018

- Bayer AG, "Bayer Interim Report as of March 31, 2018," May 3, 2018

- Bayer AG, "Bayer Interim Report as of June 30, 2018," September 5, 2018

- Bayer AG, "Bayer Interim Report as of September 30, 2018," November 13, 2018

- Bayer AG, "Bayer Annual Report 2018," February 27, 2019

- Bayer AG, "Bayer Quarterly Statement as of March 31, 2019," April 25, 2019

**Appendix C**

- Bayer AG, "Bayer Half-Year Financial Report as of June 30, 2019," July 30, 2019

- Bayer AG, "Bayer Quarterly Statement as of September 30, 2019," October 30, 2019

- Bayer AG, "Bayer Annual Report 2019," February 27, 2020

- Bayer AG, "Bayer Quarterly Statement as of March 31, 2020," April 27, 2020

- Bayer AG, "Bayer Half-Year Financial Report as of June 30, 2020," August 4, 2020

- Bayer AG, "Bayer Quarterly Statement as of September 30, 2020," November 3, 2020

- Bayer AG, "Bayer Annual Report 2020," February 25, 2021

**Websites**

- "ADR Program," *Bayer*, https://www.bayer.com/en/investors/adr-program

- "Bayer/Monsanto given final greenlight," *Global Competition Review*, June 5, 2018, https://globalcompetitionreview.com/article/bayermonsanto-given-final-greenlight

- "Bayer-Monsanto deal approved by Brazil's antitrust agency," *S&P Global Market Intelligence*, February 7, 2018, https://www.spglobal.com/marketintelligence/en/news-insights/trending/7zoplkbthuxsjawk-whyyq2

- "Bayer Raises Monsanto Cash Takeover Offer to $65bn," *The Guardian*, September 6, 2016, https://www.theguardian.com/business/2016/sep/06/bayer-raises-monsanto-cash-takeover-65bn-dollars

- "BAYRY – Bayer A.G.," *OTC Markets*, https://www.otcmarkets.com/stock/BAYRY/overview

- "Competition Bureau reaches consent agreement with Bayer in its proposed acquisition of Monsanto," *Competition Bureau Canada*, May 30, 2018, https://www.canada.ca/en/competition-bureau/news/2018/05/competition-and-innovation-safeguarded-in-the-canadian-agricultural-sector.html

- "Glyphosate," *United States Environmental Protection Agency*, https://www.epa.gov/ingredients-used-pesticide-products/glyphosate

- "Johnson Trial (2018)," *Wisner Baum*, https://www.wisnerbaum.com/toxic-tort-law/monsanto-roundup-lawsuit/johnson-trial-2018-/

- "Lawsuits mount against Monsanto over alleged Roundup cancer link," *Seeking Alpha*, October 15, 2015, https://seekingalpha.com/news/2833386-lawsuits-mount-against-monsanto-over-alleged-roundup-cancer-link

- "The Deal with Dicamba: Part One," *The National Agricultural Law Center*, January 22, 2020, https://nationalaglawcenter.org/the-deal-with-dicamba-part-one/

**Appendix C**

- "The Impact of Glysophate [*sic*] Regulation And Litigation On Monsanto," *Seeking Alpha*, July 10, 2017, https://seekingalpha.com/article/4086589-impact-glysophate-regulation-litigation-monsanto

- "The Monsanto Papers – Master Chart," *Wisner Baum*, https://www.wisnerbaum.com/assets/Monsanto%20Roundup%20pages/Secret%20Documents/monsanto-documents-chart-101217.pdf

**Exhibit 1**

# Monsanto Company
# Closing Stock Price
## 1/1/16 – 6/7/18



Source:  Public Press; *Refinitiv*; Second Amended Class Action Complaint, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.*, 12/30/21

Note:  Monsanto's closing stock price is not adjusted for dividends.  Monsanto paid a dividend of $0.54 per share in each quarter of the period shown.

