# EXHIBIT S-6

# (Ex. Z-3 to Expert Report of C. Zarcu)

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
CASE No. 3:20-cv-04737-RS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SHEET METAL WORKERS' NATIONAL PENSION FUND and
INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO.
710 PENSION FUND, individually and as Lead
Plaintiffs on behalf of all others similarly
situated, and INTERNATIONAL UNION OF OPERATING
ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA
AND DELAWARE, individually and as
Named Plaintiff, on behalf of all others
similarly situated,

                          Plaintiffs,
               -against-
BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER
WENNING, LIAM CONDON, JOHANNES DIETSCH, and
WOLFGANG NICKL,

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

          ** HIGHLY CONFIDENTIAL **
           VIDEOTAPED DEPOSITION OF
            JOSHUA R. MITTS, PH.D.
             APPEARING REMOTELY
            FRIDAY, JANUARY 6, 2023
                 9:50 a.m.


REPORTED BY:
DANIELLE GRANT
APPEARING REMOTELY FROM RICHMOND COUNTY, NEW YORK

Page 2

January 6, 2023

9:50 a.m.

Videotaped Remote Deposition of JOSHUA R. MITTS, PH.D, held remotely with all parties appearing from their respective locations, pursuant to Notice before DANIELLE GRANT, a Stenographic Reporter and Notary Public of the State of New York.

REMOTE APPEARANCES:


COHEN MILSTEIN SELLERS & TOLL, PLLC

Attorneys for the Plaintiffs

    190 South LaSalle Street

    Suite 1705

    Chicago, Illinois 60603

BY:   BENJAMIN JACKSON, ESQ., of Counsel

      CAROL V. GILDEN, ESQ., of Counsel


WACHTELL, LIPTON, ROSEN & KATZ

Attorneys for the Defendants

    51 West 52nd Street

    New York, New York 10019

BY:   NOAH YAVITZ, ESQ., of Counsel

      EMILY BARRECA, ESQ., of Counsel

      FILIP BARTEL, ESQ., of Counsel



ALSO PRESENT:

ALAN PALLER, VIDEOGRAPHER

### FEDERAL STIPULATIONS

IT IS STIPULATED AND AGREED by and between the attorneys for the respective parties herein that the filing, sealing, and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed to before the court.

- oOo -

VIDEOGRAPHER:  Good morning.  We are going on the record at 9:50 a.m. Eastern Standard time on January 6, 2023.  Please note this deposition is being conducted virtually.  The quality of recording depends on the quality of the camera and Internet connection of the participants.  What is seen from the witness and heard on the screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This begins Media Unit No. 1 of the video recorded deposition of Joshua R Mitts, Ph.D., taken by counsel for the defendant in the matter of Sheet Metal Workers National Pension Fund, et al. versus Bayer AG, et al., filed in the U.S. District Court for the Northern District of California, San Francisco Division, case Number 3:20-CV-04737.

This deposition is being conducted

Page 6

remotely using virtual technology.

My name is Alan Paller representing Veritext New York. I'm the videographer, and the court reporter is Danielle Grant, also from Veritext. I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to proceeding, please state them at the time of your appearance.

At this time, counsel will now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. YAVITZ: Noah Yavitz, Wachtell, Lipton, Rosen & Katz for the defendants. I'm here with my colleagues Emily Barreca and Filip Bartel.

MR. JACKSON: Benjamin F. Jackson from Cohen Milstein Sellers & Toll LLC on behalf of the plaintiffs. I'm here

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

with my colleagues Carol Gilden and

Norhan Bassiouny.

VIDEOGRAPHER:  The court reporter

will swear in the witness.

JOSHUA R. MITTS, PH.D, called as a witness,

having been first duly sworn by

Danielle Grant, a Notary Public within

and for the State of New York, was

examined and testified as follows:

EXAMINATION BY

MR. YAVITZ:

Q    Great.  Well, let's get started.
Can you please state your name for the
record, Professor Mitts?

A    Joshua Mitts.

Q    You've been deposed before,
Professor Mitts, correct?

A    Yes.

Q    So I'm not going to belabor the
preliminaries, but I'm going to give you a
few just a few preliminaries, just terms and
stuff.  So when I refer to "plaintiffs," I'm
going to be referring generally to the three
named plaintiffs in this action, okay?

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A      I understand.

Q      And when I use the term "complaint," I'm going to be referring to the Second Amended Class Action Complaint filed by plaintiffs in this action on December 30, 2021, understood?

A      Yes.

Q      I'm sorry.  Was that a yes?  I had the same issue at the last deposition where I may not be picking up the first word?

A      Yes.

Q      Thank you.

The plaintiffs all have really cumbersome names.  No offense meant to them. I'm going to use some shorter versions.  So I'm going to call Sheet Metal Workers National Pension Fund Sheet Metal Workers.

Do you understand that?

A      Yes.

Q      And I'm going to call the International Brotherhood of Teamsters Local Number 710 Pension Fund, just "Local 710", okay?

A      I understand.

Page 9

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    And I'm going to call the International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware the "IUOE," okay?

A    I understand.

Q    So to make life easier for the court reporter, please let me finish my questions before you start answering, that way there's no cross talk, okay?

A    I understand.

Q    And if you want to take a break, just let me know.  My only request would be that if there's a question pending, you have to answer it first.  Hopefully, that won't be a great hardship, okay?

A    No problem.

Q    Do you understand that you're testifying under oath today just as you would be testifying under oath at trial?

A    Yes.

Q    Do you understand that there's a remote deposition order governing this deposition?

A    I am generally familiar.  I

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

understand that there is such an order.  I

have not personally read that order.

Q    That's fine.  Do you understand that while you're on the record, you're not supposed to communicate with anyone except as reflected on the record?

A    Yes.

Q    Do you have any other programs currently open on your computer screen like email and notes or things like that?

A    I -- yes.  But not email or notes. I have the Veritext Exhibit Share tab open in my Google Chrome browser.

Q    Great.  We'll use that later.

Other than a copy of your report, do you have any other hard copy documents with you today?

A    No.

Q    Is there any reason, medical or otherwise, why you can't testify completely and accurately today?

A    No.

Q    Okay.  Thanks.

What did you do to prepare for

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

your deposition today?

A    I reviewed my reports.  I reviewed new evidence which had been produced after completing my report and prior to today's deposition, and I spoke with counsel concerning both of those.

Q    How long did you spend preparing?

A    In total including both the review of my report and the review of some -- I should be clear -- of the evidence which had arrived in the interim because I have not completed my review of that evidence.  I estimate approximately on the order of 40 to 50 hours, but I would have to go back and double-check to get you the exact number.

Q    How long did you spend speaking with counsel in preparation of your deposition?

A    I don't have an exact estimate, but if I were to give a rough approximation, that would be on the order of ten hours at most, maybe less.

Q    And you mentioned that you reviewed discovery materials that were

Page 12

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
produced subsequent to your submission of
your report.  I have some questions on those
materials.

What third-party produced the
materials that you reviewed?

MR. JACKSON:  Objection to form.

A    I do not have at the moment a
complete list of each of the parties whose
materials I reviewed after completion of my
report.  I did review some of the materials
as I was able during this interim period.

Q    Did you review materials produced
by Harding Loevner?

A    Yes.  I reviewed some of the
materials produced by Harding Loevner.  If I
recall, the production by Harding Loevner
was very large, and I have not completed my
review of that production.

Q    Did you produce
materials -- strike that.

Did you review materials produced
by Hardman Johnston?

A    Yes.  And similar to Harding
Loevner, the -- my recollection is that the

Page 13

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
materials produced in that production were
fairly large in volume as well, and I have
not completed my review of that production.

Q    When you say you haven't completed
your review of that production, what process
are you following to select documents for
review within the larger production from
Harding Loevner for example?

A    In general, I follow the same
process for every production which arrives.
I have been given access to an electronic
platform called "Everlaw."  In that
platform, each production as it arrives,
appears as a folder.  I then download the
production in its entirety to my systems and
begin to review document by document.  My
review of the documents is not at any -- in
any particular order, primarily depends on
the order in which the documents are
organized on my file system.

Q    And then do you just review the
document seriatim until you've reviewed them
all?

A    That's correct.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Have you reviewed the operative complaint in this action?

MR. JACKSON:  Objection to form.

A    Yes.

Q    Let's mark Exhibit 1, which should be a copy of the report that you submitted in this action, Professor Mitts.  Let me know when you have it there.

(Whereupon, the Report of Dr. Mitts was marked as Deposition Exhibit No. 1 for identification, as of this date.)

A    I have it.

Q    I want to start by looking at Appendix A to your report, so can you flip there?

A    Yes, I am there.

Q    Great.  This is your CV, right?

A    Yes.

Q    Does this CV accurately reflect your employment history?

A    Yes.

Q    I want to get a better understanding of the professional history

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
apart from academic, so a few questions on
that.

Have you ever worked on a trading
desk?

A    No.

Q    Have you ever worked at a
securities brokerage firm?

A    No.

Q    Have you ever placed an order for
an ADR on behalf of a client?

A    No.

Q    Have you ever received an order
for an ADR on behalf of a client?

A    No.

Q    Have you ever been involved in the
issuance of a new ADR?

A    No.

MR. JACKSON:  Objection to form.

I'm sorry.  Go ahead.

Q    Have you ever executed any
securities trade on behalf of any client?

A    No.

Q    In your professional life, have
you ever had any professional involvement in

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

execution or documentation of any securities

transaction?

MR. JACKSON:  Objection to form.

A    By "professional involvement," can

you clarify what you mean by that?

Q    Well, sure.  Have you ever

transmitted, executed, or documented any

securities transaction?

MR. JACKSON:  Objection to form.

A    Yes.

Q    Can you describe the circumstances

under which you transmitted, executed, or

documented a securities transaction?

MR. JACKSON:  Objection to form.

A    I purchase for my own accounts

exchange traded funds.  For example,

yesterday, I transmitted an order to

purchase a security related to the S&P 500

exchange-traded funds.

Q    And you were transmitting that

trade on your own account?

A    Yes.

Q    And did you transmit that trade

through a retail brokerage of some sort?

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    Yes.

Q    So you were executing -- strike that.

You were transmitting that trade as a retail investor personally, correct?

A    Yes.

Q    So I'll revise my question slightly, then.

In a professional capacity, have you ever transmitted, executed, or documented any securities transaction?

MR. JACKSON:  Objection to form.

A    No.

Q    Is that fair to say that you have no professional experience in securities trading?

MR. JACKSON:  Objection to form.

A    No, it is not fair to say that.

Q    What is your professional experience in securities trading?

A    For several years, I have served as an advisor to the U.S. Department of Justice.  The nature of my work with the U.S. Department of Justice is in a

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL professional capacity.  It encompasses a number of activities in connection with securities trading.  One activity, for example, is the careful review of trading activity brokerage records, the mechanics of clearing and settlement.  I am regularly called upon to provide professional advice and analysis in connection with securities trading.  That analysis may extend to and, in fact, previously has encompassed trading in ADRs as well as other securities.

Q    Prior to this case, had you ever offered an expert opinion on whether a securities transaction took place in the United States?

MR. JACKSON:  Objection to form.  Objection.  Mischaracterizes his report.

A    Could you clarify what do you mean by an expert opinion?

Q    I'll start by saying, when I say, "expert opinion" I mean an opinion as an expert in connection with litigation.  So with that understanding, I'll repeat the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

question.

Prior to this case, had you ever offered an expert opinion on whether a securities transaction took place in the United States?

MR. JACKSON:  Objection to form and mischaracterizes his report.

A    I have not issued a public expert opinion of that nature before.

Q    Have you ever been asked to develop an opinion on whether a securities transaction took place in the United States before this case?

MR. JACKSON:  Objection to form. Now, I can't -- I'm sorry to interject. Do you mean an expert opinion or an opinion --

MR. YAVITZ:  Any opinion.

A    In the course of my work providing confidential and often privileged advice and analysis in connection with litigation, regulatory, and other investigative matters, I have been asked to opine on the location of where a securities transaction has taken

Page 20

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
place.

Q    Can you share any additional details about the nature of the proceeding in which you received that request?

A    In general, the specific facts and circumstances are going to be either subject to privilege or statutory confidentiality. For example, grand jury confidentiality.  I have been asked to examine trading behavior and ordered to answer the question where a transaction has taken place.

Q    Before this case, have you ever been asked to examine whether irrevocable liability for a securities transaction was incurred in the United States?

A    The questions which have been presented to me in prior matters have involved many of the same substantive questions underlying the question of where irrevocable liability was incurred.  I have not previously been asked to opine on that specific question using that specific phrase before.

Q    Have you published any academic

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

research on the extraterritoriality of securities transactions?

A    In my capacity as a legal scholar and financial economist, I am often writing on a number of topics.  Some of those topics may implicate or be related to extraterritoriality, but I have not directly addressed as a legal matter the question of extraterritoriality in my academic writing.

Q    On what topics do you consider yourself to be an expert?

MR. JACKSON:  Objection to form.

You may answer.

A    I have --

MR. JACKSON:  And -- I'm sorry -- I would also object to the extent it calls for a legal conclusion.

I'm sorry, Professor Mitts, you may answer.

THE WITNESS:  Thank you.

A    I don't think I have explicitly characterized myself, or not often anyway, as an expert using that term but I have a Ph.D. in finance and economics.  I regularly

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL publish in peer-reviewed journals in finance, economics, and law.  My scholarship examines a number of topics in connection with trading in the financial markets.  That scholarship encompasses a wide range of substantive matters.

Q     In preparing your report, you relied upon your professional experience and professional judgment, right?

A     Yes.

Q     What experience and professional judgment did you rely upon in preparing your report?

MR. JACKSON:  Objection to form.

A     As I explain in my report, I have both reviewed the evidence which was available to me and considered that evidence in light of my experience examining data in connection with trading policies and procedures and the mechanics of clearing settlement and related activity by broker/dealers and other participants in the financial industry.  To take an example, in my work with the U.S. Department of Justice,

Page 23

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

I am frequently asked to examine detailed trading and transactional records as well as communications, policies, procedures, sometimes compliance audits and other internal memoranda produced by participants in the financial industry.  By reviewing what now has been thousands and thousands of pages of documents, and often in the course of very detailed inquiries into the mechanics of trading and the broker/dealer industry, I have developed expertise on questions which I discuss in my report.

Q    Are you an expert in interpreting trade clearing records?

MR. JACKSON:  Objection to form and to the extent it calls for a legal conclusion.

A    I would characterize my expertise both as a scholar and as one who has examined clearing and settlement records in substantial detail for many years and conducted analysis which has been relied upon by law enforcement and other parties in connection with regulatory and criminal

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL investigations.  I would characterize that expertise as extending to and encompassing clearing and settlement of securities transactions.

Q     Would you also characterize that expertise as extending to and encompassing the interpretation of trade confirmation slips?

MR. JACKSON:  Objection to form and to the extent it calls for a legal conclusion.

A     Yes.

Q     Approximately how many proceedings have you consulted on for the government?

A     In order to answer that question with specificity, I would necessarily have to reveal the existence of certain, for example, Grand Jury investigations.  I can answer your question by saying in general terms that, at any given point in time, there may be several, as many has five to ten ongoing matters at any point in time in which I may be called upon to examine trading transactional clearing and

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL settlement and related records.

As I have previously explained, that work has been ongoing for several years. So in the course of those years in which I have been advising the Department of Justice, I have been exposed and have worked with transactional clearing and settlement data in a number of matters.

Q    How did you come to begin this consulting relationship with the government that we've been discussing?

A    I am unsure how much of that is considered subject to various privileges.  I may need to consult with counsel to answer your question.

Q    I'll withdraw it.  I'll ask it a different way.

Prior to beginning this consulting relationship with the government, did you have experience or expertise in reviewing trade clearing records, settlement data and the rest?

MR. JACKSON:  Objection to form and to the extent it calls for a legal

Page 26

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

conclusion.

A      In the course of my academic work and prior to that brief practice experience as a lawyer, I was exposed to some transactional clearing and settlement data. I, for example, wrote papers which looked carefully at individual trading records, that is records of individual transactions. My work for the government, which is now several years old so to speak, was -- began fairly close in time to when I began my career as a tenure track professor.  So my exposure to transactional records was more limited prior to that point.

My familiarity was more superficial, but I had been exposed to and had experience in understanding transactional records, both in my academic work and in my doctoral work, in my scholarship, and even years before that as a practicing lawyer.

Q      Your CV notes that you're the principal of an entity called M Analytics LLC, which you've described as a consulting firm specializing in financial economics.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Do I have that right?

A     Yes.

Q     Are you the whole owner of M Analytics?

A     Yes.

Q     Can you describe the type of work that M Analytics does?

A     I would agree and restate the summary you gave.  M Analytics generally is a firm which provides consulting services, including advisory and expert testimony in connection with questions about which I have expertise since I am the sole owner and principal of M Analytics, and those topics we have previously discussed.

Q     Approximately what portion of M Analytics earnings came from litigation support in the past four years?

MR. JACKSON:  Objection to form.

A     I do not have that information at this time in front of me.

Q     Other than you, how many employees work for M Analytics?

A     I do not have any other full-time

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL employees working at M Analytics in connection with specific matters.  I may hire on a temporary basis, for example, students.  Often, not exclusively, many times it will be students at Columbia who, for example, who are interested in working on a real world matter, if you will, on the side, so to speak.  So I will, at times, in a matter which is dependent from case to case, have additional staff working with me, but they are not full-time staff.

Q     You were assisted in this matter by staff at M Analytics, right?

A     Yes.

Q     Who assisted you?

A     So these were, again, students at Columbia who were working under my discretion -- under my direction to assist me with the expert analysis and preparation of my report.

Q     How many students assisted you in this matter?

A     To the best of my recollection, I believe there were three working on this

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

matter, but I would have to confirm and -- by looking at my records.

Q    What did they do to assist you in this matter?

A    So there's any number of supporting tasks which are necessary to prepare a complete analysis.  For example, they reviewed many of the documents, which I ultimately reviewed as well and cited and included in my report.  They reviewed the language and drafting.  They may have -- and I'm giving examples because I -- I can't remember who exactly did what -- they reviewed my writing for typographical errors, they reviewed the examples which I discussed in the report.

Q    I think you just testified that the staff reviewed many of documents which you ultimately reviewed as well.  Are there any documents that your staff reviewed but you ultimately didn't review in connection with this matter?

MR. JACKSON:  Objection to form.

A    No.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    So what was the point have having them review the documents?

MR. JACKSON:  Objection to form.

A    It is, in my experience, important when conducting a careful systematic analysis of a large volume of evidence, to have as much additional review of the materials as is practical under the circumstances, both to ensure that I'm not making a mistake like a typographical error -- they caught many of those in the early stages of drafting -- but also to assist with verifying that I was, for example, accurately and correctly portraying the materials.  So by having them review the materials and having them review my report, they were able to confirm that they did not identify an obvious error in my reasoning or analysis.

Q    Are those law students -- I'm sorry.  Strike that.

Are those students also reviewing the new documents that have been produced since you submitted your report?

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

MR. JACKSON:  Objection.

Mischaracterizes testimony.

A    Unfortunately, the timing was such that the new materials arrived -- most of them at least, arrived during the month of December or late November to December, if I recall correctly, and that is the time period when students are studying for financial exams.  So for that reason, I have been reviewing these new productions myself.  My review thus far is incomplete, in part because I have, myself, a certain number of hours that I can put into reviewing each document, and some of these productions in particular were quite large in volume.  So those students are not assisting me with the ongoing review of those new productions.

Q    These students that we have been talking about, are they law students?

A    Yes.

Q    What year of law school are these students currently in?

MR. JACKSON:  Objection.

A    I do not recall; I would have to

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

go back and check.

Q    Did you personally review and approve everything that's stated in your report?

A    Yes.

Q    Did you craft the report yourself?

A    Yes.

Q    So the principal positions for which you earn compensation are your jobs at Columbia University and M Analytics; is that right?

MR. JACKSON:   Objection to form.

A    Yes.  And I'll just, for the sake of completeness, say that I -- I am agreeing that those are the principal sources of compensation, but as a technical point for example, I have personally been retained by the U.S. Department of Justice, not M Analytics.  This is more of a technical difference, but just for the sake of completeness, I want to make that clear.

Q    So apart from your job at Columbia, your role at M Analytics, and this personal retention by DOJ, did you earn or

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

do you earn material income from any other courses?

MR. JACKSON:  Objection to form.

A    I think I would need a definition of material income to answer that question. In my judgment, no, but I'm going to apply my own definition of material income.

Q    What if I define material income as more than 10 percent of your income? Would that change the answer to the question I just asked?

A    I do not believe so.  I would have to go back and check my records.  Just to give you an example, I am sometimes called upon to referee a manuscript by a peer-reviewed journal, and in doing so, I am sometimes paid a royalty or -- royalty is probably not the best word.  An honorarium for that activity.  So I would have to go back and look, but to the best of my knowledge, those activities, other than the ones you mentioned, do not exceed 10 percent of my income.

Q    Approximately what percentage of

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
your income comes from your employment at Columbia?

A    Again, I don't have my financial records in front of me.  It -- the answer to that question is highly variable.  It will fluctuate from time to time, and I have to go back to my records to give you an answer to that question.

Q    Well, approximately what percentage of your income came from your job at Columbia last year?

A    Again, I -- I don't have my financial records in front of me at this time.  I haven't prepared by tax returns yet for 2022, so I can't answer that question at this time.

Q    Okay.  That's fine.

When were you retained as an expert witness in this case?

A    I do not recall off the top of my head the exact date.

Q    Approximately when were you retained as an expert witness in this case?

A    I believe it was sometime in the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
fall of 2022, but I do not even remember the
month off the top of my head.

Q    Approximately when did you begin
your substantive work in connection with
this matter?

MR. JACKSON:  Objection to form.

A    I do not recall off the top of my
head what the -- even the approximate range
was.  I did begin to review productions as
they were coming in, so as productions were
coming in to the Everlaw system, I was -- I
had been engaged by that point and was
reviewing those materials, but I don't
recall when I exactly started prior to that.

Q    Did you have any role in
determining what documentation would be
requested from third-parties in this action?

MR. JACKSON:  I'm going to object
to the extent this calls for privileged
information.  I'm going to caution the
witness not to review privileged
communication with counsel.

A    I don't think I can answer that
question without divulging privileged

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL communications.

Q     Who retained you to work in this matter?

A     Cohen Milstein Sellers and Toll.

Q     Who specifically at Cohen Milstein reached out to you for the retention?

A     I would have to double-check my emails, but I believe that was Carol Gilden.

Q     Had you worked with Carol Gilden before this matter?

A     Not in this capacity or in any paid or retained capacity.  I have had the privilege of knowing Carol prior to this matter.  We share many interests in -- professionally in connection with securities litigation.

Q     In what context did you gain the privilege of getting to know Ms. Gilden?

A     As a scholar and academic working on questions at the forefront of securities litigation, I am frequently in contact with members of the bar -- I hope perhaps yourself one day -- to get their perspectives on all sorts of questions.  And

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

I had been introduced to Carol -- I can't even remember by who at the moment, but we had had informal conversations around all sorts of interesting issues which were being litigated in the federal courts.  I thought her perspectives were fresh and interesting, really enjoyed my conversations with her.

Q     You recently co-authored an amicus security brief in a case called Indiana Public Retirement System v. Pluralsight, right?

A     Yes.

Q     And that amicus brief was in support of appellants; do I have that right?

A     I would have to go back and look at who was appealing; I believe that's right from my recollection.

Q     Are you aware that Ms. Gilden argued that case on behalf of appellants?

A     Yes.

Q     Did you interact with Ms. Gilden or with Cohen Milstein at all in connection with the Pluralsight litigation?

MR. JACKSON:  Objection to form.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    Yes.  Yes.

Q    What was the nature of that interaction?

MR. JACKSON:  Objection to form.

A    We had had -- we had conversations about the legal issues presented by the Pluralsight case.  I believe the origin of those conversations was a paper I had written -- in, I believe it was late 2020 or early 2021.  I would have to go back and check the exact dates -- in which I documented that in connection with disclosures by publicly traded companies.

There were unusual volumes of 10b5-1 sales by public company executives.  I wrote a paper which pointed out that some anecdotal reports concerning the nature of these 10b5-1 sales were consistent with broader patterns, which were evident in the data, which showed in a nutshell that, when positive news tended to be released by public companies, there was an increase in selling activity by public company executives.  I believe, and I have to go back and check

Page 39

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

this.  I believe Ms. Gilden found that research interesting, and we had some conversations about 10b5-1 sales.

I think, many plaintiff lawyers, as I recall, found the question of 10b5-1 sales to be quite interesting because they often feature prominently in securities class actions.

Q    Thanks for that.

You're being compensated in connection with this case, right?

A    Yes.

Q    And I'll refer you in Exhibit 1 to Paragraph 9, where I think you describe the nature of your compensation.

Let me know when you're there.

A    I am there.

Q    So according to this paragraph, you're being compensated at a rate of $1,300 per hour for your work; is that an accurate statement?

A    Yes.

Q    And you're receiving further compensation based on billings by

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

M Analytics; is that right?

A     That's right.

Q     Do the students who work for you on this matter at M Analytics bill at an hourly rate?

A     Yes.

Q     What are those rates?

A     So in general, there's variation, both in the number of student hours which I ultimately bill, because it is often the case that students may take longer, for example, to learn a particular topic.  And in my judgment, some of that time should not be billable because it really is more for my benefit or their benefit than for the client.  And so the hours which I ultimately bill may be less than the hours that the students billed.  So that's one source of variability, and the rate itself is going to vary from student to student, both the rates that the students are paid and the rates which I bill at to their -- I bill to the client.

Q     So is it an individual negotiation

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
between you and each student as to how much they'll be paid per hour?

A    Yes.

Q    In this case, I think you testified earlier that there were three students.  What was the hourly rate for each student?

MR. JACKSON:  Objection to the extent it mischaracterizes testimony.

But you can answer.

A    I just don't have that information in front of me, nor can I recall for each student how much exactly they were paid.  I would have to go back and check my records.

Q    Can you give me an approximate number?  Were the students paid more or less than $500 per hour?

A    Generally, they're paid less than $500 an hour.

Q    Generally, are they made more or less than $200 per hour?

A    Generally less.  Generally less.

Q    I'm going to keep going down. Generally, are the students paid more or

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

less than a hundred dollars an hour?

A    Typically, they're -- again, the challenge with answering this question is that they're paid for more hours than one would bill for.  So -- but it probably, in general terms, a hundred to 200 an hour as a general range.  To your question earlier about individualized negotiation, part of the negotiation in setting an hourly rate depends on their prior experience.

For example, Columbia may pay an RA, a research assistant, something on the order of 20 to $30 an hour, so a rate of a hundred dollars or 150 or even 75, anything in that range, is several orders of magnitude larger than what they're being paid if they were to work at the university.  They are also in many cases, compensated, again, for more hours than I am actually billing for, which has the effect of increasing the effective compensation that they're paid relative to what is actually billed in the case at the end of the day.

Q    Did any of the students who worked

Page 43

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

for you on this matter have prior experience in similar analysis?

MR. JACKSON:  Objection to form.

A    I would have to go back and check their CVs, but in general, I would answer affirmatively, meaning some at least of the students who I work with, and I believe that's true for this case as well, have worked in the financial in services industry in connection with trading even sometimes, and at other times in other aspects of the financial services industry.

Q    But sitting here today, you don't know whether any of the students who worked on this matter had that sort of prior work in financial industry trading or the other topics you just testified to?

MR. JACKSON:  Objection to form.  Mischaracterizes his testimony.

A    I simply do not have their resumes committed to memory to answer this question firmly, but I believe that at least one if not more did.

Q    So do you directly bill

Page 44

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

the -- strike that.

Do you charge your client more per hour for the staff than you pay the staff?

MR. JACKSON:  Objection to form.

A    Yes.  That's what Paragraph 9 states.

MR. JACKSON:  Mr. Yavitz, I'm sorry to interrupt.  We've going for about an hour.  Do you want to take a break at some point?

MR. YAVITZ:  Yeah.  I've got about two minutes then we'll take a break.

MR. JACKSON:  Okay.

Q    Approximately what is the differential between the hourly rate paid to the students and the hourly rate charged to the client?

A    In order to answer that question accurately, it's important to remember, again, that I do not always charge clients the total number of hours that students have incurred and that I pay those students.  So while there is a multiple, as I explained in Paragraph 9, I receive further compensation

Page 45

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
based on their billings, that multiple is
going to vary from case to case even from
task to task within each case to ultimately
yield one number.

For me to give you one number is
not something I can do off the top of my head
because I would have to go back and review
each of the invoices and the hours that the
students had submitted and calculate what
that multiple is.

Q    Abstracting away from the fact
that you write down some of the students
hours, what is the multiple that you charge
to the client versus what you paid to the
students?

MR. JACKSON:  Objection to form.

A    It is varying from case to case.
As a general rule, the majority of my
invoice is my own time.  Sometimes as much
as 80 percent or 90 percent of the invoice
is my own time.  So the multiple is going to
vary.  It's going do vary depending on the
size of billing, and it's also to some
extent negotiated with, not only the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
students, but with the clients in that I'm
trying to ensure that I'm not billing more
than what is reasonable for a given project.
And that is necessarily a contextual
conversation which depends on the matter at
hand.

Q    Do you know what percentage of
your invoices to date in this matter have
billed for your own time?

MR. JACKSON:  Objection to form.

A    100 percent.

Q    So you haven't yet billed for the
time of your staff?

MR. JACKSON:  Objection.
Mischaracterizes testimony.

A    No.  I believe your question was
what percentage of the invoices have billed
for my time.  My answer is all of them have
billed for my time.

Q    I'm sorry.  I think -- maybe that
was a bad question.

My question is, of the amount
invoiced to date, what percentage of that
amount reflects the cost of your time?

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    Ah.  I would have to check the invoice.  I just don't have my invoices committed to memory.

Q    Okay.  Other than what we've already discussed, do you have any interest in the outcome of this case?

MR. JACKSON:  Objection to form.

A    No.

Q    Do you own any shares of Bayer AG?

A    No.

Q    Did you own any Bayer AG during the proposed class period in this matter, which is May 23, 2016, through July 6, 2020?

A    Sorry.  Let me just revise my answer.  I own index funds and exchange traded funds.  I believe my 401(k), at least, is invested in the Vanguard Total Stock Market Index Fund.  It is possible, I do not know, that that fund may own shares of Bayer.  I simply do not know.  I do not directly own shares of Bayer, nor have I -- nor did I during the class period, nor have I ever.

Q    And one last question before we

Page 48

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
break.  Approximately how many hours did you
spend preparing your report?

     A    I -- I just don't remember off the
top of my head how many.  I would have to go
back and check my records.

     Q    Do you think it was more or less
than 300 hours?

     A    It may have been around there or
maybe less, but I just -- you know, I guess
I could say it was more than 50.  It was
less than 500.  As to whether it was 150,
250, 350, I -- I just don't remember off the
top of my head.

     Q    Okay, that's just fine.

          MR. JACKSON:  Let's go off the
     record and take a little break for five
     minutes?

          VIDEOGRAPHER:  This concludes
     Media Number One of the videotaped
     deposition of Joshua Mitts.  We're off
     the record.

               (Whereupon, at 10:55 a.m., a recess
               was taken to 11:08 a.m.)
               (The proceeding resumed with all

Page 49

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
parties present.)

VIDEOGRAPHER:  This begins Media Number Two of the videotaped deposition of Dr. Joshua Mitts.  We are on the record.

Q    Welcome back, Dr. Mitts.

A    Thank you.

Q    Did you speak with counsel during the break?

A    Yes.

Q    Did you discuss the substance of your testimony with counsel during break?

A    No.

Q    Okay.  Do you have your report still on the screen?

A    Yes.

Q    Is the report a complete statement of your opinions in this case?

A    Yes.

Q    Does it provide all of the bases and reasons for your opinions?

A    Yes.

Q    Are all of the facts and data you relied upon in forming your opinions stated

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

in the report?

    A     Yes.

    Q     And I think we discussed earlier that you have done some additional work in connection with your opinions since issuing that report, right?

    A     Yes.

    Q     You've considered newly produced documents as -- for their relevance to your opinions, right?

    A     I have reviewed some of the newly produced materials, primarily to determine whether anything in those newly produced materials would lead me to change my opinion or would be inconsistent with the opinions set out in my report.

    Q     Have you identified any documents among the newly produced materials that would lead you to change your opinion or be inconsistent with the opinions set out in your report?

            MR. JACKSON:   Objection to form.

    A     No.

    Q     Are there any statements in your

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
report that require correction, amendment,
or modification of any type?

MR. JACKSON:  Objection to form.

A    Yes.  There is one typographical
error that I identified in the body of the
text.  And there is one footnote which is
missing a citation.  I'm happy to point
those out if you'd like.

Q    That would be great.  Please point
away.

A    In Paragraph 21, the text states,
I understand that courts in this district
have previously found -- and it goes on.
The citation and the reference in
Footnote 25 to Stoyas v. Toshiba, that case
was in the Central District of California,
and I understand we're in the Northern
District of California.  I believe the word
"district" there should have read "circuit."
 That was the intent.  And it was an error
to write "district," so the word district
should be corrected to "circuit."  So that's
the in-text correction.

My -- the only other place where I

Page 52

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
notice a missing citation is in Paragraph 39 where I discuss Macquarie Securities, and I believe I am missing a citation to the Bates number for the trading records in Paragraph 39.  Footnote 46 contains the Bates number for the clearing and settlement records, but not the trading brokerage records.  So those Bates numbers should have been included in footnote 46.

Q    And that missing Bates number is MACQ_00001?

A    I believe so, but I do not have any other documents in front of me other than a clean copy of my report, so I would have to go back and verify the correct Bates number.

Q    Certainly.  Fine.  Well, no need. I think we're going to get there probably.

I asked earlier how many hours you spent on this report.  How many hours, approximately, did your staff spend on this report?

A    I would have to go back and checked the invoice.  I believe, in rough,

Page 53

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
rough estimate it might have been half or
2/3, maybe as low as 1/3, somewhere in that
range.  I don't believe they spent more time
on the report than I did, but I would have
to double-check that.

Q    You referenced discovery material
in this report, right?

A    Yes.

Q    How did you go about selecting the
discovery material that you considered in
connection with this report?

MR. JACKSON:  Just an objection to
the extent it calls for privileged
communications with counsel.  And I'll
caution the witness not to reveal the
contents of those communications.

A    Other than privileged
communications with counsel, as I explained
earlier, I receive access to the Everlaw
system, which contained each production in
its entirety to my understanding.  I would
then download a local copy of each
production, usually in zip format, and then
go through file by file, typically, the

Page 54

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
natives format, the native format of the
file through each production.

Q    So to your understanding, you
reviewed all of the third-party production
materials that came in prior to the issuance
of your report?

MR. JACKSON:  Objection.
Mischaracterizes testimony.

A    Yes.

Q    Great.  You've been asked by
plaintiffs' counsel to opine on three
subjects for this litigation; is that
correct?

A    Yes.

Q    So I think those are listed in
Paragraph 8, correct?

A    Yes.

Q    So, one, you were asked to opine
on whether irrevocable liability for the
proposed classes purchases of Bayer
sponsored ADRs was incurred in the United
States; is that right?

A    Yes.

Q    And then you were asked to opine

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

on whether irrevocable liability for plaintiffs' alleged purchases were incurred in the United States; is that right?

A    That is close.  I was asked to evaluate whether those purchases were typical of or similar to those of other members of the proposed class.  In that inquiry necessarily included whether irrevocable liability was incurred for those purchases in the United States.

Q    Got it.  And then lastly, you were asked to opine on whether irrevocable liability -- strike that.

Lastly, you were asked to opine on whether it's possible to determine on a class-wide basis whether irrevocable liability was incurred in the United States by members of the class; is that right?

A    Yes.

Q    I'm sorry, is that a yes?

A    Yes.

Q    Those are the only three matters on which you're offering an opinion in this case, right?

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A     Yes.

Q     Have you been asked to opine on any other matters in this case other than those three matters?

A     No.

Q     Did you understand any analysis in this case beyond the three matters that we just listed a moment ago?

A     No.  Except for the ongoing review we discussed previously.

Q     Well, the on-going review we discussed previously is in service of evaluating the same three opinions; right?

A     That's correct.  That's correct.

Q     Does Paragraph 10 of your report summarize the conclusions you reached in this litigation?

A     Yes.

Q     So in your opinion, irrevocable liability for virtually all purchases of Bayer ADRs during the class period was incurred in the United States?

A     Yes.

Q     And in your opinion, irrevocable

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL liability was incurred in the United States for all of plaintiffs' alleged Bayer ADR purchases?

A    Yes.

Q    And in your opinion, it's possible to determine on a class-wide basis whether irrevocable liability was incurred in the United States by members of the class?

A    Yes.

Q    Great.

So I'm going to start with the first of these opinions, and then we'll march through in the order that makes sense. So starting with the opinion that virtually all ADR purchases were incurred in the United States.  In talking about this, I'm going to try to make our life simpler by introducing some terminology.  I'm going to refer to trades where irrevocable liability was incurred in the United States as "domestic trades," okay?

A    I understand.

Q    And I'm going to refer to a trade where irrevocable liability is not incurred

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL in the United States as either an extraterritorial trade or as a foreign trade, okay?

A    I understand.

Q    So if I use that terminology, you'll understand what I'm talking about?

A    Yes.

Q    Great.

Okay.  Let's go to Section 4A of your report, which starts at Paragraph 23.

Let me know when you're there.

A    I'm there.

Q    Great.

So in this section, you contrast sponsored and unsponsored ADR programs, right?

A    Yes.

Q    So once you determine that an ADR is sponsored, is that sufficient evidence to conclude that a given transaction in that ADR was domestic?

MR. JACKSON:  Objection.  Calls for a legal conclusion.

A    I am going to construe your use of

Page 59

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL the word "domestic" consistent with the prior definition you gave, which is that irrevocable liability was incurred in the United States.  I want to make clear for the record that I am not evaluating the legal question of whether such a transaction is extraterritorial for purposes of the federal securities law or any other legal question.

So construing your question -- excuse me.  Construing your use of the term "domestic" in that manner, my answer to your question is no.

MR. JACKSON:  Can we just break for one second.  Mr. Yavitz, to the extent that -- I'm going to object to your definition of "foreign transaction" to the extent that, you know, if you're going to define extraterritoriality as irrevocable liability incurred outside of the United States, I think that confuses the factual determination with the legal one.  And so I would just object to your usage of that term.  I would

Page 60

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

propose that you refer to transactions where irrevocable liability is not incurred in the United States is foreign transactions so we can just...

MR. YAVITZ:  That's fine.  I'm not trying to trick anyone here.  I'm just trying to avoid saying "irrevocable liability" like 50 million times in this deposition.

MR. JACKSON:  I know.  And we just want the record and Dr. Mitts' testimony to be clear.  That's all.

MR. YAVITZ:  Totally.  So I'll call it "foreign."  I stumble half the time when I say "extraterritorial" anyway, so I'm totally fine with that suggestion.

Q    Okay.  So I think your answer was, taking on all of the caveats around we're using the word "domestic" in a nonlegal sense, using it just to copy and paste in irrevocable liability was incurred in the United States, I think your answer was that, whether an ADR is sponsored is not

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

sufficient evidence to conclude that a given transaction in that ADR was domestic?

A    That's correct.

MR. JACKSON:   Objection to form.

Q    What other information do you need to make a determination whether a sponsored ADR was domestic?

A    My report explains the methodology that I use, which I believe in my opinion is consistent with what the courts have set out to answer that question.

Q    And in your report, your methodology includes an examination of clearing and settlement records?

A    My report states in Paragraph 20, which is just on the prior page, that the relevant factors to making this determination include the location or locations where contract formation, placement of purchase orders, passing of title, and the exchange of money occur, as well as who sold the relevant securities and how those transactions were effectuated as evidence by documentation such as

Page 62

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
confirmation slips.

Q    So a given transaction in a
sponsored ADR can be -- strike that.

So after reviewing all those
materials that you referenced a moment ago,
your ultimate conclusion could be that a
given transaction in a sponsored ADR was
domestic or it could be that it was foreign,
right?

MR. JACKSON:  Objection to form.

A    Well, there are some sponsored
ADRs which are traded on an exchange.  It is
my understanding that a security which is
listed on a domestic exchange is in its own
category.  That's my understanding of the
law.  For those sponsored ADRs, it is my
understanding that they are domestic
transactions.

Q    But a non-exchange traded
sponsored ADR can be transacted both
domestically and overseas, right?

MR. JACKSON:  Objection to form.

A    Yes, that is my understanding.

Q    In analyzing whether a given ADR

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
transaction was domestic, is it relevant
whether the ADR is sponsored?

        A    In my opinion, it is relevant.

        Q    Why is it relevant in your
opinion?

        A    As I explain in my report, there
are a number of characteristics which make
it more likely that a sponsored ADR -- let
me correct the last two words -- that the
purchase of a sponsored ADR is likely to
have occurred in the United States.  It is
more likely that the purchase of a sponsored
ADR would have occurred in the United States
for the reasons I explain in my report.

        Q    Are you referring to Paragraph 26
of your report?

        A    I am referring to several points
discussed in my report.  One aspect, if you
will, is laid out in Paragraph 26.
Paragraph 26 explains why the involvement of
the issuer and the presence of a single
established sponsor are likely to make the
trading market for a sponsored ADR far more
liquid and efficient than an unsponsored

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

program.  But as I explain elsewhere in my report, that increased liquidity and efficiency makes it much more likely that the purchase of a sponsored ADR will occur in the existing secondary market in which sponsored ADRs are much more likely to be traded among buyers and sellers in the United States.

Q     In analyzing whether a given ADR transaction was domestic, why does it matter that the secondary market for ADR -- for that ADR is more liquid and efficient?

A     I'll give, perhaps, a simple example to illustrate why.  Suppose I am seeking to purchase 10,000 ADRs, and I'm choosing -- or I'm evaluating an unsponsored ADR market versus a sponsored ADR market. The unsponsored market, being far less liquid, is much less likely to have market-makers and other market participants who are willing to sell 10,000 ADRs to me, that is 10,000 existing ADRs.  By contrast, a sponsored ADR, which trades in a more liquid and efficient trading market, is

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
likely to have market-makers and other market participants which have a greater inventory of existing sponsored ADRs.

As I explain in Paragraph 28 of my report, broker/dealers seeking to purchase or sell Bayer sponsored ADRs could freely transact in the U.S. over-the-counter trading markets with other broker/dealers without requiring that the Bank of New York Mellon issue or cancel ADRs accompanying the purchase or sale of foreign shares.

Q    So are you saying the float of the domestic market for the ADRs is typically larger for a sponsored ADR versus a non-sponsored ADR?

MR. JACKSON:  Objection to the form and to the extent it mischaracterizes testimony.

A    I'm not sure I would use the term "float" in connection with an ADR without defining the term precisely.  That term can be used sometimes to refer to shares of a company which are not held by insiders, and thus freely circulate.  An ADR is a linked

Page 66

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL security, much like other linked securities which I have examined in my research, and the supply of linked securities in many ways is analogous to that of a derivative security, which I have examined in my scholarship.  And one of the basic principles of linked or derivative securities like ADRs is that they can be freely created or canceled, if you will, by -- by market participants without the issue having to -- to issue new shares.

So it is, in fact, the presence of the sponsor which changes the trading environment for a sponsored ADR because that sponsor is uniquely positioned to supply on the domestic market a large volume of ADRs, and thereby facilitate active, liquid domestic trading in those sponsored ADRs.

Q    In Paragraph 26, you write:  The issuer's involvement in promotion of an ADR facility is likely to draw the attention of foreign investors and analysts leading to greater trading volume.

Do I have that right?

Page 67

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A     Yes.

Q     So is the idea, in part, that if I as an investor want to transact a large block of ADRs, I need the volume of the domestic market to be large enough that I can transact -- officially transact those ADRs?

MR. JACKSON:  Objection to form and mischaracterize the report.

A     It certainly is advantageous from the standpoint of liquidity and execution costs, to purchase a large block of ADRs in a market which has a large volume of trading.  This is a basic principle of market microstructure.  The more liquid and heavily traded a market is, the easier it is to transact in large volumes in that market.

Q     Would you expect the execution cost of a trade to be higher if that trade represents a very large portion of the daily volume in that security?

A     Not necessarily.  The question is a fairly complex one.  I'll try to give a short answer.  In the case of a supply

Page 68

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL constrained security like common stock where the issuance of new shares of stock has a dilutive effect on the capital structure or the shareholder base, it may very well be that the larger ones purchase is relative to the available trading volume, the greater the price impact and the greater the execution costs will be to that block transaction.

However, for a security which is a derivative of another security, it's actually a bit more complex.  If execution costs end up becoming too high to buy the ADRs in the domestic market, market participants can go to the foreign market, transact in the foreign market, and there can convert their foreign shares subsequently to newly issued ADRs.  What that does is function as a kind of pressure release valve, if you will.

Q    Thanks.  That's helpful.

Your report, in Paragraph 21, cites the Toshiba case.  And it notes in that paragraph that, in that case, irrevocable liability was incurred outside

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL the United States when the purchaser's broker/dealer conditioned the issuance of a new unsponsored (in italics) ADRs on the acquisition of underlying common stock in a foreign market.

Have I characterized that portion of your report correctly?

A    Yes.  I -- I'll just add that, elsewhere in my report, I point out additional facts as I understand them in the Toshiba matter, but that summary is an accurate summary.

Q    Yeah.  I think we'll get to some of the other Toshiba stuff in a bit.

Was the unsponsored status of the ADRs relevant in the Toshiba case?

MR. JACKSON:  Objection.  Calls for a legal conclusion and beyond scope of the report.

A    I was not asked to evaluate the evidence in the Toshiba case, nor was I asked to give a legal opinion concerning which evidence in that case may have been relevant as to a legal matter to the courts

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

determination.  I do seem to recall that the court emphasized the unsponsored nature of the ADRs in the opinion.

Q    When you say you weren't asked to evaluate the evidence of the Toshiba case, did you review the evidence in the Toshiba case that was relevant to the question of extraterritoriality?

A    It was not within the scope of my opinion, nor was I asked to evaluate evidence in the Toshiba matter.  I reviewed the court's opinion, which I cite in my report and discuss the evidence that the court identified in the language that the court used to characterize that evidence, but I did not independently evaluate evidence in the Toshiba matter.

Q    Got it.  So you read the opinion, and that was the basis -- strike that.

You read the Toshiba opinion, and that was the basis for your understanding of the facts and determinations in the Toshiba proceeding?

MR. JACKSON:  Objection to form.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

I don't mean to be difficult.  I just want to be clear.  There are three Toshiba decisions, so I just want to be clear, you know, which one we're talking about.

MR. YAVITZ:  Sure.

Q    So you read the district court's decision in January of 2022, and that was the basis of your understanding of the facts and evidence presented to the court in connection with that decision?

MR. JACKSON:  Objection to form and mischaracterizes.

A    Yes.

Q    Okay.  Let's look at Section 4B of your report starting at Paragraph 27.

Let me know when you're there.

A    I'm there.

Q    Great.

So in 27 and carrying over to 28, you observed that like transactions in any other domestic security, the purchase or sale of existing Bayer ADRs ordinarily would not involve the purchase or sale by any

Page 72

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
party to the transaction?

Am I right a there?  That's in Paragraph 28?

MR. JACKSON:  Objection to the form to the extent it mischaracterizes the report.  Are we talking about 27?

MR. YAVITZ:  I started at 27, then I shifted to 28.  Do you see it there in 28?

MR. JACKSON:  Okay.  Sorry.

A    In Paragraph 28, I state that these purchases and sales would ordinarily take the form of ordinary domestic transactions where irrevocable liability to purchase existing sponsored ADRs was incurred at the time of trade confirmation.

Q    You used the word "ordinarily."  Are there situation where the purchase or sale of existing Bayer ADRs would involve the purchase or sale of foreign shares by a party to the transaction?

MR. JACKSON:  Objection to form.

A    I'm sorry.  Can you repeat the question?

Page 73

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Yeah.  So in this passage that we've been talking about, you wrote that: The purchases and sales would ordinarily take the form of ordinary domestic transactions.  So I'm focusing on the adverb "ordinarily," and I'm asking you:  Are there non-ordinary circumstances in which the purchase or sale of existing Bayer ADRs would involve the purchase or sale of foreign shares by a party to the transaction?

MR. JACKSON:  Objection to form.

A    I can't think right now of a situation where that would be the case.

Q    Why did you use -- why did you condition that statement with the adverb "ordinarily"?

A    Because there may be purchases of existing ADRs which are not domestic transactions, but they would not involve the purchase of foreign shares.

Q    How would they be nondomestic transactions, then?

A    I have no evidence of this

Page 74

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

occurring in this case or any other matter in which I've been involved.  But it is, I suppose, theoretically possible for an existing ADR to be purchased overseas by an overseas buyer.  Someone in London could buy an ADR from someone in Paris.  It is, in theory, possible for that to occur.  I saw no evidence of it in this case, but the term "ordinarily" allows for that remote possibility.

Q    Got it.  Thank you.

Moving on to Paragraph 29, you discuss Bayer ADRs trading on the NYSE Global OTC system, right?

A    That's correct.

Q    You account that something like $2.2 million of Bayer ADRs trade on that system on a daily basis?

MR. JACKSON:  Objection.  Mischaracterizes the report.

You can answer.

A    My report states, on average, over $2.2 million of Bayer sponsored ADRs traded on NYSE Global OTC each day during the class

Page 75

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
period.

Q    Did you compare that $2.2 million
to the total daily volume of Bayer ADRs
traded domestically on a daily basis during
the class period?

A    Not while preparing my analysis.
I did read the report by Mr. Kauffman, which
was publicly filed on the docket for this
case, and I -- I informally -- and don't
recall precisely at the moment -- did a
mental comparison in my head just because I
thought it was interesting.  He looked at
overall volumes.  I had not looked at
overall volumes, nor did I think it was
necessary for my report, but I was
interested in this question myself after --
after seeing that he had calculated overall
volumes.

Q    Based on the mental comparison,
approximately what portion of the daily
trading volume of Bayer ADRs transacted on
the NYSE Global OTC system on a daily basis?

MR. JACKSON:  During the class
period?

Page 76

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A     Yeah, I don't recall.  Like I said, I didn't perform that analysis myself.  I didn't think it was necessary to do so.  I -- but in very broad terms, I don't think it was a large fraction of trading.

Q     It was a small fraction, right?

A     Again, I do not recall exactly how much.  It may have been more or less on any given day.  In general in my experience, NYSE Global OTC is not -- it's fair to say it's not the majority of trading, so it would be reasonable to infer that.  But I personally have not done that calculation here.

Q     And Bayer ADRs also trade in other trading systems, right?

MR. JACKSON:  Objection to form.

A     Could you be more specific what you mean by "trading systems"?

Q     Yeah.  It's a generic term I'm using to refer to systems like NYSE Global OTC that are not exchanges in a traditional sense, but are matching systems to facilitate trades.

Page 77

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Does that help to clarify the question?

A    It does, thank you.

In my experience, I have had extensive experience working with the over-the-counter markets in my capacity advising the Department of Justice and in other capacities analyzing trading data.  I am generally familiar with three other venues, all three of which are operated by OTC markets.  Two of those three -- the OTC Link ECN, and the OTC Link NQB -- are matching engines that bear some similarities to NYSE Global OTC.

I do not believe that, during the class period, a substantial volume of trading in Bayer sponsored ADRs was performed in either of those venues.

Q    What about the third, OTC Market OTC system.  Are you aware of there being a substantial number of Bayer ADRs trading on that system during the class period?

A    The third venue or system operated by OTC markets is the OTC Link -- what is

Page 78

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
often referred to as the intra-dealer quotation system. The -- they use the abbreviation IDQS to distinguish this product from their matching engines, both of which, incidentally, are relatively new. And I'm not sure were even in operation during the class period.

The IDQS is not a matching engine, but rather facilitates the posting of quotes by dealers, and transactions are effectuated, I believe it's fair to say, with the help of the IDQS because a buyer or seller can learn about the best bid, best offer, and, in fact, the depth of the market is generally publicly disclosed as well, which gives market participants information on available liquidity. But it would be -- it would be nonsensical to refer to trading volume on the IDQS because the IDQS does not have a matching engine and it does not facilitate trade execution. So NYSE Global OTC, to my knowledge and based on the work that I did in preparing my report, NYSE Global OTC is the only matching engine in which Bayer sponsored

Page 79

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

ADRs were traded during the class period.

Q     Got it.

Did you compare the $2.2 million daily volume of Bayer ADRs traded on the NYSE Global OTC to the total volume of Bayer ADRs outstanding during the class period?

A     No.  It would be difficult for me to see the relevancy of the outstanding ADR volume, in part because that number is fluctuating on a daily basis as the Bank of New York Mellon issues or redeems ADRs.

Q     Leading aside the relevance, did you undertake that inquiry?

A     No.

Q     Did you compare the $2.2 million daily volume traded on NYSE Global OTC during the class period to the daily trading volume of Bayer common shares?

A     No.

Q     Would it surprise you to learn that $2.2 million is a very small portion of the daily trading volume of shares?

MR. JACKSON:  Objection to form and beyond the scope.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    No.

Q    So continuing your discussion of the NYSE Global OTC system, at Paragraph 30 of your report, you observe that upon execution of a matching order on the NYSE Global OTC alternative trading system located in New York, counterparties were expressly obligated to settle the transaction.

Do I have that right?

A    Yes.

Q    And that's based on an agreement between broker/dealers and NYSE Global OTC?

MR. JACKSON:  Objection to form.

A    Yes.

Q    To your knowledge, were any of plaintiffs' alleged Bayer ADR purchases conducted on the NYSE Global OTC system?

A    Well, not as of the time that I wrote the report.  Several of the transactions occurred through broker/dealers for whom I had not received data.  Some of the purchases by plaintiffs did occur on the secondary market -- let me revise my answer.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

I did not examine transaction by transaction as to whether plaintiffs' purchases were matched through NYSE Global OTC.  The reason is that, in my analysis of plaintiffs' purchases, I was looking for, as a starting point, evidence indicating that the ADRs which were purchased were domestic or not, meaning they were existing secondary market purchases.

If I found evidence in the clearing and settlement data that they were existing ADR purchases, in my opinion, that was sufficient to conclude that those transactions were domestic.  It was not necessary to go further and ask how those orders were actually matched.  As a general rule, orders may be matched on any number of systems.  Brokers, when they place an order, often route the orders to a variety of venues.  It would not be uncommon for a purchase of Bayer sponsored ADRs to match in part on NYSE Global OTC and in part through OTC Markets to specific broker/dealers.

So having established that those

Page 82

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
transactions were the purchase of existing
sponsored ADRs, it did not seem necessary to
then go further and identify how those
matches came to be, because it was clear that
irrevocable liability had been transferred in
the United States.

Q    Did you examine any agreements
between broker/dealers and any other
alternative trading system like NYSE Global
OTC in connection with the preparation of
your report?

A    No.  There -- as I stated
previously, there were no other matching
engines which were operating in any
substantial capacity during the class
period.

Q    So your discussion in Paragraph 29
and 30 of your report, it's only relevant to
whatever fraction of Bayer ADRs traded on
the NYSE Global OTC system during the class
period, right?

MR. JACKSON:  Objection to form.
Objection, mischaracterizes the report
and testimony.

Page 83

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A     No.

Q     How is it relevant -- strike that.

How is the discussion in Paragraph 29 and 30 relevant to ADRs that did not trade on the NYSE Global OTC system?

MR. JACKSON:  Objection to form.

A     It is my understanding that the question of the location of irrevocable liability turns in part on, as I explained earlier in my report, on the location where liability is made irrevocable, that is, where the purchaser, as I quote in a footnote later on from the Toshiba opinion, is logically and legally bound to conclude the transaction.  A purchaser, in the ordinary course of trading or purchasing Bayer sponsored ADRs, is not necessarily aware of the exact venues to which a broker will route their order flow.

So the fact that at least one of the venues has an unconditional settlement obligation is relevant, not only for the purchases which end up ex-post after the fact at that venue, but also for orders which are

Page 84

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL directed to the secondary market in a manner that is likely, or at least potentially likely, possible, to arrive at that venue.

If I direct my broker to purchase given number of Bayer sponsored ADRs, I may not know which venue the broker is going to direct that order flow, but in the ordinary course, if I know that at least one of those possible venues, of which there were really only two at this time, so at least one of the two venues has an unconditional settlement obligation, then I -- in my opinion, that understanding, that expectation shapes the way in which a purchaser interacts with and the expectation that they have concerning the execution of their order, where that order will execute, the entire order, because they know that there is a pretty good chance that some of the order may execute on an unconditional matching engine. They -- it is difficult to infer from that evidence that the purchaser could have expected that irrevocable liability would only arise when foreign shares were purchased. That would

Page 85

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

seem inconsistent -- such an expectation

would seem inconsistent with the fact that

the order is going to be possibly routed to

NYSE Global OTC.

Q    In your opinion, are purchasers of

Bayer ADRs generally aware that the

agreement between broker/dealers and NYSE

Global OTC imposes a settlement obligation

upon execution of the matching order?

MR. JACKSON:  Objection to form

and beyond the scope of the report.

A    I have no personal information,

nor basis in evidence to draw any conclusion

about what a given purchaser may or may not

have known.  This agreement is publicly

disclosed, but I think the more important

point that your question is getting at is

that, in the ordinary course of purchasing

Bayer's ADRs, one generally purchases from

existing inventory, that that is precisely

because the Bayer ADR was a sponsored ADR as

we previously discussed.

If one were to open up their

brokerage account and place an order to buy

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Bayer ADRs, it is highly likely in the ordinary course of trading in Bayer ADRs, as opposed to a thinly traded unsponsored ADR, it is highly likely that one would transact in the existing secondary market in which liability is incurred at the moment of trade confirmation, full stop.

So I do think that, based on the evidence we have concerning the liquidity and trading volume and vibrancy of the secondary market for Bayer ADRs, that market participants did reasonably expect that there was a very, very, very high likelihood that they would be purchasing existing ADRs on the secondary market.

Q    Thanks.  That's helpful.

The reason I asked my question, though, is you testified, if I direct my broker to purchase a given number of Bayer sponsored ADRs, I may not know which venue the direct is going to direct that order flow, but in the ordinary course, I know that at least one of those possible venues, of which there were really only two at that

Page 87

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

time, so at least one of the two venues has an unconditional settlement obligation.  So that's what you testified.  I then asked, what is the basis of your opinion that a purchaser would know that there's an unconditional obligation.

MR. JACKSON:  Objection to form.

Q    And what's your response on that?

MR. JACKSON:  Objection to form.

A    I'll just -- I think I answered prior to -- I'll restate my answer and maybe expand on it.

MR. JACKSON:  So I should -- I'll also object to asked and answered.

A    Yeah.  I think I previously said that the settlement agreement is publicly disclosed.  There are, of course, a wide range of investors out there.  Not everyone has the same skills and sophistication, but many investors are at least aware, in my experience, of the existence of certain venues.  And the Global OTC venue, while it may have been -- exposed a small fraction of the trading volume, was one of two venues in

Page 88

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL which investors could direct order flow. And it was the only venue in which those orders could be matched in a manner akin to an exchange.

In my opinion it is -- and based on my experience, it is quite reasonable for many investors to be aware of basic facts which are publicly disclosed like settlement obligations in connection with the over-the-counter trading markets and any other alternative trading system.

Q    When you say, "based on your experience," what experience are you referring to?

A    So as I discussed previously, I have advised the Department of Justice; I have advised other parties in connection with a wide range of matters.  Just to give one example, I have frequently reviewed social media and other publications by investors in which they discuss trading venues.  Trading venues are frequently discussed on all sorts of investing platform.  You can find detailed discussions

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL of execution cost, and I'm referring here to retail investors.

I think it's obvious or sort of goes without saying that professional investors are keenly aware of execution costs and the details of the trading venues. Evidence that I have observed and interacted with in my capacity as an expert at analyzing trading data, as someone who's called upon to analyze trading data is, would be, for example, that brokers may be directed by institutional, and even sophisticated retail clients, to route order flow to particular venues.

It's -- in addition to the examples I gave of social media and other communications, which reveal an awareness of trading platforms, the fact that one directs trading order flow to a particular platform, in my experience, typically, one is doing so with awareness of the characteristics of that venue. You will see venues being discussed, the advantages and disadvantages of different venues. And some venues outright compete.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Global OTC, in fact, was quite public with its comparative advantages, and they still are, in a part to try and attract order flow to Global OTC.

Q    So in this experience reviewing social media and other communications, have you observed market participants discussing the settlement obligations with respect to execution for specific trading platform?

MR. JACKSON:  Objection to form.

A    The discussion of platforms is often wide ranging.  It tends to encompass a number of topics.  It would be unusual for individuals or institutions -- and just to make sure it's clear for the record, I didn't refer only to social media; I used that as one example.  I've also reviewed internal communications among traders in hedge funds and other large institutional investors.

These communications refer quite extensively at times to different venues and compare the characteristics of different venues.  The settlement obligation of global

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

OTC -- and here, I think, perhaps the question is misunderstanding my testimony. The settlement obligation of Global OTC is not unique to Global OTC, so I just want this to be clear for the record.  Global OTC has an expressed settlement obligation because it has a matching engine, but any purchase of domestic Bayer existing sponsored ADRs is going to yield irrevocable liability at the time of the purchase in the United States.

So as I testified previously, the settlement obligation is relevant to understanding investor expectations.  Their expectations encompass settlement matching, matching and settlement at Global OTC, but those expectations extend to the confirmation of trades of existing Bayer sponsored ADRs across the entire domestic OTC market.

Q    Okay.  So moving on in your report, you compared issuances of ADRs by the Bank of New York Mellon against the secondary market trading volume reported by FINRA, right?

A    Are you rearing to Paragraph 32?

Page 92

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    I am indeed.

A    Yes.

Q    And you concluded that the overwhelming majority of purchases of Bayer ADRs during the class period consisted of existing ADRs, right?

A    Yes.

Q    Okay.  Sorry, I missed the word. You cite daily trading statistics in Paragraph 32.  In aggregate, what percentage of Bayer ADRs purchased during the class period were newly issued?

A    I'm not sure I understand the question.  What do you mean by "in the aggregate"?

Q    I'm asking, if you divide the total number of issuances by the total trades reported by FINRA over the entire class period in aggregate, what's the result?

MR. JACKSON:  Objection to form and beyond the scope.

A    I did not perform that calculation for my report.  I don't anticipate that

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

calculation would be inconsistent with my conclusions, but I don't have that number for you right now.

Q     In reviewing the data on ADR issuances of Bayer ADRs, did you observed that issuances tended to occur in very large blocks?

MR. JACKSON:  Objection to form.

A     I think that's -- that's a little bit of an ambiguous question because -- two reasons.  The Bank of New York Mellon reported issuances as a single number.  The number that the Bank of New York Mellon reported and the date on which I reviewed was a sum total of all the issuances in a given day.

It is true that certain brokers tended to bundle together individual client purchases -- I give some examples in my report -- and more or less went to the Bank of New York Mellon with these blocks of foreign shares.  But it is not accurate to characterize the actual purchase of the ADRs by the ultimate clients as a block purchase.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

This is common in the brokerage industry.  If I purchase a hundred shares, a broker might bundle together my order with other orders. Depending on which resolution or level you are looking at, it will either look like a block purchase by the broker or a series of small purchases by the broker's clients.

It was generally the case that certain transactions, a relatively small number, were aggregated and converted -- that is new ADRs were issued, foreign shares were converted into ADRs by the Bank of New York Mellon in what ultimately became large blocks, even if they reflected smaller transactions.

Q    Looking at the BNY Mellon data, how can you tell whether a given block issuance consists of a bundle of many smaller blocks for that broker or one big block for one big client for the broker?

A    Yeah.  The data which I reviewed from the Bank of New York Mellon does not provide that detail, meaning it does not separate the underlying clients.  That's, in

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

my view, quite expected.  The Bank of New York Mellon is not a party to the underlying purchases by the client, so the counter-party to the Bank of New York Mellon is generally the broker which has aggregated those purchases or some intermediary.

As I explained in my report, the clearing and settlement data show us the transfer of title.  And I use that term loosely.  The transfer of custody would be a more precise term -- from the Bank of New York Mellon's ADR desk to the intermediary or intermediaries, and then ultimately to the custodians for the individual clients.

Q    I want to talk a little bit more about the Bank of New York Mellon because you discussed it at various points in your report.  And in particular, I want to direct you to Paragraph 38.  In Paragraph 38, you discuss the policies and procedures of Bank of NY Mellon, right?

A    Yes.  I define that term as referring to their practices and the deposit agreement.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    And just to make sure we have it all level set.  BNY Mellon is the depository bank for Bayer ADRs, right?

A    That was my conclusion based on the evidence which was made available to me. I reviewed the deposit agreement, which led me to that conclusion.  I don't know if there is another deposit agreement out there which I haven't seen.

Q    It would be news to me too.

What does it mean to serve as a depository bank to your understanding?

A    My report goes through that in fairly extensive detail.  I'm happy to restate it.  In Paragraphs 24, 25, and 26 to some extent; mostly Paragraphs 24 and 25 discuss the role of the depository, particularly Footnotes 30 and 31 in which I cite the PLC corporate and securities publication, which discusses some of the rights and responsibilities that the depository has in a depository agreement. Some of the terms which are discussed in the Cleary Gotlieb publication, including voting

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
provisions, what to do with undirected
shares in connection with voting.  And I
also discuss in -- more specifically in
connection the deposit agreement here, the
role that -- that the Bank of New York
Mellon played in connection with Bayer ADRs.

For example, Footnote 44 states
that:  Upon receipt by any custodian of any
deposit hereunder, together with the other
documents required as specified in Section
2.2 of that agreement, such custodian shall
notify the depository of such deposit and the
person or persons to whom it would apply in
this written order, any receipt or receipts
are deliverable in respect thereof and the
number of American depository shares to be
evidenced thereby.

I also mention the issue of
prerelease.  I'm happy to go on, but, yeah.

Q    No.  That's -- that's all helpful.
Thank you.

One little question on the
mechanics.  If an ADR holder wants to redeem
a previously deposited foreign share, BNY

Page 98

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Mellon is obligated to return it to them, right?

MR. JACKSON:  Objection to the extent it calls for a legal conclusion.

A    It is my understanding that the return of the foreign share would be conditional upon the cancellation of an ADR, that is, it would be an exchange rather than an unconditional return.  It's not -- you can't both get the foreign share and still hold the ADR.  But if you return -- if you return the ADR, if you will, the Bank of New York Mellon will cancel the ADR and return the foreign share.

Q    Darn.  I thought I found a loophole for infinite money.  Thank you for that clarification, though.

You know in Paragraph 38, I think, that the Bank of New York Mellon issues sponsored ADRs only after already purchased foreign shares have been deposited in its custody.

Do I have that right?

A    Yes.  And I just explain in

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Footnote 44 the basis for that conclusion.

Q    Yep.  Is that unusual for a depository bank in your experience?

A    No.

MR. JACKSON:  Objection beyond the scope.

You may answer.  Sorry.

A    No, it's not unusual in my experience.

Q    So in Footnote 45 to this same paragraph, you cite Contra Stoyas v. Toshiba, and then you quote a passage from the Toshiba opinion describing an acquisition of Toshiba -- the common stock by Barclays.

Do you see that where that is?

A    Yes.

Q    Was Barclays the depository back for Toshiba ADRs in the Toshiba case?

MR. JACKSON:  Objection.  Beyond the scope, and just -- objection to the form.

A    As I said previously, I reviewed the opinion of the court.  I do not have the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
opinion committed to memory, and I did not independently review the factual record, nor was I asked to in the Toshiba case.  I do not recall who functioned as the depository in that case off the top of my head.

Q   Do you know whether BNY Mellon's policies are different from those of the depository bank that processed the transaction at issue in the Toshiba case?

A   I do not recall which depository institution was in the Toshiba case, and I certainly, without knowing who the depository institution was, do not have knowledge as to their policies and procedures.

Q   Why are the Bank of New York Mellon's policies -- strike that.

Why do you cite the Bank of New York Mellon's policies as a distinction from the facts of the Toshiba case in Paragraph 45?

MR. JACKSON:  Objection.
Mischaracterizes the report.

A   In Paragraph 45, I do not

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
distinguish the Toshiba case except --
excuse me.  Let me restate my answer.

In Paragraph 38, the text of my opinion does not distinguish or even discuss the Toshiba case.  What Paragraph 39 states is that, in this case, meaning in the evidence which is before me, the depository agreement provides that the Bank of New York Mellon issues sponsored ADRs only after purchased foreign shares have been deposited in its custody.  And as I explain in the next sentence of that Paragraph 38:  Absent evidence to the contrary, even in the unusual case where a purchaser seeks to acquire newly sponsored ADRs rather than buying those ADRs on the secondary market, that purchaser has no obligation to acquire ADRs at the time they purchase foreign shares.

I then have a footnote, which states "contra," meaning, by contrast in the Stoyas v. Toshiba case, the court to my understanding, pointed out that, in fact, the facts of that case were different.  The facts of that case were such that the moment

Page 102

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Barclays completed the transaction for Toshiba common stock on the Tokyo Stock Exchange, the moment that Barclays completed that transaction on the Tokyo Stock Exchange, AIPTF, the purchaser, became logically and legally bound to perform its contractual obligations.

It is my understanding that the court in Toshiba identified facts in that case which did create an obligation for the purchaser to acquire ADRs at the time they purchased foreign shares, which is why I used the word "contra" in Footnote 45.  But I have seen no such evidence here, and absent evidence to the contrary, that would be inconsistent with the general practices, policies, and deposit agreement applicable in this case.

Q    You say it's your understanding that the court in Toshiba identified facts in that case which created an obligation for the purchaser to acquire ADRs at the time they purchased foreign shares.

Could you describe to your

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

recollection what those facts were?

MR. JACKSON:  Objection.  Beyond the scope and objection to form.

A     I previously stated, and I'll reiterate, that the court -- in my understanding, was that the court reviewed the factual record, and based on the evidence which had been presented in that case, came to the conclusion that the moment Barclays completed the transaction to purchase Toshiba common stock on the Tokyo Stock Exchange, based on the evidence which had been presented to the court, which I did not independently review, nor was I asked to.  But based on that evidence, the court concluded in that case that the purchaser became logically and legally bound to perform its contractual obligations, a point that I reiterate in Footnote 47.  Again citing -- quoting the case:  Once Barclays fully executed the purchase of common stock on the Tokyo Stock Exchange, AIPTF was bound to take and pay for the ADRs.

So my testimony is that I

Page 104

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
understand that the court found facts such as those were present in the record in Toshiba, but I did not independently, as I said before, review those facts.

Q   Are you aware that Barclays was the broker/dealer for the subject transaction in the Toshiba case?

MR. JACKSON:  Objection to form.

A   That is consistent with my recollection of the facts, but, again, I did not, nor was I asked to review the entirety of the record.  It may very well have been that there were more -- there was more than one broker/dealer.  I do remember in broad terms that Barclays was functioning as a broker/dealer in connection with that transaction.

Q   If you were trying to compare the facts of this case to the facts of Toshiba, wouldn't the relative comparator be the policies and procedures of the broker/dealer that conducted the transaction rather than the depository bank, BNY Mellon?

MR. JACKSON:  Objection to form.

Page 105

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    I think I'm confused by your question.  Nowhere in my opinion do I discuss, nor do I recall that the court in Toshiba discussed the policies and procedures of a broker/dealer.  Maybe you can clarify what you mean by that.  I think I'm confused what policies and procedures you're referring to.

Q    Sure.  Wouldn't the facts surrounding the trade conducted by the broker/dealer itself be the relative comparator to Toshiba rather than the policies and procedures of BNY Mellon?

MR. JACKSON:  Objection to form.

A    I disagree with the characterization of those two as intention or substitutes.  I don't think it's an either/or.  As I explained in my opinion, I think it's both; both facts are relevant, and both are discussed.  In the immediately following paragraph, I explained how I reviewed trading and clearing records, which confirm that the facts here are different from the facts of the Toshiba case as were

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
stated by the court.

Q    But sitting here today, you can't
summarize the facts of the Toshiba case as
stated by the court?

MR. JACKSON:  Objection to form.
Objection mischaracterizes testimony
and mischaracterizes report.

A    That was not my testimony.  My
testimony was that I reviewed the court's
opinion, which I cited and discussed and
quoted at length in my expert report.  I do
not have the court's opinion committed to
memory.  I have not been asked to
independently review the facts underlying
the Toshiba opinion, nor have I done so.
But I do recall the facts which are
relevant, and have discussed those relevant
facts in my reports.

Q    Okay.  So in Paragraph 37, you
write that you reviewed documentation made
available by broker/dealers who were parties
to new issuances of Bayer ADRs, and that you
had found no indication in any of that
documentation which indicates that liability

Page 107

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
for purchasing Bayer ADRs depended upon the
purchase of underlying shares in a foreign
market.

Do I have that right?

A    I'm sorry.  I want to answer your
question.  Could I ask for us to take a
break shortly?

Q    Yeah?

A    I'm happy to answer your question
if there's a natural stopping point.  But
the answer to your question is yes.  That
is, yes.

Q    I'm going to -- if you can just
give me, like, five minutes at most, then we
can take a break.  Is that okay?

A    That's great.

Q    So what documentation did you
review from broker/dealers that you are
referencing in Paragraph 37?

A    The productions which I referenced
on Everlaw were by and large the majority of
them, if not the vast majority, were
productions of trading records by
broker/dealers.  The way in which most

Page 108

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL broker/dealers maintain confirmations of trades -- well, it can vary from broker/dealer to broker/dealer and can take different forms.  It is common in my experience for broker/dealers to record orders and trade confirmations in electronic format.  Those were provided to me.

I don't have -- I can't recall by memory right now the name of every broker which was on the Everlaw system, but I reviewed all of the productions which came in.

Q    That's fine.  I'm not that unreasonable.

You mentioned confirmation slips in a few places here, and you mentioned it in your testimony here just now I think.

How would a confirmation slip reveal that liability for purchasing an ADR depended on the purchase of underlying shares in a foreign market?

MR. JACKSON:  Objection to form.

You can answer.

A    So first, it's worth remembering

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
that the term "confirmation slips," as I understand it, is given by the court in -- not the same Toshiba opinion we've discussed, but I believe the Nine Circuit opinion.  And so I am applying a methodology which has, to my understanding, been put forward by the courts, but it is -- it is possible for a confirmation slip to reveal that information.  There is any -- well, let me -- strike that.

There are certain ways in which a confirmation slip may reveal where irrevocable liability was incurred, or at these may provide probative evidence, may counsel in the direction of one conclusion or another.

Q    Okay.  In conducting this analysis that you reference in Paragraph 37, 38, and so on, did you review any order instructions from clients to their brokers in connection with individual ADR issuances?

MR. JACKSON:  Objection to form.

A    In my -- so the answer is yes.  In my experience, order instructions can take a

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
variety of forms.  Certain order instructions were available in certain forms prior to the completion of my report.  Other -- or forms of order instructions came in subsequent productions.  Just to use a simple example, sometimes order instructions are recorded in an Excel format and then later confirmed by a Bloomberg chat or an email message is consistent with what observes in an Excel sheet.  So the answer is, yes, although it may have taken different forms at different points in time as I was reviewing different productions.

Q    The documents you had reviewed prior to the issuance of your report, were the confirmation slips generally limited to the Excel format that you referenced in your testimony a moment ago?

A    No.  It would be very hard to characterize in general.  Some brokers provided Excel sheets.  Others provided a complete -- what's simple rather to what one might observe in an investigative capacity, which would be an entire search of emails

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL and Bloomberg chats and so forth.  Others may have produced something in between those two extremes.  It -- it's very hard, and I really can't generalize as to the format of order instructions or confirmation slips across the totality of those productions.

MR. YAVITZ:  Okay.  We can take a break now if it works for everyone.

A    Do we want to do a -- I'm sorry.  Do you want to go off the record first?

MR. YAVITZ:  Yeah.  Let's go off the record first.

VIDEOGRAPHER:  This conclusion Media Number Two of the media deposition of Dr. Joshua Mitts.  The time is 12:40.  We are off the record.

(Whereupon, at 12:40 p.m., a recess was taken to 1:17 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER:  This begins Media Number Three of the videotaped deposition of Dr. Mitts.  The time is 1:18.  We are back odd record.

Page 112

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Welcome back, Dr. Mitts.  Thank you for joining us post-lunch?

A    Thank you.

Q    I'll start with my standard question, which is, did you discuss the substance of your testimony with counsel during the break?

A    No.

Q    Great.  So I have marked an Exhibit 2, which if -- you should see in Exhibit Share, is a copy of the January 25, 2022, decision in Stoyas v. Toshiba.

Let me necessity when you have that.

A    I have it.

(Whereupon, the January 25, 2022, decision in Stoyas v. Toshiba was marked as Deposition Exhibit No. 2 for identification, as of this date.)

Q    Okay.  Very good.

By the way of explanation, we've been talking a little bit about this case. I just, before we get to the discussion,

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

want to level set on some of the facts so that at least you and I understand one another on what the facts of Toshiba were.

So I want to start by looking at the first page of the PDF, the right-hand column. You'll see there is a paragraph that starts, "Plaintiffs allege."

Do you see that?

A    Yes.

Q    Okay. And then it says, According to plaintiffs, both AIPTF and NETTIPF utilized the services of professional investment managers to direct the purchase and sale of Toshiba securities on their behalf.

Do you see that?

A    I do.

Q    Okay. And then in the next paragraph, it says, Plaintiffs indicate that AIPTF accessed the OTC market through AIPTF's investment manager ClearBridge Advisors.

Do you see that?

A    Yes.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Okay.  So are we aligned that ClearBridge was the investment manager who conducted the trades for plaintiffs as recounted by the court in this decision?

A    That's what I understand that text to be saying, yes.

Q    These aren't intended as gotchas. I just want to make sure we're on the same page.

Okay.  Let's flip ahead now to Page 3 of the PDF, and I want -- I'm focusing on the right-hand column, the column that contains *4 as a page delimiter. And actually, before we get there, if you look at the bottom few lines of the left-hand column on this page, it says, According to plaintiffs' summation of the evidence, on March 20, 2015, ClearBridge's trader placed a market order for 71,000 Toshiba ADRs...with ClearBridge's broker, Barclays.

Do you see that?

A    Yes.

Q    Okay.  So would you agree that,

Page 115

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
according to this recounting of the facts of
Toshiba, Barclays was the broker that
processed the transaction for plaintiffs'
investment advisor, ClearBridge?

MR. JACKSON:  Objection to form.
And objection to the extent it
mischaracterize the document.

A    I would have to review the opinion
in its entirety, which I have previously
read.  I would have to refresh my
recollection of the opinion in its entirety,
as well as examine the evidence before I
could conclude either that Barclays was
processing the transaction or what role
exactly Barclays played in this transaction.

I do read the text, which states
that ClearBridge's trader placed a market
order for 71,000 Toshiba ADRs with
ClearBridge's broker Barclays.  I understand
the opinion to be saying that.

Q    So you understand the opinion to
be saying that Barclays was ClearBridge's
broker, right?

A    Yes.

Page 116

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Okay.  Moving along, then, to the other column, the right-hand column, the paragraph that starts with *4.  It says, Plaintiffs' argument glosses over the fact that AIPTF's ability to acquire ADRs was contingent on the purchase of underlying shares of common stock that could be converted into ADRs.  The evidence indicates that Barclays traders in New York and Japan executed the purchase of common stock for conversion on behalf of their client ClearBridge.

Do you see that?

A    Yes.

Q    So the facts of Toshiba as summarized here is that Barclays, ClearBridge's broker, executed purchases of common Toshiba stock in Japan on behalf of ClearBridge, agreed?

MR. JACKSON:  Objection. Mischaracterizes the document.

A    The text states that Barclays traders in New York and Japan executed the purchase of common stock for conversion on

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

behalf of ClearBridge.

Q    Yes.  And then, if you go further down, it says, At the time the ClearBridge trader confirmed that she approved of the price, foreign exchange rate and commission, Barclays traders in New York and Japan had already executed the purchase of common stock, quote, for ADR settlement, closed quote, on behalf of ClearBridge.

Do you see that?

A    Yes.

Q    So the court is emphasizing that the purchase of foreign stock in Toshiba was for ADR settlement, correct?

MR. JACKSON:  Objection to form.  And also objection, beyond the scope.

A    I'm not able to opine right now on what the court is emphasizing or not without a more systematic review of the way that the court, in this or other opinions, emphasizes a point.  I do note that that language is not in italics, although italics doesn't always signify emphasis, I don't have -- it doesn't appear obvious to me based on

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
reading this sentence that the court is
emphasizing for ADR settlement.

Q    Well, would you agree that the
court highlights the fact by including it in
its opinion that the overseas purchase was
for ADR settlement?

MR. JACKSON:  Objection to form
and beyond scope.

A    I'm not sure what -- taking your
question quite literally, there's nothing
highlighted.  The text is not highlight.
There's no highlighting involved here.  So
I'm just having trouble understanding what
you want me to confirm.

Q    I'll move on.  But is it your
understanding that your only understanding
of the term "highlighting" is literally
changing the color of text and there's no
metaphorical usage of the term "highlight"
that would include putting the reader's
attention on a fact?

MR. JACKSON:  Objection to form.
Mischaracterizes testimony and
harassing the witness.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    I'm sorry.  I -- I'm not understanding.  I --

Q    I'll withdraw the question.  It's fine.

A    My testimony was that I don't believe this text is either literally or metaphorically highlighted or emphasized in any way.  It's not apparent to me that there's any extraordinary emphasis placed on that text.

Q    Got it.

Okay.  Let's go to -- let's go to *5 on the next page left-hand column, the carryover paragraph.  And I'm looking at the second sentence.  It says, The evidence indicates that Barclays executed the purchase of order stock in Japan on behalf of its client, ClearBridge.

Do you see that?

A    Yes.  Yes.

Q    It says, Barclays did not assume any risk of loss for purchasing the underlying shares because it already knew that ClearBridge would purchase the

Page 120

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
converted ADRs at market price.

Do you see that?

A    Yes.

Q    And then it says, Because ClearBridge was ready and willing to purchase the ADRs, it was bound to complete the ADR trade beginning with the trade of underlying Toshiba common stock.

Do you see that?

A    Yes.

Q    Thus, the triggering event that caused ClearBridge, and by extension, AIPTF to incur irrevocable liability occurred in Japan when Barclays acquired the shares on Toshiba common stock on the Tokyo Stock Exchange.

Do you see that?

A    Yes, I see that.

Q    Okay.  Great.  You can set the document aside.

I want to move on now to the next portion of your report and your next opinion, and that is the analysis of the individual Bayer ADR transactions alleged by

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
plaintiffs.  I'm going to start with
Paragraph 41.  Let me know when you're
there.  Paragraph 41 of Exhibit 1.

A    I'm going to reopen Exhibit 1 now.

Q    Yes.

A    Give me one second.

Q    I think you've got a hard copy of
it, too, I thought.

A    I do.  I just -- I -- I understood
that I should use exhibit manager -- is
that --

Q    Whatever is easier for you.  It
doesn't matter to me.

A    I have it.  I have it open.
Paragraph 41?

Q    Yeah.  So let me start here.  You
write that you reviewed all 20 purchases of
Bayer sponsored ADRs by plaintiffs.

Are you aware plaintiffs have
alleged and certified 21 purchases of Bayer
sponsored ADRs in connection with this
action?

MR. JACKSON:  Objection to the
extent it mischaracterizes the

**Page 122**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

document.  Objection to form.

A    My counts, based on the materials which were provided to me, was 20.  It is possible that I miscounted.  It is possible that the materials which were provided to me were incorrect.  But I counted 20 in the materials which I was provided.

Q    What materials are you referring to?

A    I was given a list of purchases by counsel, a list of purchases by the lead plaintiffs and the additional named plaintiff.  It is the best of my knowledge there were 20, but it is possible that I either miscounted or that there was some other error in the document.  I don't know what exactly you're referring to when you say, "21."

Q    Okay.  In any event, you looked at all of the trades on the list that plaintiff gave you?

A    I looked at all of the 20 purchases that I was given.  Assuming I counted correctly.  As for whether I looked

Page 123

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

at all of the trades, the term "trades" is a little ambiguous because, in the list I was given, there were purchases. Those purchases may have consisted of more than one trade. In order to obtain that information, it's my understanding counsel requested the records from the relevant broker/dealers. Not all of those records had arrived at the time of my report, so it's possible that at the time of my report, I had not reviewed every trade underlying those purchases.

Q    Have you now reviewed every trade underlying those purchases?

A    As I have previously testified, I have been reviewing, on an ongoing basis, the material which was produced after completing my report, and have reviewed some, but not all of that material. In the course of that review, I have reviewed additional trades, but because I have not yet completed my review, I have not reached a final determination as to whether I have identified every single trade underlying

Page 124

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

every single purchase at this time.

Q    Have you looked at, at least one trade for every single purchase at this time?

A    I can't say from memory without having the purchases in front of me and the trading records in front of me, which trades I was able to identify in the various productions.  It's important to clarify that, for any given purchase, I was generally able -- and my testimony in Paragraph 41 of the report was that I was able to identify all of the clearing records associated with the purchases by the lead and named plaintiff, the lead plaintiffs and the named plaintiff -- additional named plaintiff.  I was able to identify the clearing records because those were all contained in a single production from the DTCC.

So part of my review -- and, in fact, sometimes it was outcome determinative, for reasons I can explain, consisted of looking at the clearing records.  At other

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
times, it was necessary to evaluate the
brokerage records of individual trades.  Both
methods were employed, that is, I would
evaluate both the clearing and settlement
data, as well as the brokerage trading and
order records to the extent those were
available.

     Q    Got it.

     When you opined, in my -- in
Paragraph 41:  In my opinion, the evidence
available to me at this time indicates that
irrevocable liability for purchases by the
plaintiffs was incurred in the United
States -- at that point when you were
offering that opinion, you had not yet
examined all of the trades underlying the
purchases?

     MR. JACKSON:  Objection to form
    and objection it mischaracterizes
    testimony and report.

     A   As I stated in my report, the
evidence available to me at that time, which
included the DTCC clearing and settlement
records for all of the purchases, in fact,

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
for all of the trading during the class period, the FINRA trading records for, I believe the entirety of the class period, were also available.

Some of the individual brokerage records were available, and as such, my opinion was based, as I stated in Paragraph 41, on the evidence available to me at that time, which I just listed.

Q    Now, in this section of your report that we're looking at, Section 5, you only cite records from the DTCC and the broker instant.

Did you consider any other discovery materials in analyzing the purchases alleged by plaintiffs?

A    Well, as I explained at the outset, the discussion in Paragraph 39 of the purchase by Macquarie Securities utilized brokerage reports provided by Macquarie.  The purchase described in Paragraph 39 is discussed again in Paragraph 45.

The discussion in Paragraph 45 of

Page 127

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
the purchase by Macquarie was -- cannot be
viewed in isolation from the earlier
discussion which used Macquarie's brokerage
records.  It happens to be that the point
made in Paragraph 45 did not necessitate a
reexamination of what had been discussed in
Paragraph 39, which is why the last two
sentences of Paragraph 45 explicitly
reference Paragraph 39.  So paragraph 45, by
incorporating my discussion of Paragraph 39,
did, in fact, utilize brokerage records by
Macquarie.

Q    So in other words, you also relied
upon that brokerage record from Macquarie?

A    Yes.

Q    Okay.  So aside from the incident
records that are cited in this section, the
Macquarie record that we discussed a moment
ago, and the DTCC records that are cited in
this section, did you rely on any other
materials to support the conclusions offered
in this Section 5 of your report?

MR. JACKSON:  Objection to form.

A    Well, as I explained in Paragraph

Page 128

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL 49, there may have been, as evidenced by the clearing records, it's important to understand -- what amounts to a second-to-last Paragraph 49 of the section, it's important to understand that is referencing the prior analysis, the conclusion of which is that the clearing and settlement data allow us to identify when the purchase of Bayer sponsored ADRs consisted of newly issued Bayer sponsored ADRs.

In the course of continuing to review materials which had been produced by brokers, I was interested in the question of whether any of the evidence which had come in after my report was written was inconsistent with the conclusion I drew in Paragraph 49, which is that I had not identified any evidence which suggested that the Bank of New York Mellon deviated from its order practice of requiring foreign shares to be in the custody of the purchaser prior to an issuance of the ADRs.

In the course of my review of the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
additional evidence, I did not find any
documents, and have not thus far found any
evidence which is inconsistent with that
conclusion.

Q    Thanks.  I'm not sure that quite
answered my question, though, which is a
simple one.

You offer opinions on various
trades in Section 5.  In developing those
opinions, did you rely upon any documents
other than the Macquarie brokerage record
that we discussed, the Instinet brokerage
records that are cited in this section, and
the DTCC records that are cited in this
section.  Yes or no?

MR. JACKSON:  Objection to form?

A    In forming my opinions, I rely on
a wide variety of experience and evidence,
which allows me to reach a conclusion, but
the specific propositions, which are laid
out in this section, make reference to
specific facts which are cited.  I am not
aware of any citations which are incomplete,
meaning if I put forward a specific factual

Page 130

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL proposition and include a citation to the document from which that proposition is drawn, I am not aware of any other document which relevant to that factual proposition. But that does not mean that I am not relying on the breadth of my experience in analyzing this sort of information when forming my opinion. Because I am.

Q    Sure. And I didn't mean to discount the breadth of your experience. I was just trying to get a sense of what documents you relied upon.

Okay, let's -- with that out of the way, let's talk about the individual transactions discussed in your report. My first question on that is, I counted seven transactions, seven purchases described this section of your report.

How did you choose which purchases to specifically discuss for purposes of your report?

MR. JACKSON: I'm going to caution the witness not to, you know, respond in any way that reveals privileged

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

communications and object to the extent it calls for privileged information.

A    Each section of my opinion in this Section 5, each subsection, if you will, makes a distinct point, which is a reflection of the totality of my examination of the documents and the materials which are in the productions.

The -- in order to substantiate a general conclusion, I give specific examples. The examples I chose to include reflected the most I could describe in detail from the data in a manner that was reasonably calculated to convey support for the conclusion that I drew.

So if, for example, there were two episodes which were completely identical, there was no reason to include the second episode because I had already -- in the context of the point I was making, had already provided sufficient evidence in my view, then I may not have included the second example because there was nothing new to be learned by including it.

Page 132

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

When possible, I sought to combine and treat as many examples collectively in a sequenced discussion as possible.  But it is not -- it is not correct to conclude that I cherry-picked one example and left out another.  If there was a relevant example for which I had sufficient data to opine on, I included that example.  I may have not stated duplicative or unnecessarily data points which were -- would not have added to my analysis.

Q    Got it.

So is the analysis of the -- strike that.

Is the analysis of the purchases conveyed in this section of your report typical of the analysis you performed on the other purchases alleged by plaintiffs?

MR. JACKSON:  Objection to form.

A    Yes.  But I would go further and say that, if I thought an additional example was necessary, even if one had already been included that was similar to another example that I was contemplating, I may have -- I

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
always erred on the side of including that additional example.  So some -- sometimes in the section I'll say, for example, and then I'll say, "for another example."  And even though the first example may have been similar to the second example, I may have come to the view that the second example had some distinguishing characteristic which would be helpful in explaining how I reached my conclusion.

Q    Okay.  Thank you.  I appreciate that clarification.

Okay, with that, you had mentioned Paragraph 39 and the Macquarie trade.  I'm going to start there.  So if you can go to Paragraph 39.

As described in this Paragraph 39: Macquarie Securities placed an order to purchase 577,000 Bayer common shares on the Frankfort Stock Exchange on June 26, 2016, right?

A    That's what was conveyed by the brokerage records.  I do think it's worth pointing out that, as far as I know, the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
Frankfurt Stock Exchange was closed at that moment. I don't interpret brokerage record as making a representation about when a particular market was open. When such a record records the creation of an order, it is important to look at when that order executes in order to see when the order effectively was transmitted to the market. So what I convey is what I observed in the brokerage record. Of course, that's -- that's part of the picture.

Q    Yeah. And then as described in Paragraph 39, after executing the trades on the Frankfort Stock Exchange, Macquarie then converted those shares to ADRs on June 7, 2016; is that right?

A    I think the term "conversion" is a little ambiguous. I have used the term colloquially. It's a common term that's used. In fact, in a technical sense, to be precise about it, the purchaser is purchasing securities, American depository receipts, from the Bank of New York Mellon. The payment for those securities is --

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
consists of the foreign shares.

So it is actually a purchase of securities, and I -- I used that term knowing that we can use the term "conversion," as is often used in the foreign exchange market for example in converting one currency to another in situations where we -- what we really mean is purchasing -- like foreign exchange, we purchase one with the other.

But I just want to be clear that what is actually happening is that the Bank of New York Mellon is issuing new American depository receipts. It is selling those American depository receipts. And the payment, the consideration for those American depository receipts is the foreign shares, inevitably because the foreign shares are denominated in foreign currency and the ADRs in U.S. currency, the conversion process will entail, typically, the payment of some sort of foreign exchange fee which reflects the currency differential. More of a technical point you could come back to. But in essence, this is the purchase of new

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
securities, which is why I describe it that
way in Paragraph 39.

Q    Well, we talked earlier about the
deposit agreement.  Doesn't the deposit
agreement discuss the transaction in terms
of the deposit of foreign shares and the
receipt of an -- of an ADR?

MR. JACKSON:  Objection to form.

A    Yes.

Q    Would you describe -- when you put
money in the bank, would you describe that
as the purchase of a bank account statement?

MR. JACKSON:  Objection to form.

A    I think the analogy is
problematic, for a number of reasons.  The
answer to your question is, no, but the one
who deposits money at a bank usually does
not receive securities.  But one could, in
fact, exchange money for securities.  In
fact, you could view a broker/dealer as, in
effect, doing that.  If you purchase a bond
or other security, you are depositing your
money and receiving a security.

I understand the deposit agreement,

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

which is between the depository and the issuer, as using that terminology, but what we're describing here is the transaction between the third-party market participant and the depository.  And the exchange which is occurring here, amounts to the purchase of newly issued American depository receipts.

Q    Got it.  You think the depository agreement is an agreement solely between the issuer and the depository bank?

MR. JACKSON:  Objection.  Calls for a legal conclusion.

A    No.  I'm not opining on the scope of the deposit agreement, rather simply making the point that the terminology which is used in the deposit agreement reflects first and foremost the nature of the relationship between the issuer and the depository.  It is also the case that ADR holders' rights and responsibilities are governed by the depository agreement.

And I'm not in any way downplaying that relationship, but rather making the point that, from the standpoint of the market

Page 138

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
participant who has in their possession
foreign shares, there is no inherent change
of substance of those foreign shares which
might be implied by the word "conversion."
The language in the deposit agreement which
makes reference to the "receipt" and
"deposit" are not inconsistent with the
characterization of that secondary
transaction, that additional transaction
consisting of the deposit of foreign shares,
the giving of foreign shares, if you will, as
consideration, and the issuance of American
depository receipts.

And why that's important -- and
this is really maybe a point that's getting
lost, so I'll just emphasize it.  Brokerage
records make very clear that, from the
standpoint of the broker, the purchase of
American depository receipts is a transaction
which they treat like, in the ordinary
course, other purchase transaction.  It is
treated that way in their internal records,
and the clearing and settlement records are
virtually identical to the purchase on the

Page 139

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

secondary market except for the source.

So it is a transaction which occurs in which ADRs are issued in exchange for foreign shares.

Q    Got it.

And then you conclude in Paragraph 39:  The liability from Macquarie's June 7 purchase order for Bayer sponsored ADRs could not have become irrevocable 15 hours before the order was even placed, i.e. at the time of the June 6 purchase of the foreign shares.

Do I have that right?

A    Yes.

Q    Okay.  So I'm just making sure I understand the logic and the distinction from Toshiba.  So because plaintiff had no involvement in Macquarie's purchase of Bayer common shares, they couldn't have committed to buy ADRs at the time of the purchase of the foreign shares?

Is that the distinction being drown?

MR.  JACKSON:  Objection to form

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

and objection mischaracterizes report.

A    The report explains in Footnote 47 how the sequence here is opposite to that described in Toshiba where the market order to purchase Toshiba unsponsored ADRs was placed three days before the purchase of the foreign shares occurred.  In that case, the court concluded, as I understand it, the evidence was such that once Barclays fully executed the purchase of common stock on the Tokyo Stock Exchange, AIPTF was bound to take and pay for the ADRs.  But based on the Macquarie records which I reviewed, the order to purchase ADRs was not placed until the day after the foreign shares were purchased.

And I'll just say one more thing, which is in Footnote 47.  The court described the -- in Toshiba, the order as a market order.  And if I recall correctly, even defined market order as an order which is subject to an understanding of immediate execution, that upon placing a market order, there is an expectation that the order will

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

immediately execute at the prevailing price.

Q    Um-hmm.

A    Simplify it.

I did not identify any evidence that a market order had been placed before the June 6 purchase of the foreign shares had commenced, nor did I identify any evidence indicating that a market order had been placed at all.

Q    How is a market order typically evidenced?

A    It will vary from broker to broker, but generally, a broker may record a market order with some designation, NKT for example.  It can vary from broker to broker. When that destination is present, that, of course, doesn't necessarily imply that the broker has, in fact, submitted what is typically thought of as a market order to an exchange.

It could be used, as was the case here, to -- it seems anyway -- that is what the court seems to be saying in Toshiba is that it was used to reflect a willingness to

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
transact immediately.

What I would be looking for in the records would be a similar willingness to transact in this sort of triggering fashion, meaning as soon as the foreign shares were purchased the ADR purchase was irrevocable. I would be looking for some evidence of that.

I didn't find any evidence of such an order, whether it was called market or whether it reflected in some other way that -- that commitment to transact immediately, I did not find that in the Macquarie records prior to June 6.

Q    Okay.  Thank you.  That's helpful.

Have you heard of an entity called Harding Loevner Funds?

A    I have heard of Harding Loevner in that it is my understanding from reviewing both the complaint, some of the productions, both at the time my report was written and subsequently, that Harding Loevner, at least one of their entities, served as a sort of asset manager for the plaintiffs, or at least one or more of the plaintiffs.

Page 143

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

I am not deeply familiar with, nor was I asked to review the relationships between the plaintiffs in this case and their asset managers.  But I'm generally familiar with the role that Harding Loevner played, at least in connection with one of the lead plaintiffs, if not more.  This is based solely on my recollection at the moment.  I don't much any materials in front of me.

Q    I understand.

Are you aware that all of the transactions alleged by plaintiffs Steel Metal Workers and Local 710 were conducted by and at the discretion of Harding Loevner?

MR. JACKSON:  Objection to form. Objection, beyond the scope.

A    That would be consistent with my recollection of the materials, but at this moment going purely off of memory, I couldn't tell you which asset manager was responsible for which of the purchases and sales during the class period by memory.

Q    Got it.

But you didn't review any

Page 144

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL documents produced by Harding Loevner before issuing your opinion, did you?

MR. JACKSON:  Objection to form.

A    To my knowledge, there had -- it had not been made available to me.  That is, there was a production, one or more productions, if I recall, on the Everlaw platform which were made available to me after my report was finalized.  I did not have access to any Harding Loevner productions before my report was finalized. I don't know if that material had been produced or to whom it was produced by.  I did not receive anywhere such materials prior to finalizing my report.

Q    Did you ask for any documents from Harding Loevner before submitting your opinion?

MR. JACKSON:  Objection to the extent it calls for privileged information.

A    In general, I think my communications with counsel concerning documents in the case are privileged, but I

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

reviewed all the materials which were made available to me at the time I wrote my report.

Q    So lacking documents from the investment managers that actually conducted the trades on behalf of plaintiffs, were you at all concerned that you didn't have sufficient evidence to offer an opinion on whether the transactions in this case were domestic or foreign?

MR. JACKSON:  Objection to form.

A    Well, I think -- let me make a couple of points in response.  First, I stated in Paragraph 36 of my opinion that my conclusion was based on the evidence available to me at this time.  My conclusion that irrevocable liability was incurred in the United States was based on that evidence.  I also later in my report reserved the right to update my opinions if new information came in which would lead me to a different conclusion.

It is my understanding that, in general, the scheduling and -- and deadlines

**Page 146**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
for these sorts of reports are -- it's not that one can always wait until all the materials are in.  Maybe I'm misunderstanding, but that was my understanding.  So the answer to your question is, it did not trouble me that I was offering an opinion which was based on the available evidence, not only because my opinion was qualified to that available evidence and was, as I understood it, it wasn't -- I had no reason to think that anyone was intentionally withholding materials or delaying.

But in addition, I understood that a number of materials had been produced, and the methodology that I understood the Nine Circuit laid out, which we previously discussed, as I explained in Paragraph 37, documentation made available by broker/dealers, including confirmation slips and other instructions, much of that documentation already had been produced.  So I felt confident that, based on the substantial evidence which had been produced,

Page 147

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL and subject to the qualification that my conclusions were based on the evidence available to me at the time, I wrote my report and subject on the reservation of subsequently changing or modifying or updating my opinion as new evidence came in. When taken together, that it did not trouble me that I did not have access to the material you described.

Q    Do you think that documents from the investment manager who conducted the trade are relevant to an assessment of whether the trade was domestic?

MR. JACKSON:  Objection to form.

A    They can be relevant.  It's likely, but they're not necessarily relevant.  I'll give a few reasons, examples why.  If you -- if you are trying to determine whether a transaction in a Bayer sponsored ADR consisted of the purchase of an existing Bayer sponsored ADR, then that question can be answered, as I did in my report, by examining the clearing and settlement records.

Page 148

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Those clearing and settlement records show unequivocally where the shares were purchased -- excuse me, the ADRs. Please strike shares. Where the ADRs were purchased. In that case, it is not relevant at all what the investment manager -- what documents or records maintained by the investment manager, because the purchase of existing ADRs in the United States is an objective question that's answered in that case by examining the clearing and settlement records.

Q    What about in circumstances where an order is fulfilled through the issuance of new ADRs?

A    In that case, it is possible that instructions from the investment manager may be relevant. The factors identified in the Toshiba case included, as I understand it, but were not limited to information which would be in the possession of the investment manager.

For example, whether an order was a market order or not, would, in the ordinary

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL course, be something that the broker/dealer would record in there systems.  Similarly, the extent to which there was a commitment to purchase the ADRs immediately upon purchase of the performing shares, may have been evidenced in the brokerage records.  To the extent that the brokerage records are unclear -- and I'll just take the opportunity to reiterate that the vast majority of transactions in Bayer ADRs occurred on the secondary market -- but to the extent that for the small group of transactions consisting of new ADRs, if the broker records were ambiguous, then the investment manager records may be relevant, but that's a -- when reviewing the brokerage records in this matter, I did not see any indication which suggested that there was any ambiguity such that I would need to look at the investment manager's records before reaching the conclusion.

Q    Would it surprise you to learn that plaintiffs did not subpoena their investment managers for records in this

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

case?

MR. JACKSON:  Objection to form.

A    I have no information on who subpoenaed who outside of privileged conversations with counsel.  I observed data coming in on Everlaw, and it was not disclosed to me on Everlaw, to the best of my knowledge, who requested which documents. My understanding -- I could have this wrong -- is that, in general, in litigation, documents which are retrieved by one party are made available to other parties such that my understanding -- again, I could have this wrong -- is that everyone would receive access to the same information regardless of who requested it.

And so I always thought -- but, again, I could have this completely wrong -- it wasn't of particular ally importance which party requested a particular document.  That wasn't something that I spent time thinking about on the assumption that all documents would be made available to all of the parties in an ongoing case.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Okay.  I'll represent to you that defendants subpoenaed investment managers for documents in this case.  I'll further represent to you that plaintiffs did not subpoena investment managers for records prior to the submission of your report, and have not since subpoenaed the investment managers for records.

Based on those representations, does it surprise you that plaintiffs at no point subpoenaed potentially relevant documents for investment managers prior to the submission of your report?

MR. JACKSON:  Objection to form, beyond the scope.

You may answer.

A    I think I already answered that, but maybe I'll restate.  The identity of who requested which documents, my understanding -- and I'm, you know, I'm a professor; I'm not a practicing litigator, so I may have this wrong, but I always thought that it wasn't material.  It didn't really matter who requested documents since

Page 152

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
both sides, as I understood it, had the
ability to subpoena documents and could do
so throughout the course of the relevant
discovery period.

My understanding was that both
sides had equal opportunity, if you will, to
request documents, and so particularly if I'm
testifying in a matter, I'm -- in that case,
it goes without saying, I'm not privy to
conversations among counsel regarding things
like the timing of productions.  So I
generally don't ascribe much meaning to which
documents are requested when by which party
on the view that both parties can request
documents, I think.  And I think whatever
documents they request are made available to
both sides in the case.  So what I should be
focusing on is what's been made available,
and, you know, I don't know who is requesting
what and when.  That's not information I
have.

MR. JACKSON:  Can we go off the
record for just one second?

MR. YAVITZ:  Yeah.  Of course.

Page 153

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Let's go off the record.

VIDEOGRAPHER:  Off the record at 2:17 p.m.

(Whereupon, at 2:17 p.m., a recess was taken to 2:25 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER:  We're back on the record at 2:25 p.m.

Q     Welcome back, Professor Mitts.

A     Thank you.

Q     So just to level set.  Because we were talking about a trade, and then we got sidetracked on your surprise going on over the exact sequence of subpoenas.

So just to level set on the trade we were talking about.  That was the 577,000 Bayer share purchase on June 6 and then the subsequent ADR issuance on June 7.

Do you recall that's the trade we're talking about?

A     Yes.

Q     Okay, good.

So I'm going to mark an exhibit.

Page 154

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

This is Tab 3 for internal purposes.

Let me know when you have it in front of you.

(Whereupon, a Document, Bates-stamped HL002732 was marked as Deposition Exhibit No. 3 for identification, as of this date.)

Q    This is a document that was produced under Bates stamp HL002732.

MR. JACKSON:  I just want to go back for a second.  To the extent you're characterizing his testimony as expressing surprise or anything in that regard, I object to that as mischaracterizing his testimony.

MR. YAVITZ:  No, no, no.  By that I only meant I was interrogating him about his surprise or lack of surprise. I was making fun of myself in that.

MR. JACKSON:  Got it, understood.

A    I have the document open, Exhibit 3.

Q    Great.

So this is a document that was

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

produced to us Harding Loevner.  It's a June 6 email, as you can see at the top. From a fellow named Vikram Gowda to Chris Reale at Aquarius Securities.  Now, I'll represent to you that Vikram Gowda is a portfolio trader at Harding Loevner.  And that at the time of this email, Chris Reale served as the head of international sales trading at Macquarie.  So the subject line here -- I'm just going to walk through the email with you a little bit.  The subject line says:  HL Orders June 7, 2016.

Do you see that?

A     Yes.

Q     I guess should have asked, have you ever seen this before today?

A     It may have been in one of the productions which arrived in between completing my report and this deposition. It seems familiar.  As I said, my review is ongoing.  Sometimes I might take an initial look at a production, set aside certain documents which seem potentially of interest, and then go back and carefully

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

read those documents.

This one strikes a certain bell, so to speak, in my mind.  I think I might have picked it out, but I have to go back to my records to double-check.

Q    Okay, that's fine.

So in this email sent on June 6, Mr. Gowda writes:  Chris, please execute the below for TD06072016.

Do you see that?

A    Yes.

Q    And then Mr. Gowda continues:  We would like to access location liquidity and create/cancel the ADRs listed below.

Do you see that?

A    Yes.

Q    Do you have an understanding of the phrase "access locally liquidity" as it's being used in this email?

A    Well, every trader tends to have their own lexicon, if you will.  So it's -- it's rare that a particular term has one objective universal meaning.  But in the context of this message, I do think I have a

Page 157

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
fairly reasonable understanding of what this phrase is intended to mean.

Q    What is that understanding?

A    It is possible, potentially -- to really reach any firm conclusion here, we would need to look carefully at the context and what was going on in the market to contextualize that term.  It is possible, maybe reasonably likely, that the reference to locally liquidity is a reference to a preference for engaging in a transaction which consists of the creation of ADRs by a process that begins with the purchase of foreign shares in a local market.  The term "locally liquidity," I think can probably be fairly construed as a reference to the local trading market.

When viewed in that context, the discussion of creating ADRs is, I think, reasonably construed as reflecting the purchaser's desire to hold ADRs by means of a two-step transaction.  Step one, transaction one, purchasing the foreign shares; step two, exchange, converting -- we've used those

Page 158

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
terms colloquially -- but in effect
purchasing ADRs by delivering those foreign
shares as consideration for the ADRs.

The discussion of accessing local
liquidity, in my view, is consistent with
that interpretation.  It's also consistent
with a discussion in my report in Paragraph
39.

Q    Okay.  Let's look at the second
table in this email.  If you look at it,
Mr. Gowda writes:  Spoke to BONY Depot.  2.5
CPS to create BAYRY.

Fair to say that BONY in that
sentence probably refers to the Bank of New
York Mellon?

MR. JACKSON:  Objection to form.

A    I don't have personal knowledge,
but that seems reasonable to me.  I have
seen that -- that abbreviation used
elsewhere to refer to the Bank of New York
Mellon.

Q    Is it fair to say that in this
sentence Mr. Gowda is relying to Mr. Reale
the cost, the fee for converting Bayer

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

common shares into Bayer ADRs?

MR. JACKSON:  Objection to form.

A    So I want to emphasize, there's the colloquial way we sometimes use words, and I find myself doing that, but because this is an area where it's important to be precise, I just want to be precise.  What the email message states is to create a security with ticker BAYRY.  That is the ticker of the American Depository Receipt. The email, as I read it, does not use the term "convert."  It uses the term "create." And I want to just good back to something I said earlier, which is that the purchase of ADRs, as I explained in my report, newly issued ADRs, is, in fact, the creation of ADRs.  It is the issuance of ADRs.  And the purchase of those newly issued ADRs.

The foreign shares are not converted in a technical sense.  As we previously discussed, they are put on deposit.  They are given as consideration for the issuance, the creation of the ADRs in what amounts to a purchase of ADRs as I

Page 160

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
discuss in Paragraph 39.

Q   So in this email, Mr. Gowda is instructing Mr. Reale to create, or however you want to phrase it, 577,000 ADRs in Bayer?

MR. JACKSON:  Objection to form.

A   I'm not sure I would characterize, without more information, this email message as an instruction.  The -- again, it's -- this is very hard to do ad hoc with an email message being put in front of you and without a systematic evaluation of the way in which these individuals tend to speak to each other.  We're engaging in a little bit of Monday morning quarterback, so to speak. We're sort of second guessing or trying to interpret what they wrote.

But what I would glean from this email is an expression of -- of interest, desire.  The word "like" is used; we would "like" to do the following.

So when I read this email, I see a request to please execute; this is what we would like to do.  It is an instruction that

Page 161

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL reflects a series of orders.  It is an expression of a trading strategy.  And that trading strategy appears to have consisted of a number of transactions as is laid out in this email and in the trading records.

Q    Well, when he writes:  Please execute the below, do you read that as anything other than an instruction to execute the below?

MR. JACKSON:  Objection to form.

A    "The below" is not executable absent something more.  So I'll give you an example.  The price of the Bayer common shares is given here in U.S. dollars.  I'm not sure if you can this, it's USD value. I'm pointing to it like you can see my finger.

You know, one of my -- one of the questions which would come to my mind is, what exactly does that mean?  Presumably, each purchase of the local share has to execute on the foreign market.  And both the dollar value of the transaction and the volume of that transaction, it seems have not

Page 162

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL yet occurred, and it -- more I guess to your question, it seems not actionable in its present form.

And in fact, as I explain in Paragraph 39, 577,938 ADRs were not purchased; 577,403 ADRs, it seems from the data were. I don't know if that is because perhaps there was a dollar value limitation which we're not seeing in this message. I don't know if that's because the market turned out to be less liquid than they had assumed the prior day. But I -- it's fairly clear that this is not a market order as was the case in Toshiba. It's not even clear to me that this is an order, because it reflects a number that doesn't have any context.

So typically, when one places an order, like a limit order, there's a price per share which reflects the buyer's willingness to buy and a maximum quantity and a minimum quantity. And here, it couldn't have been the 577,938 was the minimum quantity, because the data showed that 577,403 were purchased.

Page 163

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

So when I look at this email, I find this to be far short of an order, much less a market order.  What it looks like to me is an expression of a trading strategy, a plan that had been formulated on June 6, and a plan which did not even play out in the data in the following hours when those foreign shares were purchased, and a plan which did not even play out later on June 7 when the foreign shares were provided as consideration for the ADRs.

Q    When you say the plan wasn't -- wasn't carried out, that's because of the difference of, what is it, 500 shares out of the half a million shares purchased?

MR. JACKSON:  Objection to form, mischaracterizes testimony.

A    It's not that the magnitude, in my experience, of the difference between an order and its execution volume is particularly meaningful, it's that they're two -- the fact that there is a discrepancy indicates to me that they are two very different things.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

If I tell a broker to execute a market order for a given quantity, I have never heard, in my years of experience analyzing brokerage data and brokerage practices, of anything short of that volume of shares being executed.  In fact, as I recall, that's what the court in Toshiba emphasized, that a market order had been placed, and the willingness to transact at a particular quantity immediately at whatever price one gets in the market.

So there's really multiple ways in which this seems quite different from an order.  It doesn't seem like it's a market order.  It also doesn't seem like it's a limit order because we've not seen a per share price.  Whatever -- that's really the second point, and the third point is that whatever the dollar value is here seems to be stale relative to the next day because the foreign exchange market might have change.

I guess the last point I'd make is, when I read, Please work OTD max 20 percent, this is, my understanding, a request to a

Page 165

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL broker to make sure that, over the day, the maximum volume does not exceed 20 percent of the contemporaneous trading volume. But that -- that -- I guess I'm struggling understanding how that suggests any sort of irrevocable commitment to closing this transaction. It could very well have been that the volume was so low throughout the next trading day that far less than 577,938 shares. That might explain why only by 577,403 were purchased. But perhaps far fewer could have been purchased. So when I read this, what I see is an expression of a preferred strategy.

Q    Um-hmm. So just to make sure I have your best testimony, this document, which is titled: Subject HL orders, which begins with the phrase: Please execute the below for trading date 06062016, is not an order. That's your testimony?

MR. JACKSON: Objection to form and mischaracterizes testimony.

A    My testimony is that this document describes a client's plan or desire to --

**Page 166**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL for a broker to engage in a series of distinct orders across different securities with parameters that are, quite frankly, missing material information that the broker would need to execute the transaction.

The price per share of the order in foreign currency is not specified.  The order was clearly not a market order because it didn't execute in its entirety.  So it's not a market order.  It's not a limit order because no limit price was specified, and it seems to have a note which constrains the ability of the broker to execute the transaction depending on what was happening in the foreign market, and that introduces a substantial degree of uncertainty that, in my experience, is inconsistent -- it -- I guess I'll put it this way:  Whether or not one would describe the general broad instruction as to a trading strategy as an order in a definitional sense, I do not -- it is my opinion that nothing here is inconsistent with the analysis in Paragraph 39.

There is certainly no evidence that

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

there's -- that that liability for purchasing the ADRs was irrevocable upon completion of the foreign purchase, which by its terms, didn't apparently even complete because only 577,403 shares were purchased.

So this document seems to raise lots of questions for me, but ultimately, doesn't change my view that these were, as evidenced by the brokerage records, two very distinct transactions that Macquarie engaged in.

Q    So you would expect to find subsequent communications clarifying the order prior to the implementation of the order; is that right?

MR. JACKSON:  Objection to form. Mischaracterizes testimony.

A    Not necessarily.  It could be that the client expressed a particular strategy, and I'm speaking here purely to entertain your speculative question in a sense.  I have no information, but I do think it's worth identifying the possibilities that are raised by this document, even though I have

Page 168

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

no personal knowledge as to what the broker meant. But it is certainly plausible that the broker set in motion -- the client, excuse me, set in motion a trading strategy which would consist of a number of distinct transactions. Perhaps the broker was given substantial discretion. That's what the note suggests to me: Please work over the day at a maximum of 20 percent.

So the broker seems to be given substantial discretion. I guess, if I -- if I could think of an analogy, if I asked my broker to set up a 50/50 portfolio allocation to two stocks, the broker may go out and do that, but I -- the broker will engage potentially a number of transactions to achieve that portfolio allocation. But one cannot infer anything even close to what the court held in Toshiba, namely that the moment that the foreign share transaction was completed, the purchaser became logically and legally bound to perform its ADR purchase. I see no evidence of that in this email.

Q    Well, continuing with your

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
metaphoric.  If you went to your broker and said make me a 50/50 allocation of two stocks, and the broker did that and then came back to you with the stocks, do you think you would be free to say:  No, no, you keep those stocks.  I don't want them?

MR. JACKSON:  Objection to form and objection beyond the scope.

A    Of course not.  Just like, once the ADR purchase was complete, the ADR couldn't be returned, to use your analogy. If I asked my broker to buy a hundred shares of Apple and a hundred shares of Tesla, the brokers in my liability to buy -- let's say they occur in that sequence.  You know, my liability to buy Tesla is still quite revocable after the broker has purchase Apple.

The mere fact that two transactions are a part of an overall investment strategy, doesn't make one transaction automatically triggered by the other.  In fact, every trading strategy that I'm familiar with which involves multiple transactions -- I'm not

Page 170

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

aware of a single trading strategy involving multiple transactions except for an important exception which I'll talk about, in which liability for one leg of the transaction depends on another leg of the strategy.

I could -- that's true for long/short strategies. I could open a long position in a stock and a short position in another. Those will always, absent extraordinary evidence to the contrary, and save for one exception which I'll speak about, those are distinction transactions.

The exception is if I create an order with a counter-party, like an exchange, which is specified in the order as triggering a subsequent transaction. That's what I understand the court to have held in Toshiba, that the presence of the market order made it, in fact, such that the ADR transaction was triggered automatically. That can happen in ordinary trading. I can do a one-cancels-the-other or one-triggers-the-other order where one order does trigger another and liability is

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

irrevocable.

But the mere fact that two transactions are part of a client's strategy, it may be that the two transactions occur very close in time.  There's no reason to think that one becomes noncancelable when the other executes.  I've never heard of that, and it would be very strange, I think, if one were to take that view.

Q   So I want to make sure.  I'm not characterizing your testimony, but I'm trying to understand how you're characterizing it.  So is it your position that, upon the purchase of German shares in response to this email, the stockholder -- the investment manager rather, would have the choice between keeping those German shares, or that point, deciding to continue on with their plan and creating ADRs using those shares?

MR. JACKSON:  Objection to form.

A   It is my opinion that all of the evidence that is before me, including this email and the brokerage reports, indicate

Page 172

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
that the answer to your question is, yes,
that is, there is no evidence before me to
suggest otherwise, and the only evidence
that's available indicates that the two
transactions were distinct, as I describe at
length in Paragraph 39.

Q    So just to put a fine point on it,
when Mr. Gowda said, We would like to access
local liquidity and create/cancel ADRs
listed below, is it your position that the
broker would require further instruction
from the investment manager in order to
purchase German shares and create ADRs using
those shares?

MR. JACKSON:  Objection to form.

A    I have no position, no
information, and no opinion on what the
broker may or may not have required.  I
don't see any relevance between an
additional communication and the
irrevocability of the transaction.  And not
to belabor the point, but if I tell my
broker I'd like a hundred shares of Apple
and a hundred shares of Tesla, if the broker

**Page 173**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL purchases the hundred shares of Apple, the mere fact that the broker doesn't have to call me back to confirm the second purchase, I don't really see how that bears on the cancelability of that second purchase. Absent evidence to the contrary, like a one-triggers-the-other order, so long as I could call the broker and cancel that second order, the liability for that second order hasn't occurred yet.  So the question in my mind is, is there any evidence which indicates, like there was in Toshiba, that, in fact, the second order was not cancelable.  My answer is, I haven't seen any.

Q    Okay.  Suppose that there was no evidence of further communication between the date of this email and the time of the execution of the transaction.  Would that alter your conclusion with respect to whether this is, in fact, an order for Bayer ADRs?

MR. JACKSON:  Objection to form. Objection, mischaracterizes testimony

Page 174

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
and opinion.

Q    I think I answered the question, but I'll just -- I'll just say it again. Just like the example I gave where if I tell my broker I'd like to buy two -- a hundred shares of Apple and a hundred shares of Tesla, and the broker buys apple and then maybe one minute later buys Tesla, the fact that there's no communication between the first purchase and the second purchase doesn't alter the basic conclusion that one would draw that, absent evidence to the contrary, that second transaction is cancelable until it executes.  That's the -- that's the basic presumption, and the presence or absence of additional communications doesn't change -- I don't want to use the word "presumption."  It's just a fact.  It doesn't change that fact.

Q    Got it.

Okay.  I just want to put up one more document just to close it out.

Can you mark Tab 5.

(Whereupon, a Document,

Page 175

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Bates-stamped HL002709 was marked as Deposition Exhibit No. 4 for identification, as of this date.)

A    Sorry.  Was there a Tab 4, or --

Q    No, no.  It's going to be -- it's going to be your Exhibit 4, it's just my Tab 5 internally.  It should show up in a second.

A    Oh, I see it now.

Q    Okay.

A    Yeah, it's very small.

Q    You might have to take up your screen with it.

A    Okay.  I did a full screen.  Okay.  I have it up now.

Q    Okay.  So this -- do you -- can you characterize what this document represents?  Have you seen documents like this before?

MR. JACKSON:  Objection to form.

A    I have not seen this document.  It may be in the part of the new productions which I have not yet reviewed.  It, in form, looks similar to documents I have seen

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
elsewhere which reflect records of trades, but I have not, I'd have to look carefully at each of the lines and really read it. I'm just seeing it for the first time.

Q    Understood.

Is this the sort of document that might be colloquially referred to as a "trade ticket."

A    In my experience reviewing brokerage communications, that term, trade ticket, can have a variety of meanings.  The term "ticket" is sometimes used to refer to the order, and the order parameters as they are submitted from, for example, a front office to a back office.  The terms can vary from broker to broker, but this document seems to have information on it that is consistent with evidential records of the execution of a trade, but I would have to spend more time to really understand what each means in general before I can reach a conclusion as to what a particular document means, I need an explanation or documentation of each field, especially when

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

they're talking about brokerage records, which can sometimes be cryptic and vary from broker to broker.  Sometimes some brokers are clearer than others.

But sometimes you really need more of an explanation.  Here, this seems to lack clear labeling, so it's not fully -- it's not fully clear to me what each field represents.

Q    If you look a little bit down on the page, there is line that says:  ID Agent 26017 Melon Trust of New England.

Do you see that?

A    I do see that, yes.

Q    Does that indicate to you that Mellon Trust of New England was somehow involved in the transaction being documented in this document?

MR. JACKSON:  Objection to form.  Beyond the scope.

A    It is likely, I believe -- and I'm going purely off of memory here.  I would have to confirm this by looking at the records.  But I believe the term "Mellon Trust of New England" may have referred to a

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL custodial account by the Mellon Trust of New England.  I would have to double-check that, but I -- I believe that that term, particularly the term "trust," particularly the term "trust", "Mellon Trust," refers to custodial accounts.  I'm -- I'd have to confirm that.

Q    So the -- are you -- strike that.

Are you saying that the -- the custodial account somehow had involvement in this transaction?

MR. JACKSON:  Objection. Mischaracterizes testimony.

A    It's impossible for me to give you a firm answer and conclusion as to what happened in a particular transaction when I'm being shown one page without any context or description of the fields or what it represents.  I can say that, in my experience preparing my report, that is, while I was preparing my report, I looked carefully at the DTCC records, which I describe extensively in my report.

I believe I encountered the term

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

"Mellon Trust" in reference to a custodial account for one of more of the lead plaintiffs.  And I believe that -- and, again, I'm not in any way suggesting that that's what occurred here, but I believe that certain purchases of Bayer sponsored ADRs were transferred from certain broker/dealers to custodial accounts -- let me clarify.

Were transferred from investment managers, that is investment managers who were responsible for the portfolio allocation decisions when they purchased shares -- when, for example, a party like Harding Loevner purchased shares they would transfer custody of -- excuse me.  When they purchased ADRs, they would transfer custody of those ADRs to a custodial account maintained for each client.

So it was common, in my experience looking carefully at the clear and settlement records, to observe custodial accounts for clients, one of which, I believe, was Mellon Trust.  That is the custodial account was maintained at an entity known in the DTCC

Page 180

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

system as Mellon Trust.  And that was evidence that the shares were in the custody of the plaintiff.

Q    Okay.  By the way, we've been talking about the 20,100 Bayer ADRs acquired on June 7 by plaintiff Teamsters Local 710. Are you aware that plaintiff steel workers -- steel metal workers also acquired 25,100 Bayer ADRs on the same date for the same price down to the fourth decimal?

MR. JACKSON:  Objection to form. And also, I just want to correct the record.  It's Sheet Metal Workers, not steel metal workers.

MR. YAVITZ:  Thank you.

A    Because I only have a clean copy of my report with me, I do not have each purchase committed to memory by each lead plaintiff.  When I prepared my report, I describe a series of transactions, and we previously discussed that, if I thought one transaction was sufficient to describe another transaction, meaning there would be little gained by -- little learned by

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
including a detailed discussion of a second transaction.  I might have omitted it, but I can't recall at the home the transaction you describe or that -- if I had left that transaction out because it was identical. It's impossibly.  But I would have to go back to my records and check.

Q    Okay.  Let's, just to set the record straight, what's labeled as Tab 6, but which will be Exhibit 5.

(Whereupon, the First Amended Complaint was marked as Deposition Exhibit No. 5 for identification, as of this date.)

Q    Let me know when you got it.

This is going to be a copy of the amended class action complaint filed in this action on January 18, 2021.

A    I have it open.

Q    You got it?

A    I have it open.  Thank you.

Q    Okay.  So if you can go to Page 159 in the PDF.

Let me know when you're there.

Page 182

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    159.

Q    It should say at the top, Certification pursuant to the Federal Securities Laws.

A    Yes, I do see that.

Q    Okay.  You see the first line says, The Sheet Metal Workers National Pension Fund declares as to the claims asserted under the federal securities laws that, and then there's some numbered paragraphs below it?

A    Yes.

Q    Okay.  And one of those numbered paragraphs, Number 5, says, During the class period, the SMW Pension Fund purchased and/or sold the securities that are the subject of the complaint as set forth in the attached Schedule A.

Do you see that?

A    Yes, I do.

Q    And then if you go to Page 161 of this PDF, you'll see there is below Schedule A.  And it lists a number of purchases.

Page 183

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Do you see that the top row of this table that says, 6/7/2016 under the trade date, lists a purchase of 25,100 shares at a price of 103.9916.

A    Yes, I do.

Q    Okay.  Okay.  Now I want you go to Page 163 of this PDF.

A    Okay.  I -- I'm there.

Q    Okay.  And this is another certification.  This one by the International Brotherhood of Teamsters Local Number 710 Pension Fund.  And if you go to Paragraph 5 of the certification, it says, During the class period as defined in the complaint, Local 710 purchased and/or sold the securities that are the subject of the complaint as set forth in the attached Schedule A.

Do you see that?

A    I do.

Q    And then if you go to Page 165 of the PDF, there is a Schedule A.  And under 6/7/2016, it lists the purchase of 20,100 shares for $103.9916.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Do you see that?

A    I do.

Q    Is it fair to say that these are trades conducted by Local 710 and Sheet Metal Workers for exactly the same price on exactly the same date?

A    That seems to be what the complaint is representing, yes.

Q    Great.

Recalling that both of those plaintiffs conducted all of their trades for purposes of this litigation through Harding Loevner, do you draw any inference from that overlap in trading activity?

MR. JACKSON:  Objection to form.

A    Yeah, I -- on its face, it would be highly unlikely for the two transactions to have different prices if they were performed at different times.  And it would be consistent with the practices which we've discussed of an asset manager like Harding Loevner to purchase on behalf of many clients, so those are the inferences that I would draw.  It would be fairly

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

straightforward to confirm this in the data.

Q    You can set that document aside.
Let's move on to the August 2, 2016, trade
discussed in Paragraph 46 of your report
that's Exhibit 1.

MR. JACKSON:  That was 46?

MR. YAVITZ:  Yeah, 4-6.

Q    Let me know when you're there.

A    I'm there.

Q    Okay.  So here, you concluded that
the broker Instinet filled plaintiffs' order
for Bayer ADRs by converting a portion of
367,000 common shares purchased the prior
evening, right?

A    Well, as I explain in Paragraph
46, the foreign shares had been submitted
for purchase that, based on Instinet's
records the prior evening, August 1, 2016,
again, keeping in mind the time zone and
when the market in Frankfurt opened, I
believe -- and here again I'm going off of
memory not having my materials in front of
me other than my report.  But I believe that
the transaction -- well, actually, I take

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

that back.  I am now refreshing my memory that in Paragraph 54, I did write down when the executions began.  So as I explained in paragraph -- in Footnote 54, that the order was submitted to Instinet's engine at 8:44 p.m.  The order began executing at 3 o'clock in the morning Eastern time, which was 9 o'clock a.m. in Germany, and concluded executing at 11:35 Eastern time that day when the data indicated that the order to purchase the ADRs was executed at 2:26 p.m. because the final update for that order occurred at that time.

     Q    Okay.  Well, let's mark the next exhibit.  It's going to be Exhibit 6, Tab 7 for internal purposes.

          Let me know when you've got it.

               (Whereupon, a Document,
               Bates-stamped HL002729 was marked as
               Deposition Exhibit No. 6 for
               identification, as of this date.)

     A    Okay.  Just give me one --

     Q    Yup.

     A    Got it.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Okay.  So this is another document produced to us by Harding Loevner.  It's an August 1 email -- August 1, 2016, email from Sean O'Connell to the email address USinternational@Instinet.com.

Do you see that?

A    I do.

Q    So I'll represent to you that Sean O'Connell is another trader at Harding Loevner, okay?

A    Okay.

Q    Okay.  And this email has the subject:  Line HL on 2/20/16.

Do you see that?

A    I do.

Q    And then Sean O'Connell writes, As discussed, please work the below orders for TD 8/2/2016.

Do you see that?

A    I do.

Q    And he continues, We would like to access local liquidity and create ADRs as per below.  We've reached out and confirmed with BONY that the books are open and the

Page 188

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

cost, SB 2.5 CPS (chat below).  Please

confirm on your side as well.

Do you see that?

A    Yes.

Q    And then the amount for the trade

is 367,447 ADR shares.

Do you see that?

A    Yes.

Q    Okay.  And there's a portion of

the email below the table that says, Convo

with BONY.

Do you see that?

A    Yes.

Q    And below in a chat, Mr. O'Connell

actually writes, Bayr, B-A-Y-R, good to

create?  Cost?

Do you see that?

A    Yes.

Q    And then a fellow named Rick

Maehr, M-A-E-H-R, responds, Hi, Sean.  Good

to create.  3C costs.

Do you see that?

A    Yes.

Q    So this email features the same

Page 189

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL sequence of instructions as on the last trade we looked at, right?  An instruction to access locally liquidity and create ADRs, correct?

MR. JACKSON:  Objection to form and to the extent it mischaracterizes the document.

A    It is very similar to the document we previously discussed.

Q    So is it your opinion that this document does not constitute an order for ADRs?

MR. JACKSON:  Objection to form and beyond the scope.

A    Well, as I said before, the term "order" may have different meanings and different contexts, but in my experience, there are several reasons why this email falls short of a market order to purchase ADRs.  For one, just like in the previous case we discussed, the volume of shares specified, both local shares and ADRs, is not equal to the volume of ADRs which were purchased the following day.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

In my experience, any divergence between the volume of shares in a market order and the volume of shares which were executed is -- would be extremely unusual, if not unheard of, simply because the definition of a market order is precisely that one is willing to transact at a given price that is the market price at a given quantity.

So if I am willing to -- if I submit, for example, a market order to purchase 1,000 shares of Apple, I am telling my broker I am willing to buy 1,000 shares at the current market price.  It would be unheard of, in fact, potentially inconsistent with the broker's contractual obligations, although, you know, I'm not opining on that, but it would be very strange for the broker to fulfill only 900 shares.

This is because the volume, the quantity of an order is often carefully calibrated to reflect the economic exposure of a transaction.  So if I submit a market order for a given quantity, that exposure is likely to factor into my portfolio

**Page 191**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
allocation.  And this is not just something
that I know from experience having analyzed
brokerage activity, but it's a fundamental
principle of financial economics and one that
underscores a very large peer-review
literature.

When one seeks to achieve a
particular risk/reward investment profile,
the reason why one might use a market order
of the kind that the court in Toshiba
discussed and called out specifically, is
because the volume of exposure in terms of
the number of shares is essential to the
investment strategy.  The risk return of an
investment is typically very tightly and
precisely calibrated for institutional
investors like these.  So that's one
important difference.  And I think it's very
clear this is not a market order.

As for whether this is a limit
order, every limit order I've seen, and I
have reviewed, as I said, thousands of pages
of brokerage records over the years, every
limit order has a limit price.  That price is

Page 192

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL contractually binding on the broker. Again, I'm not offering an expert opinion on that, but in -- and there may be exceptions and so forth. But in general, the broker is obligated to fulfill the other at, or below in the purchase of a purchase, the limit order price. There's no limit order price here. So that's the second reason why this doesn't appear to me to be an order, at least as that term is ordinarily used.

The third reason is that this document does not seem to convey a -- sufficient information for the foreign purchase to account for, for example, foreign currency fluctuations. So as I said before, the USD value line here is very a confusing line to interpret. Because one possible interpretation is, that's just a statement of the value of the transaction at the time of the email, but the currency exchange rates might fluctuate from the time of the email until the next day.

Another possibility is, that reflects a certain financial cap that might

Page 193

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL explain why fewer than 367,447 ADRs were purchased.  That ambiguity is another reason why I struggle to understand this as an order.  It -- it looks like a superfluous line that, at best, sort of gives some rough guidance as to the desired position size.  Much like I might tell my broker to give me $10,000 of exposure Tesla and Apple, but that's not an executable order until the broker actually goes out and places executable orders.

Then we previously discussed this note which also limits the capability of the broker to submit executable orders.  And, again, I think this is maybe the confusion, but orders, as that term is used in the market, are binding.  They are, you know, when an order is filled, a contractual obligation arises.  We've discussed this previously.

So there's no doubt in my mind that this email reflects an intent, an intention, a plan, a strategy to execute a series of orders.  The broker did so.  The broker, as I

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL explained in my report, submitted a series of orders, actually.  And, in fact, the 367,447 order -- if we're going to use that term -- was itself cancelable in part from 3 a.m. until 11:35 a.m.  And this is, I think, the plan -- maybe I wasn't clear previously; I'll try to be clear now.

The order became -- to purchase the foreign shares became irrevocable -- well, each order became irrevocable when it was executed, when it was filled.  So if you have, as was the case here, hundreds of orders, each individual order designed to maintain that 20 percent volume cap, each of those orders becomes irrevocable once it's executed.

But even the last foreign share order is still revocable until it executes. That's a fundamental principal of how the markets function.  So if -- if the last foreign share purchase is revocable until it executes, then, of course, the ADR purchase, which occurs after the foreign shares have been purchased in their entirety, the ADR

Page 195

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

purchases, is likewise revocable as well.

Q    Thank you for that.

In your opinion does this --

MR. JACKSON:  Mr. Yavitz, I'm very

sorry to interrupt, but the

videographer is --

VIDEOGRAPHER:  Can I just change

files here.  It will just take about

ten seconds.

MR. YAVITZ:  Yeah.  Go off the

record.  Thanks.

VIDEOGRAPHER:  This concludes

Media Unit Number Three of the

videotaped deposition of Dr. Joshua

Mitts.  The time is 3:26.  We are of

the record.

(Whereupon, at 3:26 p.m., a recess

was taken to 3:34 p.m.)

(The deposition resumed with all

parties present.)

VIDEOGRAPHER:  This begins Media

Number Four of the videotaped

deposition of Dr. Joshua Mitts.  The

time is 3:34.  We are on the record.

Page 196

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Thanks for coming back, Mr. Mitts. You know, I wanted to show you a document from the Toshiba case.  I'm sure you haven't seen it before, but I just wanted you to take a look at it because I wanted to get your reaction.

So I'll start by referring back to Exhibit 2.  Okay, that's the opinion, the Toshiba opinion.

Let me know when you're there.

A    I have it open.

Q    Okay.  If you go to Page 3 of the PDF.  If you look on the left side.  This is a passage that I referred you to earlier at the bottom:  ClearBridge's trader placed a market order for 7100 Toshiba ADRs...

Do you see that?

A    Yes.

Q    Great.

And if you see the citation, it says, See docket 114-8, Exhibit G.

Do you see that?

A    Yes.

(Whereupon, a Document, Docket No.

Page 197

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

000114 was marked as Deposition

Exhibit No. 7 for identification, as

of this date.)

Q    Okay.  Let's mark the next

exhibit.  What's the number?  Okay.  This

will be Exhibit 7.

Let me know when you see it up on

your screen.

A    I'm going to close this out.

Okay.  So I see --

MR. JACKSON:  I'm going to object

to any questions on this document to

the extent they weren't considered by

Dr. Mitts.  He has no personal

knowledge of this document, never seen

it before.  Everything here is beyond

the scope.  I'll continue objecting as

you question, but I wanted to note

those for the record.

MR. YAVITZ:  Thank you.

A    I have the document open.

Q    Great.  So this, as you can see

from the top, is docket number 114-8, and as

you see from the first page, it's Exhibit G.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

This is, I'll represent to you, the document that is referenced in the court's opinion. This is the market order according to the court.

MR. JACKSON:  Objection --

Q    Do you characterize --

MR. JACKSON:  --

mischaracterizes -- to the extent it mischaracterizes the opinion.

MR. YAVITZ:  Thank you.

Q    So my question for you is this: Would you characterize this email as a market order?

MR. JACKSON:  Objection.  Beyond scope.  Objection to form.

A    As I said before, I cannot characterize a document one way or the other without reviewing the totality of the evidence.  When we discussed the examples in connection with the purchases discussed in my report, I repeatedly explained that, in order to understand whether a particular order gave rise to irrevocable liability, it is necessary to evaluate the totality of the

Page 199

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

evidence and reach a conclusion that is based on that evidence.

I've been given a partially redacted email without reference to the totality of the evidence in the Toshiba case. In effect, your question is asking me to, I think to second-guess the court's factual determination that this was a market order and to disregard the footnote defining a market order. I remember -- although I've since closed out Exhibit 2. I could reopen it. I think there were more, potentially, citations than this one in the court's reasoning. But as a general rule, I don't think it's possible, less prudent, to second-guess a court's factual determination, which it reached after considering the totality of the evidence, based on a snippet that's been partially redacted and shown without any further context. It's not possible for me to do that.

Q    So looking at this document, you are unable to reach a conclusion as to whether this is a market order?

Page 200

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

MR. JACKSON:  Objection.

Mischaracterizes testimony.  Objection to form.

A    It -- again, as I said before, I haven't been asked to evaluate the totality of the evidence in this case -- in this Toshiba case.  I would have to look, not just at excerpts from a single email, but the very same sort of evidence that I considered in my report.  And I'll just use the opportunity to reiterate why I came to the conclusions that I did on the basis of the evidence which I evaluated.

The evidence that I evaluated in my report included important information that would give context to an email or snippet of a communication, and would clarify from the standpoint of the broker when the broker saw its obligation arising and how the broker characterized that obligation, as well as how the customer characterized that obligation.  I imagine that the court in this matter, in the Toshiba matter, considered the totality of that evidence in coming to the view and

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
emphasizing, or at least stating in their opinion that this was a market order and defining the term the way that it did and reaching the conclusion that it did.

Q    Got it.

If you can go back to Exhibit 6 for a moment.

Let me know when you're there.

A    I'm there.

Q    In your opinion, does this email indicate a willingness to transact in Bayer ADRs as soon as the Bayer common shares are purchased?

MR. JACKSON:  Objection to form.  Objection, beyond scope.

A    On the face of it, no.  It expresses, as I've said before, on the face of it, it expresses a desire -- it expresses a plan for a series of orders.  And it is possible to -- to, you know, take apart your definition of "willingness."  And it is possible that there is a kind of conditional willingness, meaning, under certain conditions, which are not clear from this

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

email, there's a sequence of steps which, set in motion, would ultimately lead to the acquisition of those ADRs.

I'll just also use the opportunity to point out something I neglected to mention earlier, which is that, even in the communication with the Bank of New York Mellon here, which seems to have been reproduced in part, there seems to be substantial conditionality for lack of a better word.

For example, Sean O'Connell does not -- does not even commit to a specific quantity, makes a reference to "about" 350,000 ADRs, then mentions that Instinet will reach out -- we'll tell them, Instinet, to reach out to you.  So when I read this document in its totality, there are a number of questions in my mind concerning what this exchange represents.  But unequivocal willingness to purchase the ADRs immediately upon purchase of the foreign shares such that, as soon as the foreign shares were acquired, liability for the ADRs was

**Page 203**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

logically and legally compelled, that -- that would be inconsistent with what's here, and it's also inconsistent with the evidence as I describe in my report concerning how the broker recorded its own trading with respect to both the foreign shares and the Bank of New York Mellon.

Q    In your opinion, can an order commit discretion to -- strike that.

In your opinion, can a client commit discretion to a broker in the manner in which the order is implemented?

MR. JACKSON:  Objection to form.

A    Of course; it's quite common.

Q    So if I commit discretion to a broker and the broker implements the order consistent with the scope of the discretion that I have granted, am I committed to take the shares that the broker has purchased?

MR. JACKSON:  Objection to form.

And objection, beyond scope.

A    There's a number of different scenarios encompassed by your question. If -- it's generally the case that if the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
broker has already acquired, that is if there has been an execution of a trade, that one is obligated to take delivery. But just to use a simple example, it is common for retail and institutional clients to route orders at the discretion of a broker. And what that means is that the broker is given discretion on how to carry out an order. And what that means in practice is that the broker might actually turn one order into a series of smaller orders. It's very common, for example, for brokers to execute what are called VWAP orders where they maintain at a particular fraction of volume throughout the trading day. And, obviously, it -- it's trivial, and I'm happy to talk at greater length about it, but its trivial and obvious that, until the VWAP order has executed, the part that has not yet executed is cancelable. I mean, this is so elementary I -- I'll just say it, but until an order executes, its cancelable. That is -- that is the basic rule of trading in the securities markets. Absent special

Page 205

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL situations, which the court in Toshiba was very focused on, but absent special situations or evidence to the contrary, orders are cancelable until executed.

Q    I guess what really baffles me -- and thank you for introspective.  What baffles me is, is it your understanding in Toshiba foreign shares were purchased and then Toshiba ADRs were created?

MR. JACKSON:  Objection to form, and beyond scope.

A    As I explained in Footnote 45 and Footnote 47, the court very specifically held that the moment Barclays completed the transaction for Toshiba common stock on the Tokyo Stock Exchange, the purchaser became logically and legally bound to perform its obligations, that is, to purchase the ADRs. Again, in Footnote 47, the court -- I summarize the court's decision that -- opinion that, when the market order was placed on March 20, what that meant was that once the common stock had been fully purchased in Tokyo, the purchaser was bound

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

to take and pay for the ADRs.

So the -- my understanding of the court's decision in Toshiba is simply that the order in that case was such that the purchaser was bound at the moment -- legally and logically bound to take delivery of the ADRs as soon as the foreign shares were purchased.  The court pointed to specific evidence which compelled that conclusion in its view.  I haven't evaluated that evidence independently.  I'm not second-guessing the court's decision, but I think the opinion is very clear about what compelled the court to reach that conclusion.

Q    Okay.  Let's mark another exhibit. This is going to be -- what are we at Exhibit 8?  This is 7B for us.

So let me know when you have it up on your screen.

(Whereupon, a Document, Bates-stamped HL002746 was marked as Deposition Exhibit No. 8 for identification, as of this date.)

A    I'm refreshing, but I don't see it

Page 207

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
yet.

Q    It may be a second.

A    I have it open.

Q    Great.

Okay.  So this is a continuation of the email we looked at a moment ago, and at the top it says, in an email from Jeffrey Crane of Instinet to Sean O'Connell, sent on August 2, 2016:  Hey, Sean.  Please see your ADR trade report attached.  And it says, See attached file.  Harding Loevner ADR trade report 0822016.XLXS.  And then there's a description below of the FX breakdown.

Do you see that?

A    Yes.

Q    Great.

Now, if you go to Page 4 of this document, there is a pair of tables.  One table on the left; one table on the right.

Do you see it?

A    It's very small, so I'll have to zoom in if you can just direct me to -- if you want me to look.

Q    I want to look on the left side

Page 208

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
first.

A    I'm just going to zoom into that
side first.  All right.  I have it zoomed
in.

Q    So on the left side, this
spreadsheet shows a purchase of 367,000
shares of BAYNGR on August 2, 2016.

Do you see that?

A    Yes.  I mean, I'm inferring -- I'm
not given a dictionary here, but I looked at
this transaction and so I know when this
transaction occurred.  I discuss it in my
report.  And TD 822016 is consistent with TD
representing trade date, so I'm agreeing
with you, although, it's not spelled out
clearly in this document.

Q    Thank you.

And then if you scroll to the
right side, there's another table.  And this
table shows that 367,323 ADRs in Bayer have
been converted for Harding Loevner, right?

MR. JACKSON:  Objection to the
extent it mischaracterizes the document
and also to form.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    Yeah, I -- again, I'm -- I'm sorry to just continue to be a stickler about language like "convert."  I think the first point that's important to recognize is that there is a foreign currency conversion here.  And I -- I would naturally colloquially use the term "convert" to refer to Euros and dollars, because there is, in fact, a conversion that's happening in foreign currency.  The conversion in effect reflects the difference in the market value of the foreign shares and the U.S. ADRs and that those market values are in different currencies.

So when the foreign shares are used as consideration for the U.S. shares, there is an inherent foreign exchange conversion that's happening.  And as you pointed earlier in the -- up higher in the document, that's spelled out in greater detail.  So that's -- so when I use the term "convert," I'm using it often in that sense, but I -- I agree that this is recording, it seems that the right side of this document is record the --

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
effectively, the exchange or the payment for the ADRs by means of the foreign shares.

And I guess while we're on the topic, I'll just point out that this email is quite consistent with the analysis in Paragraph 47 of my report in Footnote 54, which point out that the ADR transaction based on the data that I observed, occurred that afternoon.  And so what we are observing here is -- to me what appears to be happening is, immediately prior to this moment of exchange, the parties are memorializing the foreign exchange rates, which are accumulated throughout the day.  There seem to have been four moments in time.

So this is very consistent with what we're seeing that, in effect, the purchase of the foreign shares is occurring. There is a separate agreement on foreign exchange rates, and only thereafter is the ADR conversion complete.  And just I think that's a really important point for understanding why these are two separate transactions.  And I -- maybe I didn't fully

Page 211

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL explain this before, but I'll just briefly complete my answer, which is, to complete the foreign shares for U.S. denominated ADRs which trade in the U.S. market, there has to be this additional step of converting. And, you know, the fact that we are seeing these additional intermediary steps summarized at 12:05 p.m., is very consistent with what the trading records show, which is that by 2:26 p.m., the exchange was complete.

So what you are seeing is the foreign shares have been acquired. We've now completed acquiring the foreign shares at 11:35. We now summarize, complete the foreign exchange part of what is this next transaction. It's -- the ADR conversion is after there has been agreement and completion of the foreign exchange process. So I think this illustrates how distinct and separate each phase of this transaction is.

Q    So you view this document as solicitation of confirmation by the broker?

MR. JACKSON:  Objection.

Mischaracterizes testimony and to the

Page 212

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

form.

A    Yeah.  I don't think I ever characterized this as solicitation.  I think what I said, and I'll say it again, is that the -- really, what is -- besides the fact that transactions are just generally cancelable until executed, as a general rule, in this situation where there could be fluctuations in foreign currency, there is -- there are additional steps, additional transactions which have to take place in the foreign exchange market so that dollar-denominated ADRs can be purchased with the Euro-denominated foreign shares.

So there is a process that's taking place, and that process introduces another segmentation, if you will, another layer to the transaction that separates the purchase of the ADRs from the purchase of the foreign shares.  In other words, we could complete our purchase of foreign shares and maybe the foreign exchange market, something ends up happening and there's a crash in the foreign exchange market.

Page 213

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Well, at that point, it might not seem so desirable to convert to ADRs if the exchange rate is going to make the transaction not desirable.  The point is the economic structure of this transaction makes some cancelability all the way until that final moment.  And there's certainly no evidence which would suggest the contrary here.

Q    Right.  So in your opinion, are market orders typically cancelable until executed?

MR. JACKSON:  Objection to the form and beyond the scope.

A    Well, in the ordinary course, that question isn't -- is somewhat nonsensical, meaning it has an internal contradiction.  A market order expresses a willingness, a binding willingness to transact at the current market price.  It is, in fact, often viewed as a particularly dangerous way to transact because one must take the price as it is.

So market orders execute

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL immediately as long as the market is functioning.  And so you could end up finding -- if you put a market order to purchase securities, you could end up finding yourself paying a lot more than you expected, which is why -- which is why it's so important for a broker to know, if you're using a market order --

Q    I'm sorry to interrupt --

MR. YAVITZ:  And, Ben you can chastise if you want.  I asked a question?

MR. JACKSON:  I feel obligated to chastise you.  I think Dr. Mitts is entitled to finish that.

MR. YAVITZ:  You are, and I'll let you finish your answer Professor Mitts.

MR. JACKSON:  I think he should finish it now.  And then you can --

A    In order to --

MR. JACKSON:  Consistent with your own, you know, preliminaries that you laid out at the beginning of the deposition.

Page 215

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    In order to answer whether a market order is cancelable, it's important to understand if the question has at its core a logical inconsistency, it's not easy to give a yes or a no answer because there's something inconsistent in the question.

So because the market order takes the market as it is, it would be practically impossible in all but the most extreme situations, for one, to cancel a market order, because the order is already being filled, and in modern markets is often instantaneously filled.

So, you know, the challenge with the question -- and it really goes back to the important distinction and why it really matters what an order is and whether something is, in fact, an irrevocable binding order to transact that's filled and, therefore, becomes irrevocable or not. Because if an order contains a price, like a limit order does, a price at which I'm willing to transact or better than this price, then that provides the broker with

Page 216

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

certainty and -- and the broker knows that, if the conditions for the order are met, the transaction is irrevocable.

A market order basically has no conditions other than quantity.  So the market order is kind of like, well, I'm willing to trade, basically, at any price.  And I think that's why it's so critical to distinguish a market order from a limit order where that willingness to trade is conditional.  And it's that conditionality which gives the broker certainty and makes the broker able to cancel the order because the broker knows under the conditions under which it's going to become irrevocable.

Q    I fully acknowledge that in the ordinary course, because market orders are filled quickly due to the very limited conditions on market orders, it would be impractical to cancel it.  However, suppose I place a market order after close of market one evening.  Can I cancel it until the market opens and the order is executed the following day?

Page 217

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

MR. JACKSON: Objection to form. Improper hypothetical. And beyond the scope.

A    One of the -- so let me first say, I'm a law professor, so I enjoy hypotheticals. I ask my students hypotheticals. I'm in the profession that I'm in, in part because I love to sink my teeth into a hypothetical. One of the challenges with hypotheticals in this format is that we -- we have to understand what else is being assumed. So to talk about submitting an order to a market that's closed is sort of like showing up to shop at a store that's closed.

Q    All right. You missed part of my question. I said submitting a market order to a broker before the market is open. That is my question. If I submit a market order to a broker before the market is opened, can I cancel that order up until the point where the broker fulfills it?

MR. JACKSON: All right. Same objections. Specifically, form,

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

improper hypothetical, and beyond the scope.

A    So I guess to continue the analogy, submitting a market order to a broker while the market is closed is a little bit like asking an Instacart driver to deliver a person to go and buy something for you at a store that's closed.  Clearly, the fact that you are willing to buy at any price means that, once they've set in motion the act of purchasing, you are bound.

But, obviously, until they -- until the market opens, the order hasn't been submitted in any real sense, much like me calling up a driver or a friend or someone and saying, Go buy something tomorrow when a store opens.  I've expressed my immediate willingness to transact on a delayed basis, so it's -- it's not -- there's a sense in which I -- I haven't really submitted the order yet.  Even if I call my broker and say, Transact in a market that's not yet open, the broker and I understand that that's an instruction for tomorrow.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    So recognizing that you do not have familiarity with the facts of Toshiba, do you have any understanding the basis upon which the court concluded that that market order for ADRs was not cancelable upon the acquisition of foreign shares?

MR. JACKSON:  Objection. Mischaracterizes report and testimony and the form and to the extent it calls for speculation.

A    I'm -- first of all, I did not testify that I have no familiarity with the facts of Toshiba.  I testified that I was not asked to conduct an independent evaluation of the evidence in Toshiba, of which I'm not sure I even could conduct because, in my experience, much evidence in connection with litigation is not public, it's not publicly filed on docket, and it's not available to the general public, might be subject to protective orders or other confidentiality restrictions.

For those reasons, I am not able to express an independent opinion on the court's

Page 220

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL decision.  But as I previously stated, Footnotes 45 and 47, and more generally in my report, discuss facts which the court stated concerning Toshiba.

Q      Um-hmm.

A      One of those facts is the court characterized the purchase as a market order with a footnote defining what in the court's view a market order was.  I take the court's evaluation of the evidence in that case as compelling simply because I have not been asked to evaluate that evidence myself, and I have no reason to think that the court got it wrong because I don't have the totality of the evidence in front of me.

Q      Okay.  Let's look at another transaction, although I think I might know your answers on it.  This is the September 6, 2016, transaction discussed in Paragraph 47 of your report.

Let me know when you're there.

A      Paragraph 47 of my report.

Q      That's correct.  Exhibit 1.

A      I'm there.

Page 221

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Great.

So as described in this paragraph, you concluded that the broker, Instinet, fulfilled plaintiffs order for Bayer ADRs by exchanging for a portion of a block of 226,074 Bayer common shares that had been purchased the prior evening; is that right?

A    I -- I think the --

MR. JACKSON:  All right.

THE WITNESS:  I'm sorry?

MR. JACKSON:  I'm going to object to the extent it mischaracterizes the report and to the form.  I just -- it was just very fast, to be totally honest.

A    Sometimes I pause, also, not only for the transcription, but just to compare what you -- what you said to what I wrote and make sure that I'm -- it's not clear if you were reading what I wrote or if you were summarizing it.  But I think I wrote that trading records provided by Instinet indicate that the order to purchase foreign shares had been submitted the prior evening.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

And then Footnote 56, which is similar in many ways to Footnote 54, Footnote 56 describes the execution of that order in Germany as evidenced by Instinet's systems and when the order to purchase Bayer sponsored ADRs was finalized by Instinet.

Q     Got it.

And would you agree that the order to purchase Bayer common shares in Germany was executed by Instinet on behalf of Harding Loevner?

A     That -- that would be consistent my understanding of the evidence but I don't have -- I don't have every transaction memorized at this moment, but that sounds right to me.

Q     Okay.  Let's market another exhibit.  This is going to be Tab 9.  And Exhibit 9; I think we've caught up.

(Whereupon, a Document, Bates-stamped HL002731 was marked as Deposition Exhibit No. 9 for identification, as of this date.)

A     I have it open now.

Page 223

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q     Great.

MR. JACKSON:  If you could just give me one moment.

MR. YAVITZ:  Yeah.

MR. JACKSON:  Okay.  I have it up now.

Q     So this is a September 22, 2016, email from Vikram Gowda Jeffrey Crane at Instinet, subject line:  HL order 9/6/2016.

Do you see all that?

A     Yes.

Q     Great.

And then it says, Please work the below orders for TD 9/6/2016, we would like to buy the local shares and create ADRs.

Do you see that?

A     Yes.

Q     In your opinion, is this an order to purchase ADRs?

MR. JACKSON:  Objection to form and beyond the scope.

A     Again, they're using that term to -- in plural, to refer to at least more than one.  It's clear to me that this email

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
summarizes a desired position, which will be effectuated through a series of orders.  In fact, we know that Instinet purchased many more -- thousands of shares more; actually, 226,074 foreign shares, which were subsequently exchanged for ADRs of the same amount.

The -- so it -- you know, as I previously explained, it -- it's not, in my experience, consistent with a market order for -- a market order to execute at a quantity that is several thousand shares greater than the quantity specified in the market order.  And so it doesn't appear to be a market order to me, for that reason alone. It also doesn't appear to be a limit order because there's no limit price that's listed. And, in addition, the -- that is, there's no per share price at which the order should execute in Euros.

In fact, and this is the case for all of these examples we've looked at, there's no Euro price at all here, which is a real puzzle if one thinks about this as a --

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

as an order as that term is typically used to connotate something irrevocable or immediately binding, because, presumably, any limit order for the foreign shares would have to be in Euros because they are purchased in Euros. And the U.S. devalue, again, seems to reflect perhaps a snapshot in time, as best I can understand, of the value of the transaction. But there's no information about the price at which -- on a per share or per ADR basis, at which the purchaser is willing to transact.

So when combined, you know, when you take that, the points that I just made as well as the volume limitation as we previously discussed in the notes, and then you look at the brokerage data discussed in Footnote 56, the evidence is fairly excelling in my opinion that the orders were submitted -- effectively, the order in the foreign market was submitted at 8:45 p.m., so about four hours after this email was sent, four hours and 40 minutes or so. And then the -- excuse me, that was on September 5.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

So actually, based on Instinet's records -- excuse me -- this email didn't even trigger an order in Instinet's system until the fifth.

So another reason why I would sort of have trouble viewing this email as an order, much less a market order, is that Instinet's own records indicate that the order to purchase foreign shares, as I explain in Footnote 56, was not inputted until the evening of September 5, so that would be Monday evening. And it did not execute -- that order did not execute in Germany until September 6 at 3:00 in the morning Eastern time, so, you know, both the internal records of Instinet and the execution records are further evidence that -- in my opinion, that this email is -- is really nothing more than an expression, a desire on the part of a client to execute a particular series of orders.

So I don't mean to suggest the use of the term "order" is irrelevant or that I'm ignoring it. It's just clear that it's clear

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

that this email is an expression of a desire to execute orders, which were, in fact, executed several days later.

Q    Just to clarify that, the subject line says, HL orders 9/6/2016.  Does somewhat allay your concern about the difference in time between the date of the email and the date on which the email was essentially executed?

MR. JACKSON:  Objection to form and mischaracterizes testimony.

A    I think that's a really important point because it shows in yet another way how this email is different from the court's description of the market order in the Toshiba case, in which the court characterizes as the date of the order, if I remember correctly, was March 20.  So here, the way I would read that subject line, I think you're absolutely right to point out that subject line.  I read it to be saying, put some orders in in four days.  And that -- that's -- that would be, in my opinion, the most natural customary way to

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
read an email like this, which is we want to trade in four days, and we'd like you to put orders in at that time.

Q    Got it.

You've been talking about market orders and limit orders.  Is it possible to place an order that is not a market order or a limit order?

A    Yes.

Q    Okay.  Is it possible to place an order that does not specify with precision the amount of an equity that you wish to have acquired on your behalf?

MR. JACKSON:  Objection to form.

A    Well, no.  The amount has to be specified in some way, because otherwise a broker would not know how much to buy.  A broker could -- well, I'm thinking about purchases.  Sales, one could tell a broker to close the entirety of a position, which would still have a quantity.  Quantity would be the current position.  It wouldn't necessarily be stated as such, but it is -- it is possible for -- for someone to place

Page 229

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
an order that does not specify a particular
price, but rather has a reference to the
current price.  So you could say, I'd like
to buy at the current best offer or best
bid, but the broker has to know how many
shares.

Maybe that could be determined
formulaically or -- so there's certainly
ways, much like, close all my position, where
the number might be specified indirectly.
But the number has to be specified; you can't
transact for an unknown question.

Q    Right.  But that wasn't my
question.  What I asked was, is it possible
to place an order that does not specify with
precision the amount of an equity that is --

MR. JACKSON:  Objection to form.

Q    So I'll --

MR. JACKSON:  Sorry.

MR. YAVITZ:  I haven't asked the
question yet.  I was correcting his --

MR. JACKSON:  Okay.

MR. YAVITZ:  -- misunderstanding.

Q    So my question -- I'll reframe,

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
then -- is, is it possible to place an order in which the amount of the equity sought to be purchased is approximate?

MR. JACKSON:  Objection to form, and also asked and answered.

A    I -- I think I did answer this question.  The term "approximate" -- and you mentioned before "with precision."  I think -- and -- and I apologize if I'm just going over very trivial points.  Maybe I'm not fully understanding.  But the way that orders are submitted, both to brokers and to venues, is -- it's for a particular amount.  Even when --

Well, so maybe one way to think about "in precision," it's very plausible that the final dollar amount of the transaction might be not known at the time of the purchase so that the -- the simplest example of "approximate" or "in precision" with respect to the total dollar amount of the order, would be a limit order.  Because I could say, I want to buy, let's say a hundred shares at $10 a share, a limit price of $10 a

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

share.

Well, if I -- if I say that to my broker, if I place that into the market, what that means is that I might -- I might actually purchase for less than $10 a share because the limit price specifies the best price at which -- the -- excuse me -- the worst price at which I'm willing to transact, the higher price if I'm purchaser.

So it is definitely possible for the equity value, the dollar value of a transaction to be imprecise in the sense that I could go in thinking I'm going to spend $10 a share, and end up only spending $9 or 9.99 a share.  But what is definite and what has to be definite is the quantity of shares.

Q    Um-hmm.

A    So the equity value, the total value of the transaction is the number of shares multiplied by the price per share that I end up paying.

Q    Um-hmm.

A    That price can be different from what I thought going in, for the reasons I

Page 232

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
just gave one example of that, but the
quantity has to be specified or else how
else would the broker know to purchase.

Q    Well, that's my question, which
is -- and maybe I'll ask it a third time in
a slightly different way.

Is it possible to place an order
in which the broker receives some discretion
with respect to the exact quantity of
equities purchased?

MR. JACKSON:  Objection to form,
and also to the extent it's been asked
and answered.

A    Oh, of course.

Q    Thank you.

A    In a situation like that, it's
important to remember that the broker -- the
broker is always going to face inherent
constraints.  For example, the available
liquidity or cash margin that a customer
has.  And so no customer would give -- even
if a customer were to give a broker no
limit, there's inherent limitations.  It's a
little like the example I gave, sell all of

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
my portfolio.  So if I tell the broker to sell all of my portfolio, the broker will know what that number is.

The fact remains that a market order and a limit order simply cannot be executed without a quantity.  And what the only -- the only data point that matters for a market order is the number of shares.  So -- and this is just the last part of my answer.  If I tell a broker to execute a trade with a certain level of discretion regarding the total equity value, that broker is still constrained in quantity.  But it's -- it may very well be that the broker -- that that transaction is still cancelable.

And this really takes us back to the point we were discussing before, which is that there are lots of orders that people place with brokers.  Some specify exact quantities; some have implied quantities.  All orders are cancelable until executed.

Q    Okay.

Okay.  Let's look at another very

**Page 234**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

similar trade.  This is -- I'm not going to direct you to a paragraph in the report just yet; I'm just going to talk about the trade.

So this is Local 710's purchase of 12,400 Bayer sponsored ADRs through Instinet on December 9, 2016.  Okay?  That's the trade we're talking about.

I'm going to -- let's mark Tab 11. This will be Exhibit, probably 10.

(Whereupon, Tab 11 was marked as Deposition Exhibit No. 10 for identification, as of this date.)

A    Let me see here if it's come up.

Q    Let me know when you have it.

A    I have it.

Q    Okay.  So this is an email sent December 9, 2016, by Jeffrey Crane of Instinet, to an email address called trading and then also to Vikram Gowda.  And the subject is:  Instinet ADR trade report.

Do you see all that?

A    Yes.

Q    And there's an attachment, which is Harding Loevner ADR trade report

Page 235

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

12092016.XLSX.

Do you see that?

A     Yes.

Q     It says in the body of the email, Please see your ADR trade report attached. Okay?

A     Yes.

Q     And then if you go to the second page of this exhibit -- you have to zoom in because it's another one of these small text forms.

A     Sure.  Got it.

Q     It has two tables.  Do you see the two tables?

A     Yes.

Q     Okay.  And the left table -- recognizing this is a question that requires some inference from you, the left table reflects a purchase of 243,245 Bayer common shares on December 9, 2016, correct?

A     I mean, I --

MR. JACKSON:  Objection to the extent it mischaracterizes the document and also to the form.

Page 236

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    I -- I don't believe I -- I'd have to review my report to refresh my recollection.  I don't believe I discussed this transaction in my report.  It's possible I'm just forgetting where.  That doesn't mean that I didn't look at it.  As I said previously, if there were transactions that were similar such that the additional discussion did not really change the inferences or add important evidence to my conclusions, then I -- I may not have included it.  It is possible this was one of those types of transactions, which was similar to some of the other examples we've discussed.

Q    Um-hmm.

A    Having said all that, your summary of this is -- is plausible to me, but I haven't reviewed this transaction in refreshing myself and my report, as I had the another ones.  Although, like I said, I may have previously reviewed it.

Q    And is it likewise plausible to interpret the right-hand column on this page

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL as an indication that 243,245 ADRs are being created through an exchange on behalf of Harding Loevner?

MR. JACKSON:  Objection to form. Objection, mischaracterizes testimony and the report.  Beyond the scope.

A    I think I'll just reiterate what I said previously.  This is a very similar table.  I have some reservation with the word "exchange."  I -- there was a foreign currency exchange.  There was -- and it seems to be consistent with the other cases that we've looked at.  There was a supply of -- it seems based on -- this is consistent with the other examples we looked at.  There was the furnishing of foreign shares as delivery -- as payment against the delivery of ADRs, newly issued ADRs.  This snippet would be consistent with that construction of what happened here.

Q    Got it.

And do you see that on the far right of this, there's a price indicated, and that price is $99.2994.

Page 238

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Do you see that?

A    Yes.

Q    Great.

Okay.  Let's mark the next exhibit, which I think will be Exhibit 11. And that's going to be Tab 12 for us.

(Whereupon, a Document, Bates-stamped INSTINET000009.XLS was marked as Deposition Exhibit No. 11 for identification, as of this date.)

Q    Let me know when you're there. It's an Excel file.

A    Let me just resize it.

Q    I'm going to direct your attention to Row 2.

A    Yes, okay.  I'm there.  Yes.

Q    Okay.  Does Row 2 indicate that an order for the purchase of 243,245 shares of Bayer common stock was submitted on behalf of Harding Loevner on December 9, 2016?

MR. JACKSON:  Objection to form and scope.

A    So the -- this is -- yeah, I

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL discuss similar examples in my report of Instinet records.  My report explains in connection with some of the other episodes, as we previously discussed in Footnote 54 and 56 of my report, that orders to purchase foreign shares are typically indicated as having been submitted to Instinet's execution engine in this fashion.

So I, of course, can't give you a final evaluation of the document that I'm seeing just now.  I most likely I remember, I believe, reviewing this document.  And it's highly likely that I concluded that it was so similar to the other episodes that it did not necessitate a separate discussion.  So I guess I would -- I would say that I am familiar with this document.  I'm familiar with the structure of the order submission and execution that this document and documents like it reveal concerning Instinet's order activity.  And just based upon the document that you have shown me here, the data appear consistent with the analysis that I set forth in Footnotes 54 and

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Footnote 56, namely that the order to purchase foreign shares was submitted to Instinet's execution engine what appears to be 8:47 p.m. on December 8.

Q    Does this --

MR. JACKSON:  I just wanted to -- I'm sorry to interrupt.  I just wanted to note that I withdraw my scope objection to that question, and I just wanted to take one second to examine the document.

MR. YAVITZ:  Okay.

Q    While he's examining the document, I just want to direct you -- I want to ask a follow-up question, which is, does this row indicate that the purchase order was submitted on behalf of Harding Loevner?

MR. JACKSON:  Objection to form.

A    It -- it's difficult to analyze in an Excel sheet in a matter of seconds.  I usually do not do so as a matter of course; I take my time and carefully review the material.  I do see Column P, customer name and Harding Loevner in that column, so I am

Page 241

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

going to agree with you, but caveat, my conclusions here, it's really, you know, not the sort of thing that I would just do off the cuff.

Q    Understood.  Let's mark Exhibit 12, which is Tab 13 for us.

(Whereupon, a Document, Bates-stamped INSTINET000002.XLS was marked as Deposition Exhibit No. 12 for identification, as of this date.)

Q    Let me know when you have it.

MR. JACKSON:  Next time I ask to examine a document, you know, I'd appreciate it if you wouldn't question the witness while I'm doing that.

MR. YAVITZ:  Okay.

A    I have it open now.

Q    So my question for you is whether Row 3 of this document indicates that a purchase order for Bayer ADRs was submitted on December 8, 2016, on behalf of Harding Loevner for a quantity of 243,245 ADRs?

MR. JACKSON:  Objection to form.

Page 242

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    So the task of interpreting brokerage records is one that is highly contextual in nature.  In the prior example you gave, the second -- the prior exhibit, the second row was followed by a long series of executions, which is consistent with the examples that I discuss in Footnotes 54 and 56.

The context of the second row is essential to interpreting what that row means.  And that's because brokerage records are giving you a slice of the picture, of the pie if you will.  You're seeing a perspective into what was happening in the broker's systems, but in order to reach a conclusion about what a given row means, it is essential to evaluate the totality of the evidence. Which is what I did in my report.  So and as I explained in those footnotes and in our -- just a second ago, the conclusion that I drew concerning Row 2, in your example, much like the second row -- there are similar Row 2s in the examples considered in my report -- is informed by, as I explained in Footnotes 54

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
and 56, the totality of what happened throughout the subsequent rows and the subsequent day.

That is, the interpretation that I give to the second row is informed by the rest of the document.  Likewise, here in the prior exhibit, it was clear that the order to purchase foreign shares had been submitted at the time that was indicated because, once the market opened the next day, the order began executing as we previously looked at.

Here, while many of the same terminologies are used internally, it seems, in the Instinet's system, the remainder of the activity that -- in this file, the following lines, leads a very different conclusion.  And I'll just say a little bit more as to what I mean.

So there's a message type here, route order, which appears twice.  And the natural interpretation of route order is that an order has been routed.  And, in fact, when one looks at the documents which I cited in Footnotes 54 and 56 and in the prior tab you

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

showed, in fact, the order begins to execute once the market opens.

That's not the case here. What appears to be an order routing message here is very clearly not an order routing message because it's not routed anywhere. There's no execution which occurs in this order until the very final line, which is the next day at 11:59 a.m.

So when I -- and it might be worth mentioning that, in the course of my work advising the Department of Justice for several years now and examining thousands of pages of brokerage records, it is very common for records to require contextual interpretation. And so it's not at all unusual for similar lines, as you've shown here, to mean very different things. Because, again, brokers are providing only a certain snapshot of their systems. Here, when viewing this tab in context -- as is the case elsewhere in my report, and I cite other productions as well by Instinet -- the totality of that evidence leads me to

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
conclude that no order was routed on December 8.  It wouldn't make sense to conclude that an order was routed.  No order was executed from 4:30 to 8:47 p.m.  There -- nothing was executed from 8:47 p.

M.  What this appears to reflect is an internal recording of what will ultimately be an executed order.  And, in fact, the fact that the order is not executed until the following day indicates to me that the order was cancelable, and thus, this is consistent with my analysis.  We are -- we see that there is no indication in these data of any commitment on the part of Instinet to execute this order.  It's not even -- it has an identifier, but it's not routed anywhere.  Nothing happens to it.  It doesn't even have a price, as you can see in Column K.

So when evaluating this, in my opinion, a reasonable interpretation is that no order was truly submitted here except as an -- in the most technical narrow sense as an internal record being created for the order that would subsequently execute the

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
following day.

Q    Um-hmm.  He you say that no price is indicated, is there ever a price indicated anywhere in this spreadsheet?

A    Well, the challenge of interpreting a spreadsheet in a short time is you have to look around and so forth, but if I scroll slightly to the right, I can see that the first time that a price is indicated, it appears to be is at that last line in Column U.

And that's very consistent with what I've observed.  And, you know, it -- it is sometimes admittedly frustrating when one encounters brokerage records that seem to say one thing, but when you look carefully at it, lead to a very different conclusion.

It's clear also from that last row, that this was a very special order in that it executed with an external broker in Column Y.  And so it -- it actually -- the transact time in Column X was 11:59:56.  So all this evidence together shows that nothing was transacting, no broker seems to have been

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL involved in executing the order, nothing was really going on until 11:59 a.m. the following day.  Which I'd assume -- although, we'd have to go back and open -- the time was well after the foreign shares had been purchased.

Q    Yeah.  I'll tell you.  It's about 15 minutes after.  I just want to call your attention to --

A    I'm sorry.  If I can, I think one of the points we discussed previously is that market orders execute instantly.  And this was during the trading hours, so no single fact here is dispositive in my mind. The evidence has to be weighed in its totality.  But any sort of delay would be inconsistent with an immediate obligation to purchase the ADRs.

Q    Understood.  Thank you for that.

I just want to call your attention in the exhibit that we've been looking at. The Column U that you averted to, the price that's listed there is 99.2994; right?

A    That's what it states.

Page 248

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Okay.  Let's look at the next exhibit, which is going to be Exhibit 13, I suppose.  It's Tab 14 for us.

Let me know when you've got it.

(Whereupon, Tab 14 was marked as Deposition Exhibit No. 13 for identification, as of this date.)

A    Okay.  I have this open now.

Q    Okay.  So this is a document that was produced to us by Harding Loevner.  And I want to direct your attention to a few points on it.  One, if you look in the fifth row down, it says, Trade Date 12/9/2016.

Do you see that?

A    Yes.  Yes.

Q    Okay.  And if you look further down the page, a couple lines down, it says, Bayer sponsored ADRs.

Do you see that?

A    Yes.

Q    And then there's a line that says, SHR-FV, and then it says, 12,400.

Do you see that?

A    Yes.

Page 249

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Okay.  And then it says, Price in U.S.D., 99.2994.

Do you see that?

A    Yes.

Q    Okay.  And then if you scroll -- if you go down a bit, there's two lines that say, Harding Loevner LP, and then it says, AC International Brotherhood.

Do you see that?

A    Ah, yes, I do.  Yes.

Q    Great.

Based on your experience reviewing trading records, does this appear to be a record of a transaction in 12,400 Bayer ADRs conducted at a price of $99.2994, with a date of 12/9/2016?

A    I'll repeat my prior response that, in my experience evaluating thousands of pages of brokerage records, it -- one -- I cannot reach a conclusion, nor could most people, I think, based on a very brief view of a document which has abbreviations and seems to lack a dictionary as to what each term means.  I regularly either request

Page 250

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
dictionaries or draw inferences to the
extent that I'm able to form a view based on
a careful, sustained evaluation of the
evidence, which I'm not able to do at this
time.

So I'm happy to take your word for
it. And I don't see anything inconsistent at
the moment with the view that this is a
confirmation of a transaction, as I said
previously when we looked at a similar
document.

Q    Okay. Can you pull up Exhibit 5
quickly? This will be the last thing before
the break.

A    It's open.

Q    Okay. Can you go to Page 163 in
the PDF?

A    Yeah. It's going to take me a
second here.

MR. JACKSON: 63 or 53?

MR. YAVITZ: 63, 163.

A    Okay. I am there.

Q    So this is the certification of
Local 710 that we were looking at earlier.

Page 251

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

I want to direct your attention to the Schedule A to the certification which is 165 of the PDF.

Let me know when you're there.

A     I'm there.

Q     Okay.  And if you see, there is a row where the trade day is 12/9/2016.  It lists a purchase of 12,400 shares at $99.2994.

Do you see that?

A     I do.

Q     Do you think it likely that if Harding Loevner purchased ADRs at a price of $99.2994 on December 9, 2016, and Harding Loevner's client, Local 710, purchased a block of ADRs for the exact same price on the exact same date, that those two transactions are related?

MR. JACKSON:  Objection to form. Objection beyond the scope.

A     It's certainly plausible.  I -- as we previously discussed, there are many similar examples.  I wouldn't be surprised if that's the case here, but I would have to

Page 252

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

confirm in the data.

Q    Got it.

But this would be consistent with the pattern of prior transactions we've looked at where Harding Loevner transacts in a large block of Bayer common shares, and then subsequently there is a transaction on behalf of one of plaintiffs who are Harding Loevner's clients that are reflected in the certifications at the exact same price, right?

MR. JACKSON:  Objection to form and to the extent it misstates prior testimony.

A    I think it's a little difficult to characterize these as separate transactions. "Transaction," that term seems to entail two parties who are exchanging one thing of value for another, and maybe implies a kind of an arm's-length bargaining.  My understanding from reviewing the DTCC records is that, in effect, the purchase was made by the asset manager, Harding Loevner, let's say, and the transfer of custody of

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

the shares was a custodial transfer such that record custody -- I can't think of a better word -- was transferred, making the purchase effectively on behalf of these plaintiffs, but that there wasn't a separate transaction in the market which occurred, that this was a transfer of custody, and, thus, a purchase on behalf of the plaintiff.

Q    Got it.

My question is a little different, though.  Given the pattern of transactions we've looking at, do you think it likely that this 12,400 share block that is reported in the certification is a portion of the larger 243,205 share block that we have been looking at records of, that transacted on the same date at the same price?

MR. JACKSON:  Objection to form.

A    I have no basis to conclude one way or the other but it wouldn't -- it would be consistent with the other examples, so it's certainly plausible.  I don't give off-the-cuff opinions without carefully

Page 254

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

reviewing the evidence myself.

Q    Okay.  Great?

MR. YAVITZ:  We can take that break now.  We'll go off the record.

VIDEOGRAPHER:  This concludes Media Number Four of the videotaped deposition of Dr. Joshua Mitts.  The time is 4:56.  We are off the record.

(Whereupon, at 4:56 p.m., a recess was taken to 5:10 p.m.)

(The deposition resumed with all parties present.)

VIDEOGRAPHER:  This begins Media Unit Number Five of the videotaped deposition of Dr. Joshua Mitts.  The time is 5:10.  We are on the record.

Q    Welcome back, Professor Mitts. Did you discuss the substance of your testimony with counsel during the break?

A    No.

Q    Great.

Okay, so before the break, we were talking about a transaction in Bayer equity that occurred on December 9 of 2016.

Page 255

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Do you recall that?

A    Yes.

Q    So I want to direct you to Paragraph 42 in your report.  Let me know when you're there.

A    I am there.

Q    So in this paragraph, you write on December 9, 2016:  Lead plaintiff, International Brotherhood of Teamsters Local 710 Pension Fund purchased 4,000 Bayer sponsored ADRs through Instinet Corp in New York.  Clearing records indicate that Instinet acquired these ADRs by borrowing 10,000 and 40,000 ADRs from Industrial and Commercial Bank of China, Financial Services in New York City, New York, and Wedbush/P3 Stock Loan in Los Angeles, California.

Do you see that?

A    Yes.

Q    And that was your conclusion, correct?

MR. JACKSON:  Objection to the extent it misstates the report.

A    The clearing records indicate

Page 256

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Instinet acquired those ADRs by borrowing the 50,000 ADRs I described there.  That was the conclusion of my analysis, yes.

Q    I want to enter another exhibit, which is DTCC004.  That's going to be Exhibit 14.

(Whereupon, a Document, Bates-stamped DTCC004 was marked as Deposition Exhibit No. 14 for identification, as of this date.)

Q    And while its loading, I want to explain to you the provenance of this document, which is that it contains the content of DTCC004; however, we printed it to PDF and added line numbers and added page numbers so that it wasn't a colossal mess, because as you may recall, the native file is just an extremely long TXT file.

Do you have that open?

A    I think so.  It's 6,293 pages on my end.  I'm not sure if the preview -- I might need to download it locally, because it -- it doesn't seem to be working well with the preview.

Page 257

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Sure.  If you need to download it, please do.

A    Okay.  Let me try opening it locally.  It -- it's a very large file.

Q    I agree.

A    Okay.  I think I have it open successfully, but it's -- this is just going to take a moment.  My computer is not handling the PDF very well.

Okay.  I think -- I think I have it.

Q    Great.

A    It's open at this point, but it may be a little slower.  Yes, go ahead.

Q    Okay.  So my first question for you is this:  Can you direct me to where in this 6,293 page document it shows that Instinet fulfilled an order of 12,400 shares by borrowing 10,100 shares from Industrial and Commercial Bank of China Financial Services?

MR. JACKSON:  Objection to form, and a general objection.

A    Yes, but it will take me a minute

Page 258

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

to just get this document functioning on my end.

I think I am succeeding in getting the PDF to function, but it is very slow. Could we work with the original text file as it was produced. It's just going to be a lot faster for me to move through it because my preview app is very slow with this PDF.

Q    I think -- I mean, I don't have the original text file handy in part because there's no way to reference anything in it. I -- it might -- maybe I can help slightly. So I looked at this document -- we looked at this document. If we go to Page 2,346 of this document.

Let me know when you're there.

A    I'm sorry, Noah, I mean, with respect. This is not the document that I cited. It may be a partial reproduction of it. The page -- there's two different page numbers. There is a page number at the top; there's a page number at the center. I mean, I'm certainly trying to find what you're referring to. But this is -- the

Page 259

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
page numbers also seem out of order, so there's, for example, as I scroll through this, the original page numbers simply do not match. So I don't know exactly what I'm looking at.

MR. JACKSON: Thank you. I'm also going -- if you'll excuse me for one second. I'm just going to launch a series of objection to this. I mean, you're putting a 6,293 page document in front of the witness representing to him that it's the same document as one that's cited in his report without giving him adequate time to review whether or not that's the case. And also, as the witness noted, the page numbers in the top right-hand corner of each page are totally out of order. So it's very difficult for us to tell whether this is, in fact, a true and correct copy of the document that was produced by DTCC.

MR. YAVITZ: Okay. I appreciate that.

Page 260

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Let's go off the record while we sort out this exhibit issue.

MR. JACKSON:  Yeah.  Sure.

VIDEOGRAPHER:  Off the record at 5:17.

(Whereupon, at 5:17 p.m., a recess was taken to 5:19 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER:  Back on the record, 5:19.

(Whereupon, a Document, Bates-stamped DTCC004 AND 001168 was marked as Deposition Exhibit No. 15 for identification, as of this date.)

Q    Okay.  So I have now marked as Exhibit 15, a document that was produced by the DTCC under both the Bates number DTCC004 and also the identifying number 001168.

Do you recognize this document as the document that you -- the clearing records that you referred to?

A    Yes.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

MR. JACKSON:  I just want to note for the record that this is an extremely voluminous document, and it's unreasonable to expect the witness to have reviewed the entirety of its contents in a short time since it's been marked.

MR. YAVITZ:  Sure.

A     I do recognize the document.

Q     Great.

So my question, then, with respect to this exhibit is:  Can you direct me to where in this document it shows that Instinet fulfilled an order of 12,400 shares by borrowing 10,000 shares from Industrial and Commercial Bank of China Financial Services?

A     Yes.  So Line 49,393 shows the fulfillment of the order.  The corresponding rows shows -- that's the outgoing amount of 12,400 shares.  The incoming amounts of 10,000 and 40,000 are located at Lines 49,468 to 49,469, and Lines 49,470 and 49,471.

Page 262

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Q    Okay.  Why do you believe that those lines -- that the transactions indicated in those lines are related to plaintiffs purchase?

A    Sure.  So in order to answer that question, it's important to first understand the nature of these records.  So these records are clearing and settlement records, which show the transfer of custody from different parties.  And the clearing and settlement records are dated as of the settlement date, which for this transaction was December 14, 2016.

And what each participating daily activity summary describes is the transfers of shares into and out of that participant's account with the DTCC.  The DTCC maintains, through these records, what amounts to a type of double-entry bookkeeping system.  So each transfer in and out of a particular market participant's account is recorded on both sides of the ledger; the source account and the destination account.

Now, here -- so let me say in

Page 263

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL general, the methodology that one should employ when tracking the transfer of custody of securities, that is when I purchase securities where do they come from.  To answer that question, one has to identify the relevant accounts which are involved.

So in the case of the purchase by Instinet, I examined beginning on Line 49,382, the participant daily activity summary for December 14.  That is a new page in the DTCC records.  That is Page 278.  It is following consecutively Page 277, which begins on line 49,367.  This printout provides a line-by-line description of the delivery of these orders to and from different market participants.  Here -- and just to be clear, my conclusions here are -- I'm speaking largely from memory.  I don't have access, because we agreed -- I'm only reviewing my -- I only have a clean copy of my report with me at this time.

But, in general, the methodology that I employed was to examine each purchase by a plaintiff.  I would begin with the

Page 264

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL plaintiff's broker.  And because custody of the ADRs ultimately is transferred to the custodial account of the plaintiff as we saw, I believe, suggested by some of the PDFs that you were showing.  We will see in the DTCC records, a transfer of custodial ownership -- I will use that term -- between the amounts of those purchases.

So what we observe on Line 4,393 is a delivery.  It's indicated as minus 12,400. A delivery from Instinet to the custodial account of Local 710, which is the Bank -- the Bank of New York, which is given by code 0901.  That is one of many debits -- I'm not an accountant; I always get debit and credits mixed up.  It's one of many outgoing transactions in Instinet's account on that day.

Now, like any broker, in order or -- any market participant, in order to transfer shares out -- or securities of one's account, it is necessarily to have those shares come from somewhere.  So on a daily basis, it is generally the case that the

Page 265

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
volume of long transactions and short
transactions or transactions out of the
account for a given clearing participant into
that account, that should balance.  So the
DTTC does maintain an opening and closing
balance in these records, which you can see
for Instinet at Line 49,526.

Now, what the -- what this report
shows us is on Lines 49,468 to 49,469 and
Lines 49,470 to Line 49,471 is that the
inflow of securities into this account
consisted of two rows titled "Stock Loan."
The first row is titled "Stock Loan," and
it's for 10,000 shares with a plus sign.  And
that means that the shares are coming into
Instinet's clearing account.  And the code
for the counter-party to that deposit, if you
will, is ICBCFS, which is the Industrial and
Commercial Bank of China Financial Services
in New York City.  Now, this is a New York
City-based entity; not based in China.

The following line, 49,470, shows a
stock loan in the amount of 40,000 ADRs for a
total market value of $4.2 million, and

Page 266

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

that's their dollar value calculation.  And in Line 49,471, it shows us that that is coming from Wed-P3 STCK.  And that is Wedbush Securities P3 stock loan, which can be identified by reference.

Now, just to complete my answer, your question was, how could I believe or how could I reach the conclusion that the 12,400 shares which Instinet ultimately delivered to the custodial account of the plaintiff came from those 10,000 and 40,000 shares which had been borrowed.  Well, one way to be sure of that is to look at the total volume of ADRs which came in to Instinet's account.  In this case, Line 49,526 tells us that the total volume was 50,824 ADRs.  So it -- it's -- is it -- you know, it seems virtually impossible that the 12,400 were not funded, if you will, by the ten and 40,000.

I mean, to be clear, 50,813 ADRs were transferred out of the account.  So, you know, to be sure, shares are fungible, and there could be situations where there were so many shares coming in and such a small volume

Page 267

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
of shares going out, that we might not be
sure which shares were -- were delivered.
But in this case, the fact that the stock
loan for 50,000 ADRs was such a large
fraction, almost all, of the 50,824 ADRs
which went into the account, and, thus,
almost all of the 50,813 ADRs which went out
of the account, including the 12,400 ADRs
which were delivered to -- to the custodial
account, the client.  Taken together, that
indicates that the Instinet acquired these
ADRs, not by obtaining newly issued ADRs, but
rather by borrowing that ADRs from the
Industrial and Commercial Bank of China,
Financial Services, and Wedbush Securities/P3
Stock Loan.

    Q    If there had been a new ADR
issuance on that date to Instinet, would it
show up somewhere in these DTTC records?

            MR. JACKSON:  Objection to form.

    A    Absolutely.  And that's why in my
report, I discuss -- and I mentioned this
earlier, and it's really important.  The
evidence shows, in my opinion, that the vast

Page 268

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
majority -- almost all of the purchases of
Bayer sponsored ADRs consisted of
existing -- existing ADRs.  To the extent
that one were to ask, one wished to know,
was a given transaction, did it originate on
the domestic market, did it -- was it -- was
it a purchase of an existing ADR or a newly
sponsored ADR -- a newly issued, excuse me,
ADR, the DTCC records actually indicate when
the Bank of New York Mellon's ADR desk
issued new ADRs, and those were delivered to
the purchaser.  So the clearing records make
it very clear whether the shares were
acquired on the secondary market and
delivered to the purchaser, or whether those
shares were acquired from the Bank of New
York Mellon as newly issued ADRs.

Q    So as between the 10,000-share
loan and the 40,000-share loan, can you
determine based on this record which of
those loans was the source of the 12,400
shares?

MR. JACKSON:  Objection to form.

A    The -- the answer to your question

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

is -- which is a very good one and important one, more generally for understanding clearing and settlement.  The answer to your question is no.  And that is true for any security.  And -- and that is because broker/dealers, when they enter into orders that are executed to buy or sell securities, have a settlement obligation.  Their settlement account and their settlement obligation is not specific to -- it -- it's not that each security is identified separately -- each individual security is separately identified, rather brokers can buy and sell, and the securities that they -- that are ultimately transferred are the ones which are in their clearing and settlement account.  And it's in this respect that the settlement process, in effect, nets out purchases and sales.

Now, it is for that reason, as I explained earlier, that we have to be very careful drawing conclusions and carefully inspect the data to understand the origin of the shares which were transferred.  At least

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL inasmuch as the question is whether or not the purchaser acquired existing ADRs or whether those ADRs were acquired by -- were issued by the Bank of New York Mellon, it would be essential to examine on -- the origin by looking carefully at the data.  As I gave you in this example the number of 50,000 was a very large fraction of the total number, 50,824 ADRs, which came into Instinet's account that day, and the 50,813 which came out, we can thus logically infer that, even if we were to allocate all of the 10,000 ADRs which were borrowed, that the remaining -- I'll just say approximately because there's a small remainder here.  But the remaining 2400 must have come from the 40,000.

So in certain circumstances, we can reason at logically to infer that the -- the ADRs which were delivered must have come from a particular source.

Q    And would you expect to see similar clearing entries for -- strike that.

If Harding Loevner had multiple

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL clients for whom it was fulfilling ADR orders on December 14, 2016, would you expect to see a delivery order entry attributable to each of those clients on these DTCC records?

MR. JACKSON:  Objection to form.

A    So the -- the -- the answer is, it depends on the clearing and settlement structure of those client accounts, and it depends on the timing of those settlements. So to take each of those in turn, if -- if five clients share the same custodial bank, it might be the case, it is possible that the broker would transfer as a custodial matter the totality, the total number of ADRs held by those five clients to the custodian and then later on divide them up. That is possible.

In my review of the clearing records, which is continuing -- continues to be informed by the evidence that's coming in, but I had complete clearing records at the time of my report -- it was not particularly difficult to identify the lead plaintiffs'

**Page 272**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL purchases, which would suggest to me that those purchases for those potentially different clients were either in different custodial banks or separated as distinct transactions within the custodial records.

Just one more important point is that the timing of the transactions matters quite a bit. If the broker purchases ADRs on Monday and keeps them in its own account, then we might see, for example, those ADR transferred to clients at a later point in time. And so that's why it's important -- you know, you could clearly -- you could have a situation where a broker acquires Bayer sponsored ADRs, even newly issued ADRs, on Monday, for example, and then on Tuesday sells, as a domestic transaction, those ADRs to a client. That acts effectively like a market maker, a domestic market maker.

Well, clearly, the second transaction it is a domestic transaction. So it -- so the timing of the transaction matters as well.

Q    Looking solely at clearing

Page 273

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

records, can you determine the point at which the underlying client irrevocably committed to take those ADRs?

MR. JACKSON:  Objection to form.

A    So there's -- it's definitely the case that a domestic clearing transaction -- by that I mean a custodial transfer of ADRs which originates in an account other than the Bank of New York Mellon.  One can certainly infer that irrevocable liability was incurred on the relevant trading date corresponding to that settlement date because that's how domestic transactions occur.  They are effectuated without a foreign component by definition.

Q    Um-hmm.

A    So inasmuch as one party is purchasing from another party that is based in the U.S. that is not the Bank of New York Mellon -- one of the parties purchasing ADRs from a party that's not the Bank of New York Mellon, then the answer is, yes, we can infer that liability was irrevocable on that date.  We would not know the execution time

Page 274

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
of the order.

You know, as the many examples we've discussed show, many times there are multiple orders, and the orders are executing in the market at different points in time, so it would be somewhat difficult to -- it would be nonsensical to characterize the point in time at which a clearing record transfer was irrevocable.

If I see a 10,000 ADR transfer from a domestic seller, I -- I don't know if that -- if there were a series -- there might have been a series of hundred ADR purchases that executed throughout the trading day.  So in that case -- in that case, what we can conclude is, by the end of the trading day, irrevocable liability had been incurred in the U.S. for the totality of that -- of that amount.

Q    Okay.  I have a hypothetical for you.

Suppose that a stockholder submitted a market order for Bayer ADRs to be fulfilled through the purchase of

**Page 275**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
overseas shares, like in Toshiba.  Suppose
further that on the settlement of the trade
after the German shares had been purchased,
something went wrong at the depository bank
and they couldn't get the ADRs issued in
time.  And so instead of the original plan
of issuing new ADRs, the broker instead went
on the market, fulfilled the order by
borrowing new ADRs.

Would you -- would that alter your
knowledge as with respect to when
irrevocable commitment was made to take the
ADRs that were ultimately borrowed?

MR. JACKSON:  Objection to form
and beyond the scope.

A    Yeah.  I think I'm confused.
The -- the example you gave, by borrowing
the ADRs and buying the foreign shares, the
broker would have engaged in a particular
kind of transaction that is -- carries a
unique set of risks.  The -- the -- I -- I
guess I would have to think about -- about
your question to -- more, but I -- I don't
quite.  You know, if -- I don't quite see

**Page 276**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL the difference between the Bank of New York Mellon issuing shares and the borrowing of shares in the United States as changing my conclusion in my report.

To be more -- to be more specific, if the delivery of the shares -- of excuse me -- of the ADRs, consisted of the delivery of existing domestic ADRs which had been borrowed, then liability for that transaction arose out in the United States from start to finish.  It arose in the -- because the broker's -- because -- because the broker delivered borrowed ADRs, the purchaser received -- the -- the broker's liability to the purchaser became irrevocable when the broker confirmed the order, and if the broker confirmed the order to buy ADRs with borrowed shares -- excuse me -- with borrow ADRs, then the broker confirmed an order to buy ADR with ADRs that were already in the secondary market.

And if the broker confirms an order to buy existing ADRs with ADRs that are in the secondary market, as I explain it in my

Page 277

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
report, then liability for that transaction
arose in the United States.  So I -- the -- I
think my answer is, if the broker's liability
to the customer became irrevocable when it
confirmed that it was executing the order to
purchase ADRs and it, in fact, supplied
borrowed domestic ADRs, then that liability
became irrevocable in the United States.

Q    Let's go to Paragraph 51 of your
report.  This is -- we're moving on to your
final opinion, your ability to determine on
a classified basis where irrevocable
liability was incurred.

Let me know when you're there.

A    I'm there.

Q    Would you agree that the
particularities of -- strike that.

Would you agree that the precise
instructions given by a client to a broker
are relevant to the question of when
irrevocable liability for the issuance of a
new ADR occurs?

MR. JACKSON:  Objection to form.

A    Could you define what you mean by

Page 278

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
"specific instructions"?

Q     Sure.   Well, we were talking earlier about Toshiba, and you -- would you agree that, in Toshiba, certain particularities about the interaction between the broker and the client led the court to conclude that a market order had been placed such that the obligation for the client to take the ADRs became effective at the time that the underlying Toshiba shares were acquired?

MR. JACKSON:  Objection to form and to the extent it misstates the opinion referenced.

A     I -- I just reiterate my opinion. I -- as I explained in my report, the court identified in that case specific characteristics of the order -- the market order to purchase Toshiba unsponsored ADRs. What the court emphasized was that the conditions of that order were such that, once Barclays fully executed the purchase of common stock on the Toyota -- the Tokyo Stock Exchange, AIPTF was bound to take and

Page 279

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
pay for the ADRs once converted.

So if your question is, well, are there -- are there conditions under which orders would indicate that? I mean, sure, there could be market orders as we discussed. It wouldn't be necessarily the case that those market orders would take the form of any special communication between a broker and their client.

Q    Could you determine whether such a market order had been placed purely by reviewing clearing records in connection with that trade?

MR. JACKSON:  Objection to form and to the extent it's beyond the scope.

A    Not by reviewing clearing records alone, but by reviewing brokerage records, it would generally be clear, in my experience, if a client had put in such a market order. What the clearing records would show is the extent to which the class of purchasers may have consisted of domestic purchasers on the existing secondary market

Page 280

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
for existing Bayer sponsored ADRs.

That critically important information as to how much of the class -- perhaps virtually all of the class -- may have consisted of domestic purchasers, that information is available from the clearing records.

Q    Right.  But for those purchasers who acquired ADRs that were newly issued, what evidence would you need to review to conclude that the purchase in question was not of the type that the court deemed to be extraterritorial in Toshiba?

MR. JACKSON:  Objection to form and beyond the scope.

A    Well, as I explained in my report, the question of -- in general as to whether irrevocable liability was incurred within the United States, requires examining the location of contract formation, the placement of purchase orders, passing of title, change of money, who sold the relevant securities, and how those transactions were effectuated.  I give

**Page 281**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL examples in my report as to how one might conduct that analysis for the lead plaintiffs and the additional named plaintiff.

It is generally fairly straightforward to interpret the brokerage records.  I have not seen any evidence which would suggest that, in this case, there were orders of the kind discussed in Toshiba.  There was been no indication that purchasers of Bayer sponsored ADRs entered market orders such that, at the moment that the foreign shares were acquired, the purchaser became logically and legally bound to acquire the ADRs.

My view is that, absent evidence, it's a purely speculative and hypothetical question.  The court in Toshiba had such evidence and reached the conclusion that it did, but I did not see any evidence which would suggest that that occurred here.

Q    Right.  But -- so the court in Toshiba had before it record in which documents had been elicited from the

Page 282

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
plaintiff's investment manager in which
communications were available in which the
court could scrutinize the details of the
transaction at issue, right?

MR. JACKSON:  Objection to form.

A     As I said, I -- I have not
reviewed the totality of the evidentiary
record in Toshiba.  I'm not sure I could
even if I wanted to because, in litigation
in general, many documents are nonpublic.

Q     But you spent hundreds of hours
preparing this report, right?

MR. JACKSON:  Objection to the
extent it mischaracterizes -- well, you
know, actually, withdrawn.

You can answer.

A     As I said previously, I don't have
the exact number of hours in front of me.

Q     But I think you testified that it
was more than 200 in your rough
recollection.

A     I don't believe that I gave a
specific number.  I don't believe I said
that it was precisely more than 200.  I

Page 283

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
think I -- I spoke in terms of general ranges.

Q    Yeah.  Well, is it fair to say you spent a lot of time preparing this report?

MR. JACKSON:  Objection to form.

A    Yes.

Q    And you spent a lot of time analyzing the transactions alleged by plaintiffs to determine whether their typical of the class, right?

MR. JACKSON:  Objection to form and also --

You know what, you can -- you can answer.

A    Yes.

Q    Given how much time -- strike that.

Given that you had to spend a lot of time analyzing the transactions alleged by plaintiffs in this case to determine that they are typical of the class, wouldn't it stand to reason that a similar analysis would need to be conducted as to each and every transaction within the class?

Page 284

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

MR. JACKSON:  Objection to form and also objection to the extent it calls for a legal conclusion.

A    Putting -- I'm going to construe your question -- your use of the term "requires," not as a legal -- I -- unless I'm misunderstanding, I'm misunderstanding your question as not asking me for my legal opinion as to what the law requires, which I am not giving -- I'm not giving in this report and have not been asked to give.

But if I construe your question as referring to the sort of economic and data analysis which would be required to examine these questions on a class-wide basis, I disagree for two reasons.  One, the data show conclusively in my opinion that, for the vast majority of the purchases of Bayer sponsored ADRs, those purchases occurred within the United States.  They were the purchases of existing Bayer sponsored ADRs on the existing market, and my report explains why.

No further analysis is needed for that group of domestics purchases of existing

Page 285

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
sponsored ADRs.  For the relatively small number of newly issued ADRs, it would be, in my opinion, entirely speculative and baseless at this juncture knowing, based on the evidence that I have reviewed, to conclude that there was even one transaction of the type at issue in Toshiba.

I have not seen any evidence to suggest that occurred.  To the extent that a -- not in a detailed review of the lead plaintiffs' transaction -- transactions, transaction by transaction, has led to the same consistent conclusion that irrevocable liability was incurred within the United States for the purchase of Bayer sponsored ADRs in those instances, it is reasonable to infer that that holds true for the rest of the class.

Q    Is it --

MR. JACKSON:  I think we need to go off the record for one second.

MR. YAVITZ:  Okay.  Let's go off.

VIDEOGRAPHER:  Off the record at 6:01.

Page 286

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

(Whereupon, at 6:01 p.m., a recess was taken to 6:02 p.m.)

(The deposition resumed with all parties present.)

VIDEOGRAPHER:  Back on the record, 6:02.

Q    So, in your opinion, there's no basis to believe that a transaction of the sort that occurred in the Toshiba case occurred with respect to any ADR issuance in Bayer ADRs during the class period?

MR. JACKSON:  Objection to form.

A    I have not encountered any evidence which would indicate that that was a possibility.  In fact, the evidence that I have reviewed strongly indicates that it was highly unlikely, based on what I have reviewed, that such a transaction would have occurred.  As I explain in my report, the vast majority of purchases, including by some of the plaintiffs in this matter, were fulfilled on the domestic market, the existing secondary market.

Even after examining carefully and

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL closely the large transactions in newly issued Bayer sponsored ADRs, there was no evidence that I found which showed that irrevocable liability was incurred at the moment that the foreign shares were acquired. If anything, the communications and the brokerage records indicated that all the market participants in this case, that is, those purchasing Bayer sponsored ADRs were treating the purchase of the foreign shares and the ADRs as two distinct transactions.

And I'll just make one more brief point, which is that the Toshiba case, in my opinion having reviewed thousands of pages of brokerage records, maybe tens of thousands if not more over the years, the Toshiba transaction in my experience was highly unusual.  It was unusual for several reasons.

The first is that Toshiba was an unsponsored ADR.  And as we previously discussed that unsponsored ADRs tend to have far less domestic existing secondary market trading, meaning secondary market trading of existing ADRs.  An unsponsored ADR where a

Page 288

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL purchaser arranges for an unusual transaction compared to the sort of ordinary high volume trading which occurs in the Bayer sponsored ADRs, it would naturally be the case that that transaction would present unique differences and circumstances which would not arise in the course of purchases a heavily traded sponsored ADR.

So I find it unsurprising after this exhaustive examination of the evidence, that there have -- are not any transactions in which a market order, to use the Toshiba court's terminology, was placed days before the foreign shares were acquired, such that the purchaser became legally and logically bound to acquire the ADRs at that moment. That characterization, that description of the transaction, to me, makes a great deal of sense for a thinly traded unsponsored ADR.

And it -- the evidence I have seen is consistent with the intuition, I think, that I have having reviewed documents in this area for so long that it would be highly unlikely. And so the -- the evidence that

Page 289

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
I've reviewed is consistent with what I would
expect based on my experience reviewing
trading records.

Q    Got it.  Thank you for that.

So in support of the opinion that
you offer in Paragraph 51 of your report,
your first point, recited in Paragraph 52,
is the one we've been discussing:  The
overall majority of purchases in Bayer
sponsored ADRs consisted of domestic
purchases of existing ADRs.

So I want to set that to the side.

Your second point in Paragraph 53
says, The available evidence provides no
basis to infer that the Bank of New York
Mellon deviated from its ordinary practice
of acquiring foreign shares to be in the
custody of the purchasers prior to issuing
ADRs.

Do you see that?

MR. JACKSON:  Objection to the
extent that that's an incomplete
statement of what's in the report.

A    I see that part of the sentence,

Page 290

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
yes.

Q    Okay.

What relevance do the policies and procedures of the depository bank have to do with where irrevocable liability for -- on a classified basis was incurred by purchasers of Bayer ADRs?

MR. JACKSON:  Objection to the form.

A    I -- I think I answered this question already, but I'll go back over my answer briefly.  As I explained earlier in our discussion and earlier in my report, the policies and procedures and practices of the Bank of New York Mellon requiring that foreign shares first be in the custody of the purchaser prior to the issuing ADRs is relevant to understanding how the market functioned.

So the market functioned as a highly liquid secondary trading market in Bayer sponsored ADRs, which, on occasion, had the Bank of New York Mellon issuing newly issued ADRs after a broker/dealer had secured

**Page 291**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL the foreign shares.  That standardized policy and procedure and practice codified in the deposit agreement that the Bank of New York mellow had with market participants and with Bayer itself, gave rise to a very standardized form of interactions in the market, which lacked the sort of bespoke highly unusual, idiosyncratic arrangements which were present in Toshiba, like the placing of a market order to purchase ADRs days before the foreign shares were acquired.

That is highly unusual.  And it is inconsistent with the manner in which trading is conducted in sponsored ADRs like Bayer. And so the reference, as I explained in that paragraph, there is every indication that the time sequence and share purchases depends on the deposit agreement and policies and practices, that is these create expectations in the market for how one supplies purchased foreign shares in exchange for acquiring newly issued ADRs, and that is amenable to class-wide proof.

Q    Um-hmm.  I'll just ask the

Page 292

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL
question.  You may have answered it earlier.
Do you know whether the depository bank in
Toshiba had a policy similar to Bank of New
York Mellon as we've been discussing?

MR. JACKSON:  Objection.  Beyond
the scope.

A    I have not seen the deposit
agreement, nor do I have any personal
knowledge of the practices and procedures of
the depository institution or intuitions
plural which were involved in the Toshiba
case.  I, as I said previously, have not
reviewed the evidence in that case.  I have
not been asked to review the evidence, nor
could I review that evidence, I believe,
inasmuch as much of that evidence may not be
available publicly.

Q    One last question.  Do you know
whether the overall majority of purchases in
Toshiba unsponsored ADRs consisted of
domestic transactions in existing Toshiba
domestic ADRs?

MR. JACKSON:  Objection to form
and also beyond the scope.

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

A    I have not reviewed detailed trading records in Toshiba unsponsored ADRs. I have not been asked to review those trading records, nor have I done so.

MR. YAVITZ:  Great.  I'll conclude my questioning there.  Thank you very much, Professor Mitts.  I'll turn the mic over.

MR. JACKSON:  All right.  Let's take just take a -- let's go off the record and we'll come back.

VIDEOGRAPHER:  Off the record at 6:13.

(Whereupon, at 6:13 p.m., a recess was taken to 6:14 p.m.)

(The deposition resumed with all parties present.)

VIDEOGRAPHER:  Back on the record at 6:14.

MR. JACKSON:  I just wanted to note the parties have agreed to designate the transcript of this deposition highly confidential, and the plaintiffs have no further questions.

**Page 294**

JOSHUA R. MITTS, PH.D. - HIGHLY CONFIDENTIAL

Thank you.

MR. YAVITZ:  Let's go off the record.

VIDEOGRAPHER:  This concludes today's testimony given by Dr. Joshua Mitts.  The total number of media units used was five and will be retained by Veritext.  We are off the record at 6:15.

(Time noted:  6:15 p.m.)

Page 295

------------------------INDEX----------------------

WITNESS                    EXAMINATION BY      PAGE

JOSHUA R. MITTS, PH.D   MR. YAVITZ           5


---------------------EXHIBITS--------------------

FOR IDENTIFICATION   DESCRIPTION              PAGE

Exhibit No. 1        Report of Dr. Mitts      14

Exhibit No. 2        January 25, 2022,        112
                     decision in Stoyas v.
                     Toshiba

Exhibit No. 3        Document,                154
                     Bates-stamped HL002732


Exhibit No. 4        Document,                175
                     Bates-stamped HL002709

Exhibit No. 5        First Amended            181
                     Complaint


Exhibit No. 6        Document,                186
                     Bates-stamped HL002729

Exhibit No. 7        Document, Docket No.     197
                     000114


Exhibit No. 8        Document,                206
                     Bates-stamped HL002746

Exhibit No. 9        Document,                222
                     Bates-stamped HL002731


Exhibit No. 10       Tab 11                   234


Exhibit No. 11       Document,                238
                     Bates-stamped
                     INSTINET000009.XLS

**Page 296**

--------------------EXHIBITS--------------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 12 | Document, Bates-stamped INSTINET000002.XLS | 241 |
| Exhibit No. 13 | Tab 14 | 248 |
| Exhibit No. 14 | Document, Bates-stamped DTCC004 | 256 |
| Exhibit No. 15 | Document, Bates-stamped DTCC004 AND 001168 | 260 |

-----PROVIDED ELECTRONICALLY TO THE REPORTER-----

------------PREVIOUSLY MARKED EXHIBITS------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|

-----NONE WERE MARKED------

------------REQUESTS FOR PRODUCTION-------------

| DESCRIPTION | PAGE |
|---|---|

-----NONE WERE MADE------

Page 297

CERTIFICATE

STATE OF NEW YORK )

                    )ss:

COUNTY OF RICHMOND)

I, DANIELLE GRANT, a Certified Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That JOSHUA R. MITTS, PH.D, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness remotely.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 10th day of January, 2023.

_____

DANIELLE GRANT

Page 298

SHEET METAL WORKERS' NATIONAL PENSION FUND, et al. vs. BAYER AKTIENGESELLSCHAFT, et al. 1/6/2023 - JOSHUA R. MITTS, PH.D.

ACKNOWLEDGEMENT OF DEPONENT

I, JOSHUA R. MITTS, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

JOSHUA R. MITTS, PH.D.            Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

Page 299

SHEET METAL WORKERS' NATIONAL PENSION FUND, et al.

vs. BAYER AKTIENGESELLSCHAFT, et al.

1/6/2023 - JOSHUA R. MITTS, PH.D.

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

JOSHUA R. MITTS, PH.D.                        Date

**Page 300**

SHEET METAL WORKERS' NATIONAL PENSION FUND, et al.

vs. BAYER AKTIENGESELLSCHAFT, et al.

1/6/2023 - JOSHUA R. MITTS, PH.D.

                    E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____    _____

JOSHUA R. MITTS, PH.D.                        Date

**[& - 2016]**                                                    Page 1

| **&** | 261:23 265:15 | **12/9/2016** | **197** 295:17 |
|---|---|---|---|
| **&** 3:4,12 6:19 6:24 | 266:12 268:19 270:14 274:11 | 248:14 249:17 251:8 | **1:17** 111:19 **1:18** 111:25 |

| **0** | **10,100** 257:20 **100** 46:12 | **12092016.xlsx.** 235:2 | **2** |
|---|---|---|---|
| **00001** 52:12 **000114** 197:2 295:17 **001168** 260:14 260:21 296:9 **04737** 1:3 5:24 **06062016** 165:20 **0822016.xlxs.** 207:13 **0901** 264:15 | **10019** 3:15 **103.9916.** 183:5 183:25 **10:55** 48:23 **10b5-1** 38:16 38:19 39:4,6 **10th** 297:21 **11** 234:9,11 238:6,10 295:21,22 **112** 295:9 | **12:05** 211:9 **12:40** 111:17 111:18 **13** 241:7 248:3 248:7 296:6 **14** 248:4,6 256:7,10 262:14 263:11 271:3 295:8 296:6,7 | **2** 112:11,19 185:4 196:9 199:12 207:10 208:8 238:17 238:19 242:22 295:9 **2,346** 258:15 **2.2** 74:18,24 75:3 79:4,16 79:22 97:12 **2.5** 158:12 188:2 |

| **1** | **114-8** 196:22 197:24 | **15** 139:10 247:9 260:15 | **2/20/16** 187:14 **2/3** 53:3 |
|---|---|---|---|
| **1** 5:15 14:6,12 39:14 121:4,5 185:6,19 187:4 187:4 220:24 295:8 **1,000** 190:12,13 **1,300** 39:20 **1/3** 53:3 **1/6/2023** 298:2 299:2 300:2 **10** 33:10,23 56:16 230:25 230:25 231:6 231:14 234:10 234:12 295:21 **10,000** 64:16,22 64:23 193:9 255:15 261:16 | **11:08** 48:24 **11:35** 186:10 194:6 211:15 **11:59** 244:10 247:3 **11:59:56** 246:23 **12** 238:7 241:7 241:10 296:4 **12,400** 234:6 248:23 249:15 251:9 253:14 257:19 261:15 261:22 264:11 266:9,19 267:9 268:22 | 260:19 296:8 **150** 42:15 48:12 **154** 295:11 **159** 181:24 182:2 **161** 182:22 **163** 183:8 250:17,22 **165** 183:22 251:3 **1705** 3:7 **175** 295:12 **18** 181:19 **181** 295:14 **186** 295:15 **190** 3:6 | **20** 42:14 61:16 114:19 121:18 122:4,7,15,23 164:24 165:3 168:10 194:15 205:23 227:19 298:15 **20,100** 180:6 183:24 **200** 41:22 42:7 282:21,25 **2015** 114:19 **2016** 47:14 133:21 134:17 155:13 185:4 185:19 187:4 207:10 208:8 |

**[2016 - 49,469]**                                                              Page 2

220:20 223:8
234:7,18
235:21 238:22
241:23 251:15
254:25 255:9
262:14 271:3
**2020**   38:10
47:14
**2021**   8:7 38:11
181:19
**2022**   34:16
35:2 71:9
112:13,17
295:9
**2023**   1:20 2:12
5:5 297:22
**206**   295:18
**21**   51:12 68:22
121:21 122:19
**22**   223:8
**222**   295:20
**226,074**   221:7
224:6
**23**   47:14 58:11
**234**   295:21
**238**   295:22
**24**   96:16,17
**2400**   270:17
**241**   296:4
**243,205**   253:16
**243,245**   235:20
237:2 238:20
241:24
**248**   296:6

**25**   51:16 96:16
96:17 112:12
112:17 295:9
**25,100**   180:10
183:4
**250**   48:13
**256**   296:7
**26**   63:16,20,21
66:20 96:16
133:21
**260**   296:8
**26017**   177:12
**27**   71:17,21
72:7,8
**277**   263:13
**278**   263:12
**28**   65:5 71:21
72:4,9,10,12
**29**   74:13 82:18
83:5
**2:17**   153:4,5
**2:25**   153:6,10
**2s**   242:23

**3**

**3**   114:12 154:2
154:7,23 186:7
194:5 196:13
241:21 295:11
**30**   8:7 42:14
80:4 82:19
83:5 96:19
**300**   48:8
**31**   96:19
**32**   91:25 92:11

**350**   48:13
**350,000**   202:16
**359**   297:24
**36**   145:15
**367,000**   185:14
208:7
**367,323**   208:21
**367,447**   188:7
193:2 194:3
**37**   106:20
107:20 109:19
146:19
**38**   95:20,20
98:19 101:4,13
109:19
**39**   52:2,6 101:6
126:19,23
127:8,10,11
133:15,17,18
134:14 136:3
139:8 158:9
160:2 162:6
166:24 172:7
**3:00**   226:15
**3:20**   1:3 5:24
**3:26**   195:16,18
**3:34**   195:19,25
**3c**   188:22

**4**

**4**   114:14 116:4
175:3,5,7
207:18 295:12
**4,000**   255:11
**4,393**   264:10

**4-6**   185:8
**4.2**   265:25
**40**   11:14
225:24
**40,000**   255:15
261:23 265:24
266:12,20
268:20 270:18
**401**   47:17
**41**   121:3,4,16
124:13 125:11
126:9
**42**   255:5
**44**   97:8 99:2
**45**   99:11
100:22,25
102:14 126:24
126:25 127:6,9
127:10 205:13
220:3
**46**   52:6,10
185:5,7,17
**47**   103:20
140:3,19
205:14,20
210:7 220:3,21
220:23
**49**   128:2,5,18
**49,367**   263:14
**49,382**   263:10
**49,393**   261:19
**49,468**   261:24
265:10
**49,469**   261:24
265:10

**[49,470 - a.m.]**                                                    Page 3

**49,470** 261:24
  265:11,23
**49,471** 261:25
  265:11 266:3
**49,526** 265:8
  266:16
**4:30** 245:5
**4:56** 254:9,10
**4a** 58:10
**4b** 71:16

---
**5**
---

**5** 119:14
  126:12 127:23
  129:10 131:5
  174:24 175:8
  181:11,14
  182:15 183:14
  225:25 226:12
  250:13 295:4
  295:14
**50** 11:15 48:11
  60:9
**50,000** 256:3
  267:5 270:9
**50,813** 266:21
  267:8 270:11
**50,824** 266:17
  267:6 270:10
**50/50** 168:14
  169:3
**500** 16:19
  41:18,20 48:12
  163:15
**51** 3:14 277:10
  289:7

**52** 289:8
**52nd** 3:14
**53** 250:21
  289:14
**54** 186:3,5
  210:7 222:3
  239:5,25 242:8
  242:25 243:25
**56** 222:2,3
  225:19 226:11
  239:6 240:2
  242:9 243:2,25
**577,000** 133:20
  153:18 160:5
**577,403** 162:7
  162:25 165:12
  167:6
**577,938** 162:6
  162:23 165:10
**5:10** 254:11,17
**5:17** 260:6,7
**5:19** 260:8,12

---
**6**
---

**6** 1:20 2:12 5:4
  47:14 139:12
  141:7 142:14
  153:19 155:3
  156:8 163:6
  181:10 186:16
  186:21 201:7
  220:20 226:15
  295:15
**6,293** 256:21
  257:18 259:11

**6/7/2016** 183:3
  183:24
**60603** 3:8
**63** 250:21,22
**6:01** 285:25
  286:2
**6:02** 286:3,7
**6:13** 293:14,15
**6:14** 293:16,20
**6:15** 294:10,11

---
**7**
---

**7** 134:16 139:8
  153:20 155:13
  163:10 180:7
  186:16 197:3,7
  295:17
**71,000** 114:20
  115:19
**710** 1:6 8:23,23
  143:14 180:7
  183:13,16
  184:5 250:25
  251:16 255:11
  264:13
**710's** 234:5
**7100** 196:17
**75** 42:15
**7b** 206:18

---
**8**
---

**8** 54:17 206:18
  206:23 240:5
  241:23 245:3
  295:18

**8/2/2016**
  187:19
**80** 45:21
**822016** 208:14
**8:44** 186:7
**8:45** 225:22
**8:47** 240:5
  245:5,6

---
**9**
---

**9** 39:15 44:6,25
  186:9 222:19
  222:20,23
  231:15 234:7
  234:18 235:21
  238:22 251:15
  254:25 255:9
  295:20
**9.99** 231:15
**9/6/2016**
  223:10,15
  227:6
**90** 45:21
**900** 190:19
**99.2994** 247:24
  249:16 251:15
**99.2994.** 237:25
  249:3 251:10
**9:50** 1:21 2:13
  5:3

---
**a**
---

**a.m.** 1:21 2:13
  5:3 48:23,24
  186:9 194:5,6
  244:10 247:3

**abbreviation**
  78:4 158:20
**abbreviations**
  249:23
**ability** 116:6
  152:3 166:14
  277:12
**able** 12:12
  30:18 117:18
  124:9,12,14,18
  216:14 219:24
  250:3,5
**absence** 174:17
**absent** 101:13
  102:15 161:13
  170:10 173:7
  174:13 204:25
  205:3 281:17
**absolutely**
  227:21 267:22
**abstracting**
  45:12
**ac** 249:9
**academic** 15:2
  20:25 21:10
  26:3,19 36:20
**access** 13:12
  53:20 144:11
  147:9 150:16
  156:14,19
  172:9 187:23
  189:4 263:20
**accessed**
  113:21

**accessing** 158:5
**accompanying**
  65:11
**account** 16:22
  74:17 85:25
  136:13 178:2
  178:11 179:3
  179:18,24
  192:15 262:18
  262:22,23,24
  264:4,13,18,23
  265:4,5,12,17
  266:11,15,22
  267:7,9,11
  269:10,18
  270:11 272:10
  273:9
**accountant**
  264:16
**accounts** 16:16
  178:7 179:9,22
  263:7 271:10
**accumulated**
  210:14
**accurate** 39:21
  69:13 93:23
**accurately**
  10:22 14:21
  30:15 44:20
**achieve** 168:18
  191:8
**acknowledge**
  216:17
**acknowledge...**
  298:3

**acquire** 101:15
  101:18 102:12
  102:23 116:6
  281:15 288:17
**acquired**
  120:15 180:6,9
  202:25 204:2
  211:13 228:14
  255:14 256:2
  267:12 268:15
  268:17 270:3,4
  278:12 280:10
  281:14 287:6
  288:15 291:12
**acquires**
  272:15
**acquiring**
  211:14 289:18
  291:22
**acquisition**
  69:5 99:15
  202:4 219:7
**act** 218:12
**action** 6:9 7:25
  8:5,6 14:3,8
  35:18 121:23
  181:18,19
  297:18
**actionable**
  162:3
**actions** 39:9
**active** 66:18
**activities** 18:3
  33:22

**activity** 18:4,6
  22:22 33:20
  38:24 184:15
  191:4 239:22
  243:16 262:16
  263:10
**acts** 272:19
**actual** 93:24
**actually** 42:20
  42:23 68:12
  81:17 114:15
  135:3,12 145:6
  185:25 188:16
  193:11 194:3
  204:11 224:5
  226:2 231:6
  246:22 268:10
  282:16
**ad** 160:11
**add** 69:9
  236:11
**added** 132:11
  256:16,16
**addition** 89:16
  146:15 224:19
**additional** 20:3
  28:11 30:8
  50:5 69:11
  122:13 123:22
  124:17 129:2
  132:22 133:3
  138:10 172:21
  174:17 211:6,8
  212:11,11
  236:9 281:4

**[additions - adrs]**

**additions** 298:6
**address** 187:5
 234:19
**addressed** 21:9
**adequate**
 259:15
**administer**
 4:16 6:8
**admittedly**
 246:15
**adr** 15:11,14,17
 57:3,16 58:16
 58:19,22 60:25
 61:3,8 62:4,8
 62:21,25 63:3
 63:9,11,14,24
 64:5,10,12,13
 64:18,18,24
 65:15,16,21,25
 66:15,21 74:5
 74:7 79:9
 80:18 81:13
 85:22,22 86:4
 93:5 95:13
 97:24 98:8,12
 98:13,14
 108:20 109:22
 117:9,15 118:3
 118:7 120:8,25
 136:8 137:20
 142:7 147:21
 147:22 153:20
 168:23 169:11
 169:11 170:20
 188:7 194:23

 194:25 207:11
 207:12 210:8
 210:22 211:17
 225:12 234:21
 234:25 235:6
 267:18 268:8,9
 268:10,11
 271:2 272:11
 274:11,14
 276:20 277:23
 286:11 287:21
 287:25 288:9
 288:20
**adrs** 18:12
 54:22 56:22
 62:13,17 64:7
 64:16,22,23
 65:4,7,11,14
 66:9,17,19
 67:5,8,13
 68:14,19 69:4
 69:17 70:4
 71:24 72:16,20
 73:9,20 74:14
 74:18,24 75:4
 75:22 76:16
 77:18,22 79:2
 79:5,7,12 81:8
 81:22 82:3,20
 83:5,18 84:6
 85:7,20 86:2,3
 86:12,15,21
 91:9,18,21
 92:6,7,12 93:6
 93:24 94:12,13

 96:4 97:7
 98:21 99:20
 101:10,16,16
 101:18 102:12
 102:23 103:24
 106:23 107:2
 114:21 115:19
 116:6,9 120:2
 120:7 121:19
 121:22 128:10
 128:12,24
 134:16 135:19
 139:4,9,21
 140:6,13,15
 148:4,5,10,16
 149:5,11,14
 156:15 157:13
 157:20,22
 158:3,4 159:2
 159:16,17,18
 159:18,19,24
 159:25 160:5
 162:6,7 163:12
 167:3 171:20
 172:10,14
 173:23 179:7
 179:16,17
 180:6,10
 185:13 186:12
 187:23 189:4
 189:13,21,23
 189:24 193:2
 196:17 201:13
 202:4,16,22,25
 205:10,19

 206:2,8 208:21
 209:13 210:3
 211:4 212:14
 212:20 213:3
 219:6 221:5
 222:7 223:16
 223:20 224:7
 234:6 237:2,19
 237:19 241:22
 241:24 247:19
 248:19 249:15
 251:14,17
 255:12,14,15
 256:2,3 264:3
 265:24 266:14
 266:17,21
 267:5,6,8,9,13
 267:13,14
 268:3,4,12,18
 270:3,4,10,14
 270:21 271:17
 272:9,16,16,18
 273:4,8,21
 274:24 275:6,8
 275:10,14,19
 276:8,9,14,18
 276:19,21,24
 276:24 277:7,8
 278:10,20
 279:2 280:2,10
 281:12,16
 284:20,22
 285:2,3,17
 286:12 287:3
 287:10,12,22

**[adrs - analysis]**

287:25 288:5 288:17 289:11 289:12,20 290:8,18,23,25 291:11,15,23 292:21,23 293:3

**advantageous** 67:11

**advantages** 89:24 90:3

**adverb** 73:6,17

**advice** 18:8 19:21

**advised** 88:17 88:18

**advising** 25:6 77:8 244:13

**advisor** 17:23 115:5

**advisors** 113:23

**advisory** 27:12

**affiliations** 6:16

**affirmatively** 43:7

**afternoon** 210:10

**ag** 5:20 47:10 47:12

**agent** 177:11

**aggregate** 92:11,16,20

**aggregated** 94:11 95:6

**ago** 56:9 62:6 110:19 127:20 207:7 242:21

**agree** 5:13 27:9 114:25 118:4 209:23 222:9 241:2 257:6 277:17,19 278:5

**agreed** 4:5,9,13 116:20 263:20 293:22

**agreeing** 32:15 208:15

**agreement** 80:13 85:8,16 87:17 95:25 96:7,9,23 97:5 97:12 101:9 102:18 136:5,6 136:25 137:10 137:10,15,17 137:22 138:6 210:20 211:18 291:4,19 292:9

**agreements** 82:8

**ah** 47:2 249:11

**ahead** 15:20 114:11 257:15

**aiptf** 102:6 103:23 113:12 113:21 120:13

140:12 278:25

**aiptf's** 113:22 116:6

**akin** 88:4

**aktiengesells...** 1:12 298:1 299:1 300:1

**al** 5:20,20 298:1,1 299:1 299:1 300:1,1

**alan** 3:21 6:3

**aligned** 114:2

**allay** 227:7

**allege** 113:8

**alleged** 55:3 57:3 80:18 120:25 121:21 126:17 132:19 143:13 283:9 283:20

**allocate** 270:13

**allocation** 168:14,18 169:3 179:12 191:2

**allow** 128:9

**allows** 74:10 129:20

**ally** 150:20

**alter** 173:21 174:12 275:11

**alternative** 80:7 82:10 88:12

**ambiguity** 149:19 193:3

**ambiguous** 93:11 123:3 134:19 149:15

**amenable** 291:23

**amended** 8:5 181:12,18 295:14

**amendment** 51:2

**american** 97:17 134:23 135:13 135:15,16 137:8 138:13 138:20 159:11

**amicus** 37:9,14

**amount** 46:23 46:25 188:6 224:8 228:13 228:16 229:17 230:3,14,18,22 261:21 265:24 274:20

**amounts** 128:4 137:7 159:25 261:22 262:19 264:8

**analogous** 66:5

**analogy** 136:15 168:13 169:12 218:5

**analysis** 18:9 18:10 19:22

23:23 28:20 29:8 30:7,20 43:3 56:7 75:7 76:3 81:5 109:18 120:24 128:7 132:12 132:14,16,18 166:24 210:6 239:25 245:13 256:4 281:3 283:23 284:15 284:24

**analysts** 66:23

**analytics** 26:23 27:5,8,10,15,18 27:24 28:2,14 32:11,20,24 40:2,5

**analyze** 89:11 240:20

**analyzed** 191:3

**analyzing** 62:25 64:10 77:9 89:9 126:16 130:7 164:5 283:9,20

**anecdotal** 38:18

**angeles** 255:18

**answer** 9:15 20:11 21:14,20 24:16,20 25:15 33:6,11 34:5,8 34:16 35:24 41:11 43:6,22

44:19 46:19 47:16 59:12 60:19,24 61:12 67:25 74:22 80:25 87:12 99:8 101:3 107:6,10,12 108:24 109:24 110:11 136:17 146:6 151:17 172:2 173:15 178:16 211:3 214:18 215:2,6 230:7 233:11 262:6 263:6 266:7 268:25 269:4 271:8 273:23 277:4 282:17 283:15 290:13

**answered** 87:11,15 129:7 147:23 148:11 151:18 174:3 230:6 232:14 290:11 292:2

**answering** 9:9 42:4

**answers** 220:19

**anticipate** 92:25

**anyway** 21:23 60:17 141:23

**apart** 15:2 32:23 201:21

**apologize** 230:10

**app** 258:9

**apparent** 119:9

**apparently** 167:5

**appealing** 37:17

**appear** 117:25 192:10 224:15 224:17 239:24 249:14

**appearance** 6:13

**appearances** 3:2 6:15

**appearing** 1:19 1:25 2:19

**appears** 13:15 161:4 210:11 240:4 243:21 244:5 245:7 246:11

**appellants** 37:15,20

**appended** 298:7

**appendix** 14:16

**apple** 169:14 169:19 172:24 173:2 174:7,8 190:12 193:9

**applicable** 102:18

**apply** 33:7 97:14

**applying** 109:6

**appreciate** 133:12 241:16 259:24

**approve** 32:4

**approved** 117:5

**approximate** 35:9 41:16 230:4,8,21

**approximately** 11:14 24:14 27:17 33:25 34:10,23 35:4 44:15 48:2 52:22 75:21 270:15

**approximation** 11:21

**aquarius** 155:5

**area** 159:7 288:24

**argued** 37:20

**argument** 116:5

**arises** 193:20

**arising** 200:20

**arm's** 252:21

**arose** 276:11,12 277:3

**arrangements** 291:9

**arranges** 288:2
**arrive** 84:4
**arrived** 11:12
  31:5,6 123:10
  155:19
**arrives** 13:11
  13:14
**ascribe** 152:13
**aside** 79:13
  120:21 127:17
  155:23 185:3
**asked** 19:11,24
  20:10,14,22
  23:2 33:12
  52:20 54:11,19
  54:25 55:5,13
  55:15 56:3
  69:21,23 70:5
  70:11 86:18
  87:4,15 100:4
  103:15 104:12
  106:14 143:3
  155:16 168:13
  169:13 200:6
  214:12 219:15
  220:13 229:15
  229:21 230:6
  232:13 284:12
  292:15 293:4
**asking** 73:7
  92:17 199:7
  218:7 284:9
**aspect** 63:19
**aspects** 43:12

**asserted** 182:10
**assessment**
  147:13
**asset** 142:24
  143:5,21
  184:22 252:24
**assist** 28:19
  29:4 30:14
**assistant** 42:13
**assisted** 28:13
  28:16,22
**assisting** 31:17
**associated**
  124:15
**assume** 119:22
  247:4
**assumed**
  162:13 217:13
**assuming**
  122:24
**assumption**
  150:23
**attached**
  182:19 183:18
  207:11,12
  235:6
**attachment**
  234:24
**attention** 66:22
  118:22 238:16
  247:10,21
  248:12 251:2
**attorney** 6:17
**attorneys** 3:5
  3:13 4:6

**attract** 90:4
**attributable**
  271:5
**audio** 5:11
**audits** 23:5
**august** 185:4
  185:19 187:4,4
  207:10 208:8
**authored** 37:9
**authorized**
  4:15 6:7
**automatically**
  169:22 170:21
**available** 22:18
  68:7 78:17
  96:6 106:22
  110:3 125:8,12
  125:23 126:5,7
  126:9 144:6,9
  145:3,17 146:9
  146:10,20
  147:4 150:13
  150:24 152:17
  152:19 172:5
  219:21 232:20
  280:7 282:3
  289:15 292:18
**average** 74:23
**averted** 247:23
**avoid** 60:8
**aware** 37:19
  77:21 83:19
  85:7 87:21
  88:8 89:6
  104:6 121:20

  129:24 130:4
  143:12 170:2
  180:8
**awareness**
  89:18,22

**b**

**b** 188:16
**back** 11:15
  32:2 33:14,21
  34:8 37:16
  38:11,25 41:15
  43:5 45:8 48:6
  49:7 52:16,24
  99:19 111:25
  112:2 135:24
  153:9,11
  154:12 155:25
  156:5 159:14
  169:5 173:4
  176:16 181:8
  186:2 196:2,8
  201:7 215:16
  233:18 247:5
  254:18 260:11
  286:6 290:12
  293:12,19
**bad** 46:22
**baffles** 205:6,8
**balance** 265:5,7
**bank** 65:10
  79:11 91:22
  93:12,14,21
  94:13,23 95:2
  95:5,12,17,21
  96:4,13 97:6

**[bank - bayr]**                                              Page 9

98:13,20 99:4
100:9,17,19
101:9 104:24
128:20 134:24
135:12 136:12
136:13,18
137:11 158:15
158:21 202:8
203:7 255:16
257:21 261:17
264:13,14
265:20 267:15
268:11,17
270:5 271:13
273:10,20,22
275:5 276:2
289:16 290:5
290:16,24
291:4 292:3,4
**banks**  272:5
**bar**  36:23
**barclays**  99:16
99:19 102:2,4
103:11,21
104:6,16
114:22 115:3
115:14,16,20
115:23 116:10
116:17,23
117:7 119:17
119:22 120:15
140:10 205:15
278:23
**bargaining**
252:21

**barreca**  3:17
6:21
**bartel**  3:18
6:22
**base**  68:5
**based**  39:25
45:2 75:20
78:23 80:13
86:9 88:6,13
96:5 103:8,13
103:16 117:25
122:3 126:8
140:13 143:8
145:16,19
146:8,24 147:3
151:10 185:18
199:3,19 210:9
226:2 237:15
239:22 249:13
249:22 250:3
265:22,22
268:21 273:19
285:5 286:18
289:3
**baseless**  285:4
**bases**  49:21
**basic**  66:7
67:15 88:8
174:12,16
204:24
**basically**  216:5
216:8
**basis**  28:4
55:17 57:7
70:20,22 71:10

74:19 75:5,23
79:11 85:14
87:5 99:2
123:17 200:13
218:19 219:4
225:12 253:21
264:25 277:13
284:16 286:9
289:16 290:7
**bassiouny**  7:3
**bates**  52:4,6,9
52:11,16 154:6
154:10 175:2
186:20 206:22
222:22 238:9
241:9 256:9
260:14,20
295:11,13,16
295:19,20,23
296:4,7,9
**baumann**  1:12
**bayer**  1:12 5:20
47:10,12,21,22
54:21 56:22
57:3 65:7
71:24 72:20
73:9 74:14,18
74:24 75:4,22
76:16 77:18,22
78:25 79:5,6
79:19 80:18
81:22 82:20
83:18 84:6
85:7,22 86:2,3
86:12,20 91:9

91:18 92:5,12
93:6 96:4 97:7
106:23 107:2
120:25 121:19
121:21 128:10
128:11 133:20
139:9,19
147:20,22
149:11 153:19
158:25 159:2
160:6 161:14
173:22 179:7
180:6,10
185:13 201:12
201:13 208:21
221:5,7 222:6
222:10 234:6
235:20 238:21
241:22 248:19
249:15 252:7
254:24 255:11
268:3 272:15
274:24 280:2
281:12 284:19
284:22 285:16
286:12 287:3
287:10 288:4
289:10 290:8
290:23 291:6
291:15 298:1
299:1 300:1
**bayer's**  85:20
**bayngr**  208:8
**bayr**  188:16

**[bayry - bottom]**                                                     Page 10

**bayry** 158:13
  159:10
**bear** 77:14
**bears** 173:5
**becoming**
  68:14
**began** 26:11,12
  186:4,7 243:11
**beginning** 6:16
  25:19 120:8
  214:24 263:9
**begins** 5:15
  49:3 111:22
  157:14 165:19
  195:22 244:2
  254:14 263:14
**behalf** 1:7,9
  6:25 15:11,14
  15:22 37:20
  113:16 116:12
  116:19 117:2
  117:10 119:18
  145:7 184:23
  222:11 228:14
  237:3 238:21
  240:18 241:23
  252:9 253:5,9
**behavior** 20:10
**belabor** 7:20
  172:23
**believe** 28:25
  33:13 34:25
  36:9 37:17
  38:8,10,25
  39:2 43:8,23

46:17 47:17
51:19 52:4,13
52:25 53:4
61:10 77:16
78:12 109:5
119:7 126:4
177:21,24
178:4,25 179:4
179:6,23
185:22,24
236:2,4 239:13
262:2 264:5
266:8 282:23
282:24 286:9
292:16
**bell** 156:3
**ben** 214:11
**benefit** 40:16
  40:16
**benjamin** 3:9
  6:23
**bespoke** 291:8
**best** 28:24
  33:19,21 78:14
  78:14 122:14
  150:8 165:17
  193:6 225:8
  229:5,5 231:7
**better** 14:24
  202:12 215:24
  253:4
**beyond** 56:8
  69:19 79:25
  85:12 92:23
  99:6,21 103:3

117:17 118:9
143:17 151:16
169:9 177:20
189:15 197:17
198:15 201:16
203:22 205:12
213:15 217:3
218:2 223:22
237:7 251:21
275:16 279:16
280:16 292:6
292:25
**bid** 78:14 229:6
**big** 94:20,21
**bill** 40:5,11,18
  40:23,23 42:6
  43:25
**billable** 40:15
**billed** 40:19
  42:23 46:10,13
  46:18,20
**billing** 42:20
  45:24 46:3
**billings** 39:25
  45:2
**binding** 192:2
  193:18 213:20
  215:19 225:4
**bit** 68:13 69:15
  93:11 95:16
  112:24 155:12
  160:15 177:10
  218:7 243:18
  249:7 272:9

**block** 67:5,13
  68:9 93:25
  94:7,18,21
  221:6 251:17
  252:7 253:14
  253:16
**blocks** 93:8,22
  94:15,20
**blood** 297:18
**bloomberg**
  110:9 111:2
**bny** 94:17 96:3
  97:25 100:7
  104:24 105:14
**body** 51:6
  235:5
**bond** 136:22
**bony** 158:12,14
  187:25 188:12
**bookkeeping**
  262:20
**books** 187:25
**borrow** 276:19
**borrowed**
  266:13 270:14
  275:14 276:10
  276:14,18
  277:8
**borrowing**
  255:14 256:2
  257:20 261:16
  267:14 275:10
  275:18 276:3
**bottom** 114:16
  196:16

**[bound - buying]** Page 11

**bound** 83:15 102:7 103:18 103:23 120:7 140:12 168:23 205:18,25 206:6,7 218:12 278:25 281:15 288:17

**breadth** 130:7 130:11

**break** 9:12 44:11,13 48:2 48:17 49:10,13 59:14 107:8,16 111:9 112:8 250:15 254:5 254:20,23

**breakdown** 207:14

**brief** 26:4 37:10,14 249:22 287:13

**briefly** 211:2 290:13

**broad** 76:5 104:15 166:20

**broader** 38:20

**broker** 22:23 23:11 65:6,9 69:3 80:14,22 81:24 82:9 83:19 84:5,7 85:8 86:20 94:3,7,20,21 95:6 104:7,15

104:17,22 105:6,12 106:22 107:19 107:25 108:2,4 108:4,6,10 114:21 115:3 115:20,24 116:18 123:9 126:14 136:21 138:19 141:13 141:14,14,16 141:16,19 146:21 149:2 149:14 164:2 165:2 166:2,5 166:14 168:2,4 168:7,11,14,15 168:16 169:2,4 169:13,18 172:12,19,24 172:25 173:3,9 174:6,8 176:17 176:17 177:4,4 179:8 185:12 190:13,18 192:2,5 193:8 193:11,15,25 193:25 200:19 200:19,20 203:6,12,17,17 203:20 204:2,7 204:8,11 211:23 214:8 215:25 216:2 216:13,14,15

217:19,21,23 218:6,22,24 221:4 228:18 228:19,20 229:6 231:4 232:4,9,18,19 232:23 233:2,3 233:11,13,16 246:21,25 264:2,20 269:7 271:15 272:9 272:15 275:8 275:20 276:13 276:17,17,20 276:23 277:20 278:7 279:9 290:25

**broker's** 94:8 190:16 242:15 276:13,15 277:4

**brokerage** 15:8 16:25 18:6 52:8 85:25 94:2 125:3,6 126:6,21 127:4 127:12,15 129:12,13 133:24 134:3 134:11 138:17 149:7,8,17 164:5,5 167:10 171:25 176:11 177:2 191:4,24 225:18 242:3

242:12 244:15 246:16 249:20 279:19 281:7 287:8,16

**brokers** 81:19 89:12 93:18 109:21 110:21 128:15 169:15 177:4 204:13 230:13 233:21 244:20 269:14

**brotherhood** 1:6 8:22 183:12 249:9 255:10

**browser** 10:14

**bundle** 93:19 94:4,19

**buy** 68:14 74:6 85:25 139:21 162:21 169:13 169:15,17 174:6 190:13 218:8,10,17 223:16 228:18 229:5 230:24 269:8,15 276:18,20,24

**buyer** 74:6 78:13

**buyer's** 162:20

**buyers** 64:8

**buying** 101:16 275:19

**[buys - caught]**

**buys** 174:8,9

**c**

**calculate** 45:10
**calculated**
75:18 131:14
**calculation**
76:14 92:24
93:2 266:2
**calibrated**
190:22 191:17
**california** 1:2
5:22 51:17,19
255:18
**call** 8:17,21 9:2
60:15 173:4,9
218:22 247:9
247:21
**called** 7:6 13:13
18:8 24:24
26:23 33:15
37:10 89:10
142:10,16
191:12 204:14
234:19
**calling** 218:16
**calls** 21:18
23:17 24:11
25:25 35:20
53:14 58:23
69:18 98:5
131:3 137:12
144:21 219:10
284:4
**camera** 5:8

**cancel** 65:11
98:14 156:15
172:10 173:9
215:11 216:14
216:21,23
217:22
**cancelability**
173:6 213:7
**cancelable**
173:15 174:15
194:5 204:21
204:23 205:5
212:8 213:12
215:3 219:6
233:17,23
245:12
**canceled** 66:10
**cancellation**
98:8
**cancels** 170:23
**cap** 192:25
194:15
**capability**
193:14
**capacities** 77:9
**capacity** 17:10
18:2 21:4
36:12,13 77:7
82:16 89:9
110:24
**capital** 68:4
**career** 26:13
**careful** 18:5
30:6 250:4
269:23

**carefully** 26:8
155:25 157:7
176:3 178:23
179:21 190:21
240:23 246:17
253:25 269:23
270:7 286:25
**carol** 3:10 7:2
36:9,10,14
37:2
**carried** 163:14
**carries** 275:21
**carry** 204:9
**carrying** 71:21
**carryover**
119:15
**case** 1:3 5:23
18:13 19:3,14
20:13 28:10,11
34:20,24 37:10
37:20 38:8
39:12 40:12
41:5 42:24
43:9 45:3,3,4
45:18,18 47:7
49:19 51:16
55:25 56:4,8
67:25 68:23,24
69:17,22,24
70:6,8 73:15
74:2,9 75:10
94:9 99:20
100:4,6,10,12
100:21 101:2,6
101:7,15,22,24

101:25 102:11
102:19,22
103:10,17,21
104:8,20
105:25 106:4
112:24 137:20
140:8 141:22
143:4 144:25
145:10 148:6
148:12,17,20
150:2,25 151:4
152:9,18
162:15 189:22
194:13 196:4
199:6 200:7,8
203:25 206:5
220:11 224:22
227:17 244:4
244:23 251:25
259:16 263:8
264:25 266:16
267:4 271:14
273:7 274:16
274:16 278:18
279:7 281:9
283:21 286:10
287:9,14 288:5
292:13,14
**cases** 42:19
237:13
**cash** 232:21
**category** 62:16
**caught** 30:12
222:20

**[caused - clarification]**                                    Page 13

caused  120:13
caution  35:21
  53:16 130:23
caveat  241:2
caveats  60:20
center  258:23
central  51:17
certain  24:18
  31:13 87:22
  93:18 94:10
  109:12 110:2,3
  155:23 156:3
  179:7,8 192:25
  201:24 233:12
  244:21 270:19
  278:5
certainly  52:18
  67:11 100:13
  166:25 168:3
  213:8 229:9
  251:22 253:24
  258:24 273:11
certainty  216:2
  216:13
certificate
  297:2
certification
  4:8 182:4
  183:11,14
  250:24 251:3
  253:15
certifications
  252:11
certified
  121:21 297:6

certify  297:9,16
challenge  42:4
  215:15 246:6
challenges
  217:11
chance  84:19
change  33:11
  50:15,20 138:3
  164:22 167:9
  174:18,20
  195:8 236:10
  280:23 299:4,7
  299:10,13,16
  299:19 300:4,7
  300:10,13,16
  300:19
changes  66:14
  298:6
changing
  118:19 147:6
  276:4
characteristic
  133:9
characteristics
  63:8 89:22
  90:24 278:19
characterizati...
  105:17 138:9
  288:18
characterize
  23:19 24:2,6
  70:16 93:24
  110:21 160:8
  175:18 198:7
  198:13,18

252:17 274:8
characterized
  21:23 69:7
  200:21,22
  212:4 220:8
characterizes
  227:18
characterizing
  154:13 171:12
  171:14
charge  44:3,21
  45:14
charged  44:17
chastise  214:12
  214:15
chat  110:9
  188:2,15
chats  111:2
check  11:16
  32:2 33:14
  36:8 38:12,25
  41:15 43:5
  47:2 48:6 53:6
  156:6 178:3
  181:8
checked  52:25
cherry  132:6
chicago  3:8
china  255:16
  257:21 261:17
  265:20,22
  267:15
choice  171:18
choose  130:20

choosing  64:17
chose  131:12
chris  155:4,8
  156:9
chrome  10:14
circuit  51:20,23
  109:5 146:18
circulate  65:25
circumstances
  16:12 20:7
  30:10 73:8
  148:14 270:19
  288:7
citation  51:8,15
  52:2,4 130:2
  196:21
citations
  129:24 199:14
cite  70:13 92:10
  96:20 99:12
  100:19 126:13
  244:23
cited  29:10
  106:11 127:18
  127:20 129:14
  129:15,23
  243:24 258:20
  259:14
cites  68:23
citing  103:21
city  255:17
  265:21,22
claims  182:9
clarification
  98:18 133:13

**clarify** 16:6
  18:20 77:2
  105:7 124:10
  179:9 200:18
  227:5
**clarifying**
  167:14
**class** 8:5 39:8
  47:13,23 55:8
  55:17,19 56:22
  57:7,9 74:25
  75:6,24 77:17
  77:23 78:8
  79:2,7,18
  82:16,21 92:6
  92:12,20 126:2
  126:4 143:23
  181:18 182:15
  183:15 279:23
  280:4,5 283:11
  283:22,25
  284:16 285:19
  286:12 291:24
**classes** 54:21
**classified**
  277:13 290:7
**clean** 52:15
  180:17 263:21
**clear** 11:11
  32:22 59:5
  60:13 71:3,5
  82:5 90:16
  91:6 135:11
  138:18 162:14
  162:15 177:8,9

179:21 191:20
194:7,8 201:25
206:14 221:20
223:25 226:25
226:25 243:8
246:19 263:18
266:21 268:14
279:20
**clearbridge**
  113:22 114:3
  115:5 116:13
  116:20 117:2,4
  117:10 119:19
  119:25 120:6
  120:13
**clearbridge's**
  114:19,21
  115:18,20,23
  116:18 196:16
**clearer** 177:5
**clearing** 18:7
  22:21 23:15,21
  24:4,25 25:8
  25:22 26:6
  52:7 61:15
  81:11 95:9
  105:23 124:14
  124:19,25
  125:5,24 128:3
  128:8 138:24
  147:24 148:2
  148:12 255:13
  255:25 260:23
  262:9,11 265:4
  265:17 268:13

269:4,17
270:24 271:9
271:20,23
272:25 273:7
274:9 279:13
279:18,22
280:7
**clearly** 166:9
  208:17 218:9
  244:6 272:14
  272:21
**cleary** 96:25
**client** 15:11,14
  15:22 40:17,24
  44:3,18 45:15
  93:19 94:21
  95:4 116:12
  119:19 167:20
  168:4 179:19
  203:11 226:21
  251:16 267:11
  271:10 272:19
  273:3 277:20
  278:7,10
  279:10,21
**client's** 165:25
  171:4
**clients** 44:21
  46:2 89:14
  93:25 94:8,25
  95:15 109:21
  179:23 184:24
  204:6 252:10
  271:2,5,13,17
  272:4,12

**close** 26:12
  55:5 168:19
  171:6 174:23
  197:10 216:22
  228:21 229:10
**closed** 117:9
  134:2 199:12
  217:15,16
  218:6,9
**closely** 287:2
**closing** 165:7
  265:6
**code** 264:14
  265:17
**codified** 291:3
**cohen** 3:4 6:24
  36:5,6 37:23
**colleagues** 6:21
  7:2
**collectively**
  132:3
**colloquial**
  159:5
**colloquially**
  134:20 158:2
  176:8 209:7
**color** 118:19
**colossal** 256:17
**columbia** 28:6
  28:18 32:11,24
  34:3,12 42:12
**column** 113:7
  114:13,14,17
  116:3,3 119:14
  236:25 240:24

**[column - concerned]**

Page 15

240:25 245:19
246:12,21,23
247:23
**combine** 132:2
**combined**
225:14
**come** 25:10
128:16 133:8
135:24 161:20
234:14 263:5
264:24 270:17
270:21 293:12
**comes** 34:2
**coming** 35:11
35:12 150:7
196:2 200:25
265:16 266:4
266:25 271:22
**commenced**
141:8
**commercial**
255:16 257:21
261:17 265:20
267:15
**commission**
117:6
**commit** 202:14
203:10,12,16
**commitment**
142:12 149:4
165:7 245:15
275:13
**committed**
43:22 47:4
100:2 106:13

139:20 180:19
203:19 273:4
**common** 68:2
69:5 79:19
94:2 99:15
102:3 103:12
103:22 108:5
116:8,11,19,25
117:8 120:9,16
133:20 134:20
139:20 140:11
159:2 161:14
179:20 185:14
201:13 203:15
204:5,12
205:16,24
221:7 222:10
235:20 238:21
244:15 252:7
278:24
**communicate**
10:6
**communication**
35:23 172:21
173:18 174:10
200:18 202:8
279:9
**communicati...**
23:4 36:2
53:15,17,19
89:18 90:7,19
90:22 131:2
144:24 167:14
174:18 176:11
282:3 287:7

**companies**
38:14,23
**company** 38:16
38:24 65:24
**comparative**
90:3
**comparator**
104:21 105:13
**compare** 75:3
79:4,16 90:24
104:19 221:18
**compared**
91:21 288:3
**comparison**
75:12,20
**compelled**
203:2 206:10
206:14
**compelling**
220:12
**compensated**
39:11,20 42:19
**compensation**
32:10,17 39:16
39:25 42:22
44:25
**compete** 89:25
**complaint** 8:4,5
14:3 142:20
181:13,18
182:18 183:16
183:18 184:9
295:14
**complete** 12:9
29:8 49:18

110:23 120:7
167:5 169:11
210:22 211:3,3
211:11,15
212:21 266:7
271:23 298:9
**completed**
11:13 12:18
13:4,5 102:2,4
103:11 123:23
168:22 205:15
211:14
**completely**
10:21 131:18
150:19
**completeness**
32:15,22
**completing**
11:5 123:19
155:20
**completion**
12:10 110:4
167:3 211:18
**complex** 67:24
68:13
**compliance**
23:5
**component**
273:16
**computer**
10:10 257:9
**concern** 227:7
**concerned**
145:8

**[concerning - confidential]**                                    Page 16

| | | | |
|---|---|---|---|
| **concerning** | 145:17,23 | **conducted** 5:6 | 71:1 72:1 73:1 |
| 11:7 38:18 | 149:22 157:6 | 5:25 23:23 | 74:1 75:1 76:1 |
| 69:23 84:16 | 173:21 174:12 | 80:19 104:23 | 77:1 78:1 79:1 |
| 86:10 144:24 | 176:23 178:16 | 105:11 114:4 | 80:1 81:1 82:1 |
| 202:20 203:5 | 199:2,24 201:5 | 143:14 145:6 | 83:1 84:1 85:1 |
| 220:5 239:21 | 206:10,15 | 147:12 184:5 | 86:1 87:1 88:1 |
| 242:22 | 242:16,21 | 184:12 249:16 | 89:1 90:1 91:1 |
| **conclude** 58:21 | 243:18 246:18 | 283:24 291:15 | 92:1 93:1 94:1 |
| 61:2 81:14 | 249:21 255:21 | **conducting** | 95:1 96:1 97:1 |
| 83:15 115:14 | 256:4 266:9 | 30:6 109:18 | 98:1 99:1 |
| 132:5 139:7 | 276:5 281:20 | **confident** | 100:1 101:1 |
| 245:2,3 253:21 | 284:4 285:14 | 146:24 | 102:1 103:1 |
| 274:17 278:8 | **conclusions** | **confidential** | 104:1 105:1 |
| 280:12 285:6 | 56:17 93:3 | 1:16 7:1 8:1 | 106:1 107:1 |
| 293:6 | 127:22 147:3 | 9:1 10:1 11:1 | 108:1 109:1 |
| **concluded** 92:4 | 200:13 236:12 | 12:1 13:1 14:1 | 110:1 111:1 |
| 103:17 140:9 | 241:3 263:18 | 15:1 16:1 17:1 | 112:1 113:1 |
| 185:11 186:9 | 269:23 | 18:1 19:1,21 | 114:1 115:1 |
| 219:5 221:4 | **conclusively** | 20:1 21:1 22:1 | 116:1 117:1 |
| 239:14 | 284:18 | 23:1 24:1 25:1 | 118:1 119:1 |
| **concludes** | **condition** 73:17 | 26:1 27:1 28:1 | 120:1 121:1 |
| 48:19 195:13 | **conditional** | 29:1 30:1 31:1 | 122:1 123:1 |
| 254:6 294:5 | 98:8 201:23 | 32:1 33:1 34:1 | 124:1 125:1 |
| **conclusion** | 216:12 | 35:1 36:1 37:1 | 126:1 127:1 |
| 21:18 23:18 | **conditionality** | 38:1 39:1 40:1 | 128:1 129:1 |
| 24:12 26:2 | 202:11 216:12 | 41:1 42:1 43:1 | 130:1 131:1 |
| 58:24 62:7 | **conditioned** | 44:1 45:1 46:1 | 132:1 133:1 |
| 69:19 85:14 | 69:3 | 47:1 48:1 49:1 | 134:1 135:1 |
| 96:5,8 98:5 | **conditions** | 50:1 51:1 52:1 | 136:1 137:1 |
| 99:2 103:10 | 201:25 216:3,6 | 53:1 54:1 55:1 | 138:1 139:1 |
| 109:16 111:14 | 216:15,20 | 56:1 57:1 58:1 | 140:1 141:1 |
| 128:8,18 129:5 | 278:22 279:4 | 59:1 60:1 61:1 | 142:1 143:1 |
| 129:20 131:11 | **condon** 1:12 | 62:1 63:1 64:1 | 144:1 145:1 |
| 131:15 133:11 | **conduct** 219:15 | 65:1 66:1 67:1 | 146:1 147:1 |
| 137:13 145:16 | 219:17 281:3 | 68:1 69:1 70:1 | 148:1 149:1 |

**[confidential - consist]**

| | | | |
|---|---|---|---|
| 150:1 151:1 | 220:1 221:1 | 290:1 291:1 | **connection**  5:8 |
| 152:1 153:1 | 222:1 223:1 | 292:1 293:1,24 | 18:3,9,24 |
| 154:1 155:1 | 224:1 225:1 | 294:1 | 19:22 22:4,20 |
| 156:1 157:1 | 226:1 227:1 | **confidentiality** | 23:25 27:13 |
| 158:1 159:1 | 228:1 229:1 | 20:8,9 219:23 | 28:3 29:22 |
| 160:1 161:1 | 230:1 231:1 | **confirm**  29:2 | 35:5 36:16 |
| 162:1 163:1 | 232:1 233:1 | 30:18 105:24 | 37:23 38:13 |
| 164:1 165:1 | 234:1 235:1 | 118:15 173:4 | 39:12 43:11 |
| 166:1 167:1 | 236:1 237:1 | 177:23 178:8 | 50:6 53:12 |
| 168:1 169:1 | 238:1 239:1 | 185:2 188:3 | 65:21 71:12 |
| 170:1 171:1 | 240:1 241:1 | 252:2 | 82:11 88:10,18 |
| 172:1 173:1 | 242:1 243:1 | **confirmation** | 97:3,5,7 |
| 174:1 175:1 | 244:1 245:1 | 24:8 62:2 | 104:17 109:21 |
| 176:1 177:1 | 246:1 247:1 | 72:17 86:8 | 121:22 143:7 |
| 178:1 179:1 | 248:1 249:1 | 91:17 108:16 | 198:21 219:19 |
| 180:1 181:1 | 250:1 251:1 | 108:19 109:2,9 | 239:4 279:13 |
| 182:1 183:1 | 252:1 253:1 | 109:13 110:17 | **connotate** |
| 184:1 185:1 | 254:1 255:1 | 111:6 146:21 | 225:3 |
| 186:1 187:1 | 256:1 257:1 | 211:23 250:10 | **consecutively** |
| 188:1 189:1 | 258:1 259:1 | **confirmations** | 263:13 |
| 190:1 191:1 | 260:1 261:1 | 108:2,7 | **consider**  21:11 |
| 192:1 193:1 | 262:1 263:1 | **confirmed** | 126:15 |
| 194:1 195:1 | 264:1 265:1 | 110:9 117:5 | **consideration** |
| 196:1 197:1 | 266:1 267:1 | 187:24 276:17 | 135:16 138:13 |
| 198:1 199:1 | 268:1 269:1 | 276:18,20 | 158:4 159:23 |
| 200:1 201:1 | 270:1 271:1 | 277:6 | 163:12 209:17 |
| 202:1 203:1 | 272:1 273:1 | **confirms** | **considered** |
| 204:1 205:1 | 274:1 275:1 | 276:23 | 22:18 25:14 |
| 206:1 207:1 | 276:1 277:1 | **confused**  105:2 | 50:9 53:11 |
| 208:1 209:1 | 278:1 279:1 | 105:8 275:17 | 197:14 200:11 |
| 210:1 211:1 | 280:1 281:1 | **confuses**  59:22 | 200:24 242:24 |
| 212:1 213:1 | 282:1 283:1 | **confusing** | **considering** |
| 214:1 215:1 | 284:1 285:1 | 192:17 | 199:18 |
| 216:1 217:1 | 286:1 287:1 | **confusion** | **consist**  168:6 |
| 218:1 219:1 | 288:1 289:1 | 193:16 | |

**[consisted - copy]**                                                    Page 18

consisted 92:6
123:5 124:24
128:11 147:21
161:4 265:13
268:3 276:8
279:24 280:6
289:11 292:21
consistent
38:19 59:2
61:11 104:10
110:10 143:18
158:6,7 176:19
184:21 203:18
208:14 210:6
210:17 211:9
214:22 222:13
224:11 237:13
237:16,20
239:24 242:7
245:12 246:13
252:4 253:23
285:14 288:22
289:2
consisting
138:11 149:14
consists 94:19
135:2 157:13
constitute
189:12
constrained
68:2 233:14
constrains
166:13
constraints
232:20

construction
237:21
construe 58:25
284:5,13
construed
157:17,21
construing
59:10,11
consult 25:15
consulted
24:15
consulting
25:11,19 26:24
27:11
contact 36:22
contained
53:21 124:20
contains 52:6
114:14 215:22
256:14
contemplating
132:25
contemporan...
165:4
content 256:15
contents 53:17
261:7
context 36:18
131:21 156:25
157:7,19
162:17 178:18
199:21 200:17
242:10 244:22
contexts 189:18

contextual 46:5
242:4 244:16
contextualize
157:9
contingent
116:7
continuation
207:6
continue 5:12
171:19 197:18
209:3 218:4
continues
156:13 187:22
271:21
continuing
80:3 128:13
168:25 271:21
contra 99:12
101:21 102:14
contract 61:20
280:21
contractual
102:7 103:19
190:16 193:19
contractually
192:2
contradiction
213:18
contrary
101:14 102:16
170:11 173:7
174:14 205:4
213:9
contrast 58:15
64:23 101:21

conversation
46:6
conversations
37:4,8 38:6,9
39:4 150:6
152:11
conversion
116:12,25
134:18 135:5
135:20 138:5
209:6,10,11,18
210:22 211:17
convert 68:17
159:13 209:4,8
209:22 213:3
converted
94:11,13 116:9
120:2 134:16
159:21 208:22
279:2
converting
135:7 157:25
158:25 185:13
211:6
convey 131:15
134:10 192:13
conveyed
132:17 133:23
convo 188:11
copy 10:16,17
14:7 52:15
53:23 60:22
112:12 121:8
180:17 181:17
259:22 263:21

core  215:5
corner  259:18
corp  255:12
corporate
  96:20
correct  7:18
  13:25 17:6
  52:16 54:14,17
  56:15,15 61:4
  63:10 74:16
  117:15 132:5
  180:13 189:5
  220:24 235:21
  255:22 259:22
  298:8
corrected  51:23
correcting
  229:22
correction  51:2
  51:24
corrections
  298:6
correctly  30:15
  31:8 69:8
  122:25 140:21
  227:19
corresponding
  261:20 273:13
cost  46:25
  67:20 89:2
  158:25 188:2
  188:17
costs  67:13
  68:9,13 89:6
  188:22

counsel  3:9,10
  3:16,17,18
  5:17 6:14 11:6
  11:18 25:15
  35:23 49:9,13
  53:15,19 54:12
  109:16 112:7
  122:12 123:7
  144:24 150:6
  152:11 254:20
counted  122:7
  122:25 130:17
counter  65:8
  77:7 88:11
  95:5 170:15
  265:18
counterparties
  80:8
counts  122:3
county  1:25
  297:5
couple  145:14
  248:18
course  19:20
  23:9 25:5 26:3
  83:17 84:9
  85:19 86:3,23
  87:18 123:21
  128:13,25
  134:11 138:22
  141:18 149:2
  152:4,25
  169:10 194:23
  203:15 213:16
  216:18 232:15

239:10 240:22
  244:12 288:8
courses  33:3
court  1:2 4:17
  5:21 6:5 7:4
  9:8 70:3,15,16
  71:11 99:25
  101:22 102:10
  102:21 103:6,7
  103:14,16
  104:2 105:4
  106:2,5 109:3
  114:5 117:13
  117:19,21
  118:2,5 140:9
  140:19 141:24
  164:8 168:20
  170:18 191:11
  198:5 200:23
  205:2,14,20
  206:9,14 219:5
  220:4,7,14
  227:17 278:8
  278:17,21
  280:13 281:19
  281:23 282:4
court's  70:13
  71:8 106:10,13
  198:3 199:8,14
  199:17 205:21
  206:4,13
  219:25 220:9
  220:10 227:15
  288:14

courts  37:6
  51:13 61:11
  69:25 109:8
cps  158:13
  188:2
craft  32:7
crane  207:9
  223:9 234:18
crash  212:24
create  102:11
  156:15 158:13
  159:9,13 160:4
  170:14 172:10
  172:14 187:23
  188:17,22
  189:4 223:16
  291:20
created  66:10
  102:22 205:10
  237:3 245:24
creating  157:20
  171:20
creation  134:6
  157:13 159:17
  159:24
credits  264:16
criminal  23:25
critical  216:9
critically  280:3
cross  9:10
cryptic  177:3
cuff  241:5
  253:25
cumbersome
  8:15

**currencies**
209:15
**currency** 135:7
135:19,20,23
166:8 192:16
192:21 209:6
209:11 212:10
237:12
**current** 190:14
213:21 228:23
229:4,5
**currently** 10:10
31:23
**custodial** 178:2
178:7,11 179:2
179:9,18,22,24
253:2 264:4,7
264:12 266:11
267:10 271:13
271:15 272:5,6
273:8
**custodian** 97:9
97:12 271:18
**custodians**
95:15
**custody** 95:11
98:23 101:12
128:23 179:15
179:17 180:3
252:25 253:3,8
262:10 263:3
264:2 289:19
290:17
**customary**
227:25

**customer**
200:22 232:21
232:22,23
240:24 277:5
**cv** 1:3 5:24
14:19,21 26:22
**cvs** 43:6

**d**

**daily** 67:21
74:19 75:4,5
75:21,23 79:5
79:11,17,18,23
92:10 262:15
263:10 264:24
**dangerous**
213:22
**danielle** 1:24
2:20 6:6 7:8
297:6,25
**darn** 98:16
**data** 22:19 25:8
25:22 26:6
38:21 49:24
77:9 80:23
81:12 89:10,11
93:5 94:17,22
95:9 125:6
128:9 131:13
132:8,10 150:6
162:8,24 163:8
164:5 185:2
186:11 210:9
225:18 233:8
239:24 245:14
252:2 269:24

270:7 284:14
284:17
**date** 14:13
34:22 46:9,24
93:15 112:21
154:8 165:20
173:19 175:4
180:10 181:15
183:4 184:7
186:22 197:4
206:24 208:15
222:24 227:8,9
227:18 234:13
238:12 241:12
248:8,14
249:17 251:18
253:18 256:11
260:17 262:13
267:19 273:12
273:13,25
298:12 299:24
300:24
**dated** 262:12
**dates** 38:12
**day** 36:24
42:24 74:25
76:10 93:17
140:16 162:13
164:21 165:2
165:10 168:10
186:10 189:25
192:23 204:16
210:15 216:25
243:4,11 244:9
245:11 246:2

247:4 251:8
264:19 270:11
274:15,17
297:21 298:15
**days** 140:7
227:4,23 228:3
288:14 291:12
**deadlines**
145:25
**deal** 288:19
**dealer** 23:11
69:3 78:2
104:7,15,17,22
105:6,12 108:4
108:4 136:21
149:2 290:25
**dealers** 22:23
65:6,9 78:11
80:14,22 81:24
82:9 85:8
106:22 107:19
107:25 108:2,6
123:9 146:21
179:8 269:7
**debit** 264:16
**debits** 264:15
**december** 8:7
31:7,7 234:7
234:18 235:21
238:22 240:5
241:23 245:2
251:15 254:25
255:9 262:14
263:11 271:3

**[deciding - describe]**

**deciding** 171:19

**decimal** 180:11

**decision** 71:9 71:12 112:13 112:18 114:5 205:21 206:4 206:13 220:2 295:9

**decisions** 71:4 179:13

**declare** 298:4

**declares** 182:9

**deemed** 280:13 298:6

**deeply** 143:2

**defendant** 5:18

**defendants** 1:14 3:13 6:20 151:3

**define** 33:9 59:19 95:23 277:25

**defined** 140:22 183:15

**defining** 65:22 199:10 201:4 220:9

**definite** 231:16 231:17

**definitely** 231:11 273:6

**definition** 33:5 33:8 59:3,17 190:6 201:22

273:16

**definitional** 166:22

**degree** 166:17

**delaware** 1:8 9:5

**delay** 247:17

**delayed** 218:19

**delaying** 146:14

**delimiter** 114:14

**deliver** 218:8

**deliverable** 97:16

**delivered** 266:10 267:3 267:10 268:12 268:16 270:21 276:14

**delivering** 158:3

**delivery** 204:4 206:7 237:18 237:19 263:16 264:11,12 271:4 276:7,8

**denominated** 135:19 211:4 212:14,15

**department** 17:23,25 22:25 25:6 32:19 77:8 88:17 244:13

**depended** 107:2 108:21

**dependent** 28:10

**depending** 45:23 94:5 166:15

**depends** 5:7 13:19 42:11 46:6 170:6 271:9,11 291:18

**deponent** 298:3

**deposed** 7:17

**deposit** 95:24 96:7,9 97:5,10 97:13 102:18 136:5,5,7,25 137:15,17 138:6,8,11 159:23 265:18 291:4,19 292:8

**deposited** 97:25 98:22 101:11

**depositing** 136:23

**deposition** 1:17 2:17 4:8,14 5:5 5:16,25 8:10 9:23,24 11:2,6 11:19 14:11 48:21 49:4 60:10 111:16 111:24 112:19

154:7 155:20 175:3 181:13 186:21 195:15 195:20,24 197:2 206:23 214:25 222:23 234:12 238:10 241:10 248:7 254:8,12,16 256:10 260:15 286:4 293:17 293:24 297:11 297:13

**depository** 96:3 96:13,18,23,23 97:13,17 99:4 99:19 100:5,9 100:11,14 101:8 104:24 134:23 135:14 135:15,17 137:2,6,8,9,11 137:20,22 138:14,20 159:11 275:5 290:5 292:3,11

**deposits** 136:18

**depot** 158:12

**depth** 78:15

**derivative** 66:5 66:8 68:12

**describe** 16:12 27:7 39:15 102:25 131:13 136:2,11,12

166:20 172:6
178:24 180:21
180:23 181:5
203:5

**described**
26:24 126:22
130:18 133:18
134:13 140:5
140:19 147:10
221:3 256:3

**describes**
165:25 222:4
262:16

**describing**
99:14 137:4

**description**
178:19 207:14
227:16 263:15
288:18 295:7
296:3,15,20

**designate**
293:23

**designation**
141:15

**designed**
194:14

**desirable** 213:3
213:5

**desire** 157:22
160:21 165:25
201:19 226:21
227:2

**desired** 193:7
224:2

**desk** 15:5 95:13
268:11

**destination**
141:17 262:24

**detail** 23:22
94:24 96:15
131:13 209:21

**detailed** 23:2
23:10 88:25
181:2 285:11
293:2

**details** 20:4
89:7 282:4

**determination**
59:23 61:7,19
70:2 123:24
199:9,17

**determinations**
70:23

**determinative**
124:23

**determine**
50:13 55:16
57:7 58:19
147:20 268:21
273:2 277:12
279:11 283:10
283:21

**determined**
229:8

**determining**
35:17

**devalue** 225:7

**develop** 19:12

**developed**
23:12

**developing**
129:10

**deviated**
128:21 289:17

**dictionaries**
250:2

**dictionary**
208:11 249:24

**dietsch** 1:12

**difference**
32:21 163:15
163:20 191:19
209:12 227:8
276:2

**differences**
288:7

**different** 25:18
89:24 90:23,24
100:8 101:24
105:24 108:5
110:13,13,14
145:23 163:25
164:14 166:3
184:19,20
189:17,18
203:23 209:14
227:15 231:24
232:7 243:17
244:19 246:18
253:11 258:21
262:11 263:17
272:4,4 274:6

**differential**
44:16 135:23

**difficult** 71:2
79:8 84:22
240:20 252:16
259:20 271:25
274:7

**dilutive** 68:4

**direct** 84:5,8
86:19,22,22
88:2 95:19
113:14 207:23
234:3 238:16
240:15 248:12
251:2 255:4
257:17 261:13

**directed** 84:2
89:12

**direction** 28:19
109:16

**directly** 21:8
43:25 47:22

**directs** 89:19

**disadvantages**
89:24

**disagree**
105:16 284:17

**disclosed** 78:16
85:17 87:18
88:9 150:8

**disclosures**
38:14

**discount**
130:11

**[discovery - documentation]**

**discovery**
11:25 53:7,11
126:16 152:5
**discrepancy**
163:23
**discretion**
28:19 143:15
168:8,12
203:10,12,16
203:18 204:7,9
232:9 233:12
**discuss** 23:13
49:12 52:3
70:14 74:14
88:22 95:21
96:18 97:4
101:5 105:4
112:6 130:21
136:6 160:2
208:13 220:4
239:2 242:8
254:19 267:23
**discussed** 27:16
29:17 47:6
50:4 56:11,13
63:19 85:23
88:16,24 89:23
95:18 96:24
105:5,21
106:11,18
109:5 126:23
127:7,19
129:13 130:16
146:19 159:22
180:22 184:22

185:5 187:18
189:10,22
191:12 193:13
193:20 198:20
198:21 220:20
225:17,18
236:4,16 239:5
247:12 251:23
274:4 279:6
281:10 287:22
**discusses** 96:21
**discussing**
25:12 90:8
233:19 289:9
292:5
**discussion** 80:3
82:18 83:4
90:12 112:25
126:19,25
127:4,11 132:4
157:20 158:5,8
181:2 236:10
239:16 290:14
**discussions**
88:25
**dispositive**
247:15
**disregard**
199:10
**distinct** 131:6
166:3 167:11
168:6 172:6
211:20 272:5
287:12

**distinction**
100:20 139:17
139:23 170:13
215:17
**distinguish**
78:4 101:2,5
216:10
**distinguishing**
133:9
**district** 1:2,2
5:21,22 51:13
51:17,19,20,22
51:22 71:8
**divergence**
190:2
**divide** 92:17
271:18
**division** 1:3
5:23
**divulging** 35:25
**docket** 75:9
196:22,25
197:24 219:20
295:17
**doctoral** 26:20
**document**
13:17,17,23
31:15 115:8
116:22 120:21
122:2,17 130:3
130:4 150:21
154:5,9,22,25
165:17,24
167:7,25
174:23,25

175:18,22
176:7,17,23
177:18 185:3
186:19 187:2
189:8,9,12
192:13 196:3
196:25 197:13
197:16,22
198:2,18
199:23 202:19
206:21 207:19
208:17,24
209:20,25
211:22 222:21
235:24 238:8
239:11,13,18
239:20,23
240:12,14
241:8,15,21
243:7 248:10
249:23 250:12
256:8,14
257:18 258:2
258:14,15,16
258:19 259:11
259:13,22
260:13,19,22
260:23 261:4
261:10,14
295:11,12,15
295:17,18,20
295:22 296:4,7
296:8
**documentation**
16:2 35:17

61:25 106:21 106:25 107:18 146:20,23 176:25

**documented** 16:8,14 17:12 38:13 177:17

**documents** 10:17 13:7,18 13:20 23:9 29:9,19,21 30:3,24 50:10 50:18 52:14 97:11 110:15 129:3,11 130:13 131:8 144:2,17,25 145:5 147:11 148:8 150:9,12 150:23 151:4 151:13,20,25 152:3,8,14,16 152:17 155:24 156:2 175:19 175:25 239:21 243:24 281:25 282:11 288:23

**doing** 33:17 89:21 136:22 159:6 241:17

**doj** 32:25

**dollar** 161:24 162:9 164:20 212:14 230:18 230:22 231:12

266:2

**dollars** 42:2,15 161:15 209:9

**domestic** 57:22 58:22 59:2,12 60:21 61:3,8 62:9,15,18 63:2 64:11 65:14 66:17,19 67:6 68:15 71:23 72:14 73:5,20 81:8 81:15 91:9,19 145:11 147:14 268:7 272:18 272:20,22 273:7,14 274:12 276:9 277:8 279:24 280:6 286:23 287:23 289:11 292:22,23

**domestically** 62:22 75:5

**domestics** 284:25

**double** 11:16 36:8 53:6 156:6 178:3 262:20

**doubt** 193:22

**download** 13:15 53:23 256:23 257:2

**downplaying** 137:23

**dr** 14:10 49:5,7 60:12 111:16 111:24 112:2 195:15,24 197:15 214:15 254:8,16 294:6 295:8

**drafting** 29:12 30:13

**draw** 66:22 85:14 174:13 184:14,25 250:2

**drawing** 269:23

**drawn** 130:4

**drew** 128:18 131:16 242:21

**driver** 218:7,16

**drown** 139:24

**dtcc** 124:21 125:24 126:13 127:20 129:15 178:23 179:25 252:22 259:23 260:20 262:18 262:18 263:12 264:6 268:10 271:6

**dtcc004** 256:6,9 256:15 260:14 260:20 296:7,9

**dttc** 265:6 267:20

**due** 216:19

**duly** 7:7 297:12

**duplicative** 132:10

**e**

**e** 188:21 299:3 299:3,3 300:3 300:3,3

**earlier** 41:6 42:8 50:4 52:20 53:20 83:11 127:3 136:4 159:15 196:15 202:7 209:19 250:25 267:24 269:22 278:4 290:13 290:14 292:2

**early** 30:13 38:11

**earn** 32:10,25 33:2

**earnings** 27:18

**easier** 9:7 67:17 121:13

**eastern** 1:8 5:4 9:4 186:8,10 226:16

**easy** 215:5

**ecn** 77:13

**economic** 190:22 213:6 284:14

economics
  21:25 22:3
  26:25 191:5
economist 21:5
effect 4:17
  42:21 68:4
  136:22 158:2
  199:7 209:11
  210:18 252:23
  269:20
effective 42:22
  278:10
effectively
  134:9 210:2
  225:21 253:5
  272:19
effectuated
  61:24 78:11
  224:3 273:15
  280:25
efficiency 64:4
efficient 63:25
  64:13,25
either 20:7 58:2
  77:19 94:6
  105:19 115:14
  119:7 122:16
  249:25 272:4
electronic
  13:12 108:7
electronically
  296:11
elementary
  204:21

elicited 281:25
email 10:11,12
  110:10 155:3,8
  155:12 156:8
  156:20 158:11
  159:9,12 160:3
  160:9,11,20,23
  161:6 163:2
  168:24 171:16
  171:25 173:19
  187:4,4,5,13
  188:11,25
  189:19 192:21
  192:22 193:23
  198:13 199:5
  200:9,17
  201:11 202:2
  207:7,8 210:5
  223:9,25
  225:23 226:3,7
  226:19 227:2,9
  227:9,15 228:2
  234:17,19
  235:5
emails 36:9
  110:25
emily 3:17 6:21
emphasis
  117:24 119:10
emphasize
  138:17 159:4
emphasized
  70:3 119:8
  164:9 278:21

emphasizes
  117:21
emphasizing
  117:13,19
  118:3 201:2
employ 263:3
employed
  125:4 263:24
employees
  27:23 28:2
employment
  14:22 34:2
encompass
  90:13 91:15
encompassed
  18:11 203:24
encompasses
  18:2 22:6
encompassing
  24:3,7
encountered
  178:25 286:14
encounters
  246:16
ends 212:23
enforcement
  23:24
engage 166:2
  168:16
engaged 35:13
  167:11 275:20
engaging
  157:12 160:15
engine 78:9,21
  78:25 84:21

  91:8 186:6
  239:9 240:4
engineers 1:8
  9:3
engines 77:14
  78:5 82:15
england 177:12
  177:16,25
  178:3
enjoy 217:6
enjoyed 37:8
ensure 30:10
  46:3
entail 135:21
  252:18
enter 256:5
  269:7
entered 281:12
entertain
  167:21
entire 84:18
  91:19 92:19
  110:25
entirely 285:4
entirety 13:16
  53:22 104:12
  115:10,12
  126:4 166:10
  194:25 228:21
  261:6
entities 142:23
entitled 214:16
entity 26:23
  142:16 179:25
  265:22

**[entries - exactly]**                                                      Page 26

entries  270:24

entry  262:20
  271:4

environment
  66:15

episode  131:20

episodes
  131:18 239:4
  239:15

equal  152:7
  189:24

equities  232:11

equity  228:13
  229:17 230:3
  231:12,19
  233:13 254:24

errata  298:7

erred  133:2

error  30:12,19
  51:6,21 122:17

errors  29:16

especially
  176:25

esq  3:9,10,16
  3:17,18

essence  135:25

essential
  191:14 242:11
  242:17 270:6

essentially
  227:10

established
  63:23 81:25

estimate  11:14
  11:20 53:2

et  5:19,20
  298:1,1 299:1
  299:1 300:1,1

euro  212:15
  224:24

euros  209:8
  224:21 225:6,7

evaluate  55:6
  69:21 70:6,11
  70:17 125:2,5
  198:25 200:6
  220:13 242:18

evaluated
  200:14,15
  206:11

evaluating
  56:14 59:6
  64:17 245:20
  249:19

evaluation
  160:13 219:16
  220:11 239:11
  250:4

evening  185:15
  185:19 216:23
  221:8,25
  226:12,13

event  120:12
  122:20

everlaw  13:13
  35:12 53:20
  107:22 108:11
  144:8 150:7,8

evidence  11:4
  11:11,13 22:17

22:18 30:7
58:20 61:2,25
69:22,24 70:6
70:7,12,14,16
70:18 71:11
73:25 74:9
81:7,11 84:22
85:14 86:10
89:8 96:6
101:8,14
102:15,16
103:9,13,16
109:15 114:19
115:13 116:9
119:16 125:11
125:23 126:9
128:16,20
129:2,4,19
131:22 140:10
141:5,8 142:8
142:9 145:9,16
145:20 146:9
146:11,25
147:3,7 166:25
168:24 170:11
171:24 172:3,4
173:7,12,18
174:13 180:3
198:20 199:2,3
199:6,19 200:7
200:10,14,15
200:25 203:4
205:4 206:10
206:11 213:9
219:16,18

220:11,13,16
222:14 225:19
226:18 236:11
242:18 244:25
246:24 247:16
250:5 254:2
267:25 271:22
280:11 281:8
281:17,20,21
285:6,9 286:15
286:16 287:4
288:11,21,25
289:15 292:14
292:15,16,17

evidenced
  97:18 128:2
  141:12 149:7
  167:10 222:5

evident  38:20

evidential
  176:19

evidentiary
  282:8

ex  83:24

exact  11:16,20
  34:22 38:12
  83:19 153:16
  232:10 233:21
  251:17,18
  252:11 282:19

exactly  29:14
  35:15 41:14
  76:8 115:16
  122:18 161:21
  184:6,7 259:5

**[examination - executed]**

**examination**
7:11 61:14
131:7 288:11
295:3
**examine** 20:10
20:14 23:2
24:24 81:2
82:8 115:13
240:11 241:15
263:24 270:6
284:15
**examined** 7:10
23:21 66:3,6
125:17 263:9
**examines** 22:4
**examining**
22:19 147:24
148:12 240:14
244:14 280:20
286:25
**example** 13:9
16:17 18:5
20:9 22:24
24:19 26:7
28:4,7 29:8
30:15 32:18
33:15 40:13
42:12 64:15
88:20 89:12
90:18 97:8
110:7 131:17
131:24 132:6,7
132:9,22,24
133:3,4,5,6,7,8
135:7 141:16

148:24 161:14
174:5 176:15
179:14 190:11
192:15 202:13
204:5,13
230:21 232:2
232:20,25
242:4,22 259:3
270:8 272:11
272:17 275:18
**examples** 29:13
29:16 89:16
93:20 131:11
131:12 132:3
147:18 198:20
224:23 236:15
237:16 239:2
242:8,24
251:24 253:23
274:3 281:2
**exams** 31:10
**exceed** 33:23
165:3
**excel** 110:8,11
110:18,22
238:14 240:21
**excelling**
225:19
**except** 4:10
10:6 56:10
101:2 139:2
170:3 245:22
**exception**
170:4,12,14

**exceptions**
192:4
**excerpts** 200:9
**exchange** 16:17
16:20 47:16
61:22 62:13,15
62:20 88:5
98:9 102:4,5
103:13,23
117:6 120:17
133:21 134:2
134:15 135:6,9
135:22 136:20
137:6 139:4
140:12 141:21
157:25 164:22
170:15 192:21
202:21 205:17
209:18 210:2
210:13,14,21
211:11,16,19
212:13,23,25
213:4 237:3,11
237:12 278:25
291:22
**exchanged**
224:7
**exchanges**
76:23
**exchanging**
221:6 252:19
**exclusively**
28:5
**excuse** 59:11
101:3 148:4

168:5 179:16
225:25 226:3
231:8 259:8
268:9 276:7,19
**executable**
161:12 193:10
193:12,15
**execute** 84:18
84:20 141:2
156:9 160:24
161:8,10,23
164:2 165:19
166:6,10,14
193:24 204:13
213:25 224:12
224:21 226:14
226:14,21
227:3 233:11
244:2 245:15
245:25 247:13
**executed** 15:21
16:8,13 17:11
103:22 116:11
116:18,24
117:8 119:17
140:11 164:7
186:12 190:5
194:12,17
204:19,20
205:5 212:8
213:13 216:24
222:11 227:4
227:10 233:7
233:23 245:4,6
245:9,10

**[executed - explained]** Page 28

246:21 269:8
274:15 278:23
**executes** 134:8
171:8 174:15
194:19,23
204:23
**executing** 17:3
134:14 186:7
186:10 243:12
247:2 274:5
277:6
**execution** 16:2
67:12,19 68:9
68:13 78:22
80:6 84:17
85:10 89:2,6
90:10 140:24
163:21 173:20
176:20 204:3
222:4 226:18
239:9,20 240:4
244:8 273:25
**executions**
186:4 242:7
**executives**
38:16,24
**exhaustive**
288:11
**exhibit** 10:13
14:6,11 39:14
112:11,12,19
121:4,5,11
153:25 154:7
154:23 175:3,7
181:11,14

185:6 186:16
186:16,21
196:9,22 197:3
197:6,7,25
199:12 201:7
206:16,18,23
220:24 222:19
222:20,23
234:10,12
235:10 238:6,6
238:10 241:6
241:10 242:5
243:8 247:22
248:3,3,7
250:13 256:5,7
256:10 260:3
260:15,19
261:13 295:8,9
295:11,12,14
295:15,17,18
295:20,21,22
296:4,6,7,8
**exhibits** 295:6
296:2,14
**existence** 24:18
87:22
**existing** 64:6
64:23 65:4
71:24 72:16,20
73:9,20 74:5
81:9,12 82:2
85:21 86:6,15
91:9,18 92:7
147:22 148:10
268:4,4,8

270:3 276:9,24
279:25 280:2
284:22,22,25
286:24 287:23
287:25 289:12
292:22
**expand** 87:13
**expect** 67:19
86:13 167:13
261:5 270:23
271:4 289:3
**expectation**
84:14,16 85:2
140:25
**expectations**
91:14,15,17
291:20
**expected** 84:23
95:2 214:6
**experience**
17:16,21 22:9
22:12,19 25:21
26:4,18 30:5
42:11 43:2
76:10 77:5,6
87:22 88:7,14
88:14 89:21
90:6 99:4,10
108:6 109:25
129:19 130:7
130:11 163:20
164:4 166:18
176:10 178:21
179:20 189:18
190:2 191:3

219:18 224:11
249:13,19
279:21 287:18
289:3
**expert** 18:14,21
18:23,24 19:4
19:9,17 21:12
21:24 23:14
27:12 28:20
34:20,24 89:9
106:12 192:3
**expertise** 23:12
23:19 24:3,7
25:21 27:14
**explain** 22:16
63:7,15 64:2
65:5 98:25
101:12 124:24
162:5 165:11
185:16 193:2
211:2 226:11
256:13 276:25
286:20
**explained** 25:3
44:24 53:19
83:10 95:8
105:19,22
126:18 127:25
146:19 159:16
186:4 194:2
198:22 205:13
224:10 242:20
242:25 269:22
278:17 280:17
290:13 291:16

**[explaining - fairly]**

**explaining**
133:10
**explains** 61:9
63:21 140:3
239:3 284:23
**explanation**
112:23 176:24
177:7
**explicitly** 21:22
127:9
**exposed** 25:7
26:5,17 87:24
**exposure** 26:14
190:22,24
191:13 193:9
**express** 219:25
**expressed** 91:7
167:20 218:18
**expresses**
201:18,19,19
213:19
**expressing**
154:14
**expression**
160:20 161:3
163:5 165:14
226:20 227:2
**expressly** 80:9
**extend** 18:10
91:17
**extending** 24:3
24:7
**extension**
120:13

**extensive** 77:6
96:15
**extensively**
90:23 178:24
**extent** 21:17
23:17 24:11
25:25 35:20
41:10 45:25
53:14 59:16,18
65:18 72:6
96:17 98:5
115:7 121:25
125:7 131:2
144:21 149:4,8
149:12 154:12
189:7 197:14
198:9 208:24
219:10 221:13
232:13 235:24
250:3 252:14
255:24 268:4
278:14 279:16
279:23 282:15
284:3 285:10
289:23
**external** 246:21
**extraordinary**
119:10 170:11
**extraterritorial**
58:3 59:8
60:16 280:14
**extraterritori...**
21:2,8,10
59:20 70:9

**extreme** 215:10
**extremely**
190:5 256:19
261:4
**extremes** 111:4

**f**

**f** 6:23
**face** 184:17
201:17,18
232:19
**facilitate** 66:18
76:25 78:21
**facilitates**
78:10
**facility** 66:22
**fact** 18:11
45:12 66:13
78:14 83:21,24
85:3 89:19
90:2 101:23
116:5 118:5,22
124:23 125:25
127:12 134:21
136:20,21
141:19 159:17
162:5 163:23
164:7 169:20
169:23 170:20
171:3 173:3,14
173:22 174:9
174:20,20
190:15 194:3
209:9 211:7
212:6 213:21
215:19 218:10

224:4,22 227:3
233:5 243:23
244:2 245:9,9
247:15 259:21
267:4 277:7
286:16
**factor** 190:25
**factors** 61:18
148:19
**facts** 20:6
49:24 69:11
70:23 71:10
88:8 100:21
101:24,24
102:10,21
103:2 104:2,5
104:11,20,20
105:10,20,24
105:25 106:4
106:15,17,19
113:2,4 115:2
116:16 129:23
219:3,14 220:4
220:7
**factual** 59:23
100:3 103:8
129:25 130:5
199:8,17
**fair** 17:15,19
76:11 78:12
158:14,23
184:4 283:4
**fairly** 13:3
26:12 67:24
96:15 157:2,17

162:13 184:25 225:19 281:6

**fall** 35:2

**falls** 189:20

**familiar** 9:25 77:10 143:2,5 155:21 169:24 239:18,18

**familiarity** 26:16 219:3,13

**far** 31:12 63:24 64:19 129:3 133:25 163:3 165:10,12 237:23 287:23

**fashion** 142:5 239:9

**fast** 221:15

**faster** 258:8

**feature** 39:8

**features** 188:25

**federal** 4:3 37:6 59:8 182:4,10

**fee** 135:22 158:25

**feel** 214:14

**fellow** 155:4 188:20

**felt** 146:24

**fewer** 165:13 193:2

**field** 176:25 177:9

**fields** 178:19

**fifth** 226:5 248:13

**file** 13:21 53:25 53:25 54:3 207:12 238:14 243:16 256:18 256:19 257:5 258:6,11

**filed** 5:20 8:6 75:9 181:18 219:20

**files** 195:9

**filing** 4:7

**filip** 3:18 6:21

**filled** 185:12 193:19 194:12 215:13,14,20 216:19

**final** 123:24 186:13 213:8 230:18 239:11 244:9 277:12

**finalized** 144:10,12 222:7

**finalizing** 144:16

**finance** 21:25 22:3

**financial** 21:5 22:5,24 23:7 26:25 31:10 34:4,14 43:10 43:13,17 191:5 192:25 255:16

257:21 261:17 265:20 267:16

**financially** 6:10

**find** 88:25 129:2 142:9,13 159:6 163:3 167:13 258:24 288:10

**finding** 214:4,5

**fine** 10:4 34:18 48:15 52:18 60:6,17 108:14 119:5 156:7 172:8

**finger** 161:18

**finish** 9:8 214:16,18,20 276:12

**finra** 91:24 92:19 126:3

**firm** 15:8 26:25 27:11 157:6 178:16

**firmly** 43:23

**first** 7:7 8:11 9:15 57:13 108:25 111:11 111:13 113:6 130:17 133:6 137:18 145:14 174:11 176:5 181:12 182:7 197:25 208:2,4 209:4 217:5 219:12 246:10

257:16 262:7 265:14 287:20 289:8 290:17 295:14

**five** 24:22 48:17 107:15 254:15 271:13 271:17 294:8

**flip** 14:16 114:11

**float** 65:13,21

**flow** 83:20 84:8 86:23 88:2 89:14,20 90:4

**fluctuate** 34:7 192:22

**fluctuating** 79:11

**fluctuations** 192:16 212:10

**focused** 205:3

**focusing** 73:6 114:13 152:19

**folder** 13:15

**follow** 13:10 240:16

**followed** 242:6

**following** 13:7 105:22 160:22 163:8 189:25 216:25 243:17 245:11 246:2 247:4 263:13 265:23

**[follows - form]**

| | | | |
|---|---|---|---|
| **follows** 7:10 | 135:9,17,18,19 | **foremost** | 129:17 132:20 |
| **footnote** 51:7 | 135:22 136:7 | 137:18 | 136:9,14 |
| 51:16 52:6,10 | 138:3,4,11,12 | **forgetting** | 139:25 143:16 |
| 83:14 97:8 | 139:5,13,22 | 236:6 | 144:4 145:12 |
| 99:2,11 101:20 | 140:8,16 141:7 | **form** 4:10 12:7 | 147:15 150:3 |
| 102:14 103:20 | 142:6 145:11 | 14:4 15:19 | 151:15 158:17 |
| 140:3,19 186:5 | 157:15,24 | 16:4,10,15 | 159:3 160:7 |
| 199:10 205:13 | 158:3 159:20 | 17:13,18 18:17 | 161:11 162:4 |
| 205:14,20 | 161:23 163:9 | 19:7,15 21:13 | 163:17 165:22 |
| 210:7 220:9 | 163:11 164:22 | 22:15 23:16 | 167:17 169:8 |
| 222:2,3,3 | 166:8,16 167:4 | 24:10 25:24 | 171:22 172:16 |
| 225:19 226:11 | 168:21 185:17 | 27:20 29:24 | 173:24 175:21 |
| 239:5 240:2 | 192:14,15 | 30:4 32:13 | 175:24 177:19 |
| **footnotes** 96:19 | 194:10,18,22 | 33:4 35:7 | 180:12 184:16 |
| 220:3 239:25 | 194:24 202:23 | 37:25 38:5 | 189:6,14 |
| 242:8,20,25 | 202:24 203:7 | 43:4,19 44:5 | 198:16 200:4 |
| 243:25 | 205:9 206:8 | 45:17 46:11 | 201:15 203:14 |
| **force** 4:16 | 209:6,10,13,16 | 47:8 50:23 | 203:21 205:11 |
| **forefront** 36:21 | 209:18 210:3 | 51:4 61:5 | 208:25 212:2 |
| **foregoing** | 210:14,19,20 | 62:11,23 65:18 | 213:15 217:2 |
| 298:5 | 211:4,13,14,16 | 67:9 70:25 | 217:25 219:10 |
| **foreign** 58:3 | 211:19 212:10 | 71:13 72:6,14 | 221:14 223:21 |
| 59:17 60:5,15 | 212:13,15,20 | 72:23 73:5,13 | 227:11 228:15 |
| 62:9 65:12 | 212:22,23,24 | 76:18 79:24 | 229:18 230:5 |
| 66:23 68:16,17 | 219:7 221:24 | 80:15 82:23 | 232:12 235:25 |
| 68:18 69:6 | 224:6 225:5,22 | 83:7 85:11 | 237:5 238:23 |
| 72:21 73:11,22 | 226:10 237:11 | 87:8,10 90:11 | 240:19 241:25 |
| 84:25 93:23 | 237:17 239:7 | 92:22 93:9 | 250:3 251:20 |
| 94:12 97:25 | 240:3 243:9 | 99:23 103:4 | 252:13 253:20 |
| 98:7,11,15,22 | 247:6 273:16 | 104:9,25 | 257:23 267:21 |
| 101:11,19 | 275:19 281:13 | 105:15 106:6 | 268:24 271:7 |
| 102:13,24 | 287:6,11 | 108:23 109:23 | 273:5 275:15 |
| 107:3 108:22 | 288:15 289:18 | 115:6 117:16 | 277:24 278:13 |
| 117:6,14 | 290:17 291:2 | 118:8,23 122:2 | 279:8,15 |
| 128:22 135:2,6 | 291:12,22 | 125:19 127:24 | 280:15 282:6 |

283:6,12 284:2 286:13 290:10 291:7 292:24

**format**  53:24 54:2,2 108:8 110:8,18 111:5 217:11

**formation** 61:20 280:21

**forming**  49:25 129:18 130:8

**forms**  108:5 110:2,3,5,13 235:12

**formulaically** 229:9

**formulated** 163:6

**forth**  111:2 182:18 183:18 192:5 239:25 246:8 297:12

**forward**  109:8 129:25

**found**  39:2,6 51:14 81:11 98:16 104:2 106:24 129:3 287:4

**four**  27:19 195:23 210:16 225:23,24 227:23 228:3 254:7

**fourth**  180:11

**fraction**  76:6,7 82:20 87:24 204:15 267:6 270:9

**francisco**  1:3 5:23

**frankfort** 133:21 134:15

**frankfurt** 134:2 185:21

**frankly**  166:4

**free**  169:6

**freely**  65:7,25 66:10

**frequently**  23:2 36:22 88:20,23

**fresh**  37:7

**friday**  1:20

**friend**  218:16

**front**  27:22 34:5,14 41:13 52:14 124:7,8 143:10 154:4 160:12 176:15 185:23 220:16 259:12 282:19

**frustrating** 246:15

**fulfill**  190:19 192:6

**fulfilled**  148:15 221:5 257:19 261:15 274:25 275:9 286:23

**fulfilling**  271:2

**fulfillment** 261:20

**fulfills**  217:23

**full**  27:25 28:12 86:8 175:15

**fully**  103:22 140:10 177:8,9 205:24 210:25 216:17 230:12 278:23

**fun**  154:20

**function**  68:19 194:21 258:5

**functioned** 100:5 290:20 290:21

**functioning** 104:16 214:3 258:2

**fund**  1:5,6,8 5:19 8:18,23 9:4 47:19,20 182:9,16 183:13 255:11 298:1 299:1 300:1

**fundamental** 191:4 194:20

**funded**  266:19

**funds**  16:17,20 47:16,17 90:20 142:17

**fungible**  266:23

**furnishing** 237:17

**further**  4:9,13 39:24 44:25 81:16 82:4 117:3 132:21 151:4 172:12 173:18 199:21 226:18 248:17 275:3 284:24 293:25 297:16

**fv**  248:23

**fx**  207:14

## g

**g**  196:22 197:25

**gain**  36:18

**gained**  180:25

**general**  13:10 20:6 24:20 40:9 42:7,8 43:6 45:19 76:10 81:17 102:17 110:21 131:11 144:23 145:25 150:11 166:20 176:22 192:5 199:15 212:8 219:21 257:24 263:2 263:23 280:18 282:11 283:2

**generalize** 111:5

**[generally - going]**                                                    Page 33

generally   7:24
  9:25 27:10
  41:19,21,23,23
  41:25 77:10
  78:15 85:7,20
  94:9 95:6
  110:17 124:12
  141:14 143:5
  152:13 203:25
  212:7 220:3
  264:25 269:3
  279:20 281:6
generic   76:21
german   171:15
  171:18 172:14
  275:4
germany   186:9
  222:5,10
  226:15
getting   36:19
  85:18 138:16
  258:4
gilden   3:10 7:2
  36:9,10,19
  37:19,22 39:2
give   7:21 11:21
  33:15 34:8
  41:16 45:6
  64:14 67:24
  69:23 88:19
  93:20 107:15
  121:7 131:11
  147:18 161:13
  178:15 186:23
  193:8 200:17

  215:6 223:4
  232:22,23
  239:10 243:6
  253:24 280:25
  284:12
given   13:12
  24:21 46:4
  58:21 61:2
  62:3,8,25
  64:10 76:10
  84:6 85:15
  86:20 93:17
  94:18 109:3
  122:11,24
  123:4 124:11
  159:23 161:15
  164:3 168:7,11
  190:8,9,24
  199:4 204:8
  208:11 242:17
  253:12 264:14
  265:4 268:6
  277:20 283:17
  283:19 294:6
  297:15 298:9
gives   78:16
  193:6 216:13
giving   29:13
  138:12 242:13
  259:15 284:11
  284:11
glean   160:19
global   74:15,25
  75:23 76:11,22
  77:15 78:22,24

  79:6,17 80:4,7
  80:14,19 81:4
  81:23 82:10,21
  83:6 85:5,9
  87:23 90:2,5
  90:25 91:4,5,6
  91:16
glosses   116:5
go   5:13 11:15
  15:20 32:2
  33:14,20 34:8
  37:16 38:11,25
  41:15 43:5
  45:8 48:5,16
  52:16,24 53:10
  53:25 58:10
  68:15 81:16
  82:4 97:20
  111:11,12
  117:3 119:13
  119:13 132:21
  133:16 152:23
  153:2 154:11
  155:25 156:5
  168:15 181:7
  181:23 182:22
  183:7,13,22
  195:11 196:13
  201:7 207:18
  218:8,17
  231:14 235:9
  247:5 249:7
  250:17 254:5
  257:15 258:15
  260:2 277:10

  285:22,23
  290:12 293:11
  294:3
goes   51:14 89:5
  96:14 152:10
  193:11 215:16
going   5:3 7:20
  7:21,24 8:4,16
  8:17,21 9:2
  20:7 33:7
  35:19,21 40:20
  41:24,24 44:9
  45:3,22,23
  52:19 56:12
  57:12,18,19,24
  58:25 59:16,19
  84:7 85:4
  86:22 91:10
  107:14 121:2,5
  130:23 133:16
  143:20 153:15
  153:25 155:11
  157:8 175:6,7
  177:22 181:17
  185:22 186:16
  194:4 197:10
  197:12 206:17
  208:3 213:4
  216:16 221:12
  222:19 230:11
  231:14,25
  232:19 234:2,4
  234:9 238:7,16
  241:2 247:3
  248:3 250:19

**[going - high]**

256:6 257:8 258:7 259:8,9 267:2 284:5

**good** 5:2 84:19 112:22 153:24 159:14 188:16 188:21 269:2

**google** 10:14

**gotchas** 114:8

**gotlieb** 96:25

**governed** 137:22

**governing** 9:23

**government** 24:15 25:11,20 26:10

**gowda** 155:4,6 156:9,13 158:12,24 160:3 172:9 223:9 234:20

**grand** 20:9 24:19

**grant** 1:24 2:20 6:6 7:8 297:6 297:25

**granted** 203:19

**great** 7:13 9:16 10:15 14:19 51:10 54:11 57:11 58:9,14 71:20 107:17 112:10 120:20 154:24 184:10 196:20 197:23

207:5,17 221:2 223:2,13 238:4 249:12 254:3 254:22 257:13 261:11 288:19 293:6

**greater** 65:3 66:24 68:7,8 204:17 209:21 224:14

**group** 149:13 284:25

**guess** 48:10 155:16 162:2 164:23 165:5 166:18 168:12 199:8,17 205:6 210:4 218:4 239:17 275:23

**guessing** 160:17 206:12

**guidance** 193:7

**h**

**h** 188:21 299:3 300:3

**half** 53:2 60:15 163:16

**hand** 46:7 113:6 114:13 114:17 116:3 119:14 236:25 259:18 297:21

**handling** 257:10

**handy** 258:11

**happen** 170:21

**happened** 178:17 237:21 243:2

**happening** 135:12 166:15 209:10,19 210:11 212:24 242:15

**happens** 127:5 245:18

**happy** 51:8 96:15 97:20 107:10 204:17 250:7

**harassing** 118:25

**hard** 10:17 110:20 111:4 121:8 160:11

**harding** 12:14 12:16,17,24 13:9 142:17,18 142:22 143:6 143:15 144:2 144:11,18 155:2,7 179:14 184:13,22 187:3,10 207:12 208:22 222:12 234:25 237:4 238:22 240:18,25 241:23 248:11

249:8 251:14 251:15 252:6,9 252:24 270:25

**hardman** 12:23

**hardship** 9:16

**head** 34:22 35:3,9 45:7 48:5,14 75:12 100:6 155:9

**heard** 5:10 142:16,18 164:4 171:8

**heavily** 67:17 288:8

**hedge** 90:20

**held** 2:18 65:24 168:20 170:18 205:15 271:17

**help** 77:2 78:12 258:13

**helpful** 68:21 86:17 97:21 133:10 142:15

**hereinbefore** 297:12

**hereto** 298:8

**hereunder** 97:10

**hereunto** 297:21

**hey** 207:10

**hi** 188:21

**high** 68:14 86:14 288:3

**[higher - highly]**                                                          Page 35

| | | | |
|---|---|---|---|
| **higher**  67:20 | 79:1 80:1 81:1 | 155:1 156:1 | 225:1 226:1 |
| 209:20 231:10 | 82:1 83:1 84:1 | 157:1 158:1 | 227:1 228:1 |
| **highlight** | 85:1 86:1,2,5 | 159:1 160:1 | 229:1 230:1 |
| 118:12,20 | 87:1 88:1 89:1 | 161:1 162:1 | 231:1 232:1 |
| **highlighted** | 90:1 91:1 92:1 | 163:1 164:1 | 233:1 234:1 |
| 118:12 119:8 | 93:1 94:1 95:1 | 165:1 166:1 | 235:1 236:1 |
| **highlighting** | 96:1 97:1 98:1 | 167:1 168:1 | 237:1 238:1 |
| 118:13,18 | 99:1 100:1 | 169:1 170:1 | 239:1,14 240:1 |
| **highlights** | 101:1 102:1 | 171:1 172:1 | 241:1 242:1,3 |
| 118:5 | 103:1 104:1 | 173:1 174:1 | 243:1 244:1 |
| **highly**  1:16 7:1 | 105:1 106:1 | 175:1 176:1 | 245:1 246:1 |
| 8:1 9:1 10:1 | 107:1 108:1 | 177:1 178:1 | 247:1 248:1 |
| 11:1 12:1 13:1 | 109:1 110:1 | 179:1 180:1 | 249:1 250:1 |
| 14:1 15:1 16:1 | 111:1 112:1 | 181:1 182:1 | 251:1 252:1 |
| 17:1 18:1 19:1 | 113:1 114:1 | 183:1 184:1,18 | 253:1 254:1 |
| 20:1 21:1 22:1 | 115:1 116:1 | 185:1 186:1 | 255:1 256:1 |
| 23:1 24:1 25:1 | 117:1 118:1 | 187:1 188:1 | 257:1 258:1 |
| 26:1 27:1 28:1 | 119:1 120:1 | 189:1 190:1 | 259:1 260:1 |
| 29:1 30:1 31:1 | 121:1 122:1 | 191:1 192:1 | 261:1 262:1 |
| 32:1 33:1 34:1 | 123:1 124:1 | 193:1 194:1 | 263:1 264:1 |
| 34:6 35:1 36:1 | 125:1 126:1 | 195:1 196:1 | 265:1 266:1 |
| 37:1 38:1 39:1 | 127:1 128:1 | 197:1 198:1 | 267:1 268:1 |
| 40:1 41:1 42:1 | 129:1 130:1 | 199:1 200:1 | 269:1 270:1 |
| 43:1 44:1 45:1 | 131:1 132:1 | 201:1 202:1 | 271:1 272:1 |
| 46:1 47:1 48:1 | 133:1 134:1 | 203:1 204:1 | 273:1 274:1 |
| 49:1 50:1 51:1 | 135:1 136:1 | 205:1 206:1 | 275:1 276:1 |
| 52:1 53:1 54:1 | 137:1 138:1 | 207:1 208:1 | 277:1 278:1 |
| 55:1 56:1 57:1 | 139:1 140:1 | 209:1 210:1 | 279:1 280:1 |
| 58:1 59:1 60:1 | 141:1 142:1 | 211:1 212:1 | 281:1 282:1 |
| 61:1 62:1 63:1 | 143:1 144:1 | 213:1 214:1 | 283:1 284:1 |
| 64:1 65:1 66:1 | 145:1 146:1 | 215:1 216:1 | 285:1 286:1,18 |
| 67:1 68:1 69:1 | 147:1 148:1 | 217:1 218:1 | 287:1,18 288:1 |
| 70:1 71:1 72:1 | 149:1 150:1 | 219:1 220:1 | 288:24 289:1 |
| 73:1 74:1 75:1 | 151:1 152:1 | 221:1 222:1 | 290:1,22 291:1 |
| 76:1 77:1 78:1 | 153:1 154:1 | 223:1 224:1 | 291:9,13 292:1 |

293:1,24 294:1

**hire** 28:4

**history** 14:22 14:25

**hl** 155:13 165:18 187:14 223:10 227:6

**hl002709** 175:2 295:13

**hl002729** 186:20 295:16

**hl002731** 222:22 295:20

**hl002732** 154:6 154:10 295:11

**hl002746** 206:22 295:19

**hmm** 141:3 165:16 220:6 231:18,23 236:17 246:3 273:17 291:25

**hoc** 160:11

**hold** 98:12 157:22

**holder** 97:24

**holders** 137:21

**holds** 285:18

**home** 181:4

**honest** 221:16

**honorarium** 33:19

**hope** 36:23

**hopefully** 9:15

**hour** 39:21 41:3,18,20,22 42:2,7,14 44:4 44:10

**hourly** 40:6 41:7 42:10 44:16,17

**hours** 11:15,22 31:14 40:10,17 40:18 42:5,20 44:22 45:9,14 48:2,8 52:20 52:21 139:10 163:8 225:23 225:24 247:14 282:12,19

**hundred** 42:2,7 42:15 94:3 169:13,14 172:24,25 173:2 174:6,7 230:24 274:14

**hundreds** 194:13 282:12

**hypothetical** 217:3,10 218:2 274:21 281:18

**hypotheticals** 217:7,8,11

**i**

**i.e.** 139:11

**icbcfs** 265:19

**idea** 67:3

**identical** 131:18 138:25

181:6

**identification** 14:12 112:20 154:8 175:4 181:14 186:22 197:3 206:24 222:24 234:13 238:11 241:11 248:8 256:11 260:16 295:7 296:3,15

**identified** 50:18 51:6 70:15 102:10 102:21 123:25 128:19 148:19 266:6 269:12 269:14 278:18

**identifier** 245:17

**identify** 30:19 82:4 124:9,14 124:18 128:9 141:5,8 263:6 271:25

**identifying** 167:24 260:21

**identity** 151:19

**idiosyncratic** 291:9

**idqs** 78:4,9,13 78:20,20

**ignoring** 226:25

**illinois** 3:8

**illustrate** 64:15

**illustrates** 211:20

**imagine** 200:23

**immediate** 140:23 218:18 247:18

**immediately** 105:21 141:2 142:2,13 149:5 164:11 202:22 210:12 214:2 225:4

**impact** 68:8

**implementati...** 167:15

**implemented** 203:13

**implements** 203:17

**implicate** 21:7

**implied** 138:5 233:22

**implies** 252:20

**imply** 141:18

**importance** 150:20

**important** 30:5 44:20 85:17 124:10 128:3,6 134:7 138:15 159:7 170:3 191:19 200:16 209:5 210:23

214:8 215:3,17 227:13 232:18 236:11 262:7 267:24 269:2 272:7,13 280:3

**imposes** 85:9

**impossible** 178:15 215:10 266:18

**impossibly** 181:7

**impractical** 216:21

**imprecise** 231:13

**improper** 217:3 218:2

**inasmuch** 270:2 273:18 292:17

**incident** 127:17

**incidentally** 78:6

**include** 61:19 118:21 130:2 131:12,19

**included** 29:11 52:10 55:9 125:24 131:23 132:9,24 148:20 200:16 236:13

**includes** 61:14

**including** 11:9 27:12 96:25

118:5 131:25 133:2 146:21 171:24 181:2 267:9 286:21

**income** 33:2,6,8 33:9,10,24 34:2,11

**incoming** 261:22

**incomplete** 31:12 129:24 289:23

**inconsistency** 215:5

**inconsistent** 50:16,21 85:2 85:3 93:2 102:17 128:17 129:4 138:8 166:18,23 190:15 203:3,4 215:7 247:18 250:8 291:14

**incorporating** 127:11

**incorrect** 122:7

**increase** 38:23

**increased** 64:3

**increasing** 42:21

**incur** 120:14

**incurred** 20:16 20:21 44:23 54:22 55:3,10 55:18 56:23

57:2,8,16,21,25 59:4,21 60:4 60:23 68:25 72:17 86:7 109:14 125:14 145:18 273:12 274:18 277:14 280:19 285:15 287:5 290:7

**independent** 219:15,25

**independently** 70:17 100:3 103:15 104:4 106:15 206:12

**index** 47:16,19 295:2

**indiana** 37:10

**indicate** 113:20 171:25 177:15 201:12 221:24 226:9 238:19 240:17 255:13 255:25 268:10 279:5 286:15

**indicated** 186:11 237:24 239:7 243:10 246:4,5,11 262:4 264:11 287:8

**indicates** 106:25 116:9 119:17 125:12 163:24 172:5

173:13 241:21 245:11 267:12 286:17

**indicating** 81:7 141:9

**indication** 106:24 149:18 237:2 245:14 281:11 291:17

**indirectly** 229:11

**individual** 26:8 26:9 40:25 93:19 95:15 109:22 120:25 125:3 126:6 130:15 194:14 269:13

**individualized** 42:9

**individually** 1:6,8

**individuals** 90:15 160:14

**industrial** 255:15 257:20 261:16 265:19 267:15

**industry** 22:24 23:7,12 43:10 43:13,17 94:2

**inevitably** 135:18

**infer** 76:13 84:22 168:19

270:12,20
273:11,24
285:18 289:16
**inference**
184:14 235:19
**inferences**
184:24 236:11
250:2
**inferring**
208:10
**infinite** 98:17
**inflow** 265:12
**informal** 37:4
**informally**
75:10
**information**
27:21 35:21
41:12 61:6
78:17 85:13
109:10 123:7
130:8 131:3
144:22 145:22
148:21 150:4
150:16 152:21
160:9 166:5
167:23 172:18
176:18 192:14
200:16 225:10
280:4,7
**informed**
242:25 243:6
271:22
**inherent** 138:3
209:18 232:19
232:24

**initial** 155:22
**inputted**
226:11
**inquiries** 23:10
**inquiry** 55:9
79:14
**insiders** 65:24
**inspect** 269:24
**instacart** 218:7
**instances**
285:17
**instant** 126:14
**instantaneous...**
215:14
**instantly**
247:13
**instinet** 129:13
185:12 202:16
202:17 207:9
221:4,23 222:7
222:11 223:10
224:4 226:17
234:6,19,21
239:3 244:24
245:15 255:12
255:14 256:2
257:19 261:15
263:9 264:12
265:8 266:10
267:12,19
**instinet's**
185:18 186:6
222:5 226:2,4
226:9 239:8,22
240:4 243:15

264:18 265:17
266:15 270:11
**instinet.com.**
187:6
**instinet00000...**
241:9 296:5
**instinet00000...**
238:9 295:23
**institution**
100:12,14
292:11
**institutional**
89:13 90:20
191:17 204:6
**institutions**
90:15
**instructing**
160:4
**instruction**
160:10,25
161:9 166:20
172:12 189:3
218:25
**instructions**
109:20,25
110:3,5,7
111:6 146:22
148:18 189:2
277:20 278:2
**intended** 114:8
157:3
**intent** 51:21
193:23
**intention**
105:17 193:23

**intentionally**
146:13
**interact** 37:22
**interacted** 89:8
**interaction**
38:4 278:6
**interactions**
291:7
**interacts** 84:15
**interest** 47:6
155:25 160:20
**interested** 6:10
28:7 75:17
128:15 297:19
**interesting**
37:5,7 39:3,7
75:13
**interests** 36:15
**interim** 11:12
12:12
**interject** 19:16
**intermediaries**
95:14
**intermediary**
95:7,13 211:8
**internal** 23:6
90:19 138:23
154:2 186:17
213:18 226:17
245:8,24
**internally**
175:8 243:14
**international**
1:6,7 8:22 9:3
155:9 183:12

249:9 255:10
**internet** 5:8
**interpret** 134:3
  160:18 192:18
  236:25 281:7
**interpretation**
  24:8 158:7
  192:19 243:5
  243:22 244:17
  245:21
**interpreting**
  23:14 242:2,11
  246:7
**interrogating**
  154:18
**interrupt** 44:9
  195:6 214:10
  240:8
**intra** 78:2
**introduced**
  37:2
**introduces**
  166:16 212:17
**introducing**
  57:19
**introspective**
  205:7
**intuition**
  288:22
**intuitions**
  292:11
**inventory** 65:4
  85:21
**invested** 47:18

**investigations**
  24:2,19
**investigative**
  19:23 110:24
**investing** 88:24
**investment**
  113:14,22
  114:3 115:5
  145:6 147:12
  148:7,9,18,22
  149:15,20,25
  151:3,6,8,13
  169:21 171:17
  172:13 179:10
  179:11 191:9
  191:15,16
  282:2
**investor** 17:6
  67:4 91:14
**investors** 66:23
  87:19,21 88:2
  88:8,22 89:3,6
  90:21 191:18
**invoice** 45:20
  45:21 47:3
  52:25
**invoiced** 46:24
**invoices** 45:9
  46:9,18 47:3
**involve** 71:25
  72:20 73:10,21
**involved** 15:16
  20:19 74:3
  118:13 177:17
  247:2 263:7

292:12
**involvement**
  15:25 16:5
  63:21 66:21
  139:19 178:11
**involves** 169:25
**involving** 170:2
**irrelevant**
  226:24
**irrevocability**
  172:22
**irrevocable**
  20:14,21 54:20
  55:2,10,13,17
  56:20,25 57:8
  57:20,25 59:4
  59:20 60:3,8
  60:23 68:25
  72:15 82:6
  83:9,12 84:24
  91:10 109:14
  120:14 125:13
  139:10 142:7
  145:18 165:7
  167:3 171:2
  194:10,11,16
  198:24 215:19
  215:21 216:4
  216:16 225:3
  273:11,24
  274:10,18
  275:13 276:16
  277:5,9,13,22
  280:19 285:14
  287:5 290:6

**irrevocably**
  273:3
**isolation** 127:3
**issuance** 15:17
  54:6 68:3 69:3
  94:19 110:16
  128:23 138:13
  148:15 153:20
  159:18,24
  267:19 277:22
  286:11
**issuances** 91:21
  92:18 93:6,7
  93:13,16
  106:23 109:22
**issue** 8:10
  65:11 66:11,12
  97:19 100:10
  260:3 282:5
  285:8
**issued** 19:9
  68:18 92:13
  94:12 128:11
  137:8 139:4
  159:17,19
  237:19 267:13
  268:9,12,18
  270:5 272:16
  275:6 280:10
  285:3 287:3
  290:25 291:23
**issuer** 63:22
  137:3,11,19
**issuer's** 66:21

**[issues - joshua]**

**issues** 37:5 38:7 79:12 98:20 101:10
**issuing** 50:6 135:13 144:3 275:8 276:3 289:19 290:18 290:24
**italics** 69:4 117:23,23
**iuoe** 9:5

**j**

**jackson** 3:9 6:23,23 12:7 14:4 15:19 16:4,10,15 17:13,18 18:17 19:7,15 21:13 21:16 22:15 23:16 24:10 25:24 27:20 29:24 30:4 31:2,24 32:13 33:4 35:7,19 37:25 38:5 41:9 43:4,19 44:5,8,14 45:17 46:11,15 47:8 48:16 50:23 51:4 53:13 54:8 58:23 59:14 60:11 61:5 62:11,23 65:17 67:9 69:18

70:25 71:13 72:5,11,23 73:13 74:20 75:24 76:18 79:24 80:15 82:23 83:7 85:11 87:8,10 87:14 90:11 92:22 93:9 98:4 99:6,21 100:23 103:3 104:9,25 105:15 106:6 108:23 109:23 115:6 116:21 117:16 118:8 118:23 121:24 125:19 127:24 129:17 130:23 132:20 136:9 136:14 137:12 139:25 143:16 144:4,20 145:12 147:15 150:3 151:15 152:23 154:11 154:21 158:17 159:3 160:7 161:11 163:17 165:22 167:17 169:8 171:22 172:16 173:24 175:21 177:19 178:13 180:12 184:16 185:7

189:6,14 195:5 197:12 198:6,8 198:15 200:2 201:15 203:14 203:21 205:11 208:23 211:24 213:14 214:14 214:19,22 217:2,24 219:8 221:10,12 223:3,6,21 227:11 228:15 229:18,20,23 230:5 232:12 235:23 237:5 238:23 240:7 240:19 241:14 241:25 250:21 251:20 252:13 253:20 255:23 257:23 259:7 260:4 261:2 267:21 268:24 271:7 273:5 275:15 277:24 278:13 279:15 280:15 282:6 282:14 283:6 283:12 284:2 285:21 286:13 289:22 290:9 292:6,24 293:10,21
**january** 1:20 2:12 5:4 71:9

112:12,17 181:19 295:9 297:22
**japan** 116:10 116:19,24 117:7 119:18 120:15
**jeffrey** 207:8 223:9 234:18
**job** 32:23 34:11
**jobs** 32:10
**johannes** 1:12
**johnston** 12:23
**joining** 112:3
**joshua** 1:18 2:18 5:16 7:1,6 7:16 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 48:21 49:1,5 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1

**[joshua - kauffman]**

| | | | |
|---|---|---|---|
| 62:1 63:1 64:1 | 144:1 145:1 | 213:1 214:1 | 282:1 283:1 |
| 65:1 66:1 67:1 | 146:1 147:1 | 215:1 216:1 | 284:1 285:1 |
| 68:1 69:1 70:1 | 148:1 149:1 | 217:1 218:1 | 286:1 287:1 |
| 71:1 72:1 73:1 | 150:1 151:1 | 219:1 220:1 | 288:1 289:1 |
| 74:1 75:1 76:1 | 152:1 153:1 | 221:1 222:1 | 290:1 291:1 |
| 77:1 78:1 79:1 | 154:1 155:1 | 223:1 224:1 | 292:1 293:1 |
| 80:1 81:1 82:1 | 156:1 157:1 | 225:1 226:1 | 294:1,6 295:4 |
| 83:1 84:1 85:1 | 158:1 159:1 | 227:1 228:1 | 297:10 298:2,4 |
| 86:1 87:1 88:1 | 160:1 161:1 | 229:1 230:1 | 298:12 299:2 |
| 89:1 90:1 91:1 | 162:1 163:1 | 231:1 232:1 | 299:24 300:2 |
| 92:1 93:1 94:1 | 164:1 165:1 | 233:1 234:1 | 300:24 |
| 95:1 96:1 97:1 | 166:1 167:1 | 235:1 236:1 | **journal**  33:17 |
| 98:1 99:1 | 168:1 169:1 | 237:1 238:1 | **journals**  22:2 |
| 100:1 101:1 | 170:1 171:1 | 239:1 240:1 | **judgment** |
| 102:1 103:1 | 172:1 173:1 | 241:1 242:1 |   22:10,13 33:7 |
| 104:1 105:1 | 174:1 175:1 | 243:1 244:1 |   40:14 |
| 106:1 107:1 | 176:1 177:1 | 245:1 246:1 | **july**  47:14 |
| 108:1 109:1 | 178:1 179:1 | 247:1 248:1 | **juncture**  285:5 |
| 110:1 111:1,16 | 180:1 181:1 | 249:1 250:1 | **june**  133:21 |
| 112:1 113:1 | 182:1 183:1 | 251:1 252:1 |   134:16 139:8 |
| 114:1 115:1 | 184:1 185:1 | 253:1 254:1,8 |   139:12 141:7 |
| 116:1 117:1 | 186:1 187:1 | 254:16 255:1 |   142:14 153:19 |
| 118:1 119:1 | 188:1 189:1 | 256:1 257:1 |   153:20 155:3 |
| 120:1 121:1 | 190:1 191:1 | 258:1 259:1 |   155:13 156:8 |
| 122:1 123:1 | 192:1 193:1 | 260:1 261:1 |   163:6,10 180:7 |
| 124:1 125:1 | 194:1 195:1,15 | 262:1 263:1 | **jury**  20:9 24:19 |
| 126:1 127:1 | 195:24 196:1 | 264:1 265:1 | **justice**  17:24,25 |
| 128:1 129:1 | 197:1 198:1 | 266:1 267:1 |   22:25 25:6 |
| 130:1 131:1 | 199:1 200:1 | 268:1 269:1 |   32:19 77:8 |
| 132:1 133:1 | 201:1 202:1 | 270:1 271:1 |   88:17 244:13 |
| 134:1 135:1 | 203:1 204:1 | 272:1 273:1 | **k** |
| 136:1 137:1 | 205:1 206:1 | 274:1 275:1 | **k**  47:17 245:19 |
| 138:1 139:1 | 207:1 208:1 | 276:1 277:1 | **katz**  3:12 6:19 |
| 140:1 141:1 | 209:1 210:1 | 278:1 279:1 | **kauffman**  75:8 |
| 142:1 143:1 | 211:1 212:1 | 280:1 281:1 | |

**[keenly - legal]**

**keenly** 89:6
**keep** 41:24
  169:7
**keeping** 171:18
  185:20
**keeps** 272:10
**kind** 68:19
  191:11 201:23
  216:7 252:20
  275:21 281:10
**knew** 119:24
**know** 9:13 14:9
  36:19 39:17
  43:15 46:8
  47:20,21 48:10
  58:12 59:19
  60:11 71:5,18
  84:7,9,19
  86:21,23 87:6
  96:8 98:19
  100:7 121:3
  122:17 130:24
  133:25 144:13
  151:21 152:20
  152:20 154:3
  161:19 162:8
  162:11 169:16
  181:16,25
  185:9 186:18
  190:17 191:3
  193:18 196:3
  196:11 197:8
  201:9,21
  206:19 208:12
  211:7 214:8,23

215:15 220:18
220:22 224:4,9
225:14 226:16
228:18 229:6
232:4 233:4
234:15 238:13
241:3,13,15
246:14 248:5
251:5 255:5
258:17 259:5
266:18,23
268:5 272:14
273:25 274:3
274:12 275:25
277:15 282:16
283:14 292:3
292:19
**knowing** 36:14
  100:13 135:4
  285:5
**knowledge**
  33:22 78:23
  80:17 100:15
  122:14 144:5
  150:9 158:18
  168:2 197:16
  275:12 292:10
**known** 85:16
  179:25 230:19
**knows** 216:2,15

**l**

**labeled** 181:10
**labeling** 177:8
**lack** 154:19
  177:7 202:11

249:24
**lacked** 291:8
**lacking** 145:5
**laid** 63:20
  129:21 146:18
  161:5 214:24
**language** 29:12
  70:15 117:22
  138:6 209:4
**large** 12:18
  13:3 30:7
  31:16 66:17
  67:4,6,13,14,18
  67:21 76:6
  90:20 93:7
  94:14 107:22
  191:6 252:7
  257:5 267:5
  270:9 287:2
**largely** 263:19
**larger** 13:8
  42:17 65:15
  68:6 253:16
**lasalle** 3:6
**lastly** 55:12,15
**late** 31:7 38:10
**launch** 259:9
**law** 22:3 23:24
  30:21 31:20,22
  59:9 62:17
  217:6 284:10
**laws** 182:5,10
**lawyer** 26:5,21
**lawyers** 39:5

**layer** 212:18
**lead** 1:6 50:15
  50:20 122:12
  124:15,16
  143:7 145:22
  179:3 180:19
  202:3 246:18
  255:9 271:25
  281:3 285:11
**leading** 66:23
  79:13
**leads** 243:17
  244:25
**learn** 40:13
  78:13 79:21
  149:23
**learned** 131:25
  180:25
**led** 96:7 278:7
  285:13
**left** 114:17
  119:14 132:6
  181:5 196:14
  207:20,25
  208:6 235:17
  235:19
**leg** 170:5,6
**legal** 21:4,9,18
  23:17 24:11
  25:25 38:7
  58:24 59:6,9
  59:24 69:19,23
  69:25 98:5
  137:13 284:4,7

**[legal - little]** Page 43

284:9
**legally** 83:15
 102:7 103:18
 168:23 203:2
 205:18 206:6
 281:15 288:16
**length** 106:12
 172:7 204:18
 252:21
**level** 94:5 96:3
 113:2 153:13
 153:17 233:12
**lexicon** 156:22
**liability** 20:15
 20:21 54:20
 55:2,10,14,18
 56:21 57:2,8
 57:20,25 59:4
 59:21 60:3,9
 60:23 68:25
 72:15 82:6
 83:10,12 84:24
 86:7 91:10
 106:25 108:20
 109:14 120:14
 125:13 139:8
 145:18 167:2
 169:15,17
 170:5,25
 173:10 198:24
 202:25 273:11
 273:24 274:18
 276:10,15
 277:2,4,8,14,22
 280:19 285:15

287:5 290:6
**liam** 1:12
**life** 9:7 15:24
 57:18
**light** 22:19
**likelihood**
 86:14
**likely** 63:9,11
 63:13,23 64:4
 64:7,20 65:2
 66:22 84:3,4
 86:2,5 147:17
 157:10 177:21
 190:25 239:12
 239:14 251:13
 253:13
**likewise** 195:2
 236:24 243:7
**limit** 162:19
 164:17 166:11
 166:12 191:21
 191:22,25,25
 192:7,8 215:23
 216:10 224:17
 224:18 225:5
 228:7,9 230:23
 230:25 231:7
 232:24 233:6
**limitation**
 162:9 225:16
**limitations**
 232:24
**limited** 26:15
 110:17 148:21
 216:19

**limits** 193:14
**line** 155:10,13
 177:11 182:7
 187:14 192:17
 192:18 193:6
 223:10 227:6
 227:20,22
 244:9 246:12
 248:22 256:16
 261:19 263:10
 263:14,15,15
 264:10 265:8
 265:11,23
 266:3,16 299:4
 299:7,10,13,16
 299:19 300:4,7
 300:10,13,16
 300:19
**lines** 114:16
 176:4 243:17
 244:18 248:18
 249:7 261:23
 261:24 262:3,4
 265:10,11
**link** 77:13,13
 77:25
**linked** 65:25
 66:2,4,8
**lipton** 3:12
 6:19
**liquid** 63:25
 64:13,20,25
 66:18 67:16
 162:12 290:22

**liquidity** 64:3
 67:12 78:18
 86:10 156:14
 156:19 157:11
 157:16 158:6
 172:10 187:23
 189:4 232:21
**list** 12:9 122:11
 122:12,21
 123:3
**listed** 54:16
 56:9 62:15
 126:10 156:15
 172:11 224:18
 247:24
**lists** 182:24
 183:4,24 251:9
**literally** 118:11
 118:18 119:7
**literature**
 191:7
**litigated** 37:6
**litigation** 18:24
 19:22 27:18
 36:17,22 37:24
 54:13 56:18
 150:11 184:13
 219:19 282:10
**litigator** 151:22
**little** 48:17
 93:10 95:16
 97:23 112:24
 123:3 134:19
 155:12 160:15
 177:10 180:25

**[little - made]** Page 44

180:25 218:7
232:25 243:18
252:16 253:11
257:15
**llc** 6:24 26:24
**loading** 256:12
**loan** 255:18
265:13,14,24
266:5 267:5,17
268:20,20
**loans** 268:22
**local** 1:6 8:22
8:23 53:23
143:14 157:15
157:17 158:5
161:22 172:10
180:7 183:12
183:16 184:5
187:23 189:23
223:16 234:5
250:25 251:16
255:10 264:13
**locally** 156:19
157:11,16
189:4 256:23
257:5
**located** 80:8
261:23
**location** 19:24
61:19 83:9,11
156:14 280:21
**locations** 2:19
61:20
**loevner** 12:14
12:16,17,25

13:9 142:17,18
142:22 143:6
143:15 144:2
144:11,18
155:2,7 179:14
184:14,23
187:3,11
207:12 208:22
222:12 234:25
237:4 238:22
240:18,25
241:24 248:11
249:8 251:14
252:6,24
270:25
**loevner's**
251:16 252:10
**logic** 139:17
**logical** 215:5
**logically** 83:15
102:6 103:18
168:22 203:2
205:18 206:7
270:12,20
281:15 288:16
**london** 74:6
**long** 11:8,17
170:8,8 173:8
214:2 242:6
256:19 265:2
288:24
**longer** 40:12
**look** 33:21
37:16 71:16
94:6 114:16

134:7 149:20
155:23 157:7
158:10,11
163:2 176:3
177:10 196:6
196:14 200:8
207:24,25
220:17 225:18
233:25 236:7
246:8,17 248:2
248:13,17
266:14
**looked** 26:7
75:13,14
122:20,23,25
124:3 178:22
189:3 207:7
208:11 224:23
237:14,16
243:12 250:11
252:6 258:14
258:14
**looking** 14:15
29:3 81:6 94:6
94:17 113:5
119:15 124:25
126:12 142:3,8
177:23 179:21
199:23 247:22
250:25 253:13
253:17 259:6
270:7 272:25
**looks** 163:4
175:25 193:5
243:24

**loophole** 98:17
**loosely** 95:11
**los** 255:18
**loss** 119:23
**lost** 138:17
**lot** 214:6 258:7
283:5,8,19
**lots** 167:8
233:20
**love** 217:9
**low** 53:3 165:9
**lp** 249:8
**lunch** 112:3

**m**

**m** 26:23 27:4,8
27:10,15,17,24
28:2,14 32:11
32:20,24 40:2
40:5 188:21
245:7
**macq** 52:12
**macquarie** 52:3
126:20,22
127:2,13,15,19
129:12 133:15
133:19 134:15
140:14 142:14
155:10 167:11
**macquarie's**
127:4 139:8,19
**made** 41:21
83:12 96:6
106:21 127:6
144:6,9 145:2
146:20 150:13

**[made - market]**

150:24 152:17 152:19 170:19 225:15 252:24 275:13 296:21 298:5

**maehr** 188:21

**magnitude** 42:16 163:19

**maintain** 108:2 194:15 204:14 265:6

**maintained** 148:8 179:18 179:25

**maintains** 262:18

**majority** 45:19 76:12 92:5 107:22,23 149:10 268:2 284:19 286:21 289:10 292:20

**make** 9:7 32:22 57:18 59:5 61:7 63:8,23 90:16 96:2 114:9 129:22 138:18 145:13 164:23 165:2 165:16 169:3 169:22 171:11 213:4 221:20 245:3 268:13 287:13

**maker** 272:20 272:20

**makers** 64:21 65:2

**makes** 57:14 64:4 131:6 138:7 202:15 213:6 216:13 288:19

**making** 30:11 61:18 131:21 134:4 137:16 137:24 139:16 154:20 253:4

**manager** 113:22 114:3 121:11 142:24 143:21 147:12 148:7,9,18,23 149:15 171:17 172:13 184:22 252:24 282:2

**manager's** 149:21

**managers** 113:14 143:5 145:6 149:25 151:3,6,9,13 179:11,11

**manner** 59:12 84:2 88:4 131:14 203:12 291:14

**manuscript** 33:16

**march** 57:14 114:19 205:23 227:19

**margin** 232:21

**mark** 14:6 153:25 174:24 186:15 197:5 206:16 234:9 238:5 241:6

**marked** 14:11 112:10,19 154:6 175:2 181:13 186:20 197:2 206:22 222:22 234:11 238:10 241:10 248:6 256:9 260:15,18 261:8 296:14 296:17

**market** 47:19 63:24 64:6,12 64:18,18,19,21 64:21,25 65:2 65:3,14 66:11 66:17 67:6,14 67:16,17,18 68:15,15,16,17 69:6 77:20 78:15,16 80:25 81:10 84:2 86:6,12,12,16 90:8 91:19,23 101:17 107:4 108:22 113:21

114:20 115:18 120:2 134:5,9 135:6 137:5,25 139:2 140:5,20 140:22,24 141:6,9,11,15 141:20 142:10 148:25 149:12 157:8,15,18 161:23 162:11 162:14 163:4 164:3,9,12,15 164:22 166:9 166:11,16 170:19 185:21 189:20 190:3,7 190:9,11,14,23 191:10,20 193:18 196:17 198:4,14 199:9 199:11,25 201:3 205:22 209:12,14 211:5 212:13 212:23,25 213:12,19,21 213:25 214:2,4 214:9 215:3,8 215:9,11 216:5 216:7,10,18,20 216:22,22,24 217:14,18,19 217:20,21 218:5,6,14,23 219:5 220:8,10

**[market - mellon]**

222:18 224:11
224:12,15,16
225:22 226:8
227:16 228:6,8
231:4 233:5,9
243:11 244:3
247:13 253:7
262:21 263:17
264:21 265:25
268:7,15
272:20,20
274:6,24 275:9
276:22,25
278:8,19 279:6
279:8,12,22,25
281:12 284:23
286:23,24
287:9,23,24
288:13 290:19
290:21,22
291:5,8,11,21
**markets** 22:5
65:9 77:7,12
77:25 81:24
88:11 194:21
204:25 215:13
**marriage**
297:18
**match** 81:22
259:5
**matched** 81:4
81:17,18 88:4
**matches** 82:5
**matching** 76:24
77:14 78:5,9

78:21,25 80:6
82:14 84:21
85:10 91:8,15
91:16
**material** 33:2,6
33:8,9 53:7,11
123:18,20
144:13 147:9
151:24 166:5
240:24
**materials** 11:25
12:4,6,10,11,13
12:16,21,22
13:2 30:9,16
30:17 31:5
35:14 50:13,15
50:19 54:6
62:6 122:3,6,8
122:9 126:16
127:22 128:14
131:8 143:10
143:19 144:15
145:2 146:4,14
146:16 185:23
**matter** 5:18
21:9 28:8,10
28:13,23 29:2
29:5,23 35:6
36:4,11,15
40:5 43:2,16
46:6,9 47:13
64:11 69:12,25
70:12,18 74:2
121:14 149:18
151:25 152:9

200:23,24
240:21,22
271:16 286:22
297:20
**matters** 19:23
20:18 22:7
24:23 25:9
28:3 55:23
56:4,5,8 88:19
215:18 233:8
272:8,24
**max** 164:24
**maximum**
162:21 165:3
168:10
**mean** 16:6
18:20,23 19:17
71:2 76:20
92:15 96:12
105:7 130:6,10
135:8 157:3
161:21 204:21
208:10 226:23
235:22 236:7
243:19 244:19
258:10,18,24
259:10 266:21
273:8 277:25
279:5
**meaning** 43:7
81:9 94:24
101:7,21
129:25 142:6
152:13 156:24
180:24 201:24

213:18 287:24
**meaningful**
163:22
**meanings**
176:12 189:17
**means** 157:22
176:22,24
204:8,10 210:3
218:11 231:5
242:12,17
249:25 265:16
**meant** 8:15
154:18 168:3
205:23
**mechanics** 18:6
22:21 23:11
97:24
**media** 5:15
48:20 49:3
88:21 89:17
90:7,17 111:15
111:15,22
195:14,22
254:7,14 294:7
**medical** 10:20
**mellon** 65:10
79:12 91:22
93:12,14,22
94:14,17,23
95:3,5,17,22
96:3 97:7 98:2
98:14,20
101:10 104:24
105:14 128:21
134:24 135:13

**[mellon - mitts]**

158:16,22
177:16,24
178:2,6 179:2
179:23 180:2
202:9 203:8
268:18 270:5
273:10,21,23
276:3 289:17
290:16,24
292:5
**mellon's** 95:13
100:7,18,20
268:11
**mellow** 291:5
**melon** 177:12
**members** 36:23
55:8,19 57:9
**memoranda**
23:6
**memorializing**
210:13
**memorized**
222:16
**memory** 43:22
47:4 100:2
106:14 108:10
124:6 143:20
143:23 177:22
180:19 185:23
186:2 263:19
**mental** 75:12
75:20
**mention** 97:19
202:6

**mentioned**
11:24 33:23
108:16,17
133:14 230:9
267:23
**mentioning**
244:12
**mentions**
202:16
**mere** 169:20
171:3 173:3
**mess** 256:17
**message** 110:10
156:25 159:9
160:9,12
162:10 243:20
244:5,6
**met** 216:3
**metal** 1:5 5:19
8:17,18 143:14
180:9,14,15
182:8 184:6
298:1 299:1
300:1
**metaphoric**
169:2
**metaphorical**
118:20
**metaphorically**
119:8
**methodology**
61:9,14 109:6
146:17 263:2
263:23

**methods** 125:4
**mic** 293:9
**microstructure**
67:16
**million** 60:9
74:18,24 75:3
79:4,16,22
163:16 265:25
**milstein** 3:4
6:24 36:5,6
37:23
**mind** 156:4
161:20 173:12
185:20 193:22
202:20 247:15
**minimum**
162:22,23
**minus** 264:11
**minute** 174:9
257:25
**minutes** 44:13
48:18 107:15
225:24 247:9
**mischaracteri...**
67:10 115:8
**mischaracteri...**
18:18 19:8
31:3 41:10
43:20 46:16
54:9 65:19
71:14 72:6
74:21 82:24
100:24 106:7,8
116:22 118:24
121:25 125:20

140:2 163:18
165:23 167:18
173:25 178:14
189:7 198:9,10
200:3 208:24
211:25 219:9
221:13 227:12
235:24 237:6
282:15
**mischaracteri...**
154:16
**miscounted**
122:5,16
**missed** 92:9
217:17
**missing** 51:8
52:2,4,11
166:5
**misstates**
252:14 255:24
278:14
**mistake** 30:11
**misunderstan...**
91:3 146:5
229:24 284:8,8
**mitts** 1:18 2:18
5:17 7:1,6,15
7:16,18 8:1 9:1
10:1 11:1 12:1
13:1 14:1,8,10
15:1 16:1 17:1
18:1 19:1 20:1
21:1,19 22:1
23:1 24:1 25:1
26:1 27:1 28:1

**[mitts - moment]**                                      Page 48

| | | | |
|---|---|---|---|
| 29:1 30:1 31:1 | 119:1 120:1 | 189:1 190:1 | 255:1 256:1 |
| 32:1 33:1 34:1 | 121:1 122:1 | 191:1 192:1 | 257:1 258:1 |
| 35:1 36:1 37:1 | 123:1 124:1 | 193:1 194:1 | 259:1 260:1 |
| 38:1 39:1 40:1 | 125:1 126:1 | 195:1,16,24 | 261:1 262:1 |
| 41:1 42:1 43:1 | 127:1 128:1 | 196:1,2 197:1 | 263:1 264:1 |
| 44:1 45:1 46:1 | 129:1 130:1 | 197:15 198:1 | 265:1 266:1 |
| 47:1 48:1,21 | 131:1 132:1 | 199:1 200:1 | 267:1 268:1 |
| 49:1,5,7 50:1 | 133:1 134:1 | 201:1 202:1 | 269:1 270:1 |
| 51:1 52:1 53:1 | 135:1 136:1 | 203:1 204:1 | 271:1 272:1 |
| 54:1 55:1 56:1 | 137:1 138:1 | 205:1 206:1 | 273:1 274:1 |
| 57:1 58:1 59:1 | 139:1 140:1 | 207:1 208:1 | 275:1 276:1 |
| 60:1,12 61:1 | 141:1 142:1 | 209:1 210:1 | 277:1 278:1 |
| 62:1 63:1 64:1 | 143:1 144:1 | 211:1 212:1 | 279:1 280:1 |
| 65:1 66:1 67:1 | 145:1 146:1 | 213:1 214:1,15 | 281:1 282:1 |
| 68:1 69:1 70:1 | 147:1 148:1 | 214:18 215:1 | 283:1 284:1 |
| 71:1 72:1 73:1 | 149:1 150:1 | 216:1 217:1 | 285:1 286:1 |
| 74:1 75:1 76:1 | 151:1 152:1 | 218:1 219:1 | 287:1 288:1 |
| 77:1 78:1 79:1 | 153:1,11 154:1 | 220:1 221:1 | 289:1 290:1 |
| 80:1 81:1 82:1 | 155:1 156:1 | 222:1 223:1 | 291:1 292:1 |
| 83:1 84:1 85:1 | 157:1 158:1 | 224:1 225:1 | 293:1,8 294:1 |
| 86:1 87:1 88:1 | 159:1 160:1 | 226:1 227:1 | 294:7 295:4,8 |
| 89:1 90:1 91:1 | 161:1 162:1 | 228:1 229:1 | 297:10 298:2,4 |
| 92:1 93:1 94:1 | 163:1 164:1 | 230:1 231:1 | 298:12 299:2 |
| 95:1 96:1 97:1 | 165:1 166:1 | 232:1 233:1 | 299:24 300:2 |
| 98:1 99:1 | 167:1 168:1 | 234:1 235:1 | 300:24 |
| 100:1 101:1 | 169:1 170:1 | 236:1 237:1 | **mixed** 264:17 |
| 102:1 103:1 | 171:1 172:1 | 238:1 239:1 | **modern** 215:13 |
| 104:1 105:1 | 173:1 174:1 | 240:1 241:1 | **modification** |
| 106:1 107:1 | 175:1 176:1 | 242:1 243:1 | 51:3 |
| 108:1 109:1 | 177:1 178:1 | 244:1 245:1 | **modifying** |
| 110:1 111:1,16 | 179:1 180:1 | 246:1 247:1 | 147:6 |
| 111:24 112:1,2 | 181:1 182:1 | 248:1 249:1 | **moment** 12:8 |
| 113:1 114:1 | 183:1 184:1 | 250:1 251:1 | 37:3 56:9 62:6 |
| 115:1 116:1 | 185:1 186:1 | 252:1 253:1 | 75:11 86:7 |
| 117:1 118:1 | 187:1 188:1 | 254:1,8,16,18 | 101:25 102:4 |

**[moment - newly]**

103:10 110:19
127:19 134:3
143:9,20
168:20 201:8
205:15 206:6
207:7 210:12
213:8 222:16
223:4 250:9
257:9 281:13
287:6 288:17
**moments**
210:16
**monday** 160:16
226:13 272:10
272:17
**money** 61:22
98:17 136:12
136:18,20,24
280:23
**month** 31:6
35:3
**morning** 5:2
160:16 186:8
226:16
**motion** 168:4,5
202:3 218:11
**move** 118:16
120:22 185:4
258:8
**moving** 74:13
91:20 116:2
277:11
**multiple** 44:24
45:2,11,14,22
164:13 169:25

170:3 270:25
274:5
**multiplied**
231:21

**n**

**name** 6:3 7:14
108:10 240:24
**named** 1:9 7:25
122:13 124:16
124:17,17
155:4 188:20
281:4
**names** 8:15
**narrow** 245:23
**national** 1:5
5:19 8:18
182:8 298:1
299:1 300:1
**native** 54:2
256:18
**natives** 54:2
**natural** 107:11
227:25 243:22
**naturally** 209:7
288:5
**nature** 17:24
19:10 20:4
38:3,18 39:16
70:3 137:18
242:4 262:8
**necessarily**
24:17 46:5
55:9 67:23
83:18 141:18
147:17 167:19

228:24 264:23
279:7
**necessary** 29:7
75:16 76:4
81:16 82:3
125:2 132:23
198:25 298:7
**necessitate**
127:6 239:16
**necessity**
112:14
**need** 25:15 33:5
52:18 61:6
67:5 149:20
157:7 166:6
176:24 177:6
256:23 257:2
280:11 283:24
285:21
**needed** 284:24
**neglected** 202:6
**negotiated**
45:25
**negotiation**
40:25 42:9,10
**nets** 269:20
**nettipf** 113:12
**never** 164:4
171:8 197:16
**new** 1:25 2:22
3:15,15 6:4 7:9
11:4 15:17
30:24 31:5,11
31:18 65:10
66:12 68:3

69:4 78:6
79:12 80:8
91:22 93:12,14
93:22 94:12,13
94:23 95:2,5
95:12,17 97:6
98:13,20
100:17,19
101:9 106:23
116:10,24
117:7 128:20
131:24 134:24
135:13,13,25
145:22 147:7
148:16 149:14
158:15,21
175:23 177:12
177:16,25
178:2 202:8
203:8 255:12
255:17,17
263:11 264:14
265:21,21
267:18 268:11
268:12,17
270:5 273:10
273:20,22
275:8,10 276:2
277:23 289:16
290:16,24
291:4 292:4
297:3,9
**newly** 50:9,12
50:14,19 68:18
92:13 101:15

**[newly - objection]**

128:11 137:8 159:16,19 237:19 267:13 268:8,9,18 272:16 280:10 285:3 287:2 290:24 291:23

**news** 38:22 96:11

**nickl** 1:13

**nine** 109:5 146:17

**nkt** 141:15

**noah** 3:16 6:18 258:18

**non** 62:20 65:16 73:8

**noncancelable** 171:7

**nondomestic** 73:23

**nonlegal** 60:21

**nonpublic** 282:11

**nonsensical** 78:19 213:17 274:8

**norhan** 7:3

**northern** 1:2 5:22 51:18

**notary** 2:21 7:8 297:7 298:13 298:19

**note** 5:5 117:22 166:13 168:9

193:14 197:19 240:9 261:2 293:22

**noted** 259:17 294:11 298:7

**notes** 10:11,12 26:22 68:23 225:17

**notice** 2:20 52:2

**noticing** 6:17

**notify** 97:13

**november** 31:7

**nqb** 77:13

**number** 5:24 8:23 11:16 18:3 21:6 22:4 25:9 29:6 31:13 40:10 41:17 44:22 45:5,6 48:20 49:4 52:5,7,11 52:17 63:8 77:22 79:10 81:18 84:6 86:20 90:14 92:18 93:3,13 93:14 94:11 97:17 111:15 111:23 136:16 146:16 161:5 162:17 168:6 168:17 182:15 182:24 183:13 191:14 195:14

195:23 197:6 197:24 202:19 203:23 229:11 229:12 231:20 233:4,9 254:7 254:15 258:22 258:23 260:20 260:21 270:8 270:10 271:16 282:19,24 285:3 294:7

**numbered** 182:11,14

**numbers** 52:9 256:16,17 258:22 259:2,4 259:18

**nutshell** 38:21

**ny** 95:22

**nyse** 74:14,25 75:23 76:11,22 77:15 78:22,24 79:6,17 80:4,6 80:14,19 81:4 81:23 82:10,21 83:6 85:5,8

**o**

**o'clock** 186:8,9

**o'connell** 187:5 187:10,17 188:15 202:13 207:9

**oath** 4:16 6:8 9:19,20

**object** 21:17 35:19 59:16,24 87:15 131:2 154:15 197:12 221:12

**objecting** 197:18

**objection** 12:7 14:4 15:19 16:4,10,15 17:13,18 18:17 18:18 19:7,15 21:13 22:15 23:16 24:10 25:24 27:20 29:24 30:4 31:2,24 32:13 33:4 35:7 37:25 38:5 41:9 43:4,19 44:5 45:17 46:11,15 47:8 50:23 51:4 53:13 54:8 58:23 61:5 62:11,23 65:17 67:9 69:18 70:25 71:13 72:5,23 73:13 74:20 76:18 79:24 80:15 82:23,24 83:7 85:11 87:8,10 90:11 92:22 93:9 98:4 99:6

**[objection - okay]**

99:21,22
100:23 103:3,4
104:9,25
105:15 106:6,7
108:23 109:23
115:6,7 116:21
117:16,17
118:8,23
121:24 122:2
125:19,20
127:24 129:17
132:20 136:9
136:14 137:12
139:25 140:2
143:16,17
144:4,20
145:12 147:15
150:3 151:15
158:17 159:3
160:7 161:11
163:17 165:22
167:17 169:8,9
171:22 172:16
173:24,25
175:21 177:19
178:13 180:12
184:16 189:6
189:14 198:6
198:15,16
200:2,3 201:15
201:16 203:14
203:21,22
205:11 208:23
211:24 213:14
217:2 219:8

223:21 227:11
228:15 229:18
230:5 232:12
235:23 237:5,6
238:23 240:10
240:19 241:25
251:20,21
252:13 253:20
255:23 257:23
257:24 259:10
267:21 268:24
271:7 273:5
275:15 277:24
278:13 279:15
280:15 282:6
282:14 283:6
283:12 284:2,3
286:13 289:22
290:9 292:6,24
**objections** 4:10
6:11 217:25
**objective**
148:11 156:24
**obligated** 80:9
98:2 192:6
204:4 214:14
**obligation**
83:23 84:13
85:9 87:3,7
90:25 91:4,7
91:13 101:18
102:11,22
193:20 200:20
200:21,22
247:18 269:9

269:11 278:9
**obligations**
88:10 90:9
102:8 103:19
190:16 205:19
**observe** 80:5
110:24 179:22
264:10
**observed** 71:22
89:8 90:8 93:6
134:10 150:6
210:9 246:14
**observes**
110:11
**observing**
210:10
**obtain** 123:6
**obtaining**
267:13
**obvious** 30:19
89:4 117:25
204:18
**obviously**
204:16 218:13
**occasion**
290:23
**occur** 61:22
64:5 74:8
80:24 93:7
169:16 171:5
273:15
**occurred** 63:12
63:14 80:22
120:14 140:8
149:11 162:2

173:11 179:6
186:14 208:13
210:9 253:7
254:25 281:22
284:20 285:10
286:10,11,20
**occurring** 74:2
137:7 210:19
**occurs** 139:3
194:24 244:8
277:23 288:4
**odd** 111:25
**offense** 8:15
**offer** 78:14
129:9 145:9
229:5 289:7
**offered** 18:14
19:4 127:22
**offering** 55:24
125:16 146:8
192:3
**office** 176:16
176:16
**officer** 4:15
**officially** 67:7
**oh** 175:10
232:15
**okay** 7:25 8:24
9:5,10,16
10:24 34:18
44:14 47:5
48:15 49:15
57:22 58:4,10
60:19 71:16
72:11 91:20

**[okay - opposed]**                                                                Page 52

92:9 106:20
107:16 109:18
111:8 112:22
113:11,19
114:2,11,25
116:2 119:13
120:20 122:20
127:17 130:14
133:12,14
139:16 142:15
151:2 153:24
156:7 158:10
173:17 174:22
175:11,15,15
175:17 180:5
181:9,23 182:7
182:14 183:7,7
183:9,10
185:11 186:15
186:23 187:2
187:11,12,13
188:10 196:9
196:13 197:5,6
197:11 206:16
207:6 220:17
222:18 223:6
228:11 229:23
233:24,25
234:7,17 235:7
235:17 238:5
238:18,19
240:13 241:18
248:2,9,10,17
249:2,6 250:13
250:17,23

251:7 254:3,23
257:4,7,11,16
259:24 260:18
262:2 274:21
285:23 290:3
**old** 26:11
**omitted** 181:3
**once** 58:19
103:21 140:10
169:10 194:16
205:24 218:11
243:10 244:3
278:23 279:2
**one's** 264:22
**ones** 33:23 68:6
236:22 269:17
**ongoing** 24:23
25:4 31:18
56:10 123:17
150:25 155:22
**ooo** 4:20
**open** 10:10,13
85:24 121:15
134:5 154:22
170:8 181:20
181:22 187:25
196:12 197:22
207:4 217:19
218:23 222:25
241:19 247:5
248:9 250:16
256:20 257:7
257:14
**opened** 185:21
217:21 243:11

**opening** 257:4
265:6
**opens** 216:24
218:14,18
244:3
**operated** 77:11
77:24
**operating** 1:7
9:3 82:15
**operation** 78:7
**operative** 14:2
**opine** 19:24
20:22 54:12,19
54:25 55:13,15
56:3 117:18
132:8
**opined** 125:10
**opining** 137:14
190:17
**opinion** 18:14
18:21,23,23
19:4,10,12,17
19:18,19 50:15
50:20 55:24
56:20,25 57:6
57:15 61:10
63:4,6 69:23
70:4,11,13,19
70:21 81:13
83:14 84:13
85:6 87:5 88:6
99:14,25 100:2
101:5 105:3,19
106:11,13,16
109:4,6 115:9

115:12,21,22
118:6 120:24
125:11,16
126:8 130:9
131:4 144:3,19
145:9,15 146:8
146:10 147:7
166:23 171:23
172:18 174:2
189:11 192:3
195:4 196:9,10
198:3,10 201:3
201:11 203:9
203:11 205:22
206:13 213:11
219:25 223:19
225:20 226:19
227:25 245:21
267:25 277:12
278:15,16
284:10,18
285:4 286:8
287:15 289:6
**opinions** 49:19
49:22,25 50:6
50:11,16,21
56:14 57:13
117:21 129:9
129:11,18
145:21 253:25
**opportunity**
149:9 152:7
200:12 202:5
**opposed** 86:4

**[opposite - ordinary]**                                         Page 53

**opposite** 140:4
**order** 9:23 10:2
  10:3 11:14,22
  13:19,20 15:10
  15:13 16:18
  24:16 42:14
  44:19 57:14
  80:6 81:19
  83:20 84:8,17
  84:17,18,20
  85:4,10,25
  86:22 88:2
  89:14,20 90:4
  94:4 97:15
  109:20,25
  110:2,5,7
  111:6 114:20
  115:19 119:18
  123:6 125:7
  128:21 131:10
  133:19 134:6,7
  134:8,8 139:9
  139:11 140:5
  140:15,20,21
  140:22,22,24
  140:25 141:6,9
  141:11,15,20
  142:10 148:15
  148:24,25
  162:14,16,19
  162:19 163:3,4
  163:21 164:3,9
  164:15,16,17
  165:21 166:7,8
  166:9,11,11,21

167:15,16
170:15,16,19
170:24,24
172:13 173:8
173:10,10,14
173:22 176:14
176:14 185:12
186:5,7,11,13
189:12,17,20
190:4,7,11,21
190:24 191:10
191:20,22,22
191:25 192:8,8
192:10 193:5
193:10,19
194:4,9,11,14
194:19 196:17
198:4,14,23,24
199:9,11,25
201:3 203:9,13
203:17 204:9
204:11,19,22
205:22 206:5
213:19 214:4,9
214:21 215:2,3
215:8,12,12,18
215:20,22,23
216:3,5,7,10,10
216:14,22,24
217:14,18,20
217:22 218:5
218:14,22
219:6 220:8,10
221:5,24 222:4
222:6,9 223:10

223:19 224:11
224:12,15,16
224:17,20
225:2,5,21
226:4,8,8,10,14
226:24 227:16
227:18 228:8,8
228:9,12 229:2
229:16 230:2
230:23,23
232:8 233:6,6
233:9 238:20
239:19,22
240:2,17
241:22 242:16
243:8,11,21,22
243:23 244:2,5
244:6,8 245:2
245:4,4,9,10,11
245:16,22,25
246:20 247:2
257:19 259:2
259:19 261:15
261:20 262:6
264:20,21
271:4 274:2,24
275:9 276:17
276:18,20,23
277:6 278:8,19
278:20,22
279:12,22
288:13 291:11
**ordered** 20:11
**orders** 42:16
  61:21 81:17,18

81:20 83:25
88:4 94:4
108:7 155:13
161:2 165:18
166:3 187:18
193:12,15,17
193:25 194:3
194:14,16
201:20 204:7
204:12,14
205:5 213:12
213:25 216:18
216:20 219:22
223:15 224:3
225:20 226:22
227:3,6,23
228:4,7,7
230:13 233:20
233:23 239:6
247:13 263:16
269:7 271:3
274:5,5 279:5
279:6,8 280:22
281:10,12
**ordinarily**
71:24 72:13,18
73:4,7,18
74:10 192:11
**ordinary** 72:14
73:5,8 83:17
84:8 85:19
86:3,23 138:21
148:25 170:22
213:16 216:18
288:3 289:17

**organized**
  13:21
**origin**  38:8
  269:24 270:7
**original**  258:6
  258:11 259:4
  275:7
**originate**  268:6
**originates**
  273:9
**otc**  74:15,25
  75:23 76:11,23
  77:12,12,13,15
  77:20,21,25,25
  78:22,24 79:6
  79:17 80:4,7
  80:14,19 81:5
  81:23,24 82:11
  82:21 83:6
  85:5,9 87:23
  90:2,5 91:2,4,5
  91:6,16,19
  113:21
**otd**  164:24
**outcome**  6:10
  47:7 124:23
  297:20
**outgoing**
  261:21 264:17
**outright**  89:25
**outset**  126:19
**outside**  59:21
  68:25 150:5
**outstanding**
  79:7,9

**overall**  75:14
  75:15,18
  169:21 289:10
  292:20
**overlap**  184:15
**overseas**  62:22
  74:5,6 118:6
  275:2
**overwhelming**
  92:5
**own**  16:16,22
  33:8 45:20,22
  46:10 47:10,12
  47:16,20,22
  62:15 156:22
  203:6 214:23
  226:9 272:10
**owner**  27:4,14
**ownership**
  264:7

**p**

**p**  240:24 245:6
**p.m.**  111:18,19
  153:4,5,6,10
  186:7,12
  195:18,19
  211:9,11
  225:22 240:5
  245:5 254:10
  254:11 260:7,8
  286:2,3 293:15
  293:16 294:11
**p3**  255:17
  266:4,5 267:16

**page**  61:17
  113:6 114:10
  114:12,14,17
  119:14 177:11
  178:18 181:24
  182:22 183:8
  183:22 196:13
  197:25 207:18
  235:10 236:25
  248:18 250:17
  256:16 257:18
  258:15,21,21
  258:22,23
  259:2,4,11,17
  259:19 263:11
  263:12,13
  295:3,7 296:3
  296:15,20
  299:4,7,10,13
  299:16,19
  300:4,7,10,13
  300:16,19
**pages**  23:9
  191:23 244:15
  249:20 256:21
  287:15
**paid**  33:18
  36:13 40:22
  41:3,14,17,19
  41:25 42:5,17
  42:22 44:16
  45:15
**pair**  207:19
**paller**  3:21 6:3

**paper**  38:9,17
**papers**  26:7
**paragraph**
  39:15,19 44:6
  44:25 51:12
  52:2,6 54:17
  56:16 58:11
  61:16 63:16,20
  63:21 65:5
  66:20 68:22,24
  71:17 72:4,12
  74:13 80:4
  82:18 83:4
  91:25 92:11
  95:20,20 98:19
  99:12 100:21
  100:25 101:4,6
  101:13 105:22
  106:20 107:20
  109:19 113:7
  113:20 116:4
  119:15 121:3,4
  121:16 124:13
  125:11 126:9
  126:19,23,24
  126:25 127:6,8
  127:9,10,10,11
  127:25 128:5
  128:18 133:15
  133:17,18
  134:14 136:3
  139:7 145:15
  146:19 158:8
  160:2 162:6
  166:24 172:7

183:14 185:5 185:16 186:3,5 210:7 220:21 220:23 221:3 234:3 255:5,8 277:10 289:7,8 289:14 291:17

**paragraphs** 96:16,17 182:12,15

**parameters** 166:4 176:14

**paris** 74:7

**part** 31:12 42:9 67:3 79:10 81:23,23 83:10 90:4 124:22 134:12 169:21 171:4 175:23 194:5 202:10 204:20 211:16 217:9,17 226:21 233:10 245:15 258:11 289:25

**partial** 258:20

**partially** 199:4 199:20

**participant** 137:5 138:2 263:10 264:21 265:4

**participant's** 262:17,22

**participants** 5:9 22:23 23:6 64:21 65:3 66:11 68:15 78:17 86:13 90:8 263:17 287:9 291:5

**participating** 262:15

**particular** 13:19 31:16 40:13 89:14,20 95:19 134:5 150:20,21 156:23 164:11 167:20 176:23 178:17 191:9 198:23 204:15 226:22 229:2 230:14 262:21 270:22 275:20

**particularities** 277:18 278:6

**particularly** 96:19 152:8 163:22 178:5,5 213:22 271:24

**parties** 2:19 4:6 5:13 12:9 23:24 35:18 49:2 88:18 106:22 111:21 150:13,24 152:15 153:8 195:21 210:13

252:19 254:13 260:10 262:11 273:21 286:5 293:18,22 297:17

**party** 6:9 12:5 54:5 72:2,22 73:11 95:3,5 137:5 150:12 150:21 152:14 170:15 179:14 265:18 273:18 273:19,22

**passage** 73:2 99:13 196:15

**passing** 61:21 280:22

**past** 27:19

**paste** 60:22

**pattern** 252:5 253:12

**patterns** 38:20

**pause** 221:17

**pay** 42:12 44:4 44:23 103:24 140:13 206:2 279:2

**paying** 214:6 231:22

**payment** 134:25 135:16 135:21 210:2 237:18

**pdf** 113:6 114:12 181:24

182:23 183:8 183:23 196:14 250:18 251:4 256:16 257:10 258:5,9

**pdfs** 264:5

**peer** 22:2 33:17 191:6

**pending** 9:14

**pennsylvania** 1:8 9:4

**pension** 1:5,6,8 5:19 8:18,23 9:4 182:9,16 183:13 255:11 298:1 299:1 300:1

**people** 233:20 249:22

**percent** 33:10 33:23 45:21,21 46:12 164:24 165:3 168:10 194:15

**percentage** 33:25 34:11 46:8,18,24 92:11

**perform** 76:3 92:24 102:7 103:19 168:23 205:18

**performed** 77:18 132:18 184:20

**[performing - ph.d.]**                                                    Page 56

| | | | |
|---|---|---|---|
| **performing** 149:6 | 23:1 24:1 25:1 | 118:1 119:1 | 188:1 189:1 |
| **period** 12:12 | 26:1 27:1 28:1 | 120:1 121:1 | 190:1 191:1 |
| 31:9 47:13,23 | 29:1 30:1 31:1 | 122:1 123:1 | 192:1 193:1 |
| 56:22 75:2,6 | 32:1 33:1 34:1 | 124:1 125:1 | 194:1 195:1 |
| 75:25 77:17,23 | 35:1 36:1 37:1 | 126:1 127:1 | 196:1 197:1 |
| 78:8 79:2,7,18 | 38:1 39:1 40:1 | 128:1 129:1 | 198:1 199:1 |
| 82:17,22 92:6 | 41:1 42:1 43:1 | 130:1 131:1 | 200:1 201:1 |
| 92:13,20 126:3 | 44:1 45:1 46:1 | 132:1 133:1 | 202:1 203:1 |
| 126:4 143:23 | 47:1 48:1 49:1 | 134:1 135:1 | 204:1 205:1 |
| 152:5 182:16 | 50:1 51:1 52:1 | 136:1 137:1 | 206:1 207:1 |
| 183:15 286:12 | 53:1 54:1 55:1 | 138:1 139:1 | 208:1 209:1 |
| **person** 97:14 | 56:1 57:1 58:1 | 140:1 141:1 | 210:1 211:1 |
| 218:8 | 59:1 60:1 61:1 | 142:1 143:1 | 212:1 213:1 |
| **personal** 32:25 | 62:1 63:1 64:1 | 144:1 145:1 | 214:1 215:1 |
| 85:13 158:18 | 65:1 66:1 67:1 | 146:1 147:1 | 216:1 217:1 |
| 168:2 197:15 | 68:1 69:1 70:1 | 148:1 149:1 | 218:1 219:1 |
| 292:9 | 71:1 72:1 73:1 | 150:1 151:1 | 220:1 221:1 |
| **personally** 10:3 | 74:1 75:1 76:1 | 152:1 153:1 | 222:1 223:1 |
| 17:6 32:3,18 | 77:1 78:1 79:1 | 154:1 155:1 | 224:1 225:1 |
| 76:14 | 80:1 81:1 82:1 | 156:1 157:1 | 226:1 227:1 |
| **persons** 97:14 | 83:1 84:1 85:1 | 158:1 159:1 | 228:1 229:1 |
| **perspective** | 86:1 87:1 88:1 | 160:1 161:1 | 230:1 231:1 |
| 242:14 | 89:1 90:1 91:1 | 162:1 163:1 | 232:1 233:1 |
| **perspectives** | 92:1 93:1 94:1 | 164:1 165:1 | 234:1 235:1 |
| 36:25 37:7 | 95:1 96:1 97:1 | 166:1 167:1 | 236:1 237:1 |
| **ph.d** 2:18 7:6 | 98:1 99:1 | 168:1 169:1 | 238:1 239:1 |
| 295:4 297:10 | 100:1 101:1 | 170:1 171:1 | 240:1 241:1 |
| **ph.d.** 1:18 5:17 | 102:1 103:1 | 172:1 173:1 | 242:1 243:1 |
| 7:1 8:1 9:1 | 104:1 105:1 | 174:1 175:1 | 244:1 245:1 |
| 10:1 11:1 12:1 | 106:1 107:1 | 176:1 177:1 | 246:1 247:1 |
| 13:1 14:1 15:1 | 108:1 109:1 | 178:1 179:1 | 248:1 249:1 |
| 16:1 17:1 18:1 | 110:1 111:1 | 180:1 181:1 | 250:1 251:1 |
| 19:1 20:1 21:1 | 112:1 113:1 | 182:1 183:1 | 252:1 253:1 |
| 21:25 22:1 | 114:1 115:1 | 184:1 185:1 | 254:1 255:1 |
| | 116:1 117:1 | 186:1 187:1 | 256:1 257:1 |

258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 298:2,12
299:2,24 300:2
300:24
**phase** 211:21
**phrase** 20:23
  156:19 157:3
  160:5 165:19
**picked** 132:6
  156:5
**picking** 8:11
**picture** 134:12
  242:13
**pie** 242:14
**place** 5:12
  18:15 19:5,13
  20:2,12 51:25
  81:19 85:25

212:12,17
216:22 228:8
228:11,25
229:16 230:2
231:4 232:8
233:21
**placed** 15:10
  114:20 115:18
  119:10 133:19
  139:11 140:7
  140:15 141:6
  141:10 164:10
  196:16 205:23
  278:9 279:12
  288:14
**placement**
  61:21 280:22
**places** 108:17
  162:18 193:11
**placing** 140:24
  291:11
**plaintiff** 1:9
  39:5 122:14,21
  124:16,17,18
  139:18 180:4,7
  180:8,20 253:9
  255:9 263:25
  264:4 266:11
  281:5
**plaintiff's**
  264:2 282:2
**plaintiffs** 1:7
  1:10 3:5 6:25
  7:23,25 8:6,14
  54:12 55:3

57:3 80:18,24
81:3,6 113:8
113:12,20
114:4,18 115:4
116:5 121:2,19
121:20 122:13
124:16 125:14
126:17 132:19
142:24,25
143:4,8,13
145:7 149:24
151:5,11 179:4
184:12 185:12
221:5 252:9
253:6 262:5
271:25 281:4
283:10,21
285:12 286:22
293:25
**plan** 163:6,7,9
  163:13 165:25
  171:20 193:24
  194:7 201:20
  275:7
**platform** 13:13
  13:14 88:25
  89:20 90:10
  144:9
**platforms**
  89:19 90:12
**plausible** 168:3
  230:17 236:19
  236:24 251:22
  253:24

**play** 163:7,10
**played** 97:7
  115:16 143:6
**plc** 96:20
**please** 5:5 6:12
  7:14 9:8 51:10
  148:5 156:9
  160:24 161:7
  164:24 165:19
  168:9 187:18
  188:2 207:10
  223:14 235:6
  257:3
**pllc** 3:4
**plural** 223:24
  292:12
**pluralsight**
  37:11,24 38:8
**plus** 265:15
**point** 24:21,23
  26:15 30:2
  32:17 35:13
  44:11 51:8,10
  69:10 81:7
  85:18 103:19
  107:11 117:22
  125:15 127:5
  131:6,21
  135:24 137:16
  137:25 138:16
  151:12 164:19
  164:19,23
  171:19 172:8
  172:23 202:6
  209:5 210:5,8

210:23 213:2,5 217:22 227:14 227:21 233:8 233:19 257:14 272:7,12 273:2 274:8 287:14 289:8,14

**pointed** 38:17 101:23 206:9 209:19

**pointing** 133:25 161:17

**points** 63:18 95:18 110:13 132:10 145:14 225:15 230:11 247:12 248:13 274:6

**policies** 22:20 23:4 95:21 100:8,15,18,20 102:18 104:22 105:5,8,14 290:4,15 291:19

**policy** 291:2 292:4

**portfolio** 155:7 168:14,18 179:12 190:25 233:2,3

**portion** 27:17 67:21 69:7 75:21 79:22 120:23 185:13

188:10 221:6 253:15

**portraying** 30:15

**position** 170:9 170:9 171:14 172:11,17 193:7 224:2 228:21,23 229:10

**positioned** 66:16

**positions** 32:9

**positive** 38:22

**possession** 138:2 148:22

**possibilities** 167:24

**possibility** 74:11 192:24 286:16

**possible** 47:19 55:16 57:6 74:4,8 84:4,10 86:24 109:9 122:5,5,15 123:11 132:2,4 148:17 157:5,9 192:18 199:16 199:22 201:21 201:23 228:7 228:11,25 229:15 230:2 231:11 232:8 236:6,13

271:14,19

**possibly** 85:4

**post** 83:24 112:3

**posting** 78:10

**potentially** 84:3 151:12 155:24 157:5 168:17 190:15 199:13 272:3

**practical** 30:9

**practically** 215:9

**practice** 26:4 128:21 204:10 289:17 291:3

**practices** 95:24 102:17 164:6 184:21 290:15 291:20 292:10

**practicing** 26:21 151:22

**precise** 95:12 134:22 159:8,8 277:19

**precisely** 65:22 75:11 85:21 190:7 191:17 282:25

**precision** 228:12 229:17 230:9,17,21

**preference** 157:12

**preferred** 165:15

**preliminaries** 7:21,22 214:23

**preparation** 11:18 28:20 82:11

**prepare** 10:25 29:8

**prepared** 34:15 180:20

**preparing** 11:8 22:8,13 48:3 75:7 78:24 178:21,22 282:13 283:5

**prerelease** 97:20

**presence** 63:22 66:13 170:19 174:17

**present** 3:21 49:2 104:3 111:21 141:17 153:8 162:4 195:21 254:13 260:10 286:5 288:6 291:10 293:18

**presented** 20:18 38:7 71:11 103:9,14

**pressure** 68:20

**presumably** 161:21 225:4

**[presumption - produced]**                    Page 59

**presumption**
174:16,19
**pretty** 84:19
**prevailing**
141:2
**preview** 256:22
256:25 258:9
**previous**
189:21
**previously**
18:11 20:22
25:3 27:16
51:14 56:11,13
82:14 85:23
87:16 88:16
91:12 97:25
99:24 103:5
115:10 123:16
146:18 159:22
180:22 189:10
193:13,21
194:7 220:2
224:10 225:17
236:8,23 237:9
239:5 243:12
247:12 250:11
251:23 282:18
287:21 292:13
296:14
**price** 68:8
117:6 120:2
141:2 161:14
162:19 164:12
164:18 166:7
166:12 180:11

183:5 184:6
190:8,9,14
191:25,25
192:8,8 213:21
213:23 215:22
215:23,25
216:8 218:11
224:18,20,24
225:11 229:3,4
230:25 231:7,8
231:9,10,21,24
237:24,25
245:19 246:3,4
246:10 247:23
249:2,16
251:14,17
252:11 253:19
**prices** 184:19
**primarily**
13:19 50:13
**principal** 26:23
27:15 32:9,16
194:20
**principle** 67:15
191:5
**principles** 66:8
**printed** 256:15
**printout**
263:14
**prior** 11:5
18:13 19:3
20:18 25:19
26:4,15 35:15
36:14 42:11
43:2,16 54:6

59:3 61:17
87:12 110:4,16
128:7,23
142:14 144:16
151:7,13
162:13 167:15
185:14,19
210:12 221:8
221:25 242:4,5
243:8,25
249:18 252:5
252:14 289:19
290:18
**privilege** 20:8
36:14,19
**privileged**
19:21 35:20,22
35:25 53:14,18
130:25 131:3
144:21,25
150:5
**privileges**
25:14
**privy** 152:10
**probably** 33:19
42:6 52:19
157:16 158:15
234:10
**probative**
109:15
**problem** 9:17
**problematic**
136:16
**procedure**
291:3

**procedures**
22:21 23:4
95:21 100:16
104:22 105:6,8
105:14 290:5
290:15 292:10
**proceeding**
6:12 20:4
48:25 70:24
111:20 153:7
260:9
**proceedings**
24:14
**process** 13:6,11
135:20 157:14
211:19 212:16
212:17 269:19
**processed**
100:9 115:4
**processing**
115:15
**produce** 12:20
**produced** 11:4
12:2,5,13,16,22
13:2 23:6
30:24 50:9,13
50:14,19 111:3
123:18 128:14
144:2,14,14
146:16,23,25
154:10 155:2
187:3 248:11
258:7 259:23
260:19

**product** 78:5
**production**
12:17,19 13:2
13:4,6,8,11,14
13:16 53:21,24
54:3,5 124:20
144:7 155:23
296:19
**productions**
31:11,15,18
35:10,11
107:21,24
108:12 110:6
110:14 111:7
124:10 131:9
142:20 144:8
144:12 152:12
155:19 175:23
244:24
**profession**
217:8
**professional**
14:25 15:24,25
16:5 17:10,16
17:20 18:2,8
22:9,10,12
89:5 113:13
**professionally**
36:16
**professor** 7:15
7:18 14:8
21:19 26:13
151:22 153:11
214:18 217:6
254:18 293:8

**profile** 191:9
**program** 64:2
**programs** 10:9
58:16
**project** 46:4
**prominently**
39:8
**promotion**
66:21
**proof** 291:24
**propose** 60:2
**proposed** 47:13
54:21 55:8
**proposition**
130:2,3,5
**propositions**
129:21
**protective**
219:22
**provenance**
256:13
**provide** 18:8
49:21 94:24
109:15
**provided** 108:8
110:22,22
122:4,6,8
126:21 131:22
163:11 221:23
296:11
**provides** 27:11
101:9 215:25
263:15 289:15
**providing**
19:20 244:20

**provisions** 97:2
**prudent** 199:16
**public** 2:21 7:8
19:9 37:11
38:16,22,24
90:2 219:19,21
297:8 298:19
**publication**
96:21,25
**publications**
88:21
**publicly** 38:14
75:9 78:15
85:16 87:17
88:9 219:20
292:18
**publish** 22:2
**published**
20:25
**pull** 250:13
**purchase** 16:16
16:19 61:21
63:11,13 64:5
64:16 65:6,12
67:13 68:6
71:23,25 72:16
72:19,21 73:9
73:10,22 81:22
82:2 84:5
86:20 91:8,11
93:24,25 94:3
94:7 101:19
103:12,22
107:3 108:21
113:14 116:7

116:11,25
117:8,14 118:6
119:18,25
120:7 124:2,4
124:11 126:20
126:22 127:2
128:10 133:20
135:3,10,25
136:13,22
137:7 138:19
138:22,25
139:9,12,19,21
140:6,7,11,15
141:7 142:7
147:21 148:9
149:5,5 153:19
157:14 159:15
159:19,25
161:22 167:4
168:23 169:11
169:18 171:15
172:14 173:4,6
174:11,11
180:19 183:4
183:24 184:23
185:18 186:12
189:20 190:12
192:7,7,15
194:9,22,23
202:22,23
205:19 208:7
210:19 212:19
212:20,22
214:5 220:8
221:24 222:6

222:10 223:20
226:10 230:20
231:6 232:4
234:5 235:20
238:20 239:6
240:3,17
241:22 243:9
247:19 251:9
252:23 253:5,9
262:5 263:4,8
263:24 268:8
274:25 277:7
278:20,23
280:12,22
285:16 287:11
291:11
**purchased** 74:5
81:8 84:25
92:12 98:21
101:11 102:13
102:24 140:17
142:7 148:4,6
162:7,25 163:9
163:16 165:12
165:13 167:6
179:13,15,16
182:16 183:16
185:14 189:25
193:3 194:25
201:14 203:20
205:9,25 206:9
212:14 221:8
224:4 225:6
230:4 232:11
247:7 251:14

251:16 255:11
275:4 291:21
**purchaser**
83:13,16 84:15
84:23 85:15
87:6 101:15,17
102:6,12,23
103:17 128:23
134:22 168:22
205:17,25
206:6 225:12
231:10 268:13
268:16 270:3
276:14,16
281:14 288:2
288:16 290:18
**purchaser's**
69:2 157:22
**purchasers**
85:6 279:24,25
280:6,9 281:11
289:19 290:7
**purchases**
54:21 55:3,6
55:11 56:21
57:4,16 72:13
73:4,19 80:18
80:24 81:4,6
81:10,13 83:24
85:20 92:5
93:20 94:8
95:4,7 116:18
121:18,21
122:11,12,24
123:4,5,13,15

124:7,15
125:13,18,25
126:17 130:18
130:20 132:16
132:19 143:22
173:2 179:7
182:25 195:2
198:21 228:20
264:9 268:2
269:20 272:2,3
272:9 274:14
284:19,20,21
284:25 286:21
288:8 289:10
289:12 291:18
292:20
**purchasing**
83:17 85:19
86:15 107:2
108:20 119:23
134:23 135:9
157:24 158:3
167:2 218:12
273:19,21
287:10
**purely** 143:20
167:21 177:22
279:12 281:18
**purposes** 59:8
130:21 154:2
184:13 186:17
**pursuant** 2:20
182:4
**put** 31:14 109:7
129:25 136:11

159:22 160:12
166:19 172:8
174:22 214:4
227:23 228:3
279:21
**putting** 118:21
259:11 284:5
**puzzle** 224:25

**q**

**qualification**
147:2
**qualified**
146:10
**quality** 5:6,7
**quantities**
233:22,22
**quantity**
162:21,22,24
164:3,11 190:9
190:21,24
202:15 216:6
224:13,14
228:22,22
231:17 232:3
232:10 233:7
233:14 241:24
**quarterback**
160:16
**question** 4:11
9:14 17:8 19:2
20:11,20,23
21:9 24:16,20
25:16 33:6,11
34:6,9,16
35:25 39:6

**[question - r]**

42:4,8 43:22
44:19 46:17,22
46:23 47:25
59:7,9,10,13
61:12 67:23
70:8 72:25
75:17 77:3
83:9 85:18
86:18 91:3
92:15 93:11
97:23 105:3
107:7,10,12
112:6 118:11
119:4 128:15
129:7 130:17
136:17 146:7
147:23 148:11
162:3 167:22
172:2 173:11
174:3 197:19
198:12 199:7
203:24 213:17
214:13 215:4,7
215:16 217:18
217:20 229:13
229:15,22,25
230:8 232:5
235:18 240:10
240:16 241:16
241:20 253:11
257:16 261:12
262:7 263:6
266:8 268:25
269:5 270:2
275:24 277:21

279:3 280:12
280:18 281:19
284:6,9,13
290:12 292:2
292:19
**questioning**
293:7
**questions**  9:9
12:3 15:2
20:17,20 23:13
27:13 36:21,25
161:20 167:8
197:13 202:20
284:16 293:25
**quickly**  216:19
250:14
**quite**  31:16
39:7 88:7 90:2
90:22 95:2
118:11 129:6
164:14 166:4
169:17 203:15
210:6 272:9
275:25,25
**quotation**  78:3
**quote**  83:13
99:13 117:9,10
**quoted**  106:12
**quotes**  78:10
**quoting**  103:21

**r**

**r**  1:18 2:18 5:17
7:1,6 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1

16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1

114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1

184:1 185:1
186:1 187:1
188:1,16,21
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
203:1 204:1
205:1 206:1
207:1 208:1
209:1 210:1
211:1 212:1
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1
233:1 234:1
235:1 236:1
237:1 238:1
239:1 240:1
241:1 242:1
243:1 244:1
245:1 246:1
247:1 248:1
249:1 250:1
251:1 252:1

253:1 254:1
255:1 256:1
257:1 258:1
259:1 260:1
261:1 262:1
263:1 264:1
265:1 266:1
267:1 268:1
269:1 270:1
271:1 272:1
273:1 274:1
275:1 276:1
277:1 278:1
279:1 280:1
281:1 282:1
283:1 284:1
285:1 286:1
287:1 288:1
289:1 290:1
291:1 292:1
293:1 294:1
295:4 297:10
298:2,4,12
299:2,3,3,24
300:2,3,3,24
**ra** 42:13
**raise** 167:7
**raised** 167:25
**range** 22:6 35:9
  42:8,16 53:4
  87:19 88:19
**ranges** 283:3
**ranging** 90:13
**rare** 156:23

**rate** 39:20 40:6
  40:20 41:7
  42:10,14 44:16
  44:17 117:6
  213:4
**rates** 40:8,21
  40:22 192:21
  210:14,21
**rather** 78:10
  98:9 101:16
  104:23 105:13
  110:23 137:15
  137:24 171:17
  229:3 267:14
  269:14
**reach** 129:20
  157:6 176:22
  199:2,24
  202:17,18
  206:15 242:16
  249:21 266:9
**reached** 36:7
  56:17 123:23
  133:10 187:24
  199:18 281:20
**reaching**
  149:21 201:5
**reaction** 196:7
**read** 10:3 51:20
  70:19,21 71:8
  75:8 115:11,17
  156:2 159:12
  160:23 161:8
  164:24 165:14
  176:4 202:18

227:20,22
  228:2 298:5
**reader's** 118:21
**reading** 118:2
  221:21
**ready** 120:6
**real** 28:8
  218:15 224:25
**reale** 155:5,8
  158:24 160:4
**really** 8:14 37:8
  40:15 84:10
  86:25 111:5
  135:8 138:16
  151:25 157:6
  164:13,18
  173:5 176:4,21
  177:6 205:6
  210:23 212:6
  215:16,17
  218:21 226:20
  227:13 233:18
  236:10 241:3
  247:3 267:24
**rearing** 91:25
**reason** 10:20
  31:10 81:5
  86:18 131:19
  146:12 171:6
  191:10 192:9
  192:12 193:3
  220:14 224:16
  226:6 269:21
  270:20 283:23
  299:6,9,12,15

299:18,21
300:6,9,12,15
300:18,21
**reasonable**
46:4 76:13
88:7 157:2
158:19 245:21
285:17
**reasonably**
86:13 131:14
157:10,21
**reasoning**
30:19 199:15
**reasons** 49:22
63:15 93:12
124:24 136:16
147:18 189:19
219:24 231:25
284:17 287:19
**recall** 12:17
31:8,25 34:21
35:8,15 39:6
41:13 70:2
75:11 76:2,8
100:5,11 105:4
106:17 108:9
140:21 144:8
153:21 164:8
181:4 255:2
256:18
**recalling**
184:11
**receipt** 97:9,15
136:8 138:7
159:11

**receipts** 97:15
134:24 135:14
135:15,17
137:8 138:14
138:20
**receive** 44:25
53:20 136:19
144:15 150:15
**received** 15:13
20:5 80:23
276:15
**receives** 232:9
**receiving** 39:24
136:24
**recently** 37:9
**recess** 48:23
111:18 153:5
195:18 254:10
260:7 286:2
293:15
**recited** 289:8
**recognize**
209:5 260:22
261:10
**recognizing**
219:2 235:18
**recollection**
12:25 28:24
37:18 103:2
104:11 115:12
143:9,19 236:4
282:22
**record** 5:3,14
6:16 7:15 10:5
10:7 48:17,22

49:6 59:6
60:12 90:16
91:6 100:3
103:8 104:3,13
108:6 111:11
111:13,17,25
127:15,19
129:12 134:3,6
134:11 141:14
149:3 152:24
153:2,3,10
180:14 181:10
195:12,17,25
197:20 209:25
245:24 249:15
253:3 254:5,9
254:17 260:2,5
260:11 261:3
268:21 274:9
281:24 282:9
285:22,24
286:6 293:12
293:13,19
294:4,9 297:14
**recorded** 5:11
5:16 110:8
203:6 262:22
**recording** 5:7
5:12 209:24
245:8
**records** 18:6
23:3,15,21
25:2,22 26:8,9
26:14,19 29:3
33:14 34:5,8

34:14 41:15
48:6 52:5,8,9
61:15 105:23
107:24 123:8,9
124:8,14,19,25
125:3,7,25
126:3,7,13
127:5,12,18,20
128:3 129:14
129:15 133:24
134:6 138:18
138:23,24
140:14 142:4
142:14 147:25
148:3,8,13
149:7,8,14,16
149:17,21,25
151:6,9 156:6
161:6 167:10
176:2,19 177:2
177:24 178:23
179:22 181:8
185:19 191:24
211:10 221:23
226:2,9,17,18
239:3 242:3,12
244:15,16
246:16 249:14
249:20 252:23
253:17 255:13
255:25 260:24
262:8,9,9,12,19
263:12 264:7
265:7 267:20
268:10,13

**[records - remember]** Page 65

271:6,21,23
272:6 273:2
279:13,18,19
279:22 280:8
281:8 287:8,16
289:4 293:3,5
**recounted**
114:5
**recounting**
115:2
**redacted** 199:5
199:20
**redeem** 97:24
**redeems** 79:12
**reexamination**
127:7
**refer** 7:23
39:14 57:20,24
60:2 65:23
76:22 78:19
90:17,22
158:21 176:13
209:8 223:24
**referee** 33:16
**reference** 51:15
109:19 127:10
129:22 138:7
157:10,11,17
179:2 199:5
202:15 229:3
258:12 266:6
291:16
**referenced** 53:7
62:6 107:21
110:18 198:3

278:15
**referencing**
107:20 128:7
**referred** 78:2
176:8 177:25
196:15 260:24
**referring** 7:24
8:4 63:16,18
88:15 89:2
95:24 105:9
122:9,18 196:8
258:25 284:14
**refers** 158:15
178:6
**reflect** 14:21
141:25 176:2
190:22 225:8
245:7
**reflected** 10:7
94:15 131:12
142:11 252:10
**reflecting**
157:21
**reflection**
131:7
**reflects** 46:25
135:22 137:17
161:2 162:16
162:20 192:25
193:23 209:11
235:20
**reframe** 229:25
**refresh** 115:11
236:3

**refreshing**
186:2 206:25
236:21
**regard** 154:15
**regarding**
152:11 233:13
**regardless**
150:16
**regularly** 18:7
21:25 249:25
**regulatory**
19:23 23:25
**reiterate** 103:6
103:20 149:10
200:12 237:8
278:16
**related** 6:8
16:19 21:7
22:22 25:2
251:19 262:4
297:17
**relationship**
25:11,20
137:19,24
**relationships**
143:3
**relative** 42:23
68:6 104:21
105:12 164:21
**relatively** 78:6
94:10 285:2
**release** 68:20
**released** 38:22
**relevance**
50:10 79:13

172:20 290:4
**relevancy** 79:9
**relevant** 61:18
61:23 63:2,4,5
69:17,25 70:8
82:19 83:3,5
83:23 91:13
105:20 106:18
106:18 123:8
130:5 132:7
147:13,16,18
148:6,19
149:16 151:12
152:4 263:7
273:12 277:21
280:24 290:19
**relied** 22:9
23:23 49:25
127:14 130:13
**rely** 22:13
127:21 129:11
129:18
**relying** 130:6
158:24
**remainder**
243:15 270:16
**remaining**
270:15,17
**remains** 233:5
**remember**
29:14 35:2
37:3 44:20
48:4,13 104:15
199:11 227:19
232:18 239:12

**remembering**
108:25
**remote**  2:17 3:2
9:23 74:10
**remotely**  1:19
1:25 2:18 6:2
297:15
**reopen**  121:5
199:12
**repeat**  18:25
72:24 249:18
**repeatedly**
198:22
**report**  10:16
11:5,10 12:3
12:11 14:7,10
14:16 18:19
19:8 22:8,14
22:16 23:13
28:21 29:11,17
30:17,25 32:5
32:7 48:3
49:15,18 50:2
50:7,17,22
51:2 52:15,21
52:23 53:5,8
53:12 54:7
56:16 58:11
61:9,13,16
63:7,15,17,19
64:3 65:6
67:10 68:22
69:8,10,20
70:14 71:17
72:7 74:21,23

75:8,16 78:24
80:5,21 82:12
82:19,24 83:11
85:12 91:21
92:25 93:21
95:8,19 96:14
100:24 106:8
106:12 110:4
110:16 120:23
123:10,11,19
124:13 125:21
125:22 126:12
127:23 128:17
130:16,19,22
132:17 140:2,3
142:21 144:10
144:12,16
145:4,20 147:5
147:24 151:7
151:14 155:20
158:8 159:16
178:21,22,24
180:18,20
185:5,24 194:2
198:22 200:11
200:16 203:5
207:11,13
208:14 210:7
219:9 220:4,21
220:23 221:14
234:3,21,25
235:6 236:3,5
236:21 237:7
239:2,3,6
242:19,24

244:23 255:5
255:24 259:14
263:22 265:9
267:23 271:24
276:5 277:2,11
278:17 280:17
281:2 282:13
283:5 284:12
284:23 286:20
289:7,24
290:14 295:8
**reported**  1:23
91:23 92:19
93:13,15
253:15
**reporter**  2:21
6:6 7:4 9:8
296:11 297:7
**reports**  11:3
38:18 106:19
126:21 146:2
171:25
**represent**
151:2,5 155:6
187:9 198:2
**representation**
134:4
**representations**
151:10
**representing**
6:4 184:9
208:15 259:12
**represents**
67:21 175:19
177:9 178:20

202:21
**reproduced**
202:10
**reproduction**
258:20
**request**  9:13
20:5 152:8,15
152:17 160:24
164:25 249:25
**requested**
35:18 123:8
150:9,17,21
151:20,25
152:14
**requesting**
152:20
**requests**
296:19
**require**  51:2
172:12 244:16
**required**  97:11
172:19 284:15
298:13
**requires**
235:18 280:20
284:7,10
**requiring**
65:10 128:22
290:16
**research**  21:2
39:3 42:13
66:3
**reservation**
147:5 237:10

**[reserved - right]**

**reserved** 4:11 145:21
**resize** 238:15
**resolution** 94:5
**respect** 90:9 97:16 173:21 203:6 230:22 232:10 258:19 261:12 269:19 275:12 286:11
**respective** 2:19 4:6
**respond** 130:24
**responds** 188:21
**response** 87:9 145:14 171:16 249:18
**responsibilities** 96:22 137:21
**responsible** 143:22 179:12
**rest** 25:23 243:7 285:18
**restate** 27:9 87:12 96:16 101:3 151:19
**restrictions** 219:23
**result** 92:21
**resumed** 48:25 111:20 153:7 195:20 254:12 260:9 286:4 293:17

**resumes** 43:21
**retail** 16:25 17:6 89:3,13 204:6
**retained** 32:18 34:19,24 36:3 36:13 294:8
**retention** 32:25 36:7
**retirement** 37:11
**retrieved** 150:12
**return** 98:2,7 98:10,12,13,14 191:15
**returned** 169:12
**returns** 34:15
**reveal** 24:18 53:16 89:18 108:20 109:9 109:13 239:21
**reveals** 130:25
**review** 11:9,10 11:13 12:11,13 12:19,22 13:4 13:6,8,17,18,22 18:5 29:22 30:3,8,16,17 31:12,18 32:3 35:10,22 45:8 56:10,12 70:7 100:3 103:15 104:5,12

106:15 107:19 109:20 115:9 117:20 123:21 123:23 124:22 128:14,25 143:3,25 155:21 191:6 236:3 240:23 259:15 271:20 280:11 285:11 292:15,16 293:4
**reviewed** 11:3 11:3,25 12:6 12:10,15 13:23 14:2 22:2,17 29:9,10,11,15 29:16,19,20,21 33:17 50:12 54:5 70:12 88:20 90:18 93:15 94:22 96:7 99:24 103:7 105:23 106:10,21 108:12 110:15 121:18 123:12 123:14,19,21 140:14 145:2 175:24 191:23 236:20,23 261:6 282:8 285:6 286:17 286:19 287:15 288:23 289:2

292:14 293:2
**reviewing** 23:7 25:21 30:23 31:11,14 35:14 62:5 90:6 93:5 110:14 123:17 142:19 149:17 176:10 198:19 239:13 249:13 252:22 254:2 263:21 279:13 279:18,19 289:3
**revise** 17:8 47:15 80:25
**revocable** 169:18 194:19 194:22 195:2
**reward** 191:9
**richmond** 1:25 297:5
**rick** 188:20
**right** 14:19 22:10 27:2 28:14 32:12 37:12,15,17 39:12 40:2,3 50:7,11 53:8 54:23 55:4,19 55:25 56:14 58:17 62:10,22 66:25 72:3 73:14 74:15 76:7,17 80:11 82:22 91:24

**[right - scroll]**

92:7 93:4 95:22 96:4 98:3,24 107:5 108:10 113:6 114:13 115:24 116:3 117:18 133:22 134:17 139:14 145:21 167:16 185:15 189:3 207:20 208:4,20,22 209:24 213:11 217:17,24 221:8,10 222:17 227:21 229:14 236:25 237:24 246:9 247:24 252:12 259:18 280:9 281:23 282:5 282:13 283:11 293:10

**rights** 96:22 137:21

**rise** 198:24 291:6

**risk** 119:23 191:9,15

**risks** 275:22

**role** 32:24 35:16 96:18 97:6 115:15 143:6

**rosen** 3:12 6:19

**rough** 11:21 52:25 53:2 193:6 282:21

**route** 81:20 83:20 89:14 204:6 243:21 243:22

**routed** 85:4 243:23 244:7 245:2,4,17

**routing** 244:5,6

**row** 183:2 238:17,19 240:16 241:21 242:6,10,11,17 242:22,23,23 243:6 246:19 248:14 251:8 265:14

**rows** 243:3 261:21 265:13

**royalty** 33:18 33:18

**rs** 1:3

**rule** 45:19 81:18 199:15 204:24 212:9

**s**

**s** 299:3 300:3

**s&p** 16:19

**sake** 32:14,21

**sale** 65:12 71:24,25 72:20 72:21 73:9,10 113:15

**sales** 38:16,19 39:4,6 72:13 73:4 143:23 155:9 228:20 269:20

**san** 1:3 5:22

**save** 170:12

**saw** 74:8 200:19 264:4

**saying** 18:22 24:20 60:8 65:13 89:5 114:7 115:21 115:23 141:24 152:10 178:10 218:17 227:22

**says** 113:11,20 114:17 116:4 117:4 119:16 119:22 120:5 155:13 177:11 182:8,15 183:3 183:14 188:11 196:22 207:8 207:11 223:14 227:6 235:5 248:14,18,22 248:23 249:2,8 289:15

**sb** 188:2

**scenarios** 203:24

**schedule** 182:19,24 183:19,23

251:3

**scheduling** 145:25

**scholar** 21:4 23:20 36:20

**scholarship** 22:3,6 26:20 66:7

**school** 31:22

**scope** 69:19 70:10 79:25 85:12 92:23 99:7,22 103:4 117:17 118:9 137:14 143:17 151:16 169:9 177:20 189:15 197:18 198:16 201:16 203:18 203:22 205:12 213:15 217:4 218:3 223:22 237:7 238:24 240:9 251:21 275:16 279:17 280:16 292:7 292:25

**screen** 5:10 10:10 49:16 175:14,15 197:9 206:20

**scroll** 208:19 246:9 249:6 259:3

**scrutinize**
282:4
**sealing** 4:7
**sean** 187:5,9,17
188:21 202:13
207:9,10
**search** 110:25
**second** 8:5
59:15 119:16
121:7 128:5
131:19,23
133:7,8 152:24
154:12 158:10
160:17 164:19
173:4,6,9,10,14
174:11,14
175:9 181:2
192:9 199:8,17
206:12 207:3
235:9 240:11
242:5,6,10,21
242:23 243:6
250:20 259:9
272:21 285:22
289:14
**secondary** 64:6
64:12 80:25
81:9 84:2 86:6
86:11,16 91:23
101:17 138:9
139:2 149:12
268:15 276:21
276:25 279:25
286:24 287:23
287:24 290:22

**seconds** 195:10
240:21
**section** 58:10
58:15 71:16
97:11 126:11
126:12 127:18
127:21,23
128:5 129:10
129:14,16,22
130:19 131:4,5
132:17 133:4
**secured** 290:25
**securities** 15:8
15:22 16:2,9
16:14 17:12,16
17:21 18:4,9
18:12,15 19:5
19:12,25 20:15
21:3 24:4
36:16,21 39:8
52:3 59:9
61:23 66:2,4,9
96:20 113:15
126:20 133:19
134:23,25
135:4 136:2,19
136:20 155:5
166:3 182:5,10
182:17 183:17
204:25 214:5
263:4,5 264:22
265:12 266:5
267:16 269:8
269:15 280:24

**security** 16:19
37:10 62:14
66:2,6 67:22
68:2,11,12
71:23 136:23
136:24 159:10
269:6,12,13
**see** 72:9 79:9
89:23 99:17
112:11 113:7,9
113:17,24
114:23 116:14
117:11 119:20
120:3,10,18,19
134:8 149:18
155:3,14
156:11,16
160:23 161:17
165:14 168:24
172:20 173:5
175:10 177:13
177:14 182:6,7
182:20,23
183:2,20 184:2
187:7,15,20
188:4,8,13,18
188:23 196:18
196:21,22,23
197:8,11,23,25
206:25 207:10
207:11,15,21
208:9 223:11
223:17 234:14
234:22 235:3,6
235:14 237:23

238:2 240:24
245:13,19
246:9 248:15
248:20,24
249:4,10 250:8
251:7,11
255:19 264:6
265:7 270:23
271:4 272:11
274:11 275:25
281:21 289:21
289:25
**seeing** 75:18
162:10 176:5
210:18 211:7
211:12 239:12
242:14
**seeking** 64:16
65:6
**seeks** 101:15
191:8
**seem** 70:2 82:3
85:2,3 155:24
164:15,16
192:13 210:15
213:3 246:16
256:24 259:2
**seems** 141:23
141:24 155:21
158:19 161:25
162:3,7 164:14
164:20 166:13
167:7 168:11
176:18 177:7
184:8 202:9,10

209:24 225:7 237:13,15 243:14 246:25 249:24 252:18 266:18

**seen** 5:9 96:10 102:15 155:17 158:20 164:17 173:15 175:19 175:22,25 191:22 196:5 197:16 281:8 285:9 288:21 292:8

**segmentation** 212:18

**select** 13:7

**selecting** 53:10

**sell** 64:22 65:7 232:25 233:3 269:8,15

**seller** 78:13 274:12

**sellers** 3:4 6:24 36:5 64:8

**selling** 38:23 135:14

**sells** 272:18

**sense** 57:14 60:22 76:24 130:12 134:21 159:21 166:22 167:22 209:23 218:15,20 231:13 245:3

245:23 288:20

**sent** 156:8 207:9 225:23 234:17

**sentence** 101:13 118:2 119:16 158:15 158:24 289:25

**sentences** 127:9

**separate** 94:25 210:20,24 211:20 239:16 252:17 253:6

**separated** 272:5

**separately** 269:13,14

**separates** 212:19

**september** 220:20 223:8 225:25 226:12 226:15

**sequence** 140:4 153:16 169:16 189:2 202:2 291:18

**sequenced** 132:4

**seriatim** 13:23

**series** 94:7 161:2 166:2 180:21 193:24 194:2 201:20 204:12 224:3

226:22 242:6 259:10 274:13 274:14

**serve** 96:12

**served** 17:22 142:23 155:9

**service** 56:13

**services** 27:11 43:10,13 113:13 255:16 257:22 261:18 265:20 267:16

**set** 50:17,21 61:11 96:3 113:2 120:20 153:13,17 155:23 168:4,5 168:14 181:9 182:18 183:18 185:3 202:3 218:11 239:25 275:22 289:13 297:12,21

**setting** 42:10

**settle** 80:9

**settlement** 18:7 22:22 23:21 24:4 25:2,8,22 26:6 52:7 61:15 81:12 83:22 84:12 85:9 87:3,17 88:9 90:9,25 91:4,7,13,15,16 95:9 117:9,15

118:3,7 125:5 125:24 128:9 138:24 147:25 148:2,12 179:21 262:9 262:12,13 269:4,9,10,10 269:18,19 271:9 273:13 275:3

**settlements** 271:11

**seven** 130:17 130:18

**several** 17:22 24:22 25:4 26:11 42:16 63:18 80:21 189:19 224:13 227:4 244:14 287:19

**shapes** 84:14

**share** 10:13 20:3 36:15 97:25 98:7,11 98:15 112:12 153:19 161:22 162:20 164:18 166:7 168:21 194:18,22 224:20 225:11 230:25 231:2,6 231:15,16,21 253:14,16 268:19,20

**[share - similar]**                                                      Page 71

271:13 291:18
**shareholder**
68:5
**shares** 47:10,20
47:22 65:12,23
66:12 68:3,18
72:21 73:11,22
79:19,23 84:25
93:23 94:3,12
97:3,17 98:22
101:11,19
102:13,24
107:3 108:22
116:8 119:24
120:15 128:22
133:20 134:16
135:2,17,18
136:7 138:3,4
138:11,12
139:5,13,20,22
140:8,16 141:7
142:6 148:3,5
149:6 157:15
157:24 158:4
159:2,20
161:15 163:9
163:11,15,16
164:7 165:11
167:6 169:13
169:14 171:15
171:19,21
172:14,15,24
172:25 173:2
174:7,7 179:13
179:15 180:3

183:5,25
185:14,17
188:7 189:22
189:23 190:3,4
190:12,13,19
191:14 194:10
194:24 201:13
202:23,24
203:7,20 205:9
206:8 208:8
209:13,16,17
210:3,19 211:4
211:13,14
212:15,21,22
219:7 221:7,25
222:10 223:16
224:5,6,13
225:5 226:10
229:7 230:25
231:17,21
233:9 235:21
237:18 238:20
239:7 240:3
243:9 247:6
251:9 252:7
253:2 257:19
257:20 261:15
261:16,22
262:17 264:22
264:24 265:15
265:16 266:10
266:12,23,25
267:2,3 268:14
268:17,23
269:25 275:2,4

275:19 276:3,4
276:7,19
278:11 281:14
287:6,11
288:15 289:18
290:17 291:2
291:12,22
**sheet** 1:5 5:18
8:17,18 110:11
180:14 182:8
184:5 240:21
298:1 299:1
300:1
**sheets** 110:22
**shifted** 72:9
**shop** 217:15
**short** 67:25
163:3 164:6
170:8,9 189:20
246:7 261:7
265:2
**shorter** 8:16
**shorthand**
297:7
**shortly** 107:8
**show** 95:9
148:3 175:8
196:3 211:10
262:10 267:20
274:4 279:23
284:17
**showed** 38:21
162:24 244:2
287:4

**showing** 217:15
264:6
**shown** 178:18
199:20 239:23
244:18
**shows** 208:7,21
227:14 246:24
257:18 261:14
261:19,21
265:10,23
266:3 267:25
**shr** 248:23
**side** 28:9 133:2
188:3 196:14
207:25 208:4,6
208:20 209:25
289:13
**sides** 152:2,7
152:18 262:23
**sidetracked**
153:15
**sign** 265:15
**signature**
297:24
**signed** 4:15,17
**signify** 117:24
**similar** 12:24
43:3 55:7
132:24 133:7
142:4 175:25
189:9 222:2
234:2 236:9,15
237:9 239:2,15
242:23 244:18
250:11 251:24

**[similar - specifically]** Page 72

270:24 283:23
292:4
**similarities**
77:14
**similarly** 1:7,9
149:3
**simple** 64:14
110:7,23 129:8
204:5
**simpler** 57:18
**simplest** 230:20
**simplify** 141:4
**simply** 43:21
47:21 137:15
190:6 206:4
220:12 233:6
259:4
**single** 63:22
93:13 123:25
124:2,4,20
170:2 200:9
247:15
**sink** 217:9
**sitting** 43:14
106:3
**situated** 1:7,9
**situation** 72:19
73:15 212:9
232:17 272:15
**situations**
135:8 205:2,4
215:11 266:24
**size** 45:24
193:7

**skills** 87:20
**slice** 242:13
**slightly** 17:9
232:7 246:9
258:13
**slip** 108:19
109:9,13
**slips** 24:9 62:2
108:16 109:2
110:17 111:6
146:21
**slow** 258:5,9
**slower** 257:15
**small** 76:7
79:22 87:24
94:8,10 149:13
175:12 207:22
235:11 266:25
270:16 285:2
**smaller** 94:15
94:20 204:12
**smw** 182:16
**snapshot** 225:8
244:21
**snippet** 199:19
200:17 237:20
**social** 88:21
89:17 90:7,17
**sold** 61:23
182:17 183:16
280:23
**sole** 27:14
**solely** 137:10
143:9 272:25

**solicitation**
211:23 212:4
**somewhat**
213:17 227:7
274:7
**soon** 142:6
201:13 202:24
206:8
**sophisticated**
89:13
**sophistication**
87:20
**sorry** 8:9 15:20
19:16 21:16,19
30:22 44:9
46:21 47:15
55:21 72:11,24
92:9 99:8
107:6 111:10
119:2 175:5
195:6 209:2
214:10 221:11
229:20 240:8
247:11 258:18
**sort** 16:25
43:16 89:4
130:8 135:21
142:5,23
160:17 165:6
176:7 193:6
200:10 217:15
226:6 241:4
247:17 260:3
284:14 286:10
288:3 291:8

**sorts** 36:25
37:5 88:24
146:2
**sought** 132:2
230:3
**sounds** 222:16
**source** 40:19
139:2 262:23
268:22 270:22
**sources** 32:16
**south** 3:6
**speak** 26:11
28:9 49:9
156:4 160:14
160:16 170:12
**speaking** 11:17
167:21 263:19
**special** 204:25
205:3 246:20
279:9
**specializing**
26:25
**specific** 20:6,23
20:23 28:3
76:19 81:24
90:10 129:21
129:23,25
131:11 202:14
206:9 269:11
276:6 278:2,18
282:24
**specifically**
36:6 97:4
130:21 191:12
205:14 217:25

[specificity - steel] Page 73

**specificity**
24:17
**specified** 97:11
166:8,12
170:16 189:23
224:14 228:17
229:11,12
232:3
**specifies** 231:7
**specify** 228:12
229:2,16
233:21
**speculation**
219:11
**speculative**
167:22 281:18
285:4
**spelled** 208:16
209:21
**spend** 11:8,17
48:3 52:22
176:21 231:14
283:19
**spending**
231:15
**spent** 52:21
53:4 150:22
282:12 283:5,8
**spoke** 11:6
158:12 283:2
**sponsor** 63:23
66:14,16
**sponsored**
54:22 58:16,20
60:25 61:7

62:4,8,12,17,21
63:3,9,11,13,24
64:5,7,18,24
65:4,7,15,16
66:15,19 72:16
74:24 77:18
78:25 81:22
82:3 83:18
84:6 85:22
86:21 91:9,18
98:21 101:10
101:16 121:19
121:22 128:10
128:11 139:9
147:21,22
179:7 222:7
234:6 248:19
255:12 268:3,9
272:16 280:2
281:12 284:19
284:22 285:2
285:16 287:3
287:10 288:4,9
289:11 290:23
291:15
**spreadsheet**
208:7 246:5,7
**ss** 297:4
**staff** 28:11,12
28:14 29:19,21
44:4,4 46:14
52:22
**stages** 30:13
**stale** 164:21

**stamp** 154:10
**stamped** 154:6
175:2 186:20
206:22 222:22
238:9 241:9
256:9 260:14
295:11,13,16
295:19,20,23
296:4,7,9
**stand** 283:23
**standard** 5:4
112:5
**standardized**
291:2,7
**standpoint**
67:12 137:25
138:19 200:19
**start** 9:9 14:15
18:22 57:12
112:5 113:5
121:2,17
133:16 196:8
276:11
**started** 7:13
35:15 72:8
**starting** 57:15
71:17 81:7
**starts** 58:11
113:8 116:4
**state** 2:22 6:12
6:15 7:9,14
72:12 297:3,8
**stated** 32:4
49:25 82:13
103:5 106:2,5

125:22 126:8
132:9 145:15
220:2,4 228:24
**statement**
39:22 49:18
73:17 136:13
192:19 289:24
**statements**
50:25
**states** 1:2 18:16
19:6,13 20:16
44:7 51:12
54:23 55:4,11
55:18 56:23
57:2,9,17,21
58:2 59:5,22
60:4,24 61:16
63:12,14 64:9
69:2 74:23
82:7 91:11
97:8 101:6,21
115:17 116:23
125:15 145:19
148:10 159:9
247:25 276:4
276:11 277:3,9
280:20 284:21
285:16
**stating** 201:2
**statistics** 92:10
**status** 69:16
**statutory** 20:8
**stck** 266:4
**steel** 143:13
180:8,9,15

**stenographic** 2:21

**step** 157:23,23 157:24 211:6

**steps** 202:2 211:8 212:11

**stickler** 209:3

**stipulated** 4:5,9 4:13

**stipulations** 4:3

**stock** 47:19 68:2,3 69:5 99:15 102:3,3 102:5 103:12 103:13,22,23 116:8,11,19,25 117:9,14 119:18 120:9 120:16,16 133:21 134:2 134:15 140:11 140:12 170:9 205:16,17,24 238:21 255:18 265:13,14,24 266:5 267:4,17 278:24,25

**stockholder** 171:16 274:23

**stocks** 168:15 169:4,5,7

**stop** 86:8

**stopping** 107:11

**store** 217:16 218:9,18

**stoyas** 51:16 99:12 101:22 112:13,18 295:9

**straight** 181:10

**straightforward** 185:2 281:7

**strange** 171:9 190:18

**strategies** 170:8

**strategy** 161:3 161:4 163:5 165:15 166:21 167:20 168:5 169:21,24 170:2,6 171:4 191:15 193:24

**street** 3:6,14

**strike** 12:21 17:3 30:22 44:2 55:14 62:4 70:20 83:3 100:18 109:11 132:15 148:5 178:9 203:10 270:24 277:18 283:17

**strikes** 156:3

**strongly** 286:17

**structure** 68:4 213:6 239:19 271:10

**struggle** 193:4

**struggling** 165:5

**student** 40:10 40:21,21 41:2 41:8,14

**students** 28:5,6 28:17,22 30:21 30:23 31:9,17 31:19,20,23 40:4,12,19,22 41:7,17,25 42:25 43:8,15 44:17,22,23 45:10,13,16 46:2 217:7

**studying** 31:9

**stuff** 7:23 69:15

**stumble** 60:15

**subject** 20:7 25:14 104:7 140:23 147:2,5 155:10,12 165:18 182:18 183:17 187:14 219:22 223:10 227:5,20,22 234:21

**subjects** 54:13

**submission** 12:2 151:7,14 239:19

**submit** 190:11 190:23 193:15 217:20

**submitted** 14:7 30:25 45:10 141:19 176:15 185:17 186:6 194:2 218:15 218:21 221:25 225:21,22 230:13 238:21 239:8 240:3,18 241:22 243:9 245:22 274:24

**submitting** 144:18 217:14 217:18 218:5

**subpoena** 149:24 151:6 152:3

**subpoenaed** 150:5 151:3,8 151:12

**subpoenas** 153:16

**subscribed** 298:14

**subsection** 131:5

**subsequent** 12:2 110:6 153:20 167:14 170:17 243:3,4

**subsequently** 68:18 142:22 147:6 224:7 245:25 252:8

**substance** 49:12 112:7 138:4 254:19

**substantial** 23:22 77:17,22 82:16 146:25 166:17 168:8 168:12 202:11

**substantiate** 131:10

**substantive** 20:19 22:7 35:5

**substitutes** 105:18

**succeeding** 258:4

**successfully** 257:8

**sufficient** 58:20 61:2 81:14 131:22 132:8 145:9 180:23 192:14

**suggest** 172:4 213:9 226:23 272:2 281:9,22 285:10

**suggested** 128:20 149:19 264:5

**suggesting** 179:5

**suggestion** 60:18

**suggests** 165:6 168:9

**suite** 3:7

**sum** 93:16

**summarize** 56:17 106:4 205:21 211:15

**summarized** 116:17 211:8

**summarizes** 224:2

**summarizing** 221:22

**summary** 27:10 69:12,13 236:18 262:16 263:11

**summation** 114:18

**superficial** 26:17

**superfluous** 193:5

**supplied** 277:7

**supplies** 291:21

**supply** 66:4,16 67:25 237:14

**support** 27:19 37:15 127:22 131:15 289:6

**supporting** 29:7

**suppose** 64:15 74:4 173:17 216:21 248:4

274:23 275:2

**supposed** 10:6

**sure** 16:7 65:20 71:7 78:7 90:16 92:14 96:2 105:10 114:9 118:10 129:6 130:10 139:16 160:8 161:16 165:2 165:16 171:11 196:4 219:17 221:20 235:13 256:22 257:2 260:4 261:9 262:6 266:13 266:23 267:3 278:3 279:5 282:9

**surprise** 79:21 149:23 151:11 153:15 154:14 154:19,19

**surprised** 251:24

**surrounding** 105:11

**sustained** 250:4

**swear** 7:5

**sworn** 4:14 7:7 297:13 298:14

**system** 13:21 35:12 37:11 53:21 74:15,19 75:23 77:21,23

77:24 78:3 80:4,7,19 82:10,21 83:6 88:12 108:11 180:2 226:4 243:15 262:20

**systematic** 30:6 117:20 160:13

**systems** 13:16 76:17,20,22,24 81:19 149:3 222:5 242:16 244:21

**t**

**t** 299:3,3 300:3 300:3

**tab** 10:13 154:2 174:24 175:5,8 181:10 186:16 222:19 234:9 234:11 238:7 241:7 243:25 244:22 248:4,6 295:21 296:6

**table** 158:11 183:3 188:11 207:20,20 208:20,21 235:17,19 237:10

**tables** 207:19 235:14,15

**take** 5:12 9:12 22:24 40:12 44:10,13 48:17

**[take - testimony]**

72:14 73:5
103:24 107:7
107:16 108:4
109:25 111:8
140:13 149:9
155:22 171:10
175:13 185:25
195:9 196:6
201:21 203:19
204:4 206:2,7
212:12 213:23
220:10 225:15
240:11,23
250:7,19 254:4
257:9,25
271:12 273:4
275:13 278:10
278:25 279:8
293:11,11
**taken** 5:17
19:25 20:12
48:24 110:12
111:19 147:8
153:6 195:19
254:11 260:8
267:11 286:3
293:16
**takes** 215:8
233:18
**talk** 9:10 95:16
130:15 170:4
204:17 217:13
234:4
**talked** 136:4

**talking** 31:20
57:17 58:7
71:6 72:7 73:3
112:24 153:14
153:18,22
177:2 180:6
228:6 234:8
254:24 278:3
**task** 45:4,4
242:2
**tasks** 29:7
**tax** 34:15
**td** 187:19
208:14,14
223:15
**td06072016**
156:10
**teamsters** 1:6
8:22 180:7
183:12 255:10
**technical** 32:17
32:20 134:21
135:23 159:21
245:23
**technology** 6:2
**teeth** 217:10
**tell** 94:18
143:21 164:2
172:23 174:5
193:8 202:17
228:20 233:2
233:11 247:8
259:20
**telling** 190:12

**tells** 266:16
**temporary** 28:4
**ten** 11:22 24:23
195:10 266:20
**tend** 160:14
287:22
**tended** 38:22
93:7,19
**tends** 90:13
156:21
**tens** 287:16
**tenure** 26:13
**term** 8:3 21:24
59:11,25 65:20
65:22,22 74:9
76:21 95:10,12
95:23 109:2
118:18,20
123:2 134:18
134:19,20
135:4,5 156:23
157:9,15
159:13,13
176:11,13
177:24 178:4,5
178:6,25
189:16 192:11
193:17 194:4
201:4 209:8,22
223:23 225:2
226:24 230:8
249:25 252:18
264:8 284:6
**terminologies**
243:14

**terminology**
57:19 58:6
137:3,16
288:14
**terms** 7:22
24:21 42:7
76:5 96:24
104:16 136:6
158:2 167:4
176:16 191:13
283:2
**tesla** 169:14,17
172:25 174:8,9
193:9
**testified** 7:10
29:18 41:6
43:18 86:19
87:4 91:12
123:16 219:14
282:20
**testify** 10:21
219:13
**testifying** 9:19
9:20 152:9
**testimony**
27:12 31:3
41:10 43:20
46:16 49:13
54:9 60:13
65:19 82:25
91:3 103:25
106:7,9,10
108:18 110:19
112:7 118:24
119:6 124:12

125:21 154:13
154:16 163:18
165:17,21,23
165:24 167:18
171:12 173:25
178:14 200:3
211:25 219:9
227:12 237:6
252:15 254:20
294:6 297:14
298:9
**text** 51:7,12,24
101:4 114:6
115:17 116:23
118:12,19
119:7,11
235:11 258:6
258:11
**thank** 8:13
21:21 49:8
74:12 77:4
97:22 98:17
112:2,4 133:12
142:15 153:12
180:16 181:22
195:3 197:21
198:11 205:7
208:18 232:16
247:20 259:7
289:5 293:7
294:2
**thanks** 10:24
39:10 68:21
86:17 129:6
195:12 196:2

**theoretically**
74:4
**theory** 74:8
**thereof** 97:16
**thing** 140:18
241:4 246:17
250:14 252:19
**things** 10:11
152:11 163:25
244:19
**think** 21:22
29:18 33:5
35:24 39:5,15
41:5 46:21
48:7 50:4
52:19 54:16
59:22 60:19,24
69:14 73:14
75:15 76:4,5
85:17 86:9
87:11,16 89:4
91:2 93:10
98:19 105:2,7
105:18,20
108:18 121:8
133:24 134:18
136:15 137:9
144:23 145:13
146:12 147:11
151:18 152:16
152:16 156:4
156:25 157:16
157:20 167:23
168:13 169:6
171:7,9 174:3

191:19 193:16
194:6 199:8,13
199:16 206:13
209:4 210:22
211:19 212:3,4
214:15,19
216:9 220:14
220:18 221:9
221:22 222:20
227:13,21
230:7,10,16
237:8 238:6
247:11 249:22
251:13 252:16
253:3,13
256:21 257:7
257:11,11
258:4,10
275:17,23
277:4 282:20
283:2 285:21
288:22 290:11
**thinking**
150:22 228:19
231:14
**thinks** 224:25
**thinly** 86:4
288:20
**third** 12:5
35:18 54:5
77:20,24 137:5
164:19 192:12
232:6
**thought** 37:6
75:13 98:16

121:9 132:22
141:20 150:18
151:24 180:22
231:25
**thousand**
224:13
**thousands** 23:8
23:8 191:23
224:5 244:14
249:19 287:15
287:16
**three** 7:24
28:25 41:6
54:12 55:23
56:5,8,14 71:3
77:10,11,12
111:23 140:7
195:14
**ticker** 159:10
159:11
**ticket** 176:9,12
176:13
**tightly** 191:16
**time** 4:11 5:4
6:13,14 24:21
24:23 26:12
27:22,25 28:12
31:8 34:7,7,15
34:17 40:14
45:20,22 46:10
46:14,19,20,25
53:4 60:16
72:17 80:20
84:11 87:2
91:11 101:18

**[time - trade]** Page 78

102:12,23
110:13 111:17
111:24 117:4
123:10,11
124:2,5 125:12
125:23 126:10
139:12,21
142:21 145:3
145:17 147:4
150:22 155:8
171:6 173:19
176:5,21
185:20 186:8
186:10,14
192:20,22
195:16,25
210:16 225:8
226:16 227:8
228:4 230:19
232:6 240:23
241:14 243:10
246:7,10,22
247:5 250:6
254:9,17
259:15 261:7
263:22 271:24
272:13 273:25
274:6,9 275:7
278:11 283:5,8
283:17,20
291:18 294:11
**times** 28:6,9
43:12 60:9
90:23 125:2
184:20 274:4

**timing** 31:4
152:12 271:11
272:8,23
**title** 61:22
95:10 280:23
**titled** 165:18
265:13,14
**today** 9:19
10:18,22 11:2
43:14 106:3
155:17
**today's** 11:5
294:6
**together** 93:19
94:4 97:10
147:8 246:24
267:11
**tokyo** 102:3,5
103:12,23
120:16 140:12
205:17,25
278:24
**toll** 3:4 6:24
36:5
**tomorrow**
218:17,25
**took** 18:15 19:5
19:13
**top** 34:21 35:3
35:8 45:7 48:5
48:14 100:6
155:3 182:3
183:2 197:24
207:8 258:22
259:18

**topic** 40:13
210:5
**topics** 21:6,6,11
22:4 27:15
43:18 90:14
**toshiba** 51:16
68:23 69:12,15
69:17,22 70:6
70:7,12,18,21
70:23 71:4
83:14 99:13,14
99:15,20,20
100:4,10,12,21
101:2,6,22
102:3,10,21
103:12 104:3,8
104:20 105:5
105:13,25
106:4,16 109:4
112:13,18
113:4,15
114:21 115:3
115:19 116:16
116:19 117:14
120:9,16
139:18 140:5,6
140:20 141:24
148:20 162:15
164:8 168:20
170:18 173:13
191:11 196:4
196:10,17
199:6 200:8,24
205:2,9,10,16
206:4 219:3,14

219:16 220:5
227:17 275:2
278:4,5,11,20
280:14 281:10
281:19,24
282:9 285:8
286:10 287:14
287:17,20
288:13 291:10
292:4,12,21,22
293:3 295:10
**total** 11:9 44:22
47:18 75:4
79:6 92:18,18
93:16 230:22
231:19 233:13
265:25 266:14
266:16 270:9
271:16 294:7
**totality** 111:7
131:7 198:19
198:25 199:6
199:19 200:6
200:24 202:19
220:15 242:18
243:2 244:25
247:17 271:16
274:19 282:8
**totally** 60:14,17
221:15 259:19
**toyota** 278:24
**track** 26:13
**tracking** 263:3
**trade** 15:22
16:22,24 17:5

**[trade - transaction]** Page 79

23:15 24:8
25:22 57:24
58:3,4 67:20
67:20 72:17
74:18 76:16
78:22 83:6
86:7 105:11
108:7 120:8,8
123:6,12,14,25
124:4 133:15
147:13,14
153:14,17,21
176:9,11,20
183:4 185:4
188:6 189:3
204:3 207:11
207:12 208:15
211:5 216:8,11
228:3 233:12
234:2,4,8,21,25
235:6 248:14
251:8 275:3
279:14
**traded** 16:17
16:20 38:14
47:17 62:13,20
64:8 67:17
74:24 75:5
79:2,5,17
82:20 86:4
288:9,20
**trader** 114:20
115:18 117:5
155:7 156:21
187:10 196:16

**traders** 90:19
116:10,24
117:7
**trades** 57:20,22
64:24 76:25
91:18 92:19
108:3 114:4
122:21 123:2,2
123:22 124:8
125:3,17
129:10 134:14
145:7 176:2
184:5,12
**trading** 15:4
17:17,21 18:4
18:5,10,11
20:10 22:5,20
23:3,11 24:25
26:8 43:11,17
52:5,8 63:24
64:25 65:8
66:14,19,24
67:15 68:7
74:14 75:22
76:6,12,17,20
77:9,17,22
78:19 79:18,23
80:7 82:10
83:17 86:3,11
87:25 88:11,12
88:22,23 89:7
89:10,11,19,20
90:10 91:23
92:10 105:23
107:24 124:8

125:6 126:2,3
155:10 157:18
161:3,4,6
163:5 165:4,10
165:20 166:21
168:5 169:24
170:2,22
184:15 203:6
204:16,24
211:10 221:23
234:19 247:14
249:14 273:12
274:15,17
287:24,24
288:4 289:4
290:22 291:14
293:3,5
**traditional**
76:23
**transact** 65:8
67:4,7,7,18
68:16 86:5
142:2,5,12
164:10 190:8
201:12 213:20
213:23 215:20
215:24 218:19
218:23 225:13
229:13 231:9
246:22
**transacted**
62:21 75:22
253:18
**transacting**
246:25

**transaction**
16:3,9,14
17:12 18:15
19:5,13,25
20:12,15 58:21
59:7,18 61:3
62:3,8 63:2
64:11 68:10
72:2,22 73:12
80:10 81:2,3
83:16 100:10
102:2,5 103:11
104:8,18,23
115:4,15,16
136:6 137:4
138:10,10,20
138:22 139:3
147:20 157:12
157:23,23
161:24,25
165:8 166:6,15
168:21 169:22
170:5,17,20
172:22 173:20
174:14 177:17
178:12,17
180:23,24
181:3,4,6
185:25 190:23
192:20 205:16
208:12,13
210:8 211:17
211:21 212:19
213:5,6 216:4
220:18,20

**[transaction - type]**

222:15 225:10
230:19 231:13
231:20 233:16
236:5,20
249:15 250:10
252:8,18 253:7
254:24 262:13
268:6 272:18
272:22,22,23
273:7 275:21
276:10 277:2
282:5 283:25
285:7,12,13,13
286:9,19
287:18 288:2,6
288:19
**transactional**
23:3 24:25
25:8 26:6,14
26:18
**transactions**
21:3 24:5 26:9
60:2,5 61:24
62:19 71:22
72:15 73:6,21
73:24 78:11
80:22 81:15
82:2 94:10,16
120:25 130:16
130:18 143:13
145:10 149:11
149:13 161:5
167:11 168:7
168:17 169:20
169:25 170:3

170:13 171:4,5
172:6 180:21
184:18 210:25
212:7,12 236:8
236:14 251:19
252:5,17
253:12 262:3
264:18 265:2,3
265:3 272:6,8
273:14 280:25
283:9,20
285:12 287:2
287:12 288:12
292:22
**transacts** 252:6
**transcript**
293:23 298:5,9
**transcription**
221:18
**transfer** 95:10
95:11 179:15
179:17 252:25
253:2,8 262:10
262:21 263:3
264:7,22
271:15 273:8
274:9,11
**transferred**
82:6 179:8,10
253:4 264:3
266:22 269:16
269:25 272:12
**transfers**
262:16

**transmit** 16:24
**transmitted**
16:8,13,18
17:11 134:9
**transmitting**
16:21 17:5
**treat** 132:3
138:21
**treated** 138:23
**treating** 287:11
**trial** 4:12 9:20
**trick** 60:7
**trigger** 170:25
226:3
**triggered**
169:23 170:21
**triggering**
120:12 142:5
170:16
**triggers** 170:24
173:8
**trivial** 204:17
204:18 230:11
**trouble** 118:14
146:7 147:8
226:7
**true** 43:9 93:18
170:7 259:21
269:5 285:18
297:14 298:8
**truly** 245:22
**trust** 177:12,16
177:25 178:2,5
178:6,6 179:2
179:24 180:2

**try** 57:18 67:24
90:4 194:8
257:4
**trying** 46:3
60:7,8 104:19
130:12 147:19
160:17 171:13
258:24
**tuesday** 272:17
**turn** 204:11
271:12 293:8
**turned** 162:12
**turns** 83:10
**twice** 243:21
**two** 44:13 49:4
63:10 77:12
84:11,12 86:25
87:2,25 93:11
105:17 111:4
111:15 127:8
131:17 157:23
157:24 163:23
163:24 167:10
168:15 169:3
169:20 171:3,5
172:5 174:6
184:18 210:24
235:14,15
249:7 251:18
252:18 258:21
265:13 284:17
287:12
**txt** 256:19
**type** 27:7 51:3
243:20 262:19

**[type - united]**

280:13 285:8
**types** 236:14
**typical** 55:7
132:18 283:11
283:22
**typically** 42:3
53:25 65:14
89:21 135:21
141:11,20
162:18 191:16
213:12 225:2
239:7
**typographical**
29:15 30:11
51:5

**u**

**u** 246:12
247:23
**u.s.** 5:21 17:23
17:25 22:25
32:19 65:8
135:20 161:15
209:13,17
211:4,5 225:7
273:20 274:19
**u.s.d.** 249:3
**ultimate** 62:7
93:25
**ultimately**
29:10,20,22
40:11,17 45:4
94:14 95:14
167:8 202:3
245:8 264:3
266:10 269:16

275:14
**um** 141:3
165:16 220:6
231:18,23
236:17 246:3
273:17 291:25
**unable** 199:24
**uncertainty**
166:17
**unclear** 149:9
**uncommon**
81:21
**unconditional**
83:22 84:12,21
87:3,7 98:10
**under** 9:19,20
16:13 28:18,19
30:9 154:10
182:10 183:3
183:23 201:24
216:15,15
260:20 279:4
**underlying**
20:20 69:5
94:25 95:3
106:15 107:3
108:21 116:7
119:24 120:9
123:12,15,25
125:17 273:3
278:11
**underscores**
191:6
**understand** 8:2
8:19,25 9:6,11

9:18,22 10:2,4
51:13,18 56:7
57:23 58:5,7
69:11 92:14
104:2 109:3
113:3 114:6
115:20,22
128:4,6 136:25
139:17 140:9
143:11 148:20
170:18 171:13
176:21 193:4
198:23 215:4
217:12 218:24
225:9 262:7
269:24
**understanding**
14:25 18:25
26:18 53:22
54:4 62:14,16
62:18,24 70:22
71:10 83:8
84:14 91:14
96:13 98:6
101:23 102:9
102:20 103:7
109:7 118:14
118:17,17
119:3 123:7
140:23 142:19
145:24 146:6
150:10,14
151:21 152:6
156:18 157:2,4
164:25 165:6

205:8 206:3
210:24 219:4
222:14 230:12
252:22 269:3
290:19
**understood** 8:7
121:10 146:11
146:15,17
152:2 154:21
176:6 241:6
247:20
**undertake**
79:14
**undirected**
97:2
**unequivocal**
202:21
**unequivocally**
148:3
**unfortunately**
31:4
**unheard** 190:6
190:15
**union** 1:7 9:3
**unique** 91:5
275:22 288:6
**uniquely** 66:16
**unit** 5:15
195:14 254:15
**united** 1:2
18:16 19:6,13
20:16 54:22
55:4,11,18
56:23 57:2,9
57:17,21 58:2

**[united - versus]**                                                                 Page 82

59:5,22 60:4 60:24 63:12,14 64:9 69:2 82:7 91:11 125:14 145:19 148:10 276:4,11 277:3 277:9 280:20 284:21 285:15

**units** 294:7

**universal** 156:24

**university** 32:11 42:18

**unknown** 229:13

**unnecessarily** 132:10

**unreasonable** 108:15 261:5

**unsponsored** 58:16 63:25 64:17,19 69:4 69:16 70:3 86:4 140:6 278:20 287:21 287:22,25 288:20 292:21 293:3

**unsure** 25:13

**unsurprising** 288:10

**unusual** 38:15 90:14 99:3,9 101:14 190:5 244:18 287:19

287:19 288:2 291:9,13

**update** 145:21 186:13

**updating** 147:7

**usage** 59:25 118:20

**usd** 161:16 192:17

**use** 8:3,16 10:15 58:6,25 59:11 61:10 65:20 73:16 78:3 95:10 110:6 121:11 135:5 159:5,12 169:12 174:19 191:10 194:4 200:11 202:5 204:5 209:7,22 226:23 264:8 284:6 288:13

**used** 65:23 70:16 72:18 90:17 102:13 127:4 134:19 134:21 135:4,6 137:17 141:22 141:25 156:20 157:25 158:20 160:21 176:13 192:11 193:17 209:16 225:2 243:14 294:8

**uses** 159:13

**using** 6:2 20:23 21:24 60:21,22 76:22 137:3 171:20 172:14 209:22 214:9 223:23

**usinternational** 187:6

**usually** 53:24 136:18 240:22

**utilize** 127:12

**utilized** 113:13 126:21

**v**

**v** 3:10 37:11 51:16 99:12 101:22 112:13 112:18 295:9

**value** 161:16 161:24 162:9 164:20 192:17 192:20 209:12 225:9 231:12 231:12,19,20 233:13 252:20 265:25 266:2

**values** 209:14

**valve** 68:20

**vanguard** 47:18

**variability** 40:20

**variable** 34:6

**variation** 40:9

**variety** 81:20 110:2 129:19 176:12

**various** 25:14 95:18 124:9 129:9

**vary** 40:21 45:3 45:23,23 108:3 141:13,16 176:16 177:3

**varying** 45:18

**vast** 107:23 149:10 267:25 284:18 286:21

**venue** 77:24 83:25 84:4,7 86:21 87:23 88:3 89:23

**venues** 77:11 77:19 81:21 83:19,22 84:10 84:12 86:24 87:2,23,25 88:23,23 89:7 89:15,23,25,25 90:23,25 230:14

**verify** 52:16

**verifying** 30:14

**veritext** 6:4,7 10:13 294:9

**versions** 8:16

**versus** 5:20 45:15 64:18

65:15

**vibrancy** 86:11

**video** 5:11,16

**videographer**
3:21 5:2 6:5
7:4 48:19 49:3
111:14,22
153:3,9 195:7
195:8,13,22
254:6,14 260:5
260:11 285:24
286:6 293:13
293:19 294:5

**videotaped**
1:17 2:17
48:20 49:4
111:23 195:15
195:23 254:7
254:15

**view** 95:2
131:23 133:8
136:21 152:15
158:6 167:9
171:10 200:25
206:11 211:22
220:10 249:22
250:3,9 281:17

**viewed** 127:3
157:19 213:22

**viewing** 226:7
244:22

**vikram** 155:4,6
223:9 234:20

**virtual** 6:2

**virtually** 5:6
56:21 57:15
138:25 266:18
280:5

**volume** 13:3
30:7 31:16
66:17,24 67:5
67:14,22 68:7
75:4,22 77:17
78:19 79:5,6
79:10,17,19,23
86:11 87:25
91:23 161:25
163:21 164:6
165:3,4,9
189:22,24
190:3,4,20
191:13 194:15
204:15 225:16
265:2 266:14
266:17,25
288:3

**volumes** 38:15
67:18 75:14,15
75:19

**voluminous**
261:4

**voting** 96:25
97:3

**vs** 298:1 299:1
300:1

**vwap** 204:14
204:19

**w**

**wachtell** 3:12
6:19

**wait** 146:3

**waived** 4:8

**walk** 155:11

**want** 9:12
14:15,24 32:22
44:10 59:5
60:12 67:4
71:3,4 91:5
95:16,19 107:6
111:10,11
113:2,5 114:9
114:12 118:15
120:22 135:11
154:11 159:4,8
159:14 160:5
169:7 171:11
174:19,22
180:13 183:7
207:24,25
214:12 228:2
230:24 240:15
240:15 247:9
247:21 248:12
251:2 255:4
256:5,12 261:2
289:13

**wanted** 196:3,5
196:6 197:19
240:7,8,11
282:10 293:21

**wants** 97:24

**way** 9:10 25:18
84:15 107:25
112:23 117:20
119:9 130:15
130:25 136:3
137:23 138:23
142:11 159:5
160:13 166:19
179:5 180:5
198:18 201:4
213:7,22
227:14,20,25
228:17 230:12
230:16 232:7
253:22 258:12
266:13 297:19

**ways** 66:4
109:12 164:13
222:3 229:10

**we've** 25:12
44:9 47:5 73:3
109:4 112:23
157:25 164:17
180:5 184:21
187:24 193:20
211:13 222:20
224:23 236:15
237:14 247:22
252:5 253:13
274:4 289:9
292:5

**wedbush**
255:17 266:4
267:16

**[weighed - yeah]**

weighed 247:16

welcome 49:7
112:2 153:11
254:18

wenning 1:12

went 93:21
169:2 267:7,8
275:5,8

werner 1:12,12

west 3:14

whereof 297:21

wide 22:6
55:17 57:7
87:18 88:19
90:13 129:19
284:16 291:24

willing 64:22
120:6 190:8,10
190:13 215:24
216:8 218:10
225:13 231:9

willingness
141:25 142:4
162:21 164:10
201:12,22,24
202:22 213:19
213:20 216:11
218:19

wish 228:13

wished 268:5

withdraw
25:17 119:4
240:9

withdrawn
282:16

withholding
146:13

witness 5:10
7:5,6 21:21
34:20,24 35:22
53:16 118:25
130:24 221:11
241:17 259:12
259:17 261:5
295:3 297:11
297:15,21

wolfgang 1:13

word 8:11
33:19 51:19,22
59:2 60:21
72:18 92:9
102:14 138:5
160:21 174:19
202:12 237:11
250:7 253:4

words 63:10
127:14 159:5
212:21

work 17:24
19:20 22:25
25:4 26:3,10
26:19,20 27:7
27:24 35:5
36:3 39:21
40:4 42:18
43:8,16 50:5
78:23 164:24
168:9 187:18
223:14 244:12
258:6

worked 15:4,7
25:7 36:10
42:25 43:10,15

workers 1:5
5:19 8:17,18
143:14 180:9,9
180:14,15
182:8 184:6
298:1 299:1
300:1

working 28:2,7
28:11,18,25
36:20 77:6
256:24

works 111:9

world 28:8

worst 231:9

worth 108:25
133:24 167:24
244:11

write 45:13
51:22 66:20
106:21 121:18
186:3 255:8

writes 156:9
158:12 161:7
187:17 188:16

writing 21:5,10
29:15

written 38:10
97:15 128:17
142:21

wrong 150:11
150:15,19
151:23 220:15

275:5

wrote 26:7
38:17 73:3
80:21 145:3
147:4 160:18
221:19,21,22

**x**

x 1:4,14 246:23

**y**

y 188:16
246:21

yavitz 3:16
6:18,18 7:12
19:19 44:8,12
59:15 60:6,14
71:7 72:8
111:8,12
152:25 154:17
180:16 185:8
195:5,11
197:21 198:11
214:11,17
223:5 229:21
229:24 240:13
241:18 250:22
254:4 259:24
261:9 285:23
293:6 294:3
295:4

yeah 44:12
69:14 73:2
76:2,21 87:16
94:22 97:20
107:9 111:12

**[yeah - zoomed]**

121:17 134:13
152:25 175:12
184:17 185:8
195:11 209:2
212:3 223:5
238:25 247:8
250:19 260:4
275:17 283:4
**year**   31:22
  34:12
**years**   17:22
  23:22 25:4,5
  26:11,21 27:19
  164:4 191:24
  244:14 287:17
**yep**   99:3
**yesterday**
  16:18
**yield**   45:5
  91:10
**york**   1:25 2:22
  3:15,15 6:4 7:9
  65:10 79:12
  80:8 91:22
  93:12,14,22
  94:13,23 95:3
  95:5,13,17
  97:6 98:14,20
  100:17,20
  101:9 116:10
  116:24 117:7
  128:21 134:24
  135:13 158:16
  158:21 202:8
  203:8 255:13

255:17,17
264:14 265:21
265:21 268:11
268:18 270:5
273:10,20,22
276:2 289:16
290:16,24
291:4 292:5
297:3,9
**yup**   186:24

**z**

**zip**   53:24
**zone**   185:20
**zoom**   207:23
  208:3 235:10
**zoomed**   208:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.