# EXHIBIT S-30

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
Case No. 3:20-cv-04737-RS
------------------------------------------- x
SHEET METAL WORKERS' NATIONAL PENSION FUND and
INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL
NO. 710 PENSION FUND, individually and as Lead
Plaintiffs on behalf of all others similarly
situated, and

INTERNATIONAL UNION OF OPERATING ENGINEERS
PENSION FUND OF EASTERN PENNSYLVANIA AND
DELAWARE, individually and as Named Plaintiff,
on behalf of all others similarly situated,
                         Plaintiffs,
            -versus-

BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN,
WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH
and WOLFGANG NICKI,
                         Defendants.
------------------------------------------- x
                December 21, 2022
                9:31 a.m.

        VIDEOTAPED DEPOSITION OF CHAD W.
COFFMAN, CFA, taken via Zoom, before Fran
Insley, a Notary Public of the States of New
York and New Jersey.

A P P E A R A N C E S:

      COHEN MILSTEIN SELLERS & TOLL, PLLC
          Attorneys for Plaintiffs
          190 South LaSalle Street
          Suite 1705
          Chicago, Illinois 60603
      BY:  CAROL GILDEN, ESQ.
          BENJAMIN JACKSON, ESQ.
          NORHAN BASSIOUNY, ESQ.
          Phone:  (312) 357-0370
          cgilden@cohenmilstein.com

     WACHTELL, LIPTON, ROSEN & KATZ
          Attorneys for Defendants
          51 West 52nd Street
          New York, New York  10019

      BY:  NOAH B. YAVITZ, ESQ.
          LORENZO VILLEGAS, ESQ.
          FLIP BARTEL, Paralegal

ALSO PRESENT:
      PETER COOPER, Videographer

       xxxxx

-------------- I N D E X -----------------

WITNESS                  EXAMINATION BY        PAGE

CHAD W. COFFMAN     MR. YAVITZ              6


-------------E X H I B I T S----------------

DEPOSITION          DESCRIPTION              PAGE

Exhibit 1   Expert Report                  10

Exhibit 2   Transcript of 5/23/16 call   121

Exhibit 3   September 14 press release   151

Exhibit 4   9/14/16 earnings call        159


(EXHIBITS TO BE PRODUCED.)

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification, and the same are, hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to by an officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

xxxxx

Page 5

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:31 a.m. on Wednesday, December 21, 2022.

Please note that this deposition is being conducted virtually.  The quality of recording depends on the quality of camera and internet connection of participants.  What is seen from the witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media one of the video recorded deposition of Chad Coffman, CFA taken in the matter of Sheet Metal Workers' National Pension Fund, et al. versus Bayer AG, et al. filed in the United States District Court for the Northern District of California with case number 3:20-cv-04737-RS.

My name is Pete Cooper representing Veritext and I am the videographer.  The court reporter is Fran Insley from the firm Veritext.

Page 6

Coffman

All appearances by counsel will be held upon the stenographic record.  I am not authorized to administer an oath.  I'm not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them now.  Hearing no objections, the court reporter may now swear the witness and we can proceed.

C H A D   W.   C O F F M A N, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. YAVITZ:

Q.   Good morning, Mr. Coffman.   How are you?

A.   Good morning.

Q.   My name is Noah Yavitz.   I know we are not going to do introductions, but I'm counsel for defendants in this proceeding and thanks for spending some time with us today.

To start, can you please state your

Coffman

full name for the record?

    A.    Sure.  Chad William Coffman.

    Q.    So I know you have been deposed many times before, but I'm going to start with just a few preliminary matters to keep things smooth today.

          When I refer to plaintiffs, I'm referring generally to the three named plaintiffs in this action.  Okay?

    A.    Okay.

    Q.    When I use the term Complaint, we've had a few of them, I'm going to be referring to the Second Amended Class Action Complaint filed by plaintiffs in this action in December 2021. Understood?

    A.    Yes.

    Q.    Mr. Coffman, your audio isn't picking up perfectly.

    A.    Okay, hold on.  Let me move a little closer and see if that helps.  Is that any better?

    Q.    We will see.  I'll ask a few more questions.

          MS. GILDEN:  Excuse me, just for the

Page 8

Coffman

record, just so you know, Noah, the sound is coming through very, very clearly on my end, so it could be something with your computer.

MR. YAVITZ:  Okay.  Thank you.

Q.    I was just going to say, to avoid crosstalk, let me finish my questions.  I'll let you finish yours.  That will make life passable at least for the court reporter today. Okay?

A.    Okay.

Q.    If at any point you don't understand a question I have asked, let me know and I'll try to clarify it.  Okay?

A.    Okay.

Q.    And of course, if you want to take a break, I'm not keeping you prisoner, you're welcome to take a break.  Just let me know. Okay?

A.    Okay.

Q.    The only caveat on that of course is if there is a question pending, you'll have to answer the question before you take the break, but hopefully your questions won't be so long

Coffman

that will cause any issue.  Okay?

A.    Okay.

Q.    Do you understand that there is a remote deposition order that is governing the deposition today setting out some ground rules?

A.    I'm not aware of a specific document, no.

Q.    Well, it's not too complicated.  Do you understand that while we are on the record today, you're not allowed to communicate with anyone else other than as reflected on the record, so no side conversations and the like?

A.    I assumed that, yes.

Q.    Do you have any other programs open on your computer right now, notes or things like that?

A.    Other than the Exhibit Share, no.

Q.    Great.  Is there any reason, medical or otherwise, that you can't testify completely and accurately today?

A.    No.

Q.    So then let's talk about your report.  I'm going to mark Exhibit 1, that is Tab 1 for us. It should pop up on Exhibit Share

Page 10

Coffman

for you.

(Whereupon document was marked Exhibit 1 for identification as of this date.)

A.      I have it now.  Opening now.

MS. GILDEN:  I still don't have it.

Got it right here.

Q.      So we all have Exhibit 1 opened?

A.      I do.

Q.      Okay, thank you, Mr. Coffman.  Do you recognize this document?

A.      Yes, this appears to be a copy of the expert report I prepared.

Q.      And you signed the report, right?

A.      I did, yes.

Q.      What does that signature signify to you?

MS. GILDEN:  Objection.

A.      That I reviewed the report, authored it and agree with what is in the report.

Q.      Have you done any additional work with respect to the opinions in your report since you issued that report on October 28, 2022?

Coffman

A.    Other than prepare for the deposition, no.

Q.    Is the report a complete statement of your opinions at the class certification stage in this case?

A.    It certainly provides a summary of the two overall opinions I'm giving and much of the basis or it describes the basis underlying those two opinions so there are sub opinions there.

Obviously I have training and experience and knowledge that goes beyond what is physically written in the report, but it certainly summarizes the two opinions I expect to offer at class certification in this report.

Q.    Thanks for that.  But does the report present all of the bases and reasons for the opinions presented?

MS. GILDEN:  Objection.

A.    Yes, I believe it describes all the bases I intend to offer for my opinions.

Q.    Does it disclose all the facts and data you relied upon in forming your opinion?

A.    Yes, in Appendix A I believe it is

Page 12

Coffman

there is a description.  It doesn't list every single document, but there is a description of all the material I considered in forming my opinions, yes.

Q.    Since you issued the report, have you identified any errors in it?

A.    No, I have not.

Q.    Are there any statements in your report that you otherwise have concluded are not accurate?

A.    No.

Q.    Anything in your report that requires correction or amendment or modification of any type?

A.    No.

Q.    How many hours did you personally spend preparing the report?

A.    There are billing records to reflect that, but I don't know as I sit here right this second.

Q.    Could you ballpark it; less than a hundred or more than a hundred?

MS. GILDEN:  Objection.

A.    Probably less than a hundred.

Page 13

Coffman

Q.    Less than 50?

A.    I don't know.

Q.    Did anyone else help you prepare the report?

A.    Yes.

Q.    Who?

A.    I was assisted by Mark Hedstrom, Clara Campbell, Eric Asen, and Natalie Bitar. Those are the folks I remember working on it. In a material way there may have been others that did certain tasks beyond that, but those are the primary people that were involved in preparing the report.

Q.    Who employs those people?

A.    Global Economics Group employs those people.

Q.    Do you know how many hours that team spent on the report?

MS. GILDEN:  Objection.

A.    Again, we have billing records that reflect that.  I don't know a precise number as I sit here.

Q.    This isn't the first expert report you prepared in a securities litigation, right?

                         Coffman

     A.     No.

     Q.     On average how many expert reports
do you prepare annually in support of
litigation?

             MS. GILDEN:  Objection.

     A.     It's varied a lot from year to year,
but usually it is probably between 10 and 20.
Sometimes it's more.  Sometimes it's less.

     Q.     Did you spend more time in this
report than is typical for the average report?

             MS. GILDEN:  Objection.

     A.     I don't know that I've ever
calculated what the average time is I spend on
a report, so I really don't think I can answer
that.

     Q.     You reference some case law in your
report, right?

     A.     There are certain court decisions
that are referenced in my report, yes.

     Q.     Did you select those cases for
consideration in your report?

     A.     Look, if -- I certainly was
personally aware of many, if not all, of the --
I believe I was aware of all the case law that

Coffman

I cite in the report prior to even beginning work on this matter because they are the cases that involve discussion of market efficiency or that I have made reference to many, many times.

So I don't know -- I think that provides an answer. So I mean, yes, I'm the one who selected which ones to reference and the ones I recall referencing in this report are ones that I have known for a fair amount of time.

Q.    How did you become aware of them?

A.    Through my work as a consulting expert over the years and on my work as a testifying expert over the years.

Q.    So, have you seen them cited in legal briefs?

MS. GILDEN:  Objection.

A.    I have seen them cited in legal briefs.  I have seen them cited by other experts.  I have seen them cited in other court documents.  I also served as a neutral expert on a fair number of occasions where I have seen them referenced by both parties.

So they've been, I don't know -- I

Page 16

Coffman

don't recall how I very first learned of cases like, you know, Basic v. Levenson or Halliburton. I mean those cases have been around for quite a while. I just don't remember when I first heard of them or how.

Q. Are you offering any opinion as to the applicability of those cases to issues that are presented?

MS. GILDEN: Objection. Form of the question. Calls for a legal conclusion.

A. Could I have the question read back? I just want to make sure I properly understand what you are asking me.

Q. Yes, I'm asking whether you are offering any opinion as to the applicability of those cases to the issues before the court?

MS. GILDEN: Same objection.

A. I'm only using them for the purposes of describing the concepts that are in my report. I'm not telling the court how they should or shouldn't be applied.

Q. Thank you. You also reference some discovery materials in your report, right?

A. I believe so in this case, yes.

Page 17

Coffman

Yes, I do.

Q.    Did you request that plaintiffs' counsel provide you with those specific discovery materials?

A.    The thing that I would have to go, I would have to go to my Appendix A to make sure I'm answering for all the material that is discovery material.

The one thing that I certainly recall using that came out of discovery was the ADR's outstanding information and that is something I specifically did request information on, yes.  Let me make sure there is not anything else though that I just don't recall off the top of my head.

Q.    Sure.  You're welcome to look.  What I didn't say, what I usually say when I first mark an exhibit is whenever I mark something, I may direct you to certain portions of it, but you are welcome to look through the entire document.

A.    Thank you.

Q.    I figured it wasn't necessary for your report.  That is the general spiel.

Page 18

Coffman

A.     Give me just a second.

Q.     Of course.

A.     (Witness reviewing document.)

Yeah, I don't recall there being any discovery information I considered to review other than the ADR outstanding data that is referenced in Appendix A.

Q.     Okay.  Thank you.  So you've been asked by plaintiffs' counsel to opine on two subjects in connection with this litigation, right?

A.     Yes.

Q.     And that is summarized at paragraph 1 of your report, right?

A.     Yes.

Q.     You were asked to determine whether the market for Bayer AG ADRs was efficient during the proposed class period, correct?

A.     Yes.

Q.     And then you were asked to opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) and Section 20A of the Exchange Act in Rule 10b-5, right?

Page 19

Coffman

A.    Yes.

Q.    Those are the only two matters in which you're offering any opinion at this stage of the litigation, correct?

A.    Yes.

Q.    Have you been asked to opine on any matters in this case other than those two matters?

A.    No.

Q.    Did you undertake any analysis in this case beyond the two tasks reflected in paragraph 1 of your report?

MS. GILDEN:  Objection.

A.    There may have been some consulting exercises that were requested of my team that I may have been involved in or became aware of, but nothing that speaks to these topics or for which I was asked --

(Mr. Coffman lost his internet connection)

THE VIDEOGRAPHER:  The time is 9:47 a.m. we are going off the video.

(Brief recess taken.)

THE VIDEOGRAPHER:  The time is

Page 20

Coffman

9:47 a.m.  We are back on the record.

A.    Just completing my answer, the consulting work I was asked to perform did not involve me being asked to form an expert opinion about it.

Q.    Going to paragraphs 6 and 7 of your report, do these paragraphs summarize the conclusions you've reached in this litigation to date?

MS. GILDEN:  And, Noah, if you would just pause for a minute so we can get to those paragraphs.  Okay.

A.    Yes, paragraphs six and seven summarize the opinions I'm offering on the subjects I was asked about.

Q.    So your opinion on the efficiency of the market is that the market for Bayer ADRs was efficient during the class period, right?

A.    Yes.

Q.    Are you providing an opinion with respect to any Bayer securities other than ADRs?

A.    I have not been asked to form any specific opinions beyond that, no.

Coffman

Q.    Have you -- setting aside what you've been asked to do, have you formed any opinions as to the efficiency of other securities?

MS. GILDEN:  Objection.  Form of the question.

A.    Well, based on the information I reviewed, if I were asked whether the Bayer common shares trade in an efficient market, I have seen enough data and evidence and I haven't sort of done all the formal tests I would normally do if I were writing a report on that, but I have certainly seen enough information that would give me confidence that the Bayer common shares traded in an efficient market.

Beyond that, I don't believe I formed any other opinions that fall outside of focusing on the Bayer ADRs.

Q.    You also reached the opinion that damages in this action can be calculated on a classwide basis using a common methodology, right?

A.    Yes.

Page 22

Coffman

Q.    At this time you haven't been engaged to provide an opinion considering the amount of damages that may be recoverable, right?

A.    That's correct.  I have not.

Q.    I'm going to start with your opinion on market efficiency.  So in the past five years have you ever offered any expert opinion concluding that the market for any security was not efficient?

A.    There have been cases in which I have been asked to evaluate market efficiency and form an opinion about market efficiency where for certain securities I determined there was insufficient evidence for me to be willing to offer the opinion that those securities traded in an efficient market.  That opinion obviously never made it into a report because I wasn't asked to provide a report.

So looking just at the reports I filed, I don't recall ever having actually issued a report that says the market for a security was not efficient, but I certainly concluded that there was insufficient evidence

Page 23

Coffman

of efficiency for securities than was not asked to report a report on that.

Q.    Approximately how long ago was the last time that happened?

MS. GILDEN:  Objection.

A.    Certainly, there have been a number of times over the last three years that's occurred where, you know, I certainly felt there was insufficient evidence to conclude certain securities were traded in an efficient market.

Q.    I want to flip to paragraph 20 of your report.  Let me know when you are there.

A.    Okay.

Q.    So in this paragraph you discuss the concept of semi-strong efficiency, right?

A.    Yes.

Q.    Is that the definition of efficiency that you applied in your report?

MS. GILDEN:  Objection.

A.    Yes.

Q.    In your opinion then the price of Bayer ADR reflected all publicly available information throughout the class period?

Coffman

A.    Well, as long as, you know, publicly available means the way I interpret that phrase as widely available public information, in my opinion Bayer ADR, the market price of Bayer ADR is reflected in widely available public information, yes.

Q.    In your opinion, the price of Bayer ADRs adjusted to widely available public information rapidly throughout the class period, right?

A.    Yes.

Q.    Your report in this paragraph 20 talks about new information; do you see that? It says "This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion."  Do you see that?

A.    Yes.

Q.    How do you define the term new in this context?

A.    Well, I mean in the most general way I'm talking about information that wasn't previously disclosed.  I think in a -- in analyzing whether something was new, one also

Page 25

Coffman

has to take into account context so that I don't know that I can define that in a very precise way without getting into details about how context can differ where even repeating the same thing might provide new information because the context or expectations have changed, but certainly at a very general level, it's talking about something that hasn't previously been disclosed in exactly the way it was disclosed before.

Q.    So are you saying that the market reaction to a disclosure depends on other information available to the market at the given date of the disclosure?

MS. GILDEN:    Objection. Mischaracterizes testimony.

A.    Well, I think determining whether something was new and provided new information in the market can depend on context.  Let me just give a simple example.

You know, a company can say, you know, we have a billion dollars in our bank account.  We have cash of a billion dollars and then three months later they could say the

Page 26

Coffman

exact same thing.  We have cash of a billion dollars, but that might reflect something very new if the company had a particularly good or particularly bad quarter and expectations for cash flow had changed.

The very fact that it's the very same words doesn't mean that it is not new is all I'm saying.  So context can matter.

Q.    Thank you for that.  If there is no new information in a disclosure, however, then the disclosure shouldn't affect a company's stock price, right?

MS. GILDEN:  Objection.

A.    If there is literally no meaningful information, additional meaningful information provided given -- and the context hasn't changed where somebody would interpret that information differently, then I would generally agree with you.  If there is not some reason to believe that it is providing additional incremental information, one would not expect prices to move based on that rerelease of that exact same information.

Q.    Got it, but if the context has

Page 27

Coffman

changed where someone would interpret that information differently, then an identical disclosure can prompt a different market reaction; is that what you are saying?

A.     Possibly, yes.

Q.     You also used the word rapidly. What does it mean for information to be rapidly reflected in a share price?

A.     The way I interpret that in the way I do my analysis and think about it is in a very short number of days, one day or some very small number of days.  Sorry, I can't be a little more precise than that, but obviously the tests I perform within the report, within this report are focused on whether there is evidence of the market reacting within a single day.

There can be circumstances where you can measure price movements at shorter durations or at slightly longer durations, but certainly it doesn't extend beyond what I would characterize as a small number of days, two or three days.

Q.     What are the circumstances under

Page 28

Coffman

which it would take three days for information
to be digested by the market?

A.    Well, I don't know that I can define
all the circumstances under which that might
occur, but what I have seen many, many times in
the course of my work over 20 years analyzing
price reactions to new information in stock
markets is that when a piece of information,
when a particularly material piece of
information comes to the market, especially if
it's unexpected in some major way, you know,
and it's difficult to figure out what the value
of that is for the firm, it can take actual
market participants some time to settle on what
they believe the ultimate impact of that is and
the market can be influenced over a short
period of time, maybe a couple of days by
things like additional analyst reports that are
commenting on that news and processing that
news, discussing the nuances of that news.

So, you know, and so where there is
evidence that, you know, the information was
difficult to value and there is commentary on
that over a series of days and there is

Page 29

Coffman

increased volume over a series of days and you see increased price volatility over a series of days, those are all indications to me that it may be taking slightly longer than one single day for the news to be fully reflected in the price.

Q.    From a market efficiency perspective would publicly available information include information that is publicly disclosed by the company itself?

A.    Of course, yes.

Q.    What about widely circulated news reports?

MS. GILDEN:  Objection.

A.    And let me clarify my prior answer only because I have seen cases that have involved these sorts of issues.  If a company issues a press release and that press release is clearly picked up by wire services and things like that, that is clearly information the company is putting out that is widely publicly available.

If they put out some leaflet or something that doesn't gain wide distribution,

Coffman

then not necessarily, right.  So I think context does matter, but generally if a company is announcing something to the public generally through the use of a typical means like a press release or a regulatory filing or something like that, then I believe it's fair to presume that it is publicly available and rapidly considered.

Same with widely distributed, going back to your most recent question, I would say the same with widely distributed media outlets. Their reports would be considered widely available to the market rapidly.

Q.   What about widely distributed judicial decisions?

MS. GILDEN:  Objection.  Form of the question.

A.   So, just to make sure I understand your question.  So you are saying are widely distributed judicial opinions something that would be considered publicly available?

Q.   Yes, that is the better form of my question.

A.   Yes, I believe that is the case.  I

Coffman

mean we can debate what widely available means or widely distributed means, but yes, if there is evidence that a legal decision has been issued and that legal decision is mentioned in the news, it's mentioned in filings, it's, you know, by analyst then clearly it's -- it would be appropriate to consider it publicly available.

Q.    So moving through the definition of efficiency in paragraph 24 of your report, you write "In my view, the Cammer decision identified important metrics to consider when evaluating efficiency for purposes of the 'fraud on the market' theory;" do you see that?

A.    Yes.

Q.    What is the basis for your view on that topic?

A.    Well, I think I address that within each of the Cammer factors.  So, for example, in factor one, in paragraph 28, I identify that Cammer factor and what Cammer said about it and then in paragraph 29 I describe my basis for believing that is, in fact, a factor that is important to consider and what it conveys and

Coffman

why it conveys it as a matter of economics.

Q.    Are you aware of any peer review publications on financial economics that consider the Cammer factors as components of an overall efficiency analysis?

A.    I'm not aware of a peer reviewed article that addresses that question.

Q.    You hold a CFA certificate, right?

A.    I don't think it's called a certificate, but yes, it's a -- I have a -- I'm a -- let's see what is the right phrase I'm supposed to use?  I'm a charter holder, CFA charter holder I think is the phrase.

Q.    Thank you for the correction.  Were you trained on the application of the Cammer factors when you obtained your CFA?

A.    That was not a topic of the -- of that program, no.

Q.    Did your CFA training address the topic of market efficiency?

A.    I believe generally market efficiency was referenced and the concept was introduced as part of that as well as part of other formal training I have had, but so it was

Coffman

certainly a topic that was referenced.

Q.    Were you -- there are various examinations in connection with obtaining your CFA charter, right?

A.    Yes.

Q.    Did any of those examinations test you on your ability to identify whether a market is efficient?

A.    I don't recall that being part of the examination.

Q.    How did you become an expert on market efficiency?

A.    Well, I have a background in economics, both at an undergraduate level.  I have taken a number of finance and economics courses as part of my graduate work.  Certainly market efficiency was covered in the finance courses.  Through my CFA, again, the concepts of market efficiency and what is considered in terms of what investment managers consider important information was covered.

The tools used to analyze market efficiency, the underlying quantitative methodologies that I employ are things that I

Coffman

learned as both an undergraduate, as a graduate and as someone who went through the CFA program and then many years of experience of focusing on the types of information that affects stock prices or securities prices more generally, what the fundamental economic principles are that guide how securities are priced and valued and as I said, working for many years in the industry of providing analyses of these sorts of questions, both as initially as somebody who supported other experts and then doing much of my own consulting work and then having served as an expert both on a consulting basis for defendants and neutral experts and plaintiffs.

This is essentially my life's work, is analyzing, is largely analyzing how stock prices are impacted by new information.

Q.    Would you agree that the lion's share of that experience has been acquired through your service as an expert in support of litigation?

A.    No, I spent many years learning the tools of -- quantitative tools of economics and statistics.  I certainly for many years

Coffman

performed analyses not as a testifying expert but in support of others analyzing these issues and then ultimately as an expert.  So I don't know that I can quantify easily all those different aspects, but certainly my experience goes well beyond that as serving as an expert for a particular type of client.

Q.    When you say I spent many years learning the tools of quantitative economics and statistics, you're referring to your undergraduate and graduate training?

A.    Yes.

Q.    In your undergraduate and graduate training, were you instructed on how to use those tools to gauge market efficiency?

A.    For much of it, no.  It's really about those tools and what all the different aspects they can be used for at a more fundamental level in performing quantitative analysis and drawing statistical inferences off of data and evidence.

Certainly, in the finance related courses I have taken, it was much closer to the application of analyzing whether or not they're

Page 36

Coffman

focused more on things like securities analysis and time series analysis where event studies like methods were used to evaluate information, but there was no formal course work that was specifically focused on analyzing everything that I need to analyze when looking at market efficiency.

Q.    So in this course work, they taught you, for example, how to run regressions, right?

MS. GILDEN:  Objection.  Form of the question.  Mischaracterizes testimony.

A.    How to run regressions, what the underlying assumptions are, how the conditions under which it's appropriate to draw inferences and how to use the statistics and not use the statistics to draw inferences.

So, you know, it's a lot more than just how do you plug variables into the computer.  It's how do you use these to actually reach relevant conclusions and in a scientific way.

Q.    But in this course work they did not teach you what specific factors to analyze in

Page 37

Coffman

order to develop a conclusion about whether a market is efficient, correct?

MS. GILDEN:  Objection. Mischaracterizes testimony.

A.    I don't recall any course that was -- any part of a course that was dedicated to describing here is the specific factors you should analyze for market efficiency or not, no.

Q.    Since acquiring your degrees have you conducted any published academic research on the topic of market efficiency?

A.    No.

Q.    I want to look now at Section 7C of your report that's beginning at paragraph 34 of Exhibit 1.

A.    Okay.

Q.    So in that section, just to situate us, you discuss analysts' coverage as a factor supporting efficiency. I want to particularly direct you to paragraph 36.  In that paragraph you note that 24 separate firms had equity analysts issue reports on Bayer during the class period, right?

Page 38

Coffman

A.    At least that many.  If you read sort of the whole paragraph in context, you would note that I acknowledge that we may not have all the analyst reports that were out there, but there were at least 24 separate firms that I was able to identify, yes.

Q.    Do you know whether all 24 or more of those analysts covered Bayer throughout the class period?

A.    Not as I sit here from memory, no. I know there were some firms that did and it certainly is possible that some covered them for only a portion of the class period.  I just don't have specific recollection.

Q.    Is that something that your staff would have checked?

A.    I don't think they would have identified for each analyst firm the specific time period over which they analyze reports. The one thing I do instruct them to check, I certainly saw a list of, is just generally that there was analysts' coverage throughout the class period.

In other words, that, you know, all

Coffman

1,229 analyst reports I make reference to here, I know didn't occur just over the second half of the class period.  I make sure that there is a distribution across time of the analysts' reports.  I don't track, for example, or didn't ask my staff to track whether J.P. Morgan specifically let's say issued reports, you know, every year of the class period or every quarter of the class period.

Q.    If only 23 firms had provided analyst coverage for Bayer, would that have altered your conclusion on this factor?

A.    No.

Q.    How many analysts is enough to support a finding of efficiency?

A.    I don't know that I have a specific number in mind that is what I would consider a threshold, but I mean, again, clearly for a case like this where we are looking at a fairly long class period of four years or so, you know, I would want to see that there is multiple analysts issuing reports, you know, throughout that entire time.  Whether the total number would need to be -- I don't have -- have

Page 40

Coffman

a particular number in mind that would be the threshold.  The way I approached this question is, is there clearly significant analyst coverage of this company where there are widely disseminated reports throughout the class period that are providing information and analysis about this company.

That was a very easy question to answer in this case and so I wasn't approaching it with a particular threshold level in mind.

Q.    Are you aware of any academic literature assessing how the number of analysts covering a given security impacts the efficiency of that security?

A.    Well, I'm certainly aware of literature, academic literature that talks about how analysts could be important to the market in terms of providing information and can actually impact market prices.  So certainly the thread of that research is that analysts' coverage matters, but I don't recall a published academic study ever concluding or describing what quote, unquote, sufficient analyst coverage would be to support a

Page 41

Coffman

conclusion of market efficiency.

As I'm clear in my report, there is no bright line test for market efficiency on any of these factors. It is looking at the factors as a whole and what the evidence in totality is showing.

Q. How do you objectively determine whether there have been enough -- strike that.

How do you objectively determine whether there were enough analysts covering a stock for purposes of a market efficiency analysis?

MS. GILDEN: Objection.

A. Again, I don't think the right way to think about it is below some threshold means the market is inefficient. That's not really the point.

The point is to say one of the underlying predicates of market efficiency is that there is widely available information that is being analyzed by market participants and the literature has identified analysts as one important way that information is conveyed about companies and analysis has been done

Page 42

Coffman

about companies that has been widely distributed and that provides a useful mechanism by which information is considered and therefore is supportive of market efficiency when there is analyst coverage of a company.

So my -- the purpose of me looking at this factor is not to assess it against a threshold where it says below some threshold that means the market is inefficient.  That is not even the right way to think about the problem or the question.

The question is, is there empirical evidence in this particular case that the informational function of analysts is happening and is their evidence of substantial analyst coverage here and the answer to that question in this particular case is obviously yes, given the immense amount of analyst coverage there was.

Q.    So is the core intuition that analysts provide a conduit for disseminating information about a company to the market?

A.    Disseminating information and

Page 43

Coffman

analyzing that information in a way that is useful to investors.

Q.   So if there were significant news about a company, you would expect to see it discussed in analyst reports contemporaneously, right?

A.   When you say significant, I want to make sure we are talking about the same thing. If there is sort of obvious fundamentally new information that is obviously fundamentally material, I think it's reasonable to think that is something analysts would talk about.  I don't know -- I certainly have seen cases where information that is clearly important to investors wasn't really the focus of analysts though.  So I don't think you can conclude that just because analysts don't talk about something it's not important, but there is certainly a very high degree of correlation between fundamentally material important information being released and what analysts are talking about.

Q.   I want to turn next to the section in which you discuss Form S-3 eligibility.

Page 44

Coffman

That's Section 7E beginning on paragraph 43. Let me know when you are there.

A.    Okay, I'm there.

Q.    In this section you discuss Bayer's eligibility to file on Form F-3, right?

A.    Yes.  I'm sorry, I thought I answered the question.  Maybe the sound didn't come through.

Q.    My apologies.  It's short answers sometimes aren't coming through to me, but I can look at my real time and figure it out, so that's okay.

And Bayer's ability to file on Form F-3 was one of the factors you found to support the efficiency of the market for Bayer ADRs, right?

A.    Well, I think again, you know, I describe in the report what the -- I'm not suggesting they were eligible to file Form S-3 and that fact supports market efficiency here. They weren't eligible to file Form F-3 is my understanding.

What I'm saying is that in describing what the relevance of this factor

Page 45

Coffman

is, which is that the SEC allows certain companies that have provided sufficiently high level of public information are able to rely on that breath of information being already publicly reported to not necessarily repeat the information all the time.

And so, again, the underlying economic logic and sort of informational logic here is that when a company is provided a substantial amount of information and meets certain criteria that then that provides some additional evidence that the conditions are present for market efficiency.

I'm saying given that Bayer filed documents or released earnings in documents providing information about its business on a timely manner, it didn't fail to pay dividends, it didn't default on any of its debts.  It effectively satisfied the criteria to be an F-3 filer, but they are not actually an F-3 filer because my understanding is that they don't file with the SEC.

Q.    Thanks for that.  What you wrote in your report though was "Throughout the Class

Page 46

Coffman

Period, I found no evidence that Bayer failed to file relevant documents in a timely manner," right?

A.    Yes.

Q.    What did you mean by failed to file relevant documents in a timely manner?

A.    I meant provide regular updates to the market about its performance and its financial standing, meaning regular, essentially quarterly earnings reports and providing information to the market about the performance of its business.

Q.    So you're referring to annual and quarterly reports filed in Europe rather than SEC filings?

MS. GILDEN:  Objection.

A.    Or that were released by the company publicly, yes.

Q.    A general question, have you ever evaluated market efficiency for securities issued by a non-U.S. issuer before this report?

A.    Yes.

Q.    How many times?

A.    I don't know the exact number, but

Page 47

Coffman

certainly I have issued reports on probably at least a handful of ADR issuances and certainly done consulting work on many more.

Q. How do you gauge whether annual reports issued by an overseas company are the equivalent of periodic exchange act required reporting practices for purposes of this Cammer factor?

MS. GILDEN: Objection. Form of the question.

A. I don't know that I have evaluated whether they are -- I think the term you used was equivalent in all respects, but certainly reviewed the disclosures here in this matter to evaluate whether they provided your relevant details about their quarterly performance including financial statements that included income statements, balance sheets, cash flow statements, et cetera and notes to those statements and a discussion of how the business was doing in comparison against prior periods, et cetera.

I didn't evaluate whether it met every single criteria that might be necessary

Page 48

Coffman

to qualify as an SEC -- that met all the qualifications necessarily of an SEC report, but they certainly contained the relevant information, you know, a substantial amount of relevant information that investors would consider important like quarterly financial statements.

Q.    So for this Cammer factor, the only citation to authority you have in this section is to the Cammer decision itself, right?

MS. GILDEN:  Actually, can we pause for a minute?  I want to reread the question.  Objection.  Form of the question.  Mischaracterizes testimony.

A.    Well, in paragraph 44 I make reference to an SEC description of what Form F-3 is and describe so in footnote 49 and 50. I make reference to specific information from the SEC about what Form F-3 is and that information provides the information where I describe the types of information that are required in a form for eligibility for Form F-3.

Q.    Other than Cammer, do you cite any

Coffman

authority in this section for the proposition that eligibility to file on Form F-3 supports an inference of efficiency?

A.    No, and look I want to be very clear.  I don't think ability to form file S-3 or F-3 standing alone provides evidence, sufficient evidence to conclude a market is efficient.  I think it's, as I describe at the end of paragraph 44, it provides some confirmatory evidence of efficiency, but it's not a requirement and I certainly would never conclude a security was efficient by looking at Form S-3 alone and I don't think there is any academic literature out there that talks about that as a sufficient condition for market efficiency.

Q.    That was kind of my question.  Are you aware of any academic literature indicating that eligibility to file on Form S-3 or F-3 supports a finding of market efficiency?

A.    I don't think there is anything that specific.  I think there is literature out there that talks about how information dissemination and the breath of information

Coffman

dissemination can impact market efficiency and that is my understanding of the underlying logic.  The Cammer decision used is, is not so much about the Form S-3 as much as it is about the -- that there has been substantial information dissemination by the company in prior periods that that means there is a robust set of information out there already about the company and certainly the academic literature talks about information dissemination as important for market efficiency.

Q.    Okay.  Let's talk about the next factor.  This is factor five which is in your Section 7F beginning at paragraph 46 of our Exhibit 1.  In this section you describe event studies that you undertook to assess the responsiveness of Bayer ADRs to news, right?

A.    Yes, I'm analyzing the cause and effect relationship between new information and changes in the market price of the security, yes, and I use event studies to do that.

Q.    The first step in the analysis was running a regression of Bayer ADR prices against a Euro stocks market index, right?

Coffman

A.    Well, that is a component of it, yes.  The first -- certainly that is a predicate to what comes later, yes.  There was a lot of effort and work put into thinking about what is the right form of that regression to begin with, but yes, once I settled on that specification of the form of the regression, that then informs the remainder of the analysis.

Q.    For purposes of that regression analysis, you used two different regression windows, right?

A.    Well, no, I actually used many more than two different event estimation windows.  I estimated for every day during the class period, I ran a regression that had an estimation window.  That estimation window for most of the days is the immediately preceding 120 trading days or roughly six months.

So for every day my estimation window was roughly six months prior for the vast majority of dates.  The only time -- and that's a normal practice I use.  The only time I deviated from that was in the 120 days

Page 52

Coffman

immediately following the closing of the merger with Monsanto.

I didn't want to use data from prior to the closing of that merger in the estimation window. So for the first 120 days after the closing of the Monsanto merger I used a single estimation window which is the first 120 days of post Monsanto merger.

Q.    Why did you adopt that approach?

A.    I have seen evidence in numerous cases that upon the closing of a substantial merger where both companies were a fairly substantiallized or at least, you know, that the target company is large enough where the scope of the company's businesses is changed in such a way that the return generating process may be different after the merger.

So now that Monsanto is part of Bayer, there may be differences in how the market interprets new information, how it might be correlated with market indices, with how sensitive it might be to new information.

So it seemed reasonable to me and it's a practice I have adopted in a number of

Page 53

Coffman

other matters where, after a major merger like that, to not use data premerger when performing the event study.

Q.    The merger agreement was signed in 2016, right?

A.    I believe that's right, yes.

Q.    And then the merger closed in 2018, right?

A.    Correct, yes.

Q.    So after the signing of the merger agreement in 2016, wouldn't the price of Bayer ADRs have fully incorporated the value of the anticipated merger?

A.    Well, the market capitalization of the two companies would not be combined prior to the closing of the merger.  So the prime time shares outstanding would not equal the combined value of the companies.  That is the way I interpreted your question.  Maybe you're asking me something slightly different.

Q.    I think I am.  So in paragraph 51, for example, you say the merger with Monsanto altered, quote, "What would be considered relevant by market participants," closed quote.

Page 54

Coffman

Do you see that?

A.    Yes.

Q.    At the time of signing wouldn't Bayer stockholders assume that because the transaction is going to close all information relevant to Monsanto is thus also relevant to Bayer?

MS. GILDEN:  Objection to form of the question.

A.    Oh, okay.  Yeah, I mean I think it was the way you phrased your prior question that was throwing me off.  So certainly information about Monsanto and the value of Monsanto would now be considered relevant information to a Bayer shareholder.

I disagree with your characterization that they would assume it is definitely going to close.  There is -- any time there is an announced merger, there is some probability that the merger won't close or that the terms of the merger will change over time.  So it's not as if the company will trade as if they are actually combined with certainty, but it will certainly begin to

Page 55

Coffman

reflect the factors that may be influencing the company now includes Monsanto.

Q.    Okay.  Thank you for that.  So after running this regression, you compared Bayer ADR price reaction on the dates of earning announcements to price reaction on what you term least news days, right?

A.    Yes.

Q.    Let's start by talking a little bit about the event studies on the earnings announcement dates.

A.    Okay.

Q.    You analyzed 20 earnings announcement dates, right?

A.    Correct.

Q.    Before you prepared the event studies for those 20 dates, did you form a hypothesis about the expected price reaction on each date?

A.    No.

Q.    In your experience how often do you see significant price movement on an earnings announcement date?

A.    Well, I think it can vary widely

Page 56

Coffman

from company to company.  You certainly, and for some companies earnings may not be the most important thing or even close to the most important thing that the company is announcing.  So say, for example, in the pharmaceutical industry for companies, before they are actually selling anything, they are just going through clinical trials and, therefore, they are not selling any product yet.  You wouldn't necessarily expect their quarterly earnings reports, the earnings themselves to be critical information.  You would expect their progress through the FDA approval process to be the more relevant information.  So for companies like that, you don't really expect earnings to necessarily be a driving factor.

For mature companies or at least on the more mature side like Bayer, certainly earnings announcements will more often than you would expect by random chance alone contain material information that will move the stock price.  Sometimes in a statistically significant way, but certainly not always and as I describe in my report, they may not be

Page 57

Coffman

significantly -- a particular earnings announcement may not be significant for a variety of reasons.  So I don't think there is a specific expectation about any particular percentage of earnings announcements you expect to be significant.  I have seen cases where it's as low as 20 percent.  I have seen cases where it's as high as a hundred percent.  I don't think there is a well accepted sort of expectation there.

What I'm really trying to test though is whether there is evidence, clear scientific evidence that on days where there is substantial news like an earnings announcement for Bayer that we see more price reaction when compared to a control group.  That's the scientific test I'm performing.

Q.    After you ran those event studies on the earnings announcement dates, you found no significant price reaction on 13 of the 20 dates, right?

A.    That's correct.  Seven of them were statistically significant at the 95 percent level or higher and 13 of them were not.

Page 58

Coffman

Q.    Did you examine the announcements on those 13 nonsignificant dates to check if the announcements contain material information?

MS. GILDEN:  Objection to form of the question.  Calls for a legal opinion.

A.    I evaluated the earnings announcements and the analyst reaction to those earnings announcement for each of those 20 dates, yes.

Q.    And for the 13 dates where there was no significant price movement, did you reach a conclusion as to whether material news had been announced?

MS. GILDEN:  Objection.

A.    Well, I think, I convinced myself that on all 20 there was material new information announced.  Now, that doesn't necessarily mean, as I described in my report, that you would expect a statistically significant stock price reaction to all of them or even a majority of them.

In many cases in these 20 earnings announcements, the earnings information and the mix of information that was provided about

Page 59

Coffman

earnings and other things was either largely in line with what the market expected or that there was some components of positive information and some components of negative information.  So, you know, I convinced myself that there wasn't an example of a day here where unequivocally, you know, there was, you know, unit directional material information that should have caused a stock price movement that was significant that we didn't observe.

So, in essence, there was no -- none of these 20 dates where I looked at the information and looked at the stock price reaction and said that just doesn't fit with the directionality of the information that was provided.

Q.    So I take it you weren't surprised to find that only 35 percent of the earnings dates evidenced significant price reaction?

A.    That result was not particularly surprising to me one way or the other, no.

Q.    If the fraction had been say 15 percent would the -- would your conclusion have changed?

Page 60

Coffman

A.    I don't think my conclusion that the market was efficient would have changed. Whether this specific test would have yielded a 95 percent significant result, I don't know.  I would have to do the math to figure that out. I think that's the best answer I can give you right now.  I don't think my analysis would have stopped at that point and I would have concluded the market was inefficient.

Q.    Understood.  By the way, you were testifying earlier that you looked at the analyst reports and earnings announcements for the individual earnings dates, right?

A.    Yes.

Q.    When you were evaluating that data, did you develop an opinion as to whether the news was positive for the company or negative for the company overall?

MS. GILDEN:  Objection.  Form of the question.

A.    I think it wasn't so much that I formed an opinion about whether the overall information was positive or negative as to whether or not the -- for example, on a day

Page 61

Coffman

where there was a statistically significant stock price movement, it was clear to me -- on the seven days there were significant stock price movements, it was clear to me there was material new information that could explain why the market moved significantly in the direction it did.

Q.    So you did look at directionality as part of that analysis?

A.    Yes and then for the 13 that weren't significant, I said given the mix of information here, is it outside the bounds of reasonability to think that you wouldn't necessarily see a huge stock price move and for many of them it was very clear that the analysts were saying this was largely in line order.  There was a mix of positive and negative news.  It was never a case where I looked at any of those 20 days and said wow, this price reaction seems out of line with the nature of the information that was provided.

Q.    Why did you rely on analyst reports to help you develop that opinion?

MS. GILDEN:  Objection.

Page 62

Coffman

A.    Because within the academic literature and within the financial economics industry and investment analysis industry generally, I think it's understood that analysts can provide an important source of information as to how the market was viewing information.

They are not the end all be all, but certainly they often put out information about what expectations are before an announcement and then compare that to what the actual announcement was.  So it provides a pretty good benchmark, not always perfect, but a pretty good benchmark in many cases about what the market expectation was and how the new information compared against that expectation and what the -- in their view at least, the takeaway was from the new information that was announced.

Q.    Moving on to least news days, you define that as days when you identified only two or fewer Bayer or Monsanto related news articles from the Factiva database and no analyst reports, no SEC filings, no company

Page 63

Coffman

conferences reported, right?

A.    Or press releases.  I think I also considered whether there were press releases issued by the company, yes, that's generally how I defined these news days.  Once the list of least news days was developed, I went through each of those days in the articles there were to make sure I could, just by looking at those articles, say yeah, that information doesn't seem particularly material.  For three of the days identified -- I think there were initially 28 days on that list of least news days.  For three of those days, when I looked at the news articles I couldn't just, you know, ex ante once looking at it say, you know, that's not really material.  It doesn't mean I concluded it was material, but for three of the days when I looked at the news, I was like, you know, I can't just conclude by looking at the information itself whether it was material or not.  So I took those three days out.

Q.    What standard did you apply to determine whether news on a given day was

Page 64

Coffman

material?

A.    Whether it's the type of information that I think would be reasonably considered by an investor in potentially materially changing their view on the company and its cash generating or profit generating ability.

So, you know, if it's an article about, you know, some customer mentioning Bayer or a Bayer product, you know, that's obviously not new material information that would affect the stock price.

If it's a discussion of the breath of lawsuits being filed against Monsanto related to Roundup, it's not so easy to say that wasn't providing some new information. So, you know, I would have excluded that or, for example, if a company was just announcing the date of a presentation but didn't provide any information about what that presentation was or, you know, give any context of what sort of -- to draw any conclusion about the company from it, it was just providing logistically when this conference was going to be held that is the sort of thing I concluded wasn't

Case 3:20-cv-04737-RS   Document 178-3   Filed 06/01/23   Page 66 of 328

Page 65

Coffman

material.

So we can go through each one of those articles and I can describe for each one of those articles why I didn't think it was material, but the standard I was applying was, is this the sort of information that, you know, a rational investor would consider to be important new information for the company.

Q.   So I do want to go through those dates individually, but before we do, did you personally review all the news articles on the least news days?

A.   I first asked my staff to do it and if there was and they identified the days on which there was any question, again, when you look at these articles, often you can determine immediately that there is really nothing material about it, but if there was any question about that, then there was a session where I sat down with a couple of my staff members and went through each of the articles that they determined it was not easy to conclude.

Q.   Are your staff -- sorry.

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Page 66

Coffman

MS. GILDEN:  I was just going to say, Noah, when we are at a good point to take a break, I would like to do that.

I know that you're continuing with this line of questioning, which is fine, but before you move on, I would like to take a break.

MR. YAVITZ:  That's totally fine. So what I'll do is I will finish this line of questioning and then we will take a break and then we will finish up the Cammer factor five and continue on with the rest of our pleasant day, okay?

MS. GILDEN:  Perfect.

Q.    I think you testified that the process for reviewing the news on the least news days was for your staff to do a first pass and then you sat down and discussed with them any news items they identified as potentially raising questions around materiality; is that approximately right?

A.    That's a fair description, yes.

Q.    Are your staff members experts on what types of news articles are material to a

Page 67

Coffman

market?

MS. GILDEN:  Objection to form of the question.

A.    I would say they have a combination of formal training on that and certainly experience working on my matters where we regularly discuss what types of information are and aren't material and the principles that are behind that, yes.  So they have experience and training, you know, and general training as to what is important for investors to consider.

Q.    So let's talk about the three dates quickly then.  We can start with whatever was the first in time.  Your report doesn't disclose I don't think which dates you actually removed.

A.    I think it does.

Q.    What do you recall?

A.    I think it does.  Give me just a second.  I think footnote 69 addresses this.

Q.    Let's start with the first dates then.  What article caused you to disqualify that date as a least news date?

A.    I don't remember off the top of my

Page 68

Coffman

head.

Q.    Well, do you recall any of the articles that cause you to disqualify dates as least news dates?

A.    I remember -- just the one memory I have is that there was certainly on at least one of these three dates an article that discussed the Roundup litigation that Monsanto was facing and some information about what was happening in that area and I just, without doing a deep dive into whether anything in that article was, in fact, new or not and the degree to which investors might see some of that information being new or not, that I wasn't willing to just dismiss it as immaterial.

To be very clear, I did not conclude it was material.  I did not conclude that there actually was new information that an investor should consider or would consider important.  I just couldn't dismiss it out of hand without doing further analysis and, therefore, I didn't want to consider it a least news date because again, the purpose of what I was trying to get here is to a set of dates that you effectively

Page 69

Coffman

had no news.

It's just there is so much coverage of Bayer and Monsanto, it's difficult to identify any dates where there is no news.  So I had to set the threshold a little bit higher where I allowed certain, you know, small pieces of information to be coming out about the company to identify effectively dates with no news.

So I couldn't, given what was discussed in there, I couldn't out of hand say this was a no news date, but I was not making an affirmative conclusion that the news was new or material.

Q.    Did you or any of your staff look at the Bayer ADR price movement on those three excluded dates?

A.    Not in making those decisions, no. I remember the meeting when we did this and know the results of the event study were not available to me in making these decisions.

Q.    But subsequently did you run event studies on those dates?

A.    Well, I think we ran an event study

Coffman

on every day using the computer program that we used, but those three dates did not end up getting included in the formal comparison of no news dates versus news dates.

Q.    Do you know whether there was a statistically significant price reaction of news on those dates?

A.    I don't.

Q.    Why not include those dates in your sample of dates with new information?

A.    Because I didn't conclude there was material new information on those dates.  I just couldn't conclude there was no news.

Q.    Okay, we ask take a break now.  We can go off the record?

A.    Thank you.

THE VIDEOGRAPHER:  The time is 10:51 a.m.  This is the end of media one and we are going off the record.

(Brief recess taken.)

THE VIDEOGRAPHER:  The time is 11:04 a.m.  This is the beginning of media number two and we are on the record.

Page 71

Coffman

BY MR. YAVITZ:

Q.    Welcome back, Mr. Coffman.  Thank you for returning.

A.    Thank you.

Q.    Did you discuss the substance of your testimony with counsel during the break?

A.    No.

Q.    I'm just going to have a few more technical questions about your least news analysis.  Okay?

A.    Okay.

Q.    So your event studies looked at days with a statistically significant price movement, right?

A.    Well, one metric I calculated was what percentage of the days were statistically significant.  So I looked beyond those days.  It's just I did calculate what fraction of the days were statistically significant.  That is one of the three measures I relied on.

Q.    Thank you.  My question is a little more specific.  In analyzing price movement on a given date, what time window did you apply?

A.    A one day time window.  So the

Page 72

Coffman

market date immediately following whatever that news event was.

Q.    So does that mean that for, if you, for example, have a market date of January 5th, did you consider the price movement from the close of trading on January 4th through the close of trading on January 5th or did you consider something else?

A.    Yes, the price movement between two closing prices, the previous closing price and the next closing price.

Q.    Did your valuation of the news on a given day include information released after market close on the prior day?

A.    Yes, so if, for example, the release of information was at 5:00 in the afternoon, then I would consider the market date to be the next trading date.

Q.    And that's just -- that was information available on the database.  I'll restate the question.

            MS. GILDEN:  Object to form.

Q.    The time of publication was information available on the Factiva database?

Page 73

Coffman

A.    Well, for any -- if we are talking about the news articles for identifying the least news days, yes.  If we are talking about the earnings announcements, I believe the earnings announcements were published through the use of press releases which had a time on them and then there were also articles that had timestamps on them that first discussed those earnings.

So through a combination of the press releases and the timing of those and the news announcements we -- for every one of the 20 dates we were able to determine what the appropriate market date was.

Q.    Did your evaluation of the news on a given day exclude information released after market close on that day?

MS. GILDEN:  Objection.
Mischaracterizes testimony.

A.    I guess I'm confused by your question at this point.

Q.    Sure.

A.    If you can rephrase.

Q.    I'll return back to this

Page 74

Coffman

January 5th.  If January 5th was the target date and news were released after market closed on January 5th, would that news be treated as news from January 5th for purposes of your least news analysis?

A.    If a timestamp was available and it was after market hours, then that would be considered news for January 6.

Q.    Do you know what proportion of news article in the Factiva database had a timestamp available?

A.    I don't know that off the top of my head.  Some do.  Some don't.

Q.    And if the least news day under evaluation was a Monday, would your evaluation have included any news after market closed from the prior Friday?

A.    Yes.

Q.    In selecting least news days, did you consider whether significant news had been announced during the prior trading day?

A.    No.

Q.    Why not?

A.    Because the design of this test is

Page 75

Coffman

just to look at one day windows.

Q.    But earlier you testified that even in an efficient market, it could take more than a day for the market to internalize significant news, right?

A.    It could take that long for it to fully reflect new news, yes.  So it's, I guess in theory possible, you could have some bleed over of news, but that would -- if that were true for one of our -- for one of my least news days, that would bias against the finding I'm trying to reach or that I'm testing for, but it's -- you can't completely rule that out, but those sorts of events are relatively rare across the entire sort of -- as a fraction of all days, but it certainly is not absolutely impossible that news from a prior date could have still been continuing to influence to a certain degree the news on another day, but the design of the test didn't take that into account.

Q.    Thank you.  I'm going to move on to a new topic.

In developing your opinion on the

Page 76

Coffman

efficiency of the market for Bayer ADRs, did you also analyze market for Bayer common shares?

A.    Well, I didn't analyze each and every factor, but I certainly, for example, compared the Bayer ADR price against the Bayer common share price after accounting for exchange rates to see whether there appears to be a common price between the two markets.  I certainly saw, and it's presented in my report, the total market capitalization of Bayer common.

Certainly the analyst reports pertain to both Bayer common and Bayer ADR since they are covering the company as a whole. So, I reviewed a substantial amount of data and information related to Bayer common and since the prices essentially, with the exception of a small period that I describe in my report, effectively totally overlap each other.

So when you look at Exhibit 14 of my report, with the exception of a very small period of time which I talk about in my report, when you plot the two price lines, one covers

Page 77

Coffman

the other to the extent you can't even really see the other one. So, the fact that the price movements were essentially coincident here gives me great confidence that the Bayer common market was efficient too, but I didn't run event studies specifically on Bayer common or anything like that.

So the level of analysis wasn't the same and it wasn't a target of my analysis, but I certainly saw plenty of data related to Bayer common stock.

Q. The analysis you were just describing, that was an analysis comparing the daily closing prices of Bayer ADRs and Bayer common shares, right?

A. Yes.

Q. Do the markets for ADRs and common shares close at the same time every day?

A. No, which is why you would expect some difference between the two and some difference between the two would not be surprising at all because of the synchronous nature of when the closing prices occur, so they do not close at exactly the same time, no.

Page 78

Coffman

Q.    Did you identify that expected diversions between the closing prices?

MS. GILDEN:  Objection.  Form of the question.

A.    I didn't devise any model to try to predict what that divergence would be, no.

Q.    Well, I think what you said earlier was the price movements were essentially coincidences.  Strike that.

I think what you testified earlier was that the fact that the price movements were essentially coincident here gives me that the Bayer common market was efficient too?

A.    Meaning that when looked at broadly the market price of Bayer common was consistent with the market price of Bayer ADRs.  They weren't identical, but when you looked at Exhibit 14, it's very clear that these two securities prices tracked together.

So if you want to get down at the level of minute by minute or hour by hour or the divergence on any one day, of the small divergence on any one day, I don't have a model for that, but looking broadly at how the prices

Page 79

Coffman

track with each other, it's clear that they --
that this is effectively a common market.

Q.    Why didn't you examine intraday --
strike that.

Why didn't you compare intraday
price movements for Bayer ADRs and Bayer common
shares?

A.    It wasn't necessary to reach the
opinions that I'm giving and as you mention
they are not, at least for portions of the
Bayer, I actually don't recall if they trade
coincidently for a portion of the day, but
certainly there are large portions of the day
only one of two is trading at a time.

Q.    Did you assess whether information
was first incorporated in the common share or
in the ADR market?

A.    Well, I think that could be
dependent on the timing of the news or would be
dependent on the timing of the news as to which
market would have the opportunity to react
first.  So I don't think of it as one just
following the other.  It's -- based on the
timing of the news, you would expect to see the

Page 80

Coffman

movement first in one or the other just based on the timing.

Q.    So I want to look at Section 7L, which is paragraph 79 of your report, in which you discuss "Options trading in Bayer ordinary shares."  Let me know when you are there.

A.    Okay, I'm there.

Q.    Did you identify an equivalent market for option in Bayer ADRs?

A.    No, I don't believe -- I did not see evidence of options markets that specifically relate to Bayer ADRs as the underlying security.

Q.    So you opine that the market and options for Bayer ordinary shares supports a finding that Bayer ADRs traded in an efficient market, right?

A.    Given the integration of the two markets and the evidence I see of the two stock prices moving together, yes.

Q.    Why would options trading in the market for Bayer common shares support that finding about Bayer ADRs?

A.    Because the nature of the securities

Coffman

are that they are claimed on the same which is a minority share of the Bayer corporation or Bayer AG.

So economically these assets are essentially an equivalent claim on future cash flows of a firm.  So the prices there is a clear relationship between prices of the Bayer common shares and the Bayer ADRs.

If there was some and the academic literature shows that if you can take option positions on a security, then that can enhance efficiency and so because Bayer common and Bayer ADRs are effectively the same asset, claims on the same cash flows, that implies that the option, taking option positions with respect to Bayer common is economically equivalent or largely economically equivalent on taking an option on Bayer ADRs.

In other words, one could easily hedge their Bayer ADR with a Bayer common option and it would have -- I don't want to say identical, but roughly equivalent to having an option on Bayer ADRs given the integration of the two markets.

Page 82

Coffman

Q.    I want to flip back to paragraph 73 now.  Can you tell me when you are there?

A.    Sure.

Q.    Are you there?

A.    Yes, I'm there, sorry.

Q.    Thank you.  So here you looked at the percentage of outstanding Bayer ADRs held by insiders, right?

A.    That's correct, yes.

Q.    You found that because none of the Bayer ADRs were held by insiders that supported an inference of market efficiency, right?

A.    That supports it, yes.  Again it is not a bright line test for market efficiency, but it certainly provides information consistent with market efficiency.

Q.    Did you examine the percentage of Bayer ordinary shares held by insiders?

A.    I don't recall if that was part of what I looked at or not.  Give me just a second.  I don't recall focusing on that, no.

Q.    Given, as you just testified, the link between the two markets, wouldn't the insider holdings of Bayer common shares be

Page 83

Coffman

equally relevant to market efficiency?

A.    Well, given that there is no insider -- there is not a substantial amount of insiders holding the ADR, that is certainly not something that would serve as an impediment to efficient trading of the ADRs.  I think that is the point I'm making.  I think I'll just leave my answer there.

Q.    Now let's look at paragraph 74. Here you look at institutional ownership of Bayer ADRs, right?

A.    Let me get there.  Just a second. Yes, I'm there.

Q.    Did you examine the percentage of Bayer ordinary shares owned by institutional investors?

A.    I did not, no.  Not that I recall.

Q.    Wouldn't that be equally relevant to the efficiency of the Bayer market?

A.    Again, the question I was asking, is there evidence of there being institutional holdings that suggest the presence of sophisticated well-informed investors owning the ADRs that would provide support to the

Page 84

Coffman

conclusion of market efficiency.  I wasn't asking whether there was substantial institutional investor holdings of the common.

Q.    But why do you look at the percentage of the public float that was owned by institutional investors?

A.    To get some sense of a number beyond just a raw share number to suggest that those holdings are a meaningful portion of the total. In other words, if I just knew that 10 million shares were held by institutions, I really need to know what the denominator is of how many shares are out there to know whether that is a meaningful percentage of the shares outstanding.  So that's why I converted to a percentage.

Q.    But there is no economic distinction between owning an ADR and owning a Bayer common share, right?

MS. GILDEN:  Objection.  Form of the question.  Mischaracterizes testimony.

A.    Can I have that read back, please.

(Whereupon the record was read back by the reporter.)

Page 85

Coffman

Q.    I'll restate the question.  But there is no economic distinction between owning a Bayer ADR and a Bayer common share, right?

MS. GILDEN:  Objection.  Form of the question.  Mischaracterizes testimony.

A.    In a broad sense and in the long term sense, no, I agree there is no meaningful economic distinction in terms of the ultimate cash flows that may or for how investors would think about the value of those investments in a general way.

As I discuss in my report, there are examples -- there is at least one example of a short period of time where there was an economic distinction between there was a right that was distributed to the common shareholders that could not be distributed to the ADR shareholders and instead those ADR shareholders got a cash payment at a later date.

So clearly there are some very subtle differences in terms of how you would value these securities at certain points in time, but as a broad concept, there is not a meaningful economic distinction between the

Page 86

Coffman

two.

Q.    Given that, wouldn't the overall public float adding together common shares and ADRs be the appropriate denominator for your additional factor institutional ownership analysis?

A.    Again, I'm trying to analyze specifically the ADR market and so I focused on the fraction in the ADR market.

Q.    Do you know the relative size -- I'm sorry, were you finished?

A.    I'm done.  Go ahead.

Q.    Do you know the relative size of the ADR market as compared to the market for Bayer common shares?

A.    I don't have a precise number, but certainly the comparison of Exhibit 9A to my report and 9B to my report gives a sense of what that is.  So let's just -- it's roughly mid single digits.  Percentage is held in ADR form.  It probably varied over time.

I'm just doing a point in time comparison between Exhibit A and Exhibit B, but the ordinary share market capitalization is

Page 87

Coffman

much higher than the ADR market capitalization and that difference looks to be about -- it seems to reflect like mid single digits is the percentage held in ADR form.

Q.    So the institutional holders of Bayer ADRs represent a very small percentage of the combined float as between Bayer ADRs and the Bayer common shares, right?

A.    I think that's a fair statement, yes.

Q.    And sitting here today, you don't know what percentage of the overall common float -- strike that.

Sitting here today, you don't know what the overall institutional ownership share is for the aggregate float including both common shares and Bayer ADRs?

A.    I don't have that -- a recollection of what that is and I don't recall seeing that data in the preparation of my report.

Q.    If only 10 percent of the public float had been owned by institutional investors, would that alter your opinion on this factor?

Page 88

Coffman

MS. GILDEN:  Objection to form of the question.

A.    No, I think it -- the fact that there is a substantial portion of institutional holders of the ADR is really the evidence I'm pointing to as support for my position.

Q.    What level of institutional ownership qualifies as substantial in your opinion?

A.    I don't have a particular threshold in mind, but it clearly, give me just a second. Yeah, I don't have a particular threshold in mind.  There were at all points during the class period that I have measured millions of shares held by the ADRs and that represented, it varies over time, but between about -- it averages 21 percent over the class period.  It varies between about 7 percent and 68 percent, so it varies quite a bit over the class period. On average it's about 20 percent and in every period it's millions of shares.

Q.    When you cited those numbers, are you referring to the numbers shown in Exhibit 12 in your report?

Page 89

Coffman

A.    Yes.

Q.    Would you agree that the volume dropped -- strike that.

Would you agree that the institutional holdings rate dropped significantly around June of 2018?

A.    It went down pretty substantially from June 2018 to September of 2018, yes, and I recall having my staff look into that to verify that that was actually accurate because that was a fairly substantial change and we identified the 13F filing of the particular institution that counted for that decline or a big piece of that decline.

Q.    Did you examine whether that decline had any impact on market efficiency?

A.    Well, I don't know that there is a way to test that specific proposition other than to say I looked at all the factors over the entirety of the class period and it's not as if there was any other metric in terms of volume or total market cap or anything else that changed in a significant way at that time.

So, I have no reason to believe that

Page 90

Coffman

the sale by one institution of a substantial amount of shares would impact the overall market efficiency of the market and it certainly didn't suggest that any of my tests failed as a result.

Q.   Are you aware of any academic literature examining the relationship between the level of institutional ownership in a security and the efficiency of the market for that security?

A.   I have a vague recollection of at least one article that analyzed that issue.  I don't remember the name of it or what all the conclusions were, but I think there have been at least in that one circumstance an attempt to try to establish some relationship there.

Q.   You said you don't recall all the conclusions of that article.  Do you recall any of the conclusions of that article?

A.   Again, I am having a vague recollection of that article, so I don't want to speculate on the record without having a chance to go back and review it.

Q.   Are you relying on that article to

Page 91

Coffman

support the analysis presented in your report?

A.    No.

Q.    We were talking earlier about your analysis of the price movements of common shares and Bayer ADRs.  I want to talk a little more about that.  I think that discussion is in Section 7M of your report, which starts at paragraph 80.  So I'm going to direct you there and let me know when you are there.

A.    Okay, I'm there.

Q.    So in this section you examined the absence of arbitrage opportunity between the Bayer ordinary shares and Bayer ADRs, right?

A.    I analyze whether there was evidence of a lack of arbitrage opportunity there, yes.

Q.    Why is that relevant to the efficiency of the market for Bayer ADRs?

A.    Because if you have another market out there that has a -- that is a security that is effectively equivalent in the respects that I described before in terms of what the ultimate claim of that asset is and there is an active trading market for that security as well, then economic theory would tell you that

Page 92

Coffman

there should be one price for those two things.

So, in other words, there shouldn't be without some rationale for why those prices should diverge or couldn't be arbitraged with each other. You would not expect those assets to have very different prices and so, given that there was a very active market for Bayer common, which provides ultimately the same claim on Bayer as the ADR, it was a reasonable and I think important comparison to make.

Q. Would you agree that the price of Bayer common is itself material information for the market for Bayer ADRs?

A. I'm thinking. Well, it's certainly something -- it's certainly information that investors would have access to. Yeah, I don't see why it couldn't be. I'm just -- I'm trying to think through the implications of your question.

Q. Well, we can get to the implications in a moment.

A. No, I'm talking about the economic implications. I'm not talking about any particular implication in this case.

Page 93

Coffman

I am just trying to think of -- I haven't been asked that question in that way before, so I'm just trying to think through the concepts.  It's certainly a piece of information that investors in the ADR consider. I can't exclude the possibility that it would provide some material information.

Q.    So, in this section of your report you concluded that the lack of quote "persistent divergence" closed quote between the price of Bayer ADR and Bayer common supports your view that Bayer ADRs traded in an efficient market, right?

A.    Yes, and I would even go so far as to say it's more -- it's stronger than no persistent divergency as I described earlier on Exhibit 14.  They effectively overlap each other with only very small differences over, you know, essentially the whole class period minus the 14 day period or 12 day period I talk about in my report.

Q.    I want to talk about that 12 day period.  You identified a divergence between the market prices on 12 consecutive market

Page 94

Coffman

dates between June 6 and June 21, 2018; is that right?

A.    Yes, give me just a second.  I just want to find that section where I talk about that so I can make sure the dates you are quoting are accurate.

Q.    If it is helpful, I think it's footnote 91 or page 29 of your report?

A.    Thank you.  Yes, June 6, 2018 through June 21, 2018.

Q.    In that footnote you cite a few potential explanations for this divergence, right?

A.    Yes.

Q.    One explanation you offer is that "BNY Mellon had temporarily suspended its issuances and cancellations of Bayer ADRs," right?

A.    Yes.

Q.    Why would that explain the divergence in market prices?

A.    Again, that can create a temporary supply and demand issue for the stock, particularly if right around the time of the

Page 95

Coffman

merger there were merger arbitrage funds that were doing -- trying to unwind investments that it might have involved a combination of the ADRs, the commons and options on the common. That part of their strategy might, to unwind their positions or enter their positions, would be involved converting between ADRs and common and so to the extent there was demand for their conversion that couldn't be met for a very short period of time, that could influence the supply and demand of ADRs over a short period of time in a way that makes it slightly different for the supply and demand for common shares.

Q.    Could you explain a little more why would converting between ADRs and common be necessary to unwind an investment that involved a combination of ADRs?

A.    I don't know all the reasons.  There could be for some tax related reason a desire to purchase or sell in the United States or outside the United States.  And in particular, there may have been a desire to transact it at exactly the same time in those instruments so

Page 96

Coffman

you would want to unwind a transaction at precisely the same time using the common and the options markets in Europe.

I don't know that that was occurring. I'm just saying that those are possibilities as to why there might have been specific demand for conversion between the ADRs and the common that couldn't be met at that time.

Q. Is it sometimes just more efficient for a stockholder to acquire a large block on the larger common share market and then convert to ADRs?

MS. GILDEN: Objection. Form of the question.

A. That is possible. I don't know the extent to which that occurred or could occur, but it's certainly possible.

Q. Another explanation you have in footnote 91 is that the merger with Monsanto was being completed. Why would that explain the divergent to market prices?

A. Again, I think that really relates to number two. I don't know that it's an

Page 97

Coffman

independent reason from number two because the description of why they temporarily suspended issuances and cancellations was to deal with the merger.

Q.    And then you cite "There was a spike in short interest in Bayer ADRs likely resulting from merger arbitrage activity."

Why would that explain the divergence in market prices?

A.    Because if there are people entering or exiting short positions, large short positions, they may need to deliver a specific security related to that short interest position.  So if somebody has a short, let's say somebody went short a million ADRs, then to cover that position they would have to deliver a million ADRs and as you suggested, maybe a good way to do that would be to buy common and convert it to ADR.

So those mechanisms that would allow it to act as a single market essentially were for a very short period suspended.  So that's why there could be supply and demand that could differ for some short period of time between

Page 98

Coffman

the ADRs and the common.

And again, like just to put this whole discussion in context, you know, the question -- the relevant question being asked here is, is the market for Bayer ADRs sufficiently efficient that if there were material misstatements, that the price of the ADRs would reflect it.  And none of the issues we are talking about now, small divergences over a short period of time related to a combination of supply and demand issues and a clear explanation for a portion of that divergence as a result of this rights distribution and how it had to be performed in my view causes any question as to whether the market is sufficiently efficient that material misstatements would be impounded in the price.

Q.    Leaving aside the legal implications of your opinion, your opinion is that the market for Bayer ADRs was efficient throughout the class period, right?

MS. GILDEN:  Objection.

A.    Yes.

Q.    And the class period includes this

Coffman

June period, June 2018 period we have been talking about, right?

A.    Correct and I'm saying, yes.

Q.    So was information about Bayer ordinary share price reflected rapidly and in an unbiased fashion in the price of Bayer ADRs during that June 2018 period?

A.    I'm sorry, can I have that read back, please?

Q.    I can just repeat the question too. Was information about Bayer ordinary shares reflected rapidly and in an unbiased fashion in the price of Bayer ADRs during the June 2018 period?

MS. GILDEN:  Objection.

A.    When you say information about Bayer ordinary shares, are you limiting it to information about the share price or when you say Bayer ordinary shares are you saying Bayer, the company and its prospects and what was happening with the company?

Q.    I'm asking about the ordinary share price.

A.    Yes, the ordinary share price was

Coffman

publicly available and could be incorporated quickly into how people were trading Bayer ADRs.

Q.    But given the -- strike that.

Given the divergence in the trading prices during that period, was that information incorporated into Bayer ADR prices?

A.    Yes, I don't see any reason to believe it wasn't.  What I'm describing here is that in the context of performing my market efficiency analysis, I look to see whether the Bayer common market and the Bayer ADR market were integrated in terms of the prices following each other and for all but this 12 day window there was clear evidence that they tracked almost imperceptibly with each other with imperceptible differences of any substantial amount, but I noted that there was a period where they diverged in the same direction for 12 straight days in an amount that was not de minimus and analyzed that and I asked the question is there a non -- an explanation for why this was occurring at this particular point in time that doesn't suggest

Page 101

Coffman

the market suddenly became inefficient and the answer to that question was yes.

There are several explanations, one which is a clear economic, you would expect them to diverge and the others are that there was substantial supply and demand for shares around this time or there was substantial demand for shares around this time because it was right around the time of the merger.

There was substantial evidence of short interest surrounding the time of the merger so that there was, in my view, clear evidence of merger arbitrage activity and there was a suspension by BNY Mellon of the ability to convert directly between ADRs and the common.

So all of those things creates slightly different supply and demand conditions for the two securities that were very temporary but existed and that provides a logical explanation for why the prices diverge that does not imply the market suddenly became inefficient or was inefficient for a short period of time.

Page 102

Coffman

Q.    When you talk about merger arbitrage activity, are you referring to market participants betting on whether the merger would close?

A.    Yes, or taking positions that they believed took advantage of how the securities were priced relative to each other including the implied probability of the merger would close, yes.

Q.    I want to move on for the moment at least to talk about damages a little bit.

Turning to paragraph 81 of your report, let me know when you are there.

A.    I'm there.

Q.    You wrote, "Counsel for Plaintiffs also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Plaintiffs' theory of liability," right?

A.    Yes.

Q.    Why is it important that the damages methodology be consistent with the plaintiffs' theory of liability?

Page 103

Coffman

MS. GILDEN: Objection. Form of the question.

A. Well, if I'm evaluating whether the out-of-pocket methodology, which is what I'm talking about in this section, is applicable to this case, I want to make sure I understand from an economic point of view whether plaintiffs' theory is consistent with using the out-of-pocket methodology.

So I want to at least know that plaintiffs' theory is economically coherent and would lead to, in this case, at least plausibly a divergence between the observed price and what the price would have been had the full truth been disclosed and then are there events that plausibly allowed the market to understand that the -- that were plausible revelations of the relevant truth that would cause the inflation to be dissipated.

So, in offering my opinion, I wanted to make sure that I understood plaintiffs' theory of liability in general and whether the out-of-pocket methodology applied to it.

Q. I think you used the words

Page 104

Coffman

economically coherent in that answer.  What do you mean by economically coherent?

A.    Meaning that if plaintiffs' claims are accurate, is the type of information that they are claiming the market -- was withheld from the market illegally, is that the type of information that would cause the market price to be lower if the full truth had been known and are they alleging the types of events that allegedly dissipated that inflation that at least are plausibly causally tied to that and makes it -- that it is a plausible economic story that makes sense.

Q.    So in assessing the suitability of the out-of-pocket methodology, you looked at whether the revelations were plausibly tied to the alleged misrepresentations, right?

A.    Yes.

Q.    What did you do to evaluate whether your proposed methodology is consistent with plaintiffs' theory of liability?

A.    Sure.  So use of the out-of-pocket methodology involves assessing for each individual investor whether they were damaged

Page 105

Coffman

by or could have been damaged by paying an inflated securities price in this case, sometimes you can have a case involving deflation, but I'm just going to talk uniquely about inflation here.

Paid an inflated price and then held that share through some event that dissipated that inflation. And that's the methodology that is, you know, virtually -- used in virtually every case, 10b-5 case that I have ever been involved in and the question is are plaintiffs, therefore, alleging that there was some withheld information or misinformation that could plausibly keep the price higher than it would have been otherwise had the relevant truth been told.

And here in this case, you know, plaintiffs are obviously alleging that defendants reassured the market about the degree and quality of due diligence that was done with respect to the potential Roundup liabilities related to Roundup as part of the Monsanto deal and if those reassurances were false and gave the market false comfort about

Coffman

the nature and risk of those liabilities, then the stock price reasonably in my mind would have traded higher than if they were told the whole truth assuming plaintiffs' allegations are correct to some degree.  And then -- and they explicitly alleged the market price was inflated.  So that is clearly their theory of liability that the market price was higher than it otherwise would have been and then they alleged there were dates where the relevant truth was revealed in terms of the market learning that the risk and liabilities that the company faced were higher than previously expected through jury verdicts and the scope, understanding the scope of a potential settlement and price of a potential settlement and then ultimately the rejection of that potential settlement.

So they are clearly alleging events that are related to that, to the risks the company faced as a result of the Roundup litigation and so, in my mind there was an economically coherent story here.  They were lied to about the risks and then some of the

Page 107

Coffman

risks ultimately came to pass.

Q.    We can get into this more later, but is that a manifestation of risk theory or is that a corrective disclosure theory?

A.    When you say manifestation of risk, I think they use the term and I use the term materialization of the risk.  That's what I assume you mean.  From an economic point of view, I don't draw a distinction between those two.

Again, what you are really asking is can you causally tie a price decline to the revelation of relevant information and does that provide you some information about the degree to which the stock price may have been inflated earlier.  It doesn't need to be dollar for dollar, but the general approach of using changes in the artificial inflation per share to compute damages and that that calculation would be the same across the entire class and formulate across the entire class once you establish what that inflation is, is the opinion on giving.  There is a common methodology that would allow you to calculate

Page 108

Coffman

damages.

Q.    If you can't causally tie a price decline to the revelation of relevant information, then the out-of-pocket damages methodology would be inapplicable, right?

A.    No, it would be completely applicable.  The answer might just be zero. Right, I mean if the amount of inflation, let's say you have three correct disclosures, alleged corrective disclosures and, you know, each one of them there was a dollar abnormal stock price and so there were losses of $3 being alleged, if you can't tie -- causally tie those drops to the misrepresentations or omissions in a case for two of the three, then the damages at most would be related to one of those three drops. Or if the finder of fact determined all three, there is no causation, then the artificial inflation implied by that is zero and damages would be zero.

So it's not an indictment of the out-of-pocket methodology or whether you can do it classwide that is just an indictment of plaintiffs' theory or the evidence they have,

Page 109

Coffman

but it doesn't change that the out-of-pocket methodology can be applied classwide.  It still gives the right answer.

Q.    Staying on your understanding of plaintiffs' theory of liability, what do due diligence deficiencies were alleged by plaintiffs in this action?

A.    I don't know that I can recall off the top of my head all of the aspects that they allege.  I mean I read the Complaint a long time ago.  I mean my general understanding and again this is based on my reading and is that there was very little due diligence done when what was told to the market is that they had done substantial due diligence on these issues of eventual liabilities, but to reach the opinions I reached at this point in the case, I didn't have to dive into the sort of nitty gritty details of exactly what they alleged did or didn't happen as part of due diligence.  My general understanding is they are alleging there is not much due diligence done at all.

Q.    Are you familiar with the term inflation maintenance?

Page 110

Coffman

A.    Yes, as I think I understand that term, yes.

Q.    How do you understand that term?

A.    Meaning that in a case such as this where there is an allegation of a failure to disclose something or a sort of misrepresentation that doesn't surprise the market and cause a price increase, but rather prevents the stock price or security price from falling to the level it should have because the information the market should have gotten didn't arrive.

So, in other words, it's my understanding of the concept you're describing is one in which a company doesn't fully disclose something and, therefore, the price doesn't decline as it should, but rather introduces inflation by maintaining the current stock price.

Q.    Are plaintiffs in this case asserting a liability theory based on inflation maintenance?

A.    That may be a component of it.  I don't -- I have not explicitly studied whether

Coffman

there is evidence that the stock price actually went up on any of plaintiffs' alleged reassurances that were false and misleading. I'm -- I mean inflation maintenance certainly could be a part of what they are alleging, yes, that is my general understanding, but again, I don't think whether -- my opinion doesn't turn on whether that is the case or not.

Q.    Do you know whether plaintiffs have also asserted that alleged misstatements in this case caused the price of Bayer ADRs to increase?

MS. GILDEN:  Objection.  Asked and answered.

A.    As I sit here right now, I don't specifically recall whether at any point during the Complaint they suggested the price went up as a result of any of the misstatements.  That is not something I specifically analyzed and wasn't particularly relevant to any of the analyses or conclusions I have drawn.

Q.    So, in opining on the common application of an out-of-pocket damage methodology to plaintiffs' theory of liability,

Page 112

Coffman

you did not take into account whether plaintiffs have alleged that misstatements in this case caused Bayer's ADR price to increase; is that right?

MS. GILDEN:  Objection.
Mischaracterizes testimony.

A.    Whether the out-of-pocket method is applicable and applicable classwide, regardless of whether there is strictly inflation maintenance where the price never went up on any of the alleged misstatements or if on some of the alleged misstatements the price did go up as a result of the misrepresentation, alleged misrepresentations, either way the out-of-pocket methodology can be applied classwide under either circumstance.  So I didn't need to come to a conclusion about that topic to offer the opinion I'm giving.

Q.    But my question was, did you assess that topic?  Did you assess whether plaintiffs have alleged not just an inflation maintenance theory of liability, but also a front end inflation theory of liability?

MS. GILDEN:  Objection.  Asked and

Page 113

Coffman

answered.

A.    Well, from an economic point of view, I don't see those as really different theories of liability in the sense that they are alleging the price, had there been full disclosure, would have been lower than the price that existed, whether part of that is the removal of price increases that were caused or whether that is simply the removal of or simply price maintenance.

There was no need to distinguish between those or, in other words, the -- as I stated before, the out-of-pocket methodology can be applied equally in either way.  So there wasn't a need for me and I did not assess whether this is purely a price maintenance case or some combination of price maintenance and price increases resulting from any alleged misrepresentations and when I say -- when I use the term a price maintenance case, that's not to say in any way it's different from an economic point of view and from the applicability of the out-of-pocket methodology that is different than any other case where the

Page 114

Coffman

allegation is that there was an inflated price.

Q.    So, in your view, is the out-of-pocket damage methodology appropriate in all cases asserting 10b-5 claims?

A.    If plaintiffs' theory is the damages stem from an inflated price and that the dissipation of that inflation was caused by revelation of the relevant truth and the allegations are economically coherent, in other words, it makes economic sense that the type of information that was withheld would inflate the price and that the inflation would be dissipated by the types of events that they are alleging, then yes.

Now I have been involved in cases where or have been asked about cases where I concluded that wasn't the case or I have been involved in cases where it's a rare case, but where plaintiffs are seeking to recover something much more than out-of-pocket damages. So it's not that the out-of-pocket damages couldn't apply there, but there is an allegation that there was some other appropriate way to calculate damages.  So I

Page 115

Coffman

think that answers your question.

Q.    It does.  In how many cases have you calculated damages?  Actually, strike that.

In how many securities cases have you calculated damages?

MS. GILDEN:  Objection.  Vague as to time frame.

Q.    Ever?

A.    If you're talking about cases in which I have been asked to actually opine on per share damages and offer a report, on the order of probably a dozen or a couple dozen. Somewhere in that range.  I could go through my CV and try to identify how many there are.

If you're talking about calculations done over my career on all the cases in which I was asked to perform damages calculations under a variety of assumptions, to assist counsel in trying to evaluate the value of their case under a variety of different assumptions, it's probably in the hundreds.

Q.    Sticking on the cases in which you have opined on per share damages and offered a report, in how many of those cases has a court

Coffman

accepted your calculation of damages?

A.    When you say accepted my calculation

of damages, you mean rendered a judgment

essentially?

Q.    Yes.

A.    I don't think any of the cases that

I have given opinions on damages on ever

reached trial.  So I don't think there was ever

an opportunity for that to happen.  Can I hear

that question again?

Q.    Sure.  Can we read it back, please?

(Whereupon the record was read back

by the reporter.)

A.    In a number of those cases after the

cases settled, my damages calculations were

used as the basis for how to allocate the

settlement and to provide relief to class

members and in a number of those cases the

courts found the approach that was taken to

that fair and reasonable, a fair and reasonable

distribution of the settlement money using my

damages analyses as the basis.

So I think that's different than

what you are asking in terms of accepting

Page 117

Coffman

damages and providing a judgment, but certainly there have been times courts have reviewed my damages approaches and analyses and determined that they were fair and reasonable approaches for ultimately distributing money received at settlements.

Q.    In those settlement proceedings that you are referring to, were your damages calculations disputed in any of those proceedings?

A.    I can recall a couple of times that there were objectors to the settlement that required me to file a declaration describing and justifying the decisions that were made about how to calculate damages.  I'm having a hard time remembering the details of which cases those were, what all the circumstances were, but there have certainly been times that the plan of allocation is what that is referred to was challenged on some dimension that I had to respond to.

Q.    I'm going to shift topics just a little.  Earlier we were talking about the need to assess whether plaintiffs' theory of

Page 118

Coffman

liability is economically coherent, right?

A.    Yes.

Q.    In connection with that, it's important to examine the logical connection between alleged misrepresentations and alleged corrective disclosures.

MS. GILDEN:    Objection.    Form of the question.

A.    I took it upon my -- I take it upon myself to examine whether there is a logical connection between the alleged corrective disclosures and the alleged misrepresentations. Whether some finder of fact determines whether that is necessary or not.  I take it upon myself to have that as part of my criteria for being willing to offer the opinion I'm offering here.

Q.    So if you found there wasn't a logical connection, then you would not be able to offer the opinion as to whether plaintiffs' theory of liability is susceptible to a common damages methodology, right?

A.    If there was no logical connection between the alleged corrective disclosures and

Page 119

Coffman

what plaintiffs were alleging was misrepresented, then I would not offer the opinion I'm offering.

Just to be clear, that doesn't mean I analyzed loss causation and affirmatively said these events did reveal some fraud. I'm just saying there is a logically, economically coherent story by which that could be the case.

Q. In developing -- strike that.

In assuring yourself that there was a logical connection between the alleged misrepresentations and the alleged corrective disclosures, did you examine the Complaint?

A. I reviewed the Complaint, yes, and I saw the general nature of what plaintiffs were alleging and how it was related to misalleged misstatements or omissions about the due diligence performed and the riskiness of the Roundup liabilities and I saw that they were alleging disclosures specifically related to liabilities being found for Roundup and potential settlement issues surrounding the settlement of those claims.

So clearly the alleged corrective

Page 120

Coffman

disclosures were logically connected to the market learning more about potential Roundup liabilities and the plaintiffs are alleging that there wasn't sufficient disclosure about the riskiness of those Roundup liabilities. So that is the logical connection in my mind.

Q.    Got it.  I'm going to walk through a few of the disclosures with you.  I'm not going to do all of them because we would go day-to-day for a week, but I'm going to talk through a couple of them.

Can we mark -- I think we are at Exhibit 2 somehow, which is Tab 6 internally.

A.    Hold on.  I got automatically locked out of Exhibit Share, so it is going to take me a second to get back in.

MS. GILDEN:  I'm also going to need some time to try to get back into the --

MR. YAVITZ:  We can take a break here.  I've been going about an hour.  We can take a break, get all our computers and have a quick lunch and then come back. Is that acceptable to everyone?

MS. GILDEN:  Sure, that's fine.

Page 121

Coffman

What do you have in mind, Noah, in terms of the amount of time?  Actually, why don't we go off the record so we can discuss what would be appropriate.

MR. YAVITZ:  Let's go off the record.

THE VIDEOGRAPHER:  The time is 12:13 p.m.  This is the end of media two and we are going off the record.

(Brief recess taken.)

THE VIDEOGRAPHER:  The time is 12:29 p.m.  This is the beginning of media three and we are on the record.

BY MR. YAVITZ:

Q.    Welcome back again, Mr. Coffman. Same question as before.  Did you discuss the substance of your testimony with counsel during the break?

A.    No.

Q.    So I have marked several exhibits while we slumbered.  The first of them is Exhibit 2.  Could you open that up now?

(Whereupon document was marked Exhibit 2 for identification as of this

Page 122

Coffman

date.)

A.    Sure.

Q.    So this, unless I got the numbering wrong, should be a document that reflects the transcript of a May 23, 2016 call involving representatives of Bayer.  Is that what you have?

A.    That seems to be what this is, yes.

Q.    So I would like to skip ahead to page 7 of this document of Exhibit 2 and I'm referring to the internal pagination so the numbers at the bottom of the page rather than the PDF numbers.

A.    Okay.

Q.    Are you there?

A.    Yes.

Q.    So I'm going to direct -- you can look at any part of this document you so choose, but I'm going to direct your attention to the response in the middle of the page from Johannes Dietsch.  It starts "Thank you, Liam." Do you see that?

A.    Yes.

Q.    Then if you continue on a few

Coffman

sentences, there is a sentence that starts, "The preliminary analysis," and it reads, "The preliminary analysis, which we expect to verify through the due diligence shows that the combination would generate substantial sales and cost synergies."  Do you see that?

A.    I do.

Q.    Would you characterize liabilities arising from Monsanto's Roundup litigation as a sales synergy?

MS. GILDEN:  Objection.  Form of the question.  Outside scope of report.  Also outside expertise of expert.

MR. YAVITZ:  If counsel is done with her testimony, I think we are ready to go with you, Mr. Coffman.

MS. GILDEN:  My objection is noted, Noah.

A.    I have not analyzed this statement in the full context of the document.  I am struggling to see how there could be a logical connection between sales synergies and the Roundup litigation, but that doesn't mean there could be somehow, but that wouldn't be the

Page 124

Coffman

first thing I would think of when I saw this statement.

Q.    Do you also struggle to see a logical connection between cost synergies and the Roundup litigation?

MS. GILDEN:  Objection.  Form of the question.  Outside scope of report.

A.    Not necessarily.  For some reason there could be legal synergies by combining the company and dealing with the litigation, both we are dealing with.  I certainly could not rule that out and there is a potential I see, at least a potential for a logical connection there.

Q.    When you talk about cost synergies in that context, are you referring to the cost of defending the litigation?

A.    That could be one.  There could be others.  I don't know.  Others, I don't know.  There could be insurance.  There could be a host of ways to think about how there could be cost synergies there.

Q.    Would you -- do you find a logical connection between diligence on cost synergies

Coffman

and diligence on the magnitude of potential liability posed by the portfolio of Roundup litigation at Monsanto?

MS. GILDEN:  Objection.  Form of the question.

A.    To the extent the ultimate total liability includes the cost of defending and things like that or insurance or settlements, I can't opine that there is no connection there. The sales I don't see how there can be a connection or it's not obvious to me.  The cost synergies, there are reasonable ways to think that cost synergies may have some relationship to, may -- I don't know if they do or not, but may have some logical connection to defending these cases.

Q.    But the things that come to your mind right now in terms of that potential logical connection are costs of defense, insurance, anything else?

A.    I don't know.  Again, this is the first time I really focused on this question. It's not the topic of my report.  It has nothing to do with market efficiency or whether

Coffman

there is a common methodology, but those are the things that come to mind as ways you could have cost synergies.  There could be others. I'm not excluding any possibility.

Q.    Understood, but you testified earlier that if there was no logical connection between the misrepresentations and the corrective disclosures, then you wouldn't be able to offer an opinion on the existence of common methodology or damages, right?

A.    Well, a logical connection to their overall theory, yes.  I wasn't analyzing every single statement that was alleged.  I'm not sure this statement was even as part of the alleged.  I just don't have a direct recollection of it, but I'm talking about their overall theory in taking their allegations as a whole.

Q.    Well, if a given misrepresentation had no logical connection to the corrective disclosures, would it be appropriate to apply an out-of-pocket damages theory to assess the damages resulting from that statement?

MS. GILDEN:  Objection.

Page 127

Coffman

Argumentative.  Outside scope of report. Mischaracterizing testimony.

A.    Again, I think taking your question to its logical conclusion, if this were the only misstatement and there was no liability associated with because it had no logical connection somehow to the issue, then the out-of-pocket methodology would not assign any artificial inflation to this.

The plaintiffs -- I understand plaintiffs' theory to be about broad statements regarding -- not about broad statements -- about specific statements about the company having performed due diligence related to the Monsanto liabilities and that those statements were false and misleading for a number of reasons.

Whether this particular statement you're pointing me to is even one of the alleged misrepresentations, I don't know or don't recall.  And certainly there are other statements plaintiffs allege that are much more directly on point to the due diligence they performed with respect to the Roundup

Page 128

                         Coffman

litigation.

        Q.    Well, let's look at some more.
Further down the same page, if you look at the
third paragraph within Mr. Dietsch's somewhat
lengthy answer, there is a paragraph starting
"As you know, Bayer is always committed."  Do
you see that paragraph?

        A.    Yes.

        Q.    And then if you go four lines down,
there is a sentence that reads, "We are very
confident we will maintain the strong
integration track record, which we have built
in the past."  Do you see that?

        A.    Yes.

        Q.    Do you have an understanding of the
word integration as used in the context of a
corporate merger?

                MS. GILDEN:  Objection.  Form of the
        question.  This is -- I will note for the
        record this is a 19 page document that is
        being shown to the witness for the first
        time.  This is outside the scope of the
        report.  That's an additional objection.

        A.    Yes, give me just a second to read

Coffman

this with a little bit of context.

Q.    Totally.

A.    (Witness reading document).

I mean I have a general understanding of what business integration in the context of a merger means.  It's certainly not something I have analyzed in the context of this particular case or what all the things that could be referring to in this particular case, but I have a general understanding as to an economist and somebody who analyzes public disclosures that's been involved in a number of merger and acquisitions -- cases that have involved mergers and acquisitions, evaluations of mergers and acquisitions.  I have a general understanding of what that typically means in these types of contexts.

Q.    What is your understanding of that word?

A.    That it's talking about how you -- how well you integrate the companies together to achieve the goals that you set out in terms of potential synergies, both on the revenue side as well as the cost side and also it can

Coffman

refer to integration of cultures and processes so that in support of those synergy goals and other goals of having a smooth combination of the firms.

Q.    Is there a logical connection between Bayer's integration process in connection with the merger and the magnitude of potential liability arising out of glyphosate claims against Monsanto?

MS. GILDEN:  Objection.  Outside the scope of the report.

A.    If you're talking about integration from an infrastructure standpoint, I don't necessarily see a logical connection.  If you're talking about integration from the ability to meet financial goals given all the risks the companies are facing, I could see how it relates that way.  So I don't think it's necessarily -- there is necessarily no connection.

Q.    Well, you read this paragraph, right?

MS. GILDEN:  Objection.  Argumentative.  This is a 19 page document

Coffman

as we've noted.

A.    I have read that paragraph, yes.  I believe your question was what integration meant to me generally.

Q.    Yes.  Well, I'm asking whether you have a view on what integration means in this paragraph now?

MS. GILDEN:  You're asking him to opine on what Mr. Dietsch meant when he used the phrase integration in this paragraph?

MR. YAVITZ:  I'm asking him to opine based on his expertise in interpreting how markets read disclosures, how the market would understand this disclosure and its use of the word integration.

MS. GILDEN:  Objection.

A.    I don't think --

MS. GILDEN:  Excuse me.  Objection.  Outside scope of report.  You may answer if you can.

A.    I think I would just refer to my prior answer.  I don't think I would change anything I answered already.

Page 132

Coffman

Q.    In this paragraph does Mr. Dietsch discuss overall financial goals?

MS. GILDEN:  Objection.  The document speaks for itself.

A.    I think the last sentence of the paragraph says, "As well as superior execution enable us to deliver on our promises."  My reading of this would be that those promises include the financial goals that they've set out.

I think the next paragraph that is still talking about execution capability says, "We deliver on synergies we identify and the result is strong value creation for our shareholders."  So I think anything attendant to value creation is what they are talking about here.  I don't think it's limited necessarily to the specific things that are discussed in the last three sentences of the prior paragraph.  So again, that's just my -- that is how I, as an economist, read it.

Q.    Let's now go to page 14 of the same document.  And I'm going to direct you to the second statement from Werner Baumann.  Do you

                            Coffman

see it?  It's about two-thirds down the page?

            MS. GILDEN:  I'm sorry, counsel, can

    you wait one minute?  I seem to have -- I

    think I skipped documents.  You're on page

    14, the September 14?

            MR. YAVITZ:  I'm on page 14 of

    Exhibit 2.

            MS. GILDEN:  I think I have

    accidentally skipped.

    Q.    As she gets there, Mr. Coffman, I'm

going to be focusing your attention on the last

sentence, the last two sentences of that

paragraph, starting "At the same time, looking

at."  Can you just take a second and read those

two sentences and let me know when you're done?

            MS. GILDEN:  Okay, I'm on page 14

    now of Exhibit 2 and, Noah, where are you

    directing Mr. Coffman to just so I'm at

    the same place?

            MR. YAVITZ:  Sure.  I'm directing

    him to the last two sentences of the

    statement by Werner Baumann on that page

    starting with "At the same time, looking

    at political."

Case 3:20-cv-04737-RS   Document 178-3   Filed 06/01/23   Page 135 of 328

Coffman

MS. GILDEN:  Okay, I'm there.

A.    I just want to refer back to the original question that he's answered.  Give me a second.

Q.    I think you have to go back to the prior page.

A.    Yes, I see that.  (Witness reading document).  Okay.

Q.    Ready?

A.    Yep.

Q.    Great.  So, looking first at the question asked, which is a fair place to start, the question is, "I believe there is a renewal of the glyphosate license in Europe, a decision to be made, just wondering whether there is a material risk of that deal," right?

A.    That's part of the question, yes.

Q.    And then is it fair to characterize Mr. Baumann's response as discussing risk associated with renewal of the glyphosate license in Europe?

MS. GILDEN:  Objection.  Outside the scope of the report.

A.    He does seem to make reference to

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 135

Coffman

that renewal in his answer.

Q.    Is he talking about anything else in his answer that you can perceive?

MS. GILDEN:  Objection.  Form of the question.

A.    Well, I mean he is talking about details with respect to the synergies and where they are coming from and the timing of them.

Q.    Directing you specifically though to the two sentences starting with "Looking at political and regulatory environment" and with that also coming to the topic of glyphosate, in those two sentences he is talking about renewal of the glyphosate license in Europe, right?

MS. GILDEN:  Objection.  Form of the question.  Disregards context.

A.    Well, I mean the first part of the sentence is talking about political and regulatory environment and then it seems to be a conjunction "and the pending rule of the glyphosate authorization in Europe," so he seems to be referring to something -- I mean he is certainly talking about the renewal of glyphosate in there, but I think also seems to

Coffman

be referring to things outside of that.

Q.    About political regulatory issues connected to glyphosate, right?

A.    That seems to be -- I mean those are the words that are used, is political and regulatory environment.

Q.    To your understanding, in preparing your opinion on damages, have plaintiffs alleged that they misled the market about the likelihood that European regulators would renew authorization for the use of glyphosate?

MS. GILDEN:  Objection.  Outside the scope of the report.

A.    As I sit here, I don't specifically recall whether that was alleged or not.

Q.    Do you perceive a logical connection between this statement here and your understanding of plaintiffs' theory of liability?

MS. GILDEN:  Objection.

A.    Well, again, my understanding of plaintiffs' theory of liability is that this represented the degree of due diligence that was done with respect to the Roundup

Coffman

litigation.  While I don't see explicit reference to glyphosate litigation here, whether that is what was in the mind or not of Mr. Baumann at the time, I am just not prepared to offer an opinion on.

Q.    Well, you testified earlier that in assessing whether an out-of-pocket damages methodology is appropriate, you independently as an economist need to assess whether there is a logical connection between the alleged misstatements and the corrective disclosures, right?

MS. GILDEN:  Objection.
Mischaracterizes testimony.  Asked and
answered.

A.    I assess that within the context of assuming that the gravamen of plaintiffs' theory of liability is that Monsanto, I'm sorry, defendants misrepresented the due diligence they had done of the Monsanto liabilities related to Roundup litigation.

I did not undertake nor was it necessary to give the opinions I'm giving to dissect each alleged misstatement and assess

Page 138

Coffman

whether it accurately or appropriately is included as part of what was concealing the lack of due diligence that they allege.

So there are certainly alleged misstatements, alleged in the Complaint that directly talk about due diligence of the Roundup, potential Roundup liabilities.  I recall reading those.

I didn't evaluate whether every single misstatement is properly included as concealing what they are alleging is the relevant truth that was conceived.

Q.    But you've opined, have you not, that there exists a common methodology for assessing damages arising out of every single statement, right?

MS. GILDEN:  Objection.
Mischaracterizes testimony.

A.    Well, I don't think I have used the words every single statement.  I think I used the words that there was an economic coherence of their allegations and I described what my understanding of the central tenet of their allegations was and that there were statements

Page 139

Coffman

with respect to -- that they are alleging there were statements that concealed and misled the marketing and concealed the amount of due diligence that was done.

I did not undertake to assess whether each and every statement that was alleged is properly included as an alleged misstatement. I'm basing my opinion off what my overall understanding of their theory of liability is.

Q. Okay. Let's look at another statement.

A. And just to round off my answer, sorry, even if what is sort of implied by your questioning here is that this statement doesn't have a logical connection to potential Roundup liabilities, even if that is true and I'm not saying it is, but even if it were true, it does nothing, absolutely nothing to change whether or not the out-of-pocket methodology is appropriate and can be performed classwide on whatever statements are appropriately considered in the case.

Q. I guess I'm a little confused

Coffman

because my understanding of your testimony earlier was that you couldn't offer an opinion about the classwide application of the out-of-pocket methodology unless you could identify a logical connection between the misrepresentations made and the corrective disclosures that revealed the misrepresentations.  Was my understanding wrong?

A.    And I think I described for you that there are allegations that there were specific statements about the amount and quality of due diligence that was done that plaintiffs are alleging were false and misleading and I think there are clear examples of those statements in their Complaint whether every single statement that is alleged in the Complaint is properly pled is a different question.  And you're pointing me here to one that there is some question being raised about whether this relates to plaintiffs' claims or not properly and I'm saying that whatever the conclusion is on that, does not make my opinion about the out-of-pocket methodology rise or fall.  It's

Page 141

Coffman

just which statements are appropriately included and considered when doing the damages analysis.

Q.    Well, I want to present you with a hypothetical.  Suppose this is the only statement that plaintiffs alleged.  It's a very short Complaint.  Suppose this is the statement that they say was the misrepresentation.

Under that assumption, would you be able to offer the opinion that you have offered in your report concerning the classwide application of damages?

MS. GILDEN:  Objection.  Improper hypothetical.  No foundation.

A.    The short answer is I would have to think long and hard about that.  I don't know is the answer.  I would have to -- that is certainly not the question I was confronted with in preparing my report, so I would certainly need to read this entire statement in much more context and give it real thought and understand if this were the only statement at issue how plaintiffs would characterize this as relating to the Roundup litigations and whether

Coffman

or not those -- that presented a logical connection.

There is -- it's just so far removed from the actual facts here that I don't think I can give an answer to that.

Q.    But sitting here today, having read what you've read, you're not able to offer an opinion as to whether this statement, whether the damages associated with this statement could be analyzed on a classwide basis?

MS. GILDEN:  Objection.  Improper hypothetical.  Out of scope of report. And mischaracterizes the nature of what Mr. Coffman is here to opine on and what plaintiffs' allegations are as alleged in the Complaint.

Q.    You may answer.

A.    I have not done enough work or analysis to be able to testify to you right now that if this were the only statement in the case that I would feel comfortable saying that this was logically connected to the Roundup due diligence.  This is not the only statement in the case.

Page 143

Coffman

I am not basing my opinion on this and it still doesn't change whether or not the out-of-pocket methodology can be used or can be done classwide, but if there is no logical connection, then it's hard to see how there could ever be inflation, but I'm just not at this time prepared to offer an opinion that if this were the only statement in the case, that there would be an obvious logical connection. I think there are obvious logical connections to other statements that I'm aware of.

Q. Got it. We may get to some of those. I'm not going to get to every one in the case as I said. We will do a few more.

Staying in the same document, I'm going to go to page 16 now, the top of the page. This is still Exhibit 2. This is a statement by Liam Condon.

A. Let me say one other thing to be clear about my answer. You asked me to look at those statements in isolation and based on where they occur in this document what conclusions you could or couldn't draw about what they do and don't relate to. I'm doing

Page 144

Coffman

the best I can to answer those questions in isolation.

I understand plaintiffs also might be alleging that in the entire context of this discussion given the totality of what they said that there was other things they should have said.  My answer didn't even attempt to analyze that.  I'm just looking at the isolated statements you pointed me to.

Q.    Understood.  Let's look at another isolated statement.

MS. GILDEN:  Actually, I'm going to object.  If you're going to go through and pull out individual statements and improperly ask the witness to opine on them when it's outside the scope of the report, I think this is highly improper.

MR. YAVITZ:  Your objection is noted.

MS. GILDEN:  And I think if we are going to go through the entire thing, Mr. Coffman, I think you're going to have to read the entire -- all 17 pages in order to answer questions that don't even

Page 145

Coffman

go to what you are here to testify as an expert on, but since these are being pulled out of context, I think you're going to have to read the whole 17 pages.

MR. YAVITZ:  I'm sorry, Carol, are you instructing the witness on how to approach his responses to my questions?

MS. GILDEN:  I'm instructing the witness not to answer questions out of context.  If you're putting a 17 page document in front of the witness, I think he has the right to go through the whole document.

MR. YAVITZ:  So you're instructing the witness not to answer my question on the basis of your objection?

MS. GILDEN:  No, that's not what I said.  You heard my objection and you heard my position.  So it's -- if Mr. Coffman feels he needs to examine all 17 pages, he may want to do that.  It's up to him.

MR. YAVITZ:  Maybe that could be a lunch break activity.

Page 146

Coffman

Q.    In the interim there is one other --
two other points I want to point you to in this
document and recognizing that you're looking at
them in isolation, I'm directing you to them.
I'll ask the questions and if you decide you
cannot answer them without reviewing the
entirety of the document as you seem to have
been coached by your counsel, we can take it
from there.

I was pointing to you to page 16.
I'm looking at the third line down, a sentence
that starts with "So we don't foresee any major
issues with regulatory authorities, but we will
be going through a diligent process."  Do you
see that?

A.    I see that sentence.

Q.    That is a statement about regulatory
approval in the transaction, right?

A.    Let me go back and read the context
of the question.

Q.    Of course.  Thank you.

A.    (Witness reading document).

Q.    You got to go back a bit.  I think
it starts at 14.

Page 147

Coffman

A.    Okay, I read that question and answer.  I have not gone back and read the entire document at this point, but I read that question and answer.

Q.    I appreciate that.  This is a statement about regulatory approval for the merger, right?

A.    I don't know what he had in his mind when he was talking about regulatory authorities, for what all the issues might be with respect to regulatory authorities -- give me just a second.  And that the question is about regulatory hurdles generally and then the answer is about regulatory concerns generally, so I don't want to speculate about what he did or didn't have in his mind or what that means or what all the different things that could encompass.

Q.    Do you perceive a logical connection between this statement here and due diligence on Monsanto's legacy portfolio of glyphosate liability?

MS. GILDEN:  Objection.  Outside scope of report.

Page 148

Coffman

A.    I can't rule that out.

Q.    What logical connection do you perceive?

A.    Well, you are talking about a product that allegedly, according to this litigation, causes cancer and what regulatory issues that might cause with any regulatory agency around the world and what he had in his mind when he was talking about that.  I just don't know.  I don't want to speculate about it, but I can't sit here and testify to you that that didn't include regulatory issues surrounding the liabilities they faced on Roundup.

Q.    To your understanding have plaintiffs alleged that they have misled the market about the likelihood that regulators would approve the transaction?

MS. GILDEN:  Objection.

A.    I don't recall a specific allegation along those lines, but again, it's a long Complaint.  I don't have it committed to memory, but as I sit here, I don't recall an allegation of that sort.

Page 149

Coffman

Q.    In any event, if plaintiffs, if -- strike that.

In any event, if defendants had misled the market about the likelihood of the transaction being consummated, that would be a moot point because the transaction was actually consummated, right?

MS. GILDEN:  Objection.  Improper hypothetical.

A.    That sounds like you're asking me for a legal conclusion about what is moot or not in that context and I'm not prepared to answer that.

Q.    Well, any misinformation that existed in the market concerning the likelihood that the transaction would be consummated would dissipate at the point where the transaction was actually consummated as an economic matter, right?

MS. GILDEN:  Objection.  Calls for a legal conclusion.  Improper hypothetical.

A.    I'm taking as your hypothetical that there is some misstatement about the likelihood of the deal being able to be consummated from

Coffman

some legal perspective.  I think the very fact

that there was a merger consummated does not

necessarily suggest there was harm from -- does

not necessarily rule out that there was harm

from a misstatement depending on if the nature

of the deal ended up being different than what

was originally contemplated.

          So the very fact of a transaction

certainly doesn't make that moot.

     Q.    Okay.  Fair enough.  But in any

event, you have -- your understanding of

plaintiffs' theory of liability does not

encompass misrepresentations concerning the

likelihood of the transaction with Monsanto

being consummated, does it?

     A.    Can I have that read back, please.

     Q.    I can read it.  But in any event

your understanding of plaintiffs' theory of

liability in this case does not encompass

misrepresentations concerning the likelihood of

the merger transaction with Monsanto being

consummated, does it?

     A.    I don't have a specific recollection

of that being part of their allegations.

Page 151

Coffman

Q.    Okay.  So now I want to look at a short document which will warm the cockling of Carol's heart.  This is Tab 7.  It's Exhibit 3 -- I'm sorry, my Tab 7.  I'm marking Exhibit 3.  This should be, unless we messed it up, a September 14 press release issued by Bayer.  Is that what you are seeing?

A.    Yes.

(Whereupon document was marked Exhibit 3 for identification as of this date.)

Q.    I want to direct you to the second page and in particular the third line from the top.  So that is a sentence that starts "Bayer has confirmed sales and cost synergy assumptions in due diligence."  Do you see that?  Is how the sentence starts?  Do you see that?

A.    I see that.

Q.    Again, do sales synergies extend to legacy toward liability like the glyphosate litigation?

MS. GILDEN:  Objection.

A.    Well, look, the legal liability from

Page 152

Coffman

selling a product is so high that it might not make sense to sell it anymore to reduce sales or to only use it in some context like that. There certainly are ways that I could conceive that sales synergies could ultimately be impacted by the outcomes of the litigation related to glyphosate.  So I don't think I can suggest there is no potential link there.

I mean that -- to the extent that their ability to sell glyphosate is part of their estimates of synergies, that would, in my view, have to take into account whether -- whether making those sales is even appropriate given the potential liability.  So I don't think I can sit here and tell you those are completely unrelated.

Q.   What is your understanding of the word synergy as you are using it in that response?

MS. GILDEN:  Objection.

A.   That by combining the companies, you can increase the sales relative to keeping the companies separate.

Q.   And synergies, in particular, would

Page 153

Coffman

focus on the complementarities between the businesses, right?

A.    Yes, to a degree.  I think those complementarities would also depend on the ability to keep selling products though.  So again, I don't think that has nothing to do with -- potentially nothing to do with the risks that Monsanto was facing.

Q.    So if the result of the litigation over glyphosate was that Monsanto and Bayer could no longer sell any glyphosate containing products, then that would be the logical connection to this statement; is that what you are saying?

A.    Or that it is --

MS. GILDEN:  Objection.

A.    Go ahead, Carol.

MS. GILDEN:  Go ahead.

A.    Or that it severely limited their ability to sell it or only be able to sell it in certain contexts, so I'm not saying they couldn't sell it at all or that if the gross plan for glyphosate had to be adjusted such that it couldn't be used in a number of

Coffman

follow-on applications.  There is a lot of ways that a product's legal risk could affect how well it could be sold and the degree to which it could be sold through the combined companies' sales organizations.  So I just can't tell you that there is no linkage there.

Q.    I'll repeat a question from earlier. If this were the only statement in the case, would you be able to opine that there is sufficient logical connection between this statement and the alleged corrective disclosures such that the out-of-pocket damages methodology can be applied on a classwide basis?

MS. GILDEN:  Objection.  Improper hypothetical.  Loss causation.

A.    Well, I think, also I have to take the statement in the context of the entire paragraph.  I mean this entire paragraph is labeled "Value Creation," right?  And it says "Pro forma sales of the combined agricultural business amounted to 23 billion Euros in calendar 2015.  The combined company will be well positioned to participate in the

Page 155

Coffman

agricultural industry with significant long term growth potential.  Beyond the attractive long term value creation potential of the combination, Bayer expects the transaction to provide its shareholders with accretion to core EPS (earnings per share) in the first full year after closing and a double digit percentage accretion in the third full year."

Again, whether the extent to which those statements may or may not be misleading could have some relationship to whether or not Bayer properly assessed the risk of losses from glyphosate litigation in making those statements.  So I just don't -- when you say this statement, you're pointing me to one particular statement about confirmed sales and cost synergies, but it's being made in the context of a much broader statement about how this -- based on their analysis, they believe this business combination is going to create value for Bayer's shareholders.

Q.    Okay.  Skipping down to the third paragraph below the header "Headquarters and Employees," do you see it goes, "Financing and

Page 156

Coffman

Closing Conditions" and then "Headquarters and Employees" and there are three paragraphs after Headquarters and Employees.

I want to look at the third paragraph which says, "Bayer has extensive experience in successfully integrating acquisitions from a business, geographic and cultural perspective and remains committed to its strong culture of innovation, sustainability and social responsibility."

Does that statement, as you sit here today reading it, relate to diligence on legacy tort liability at Monsanto?

MS. GILDEN:  Objection.  Outside scope of report.  Also out of context.

A.    Well, I think this statement is talking about Bayer's experience in having successfully integrated acquisitions and from a business, geographic and cultural perspective and that would obviously include addressing any of the risks in the companies that they were acquiring.

So, again, taking this statement individually, I don't think I can conclude that

Page 157

Coffman

it has nothing to do with statements about their ability to manage risk of companies they are acquiring.

Again, this is so far afield of what my opinion is based on, it's not clear to me the relevance of this question, but it's, you know, the statement itself doesn't explicitly describe, you know, Roundup litigation or the due diligence around Roundup litigation, but it's certainly talking about the company's experience in having successfully integrated prior acquisitions which would include the management of any risks those businesses had.

Q.    In your opinion, can a statement be so generic that it couldn't possibly have a price impact on a stock?

MS. GILDEN:  Objection.  Outside the scope of report.  Calls for a legal conclusion.

A.    If you're asking me if that is possible or plausible, it's certainly plausible, but you're asking me like as a legal matter is something so generic that it can't have price impact, that sounds like you're

Page 158

Coffman

asking me for a legal conclusion, but you know, is it possible that something so generic that it would be difficult to tie it to a particular price impact, that could occur. Whether -- I'm not suggesting it is occurring here in any shape or form, but that is plausible.

Q.   Well earlier I was asking as an economic matter. Earlier when we were talking about your Cammer factor five analysis, there were a number of dates on which we talked about your review of earning dates announcements, your review of news reports of individual dates and you were able to develop conclusions as to whether you viewed an individual statement as material and thus likely to be linked with a significant price, right?

MS. GILDEN:  Objection.

Mischaracterize his testimony.

A.   When you say individual statement, I'm not sure what you are referring to because my approach is to look at the totality of what is revealed in an earnings announcement which includes lots of different things, earnings, management's discussion, conference call, et

Page 159

Coffman

cetera.

There could be lots of things that are disclosed at the time they are announcing earnings.  So I don't think anything I testified to suggested that I was isolating out individual statements out of those documents and concluding anything specific about them.

Q.    Okay, fair enough.  I want to look at one last document then we can take our lunch.  This is going to be Exhibit 4 I believe, which is, if I got it right, a transcript of an earnings call with Bayer representatives that took place on September 14, 2016.

(Whereupon document was marked Exhibit 4 for identification as of this date.)

Q.    Let me know if that is the document that is appearing before your eyes now.

A.    Yes, that's what it appears to be.

Q.    Okay, great.  So I want to look at page 15 of this document.  And in particular, I want to direct your attention to a colloquy between an analyst named Donald David Carson

Page 160

Coffman

and defendant, Werner Baumann, and then subsequent Liam Condon so there is going to be a little bit of reading on this one.

So there is a question from Donald Carson, "The regulators aren't only looking at this deal in isolation" -- so he asks "because we never seen a situation like with this kind of consolidation happening all at once that you're going to receive --" I'll start again. Strike that.

What gives you the confidence in "because we've never seen a situation with this kind of consolidation happening all at once that you're going to receive all the required regulatory approvals and that there won't be more divestitures required than you originally anticipate;" do you see that question?

A.    Yes, give me just a second to get a little more context, but I see the question. Give me just a second.

Q.    Okay?

A.    (Witness reading document).  Okay, I finished reading the question portion from Mr. Carson.

Page 161

Coffman

Q.    Do you understand that to be a question about divestitures mandated by antitrust authorities?

MS. GILDEN:  Objection to the form of the question.

A.    At least my reading as an economist of this back and forth, the topic of it seems to be approval by regulatory, the antitrust authorities.

Q.    I'm going to skip over this response from Hugh Grant, which I'm assuming from context, although I have not verified it, is not the actor although the alternative would be funnier.  He says, "And I mean, from our view, we've gotten extensive, of course, advice from antitrust experts and law firms.  And at the end of the day, we really look at things through a specific market and specific portfolio, and because of the high complementarity from a portfolio and geographic point of view, we see very minor issues, which we think can be taken care of relatively speedily."  Do you see that?

A.    Yes.  Just to be comfortable, I want

Page 162

Coffman

to see what Hugh Grant says in the middle. Give me just a second.

Q.    Go ahead.  He is more straight forward than us bumbling than the more famous namesake so I think we can get through it quickly hopefully.

A.    (Witness reading document).  Okay, I see that now or I read that now.

Q.    Thanks.  Do you perceive any logical connection between these statements that we just read together and due diligence performed by Bayer on legacy Monsanto glyphosate liability?

MS. GILDEN:  Objection.  Outside the scope of report.  Object to the form of the question.

A.    I don't see any explicit reference to it.  Whether one could read something into it in reviewing the entire context of the document, I'm not opining on, but based on my reading of this question and answer, there is certainly no explicit reference or obvious reference to the glyphosate litigation.

Q.    Do you perceive an implicit

Page 163

Coffman

reference to the glyphosate litigation in this colloquy?

MS. GILDEN:  Objection.

A.    I don't know that I know enough to completely rule it out.  Whether given all the consolidation that is happening and all the things the antitrust regulators are looking at, whether one of the things they could be looking at could be litigation issues, I just don't know.

Q.    Revisiting the hypothetical I have come to favor, if this were the only misrepresentation alleged in the Complaint, would you be able to offer an opinion that damages are calculable on a classwide basis in this action?

MS. GILDEN:  Objection.  Improper hypothetical.  Outside scope of report.

A.    My opinion is based on the understanding of the gravamen of plaintiffs' Complaint that I have articulated.  Whether you're asking me a hypothetical of a Complaint that only contained this statement as a potential misstatement about glyphosate

Page 164

Coffman

liability that Monsanto faced and the due diligence related to those, I would need to understand better than just reading these what the logical connection is the plaintiffs would be drawing if this were the only statement.  I can't conclude that it is completely unrelated, as I described in my prior testimony, but the connection isn't obvious here, so I would want -- need to understand more before I would be willing to say there was a coherent economic theory based on just this statement.

Again, I want to disconnect that a little bit from whether the out-of-pocket methodology is still relevant and calculable on a classwide basis because I think it still is. The question is if this were the only statement that were determined, that this isn't related to glyphosate litigation and due diligence related to glyphosate litigation, then the inflation related to this would be zero and you would still get the appropriate answer out of the out-of-pocket methodology.  It would just be zero.  So that is why I'm a little confused. I mean I talked about how part of my process is

Page 165

Coffman

to understand, in giving the opinion I'm giving, is to understand the economic coherence broadly of plaintiffs' allegation.  It wasn't to say can you take out each statement in isolation and build a case based just on that.

So I'm just trying to give you the best answer I can having read this statement and this question and answer in isolation and I think I have done the best I can for that.

Q.   I appreciate that, sir.  I agree you have.  One last question and then we can all take a well deserved lunch.

Would it surprise you to learn that the defendants are not alleged in this case to have made any public statements specifically directed to the Monsanto glyphosate litigation until after the first corrective disclosure?

MS. GILDEN:  Objection.  Form of the question.  It further mischaracterizes the complaint.

A.   Can I have that question read back, please?

Q.   I can read it to you.  Would it surprise you to learn that defendants are not

Page 166

Coffman

alleged to have made any public statements specifically directed to the Monsanto glyphosate litigation until after the first corrective disclosure?

MS. GILDEN:  And the same objections obviously stand.

A.    My understanding is of plaintiffs' position that they made statements directly related to due diligence related to glyphosate litigation earlier than the first corrective disclosure.

Q.    If that understanding is correct, would it impact your opinion on damages in this litigation?

MS. GILDEN:  Objection.  Outside the scope of the report.  He's not rendering an opinion on damages.

A.    Again, I don't think it impacts whether the out-of-pocket methodology can be performed on a classwide basis or is calculable on a classwide basis.  I think what you are trying to do is call into question whether or not there are any actual statements by defendants that relate to the topic area that

Page 167

Coffman

plaintiffs are alleging they do.

I'm not prepared here to give an opinion or to react to a characterization that I understand is at odds with plaintiffs' theory of the case.

MR. YAVITZ: We can go off the record and take lunch and come back in the -- however we decide after the break.

THE VIDEOGRAPHER: The time is 1:34 p.m. This is the end of media number three and we are going off the record.

(Lunch recess taken.)

AFTERNOON SESSION

THE VIDEOGRAPHER: The time is 2:13 p.m. This is the beginning of media number four and we are on the record.

BY MR. YAVITZ:

Q. Hello again, Mr. Coffman. My standard question, did you discuss the substance of your testimony with counsel during the break?

A. No.

Q. I want to talk about the corrective disclosures now. To calculate out-of-pocket

Page 168

Coffman

damages, do you need a reliable methodology for measuring artificial inflation per share?

A.    Well, when you say do you need a reliable, I mean in order for me to offer personally a damages opinion, I feel I need a reliable methodology for quantifying the inflation per share before I would testify to it.

I don't want to say what the ultimate requirements are, but for me to offer an opinion on damages ultimately that quantifies damages, I would want what I would consider a reliable method or a reasonable method to calculate the inflation per share.

Q.    As we discussed a little bit over the course of today, plaintiffs in this case allege that the truth about Bayer's diligence was revealed in several corrective disclosures, right?

A.    Well, they reveal that the relevant truth was revealed by showing that the risks were much higher than the market appreciated. I don't think -- so just to be clear, I don't think there were explicit disclosures regarding

Coffman

the due diligence itself, but there was the verdicts and other events that revealed the much greater risks that the company faced of liability than plaintiffs allege was applied by the prior statements.

Q.    So based on the prior statements, the market had a conception of the litigation risk posed by the glyphosate litigation; is that right?

A.    Well, I mean implicitly the market I'm sure was trying to value what levels of risk there were involved in that and plaintiffs are alleging generally that in considering and engaging in the merger with Monsanto had done due diligence to satisfy themselves that the risk was -- did not change a decision of whether they should proceed with the merger and that those were manageable risks.

Q.    And then the verdicts and other litigation developments happened and that caused the market to reevaluate the risk posed by the glyphosate litigation, right?

MS. GILDEN:  Objection.  Form of the question.  Also outside -- I'm not sure

Page 170

Coffman

exactly what the question is, but I think you're sort of bordering on going outside the scope of what Mr. Coffman has rendered opinions on to date.

A.    I mean my understanding is plaintiffs are alleging that the events you are speaking of, the verdicts and the events related to the proposed settlement and the rejection of the proposed settlement, that those revealed to the market a higher level of risk than the market had previously appreciated, yes.

Q.    I want to direct you to paragraph 84 of your report.  That's Exhibit 1.

A.    Right.  Let me get there just a second.  Okay, I'm there, yes.

Q.    In this paragraph you discuss how "Inflation can be calculated by using an event study to measure the price reaction to a corrective disclosure."  Is that a fair characterization?

MS. GILDEN:  Can you rephrase that question?  I'm going to object to the form, Noah.

Page 171

Coffman

Q.    I'll just ask a different question. What opinion are you offering in paragraph 84 of your report?

A.    Well, it's trying to provide some additional detail as to how typically artificial inflation might be calculated.  You know, every case is different in certain respects as to exactly, you know, what techniques and methodologies might be necessary, but it describes how often in many cases the computation of the artificial inflation starts from an event study model.  It doesn't finish with an event study model, but starts from an event study model that measures the price reactions to disclosures that reveal the relevant truth, so that is conceptually one way and a way that is often used to at least begin the analysis of how to quantify the artificial inflation.

Q.    Do you plan to use event studies to assess inflation in this case?

MS. GILDEN:  Objection.  Outside the scope.

A.    I have not been asked to form an

Page 172

Coffman

opinion in this case or whether I will be asked to form an opinion in this case nor have I agreed to take on the component of this case where I would have to compute artificial inflation.

Q.    Are you proposing any methodology for the computation for artificial inflation?

A.    Well, given my understanding of the logic of plaintiffs' case and the theory of plaintiffs' case, it seems to me that an important input would be the amount by which the stock price declines on any corrective disclosures that are deemed causally, you know, related to the misrepresentations.

There would still need to be a lot more that would need to be considered.  In other words, you wouldn't just take those results, whatever they are and say that's the degree of artificial inflation.  There is a lot more thought that would have to go into it, but it's hard for me to imagine a methodology that doesn't at least look at that and use it as relevant information.

Q.    Well, other than the sort of event

Page 173

Coffman

study analysis described in paragraph 84, have you ever used another approach to quantity filing inflation in a securities litigation?

A.      There certainly has been many cases where I used things in addition to that and one case where the computation of inflation really had to go beyond the event study.

There is one case in particular I recall where a company announced that it been indicted for murder and at the same time moved forward their amazingly great earnings announcement to move forward at the same time and the net result was a -- that the stock price didn't move in a statistically significant way.  That's about as clear and stark and as you can imagine an example of where you can't just look at the results of the event study and conclude nothing happened.

So in that particular case, we had to come up with a valuation of the earnings information and what positive impact that had on the stock price and then infer from that what the impact of the indictment was.  So that's an example where the event study played

Page 174

Coffman

a role, but it wasn't the primary role in determining artificial inflation.

There is other cases where, you know, the amount of artificial inflation that came out was certainly started from a calculation of the abnormal return from an event study, but then either through confounding information or other factors that, you know, it was clearly needed to be addressed, the amount of dissipation of artificial inflation ended up being far less than the full stock price decline.

Also, even if once that number is determined, you have to determine was that amount also present throughout the class period. So, for example, I recall one case where the amount of artificial inflation that came out at the time of the corrective disclosure was pretty much the full amount of the stock price decline, but we had information from discovery that allowed us to calculate how the size of that -- of what could have been disclosed at different points in time would have been different and that the inflation

Page 175

Coffman

changed over time and that's been the case on a number of cases where my loss causation and damages analysis took into account how things had changed over time to affect the inflation as well.  So it still started from the event study, but certainly didn't stop there.

Q.    Sitting here today have you explored whether any of these additional steps beyond event study will need to be undertaken to calculate damages in this case?

A.    I haven't assessed that specifically, no, what additional analyses may or may not be necessary.  That is not something I have evaluated.

Q.    In your report you haven't proposed a methodology for handling the sorts of circumstances that you just described in your answer?

A.    No, and ultimately what might be necessary or what analysis needs to be completely could depend greatly on what assumptions I or any other damages expert would be given about what plaintiffs expect to prove. So through discovery plaintiffs could expect to

Page 176

Coffman

prove a lot or a little.

If they said assume X, that the fraud didn't really start until halfway through the class period, I have come across situations like that or assume that we have, you know, amazing evidence that the company -- this was so bad, the company knew from the beginning exactly what was going to happen and they were surprised how not bad it was. And so that there could have been even more inflation than what came out at the end.

So based on discovery and what assumptions I can be given and other economic analysis of what was impacting the price at the time of the corrective disclosures, all those things could come into play and I have not made an assessment of all the things that might or would need to be considered.

Q. So, staying on paragraph 84, it says, "An event study would also need to consider whether and to what extent any non-fraud related information" dot dot dot "contributed to the observed price movement," right?

Page 177

Coffman

A.    Correct.

Q.    And that's what you term here confounding information, right?

A.    Correct.

Q.    So for purposes of your damages analysis, you have to isolate true facts related to the alleged fraud and then the dissemination of material non-fraud related company specific information, right?

A.    To the extent there is non-fraud related information that is impacting the price that has no causal connection whatsoever to the fraud, yes, that would have to be addressed and excluded from any measurement of inflation that was dissipated.

Q.    That's not an analysis you have undertaken as of yet, right?

A.    That's correct.

Q.    Is it always possible to control for non-fraud related information using an event study model?

A.    Well, I think there is a problem with your question there.  So the event study can tell you the total amount of stock price

Page 178

Coffman

movement over a given period of time.  So, when you say can you disaggregate with the event study, does the event study allow you to disaggregate, many times the disaggregation is outside the event study in the sense that you get the results of the event study and then you have to do some other sort of analysis to parse the underlying impacts.

There can be circumstances where there are timing differences and disclosures where maybe you can use an event study, an intraday event study or some other method to parse out information that is fraud related and non-fraud related based purely on timing.  Then the event study alone could help you, but typically the disaggregation I'm talking about, if it's based on contemporaneous information release, really falls outside the event study methodology.

Q.    I appreciate that clarification. I'll rephrase my question.  Is it always possible to disaggregate non-fraud related information from the stock reaction observed in an event study?

Page 179

Coffman

A.    In my observation experience, there has always been some reasonable progress you can make in doing that.  You know, it's not always exact.  In other words, there certainly have been times where and I'm just going to use hypothetical numbers that aren't tied to any specific facts, but if there is a stock price decline of $10 and say the confounding information using a conservative method, some reasonable conservative method you can say can't be more than $3, you don't even think it's anywhere close to $3.  Let's say you think it's most likely 50 cents, but you don't have a -- you think it's more reasonable to be conservative and say there is reasons to believe it can't possibly be more than $3, then concluding that there is artificial inflation dissipation of $7, that's -- a reasonable approach is that a perfect disaggregation probably not, but that's a reasonable approach. I always found that no matter what there is, some reasonable progress you can make in disaggregating that provides the finder of fact information that assists them in evaluating

Page 180

Coffman

that question.

Q.    The ultimate goal of that disaggregation process is to isolate the portion of the stock reaction that corresponds to the revelation of the fraud, right?

A.    Or the relevant truth that has been concealed.  In other words, it's rare to come across a disclosure where there is an admission of fraud.  Sometimes it happens, but not very often.  More frequently it's an announcement of bad news of some kind that reveals the relevant truth that has been concealed and that is what ties the fraud and that's what I understand is being alleged here.

Q.    So let's start with the first of disclosure.  Is it your understanding that that was a jury verdict issued in August of 2018?

MS. GILDEN:  Objection.  Outside of scope of report.

A.    I recall there being an alleged disclosure that was a -- I think it's referred to as the Johnson case.  I don't recall off the top of my head the specific date, but I recall there being a date plaintiffs are alleging that

Page 181

Coffman

that revealed a portion of the relevant truth that was hidden by the alleged misstatements and omissions.

Q.    Got it.  I'm just going to call it the Johnson verdict.  Will you understand what I mean if I do that?

A.    The initial verdict, sure, yes.

Q.    Is it your understanding that that was a corrective disclosure concerning Bayer's cost synergies from the merger?

MS. GILDEN:  Objection.  Outside the scope of report.

A.    I don't know.  I don't think I have a view one way or the other on whether there is some causal link between that verdict and statements about cost synergies.  That is just not something I have evaluated.

Q.    Based on your understanding of plaintiffs' theory of liability, are you understanding plaintiffs to allege that the Johnson verdict was a corrective disclosure concerning Bayer's cost synergies from the merger?

MS. GILDEN:  Objection.  Outside the

Page 182

Coffman

scope of the report.  Mischaracterizes plaintiffs' allegations.

A.   Well, I understand plaintiffs to be alleging that that event reflected the materialization of a risk that the -- that existed as a result of or the materialization of an undisclosed risk given that there was a gap between the way defendants described the due diligence that occurred with respect to those potential liabilities and what the real truth was underlying what had been performed and so my understanding is that this was a -- this -- a Johnson verdict provided the market with new information about the risks that the company actually faced and the market, therefore, updated its expectations as to the financial impact of those risks and that may have also had a -- a big impact on the market's perception of what synergies would be achievable through the merger, but I don't know whether -- you know, whether -- I mean that's the best way I can describe it.

So I don't -- there could be a logical connection between statements about

Page 183

Coffman

cost synergies and the risks they really faced and whether those cost synergies would be achieved based on the greater risk that was out there, how exactly plaintiffs anticipate connecting those two things or if they plan on connecting those two things, I just don't know. That's not what I understand to be the gravamen of their allegations.

Their allegation is that there was substantial financial risk out there that there had been claimed due diligence about that they had not really done a thorough due diligence of.

Q. I'm trying to understand the connection as you understand it. So in preparing your efficiency analysis, you looked at the different sources of public information from Bayer, right?

MS. GILDEN: Objection.

A. I looked at sources of public information about the company in the context of my market efficiency analysis, yes.

Q. Are you aware that beginning in March of 2017 a Federal Court unsealed the

Page 184

Coffman

internal Monsanto documents that are cited at various points in plaintiffs' Complaint?

A.    That's not something I had focused on, no.

Q.    Have you ever heard of the term Monsanto papers?

A.    I have heard that term used and I think I believe I saw that term used in the Complaint, but I have not studied what all those things are exactly when they were unsealed.  I don't have a recollection of the details of that.

Q.    Are you aware that the Monsanto papers garnered a substantial test reaction?

MS. GILDEN:  Objection.  Outside the scope of report.

A.    As I sit here right now, that was not a topic I was particularly focused on in the completion of my report, so I don't recall knowing whether there was or there wasn't.

Q.    Are you aware, sitting here today, that in March of 2017 a California state court ruled against Monsanto in a case challenging California's decision to require Monsanto to

Page 185

Coffman

warn Roundup consumers of glyphosate's purported carcinogenicity?

MS. GILDEN:  I'm going to again object to the extent this is delving into calculation of damages or loss causation. It's outside the scope of the report.

A.    I don't recall if I -- in preparation of my report, I became aware of that, but as I sit here right now, I don't recall the details of that or when it occurred.

Q.    Then I take it that you're likewise not aware of whether that court development was widely reported in the press, right?

MS. GILDEN:  Objection.

A.    I don't recall focusing on that, no.

Q.    Are you aware that a second tranche of internal Monsanto documents were published online in August of 2017?

MS. GILDEN:  Objection.  Once again I'm going to object to the extent that this is delving outside the scope of the report into damages or loss causation.

A.    I remember at some point seeing some general coverage of Monsanto documents being

Coffman

released in the context of these litigations. I don't remember the details of when that was.

Q.    Are you aware that in February of 2018 a committee of the US House of Representatives held a hearing to examine the safety of glyphosate?

MS. GILDEN:  Once again, I object to the extent that this goes outside the scope of the report and attempts to improperly delve into damages or loss causation.

A.    I don't -- as I sit here today, I don't have a specific recollection of that.

Q.    Sitting here today do you have a specific recollection of the fact that in March of 2018 a Federal Court held a week of hearings to assess the admissibility of the glyphosate plaintiffs' expert evidence?

MS. GILDEN:  Again, I object to the extent this goes outside the scope of the report and it is an improper attempt to delve into damages or loss causation.

A.    I don't have a specific recollection of that.  I mean, just to put it in -- I just

Page 187

Coffman

want to make sure this is put in context.  None of this information was relevant to my methodology for evaluating market efficiency or whether there was a classwide damages methodology.  So it wasn't the focus nor did it need to be the focus of what I was -- to answer the questions I was being given, but no, I don't remember that specific event at that specific time as I sit here.

Q.    Are you aware that the Johnson litigation itself was public?

MS. GILDEN:  Object.  Again to the extent that this goes outside the scope of the report and attempts to delve into the calculation of damages or loss causation.

A.    I recall seeing some coverage of the Johnson trial.  I don't recall exactly what form it took or how detailed it was.  I generally remember there were articles that are talking about how the case was going.  So logically that means somebody saw what was going on in the courtroom.

Q.    Did you know that transcripts and trial exhibits from the Johnson litigation were

Page 188

Coffman

posted online contemporaneously by counsel representing glyphosate plaintiffs?

MS. GILDEN:  Objection.  Outside the scope of the report and is an improper attempt to delve into the calculation of damages and loss causation.

A.    I don't believe I ever became aware of who was posting what during the trial.

Q.    When we talked earlier about the efficiency of the market for Bayer ADRs, you concluded that the market would rapidly incorporate publicly available information into the market price, right?

A.    Yes, I made the caveat about widely available information, but yes, I did.

Q.    So in your opinion, if we assume that the information I just discussed was widely available, the market would have incorporated all that information into Bayer's ADR price, right?

MS. GILDEN:  Objection.  Outside the scope of the report.

A.    To the extent based on actually analyzing that evidence and that it was

Page 189

Coffman

actually widely available, then I would assume it would be -- then I conclude it would be incorporated into the market price. I have not looked into how widely disseminated that information was at the time.

Q. Understood. Nor did you analyze the market reaction to any of the developments that I just described, did you?

A. No, that was not necessary to reach the conclusions or the opinions I'm giving at this time.

Q. So, again, assuming that information about the Johnson trial was widely disseminated and thus incorporated into the market price, what new information did the jury verdict reveal?

MS. GILDEN: Objection. I'm sorry, Noah, were you finished?

MR. YAVITZ: I'm done now, yes.

MS. GILDEN: Objection. Outside scope of the report. It is an improper attempt to delve into damages and loss causation.

A. I don't know that I can characterize

Page 190

Coffman

all the things that may have been new there.
Obviously the jury decision itself was new.  I
don't recall what other aspects of their
decision were or were not present there.
That's not a subject I have really done deep
analysis on.

Q.    Let's move on to the second
corrective disclosure.  Do you recall what the
second corrective disclosure was?

MS. GILDEN:  Objection to the form
of the question.

A.    I'm sorry.  I could obviously answer
this by looking through the Complaint, but my
recollection is that it had something to do
with an appeal to the Johnson case and whether
or not the damages award could stand as it was
or whether the verdict could be -- it had
something to do with the appeal of the original
verdict I believe.

Q.    What is your understanding of the
logical connection between that disclosure and
the misrepresentations alleged by plaintiffs?

MS. GILDEN:  Objection.  Form of the
question.  In addition outside the scope

Page 191

Coffman

of the report.

A.    My general understanding is that it provided additional information about the -- to a degree of the extent of liabilities the firm might face going forward as a result of the Roundup litigation.

Q.    After the Johnson verdict, is it your opinion that the market updated its understanding of the quality of due diligence performed by Bayer in connection --

THE COURT REPORTER:  One more time. I'm sorry.

Q.    After the Johnson verdict, is it your understanding that the market remained deceived about the quality of due diligence Bayer had performed on the Monsanto glyphosate litigation?

A.    Well, my understanding is that that did not -- that event, according to plaintiffs -- I haven't done my own analysis, but according to plaintiffs that that event provided some information that allowed the market to update its risk assessments, but that it wasn't a full revelation of the truth and

Page 192

Coffman

that there were additional alleged

misstatements after the Johnson verdict.

Q.    Are you aware that according to

plaintiffs, Bayer admitted on August 16, 2018

that it hadn't reviewed any internal documents

in connection with its premerger diligence?

A.    I don't remember.

MS. GILDEN:  Objection.

A.    I don't remember dates specifically,

but I do remember some part of the Complaint

that described that they had not done much due

diligence, that the company acknowledged having

not done substantial due diligence.

Q.    Did you analyze the market reaction

to that disclosure?

MS. GILDEN:  Objection.  Outside the

scope of the report.

A.    I did not, no.  That was not part

of -- that was not necessary to answer the

questions I was asked.

Q.    After that disclosure, is it fair to

conclude that investors no longer thought that

Bayer had reviewed any internal Monsanto

documents in connection with its premerger

Page 193

Coffman

diligence?

MS. GILDEN:  Objection.  Form of the question.  Also objection outside the scope of the report.

A.    I have not evaluated whether that is a reasonable conclusion from that disclosure or not given the full context of what was said or what the allegations suggest should have been fully disclosed.  I just don't know.

Q.    When it comes time to calculating damages, will you need to determine the inflation on a day-to-day basis throughout the class period?

A.    My understanding is whoever is tasked with giving an opinion about inflation per share that part of -- in order for the out-of-pocket methodology to work, you have to specify what the inflation was throughout the class period, yes.

Q.    In order to determine what the inflation was throughout the class period, will it be necessary to determine what information -- what misinformation remained in the market?

Page 194

Coffman

A.    I think to do a reasonable analysis of the inflation per share, it would have to take into account what information is already public and what information remains concealed under plaintiffs' theory of the case, yes, that would have to be addressed.

Q.    Let's go to the third corrective disclosure.  Do you recall that is another jury verdict in another glyphosate trial?

MS. GILDEN:  Objection to form of the question.

A.    I forget the name of the case off the top of my head, but yes, I recall that as the third one.

Q.    And then do you recall that after that third corrective disclosure, Bayer lost another glyphosate case in May of 2019?

MS. GILDEN:  Objection.  Form of the question.  Additionally object outside the scope of the report.

A.    As I sit here right now, I had not recalled that.  I know there were a number of different ongoing litigations.  I don't remember the details of all that were reported

Page 195

Coffman

during the class period.

Q.    Well, I'll represent to you that in May of 2019, Bayer lost the glyphosate case, okay?

A.    Okay.

Q.    And I'll further represent that the jury delivered a $2 billion verdict against the Monsanto Bayer conglomerate, okay?

A.    Okay.

Q.    Supposing that is true, would you expect that to be treated as a corrective disclosure concerning Bayer's premerger diligence on Monsanto's glyphosate liability?

A.    I think it's certainly an event one would want to evaluate to determine whether or not it was corrective and what price response there would have been.

Q.    If there was no price reaction -- strike that.

If there was no significant price reaction, what would you infer from that?

MS. GILDEN:  Objection.  Outside the scope of the report.  Also improper hypothetical.

Page 196

Coffman

A.    I think it would depend on a lot of the facts and circumstances.  So if one hypothesis would be that the market, as a result of the prior verdicts, was already anticipating that it was going to keep losing trials at some pace or another, could be that for some reason the market didn't see that individual case as somehow reflective of or representative of all the other cases for some reason.  Those are only two of an expansive possible interpretations but that's, you know, I would want to evaluate the details of the timing of that and I would want to evaluate the specific facts and circumstances, but it is certainly something that should be evaluated.

Q.    And then I think you've testified that the remaining corrective disclosures had to do with an announcement of settlement of glyphosate litigation, right?

A.    Well, an announcement -- my understanding is there was an announcement of a settlement and then follow-on news to that quickly thereafter as related to what was it settling and what was the scope of that and

Page 197

Coffman

then another disclosure where the judge --
where a judge rejected the proposed settlements
in some form.

Q.    What is your understanding of the
logical connection between those announcements
and plaintiffs' theory of liability?

MS. GILDEN:  Objection.  Outside the
scope.

A.    Go ahead.  You know, while I haven't
analyzed those disclosures in detail and all
the different ways they might be connected, my
general understanding is that the decline in
the wake of the announcement of the settlement
was from an understanding of -- that the
settlement wasn't really covering the full
scope of the liability and so the amount they
were paying relative to what was out there may
not -- may have implied a total liability that
was higher than the market was expecting,
therefore, giving the market a much better idea
of what the true risk and liabilities might be.

And then my understanding is that
the rejection of the settlement had something
to do with the belief that it wasn't sufficient

Page 198

Coffman

to cover the liabilities that were out there, so again giving the market an updated sense of what the total amount to cover those liabilities might be much higher than the market was expecting.

Q.    In devising a methodology for calculating damages, do you agree that you can only carry inflation associated with a misrepresentation back to the point in time when the truth could or should have been disclosed?

A.    Well, I want to separate -- I don't want to get too much into semantics, but when you just jumped all that is into quote, unquote, "damages methodology" obviously the way I described the damages methodology in my report, the out-of-pocket method, doesn't depend on any of these factors.

What you are talking about now is how to appropriately do a loss causation analysis to quantify the artificial inflation per share that flows into that common damages methodology.  So I want to make that distinction clear.  But in terms of I think in

Page 199

Coffman

doing a loss causation analysis that quantifies
the artificial inflation over time, you would
have to pay careful attention to over what
periods of time can -- do the price declines
relate back to causal.  So, for example, I
think if there has to be -- if you have a
decline that is to some degree fraud related
and we are all in agreement on that and then
the question is well how far back can you take
that particular price decline as in -- or how
far back did that inflation exist, you have to
analyze when could some piece of that relevant
truth have been disclosed and in what degree
and at what time.

You have to take into account when
are there misstatements of that is causally
related to.  So I think that answers your
question.  You do have to analyze how far back
you can take it based on when the
misrepresentations were actually made that are
causally related to that, revealing that
relevant truth.

Q.    In that process -- strike that.
That analysis will be part of the

Page 200

Coffman

process for determining inflation on each day within the class period, right?

A.    That -- in my experience when doing a loss causation of damages analysis, yes, that has to be taken into account when assessing what the inflation was throughout the class period.

Q.    If you couldn't do that, you wouldn't be able to calculate damages, right?

A.    I don't know what you mean by you couldn't do it.  Again, I think my understanding at least is that courts have recognized that computing damages in class action securities cases is inherently difficult because you're trying to say how would a stock price have traded differently if it had a different set of information that's not directly observable.

So one has to do an analysis to try to evaluate that and my understanding is that the standard for that is reasonability and in my experience there has always been a reasonable way to try to quantify that inflation.  Sometimes you have do it

Page 201

Coffman

conservatively if you don't have full information or, you know, if -- but it's -- in every case I have been involved in, there is some reasonable way to do that.

Q.    Sitting here today, do you have an understanding of the earliest date on which defendants could have disclosed the true risk associated with Monsanto's glyphosate liability?

MS. GILDEN:  Objection.  Outside the scope of report.

A.    I don't, no.

Q.    How would you go about assessing that question for purposes of calculating damages?

A.    Well, I don't know that an assessment of that precise thing would be necessary.  Again, they made statements about the due diligence.  I don't know to what extent at some point they would, that defendants would have to fully disclose exactly what they believed the liability, the total liability was.

You're asking a question that I'm

Page 202

Coffman

not sure comports with the information set that they were required to disclose.  I just don't know, but if that had to be done, you would do the best you can through discovery to figure out who knew what and when.  That's my understanding of the purpose of discovery.

Q.    Just to make sure I understand, so the first corrective disclosure we talked about was the Johnson verdict, right?

A.    Yes.

Q.    For purposes of the out-of-pocket damages analysis, are you assuming that Bayer should have disclosed the outcome of that case before the outcome eventuated?

A.    Of course not.

MS. GILDEN:  Objection.  Just for clarity, it's not an out-of-pocket damage analysis.  It's that there is a methodology and the methodology is out-of-pocket.  I just want this line of questioning to be clear.

MR. YAVITZ:  Thank you.

Q.    Then, how will you go about evaluating what Bayer should have disclosed

Page 203

Coffman

absent fraud?

A.    Well, I think as -- again, I don't know if I'm the person to view this that reaches this point.  My understanding is that whatever expert is trying to answer that question will have to have an assumption or some facts or something to describe, maybe not verbatim, but at least in, you know, in terms of what information investors were entitled to, during the class period.

So if the -- and again I'm not saying this is the right way to think about this case or this is what the facts will support, but let's just hypothetically say after they make the first alleged mistake, that the very next day they came out and said you know what, we really haven't done any due diligence.  We have no idea what the level of this risk is or whether this is abet the company risk.  We just don't have any idea what this really represents.

In my view the stock price would have dropped and it would have dropped quite a bit.  Exactly how much, I don't know at this

Page 204

Coffman

point. I would have to come up with -- whoever is doing this would have to come up with a method if that is the real but-for world to consider, how would the market have interpreted that information and to what extent does it drop it towards the end of the class period at least assist in answering that question.

Q. I want to talk more about the litigation risk point, but two quick clean-up questions.

Do you understand that at some point in this proceeding the court could determine that some of the alleged corrective disclosures weren't corrected as a matter of law?

A. I have no reason to doubt that is -- the court could do that if they wanted to.

Q. How would the methodology proposed used to calculate damages account for one of the corrective disclosures being taken out of the case?

A. I don't think it changes the use of the out of pocket methodology at all. That is still what would be used on a classwide basis. Now that may have implications for how much

Page 205

Coffman

inflation there was to the degree that the inflation numbers are based on some analysis of the declines on those dates and using that as an input into the inflation calculation.  It may be that that reduces the inflation per share.  I don't know though is the answer.

Let's -- again, I'm going to make up a complete hypothetical.  It has nothing to do with what may or may not end up being the truth in this case, but let's say, through whatever analysis is done, the inflation is $5 a share at the beginning of the class period and up through the first corrective disclosure and then it's determined that that inflation gets fully dissipated on the first corrective disclosure.  Then the removal of some of the later corrective disclosure might have absolutely no impact on damages, right.  Likewise, if the methodology for computing the inflation isn't based on necessarily analyzing the drops on the corrective disclosures, but some other fundamental analysis of how much the due diligence is worth, then would removing one of the disclosures actually impact the

Page 206

Coffman

inflation on any given day during the class period?  I don't know.  It might not.

That's why -- I'm not trying to be difficult in not answering your question.  I'm trying to say it really, really depends on the nature and details of the loss causation analysis and what the underlying logic is for how you get to that inflation.  It may be that removing a corrective disclosure has important impacts on that calculation and would need to be addressed and in other circumstances maybe it wouldn't.

Q.    I appreciate that.  I don't think you're being difficult.  I appreciate the answer.  I want to talk a little more about this adjustment in the market perception of the litigation risk that we talked about earlier.

Do you believe, as a general matter, that even when a risk is fully and adequately disclosed to the market, the market can still be surprised by the realization of that risk?

A.    That's possible, yes.

Q.    So if the market is told there is a 50 percent chance of something happening and

Page 207

Coffman

then the bad thing happens, you can still get a stock price reaction from that event, right?

A.    Yes.

Q.    Even if the true likelihood of it happening was 50 percent?

A.    Correct.  In that case my understanding is there is no fraud.  That is just the materialization of a bad outcome.

Q.    How would you go about analyzing the risk of Monsanto losing in the glyphosate litigation?

MS. GILDEN:  Objection.  Outside the scope of the report.

A.    I don't know all the ways that might be done, but I also think it would be important to look at it not necessarily from the likelihood of losing any one case, but given all the detail that is out there and all the information that is out there and all the due diligence that could have been done what was likely the outstanding, you know, risk that was out there.

In other words, you know, I think you have to look -- you would have to look at

Page 208

Coffman

the information setting in totality and say given what they told the market versus what they should have told the market, how would the market have assessed that risk differently and that's going to be an important -- that would have to be an important component to any loss causation analysis I would think.

Q.    Do you agree that using the entire stock drop following the realization of a risk would overcompensate a plaintiff who alleged that the defendant understated the magnitude of that risk?

MS. GILDEN:  Objection.  Form of the question.  Also outside the scope of report to the extent it's talking about this litigation.

A.    Not necessarily.  I mean there are certainly scenarios where you can create or you can set up assumptions where that bad event, the drop on that bad event would be not a mere of what the drop would be had there been a full disclosure.  That can occur.  It doesn't necessarily always have to occur though especially if essentially the risk of given the

Page 209

Coffman

facts that were known or should have been known was that they were exceptionally likely to lose a number of very large trials, even if it wasn't the Johnson trial, but some trial along the way, there was going to be a realization, it was certain there was going to be a realization of a big risk that the market under appreciated, then maybe not.  So I think that is something that would have to be analyzed here.

Q.    When you say something that would have to be analyzed carefully, the topic that would have to be analyzed carefully is the but-for risk if there had been no fraud and the risk that the market expected given that there was fraud?

A.    That could be an important component of what was necessary to analyze.  Again, given that I have not been tasked with analyzing loss causation in this case, the entire contour of what would be necessary or all the analyses is not something I know or have concluded about, but is it possible that an important way to think about this case is or an important

Page 210

Coffman

analysis one would have to do is to say what is the risk the market actually imputed given the statements that were made and what would be the alternative amount of risk that would be priced in had they told the full truth about what lack of due diligence there was?  That could be an important component of what needs to be assessed to reasonably calculate damages here.

Q.    Sitting here today, have you proposed a methodology to capture inflation stemming just from the concealed risk rather than the whole realization of risk?

MS. GILDEN:  Objection.  Form of the question.  In addition, outside scope of the report.

A.    I haven't done a loss causation analysis.  So to what degree any decline at the end of the class period associated with a corrective disclosure, I haven't even determined whether there are corrective disclosures, but even if they were, the degree to which that would need to be adjusted to reflect a difference in risk earlier rather than a full, you know, probability of that risk

Page 211

Coffman

occurring, I just haven't analyzed that.

I describe how the out-of-pocket methodology, which can be done on a classwide basis, appropriately compensates investors and is consistent with plaintiffs' theory of the case.  Exactly how one would quantify that inflation to address all the sorts of issues you're raising, I have no opinion on.

Q.    Apart from the -- I'll start over.

We've been discussing the corrective disclosures.  Would you agree that all those corrective disclosures stem from adverse developments or settlement in the glyphosate litigation?

MS. GILDEN:  Objection. Mischaracterizes testimony in order to make the assumption contained in the question.  Also outside scope of the report.

A.    They all relate to Roundup related litigation or glyphosate related litigation. Also, just to be clear, when we say the glyphosate litigation, I'm referring to the totality of all the claims that have been made,

Page 212

Coffman

not just one particular case.

I think it's fair to characterize it as relating to events that are directly related to potential glyphosate or actual glyphosate liability that is revealed.

Q.    Apart from whatever fraudulent information was revealed in those decisions, wasn't it independently bad news for Bayer that suffered those losses in litigation?

MS. GILDEN:  Objection.  Outside scope of report.

A.    Well, I don't think that -- I think generally speaking the corrective disclosures that are alleged or at least the declines in prices were tied to bad news and the plaintiffs are alleging that that is because or at least a portion of it is because it's reflecting the relevant truth.

There was no admission of fraud, but there was -- plaintiffs are alleging there was a revelation of at least a portion of the relevant truth associated with each of those. Whether there is also independent bad news that isn't really related to the alleged

Page 213

Coffman

misstatements, that is my understanding of what the loss causation analysis is for and assessment of the degree to which there is confounding information.  That is a standard thing that is dealt with during the merits phase in a loss causation analysis.

Q.    Is it fair to gather that since you regard it as part of the loss causation analysis you're not proposing a methodology for identifying the portion of the post corrective disclosure stock drops that stem from the revelation of the fraud?

A.    That's correct.  And you keep saying revelation of the fraud.  I just want to be clear there was no explicit admission of fraud. There was what plaintiffs allege were disclosures of the relevant truth, but that's correct, I have not done that analysis and am not offering an opinion on what would be necessary to do that analysis.

Q.    Are you aware that plaintiffs in this case previously allege that defendants overstated the evidentiary basis for Monsanto defenses in the glyphosate litigation?

Page 214

Coffman

A.    Yes.

Q.    Are you aware that the court actually held that plaintiffs pleaded that defendants had made a material misrepresentation about the strength of Monsanto's defenses?

A.    Yes.

Q.    Are you aware that plaintiffs formally allege that stock drops following the alleged corrective disclosures were caused in part by that misrepresentation?

MS. GILDEN:  Objection to the extent it mischaracterizes plaintiffs' Complaint and allegations.

A.    Certainly I recall them alleging a causal connection, whether or not those are mutually exclusive of each other or overlapping of each other, that I don't have a particular view on.  I certainly remember there being allegations of that nature.

Q.    Is it your understanding that those allegations of misrepresentation have been dismissed from this case?

A.    I understand certain statements

Page 215

Coffman

have.  Whether the stock price declines that were originally pled to be related to those, whether those declines are coincident with other and not mutually exclusive of other claims, that's what I'm not expressing a view on.  I don't think you can make any assumption that any portion of the decline on the corrective disclosures is now unrelated to what remains in the case, but I agree with you that certain alleged misstatements have been removed from the case.

Q.    Well, in approaching the damages question, do you agree you'll need to consider whether a portion of the stock drop stems from the revelation of the falsity of those dismissed statements?

A.    Well, I think if there is a conclusion that some portion of the decline is exclusively related to those statements as opposed to sort of a non-mutually exclusive decline, then possibly, but I think there is no reason -- I haven't drawn any conclusion one way or the other that removal of some misstatements somehow requires an explicit

Page 216

Coffman

disaggregation of some portion of the corrective disclosure.

It may be, in other words, that those -- that that decline sort of relates to both in a non-mutual exclusive way.

Q.    Am I correct then to conclude that you are not proposing a methodology for the disaggregation of the stock drop caused by the dismissed misrepresentations as opposed to the stock drop caused by the misrepresentations that remain in the case?

MS. GILDEN:  Objection. Mischaracterizes testimony.

A.    I'm saying I have not proposed a methodology to do that and also that it may not be necessary to do that.  I have not drawn a conclusion that it would be necessary to do that.

Q.    And you haven't analyzed whether it would be necessary to do that as of yet, right?

A.    That's correct.

MR. YAVITZ:  We've been going about an hour.  I can take a break now if that works because I'm in between sections and

Page 217

Coffman

then we are in the home stretch, so let's go off the record.

THE VIDEOGRAPHER:  The time is 3:13 p.m.  This is the end of media number four and we are going off the record.

(Brief recess taken.)

THE VIDEOGRAPHER:  The time is 3:29 p.m.  This is the beginning of media number five and we are on the record.

BY MR. YAVITZ:

Q.    Welcome back once again, Mr. Coffman.  Did you discuss the substance of your testimony with counsel during the break?

A.    No.

Q.    I'm going to direct you to paragraph 85 of your report, Exhibit 1, and I want to dwell on that for a little bit, so let me know when you are there.

A.    Okay, I'm there.

Q.    So you know here that a calculation of damages would require an analysis of how inflation per share may have evolved over the class period; is that right?

A.    Yes.

Coffman

Q.    And you write that, "An analysis can rely on valuation techniques, including but not limited to, event studies, fundamental valuation and temporaneous valuations or documents or some combination of the above;" is that right?

A.    Yes.

Q.    Have you developed an opinion, sitting here today, on whether any reliable valuation technique exists for measuring the evolution of inflation in this case?

A.    I have not done any specific work to evaluate which, if any, of these methodologies would be necessary or what methodology would be necessary.

Q.    Have you identified an appropriate means in this case for taking any stock price drop attributable to fraud related information and tracking that back to determine the amount by which the price of the stock was inflated on the date of a misrepresentation?

A.    No, that would require a detailed loss causation analysis which I have not done.

Q.    I think you mention here a couple of

Coffman

different methodologies; constant dollar inflation, constant percentage inflation.  My question is, when is a constant dollar inflation ban appropriate?

A.    Well, there may be a number of different circumstances, but again, I'm going to speak in broad generalities here.  So an example I often give of where a cost of dollar inflation would obviously be appropriate is if the dollar value of the fraud was consistent over time so that -- if it's reasonable to believe that whether the full truth is sold on the first day of the class period or on the last day of the class period, that it would have the similar dollar impact that would suggest that the cost of a dollar inflation would be or might be appropriate.

So, for example, if a company just failed to disclose that they didn't have a billion dollars in the bank that they had claimed to have, setting aside for the moment what other signaling issues that might have the value of the billion dollars didn't really change itself, so that might suggest constant

Page 220

Coffman

dollar inflation.

Q.    When is a constant percentage inflation ban appropriate?

A.    Again, there might be a number of different times it's appropriate or the most reasonable thing to use, but again, a very stylized example often used is if a company claims to have five factories assuming each factory is identical and they really only have four, so that the entire productive capacity of the firm was overstated by 20 percent, then something like that, you know, constant percentage inflation would be an appropriate thing to consider.

And again, you know, the real world is messier than either of those stylized examples, but those are the types of things you would want to consider when evaluating what inflation would be appropriate.

Q.    I want to talk about a few factors that could have influenced inflation the evolution of inflation at different times in this case.

The first, the glyphosate litigation

Page 221

Coffman

that we have been talking about was originally a Monsanto liability, right?

A.    Monsanto potential liability, yes or you know -- yes, these were Monsanto liabilities that were at issue.

Q.    So whatever risk that litigation posed, the risk would only impact Bayer if Bayer consummated the acquisition of Monsanto, right?

MS. GILDEN:  Objection.  Form of the question.

A.    I think in terms of actual payment of liabilities, I understand the logic you're implying and there is logic to it if you're assuming it requires or to the extent we are talking about actual ultimate payment of liabilities.  However, to the extent that it is really just a misstatement regarding due diligence and what the perceived risk is, that is not necessarily true, so let me give you a scenario where that might not be true.

Again, I'm not suggesting this is anywhere close to the actual facts in this case, but could you image saying we are going

Page 222

Coffman

to do this deal, we have done due diligence, it looks great, we are going to proceed and then several months later before a deal is consummated, they reveal, you know what, we were wrong.  We hadn't done due diligence. This isn't going to work.  We are not going to be able to do this deal and all of the value that the investors had placed on the ability to do the deal evaporates and the stock price falls at that point even though no deal is ever done, right.

I think under those scenarios you can still make an argument that the stock was overpriced as a result of misstatements about what due diligence had already been done.  So I don't think it requires necessarily there absolutely having been a deal done to get to a similar result.

Q.    Is it that scenario you just outlined, is it your understanding that that scenario is the theory of liability alleged by plaintiffs in this case?

A.    Well, I think it's -- that is obviously not the entire theory because that's

Page 223

Coffman

not how the relevant truth became revealed here, but I think in terms of it's part of what plaintiffs are alleging is that all along they had misstated the degree to which they had done due diligence and to which there were huge -- and the extent to which there was risk to the benefits that were being touted.

And so I think plaintiffs are certainly alleging that the information set investors had even premerger was improper.

Q.    But I think we discussed earlier, I apologize if I am mischaracterizing your testimony, that you anticipate that the measure of inflation will be based on the gap between the true risk from the glyphosate litigation and the market's mistaken understanding of that risk based on the misrepresentations made by defendants; is that right?

A.    Well, I think it would involve the assessment of the risks the company was facing and the misperception of the risks the company was facing, so I don't think anything I said was inconsistent with that.

So, for example, the scenario I just

Page 224

Coffman

outlined where the company claims they did great due diligence when, in fact, they did none and, in fact, once there was due diligence or somehow the information comes to light that these liabilities are much greater, the outcome that could still have an impact on the stock price, right, and the degree to which the ultimate corrective disclosures contain a reflection of what that inflation was or at least a portion of what that inflation was is something that would have to be evaluated.  I don't think anything I said was inconsistent with the logic you just put out there.

Q.    Maybe I can get at the same question in a more general way.  Would you expect that during the preclose period, inflation in the price of Bayer ADRs would be impacted by the market's assessment of the likelihood of the market closing?

MS. GILDEN:  Objection.  Outside the scope of the report.

A.    Possibly.  I mean that's something I would want to evaluate carefully.  I don't know that I can give you an answer right now.  I

Page 225

Coffman

think it would be speculative to say whether it absolutely would or wouldn't, but it is something I certainly would want to think about and consider carefully.

Q.    How would you go about evaluating the likelihood of the -- strike that.

How would you go about evaluating the market's assessment of the likelihood of Bayer's acquisition of Monsanto closing during the preclose period?

A.    Well, there are quantitative techniques of comparing the price of Monsanto with the price of Bayer and how those move over time to try to get an assessment of the probability that the deal would go through.  So there are quantitative methods for doing that.

Q.    Would you agree that under plaintiffs' theory of liability, the magnitude inflation is correlated with the magnitude of the potential litigation losses coming out of the plaintiffs' litigation?

MS. GILDEN:  Objection.  Outside the scope of the report.

A.    I can think of reasons it would be

Page 226

Coffman

and reasons it might not be.  If there were --
so let me give the example of where it might
not be.

If all the plaintiffs really could
have disclosed or -- I'm sorry, if all
defendants really could have disclosed for some
period early in the class period days, we have
no idea what the liability is.  We just haven't
looked at it.  Then the price reaction you
might see in that but-for world, right, might
not be highly correlated with an objective
assessment of what the liability really is
because the market may just have to assume they
don't know what the hell they are doing.

This could be a bet the company
thing and nobody really even -- and they are
not even looking.  This is insanity, right.  So
I don't, you know, an alternative might be that
the -- what whoever is doing this analysis
might be asked to assume we didn't look at it
and oh, by the way, now that we have looked at
it, it is X or X is a reasonable assessment of
it or we would have to consider X, Y and Z
factors that really aren't publicly known, but

Page 227

Coffman

you know, we now have to consider.  It depends on what the assumption that is given to the expert about what should have been -- I think is going to have some influence as to whether that correlation that you are talking about exists or not.

Q.    That's very helpful.  My question is also a little more focused.  So if the total glyphosate liability out of the whole portfolio of litigation was $10, all else equal, you wouldn't expect the market to react much to the revelation that Bayer had misstated its diligence on the $10 liability, right?

MS. GILDEN:  Objection.  Outside the scope of the report.  Improper hypothetical.

A.    You're talking about just $10 as the total liability; not $10 per share, just $10?

Q.    A $10 bill.

A.    Okay.  Again, would that signal something about the due diligence process and the reasonableness of their -- of defendant's efforts to protect shareholders?  I think you could debate or come to some conclusion that

Page 228

Coffman

that has some value too.  So it wouldn't necessarily just be the $10, but obviously $10 is a nonmaterial risk in the company the size of Bayer.  I don't think you would attribute any inflation over that specific $10, but I think it would still send a very negative signal that they had basically rolled the dice and had not known what they were really facing. And the fact that it ended up being only $10 is probably more luck than anything.

Q.    On the other hand, if the liability is $10 billion, then you might expect the market to have a greater reaction to the revelation that Bayer did an adequate diligence on that liability and lied about it, right?

MS. GILDEN:  Objection.  Outside the scope of the report.

A.    Well, again, I think it's important to think what is the market being told at the time that this assessment is being made.  If they are being told we just doesn't know, we actually have done it and we don't know, that is different than saying we haven't done it. We didn't know at the time that we agreed to

Page 229

Coffman

the deal.  Now we've done some due diligence, it's a $10 billion exposure, that would be much larger reaction than if they said the same thing but there was a $10 exposure.  So -- but which of those is the actual but-for world that an expert would be asked to assume or somewhere in between or some combination of those, you know, until the loss causation analysis is being performed under whatever assumptions plaintiffs think they can prove, that's just pure speculation.  I don't know.

Q.   I think earlier you mentioned that you had come across a newspaper article on one of the potential least news days on which there was some reporting of some sort about the number of cases filed, the breadth of the litigation; am I recalling that correctly?

A.   Yes, I said I didn't remember the exact details, but it had something to do with the scope of glyphosate litigation.

Q.   So if the scope of the litigation grew over time would we -- would you expect that to impact the market's assessment of the magnitude of concealed risk arising out of

Page 230

Coffman

fraudulent statements about due diligence?

A.    Well, my general understanding from experience in seeing other matters or other companies that were facing these types of, you know, mass tort liabilities, the market is not just focused on the number of cases that have been filed to date.

They are trying to make an assessment of what is the overall, what is the overall scope of the potential liability.  So just as you go through time and the number of cases is going up, that doesn't necessarily mean that the overall assessment of the liability is going up because some of that increase in cases is expected.

So when you say that the liability is growing over time, I don't know if you mean just in terms of case counts or it's actually viewed as like each case is worth more and, therefore, you have to, that the value of the liability is actually increasing even though the number of cases is not growing at a rate higher than expected.

Q.    I mean what I'm asking is whether

Page 231

Coffman

the market's perception of the magnitude of potential liability arising out of the glyphosate litigation would have an impact on the day-to-day analysis of inflation?

MS. GILDEN:  Objection.  Outside the scope.

A.    Depending on the assumptions provided, it may or it may not I think is the best way I can say it.  I could imagine a scenario where for some periods of time prior to the merger being consummated it may not matter that much.

After consummation of the merger where the, you know, understanding of what due diligence failed to uncover might be changing over time, you might have to take that into account.  I just don't know as I sit here.  I haven't been asked to perform that analysis or been given all the appropriate assumptions, I would need to even start to think about that.

Q.    So, you would look for direction from counsel on assumptions in connection with that?

A.    Well, I would want assumptions on

Page 232

Coffman

what they expect to be able to prove and what, as a legal matter, what their position is as to what was required to have been disclosed and then it would be my role or somebody with my -- with the ability to do the things that I do, in other words, expert would have to then try to value that new information set given what legally counsel is describing should have been disclosed.

Q.    Just a few more questions on damages.  How much time did you spend preparing the damages section of your report?

A.    In terms of the actual writing of the words, virtually none because I used similar language or nearly exact language if not exact language in other reports.

In terms of the assessment of whether I could give that opinion, I don't have an exact number, but ballpark 10 to 20 hours. It certainly required a review of the Complaint, an understanding of plaintiffs' allegations, thinking about those allegations and initial discussions with counsel about making sure I understood what their allegations

Page 233

Coffman

were and what they were seeking in making sure that what I was describing as the out-of-pocket methodology is consistent with what they understood they were pursuing as part of the case.

So that was probably 10 to 20 hours of work I would guess and it was coincident with doing other work in the case, but on market efficiency, but probably 10 to 20 hours I would say.

Q.    But you would agree in terms of the actual language of the report there is virtually no tailoring to the facts of this case, right?

MS. GILDEN:   Objection.  Form of the question.

A.    In terms of the writing of the words, not really as I described.  You know, if you put up other reports similar to this in terms of the questions I was being asked, the language of that section is either identical or nearly identical in most of those cases because it's sort of the point which is that there is a well accepted damages approach in these types

Page 234

Coffman

of cases that as long as the conditions I described are present, I feel comfortable offering the opinion that ubiquitous method can be used in this case as well.

Q.    Let's talk about some more basic stuff.  What did you do to prepare for your deposition today?

A.    I reread my report.  I reviewed some of the backup material that was -- the exhibits and some of the earnings announcement material, et cetera.  I met briefly by phone with a couple of members of my staff just to ask them questions to make sure I had full understanding of certain things and to remind myself of certain details and then I had a call with plaintiffs' counsel.

Q.    Do you recall anything about the questions you asked of your staff?

A.    Just reminding me details of the regression analysis and where we got certain data.  It was really after reading my report just confirming some of the details.

Q.    You listed the materials you reviewed in preparing for your deposition.  Did

Page 235

Coffman

you review any documents that you haven't listed in your expert report as documents relied upon in that report?

A.    No.

Q.    Did you review any other documents produced in discovery in this action as you prepared for your deposition?

A.    Other than the ones related to ADRs outstanding, no.

Q.    I think you said a phone call with plaintiffs' counsel?

A.    That's correct, yes.  It was the same call.

Q.    About how long was that phone call?

A.    About two and a half to three hours I think.

Q.    Did plaintiffs' counsel review any documents with you on that phone call?

A.    No.

Q.    Let's go to Appendix B to your report.  Again, this is Exhibit 1.  Let me know when you are there.

A.    Okay, I'm there.

Q.    This is your CV, right?

Page 236

Coffman

A.    Yes.

Q.    Have you held any professional certifications other than a CFA?

A.    No.

Q.    Have you ever held any professional licenses other than a CFA, including any securities licenses?

A.    No.

Q.    Does this CV accurately reflect your employment history since 1992?

A.    Yes.

Q.    In approximately what year did you begin serving as -- strike that.

In approximately what year did you begin working in support of litigation analysis?

A.    I want to go back to one of your prior questions.  I think you said 1992.  This reflects my employment history back to 1995.  I did have some jobs when I was in college that are not listed here, but since 1995, it's accurate or up to date.

Q.    Thank you for the correction.

A.    So when did I first start supporting

Page 237

Coffman

experts in this area?  It would have been probably 1996.

Q.    So right out of college?

A.    Yes.

Q.    In approximately what year did you begin yourself serving as a litigation expert?

A.    Well, there were certain consulting --

MS. GILDEN:  Objection.  Are you drawing a distinction between consulting versus testifying?

MR. YAVITZ:  I'll ask in turn.

Q.    In approximately what year did you begin serving as a consulting litigation expert?

A.    So there were certainly cases as far back as 19 -- probably 1997 where I was essentially the lead contact with certain clients performing certain types of analysis, including perspective damages analyses in securities litigation.

So, you know, pretty much throughout my career.  Maybe in the first year or two I was at Chicago Partners there were clients that

Page 238

Coffman

were relying directly on me to provide expertise on a variety of different kinds of cases, including securities litigation.

Q.    Then in approximately what year did you begin serving as a testifying litigation expert?

A.    I was engaged a couple of times to be an expert and prepare expert materials or at least working towards preparing expert materials over the last couple of years at Chicago Partners.  So I began agreeing to take testifying engagements around that time.  I think 2007, 2006, somewhere in that time frame.

Q.    So that's about ten years after you started your work as a non-testifying litigation expert?

A.    Correct and I think that's about the same time -- maybe it was a little earlier 2005, 2006 when I started serving as a neutral expert where I was involved in mediations where I was evaluating the expert work on both sides of class action securities litigation and a couple of other types of cases too, but mostly class action securities litigation.

Coffman

Q.   Do you still serve in that capacity as a mediating expert?

A.   It's been a long time.  It's been a few years since I have done that.  Every once in a while I will be contacted by one of the mediators I've worked with in the past on a very narrow question, but less involved as a -- as sort of fully involved in the mediation process.

Q.   Since 2008 when you left Chicago Partners, you have worked at something called Global Economics Group, right?

A.   That's correct.  It was originally called Winnemac Consulting, but later changed its name to Global Economics Group.

Q.   Can you describe the type of work that Global Economics Group performs?

A.   Sure.  I mean it is really sort of summarized there on the CV, but it's essentially a group of professionals that use their expertise in economics, finance, statistics, valuation and accounting and other areas to answer questions, both in litigation matters and non-litigation matters.

Page 240

Coffman

Q.    Approximately what portion of Global Economics' earnings come from the litigation matters in connection with defense support?

A.    I think that's varied overtime.

Q.    On average in the last year?

A.    That's not something I ever actually calculated just getting a source from what people are working on, doing.  It's probably a majority related to litigation, but there are some substantial non-litigation engagements the firm is involved with as well.

Q.    Could you describe in general terms what those substantial non-litigation engagements the firm is involved in?

A.    People within the firm are affiliated with the firm that are engaged to draft things like white papers or to perform some sort of analysis that is then used internal to a corporation or used for other types of efforts.

So it's really just performing economic analysis that could get used outside litigation context.  It's been in a number of forums, surveys, reports, white papers things

Coffman

like that, advising companies.

Q.    Is Global Economics' litigation work primarily related to securities litigation matters?

A.    Again, I think that's varied over time, but no, it's not.  Historically it's been a substantial portion of the business, but not the vast majority.

Q.    As reported on your CV, your current position at Global Economics is president, right?

A.    Yes.

Q.    What do you do in your capacity as president of Global Economics Group?

A.    I'm responsible for the day-to-day operations of the firm, overseeing its financial aspects, overseeing at a broad level staffing, just operating, essentially running the firm on a day-to-day basis.

Q.    It sounds like a lot of work.

A.    Not always.  I have wonderful people supporting me.  Especially on the financial side I have somebody I couldn't live without and I have a great staff.  So it's -- I work

Page 242

Coffman

hard, but it's manageable.

Q.    Do you do any litigation related work apart from your position as president of Global Economics?

A.    You mean outside the firm, Global Economics Group?

Q.    Yes, like on the side.

A.    No.

Q.    Any expert witness work outside of the auspices of the Global Economics Group?

A.    No.

Q.    Who owns Global Economics Group?

A.    There are four individuals with equity stakes in Global Economics Group.

Q.    Are you one of those individuals?

A.    Yes.

Q.    Congratulations.  How many employees does Global Economics Group have?

A.    It depends on how you count certain part time people.  In terms of full-time equivalents it's somewhere around 29 or 30.

Q.    I should have asked by the way, you said four people have equity stakes in Global Economics.  Are those four equal equity stakes?

Page 243

Coffman

A.    No.

Q.    Approximately what is your equity stake in Global Economics Group?

A.    A little over 20 percent.

Q.    We've already talked I think about the Global Economics Group employees who worked with you on this case.  Is there anyone else, aside from the folks you listed earlier in your testimony, who helped you with your work on the expert report in this case?

A.    No.  Like I said, I think there may have been other staff people that did small things here and there at the direction of the people I already listed, but the primary people working on this were the people I already listed.

Q.    Just to confirm, you personally reviewed and approved everything that is stated in your report, correct?

A.    I reviewed the report in its entirety and agreed with it, yes.

Q.    Your CV also lists a position at something called Market Platform Dynamics?

A.    Yes.

Page 244

Coffman

Q.    Can you describe the type of work that Market Platform Dynamics does?

A.    They really do or did -- they don't do a lot of stuff anymore, but they were much more active in the past and what they did primarily was strategy consulting in platform type businesses.

So businesses where there is a -- the platforms bring together groups of consumers and providers.  So think of credit card platforms.  So there is card issuers and then there is cardholders and managing the interaction between those.  Same thing with software platforms generally where there is app developers on one side and then users on the other.

So it's a firm that does strategy consulting in those types of businesses because there is a unique set of economic theories that relate to those types of businesses.

Q.    And I sort of inferred from your answer that that business is not as active as it formerly was; is that a correct surmise?

A.    That's correct.  It still does some

Coffman

work, but not that much and I'm involved just at a management level.  I do not perform any consulting work in that business.

Q.    So fair to say then that the principal positions for which you earn compensation are your jobs at Global Economics Group and your job at Market Platform Dynamics?

A.    Correct.  Although I don't think even over the last several years there has been any from Market Platform Dynamics.  My income is almost exclusively derived, at least work related income, from Global Economics Group.

Q.    Your income from Global Economics Group, are you being paid solely as an employee of Global Economics Group?

A.    I'm being paid as an employee of Global Economics Group, yes.  There is a formula for how much I'm paid, but yes, I'm paid as an employee.

Q.    Do you also receive distributions as an equity holder of Global Economics Group?

A.    Yes.

Q.    What is the relative income from your status as an equity holder versus your

Page 246

Coffman

status as an employee?

A.    Again, that's changed over time assuming your question relates to the last couple of years.  Certainly a majority comes from directly from my own consulting work or people working on projects for which I'm the finder.  So it directly relates to the work on cases of minority if my income comes from equity ownership of the firm.

Q.    I guess what I'm driving at, maybe I'll ask the question more directly, paragraph 2 of your report, not that we have to flip there because I'm not going to go into hermeneutics on it, but it says "Global Economics Group is being compensated at an hourly rate of $900 per hour for my work on this matter, and at standard hourly rates for members of my staff who performed work in connection with this report under my direction and supervision."

So my question is, how much are you getting paid on an hourly basis for the work being performed by Global Economics Group in connection with this report?

Page 247

Coffman

A.    Sure.  So under my agreement with Global Economics Group, I receive 80 percent of my own hourly rate and 20 percent of the staff work on cases where I'm deemed the finder of the case.

Q.    I think we said earlier you listed four or five people at Global Economics Group who are working on this under your direction, right?

A.    Yes.

Q.    So you'll get 20 percent of the fees charged by each of those staff members?

A.    Yes.

Q.    Do you know approximately what rates those staff members charge?

A.    I don't know the exact numbers. Mr. Hedstrom I believe is around 400 an hour and the others are between -- Clara Campbell is I believe in the three to 400 range and the other two are in the two to 300 range.  I don't know the exact numbers though.

Q.    You said I think that there may have been other people that were directed by those staff members to do work?

Page 248

Coffman

A.    To some small degree, yes.

Q.    Would you also get a 20 percent cut of the fees that they charge?

A.    Yes.

Q.    Your CV, returning to your CV, your CV lists two academic publications?

A.    That's correct.

Q.    One of those publications concerns land value and the other concerns university admission preferences; is that a fair characterization?

A.    Yes, that's a fair summary.

Q.    And that's a complete listing of your academic publications, right?

A.    Yes.

Q.    Just to confirm then, have you ever published academic work on the securities markets?

A.    No.

Q.    Have you ever published academic work on market efficiency?

A.    No.

Q.    Have you ever published academic work on the estimation of fair price inflation?

Page 249

Coffman

A.     No.

Q.     On what topics do you consider yourself to be an expert?

A.     Well, broadly speaking, economics, finance, statistics.  While I don't hold myself out as an accounting expert so to speak, I certainly have more than a layman's understanding of accounting and accounting principles, valuation generally and certainly securities valuation has a subcomponent of that.  Give me just a moment.  I think that's a fair summary.

Q.     I thought you were going to go on and say golf or bowling, so thank you.

Earlier you testified that you started with your litigation support work pretty much right out of college, right?

A.     Yes.

Q.     So how did you come to obtain this expertise that you described a moment ago?

A.     A combination of formal training and experience and knowledge gained through both of those.

Q.     And when you say experience, you

Page 250

Coffman

mean experience on the job providing litigation support or do you mean something else?

A.    Well, I would describe it more as experience on the job performing and applying economic principle, performing economic analysis and performing economic principle.  At Chicago Partners the partners in that firm were primarily professors from the University of Chicago in either the business school or the economics department.  So I got what I view as exceptionally great on the job training on how to do economics and finance generally.

Q.    Got it.  Well, I won't disagree with you, the quality of the economics professors at U of Chicago.  You got me there.

When were you retained as an expert witness in this case?

A.    I don't recall exactly.

Q.    Do you recall approximately?

A.    I mean I certainly recall working on this report starting several months prior to when the report was filed.  There may have been some consulting work some time before that, but I just don't recall when I was first contacted

Coffman

or retained, but the vast majority of the work was performed in the few months leading up to the report being issued.

Q.    Were you retained by plaintiffs' counsel in connection with the litigation?

A.    Yes.

Q.    When I say plaintiffs' counsel here, I mean Cohen & Milstein.  Do you share that understanding?

A.    That is who I was contacted by.  I forget if there is any local co-counsel or anything like that, but my interactions have been with Cohen Milstein.

Q.    Who specifically at Cohen Milstein retained you?

A.    You know, I really don't remember the conversation.  It may have been Carol Gilden, but I just don't remember the specific conversation.

Q.    Have you worked with Carol before on securities litigation?

A.    There have been other cases in which she has been involved in in which I was involved in, yes.

Coffman

Q.    About how many cases?

A.    I don't know the answer to that because there are oftentimes that there is co-counsel, but I'm just not aware of what they are all doing in the background.  I can certainly remember one other case where Carol was very involved.  Beyond that, I don't have perfect recollection of who worked on what cases.

Q.    I'm still on your CV and I want to direct you to the portion of it that has a header "Testimony."  Let me know when you are there.

A.    Okay.  I think there are a couple of different places where there is that heading.

Q.    I'm looking under professional experience and then it says testimony.  This is on page 2 of 18 of your CV.  Do you see that?

A.    Yes, I think the confusion I'm having is that really falls under the section Securities Valuation and Market Manipulation Cases and then there is another section I believe for labor and employment related cases where there is a testimony section as well.  So

Page 253

Coffman

that is the only reason I was --

Q.    Very helpful clarification.  Thank you.  I didn't understand how the header structure worked in your CV.  So I am content for the moment just to look at the section saying "Testimony," underneath "Securities Valuation and Market Manipulation Cases".  Are you there on page 2 of page 18 of your CV?

A.    Yes.

Q.    Does this section of Appendix B contain a complete list of all securities valuation and market manipulation cases in which you have provided reports or testimony since 2008?

A.    Yes.

Q.    Have there been any cases that you've become involved in since this report was submitted in October 28 of 2022 that are by virtue of that that are not included in this list?

A.    I would have to go back and check the timing of when something was issued.  Let me look at the last thing that is listed here and see if that is -- I don't recall filing

Page 254

Coffman

anything since this report.

Q.    When was the last time you were retained on behalf of a defendant in connection with securities litigation?

A.    About -- probably about six months ago.

Q.    Oh, okay.  How about before that six months ago; when was the last time before that?

A.    It may be three or four years ago. It may be more than that.  Covid has sort of like distorted time.  Maybe longer than that. Maybe six, seven years ago.  I'm not sure.

Q.    I certainly understand on Covid.  Is it fair to say that the vast majority of your engagements in connection with securities litigation have been on behalf of plaintiffs?

A.    That's I think a fair assessment, yes.

Q.    By the way, there are -- at Global Economics Group, are there other experts who perform expert work in connection with securities litigation?

A.    Yes.

Q.    Do you have an approximate sense of

Page 255

Coffman

how many?  Across all the experts, do you have a sense in aggregate for how many reports are issued in securities litigation by experts retained, employed by Global Economics Group on an annual basis?

A.    Again, securities litigation, I'm including in that things like securities valuation and sort of general damages and valuation matters relating to securities.

I don't know is the answer.  I think it's a minority.  In other words, I think of people that are employees at Global Economics Group I probably have the majority, probably a substantial majority of the reports filed in securities related litigation, but there are some others.

Q.    Returning to the compensation point, just one or two other questions.

Will either you or Global Economics Group receive any sort of compensation beyond the hourly rates that are described in your report?

A.    No.

Q.    I think I know the answer to this

Page 256

Coffman

one, but is your compensation contingent in any way on the outcome of the case?

A.    No.

Q.    Do you anticipate that if a class is certified, you'll be engaged to provide an opinion concerning the amount of damages that may be recoverable in this case?

A.    I have no idea.

Q.    Well, have you been involved in the past in securities litigation where you have submitted a report on class certification and class certification has been granted?

A.    Yes.

Q.    In approximately what proportion of those cases have you substantively been retained to submit another report on loss causation for example?

A.    I mean certainly a fair number.  I think many of those cases settle before we ever get to that analysis.  Many of those cases I'm asked to be the testifying expert, for whatever reason we don't get to a report stage.  Others I actually filed reports.  Others I have not been asked to be the testifying expert and

Page 257

Coffman

somebody has been and others I have expressed that I didn't want to be the testifying expert going forward and was not.

Q.    Would it be unusual, assuming -- strike that.

Assuming this case does not settle, would it be unusual for you not to be asked to submit a subsequent report on loss causation or the merits otherwise?

A.    Not at all, no.

Q.    Based on your experience in this enterprise, how much do you typically charge for merits report in securities litigation?

A.    I don't know that I have ever calculated that. I can just tell you that there have been extremes. I would say that it's hard to imagine a case where I do a merits report that is less than a hundred to $150,000 total to get to a report and a deposition, et cetera, rebuttal reports, et cetera.

There have been cases that the fees ended up being between one and $2,000,000. So it varies a lot depending on the facts, circumstances and what I'm asked to do.

Coffman

Q.    Leaving aside the possibility that you may not be asked to submit a merits report or you may refuse to submit a merits report, if the court denies class certification, would you agree that you definitely won't be submitting a merits report in this litigation?

A.    I guess, assuming there is no appeal and reversal of that, then I don't think I would be asked to perform a merits analysis.

Q.    So all told good news for you potentially if the court grants class certification, right?

A.    That only -- in my mind I only think about that from the standpoint of that the work we did was appropriate and sufficient and accepted.  Could there be some future financial, you know, impacts from being asked to perform more work, sure, but that's really not what I spend my day focused on.

I try to spend my day focused on doing high quality work that is supportive of the process and let the chips fall where they may from there.

Q.    Your response speaks of noble and

Coffman

admirable spirit, so I recognize that.  Other than what we have already discussed, do you have any other interest in the outcome of this case?

A.    None.

Q.    Do you own any Bayer AG securities?

A.    Not directly.  Only to the extent a mutual fund I have might hold it, which I'm not even aware of, but not directly, no.  I have no known stake in Bayer AG.

Q.    Did you own any Bayer AG securities during the proposed class period in this case?

A.    No, not -- maybe indirectly through like I have S&P 500 ETF funds.  I don't think Bayer is part of the S&P 500.  I have one foreign ETF.  I'm sure Bayer may be a piece of that, but no, I've never made a direct investment in the Bayer AG.

Q.    Let's take another little break. I'm going to look at my notes and see if I have any further questions and then we will come back and do any cleanup as necessary.

MR. YAVITZ:  So let's go off the record.

Page 260

Coffman

THE VIDEOGRAPHER:  The time is 4:21 p.m.  We are going off video record.

(Brief recess taken.)

THE VIDEOGRAPHER:  The time is 4:36 p.m.  We are back on the video record.

BY MR. YAVITZ:

Q.    Welcome back, Mr. Coffman.  I only have one question, which is whether you discussed the substance of your testimony with counsel during the break?

A.    I did not.

Q.    I have concluded my questions pending any recross or redirect.

MS. GILDEN:  I have no redirect.  I know Mr. Coffman wanted to update one of his answers.

THE WITNESS:  Yes, you had asked me in the last session about whether there were any reports I had filed since the filing of this report that aren't reflected and in thinking about that further, there is one report I recall now that I issued, I believe sometime in

Page 261

Coffman

November or earlier December that I was not thinking about at the time.  It was in the Maxar litigation.

MR. YAVITZ:  I appreciate that clarification.  Thank you.  Carol, if you don't have any further questions, we can go off the record and conclude the deposition.

MS. GILDEN:  So you know, we are reserving rights to designate either the deposition or parts of it confidential.

MR. YAVITZ:  Understood.

THE VIDEOGRAPHER:  We are off the record at 4:37 p.m. and this concludes today's testimony given by Chad Coffman CFA.

The total number of media used was five and will be retained by Veritext.

(Time noted:  4:37 p.m.)

Page 262

A C K N O W L E D G M E N T

STATE OF                    :

                            :ss

COUNTY OF                   :


          I, CHAD W. COFFMAN, hereby certify

that I have read the transcript of my testimony

taken under oath in my deposition on the 21st

day of December, 2022; that the transcript is a

true, complete record of my testimony and that

the answers on the record as given by me are

true and correct.


                      -------------------------

                          CHAD W. COFFMAN


Signed and subscribed to before

me this                          day of

                          , 2023.


----------------------------------------

Notary Public of the State of

Page 263

C E R T I F I C A T E

I, FRAN INSLEY, hereby certify that the Deposition of CHAD W. COFFMAN was held before me on the 21st day of December, 2022; that said witness was duly sworn before the commencement of testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Deposition of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of December, 2022.

- - - - - - - - - - - - -

FRAN INSLEY

**Page 264**

**VERITEXT LEGAL SOLUTIONS**

NAME OF CASE: SHEET METAL v. OPERATING ENGINEERS

DATE OF DEPOSITION: DECEMBER 21, 2022

NAME OF DEPONENT:  CHAD W. COFFMAN

| PAGE | LINE(S) | CHANGE | REASON |
|------|---------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

_____

SUBSCRIBED AND SWORN TO BEFORE ME

THIS___DAY OF _____, 20__.


 (NOTARY PUBLIC)   MY COMMISSION EXPIRES:

**[& - 5]**

**&**

**&** 2:3,11 251:9

**0**

**04737** 1:4 5:21

**1**

**1** 3:8 9:24,25 10:4,9 18:15 19:13 37:17 50:16 170:15 217:17 235:22
**1,229** 39:2
**10** 3:8 14:8 18:24 84:11 87:22 102:19 179:9 227:11,14 227:18,19,19,20 228:3,3,6,10,13 229:3,5 232:20 233:7,10
**10019** 2:13
**10:51** 70:19
**10b** 18:25 105:11 114:5
**11:04** 70:23
**12** 88:25 93:21 93:23,25 100:15 100:21
**120** 51:20,25 52:6,8
**121** 3:9
**12112** 263:21
**12:13** 121:9
**12:29** 121:13
**13** 57:21,25 58:3 58:11 61:11
**13f** 89:13

**14** 3:10 76:22 78:19 93:18,21 132:23 133:6,6,7 133:17 146:25 151:7 159:15
**15** 59:24 159:23
**150,000** 257:19
**151** 3:10
**159** 3:11
**16** 143:17 146:11 192:5
**17** 144:24 145:5 145:11,22
**1705** 2:5
**18** 252:19 253:9
**19** 128:21 130:25 237:18
**190** 2:5
**1992** 236:11,19
**1995** 236:20,22
**1996** 237:3
**1997** 237:18
**1:34** 167:11

**2**

**2** 3:9 120:14 121:23,25 122:11 133:8,18 143:18 195:8 246:13 252:19 253:9
**2,000,000** 257:23
**20** 14:8 23:13 24:13 28:7 55:14,18 57:8,21 58:9,17,23 59:13 61:20 73:14 88:21 220:12

232:20 233:7,10 243:5 247:4,12 248:3 264:21
**2005** 238:20
**2006** 238:14,20
**2007** 238:14
**2008** 239:11 253:15
**2015** 154:24
**2016** 53:6,12 122:6 159:15
**2017** 183:25 184:23 185:19
**2018** 53:8 89:7,9 89:9 94:2,10,11 99:2,8,14 180:18 186:5,17 192:5
**2019** 194:18 195:4
**2021** 7:15
**2022** 1:18 5:4 10:25 253:19 262:10 263:6,20 264:4
**2023** 262:18
**20a** 18:24
**21** 1:18 5:4 88:18 94:2,11 264:4
**21st** 262:9 263:6
**23** 39:11 122:6 154:23
**24** 31:11 37:23 38:6,8
**27th** 263:20
**28** 10:24 31:21 63:13 253:19

**29** 31:23 94:9 242:22
**2:13** 167:16

**3**

**3** 3:10 43:25 44:6,15,20,22 45:20,21 48:18 48:20,24 49:3,6 49:7,14,20,20 50:5 108:13 151:5,6,11 179:12,13,17
**30** 242:22
**300** 247:21
**312** 2:8
**34** 37:16
**35** 59:19
**357-0370** 2:8
**36** 37:22
**3:13** 217:5
**3:20** 1:4 5:21
**3:29** 217:9

**4**

**4** 3:11 159:11,17
**400** 247:18,20
**43** 44:2
**44** 48:16 49:10
**46** 50:15
**49** 48:18
**4:21** 260:3
**4:36** 260:6
**4:37** 261:15,20
**4th** 72:7

**5**

**5** 18:25 105:11 114:5 205:12

**[5/23/16 - additionally]**                                    Page 2

**5/23/16**   3:9
**50**   13:2 48:18
  179:14 206:25
  207:6
**500**   259:15,16
**51**   2:13 53:22
**52nd**   2:13
**5:00**   72:17
**5th**   72:5,8 74:2,2
  74:4,5

**6**

**6**   3:4 20:7 74:9
  94:2,10 120:14
**60603**   2:6
**68**   88:19
**69**   67:21

**7**

**7**   20:7 88:19
  122:11 151:4,5
  179:19
**710**   1:6
**73**   82:2
**74**   83:10
**79**   80:5
**7c**   37:15
**7e**   44:2
**7f**   50:15
**7l**   80:4
**7m**   91:8

**8**

**80**   91:9 247:3
**81**   102:13
**84**   170:14 171:3
  173:2 176:20
**85**   217:17

**9**

**9/14/16**   3:11
**900**   246:17
**91**   94:9 96:21
**95**   57:24 60:5
**9:31**   1:18 5:3
**9:47**   19:23 20:2
**9a**   86:18
**9b**   86:19

**a**

**a.m.**   1:18 5:3
  19:23 20:2
  70:19,23
**abet**   203:20
**ability**   33:8
  44:14 49:6 64:7
  101:15 130:17
  152:11 153:6,21
  157:3 222:9
  232:6
**able**   38:7 45:4
  73:14 118:20
  126:10 141:11
  142:8,20 149:25
  153:21 154:10
  158:14 163:15
  200:10 222:8
  232:2
**abnormal**
  108:12 174:7
**absence**   91:13
**absent**   203:2
**absolutely**   75:17
  139:20 205:19
  222:18 225:3
**academic**   37:12
  40:12,17,23

49:15,19 50:10
  62:2 81:10 90:7
  248:7,15,18,21
  248:24
**acceptable**
  120:24
**accepted**   57:10
  116:2,3 233:25
  258:17
**accepting**   116:25
**access**   92:17
**accidentally**
  133:10
**account**   25:2,24
  75:22 112:2
  152:13 175:4
  194:4 199:16
  200:6 204:19
  231:18
**accounting**   76:8
  239:23 249:7,9,9
**accretion**   155:6
  155:9
**accurate**   12:11
  89:11 94:7
  104:5 236:23
**accurately**   9:21
  138:2 236:10
**achievable**
  182:21
**achieve**   129:23
**achieved**   183:4
**acknowledge**
  38:4
**acknowledged**
  192:13
**acquire**   96:12

**acquired**   34:20
**acquiring**   37:11
  156:23 157:4
**acquisition**
  221:9 225:10
**acquisitions**
  129:14,15,16
  156:8,19 157:13
**act**   18:24 47:7
  97:22 102:19
**action**   6:5 7:10
  7:14,15 18:22
  21:22 109:8
  163:17 200:15
  235:7 238:23,25
**active**   91:24 92:8
  244:6,23
**activity**   97:8
  101:14 102:3
  145:25
**actor**   161:14
**actual**   28:14
  62:12 142:5
  166:24 212:5
  221:13,17,24
  229:6 232:14
  233:13
**adding**   86:4
**addition**   173:6
  190:25 210:15
**additional**   10:22
  26:16,21 28:19
  45:13 86:6
  128:24 171:6
  175:9,13 191:4
  192:2
**additionally**
  194:20

**address** 31:19 32:20 211:8
**addressed** 174:11 177:14 194:7 206:12
**addresses** 32:8 67:21
**addressing** 156:21
**adequate** 228:15
**adequately** 206:20
**adjust** 24:16
**adjusted** 24:9 153:24 210:23
**adjustment** 206:17
**administer** 4:16 6:4
**admirable** 259:2
**admissibility** 186:18
**admission** 180:9 212:20 213:16 248:11
**admitted** 192:5
**adopt** 52:10
**adopted** 52:25
**adr** 18:7 23:24 24:5,6 47:3 50:24 55:5 69:17 76:7,15 79:18 81:21 83:5 84:19 85:4 85:18,19 86:9,10 86:15,21 87:2,5 88:6 92:10 93:6 93:12 97:20

100:8,13 112:4 188:21
**adr's** 17:12
**adrs** 18:18 20:18 20:23 21:20 24:9 44:16 50:18 53:13 76:2 77:15,18 78:17 79:7 80:10,13,17,24 81:9,14,19,24 82:8,12 83:7,12 83:25 86:5 87:7 87:8,18 88:16 91:6,14,18 92:14 93:13 94:18 95:5,8,12,17,19 96:8,14 97:7,16 97:18 98:2,6,9 98:21 99:7,14 100:4 101:16 111:12 188:11 224:18 235:9
**advantage** 102:7
**adverse** 211:13
**advice** 161:16
**advising** 241:2
**affect** 26:12 64:11 154:3 175:5
**affiliated** 240:17
**affirmative** 69:14
**affirmatively** 119:6
**afield** 157:5
**afternoon** 72:17 167:14

**ag** 5:18 18:18 81:4 259:7,11,12 259:19
**agency** 148:9
**aggregate** 87:17 255:3
**ago** 23:4 109:12 249:21 254:7,9 254:10,13
**agree** 5:12 10:21 26:20 34:19 85:8 89:3,5 92:12 165:11 198:8 208:9 211:12 215:10 215:14 225:18 233:12 258:6
**agreed** 4:4,9,14 172:4 228:25 243:22
**agreeing** 238:12
**agreement** 53:5 53:12 199:9 247:2
**agricultural** 154:22 155:2
**ahead** 86:13 122:10 153:18 153:19 162:4 197:10
**aktiengesellsc...** 1:14
**al** 5:17,18
**allegation** 110:6 114:2,24 148:21 148:25 165:4 183:10

**allegations** 106:5 114:10 126:18 138:23 138:25 140:12 142:16 150:25 182:3 183:9 193:9 214:15,21 214:23 232:23 232:23,25
**allege** 109:11 127:23 138:4 168:18 169:5 181:21 213:17 213:23 214:10
**alleged** 104:18 106:7,11 108:10 108:13 109:7,20 111:3,11 112:3 112:12,13,15,22 113:19 118:6,6 118:12,13,25 119:12,13,25 126:14,16 127:21 136:10 136:16 137:11 137:25 138:5,6 139:8,8 140:18 141:7 142:16 148:17 154:12 163:14 165:15 166:2 177:8 180:15,21 181:3 190:23 192:2 203:16 204:14 208:11 212:15 212:25 214:11 215:11 222:22

**[allegedly - answer]**

**allegedly** 104:11 148:6

**alleging** 104:10 105:13,19 106:20 109:22 111:6 113:6 114:15 119:2,17 119:21 120:4 138:12 139:2 140:15 144:5 167:2 169:14 170:7 180:25 182:5 212:17,21 214:16 223:4,10

**allocate** 116:17

**allocation** 117:20

**allow** 97:21 107:25 178:4

**allowed** 9:11 69:7 103:17 174:22 191:23

**allows** 45:2

**alter** 87:24

**altered** 39:13 53:24

**alternative** 161:14 210:5 226:19

**amazing** 176:7

**amazingly** 173:12

**amended** 7:14

**amendment** 12:14

**amount** 15:10 22:4 42:20 45:11 48:5

76:17 83:4 90:3 100:19,21 108:9 121:3 139:4 140:13 172:12 174:5,11,16,18 174:20 177:25 197:17 198:4 210:5 218:20 256:7

**amounted** 154:23

**analyses** 34:10 35:2 111:22 116:23 117:4 175:13 209:22 237:21

**analysis** 19:11 27:11 32:6 35:21 36:2,3 40:8 41:13,25 50:23 51:10,12 60:8 61:10 62:4 68:22 71:11 74:6 77:9,10,13 77:14 86:7 91:2 91:5 100:12 123:3,4 141:4 142:20 155:20 158:10 171:19 173:2 175:4,21 176:15 177:7,17 178:8 183:17,23 190:7 191:21 194:2 198:22 199:2,25 200:5 200:20 202:13 202:19 205:3,12 205:23 206:8

208:8 210:2,18 213:3,7,10,19,21 217:22 218:2,24 226:20 229:9 231:5,19 234:21 236:17 237:20 240:19,23 250:7 256:21 258:10

**analyst** 28:19 31:7 38:5,19 39:2,12 40:4,25 42:6,17,20 43:6 58:8 60:13 61:23 62:25 76:14 159:25

**analysts** 37:20 37:24 38:9,23 39:5,15,23 40:13 40:18,22 41:11 41:23 42:16,23 43:13,16,18,22 61:17 62:6

**analyze** 33:23 36:7,25 37:9 38:20 76:3,5 86:8 91:15 144:8 189:7 192:15 199:13 199:19 209:19

**analyzed** 41:22 55:14 90:13 100:22 111:20 119:6 123:20 129:8 142:11 197:11 209:10 209:13,14 211:2 216:20

**analyzes** 129:12

**analyzing** 24:25 28:7 34:17,17 35:3,25 36:6 43:2 50:19 71:23 126:13 188:25 205:21 207:10 209:20

**announced** 54:20 58:14,18 62:20 74:22 173:10

**announcement** 55:12,15,24 57:3 57:15,20 58:9 62:11,13 158:23 173:13 180:11 196:19,21,22 197:14 234:11

**announcements** 55:7 56:20 57:6 58:2,4,8,24 60:13 73:5,6,13 158:12 197:6

**announcing** 30:4 56:5 64:18 159:4

**annual** 46:14 47:5 255:6

**annually** 14:4

**answer** 8:24 14:15 15:7 20:3 29:16 40:10 42:18 60:7 83:9 101:3 104:2 108:8 109:4 128:6 131:21,24 135:2,4 139:14

141:16,18 142:6
142:18 143:21
144:2,8,25
145:10,16 146:7
147:3,5,15
149:14 162:22
164:22 165:8,9
175:19 187:7
190:13 192:20
203:6 205:7
206:16 224:25
239:24 244:23
252:3 255:11,25
**answered**  44:8
  111:15 113:2
  131:25 134:4
  137:16
**answering**  17:8
  204:8 206:5
**answers**  44:10
  115:2 199:18
  260:18 262:12
**ante**  63:16
**anticipate**
  160:18 183:5
  223:14 256:5
**anticipated**
  53:14
**anticipating**
  196:6
**antitrust**  161:4,9
  161:17 163:8
**anymore**  152:3
  244:5
**apart**  211:10
  212:7 242:4
**apologies**  44:10

**apologize**  223:13
**app**  244:15
**appeal**  190:16
  190:19 258:8
**appearances**  6:2
**appearing**
  159:20
**appears**  10:13
  76:9 159:21
  263:11
**appendix**  11:25
  17:7 18:8
  235:21 253:11
**applicability**
  16:8,16 113:24
**applicable**  103:6
  108:8 112:9,9
**application**
  32:16 35:25
  111:24 140:4
  141:13
**applications**
  154:2
**applied**  16:22
  23:20 103:24
  109:3 112:16
  113:15 154:14
  169:5
**apply**  63:24
  71:24 114:23
  126:22
**applying**  65:6
  250:5
**appreciate**  147:6
  165:11 178:21
  206:14,15 261:5
**appreciated**
  168:23 170:13

209:9
**approach**  52:10
  107:18 116:20
  145:8 158:22
  173:3 179:20,21
  233:25
**approached**  40:3
**approaches**
  117:4,5
**approaching**
  40:10 215:13
**appropriate**
  31:8 36:16
  73:15 86:5
  114:4,25 121:5
  126:22 137:9
  139:22 152:14
  164:22 218:17
  219:5,10,18
  220:4,6,14,20
  231:20 258:16
**appropriately**
  138:2 139:23
  141:2 198:21
  211:5
**approval**  56:14
  146:19 147:7
  161:9
**approvals**
  160:16
**approve**  148:19
**approved**  243:19
**approximate**
  254:25
**approximately**
  23:4 66:22
  236:13,15 237:6
  237:14 238:5

240:2 243:3
247:15 250:20
256:15
**arbitrage**  91:13
  91:16 95:2 97:8
  101:14 102:2
**arbitraged**  92:5
**area**  68:11
  166:25 237:2
**areas**  239:24
**argument**
  222:14
**argumentative**
  127:2 130:25
**arising**  123:10
  130:9 138:16
  229:25 231:3
**arrive**  110:13
**article**  32:8 64:8
  67:23 68:8,13
  74:11 90:13,19
  90:20,22,25
  229:14
**articles**  62:24
  63:8,10,15 65:4
  65:5,12,17,22
  66:25 68:4 73:3
  73:8 187:20
**articulated**
  163:22
**artificial**  107:19
  108:19 127:10
  168:3 171:7,12
  171:20 172:5,8
  172:20 174:3,5
  174:12,18
  179:18 198:22
  199:3

**[asen - aware]** Page 6

asen   13:9
aside   21:2 98:19
  219:22 243:9
  258:2
asked   8:14 18:10
  18:17,21 19:7,19
  20:4,5,16,24
  21:3,9 22:13,20
  23:2 65:14 93:3
  98:5 100:23
  102:17 111:14
  112:25 114:17
  115:11,18
  134:13 137:15
  143:21 171:25
  172:2 192:21
  226:21 229:7
  231:19 233:21
  234:19 242:23
  256:22,25 257:8
  257:25 258:3,10
  258:18 260:19
asking   16:14,15
  53:21 83:21
  84:3 99:23
  107:12 116:25
  131:6,9,13
  149:11 157:21
  157:23 158:2,8
  163:23 201:25
  230:25
asks   160:7
aspects   35:6,19
  109:10 190:4
  241:18
asserted   111:11
asserting   110:22
  114:5

assess   42:9 50:17
  79:16 112:20,21
  113:16 117:25
  126:23 137:10
  137:17,25 139:6
  171:22 186:18
assessed   155:13
  175:12 208:5
  210:9
assessing   40:13
  104:15,24 137:8
  138:16 200:6
  201:14
assessment
  176:18 201:18
  213:4 223:21
  224:19 225:9,15
  226:13,23
  228:21 229:24
  230:10,14
  232:18 254:18
assessments
  191:24
asset   81:14
  91:23
assets   81:5 92:6
assign   127:9
assist   115:19
  204:8
assisted   13:8
assists   179:25
associated   127:7
  134:21 142:10
  198:9 201:9
  210:19 212:23
assume   54:5,18
  107:9 176:3,6
  188:17 189:2

226:14,21 229:7
assumed   9:14
assuming   106:5
  137:18 161:12
  189:13 202:13
  220:9 221:16
  246:4 257:5,7
  258:8
assumption
  141:10 203:7
  211:18 215:7
  227:3
assumptions
  36:15 115:19,21
  151:17 175:23
  176:14 208:20
  229:10 231:8,20
  231:23,25
assuring   119:11
attempt   90:16
  144:8 186:22
  188:6 189:23
attempts   186:10
  187:15
attendant
  132:16
attention   122:20
  133:12 159:24
  199:4
attorneys   2:4,12
  4:5
attractive   155:3
attributable
  218:19
attribute   228:5
audio   5:10 7:18
august   180:18
  185:19 192:5

auspices   242:11
authored   10:20
authorities
  146:14 147:11
  147:12 161:4,10
authority   48:10
  49:2
authorization
  135:22 136:12
authorized   4:16
  6:4
automatically
  120:15
available   23:24
  24:3,4,6,9,16
  25:14 29:9,23
  30:8,14,22 31:2
  31:9 41:21
  69:22 72:21,25
  74:7,12 100:2
  188:13,16,19
  189:2
average   14:3,11
  14:14 88:21
  240:6
averages   88:18
avoid   8:7
award   190:17
aware   9:7 14:24
  14:25 15:12
  19:17 32:3,7
  40:12,16 49:19
  90:7 143:12
  183:24 184:14
  184:22 185:9,13
  185:17 186:4
  187:11 188:8
  192:4 213:22

Page 7

214:3,9 252:5
259:10

**b**

**b**   2:14 3:6 18:24
86:24 102:19
235:21 253:11
**back**   16:12 20:2
30:11 71:3
73:25 82:2
84:23,24 90:24
99:10 116:12,13
120:17,19,23
121:16 134:3,6
146:20,24 147:3
150:17 161:8
165:22 167:8
198:10 199:6,10
199:12,19
217:12 218:20
236:18,20
237:18 253:22
259:23 260:6,9
**background**
33:14 252:6
**backup**   234:10
**bad**   26:5 176:8
176:10 180:12
207:2,9 208:20
208:21 212:9,16
212:24
**balance**   47:19
**ballpark**   12:22
232:20
**ban**   219:5 220:4
**bank**   25:23
219:21

**bartel**   2:15
**based**   21:8 26:23
79:24 80:2
109:13 110:22
131:14 143:22
155:20 157:6
162:21 163:20
164:12 165:6
169:7 176:13
178:15,18
181:19 183:4
188:24 199:20
205:3,21 223:15
223:18 257:12
**bases**   11:18,22
**basic**   16:3 234:6
**basically**   228:8
**basing**   139:9
143:2
**basis**   11:9,9
21:23 31:17,23
34:14 116:17,23
142:11 145:17
154:15 163:16
164:16 166:21
166:22 193:13
204:24 211:5
213:24 241:20
246:23 255:6
**bassiouny**   2:8
**baumann**   1:14
132:25 133:23
137:5 160:2
**baumann's**
134:20
**bayer**   1:14 5:18
18:18 20:18,22
21:9,16,20 23:24

24:5,5,8 37:24
38:9 39:12
44:16 45:15
46:2 50:18,24
52:20 53:12
54:5,8,16 55:5
56:19 57:16
62:23 64:9,10
69:4,17 76:2,3,7
76:7,12,15,15,18
77:5,7,11,15,15
78:14,16,17 79:7
79:7,12 80:6,10
80:13,16,17,23
80:24 81:3,4,8,9
81:13,14,17,19
81:21,21,24 82:8
82:12,19,25
83:12,16,20
84:19 85:4,4
86:15 87:7,8,9
87:18 91:6,14,14
91:18 92:8,10,13
92:14 93:12,12
93:13 94:18
97:7 98:6,21
99:5,7,12,14,17
99:20,20 100:3,8
100:13,13
111:12 122:7
128:7 151:8,15
153:11 155:5,13
156:6 159:13
162:13 183:19
188:11 191:11
191:17 192:5,24
194:17 195:4,9
202:13,25 212:9

221:8,9 224:18
225:14 227:13
228:5,15 259:7
259:11,12,16,17
259:19
**bayer's**   44:5,14
112:4 130:7
155:22 156:18
168:18 181:10
181:23 188:20
195:13 225:10
**began**   238:12
**beginning**   15:2
37:16 44:2
50:15 70:23
121:13 167:16
176:8 183:24
205:13 217:9
**behalf**   1:7,10
254:4,17
**belief**   197:25
**believe**   11:21,25
14:25 16:25
21:18 26:21
28:16 30:7,25
32:22 53:7 73:5
80:11 89:25
100:10 131:4
134:14 155:20
159:12 179:17
184:9 188:8
190:20 206:19
219:13 247:18
247:20 252:24
260:25
**believed**   102:7
201:23

**[believing - capitalization]**                                      Page 8

**believing** 31:24
**benchmark**
  62:14,15
**benefits** 223:8
**benjamin** 2:7
**best** 60:7 144:2
  165:8,10 182:23
  202:5 231:10
**bet** 226:16
**better** 7:22
  30:23 164:4
  197:21
**betting** 102:4
**beyond** 11:13
  13:12 19:12
  20:25 21:18
  27:22 35:7
  71:18 84:8
  155:3 173:8
  175:9 252:8
  255:21
**bias** 75:12
**big** 89:15 182:19
  209:8
**bill** 227:20
**billing** 12:19
  13:21
**billion** 25:23,24
  26:2 154:23
  195:8 219:21,24
  228:13 229:3
**bit** 55:10 69:6
  88:20 102:12
  129:2 146:24
  160:4 164:14
  168:16 203:25
  217:18

**bitar** 13:9
**bleed** 75:9
**block** 96:12
**blood** 263:14
**bny** 94:17
  101:15
**bordering** 170:3
**bottom** 122:13
**bounds** 61:13
**bowling** 249:15
**breadth** 229:17
**break** 8:18,19,24
  66:4,8,12 70:15
  71:7 120:20,22
  121:19 145:25
  167:9,22 216:24
  217:14 259:20
  260:12
**breath** 45:5
  49:25 64:13
**brief** 19:24
  70:21 121:11
  217:7 260:4
**briefly** 234:12
**briefs** 15:17,20
**bright** 41:4
  82:15
**bring** 244:10
**broad** 85:7,24
  127:12,13 219:8
  241:18
**broader** 155:19
**broadly** 78:15
  78:25 165:4
  249:5
**brotherhood** 1:6
**build** 165:6

**built** 128:13
**bumbling** 162:5
**business** 45:17
  46:13 47:21
  129:6 154:23
  155:21 156:8,20
  241:8 244:23
  245:4 250:10
**businesses** 52:16
  153:3 157:14
  244:8,9,19,21
**buy** 97:19

**c**

**c** 2:2 6:13,13
  262:2 263:3,3
**calculable**
  163:16 164:15
  166:21
**calculate** 71:19
  107:25 114:25
  117:16 167:25
  168:15 174:22
  175:11 200:10
  204:19 210:9
**calculated** 14:14
  21:22 71:16
  115:4,6 170:19
  171:7 240:8
  257:16
**calculating**
  18:22 193:11
  198:8 201:15
**calculation**
  107:20 116:2,3
  174:7 185:6
  187:16 188:6
  205:5 206:11

  217:21
**calculations**
  115:16,18
  116:16 117:10
**calendar** 154:24
**california** 1:2
  5:20 184:23
**california's**
  184:25
**call** 3:9,11 122:6
  158:25 159:13
  166:23 181:5
  234:16 235:11
  235:14,15,19
**called** 32:10
  239:12,15
  243:24
**calls** 16:11 58:6
  149:21 157:19
**camera** 5:7
**cammer** 31:12
  31:20,22,22 32:5
  32:16 47:8 48:9
  48:11,25 50:4
  66:13 158:10
**campbell** 13:9
  247:19
**cancellations**
  94:18 97:4
**cancer** 148:7
**cap** 89:23
**capability**
  132:13
**capacity** 220:11
  239:2 241:14
**capitalization**
  53:15 76:12
  86:25 87:2

capture 210:11
carcinogenicity
  185:3
card 244:12,12
cardholders
  244:13
care 161:23
career 115:17
  237:24
careful 199:4
carefully 209:13
  209:14 224:24
  225:5
carol 2:7 145:6
  153:18 251:18
  251:21 252:7
  261:6
carol's 151:4
carry 198:9
carson 159:25
  160:6,25
case 1:4 5:20
  11:6 14:17,25
  16:25 19:8,12
  30:25 39:20
  40:10 42:15,19
  61:19 92:25
  103:7,13 105:3,4
  105:11,11,18
  108:15 109:18
  110:5,21 111:9
  111:12 112:4
  113:17,21,25
  114:18,19
  115:20 119:9
  129:9,11 139:24
  142:22,25 143:9
  143:15 150:20

154:9 165:6,15
167:6 168:17
171:8,22 172:2,3
172:4,10,11
173:7,9,20
174:17 175:2,11
180:23 184:24
187:21 190:16
194:6,13,18
195:4 196:9
201:4 202:14
203:14 204:21
205:11 207:7,18
209:21,25 211:7
212:2 213:23
214:24 215:10
215:12 216:12
218:12,18
220:24 221:25
222:23 230:19
230:20 233:6,9
233:15 234:5
243:8,11 247:6
250:18 252:7
256:3,8 257:7,18
259:5,13 264:3
cases 14:21 15:3
  16:2,4,8,17
  22:12 29:17
  43:14 52:12
  57:7,8 58:23
  62:15 114:5,16
  114:17,19 115:3
  115:5,10,17,23
  115:25 116:7,15
  116:16,19
  117:18 125:17
  129:14 171:12

173:5 174:4
175:3 196:10
200:15 229:17
230:7,13,16,23
233:23 234:2
237:17 238:4,24
246:9 247:5
251:23 252:2,10
252:23,24 253:8
253:13,17
256:16,20,21
257:22
cash 25:24 26:2
  26:6 47:19 64:6
  81:6,15 85:10,20
causal 177:13
  181:16 199:6
  214:17
causally 104:12
  107:13 108:3,14
  172:14 199:17
  199:22
causation
  108:19 119:6
  154:17 175:3
  185:6,23 186:12
  186:23 187:16
  188:7 189:24
  198:21 199:2
  200:5 206:7
  208:8 209:21
  210:17 213:3,7,9
  218:24 229:9
  256:18 257:9
cause 9:2 50:19
  68:4 103:19
  104:8 110:9
  148:8

caused 59:10
  67:23 111:12
  112:4 113:9
  114:8 169:22
  214:11 216:9,11
causes 98:16
  148:7
caveat 8:22
  188:15
central 138:24
cents 179:14
certain 13:12
  14:19 17:20
  22:15 23:11
  45:2,12 69:7
  75:20 85:23
  153:22 171:8
  209:7 214:25
  215:11 234:15
  234:16,21 237:8
  237:19,20
  242:20
certainly 11:7,15
  14:23 17:10
  21:14 22:24
  23:7,9 25:8
  27:22 33:2,17
  34:25 35:6,23
  38:13,22 40:16
  40:21 43:14,20
  47:2,3,14 48:4
  49:12 50:10
  51:3 54:13,25
  56:2,19,24 62:10
  67:6 68:7 75:17
  76:6,11,14 77:11
  79:14 82:16
  83:5 86:18 90:5

92:15,16 93:5
96:19 111:5
117:2,19 124:12
127:22 129:7
135:24 138:5
141:19,21
150:10 152:5
157:11,22
162:23 173:5
174:6 175:7
179:5 195:15
196:16 208:19
214:16,20
223:10 225:4
232:21 237:17
246:5 249:8,10
250:21 252:7
254:14 256:19
**certainty** 54:25
**certificate** 32:9
32:11
**certification** 4:6
11:5,16 256:12
256:13 258:5,13
**certifications**
236:4
**certified** 256:6
**certify** 262:7
263:4
**cetera** 47:20,23
159:2 234:12
257:21,21
**cfa** 1:21 5:15
32:9,13,17,20
33:5,19 34:3
236:4,7 261:17
**cgilden** 2:9

**chad** 1:20 3:4
5:15 7:3 261:16
262:7,15 263:5
264:4
**challenged**
117:21
**challenging**
184:24
**chance** 56:21
90:24 206:25
**change** 54:22
89:12 109:2
131:24 139:20
143:3 169:17
219:25 264:5
**changed** 25:8
26:6,18 27:2
52:16 59:25
60:3 89:24
175:2,5 239:15
246:3
**changes** 50:21
107:19 204:22
**changing** 64:5
231:16
**characterization**
54:18 167:4
170:22 248:12
**characterize**
27:23 123:9
134:19 141:24
189:25 212:3
**charge** 247:16
248:4 257:13
**charged** 247:13
**charter** 32:13,14
33:5

**check** 38:21 58:3
253:22
**checked** 38:17
**chicago** 2:6
237:25 238:12
239:11 250:8,10
250:16
**chips** 258:23
**choose** 122:20
**circulated** 29:13
**circumstance**
90:16 112:17
**circumstances**
27:19,25 28:5
117:18 175:18
178:10 196:3,15
206:12 219:7
257:25
**citation** 48:10
**cite** 15:2 48:25
94:12 97:6
**cited** 15:16,19,20
15:21 88:23
184:2
**claim** 81:6 91:23
92:10
**claimed** 81:2
183:12 219:22
**claiming** 104:6
**claims** 81:15
104:4 114:5
119:24 130:10
140:22 211:25
215:6 220:9
224:2
**clara** 13:9
247:19

**clarification**
178:21 253:3
261:6
**clarify** 8:15
29:16
**clarity** 202:18
**class** 7:14 11:5
11:16 18:19
20:19 23:25
24:10 37:25
38:10,14,24 39:4
39:9,10,21 40:6
45:25 51:16
88:15,18,20
89:21 93:20
98:22,25 102:18
107:21,22
116:18 174:16
176:5 193:14,20
193:22 195:2
200:3,7,14
203:11 204:7
205:13 206:2
210:19 217:24
219:14,15 226:8
238:23,25 256:5
256:12,13 258:5
258:12 259:13
**classwide** 21:23
108:24 109:3
112:9,17 139:22
140:4 141:12
142:11 143:5
154:14 163:16
164:16 166:21
166:22 187:5
204:24 211:4

| | | | |
|---|---|---|---|
| **clean** 204:10 | **coffman** 1:21 3:4 | 109:1 110:1 | 183:1 184:1 |
| **cleanup** 259:23 | 5:15 6:1,18 7:1 | 111:1 112:1 | 185:1 186:1 |
| **clear** 41:3 49:6 | 7:3,18 8:1 9:1 | 113:1 114:1 | 187:1 188:1 |
| 57:13 61:3,5,16 | 10:1,11 11:1 | 115:1 116:1 | 189:1 190:1 |
| 68:17 78:19 | 12:1 13:1 14:1 | 117:1 118:1 | 191:1 192:1 |
| 79:2 81:8 98:13 | 15:1 16:1 17:1 | 119:1 120:1 | 193:1 194:1 |
| 100:16 101:5,13 | 18:1 19:1,20 | 121:1,16 122:1 | 195:1 196:1 |
| 119:5 140:16 | 20:1 21:1 22:1 | 123:1,17 124:1 | 197:1 198:1 |
| 143:21 157:6 | 23:1 24:1 25:1 | 125:1 126:1 | 199:1 200:1 |
| 168:24 173:16 | 26:1 27:1 28:1 | 127:1 128:1 | 201:1 202:1 |
| 198:25 202:22 | 29:1 30:1 31:1 | 129:1 130:1 | 203:1 204:1 |
| 211:23 213:16 | 32:1 33:1 34:1 | 131:1 132:1 | 205:1 206:1 |
| **clearly** 8:3 29:20 | 35:1 36:1 37:1 | 133:1,11,19 | 207:1 208:1 |
| 29:21 31:7 | 38:1 39:1 40:1 | 134:1 135:1 | 209:1 210:1 |
| 39:19 40:4 | 41:1 42:1 43:1 | 136:1 137:1 | 211:1 212:1 |
| 43:15 85:21 | 44:1 45:1 46:1 | 138:1 139:1 | 213:1 214:1 |
| 88:12 106:8,20 | 47:1 48:1 49:1 | 140:1 141:1 | 215:1 216:1 |
| 119:25 174:10 | 50:1 51:1 52:1 | 142:1,15 143:1 | 217:1,13 218:1 |
| **client** 35:8 | 53:1 54:1 55:1 | 144:1,23 145:1 | 219:1 220:1 |
| **clients** 237:20,25 | 56:1 57:1 58:1 | 145:21 146:1 | 221:1 222:1 |
| **clinical** 56:9 | 59:1 60:1 61:1 | 147:1 148:1 | 223:1 224:1 |
| **close** 54:6,19,21 | 62:1 63:1 64:1 | 149:1 150:1 | 225:1 226:1 |
| 56:4 72:7,8,15 | 65:1 66:1 67:1 | 151:1 152:1 | 227:1 228:1 |
| 73:18 77:19,25 | 68:1 69:1 70:1 | 153:1 154:1 | 229:1 230:1 |
| 102:5,10 179:13 | 71:1,3 72:1 73:1 | 155:1 156:1 | 231:1 232:1 |
| 221:24 | 74:1 75:1 76:1 | 157:1 158:1 | 233:1 234:1 |
| **closed** 53:8,25 | 77:1 78:1 79:1 | 159:1 160:1 | 235:1 236:1 |
| 74:3,17 93:11 | 80:1 81:1 82:1 | 161:1 162:1 | 237:1 238:1 |
| **closer** 7:21 35:24 | 83:1 84:1 85:1 | 163:1 164:1 | 239:1 240:1 |
| **closing** 52:2,5,7 | 86:1 87:1 88:1 | 165:1 166:1 | 241:1 242:1 |
| 52:12 53:17 | 89:1 90:1 91:1 | 167:1,19 168:1 | 243:1 244:1 |
| 72:11,11,12 | 92:1 93:1 94:1 | 169:1 170:1,4 | 245:1 246:1 |
| 77:15,24 78:3 | 95:1 96:1 97:1 | 171:1 172:1 | 247:1 248:1 |
| 155:8 156:2 | 98:1 99:1 100:1 | 173:1 174:1 | 249:1 250:1 |
| 224:20 225:10 | 101:1 102:1 | 175:1 176:1 | 251:1 252:1 |
| **coached** 146:9 | 103:1 104:1 | 177:1 178:1 | 253:1 254:1 |
| **cockling** 151:3 | 105:1 106:1 | 179:1 180:1 | 255:1 256:1 |
| | 107:1 108:1 | 181:1 182:1 | 257:1 258:1 |

259:1 260:1,9,17
261:1,16 262:7
262:15 263:5
264:4
**cohen** 2:3 251:9
251:14,15
**cohenmilstein....**
2:9
**coherence**
138:22 165:3
**coherent** 103:12
104:2,3 106:24
114:10 118:2
119:9 164:11
**coincidences**
78:10
**coincident** 77:4
78:13 215:4
233:8
**coincidently**
79:13
**college** 236:21
237:4 249:18
**colloquy** 159:24
163:3
**combination**
67:5 73:11 95:4
95:19 98:12
113:18 123:6
130:4 155:5,21
218:6 229:8
249:22
**combined** 53:16
53:19 54:24
87:8 154:5,22,24
**combining**
124:10 152:22

**come** 44:9
112:18 120:23
125:18 126:3
163:13 167:8
173:21 176:5,17
180:8 204:2,3
227:25 229:14
240:3 249:20
259:22
**comes** 28:11
51:4 193:11
224:5 246:5,9
**comfort** 105:25
**comfortable**
142:22 161:25
234:3
**coming** 8:3
44:11 69:8
135:9,13 225:21
**commencement**
263:7
**commentary**
28:24
**commenting**
28:20
**commission**
264:24
**committed** 128:7
148:23 156:9
**committee** 186:5
**common** 18:23
21:10,16,23 76:3
76:8,10,13,15,18
77:5,7,12,16,18
78:14,16 79:3,7
79:17 80:23
81:9,13,17,21
82:25 84:4,19

85:4,17 86:4,16
87:9,13,18 91:5
92:9,13 93:12
95:5,8,14,17
96:3,9,13 97:19
98:2 100:13
101:17 102:20
107:24 111:23
118:22 126:2,11
138:15 198:23
**commons** 95:5
**communicate**
9:11
**companies** 41:25
42:2 45:3 52:13
53:16,19 56:3,7
56:15,18 129:22
130:18 152:22
152:24 154:6
156:22 157:3
230:5 241:2
**company** 25:22
26:4 29:11,18,22
30:3 40:5,8 42:7
42:24 43:5
45:10 46:18
47:6 50:7,10
52:15 54:23
55:3 56:2,2,5
60:18,19 62:25
63:5 64:6,18,22
65:9 69:9 76:16
99:21,22 106:14
106:22 110:16
124:11 127:14
154:24 169:4
173:10 176:7,8
177:10 182:16

183:22 192:13
203:21 219:19
220:8 223:21,22
224:2 226:16
228:4
**company's** 26:12
52:16 157:11
**compare** 62:12
79:6
**compared** 55:5
57:17 62:17
76:7 86:15
**comparing**
77:14 225:13
**comparison**
47:22 70:4
86:18,24 92:11
**compensated**
246:16
**compensates**
211:5
**compensation**
245:7 255:18,21
256:2
**complaint** 7:12
7:14 109:11
111:18 119:14
119:15 138:6
140:17,18 141:8
142:17 148:23
163:14,22,23
165:21 184:3,10
190:14 192:11
214:14 232:22
**complementari...**
153:2,5
**complementarity**
161:21

**[complete - connection]**

complete  11:4 205:9 248:14 253:12 262:11
completed  96:22
completely  9:20 75:14 108:7 152:17 163:6 164:7 175:22
completing  20:3
completion 184:20
complicated  9:9
component  51:2 110:24 172:4 208:7 209:18 210:8
components 32:5 59:4,5
comports  202:2
computation 171:12 172:8 173:7
compute  107:20 172:5
computer  8:5 9:16 36:21 70:2
computers 120:22
computing 200:14 205:20
concealed  139:3 139:4 180:8,13 194:5 210:12 229:25
concealing  138:3 138:12
conceive  152:5

conceived 138:13
concept  23:17 32:23 85:24 110:15
conception 169:8
concepts  16:20 33:19 93:5
conceptually 171:17
concerning 141:12 149:16 150:14,21 181:10,23 195:13 256:7
concerns  147:15 248:9,10
conclude  23:10 43:17 49:8,13 63:20 65:24 68:17,18 70:12 70:14 156:25 164:7 173:19 189:3 192:23 216:7 261:8
concluded  12:10 22:25 60:10 63:18 64:25 93:10 114:18 188:12 209:23 260:14
concludes 261:15
concluding 22:10 40:23 159:8 179:18

conclusion  16:11 37:2 39:13 41:2 58:13 59:24 60:2 64:22 69:14 84:2 112:18 127:5 140:23 149:12 149:22 157:20 158:2 193:7 215:19,23 216:18 227:25
conclusions  20:9 36:22 90:15,19 90:20 111:22 143:24 158:14 189:11
condition  49:16
conditions  36:15 45:13 101:19 156:2 234:2
condon  1:14 143:19 160:3
conducted  5:6 37:12
conduit  42:23
conference 64:24 158:25
conferences  63:2
confidence  21:15 77:5 160:12
confident  128:12
confidential 261:12
confirm  243:18 248:17
confirmatory 49:11

confirmed 151:16 155:17
confirming 234:23
confounding 174:9 177:4 179:9 213:5
confronted 141:19
confused  73:21 139:25 164:24
confusion 252:20
conglomerate 195:9
congratulations 242:18
conjunction 135:21
connected  120:2 136:4 142:23 197:12 263:14
connecting 183:6,7
connection  5:8 18:11 19:21 33:4 118:4,5,12 118:20,24 119:12 120:7 123:23 124:5,14 124:25 125:10 125:12,16,20 126:7,12,21 127:8 130:6,8,15 130:21 136:17 137:11 139:17 140:6 142:3 143:6,10 147:20

148:3 153:14 154:11 162:11 164:5,9 177:13 182:25 183:16 190:22 191:11 192:7,25 197:6 214:17 231:23 240:4 246:20,25 251:6 254:4,16 254:22

**connections** 143:11

**consecutive** 93:25

**conservative** 179:10,11,16

**conservatively** 201:2

**consider** 31:8,13 31:25 32:5 33:21 39:18 48:7 65:8 67:12 68:20,20,23 72:6 72:9,18 74:21 93:6 168:14 176:22 204:5 215:14 220:15 220:19 225:5 226:24 227:2 249:3

**consideration** 14:22

**considered** 12:4 18:6 30:9,13,22 33:20 42:4 53:24 54:15 63:4 64:4 74:9 139:24 141:3

172:17 176:19

**considering** 22:3 169:14

**consistent** 78:16 82:17 102:20,24 103:9 104:21 211:6 219:11 233:4

**consolidation** 160:9,14 163:7

**constant** 219:2,3 219:4,25 220:3 220:13

**consulting** 15:13 19:15 20:4 34:13,14 47:4 237:9,11,15 239:15 244:7,19 245:4 246:6 250:24

**consumers** 185:2 244:11

**consummated** 149:6,8,17,19,25 150:3,16,23 221:9 222:5 231:12

**consummation** 231:14

**contact** 237:19

**contacted** 239:6 250:25 251:11

**contain** 56:21 58:4 224:9 253:12

**contained** 48:4 163:24 211:18

**containing** 153:12

**contemplated** 150:8

**contemporane...** 178:18

**contemporane...** 43:6 188:2

**content** 253:5

**context** 24:21 25:2,5,7,20 26:9 26:17,25 30:3 38:3 64:21 98:4 100:11 123:21 124:17 128:17 129:2,7,8 135:17 137:17 141:22 144:5 145:4,11 146:20 149:13 152:4 154:19 155:19 156:16 160:20 161:13 162:20 183:22 186:2 187:2 193:8 240:24

**contexts** 129:18 153:22

**contingent** 256:2

**continue** 5:11 66:13 122:25

**continuing** 66:5 75:19

**contour** 209:21

**contributed** 176:24

**control** 57:17 177:20

**conversation** 251:18,20

**conversations** 9:13

**conversion** 95:10 96:8

**convert** 96:13 97:20 101:16

**converted** 84:16

**converting** 95:8 95:17

**conveyed** 41:24

**conveys** 31:25 32:2

**convinced** 58:16 59:6

**cooper** 2:18 5:22

**copy** 10:13

**core** 42:22 155:6

**corporate** 128:18

**corporation** 81:3 240:20

**correct** 18:19 19:5 22:6 37:3 53:10 55:16 57:23 82:10 99:4 106:6 108:10 166:13 177:2,5,19 207:7 213:14,19 216:7 216:22 235:13 238:18 239:14 243:20 244:24 244:25 245:9 248:8 262:13

**corrected** 204:15

[correction - damages]                                                    Page 15

correction 12:14 32:15 236:24
corrective 107:5 108:11 118:7,12 118:25 119:13 119:25 126:9,21 137:12 140:7 154:12 165:18 166:5,11 167:24 168:19 170:21 172:13 174:19 176:16 181:10 181:22 190:9,10 194:8,17 195:12 195:17 196:18 202:9 204:14,20 205:14,16,18,22 206:10 210:20 210:21 211:11 211:13 212:14 213:11 214:11 215:9 216:3 224:9
correctly 229:18
correlated 52:22 225:20 226:12
correlation 43:20 227:6
corresponds 180:5
cost 123:7 124:5 124:16,17,23,25 125:8,12,14 126:4 129:25 151:16 155:18 181:11,17,23 183:2,3 219:9,17

costs 125:20
counsel 6:2,23 17:4 18:10 71:7 102:16 115:19 121:18 123:15 133:3 146:9 167:21 188:2 217:14 231:23 232:9,24 234:17 235:12,18 251:6 251:8,12 252:5 260:12 263:11 263:18
count 242:20
counted 89:14
counts 230:19
county 262:5
couple 28:18 65:21 115:13 117:12 120:12 218:25 234:13 238:8,11,24 246:5 252:15
course 8:17,22 18:3 28:7 29:12 36:5,9,24 37:6,7 146:22 161:16 168:17 202:16
courses 33:17,19 35:24
court 1:2 4:18 5:19,24 6:10 8:10 14:19 15:21 16:17,21 115:25 183:25 184:23 185:13 186:17 191:12 204:13,17 214:3

258:5,12
courtroom 187:23
courts 116:20 117:3 200:13
cover 97:17 198:2,4
coverage 37:20 38:23 39:12 40:5,22,25 42:6 42:18,20 69:3 185:25 187:17
covered 33:18 33:22 38:9,13
covering 40:14 41:11 76:16 197:16
covers 76:25
covid 254:11,14
create 94:23 155:21 208:19
creates 101:18
creation 132:15 132:17 154:21 155:4
credit 244:11
criteria 45:12,20 47:25 118:16
critical 56:12
crosstalk 8:8
cultural 156:9 156:20
culture 156:10
cultures 130:2
current 110:19 241:10
customer 64:9

cut 248:3
cv 1:4 5:21 115:15 235:25 236:10 239:20 241:10 243:23 248:6,6,7 252:11 252:19 253:5,9

d

d 3:2 6:13 262:2
daily 77:15
damage 111:24 114:4 202:18
damaged 104:25 105:2
damages 18:22 21:22 22:4 102:12,18,23 107:20 108:2,5 108:16,20 114:6 114:21,22,25 115:4,6,12,18,24 116:2,4,8,16,23 117:2,4,9,16 118:23 126:11 126:23,24 136:9 137:8 138:16 141:3,13 142:10 154:13 163:16 166:14,18 168:2 168:6,12,13 175:4,11,23 177:6 185:6,23 186:11,23 187:5 187:16 188:7 189:23 190:17 193:12 198:8,16 198:17,23 200:5

200:10,14
201:16 202:13
204:19 205:19
210:9 215:13
217:22 232:12
232:13 233:25
237:21 255:9
256:7
**data** 11:24 18:7
21:11 35:22
52:4 53:3 60:16
76:17 77:11
87:21 234:22
**database** 62:24
72:21,25 74:11
**date** 10:5 20:10
25:15 55:20,24
64:19 67:24,24
68:23 69:13
71:24 72:2,5,18
72:19 73:15
74:3 75:18
85:20 122:2
151:12 159:18
170:5 180:24,25
201:7 218:22
230:8 236:23
264:4
**dates** 51:23 55:6
55:12,15,18
57:20,22 58:3,10
58:11 59:13,20
60:14 65:11
67:13,16,22 68:4
68:5,8,25 69:5,9
69:18,24 70:3,5
70:5,8,10,11,13
73:14 94:2,6

106:11 158:11
158:12,13
192:10 205:4
**david** 159:25
**day** 27:12,18
29:6 51:16,21
59:7 60:25
63:25 66:14
70:2 71:25
72:14,15 73:17
73:18 74:15,22
75:2,5,20 77:19
78:23,24 79:13
79:14 93:21,21
93:23 100:16
120:11,11
161:18 193:13
193:13 200:2
203:17 206:2
219:14,15 231:5
231:5 241:16,16
241:20,20
258:20,21
262:10,17 263:6
263:20 264:21
**days** 27:12,13,23
27:24 28:2,18,25
29:2,4 51:19,20
51:25 52:6,8
55:8 57:14 61:4
61:20 62:21,22
63:6,7,8,12,13
63:14,14,19,23
65:13,15 66:18
71:13,17,18,20
73:4 74:20
75:12,17 100:21
226:8 229:15

**de** 100:22
**deal** 97:4 105:24
134:17 149:25
150:7 160:7
222:2,4,8,10,11
222:18 225:16
229:2
**dealing** 124:11
124:12
**dealt** 213:6
**debate** 31:2
227:25
**debts** 45:19
**deceived** 191:16
**december** 1:18
5:4 7:15 261:2
262:10 263:6,20
264:4
**decide** 146:6
167:9
**decision** 31:4,5
31:12 48:11
50:4 134:15
169:17 184:25
190:3,5
**decisions** 14:19
30:16 69:19,22
117:15 212:8
**declaration**
117:14
**decline** 89:14,15
89:16 107:13
108:4 110:18
174:13,21 179:9
197:13 199:8,11
210:18 215:8,19
215:22 216:5

**declines** 172:13
199:5 205:4
212:15 215:2,4
**dedicated** 37:7
**deemed** 172:14
247:5
**deep** 68:12 190:6
**default** 45:19
**defendant** 160:2
208:12 254:4
**defendant's**
227:23
**defendants** 1:16
2:12 6:23 34:15
105:20 137:20
149:4 165:15,25
166:25 182:9
201:8,21 213:23
214:5 223:19
226:7
**defending**
124:18 125:8,16
**defense** 125:20
240:4
**defenses** 213:25
214:7
**deficiencies**
109:7
**define** 24:20
25:3 28:4 62:22
**defined** 63:6
**definitely** 54:19
258:6
**definition** 23:19
31:10
**deflation** 105:5
**degree** 43:20
68:13 75:20

105:21 106:6 107:16 136:24 153:4 154:4 172:20 191:5 199:8,14 205:2 210:18,22 213:4 223:5 224:8 248:2

**degrees** 37:11

**delaware** 1:9

**deliver** 97:13,17 132:8,14

**delivered** 195:8

**delve** 186:11,23 187:15 188:6 189:23

**delving** 185:5,22

**demand** 94:24 95:9,12,14 96:8 97:24 98:12 101:7,9,19

**denies** 258:5

**denominator** 84:13 86:5

**department** 250:11

**depend** 25:20 153:5 175:22 196:2 198:19

**dependent** 79:20 79:21

**depending** 150:6 231:8 257:24

**depends** 5:7 25:13 206:6 227:2 242:20

**deponent** 264:4

**deposed** 7:4

**deposition** 1:20 3:7 4:15 5:5,15 9:5,6 11:3 234:8 234:25 235:8 257:20 261:9,12 262:9 263:5,13 264:4

**derived** 245:12

**describe** 31:23 44:19 48:18,22 49:9 50:16 56:25 65:4 76:20 157:9 182:23 203:8 211:3 239:17 240:13 244:2 250:4

**described** 58:19 91:22 93:17 138:23 140:11 164:8 173:2 175:18 182:9 189:9 192:12 198:17 233:19 234:3 249:21 255:22

**describes** 11:9 11:21 171:11

**describing** 16:20 37:8 40:24 44:25 77:14 100:10 110:15 117:14 232:9 233:3

**description** 3:7 12:2,3 48:17 66:23 97:3

**deserved** 165:13

**design** 74:25 75:21

**designate** 261:11

**desire** 95:21,24

**detail** 171:6 197:11 207:19

**detailed** 187:19 218:23

**details** 25:4 47:17 109:20 117:17 135:8 184:13 185:11 186:3 194:25 196:13 206:7 229:20 234:16 234:20,23

**determine** 18:17 41:8,10 63:25 65:17 73:14 174:15 193:12 193:21,23 195:16 204:13 218:20

**determined** 22:15 65:23 108:18 117:4 164:18 174:15 205:15 210:21

**determines** 118:14

**determining** 25:18 174:3 200:2

**develop** 37:2 60:17 61:24 158:14

**developed** 63:7 218:9

**developers** 244:16

**developing** 75:25 119:10

**development** 185:13

**developments** 169:21 189:8 211:14

**deviated** 51:25

**devise** 78:6

**devising** 198:7

**dice** 228:8

**dietsch** 1:14 122:22 131:10 132:2

**dietsch's** 128:5

**differ** 25:5 97:25

**difference** 77:21 77:22 87:3 210:24

**differences** 52:20 85:22 93:19 100:18 178:11

**different** 27:4 35:6,18 51:12,15 52:18 53:21 92:7 95:14 101:19 113:4,22 113:25 115:21 116:24 140:19 147:18 150:7 158:24 171:2,8 174:24,25 183:18 194:24

197:12 200:18 219:2,7 220:6,23 228:24 238:3 252:16

**differently** 26:19 27:3 200:17 208:5

**difficult** 28:13 28:24 69:4 158:4 200:15 206:5,15

**digested** 28:3

**digit** 155:8

**digits** 86:21 87:4

**diligence** 105:21 109:7,14,16,21 109:23 119:19 123:5 124:25 125:2 127:15,24 136:24 137:21 138:4,7 139:5 140:14 142:24 147:21 151:17 156:13 157:10 162:12 164:3,19 166:10 168:18 169:2,16 182:10 183:12,13 191:10,16 192:7 192:13,14 193:2 195:14 201:20 203:19 205:24 207:21 210:7 221:20 222:2,6 222:16 223:6 224:3,4 227:14 227:22 228:15 229:2 230:2

231:16

**diligent** 146:15

**dimension** 117:21

**direct** 17:20 37:22 91:9 122:18,20 126:16 132:24 151:13 159:24 170:14 217:16 252:12 259:18

**directed** 165:17 166:3 247:24

**directing** 133:19 133:21 135:10 146:5

**direction** 61:7 100:21 231:22 243:14 246:20 247:9

**directional** 59:9

**directionality** 59:16 61:9

**directly** 101:16 127:24 138:7 166:9 200:19 212:4 238:2 246:6,8,12 259:8 259:10 263:16

**disaggregate** 178:3,5,23

**disaggregating** 179:24

**disaggregation** 178:5,17 179:20 180:4 216:2,9

**disagree** 54:17 250:14

**disclose** 11:23 67:16 110:7,17 201:22 202:3 219:20

**disclosed** 24:24 25:10,11 29:10 103:16 159:4 174:24 193:10 198:12 199:14 201:8 202:14,25 206:21 226:6,7 232:4,10

**disclosure** 25:13 25:15 26:11,12 27:4 107:5 113:7 120:5 131:16 165:18 166:5,12 170:21 174:20 180:9,17 180:22 181:10 181:22 190:9,10 190:22 192:16 192:22 193:7 194:9,17 195:13 197:2 202:9 205:14,17,18 206:10 208:23 210:20 213:12 216:3

**disclosures** 47:15 108:10,11 118:7,13,25 119:14,21 120:2 120:9 126:9,22 129:13 131:15 137:12 140:8 154:13 167:25 168:19,25

171:16 172:14 176:16 178:11 196:18 197:11 204:14,20 205:22,25 210:22 211:12 211:13 212:14 213:18 214:11 215:9 224:9

**disconnect** 164:13

**discovery** 16:24 17:5,9,11 18:6 174:22 175:25 176:13 202:5,7 235:7

**discuss** 23:16 37:20 43:25 44:5 67:8 71:6 80:6 85:13 121:5,17 132:3 167:20 170:18 217:13

**discussed** 43:6 66:19 68:9 69:12 73:9 132:20 168:16 188:18 223:12 259:3 260:11

**discussing** 28:21 134:20 211:11

**discussion** 15:4 47:21 64:13 91:7 98:4 144:6 158:25

**discussions** 232:24

**dismiss** 68:16,21
**dismissed**
  214:24 215:17
  216:10
**disputed** 117:10
**disqualify** 67:23
  68:4
**disregards**
  135:17
**dissect** 137:25
**disseminated**
  40:6 189:5,14
**disseminating**
  42:23,25
**dissemination**
  49:25 50:2,7,11
  177:9
**dissipate** 149:18
**dissipated**
  103:20 104:11
  105:8 114:14
  177:16 205:16
**dissipation**
  114:8 174:11
  179:19
**distinction** 84:18
  85:3,9,16,25
  107:10 198:25
  237:11
**distinguish**
  113:12
**distorted** 254:12
**distributed**
  30:10,12,15,21
  31:3 42:3 85:17
  85:18
**distributing**
  117:6

**distribution**
  29:25 39:5
  98:15 116:22
**distributions**
  245:21
**district** 1:2,2
  5:19,20
**dive** 68:12
  109:19
**diverge** 92:5
  101:6,22
**diverged** 100:20
**divergence** 78:7
  78:23,24 93:11
  93:24 94:13,22
  97:10 98:14
  100:6 103:14
**divergences**
  98:10
**divergency**
  93:17
**divergent** 96:23
**diversions** 78:3
**divestitures**
  160:17 161:3
**dividends** 45:18
**division** 1:3
**document** 9:8
  10:3,12 12:3
  17:22 18:4
  121:24 122:5,11
  122:19 123:21
  128:21 129:4
  130:25 132:5,24
  134:9 143:16,23
  145:12,14 146:4
  146:8,23 147:4
  151:3,10 159:10

  159:16,19,23
  160:23 162:8,21
**documents**
  15:22 45:16,16
  46:3,7 133:5
  159:7 184:2
  185:18,25 192:6
  192:25 218:6
  235:2,3,6,19
**doing** 34:12
  47:22 68:12,22
  86:23 95:3
  141:3 143:25
  179:4 199:2
  200:4 204:3
  225:17 226:15
  226:20 233:9
  240:9 252:6
  258:22
**dollar** 107:17,18
  108:12 219:2,4,9
  219:11,16,17
  220:2
**dollars** 25:23,24
  26:3 219:21,24
**donald** 159:25
  160:5
**dot** 176:23,23,23
**double** 155:8
**doubt** 204:16
**dozen** 115:13,13
**draft** 240:18
**draw** 36:16,18
  64:22 107:10
  143:24
**drawing** 35:21
  164:6 237:11

**drawn** 111:22
  215:23 216:17
**driving** 56:17
  246:11
**drop** 204:7
  208:10,21,22
  215:15 216:9,11
  218:19
**dropped** 89:4,6
  203:24,24
**drops** 108:14,17
  205:22 213:12
  214:10
**due** 105:21
  109:6,14,16,21
  109:23 119:18
  123:5 127:15,24
  136:24 137:20
  138:4,7 139:4
  140:13 142:23
  147:21 151:17
  157:10 162:12
  164:2,19 166:10
  169:2,16 182:10
  183:12,13
  191:10,16
  192:12,14
  201:20 203:18
  205:24 207:20
  210:7 221:19
  222:2,6,16 223:6
  224:3,4 227:22
  229:2 230:2
  231:15
**duly** 6:14 263:7
**durations** 27:21
  27:21

**[dwell - engaged]**

| | | | |
|---|---|---|---|
| **dwell** 217:18 | **eastern** 1:9 | **effect** 4:17 50:20 | **effort** 51:5 |
| **dynamics** 243:24 | **easy** 40:9 64:15 | **effectively** 45:20 | **efforts** 227:24 |
| 244:3 245:8,11 | 65:23 | 68:25 69:9 | 240:21 |
| **e** | **economic** 34:7 | 76:21 79:3 | **either** 59:2 |
| **e** 2:2,2 3:2,6 | 45:9 84:18 85:3 | 81:14 91:21 | 112:15,17 |
| 262:2,2 263:3,3 | 85:9,16,25 91:25 | 93:18 | 113:15 174:8 |
| **earlier** 60:12 | 92:23 101:5 | **efficiency** 15:4 | 220:17 233:22 |
| 75:3 78:8,11 | 103:8 104:13 | 20:17 21:4 22:8 | 250:10 255:20 |
| 91:4 93:17 | 107:9 113:3,23 | 22:13,14 23:2,17 | 261:11 |
| 107:17 117:24 | 114:11 138:22 | 23:19 29:8 | **eligibility** 43:25 |
| 126:7 137:7 | 149:19 158:9 | 31:11,14 32:6,21 | 44:6 48:23 49:3 |
| 140:3 154:8 | 164:11 165:3 | 32:23 33:13,18 | 49:20 |
| 158:8,9 166:11 | 176:14 240:23 | 33:20,24 35:16 | **eligible** 44:20,22 |
| 188:10 206:18 | 244:20 250:6,6,7 | 36:8 37:9,13,21 | **empirical** 42:14 |
| 210:24 223:12 | **economically** | 39:16 40:15 | **employ** 33:25 |
| 229:13 238:19 | 81:5,17,18 | 41:2,4,12,20 | 263:18 |
| 243:9 247:7 | 103:12 104:2,3 | 42:6 44:16,21 | **employed** 255:5 |
| 249:16 261:2 | 106:24 114:10 | 45:14 46:21 | **employee** 245:15 |
| **earliest** 201:7 | 118:2 119:8 | 49:4,11,17,21 | 245:17,20 246:2 |
| **early** 226:8 | **economics** 13:16 | 50:2,12 76:2 | **employees** |
| **earn** 245:6 | 32:2,4 33:15,16 | 81:13 82:13,15 | 155:25 156:3,4 |
| **earning** 55:6 | 34:24 35:10 | 82:17 83:2,20 | 242:18 243:7 |
| 158:12 | 62:3 239:13,16 | 84:2 89:17 90:4 | 255:13 |
| **earnings** 3:11 | 239:18,22 240:3 | 90:10 91:18 | **employment** |
| 45:16 46:11 | 241:3,11,15 | 100:12 125:25 | 236:11,20 |
| 55:11,14,23 56:3 | 242:5,7,11,13,15 | 183:17,23 187:4 | 252:24 |
| 56:11,12,16,20 | 242:19,25 243:4 | 188:11 233:10 | **employs** 13:15 |
| 57:2,6,15,20 | 243:7 245:7,13 | 248:22 | 13:16 |
| 58:7,9,23,24 | 245:14,16,18,22 | **efficient** 18:18 | **enable** 132:8 |
| 59:2,19 60:13,14 | 246:16,24 247:3 | 20:19 21:10,16 | **encompass** |
| 73:5,6,10 155:7 | 247:8 249:5 | 22:11,18,24 | 147:19 150:14 |
| 158:23,24 159:5 | 250:11,13,15 | 23:11 33:9 37:3 | 150:20 |
| 159:13 173:12 | 254:21 255:5,13 | 49:9,13 60:3 | **ended** 150:7 |
| 173:21 234:11 | 255:20 | 75:4 77:6 78:14 | 174:12 228:10 |
| 240:3 | **economist** | 80:17 83:7 | 257:23 |
| **easily** 35:5 81:20 | 129:12 132:22 | 93:14 96:11 | **engaged** 22:3 |
| | 137:10 161:7 | 98:7,17,21 | 238:8 240:17 |
| | | | 256:6 |

**engagements** 238:13 240:11 240:15 254:16
**engaging** 169:15
**engineers** 1:8 264:3
**enhance** 81:12
**enter** 95:7
**entering** 97:11
**enterprise** 257:13
**entire** 17:21 39:24 75:16 107:21,22 141:21 144:5,22 144:24 147:4 154:19,20 162:20 208:9 209:21 220:11 222:25
**entirety** 89:21 146:8 243:22
**entitled** 203:10
**environment** 135:12,20 136:7
**eps** 155:7
**equal** 53:18 227:11 242:25
**equally** 83:2,19 113:15
**equity** 37:23 242:15,24,25 243:3 245:22,25 246:10
**equivalent** 47:7 47:14 80:9 81:6 81:18,18,23 91:21

**equivalents** 242:22
**eric** 13:9
**errors** 12:7
**especially** 28:11 208:25 241:23
**esq** 2:7,7,8,14,15
**essence** 59:12
**essentially** 34:16 46:11 76:19 77:4 78:9,13 81:6 93:20 97:22 116:5 208:25 237:19 239:21 241:19
**establish** 90:17 107:23
**estimated** 51:16
**estimates** 152:12
**estimation** 51:15 51:18,18,21 52:5 52:8 248:25
**et** 5:17,18 47:20 47:23 158:25 234:12 257:20 257:21
**etf** 259:15,17
**euro** 50:25
**europe** 46:15 96:4 134:15,22 135:15,22
**european** 136:11
**euros** 154:23
**evaluate** 22:13 36:4 47:16,24 104:20 115:20 138:10 195:16 196:13,14

200:21 218:14 224:24
**evaluated** 46:21 47:12 58:7 175:15 181:18 193:6 196:16 224:12
**evaluating** 31:14 60:16 103:4 179:25 187:4 202:25 220:19 225:6,8 238:22
**evaluation** 73:16 74:16,16
**evaluations** 129:15
**evaporates** 222:10
**event** 36:3 50:16 50:22 51:15 53:4 55:11,17 57:19 69:21,23 69:25 71:13 72:3 77:7 105:8 149:2,4 150:12 150:18 170:19 171:13,14,15,21 172:25 173:8,19 173:25 174:8 175:6,10 176:21 177:21,24 178:3 178:4,6,7,12,13 178:16,19,25 182:5 187:9 191:20,22 195:15 207:3 208:20,21 218:4

**events** 75:15 103:16 104:10 106:20 114:14 119:7 169:3 170:7,8 212:4
**eventual** 109:17
**eventuated** 202:15
**evidence** 21:11 22:16,25 23:10 27:17 28:23 31:4 35:22 41:6 42:15,17 45:13 46:2 49:7,8,11 52:11 57:13,14 80:12,20 83:22 88:6 91:15 100:16 101:11 101:14 108:25 111:2 176:7 186:19 188:25
**evidenced** 59:20
**evidentiary** 213:24
**evolution** 218:12 220:23
**evolved** 217:23
**ex** 63:16
**exact** 26:2,24 46:25 179:5 229:20 232:16 232:17,20 247:17,22
**exactly** 25:10 77:25 95:25 109:20 170:2 171:9 176:9 183:5 184:11

**[exactly - exposure]**

187:18 201:22 203:25 211:7 250:19

**examination** 3:3 6:17 33:11

**examinations** 33:4,7

**examine** 58:2 79:4 82:18 83:15 89:16 118:5,11 119:14 145:21 186:6

**examined** 6:15 91:12

**examining** 90:8

**example** 25:21 31:20 36:10 39:6 53:23 56:6 59:7 60:25 64:18 72:5,16 76:6 85:14 173:17,25 174:17 199:6 219:9,19 220:8 223:25 226:3 256:18

**examples** 85:14 140:16 220:18

**exception** 76:19 76:23

**exceptionally** 209:3 250:12

**exchange** 18:24 47:7 76:9 102:19

**exclude** 73:17 93:7

**excluded** 64:17 69:18 177:15

**excluding** 126:5

**exclusive** 214:18 215:5,21 216:6

**exclusively** 215:20 245:12

**excuse** 7:25 131:20

**execution** 132:7 132:13

**exercises** 19:16

**exhibit** 3:8,9,10 3:11 9:18,24,25 10:4,9 17:19 37:17 50:16 76:22 78:19 86:18,24,24 88:24 93:18 120:14,16 121:23,25 122:11 133:8,18 143:18 151:4,6 151:11 159:11 159:17 170:15 217:17 235:22

**exhibits** 3:13 121:21 187:25 234:10

**exist** 199:12

**existed** 101:21 113:8 149:16 182:7

**existence** 126:10

**exists** 138:15 218:11 227:7

**exiting** 97:12

**expansive** 196:11

**expect** 11:15 26:22 43:5 56:11,13,16,21 57:6 58:20 77:20 79:25 92:6 101:5 123:4 175:24,25 195:12 224:16 227:12 228:13 229:23 232:2

**expectation** 57:5 57:11 62:16,17

**expectations** 25:7 26:5 62:11 182:17

**expected** 55:19 59:3 78:2 106:15 209:16 230:16,24

**expecting** 197:20 198:6

**expects** 155:5

**experience** 11:13 34:4,20 35:6 55:22 67:7,10 156:7,18 157:12 179:2 200:4,23 230:4 249:23,25 250:2,5 252:18 257:12

**expert** 3:8 10:14 13:24 14:3 15:14,15,22 20:5 22:9 33:12 34:14,21 35:2,4 35:7 123:14

145:3 175:23 186:19 203:6 227:4 229:7 232:7 235:3 237:7,16 238:7,9 238:9,10,17,21 238:22 239:3 242:10 243:11 249:4,7 250:17 254:22 256:22 256:25 257:3

**expertise** 123:14 131:14 238:3 239:22 249:21

**experts** 15:21 34:12,15 66:24 161:17 237:2 254:21 255:2,4

**expires** 264:24

**explain** 61:6 94:21 95:16 96:22 97:9

**explanation** 94:16 96:20 98:13 100:24 101:22

**explanations** 94:13 101:4

**explicit** 137:2 162:18,23 168:25 213:16 215:25

**explicitly** 106:7 110:25 157:8

**explored** 175:8

**exposure** 229:3 229:5

expressed 257:2
expressing 215:6
extend 27:22
151:21
extensive 156:6
161:16
extent 77:2 95:9
96:18 125:7
152:10 155:10
176:22 177:11
185:5,21 186:9
186:21 187:14
188:24 191:5
201:20 204:6
208:16 214:13
221:16,18 223:7
259:8
extremes 257:17
eyes 159:20

**f**

f 6:13,13 44:6,15
44:22 45:20,21
48:18,20,24 49:3
49:7,20 263:3
face 191:6
faced 106:14,22
148:14 164:2
169:4 182:16
183:2
facing 68:10
130:18 153:9
223:21,23 228:9
230:5
fact 26:7 31:24
44:21 68:13
77:3 78:12 88:4
108:18 118:14

150:2,9 179:24
186:16 224:3,4
228:10
factiva 62:24
72:25 74:11
factor 31:21,22
31:24 37:20
39:13 42:9
44:25 47:9 48:9
50:14,14 56:17
66:13 76:6 86:6
87:25 158:10
factories 220:9
factors 31:20
32:5,17 36:25
37:8 41:5,6
44:15 55:2
89:20 174:9
198:19 220:21
226:25
factory 220:10
facts 11:23 142:5
177:7 179:8
196:3,15 203:8
203:14 209:2
221:24 233:14
257:24
fail 45:18
failed 46:2,6
90:6 219:20
231:16
failure 110:6
fair 15:10,23
30:7 66:23
87:10 116:21,21
117:5 134:13,19
150:11 159:9
170:21 192:22

212:3 213:8
245:5 248:11,13
248:25 249:13
254:15,18
256:19
fairly 39:20
52:13 89:12
fall 21:19 140:25
258:23
falling 110:11
falls 178:19
222:11 252:21
false 105:25,25
111:4 127:17
140:15
falsity 215:16
familiar 109:24
famous 162:5
far 93:15 142:4
157:5 174:12
199:10,12,19
237:17
fashion 24:17
99:7,13
favor 163:13
fda 56:14
february 186:4
federal 183:25
186:17
feel 142:22 168:6
234:3
feels 145:21
fees 247:12
248:4 257:22
felt 23:9
fewer 62:23
figure 28:13
44:12 60:6

202:5
figured 17:24
file 44:6,14,20
44:22 45:23
46:3,6 49:3,6,20
117:14
filed 5:18 7:14
22:22 45:15
46:15 64:14
229:17 230:8
250:23 255:15
256:24 260:21
filer 45:21,21
filing 4:6 30:6
89:13 173:4
253:25 260:22
filings 31:6
46:16 62:25
finance 33:16,18
35:23 239:22
249:6 250:13
financial 32:4
46:10 47:18
48:7 62:3
130:17 132:3,10
182:18 183:11
241:18,23
258:18
financially 6:6
financing 155:25
find 59:19 94:5
124:24
finder 108:18
118:14 179:24
246:8 247:5
finding 39:16
49:21 75:12
80:17,24

**fine** 66:6,9 120:25

**finish** 8:8,9 66:10,12 171:14

**finished** 86:12 160:24 189:19

**firm** 5:25 28:14 38:19 81:7 191:5 220:12 240:12,15,16,17 241:17,20 242:6 244:18 246:10 250:8

**firms** 37:23 38:7 38:12 39:11 130:5 161:17

**first** 6:14 13:24 16:2,6 17:18 50:23 51:3 52:6 52:8 65:14 66:18 67:15,22 73:9 79:17,23 80:2 121:22 124:2 125:23 128:22 134:12 135:18 155:7 165:18 166:4,11 180:16 202:9 203:16 205:14 205:16 219:14 220:25 236:25 237:24 250:25

**fit** 59:15

**five** 22:8 50:14 66:13 158:10 217:10 220:9 247:8 261:19

**flip** 2:15 23:13 82:2 246:13

**float** 84:6 86:4 87:8,14,17,23

**flow** 26:6 47:19

**flows** 81:7,15 85:10 198:23

**focus** 43:16 153:2 187:6,7

**focused** 27:16 36:2,6 86:9 125:23 184:4,19 227:9 230:7 258:20,21

**focusing** 21:20 34:4 82:22 133:12 185:16

**folks** 13:10 243:9

**follow** 154:2 196:23

**following** 52:2 72:2 79:24 100:15 208:10 214:10

**follows** 6:16

**footnote** 48:18 67:21 94:9,12 96:21

**force** 4:17

**foreign** 259:17

**foresee** 146:13

**forget** 194:13 251:12

**form** 4:10 16:10 20:5,24 21:6 22:14 30:17,23 36:12 43:25

44:6,14,20,22 47:10 48:14,17 48:20,23,23 49:3 49:6,14,20 50:5 51:6,8 54:9 55:18 58:5 60:20 67:3 72:23 78:4 84:21 85:5 86:22 87:5 88:2 96:15 103:2 118:8 123:12 124:7 125:5 128:19 135:5,16 158:7 161:5 162:16 165:19 169:24 170:25 171:25 172:3 187:19 190:11 190:24 193:3 194:11,19 197:4 208:14 210:14 221:11 233:16

**forma** 154:22

**formal** 21:12 32:25 36:5 67:6 70:4 249:22

**formally** 214:10

**formed** 21:3,19 60:23

**formerly** 244:24

**forming** 11:24 12:4

**formula** 245:19

**formulate** 107:22

**forth** 161:8

**forums** 240:25

**forward** 162:5 173:12,13 191:6 257:4

**found** 44:15 46:2 57:20 82:11 116:20 118:19 119:22 179:22

**foundation** 141:15

**four** 39:21 128:10 167:17 217:6 220:11 242:14,24,25 247:8 254:10

**fraction** 59:23 71:19 75:16 86:10

**frame** 115:8 238:14

**fran** 1:21 5:24 263:4,22

**francisco** 1:3

**fraud** 31:15 119:7 176:4,23 177:8,9,11,14,21 178:14,15,23 180:6,10,14 199:8 203:2 207:8 209:15,17 212:20 213:13 213:15,16 218:19 219:11

**fraudulent** 212:7 230:2

**frequently** 180:11

**[friday - give]**

**friday** 74:18
**front** 112:23
  145:12
**full** 7:2 103:15
  104:9 113:6
  123:21 155:7,9
  174:13,20
  191:25 193:8
  197:16 201:2
  208:22 210:6,25
  219:13 234:14
  242:21
**fully** 29:6 53:13
  75:8 110:16
  193:10 201:22
  205:16 206:20
  239:9
**function** 42:16
**fund** 1:5,6,9 5:17
  259:9
**fundamental**
  34:7 35:20
  205:23 218:4
**fundamentally**
  43:10,11,21
**funds** 95:2
  259:15
**funnier** 161:15
**further** 4:9,14
  68:22 128:4
  165:20 195:7
  259:22 260:24
  261:7
**future** 81:6
  258:17

**g**

**g** 262:2
**gain** 29:25
**gained** 249:23
**gap** 182:9
  223:15
**garnered** 184:15
**gather** 213:8
**gauge** 35:16 47:5
**general** 17:25
  24:22 25:8
  46:20 67:11
  85:12 103:23
  107:18 109:12
  109:22 111:7
  119:16 129:5,11
  129:16 185:25
  191:3 197:13
  206:19 224:16
  230:3 240:13
  255:9
**generalities**
  219:8
**generally** 7:9
  26:19 30:3,4
  32:22 34:6
  38:22 62:5 63:5
  131:5 147:14,15
  169:14 187:20
  212:14 244:15
  249:10 250:13
**generate** 123:6
**generating** 52:17
  64:7,7
**generic** 157:16
  157:24 158:3
**geographic**
  156:8,20 161:21

**getting** 25:4 70:4
  240:8 246:23
**gilden** 2:7 7:25
  10:7,19 11:20
  12:24 13:20
  14:6,12 15:18
  16:10,18 19:14
  20:11 21:6 23:6
  23:21 25:16
  26:14 29:15
  30:17 36:12
  37:4 41:14
  46:17 47:10
  48:12 54:9 58:5
  58:15 60:20
  61:25 66:2,15
  67:3 72:23
  73:19 78:4
  84:21 85:5 88:2
  96:15 98:23
  99:16 103:2
  111:14 112:6,25
  115:7 118:8
  120:18,25
  123:12,18 124:7
  125:5 126:25
  128:19 130:11
  130:24 131:9,18
  131:20 132:4
  133:3,9,17 134:2
  134:23 135:5,16
  136:13,21
  137:14 138:18
  141:14 142:12
  144:13,21 145:9
  145:18 147:24
  148:20 149:9,21
  151:24 152:21

  153:17,19
  154:16 156:15
  157:18 158:18
  161:5 162:15
  163:4,18 165:19
  166:6,16 169:24
  170:23 171:23
  180:19 181:12
  181:25 183:20
  184:16 185:4,15
  185:20 186:8,20
  187:13 188:4,22
  189:18,21
  190:11,24 192:9
  192:17 193:3
  194:11,19
  195:23 197:8
  201:11 202:17
  207:13 208:14
  210:14 211:16
  212:11 214:13
  216:13 221:11
  224:21 225:23
  227:15 228:17
  231:6 233:16
  237:10 251:19
  260:16 261:10
**give** 18:2 21:15
  25:21 60:7
  64:21 67:20
  82:21 88:12
  94:4 128:25
  134:4 137:24
  141:22 142:6
  147:12 160:19
  160:21 162:3
  165:7 167:3
  219:9 221:21

**[give - greater]**                                                    Page 26

224:25 226:3
232:19 249:12
**given** 25:15
26:17 40:14
42:19 45:15
61:12 63:25
69:11 71:24
72:14 73:17
80:19 81:24
82:23 83:3 86:3
92:7 100:5,6
116:8 126:20
130:17 144:6
152:15 163:6
172:9 175:24
176:14 178:2
182:8 187:8
193:8 206:2
207:18 208:3,25
209:16,19 210:3
227:3 231:20
232:8 261:16
262:12
**gives** 77:5 78:13
86:19 109:4
160:12
**giving** 11:8
79:10 107:24
112:19 137:24
165:2,3 189:11
193:16 197:21
198:3
**global** 13:16
239:13,16,18
240:2 241:3,11
241:15 242:5,6
242:11,13,15,19
242:24 243:4,7

245:7,13,14,16
245:18,22
246:15,24 247:3
247:8 254:20
255:5,13,20
**glyphosate**
130:9 134:15,21
135:13,15,22,25
136:4,12 137:3
147:22 151:22
152:8,11 153:11
153:12,24
155:14 162:13
162:24 163:2,25
164:19,20
165:17 166:4,10
169:9,23 186:7
186:18 188:3
191:17 194:10
194:18 195:4,14
196:20 201:9
207:11 211:14
211:22,24 212:5
212:5 213:25
220:25 223:16
227:10 229:21
231:4
**glyphosate's**
185:2
**go** 5:12 17:6,7
65:3,10 70:16
86:13 90:24
93:15 112:13
115:14 120:10
121:4,6 123:16
128:10 132:23
134:6 143:17
144:14,22 145:2

145:13 146:20
146:24 153:18
153:19 162:4
167:7 172:21
173:8 194:8
197:10 201:14
202:24 207:10
217:3 225:6,8,16
230:12 235:21
236:18 246:14
249:14 253:22
259:24 261:8
**goal** 180:3
**goals** 129:23
130:3,4,17 132:3
132:10
**goes** 11:13 35:7
155:25 186:9,21
187:14
**going** 5:3 6:22
7:5,13 8:7 9:24
19:23 20:7 22:7
30:10 54:6,19
56:8 64:24 66:2
70:20 71:9
75:23 91:9
105:5 117:23
120:8,9,11,16,18
120:21 121:10
122:18,20
132:24 133:12
143:14,17
144:13,14,22,23
145:5 146:15
155:21 159:11
160:3,10,15
161:11 167:12
170:3,24 176:9

179:6 181:5
185:4,21 187:21
187:23 191:6
196:6 205:8
208:6 209:6,7
216:23 217:6,16
219:7 221:25
222:3,7,7 227:5
230:13,15
246:14 249:14
257:4 259:21
260:3
**golf** 249:15
**good** 5:2 6:18,20
26:4 62:13,15
66:3 97:19
258:11
**gotten** 110:12
161:16
**governing** 9:5
**graduate** 33:17
34:2 35:12,14
**grant** 161:12
162:2
**granted** 256:13
**grants** 258:12
**gravamen**
137:18 163:21
183:8
**great** 9:19 77:5
134:12 159:22
173:12 222:3
224:3 241:25
250:12
**greater** 169:4
183:4 224:6
228:14

**greatly** 175:22
**grew** 229:23
**gritty** 109:20
**gross** 153:23
**ground** 9:6
**group** 13:16
  57:17 239:13,16
  239:18,21
  241:15 242:7,11
  242:13,15,19
  243:4,7 245:8,13
  245:15,16,18,22
  246:16,24 247:3
  247:8 254:21
  255:5,14,21
**groups** 244:10
**growing** 230:18
  230:23
**growth** 155:3
**guess** 73:21 75:8
  139:25 233:8
  246:11 258:8
**guide** 34:8

**h**

**h** 3:6 6:13
**half** 39:3 235:16
**halfway** 176:4
**halliburton** 16:4
**hand** 68:21
  69:12 228:12
  263:20
**handful** 47:3
**handling** 175:17
**happen** 109:21
  116:10 176:9
**happened** 23:5
  169:21 173:19

**happening** 42:16
  68:11 99:22
  160:9,14 163:7
  206:25 207:6
**happens** 180:10
  207:2
**hard** 117:17
  141:17 143:6
  172:22 242:2
  257:18
**harm** 150:4,5
**head** 17:16 68:2
  74:14 109:10
  180:24 194:14
**header** 155:24
  252:13 253:4
**heading** 252:16
**headquarters**
  155:24 156:2,4
**hear** 116:10
**heard** 5:9 16:6
  145:19,20 184:6
  184:8
**hearing** 6:10
  186:6
**hearings** 186:17
**heart** 151:4
**hedge** 81:21
**hedstrom** 13:8
  247:18
**held** 6:3 64:24
  82:8,12,19 84:12
  86:21 87:5
  88:16 105:7
  186:6,17 214:4
  236:3,6 263:5
**hell** 226:15

**hello** 167:19
**help** 13:4 61:24
  178:16
**helped** 243:10
**helpful** 94:8
  227:8 253:3
**helps** 7:21
**hereunto** 263:19
**hermeneutics**
  246:15
**hidden** 181:3
**high** 43:20 45:3
  57:9 152:2
  161:20 258:22
**higher** 57:25
  69:6 87:2
  105:15 106:4,9
  106:14 168:23
  170:11 197:20
  198:5 230:24
**highly** 144:18
  226:12
**historically**
  241:7
**history** 236:11
  236:20
**hold** 7:20 32:9
  120:15 249:6
  259:9
**holder** 32:13,14
  245:22,25
**holders** 87:6
  88:6
**holding** 83:5
**holdings** 82:25
  83:23 84:4,10
  89:6

**home** 217:2
**hopefully** 8:25
  162:7
**host** 124:22
**hour** 78:22,22
  120:21 216:24
  246:17 247:18
**hourly** 246:17
  246:18,23 247:4
  255:22
**hours** 12:17
  13:18 74:8
  232:20 233:7,10
  235:16
**house** 186:5
**huge** 61:15
  223:6
**hugh** 161:12
  162:2
**hundred** 12:23
  12:23,25 57:9
  257:19
**hundreds** 115:22
**hurdles** 147:14
**hypothesis** 55:19
  196:4
**hypothetical**
  141:6,15 142:13
  149:10,22,23
  154:17 163:12
  163:19,23 179:7
  195:25 205:9
  227:17
**hypothetically**
  203:15

**i**

**idea** 197:21
203:19,21 226:9
256:9
**identical** 27:3
78:18 81:23
220:10 233:22
233:23
**identification**
10:4 121:25
151:11 159:17
**identified** 12:7
31:13 38:19
41:23 62:22
63:12 65:15
66:20 89:13
93:24 218:17
**identify** 31:21
33:8 38:7 69:5,9
78:2 80:9
115:15 132:14
140:6
**identifying** 73:3
213:11
**illegally** 104:7
**illinois** 2:6
**image** 221:25
**imagine** 172:22
173:17 231:10
257:18
**immaterial**
68:16
**immediately**
51:19 52:2
65:18 72:2
**immense** 42:20
**impact** 28:16
40:20 50:2

89:17 90:3
157:17,25 158:5
166:14 173:22
173:24 182:18
182:19 205:19
205:25 219:16
221:8 224:7
229:24 231:4
**impacted** 34:18
152:7 224:18
**impacting**
176:15 177:12
**impacts** 40:14
166:19 178:9
206:11 258:18
**impediment**
83:6
**imperceptible**
100:18
**imperceptibly**
100:17
**implication**
92:25
**implications**
92:19,21,24
98:19 204:25
**implicit** 162:25
**implicitly** 169:11
**implied** 102:9
108:20 139:15
197:19
**implies** 24:15
81:15
**imply** 101:23
**implying** 221:15
**important** 31:13
31:25 33:22
40:18 41:24

43:15,19,21 48:7
50:12 56:4,5
62:6 65:9 67:12
68:20 92:11
102:23 118:5
172:12 206:10
207:16 208:6,7
209:18,24,25
210:8 228:19
**impossible** 75:18
**impounded**
98:18
**improper** 141:14
142:12 144:18
149:9,22 154:16
163:18 186:22
188:5 189:22
195:24 223:11
227:16
**improperly**
144:16 186:11
**imputed** 210:3
**inapplicable**
108:6
**include** 29:9
70:10 72:14
132:10 148:13
156:21 157:13
**included** 47:18
70:4 74:17
138:3,11 139:8
141:3 253:20
**includes** 55:3
98:25 125:8
158:24
**including** 47:18
87:17 102:8
218:3 236:7

237:21 238:4
255:8
**income** 47:19
245:11,13,14,24
246:9
**inconsistent**
223:24 224:13
**incorporate**
188:13
**incorporated**
53:13 79:17
100:2,8 188:20
189:4,15
**increase** 110:9
111:13 112:4
152:23 230:16
**increased** 29:2,3
**increases** 113:9
113:19
**increasing**
230:22
**incremental**
26:22
**independent**
97:2 212:24
**independently**
137:9 212:9
**index** 50:25
**indicating** 49:19
**indications** 29:4
**indices** 52:22
**indicted** 173:11
**indictment**
108:22,24
173:24
**indirectly**
259:14 263:16

**individual** 60:14
104:25 144:15
158:13,15,20
159:7 196:9
**individually** 1:6
1:9 65:11
156:25
**individuals**
242:14,16
**industry** 34:10
56:7 62:4,4
155:2
**inefficient** 41:17
42:11 60:10
101:2,24,24
**infer** 173:23
195:22
**inference** 49:4
82:13
**inferences** 35:21
36:16,18
**inferred** 244:22
**inflate** 114:12
**inflated** 105:3,7
106:8 107:17
114:2,7 218:21
**inflation** 103:20
104:11 105:6,9
107:19,23 108:9
108:20 109:25
110:19,22 111:5
112:10,22,24
114:8,13 127:10
143:7 164:21
168:3,8,15
170:19 171:7,13
171:20,22 172:6
172:8,20 173:4,7

174:3,5,12,18,25
175:5 176:11
177:15 179:18
193:13,16,19,22
194:3 198:9,22
199:3,12 200:2,7
200:25 205:2,3,5
205:6,12,15,21
206:2,9 210:11
211:8 217:23
218:12 219:3,3,5
219:10,17 220:2
220:4,14,20,22
220:23 223:15
224:10,11,17
225:20 228:6
231:5 248:25
**influence** 75:19
95:11 227:5
**influenced** 28:17
220:22
**influencing** 55:2
**information**
17:12,14 18:6
21:8,15 23:25
24:4,7,10,14,16
24:23 25:6,14,19
26:11,16,16,19
26:22,24 27:3,8
28:2,8,9,11,23
29:9,10,21 33:22
34:5,18 36:4
40:7,19 41:21,24
42:4,24,25 43:2
43:11,15,22 45:4
45:5,7,11,17
46:12 48:5,6,19
48:21,21,22

49:24,25 50:7,9
50:11,20 52:21
52:23 54:6,14,16
56:13,15,22 58:4
58:18,24,25 59:5
59:6,9,14,16
60:24 61:6,13,22
62:7,8,10,17,19
63:11,21 64:3,11
64:16,20 65:7,9
67:8 68:10,15,19
69:8 70:11,13
72:14,17,21,25
73:17 76:18
79:16 82:16
92:13,16 93:6,8
99:5,12,17,19
100:7 104:5,8
105:14 107:14
107:15 108:5
110:12 114:12
172:24 173:22
174:9,21 176:23
177:4,10,12,21
178:14,18,24
179:10,25
182:15 183:18
183:22 187:3
188:13,16,18,20
189:6,13,16
191:4,23 193:24
194:4,5 200:18
201:3 202:2
203:10 204:6
207:20 208:2
212:8 213:5
218:19 223:10
224:5 232:8

**informational**
42:16 45:9
**informed** 83:24
**informs** 51:9
**infrastructure**
130:14
**inherently**
200:15
**initial** 181:8
232:24
**initially** 34:11
63:13
**innovation**
156:10
**input** 172:12
205:5
**insanity** 226:18
**insider** 82:25
83:4
**insiders** 82:9,12
82:19 83:5
**insley** 1:22 5:24
263:4,22
**institution** 89:14
90:2
**institutional**
83:11,16,22 84:4
84:7 86:6 87:6
87:16,23 88:5,8
89:6 90:9
**institutions**
84:12
**instruct** 38:21
**instructed** 35:15
**instructing**
145:7,9,15
**instruments**
95:25

**insufficient**
22:16,25 23:10
**insurance**
124:21 125:9,21
**integrate** 129:22
**integrated**
100:14 156:19
157:12
**integrating**
156:7
**integration**
80:19 81:24
128:13,17 129:6
130:2,7,13,16
131:4,7,11,17
**intend** 11:22
**interaction**
244:14
**interactions**
251:13
**interest** 97:7,14
101:12 259:4
**interested** 6:6
263:16
**interim** 146:2
**internal** 122:12
184:2 185:18
192:6,24 240:20
**internalize** 75:5
**internally**
120:14
**international** 1:6
1:8
**internet** 5:8
19:20
**interpret** 24:3
26:18 27:2,10

**interpretations**
196:12
**interpreted**
53:20 204:5
**interpreting**
131:14
**interprets** 52:21
**intraday** 79:4,6
178:13
**introduced**
32:24
**introduces**
110:19
**introductions**
6:22
**intuition** 42:22
**investment**
33:21 62:4
95:18 259:19
**investments**
85:11 95:3
**investor** 64:5
65:8 68:19 84:4
104:25
**investors** 43:3
43:16 48:6
67:12 68:14
83:17,24 84:7
85:10 87:24
92:17 93:6
192:23 203:10
211:5 222:9
223:11
**involve** 15:4
20:5 223:20
**involved** 13:13
19:17 29:18
95:4,8,18 105:12

114:16,19
129:13,15
169:13 201:4
238:21 239:8,9
240:12,15 245:2
251:24,25 252:8
253:18 256:10
**involves** 104:24
**involving** 105:4
122:6
**isolate** 177:7
180:4
**isolated** 144:9,12
**isolating** 159:6
**isolation** 143:22
144:3 146:5
160:7 165:6,9
**issuances** 47:3
94:18 97:4
**issue** 9:2 37:24
90:13 94:24
127:8 141:24
221:6
**issued** 10:24
12:6 22:23 31:5
39:8 46:22 47:2
47:6 63:5 151:7
180:18 251:4
253:23 255:4
260:25
**issuer** 46:22
**issuers** 244:12
**issues** 16:8,17
29:18,19 35:3
98:9,12 109:16
119:23 136:3
146:14 147:11
148:8,13 161:22

163:10 211:8
219:23
**issuing** 39:23
**items** 66:20

**j**

**j.p.** 39:7
**jackson** 2:7
**january** 72:5,7,8
74:2,2,4,5,9
**jersey** 1:23
**job** 245:8 250:2
250:5,12
**jobs** 236:21
245:7
**johannes** 1:14
122:22
**johnson** 180:23
181:6,22 182:14
187:11,18,25
189:14 190:16
191:8,14 192:3
202:10 209:5
**judge** 197:2,3
**judgment** 116:4
117:2
**judicial** 30:16,21
**jumped** 198:15
**june** 89:7,9 94:2
94:2,10,11 99:2
99:2,8,14
**jury** 106:15
180:18 189:16
190:3 194:9
195:8
**justifying**
117:15

**[k - liabilities]** Page 31

**k**

**k** 262:2
**katz** 2:11
**keep** 7:6 105:15
153:6 196:6
213:14
**keeping** 8:18
152:23
**kind** 49:18 160:8
160:14 180:12
**kinds** 238:3
**knew** 84:11
176:8 202:6
**know** 6:21 7:4
8:2,14,19 12:20
13:3,18,22 14:13
15:6,25 16:3
23:9,14 24:2
25:3,22,23 28:4
28:12,22,23 31:7
35:5 36:19 38:8
38:12,25 39:3,9
39:17,22,23
43:14 44:3,18
46:25 47:12
48:5 52:14 59:6
59:8,9 60:5
63:16,17,20 64:8
64:9,10,17,21
65:7 66:5 67:11
69:7,21 70:6
74:10,13 80:7
84:13,14 86:11
86:14 87:13,15
89:18 91:10
93:20 95:20
96:5,17,25 98:4
102:14 103:11

105:10,18
108:11 109:9
111:10 124:20
124:20 125:15
125:22 127:21
128:7 133:16
141:17 147:9
148:11 157:8,9
158:2 159:19
163:5,5,11 171:8
171:9 172:14
174:5,10 176:6
179:4 181:14
182:21,22 183:7
187:24 189:25
193:10 194:23
196:12 197:10
200:11 201:3,17
201:20 202:4
203:4,9,18,25
205:7 206:3
207:15,22,24
209:23 210:25
217:18,21
220:13,16 221:5
222:5 224:24
226:15,19 227:2
228:22,23,25
229:9,12 230:6
230:18 231:15
231:18 233:19
235:22 237:23
247:15,17,22
251:17 252:3,13
255:11,25
257:15 258:18
260:17 261:10

**knowing** 184:21
**knowledge** 11:13
249:23
**known** 15:10
104:9 209:2,2
226:25 228:9
259:11

**l**

**l** 4:2 262:2
**labeled** 154:21
**labor** 252:24
**lack** 91:16 93:10
138:4 210:6
**land** 248:10
**language** 232:16
232:16,17
233:13,22
**large** 52:15
79:14 96:12
97:12 209:4
**largely** 34:17
59:2 61:17
81:18
**larger** 96:13
229:4
**lasalle** 2:5
**law** 14:17,25
161:17 204:15
**lawsuits** 64:14
**layman's** 249:8
**lead** 1:6 103:13
237:19
**leading** 251:3
**leaflet** 29:24
**learn** 165:14,25
**learned** 16:2
34:2

**learning** 34:23
35:10 106:13
120:3
**leave** 83:8
**leaving** 98:19
258:2
**left** 239:11
**legacy** 147:22
151:22 156:13
162:13
**legal** 15:17,19
16:11 31:4,5
58:6 98:19
124:10 149:12
149:22 150:2
151:25 154:3
157:19,23 158:2
232:3 264:2
**legally** 232:9
**lengthy** 128:6
**level** 25:8 33:15
35:20 40:11
45:4 57:25 77:9
78:22 88:8 90:9
110:11 170:11
203:19 241:18
245:3
**levels** 169:12
**levenson** 16:3
**liabilities** 105:23
106:2,13 109:17
119:20,22 120:4
120:6 123:9
127:16 137:22
138:8 139:18
148:14 182:11
191:5 197:22
198:2,5 221:6,14

221:18 224:6 230:6

**liability** 102:21 102:25 103:23 104:22 106:9 109:6 110:22 111:25 112:23 112:24 113:5 118:2,22 125:3,8 127:6 130:9 136:20,23 137:19 139:11 147:23 150:13 150:20 151:22 151:25 152:15 156:14 162:14 164:2 169:5 181:20 195:14 197:7,17,19 201:10,23,23 212:6 221:3,4 222:22 225:19 226:9,13 227:10 227:14,19 228:12,16 230:11,15,17,22 231:3

**liam** 1:14 122:22 143:19 160:3

**license** 134:15 134:22 135:15

**licenses** 236:7,8

**lied** 106:25 228:16

**life** 8:9

**life's** 34:16

**light** 224:5

**likelihood** 136:11 148:18 149:5,16,24 150:15,21 207:5 207:18 224:19 225:7,9

**likewise** 185:12 205:20

**limited** 132:18 153:20 218:4

**limiting** 99:18

**line** 41:4 59:3 61:17,21 66:6,10 82:15 146:12 151:14 202:21 264:5

**lines** 76:25 128:10 148:22

**link** 82:24 152:9 181:16

**linkage** 154:7

**linked** 158:16

**lion's** 34:19

**lipton** 2:11

**list** 12:2 38:22 63:6,13 253:12 253:21

**listed** 234:24 235:3 236:22 243:9,15,17 247:7 253:24

**listing** 248:14

**lists** 243:23 248:7

**literally** 26:15

**literature** 40:13 40:17,17 41:23 49:15,19,23

50:10 62:3 81:11 90:8

**litigation** 13:25 14:5 18:11 19:5 20:9 34:22 68:9 106:23 123:10 123:24 124:6,11 124:18 125:4 128:2 137:2,3,22 148:7 151:23 152:7 153:10 155:14 157:9,10 162:24 163:2,10 164:19,20 165:17 166:4,11 166:15 169:8,9 169:21,23 173:4 187:12,25 191:7 191:18 196:20 204:10 206:18 207:12 208:17 211:15,22,22,24 212:10 213:25 220:25 221:7 223:16 225:21 225:22 227:11 229:18,21,22 231:4 236:16 237:7,15,22 238:4,6,17,23,25 239:24,25 240:3 240:10,11,14,24 241:3,4 242:3 249:17 250:2 251:6,22 254:5 254:17,23 255:4 255:7,16 256:11 257:14 258:7

261:4

**litigations** 141:25 186:2 194:24

**little** 7:20 27:14 55:10 69:6 71:22 91:6 95:16 102:12 109:14 117:24 129:2 139:25 160:4,20 164:14 164:24 168:16 176:2 206:16 217:18 227:9 238:19 243:5 259:20

**live** 241:24

**local** 1:6 251:12

**locked** 120:15

**logic** 45:9,9 50:4 172:10 206:8 221:14,15 224:14

**logical** 101:21 118:5,11,20,24 119:12 120:7 123:22 124:5,14 124:24 125:16 125:20 126:7,12 126:21 127:5,7 130:6,15 136:17 137:11 139:17 140:6 142:2 143:5,10,11 147:20 148:3 153:13 154:11 162:10 164:5 182:25 190:22

**[logical - market]** Page 33

197:6
**logically** 119:8
120:2 142:23
187:22
**logistically**
64:23
**long** 8:25 23:4
24:2 39:21 75:7
85:7 109:11
141:17 148:22
155:2,4 234:2
235:15 239:4
**longer** 27:21
29:5 153:12
192:23 254:12
**look** 14:23 17:17
17:21 37:15
44:12 49:5 61:9
65:17 69:16
75:2 76:22 80:4
83:10,11 84:5
89:10 100:12
122:19 128:3,4
139:12 143:21
144:11 151:2,25
156:5 158:22
159:9,22 161:18
172:23 173:18
207:17,25,25
226:21 231:22
253:6,24 259:21
**looked** 59:13,14
60:12 61:20
63:15,19 71:13
71:18 78:15,18
82:7,21 89:20
104:16 183:17
183:21 189:5

226:10,22
**looking** 22:21
36:7 39:20 41:5
42:8 49:13
63:10,16,21
78:25 133:14,24
134:12 135:11
144:9 146:4,12
160:6 163:8,9
190:14 226:18
252:17
**looks** 87:3 222:3
**lorenzo** 2:15
**lose** 209:3
**losing** 196:6
207:11,18
**loss** 119:6
154:17 175:3
185:6,23 186:11
186:23 187:16
188:7 189:23
198:21 199:2
200:5 206:7
208:7 209:20
210:17 213:3,7,9
218:24 229:9
256:17 257:9
**losses** 108:13
155:13 212:10
225:21
**lost** 19:20 194:17
195:4
**lot** 14:7 36:19
51:5 154:2
172:16,20 176:2
196:2 241:21
244:5 257:24

**lots** 158:24 159:3
**low** 57:8
**lower** 104:9
113:7
**luck** 228:11
**lunch** 120:23
145:25 159:11
165:13 167:8,13

**m**

**m** 6:13 262:2
**magnitude** 125:2
130:8 208:12
225:19,20
229:25 231:2
**maintain** 128:12
**maintaining**
110:19
**maintenance**
109:25 110:23
111:5 112:11,22
113:11,17,18,21
**major** 28:12
53:2 146:13
**majority** 51:23
58:22 240:10
241:9 246:5
251:2 254:15
255:14,15
**making** 69:13,19
69:22 83:8
152:14 155:14
232:25 233:2
**manage** 157:3
**manageable**
169:19 242:2
**management**
157:14 245:3

**management's**
158:25
**managers** 33:21
**managing**
244:13
**mandated** 161:3
**manifestation**
107:4,6
**manipulation**
252:22 253:8,13
**manner** 45:18
46:3,7
**march** 183:25
184:23 186:16
**mark** 9:24 13:8
17:19,19 120:13
**marked** 10:3
121:21,24
151:10 159:16
**market** 15:4
18:18 20:18,18
21:10,17 22:8,10
22:13,14,18,23
23:12 24:5
25:12,14,20 27:4
27:17 28:3,11,15
28:17 29:8
30:14 31:15
32:21,22 33:9,13
33:18,20,23
35:16 36:7 37:3
37:9,13 40:19,20
41:2,4,12,17,20
41:22 42:5,11,24
44:16,21 45:14
46:9,12,21 49:8
49:16,21 50:2,12
50:21,25 52:21

52:22 53:15,25
59:3 60:3,10
61:7 62:7,16
67:2 72:2,5,15
72:18 73:15,18
74:3,8,17 75:4,5
76:2,3,12 77:6
78:14,16,17 79:3
79:18,22 80:10
80:15,18,23
82:13,15,17 83:2
83:20 84:2 86:9
86:10,15,15,25
87:2 89:17,23
90:4,4,10 91:18
91:19,24 92:8,14
93:14,25,25
94:22 96:13,23
97:10,22 98:6,17
98:21 100:11,13
100:13 101:2,23
102:3 103:17
104:6,7,8 105:20
105:25 106:7,9
106:12 109:15
110:9,12 120:3
125:25 131:15
136:10 148:18
149:5,16 161:19
168:23 169:8,11
169:22 170:11
170:12 182:14
182:16 183:23
187:4 188:11,12
188:14,19 189:4
189:8,15 191:9
191:15,24
192:15 193:25

196:4,8 197:20
197:21 198:3,6
204:5 206:17,21
206:21,24 208:3
208:4,5 209:8,16
210:3 224:20
226:14 227:12
228:14,20 230:6
233:10 243:24
244:3 245:8,11
248:22 252:22
253:8,13
**market's** 182:19
223:17 224:19
225:9 229:24
231:2
**marketing** 139:4
**markets** 28:9
76:10 77:18
80:12,20 81:25
82:24 96:4
131:15 248:19
**marking** 151:5
**marriage** 263:15
**mass** 230:6
**material** 12:4
13:11 17:8,9
28:10 43:12,21
56:22 58:4,13,17
59:9 61:6 63:11
63:17,18,22 64:2
64:11 65:2,6,19
66:25 67:9
68:18 69:15
70:13 92:13
93:8 98:8,17
134:17 158:16
177:9 214:5

234:10,11
**materiality**
66:21
**materialization**
107:8 182:6,7
207:9
**materially** 64:5
**materials** 16:24
17:5 234:24
238:9,11
**math** 60:6
**matter** 5:16 15:3
26:9 30:3 32:2
47:15 149:19
157:24 158:9
179:22 204:15
206:19 231:13
232:3 246:18
263:17
**matters** 7:6 19:3
19:8,9 40:22
53:2 67:7 230:4
239:25,25 240:4
241:5 255:10
**mature** 56:18,19
**maxar** 261:4
**mean** 15:7 16:4
24:22 26:8 27:8
31:2 39:19 46:6
54:11 58:19
63:18 72:4
104:3 107:9
108:9 109:11,12
111:5 116:4
119:5 123:24
129:5 135:7,18
135:23 136:5
152:10 154:20

161:15 164:25
168:5 169:11
170:6 181:7
182:22 186:25
200:11 208:18
224:23 230:14
230:18,25
239:19 242:6
250:2,3,21 251:9
256:19
**meaning** 46:10
78:15 104:4
110:5
**meaningful**
26:15,16 84:10
84:15 85:8,25
**means** 24:3 30:5
31:2,3 41:16
42:11 50:8
129:7,17 131:7
147:17 187:22
218:18
**meant** 46:8
131:5,10
**measure** 27:20
170:20 223:14
**measured** 88:15
102:18
**measurement**
177:15
**measures** 71:21
171:15
**measuring** 168:3
218:11
**mechanism** 42:4
**mechanisms**
97:21

**media**  5:14 30:12 70:19,23 121:9,13 167:11 167:16 217:5,9 261:18
**mediating**  239:3
**mediation**  239:9
**mediations** 238:21
**mediators**  239:7
**medical**  9:19
**meet**  130:17
**meeting**  69:20
**meets**  45:11
**mellon**  94:17 101:15
**members**  65:22 66:24 102:18 116:19 234:13 246:19 247:13 247:16,25
**memory**  38:11 68:6 148:24
**mention**  79:10 218:25
**mentioned**  31:5 31:6 229:13
**mentioning**  64:9
**mere**  208:21
**merger**  52:2,5,7 52:9,13,18 53:2 53:5,8,11,14,17 53:23 54:20,21 54:22 95:2,2 96:21 97:5,8 101:10,13,14 102:2,4,9 128:18 129:7,14 130:8

147:8 150:3,22 169:15,18 181:11,24 182:21 231:12 231:14
**mergers**  129:15 129:16
**merits**  213:6 257:10,14,18 258:3,4,7,10
**messed**  151:6
**messier**  220:17
**met**  47:24 48:2 95:10 96:9 234:12
**metal**  1:5 5:16 264:3
**method**  112:8 168:14,15 178:13 179:10 179:11 198:18 204:4 234:4
**methodologies** 33:25 171:10 218:14 219:2
**methodology** 18:23 21:23 102:20,24 103:5 103:10,24 104:16,21,24 105:9 107:25 108:6,23 109:3 111:25 112:16 113:14,24 114:4 118:23 126:2,11 127:9 137:9 138:15 139:21 140:5,25 143:4

154:14 164:15 164:23 166:20 168:2,7 172:7,22 175:17 178:20 187:4,6 193:18 198:7,16,17,24 202:20,20 204:18,23 205:20 210:11 211:4 213:10 216:8,16 218:15 233:4
**methods**  36:4 225:17
**metric**  71:16 89:22
**metrics**  31:13
**mid**  86:21 87:4
**middle**  122:21 162:2
**million**  84:11 97:16,18
**millions**  88:15 88:22
**milstein**  2:3 251:9,14,15
**mind**  39:18 40:2 40:11 88:12,14 106:3,23 120:7 121:2 125:19 126:3 137:4 147:9,17 148:10 258:14
**minimus**  100:22
**minor**  161:22
**minority**  81:3 246:9 255:12

**minus**  93:21
**minute**  20:12 48:13 78:22,22 133:4
**misalleged** 119:17
**mischaracterize** 158:19
**mischaracterizes** 25:17 36:13 37:5 48:15 73:20 84:22 85:6 112:7 137:15 138:19 142:14 165:20 182:2 211:17 214:14 216:14
**mischaracteriz...** 127:3 223:13
**misinformation** 105:14 149:15 193:24
**misleading** 111:4 127:17 140:15 155:11
**misled**  136:10 139:3 148:17 149:5
**misperception** 223:22
**misrepresentat...** 110:8 112:14 126:20 141:9 163:14 198:10 214:6,12,23 218:22
**misrepresentat...** 104:18 108:15

112:15 113:20 118:6,13 119:13 126:8 127:21 140:7,9 150:14 150:21 172:15 190:23 199:21 216:10,11 223:18

**misrepresented** 119:3 137:20

**misstated** 223:5 227:13

**misstatement** 127:6 137:25 138:11 139:9 149:24 150:6 163:25 221:19

**misstatements** 98:8,18 111:11 111:19 112:3,12 112:13 119:18 137:12 138:6 181:3 192:3 199:17 213:2 215:11,25 222:15

**mistake** 203:16

**mistaken** 223:17

**mix** 58:25 61:12 61:18

**model** 78:6,24 171:13,14,15 177:22

**modification** 12:15

**moment** 92:22 102:11 219:22 249:12,21 253:6

**monday** 74:16

**money** 116:22 117:6

**monsanto** 52:3,7 52:9,19 53:23 54:7,14,15 55:3 62:23 64:14 68:9 69:4 96:21 105:24 125:4 127:16 130:10 137:19,21 150:15,22 153:9 153:11 156:14 162:13 164:2 165:17 166:3 169:15 184:2,7 184:14,24,25 185:18,25 191:17 192:24 195:9 207:11 213:24 221:3,4,5 221:9 225:10,13

**monsanto's** 123:10 147:22 195:14 201:9 214:7

**months** 25:25 51:20,22 222:4 250:22 251:3 254:6,9

**moot** 149:7,12 150:10

**morgan** 39:7

**morning** 5:2 6:18,20

**move** 7:20 26:23 56:22 61:15 66:7 75:23

102:11 173:13 173:15 190:8 225:14

**moved** 61:7 173:11

**movement** 55:23 58:12 59:10 61:3 69:17 71:15,23 72:6,10 80:2 176:24 178:2

**movements** 27:20 61:5 77:4 78:9,12 79:7 91:5

**moving** 31:10 62:21 80:21

**multiple** 39:23

**murder** 173:11

**mutual** 216:6 259:9

**mutually** 214:18 215:5,21

**n**

**n** 2:2 3:2 4:2 6:13 262:2,2

**name** 5:22 6:21 7:2 90:14 194:13 239:16 264:3,4

**named** 1:9 7:9 159:25

**namesake** 162:6

**narrow** 239:8

**natalie** 13:9

**national** 1:5 5:17

**nature** 61:22 77:24 80:25 106:2 119:16 142:14 150:6 206:7 214:21

**nearly** 232:16 233:23

**necessarily** 30:2 45:6 48:3 56:11 56:17 58:19 61:15 124:9 130:15,20,20 132:19 150:4,5 205:21 207:17 208:18,24 221:21 222:17 228:3 230:13

**necessary** 17:24 47:25 79:9 95:18 118:15 137:24 171:11 175:14,21 189:10 192:20 193:23 201:19 209:19,22 213:21 216:17 216:18,21 218:15,16 259:23

**need** 36:7 39:25 84:12 97:13 107:17 112:18 113:12,16 117:24 120:18 137:10 141:21 164:3,10 168:2,4 168:6 172:16,17 175:10 176:19

176:21 187:7
193:12 206:11
210:23 215:14
231:21
**needed**  174:10
**needs**  145:21
175:21 210:8
**negative**  59:5
60:18,24 61:19
228:7
**net**  173:14
**neutral**  15:22
34:15 238:20
**never**  22:19
49:12 61:19
112:11 160:8,13
259:18
**new**  1:22,23 2:13
2:13 24:14,16,20
24:25 25:6,19,19
26:4,8,11 28:8
34:18 43:10
50:20 52:21,23
58:17 61:6
62:16,19 64:11
64:16 65:9
68:13,15,19
69:14 70:11,13
75:8,24 182:15
189:16 190:2,3
232:8
**news**  28:20,21
28:21 29:6,13
31:6 43:4 50:18
55:8 57:15
58:13 60:18
61:19 62:21,23
63:6,7,14,15,19

63:25 65:12,13
66:17,18,20,25
67:24 68:5,23
69:2,5,10,13,14
70:5,5,8,14
71:10 72:3,13
73:3,4,13,16
74:3,4,5,6,9,10
74:15,17,20,21
75:6,8,10,11,18
75:20 79:20,21
79:25 158:13
180:12 196:23
212:9,16,24
229:15 258:11
**newspaper**
229:14
**nicki**  1:15
**nitty**  109:19
**noah**  2:14 6:21
8:2 20:11 66:3
121:2 123:19
133:18 170:25
189:19
**noble**  258:25
**non**  46:22
100:23 176:23
177:9,11,21
178:15,23
215:21 216:6
238:16 239:25
240:11,14
**nonmaterial**
228:4
**nonsignificant**
58:3
**norhan**  2:8

**normal**  51:24
**normally**  21:13
**northern**  1:2
5:20
**notary**  1:22 6:15
262:20 264:24
**note**  5:5 37:23
38:4 128:20
**noted**  100:19
123:18 131:2
144:20 261:20
**notes**  9:16 47:20
259:21
**november**  261:2
**nuances**  28:21
**number**  5:21
13:22 15:23
23:7 27:12,13,23
33:16 39:18,25
40:2,13 46:25
52:25 70:24
84:8,9 86:17
96:25 97:2
116:15,19
127:17 129:13
153:25 158:11
167:11,17
174:14 175:3
194:23 209:4
217:5,10 219:6
220:5 229:17
230:7,12,23
232:20 240:24
256:19 261:18
**numbering**
122:4
**numbers**  88:23
88:24 122:13,14

179:7 205:3
247:17,22
**numerous**  52:11

**o**

**o**  4:2 6:13 262:2
**oath**  4:17 6:4
262:9
**object**  72:23
144:14 162:16
170:24 185:5,21
186:8,20 187:13
194:20
**objection**  10:19
11:20 12:24
13:20 14:6,12
15:18 16:10,18
19:14 21:6 23:6
23:21 25:16
26:14 29:15
30:17 36:12
37:4 41:14
46:17 47:10
48:14 54:9 58:5
58:15 60:20
61:25 67:3
73:19 78:4
84:21 85:5 88:2
96:15 98:23
99:16 103:2
111:14 112:6,25
115:7 118:8
123:12,18 124:7
125:5 126:25
128:19,24
130:11,24
131:18,20 132:4
134:23 135:5,16

Page 38

136:13,21
137:14 138:18
141:14 142:12
144:19 145:17
145:19 147:24
148:20 149:9,21
151:24 152:21
153:17 154:16
156:15 157:18
158:18 161:5
162:15 163:4,18
165:19 166:16
169:24 171:23
180:19 181:12
181:25 183:20
184:16 185:15
185:20 188:4,22
189:18,21
190:11,24 192:9
192:17 193:3,4
194:11,19
195:23 197:8
201:11 202:17
207:13 208:14
210:14 211:16
212:11 214:13
216:13 221:11
224:21 225:23
227:15 228:17
231:6 233:16
237:10
**objections** 4:10
6:8,10 166:6
**objective** 226:12
**objectively** 41:8
41:10
**objectors** 117:13

**observable**
200:19
**observation**
179:2
**observe** 59:11
**observed** 103:14
176:24 178:24
**obtain** 249:20
**obtained** 32:17
**obtaining** 33:4
**obvious** 43:10
125:12 143:10
143:11 162:23
164:9
**obviously** 11:12
22:19 27:14
42:19 43:11
64:10 105:19
156:21 166:7
190:3,13 198:16
219:10 222:25
228:3
**occasions** 15:23
**occur** 28:6 39:3
77:24 96:18
143:23 158:5
208:23,24
**occurred** 23:9
96:18 182:10
185:11
**occurring** 96:6
100:24 158:6
211:2
**october** 10:24
253:19
**odds** 167:5
**offer** 11:16,22
22:17 94:16

112:19 115:12
118:17,21 119:3
126:10 137:6
140:3 141:11
142:8 143:8
163:15 168:5,11
**offered** 22:9
115:24 141:11
**offering** 16:7,16
19:4 20:15
103:21 118:17
119:4 171:3
213:20 234:4
**officer** 4:16
**oftentimes** 252:4
**oh** 54:11 226:22
254:8
**okay** 7:10,11,20
8:6,11,12,15,16
8:20,21 9:2,3
10:11 18:9
20:13 23:15
37:18 44:4,13
50:13 54:11
55:4,13 66:14
70:15 71:11,12
80:8 91:11
122:15 133:17
134:2,9 139:12
147:2 150:11
151:2 155:23
159:9,22 160:22
160:23 162:8
170:17 195:5,6,9
195:10 217:20
227:21 235:24
252:15 254:8

**omissions**
108:15 119:18
181:4
**once** 51:7 63:6
63:16 107:22
160:9,14 174:14
185:20 186:8
217:12 224:4
239:5
**ones** 15:8,9,10
235:9
**ongoing** 194:24
**online** 185:19
188:2
**open** 9:15
121:23
**opened** 10:9
**opening** 10:6
**operating** 1:8
241:19 264:3
**operations**
241:17
**opine** 18:10,21
19:7 80:15
102:17 115:11
125:10 131:10
131:13 142:15
144:16 154:10
**opined** 115:24
138:14
**opining** 111:23
162:21
**opinion** 11:24
16:7,16 19:4
20:6,17,21 21:21
22:3,7,9,14,17
22:18 23:23
24:5,8 58:6

**[opinion - paragraph]**

Page 39

| | | | |
|---|---|---|---|
| 60:17,23 61:24 75:25 87:24 88:10 98:20,20 103:21 107:24 111:8 112:19 118:17,21 119:4 126:10 136:9 137:6 139:9 140:3,24 141:11 142:9 143:2,8 157:6,15 163:15 163:20 165:2 166:14,18 167:4 168:6,12 171:3 172:2,3 188:17 191:9 193:16 211:9 213:20 218:9 232:19 234:4 256:7<br>**opinions** 10:23 11:5,8,10,10,15 11:19,22 12:5 20:15,25 21:4,19 30:21 79:10 109:18 116:8 137:24 170:5 189:11<br>**opportunity** 79:22 91:13,16 116:10<br>**opposed** 215:21 216:10<br>**option** 80:10 81:11,16,16,19 81:22,24<br>**options** 80:6,12 80:16,22 95:5 96:4 | **order** 9:5 37:2 61:18 115:13 144:25 168:5 193:17,21 211:17<br>**ordinary** 80:6,16 82:19 83:16 86:25 91:14 99:6,12,18,20,23 99:25<br>**organizations** 154:6<br>**original** 134:4 190:19<br>**originally** 150:8 160:17 215:3 221:2 239:14<br>**outcome** 6:7 202:14,15 207:9 224:6 256:3 259:4 263:17<br>**outcomes** 152:7<br>**outlets** 30:12<br>**outlined** 222:21 224:2<br>**outside** 21:19 61:13 95:23 123:13,14 124:8 127:2 128:23 130:11 131:21 134:23 136:2,13 144:17 147:24 156:15 157:18 162:15 163:19 166:16 169:25 170:3 171:23 178:6,19 180:19 181:12,25 | 184:16 185:7,22 186:9,21 187:14 188:4,22 189:21 190:25 192:17 193:4 194:20 195:23 197:8 201:11 207:13 208:15 210:15 211:19 212:11 224:21 225:23 227:15 228:17 231:6 240:23 242:6,10<br>**outstanding** 17:12 18:7 53:18 82:8 84:16 207:22 235:10<br>**overall** 11:8 32:6 60:19,23 86:3 87:13,16 90:3 126:13,18 132:3 139:10 230:10 230:11,14<br>**overcompensate** 208:11<br>**overlap** 76:21 93:18<br>**overlapping** 214:18<br>**overpriced** 222:15<br>**overseas** 47:6<br>**overseeing** 241:17,18<br>**overstated** 213:24 220:12 | **overtime** 240:5<br>**owned** 83:16 84:6 87:23<br>**ownership** 83:11 86:6 87:16 88:9 90:9 246:10<br>**owning** 83:24 84:19,19 85:3<br>**owns** 242:13<br><br>**p**<br><br>**p** 2:2,2 4:2<br>**p.m.** 121:9,13 167:11,16 217:5 217:9 260:3,6 261:15,20<br>**pace** 196:7<br>**page** 3:3,7 94:9 122:11,13,21 128:4,21 130:25 132:23 133:2,5,7 133:17,23 134:7 143:17,18 145:11 146:11 151:14 159:23 252:19 253:9,9 264:5<br>**pages** 144:24 145:5,22<br>**pagination** 122:12<br>**paid** 105:7 245:15,17,19,20 246:23<br>**papers** 184:7,15 240:18,25<br>**paragraph** 18:14 19:13 23:13,16 |

24:13 31:11,21
31:23 37:16,22
37:22 38:3 44:2
48:16 49:10
50:15 53:22
80:5 82:2 83:10
91:9 102:13
128:5,6,8 130:22
131:3,8,12 132:2
132:7,12,21
133:14 154:20
154:20 155:24
156:6 170:14,18
171:3 173:2
176:20 217:16
246:12
**paragraphs** 20:7
  20:8,13,14 156:3
**paralegal** 2:15
**parse** 178:8,14
**part** 32:24,24
  33:10,17 37:7
  52:19 61:10
  82:20 95:6
  105:23 109:21
  111:6 113:8
  118:16 122:19
  126:15 134:18
  135:18 138:3
  150:25 152:11
  164:25 192:11
  192:19 193:17
  199:25 213:9
  214:12 223:3
  233:5 242:21
  259:16
**participants** 5:8
  28:15 41:22

53:25 102:4
**participate**
  154:25
**particular** 35:8
  40:2,11 42:15,19
  57:2,5 88:11,13
  89:13 92:25
  95:23 100:25
  127:19 129:9,10
  151:14 152:25
  155:17 158:4
  159:23 173:9,20
  199:11 212:2
  214:19
**particularly**
  26:4,5 28:10
  37:21 59:21
  63:11 94:25
  111:21 184:19
**parties** 4:5 5:12
  15:24 263:15
**partners** 237:25
  238:12 239:12
  250:8,8
**parts** 261:12
**party** 6:5 263:10
**pass** 66:18 107:2
**passable** 8:10
**pause** 20:12
  48:12
**pay** 45:18 199:4
**paying** 105:2
  197:18
**payment** 85:20
  221:13,17
**pdf** 122:14
**peer** 32:3,7

**pending** 8:23
  135:21 260:15
**pennsylvania**
  1:9
**pension** 1:5,6,9
  5:17
**people** 13:13,15
  13:17 97:11
  100:3 240:9,16
  241:22 242:21
  242:24 243:13
  243:15,15,16
  246:7 247:8,24
  255:13
**perceive** 135:4
  136:17 147:20
  148:4 162:10,25
**perceived**
  221:20
**percent** 57:8,9
  57:24 59:19,24
  60:5 87:22
  88:18,19,19,21
  206:25 207:6
  220:12 243:5
  247:3,4,12 248:3
**percentage** 57:6
  71:17 82:8,18
  83:15 84:6,15,17
  86:21 87:5,7,13
  155:8 219:3
  220:3,14
**perception**
  182:20 206:17
  231:2
**perfect** 62:14
  66:15 179:20
  252:9

**perfectly** 7:19
**perform** 20:4
  27:15 115:18
  231:19 240:18
  245:3 254:22
  258:10,19
**performance**
  46:9,13 47:17
**performed** 35:2
  98:15 119:19
  127:15,25
  139:22 162:12
  166:21 182:12
  191:11,17
  229:10 246:19
  246:24 251:3
**performing**
  35:20 53:3
  57:18 100:11
  237:20 240:22
  250:5,6,7
**performs** 239:18
**period** 18:19
  20:19 23:25
  24:11 28:18
  37:25 38:10,14
  38:20,24 39:4,9
  39:10,21 40:7
  46:2 51:17
  76:20,24 85:15
  88:15,18,20,22
  89:21 93:20,21
  93:21,24 95:11
  95:12 97:23,25
  98:11,22,25 99:2
  99:2,8,15 100:7
  100:20 101:25
  174:17 176:5

**[period - pointing]**                                                    Page 41

178:2 193:14,20
193:22 195:2
200:3,8 203:11
204:7 205:13
206:3 210:19
217:24 219:14
219:15 224:17
225:11 226:8,8
259:13
**periodic** 47:7
**periods** 47:22
50:8 199:5
231:11
**persistent** 93:11
93:17
**person** 203:4
**personally** 12:17
14:24 65:12
168:6 243:18
**perspective** 29:8
150:2 156:9,20
237:21
**pertain** 76:15
**pete** 5:22
**peter** 2:18
**pharmaceutical**
56:6
**phase** 213:7
**phone** 2:8
234:12 235:11
235:15,19
**phrase** 24:3
32:12,14 131:11
**phrased** 54:12
**physically** 11:14
**picked** 29:20
**picking** 7:19

**piece** 28:9,10
89:15 93:5
199:13 259:17
**pieces** 69:7
**place** 5:12
133:20 134:13
159:14
**placed** 222:9
**places** 252:16
**plaintiff** 1:9
208:11
**plaintiffs** 1:7,11
2:4 7:8,10,15
17:3 18:10
34:15 102:16,21
102:24 103:9,12
103:22 104:4,22
105:13,19 106:5
108:25 109:6,8
110:21 111:3,10
111:25 112:3,21
114:6,20 117:25
118:21 119:2,16
120:4 127:11,12
127:23 136:9,19
136:23 137:18
140:14,22 141:7
141:24 142:16
144:4 148:17
149:2 150:13,19
163:21 164:5
165:4 166:8
167:2,5 168:17
169:5,13 170:7
172:10,11
175:24,25
180:25 181:20
181:21 182:3,4

183:5 184:3
186:19 188:3
190:23 191:21
191:22 192:5
194:6 197:7
211:6 212:16,21
213:17,22 214:4
214:9,14 222:23
223:4,9 225:19
225:22 226:5
229:11 232:22
234:17 235:12
235:18 251:5,8
254:17
**plan** 117:20
153:24 171:21
183:6
**platform** 243:24
244:3,7 245:8,11
**platforms**
244:10,12,15
**plausible** 103:18
104:13 157:22
157:23 158:7
**plausibly** 103:13
103:17 104:12
104:17 105:15
**play** 176:17
**played** 173:25
**pleaded** 214:4
**pleasant** 66:14
**please** 5:5 6:9,25
84:23 99:10
116:12 150:17
165:23
**pled** 140:19
215:3

**plenty** 77:11
**pllc** 2:3
**plot** 76:25
**plug** 36:20
**pocket** 103:5,10
103:24 104:16
104:23 108:5,23
109:2 111:24
112:8,16 113:14
113:24 114:4,21
114:22 126:23
127:9 137:8
139:21 140:5,25
143:4 154:13
164:14,23
166:20 167:25
193:18 198:18
202:12,18,21
204:23 211:3
233:3
**point** 8:13 41:18
41:19 60:9 66:3
73:22 83:8
86:23 100:25
103:8 107:9
109:18 111:17
113:3,23 127:24
146:3 147:4
149:7,18 161:22
185:24 198:10
201:21 203:5
204:2,10,12
222:11 233:24
255:18
**pointed** 144:10
**pointing** 88:7
127:20 140:20
146:11 155:16

**[points - price]** Page 42

**points** 85:23 88:14 146:3 174:24 184:3
**political** 133:25 135:12,19 136:3 136:6
**pop** 9:25
**portfolio** 125:3 147:22 161:20 161:21 227:10
**portion** 38:14 79:13 84:10 88:5 98:13 160:24 180:5 181:2 212:18,22 213:11 215:8,15 215:19 216:2 224:11 240:2 241:8 252:12
**portions** 17:20 79:11,14
**posed** 125:3 169:9,22 221:8
**position** 88:7 97:15,17 145:20 166:9 232:3 241:11 242:4 243:23
**positioned** 154:25
**positions** 81:12 81:16 95:7,7 97:12,13 102:6 245:6
**positive** 59:4 60:18,24 61:18 173:22

**possibilities** 96:7
**possibility** 93:7 126:5 258:2
**possible** 38:13 75:9 96:17,19 157:22 158:3 177:20 178:23 196:12 206:23 209:24
**possibly** 27:6 157:16 179:17 215:22 224:23
**post** 52:9 213:11
**posted** 188:2
**posting** 188:9
**potential** 94:13 105:22 106:16 106:17,19 119:23 120:3 124:13,14 125:2 125:19 129:24 130:9 138:8 139:17 152:9,15 155:3,4 163:25 182:11 212:5 221:4 225:21 229:15 230:11 231:3
**potentially** 64:5 66:20 153:8 258:12
**practice** 51:24 52:25
**practices** 47:8
**preceding** 51:19
**precise** 13:22 25:4 27:14 86:17 201:18

**precisely** 96:3
**preclose** 224:17 225:11
**predicate** 51:4
**predicates** 41:20
**predict** 78:7
**preferences** 248:11
**preliminary** 7:6 123:3,4
**premerger** 53:3 192:7,25 195:13 223:11
**preparation** 87:21 185:9
**prepare** 11:2 13:4 14:4 234:7 238:9
**prepared** 10:14 13:25 55:17 137:5 143:8 149:13 167:3 235:8
**preparing** 12:18 13:14 136:8 141:20 183:17 232:12 234:25 238:10
**presence** 83:23
**present** 2:17 11:18 45:14 141:5 174:16 190:5 234:3
**presentation** 64:19,20
**presented** 11:19 16:9 76:11 91:2 142:2

**president** 241:11 241:15 242:4
**press** 3:10 29:19 29:19 30:5 63:3 63:4 73:7,12 151:7 185:14
**presume** 30:7
**pretty** 62:13,14 89:8 174:20 237:23 249:18
**prevents** 110:10
**previous** 72:11
**previously** 24:24 25:10 106:14 170:12 213:23
**price** 23:23 24:5 24:8 26:13 27:9 27:20 28:8 29:3 29:7 50:21 53:12 55:6,7,19 55:23 56:23 57:16,21 58:12 58:21 59:10,14 59:20 61:3,5,15 61:21 64:12 69:17 70:7 71:14,23 72:6,10 72:11,12 76:7,8 76:10,25 77:3 78:9,12,16,17 79:7 91:5 92:2 92:12 93:12 98:8,18 99:6,7 99:14,19,24,25 103:14,15 104:8 105:3,7,15 106:3 106:7,9,17 107:13,16 108:3

**[price - providers]** Page 43

108:12 110:9,10 110:10,17,20 111:2,12,18 112:4,11,13 113:6,8,9,11,17 113:18,19,21 114:2,7,13 157:17,25 158:5 158:17 170:20 171:16 172:13 173:15,23 174:13,21 176:15,24 177:12,25 179:8 188:14,21 189:4 189:15 195:17 195:19,21 199:5 199:11 200:17 203:23 207:3 215:2 218:18,21 222:10 224:8,18 225:13,14 226:10 248:25
**priced** 34:8 102:8 210:5
**prices** 24:15 26:23 34:6,6,18 40:20 50:24 72:11 76:19 77:15,24 78:3,20 78:25 80:21 81:7,8 92:4,7 93:25 94:22 96:23 97:10 100:7,8,14 101:22 212:16
**primarily** 241:4 244:7 250:9

**primary** 13:13 174:2 243:15
**prime** 53:17
**principal** 245:6
**principle** 250:6 250:7
**principles** 34:7 67:9 249:10
**prior** 15:2 29:16 47:22 50:8 51:22 52:4 53:16 54:12 72:15 74:18,22 75:18 131:24 132:21 134:7 157:13 164:8 169:6,7 196:5 231:11 236:19 250:22
**prisoner** 8:18
**pro** 154:22
**probability** 54:21 102:9 210:25 225:16
**probably** 12:25 14:8 47:2 86:22 115:13,22 179:21 228:11 233:7,10 237:3 237:18 240:9 254:6 255:14,14
**problem** 42:13 177:23
**proceed** 6:12 169:18 222:3
**proceeding** 6:9 6:23 204:13

**proceedings** 117:8,11
**process** 52:17 56:14 66:17 130:7 146:15 164:25 180:4 199:24 200:2 227:22 239:10 258:23
**processes** 130:2
**processing** 28:20
**produced** 3:13 235:7
**product** 56:10 64:10 148:6 152:2
**product's** 154:3
**productive** 220:11
**products** 153:6 153:13
**professional** 236:3,6 252:17
**professionals** 239:21
**professors** 250:9 250:15
**profit** 64:7
**program** 32:19 34:3 70:2
**programs** 9:15
**progress** 56:13 179:3,23
**projects** 246:7
**promises** 132:8 132:9
**prompt** 27:4

**properly** 16:13 138:11 139:8 140:18,22 155:13
**proportion** 74:10 256:15
**proposed** 18:19 104:21 170:9,10 175:16 197:3 204:18 210:11 216:15 259:13
**proposing** 172:7 213:10 216:8
**proposition** 49:2 89:19
**prospects** 99:21
**protect** 227:24
**prove** 175:24 176:2 229:11 232:2
**provide** 17:4 22:3,20 25:6 42:23 46:8 62:6 64:19 83:25 93:8 107:15 116:18 155:6 171:5 238:2 256:6
**provided** 25:19 26:17 39:11 45:3,10 47:16 58:25 59:17 61:22 182:14 191:4,23 231:9 253:14
**providers** 244:11

**[provides - quickly]**

**provides** 11:7 15:7 42:3 45:12 48:21 49:7,10 62:13 82:16 92:9 101:21 179:24
**providing** 20:21 26:21 34:10 40:7,19 45:17 46:12 64:16,23 117:2 250:2
**public** 1:22 6:15 24:4,6,9 30:4 45:4 84:6 86:4 87:22 129:12 165:16 166:2 183:18,21 187:12 194:5 262:20 264:24
**publication** 72:24
**publications** 32:4 248:7,9,15
**publicly** 23:24 24:2,16 29:9,10 29:23 30:8,22 31:8 45:6 46:19 100:2 188:13 226:25
**published** 37:12 40:23 73:6 185:18 248:18 248:21,24
**pull** 144:15
**pulled** 145:4
**purchase** 95:22
**pure** 229:12

**purely** 113:17 178:15
**purported** 185:3
**purpose** 42:8 68:24 202:7
**purposes** 16:19 31:14 41:12 47:8 51:11 74:5 177:6 201:15 202:12
**pursuing** 233:5
**put** 29:24 51:5 62:10 98:3 186:25 187:2 224:14 233:20
**putting** 29:22 145:11

**q**

**qualifications** 48:3
**qualifies** 88:9
**qualify** 48:2
**quality** 5:6,7 105:21 140:13 191:10,16 250:15 258:22
**quantifies** 168:13 199:2
**quantify** 35:5 171:19 198:22 200:24 211:7
**quantifying** 168:7
**quantitative** 33:24 34:24 35:10,20 225:12 225:17

**quantity** 173:3
**quarter** 26:5 39:10
**quarterly** 46:11 46:15 47:17 48:7 56:11
**question** 4:11 8:14,23,24 16:11 16:12 21:7 30:11,18,20,24 32:8 36:13 40:3 40:9 42:13,14,18 44:8 46:20 47:11 48:14,15 49:18 53:20 54:10,12 58:6 60:21 65:16,20 67:4 71:22 72:22 73:22 78:5 83:21 84:22 85:2,6 88:3 92:20 93:3 96:16 98:5,5,16 99:11 100:23 101:3 103:3 105:12 112:20 115:2 116:11 118:9 121:17 123:13 124:8 125:6,23 127:4 128:20 131:4 134:4,13,14,18 135:6,17 140:19 140:21 141:19 145:16 146:21 147:2,5,13 154:8 157:7 160:5,18 160:20,24 161:3

161:6 162:17,22 164:17 165:9,12 165:20,22 166:23 167:20 169:25 170:2,24 171:2 177:24 178:22 180:2 190:12,25 193:4 194:12,20 199:10,19 201:15,25 203:7 204:8 206:5 208:15 210:15 211:19 215:14 219:4 221:12 224:15 227:8 233:17 239:8 246:4,12,22 260:10
**questioning** 66:6 66:11 139:16 202:22
**questions** 7:24 8:8,25 34:11 66:21 71:10 144:2,25 145:8 145:10 146:6 187:8 192:21 204:11 232:11 233:21 234:14 234:19 236:19 239:24 255:19 259:22 260:14 261:7
**quick** 120:23 204:10
**quickly** 67:14 100:3 162:7

**[quickly - recall]** Page 45

196:24
**quite** 16:5 88:20
  203:24
**quote** 40:24
  53:24,25 93:10
  93:11 198:15
**quoting** 94:7

**r**

**r** 2:2 263:3
**raised** 140:21
**raising** 66:21
  211:9
**ran** 51:17 57:19
  69:25
**random** 56:21
**range** 115:14
  247:20,21
**rapidly** 24:10,17
  27:7,8 30:8,14
  99:6,13 188:12
**rare** 75:15
  114:19 180:8
**rate** 89:6 230:23
  246:17 247:4
**rates** 76:9
  246:18 247:15
  255:22
**rational** 65:8
**rationale** 92:4
**raw** 84:9
**reach** 36:22
  58:12 75:13
  79:9 109:17
  189:10
**reached** 20:9
  21:21 109:18
  116:9

**reaches** 203:5
**react** 79:22
  167:4 227:12
**reacting** 27:17
**reaction** 25:13
  27:5 55:6,7,19
  57:16,21 58:8,21
  59:15,20 61:21
  70:7 170:20
  178:24 180:5
  184:15 189:8
  192:15 195:19
  195:22 207:3
  226:10 228:14
  229:4
**reactions** 28:8
  171:16
**read** 16:12 38:2
  84:23,24 99:9
  109:11 116:12
  116:13 128:25
  130:22 131:3,15
  132:22 133:15
  141:21 142:7,8
  144:24 145:5
  146:20 147:2,3,4
  150:17,18 162:9
  162:12,19 165:8
  165:22,24 262:8
**reading** 109:13
  129:4 132:9
  134:8 138:9
  146:23 156:13
  160:4,23,24
  161:7 162:8,22
  164:4 234:22
**reads** 123:3
  128:11

**ready** 123:16
  134:10
**real** 44:12
  141:22 182:11
  204:4 220:16
**realization**
  206:22 208:10
  209:6,8 210:13
**really** 14:15
  35:17 41:17
  43:16 56:16
  57:12 63:17
  65:18 77:2
  84:12 88:6
  96:24 107:12
  113:4 125:23
  161:18 173:7
  176:4 178:19
  183:2,13 190:6
  197:16 203:18
  203:22 206:6,6
  212:25 219:24
  220:10 221:19
  226:5,7,13,17,25
  228:9 233:19
  234:22 239:19
  240:22 244:4
  251:17 252:21
  258:19
**reason** 9:19
  26:20 89:25
  95:21 97:2
  100:9 124:9
  196:8,11 204:16
  215:23 253:2
  256:23 264:5
**reasonability**
  61:14 200:22

**reasonable**
  43:12 52:24
  92:10 116:21,21
  117:5 125:13
  168:14 179:3,11
  179:15,19,21,23
  193:7 194:2
  200:24 201:5
  219:12 220:7
  226:23
**reasonableness**
  227:23
**reasonably** 64:4
  106:3 210:9
**reasons** 11:18
  57:4 95:20
  127:18 179:16
  225:25 226:2
**reassurances**
  105:24 111:4
**reassured**
  105:20
**rebuttal** 257:21
**recall** 15:9 16:2
  17:11,16 18:5
  22:22 33:10
  37:6 40:22
  67:19 68:3
  79:12 82:20,22
  83:18 87:20
  89:10 90:18,19
  109:9 111:17
  117:12 127:22
  136:16 138:9
  148:21,24
  173:10 174:17
  180:21,23,24
  184:20 185:8,11

**[recall - relationship]** Page 46

185:16 187:17 187:18 190:4,9 194:9,14,16 214:16 234:18 250:19,20,21,25 253:25 260:24

**recalled** 194:23

**recalling** 229:18

**receive** 160:10 160:15 245:21 247:3 255:21

**received** 117:6

**recess** 19:24 70:21 121:11 167:13 217:7 260:4

**recognize** 10:12 259:2

**recognized** 200:14

**recognizing** 146:4

**recollection** 38:15 87:19 90:12,22 126:17 150:24 184:12 186:14,16,24 190:15 252:9

**record** 5:3,13 6:3 7:2 8:2 9:10 9:13 20:2 70:16 70:20,24 84:24 90:23 116:13 121:4,7,10,14 128:13,21 167:8 167:12,17 217:3 217:6,10 259:25 260:3,7 261:8,15

262:11,12 263:13

**recorded** 5:10 5:15

**recording** 5:7,11

**records** 12:19 13:21

**recover** 114:20

**recoverable** 22:4 256:8

**recross** 260:15

**redirect** 260:15 260:16

**reduce** 152:3

**reduces** 205:6

**reevaluate** 169:22

**refer** 7:8 130:2 131:23 134:3

**reference** 14:17 15:5,8 16:23 39:2 48:17,19 134:25 137:3 162:18,23,24 163:2

**referenced** 14:20 15:24 18:8 32:23 33:2

**referencing** 15:9

**referred** 117:20 180:22

**referring** 7:9,13 35:11 46:14 88:24 102:3 117:9 122:12 124:17 129:10 135:23 136:2 158:21 211:24

**reflect** 12:19 13:22 26:3 55:2 75:8 87:4 98:9 210:24 236:10

**reflected** 9:12 19:12 23:24 24:6 27:9 29:6 99:6,13 182:5 260:23

**reflecting** 212:18

**reflection** 224:10

**reflective** 196:9

**reflects** 122:5 236:20

**refuse** 258:4

**regard** 213:9

**regarding** 127:13 168:25 221:19

**regardless** 112:9

**regression** 50:24 51:6,8,11,12,17 55:5 234:21

**regressions** 36:10,14

**regular** 46:8,10

**regularly** 67:8

**regulators** 136:11 148:18 160:6 163:8

**regulatory** 30:6 135:12,20 136:3 136:7 146:14,18 147:7,10,12,14 147:15 148:7,8 148:13 160:16 161:9

**rejected** 197:3

**rejection** 106:18 170:10 197:24

**relate** 80:13 143:25 156:13 166:25 199:6 211:21 244:21

**related** 6:5 35:23 62:23 64:15 76:18 77:11 95:21 97:14 98:11 105:23 106:21 108:17 119:17,21 127:15 137:22 152:8 164:3,18 164:20,21 166:10,10 170:9 172:15 176:23 177:8,9,12,21 178:14,15,23 196:24 199:8,18 199:22 211:21 211:22 212:4,25 215:3,20 218:19 235:9 240:10 241:4 242:3 245:13 252:24 255:16

**relates** 96:24 130:19 140:22 216:5 246:4,8

**relating** 141:25 212:4 255:10

**relationship** 50:20 81:8 90:8 90:17 125:14 155:12

**relative** 86:11,14 102:8 152:23 197:18 245:24

**relatively** 75:15 161:23

**release** 3:10 29:19,19 30:6 72:16 151:7 178:19

**released** 43:22 45:16 46:18 72:14 73:17 74:3 186:2

**releases** 63:3,4 73:7,12

**relevance** 44:25 157:7

**relevant** 36:22 46:3,7 47:16 48:4,6 53:25 54:7,7,15 56:15 83:2,19 91:17 98:5 103:19 105:16 106:11 107:14 108:4 111:21 114:9 138:13 164:15 168:21 171:17 172:24 180:7,12 181:2 187:3 199:13,23 212:19,23 213:18 223:2

**reliable** 168:2,5 168:7,14 218:10

**relied** 11:24 71:21 235:4

**relief** 116:18

**rely** 45:4 61:23 218:3

**relying** 90:25 238:2

**remain** 216:12

**remainder** 51:9

**remained** 191:15 193:24

**remaining** 196:18

**remains** 156:9 194:5 215:10

**remember** 13:10 16:6 67:25 68:6 69:20 90:14 185:24 186:3 187:9,20 192:8 192:10,11 194:25 214:20 229:19 251:17 251:19 252:7

**remembering** 117:17

**remind** 234:15

**reminding** 234:20

**remote** 9:5

**removal** 113:9 113:10 205:17 215:24

**removed** 67:17 142:4 215:11

**removing** 205:24 206:10

**rendered** 116:4 170:4

**rendering** 166:17

**renew** 136:11

**renewal** 134:14 134:21 135:2,14 135:24

**repeat** 45:6 99:11 154:8

**repeating** 25:5

**rephrase** 73:24 170:23 178:22

**report** 3:8 9:24 10:14,15,20,21 10:23,24 11:4,14 11:16,18 12:6,10 12:13,18 13:5,14 13:19,24 14:11 14:11,15,18,20 14:22 15:2,9 16:21,24 17:25 18:15 19:13 20:8 21:13 22:19,20,23 23:3 23:3,14,20 24:13 27:15,16 31:11 37:16 41:3 44:19 45:25 46:22 48:3 56:25 58:19 67:15 76:11,20 76:23,24 80:5 85:13 86:19,19 87:21 88:25 91:2,8 93:9,22 94:9 102:14 115:12,25 123:13 124:8 125:24 127:2

128:24 130:12 131:21 134:24 136:14 141:12 141:20 142:13 144:18 147:25 156:16 157:19 162:16 163:19 166:17 170:15 171:4 175:16 180:20 181:13 182:2 184:17,20 185:7,9,23 186:10,22 187:15 188:5,23 189:22 191:2 192:18 193:5 194:21 195:24 198:18 201:12 207:14 208:16 210:16 211:20 212:12 217:17 224:22 225:24 227:16 228:18 232:13 233:13 234:9,22 235:3,4 235:22 243:11 243:20,21 246:13,20,25 250:22,23 251:4 253:18 254:2 255:23 256:12 256:17,23 257:9 257:14,19,20 258:3,4,7 260:22 260:24

**reported** 45:6 63:2 185:14 194:25 241:10

reporter 5:24 6:10 8:10 84:25 116:14 191:12

reporting 47:8 229:16

reports 14:3 22:21 28:19 29:14 30:13 37:24 38:5,20 39:2,6,8,23 40:6 43:6 46:11,15 47:2,6 56:12 60:13 61:23 62:25 76:14 158:13 232:17 233:20 240:25 253:14 255:3,15 256:24 257:21 260:21

represent 87:7 195:3,7

representative 196:10

representatives 122:7 159:14 186:6

represented 88:16 136:24 263:10

representing 5:22 188:3

represents 203:22

request 17:3,13

requested 19:16

require 184:25 217:22 218:23

required 47:7 48:23 117:14 160:15,17 202:3 232:4,21

requirement 49:12

requirements 168:11

requires 12:14 215:25 221:16 222:17

reread 48:13 234:9

rerelease 26:23

research 37:12 40:21

reserved 4:11

reserving 261:11

respect 10:23 20:22 81:17 105:22 127:25 135:8 136:25 139:2 147:12 182:10

respective 4:5

respects 47:14 91:21 171:9

respond 117:22

response 122:21 134:20 152:20 161:11 195:17 258:25

responses 145:8

responsibility 156:11

responsible 241:16

responsiveness 50:18

rest 66:14

restate 72:22 85:2

result 59:21 60:5 90:6 98:14 106:22 111:19 112:14 132:15 153:10 173:14 182:7 191:6 196:5 222:15,19

resulting 97:8 113:19 126:24

results 69:21 172:19 173:18 178:7

retained 250:17 251:2,5,16 254:4 255:5 256:17 261:19

return 52:17 73:25 174:7

returning 71:4 248:6 255:18

reveal 119:7 168:21 171:16 189:17 222:5

revealed 106:12 140:8 158:23 168:19,22 169:3 170:11 181:2 212:6,8 223:2

revealing 199:22

reveals 180:12

revelation 107:14 108:4 114:9 180:6

191:25 212:22 213:13,15 215:16 227:13 228:15

revelations 103:18 104:17

revenue 129:24

reversal 258:9

review 18:6 32:3 65:12 90:24 158:12,13 232:21 235:2,6 235:18

reviewed 10:20 21:9 32:7 47:15 76:17 117:3 119:15 192:6,24 234:9,25 243:19 243:21

reviewing 18:4 66:17 146:7 162:20

revisiting 163:12

right 9:16 10:8 10:15 12:20 13:25 14:18 16:24 18:12,15 18:25 20:19 21:24 22:5 23:17 24:11 26:13 30:2 32:9 32:12 33:5 36:11 37:25 41:15 42:12 43:7 44:6,17 46:4 48:11 50:18,25 51:6,13 53:6,7,9 55:8,15

57:22 60:8,14
63:2 66:22
71:15 75:6
77:16 80:18
82:9,13 83:12
84:20 85:4,16
87:9 91:14
93:14 94:3,14,19
94:25 98:22
99:3 101:10
102:21 104:18
108:6,9 109:4
111:16 112:5
118:2,23 125:19
126:11 130:23
134:17 135:15
136:4 137:13
138:17 142:20
145:13 146:19
147:8 149:8,20
153:3 154:21
158:17 159:12
168:20 169:10
169:23 170:16
176:25 177:4,10
177:18 180:6
183:19 184:18
185:10,14
188:14,21
194:22 196:20
200:3,10 202:10
203:13 205:19
207:3 216:21
217:24 218:7
221:3,10 222:12
223:19 224:8,25
226:11,18
227:14 228:16

233:15 235:25
237:4 239:13
241:12 247:10
248:15 249:18
249:18 258:13
**rights** 98:14
261:11
**rise** 140:25
**risk** 106:2,13
107:4,6,8 134:17
134:20 154:3
155:13 157:3
169:9,13,17,22
170:12 182:6,8
183:4,11 191:24
197:22 201:8
203:20,21
204:10 206:18
206:20,22
207:11,22 208:5
208:10,13,25
209:8,15,16
210:3,5,12,13,24
210:25 221:7,8
221:20 223:7,16
223:18 228:4
229:25
**riskiness** 119:19
120:6
**risks** 106:21,25
107:2 130:18
153:9 156:22
157:14 168:22
169:4,19 182:15
182:18 183:2
223:21,22
**robust** 50:8

**role** 174:2,2
232:5
**rolled** 228:8
**rosen** 2:11
**roughly** 51:20
51:22 81:23
86:20
**round** 139:14
**roundup** 64:15
68:9 105:22,23
106:22 119:20
119:22 120:3,6
123:10,24 124:6
125:3 127:25
136:25 137:22
138:8,8 139:17
141:25 142:23
148:15 157:9,10
185:2 191:7
211:21
**rs** 1:4 5:21
**rule** 18:25 75:14
124:13 135:21
148:2 150:5
163:6
**ruled** 184:24
**rules** 9:6
**run** 36:10,14
69:23 77:6
**running** 50:24
55:5 241:19

**s**

**s** 2:2 3:6 4:2,2
43:25 44:20
49:6,14,20 50:5
264:5

**s&p** 259:15,16
**safety** 186:7
**sale** 90:2
**sales** 123:6,11,23
125:11 151:16
151:21 152:3,6
152:14,23 154:6
154:22 155:17
**sample** 70:11
**san** 1:3
**sat** 65:21 66:19
**satisfied** 45:20
**satisfy** 169:16
**saw** 38:22 76:11
77:11 119:16,20
124:2 184:9
187:22
**saying** 25:12
26:9 27:5 30:20
44:24 45:15
61:17 96:6 99:4
99:20 119:8
139:19 140:23
142:22 153:15
153:22 203:13
213:14 216:15
221:25 228:24
253:7
**says** 22:23 24:15
42:10 132:7,13
154:21 156:6
161:15 162:2
176:21 246:15
252:18
**scenario** 221:22
222:20,22
223:25 231:11

**scenarios** 208:19 222:13
**school** 250:10
**scientific** 36:23 57:14,18
**scope** 52:16 106:15,16 123:13 124:8 127:2 128:23 130:12 131:21 134:24 136:14 142:13 144:17 147:25 156:16 157:19 162:16 163:19 166:17 170:4 171:24 180:20 181:13 182:2 184:17 185:7,22 186:10 186:21 187:14 188:5,23 189:22 190:25 192:18 193:5 194:21 195:24 196:25 197:9,17 201:12 207:14 208:15 210:15 211:19 212:12 224:22 225:24 227:16 228:18 229:21 229:22 230:11 231:7
**screen** 5:10
**sealing** 4:6
**sec** 45:2,23 46:16 48:2,3,17 48:20 62:25

**second** 7:14 12:21 18:2 39:3 67:21 82:22 83:13 88:12 94:4 120:17 128:25 132:25 133:15 134:5 147:13 151:13 160:19,21 162:3 170:17 185:17 190:8,10
**section** 18:23,24 37:15,19 43:24 44:2,5 48:10 49:2 50:15,16 80:4 91:8,12 93:9 94:5 102:19 103:6 232:13 233:22 252:21,23,25 253:6,11
**sections** 216:25
**securities** 13:25 20:22 21:5 22:15,17 23:2,11 34:6,8 36:2 46:21 78:20 80:25 85:23 101:20 102:7 105:3 115:5 173:4 200:15 236:8 237:22 238:4,23,25 241:4 248:18 249:11 251:22 252:22 253:7,12 254:5,16,23 255:4,7,8,10,16

256:11 257:14 259:7,12
**security** 22:10 22:24 24:15 40:14,15 49:13 50:21 80:14 81:12 90:10,11 91:20,24 97:14 110:10
**see** 7:21,23 24:14,18 29:3 31:15 32:12 39:22 43:5 54:2 55:23 57:16 61:15 68:14 76:9 77:3 79:25 80:11,20 92:18 100:9,12 113:4 122:23 123:7,22 124:4,13 125:11 128:8,14 130:15 130:18 133:2 134:8 137:2 143:6 146:16,17 151:17,18,20 155:25 160:18 160:20 161:22 161:24 162:2,9 162:18 196:8 226:11 252:19 253:25 259:21
**seeing** 87:20 151:8 185:24 187:17 230:4
**seeking** 114:20 233:2
**seen** 5:9 15:16 15:19,20,21,23

21:11,14 28:6 29:17 43:14 52:11 57:7,8 160:8,13
**select** 14:21
**selected** 15:8
**selecting** 74:20
**sell** 95:22 152:3 152:11 153:12 153:21,21,23
**sellers** 2:3
**selling** 56:8,10 152:2 153:6
**semantics** 198:14
**semi** 23:17
**send** 228:7
**sense** 84:8 85:7,8 86:19 104:14 113:5 114:11 152:3 178:6 198:3 254:25 255:3
**sensitive** 52:23
**sentence** 123:2 128:11 132:6 133:13 135:19 146:12,17 151:15,18
**sentences** 123:2 132:20 133:13 133:16,22 135:11,14
**separate** 37:23 38:6 152:24 198:13
**september** 3:10 89:9 133:6

151:7 159:15
**series** 28:25 29:2
  29:3 36:3
**serve** 83:6 239:2
**served** 15:22
  34:13
**service** 34:21
**services** 29:20
**serving** 35:7
  236:14 237:7,15
  238:6,20
**session** 65:20
  167:14 260:20
**set** 50:9 68:25
  69:6 129:23
  132:10 200:18
  202:2 208:20
  223:10 232:8
  244:20 263:19
**setting** 9:6 21:2
  208:2 219:22
**settle** 28:15
  256:20 257:7
**settled** 51:7
  116:16
**settlement**
  106:17,17,19
  116:18,22 117:8
  117:13 119:23
  119:24 170:9,10
  196:19,23
  197:14,16,24
  211:14
**settlements**
  117:7 125:9
  197:3
**settling** 196:25

**seven** 20:14
  57:23 61:4
  254:13
**severely** 153:20
**shape** 158:7
**share** 9:18,25
  27:9 34:20 76:8
  79:17 81:3 84:9
  84:20 85:4
  86:25 87:16
  96:13 99:6,19,23
  99:25 102:17
  105:8 107:19
  115:12,24
  120:16 155:7
  168:3,8,15
  193:17 194:3
  198:23 205:7,12
  217:23 227:19
  251:9
**shareholder**
  54:16
**shareholders**
  85:17,19,19
  132:16 155:6,22
  227:24
**shares** 21:10,16
  53:18 76:4
  77:16,19 79:8
  80:7,16,23 81:9
  82:19,25 83:16
  84:12,14,15 86:4
  86:16 87:9,18
  88:16,22 90:3
  91:6,14 95:15
  99:12,18,20
  101:7,9

**sheet** 1:5 5:16
  264:3
**sheets** 47:19
**shift** 117:23
**short** 27:12
  28:17 44:10
  85:15 95:11,12
  97:7,12,12,14,15
  97:16,23,25
  98:11 101:12,24
  141:8,16 151:3
**shorter** 27:20
**showing** 41:7
  168:22
**shown** 88:24
  128:22
**shows** 81:11
  123:5
**side** 9:13 56:19
  129:25,25
  241:24 242:8
  244:16
**sides** 238:22
**signal** 227:21
  228:8
**signaling** 219:23
**signature** 10:17
  263:21
**signed** 4:15,18
  10:15 53:5
  262:17
**significant** 40:4
  43:4,8 55:23
  56:24 57:3,7,21
  57:24 58:12,21
  59:11,20 60:5
  61:2,4,12 70:7
  71:14,18,20

74:21 75:5
  89:24 155:2
  158:17 173:16
  195:21
**significantly**
  57:2 61:7 89:7
**signify** 10:17
**signing** 53:11
  54:4
**similar** 219:16
  222:19 232:16
  233:20
**similarly** 1:7,10
**simple** 25:21
**simply** 113:10
  113:10
**single** 12:3 27:17
  29:5 47:25 52:7
  86:21 87:4
  97:22 126:14
  138:11,16,21
  140:17
**sir** 165:11
**sit** 12:20 13:23
  38:11 111:16
  136:15 148:12
  148:24 152:16
  156:12 184:18
  185:10 186:13
  187:10 194:22
  231:18
**sitting** 87:12,15
  142:7 175:8
  184:22 186:15
  201:6 210:10
  218:10
**situate** 37:19

**[situated - start]**

situated  1:7,10
situation  160:8
  160:13
situations  176:5
six  20:14 51:20
  51:22 254:6,8,13
size  86:11,14
  174:23 228:4
skip  122:10
  161:11
skipped  133:5
  133:10
skipping  155:23
slightly  27:21
  29:5 53:21
  95:13 101:19
slumbered
  121:22
small  27:13,23
  69:7 76:20,23
  78:23 87:7
  93:19 98:10
  243:13 248:2
smooth  7:6
  130:4
social  156:11
software  244:15
sold  154:4,5
  219:13
solely  245:15
solutions  264:2
somebody  26:18
  34:11 97:15,16
  129:12 187:22
  232:5 241:24
  257:2
somewhat  128:5

sophisticated
  83:24
sorry  27:13 44:7
  65:25 82:6
  86:12 99:9
  133:3 137:20
  139:15 145:6
  151:5 189:18
  190:13 191:13
  226:6
sort  21:12 38:3
  43:10 45:9
  57:10 64:21,25
  65:7 75:16
  109:19 110:7
  139:15 148:25
  170:3 172:25
  178:8 215:21
  216:5 229:16
  233:24 239:9,19
  240:19 244:22
  254:11 255:9,21
sorts  29:18
  34:10 75:15
  175:17 211:8
sound  8:2 44:8
sounds  149:11
  157:25 241:21
source  62:6
  240:8
sources  183:18
  183:21
south  2:5
speak  219:8
  249:7
speaking  170:8
  212:14 249:5

speaks  19:18
  132:5 258:25
specific  9:7 17:4
  20:25 36:25
  37:8 38:15,19
  39:17 48:19
  49:23 57:5 60:4
  71:23 89:19
  96:8 97:13
  127:14 132:19
  140:12 148:21
  150:24 159:8
  161:19,19
  177:10 179:8
  180:24 186:14
  186:16,24 187:9
  187:10 196:15
  218:13 228:6
  251:19
specifically
  17:13 36:6 39:8
  77:7 80:12 86:9
  111:17,20
  119:21 135:10
  136:15 165:16
  166:3 175:13
  192:10 251:15
specification
  51:8
specify  193:19
speculate  90:23
  147:16 148:11
speculation
  229:12
speculative
  225:2
speedily  161:24

spend  12:18
  14:10,14 232:12
  258:20,21
spending  6:24
spent  13:19
  34:23 35:9
spiel  17:25
spike  97:6
spirit  259:2
ss  262:4
staff  38:16 39:7
  65:14,21,25
  66:18,24 69:16
  89:10 234:13,19
  241:25 243:13
  246:19 247:4,13
  247:16,25
staffing  241:19
stage  11:6 19:4
  256:23
stake  243:4
  259:11
stakes  242:15,24
  242:25
stand  166:7
  190:17
standard  63:24
  65:6 167:20
  200:22 213:5
  246:18
standing  46:10
  49:7
standpoint
  130:14 258:15
stark  173:17
start  6:25 7:5
  22:7 55:10
  67:14,22 134:13

**[start - study]** Page 53

160:10 176:4
180:16 211:10
231:21 236:25
**started** 174:6
175:6 238:16,20
249:17
**starting** 128:6
133:14,24
135:11 250:22
**starts** 91:8
122:22 123:2
146:13,25
151:15,18
171:13,15
**state** 6:9,25
184:23 262:4,20
**stated** 113:14
243:19
**statement** 11:4
87:10 123:20
124:3 126:14,15
126:24 127:19
132:25 133:23
136:18 138:17
138:21 139:7,13
139:16 140:17
141:7,8,21,23
142:9,10,21,24
143:9,19 144:12
146:18 147:7,21
153:14 154:9,12
154:19 155:16
155:17,19
156:12,17,24
157:8,15 158:15
158:20 163:24
164:6,12,17
165:5,8

**statements** 12:9
47:18,19,20,21
48:8 127:12,13
127:14,16,23
138:25 139:3,23
140:13,16 141:2
143:12,22
144:10,15
155:11,15 157:2
159:7 162:11
165:16 166:2,9
166:24 169:6,7
181:17 182:25
201:19 210:4
214:25 215:17
215:20 230:2
**states** 1:2,22
5:19 95:22,23
**statistical** 35:21
**statistically**
56:23 57:24
58:20 61:2 70:7
71:14,17,20
173:15
**statistics** 34:25
35:11 36:17,18
239:23 249:6
**status** 245:25
246:2
**staying** 109:5
143:16 176:20
**stem** 114:7
211:13 213:12
**stemming**
210:12
**stems** 215:15
**stenographic** 6:3

**stenographically**
263:9
**step** 50:23
**steps** 175:9
**sticking** 115:23
**stipulated** 4:4,9
4:14
**stock** 26:13 28:8
34:5,17 41:12
56:22 58:21
59:10,14 61:3,4
61:15 64:12
77:12 80:20
94:24 106:3
107:16 108:12
110:10,20 111:2
157:17 172:13
173:14,23
174:13,21
177:25 178:24
179:8 180:5
200:16 203:23
207:3 208:10
213:12 214:10
215:2,15 216:9
216:11 218:18
218:21 222:10
222:14 224:7
**stockholder**
96:12
**stockholders**
54:5
**stocks** 50:25
**stop** 175:7
**stopped** 60:9
**story** 104:14
106:24 119:9

**straight** 100:21
162:4
**strategy** 95:6
244:7,18
**street** 2:5,13
**strength** 214:6
**stretch** 217:2
**strictly** 112:10
**strike** 41:9 78:10
79:5 87:14 89:4
100:5 115:4
119:10 149:3
160:11 195:20
199:24 225:7
236:14 257:6
**strong** 23:17
128:12 132:15
156:10
**stronger** 93:16
**structure** 253:5
**struggle** 124:4
**struggling**
123:22
**studied** 110:25
184:10
**studies** 36:3
50:17,22 55:11
55:18 57:19
69:24 71:13
77:7 171:21
218:4
**study** 40:23 53:4
69:21,25 170:20
171:13,14,15
173:2,8,19,25
174:8 175:7,10
176:21 177:22
177:24 178:4,4,6

178:7,12,13,16 178:19,25

**stuff** 234:7 244:5

**stylized** 220:8,17

**sub** 11:10

**subcomponent** 249:11

**subject** 18:23 190:6

**subjects** 18:11 20:16

**submit** 256:17 257:9 258:3,4

**submitted** 253:19 256:12

**submitting** 258:6

**subscribed** 262:17 264:21

**subsequent** 160:3 257:9

**subsequently** 69:23

**substance** 71:6 121:18 167:21 217:13 260:11

**substantial** 42:17 45:11 48:5 50:6 52:12 57:15 76:17 83:4 84:3 88:5,9 89:12 90:2 100:19 101:7,8 101:11 109:16 123:6 183:11 184:15 192:14 240:11,14 241:8 255:15

**substantiallized** 52:14

**substantially** 89:8

**substantively** 256:16

**subtle** 85:22

**successfully** 156:7,19 157:12

**suddenly** 101:2 101:23

**suffered** 212:10

**sufficient** 40:24 49:8,16 120:5 154:11 197:25 258:16

**sufficiently** 45:3 98:7,17

**suggest** 83:23 84:9 90:5 100:25 150:4 152:9 193:9 219:17,25

**suggested** 97:18 111:18 159:6

**suggesting** 44:20 158:6 221:23

**suitability** 104:15

**suite** 2:5

**summarize** 20:8 20:15

**summarized** 18:14 239:20

**summarizes** 11:15

**summary** 11:7 248:13 249:13

**superior** 132:7

**supervision** 246:21

**supply** 94:24 95:12,14 97:24 98:12 101:7,19

**support** 14:4 34:21 35:3 39:16 40:25 44:15 80:23 83:25 88:7 91:2 130:3 203:15 236:16 240:4 249:17 250:3

**supported** 34:12 82:12

**supporting** 37:21 236:25 241:23

**supportive** 42:5 258:22

**supports** 44:21 49:3,21 80:16 82:14 93:13

**suppose** 141:6,8

**supposed** 32:13

**supposing** 195:11

**sure** 7:3 16:13 17:7,14,17 30:19 39:4 43:9 63:9 73:23 82:4 94:6 103:7,22 104:23 116:12 120:25 122:3 126:15 133:21 158:21 169:12,25 181:8 187:2 202:2,8

232:25 233:2 234:14 239:19 247:2 254:13 258:19 259:17

**surmise** 244:24

**surprise** 110:8 165:14,25

**surprised** 59:18 176:10 206:22

**surprising** 59:22 77:23

**surrounding** 101:12 119:23 148:14

**surveys** 240:25

**susceptible** 118:22

**suspended** 94:17 97:3,23

**suspension** 101:15

**sustainability** 156:11

**swear** 6:11

**sworn** 4:16,18 6:14 263:7 264:21

**synchronous** 77:23

**synergies** 123:7 123:23 124:5,10 124:16,23,25 125:13,14 126:4 129:24 132:14 135:8 151:21 152:6,12,25 155:18 181:11 181:17,23

**[synergies - testimony]**                                    Page 55

182:20 183:2,3
**synergy** 123:11
  130:3 151:16
  152:19

**t**

**t** 3:6 4:2,2 262:2
  263:3,3
**tab** 9:25 120:14
  151:4,5
**tailoring** 233:14
**take** 5:11 8:17
  8:19,24 25:2
  28:2,14 59:18
  66:4,8,11 70:15
  75:4,7,21 81:11
  112:2 118:10,15
  120:16,20,22
  133:15 146:9
  152:13 154:18
  159:10 165:5,13
  167:8 172:4,18
  185:12 194:4
  199:10,16,20
  216:24 231:17
  238:12 259:20
**takeaway** 62:19
**taken** 1:21 5:16
  19:24 33:16
  35:24 70:21
  116:20 121:11
  161:23 167:13
  200:6 204:20
  217:7 260:4
  262:9 263:8
**talk** 9:23 43:13
  43:18 50:13
  67:13 76:24

91:6 93:21,23
94:5 102:2,12
105:5 120:11
124:16 138:7
167:24 204:9
206:16 220:21
234:6
**talked** 158:11
  164:25 188:10
  202:9 206:18
  243:6
**talking** 24:23
  25:9 43:9,23
  55:10 73:2,4
  91:4 92:23,24
  98:10 99:3
  103:6 115:10,16
  117:24 126:17
  129:21 130:13
  130:16 132:13
  132:17 135:3,7
  135:14,19,24
  147:10 148:5,10
  156:18 157:11
  158:9 178:17
  187:21 198:20
  208:16 221:2,17
  227:6,18
**talks** 24:14
  40:17 49:15,24
  50:11
**target** 52:15
  74:2 77:10
**tasked** 193:16
  209:20
**tasks** 13:12
  19:12

**taught** 36:9
**tax** 95:21
**teach** 36:25
**team** 13:18
  19:16
**teamsters** 1:6
**technical** 71:10
**technique**
  218:11
**techniques**
  171:10 218:3
  225:13
**tell** 82:3 91:25
  152:16 154:7
  177:25 257:16
**telling** 16:21
**temporaneous**
  218:5
**temporarily**
  94:17 97:3
**temporary** 94:23
  101:20
**ten** 238:15
**tenet** 138:24
**term** 7:12 24:20
  47:13 55:8 85:8
  107:7,7 109:24
  110:3,4 113:21
  155:3,4 177:3
  184:6,8,9
**terms** 33:21
  40:19 54:22
  85:9,22 89:22
  91:22 100:14
  106:12 116:25
  121:2 125:19
  129:23 198:25
  203:9 221:13

223:3 230:19
232:14,18
233:12,18,21
240:13 242:21
**test** 33:7 41:4
  57:12,18 60:4
  74:25 75:21
  82:15 89:19
  184:15
**testified** 6:15
  66:16 75:3
  78:11 82:23
  126:6 137:7
  159:6 196:17
  249:16
**testify** 9:20
  142:20 145:2
  148:12 168:8
**testifying** 15:15
  35:2 60:12
  237:12 238:6,13
  238:16 256:22
  256:25 257:3
**testimony** 25:17
  36:13 37:5
  48:15 71:7
  73:20 84:22
  85:6 112:7
  121:18 123:16
  127:3 137:15
  138:19 140:2
  158:19 164:8
  167:21 211:17
  216:14 217:14
  223:14 243:10
  252:13,18,25
  253:7,14 260:11
  261:16 262:8,11

263:8,8
**testing** 75:13
**tests** 21:12 27:15
90:5
**thank** 8:6 10:11
16:23 17:23
18:9 26:10
32:15 55:4
70:17 71:3,5,22
75:23 82:7
94:10 122:22
146:22 202:23
236:24 249:15
253:3 261:6
**thanks** 6:24
11:17 45:24
162:10
**theories** 113:5
244:20
**theory** 31:15
75:9 91:25
102:21,25 103:9
103:12,23
104:22 106:8
107:4,5 108:25
109:6 110:22
111:25 112:23
112:24 114:6
117:25 118:22
126:13,18,23
127:12 136:19
136:23 137:19
139:10 150:13
150:19 164:12
167:5 172:10
181:20 194:6
197:7 211:6
222:22,25

225:19
**thing** 17:6,10
25:6 26:2 38:21
43:9 56:4,5
64:25 124:2
143:20 144:22
201:18 207:2
213:6 220:7,15
226:17 229:5
244:14 253:24
**things** 7:6 9:16
28:19 29:21
33:25 36:2 59:2
92:2 101:18
125:9,18 126:3
129:9 132:19
136:2 144:7
147:18 158:24
159:3 161:18
163:8,9 173:6
175:4 176:17,18
183:6,7 184:11
190:2 220:18
232:6 234:15
240:18,25
243:14 255:8
**think** 14:15 15:6
24:24 25:18
27:11 30:2
31:19 32:10,14
38:18 41:15,16
42:12 43:12,12
43:17 44:18
47:13 49:6,9,14
49:22,23 53:22
54:11 55:25
57:4,10 58:16
60:2,7,8,22

61:14 62:5 63:3
63:12 64:4 65:5
66:16 67:16,18
67:20,21 69:25
78:8,11 79:19,23
83:7,8 85:11
87:10 88:4
90:15 91:7
92:11,19 93:2,4
94:8 96:24
103:25 107:7
110:2 111:8
115:2 116:7,9,24
120:13 123:16
124:2,22 125:13
127:4 130:19
131:19,23,24
132:6,12,16,18
133:5,9 134:6
135:25 138:20
138:21 140:11
140:15 141:17
142:5 143:11
144:18,21,23
145:4,12 146:24
150:2 152:8,16
153:4,7 154:18
156:17,25 159:5
161:23 162:6
164:16 165:10
166:19,22
168:24,25 170:2
177:23 179:12
179:13,15
180:22 181:14
184:9 194:2
195:15 196:2,17
198:25 199:7,18

200:12 203:3,13
204:22 206:14
207:16,24 208:8
209:9,25 212:3
212:13,13 215:7
215:18,22
218:25 221:13
222:13,17,24
223:3,9,12,20,23
224:13 225:2,4
225:25 227:4,24
228:5,7,19,20
229:11,13 231:9
231:21 235:11
235:17 236:19
238:14,18 240:5
241:6 243:6,12
244:11 245:9
247:7,23 249:12
252:15,20
254:18 255:11
255:12,25
256:20 258:9,14
259:15
**thinking** 51:5
92:15 232:23
260:23 261:3
**third** 128:5
146:12 151:14
155:9,23 156:5
194:8,15,17
**thirds** 133:2
**thorough** 183:13
**thought** 44:7
141:22 172:21
192:23 249:14
**thread** 40:21

**three** 7:9 23:8
25:25 27:24
28:2 63:12,14,18
63:22 67:13
68:8 69:17 70:3
71:21 108:10,16
108:17,18
121:14 132:20
156:3 167:12
235:16 247:20
254:10
**threshold** 39:19
40:3,11 41:16
42:10,10 69:6
88:11,13
**throwing** 54:13
**tie** 107:13 108:3
108:14,14 158:4
**tied** 104:12,17
179:7 212:16
**ties** 180:14
**time** 4:11 6:24
14:10,14 15:11
19:22,25 22:2
23:5 28:15,18
36:3 38:20 39:5
39:24 44:12
45:7 51:23,24
53:18 54:4,20,23
67:15 70:18,22
71:24,25 72:24
73:7 76:24
77:19,25 79:15
85:15,24 86:22
86:23 88:17
89:24 94:25
95:11,13,25 96:3
96:10 97:25

98:11 100:25
101:8,9,10,12,25
109:12 115:8
117:17 120:19
121:3,8,12
125:23 128:23
133:14,24 137:5
143:8 159:4
167:10,15
173:11,13
174:19,24 175:2
175:5 176:16
178:2 187:10
189:6,12 191:12
193:11 198:10
199:3,5,15 217:4
217:8 219:12
225:15 228:21
228:25 229:23
230:12,18
231:11,17
232:12 238:13
238:14,19 239:4
241:7 242:21,21
246:3 250:24
254:3,9,12 260:2
260:5 261:3,20
**timely** 45:18
46:3,7
**times** 7:5 15:5
23:8 28:6 46:24
117:3,12,19
178:5 179:6
220:6,23 238:8
**timestamp** 74:7
74:11
**timestamps** 73:9

**timing** 73:12
79:20,21,25 80:3
135:9 178:11,15
196:14 253:23
**today** 6:24 7:7
8:10 9:6,11,21
87:12,15 142:7
156:13 168:17
175:8 184:22
186:13,15 201:6
210:10 218:10
234:8
**today's** 261:16
**told** 105:17
106:4 109:15
206:24 208:3,4
210:6 228:20,22
258:11
**toll** 2:3
**tools** 33:23 34:24
34:24 35:10,16
35:18
**top** 17:16 67:25
74:13 109:10
143:17 151:15
180:24 194:14
**topic** 31:18
32:18,21 33:2
37:13 75:24
112:19,21
125:24 135:13
161:8 166:25
184:19 209:13
**topics** 19:18
117:23 249:3
**tort** 156:14
230:6

**total** 39:24 76:12
84:10 89:23
125:7 177:25
197:19 198:4
201:23 227:9,19
257:20 261:18
**totality** 41:7
144:6 158:22
208:2 211:25
**totally** 66:9
76:21 129:3
**touted** 223:8
**track** 39:6,7 79:2
128:13
**tracked** 78:20
100:17
**tracking** 218:20
**trade** 21:10
54:23 79:12
**traded** 21:16
22:18 23:11
80:17 93:13
106:4 200:17
**trading** 51:20
72:7,8,19 74:22
79:15 80:6,22
83:7 91:24
100:3,6
**trained** 32:16
**training** 11:12
32:20,25 35:12
35:15 67:6,11,11
249:22 250:12
**tranche** 185:17
**transact** 95:24
**transaction** 54:6
96:2 146:19
148:19 149:6,7

149:17,18 150:9
150:15,22 155:5
**transcribed**
263:9
**transcript** 3:9
122:6 159:13
262:8,10 263:12
**transcripts**
187:24
**treated** 74:4
195:12
**trial** 4:12 116:9
187:18,25 188:9
189:14 194:10
209:5,5
**trials** 56:9 196:7
209:4
**true** 75:11
139:18,19 177:7
195:11 197:22
201:8 207:5
221:21,22
223:16 262:11
262:13 263:12
**truth** 103:16,19
104:9 105:17
106:5,12 114:9
138:13 168:18
168:22 171:17
180:7,13 181:2
182:12 191:25
198:11 199:14
199:23 205:10
210:6 212:19,23
213:18 219:13
223:2
**try** 8:15 78:6
90:17 115:15

120:19 200:20
200:24 225:15
232:7 258:21
**trying** 57:12
68:24 75:13
86:8 92:18 93:2
93:4 95:3
115:20 165:7
166:23 169:12
171:5 183:15
200:16 203:6
206:4,6 230:9
**turn** 43:24 111:8
237:13
**turning** 102:13
**two** 11:8,10,15
18:10 19:3,8,12
27:23 51:12,15
53:16 62:23
70:24 72:10
76:10,25 77:21
77:22 78:19
79:15 80:19,20
81:25 82:24
86:2 92:2 96:25
97:2 101:20
107:11 108:16
121:9 133:2,13
133:16,22
135:11,14 146:3
183:6,7 196:11
204:10 235:16
237:24 247:21
247:21 248:7
255:19
**type** 12:15 35:8
64:3 104:5,7
114:11 239:17

244:2,8
**types** 34:5 48:22
66:25 67:8
104:10 114:14
129:18 220:18
230:5 233:25
237:20 238:24
240:21 244:19
244:21
**typical** 14:11
30:5
**typically** 129:17
171:6 178:17
257:13

**u**

**u** 4:2 250:16
**u.s.** 46:22
**ubiquitous** 234:4
**ultimate** 28:16
85:9 91:23
125:7 168:11
180:3 221:17
224:9
**ultimately** 35:4
92:9 106:18
107:2 117:6
152:6 168:12
175:20
**unbiased** 24:17
99:7,13
**uncover** 231:16
**undergraduate**
33:15 34:2
35:12,14
**underlying** 11:9
33:24 36:15
41:20 45:8 50:3

80:13 178:9
182:12 206:8
**underneath**
253:7
**understand** 8:13
9:4,10 16:13
30:19 103:7,17
110:2,4 127:11
131:16 141:23
144:4 161:2
164:4,10 165:2,3
167:5 180:14
181:6 182:4
183:8,15,16
202:8 204:12
214:25 221:14
253:4 254:14
**understanding**
44:23 45:22
50:3 106:16
109:5,12,22
110:15 111:7
128:16 129:6,11
129:17,19 136:8
136:19,22
138:24 139:10
140:2,9 148:16
150:12,19
152:18 163:21
166:8,13 170:6
172:9 180:17
181:9,19,21
182:13 190:21
191:3,10,15,19
193:15 196:22
197:5,13,15,23
200:13,21 201:7
202:7 203:5

207:8 213:2 214:22 222:21 223:17 230:3 231:15 232:22 234:14 249:9 251:10
**understated** 208:12
**understood** 7:16 60:11 62:5 103:22 126:6 144:11 189:7 232:25 233:5 261:13
**undertake** 19:11 137:23 139:6
**undertaken** 175:10 177:18
**undertook** 50:17
**undisclosed** 182:8
**unequivocally** 59:8
**unexpected** 28:12
**union** 1:8
**unique** 244:20
**uniquely** 105:5
**unit** 59:9
**united** 1:2 5:19 95:22,23
**university** 248:10 250:9
**unquote** 40:24 198:16
**unrelated** 152:17 164:7 215:9

**unsealed** 183:25 184:12
**unusual** 257:5,8
**unwind** 95:3,6 95:18 96:2
**update** 191:24 260:17
**updated** 182:17 191:9 198:3
**updates** 46:8
**use** 7:12 30:5 32:13 35:15 36:17,17,21 50:22 51:24 52:4 53:3 73:7 104:23 107:7,7 113:20 131:17 136:12 152:4 171:21 172:23 178:12 179:6 204:22 220:7 239:21
**useful** 42:3 43:3
**users** 244:16
**usually** 14:8 17:18

**v**

**v** 16:3 264:3
**vague** 90:12,21 115:7
**valuation** 72:13 173:21 218:3,5 218:11 239:23 249:10,11 252:22 253:8,13 255:9,10

**valuations** 218:5
**value** 28:13,24 53:13,19 54:14 85:11,23 115:20 132:15,17 154:21 155:4,22 169:12 219:11 219:24 222:8 228:2 230:21 232:8 248:10
**valued** 34:8
**variables** 36:20
**varied** 14:7 86:22 240:5 241:6
**varies** 88:17,19 88:20 257:24
**variety** 57:4 115:19,21 238:3
**various** 33:3 184:3
**vary** 55:25
**vast** 51:23 241:9 251:2 254:15
**verbatim** 203:9
**verdict** 180:18 181:6,8,16,22 182:14 189:16 190:18,20 191:8 191:14 192:3 194:10 195:8 202:10
**verdicts** 106:15 169:3,20 170:8 196:5
**verified** 161:13
**verify** 89:10 123:4

**veritext** 5:23,25 261:19 264:2
**versus** 1:12 5:18 70:5 208:3 237:12 245:25
**video** 5:11,14 19:23 260:3,6
**videographer** 2:18 5:2,23 19:22,25 70:18 70:22 121:8,12 167:10,15 217:4 217:8 260:2,5 261:14
**videotaped** 1:20
**view** 31:12,17 62:18 64:6 93:13 98:16 101:13 103:8 107:10 113:4,23 114:3 131:7 152:13 161:15 161:22 181:15 203:4,23 214:20 215:6 250:11
**viewed** 158:15 230:20
**viewing** 62:7
**villegas** 2:15
**virtually** 5:6 105:10,11 232:15 233:14
**virtue** 253:20
**volatility** 29:3
**volume** 29:2 89:3,23

**[w - work]**                                                        Page 60

| w | wanted 103:21 | welcome 8:19 | wire 29:20 |
|---|---|---|---|

**w**

**w** 1:20 3:4 6:13
262:2,7,15 263:5
264:4
**wachtell** 2:11
**wait** 133:4
**waived** 4:7
**wake** 197:14
**walk** 120:8
**want** 8:17 16:13
23:13 37:15,21
39:22 43:8,24
48:13 49:5 52:4
65:10 68:23
78:21 80:4
81:22 82:2
90:22 91:6
93:23 94:5 96:2
102:11 103:7,11
134:3 141:5
145:22 146:3
147:16 148:11
151:2,13 156:5
159:9,22,24
161:25 164:10
164:13 167:24
168:10,13
170:14 187:2
195:16 196:13
196:14 198:13
198:14,24
202:21 204:9
206:16 213:15
217:17 220:19
220:21 224:24
225:4 231:25
236:18 252:11
257:3

**wanted** 103:21
204:17 260:17
**warm** 151:3
**warn** 185:2
**way** 13:11 24:3
24:22 25:4,10
27:10,10 28:12
36:23 40:3
41:15,24 42:12
43:2 52:17
53:20 54:12
56:24 59:22
60:11 85:12
89:19,24 93:3
95:13 97:19
112:15 113:15
113:22 114:25
130:19 171:18
171:18 173:16
181:15 182:9,23
198:17 200:24
201:5 203:13
209:6,24 215:24
216:6 224:16
226:22 231:10
242:23 254:20
256:3
**ways** 124:22
125:13 126:3
152:5 154:2
197:12 207:15
**we've** 7:12 131:2
160:13 161:16
211:11 216:23
229:2 243:6
**wednesday** 5:4
**week** 120:11
186:17

**welcome** 8:19
17:17,21 71:3
121:16 217:12
260:9
**wenning** 1:14
**went** 34:3 63:7
65:22 89:8
97:16 111:3,18
112:11
**werner** 1:14,14
132:25 133:23
160:2
**west** 2:13
**whatsoever**
177:13
**whereof** 263:19
**white** 240:18,25
**wide** 29:25
**widely** 24:4,6,9
29:13,22 30:10
30:12,13,15,20
31:2,3 40:5
41:21 42:2
55:25 185:14
188:15,19 189:2
189:5,14
**william** 7:3
**willing** 22:16
68:16 118:17
164:11
**window** 51:18
51:18,22 52:6,8
71:24,25 100:16
**windows** 51:13
51:15 75:2
**winnemac**
239:15

**wire** 29:20
**withheld** 104:6
105:14 114:12
**witness** 3:3 5:9
6:11,13 18:4
128:22 129:4
134:8 144:16
145:7,10,12,16
146:23 160:23
162:8 242:10
250:18 260:19
263:7,13,19
**wolfgang** 1:15
**wonderful**
241:22
**wondering**
134:16
**word** 27:7
128:17 129:20
131:17 152:19
**words** 26:8
38:25 81:20
84:11 92:3
103:25 110:14
113:13 114:11
136:6 138:21,22
172:18 179:5
180:8 207:24
216:4 232:7,15
233:19 255:12
**work** 10:22 15:3
15:13,14 20:4
28:7 33:17
34:13,16 36:5,9
36:24 47:4 51:5
142:19 193:18
218:13 222:7
233:8,9 238:16

**[work - zoom]**

| | x | z |
|---|---|---|
| 238:22 239:17 241:3,21,25 242:4,10 243:10 244:2 245:2,4,12 246:6,8,17,19,23 247:5,25 248:18 248:22,25 249:17 250:24 251:2 254:22 258:15,19,22 | **x**  1:5,17 3:2,6 176:3 226:23,23 226:24 | **z**  226:24 **zero**  108:8,20,21 164:21,24 **zoom**  1:21 |
| | **xxxxx**  2:20 4:20 | |

| | y | |
|---|---|---|
| **worked**  239:7,12 243:7 251:21 252:9 253:5 **workers**  1:5 5:17 **working**  13:10 34:9 67:7 236:16 238:10 240:9 243:16 246:7 247:9 250:21 **works**  216:25 **world**  148:9 204:4 220:16 226:11 229:6 **worth**  205:24 230:20 **wow**  61:20 **write**  31:12 218:2 **writing**  21:13 232:14 233:18 **written**  11:14 **wrong**  122:5 140:10 222:6 **wrote**  45:24 102:16 | **y**  226:24 **yavitz**  2:14 3:4 6:17,21 8:6 66:9 71:2 120:20 121:6,15 123:15 131:13 133:7,21 144:19 145:6,15 145:24 167:7,18 189:20 202:23 216:23 217:11 237:13 259:24 260:8 261:5,13 **yeah**  18:5 54:11 63:10 88:13 92:17 **year**  14:7,7 39:9 155:7,9 236:13 236:15 237:6,14 237:24 238:5 240:6 **years**  15:14,15 22:9 23:8 28:7 34:4,9,23,25 35:9 39:21 238:11,15 239:5 245:10 246:5 254:10,13 **yep**  134:11 **yielded**  60:4 **york**  1:23 2:13 2:13 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.