# EXHIBIT B

Carol V. Gilden (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Email: cgilden@cohenmilstein.com

Nicole Lavallee (SBN 165755)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email:  nlavallee@bermantabacco.com
         avahdat@bermantabacco.com

*Attorneys for Lead Plaintiffs and Additional Named Plaintiff*
[Additional Counsel on Signature Page for Accompanying Motion]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>     vs.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>        Defendants. | Case No: 3:20-cv-04737-RS<br><br>**<u>CLASS ACTION</u>**<br><br>**EXPERT REPORT OF PROFESSOR JOSHUA R. MITTS, PH.D.**<br><br>Ctrm:  3 – 17th Floor<br>Judge:  Richard Seeborg<br><br>FILED UNDER SEAL |

[No: 3:20-cv-04737-RS] EXPERT REPORT OF PROFESSOR JOSHUA R. MITTS, PH.D.

**TABLE OF CONTENTS**

I.    INTRODUCTION                                                                                    1

      A.    Qualifications                                                                            1

      B.    Summary of Conclusions                                                                    2

II.   FACTUAL OVERVIEW                                                                                3

III.  THE DOMESTIC APPLICABILITY OF SECTION 10(B) OF THE SECURITIES
      EXCHANGE ACT OF 1934 AND IRREVOCABLE LIABILITY UNDER
      *MORRISON*                                                                                      5

IV.   IRREVOCABLE LIABILITY FOR VIRTUALLY ALL PURCHASES OF BAYER
      ADRS DURING THE CLASS PERIOD WAS INCURRED IN THE UNITED
      STATES                                                                                          6

      A.    Sponsored ADRs: Background and Overview                                                   6

      B.    Secondary Market Trading in Bayer Sponsored ADRs                                          8

            1.    Overview of the Bayer Sponsored ADR Program                                         8

            2.    Secondary Market Trading in Bayer Sponsored ADRs                                    11

      C.    Issuances of New Sponsored ADRs by the Bank of New York Mellon                            12

V.    THE PLAINTIFFS' PURCHASES WERE TYPICAL OF CLASS MEMBERS                                         14

VI.   ABILITY TO DETERMINE ON A CLASS-WIDE BASIS WHERE
      IRREVOCABLE LIABILITY WAS INCURRED                                                              18

VII.  CONCLUSION                                                                                      18

## I.    <u>INTRODUCTION</u>

### A.    Qualifications

1.    I am a tenured Professor of Law at Columbia Law School.  I am also the principal of M Analytics LLC, a consulting firm specializing in financial economics.  I hold a Ph.D. in Finance & Economics from Columbia University, a J.D. from Yale University, and a B.A. in Liberal Studies from Georgetown University.

2.    I have published extensively in the fields of economics, finance, and law.  My articles have appeared in peer-reviewed journals, including the *Journal of Finance* (winner of the Dimensional Fund Advisors Distinguished Paper Prize (2020)), the *Journal of Law and Economics*, the *Journal of Legal Studies*, the *Journal of Institutional and Theoretical Economics*, the *International Review of Law and Economics*, the *Journal of Financial Regulation*, the *Business Lawyer*, and the *Harvard Business Law Review*, among others.

3.    I have been invited to present my research at numerous conferences and workshops in finance and law and economics, including the Annual Meeting of the American Finance Association, the Annual Meeting of the American Law & Economics Association, the Conference on Empirical Legal Studies, the Columbia Business School Conference on News and Finance, and the 8th Symposium on Intelligent Investing at Ivey Business School, and at workshops at Harvard University, Columbia University, New York University, The University of Texas at Austin, and Vanderbilt University.

4.    I have reviewed articles for peer-reviewed journals in finance and law and economics, including *The Review of Financial Studies*, *The Journal of Law and Economics*, *The Journal of Legal Studies*, *International Review of Law and Economics*, and *Journal of Empirical Legal Studies*.  My research and commentary have been featured in *The Wall Street Journal*, *Reuters*, *Bloomberg*, *The Washington Post*, *MarketWatch*, *Law360*, *Bloomberg Law*, *Bloomberg View*, *Bloomberg BNN*, and *The Globe and Mail*.

5.    In addition to my research and teaching and academic responsibilities, I advise on the analysis of trading data in connection with securities violations.  I have extensive experience

supporting the U.S. Department of Justice.  My research and expert opinions have been presented to the U.S. Securities and Exchange Commission and other regulatory bodies.

6.    At Columbia University, I have taught courses on securities regulation, law and economics, data science, and contracts.  My courses encompass economic theory, quantitative methods of valuation, asset pricing, investments, and data analytics as well as the economics of securities fraud, market manipulation, and insider trading.

7.    My qualifications, publications, and expert witness testimony over the past five years are summarized in detail in my *curriculum vitae*, attached to this report as Appendix A.

**B.    Summary of Conclusions**

8.    I have been retained by the Court-appointed Plaintiffs in this matter to render three opinions:

i.    ***First***, whether irrevocable liability for the proposed Class's purchases of Bayer sponsored American Depositary Receipts ("ADRs") (Ticker: BAYRY) from May 23, 2016 to July 6, 2020, inclusive (the "Class Period") was incurred in the United States;

ii.    ***Second***, whether the Plaintiffs' purchases were typical of those of other members of the proposed Class, defined as all persons or entities that purchased or otherwise acquired Bayer ADRs during the Class Period, because irrevocable liability was incurred for those purchases in the United States;

iii.    ***Third***, whether it is possible to determine on a Class-wide basis whether irrevocable liability was incurred in the United States by members of the Class.

9.    In reaching these opinions, I have relied upon various publicly available materials and other materials, which are listed in Appendix B and/or otherwise cited in this report.  The research and analysis upon which my opinions are based has been conducted by me with the assistance of personnel working under my direction and supervision.  I reserve the right to modify this report and my conclusions based on additional information and materials I might review, including materials that have not yet been made available for review.  I am being compensated at a rate of $1,300 per hour for my work in this matter.  I have been assisted in this matter by staff at M Analytics LLC working under

my direction, and I receive further compensation based on those billings.  M Analytics LLC's and my compensation are not dependent on my opinions expressed in this report or the outcome of this matter.

10.    Based on my analysis to date, my review of available materials, my experience, and my professional judgment, I have formed the opinion that: i) irrevocable liability for virtually all purchases of Bayer sponsored ADRs during the Class Period was incurred in the United States, ii) Plaintiffs' purchases of Bayer sponsored ADRs were typical of Class Members because irrevocable liability was incurred for those purchases within the United States, and iii) it is possible to determine on a Class-wide basis whether irrevocable liability was incurred in the United States by members of the Class.

11.    The remainder of my report is organized as follows: Section II provides a factual overview of the case.  Section III reviews the domestic applicability of Section 10(b) of the Securities Exchange Act of 1934, which turns on the question of where "irrevocable liability" was incurred. Section IV outlines how irrevocable liability for purchases of Bayer Sponsored ADRs during the Class Period was incurred in the United States.  Section V discusses how the Plaintiff's transactions were typical of Class Members.  Section VI evaluates the ability to determine irrevocable liability on a Class-wide basis.  Finally, Section VIII concludes my report.

## II.    FACTUAL OVERVIEW

12.    In this Section, I describe the relevant facts underlying this case as I understand them based upon Plaintiffs' complaint, filed on December 30, 2021,[1] as narrowed by the opinions of the U.S. District Court for the Northern District of California, dated October 19, 2021[2] and May 18, 2022.[3]

13.    On May 23, 2016, Bayer — a German multinational pharmaceutical and life science corporation — announced that it made a $62 billion offer to acquire Monsanto, an agrochemical

---

[1] Second Amended Class Action Compl., *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, No. 20-cv-04737-RS, ECF No. 107 (N.D. Cal. Dec. 30, 2021) [hereinafter Compl.].

[2] *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, No. 20-cv-04737-RS, 2021 WL 4864421 (N.D. Cal. Oct. 19, 2021).

