Carol V. Gilden (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Email: cgilden@cohenmilstein.com

*Lead Counsel for Plaintiffs and the Class*
[Additional Counsel on Signature Page]

Nicole Lavallee (SBN 165755)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        avahdat@bermantabacco.com

*Liaison Counsel for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>   vs.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>      Defendants. | Case No: 3:20-cv-04737-RS<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR LEAVE TO AMEND THE CASE MANAGEMENT SCHEDULE TO SUBSTITUTE EXPERT WITNESS**<br><br>Ctrm:  3 – 17th Floor<br>Judge:  Richard Seeborg |

[No. 3:20-CV-04737-RS] PLAINTIFFS' REPLY MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF MOT. FOR LEAVE TO AMEND THE CASE MANAGEMENT SCHEDULE TO SUBSTITUTE EXPERT WITNESS

## I.    PRELIMINARY STATEMENT

Plaintiffs' expert, Mr. Martin, is facing dire, life-threatening health conditions that have required surgery and medical treatment for cancer that render him unable to testify. Plaintiffs regret this unforeseen development but have taken swift and diligent steps to secure a highly qualified substitute expert who can offer opinions consistent with Mr. Martin's planned testimony. Defendants now seek to exploit Mr. Martin's medical crisis to gain a litigation advantage, manufacturing a last-minute objection to a modest four-week extension of the schedule.[1]

It would be fundamentally unfair to allow ***Defendants*** to choose the due diligence expert ***Plaintiffs*** must present in their case-in-chief at trial. Mr. Martin's sudden and severe health deterioration was unforeseeable, and Plaintiffs have acted in good faith and with urgency to ensure that a replacement expert is available to provide substantially the same opinions Mr. Martin was prepared to offer. Specifically, Plaintiffs' replacement expert will testify, as Mr. Martin would have, that Bayer's due diligence regarding Monsanto's reputational and litigation risks was inconsistent with industry custom and practice. Denying Plaintiffs' request would not only punish them for circumstances beyond their control but would also result in undue prejudice to the Class, depriving them of the opportunity to present critical expert testimony on a central issue in this case.

Defendants' opposition misrepresents the factual background of this dispute and conflates the distinct roles Plaintiffs intended their experts, Mr. Martin and Mr. Kelly, to play at trial. The Court should reject Defendants' opportunistic objections. The reality is straightforward: Plaintiffs seek only a brief and reasonable extension to allow for an appropriate substitution, ensuring that Defendants do not reap an unjust windfall from Mr. Martin's medical emergency, which would be severely detrimental to the rights and interests of thousands of class members. Because good cause exists to

---

[1] "Opening Brief" refers to Plaintiffs' opening brief. ECF No. 234. "Jackson Decl." refers to the Declaration of Benjamin F. Jackson. ECF No. 234-1. "Opp'n Br." refers to Defendants' opposition brief. ECF No. 238. "Yavitz Decl." refers to the Declaration of Noah B. Yavitz. ECF No. 238-1. "Gilden Decl." refers to the accompanying Declaration of Carol V. Gilden.

amend the case schedule to permit Plaintiffs to substitute an expert who will provide substantially the same opinions as Mr. Martin, the Court should grant Plaintiffs' Motion.[2]

## II.    DEFENDANTS WILL NOT BE PREJUDICED BY A SHORT FOUR-WEEK EXTENSION NOR WILL THEY BE UNFAIRLY DISADVANTAGED.

Defendants have failed to articulate any concrete or tangible prejudice they will suffer from a modest four-week extension of the dispositive motion schedule. They provide no specific harm or disadvantage they would incur in their ability to litigate this case beyond the general inconvenience of a schedule adjustment, which is insufficient to warrant denial of Plaintiffs' request. Indeed, courts have consistently held that mere delay does not constitute undue prejudice under these circumstances. *See, e.g.*, *Cabrera v. Google LLC*, 2021 WL 2435380, at *3 (N.D. Cal. June 15, 2021) ("delay alone is not unduly prejudicial"); *Tanner v. State Farm Mut. Auto. Ins. Co.*, 2020 WL 6750802, at *3 n.37 (D. Alaska Oct. 6, 2020) (no prejudice without allegations of "harm as a result of the delay itself").

Although Defendants now claim to be gravely concerned about extending the case schedule, their past conduct belies their newfound urgency. Notably, Defendants did not oppose prior scheduling modifications and have themselves benefited from past schedule extensions, further undercutting their claim that this modest delay is unduly prejudicial.

