Carol V. Gilden (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
Email: cgilden@cohenmilstein.com

*Lead Counsel for Plaintiffs and the Class*
[Additional Counsel on Signature Page of Motion]

Nicole Lavallee (SBN 165755)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
       avahdat@bermantabacco.com

*Liaison Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| SHEET METAL WORKERS' NATIONAL PENSION FUND and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, individually and as Lead Plaintiffs on behalf of all others similarly situated, and<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and as Named Plaintiff, on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>    vs.<br><br>BAYER AKTIENGESELLSCHAFT, WERNER BAUMANN, WERNER WENNING, LIAM CONDON, JOHANNES DIETSCH, and WOLFGANG NICKL,<br><br>            Defendants. | Case No. 3:20-cv-04737-RS<br><br>CLASS ACTION<br><br>**DECLARATION OF CAROL V. GILDEN IN SUPPORT OF (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**<br><br>Date:       October 30, 2025<br>Time:      1:30 p.m.<br>Judge:     Richard Seeborg<br>Courtroom: 3 — 17th Floor |

[No. 3:20-CV-04737-RS] GILDEN DECLARATION IN SUPPORT OF MOTIONS FOR APPROVAL OF SETTLEMENT AND FEES AND EXPENSES

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................I

TABLE OF EXHIBITS ............................................................................................................ III

    I.   PRELIMINARY STATEMENT ........................................................................... 2

    II.  SUMMARY OF PLAINTIFFS' CLAIMS ........................................................... 4

    III. HISTORY OF THE ACTION ................................................................................ 5

          A.     The Appointment of Lead Plaintiffs and Lead Counsel ............................. 5

          B.     The Investigation and Filing of the First Amended Complaint ................. 5

          C.     Defendants' First Motion to Dismiss........................................................ 7

          D.     Plaintiffs' Second Amended Complaint .................................................... 9

          E.     Defendants' Second Motion to Dismiss .................................................... 9

          F.     Plaintiffs' Motion for Class Certification ............................................... 10

          G.    Class Notice ........................................................................................... 11

          H.    Discovery .............................................................................................. 12

    IV. SETTLEMENT ................................................................................................... 18

          A.     The Parties' Settlement Negotiations and Mediations............................ 18

          B.     Preparation of Settlement Documents and Preliminary Approval Motion 19

    V.   RISKS OF CONTINUED LITIGATION ........................................................... 20

          A.     Risks Related to Proving Falsity............................................................. 20

          B.     Risks Related to Proving Scienter........................................................... 21

          C.     Risks Related to Proving Loss Causation ................................................ 22

          D.     Risks Related to Proving Damages.......................................................... 22

    VI. PLAINTIFFS' COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASS TO DATE ................................................... 23

    VII.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ....................... 25

    VIII.    THE FEE AND EXPENSE MOTION.................................................................. 28

          A.     The Fee Request...................................................................................... 28

B.      The Expense Request ............................................................... 34

C.      PSLRA Reimbursement to Plaintiffs ......................................... 36

IX. CONCLUSION ................................................................................... 36

## TABLE OF EXHIBITS

| | |
|---|---|
| **Exhibit 1** | Declaration of Miles N. Ruthberg in Support of Plaintiffs' Motion for Final Approval ("Mediator Decl.") |
| **Exhibit 2** | Declaration of Lori Wood, Executive Director of Sheet Metal Workers' National Pension Fund, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Wood Decl.") |
| **Exhibit 3** | Declaration of Michael O'Malley, Administrator of the International Brotherhood of Teamsters Local No. 710 Pension Fund, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("O'Malley Decl.") |
| **Exhibit 4** | Declaration of John Heenan, Administrator of the International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware IUOE Local 542, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Heenan Decl.") |
| **Exhibit 5** | Declaration of Adam Walter of A.B. Data, Inc. Regarding (A) Mailing of Notice and Claim Form and (B) Publication of the Summary Notice ("Mailing Decl.") |
| **Exhibit 5A** | Copy of the Notice Packet |
| **Exhibit 5B** | Copy of Proof of Publication of the Summary Notice in *The Wall Street Journal* |
| **Exhibit 5C** | Copy of Proof of Publication of the Summary Notice on PR Newswire |
| **Exhibit 6** | Declaration of Carol V. Gilden in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses on Behalf of Lead Counsel Cohen Milstein Sellers & Toll PLLC ("CMST Fee Decl.") |
| **Exhibit 6A** | Cohen Milstein Lodestar Report |
| **Exhibit 6B** | Report of Time by Task Categories |
| **Exhibit 6C** | Expense Report |
| **Exhibit 6D** | Firm Resume |
| **Exhibit 7** | Declaration of Nicole Lavallee in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses on Behalf of Berman Tabacco ("BT Fee Decl.") |
| **Exhibit 7A** | Berman Tabacco Lodestar Report |
| **Exhibit 7B** | Report of Time by Task Categories |
| **Exhibit 7C** | Expense Report |
| **Exhibit 7D** | Firm Resume |
| **Exhibit 8** | All Plaintiffs' Counsel Summary Lodestar and Expense Table |

I, Carol V. Gilden, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a member in good standing of the bar of the State of Illinois and have been admitted *pro hac vice* in this pending action. ECF No. 33.

2.     I am a partner with the law firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"). Cohen Milstein was appointed Lead Counsel for Lead Plaintiffs Sheet Metal Workers National Pension Fund ("SMW") and International Brotherhood of Teamsters Local No. 710 Pension Fund ("Local 710") (together, "Lead Plaintiffs") in the above-captioned action (the "Action"). ECF No. 44. Cohen Milstein also represents additional named plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware IUOE Local 542 ("IUOE") (collectively with Lead Plaintiffs, "Plaintiffs"). I have personal knowledge of the matters stated herein based on my active participation in all aspects of the prosecution and settlement of the Action.[1]

3.     I respectfully submit this Declaration in support of Plaintiffs' motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Federal Rules" or "Rules") for final approval of the proposed settlement ("Final Approval Motion") with all defendants in this Action: Bayer Aktiengesellschaft ("Bayer"), Werner Baumann, Werner Wenning, Liam Condon, Johannes Diestch, and Wolfgang Nickl ("Individual Defendants" and, together with Bayer, "Defendants"). If approved, the Settlement will resolve all claims asserted in the Action, or that could have been asserted, against Defendants and related persons on behalf of the Court-certified Class consisting of all persons and entities that purchased or otherwise acquired Bayer American Depository Receipts ("ADRs") between May 23, 2016 and July 6, 2020 and suffered damages (the "Class Period").[2] The Court

---

[1] Unless otherwise indicated, capitalized terms herein will have their meaning as defined in the Stipulation and Agreement of Settlement, dated April 23, 2025 ("Stipulation" or "Stip."). ECF No. 253-2.

[2] Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each of the Individual Defendants; (iii) any subsidiary or affiliate of Bayer, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); (iv) the directors and officers of Bayer during the Class Period, as well as the members of their immediate families; and (v) the legal representatives, heirs, successors, and assigns of any such excluded party. Also excluded from the Class are any persons or entities who or which have submitted a valid request for exclusion from the Class in connection with the earlier Court-approved notice to Class Members informing them of the certification, in each case

preliminarily approved the Settlement and directed notice thereof to the Class by Order dated June 27, 2025. ECF No. 260 ("Preliminary Approval Order").

4.    I also respectfully submit this Declaration in support of (i) the proposed plan for allocating the net proceeds of the Settlement to eligible Class Members ("Plan of Allocation" or "Plan") and (ii) Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[3] for an award of attorneys' fees of 27% of the Settlement Fund; payment of Litigation Expenses incurred by Plaintiffs' Counsel in the amount of $3,281,973.16; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), payment of $31,485.14, in the aggregate, to Plaintiffs for costs incurred in connection with their representation of the Class ("Fee and Expense Motion").

5.    For the reasons set forth below and in the accompanying memoranda in support of the Final Approval Motion and the Fee and Expense Motion, I respectfully submit that the terms of the Settlement and the Plan of Allocation are fair, reasonable, and adequate, and should be approved by the Court. I also respectfully submit that the Fee and Expense Motion is fair, reasonable, supported by the facts and the law, and should be granted in all respects. The Settlement, Plan of Allocation, and Fee and Expense Motion have the full support of Plaintiffs. *See* Ex. 2 ¶¶ 5–10; Ex. 3 ¶¶ 5–10; Ex. 4 ¶¶ 4–9.

## I.    PRELIMINARY STATEMENT

6.    The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a total cash payment of $38,000,000, plus interest, for the benefit of the Class. As detailed herein, the Settlement is a highly favorable outcome for the Class because it confers a substantial, certain, and near-term recovery for Class Members while avoiding the significant risks of continued litigation, including the risk that the Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

who or which has not and does not submit a timely and valid request to opt back into the Class. Stip. ¶ 1(h).
    [3] "Plaintiffs' Counsel" refers collectively to Cohen Milstein and Liaison Counsel Berman Tabacco ("Liaison Counsel").