HIGHLY CONFIDENTIAL

**Exhibit 2**

# Bayer AG
# Examples of Probability of Bayer-Monsanto Merger Completion
# Reported by Analysts
## 5/1/16 – 6/15/18



Source: Analyst Reports; Public Press; Second Amended Class Action Complaint, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.*, 12/30/21

Note: The chart shows analyst point estimates of the probability that the Bayer-Monsanto merger would be completed. Estimates reported as ranges are not shown. If analysts reported multiple possible scenarios under which the merger would be completed, the chart shows the sum of the probability assigned to each scenario. In a report published 9/6/16, Bernstein stated "We see the fairly modest raise as further indication that Bayer is feeling stretched by this deal, and is not willing to go north of $130. We see a relatively low probability (40%) that Monsanto will accept something close to $127.50/share...We give a Monsanto/Bayer deal 50% chance of passing after divestments (again, assuming the two sides agree)." Bernstein's estimate is shown as 20% (40% * 50%).

HIGHLY CONFIDENTIAL

**Exhibit 3**

# Bayer AG
## Number of Roundup Litigation Plaintiffs
### 10/23/15 – 2/23/21



Source: Bayer Quarterly and Annual Reports; Monsanto SEC Filings; Public Press; Second Amended Class Action Complaint, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.*, 12/30/21

Note: Counts of Roundup litigation plaintiffs reported before 6/7/18 are obtained from Monsanto's SEC filings and shown as of the SEC filing date. Counts of Roundup litigation plaintiffs reported after 6/7/18 are obtained from Bayer's quarterly and annual reports to shareholders and shown as of the report publication date.

HIGHLY CONFIDENTIAL

**Exhibit 4**

# Bayer AG
# Examples of Estimates of Bayer's Roundup Litigation Settlement Reported by Analysts
## 7/19/18 – 7/6/20



Source: Analyst Reports; *Refinitiv;* Second Amended Class Action Complaint, *Sheet Metal Workers' National Pension Fund, et al. v. Bayer Aktiengesellschaft, et al.,* 12/30/21

Note: The chart shows reported analyst point estimates of Bayer's Roundup litigation settlement over time. Estimates reported as ranges, discounted values, after-tax values, or worst-case or best-case scenarios are not shown. Repeated estimates by the same contributor on different dates are shown. Estimates reported in EUR are converted to USD using the closing exchange rate on the day of the report.

HIGHLY CONFIDENTIAL

**Exhibit 5**



# Bayer AG
# Price Difference Between Closing ADR and Ordinary Share Price
## 5/23/16 – 7/6/20

Source:  Expert Report of Chad W. Coffman, CFA, and Backup Materials, 10/28/22

Note:  Prior to 9/20/17, each ADR represented one ordinary share.  On and after that date, each ADR represented one-quarter of an ordinary share.  The price difference plotted in this chart is based on the data underlying Exhibit 14 of Mr. Coffman's report.  In that exhibit, Mr. Coffman plots the closing prices of Bayer's ADR and ordinary share, where the ADR price is adjusted to consistently represent the 4:1 ADR-to-ordinary share ratio and the ordinary share price is divided by four.  The price difference plotted in this chart is calculated as the difference between the two price series from Exhibit 14 in Mr. Coffman's report, multiplied by four to make figures comparable to the value of a single Bayer ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 6A**



# Bayer AG
## Intraday Ordinary Share and ADR Prices
### 6/1/18

Source:  *OTC Markets Data*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 6B**

# Bayer AG
## Intraday Ordinary Share and ADR Prices
### 6/4/18



● Four ADRs    ● One Ordinary Share

Source:  *OTC Markets Data*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 6C**



# Bayer AG
## Intraday Ordinary Share and ADR Prices
### 6/5/18

Source:  *OTC Markets Data*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 6D**

# Bayer AG
# Intraday Ordinary Share and ADR Prices
## 6/6/18



Source: *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share. The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6E**

# Bayer AG
# Intraday Ordinary Share and ADR Prices
## 6/7/18



Source: *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share. The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6F**



## Bayer AG
## Intraday Ordinary Share and ADR Prices
6/8/18

Source:  *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.  The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6G**

# Bayer AG
## Intraday Ordinary Share and ADR Prices
### 6/11/18



• Four ADRs    • Four ADRs Minus $1.664    • One Ordinary Share

Source:  *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.  The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6H**

# Bayer AG
# Intraday Ordinary Share and ADR Prices
## 6/12/18



Source: *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share. The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6I**