[3] *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, No. 20-cv-04737-RS, 2022 WL 1570002 (N.D. Cal. May 18, 2022).

behemoth.[4]  At the time, Monsanto faced a growing number of lawsuits relating to the potential carcinogenicity of glyphosate — the active ingredient in Roundup, Monsanto's flagship and best-selling herbicide.[5]  Plaintiffs allege that Bayer moved forward with the transaction without conducting adequate due diligence on the legal risks associated with Roundup, all while Bayer and certain senior executives and Board members assured investors that Bayer's due diligence was exhaustive and thorough.  On September 14, 2016, Bayer announced that it signed the merger agreement.[6]  That same day, Bayer's CEO Werner Baumann assured investors that Bayer had "confirmed in due diligence" the merger's "significant potential for sales and cost synergies."[7]

14.    In March 2017, internal Monsanto documents produced in the Roundup litigation (widely known as the "Monsanto Papers") revealed that Monsanto had known about glyphosate's potential toxicity for years and had been manipulating academic research on glyphosate's health risks.[8] Despite the content in the Monsanto Papers, Baumann reassured investors that Bayer had conducted adequate due diligence.  For example, in an earnings call on July 27, 2017, Baumann stated that "the Monsanto people went out of their way to provide us with transparency, data and visibility to the most critical questions we had."[9]

15.    As another example, on May 25, 2018, Baumann continued to reassure investors of the substantial benefits and low risks of the merger, stating at Bayer's annual shareholder meeting that the merger was "just as attractive today as we assessed it to be two years ago."[10]  On June 7, 2018, Bayer announced it had completed the merger for $63 billion.[11]

16.    On August 10, 2018, *Johnson v. Monsanto Company* — one of the Roundup lawsuits — resulted in a verdict against Monsanto and total damages of $289 million, after a trial in which

---

[4] Compl. ¶¶ 48, 61, 83.

[5] Compl. ¶ 77.

[6] Compl. ¶ 96.

[7] *Id*.

[8] Compl. ¶ 96, 106-107.

[9] Compl. ¶ 107.

[10] Compl. ¶ 109.

[11] Compl. ¶ 116.

[No: 3:20-cv-04737-RS] EXPERT REPORT OF PROFESSOR JOSHUA R. MITTS, PH.D.                    4

internal Monsanto emails were introduced into evidence.[12]   On March 19, 2019, *Hardeman v. Monsanto Company* — another Roundup lawsuit — resulted in a verdict against Monsanto and total damages of $80 million, after a trial in which additional internal Monsanto emails were introduced into evidence.[13] On May 13, 2019, a third Roundup lawsuit resulted in another verdict against Monsanto and total damages of $2.055 billion, after a trial in which the plaintiffs introduced numerous internal Monsanto documents into evidence.[14]  On June 24, 2020, Bayer announced that it reached settlement for existing and future Roundup claims for $10.9 billion.[15]

17.     From May 23, 2016 (when Bayer first announced the merger) through July 7, 2020 (following Bayer's finalized announcement of its approximately $10.9 billion settlement), the price of Bayer ADRs declined by 26.1% — from $24.06 to $17.77— resulting in a market capitalization loss of $12.87 billion or 20% of the purchase price of Monsanto.[16]

## III.    THE DOMESTIC APPLICABILITY OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND IRREVOCABLE LIABILITY UNDER *MORRISON*

18.     I understand that the Supreme Court in *Morrison v. Nat'l Australia Bank Ltd.* held that to establish a claim under Section 10(b) of the Securities Exchange Act of 1934, alleged misstatements or omissions must be made with scienter in connection with the purchase or sale of (1) a security listed on a domestic exchange or (2) any other security in the United States.[17]  Either prong is sufficient.[18]

19.     It is my understanding that the U.S. Court of Appeals for the Ninth Circuit has found that while ADRs are a security and thus subject to Section 10(b),[19] over-the-counter markets are not exchanges for purposes of *Morrison*.[20]  For that reason, ADRs which trade on the OTC Link ATS

---

[12] Compl. ¶ 128.

[13] Compl. ¶¶ 25, 159.

[14] Compl. ¶ 184.

[15] Compl. ¶ 203-204.

[16] Compl. ¶ 32.

[17] *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010)

[18] *United States v. Martoma*, No. 12 CR 973 PGG, 2013 WL 6632676, at *3 (S.D.N.Y. Dec. 16, 2013)

[19] *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 939 (9th Cir. 2018)

[20] *Id.* at 946.

platform operated by OTC Markets Group, for example, do not satisfy the first prong of *Morrison*.[21] However, Section 10(b) does apply to the purchase or sale of ADRs "in the United States" under the second prong of *Morrison*.

20.    I further understand that the U.S. Court of Appeals for the Ninth Circuit has held that a purchase or sale occurs "in the United States" under *Morrison* when irrevocable liability is incurred within the United States.[22] The Ninth Circuit identified relevant factors to making this determination as the location(s) where "contract formation, placement of purchase orders, passing of title, and the exchange of money" occur.[23] The Ninth Circuit also pointed to "who sold the relevant securities and how those transactions were effectuated, as evidenced by documentation such as confirmation slips."[24]

21.    I understand that courts in this district have previously found that irrevocable liability was incurred outside the United States when the purchaser's broker-dealer conditioned the issuance of new, *unsponsored* ADRs on the acquisition of underlying common stock in a foreign market because, in that situation, irrevocable liability was incurred when the underlying shares were purchased in a foreign market.[25]

22.    In the following Section, I consider whether the available economic and financial evidence indicates that irrevocable liability for purchases of Bayer sponsored ADRs was incurred in the United States.

## IV.    IRREVOCABLE LIABILITY FOR VIRTUALLY ALL PURCHASES OF BAYER ADRS DURING THE CLASS PERIOD WAS INCURRED IN THE UNITED STATES

### A.    Sponsored ADRs: Background and Overview

---

[21] OTC Link ATS is an Inter-Dealer Quotation System ("IDQS"), which provides "bid and ask quotations of participating brokers or dealers, or comparably accurate and reliable pricing information, which shall constitute firm bids or offers for at least such minimum numbers of shares or minimum dollar amounts as the Commission and the registered securities association or national securities exchange shall require." 15 U.S.C. § 78q-2(b)(2)(C).

[22] *Stoyas v. Toshiba Corp.*, 896 F.3d at 948-949.

[23] *Id*. at 948.

[24] *Id.* at 949.

[25] *Stoyas v. Toshiba Corp.*, No. 2:15-CV-04194 DDP-JC, 2022 WL 220920, at *5 (C.D. Cal. Jan. 25, 2022).

23.    An American Depositary Receipt (ADR) is a negotiable instrument that represents an ownership interest in a specified number of securities, which the securities holder has deposited with a designated bank depositary.[26] I understand that foreign private issuers (like Bayer) are permitted to have their equity securities trade in over-the-counter markets in the United States pursuant to SEC Rule 12g3-2(b), which provides an exemption from registration under Section 12(g) of the Securities Exchange Act of 1934.[27]

24.    ADRs may be either unsponsored or sponsored.[28] I understand that any depositary may establish an unsponsored ADR for any issuer who qualifies for the Rule 12g3-2(b) exemption, and that facility may be established without any consultation with or input from the issuer so long as the depositary has a reasonable, good faith belief that the issuer qualified for the Rule 12g3-2(b) exemption.[29] It is my understanding that once established, an unsponsored ADR program can be terminated at the discretion of the depositary, subject to the terms of the deposit agreement. Theoretically, any depositary could create an unsponsored ADR for any foreign private issuer at any time.

25.    By contrast, a sponsored ADR is a standing facility established with the cooperation of the issuer. I understand that, once established, a sponsored ADR facility precludes the creation of an unsponsored ADR by other depositaries, and that before an issuer can establish a sponsored ADR,

[26] Exemption From Registration Under Section 12(G) of the Securities Exchange Act of 1934 for Foreign Private Issuers, 73 Fed. Reg. 52751, 52752 n.14 (Sept. 10, 2008).

[27] *Id.*

[28] The terms "Level I" and "Level II/III" are sometimes used to distinguish between sponsored ADR programs which trade over-the-counter as opposed to on a listed exchange. It is my understanding that the SEC has not formally employed these terms when enacting rules governing the exemption from registration under Rule 12g3-2(b), which is only available to ADRs which do not trade on a listed exchange. 17 C.F.R. § 240.12g3–2 (2008).