Defendants' failure to articulate any specific prejudice is particularly significant given that this case remains in the pretrial stage. Unlike extensions that disrupt trial dates or critical hearings, the requested adjustment affects only the briefing schedule for dispositive motions. Courts routinely grant similar scheduling adjustments. *See, e.g.*, *Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2018 WL 6138190, at *3 (C.D. Cal. Jan. 24, 2018) (amending scheduling order to allow plaintiff to take two depositions in part because "no trial date [was] presently set"); *cf. Landes v. Skil Power Tools*, 2013 WL 6859837, at *5 (E.D. Cal. Dec. 30, 2013) (vacating the trial date "is a slight inconvenience which does not warrant denying [a] request" to modify the scheduling order); *see also*

---

[2] Defendants' counsel's declaration purports to attach a "true and correct" copy of an email exchange among Plaintiffs' counsel and Defendants' counsel dated February 3–4, 2025. However, Defendants' counsel selectively omitted an email from that exchange, which Plaintiffs now include for completeness. *See* Gilden Decl. Ex. 1.

*id.* at 3 ("Where [a] scheduling order can have an outcome-determinative effect on the case . . . total inflexibility is undesirable." (citation and internal quotation marks omitted)).

Further, there is no reason to think that granting the Motion will give Plaintiffs an unfair advantage. While Defendants argue that substitution would allow Plaintiffs to refine their expert case in response to prior critiques, this argument is speculative and ignores critical facts. First, the substitute expert will offer opinions substantially similar to Mr. Martin's, meaning Defendants are not facing an unexpected shift in the substance of Plaintiffs' expert testimony. The fact that the substitute expert will require several weeks to familiarize himself with the voluminous discovery materials before drafting and signing his report is both expected and unremarkable.

Second, Defendants fail to acknowledge that courts have consistently permitted expert substitutions when a party acts in good faith and the opposing side has an opportunity to respond. The case law recognizes that substitution is not an improper litigation tactic but rather a necessary procedural accommodation when an expert becomes unavailable. *See, e.g.*, *Landes*, 2013 WL 6859837, at *5; *In re Northrop Grumman Corp. ERISA Litig.*, 2016 WL 6826171, at *2 (C.D. Cal. Apr. 7, 2016).

In any event, Defendants will not be unduly prejudiced because they will have a full and fair opportunity to respond. They will have the chance to review the substitute expert's opinions, depose the expert, and, if necessary, incorporate this discovery into a summary judgment motion or a *Daubert* motion. The procedural safeguards available to Defendants ensure that they will not be disadvantaged by the substitution. Any inconvenience to Defendants is minimal and does not outweigh the severe prejudice Plaintiffs and the Class would suffer if deprived of expert testimony on this critical issue. Indeed, Plaintiffs and the Class would be significantly disadvantaged if they were forced to proceed without their expert of choice on an issue central to their claims.

Finally, the cases Defendants cite lend no support to their position here. *See Bagwell v. CBS Broad. Inc.*, 2021 WL 9145409, at *3 (C.D. Cal. Oct. 19, 2021) (prohibiting party from substituting in new, "better" expert for current expert whose proffered testimony was ruled inadmissible under Rule 702 and *Daubert* standard); *Fujifilm Corp. v. Motorola Mobility LLC*, 2014 WL 8094582, at *2

(N.D. Cal. Nov. 19, 2014) (permitting expert substitution); *Jones v. Nat'l R.R. Passenger Corp.*, 2022 WL 689000, at *3 (N.D. Cal. Feb. 23, 2022) (no prejudice where substitute expert's opinions are substantially similar to original experts'); *PacifiCorp v. Gas Transmission Nw. Corp.*, 2013 WL 12433260, at *2 (D. Or. Nov. 26, 2013) (same); *U.S. ex rel. Agate Steel Inc. et al v. Jaynes Corp.*, 2015 WL 1546717, at *2 (D. Nev. Apr. 6, 2015) (same).

## III. DENYING PLAINTIFFS THEIR CHOICE OF DUE DILIGENCE EXPERT WOULD CAUSE SEVERE AND UNDUE PREJUDICE.

Plaintiffs and the Class, by contrast, would suffer significant prejudice if denied the opportunity to present expert testimony on due diligence customs and practices—an issue central to this case—due to circumstances beyond their control. Mr. Martin was set to play a crucial role in Plaintiffs' case-in-chief at trial: He was to testify that Bayer's due diligence on the risks posed by the Roundup Litigation was inconsistent with industry custom and practice given the known red flags. His expert testimony, informed by decades of experience as an investment banker and corporate director, would have helped the jury assess how a reasonable entity in Bayer's position should have approached its due diligence. Excluding this testimony would tilt the scales in Defendants' favor by undermining Plaintiffs' ability to present a complete and compelling case to the jury. A jury cannot properly assess whether Bayer's statements to investors were misleading without understanding the prevailing industry customs and practices.