7.    The proposed Settlement is the result of extensive efforts by Plaintiffs and Lead Counsel, which included, among other things: (i) drafting two detailed amended complaints, based on a comprehensive investigation; (ii) defeating two motions to dismiss; (iii) moving successfully for class certification; (iv) issuing forty-seven subpoenas to non-parties; (v) exchanging and responding to extensive written discovery and analyzing document productions, which entailed, among other things, reviewing roughly 200,000 pages of documents produced by Defendants, including a subset of documents written in German; (vi) taking and defending a total of twenty-four depositions in New York, the United Kingdom, Belgium, the Netherlands, and Germany, with the one in Germany secured through the Hague Convention and administered by a German court; (vii) completing fact discovery (viii) serving and/or analyzing a total of twenty expert reports, including thirteen reports from Plaintiffs' five expert witnesses and seven reports from Defendants' three expert witnesses and (ix) engaging in extended months-long arm's-length settlement negotiations overseen by an independent mediator, including two full-day in-person mediation sessions that took place over five months apart and which included extended discussions and negotiations with esteemed and experienced defense counsel.  Based on these efforts, Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement.

8.    The proposed $38 million cash Settlement is a favorable recovery given the real risks that protracted litigation might lead to a lesser or no recovery—including significant risks relating to liability, loss causation, and damages—and guarantees a significant and near-term recovery for the Class.

9.    The Settlement followed extensive and complex negotiations between experienced counsel, which included two mediation sessions overseen by Miles N. Ruthberg, Esq., of Phillips ADR Enterprises, P.C., a former trial, appellate, and settlement lawyer who is now an experienced mediator of securities class actions and other complex litigation. The $38 million Settlement Amount was based on a mediator's recommendation made by Mr. Ruthberg.

Case 3:20-cv-04737-RS    Document 270    Filed 09/25/25    Page 8 of 40

10.     As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Plaintiffs' damages expert, provides for the equitable distribution of the Net Settlement Fund to Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on the amount of each Authorized Claimant's claim amount as calculated by the Claims Administrator pursuant to the Plan.

11.     For their efforts in achieving the Settlement, Lead Counsel request attorneys' fees of 27% of the Settlement Fund. This request is only a modest increase from the 25% benchmark and on the very low end of the range of fees that courts in this District and Circuit typically award in connection with comparable settlements. Moreover, the fee request is a lower amount than the lodestar that Plaintiffs' Counsel devoted to the case, representing a negative multiplier of approximately 0.8. Lead Counsel respectfully submit that the requested fee is fair and reasonable in light of the result achieved in the Action, the efforts of Lead Counsel, and the risks and complexity of the litigation.

## II.     SUMMARY OF PLAINTIFFS' CLAIMS

12.     Plaintiffs' claims in this Action are set forth in the operative Second Amended Class Action Complaint, filed on December 30, 2021 (ECF No. 107) (the "SAC"), which asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against Defendants.

13.     In the SAC, Plaintiffs allege, among other things, that Defendants violated the Exchange Act by making false and misleading statements about Bayer's due diligence in connection with its acquisition of the Monsanto Company (the "Merger"). In particular, Plaintiffs allege that Defendants made false and misleading statements during the Class Period about Bayer's due diligence relating to Monsanto's potential exposure to lawsuits alleging that Roundup, a Monsanto-produced herbicide, causes non-Hodgkin's lymphoma (the "Roundup Litigation"). Plaintiffs allege that Defendants made false and misleading statements and omissions to promote the Merger, assuring investors that Bayer had conducted an extensive due diligence investigation on Monsanto and its exposure in the Roundup Litigation when Bayer had not reviewed or requested any internal Monsanto

[No. 3:20-CV-04737-RS] GILDEN DECLARATION IN SUPPORT OF MOTIONS FOR APPROVAL OF SETTLEMENT AND FEES AND EXPENSES                                        4

documents relating to Roundup's legal risks as part of the due diligence process. Plaintiffs further allege that Defendants' false and misleading statements concealed material risks and artificially inflated the price of Bayer ADRs. Plaintiffs allege that these concealed risks materialized and the truth about the extent of Bayer's due diligence was revealed by a series of legal defeats in the Roundup Litigation, by Bayer's announcement of a commitment to pay up to $10.9 billion to settle the Roundup Litigation, and by a statement by the judge presiding over that proposed settlement that he was tentatively inclined not to approve it. Plaintiffs allege that each of these developments caused artificial inflation in the price of Bayer ADRs to dissipate during the Class Period and the price of Bayer ADRs to drop, harming the members of the Class.

## III.    HISTORY OF THE ACTION

### A.    The Appointment of Lead Plaintiffs and Lead Counsel

14.    On July 15, 2020, the initial complaint was filed in this Action under the caption *City of Grand Rapids General Retirement System & City of Grand Rapids Police & Fire Retirement System v. Bayer et al*, asserting violations of the Exchange Act against Bayer and the Individual Defendants. ECF No. 1.

15.    On September 14, 2020, SMW and Local 710 filed a motion for appointment to serve as Lead Plaintiffs. ECF No. 23. As set forth in their motion, SMW and Local 710 had the largest financial interest of any of the competing movants and were adequate representatives of the proposed class. *Id.* Four other entities initially filed motions for appointment as lead plaintiff (ECF Nos. 12, 16), all of whom subsequently filed notices of non-opposition to SMW and Local 710's motion, recognizing that SMW and Local 710 had the largest financial interest (ECF No. 34, 35).

16.    On October 21, 2020, the Court appointed these funds as Lead Plaintiffs for the Action and approved Lead Plaintiffs' selection of Cohen Milstein as Lead Counsel and Berman Tabacco as Liaison Counsel. ECF No. 44.

### B.    The Investigation and Filing of the First Amended Complaint

17.    Lead Counsel undertook an extensive investigation regarding the potential claims that could be asserted by Plaintiffs in the Action. This investigation began prior to the Court's

appointment of Lead Plaintiffs and continued through the preparation of the Amended Class Action Complaint. The investigation included a thorough review and analysis of: (i) public filings made by Bayer and The Monsanto Company ("Monsanto") with government regulators; (ii) research reports prepared by securities and financial analysts; (iii) transcripts of Bayer investor conference calls; (iv) Bayer investor presentations; (v) press releases and media reports; and (vi) securities pricing data. In addition, in preparation for the FAC and throughout the litigation, Lead Counsel extensively researched public materials related to Bayer's acquisition of Monsanto, as well as court filings and other public materials and evidence from the state and federal actions against Monsanto alleging that Roundup, a Monsanto-produced herbicide, causes non-Hodgkin's lymphoma.

18.    In addition, in connection with the preparation of the Complaint, Lead Counsel consulted with individuals with expertise in due diligence, accounting and audit procedures, and damages. Lead Counsel also conducted extensive legal research to determine which theories of liability to allege and how to allege those theories in light of the applicable law and precedent in this District and Circuit. For example, Lead Counsel researched the law in the Ninth Circuit on pertinent legal issues, such as pleading standards for allegations on behalf of ADR purchasers, viability of claims based on different categories of misstatements, and pleading loss causation for trades with a two-day trading window.

19.    On January 19, 2021, Lead Plaintiffs, along with additional named plaintiff IUOE, filed and served the 151-page, 385-paragraph Amended Class Action Complaint (ECF No. 47) based on this extensive investigation. The FAC asserted claims against Bayer and the Individual Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.

20.    The FAC alleged that Defendants made materially false and misleading statements about Bayer's acquisition of Monsanto, including Bayer's merger due diligence, Bayer's access to Monsanto's internal documents, and the evidence concerning whether Roundup and glyphosate cause non-Hodgkin's lymphoma. The FAC further claimed that Bayer fraudulently understated liabilities and overstated profits in its financial reports by allegedly failing to account for potential Roundup-

related legal liabilities and allegedly failing to disclose litigation risks as contingent liabilities. The FAC claimed that these alleged misrepresentations and omissions inflated Bayer ADR prices during the Class Period, harming investors when the alleged truth emerged.

### C.    Defendants' First Motion to Dismiss

21.    On March 22, 2021, Defendants moved to dismiss the FAC. ECF No. 61 ("First Motion to Dismiss"). In their motion, Defendants asserted that the FAC should be dismissed in its entirety because it failed to sufficiently plead that (i) the statements at issue were materially false or misleading; (ii) Defendants knew that their statements were false or were deliberately reckless as to their truth or falsity; and (iii) Defendants' misstatements foreseeably caused Plaintiffs' loss. Defendants also argued that the FAC failed to plead a violation of Section 20(a) because the FAC pled no underlying violation of the Exchange Act. *See generally id.*

22.    Defendants' First Motion to Dismiss also included a request that the Court consider documents incorporated by reference in the FAC and also take judicial notice of additional documents submitted to the Court, including various SEC filings and other public documents. ECF No. 62. In total, the First Motion to Dismiss and its exhibits and other supporting materials amounted to over 609 pages. *See* ECF Nos. 61, 62, 63.