# Bayer AG
## Intraday Ordinary Share and ADR Prices
6/13/18

Source:  *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.  The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6J**



## Bayer AG
## Intraday Ordinary Share and ADR Prices
### 6/14/18

Source: *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share. The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6K**

# Bayer AG
## Intraday Ordinary Share and ADR Prices
### 6/15/18



Source:  *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.  The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6L**

# Bayer AG
## Intraday Ordinary Share and ADR Prices
6/18/18



Source: *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share. The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6M**

# Bayer AG
# Intraday Ordinary Share and ADR Prices
## 6/19/18



Source: *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share. The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL



# Bayer AG
## Intraday Ordinary Share and ADR Prices
### 6/20/18

● Four ADRs    ● Four ADRs Minus $1.664    ● One Ordinary Share

Source:  *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.  The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL



# Bayer AG
## Intraday Ordinary Share and ADR Prices
### 6/21/18

Source:  *OTC Markets Data*; *Refinitiv*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.  The chart also shows the value of four ADRs without the promised future distribution of $0.416 per ADR announced on 6/15/18 and paid to owners of ADRs as of market close on 6/21/18.

HIGHLY CONFIDENTIAL

**Exhibit 6P**



# Bayer AG
## Intraday Ordinary Share and ADR Prices
6/22/18

Source:  *OTC Markets Data*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

# Bayer AG
## Intraday Ordinary Share and ADR Prices
6/25/18



Source:  *OTC Markets Data*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 6R**

# Bayer AG
## Intraday Ordinary Share and ADR Prices
6/26/18



Source: *OTC Markets Data*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 6S**



# Bayer AG
## Intraday Ordinary Share and ADR Prices
6/27/18

Source: *OTC Markets Data*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 6T**

# Bayer AG
## Intraday Ordinary Share and ADR Prices
6/28/18



Source:  *OTC Markets Data*; *Tick Data*

Note:  The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR.  Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 6U**

# Bayer AG
# Intraday Ordinary Share and ADR Prices
## 6/29/18



Source: *OTC Markets Data*; *Tick Data*

Note: The chart displays the price of the last transaction in each minute for Bayer's ordinary shares and the price of each regular transaction for Bayer's ADR. Bayer's ordinary share price is converted from EUR to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four because each ADR represents one-quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 7**

# Bayer AG
# June 2018 Rights Offering Timeline, Average ADR-Ordinary Share Price Difference, and Price Difference Explained by ADR Cash Distribution
## 6/1/18 – 6/30/18



Source: *OTC Markets Data*; *Refinitiv*; *Tick Data*; "Bayer resolves capital increase with subscription rights against cash contributions in the amount of 6.0 billion euros to finance the acquisition of Monsanto," *Dow Jones Institutional News*, 6/3/18; BNY Mellon Depositary Receipts Announcement, "Books Closed / Open Announcement," 6/5/18; BNY Mellon Corporate Action Notice, "Cash Distr bution Resulting from the Sale of Rights," 6/15/18; BNY Mellon Depositary Receipts Announcement, "Books Closed / Open Announcement," 6/19/18

Note:  The Average ADR-Ordinary Share Price Difference is the daily average price difference between Bayer's ADR and ordinary share and is calculated as the simple average of the price differences between 9:30 AM ET and 11:30 AM ET, the window during which both the U.S. and German stock markets are open.  Price differences are calculated for every minute where at least one transaction occurred for both Bayer's ADR and ordinary share and are based on the price of the last trade for each security in a given minute.  The ordinary share price is converted to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four to represent the implicit value of a single ordinary share, as during this period one ADR represented a quarter of an ordinary share.  The Price Difference Explained by Cash Distribution corresponds to the maximum price difference between Bayer's ADR and ordinary share that could be explained by the cash distr bution available to holders of Bayer's ADR, but not to ordinary shareholders, between 6/6/18, the day the ordinary shares began trading ex-rights, and 6/22/18, the day the ADR began trading ex-dividend.  BNY Mellon made a gross cash distribution of $0.416 per ADR ($1.664 per four ADRs) to distribute the proceeds from the sale of the rights.  The rights traded between 6/6/18 and 6/15/18, with a maximum closing price of $1.99.