[29] Exemption From Registration Under Section 12(G) of the Securities Exchange Act of 1934 for Foreign Private Issuers, 73 Fed. Reg. 52751, 52762 (Sept. 10, 2008).

they must ensure that any existing unsponsored ADRs are terminated.[30] The issuer, with the agreement of the depositary, determines the rights of ADR holders.[31]

26.    The involvement of the issuer and the presence of a single, established sponsor are likely to make the trading market for a sponsored ADR far more liquid and efficient than an unsponsored program for several reasons. For one, the issuer's involvement and promotion of an ADR facility is likely to draw the attention of foreign investors and analysts, leading to greater trading volume. Moreover, a single depositary institution yields substantial benefits for investors by making it easier to measure the volume of outstanding ADRs and centralizing the issuance of ADRs. Consistent with this simple economic logic, a report by Deutsche Bank found that in September 2015, although unsponsored ADRs outnumbered over-the-counter sponsored ADRs nearly two to one, the dollar volume of trading in the market for over-the-counter sponsored ADRs was over twice as much as in the market for unsponsored ADRs, i.e., $98 billion compared to $44 billion.[32]

**B.    Secondary Market Trading in Bayer Sponsored ADRs**

**1.    Overview of the Bayer Sponsored ADR Program**

27.    Since 2007, Bayer has maintained an over-the-counter ADR facility with the Bank of New York Mellon, then operating as the Bank of New York, serving as the depositary.[33] I reviewed

---

[30] Matthew D. Bersani et al., *ADR Programs: Impact of Unsponsored Programs on Non-US Issuers*, PLC CORPORATE & SECURITIES (2009) at 2 ("the depositary bank selected to implement the sponsored ADR program will request that the depositary banks that have established the unsponsored programs withdraw the unsponsored programs. The depositary banks that have established the unsponsored programs will typically request to be compensated for any losses associated with termination of the unsponsored programs").

[31] Matthew D. Bersani et al., *ADR Programs: Impact of Unsponsored Programs on Non-US Issuers*, PLC CORPORATE & SECURITIES (2009), at 1 ("[through the depositary agreement the issuer and depositary are] able to exercise control regarding the terms and conditions of the ADR program, including how many ADRs are registered for trading and what rights the holders of those ADRs are granted."). Terms of the depositary agreement may include provisions allowing ADR holders to direct the votes of the corresponding shares held by the custodian, and in certain agreements allow the depositary to vote undirected shares with management's direction. *Guide to Public ADR Offerings in the United States*, Cleary Gottlieb Steen & Hamilton LLP (April 2011), at 4 ("Depositaries will, of course, vote the shares they hold in accordance with instructions from ADR holders, and are often willing to vote shares for which no instruction is given in accordance with management's direction or in the same proportion that all other outstanding shares are voted.").

[32] *Unsponsored ADRs Market Review*, Deutsche Bank Global Transaction Banking (May 2015), at 8.

[33] THE BANK OF NEW YORK, BAYER AKTIENGESELLSCHAFT DELISTING NOTICE (Sept. 27, 2007),

the Deposit Agreement dated as of November 28, 1994, as most recently amended and restated as of April 23, 2018, between Bayer and the Bank of New York Mellon, which provides that Bayer may terminate the Deposit Agreement "at any time."[34] Moreover, the degree of Bayer's involvement with its ADR facility indicates that it is a sponsored program. Not only did Bayer establish the program, but the company also maintains a dedicated English-language website to promote the sponsored ADR facility, provide information about the sponsored ADR facility, link to current price quotes for the sponsored ADR facility and provide contact information for holders, brokers, and investors in the sponsored ADR facility.[35] The Bank of New York Mellon also represents to the public that Bayer's ADR program is sponsored.[36]

28.     For all these reasons, broker-dealers seeking to purchase or sell Bayer sponsored ADRs could freely transact in the U.S. over-the-counter trading markets with other broker-dealers without requiring that the Bank of New York Mellon issue or cancel ADRs accompanying the purchase or sale of foreign shares. These purchases and sales would ordinarily take the form of ordinary domestic transactions where irrevocable liability to purchase *existing* sponsored ADRs was incurred at the time of trade confirmation. Like transactions in any other domestic security, the purchase or sale of *existing* Bayer sponsored ADRs ordinarily would not involve the purchase or sale of foreign shares by any party to the transaction.

29.     Consider, for example, trading in Bayer sponsored ADRs on NYSE Global OTC, an alternative trading system located in New York, NY.[37] On average, over $2.2 million of Bayer sponsored ADRs traded on NYSE Global OTC each day during the Class Period. Section 11 of the

https://www.adrbnymellon.com/files/ac21090.pdf.

[34] Deposit Agreement Section 6.2, BNYM-000052–BNYM000053 (000837).

[35] BAYER ADR PROGRAM, https://www.bayer.com/en/investors/adr-program (last visited Oct. 16, 2022).

[36] BNY MELLON, *DR DIRECTORY*, https://www.adrbnymellon.com/directory/dr-directory (last visited Oct. 22, 2022).

[37] Global OTC was operated by Archipelago Trading Services, Inc., whose parent corporation Archipelago Holdings Inc. was acquired by the New York Stock Exchange in 2006. *See NYSE Approves Merger with Electronic Trading Company*, N.Y. TIMES, Dec. 7, 2005, https://www.nytimes.com/2005/12/07/business/worldbusiness/nyse-approves-merger-with-electronic-trading-company.html. As shown in Exhibit 1, FINRA records still show Archipelago Trading Services, Inc., as an active, registered broker-dealer under the MPID ARCA.

agreement between broker-dealers and NYSE Global OTC imposes a settlement obligation upon execution of a matching order on the alternative trading system:

> Broker-Dealer agrees that it is Broker-Dealer's absolute, unconditional and unassignable obligation, in connection with: (i) each trade executed through any terminal linked to the Global OTC System used by Broker-Dealer or an Authorized Party or any user identification number allocated or assigned to Broker-Dealer, and (ii) any orders placed with ATS's help desk by Broker-Dealer's Personnel or an Authorized Party's employees, to make and ensure timely delivery of the subject securities and/or other distributions as well as any required remittance of interest, dividend payments and/or other distributions. Broker-Dealer shall honor this settlement obligation whether or not: (a) such executed trade was made as a principal, or for a third party account as a broker, agent, trustee or other representative; (b) any such third party account honors its obligations to deliver in a timely manner securities and/or funds, or to remit in a timely manner interest, dividends, or other distributions to Broker-Dealer; (c) said trade was executed by an employee or an Authorized Party or was authorized by Broker-Dealer; and (d) Broker-Dealer wishes to challenge or raise defenses of any nature whatsoever to such transaction.

30.     These settlement obligations applied to transactions in Bayer sponsored ADRs.  That is, upon execution of a matching order on the NYSE Global OTC alternative trading system located in New York, counterparties were expressly obligated to settle the transaction.  There is no question that irrevocable liability is incurred in the United States in connection with secondary market transactions like purchases of Bayer sponsored ADRs on the NYSE Global OTC alternative trading system.  Under the agreement between broker-dealers and NYSE Global OTC, irrevocable liability for such a transaction arose "whether or not: (a) such executed trade was made as a principal, or for a third party account as a broker, agent, trustee or other representative; (b) any such third party account honors its obligations to deliver in a timely manner securities and/or funds, or to remit in a timely manner interest, dividends, or other distributions to Broker-Dealer."

31.     One way to measure the extent to which purchases of Bayer sponsored ADRs occurred on the secondary market is to compare (a) issuances of ADRs by the Bank of New York Mellon to (b) secondary market trading volume reported to FINRA.  A low ratio of (a) to (b) indicates that a relatively large volume of transactions in Bayer sponsored ADRs consisted of purchases of *existing* ADRs.[38]

---

[38] ADR issuances are not subject to trade reporting requirements and thus are not included in daily trading volume.  Order Approving a FINRA Proposed Rule Change Relating to OTC Transactions in Equity Securities That Are Part of a Distribution and Transfers of Equity Securities To Create or

**2.      Secondary Market Trading in Bayer Sponsored ADRs**

32.      I have reviewed records provided by BNY Mellon as well as publicly available data which indicate that the overwhelming majority of purchases of Bayer sponsored ADRs during the Class Period consisted of existing ADRs.  On a daily basis during the Class Period, the median volume of Bayer sponsored ADRs issued by BNY Mellon was only 1.66% of FINRA-reported trading volume in the secondary market.  On 74% of trading days during the Class Period, the volume of Bayer sponsored ADRs issued by BNY Mellon was less than 10% of FINRA-reported trading volume in the secondary market.  And on 83% of trading days during the Class Period, the volume of Bayer sponsored ADRs issued by BNY Mellon was less than 20% of FINRA-reported trading volume in the secondary market.