The fairness and integrity of the trial process depend on ensuring that ***all*** parties have an opportunity to present the relevant evidence they believe is necessary to their case. This is precisely why courts routinely allow expert substitution in similar circumstances. *Landes*, 2013 WL 6859837, at *5; *Novalk, LLC v. Evanston Ins. Co.*, 2023 WL 8458250, at *4 (S.D. Cal. Dec. 6, 2023).

## IV. DEFENDANTS DISTORT THE RECORD IN AN ATTEMPT TO OBSCURE THAT THEIR TACTICS ARE THE UNDERLYING CAUSE OF THE EXPERT DISCOVERY DELAYS.

### A. Defendants' deliberate delay tactics—not Plaintiffs' actions—are the primary cause of the expert discovery delays in this case.

While Mr. Martin's unforeseen illness undoubtedly contributed to scheduling difficulties, Defendants' tactics played a key role in causing the need to extend the expert discovery schedule. As

the email exchange cited by Defendants (Yavitz Decl. Ex. 1) makes clear, Plaintiffs disclosed their expert witnesses on June 11, 2024,[3] yet Defendants inexplicably waited until October 25, 2024—in the run-up to the holiday season—to broach the scheduling of these five experts' depositions, and they did so only at Plaintiffs' prompting. Defendants stalled further and waited until the parties' October 28, 2024 meet-and-confer to propose deposition dates, making it significantly harder for Plaintiffs to coordinate their five experts' and multiple counsel's availability.

When Defendants finally proposed dates on October 31, 2024, they demanded depositions for four of Plaintiffs' five experts within an eight-business-day span over Thanksgiving week and the following week (November 25, 26, 27, 29, and December 2, 3, 4, 5). This transparent attempt to disadvantage Plaintiffs was especially egregious given the extensive preparation Defendants undertook with their own witnesses in between their depositions.[4] Plaintiffs were able to accommodate two of Defendants' proposed dates, as well as depositions of Defendants' two expert witnesses on November 21 and December 6—meaning the parties scheduled four depositions on ten of the dates proposed by Defendants—but could not schedule Mr. Martin and Mr. Kelly on the other dates due to preexisting commitments.[5]

After the Court granted the parties' stipulation to extend the expert discovery deadline to December 20, 2024, ECF Nos. 226, 227, Mr. Martin's deposition was scheduled for December 17. However, after Plaintiffs informed Defendants that Mr. Martin had been hastily scheduled for orthopedic surgery and could only be deposed from a hospital-like bed, Defendants chose not to proceed. The parties then jointly requested, and the Court granted, a further extension to January 10, 2025 to allow Mr. Martin time to recover. ECF Nos. 228, 229. Unfortunately, Mr. Martin's health

---

[3] The sole exception is Mr. Kelly, whose rebuttal report was served on October 18, 2024.

[4] Defendants' fact witnesses testified that their counsel typically spent multiple days—and up to 25 hours over five separate meetings—preparing them for depositions.

[5] On November 6, 2024, Defendants belatedly proposed depositions on November 18–20 and 22—dates they had not previously offered to Plaintiffs. By then, Plaintiffs' experts and counsel had other commitments on those dates.

deteriorated after the surgery to the point where it became a life-threatening condition, leading to the current situation.

Defendants' claim that Plaintiffs "sat on" information about Mr. Martin's withdrawal "for 11 days . . . until the eve of mediation," Opp'n Br. at 5, is misleading. Defendants cite a January 19, 2025 communication in which Mr. Martin stated he was awaiting test results to determine his treatment plan and that his return date was uncertain. See Jackson Decl. ¶ 26. Recognizing the likely need for substitution given his cancer diagnosis, Plaintiffs immediately began researching potential replacements, reached out to candidates within days, and informed Defendants of their intent to substitute for Mr. Martin immediately after identifying a viable substitute on January 30, 2025. They then confirmed that Mr. Martin agreed with this approach on February 2, 2025, shortly before filing the present Motion. Jackson Decl. ¶¶ 27–29.

In short, Defendants' efforts to shift blame are both baseless and contradicted by the record. The delays in Mr. Martin's deposition grew out of Defendants' failure to timely schedule the deposition before the then-existing December 6, 2024 expert discovery cut-off, followed by the unforeseen and subsequent spiraling decline in Mr. Martin's health. Any suggestion that Plaintiffs caused the delay is meritless.