23.    On May 21, 2021, Plaintiffs filed and served a memorandum of law in opposition to the First Motion to Dismiss. ECF No. 73. Plaintiffs argued that the FAC adequately detailed the reasons why each challenged statement was materially false and omitted material facts, raised a strong inference of scienter, established that the misstatements caused Plaintiffs' loss, and stated a Section 20(a) claim. *See generally id.* Along with the opposition, Plaintiffs filed a request that the Court take judicial notice of four additional documents that were either incorporated by reference into the FAC or in the public record. ECF Nos. 74, 75.

24.    Plaintiffs also objected to Defendants' request for judicial notice. ECF No. 76. Plaintiffs argued that the request should be denied to the extent that Defendants asked the Court to assume the truth of all the matters asserted in their exhibits if such assumptions only serve to dispute the facts stated in the FAC. *Id.* Plaintiffs also argued that the Court should reject the request insofar

as Defendants sought to use the documents to provide context for the false and misleading statements alleged in the FAC. *Id.*

25.     On June 21, 2021, Defendants served their reply papers in further support of the First Motion to Dismiss and their request for judicial notice. ECF Nos. 78, 79. In their reply in support of the request for judicial notice, Defendants opposed Plaintiffs' request for judicial notice as to one of the four exhibits but declined to oppose the other three. ECF No. 79.

26.     On October 15, 2021, the Court heard oral argument on Defendants' motion. ECF No. 87.

27.     On October 19, 2021, the Court issued an Order denying Defendants' First Motion to Dismiss ("First MTD Order"). ECF No. 90. The Court held that Plaintiffs had stated a claim with respect to Defendants' statements concerning Bayer's due diligence on the Monsanto merger, but not with respect to the other alleged misstatements and omissions identified in the FAC as pleaded. *Id.* Specifically, the Court found that Plaintiffs failed to plead falsity as to the statements concerning Defendants' accounting for the risk of losses in the Roundup Litigation and scienter as to the statements concerning glyphosate safety.

28.     On November 2, 2021, Defendants sought leave to file a motion for reconsideration of the Court's denial. ECF No. 93. Defendants challenged the First MTD Order's holdings that the FAC adequately pleaded that Defendants' statements about pre-merger diligence falsely implied that Bayer had reviewed Monsanto internal documents relating to glyphosate and that Defendants had a motive to pursue the Monsanto transaction despite known risks. *Id.*

29.     On November 3, 2021, the Court issued an Order requesting that Plaintiffs respond to Defendants' motion for leave to file a motion for reconsideration. ECF No. 94.

30.     On November 12, 2021, Plaintiffs filed and served a memorandum of law in opposition to Defendants' motion for leave, arguing that Defendants did not meet the high bar for leave to file a motion for reconsideration. ECF No. 95.

31.     On November 15, 2021, the Court issued an Order denying Defendants' motion or leave to file a motion for reconsideration because the Court already considered Defendants' arguments when ruling on the First Motion to Dismiss. ECF No. 97.

**D.      Plaintiffs' Second Amended Complaint**

32.     On November 19, 2021, the Parties filed a stipulation agreeing to a deadline of December 17, 2021 for filing a second amended complaint, adjourning the initial case management conference until after that complaint was filed, and confirming that Defendants were not required to answer the FAC. ECF No. 100.

33.     On December 17, 2021, Plaintiffs filed a motion for leave to file the SAC to (a) supplement their allegations concerning Bayer's statements about the evidence on whether Roundup and glyphosate cause non-Hodgkin's lymphoma and (b) withdraw their allegations concerning Bayer's accounting statements. ECF No. 102. Defendants did not object to the filing of the SAC subject to a reservation of their right to move for its dismissal. ECF No. 104.

34.     On December 29, 2021, the Court granted a joint stipulation and scheduling order allowing Plaintiffs to file the SAC. ECF No. 105.

35.     On December 30, 2021, Plaintiffs filed the SAC. ECF No. 107. The SAC brought the same Exchange Act claims as the FAC but, pursuant to the motion for leave to amend, based on only two of the FAC's three categories of misstatements: those concerning Bayer's due diligence efforts prior to the Monsanto acquisition and those concerning glyphosate safety and the evidentiary basis for Monsanto's science-based trial defenses in the Roundup Litigation. *See generally id.*

**E.      Defendants' Second Motion to Dismiss**

36.     On January 31, 2022, Defendants moved to dismiss the SAC. ECF No. 110 ("Second Motion to Dismiss"). In their motion, Defendants argued that Plaintiffs should be foreclosed from advancing their claims based on the statements concerning the evidentiary basis for Monsanto's science-based trial defenses in the Roundup Litigation. Specifically, Defendants contended that the SAC did not plead falsity or scienter as to these statements. *Id.*

37.    Defendants' Second Motion to Dismiss also included a request that the Court take judicial notice of 11 documents submitted to the Court on the basis that the documents were government records, judicial records, or documents incorporated by reference into the SAC. ECF No. 112.

38.    On March 2, 2022, Plaintiffs filed and served a memorandum of law in opposition to the Second Motion to Dismiss. ECF No. 114. Plaintiffs argued that the SAC pleaded that, as part of a conscious investor relations strategy, Defendants told investors that Monsanto's defenses were supported by far more scientific evidence than was truly the case, and that Defendants had a clear motive to mislead investors, had extensive access to and/or knowledge of information showing their statements were false and misleading, and personally signed communications to shareholders containing false and misleading statements. *Id.* Plaintiffs did not oppose Defendants' request for judicial notice. *Id.* at 13 n.5.

39.    On March 16, 2022, Defendants served their reply papers in further support of the First Motion to Dismiss and their request for judicial notice. ECF No. 116.

40.    On May 18, 2022, the Court issued an Order denying Defendants' Second Motion to Dismiss ("Second MTD Order"). ECF No. 122. The Court held that Plaintiffs could not proceed on the theory of liability based on the statements about Monsanto's science-based trial defenses, but that because the First MTD Order determined that Plaintiffs could proceed on the due diligence theory, the Second Motion to Dismiss was denied.

41.    On June 22, 2022, Defendants filed an Answer to the SAC, asserting, among other defenses, that Plaintiffs' claims were barred because they would require an extraterritorial application of the federal securities laws. ECF No. 127.

**F.    Plaintiffs' Motion for Class Certification**

42.    On October 28, 2022, Plaintiffs moved for (i) certification of a class of all persons or entities that purchased or otherwise acquired Bayer's publicly traded ADRs from May 23, 2016 to July 6, 2020; (ii) appointment of Plaintiffs as Class Representatives; and (iii) appointment of Cohen Milstein as Class Counsel. ECF No. 140. The motion was supported by two expert reports: a 32-page

report from Chad Coffman, initially of Global Economics Group LLC and later of Peregrine Economics LLP, on market efficiency and damages and an 18-page report from Professor Joshua R. Mitts addressing extraterritoriality and the structure of Plaintiffs' and the Class's Bayer ADR transactions.

43. On February 4, 2023, Defendants opposed class certification, arguing that Plaintiffs' claims were atypical of the proposed Class due to their claimed susceptibility to an extraterritoriality defense. ECF No. 150. Defendants also argued that Plaintiffs had not provided a common methodology to establish that putative Class Members traded Bayer ADRs domestically or to establish Class-wide damages. Defendants' opposition included two expert reports: a 48-page report from Mark J. Garmaise on market efficiency and damages and a 54-page report from Cristian Zarcu on extraterritoriality and the structure of Bayer ADR transactions.

44. Between December 21, 2022 and March 9, 2023, the Parties conducted seven depositions related to class certification, including depositions of three of Plaintiffs' Rule 30(b)(6) representatives. They also deposed the Parties' market efficiency and economics experts, Coffman (for Plaintiffs) and Garmaise (for Defendants), as well as their ADR and extraterritoriality experts, Mitts (for Plaintiffs) and Zarcu (for Defendants).

45. On April 13, 2023, the Court held oral argument on Plaintiffs' motion for class certification. ECF No. 171.

46. On May 19, 2023, the Court issued an Order granting the motion for class certification, appointing SMW, Local 710, and IUOE class representatives, and appointing Cohen Milstein as class counsel. ECF No. 175.

**G.  Class Notice**

47. After the Court certified the Class, Plaintiffs solicited bids from five class administration vendors and ultimately selected A.B. Data as the Class Administrator. Plaintiffs then drafted the Class Notice documents: the notice of pendency, summary notice, postcard notice, and website text.

48.     On October 25, 2023, the Parties filed a stipulation proposing procedures for giving notice to the Class, in compliance with the requirements set forth in Rule 23. On October 31, 2023, the Court entered an Order approving the proposed notice of pendency program (ECF No. 197), which included mailing or emailing a long-form notice (the "Class Notice") to all potential Class Members who could be identified through reasonable effort, publishing a summary notice, and posting the Class Notice and other relevant case information on a website created for the Action.

49.     On November 14, 2023, the Class Administrator began mailing the Class Notice to potential Class Members. ECF No. 200 ¶¶ 4–7. The same day, the Class Administrator established a case-specific, toll-free telephone helpline to assist potential Class Members with questions about the Action. *Id.* ¶ 12.