HIGHLY CONFIDENTIAL

**Exhibit 8**



# Bayer AG
## ADR Short Interest Percentage
## 5/23/16 – 7/6/20

Source: Expert Report of Chad W. Coffman, CFA, and Backup Materials, 10/28/22; *S3*

Note: S3 data is recorded as of the settlement date. S3 data presented in the chart is adjusted by two trading days to be presented as of the trade date. Short interest percentage is calculated as the number of ADRs sold short divided by the number of ADRs outstanding. Dates without data on ADRs outstanding are excluded.

HIGHLY CONFIDENTIAL

**Exhibit 9**



# Bayer AG
# ADR Short Interest Percentage and Average ADR-Ordinary Share Price Difference
## 6/1/18 – 6/30/18

Source:  *OTC Markets Data*; *Refinitiv*; *S3*; *Tick Data*; Expert Report of Chad W. Coffman, CFA, and Backup Materials, 10/28/22; "Bayer resolves capital increase with subscription rights against cash contributions in the amount of 6.0 billion euros to finance the acquisition of Monsanto," *Dow Jones Institutional News*, 6/3/18; BNY Mellon Depositary Receipts Announcement, "Books Closed / Open Announcement," 6/5/18; BNY Mellon Corporate Action Notice, "Cash Distribution Resulting from the Sale of Rights," 6/15/18; BNY Mellon Depositary Receipts Announcement, "Books Closed / Open Announcement," 6/19/18

Note:  S3 data is recorded as of the settlement date.  S3 data presented in the chart is adjusted by two trading days to be presented as of the trade date.  Short interest percentage is calculated as the number of ADRs that have been sold short divided by the number of ADRs outstanding.  The Average ADR-Ordinary Share Price Difference is the daily average price difference between Bayer's ADR and ordinary share and is calculated as the simple average of the price differences between 9:30 AM ET and 11:30 AM ET, the window during which both the U.S. and German stock markets are open.  Price differences are calculated for every minute where at least one transaction occurred for both Bayer's ADR and ordinary share and are based on the price of the last trade for each security in a given minute.  The ordinary share price is converted to USD using the contemporaneous EURUSD exchange rate.  The ADR price is multiplied by four to represent the implicit value of a single ordinary share, as during this period one ADR represented a quarter of an ordinary share.

HIGHLY CONFIDENTIAL

**Exhibit 10**

# Bayer AG
## ADR Short Sale Borrowing and Lending Rates and Average ADR-Ordinary Share Price Difference
6/1/18 – 6/30/18



Source: *OTC Markets Data*; *Refinitiv*; *S3*; *Tick Data*; "Bayer resolves capital increase with subscription rights against cash contributions in the amount of 6.0 billion euros to finance the acquisition of Monsanto," *Dow Jones Institutional News*, 6/3/18; BNY Mellon Depositary Receipts Announcement, "Books Closed / Open Announcement," 6/5/18; BNY Mellon Corporate Action Notice, "Cash Distr bution Resulting from the Sale of Rights," 6/15/18; BNY Mellon Depositary Receipts Announcement, "Books Closed / Open Announcement," 6/19/18

Note: S3 data is recorded as of the settlement date. S3 data presented in the chart is adjusted by two trading days to be presented as of the trade date. The "Offer Rate" is the market composite financing fee paid for existing short positions. The "Last Rate" is the market composite lending fee earned for incremental shares loaned on each respective date. The Offer and Last rates are both annualized by S3, and are the rates that would be applied to the market value of the securities borrowed to estimate dollar costs. The Average ADR-Ordinary Share Price Difference is the daily average price difference between Bayer's ADR and ordinary share and is calculated as the simple average of the price differences between 9:30 AM ET and 11:30 AM ET, the window during which both the U.S. and German stock markets are open. Price differences are calculated for every minute where at least one transaction occurred for both Bayer's ADR and ordinary share and are based on the price of the last trade for each security in a given minute. The ordinary share price is converted to USD using the contemporaneous EURUSD exchange rate. The ADR price is multiplied by four to represent the implicit value of a single ordinary share, as during this period one ADR represented a quarter of an ordinary share.

HIGHLY CONFIDENTIAL