33.      The available evidence indicates that virtually all secondary market transactions in Bayer sponsored ADRs reported to FINRA occurred in the United States.  Under FINRA reporting rules, transactions may be reported to FINRA only if at least one party is a FINRA member,[39] and virtually all FINRA members are located in the United States.[40]  For this reason, irrevocable liability for the purchase of an existing Bayer sponsored ADR where one party was a FINRA member almost certainly occurred in the United States.

34.      To confirm that virtually all secondary market purchases of existing Bayer sponsored ADRs reported to FINRA occurred in the United States, I examined records of trade executions during the Class Period provided by FINRA.  Exhibit 1 presents the total volume of ADRs purchased by each FINRA member.[41]  I restrict the table to FINRA members whose ADR purchase volume is at least 0.1% of the total ADR purchase volume, which yields forty (40) FINRA members whose purchases

---

Redeem Instruments Such as ADRs and ETFs, 76 Fed. Reg. 48937, 48939 (Aug. 8, 2011).  Of course, purchases and sales of those ADRs in the secondary market are reportable trades.

[39] *See, e.g.*, FINRA, *Trade Reporting Frequently Asked Questions*, at Q202.3, https://www.finra.org/filing-reporting/market-transparency-reporting/trade-reporting-faq (last visited Oct. 23, 2022) ("[I]t is not permissible for a FINRA member to report a trade to a FINRA Facility that was executed between two non-members if the FINRA member is not a party to the trade.").

[40] FINRA, *Broker-Dealer Firms We Regulate*, https://www.finra.org/about/firms-we-regulate/broker-dealer-firms-we-regulate (last updated August 24, 2022).

[41] Specifically, I examine transactions over the Class Period where the reporting side code is "B" (for buy) and take the sum of the execution quantity by the MPID of the reporting side.

account for 99% of total purchases during the Class Period. As Exhibit 1 shows, every one of these purchasers of existing Bayer sponsored ADRs is located in the United States.[42]

35. It is thus clear that the overwhelming majority of purchases of Bayer sponsored ADRs during the Class Period consisted of the purchase of *existing* ADRs on the secondary market where irrevocable liability was incurred in the United States.

**C.     Issuances of New Sponsored ADRs by the Bank of New York Mellon**

36. Moreover, I have examined the small fraction of transactions where new Bayer sponsored ADRs were issued by the Bank of New York Mellon following the deposit of Bayer foreign shares by market participants. I have reviewed the evidence concerning these transactions that is available to me at this time, including "who sold the relevant securities and how those transactions were effectuated, as evidenced by documentation such as confirmation slips."[43] Based on the evidence available to me at this time, I conclude that irrevocable liability for those transactions was incurred in the United States for several reasons.

37. For one, I have reviewed documentation made available by the broker-dealers who were parties to those transactions, including confirmation slips. There is no indication in any of that documentation that I have reviewed which indicates that liability for purchasing Bayer sponsored ADRs depended upon the purchase of underlying shares in a foreign market.

38. Moreover, I have reviewed the policies and procedures of the Bank of New York Mellon and the Deposit Agreement between the Bank of New York Mellon and Bayer. The Bank of New York Mellon does *not* purchase Bayer foreign shares and thus *cannot* condition the issuance of ADRs on the purchase of foreign shares. Rather, the Bank of New York Mellon issues sponsored Bayer ADRs only *after* already-purchased foreign shares have been deposited in its custody.[44] Absent

---

[42] I identify the location of a broker-dealer using FINRA's BrokerCheck database.

[43] *Toshiba*, 896 F.3d at 949.

[44] The Deposit Agreement between Bayer and the Bank of New York Mellon provides that "*Upon receipt by any Custodian of any deposit* . . . hereunder, together with the other documents required as specified in Section 2.2 above, such Custodian shall notify the Depositary of such deposit and the person or persons to whom or upon whose written order a Receipt or Receipts are deliverable in respect thereof and the number of American Depositary Shares to be evidenced thereby.*" Deposit Agreement § 2.3, BNYM-000013–BNYM000014 (000837) (emphasis added). While the Deposit Agreement also allows for a pre-release of ADRs prior to deposit of the foreign shares, Section 2.9 requires that every

evidence to the contrary, even in the unusual case where a purchaser seeks to acquire newly issued sponsored ADRs rather than buying those ADRs on the secondary market, ***that purchaser has no obligation to acquire ADRs at the time they purchase foreign shares***.[45]  Liability to purchase Bayer sponsored ADRs newly issued by the Bank of New York Mellon ordinarily becomes irrevocable only when an order to purchase those ADRs is confirmed by the Bank of New York Mellon in New York.

39.    I have reviewed trading and clearing records which confirm that broker-dealers purchased foreign shares of Bayer well before placing orders to purchase Bayer sponsored ADRs.  For example, on June 6, 2016 at 21:47:37, Macquarie Securities ("Macquarie") placed an order to purchase 577,403 foreign shares of Bayer on the Frankfurt Stock Exchange (Xetra).  The records indicate that irrevocable liability for the purchase of those foreign shares was incurred at that time.  ***The next day***, June 7, at 13:28:27, Macquarie placed an order to purchase 577,403 Bayer sponsored ADRs.  Clearing records show that Macquarie transferred ownership of the foreign shares it had already purchased to Citibank, in New York, who subsequently transferred them to Bank of New York Mellon.[46]  The Bank of New York Mellon then issued Bayer sponsored ADRs to Citibank, who transferred ownership of those sponsored ADRs to Macquarie.  Liability for Macquarie's June 7 purchase order for Bayer sponsored ADRs could not have become irrevocable ***fifteen hours before the order was even placed***, *i.e.*, at the time of the June 6 purchase of the foreign shares.[47]  Rather, irrevocable liability for all those

pre-release be accompanied by a special written representation and agreement to that effect.  I was unable to identify any pre-release representations in the data I reviewed from the Bank of New York Mellon.  Moreover, records provided by Bank of New York Mellon describe only ADR issuances and cancellations, which strongly suggests that no pre-releases occurred during the Class Period.

[45] *Contra Stoyas v. Toshiba Corp.*, No. 2:15-CV-04194 DDP-JC, 2022 WL 220920, at *4 (C.D. Cal. Jan. 25, 2022) ("*The moment Barclays completed the transaction for Toshiba common stock on the Tokyo Stock Exchange, however, AIPTF [the purchaser] became logically and legally bound to perform its contractual obligations.*" (emphasis added)).

[46] DTCC001 (00165).

[47] This sequence is opposite to that described in *Toshiba*, where the market order to purchase Toshiba unsponsored ADRs was placed on March 20, 2015 but purchase of the foreign shares did not occur until March 23.  In that case, "*once Barclays fully executed the purchase of common stock on the Tokyo Stock Exchange, AIPTF was bound to take and pay for the ADRs, once converted.*" *Toshiba*, 2022 WL 220920, at *4 (emphasis added).  Here, by contrast, according to Macquarie records, ***the order to purchase Bayer sponsored ADRs was not placed until the day after the foreign shares were purchased***.

transactions was incurred on June 7, at the time Bank of New York Mellon issued Bayer sponsored ADRs, which it did in the United States.

40.    For these reasons, the available evidence indicates that irrevocable liability for virtually all purchases of Bayer sponsored ADRs was incurred in the United States.

## V.    THE PLAINTIFFS' PURCHASES WERE TYPICAL OF CLASS MEMBERS

41.    I reviewed all twenty (20) purchases of Bayer sponsored ADRs by the Lead Plaintiffs in this matter, International Brotherhood of Teamsters Local No. 710 Pension Fund and Sheet Metal Workers' National Pension Fund, as well as those purchases by additional plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("Plaintiffs").  In my opinion the evidence available to me at this time indicates that irrevocable liability for purchases by the Plaintiffs was incurred in the United States, and as such, the Plaintiffs' purchases were typical of Class Members.