**B.    Plaintiffs acted diligently once they learned Mr. Martin could no longer serve as an expert witness.**

Defendants contend that Plaintiffs failed to exercise diligence in seeking a substitute expert, but this assertion is meritless. Plaintiffs have acted in good faith and with reasonable promptness in response to unforeseen circumstances, and the record demonstrates their diligence at every step. Plaintiffs swiftly informed both the Court and Defendants upon learning of the developments in Mr. Martin's worsening health condition, as laid out in detail in Plaintiffs' opening brief and the accompanying declaration. *See* Opening Br. at 3–5; Jackson Decl. Plaintiffs also did not receive a final indication from Mr. Martin that he agreed a substitute expert would be necessary until February 2, 2025—just three days before filing this motion. Further, Plaintiffs acted swiftly to engage a qualified substitute expert and promptly filed the instant Motion.

[No. 3:20-CV-04737-RS] PLAINTIFFS' REPLY MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF MOT. FOR LEAVE TO AMEND THE CASE MANAGEMENT SCHEDULE TO SUBSTITUTE EXPERT WITNESS    6

Defendants' argument that Plaintiffs failed to act diligently in "preserving Mr. Martin's testimony," Opp'n Br. at 4–5, is entirely unfounded. There is no legal requirement for a party to depose its own expert solely for the purpose of preserving direct testimony in case of future unavailability. The purpose of Mr. Martin's deposition was to provide Defendants with the opportunity to cross-examine him, not for Plaintiffs to conduct a direct examination. Even if Defendants had deposed him, Plaintiffs would still need a substitute expert to present the opinion testimony Mr. Martin planned to offer during Plaintiffs' direct examination of him at trial.

Defendants' reliance on *Gbarabe v. Chevron Corp.*, 2017 WL 956628, at *17–18 (N.D. Cal. Mar. 13, 2017), is also misplaced. There, the Court found the plaintiff had not acted diligently because they were nearly 10 months late in disclosing the original expert's opinions, then waited at least 4.5 months after they became aware of the need to replace that expert to file a motion to substitute. *Id.* That is a far cry from here, where Plaintiffs timely submitted Mr. Martin's opinions then filed their motion to substitute within days of their final conversation with Mr. Martin.

In sum, Plaintiffs have acted responsibly and expeditiously at every stage. They notified all parties as soon as they became aware of the issue, confirmed the necessity of substitution before taking further steps, and proceeded diligently to secure a replacement expert.

## V.    MR. KELLY IS NOT AN APPROPRIATE SUBSTITUTE FOR MR. MARTIN.

Mr. Kelly is not a suitable substitute for Mr. Martin for several compelling reasons, each of which underscores the fundamental differences in their expertise, intended roles, and the scope of their analyses. Defendants' suggestion that Mr. Kelly could simply replace Mr. Martin is a clever ruse designed to make it appear extra time and effort could be avoided by Mr. Kelly taking Mr. Martin's place. However, Defendants blatantly ignore the critical distinctions between the two and mischaracterize the nature of the expert testimony in this case.

First, Mr. Kelly and Mr. Martin possess significantly different qualifications and professional backgrounds. Mr. Kelly is a lawyer with experience addressing legal ethics and privilege issues, while Mr. Martin is a financier with decades of experience in investment banking, mergers and acquisitions, and due diligence for negotiated transactions. These are distinct fields requiring

different knowledge bases, methodologies, and analytical approaches. Mr. Martin's expertise is directly relevant to assessing whether Bayer's due diligence on Monsanto's litigation and reputational risks was in line with investors' customary expectations. In contrast, Mr. Kelly's expertise pertains specifically to the legal aspects of merger due diligence and privilege-related issues, which are only one small aspect of the broader due diligence inquiry at issue in this case.

More importantly, Plaintiffs designed Mr. Kelly's trial role to align specifically with his legal expertise. His primary function is to be a rebuttal witness—to rebut the implausible assertion of Defendants' due diligence "expert"[6] that Bayer would have refrained from seeking internal Monsanto information about the Roundup Litigation due to concerns about waiving privilege. This is a narrow and targeted role focused on a discrete issue.[7]

In contrast, Mr. Martin's role was much broader and encompassed an evaluation of Bayer's overall approach to assessing litigation and reputational risks associated with Monsanto. His testimony was intended to provide the jury with a comprehensive understanding of how industry professionals typically assess such risks in the context of high-stakes mergers and acquisitions. His analysis was grounded in financial industry norms, due diligence best practices, and established methodologies and practices used by financiers and investment professionals. Reflecting these distinct roles, Mr. Kelly and Mr. Martin reviewed different sets of materials in forming their respective opinions, and Mr. Kelly's review was necessarily significantly more limited in scope.