50.     Also on November 14, 2023, the Class Administrator posted the Class Notice on www.BayerADRSecuritiesLitigation.com. ECF No. 200 ¶ 13.

51.     On November 28, 2023, the Class Administrator published the summary notice in *The Wall Street Journal* and distributed it on the internet via *PR Newswire*. *Id.* ¶ 11. The notices described the Action and informed potential Class Members how to participate in the Action and how to exclude themselves (or "opt out") from it. ECF Nos. 200-1, 200-2. The notices explained the right to opt out and the procedures for doing so, including a January 29, 2023 deadline. *Id.* Only 11 requests for exclusion from the Class were received. ECF No. 200 ¶ 15.

**H.     Discovery**

52.     The fact and merits discovery phases in this Action spanned nearly three years, from June 2022 through February 2025, when the Parties reached the Settlement. Merits discovery was extensive, complex, and time-intensive: Plaintiffs reviewed approximately 32,185 documents (roughly 200,000 pages) produced by Defendants, including a subset of documents written in German, and approximately 4,953 documents produced by twenty-eight third parties; served forty-seven subpoenas; took eleven and defended three fact depositions, including the depositions of Plaintiffs and current and former employees of Bayer; litigated numerous discovery disputes; served nine and received and analyzed six expert reports; and took two and defended four expert depositions.

53. The Parties engaged in extensive negotiations, international coordination, and multiple court interventions to resolve discovery disputes. The extensive discovery performed and further discussed below allowed Plaintiffs and Counsel to fully evaluate the strengths and weaknesses of Plaintiffs' claims and to assess the fairness of the Settlement.

1. **Initial Disclosures, Initial Case Management Conference, Protective Order, ESI Protocol, and Remote Deposition Protocol**

54. On June 21, 2022, the Parties exchanged Initial Disclosures in accordance with Rule 26(a)(1). ECF No. 130 ¶ 7.

55. On June 23, 2022, the Parties filed a joint status report detailing their efforts to prepare a discovery plan and schedule pursuant to Rule 26(f)(3). ECF No. 130.

56. The Court held the Initial Case Management Conference on June 30, 2022 (ECF No. 132) and issued the Initial Case Management Scheduling Order the next day on July 1, 2022 (ECF No. 133), which adopted the Parties' proposed discovery plan and schedule.

57. In September and October 2022, the Parties engaged in a series of meet-and-confers to negotiate a confidentiality and protective order ("Protective Order"). Given the complexity of the case, the Protective Order included measures addressing foreign data privacy laws. On October 4, 2022, Plaintiffs filed the stipulated Protective Order, which the Court approved on October 6, 2022. ECF No. 138.

58. The Parties also negotiated and agreed to a Stipulated Forms and Format for Document Productions, which the Court approved on October 6, 2022 (ECF No. 137), and a Stipulated Order Regarding Remote Deposition Protocol, which the Court approved on December 19, 2022 (ECF No. 146). Given that many relevant documents were in German and that several of the witnesses did not speak English as their first language, the Parties later negotiated a Stipulated Order on Translation and Interpretation, approved by the Court on February 8, 2024. ECF No. 203. Pursuant to the Stipulation, Plaintiffs provided certified translations of German-language exhibits to Defendants in advance of depositions as needed, and several depositions required continuous or standby live German-to-English interpretation.

### 2. Discovery on Extraterritoriality

59.    In response to Defendants raising extraterritoriality as a defense, between August 12, 2022 and September 19, 2022, Plaintiffs issued subpoenas to thirty-seven non-parties—including Bayer's ADR program depositary, Bank of New York Mellon, as well as numerous broker-dealers, trading platforms, FINRA, and DTCC—to obtain discovery concerning the structuring and mechanics of Plaintiffs' and the Class's Bayer ADR transactions during the Class Period. Plaintiffs ultimately obtained transaction and clearing records for most, if not all, of the Class's Bayer ADR transactions during the Class Period, along with other documents and data. Defendants, in turn, subpoenaed Plaintiffs' two investment advisors on November 10, 2022.

### 3. Discovery Propounded on Defendants

60.    Plaintiffs served multiple sets of document requests, interrogatories, and requests for admission on Defendants between June 2022 and May 10, 2024. Plaintiffs served their First Set of RFPs on July 29, 2022, comprising 60 requests for documents related to Bayer's acquisition of Monsanto, due diligence, and litigation risks associated with Monsanto's Roundup product. These requests encompassed internal communications, board minutes, advisory reports, acquisition agreements, financial and reputational risk assessments, and documents on Bayer's ADR program and investor communications. On July 24, 2023, Plaintiffs served their Second Set of RFPs, seeking all securities analyst reports on Bayer or Monsanto in Defendants' possession.

61.    Plaintiffs also served two sets of interrogatories. The first, issued on July 24, 2023, sought information on Bayer's review of documents concerning glyphosate and Roundup during due diligence for the Monsanto acquisition. The second, served on April 10, 2024, requested Defendants' factual support for the 16 defenses raised in Defendants' Answer to the SAC. On April 10, 2024, Plaintiffs also served their First Set of RFAs, requesting that Defendants admit various facts relating to the admissibility of certain of their produced documents at trial. Defendants responded and objected to each of these interrogatories and RFAs.

62. In addition to the forty-seven non-party subpoenas issued during the class certification stage, Plaintiffs served 10 more subpoenas to financial institutions and an auditing firm involved in Bayer's Monsanto acquisition.

63. Between September 12, 2022 and March 8, 2024, the Parties held numerous meet-and-confer conferences, typically via telephone, and exchanged 24 letters addressing discovery disputes and negotiations. These communications concerned the scope and manner of the requested document productions, interrogatories, and requested admissions, including issues related to search terms and document custodians, and other disputes related to the requests.

64. Lead Counsel efficiently and thoroughly reviewed the 32,185 documents (roughly 200,000 pages) that Defendants produced throughout fact discovery, a subset of which were in the German language. A fully in-house team of partners, associates, and discovery counsel reviewed and analyzed the productions.

65. Based on the documents that Defendants produced, Lead Counsel conducted eleven depositions of fact witnesses, including Bayer's current and former senior executives, board members, and general counsels. The depositions took place in multiple locations in the United States and Europe, including New York, the United Kingdom, Belgium, the Netherlands, and Germany, necessitating international travel and logistical coordination.

66. Securing the deposition of Bayer's former General Counsel, Dr. Roland Hartwig, was particularly logistically and linguistically challenging. Plaintiffs believed that his testimony was critical to proving scienter and thus undertook the effort to depose him. Plaintiffs enlisted German co-counsel and sought a Letter of Request for International Judicial Assistance under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, which the Court granted on June 21, 2024. ECF No. 216. Plaintiffs then coordinated with the relevant Germany authorities, resulting in a September 12, 2024 hearing in Potsdam, Germany where a German judge conducted the deposition of Dr. Hartwig with additional questioning from both Lead Counsel and Defendants' Counsel through the use of live interpreters. Several rounds of submissions to the

German court were required before the hearing, and both Lead Counsel and Defendants' Counsel traveled to Germany to participate.

67.    The fact and expert depositions yielded important evidence for the record and informed Plaintiffs' and Lead Counsel's understanding of the strengths and weaknesses of the Class's claims.

### 4.    Discovery Propounded on Plaintiffs

68.    Defendants served their First RFPs on November 10, 2022, comprising 66 requests to Plaintiffs for documents related to their claims, Bayer securities investments, communications with Bayer and Monsanto, and investment due diligence records. Defendants also sought materials on Plaintiffs' legal representation, expert witnesses, and discussions regarding Bayer's market performance and stock price decline.

### 5.    Discovery Disputes

69.    Though the Parties negotiated many discovery issues independently, they sought Court intervention on four issues.

70.    In a motion filed on December 1, 2023, the Parties asked the Court to resolve two disputes: (1) whether Defendants had waived privilege over certain due diligence documents identified in their interrogatory responses and (2) whether documents withheld as privileged were primarily business-related and should be produced. ECF No. 198. The Court ruled that Defendants had impliedly waived privilege over the specified due diligence documents and ordered their production but upheld Defendants' other assertions of privilege. ECF No. 199.

71.    In a motion filed on April 2, 2024, the Parties sought rulings on whether Defendants could withhold a portion of a letter to Bayer's Supervisory Board and whether Plaintiffs could depose Dr. Hartwig, Bayer's former general counsel. ECF No. 207. On April 18, 2024, the Court ruled in Plaintiffs' favor on both issues, ordering Defendants to produce the letter and granting a four-month extension of fact discovery to allow Dr. Hartwig's deposition. ECF No. 210.

### 6. **Expert Discovery**

72. The Parties completed fact discovery on May 10, 2024, except for the deposition of Dr. Hartwig and Dr. Gabriel Harnier, another of Bayer's former general counsels, which were completed on September 12, 2024 and September 24, 2024, respectively.