42.    Records indicate that several purchases by Plaintiffs consisted of existing ADRs which executed in the secondary market within the United States.  On December 9, 2016, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 12,400 Bayer sponsored ADRs through Instinet Corp. in New York.  Clearing records indicate that Instinet acquired these ADRs by borrowing 10,000 and 40,000 ADRs from Industrial and Commercial Bank of China Financial Services in New York City, New York and Wedbush Securities / P3 Stock Loan in Los Angeles, California. [48]  That is, the clearing records show that Instinet sold the Lead Plaintiff *existing* ADRs it had borrowed from other broker-dealers in the United States.  For this reason, irrevocable liability for this purchase was incurred in the United States.

43.    For another example, on May 26, 2020, additional plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware purchased 7,980 Bayer sponsored ADRs through the IUOE Johnston account held at UBS Securities.  According to clearing records, UBS Securities acquired these ADRs on the secondary market from Bank of America, N.A. and its own securities lending desk, which had borrowed Bayer sponsored ADRs from Credit Suisse

---

[48] DTCC004 (00168).

Securities (USA). [49] That is, the clearing records show that UBS Securities acquired **existing** ADRs from other broker-dealers in the United States. For this reason, irrevocable liability for this purchase was incurred in the United States.

44. For yet another example, on June 3, 2020, additional plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware purchased 4,530 Bayer sponsored ADRs through the IUOE Johnston account held at Cowen & Co. According to clearing records, Cowen & Co. acquired these ADRs on the secondary market from other market participants in the United States including Bank of America, TD Ameritrade, SG America, E*Trade and others. [50] That is, clearing records show that Cowen & Co. acquired *existing* ADRs from other broker-dealers in the United States. For this reason, irrevocable liability for this purchase was incurred in the United States.

45. Other purchases by at least one of the Plaintiffs, International Brotherhood of Teamsters Local No. 710 Pension Fund, consisted of new sponsored Bayer ADRs issued by the Bank of New York Mellon. For example, on June 7, 2016, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 20,100 sponsored Bayer ADRs from Macquarie Securities. Clearing records indicate that Macquarie fulfilled that order by transferring to the custody of that Plaintiff 20,100 of the 577,403 ADRs it had purchased from the Bank of New York Mellon on that day. [51] As described in paragraph 39 *supra*, the purchase of the foreign shares underlying this transaction had *already* occurred the preceding day, June 6. Liability for Macquarie's June 7 purchase order for Bayer sponsored ADRs could not have become irrevocable **before the ADR order was even placed**, *i.e.*, at the time of the June 6 purchase of the foreign shares. [52]

46. Similarly, on August 2, 2016, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 13,110 sponsored Bayer ADRs from Instinet Corp. ("Instinet"). Clearing records indicate that Instinet fulfilled that order by transferring to the custody

---

[49] DTCC032 (001195).

[50] DTCC032 (001195)

[51] DTCC001 (00165).

[52] *See* footnote *47 supra.*

of that Plaintiff 13,110 of the 367,323 ADRs it had purchased from the Bank of New York Mellon that day.[53] Trading records provided by Instinet indicate that the order to purchase the foreign shares underlying this transaction was submitted at 20:44:48.560 the previous evening, August 1, 2016.[54] Liability for Instinet's August 2 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable **before the ADR order was even placed**, i.e., at the time of the August 1 purchase of the foreign shares.

47.    For another example, on September 6, 2016, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 8,020 sponsored Bayer ADRs from Instinet Corp. ("Instinet"). Clearing records indicate that Instinet fulfilled that order by transferring to the custody of that Plaintiff 8,020 of the 226,074 ADRs it had purchased from the Bank of New York Mellon that day.[55] Trading records provided by Instinet indicate that the order to purchase the foreign shares underlying this transaction was submitted at 20:45:06.953 the previous evening, September 5, 2016.[56] Liability for Instinet's September 6 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable **before the ADR order was even placed**, i.e., at the time of the September 5 purchase of the foreign shares.

48.    For yet another example, on September 18, 2017, Lead Plaintiff International Brotherhood of Teamsters Local No. 710 Pension Fund purchased 19,900 sponsored Bayer ADRs from Instinet Corp. ("Instinet"). Clearing records indicate that Instinet fulfilled that order by

---

[53] DTCC003 (001167).

[54] The data provided by Instinet indicate that the order to purchase foreign shares was submitted to Instinet's execution engine at 20:44:48.560 on August 1. This order began executing in the European markets at 03:00:12.201 Eastern Time on August 2, 2016 (*i.e.*, 9:00am in Germany) and concluded executing at 11:35:01.006 Eastern Time that same day. The data provided by Instinet also indicate that the order to purchase Bayer sponsored ADRs was executed at 14:26:14.155 Eastern Time on August 2, 2016, as the final update for that order occurred at that time in Instinet's systems. INSTINET000001; INSTINET000007.

[55] DTCC002 (001166).

[56] The data provided by Instinet indicate that this order to purchase foreign shares was submitted to Instinet's execution engine at 20:45:06.953 on September 5, 2016. This order began executing in the European markets at 03:00:01.475 Eastern Time on September 6, 2016 (*i.e.*, 9:00am in Germany) and concluded executing at 11:35:22.841 Eastern Time on September 6, 2016. The data provided by Instinet also indicate that the order to purchase Bayer sponsored ADRs was executed at 14:43:59.427 Eastern Time on September 6, 2016, as the final update for that order occurred at that time in Instinet's systems. INSTINET000001; INSTINET000008.

transferring to the custody of that Plaintiff 19,900 of the 313,544 ADRs it had purchased from the Bank of New York Mellon that day.[57] Trading records provided by Instinet indicate that it had placed an order to purchase a portion of the foreign shares underlying this transaction at 20:51:02.762 the evening of the preceding trading day, December 15, 2017. Specifically, Instinet obtained 78,525 of the 313,544 foreign shares in that order, which concluded executing on the foreign markets at 11:36:34.841 Eastern Time.[58] By implication, the remaining 235,019 foreign shares had already been purchased. According to Instinet records, the purchase of 313,544 ADRs from the Bank of New York Mellon did not occur until 11:56:29.281.[59] Liability for Instinet's September 6 purchase of Bayer sponsored ADRs from the Bank of New York Mellon could not have become irrevocable ***before the ADR order was even placed***, i.e., at the time of the purchase of the foreign shares that morning for the partial amount (and even before that for the remaining foreign shares).

49.    More generally, to the extent that International Brotherhood of Teamsters Local No. 710 Pension Fund may have purchased other newly issued ADRs, or that Sheet Metal Workers' National Pension Fund and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware may have made such purchases, I have not identified any evidence which suggests that the Bank of New York Mellon deviated from its ordinary practice of requiring foreign shares to be in the custody of the purchaser ***prior to*** issuance of the ADRs. Rather, the data strongly suggest that the standard process followed in paragraph 39 *supra* was followed for every ADR issuance, which was consistent with the Deposit Agreement described in paragraph 38 *supra*.

50.    For these reasons, it is my opinion that purchases of Bayer sponsored ADRs by the Plaintiffs were typical of members of the Class because irrevocable liability for those purchases was incurred within the United States.

---

[57] DTCC010 (001174).

[58] INSTINET000010.

[59] INSTINET000003.

## VI.    ABILITY TO DETERMINE ON A CLASS-WIDE BASIS WHERE IRREVOCABLE LIABILITY WAS INCURRED

51.    In my opinion, the question of where irrevocable liability was incurred is capable of being determined on a Class-wide basis for two reasons.

52.    *First*, the trading records described in paragraph 32 *supra* indicate that the overwhelming majority of purchases in Bayer sponsored ADRs consisted of domestic purchases of *existing* ADRs on the secondary market.  For these secondary market purchases, irrevocable liability was unquestionably incurred in the United States.

53.    *Second*, the available evidence provides no basis to infer that the Bank of New York Mellon deviated from its ordinary practice of requiring foreign shares to be in the custody of the purchaser *prior to* issuing ADRs, such that the purchaser's irrevocable liability to purchase ADRs arises only *after* the purchase of foreign shares had already occurred.  There is every indication that the time sequence of foreign share purchases and ADR issuances depends on the Deposit Agreement and policies and practices of the Bank of New York Mellon, which are amenable to Class-wide proof.