---

[6] Defendants' purported due diligence "expert" is Gary Lawrence, the author of a self-published treatise on due diligence for business transactions. Despite Defendants' referring to him as "Prof. Lawrence," Mr. Lawrence is merely an adjunct professor who teaches one course per term, has never published in an academic law review or journal, and runs a supposed research "center" meant to bolster his personal credentials. Plaintiffs reject Mr. Lawrence's claim that Mr. Martin's or Mr. Kelly's analyses are flawed, and in any event Mr. Martin and Mr. Kelly have convincingly shown that Mr. Lawrence's opinions are riddled with errors and unsupported assumptions and contradict his own treatise.

[7] Mr. Kelly does address whether buy-side diligence on material litigation risks typically includes requests for a target's non-public documents, but only in the specific context of rebutting Mr. Lawrence's implausible claim in his opening report that buyers avoid making such requests due to confidentiality, privilege, or regulatory concerns. Mr. Kelly's opinion is thus tethered to the legal implications of due diligence requests and how they shape what due diligence is ultimately performed.

---

[No. 3:20-CV-04737-RS] PLAINTIFFS' REPLY MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF MOT. FOR LEAVE TO AMEND THE CASE MANAGEMENT SCHEDULE TO SUBSTITUTE EXPERT WITNESS     8

Forcing Plaintiffs to rely on Mr. Kelly's limited rebuttal testimony in their affirmative case would create a significant and unfair disadvantage to the Class. It would distort the intended use of each expert's testimony and deprive Plaintiffs and the Class of a full and fair opportunity to present their case. Mr. Martin's testimony is simply not fully interchangeable with Mr. Kelly's.[8] Defendants' attempt to have the Court order Mr. Kelly to take Mr. Martin's place should be rejected out of hand.

Defendants' reliance on *Fujifilm*, 2014 WL 8094582, and *Nijjar v. Gen. Star Indem. Co.*, 2014 WL 271630 (C.D. Cal. Jan. 23, 2014), is misplaced. In *Fujifilm*, the Court did not compel a party to substitute a rebuttal expert for a primary expert. In fact, the court in that case allowed the substitution of an entirely new primary expert. *See* 2014 WL 8094582, at *1–2. In *Nijjar*, the Court permitted the plaintiff to substitute a rebuttal expert witness for their primary expert witness, but did not allow the plaintiff an unrestricted choice of expert. The facts, however, were strikingly different from those here. In *Nijjar*, the original primary expert had to be withdrawn due to a conflict of interest that the plaintiff could have discovered through "reasonable diligence" and a review of public court filings. In other words, the plaintiff's negligence necessitated the substitution, unlike here, where circumstances beyond the party's control caused the issue. Moreover, the substitution in *Nijjar* would have delayed the trial and burdened the court—unlike here, where no hearing or trial dates have been set. *Id.* at *1–3. *Nijjar* is simply inapplicable here.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the Motion.

Dated:    February 19, 2025

By:    /s/ Carol V. Gilden
Carol V. Gilden (*pro hac vice*)
cgilden@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street, Suite 1705
Chicago, IL 60603

---

[8] Defendants also fail to mention that they devoted a significant portion of Mr. Kelly's deposition to harassing him about an unrelated SEC settlement concerning late financial audits at a hedge fund where he previously worked. This settlement has no bearing on his opinions in this case regarding how privilege concerns affect merger due diligence. Defendants' primary motive for insisting that Plaintiffs rely on Mr. Kelly as their main due diligence witness is transparent—they aim to turn his SEC settlement into a distracting sideshow during Plaintiffs' case-in-chief at trial.

Telephone: (312) 357-0370
Facsimile: (312) 357-0369

Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Chris Lometti (*pro hac vice*)
clometti@cohenmilstein.com
Benjamin F. Jackson (*pro hac vice*)
bjackson@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

*Lead Counsel for Plaintiffs and the Class*

Nicole Lavallee (SBN 165755)
nlavallee@bermantabacco.com
Alexander S. Vahdat (SBN 284963)
avahdat@bermantabacco.com
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Liaison Counsel for Plaintiffs and the Class*

*Attorneys for Lead Plaintiffs Sheet Metal Workers' National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, and Named Plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware Local No. 542*