73. During expert discovery, Plaintiffs served nine expert reports, including (i) a 37-page report from Joshua R. Mitts analyzing the mechanics and structure of Plaintiffs' Bayer ADR transactions during the Class Period; (ii) a 14-page opening report and a 10-page reply report from Afra Afsharipour discussing Bayer's and Monsanto's incentives and rights under their merger agreement; (iii) a 31-page rebuttal report from Christopher Kelly addressing due diligence on material litigation risks; (iv) an 80-page opening report, a 20-page rebuttal report, and an 18-page reply report from Jeffrey S. Martin concerning merger due diligence customs and practices; and (v) a 76-page opening report and a 28-page reply report from Chad Coffman on loss causation and damages.

74. During merits discovery, Defendants served four expert reports, including: (i) a 58-page report from Mark J. Garmaise on loss causation and damages; and (ii) a 38-page opening report, a 32-page rebuttal report, and a 22-page reply report from Gary Lawrence discussing merger due diligence customs and practices.

75. The Parties conducted six expert depositions. Plaintiffs deposed both of Defendants' expert witnesses and Defendants deposed four of Plaintiffs' expert witnesses: Mitts, Afsharipour, Kelly, and Coffman.

76. Defendants noticed a deposition of Plaintiffs' final expert witness, Jeffrey Martin, who had prepared opening, rebuttal, and reply expert reports on merger due diligence customs and practices. ECF No. 234-1 ¶¶ 5, 9. Lead Counsel met with Martin for several hours on two different occasions to prepare for the deposition. *Id.* ¶¶ 13, 19. However, due to developing serious, life-threatening medical diagnoses, Martin was unable to continue to serve as a testifying expert witness in the Action. *Id.* ¶ 19. With Martin unavailable, Lead Counsel researched several potential replacement expert witness candidates and inquired about their availability to serve as an expert in

Mr. Martin's stead, ultimately retaining an expert witness. *Id.* ¶ 27. On February 5, 2025, Plaintiffs filed a motion for leave to amend the case management schedule to substitute Martin (ECF No. 234), which Defendants opposed on February 12, 2025, arguing that Plaintiffs' expert Kelly should act as the substitute expert on the topic (ECF No. 238). On February 19, 2025, Plaintiffs filed a reply in support of the motion. ECF No. 239. The motion was still pending when the Parties reached the Settlement.

## IV.    SETTLEMENT

### A.    The Parties' Settlement Negotiations and Mediations

77.    During the summer of 2024, the Parties first attempted to resolve the Action through mediation and retained Miles N. Ruthberg of Phillips ADR Enterprises, P.C. to act as mediator. In advance of the first mediation session, the Parties exchanged and submitted to Mr. Ruthberg detailed opening and reply mediation statements addressing liability and damages.

78.    On August 22, 2024, the Parties participated in a full-day, in-person mediation with Mr. Ruthberg. During the mediation session, attended by Plaintiffs, representatives of Bayer, and representatives of Defendants' insurers, counsel for the Parties presented arguments regarding their clients' respective positions and exchanged multiple rounds of settlement demands and offers, but ultimately the Parties were not able to reach an agreement during this mediation session.

79.    Over the next several months, the Parties resumed expert discovery with the exchange of reports and expert depositions, and began to prepare for summary judgment and *Daubert* motion briefing.

80.    Over five months later, the Parties agreed to a second in-person mediation session with Mr. Ruthberg on January 31, 2025. The Parties exchanged detailed supplemental mediation statements and Plaintiffs provided Mr. Ruthberg with a mediators'-eyes-only reply to Defendants' supplemental mediation statement, which Lead Counsel agreed to provide to Defendants. Lead Counsel, Plaintiffs, Defendants' Counsel, representatives of Bayer, and representatives of Defendants' insurers met for a full-day session with Mr. Ruthberg on that date and continued their negotiations. Despite thorough discussion and negotiation, the Parties did not reach a settlement.

81.    The Parties continued to engage in extensive negotiations through the mediator over the course of the next several weeks. On February 20, 2025, Mr. Ruthberg issued a mediator's recommendation proposing to resolve all claims in exchange for a $38 million cash payment, subject to the negotiation of non-financial terms for Settlement and Court approval. After further discussion and consultation with Plaintiffs and with their authorization, Lead Counsel accepted the mediator's recommendation on Plaintiffs' behalf. On February 25, 2025, the Parties notified the Court of the settlement in principle.

**B.    Preparation of Settlement Documents and Preliminary Approval Motion**

82.    In the weeks after reaching the settlement in principle, the Parties continued to negotiate the non-monetary terms of the settlement agreement and to draft related settlement documents.

83.    On March 25, 2025, the Parties executed a detailed Term Sheet.

84.    On April 23, 2025, the Parties executed the Stipulation and Agreement of Settlement (ECF No. 253-2) setting forth the full terms of their agreement to settle the Action. The same day, Plaintiffs filed the Stipulation with the Court along with the motion for preliminary approval of the Settlement. ECF No. 253 ("Preliminary Approval Motion").

85.    Also on April 23, 2025, the Parties also executed a Supplemental Agreement establishing the conditions under which Defendants could terminate the Settlement if persons and entities who requested exclusion from the Class exceeded a certain threshold. The Parties recognized that the Supplemental Agreement would only apply if the Court required the Settlement to provide a second opportunity for Class Members to opt out of the Class. As Plaintiffs discussed in the Preliminary Approval Motion, Class Members previously had the opportunity to opt out of the Class in 2024 in connection with the Class Notice, and only 11 Class Members did so. The previous exclusions were not sufficient to reach the Supplemental Agreement's opt-out threshold.

86.    On June 26, 2025, the Court held a hearing on the Preliminary Approval Motion. ECF No. 259. The Court granted the Motion from the bench, scheduled the Fairness Hearing for October

30, 2025 to determine, among other things, whether the Settlement should be finally approved, and informed the Parties that it would issue a written order memorializing the ruling. *Id.*

87.     On June 27, 2025, the Court issued the Order Preliminarily Approving Settlement and Providing for Notice. ECF No. 260. The Order, among other things, (i) preliminarily approved the Settlement; (ii) approved the form of Notice, Summary Notice, and the Claim Form, and authorized notice to be given to Class Members through mailing of the Notice and Claim Form and publication of the Summary Notice in *The Wall Street Journal* and over *PR Newswire*; (iii) approved the appointment of A.B. Data as Claims Administrator; (iv) established procedures and deadlines by which Class Members could participate in the Settlement or object to the Settlement, the proposed Plan of Allocation, and/or the motion for attorneys' fees and expenses; (v) declined to provide a second opportunity for Class Members to request exclusion; and (vi) set a schedule for the filing of opening and reply papers in support of final approval of the proposed Settlement and Plan of Allocation and the fee and expense application.

## V.    RISKS OF CONTINUED LITIGATION

88.     The Action presented significant risks to establishing liability. Plaintiffs would have faced substantial risks in establishing each of the required elements of falsity, scienter, loss causation, and damages, and Defendants would have only had to successfully challenge one element to prevail or to substantially decreased the Class's possible recovery. Moreover, even if Plaintiffs prevailed at trial, Defendants could have appealed the verdict, further risking and delaying the Class's recovery. In light of the most significant risks discussed below, the Settlement constitutes an excellent result for the Class.

### A.    Risks Related to Proving Falsity

89.     Plaintiffs faced significant challenges in proving that all the misstatements alleged in the SAC were materially false.

90.     Defendants likely would have continued to argue that the case record does not support Plaintiffs' contention that investors interpreted Defendants' pre-August 10, 2018 statements—all the statements preceding the verdict in the first Roundup Litigation trial—as providing an implied

assurance about the scope of Bayer's due diligence on the Roundup Litigation. Defendants' argument that these statements referred merely to due diligence on other topics or the merger generally could have resonated with a jury. If a jury agreed with Defendants that the pre-August 10, 2018 statements were not false or materially misleading, Plaintiffs' damages would drop substantially, as much of the claimed loss comes from that time period.

91.     Defendants would also challenge statements from later in the Class Period that did allegedly refer to Bayer's due diligence on the Roundup Litigation on the basis that the statements were accurate in describing Bayer's "customary" and "appropriate" due diligence process. Explaining to a jury the industry standards for merger due diligence would be a challenge for Plaintiffs, especially given that the issue would have been the subject of competing expert testimony.

92.     Arguing the falsity of these statements at trial would be additionally challenging if Plaintiffs were not to prevail on their motion to substitute their due diligence expert, Jeffrey S. Martin, who is no longer available to give expert testimony in the Action due to unforeseeable, serious health diagnoses and treatment. As discussed above, Plaintiffs' motion to extend the case management schedule to substitute another expert for Mr. Martin was pending at the time the Parties reached the Settlement, and Defendants' position was that Plaintiffs should be required to replace Mr. Martin with Mr. Kelly, who was a rebuttal witness for Plaintiffs on select due diligence issues. *See* ECF No. 239. As Plaintiffs argued in their motion, proceeding without their preferred other expert—whose role at trial was to be far broader and more central than the rebuttal expert's—would seriously disadvantage their ability to convince the jury that Bayer's due diligence on the Roundup Litigation fell short of industry standards, and as such, were false or materially misleading to investors.