## VII.    CONCLUSION

54.    Based on my analysis to date, review of materials, my experience, and my professional judgment, it is my opinion that irrevocable liability for the overwhelming majority of purchases of Bayer sponsored ADRs during the Class Period was incurred in the United States.  Moreover, Lead Plaintiffs' purchases of Bayer sponsored ADRs were typical of Class Members because irrevocable liability was incurred for those purchases within the United States.  Finally, it is possible to determine on a Class-wide basis whether irrevocable liability was incurred in the United States by members of the Class.

55.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 28, 2022.

*/s/ Joshua R. Mitts*
JOSHUA R. MITTS, PH.D.

## EXHIBIT 1: PURCHASERS OF BAYER SPONSORED ADRS DURING THE CLASS PERIOD

| # | Reporting MPID | Market Participant | Main Address on FINRA BrokerCheck (as of 10/23/22) | Total Purchase Quantity | Purchase Proportion |
|---|---|---|---|---|---|
| 1 | ARCA | ARCHIPELAGO TRADING SERVICES, INC. | 353 NORTH CLARK STREET, SUITE 3200 CHICAGO, IL 60654 | 52,361,596 | 14.895% |
| 2 | INTL | STONEX FINANCIAL INC. | 329 PARK AVENUE NORTH, SUITE 350 WINTER PARK, FL 32789 | 50,249,458 | 14.295% |
| 3 | NITE | VIRTU AMERICAS LLC | 1633 BROADWAY, 41ST FLOOR NEW YORK, NY 10019 | 30,136,663 | 8.573% |
| 4 | CDEL | CITADEL SECURITIES LLC | 200 SOUTH BISCAYNE BLVD, 33RD FLOOR MIAMI, FL 33131 | 23,000,207 | 6.543% |
| 5 | CSTI | CANACCORD GENUITY LLC | 535 MADISON AVENUE NEW YORK, NY 10022 | 19,167,265 | 5.453% |
| 6 | ECUT | COWEN AND COMPANY | 599 LEXINGTON AVENUE, 20TH FLOOR NEW YORK, NY 10022 | 18,906,171 | 5.378% |
| 7 | CANT | CANTOR FITZGERALD & CO. | 110 EAST 59TH STREET, 4TH FLOOR NEW YORK, NY 10022 | 15,240,173 | 4.335% |
| 8 | INCA | INSTINET, LLC | 309 WEST 49TH STREET NEW YORK, NY 10019 | 12,956,039 | 3.686% |
| 9 | JANE | JANE STREET CAPITAL, LLC | 250 VESEY STREET, 5TH FLOOR NEW YORK, NY 10281 | 9,918,247 | 2.821% |
| 10 | ETRF | G1 EXECUTION SERVICES, LLC | 175 W. JACKSON BLVD., SUITE 1700 CHICAGO, IL 60604 | 9,535,958 | 2.713% |
| 11 | GTSM | GTS SECURITIES LLC | 545 MADISON AVENUE NEW YORK, NY 10022 | 8,691,994 | 2.473% |
| 12 | MLCO | BOFA SECURITIES, INC. | ONE BRYANT PARK NEW YORK, NY 10036 | 8,629,171 | 2.455% |
| 13 | MAXM | MAXIM GROUP LLC | 300 PARK AVE, 16TH FLOOR NEW YORK, NY 10022 | 7,694,097 | 2.189% |
| 14 | OTCX | OTC LINK ECN ATS | 300 VESEY STREET, 12TH FLOOR NEW YORK, NY 10282 | 7,275,937 | 2.070% |
| 15 | MCAP | MCAP LLC | 1633 BROADWAY, 28TH FLOOR NEW YORK, NY 10019 | 7,018,339 | 1.997% |

1

| # | Reporting MPID | Market Participant | Main Address on FINRA BrokerCheck (as of 10/23/22) | Total Purchase Quantity | Purchase Proportion |
|---|---|---|---|---|---|
| 16 | LEHM | BARCLAYS CAPITAL INC. | 745 7TH AVENUE NEW YORK, NY 10019 | 6,675,972 | 1.899% |
| 17 | SBSH | CITIGROUP GLOBAL MARKETS INC. | 388 GREENWICH STREET NEW YORK, NY 10013 | 6,137,602 | 1.746% |
| 18 | JPMS | J.P. MORGAN SECURITIES LLC | 383 MADISON AVENUE NEW YORK, NY 10179 | 4,848,855 | 1.379% |
| 19 | BTIG | BTIG, LLC | 600 MONTGOMERY STREET, 6TH FLOOR SAN FRANCISCO, CA 94111 | 4,644,087 | 1.321% |
| 20 | FBCO | CREDIT SUISSE SECURITIES (USA) LLC | 11 MADISON AVENUE NEW YORK, NY 10010 | 4,161,465 | 1.184% |
| 21 | JONE | JONESTRADING | 555 SAINT CHARLES DRIVE, SUITE #200 THOUSAND OAKS, CA 91360 | 4,149,069 | 1.180% |
| 22 | GFIS | GFI SECURITIES LLC | 55 WATER STREET, 10TH FLOOR NEW YORK, NY 10041 | 4,128,110 | 1.174% |
| 23 | BARD | ROBERT W. BAIRD & CO. INCORPORATED | 777 E. WISCONSIN AVENUE MILWAUKEE, WI 53202 | 3,315,268 | 0.943% |
| 24 | PFPI | TULLETT PREBON FINANCIAL SERVICES LLC | 200 VESEY STREET, 5TH FLOOR NEW YORK, NY 10281 | 3,134,387 | 0.892% |
| 25 | DBOX | JUSTLY MARKETS LLC | 1441 BROADWAY, SUITE 5116 NEW YORK, NY 10018 | 3,079,446 | 0.876% |
| 26 | BGCE | BGC FINANCIAL, L.P. | 55 WATER STREET, 10TH FLOOR NEW YORK, NY 10004 | 2,723,036 | 0.775% |
| 27 | AUTO | CITIGROUP GLOBAL MARKETS INC. | 388 GREENWICH STREET NEW YORK, NY 10013 | 2,586,304 | 0.736% |
| 28 | ADAM | CANACCORD GENUITY LLC | 535 MADISON AVENUE NEW YORK, NY 10022 | 2,545,075 | 0.724% |
| 29 | OLMN | OLD MISSION MARKETS LLC | 1 N. DEARBORN ST., 8TH FLOOR CHICAGO, IL 60602 | 1,780,009 | 0.506% |
| 30 | NFSC | NATIONAL FINANCIAL SERVICES LLC | 245 SUMMER STREET BOSTON, MA 02210 | 1,690,730 | 0.481% |
| 31 | VNDM | WALL STREET ACCESS | 100 WALL STREET, SUITE 804 NEW YORK, NY 10005 | 1,635,269 | 0.465% |
| 32 | PUMA | PUMA CAPITAL, LLC | 555 THEODORE FREMD AVENUE, SUITE C204 RYE, NY 10580 | 1,443,426 | 0.411% |

| # | Reporting MPID | Market Participant | Main Address on FINRA BrokerCheck (as of 10/23/22) | Total Purchase Quantity | Purchase Proportion |
|---|---|---|---|---|---|
| 33 | UBSS | UBS SECURITIES LLC | 1285 AVENUE OF THE AMERICAS NEW YORK, NY 10019 | 1,425,031 | 0.405% |
| 34 | MSCO | MORGAN STANLEY & CO. LLC | 1585 BROADWAY NEW YORK, NY 10036 | 1,396,465 | 0.397% |
| 35 | UBSB | UBS SECURITIES LLC | 1285 AVENUE OF THE AMERICAS NEW YORK, NY 10019 | 1,266,392 | 0.360% |
| 36 | GSCO | GOLDMAN SACHS & CO. LLC | 200 WEST STREET NEW YORK, NY 10282 | 1,172,008 | 0.333% |
| 37 | BSSC | J.P. MORGAN SECURITIES LLC | 383 MADISON AVENUE NEW YORK, NY 10179 | 953,189 | 0.271% |
| 38 | DTTX | VIRTU AMERICAS LLC | 1633 BROADWAY, 41ST FLOOR NEW YORK, NY 10019 | 778,760 | 0.222% |
| 39 | JEFF | JEFFERIES LLC | 520 MADISON AVENUE NEW YORK, NY 10022 | 636,461 | 0.181% |
| 40 | WABR | WALL STREET ACCESS | 100 WALL STREET, SUITE 804 NEW YORK, NY 10005 | 557,764 | 0.159% |

3

# Appendix A

# C.V.

# JOSHUA R. MITTS

435 West 116 Street • New York, NY 10027 • (202) 460-0003 • joshua.mitts@law.columbia.edu

Professor Joshua Mitts uses advanced data science for his research on corporate and securities law.  Mitts employs empirical methods, including statistical analysis and machine learning, to study short selling, insider trading on cybersecurity breaches and corporate disclosures, and information leakage following hedge-fund activism.  Professor Mitts also advises on the analysis of trading data in connection with high-frequency market manipulation and securities violations.  He has extensive experience supporting the U.S. Department of Justice.