**B.     Risks Related to Proving Scienter**

93.     With respect to scienter, Defendants would argue that they did not act with fraudulent intent. Defendants have strenuously argued that Defendants relied exclusively on information and guidance they received from Bayer's in-house counsel who participated in the due diligence, that Defendants believed that Bayer's due diligence was standard, and therefore, that Defendants lacked the requisite state of mind to make their statements fraudulent. This contention would be supported

by Defendants' argument that the Individual Defendants have no personal experience conducting litigation due diligence and, indeed, are European executives with no personal knowledge of U.S. industry-standard diligence on acquiring a U.S. public company.

94.     Plaintiffs' due diligence expert's unavailability would also threaten their case on scienter. In addition, Defendants would likely seek to exclude testimony from Plaintiffs' expert Afsharipour on how the terms of Bayer's merger agreement with Monsanto gave Bayer an incentive not to seek, and Monsanto not to provide, thorough due diligence on the Roundup Litigation, testimony which Plaintiffs intended to deploy to help prove scienter.

### C.     Risks Related to Proving Loss Causation

95.     With respect to loss causation, Defendants would likely have continued to challenge Plaintiffs' argument that the Roundup Litigation's unfavorable jury verdicts and July 2020 rejection of a proposed litigation settlement revealed the truth about Bayer's due diligence. Defendants would have argued that Plaintiffs' theory disregards other similar developments in the Roundup Litigation that would also have at least partially revealed the truth of Defendants' alleged misstatements. These events included the public release of internal Monsanto documents in March 2017 and developments in the heavily publicized *Johnson* trial—the first Roundup Litigation to go to trial—in 2018.

96.     Defendants might also have sought to exclude—or challenged thoroughly in cross-examination—the expert testimony of Plaintiffs' expert Coffman on the basis that Coffman's loss causation analysis relied on incorrect assumptions. These assumptions included, for example, that Bayer stockholders would have predicted the outcome of the Roundup Litigation and treated it as the worst-case scenario on every day of the Class Period, without allowing for any new information to affect their predictions.

### D.     Risks Related to Proving Damages

97.     Even if Plaintiffs prevailed at trial on liability, they would also face uncertainty in their effort to prove damages.

98.     Defendants would be almost certain to continue to raise various issues with Plaintiffs' damages calculation, which together would reduce Plaintiffs' claim for damages by over 85%. For

one, Defendants would argue that Plaintiffs' damages expert relied on a methodology that implausibly assumed that all of the ADR price decline was caused by market revelations about Bayer's due diligence and no other developments in the Roundup Litigation. For another, Defendants would argue that because a portion of the Class acquired their ADRs through conversion of ordinary Bayer shares that were purchased in Germany, and therefore were not domestic trades actionable under the Exchange Act. Omitting the losses of this portion of the Class would lower the maximum damages amount even further.

99.    All these issues would continue to be litigated over the course of months or possibly years, as the Parties would have had to adjourn the trial date scheduled on July 21, 2025 had a settlement not been reached. At the time the Parties reached the Settlement, Plaintiffs' motion to substitute their due diligence expert was still pending, and the Parties had not yet briefed summary judgment and *Daubert* motions. Although summary judgment could potentially have narrowed some of the issues in the case, the Action would almost certainly proceed to trial on many disputes of material fact. Even if Plaintiffs ultimately prevailed at trial, they would still face likely appeals—a process that could extend for years and might lead to a smaller recovery, or no recovery at all. And at any point, Plaintiffs could have to fend off a challenge to their class certification, as discussed in the Final Approval Motion.

100.    Given these significant risks of continued litigation and the range of potential outcomes at trial and on appeal, Plaintiffs and Lead Counsel strongly believe that the $38 million Settlement represents a highly favorable result for the Class.

## VI.    PLAINTIFFS' COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASS TO DATE

101.    The Preliminary Approval Order directed that the Notice of (I) Proposed Class Action Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") be disseminated to Class Members as set forth in that Order. The Preliminary Approval Order also set October 9, 2025 as the deadline for Class Members to opt back into the class if they previously submitted a request for exclusion in connection with the Class Notice and to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Motion.

102.    In accordance with the Preliminary Approval Order, Lead Counsel instructed A.B. Data, who was hired following a rigorous and competitive bid process, to begin disseminating copies of the Notice and Claim Form by mail and to publish the Summary Notice. The Notice contains, among other things, a description of the Action and the Settlement, the reasons for the Settlement, the proposed Plan of Allocation, and information about the Class Members' rights to participate in the Settlement, to opt back into the Class, and object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Motion. The Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 27% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $3,550,000.

103.    To disseminate the Notice and Claim Form (together, the "Notice Packet"), A.B. Data obtained information from banks, brokers, and other nominees regarding the names and addresses of potential Class Members. The accompanying Declaration of Adam Walter ("Mailing Decl."), attached hereto as Exhibit 5, provides additional information about the Claims Administrator's distribution of the Notice Packet. *See* Mailing Decl. ¶ 3.

104.    A.B. Data began mailing copies of the Notice Packet to potential Class Members and nominee owners on July 21, 2025. *Id.* ¶ 5. As of September 25, 2025, A.B. Data had mailed a total of 223,953 Notice Packets to potential Class Members and nominees. *Id.* ¶ 9.

105.    Also on July 21, 2025, A.B. Data published information about the Settlement on the Case Website, www.BayerADRSecuritiesLitigation.com, including copies of the Notice and Claim Form, as well as copies of the Complaint, Stipulation, Preliminary Approval Order, and other relevant documents. *Id.* ¶ 13. The website also allows Class Members to submit their claims online if they wish to do so. Lead Counsel and A.B. Data have regularly monitored the Case Website to ensure that it is operating correctly. Lead Counsel and A.B. Data will continue to monitor and to update the Case Website as the settlement process continues. For example, Plaintiffs' papers in support of their motion for final approval of the Settlement and Lead Counsel's papers in support of their motion for attorneys' fees and Litigation Expenses will be made available on the case website after they are filed, and any orders entered by the Court in connection with those motions will also be published.

Lead Counsel also published copies of the Notice and Claim Form to their firm website, www.cohenmilstein.com.

106.    On July 21, 2025, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over *PR Newswire*. *Id.* ¶ 11.

107.    As noted above, the deadline for Class Members to file objections to the Settlement, Plan of Allocation, or Fee and Expense Motion is October 9, 2025. To date, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Motion have been received. Plaintiffs and Lead Counsel will file reply papers on or before October 9, 2025 that will address any objections that may be received.

## VII.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

108.    Pursuant to the Preliminary Approval Order and as set forth in the Notice, all Class Members seeking eligibility to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than October 16, 2025. The Net Settlement Fund will be distributed among Class Members who submit timely, eligible claims according to the plan of allocation approved by the Court.

109.    Lead Counsel consulted with Plaintiffs' damages expert, Chad Coffman, a financial economist initially of Global Economics Group LLC and later of Peregrine Economics LLP, in developing the proposed Plan of Allocation for the Net Settlement Fund. Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses as a result of the alleged violations of the federal securities laws.

110.    The Plan of Allocation is set forth at pages 18 to 23 of the Notice. *See* Mailing Decl., Ex. A at 18–23. As described in the Plan, the calculations pursuant to the Plan of Allocation are intended as a method to weigh the claims of Class Members against one another for the purposes of making an equitable *pro rata* allocation of the Net Settlement Fund. *Id.* at 18 ¶ 2.

111.    The Plan is based on Plaintiffs' allegations that Defendants' materially false and misleading statements and omissions caused artificial inflation in the prices of Bayer ADRs during the Class Period in violation of the Exchange Act, and that a series of public disclosures that each partially corrected the alleged misrepresentations and omissions removed that inflation.

112.    The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of each Claimant's claim, and only to Authorized Claimants. *Id.* at 18 ¶ 1. The Plan calculates a Recognized Loss amount for each purchase or acquisition of Bayer ADRs during the Class Period that is listed in the Claim Form and for which adequate documentation is provided by the Claimant. The calculation of Recognized Loss under the Plan will depend on when the Claimant purchased and/or sold their shares, whether the Claimant held their shares through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e), and the value of their shares when the Claimant purchased, sold, or held them.

113.    In developing the Plan, Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share closing prices of Bayer ADRs which allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions during the Class Period. In calculating the estimated artificial inflation, Plaintiffs' damages expert considered the price changes in Bayer ADRs in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces.

114.    In general, Recognized Loss amounts under the Plan are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares.

115.    For shares sold before August 13, 2018, the Recognized Loss is zero, because those shares were sold before the first alleged corrective disclosure and thus were not damaged by the alleged fraud. *Id.* at 19 ¶ 6(2)(i). For shares sold from August 13, 2018 through the end of the Class Period on July 6, 2020, the Recognized Loss is the lesser of (a) the difference between the amount of

artificial inflation per share at the date of purchase or acquisition and the date of sale, or (b) the difference between the purchase or acquisition price and the sale price per share. *Id.* at 19 ¶ 6(2)(ii).