## ACADEMIC APPOINTMENTS

**Columbia University**, New York, NY
*Professor of Law* (July 1, 2022 – present)
*Associate Professor of Law* (2017 – 2022)
*Milton Handler Fellow* (2020-22)
Member, *Advisory Committee on Socially Responsible Investing* (2021-present)
  Subcommittees: Racial Justice, Fossil Fuels

## EDUCATION

**Columbia Business School**, Ph.D. in Finance & Economics, 2018

**Yale Law School**, J.D., 2013

**Georgetown University**, B.A in Liberal Studies, *summa cum laude*, 2010

## PUBLICATIONS & WORKING PAPERS

Post-Appointment (2017 – present)

***Calamity: Event-Driven Suits and the Rethinking of Securities Litigation*** (with Merritt B. Fox) (forthcoming, BUS. L., 2022)

***Index-Fund Governance: An Empirical Study of the Lending-Voting Tradeoff*** (revise & resubmit, J. LEG. STUD., 2021) (with Edwin Hu & Haley Sylvester), https://ssrn.com/abstract_id=3673531

***Passive Exit*** (under review, 2021), https://ssrn.com/abstract_id=3716249

***Insider Trading and Strategic Disclosure*** (working paper, 2020), https://ssrn.com/abstract_id=3741464

***Short and Distort,*** 49 J. LEG. STUD. 287 (2020), https://ssrn.com/abstract_id=3198384

***A Legal Perspective on Technology and the Capital Markets: Social Media, Short Activism and the Algorithmic Revolution*** (conference article, COLUM. / FINRA TECH. CONF., 2019), https://ssrn.com/abstract_id=3447235

***Trading Against the Random Expiration of Private Information: A Natural Experiment***, 75 J. FIN. 5 (2020) (with Mohammadreza Bolandnazar, Robert J. Jackson, Jr. & Wei Jiang), https://ssrn.com/abstract_id=2544128

 *Winner, Journal of Finance Dimensional Fund Advisors Distinguished Paper Prize (2020)*

***Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets***, 74 BUS. LAW. 1015 (2019) (with Jonathan R. Macey), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3279838

 Cited and relied upon by the Delaware Supreme Court in *Fir Tree v. Jarden* (2020).

***I Promise to Pay***, 62 J. L. & ECON. 117 (2019), https://ssrn.com/abstract_id=2994192

***What Can we Learn from Stock Prices?: Cash Flow, Risk and Shareholder Welfare,*** 175 J. INST. & THEO. ECON. 178 (2019) (conference issue), https://ssrn.com/abstract_id=3285605

*Trial by Skype: A Causality-Oriented Replication Exploring the Use of Remote Video Adjudication in Immigration Removal,* 59 INT'L REV. L. & ECON. 82 (2019) (with Dane Thorley) (replication issue), https://www.sciencedirect.com/science/article/abs/pii/S0144818818303326

*Informed Trading and Cybersecurity Breaches*, 9 HARV. BUS. L. REV. 1 (2019) (with Eric Talley), https://www.hblr.org/wp-content/uploads/sites/18/2019/11/Final_MittsTalley.pdf

*Activist Directors and Agency Costs: What Happens When an Activist Director Goes on the Board?*, 104 CORNELL L. REV. 381 (2019) (with Robert Bishop, John C. Coffee, Jr. & Robert J. Jackson, Jr.), https://www.cornelllawreview.org/2019/01/15/activist-directors-and-agency-costs-what-happens-when-an-activist-director-goes-on-the-board/

One of the Top 10 Corporate and Securities Articles of 2019 Chosen By *Corporate Practice Commentator*

*The Cost of Transparency* (2019) (with Yifeng Guo)

Pre-Appointment (2012-2017)

*The 8-K Trading Gap* (2016) (with Alma Cohen & Robert J. Jackson, Jr.)

*Systemic Risk and Managerial Incentives in the Dodd-Frank Orderly Liquidation Authority*, 1 J. FIN. REG. 51 (2015)

*Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 CORNELL L. REV. 99 (2014) (with Jonathan R. Macey)

*Anti-Herding Regulation*, 5 HARV. BUS. L. REV. 1 (2014) (with Ian Ayres)

*Mechanism Design in M&A Auctions*, 38 DEL. J. CORP. L. 873 (2014) (with Steven J. Brams), *cited in* In re *Appraisal of Dell Inc.*, C.A. No. 9322-VCL (Del. Ch., May 31, 2016)

*Three Proposals for Regulating the Distribution of Home Equity*, 31 YALE J. ON REG. 77 (2014) (with Ian Ayres)

*Law and Mechanism Design: Procedures to Induce Honest Bargaining*, 68 NYU ANN. SURV. AM. L. 729 (2013) (with Steven J. Brams)

*Snake Oil Salesmen or Purveyors of Knowledge: Off-Label Promotions and the Commercial Speech Doctrine*, 23 CORNELL J. L. & PUB. POL'Y 337 (2013) (with Constance E. Bagley & Richard Tinsley)

*A Private Ordering Solution to Blockholder Disclosure*, 35 N.C. CENT. L. REV. 203 (2013)

Comment, *Recoupment Under Dodd-Frank: Punishing Financial Executives and Perpetuating "Too Big to Fail,"* 122 YALE L.J. 507 (2012)

**RULEMAKING PETITIONS**

*SEC Rulemaking Petition on Short and Distort* (filed on February 12, 2020) (co-drafted with John C. Coffee, Jr.), https://www.sec.gov/rules/petitions/2020/petn4-758.pdf

**Other Signatories: James D. Cox**, Brainerd Currie Professor of Law, Duke University School of Law; **Edward F. Greene**, General Counsel, Securities & Exchange Commission (1981-82); Director, Division of Corporation Finance (1979-81); Senior Counsel, Cleary Gottlieb Steen & Hamilton, Co-Director, Program on Law, Economics & Capital Markets, Columbia Law School; **Meyer Eisenberg**, Deputy General Counsel and Acting Director, Division of Investment Management Securities & Exchange Commission (1998-2006); **Colleen Honigsberg**, Associate Professor of Law, Stanford Law School; **Donald Langevoort**, Thomas Aquinas Reynolds Professor of Law, Georgetown University Law Center; **Peter Molk**, Associate Professor of Law, University of Florida Levin College of Law; **Randall Thomas**, John S. Beasley II Chair in Law and Business, Vanderbilt Law School, Professor of Management. Owen Graduate School of Management; **Robert B. Thompson**, Peter P. Weidenbruch, Jr. Professor of Business Law, Georgetown University Law Center; **Andrew Verstein**, Professor of Law, Wake Forest University School of Law; and **Charles K. Whitehead**, Myron C. Taylor Alumni Professor of Business Law, Cornell Law School.

**OTHER PUBLICATIONS**

*Petition for Rulemaking on Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Feb. 18, 2020) (with John C. Coffee, Jr.)

*Long-Run Short Selling*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 9, 2019) (with John C. Coffee, Jr.)

*Short Selling and the New Market Manipulation*, COLUM. LAW SCH. BLUE SKY BLOG (Mar. 18, 2019) (with John C. Coffee, Jr.)

*Why Investors Pay So Much for Dual Class Firms*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 2, 2019)

*What Can We Learn From Stock Prices?*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 18, 2018)

*Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Nov. 13, 2018)

*Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Nov. 12, 2018) (with Jonathan Macey)

*A Data-Driven Defense to "Short and Distort"*, NEW YORK LAW JOURNAL (Sep. 13, 2018)

*Quarterly Reporting and Market Liquidity*, COLUM. LAW SCH. BLUE SKY BLOG (Aug. 27, 2018)

*What Happens When an Activist Goes on the Board?*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 29, 2018) (with John C. Coffee, Jr.)