116.    For shares sold during the 90-day period after the end of the Class Period, from July 7, 2020 through October 2, 2020, the Recognized Loss is the lesser of the (a) artificial inflation at the time of purchase or acquisition; (b) the difference between the purchase/acquisition price and the average closing price of the ADRs during that period; or (c) the difference between the purchase/acquisition price and the sale price. *Id.* at 19 ¶ 6(2)(iii).

117.    Finally, for shares still held as of October 2, 2020 (the end of the 90-day lookback period), the Recognized Loss is the lesser of (a) the artificial inflation at the time of purchase/acquisition or (b) the difference between the purchase/acquisition price and the average closing price for the ADRs during the 90-day period. *Id.* at 19 ¶ 6(2)(iv).

118.    These provisions of the Plan track the PSLRA's statutory requirements that any plaintiff's recovery under the Exchange Act be limited to the difference between the purchase price paid and the average trading price of the security during the 90-day period after the information correcting the misstatement was disseminated to the market. *See* 15 U.S.C. § 78u-4(e)(1).

119.    The Net Settlement Fund will be allocated among all Authorized Claimants whose prorated payment is $10.00 or greater. If an Authorized Claimant's prorated payment calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to that Authorized Claimant. Mailing Decl., Ex. A at 18 ¶ 4.

120.    The Claims Administrator will calculate Authorized Claimants' Recognized Losses under the Plan using the transaction information that Claimants provide to the Claims Administrator in their Claim Forms. Once the Claims Administrator has processed all submitted claims and after the Court has finally approved the Settlement and the Settlement has reached its Effective Date, the Claims Administrator will make distributions to eligible Authorized Claimants by check. *Id.* at 21 ¶ 15.

121.    If any funds remain in the Net Settlement Fund after at least six months from the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, Lead Counsel will

redistribute the funds among Authorized Claimants who have cashed their checks in an equitable and economic way, as long as the redistribution is feasible and cost-effective. *Id.* Lead Counsel will repeat these redistributions until the balance in the Net Settlement Fund is no longer feasible or economical to distribute, such as, for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available. *Id.* At that point, any balance that still remains, after payment of Notice and Administration Expenses, Taxes, and any unpaid attorneys' fees and expenses, will be contributed to the Council for Institutional Investors, a nonprofit, non-sectarian organization, or another organization approved by the Court. *Id.*

122.    For these reasons, the Plan of Allocation fairly and rationally allocates the proceeds of the Net Settlement Fund among Class Members based on their Recognized Loss. To date, no objections to the proposed Plan of Allocation have been received.

## VIII.    THE FEE AND EXPENSE MOTION

123.    Lead Counsel are applying to the Court for an award of attorneys' fees of 27% of the Settlement Fund, including interest as earned on that portion of the Settlement Fund, for all Plaintiffs' Counsel. Lead Counsel also request payment from the Settlement Fund of expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action.

124.    The legal authorities supporting the requested fees and expenses are discussed in Lead Counsel's Fee and Expense Motion. As discussed therein, the 27% fee request is squarely within the range of percentage fees awarded in this District and Circuit in comparable securities class actions and represents only a modest increase above the Ninth Circuit's 25% attorneys' fees benchmark. The requested fee award is fair and reasonable in light of all the circumstances in this Action.

### A.    The Fee Request

125.    For the efforts of Plaintiffs' Counsel on behalf of the Class, Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis. As discussed in the accompanying Fee and Expense Motion, the percentage method of assessing attorneys' fees is the appropriate method of fee recovery here because it aligns the attorneys' interest in being paid a fair fee with the interests of the Class in achieving the maximum recovery in the shortest amount of time

as required under the circumstances. Use of the percentage method has been recognized as appropriate by the Supreme Court and Ninth Circuit for cases like this one where counsel has recovered an all-cash common fund for a class.

126. Below is a summary of the primary factual basis for Lead Counsel's Fee and Expense motion. The accompanying Fee and Expense Motion provides a full analysis of the factors applicable to courts' evaluation of requests for attorneys' fee and expenses from a common fund.

### 1. Plaintiffs Have Authorized and Support the Fee Application

127. Plaintiffs SMW, Local 710, and IUOE are sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of this Action. *See* Ex. 2 ¶¶ 2, 4; Ex. 3 ¶¶ 2, 4; Ex. 4 ¶¶ 2–3. Plaintiffs have each evaluated the fee request and fully support the fee requested. *See* Ex. 2 ¶¶ 7–9; Ex. 3 ¶¶ 7–9; Ex. 4 ¶¶ 6–8. Plaintiffs agree that the proposed fee of 27% is fair and reasonable in light of the result obtained for the Class, the work performed by Plaintiffs' Counsel, and the risks counsel faced in prosecuting the Action. *Id.*

### 2. Lead Counsel's Diligent Work on this Action

128. Lead Counsel has devoted significant time and resources to the prosecution of this Action on behalf of the Class. As detailed herein, Lead Counsel's work included, among other things: (i) drafting two detailed amended complaints, based on a comprehensive investigation; (ii) defeating two comprehensive motions to dismiss; (iii) moving successfully for class certification; (iv) issuing forty-seven subpoenas to non-parties; (v) exchanging and responding to extensive written discovery and analyzing document productions, which entailed, among other things, reviewing roughly 200,000 pages of documents produced by Defendants, including a subset of documents written in German; (vi) taking and defending a total of twenty-four depositions in New York, the United Kingdom, Belgium, the Netherlands, and Germany, with the one in Germany secured through the Hague Convention and administered by a German court; (vi) completing fact discovery; (viii) serving and/or analyzing a total of twenty expert reports, including thirteen reports from Plaintiffs' five expert witnesses and seven reports from Defendants' three expert witnesses and (ix) engaging in extended months-long arms'-length settlement negotiations overseen by an independent mediator, including

two full-day in-person mediation sessions that took place over five months apart and which included extended discussions and negotiations with esteemed and experienced defense counsel.

129.    Attached hereto as Exhibits 6 and 7 are Declarations from me on behalf of Cohen Milstein and Nicole Lavallee on behalf of Berman Tabacco in further support of the Fee and Expense Motion. Included within each supporting Declaration are schedules summarizing the hours, lodestar, and expenses of each firm from the inception of the case through August 31, 2025; a breakdown of Litigation Expenses by category; and a firm resume. No time expended in preparing the application for fees and expenses has been included.

130.    As set forth in Exhibit 8, a summary table of Plaintiffs' Counsel's lodestar and expenses, Plaintiffs' Counsel collectively expended a total of 14,762.30 hours in the prosecution of this Action from its inception through August 31, 2025 for a lodestar of $13,367,092. The requested fee of 27% of the Settlement Fund would be $10,260,000 (plus interest accrued at the same rate as the Settlement Fund), and therefore represents a negative multiplier of approximately 0.8 of Plaintiffs' Counsel's lodestar. As discussed in further detail in the Fee and Expense Motion, the lodestar multiplier cross-check is far below the range of multipliers typically seen in comparable securities class actions and in other class actions involving significant contingency fee risk in this Circuit and elsewhere. In such cases, multipliers typically range from 1 to 4.

### 3.    Experience and Standing of Plaintiffs' Counsel

131.    A copy of Lead Counsel's firm resume, which includes information about the standing of the firm, is attached as Exhibit 6D.

132.    As demonstrated by its firm resume, Cohen Milstein is considered one of the top plaintiff-side law firms in the country. In 2025, *The National Law Journal* named the firm Plaintiff Law Firm of the Year, and *Law360* named the firm a "ceiling smasher" and ranked the firm number two for having the highest representation of women in the equity partnership. Cohen Milstein's Securities Litigation & Investor Protection practice is ranked among the nation's leading practices of its kind. The practice was named Securities Practice of the Year by *The National Law Journal* (2024)

and *Law360* (2020, 2022, 2023). *Chambers USA*, *Legal 500*, and *Benchmark Litigation* also consistently rank the firm among the top plaintiff-side securities litigation practices in the country.

133.    Cohen Milstein has recovered billions of dollars for its public pension fund and Taft-Hartley fund clients and other institutional investor clients, including in some of the largest and most complex securities class actions in recent history. For example, Cohen Milstein as co-lead counsel obtained a $1 billion settlement for the class in *In re Wells Fargo & Co. Securities Litigation*, No. 20-cv-4494 (S.D.N.Y.), which is the 17th largest securities class action settlement in history, the sixth largest in the last decade, the ninth largest in the Second Circuit, and the largest ever without a restatement or related actions by the Securities & Exchange Commission or the U.S. Department of Justice.

134.    Cohen Milstein also recovered more than $2.5 billion for investors in a dozen mortgage-backed securities ("MBS") class actions, including landmark settlements of $500 million on behalf of institutional investor clients against Countrywide Financial Corporation (*Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-302 (C.D. Cal.)) and against Bear Stearns (*In re Bear Stearns Mortgage Pass-Through Litig.*, No. 08-cv-8093 (S.D.N.Y.)). Other MBS class action settlements include: a $275 million settlement in an action against the Royal Bank of Scotland (*N.J. Carpenters Health Fund v. The Royal Bank of Scotland Grp., plc, et al*, No. 08-cv-5310 (S.D.N.Y.)); $335 million in settlements against Residential Accredit Loans, Inc. and various investment banks (*N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-cv-8781 (S.D.N.Y.)); a $165 million settlement against various underwriters (*N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., et al*, No. 08-cv-5310 (S.D.N.Y.)); and a $110 million settlement in a class action against Credit Suisse AG and its affiliates (*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., et al*, No. 08-cv-5653 (S.D.N.Y.)).