*Informed Trading and Cybersecurity Breaches*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Jan. 26, 2018) (with Eric Talley)

*Proactive Regulation*, REGBLOG: PENN PROGRAM ON REGULATION (Jun. 23, 2014)

*The Three Justifications for Piercing the Corporate Veil*, HARV. L. SCH. FORUM ON CORP. GOV. & FIN. REG. (Mar. 27, 2014) (with Jonathan R. Macey)

*Why the CFPB's Qualified Mortgage Rule Misses the Mark*, FREAKONOMICS BLOG (Jan. 17, 2014), *republished in* COLUM. L. SCH. BLUE SKY BLOG (Feb. 10, 2014) (with Ian Ayres)

*An Incentive-Compatible Alternative to "Don't Ask Don't Waive" Standstills*, COLUM. L. SCH. BLUE SKY BLOG (May 28, 2013) (with Steven J. Brams)

## TEACHING EXPERIENCE

**Columbia Law School**, New York, NY                    2017 – present
*Data and Predictive Coding for Lawyers (January 2018, January 2019, May 2021)*
*Securities Regulation (Spring 2018, Spring 2019, Spring 2020, Spring 2021, Spring 2022)*
*Contracts (Fall 2018, Fall 2019)*

## PROFESSIONAL EXPERIENCE

**Sullivan & Cromwell LLP**, New York, NY                    2013 – 2014
*Associate*

## PRESENTATIONS

**2021-22**

Conference on Empirical Legal Studies Harvard Law School and the Program on International Financial Systems (PIFS) for Comissão de Valores Mobiliários (CVM); IOSCO/PIFS-Harvard Law School Global Certificate Program for Regulators of Securities Markets (GCP); Reichman University (Israel); Regulatory Fundamentals Group; Ira M. Millstein Center for Global Markets and Corporate Ownership

**2019-20**

2020 UF Business Law Conference; 2020 George A. Leet Symposium, Columbia Law School Blue Sky Workshop; Harvard-NYU Corporate Law Academic Workshop Series; Junior Corporate Law Academic Workshop; Columbia Law School Faculty Workshop; American Law & Economics Association Annual Meeting; Cornell Law & Tech Workshop; Cadwalader, Wickersham & Taft, New York, NY; Richards, Layton & Finger, Wilmington, DE; Columbia Business School News and Finance Conference, New York, NY; Texas Law & Economics Workshop, Austin, TX; Securities

Law Roundtable at Tulane Corporate Law Institute, New Orleans, LA; Vanderbilt Law & Economics Workshop, Nashville, TN; 8th Symposium on Intelligent Investing at Ivey Business School, Toronto, Canada

**2017-18**

Conference on Empirical Legal Studies; Junior Corporate Law Scholars Workshop at Columbia Law School; American Law & Economics Association Annual Meeting; Securities & Exchange Commission; Seminar on Corporate and Capital Markets Law and Policy at Harvard Law School (February 2018 and October 2018); Experimental Methods in Legal Scholarship III Conference at Columbia Law School; Law, Economics & Organization Workshop at Harvard Law School; Penn Law School Corporate Roundtable; Symposium of Journal of Institutional and Theoretical Economics; UVA/Santa Fe. Institute Conference on Computational Study of the Law; Columbia Law Faculty Workshop; Columbia Law Blue Sky Workshop; Journal Corporate Law Scholars Workshop at NYU Law School

**2013-16**

American Law & Economics Association Annual Meeting (2016, 2015, 2014, 2013); Conference on Empirical Legal Studies (2015, 2014, 2013); Columbia Finance Faculty Workshop (2016); American Finance Association Annual Meeting (2016); Minnesota Law & Economics Seminar (2015); Georgetown Law & Economics Workshop (2014); Virginia Law Symposium on Disclosure (2014); Federal Reserve Conference on Community Banking in the 21st Century (2014); Symposium on Crises-Driven Regulation, University of St. Thomas School of Law (2014); University of Connecticut School of Law, Junior Scholars Workshop (2013)

## EXPERT TESTIMONY (PUBLIC)

*Set Capital v. Credit Suisse* (S.D.N.Y., 2022)
In re *Tesla Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC (N.D.C.A)
*Brookfield v. IPL,* Alberta Securities Commission (2021)
*Burford v. LSE*, CL-2019-000604 (Business and Property Courts of England and Wales Commercial Court (QBD))
*Farmland Partners v. Fortunae*, No. 1:18-cv-02351-KLM (D. Colo.)
Additional nonpublic matters

## PEER REVIEW

Journal of Legal Studies
Journal of Law, Economics & Organization
International Review of Law & Economics
Review of Law & Economics
Review of Financial Studies
Conference on Empirical Legal Studies

## GRANTS, FELLOWSHIPS & AWARDS

Columbia Brown Institute for Media Innovation, 2016-17 Magic Grant (with Colleen Honigsberg)

Columbia Business School, Paul and Sandra Montrone Doctoral Fellowship, 2016

Yale Law School, Oscar M. Ruebhausen Fund, 2014 (with Ian Ayres)

## BAR ADMISSION

New York

# Appendix B

# Documents Considered

**Publications**

1. Matthew D. Bersani et al., *ADR Programs: Impact of Unsponsored Programs on Non-US Issuers*, PLC CORPORATE & SECURITIES (2009)

2. *Guide to Public ADR Offerings in the United States*, Cleary Gottlieb Steen & Hamilton LLP (April 2011)

3. *Unsponsored ADRs Market Review*, Deutsche Bank Global Transaction Banking (May 2015)

4. BANK OF NEW YORK, BAYER AKTIENGESELLSCHAFT DELISTING NOTICE (Sept. 27, 2007), https://www.adrbnymellon.com/files/ac21090.pdf

5. BAYER ADR PROGRAM, https://www.bayer.com/en/investors/adr-program (last visited Oct. 16, 2022).

6. BNY MELLON, DR DIRECTORY, https://www.adrbnymellon.com/directory/dr-directory (last visited Oct. 22, 2022).

7. *NYSE Approves Merger with Electronic Trading Company*, N.Y. TIMES, Dec. 7, 2005, https://www.nytimes.com/2005/12/07/business/worldbusiness/nyse-approves-merger-with-electronic-trading-company.html.

8. FINRA, *Trade Reporting Frequently Asked Questions*, at Q202.3, https://www.finra.org/filing-reporting/market-transparency-reporting/trade-reporting-faq (last visited Oct. 23, 2022)

9. FINRA, *Broker-Dealer Firms We Regulate*, https://www.finra.org/about/firms-we-regulate/broker-dealer-firms-we-regulate (last updated August 24, 2022).

**Third Party Productions**

1. ABN AMRO Clearing Chicago LLC, ABN000001

2. BGC Financial Inc., BGC-00001

3. BTIG, LLC, BTIG_ECF_001–BTIG_ECF_0028

4. Credit Suisse Securities (USA) LLC, CS_SheetMetal_001–CS_SheetMetal_002

5. Depository Trust Clearing Corporation, DTCC001–DTCC034 (same as 001165-001198)

6. FINRA, FINRA000001–FINRA 000015

7. Instinet LLC, INSTINET000001–INSTINET000011

8. Lightspeed Financial Services Group LLC, LS000001–LS000002

9. Macquarie Capital (USA) Inc., MACQ_000001

10. Maxim Group, Maxim000001–Maxim000002

11. Merrill, Lynch, Pierce, Fenner & Smith Incorporated, BOFAS001–BOFAS006

12. New York Stock Exchange, NYSE000001

13. OTC Markets, OTC000001–OTC001160

14. Puma Capital, LLC, Puma00001–Puma010816

15. SG Americas Securities, LLC, SGAS 000001 to SGAS 000007

16. The Bank of New York Mellon Corporation, BNYM-000001–BNYM-000557 (same as 000583–001286)

17. The Vertical Trading Group, LLC, VTG000001

18. UBS Securities LLC, UBS000001

19. Wall Street Access NY Corporation, WSANYC000001–WSANYC000006