135.    Over the past 11 years, Cohen Milstein has achieved well over $1 billion in securities class action and shareholder derivative settlements in California federal and state courts and other courts throughout the Ninth Circuit. For example, Cohen Milstein, as lead or co-lead counsel, recovered $500 million on behalf of institutional investor clients against Countrywide Financial

Corporation (noted above) before the Central District of California; a historic $310 million commitment from Alphabet's board of directors to fund workplace policies and institute robust corporate reforms (*In re Alphabet S'hlder Derivative Litig.*, No. 19-cv-341522 (Cal. Sup. Ct.)); a $90 million settlement and landmark corporate governance reforms from Wynn Resorts' board of directors (*In re Wynn Resorts, Ltd. Derivative Litig.*, No. A-18-769630-B (Eighth Jud. Dist. Ct., Clark Cnty., Nev.)); a $50 million settlement against SanDisk LLC (*In re SanDisk LLC Sec. Litig.*, No. 15-cv-1455 (N.D. Cal.)); a $50 million funding commitment from Pinterest's board of directors for workplace policy changes and board reforms (*In re Pinterest Derivative Litig.*, No. 20-cv-8331 (N.D. Cal.)); a $37.5 million settlement against Silvergate Capital (*In re Silvergate Capital Corp. Sec. Litig.*, No. 22-cv-1936 (S.D. Cal.); a $15 million monetary package plus extensive government reforms valued at $117 million against Intuitive Surgical (*Public School Teachers' Pension & Ret. Fund v. Gary S. Guthart, et al (Intuitive Surgical Derivative Litig.)*, No. 2014 CIV-526930 (Cal. Sup. Ct.)); and a $7 million settlement in *In re Tintri, Inc. Sec. Litig.*, No. 17-CIV-4312 (Cal. Sup. Ct.).

### 4. **Standing and Caliber of Defendants' Counsel**

136.    Defendants were represented in the Action by extremely capable counsel from Wachtell, Lipton, Rosen & Katz ("Wachtell"). Wachtell vigorously represented their clients throughout the Action. In the face of this skillful and well-financed opposition, Lead Counsel were able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that are highly favorable to the Settlement Class.

### 5. **Risks of Litigation**

137.    Lead Counsel undertook the prosecution of the Class's claims on an entirely contingency-fee basis. The considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above, and those risks, as well as the time and expenses incurred by Lead Counsel without any payment for over five years, were extensive.

138.    From the time Lead Counsel began to pursue prosecution of this Action, Lead Counsel understood that the litigation promised to be complex, expensive, lengthy, and hard-fought, with no guarantee that Lead Counsel would ever be compensated for the substantial investment of time and

the outlay of money that the prosecution of the case would require. In undertaking the responsibility of litigating the Action on behalf of the Class, Lead Counsel were nonetheless obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would advance all costs necessary to pursue the case vigorously and successfully. These costs included funds to compensate vendors, experts, and consultants, as well as to cover the considerable out-of-pocket costs that a securities class action typically requires. Lead Counsel recognized that complex shareholder litigation like this one often proceeds for several years before reaching a conclusion, and that the financial burden on contingency-fee counsel is far greater than on a firm that is paid on an ongoing basis. Lead Counsel have received no compensation during the course of this Action and no reimbursement of any out-of-pocket expenses.

139.    Lead Counsel also took on the risk that no recovery at all would be achieved in the Action. As discussed above, in the Final Approval Motion, and in the Fee and Expense Motion, this case presented a number of significant trial risks and uncertainties from the outset, including challenges in proving the materiality and falsity of Defendants' statements, demonstrating Defendants' scienter, and establishing causation and damages.

140.    The Settlement was reached only after nearly five years of litigation in face of these risks and costs. In the face of significant risk and uncertainty, Lead Counsel's diligent efforts have resulted in a substantial and certain recovery for the Class.

### 6.    The Reaction of the Class to the Fee Application

141.    As noted above, as of September 25, 2025, A.B. Data has sent more than 223,953 Notice Packets to potential Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 27% of the Settlement Fund. *See* Mailing Decl. ¶ 9 and Ex. A at 3 ¶ 5. Class Members were also notified of the attorneys' fee request in the Court-approved Summary Notice published in *The Wall Street Journal* and transmitted over *PR Newswire* on July 21, 2025. *Id.* ¶ 11. To date, no objections to the request for attorneys' fees have been received.

**B.      The Expense Request**

142.    Lead Counsel also seek payment from the Settlement Fund for the Litigation Expenses that Plaintiffs' Counsel reasonably incurred in connection with commencing, litigating, and settling the claims asserted in the Action.

143.    From the outset of the Action, Lead Counsel have been aware that they might not recover any of the expenses they incurred and, further, if their expenses were to be reimbursed, reimbursement would not occur until the Action was successfully resolved, which could take several years. Lead Counsel also understood that, even assuming the case awas ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. As a result, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

144.    As set forth in Exhibits 6 and 7 hereto, Plaintiffs' Counsel have paid or incurred a total of $3,281,973.16 in Litigation Expenses in connection with the prosecution of this Action. These expenses are billed separately by Plaintiffs' Counsel and are not duplicated in Plaintiffs' Counsel's hourly rates. Detailed indices of Plaintiffs' Counsel's Litigation Expenses by category are attached to this Declaration as Exhibits 6C and 7C.

145.    Lead Counsel expended $2,606,381.00, or approximately 79% of all Litigation Expenses, on the retention of experts. As discussed above, Lead Counsel retained six well-qualified experts in the fields of due diligence, mergers and acquisitions, extraterritoriality, and loss causation and damages, who, in the aggregate, produced 13 expert, rebuttal, and reply reports and sat for six depositions in connection with class certification and merits discovery.

146.    Another major component of expenses was for the retention of professional services, totaling $146,362.30. This category of expenses included included the class and claims administration services of A.B. Data ($2,711.46); forensic analysis services ($517.98); and the retention of a German law firm, Wach Und Meckes ($123,970.44), to assist with securing and

administering a deposition of Bayer's former general counsel through the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.

147.    Another substantial component of Plaintiffs' Counsel's expenses was the cost of court reporters, videographers, interpreters, translators, and transcripts in connection with court hearings and the depositions that Lead Counsel took or defended during the course of the Action. These charges amounted to $222,807.71.

148.    Another large component of the Litigation Expenses was for online legal research, which included research necessary to prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, move for class certification, and research various discovery issues, among other similar tasks. The charges for online legal research amounted to $91,153.94.

149.    Lead Counsel also incurred $80,675.00 in connection with the extensive mediation efforts of Mr. Ruthberg.

150.    Lead Counsel's expenses also include $85,869.28 for work-related transportation expenses, meals, and lodging related to, among other things, traveling in connection with court hearings, depositions, and the mediations.[4]

151.    The other expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, process server fees, express mail and courier services, working meals, and investigative services.

152.    All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by Plaintiffs. *See* Ex. 2 ¶ 10; Ex. 3 ¶ 10; Ex. 4 ¶ 9.

---

[4] This amount also includes anticipated expenses associated with my firm's attendance at the Final Approval Hearing.

## C.    PSLRA Reimbursement to Plaintiffs

153.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Pursuant to this provision, Plaintiffs seek reimbursement of the reasonable costs they incurred as a result of their efforts on behalf of the Class. Specifically, SMW seeks reimbursement of $15,765.24 for the 81 hours that its employees dedicated to the Action (Ex. 2 ¶¶ 11–12); Local 710 seeks reimbursement of $10,845.00 for the 57 hours that its employees and outside Fund counsel dedicated to the Action (Ex. 3 ¶¶ 11–14); and IUOE seeks reimbursement of $4,845.00 for the 51 hours that its employees dedicated to the Action (Ex. 4 ¶¶ 10–11). Each Plaintiff's total hours comprise the time spent preparing and sitting for a Rule 30(b)(6) deposition and attending both full-day mediation sessions, among other work supporting the prosecution of the Action on behalf of the Class. *See* Ex. 2 ¶ 4; Ex. 3 ¶ 4; Ex. 4 ¶ 3. The considerable time and resources that Plaintiffs' staff expended on Plaintiffs' representation of the Class would otherwise have been devoted to their regular professional endeavors and therefore constitute costs to Plaintiffs.

## IX.    CONCLUSION

154.    For all the reasons set forth above, Lead Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 27% of the Settlement Fund warrants approval as fair and reasonable, and that the requests for payment of Litigation Expenses in the amount of $3,281,973.16 and reimbursement of Plaintiffs' costs of $31,485.14, in the aggregate, also warrant approval.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 25th day of September, 2025, at Chicago, Illinois.

/s/ Carol V. Gilden
Carol V. Gilden